## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action |
| v. | ) | No. 99-CV-02496 (GK) |
| | ) | |
| PHILIP MORRIS USA INC., | ) | Next scheduled appearance: |
| f/k/a PHILIP MORRIS INC., *et al.*, | ) | December 22, 2003 |
| | ) | |
| Defendants. | ) | **REDACTED FOR** |
| | ) | **PUBLIC FILING**[1] |

---

### MEMORANDUM IN SUPPORT OF THE UNITED STATES'
### MOTION FOR EVIDENTIARY AND MONETARY SANCTIONS AGAINST
### PHILIP MORRIS USA AND ALTRIA GROUP DUE TO SPOLIATION OF EVIDENCE

---

[1] Information that has been designated as CONFIDENTIAL: US v. PM, 99CV02496 by Philip Morris pursuant to Order #7 has been redacted from this Memorandum at pp. 26-27.

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.   Philip Morris USA's Policies And Efforts To Preserve Electronic
     Mail Were Inadequate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     1.   Philip Morris USA's Policies For The Preservation Of Email
          Are Created And Approved By Its Parent Company,
          Defendant Altria Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     2.   Philip Morris Utilizes a "Print and Retain" Policy for the
          Retention of Email . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     3.   Philip Morris Chose to Delete Electronically-Stored Email
          Every Month and Recycled Back-up Tapes Every
          Three Weeks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          a.   Monthly Deletions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          b.   The Three-Week Cycle for Back-up Tapes . . . . . . . . . . . . . . . 10

     4.   Philip Morris Was Aware That Its Employees Found Policies
          For The Retention Of Email Confusing, Leading To The
          Loss Of Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     5.   Philip Morris Failed to Take Easy and Inexpensive Steps That
          Would Have Prevented the Irretrievable Loss of Deleted Email . . . . . . . 15

B.   Philip Morris Violated The Court's Preservation Order By Failing To
     Retain All Relevant And Potentially Relevant Email . . . . . . . . . . . . . . . . . . . 18

     1.   Philip Morris Discovered the Violation of Order #1 Four
          Months Before It Notified the Court and Two Months Before
          It Suspended Monthly System-Wide Email Deletions . . . . . . . . . . . . . . 18

     2.   Numerous High-Level Witnesses, All Involved in Activities at
          Issue in This Action, Failed to Retain Email Subject to the
          Preservation Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

           3.      The Deletion of Email in Violation of the Preservation Order Involved More Than the Eleven Employees Specifically Identified by Philip Morris . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

   C.    Email Is An Integral Part Of Philip Morris's Business  . . . . . . . . . . . . . . . . . . . 24

III.   ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

   A.    The Court May Impose Sanctions For Failure To Preserve Relevant Evidence And Failure To Comply With Court Preservation Orders . . . . . . . . . . 27

           1.      Federal Rules of Civil Procedure 16 and 37 Authorize the Imposition of Sanctions Against Philip Morris . . . . . . . . . . . . . . . . . . . . 27

           2.      Violation of the Duty to Preserve Evidence That Exists Independently and Apart From Specific Preservation Orders is Sanctionable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

   B.    Philip Morris's Failure To Preserve Relevant Evidence Warrants The Imposition Of Sanctions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

           1.      Philip Morris's Failure to Preserve Email Was a Direct and Foreseeable Result of Official Company Policies . . . . . . . . . . . . . . . . . 35

                      a.      As an Experienced Litigant With Experienced Counsel, Philip Morris Should Have Taken Steps to Avoid the Destruction of Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

                      b.      The Record of Philip Morris's Behavior Throughout the Discovery Phase of This Action Provides Further Support for the Imposition of Sanctions  . . . . . . . . . . . . . . . . . . . . . . . . . 40

           2.      The Irretrievable Loss of Email Is An Insoluble Problem and Prejudices the United States' Ability to Pursue Its Claims in This Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

   C.    The Court Should Impose Evidentiary And Monetary Sanctions Against Philip Morris USA And Altria Group  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

           1.      The Determination of an Appropriate Sanction is Left to the Court's Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

2.      Severe Evidentiary and Monetary Sanctions Are Necessary
        to Insure the Integrity of Judicial Proceedings in Cases Involving
        Spoliation of Evidence in Circumstances Such as Those
        Present Here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

3.      Evidentiary Sanctions Should Include Evidentiary Inferences
        and Preclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

        a.      The Court Should Infer That Philip Morris Targeted
                Youth in its Marketing, Manipulated the Nicotine Levels
                in its Cigarettes and Failed to Market Potentially Less
                Hazardous Cigarettes After October 19, 1999 . . . . . . . . . . . . . 55

        b.      The Court Should Preclude Philip Morris From Calling
                Peter Lipowicz as a Fact or Expert Witness  . . . . . . . . . . . . . . . 61

        c.      The Court Should Preclude Philip Morris From
                Asserting Compliance With the Master Settlement
                Agreement as a Defense to the United States' Claims . . . . . . . . 62

4.      Monetary Sanctions Should Include a Fine and Reimbursement
        of Certain Expenses Incurred by the United States . . . . . . . . . . . . . . . 64

        a.      The Court Should Fine Philip Morris Not Less
                Than $2,995,000  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

        b.      The Court Should Order Altria Group and Philip Morris to
                Reimburse the United States for Costs Associated With
                the December 19-20, 2002 Deposition of Philip Morris on
                Email Destruction Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

IV.   CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Adolph Coors Co. v. Amer. Ins. Co.*, 164 F.R.D. 507 (D. Colo. 1993) . . . . . . . . . . . . . . . . 29, 41

*Akiona v. United States,* 938 F.2d 158 (9th Cir. 1991),
*cert. denied,* 503 U.S. 962 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57, 60

*Alexander v. National Farmers Org.*, 687 F.2d 1173 (8th Cir. 1982) . . . . . . . . . . . . . . . . . . 44

*Anderson v. National R.R. Passenger Corp.*, 866 F.Supp. 937 (E.D.Va. 1994) . . . . . . . . . . . 55

*Battocchi v. Washington Hosp. Ctr.*, 581 A.2d 759 (D.C. 1990) . . . . . . . . . . . . . . . . . 32, 33, 35

*Byrnie v. Town of Cromwell*, 243 F.3d 93 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Chambers v. PASCO, Inc.*, 501 U.S. 32 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*,
602 F.2d 1062 (2nd Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 64

*Donato v. Fitzgibbons*, 172 F.R.D. 75 (S.D.N.Y 1997) . . . . . . . . . . . . . . . . . . . . . . . 29, 36, 39, 48

*Glover v. BIC Corp.*, 6 F.3d 1318 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 35, 56, 57

*GTFM, Inc. v. Wal-Mart Stores, Inc.*, No. 98 CIV. 7724 RPP,
2000 WL 335558 (S.D.N.Y. Mar. 30, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Hammond v. Coastal Rental & Equip. Co., Inc.*, 95 F.R.D. 74 (S.D. Tex. 1982) . . . . . . . . . . . 30

*Holmes v. Amerex Rent-A-Car*, 710 A.2d 846 (D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 32, 35

*Howell v. Maytag*, 168 F.R.D. 502 (M.D. Pa. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Hull v. Eaton Corp.*, 825 F.2d 448 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*In re Prudential Insurance Co.*, 169 F.R.D. 598 (D.N.J. 1997) . . . . . . . . . . 28, 48-53, 61, 64-66

*Jeanblanc v. Oliver Carr Co.*, Civ. A. No. 91-0128 (JHG),
1992 WL 189434 (D.D.C. July 24, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 44, 47

*Martin v. Heco/Nostalgia Enterprises Co.*, 186 F.R.D. 601 (E.D. Cal. 1999) . . . . . . . . . . 28, 35

*Matter of Sanction of Baker*, 744 F.2d 1438 (10th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees and Restaurant Employees Int'l Union*, 212 F.R.D. 178 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . 29

*Monroe v. Ridley*, 135 F.R.D. 1 (D.D.C. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 48, 54

*Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*, 692 F.2d 214 (1st Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 60

*Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543 (N.D. Ca. 1987) . . . . . . . . 44, 50

*National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639 (1976) . . . . . . . 29, 48, 53

*Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395 (D.C. Cir. 1984) . . . . . . . . . . . . 48

*Ohio v. Arthur Anderson & Co.*, 570 F.2d 1370 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . 29

*Republic of the Philippines v. Westinghouse Electric Corp.*, 43 F.3d 65 (3rd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 41

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99 (2nd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 34-36

*Rice v. United States*, 917 F. Supp. 17 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 55

*Schmid v. Milwaukee Electric Tool Corp.*, 13 F.3d 76 (3rd Cir. 1994) . . . . . . . . . . . . . . . . . . 56

*Shepherd v. Amer. Broadcasting Co.*, 62 F.3d 1469 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . 31

*Trigon Ins. Co. v. United States*, 204 F.R.D. 277 (E.D. Va. 2001) . . . . . . . . . . . . . . . . . . . . 33-35

*Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . 36

*United States v. Microsoft Corp.*, No. CIV. A. 98-1232, 1998 WL 614485 (D.D.C. Sept. 14, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Update Art, Inc. v. Modiin Publishing, Ltd.*, 843 F.2d 67 (2nd Cir. 1988) . . . . . . . . . . . . . 54, 64

*Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148 (4th Cir.1995) . . . . . . . . . . . . . . . . . . . 35, 55, 56

*William T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. 1443 (C.D. Cal. 1984), *aff'd* 104 F.R.D. 119 (C.D.Cal. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 30

*Young v. Office of the United States Senate Sergeant at Arms*, 217 F.R.D. 61 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 31

**Rules and Statutes**

Federal Rule of Civil Procedure 16(f)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

Advisory Committee Notes to Federal Rule of Civil Procedure 16 . . . . . . . . . . . . . . . . . . . . . 28

Federal Rule of Civil Procedure 37(b)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 55, 62, 64

**Other Authorities**

Matthew J. Bester, *A Wreck on the Info-Bahn: Electronic Mail and the
Destruction of Evidence*, 6 Comm. L. Conspectus 75 (1998)  . . . . . . . . . . . . . . . . . . . . . . . . . 42

Christopher V. Cotton, *Document Retention Programs for Electronic
Records: Applying a Reasonableness Standard to the Electronic Era*,
24 J. Corp. L. 417 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Charles A. Lovell & Roger W. Holmes, *The Dangers of E-Mail: The Need
for Electronic Data Retention Policies*, R.I.B.J., Dec. 1995  . . . . . . . . . . . . . . . . . . . . . . . . . 43

Chris O'Reilly & Jason Derting, *Technolawyer.com: True Electronic Discovery
Has Come of Age*, 5 No. 2 Lawyers J. 4, Jan. 24, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 56

Samuel A. Thumma & Darrel S. Jackson, *The History of Electronic Mail
in Litigation*, 16 Santa Clara Computer & High Tech. L.J., 1 (1999) . . . . . . . . . . . . . . . . . 43, 56

Stephen Zovickian, *Electronic Discovery in Construction Litigation*,
18 Construction Law. 8 (July 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## I.  <u>INTRODUCTION</u>

On June 19, 2002, Philip Morris USA revealed that it failed to preserve all documents containing information potentially relevant to this action, as expressly required by the Court in Order #1, First Case Management Order for Initial Scheduling Conference.  *See* Order #1, ¶ 7 (the "Preservation Order").  Philip Morris's noncompliance with Order #1 resulted from system-wide deletions of electronic mail that occurred at Philip Morris on a monthly basis, even after entry of the Court's Preservation Order, *see* June 19, 2002 letter from Frederick to Hon. Gladys Kessler at 2 (attached as Ex. 1), in combination with a company policy that required back-up tapes to be recycled and overwritten after only 21 days.  As set out below, subsequent discovery has shown that the deleted email, which came from numerous high level Philip Morris officers and key employees, could have been retained if Philip Morris had taken minor and inexpensive measures to insure compliance with the Preservation Order.  Because those measures were not taken, the deleted email is forever lost.  It is, as the Court observed, "an insoluble problem.  You cannot recreate what has been destroyed."  Transcript, January 17, 2003 Status Hearing at 39 (attached as Ex. 2).  As a result, the Court should impose evidentiary sanctions that will prevent Philip Morris from benefitting from its violation of Order #1 and monetary sanctions sufficient to deter Philip Morris from future abuse of judicial process through the failure to maintain relevant evidence.

## II.  <u>FACTUAL BACKGROUND</u>

On October 19, 1999, the Court entered Order #1, the First Case Management Order for Initial Scheduling Conference.  Within Order #1, the Court required:

> 7.  Each party shall preserve all documents and other records containing information potentially relevant to the subject matter of this litigation.  Each party shall also preserve any physical evidence

> or potential evidence and shall not conduct any testing that alters
> the physical evidence without notifying opposing counsel and,
> unless counsel stipulate to the test, without obtaining the Court's
> permission to conduct the test.

Order #1, ¶ 7 at 4-5.  Philip Morris elected to inform employees of the Court's requirement not by

distribution of the Preservation Order, but by creating what the company calls a Disposal

Suspension Notice.  Dep. of William P. Brandt, June 17, 2003 ("Brandt Dep.") at 22:14-24:2

(attached as Ex. 3).  *See also* Dep. of Philip Morris Incorporated pursuant to Rule 30(b)(6) (by

designee Michael T. Wallmeyer) on electronic mail retention and deletion (hereinafter

"Wallmeyer Dep."), Dec. 19, 2002 at 36:12-38, Dec. 20, 2002 at 301:23-304:6 (attached as

Ex. 4); Dep. of Helmut Reif, July 30, 2003 at 14:4-13 (attached as Ex. 5).  The only guidance

provided to employees as to the subject matter of documents subject to the Preservation Order

was the Disposal Suspension Notice.  Wallmeyer Dep., Dec. 19, 2002 at 38:11-14, Dec. 20, 2002

at 301:23-304:6 and Dep. Ex. 28 (Nov. 8, 1999 Mem. from William F. Lynch III to Distribution);

Brandt Dep. at 22:6-18.

Fatal to Philip Morris's document preservation efforts, however, the November 8, 1999

Disposal Suspension Notice was one of myriad ever-changing notices distributed to Philip

Morris employees by inconsistent means and at irregular intervals, providing little in the way of

meaningful guidance as to what records needed to be saved and the form – paper or electronic –

for preserving them.  Not only were the company's efforts inadequate to accomplish preservation,

but high level management at both Philip Morris Incorporated (n/k/a Philip Morris USA Inc.) and

Philip Morris Companies (n/k/a Altria Group) were aware that the company's policies were

resulting in the failure to preserve documents required for litigation.  Those policies included

monthly system-wide deletions of email, which continued after entry of the Preservation Order,

and a requirement that back-up tapes be recycled and overwritten after three weeks.  The

company's failure to comply with the Preservation Order was a direct and foreseeable result of

this aggressive and severe deletion regimen – one that insured that lost email would be forever

irretrievable.

**A.      Philip Morris USA's Policies And Efforts To Preserve Electronic Mail Were
          Inadequate**

> **1.      Philip Morris USA's Policies for the Preservation of Email Are Created
>           and/or Approved By Its Parent Company, Defendant Altria Group**

The policy governing the retention of email at Philip Morris was generated by the Philip

Morris Electronic Communications Task Force.  Brandt Dep. at 256:11-18.  The Task Force

"was a collaborative effort with representatives of various Philip Morris Companies to generate a

company-wide email policy" that completed its work in late 1997 or early 1998.  *Id.* at 256:19-

25, 257:11-14.  All of the work of the Task Force was approved by the Management Committee

of Philip Morris Companies, which included Geoffrey Bible, Murray Bring and other officers of

Philip Morris Companies.  *Id.* at 258:14-259:14.  At that time, Mr. Bible was the Chairman and

Chief Executive Officer of Philip Morris Companies.  Dep. of Geoffrey Bible, August 22, 2002

at 19:14-23 (attached as Ex. 6).  Mr. Bring served as Vice Chairman and General Counsel.  *See,*

*e.g.,* December 16, 1997 letter from Bring to Bradley (2073952530) (attached as Ex. 7).  An

electronic communications policy referencing electronic mail was issued by Mr. Bible in June

1998.  Wallmeyer Dep. at 220:8-15.

William P. Brandt held the positions of Director, Worldwide Records Management and

Senior Counsel and, later, Director, Records and Information Management for the Companies of

Philip Morris between October 2, 1996 and April 5, 2002.  Brandt Dep. at 15:10-16:9, 16:23-

17:16.  During the entirety of Mr. Brandt's employment at Philip Morris Companies – a period

that spans the filing of this lawsuit, the entry of the Preservation Order and the failure by Philip

Morris employees to preserve electronic mail – Philip Morris USA was not permitted to change

policies related to the retention of email without Mr. Brandt's approval.  *Id.* at 70:24-71:6.  And

during the entirety of Mr. Brandt's employment, Philip Morris USA followed the requirement

that Mr. Brandt approve any change in retention policy.  *Id.* at 71:7-12.  Philip Morris Companies

also oversaw the issuance and distribution of Disposal Suspension Notices that required the

preservation of records for litigation.  The notices were generated by Mr. Brandt's office,

distributed to records management personnel at Philip Morris USA, and then passed on to

employees.  *Id.* at 16:23-17:16.

      **2.**      <u>**Philip Morris Utilizes a "Print and Retain" Policy for the Retention of Email**</u>

All records at Philip Morris, including electronic mail, are divided into two categories:

primary records and transient records.  Dep. of William Lynch III ("Lynch Dep."), April 26, 2002

at 96:20-97:13 (attached as Ex. 8).  A primary record is "the one official Company copy of a

record that has future reference value."  Wallmeyer Dep., Dec. 19, 2002 at 138:9-139:9.

Transient records "have no future reference value to the company; they typically exist for the

business convenience of individual employees who are responsible for managing them.

Transient records may and should be disposed of as soon as they are no longer needed for active

use, unless they are subject to disposal suspension," and can be disposed of by any employee.  *Id.*

at 140:2-13.  *See also* A Guide to Effective Information Management (Ex. 41 to Wallmeyer

Dep.) at 2085184520.

Philip Morris asks that its employees "print and retain" electronic records, including

email, that are subject to disposal suspension.  *Id.*, Dec. 19, 2002 at 158:14-159:23, Dec. 20,

2002 at 290:1-3; Lynch Dep. at 129:14-130:2.  One of Philip Morris's references for document

retention policies, A Guide to Effective Information Management, advises employees:  "If the record . . . is capable of being printed, then you must print it and retain it in printed form for disposal suspension purposes, unless you have been instructed otherwise by Records Management personnel.  Thereafter, you should treat the electronic copy as a duplicate and delete it as soon as you no longer need it."  A Guide to Effective Information Management (Ex. 41 to Wallmeyer Dep.) at 2085184533.   The print and retain policy relies on individual employees to print and retain in their files all email and attachments that are subject to court preservation orders or otherwise required for litigation.  *Id.*  The instruction to employees to "treat the electronic record as a duplicate and delete it as soon as you no longer need it" applies to records under disposal suspension – that is, even in the case of records that are subject to court preservation orders or otherwise relate to pending litigation, employees are instructed to consider the electronic records as duplicates and delete them as soon as they are no longer needed.  Wallmeyer Dep. at 159:24-160:6; A Guide to Effective Information Management (Ex. 41 to Wallmeyer Dep.) at 2085184533.

The "print and retain" obligation is limited, however.  Recipients of email are not required to retain mail sent from within the company, unless they alter or forward the mail.  For example, for an electronic mail message that is sent from one employee to five others and copied to seven more, only the author is asked to print and retain.  The others are free to delete the message, leading to a situation where the failure by the author to print and retain a copy results in the loss of the document.  *See* Mem. from Brandt to Distribution, April 1, 1998 re Reformation of Records Management Procedures Governing Retention of Identical Copies of Disposal-Suspended Records (Ex. 27 to Wallmeyer Dep. at 2074706311-6312).  *See also* Lynch Dep. at 102:23-104:24; A Guide to Effective Information Management (Ex. 41 to Wallmeyer Dep.) at

2085184528 ("you need not keep an identical copy as long as the record itself reflects that a copy has been sent to you"), 2085184529 ("E-mail programs automatically record recipients, so those recipients do not have to retain their copies").

As set out in Section II.A.1 above, Philip Morris developed a company-wide policy for the use and retention of email early in 1998 that was applicable to both Philip Morris Companies and Philip Morris USA, and the Chairman and Chief Executive Officer of Philip Morris Companies, Geoffrey Bible, distributed the policy in June 1998.  As of the end of 2002, that policy was contained partly within the Philip Morris Electronic Information and Communications Policy.  Wallmeyer Dep., Dec. 19, 2002 at 220:17-221:24 and Dep. Ex. 17.  The policy "governs Philip Morris Companies, Inc., its operating companies, subsidiaries and affiliates.  'Operating Companies' of Philip Morris Companies, Inc. include Philip Morris Management Corp. (PMMC), Philip Morris Incorporated (PM USA), [and] Philip Morris International."  Ex. 17 to Wallmeyer Dep. at 206750041.   Unfortunately, if an employee at Philip Morris has a question about the company's policy for electronic communications, the Electronic Information and Communications Policy does not exist as a single source for an answer.  Rather, "there are a number of policies that intertwine relating to electronic communications and email records management policies, security policies, ... Guide to Effective Information Management and so forth."  Wallmeyer Dep., Dec. 19, 2002 at 222:7-11.  Moreover, the records management policy formation process is an ongoing one – "there have been evolutions in the policy and evolutions in the applications of the policy as the technologies have changed."  *Id.* at 227:2-7.  Policies are revised and updated, resulting in a maze of documents that must be negotiated to determine how documents should be treated.  *Id.* at 227:8-228:1.

In fact, an employee turning to the Electronic Information and Communications Policy will find nothing concerning the "print and retain" obligation for email that is subject to disposal suspension; instead, the employee must look elsewhere. *See* Electronic Information and Communications Policy (Ex. 17 to Wallmeyer Dep.). As set out above, the requirement is contained within A Guide to Effective Information Management, but the guide did not exist until August 15, 2000, nearly a year after the Complaint in this action was filed and 10 months after the Court entered its Preservation Order. A Guide to Effective Information Management (Ex. 41 to Wallmeyer Dep.) at 2085184514; Wallmeyer Dep., Dec. 19, 2002 at 209:24-210:2. And at some earlier point in time, Philip Morris employees were advised that they had the option of *either* printing *or* saving to hard drives, Wallmeyer Dep., Dec. 20, 2002 at 290:4-9, but Philip Morris's Rule 30(b)(6) designee on email retention policies was unable to pinpoint where amongst the many varying records management policies and documents a Philip Morris employee would have found such information, indicating: "Well it – I mean, it would be – my recollection is it would be in one of the – referenced in one of the records management manuals or in the Guide to Effective Information Management or in practices or tips or techniques like that." *Id.* at 290:13-17. Moreover, the option – printing and retaining *or* saving – is no longer permitted under Philip Morris policy; it disappeared with one of the numerous changes to Philip Morris's records management policies. *See generally id.* at 290:4-9.

As but one further example of the myriad policies and communications requiring negotiation by Philip Morris employees, there were 34 separate disposal suspension notices in 1998, applying to various types of documents and different parts of Philip Morris USA and Philip Morris Companies, that employees needed to reference in order to determine whether a transient record was subject to a court preservation order or was otherwise relevant to pending

litigation. *Id.*, Dec. 20, 2002 at 296:17-297:2 and Dep. Ex. 27. While the notices are compiled

and stored in a master listing, *see* Ex. 27 to Wallmeyer Dep., they are distributed to employees

haphazardly:

> If there are disposal suspension notices that apply to only specific
> individuals [or] functions, they would be distributed to those
> individuals or functions by the – by Doug Miller's organization for
> the records coordinators. Doug indicated that in many cases the
> disposal suspension notices go from his organization to the records
> coordinators. In some cases, they are, in fact, distributed by Doug's
> organization directly.

Wallmeyer Dep., Dec. 20, 2002 at 297:18-298:2. Disposal suspension notices are distributed by

inconsistent means as well, either "[i]n hard copy or email fashion. Sometimes both." *Id.*

at 298:4-5.

### 3. Philip Morris Chose to Delete Electronically-Stored Email Every Month But Recycled Back-up Tapes Every Three Weeks

#### a. Monthly Deletions

Philip Morris regularly deletes email stored electronically by its employees. Before the

Court entered the Preservation Order in this action, Philip Morris deleted all email and

attachments more than 60 days old from employees' in-boxes, sent items and deleted items

folders on a monthly basis. Wallmeyer Dep., Dec. 20, 2002 at 334:12-336:7. The regular

deletion practice was an ongoing one that existed as a monthly occurrence at least as early as

1995. *See* Ex. 30 to Wallmeyer Dep. at 2074697971A; Ex. 31 to Wallmeyer Dep.

After the Court entered the Preservation Order on October 19, 1999, the monthly

deletions continued: Philip Morris undertook system clean-ups on the third weekend of every

month through March 2002. Wallmeyer Dep., Dec. 20, 2002 at 341:11-18. Specifically, on the

third weekend of every month following the entry of the Preservation Order, Philip Morris

deleted all email and attachments more than 60 days old from the in-boxes, sent items and deleted items folders of every one of its employees.  *Id.*  The deletions were run on a server-by-server basis for all users on each mail server at Philip Morris.  *Id.* at 340:20-25.

Over the time period during which monthly deletions have occurred, email users at Philip Morris have been notified of upcoming system purges in various ways, but none of the notifications have been sufficient to insure preservation of email or an absence of confusion on the part of Philip Morris employees.  For example, a 1995 notification of an upcoming system clean-up process encouraged employees to delete email, stating: "Most of you have been diligent about keeping old mail to a minimum.  That diligence is appreciated."  Ex. 30 to Wallmeyer Dep. at 2074697971A.  There was no mention of the print and retain policy.  *Id.*  In addition, only a few employees were to receive a reminder that a substantial number of old messages would be deleted in the purge.  *Id.*

A memorandum dated August 21, 1995 advises that Information Services for the Philip Morris Corporate Legal Department had "recently implemented an electronic mail automatic deletion procedure that is intended to manage electronic mail messages on the system."  Ex. 31 to Wallmeyer Dep. at 2048758747.  The memorandum specifically indicates: "It was decided that in the early stages of the Legal Department automatic deletion process that no notice of the ability to save messages locally would be given."  *Id.*  The memorandum considered a later alteration that would advise users that an option for saving email older than 60 days "is to save the electronic mail to a local folder," but would nevertheless have to caution that "[f]or users with a large volume of messages, this alternative saving technique should only be used after you have substantially reduced your current electronic mail message inventory; otherwise, your messages may be lost even if saved electronically."  *Id.* at 2048758747-8748.

Eventually, the notification to users evolved to simply advise:

ATTENTION TO ALL EXCHANGE USERS

> On Saturday, November 17, 2001 the Exchange server mailboxes will be purged.  The purge criterion is to eliminate all mail messages older than 60 days in the In-Box, Sent Items, and Deleted Items folders and their sub-folders.  The Exchange server mailboxes will be purged on the third Saturday of every month.  Other folders you created using your Outlook client will not be purged.

Ex. 33 to Wallmeyer Dep. at 2067540184.  *See also* Wallmeyer Dep., Dec. 20, 2002 at 344:1-345:18.  This notification and similar reminders were used both before and after the Court entered the Preservation Order.  *Id.* at 345:15-18, 346:7-12.  The notification contains no reference to the Court's Preservation Order in this case.  It does not even inform employees of the print and retain policy, nor does it reference the company's obligation to otherwise preserve documents and information for litigation.  In fact, it was not until December 2001, *more than two years after this action was filed* and more than two years after the Court entered the Preservation Order, that Philip Morris changed the notification to specifically remind employees of the print and retain requirement for disposal suspended records.  Ex. 33 to Wallmeyer Dep. at 2067540183, 0185; Wallmeyer Dep., Dec. 20, 2002 at 345:19-346:24.

**b.** **The Three-Week Cycle for Back-up Tapes**

Like many companies, Philip Morris regularly copies electronic records, including email, to back-up tapes.  Wallmeyer Dep., Dec. 19, 2002 at 14:16-25.  Philip Morris requires, however, that back-up tapes be recycled, *i.e.*, written over, after only three weeks.  *Id.* at 169:6-170:14; Financial Policy Guide: Providing Email Services, 2067540083-0085 at 0084 (attached as Ex. 9).  That is, the "tapes would be created in one week.  They would be stored for two additional weeks, and then come back and be available for reuse after the third week."  Wallmeyer Dep.,

-10-

December 19, 2002 at 170:17-20.  All of the back-up tapes are placed on the three-week recycle track, *id.* at 175:19-23, or, in the words of the official policy applicable to the Philip Morris (Altria Group) Companies world-wide, "no more than three weeks of [] backup files are to be retained."  2067540083-0085 at 0084.  And when back-up tapes are recycled by overwriting new information on them, the information that was previously on the back-up tape becomes irretrievable.  Wallmeyer Dep., Dec. 20, 2002 at 363:24-365:16.

The decision to recycle back-up tapes after only three weeks emerged from a subcommittee of the Philip Morris Electronic Communications Task Force.  Brandt Dep. at 256:11-18.  As set out above, all of the work of the Task Force was approved by the Management Committee of Philip Morris Companies, which included Geoffrey Bible, Murray Bring and other officers of Philip Morris Companies.  *Id.* at 258:14-259:14.  The decision to use a three-week recycle period for back-up tapes, and the direction that no back-up tapes be retained for longer than three weeks, was communicated in a 1998 memorandum from the Chief Financial Officer of Philip Morris Companies, Louis Camerilli, who presently serves as Chairman of the Board of Directors and Chief Executive Officer of Altria Group.  Wallmeyer Dep., Dec. 20, 2002 at 361:10-21; 2067540083-0085 at 0084; http://www.altria.com/about_altria/biography/ 01_02_01_04_Camilleri.asp (accessed November 7, 2003) (attached as Ex. 10).  The announcement of a three-week retention period for email back-up tapes was the only policy applicable to email to come from the company's Chief Financial Officer.  Wallmeyer Dep., Dec. 19, 2002 at 171:14-18 ("Policies applicable to email from the CFO?  That document was the only one that I recall being identified as CFO distribution").

-11-

4.     **Philip Morris Was Aware That Its Employees Found Policies for the Retention of Email Confusing, Leading to the Loss Of Documents**

Philip Morris was aware that its employees were confused about both the policy for retention of electronic records, including email, and the effect of regular system-wide deletions. Philip Morris was also aware that the confusion, combined with its monthly system purges and three-week retention cycle for back-up tapes, resulted in the destruction of documents subject to discovery in this and other litigation.

As a general matter, testimony from Philip Morris witnesses confirms that the maze of policy manuals and communications to employees concerning document retention were difficult to understand. Michael Watkins, who worked as a scientist at Philip Morris USA for fifteen years through January 2002, explained succinctly that "the implementation of the document policy was unclear to a lot of employees." Dep. of Michael L. Watkins, Ph.D., May 9, 2002 at 350:6-7 (attached as Ex. 11). He explained that "it was not unusual for people to clear their office by shredding documents. I don't know what, I can't recall specific documents that anyone was shredding. My understanding was that, well, it wasn't clear what you could shred and what you couldn't in that regard." *Id.* at 351:3-9.

The confusion about document retention extended specifically to email. In January 1998, William Brandt, the Director, Worldwide Records Management and Senior Counsel at Philip Morris Management Corporation (with responsibility for the records management program at Philip Morris Companies and Philip Morris USA), *see, e.g.,* Brandt Dep. at 50:20-51:4, received an email message from Mi Wong, an employee in the Information Services department of Philip Morris Management Corporation. Brandt Dep. at 219:2-5 and Dep. Ex. 8. Ms. Wong specifically asked what the Philip Morris policy was for email and documents subject to disposal suspension,

further indicating that she had heard three different statements of the means for saving email subject to preservation requirements: (1) "print and retain a hard copy and delete the electronic form"; (2) "print and retain a hard copy and keep the electronic form"; and (3) "keep and leave it in electronic form, whether its [sic] a hard drive, file server, or removable media."  Ex. 8 to Brandt Dep. at 208246983C.  Ms. Wong further surmised, "[M]aybe they are all valid."  *Id.*  The fact is, however, that if Ms. Wong and other employees chose to keep and leave their email in electronic form, it would be deleted during Philip Morris's monthly system purges.  Not only that, but the company's policy requiring back-up tapes to be recycled after three weeks insures that deleted items cannot be retrieved.

Upon learning that Ms. Wong was unaware of the company policy for the retention of email, Philip Morris took no action beyond discussing the issue with Ms. Wong and answering her specific questions.  Brandt Dep. at 225:21-226:12.  Despite the fact that Ms. Wong incorrectly understood from others – that she "had heard" – that she could save her email by merely "keep[ing] and leav[ing] it in electronic form," Philip Morris took no action.  Even though Ms. Wong's misunderstanding would necessarily result in the failure to preserve email and attachments, there was no company-wide communication reiterating or clarifying the policy. *Id.* at 226:13-16.  There was no investigation to determine whether Ms. Wong's misunderstanding was shared by other employees.  *Id.* at 227:4-7.  And there was no investigation to determine whether Ms. Wong's misunderstanding led to the deletion of email that should have been retained, despite the fact that Philip Morris was involved in litigation that required it to preserve documents at that time.  *Id.* at 227:8-16; 229:2-11; 229:24-230:6.  In fact, Mr. Brandt asserted, "I don't know that the issue was even raised."  *Id.* at 230:5-6.

-13-

In another instance, Mr. Brandt had a conversation with a factory manager at Philip

Morris's Blended Leaf plant in Richmond[2] who "seemed a little unclear of his obligations

regarding e-mail." *Id.* at 248:18-249:25.  The factory manager, Johnny Nienow, told Mr. Brandt

that "they didn't have enough printers in the factory." *Id.* at 249:2-3.  Of course, due to Philip

Morris's policy and practice, which involved monthly email deletions and required recycling and

overwriting back-up tapes every three weeks, the failure to promptly print and retain email

resulted in its irretrievable loss.  And yet there was no change in policy and practice – no

suspension of monthly deletions and no extended retention of back-up tapes – instituted as a

result of the fact that the factory manager, like Ms. Wong, was "unclear of his obligations

regarding e-mail" and the fact that there were not "enough printers in the factory" to adequately

comply with the print and retain rule.  *See* Sections II.A.2 and II.A.3, *supra*.[3]

Despite his firsthand knowledge that employees found company policies for email

retention to be unclear, during the five and a half years that Mr. Brandt was at Philip Morris, he

never conducted any audits of Philip Morris USA to determine the extent of compliance with the

print and retain rule, nor was he aware of any audits or investigations conducted within the

---

[2]  Leaf blending practices are important to this case.  The United States alleges that, as part of their scheme to defraud, defendants manipulated nicotine levels in order to insure the addictiveness of cigarettes.  Nicotine in cigarettes can be controlled and manipulated through selective leaf blending.  More specifically, through leaf blending, or a combination of blending and additives, defendants can control the amount of nicotine delivered to smokers.  *See, e.g.,* United States Preliminary Proposed Findings of Fact (R. 1959; January 29, 2003) at ¶¶ 747-749.

[3]  Indeed, CFO Louis Camilleri's memorandum announcing the three week recycle period for email server back-up tapes was issued shortly after an email server crashed in January 1998.  *See* Ex. 10 to Brandt Dep. (2082425165). As Mr. Brandt explained, after the server crash "there was no way to determine what had or hadn't been on it, and because it went down suddenly without warning, there was no way to determine whether – if there was any print and retain obligation, whether people had had time to do it."  Brandt Dep. at 251:16-21.  And yet monthly deletions continued, and the memorandum announcing the three-week retention period for back-up tapes was issued just over two months after the crash, eliminating any meaningful opportunity to restore lost email in the event of future server crashes, other technical difficulties, or employees' failure to print and retain email subject to court preservation orders or otherwise relevant to ongoing litigation.

company.  Brandt Dep. at 260:19-25; 260:18-24.  Similarly, there were no audits or investigations to determine whether employees at Philip Morris Companies were complying with the print and retain policy as it applied to email.  *Id.* at 261:2-17.

The confusion expressed by Dr. Watkins, Ms. Wong and Mr. Nienow extended to the eleven high-level employees Philip Morris has specifically identified as those who failed to print and retain email after entry of the Preservation Order in this case.  As more fully explained below, "these individuals thought that their email was being retained, [but the loss of their email was caused by] their lack of understanding of how the IS system clean-up really worked coupled with the failure to fully follow the print and retain policy."  Wallmeyer Dep., Dec. 20, 2002 at 397:9-13.

### 5.   Philip Morris Failed to Take Easy and Inexpensive Steps That Would Have Prevented the Irretrievable Loss of Deleted Email

Philip Morris could have insured that deleted mail would be recoverable despite its system purges, but elected not to do so.  The monthly system clean-up process was configured to move items 60 days or older to what is called a system clean-up folder in the Microsoft Exchange email system that is used by the company.  *Id.* at 381:4-11.  Items that are older than 75 days – or those that have already been in the system clean-up folder for at least 15 days – are "ghost deleted."  *Id.* at 381:11-15.  Items that are "ghost deleted" can be restored, *id.* at 379:11-21, but Philip Morris configured its email system so that email would only remain as a ghost deleted item – and only be capable of restoration – for 30 days.  *Id.* at 381:15-19.  It is possible, however, to configure the system to retain ghost deleted items for at least 9,999 days, or more than 27 years.  *Id.* at 381:24-382:23.

Philip Morris believes that setting the ghost items retention period at such a level would cause system storage capacity problems on the servers at Philip Morris, necessitating additional server storage space. *Id.* at 382:24-383:3. But evidence shows that the ghost items retention period could have been set at a much higher level than the 30 day period chosen by Philip Morris. As the Court is aware, after Philip Morris discovered that the email of certain employees who are witnesses in this case had been lost, it decided to suspend its monthly system deletions. *Id.*, Dec. 19, 2002 at 111:19-112:1. *See also* June 19, 2002 letter from Frederick to Hon. Gladys Kessler at 2.[4] Philip Morris did not resume periodic deletions until after July 21, 2003, 15 months after the suspension. *See* July 21, 2003 letter from Frederick to Eubanks and Brody at 2 (attached as Ex. 12) ("Philip Morris intends to recommence the system maintenance deletions"). As of July 21, 2003, the system had not yet reached capacity; it was only by that date that the volume of retained email allegedly reached the point where "the current volume – and its continued growth – place the stability of the system at risk and increase the likelihood of a system failure." *Id.* at 1-2. Accordingly, the system capacity was sufficient to retain ghost deleted items for *at least* 15 months, rather than the 30-day period used by Philip Morris, and the company could have set its system to insure that an archived email from well over a year's time frame would have been available in the event of its employees' failure to retain disposal suspended records.[5]

---

[4] As discussed in Section B.1, *infra*, however, Philip Morris did not suspend monthly deletions until two months after it first discovered that its employees had violated the Preservation Order by failing to retain email, a time two and a half *years* after this case was filed.

[5] Philip Morris planned to increase the number of servers on its system by April 2003 in order to increase system capacity. Wallmeyer Dep., Dec. 19, 2002 at 113:4-13. But whether Philip Morris ultimately did add to its server capacity or not, Philip Morris had not undertaken an expansion of system capacity as of at least November 2002, six months after monthly deletions were suspended, *Id.* at 113:14-21, showing the ability to retain email electronically for far longer than company policy permitted.

Even when ghost deleted items were being purged after 30 days, there was an alternative means by which Philip Morris easily and inexpensively could have insured that email and attachments would not be irretrievably lost in violation of court preservation orders.  Specifically, Philip Morris simply could have performed a system-wide back-up each month, just prior to the monthly system purge, and retained the back-up tapes.  Wallmeyer Dep., Dec. 20, 2002 at 379:22-380:1 (means of recovering deleted email are "[r]ecovering from back-up tape" and "recovering from the ghost deleted").  Every single email server at Philip Morris can be backed up on approximately 80-85 back-up tapes.  *Id.*, Dec. 19, 2002 at 108:24-109:24.  The back-up tapes, made by Tivoli, cost less than $50 per tape.  *Id.* at 110:1-3 ("it's, like, $49-and-change a piece").  Accordingly, Philip Morris could have run an entire system back-up each month, just prior to the monthly system purge, and saved rather than overwritten the tapes at a cost of less than $4,250 per month for the 80-85 tapes required to back-up all email in the system.  That is, for $4,250 per month, Philip Morris could have insured the existence of a complete archive of its employees' email and full compliance with the Preservation Order.[6]  Even less expensive, Philip Morris could have utilized its excess server capacity to space its system-wide deletions out to six-

---

[6] Philip Morris's 30(b)(6) deponent on email issues later asserted that he was told that it would cost "millions of dollars to continue to grow back-up tapes and not purge them."  Wallmeyer Dep., Dec. 20, 2002 at 353:16-17.  But the deponent was unaware of what precise costs were considered in the analysis, beyond an assertion that it involved "the cost of the tapes, the cost of transport and the cost of storage."  *Id.* at 355:20-24.  The deponent did not know how many tapes were used to come up with the imprecise figure of "millions of dollars," but the deponent did indicate that the cost included items that are not required for a monthly back-up that would have allowed Philip Morris to comply with the Preservation Order.  Specifically, the calculation included not just monthly back-up tapes, which would number only 80-85, but "weekly back-ups *and* the day incrementals."  *Id.* at 357:25-358:6 (emphasis added).  Even assuming that the weekly and daily tapes include *only* email, the inclusion of daily and weekly back-up tapes in the calculation pushes the $4,250 figure to $148,750, of which $144,500 is unnecessary to insure a complete archive of employee email and attachments.  The deponent did not know whether there was any determination of the cost to save a single set of monthly back-up tapes before each month's purge and save only those tapes.  *Id.* at 358:10-13.  The deponent did not know how many tapes, overall, are generated as part of the weekly back-ups and daily incrementals at Philip Morris over a month's time frame.  *Id.* at 358:20-359:8.  In view of the foregoing, any assertion that it would cost Philip Morris "millions of dollars" to back-up its email servers on a monthly basis and save one set of 80-85 back-up tapes which, even years ago, were only 4-5 inches square and an inch thick, *id.* at 353:18-354:7, is simply not credible.

month intervals so that it would only have to retain back-ups twice a year, thereby creating a complete archive of its employees' email for under $8,500 per year.

**B.     Philip Morris Violated The Court's Preservation Order By Failing To Retain All Relevant And Potentially Relevant Email**

   **1.     Philip Morris Discovered the Violation of Order #1 Four Months Before It Notified the Court and Two Months Before It Suspended Monthly System-Wide Email Deletions**

By letter of June 19, 2002, Philip Morris advised the Court of its failure to comply with the Preservation Order.  *See* June 19, 2002 letter from Frederick to Hon Gladys Kessler.  In the letter, counsel for Philip Morris explained that "some employees did not fully comply with [the] 'print and retain' policy," by specifically "fail[ing] either to print the email or migrate the email to 'safe' locations on their computers before it was deleted." *Id.* at 2.  The June 19, 2002 letter was not only the first time that Philip Morris advised the Court of its violation of the Preservation Order, but it also marked the first time that the United States was informed of Philip Morris's failure to preserve relevant email.

Philip Morris first became aware of the lost email four months before it chose to notify the Court and the United States.  Wallmeyer Dep., Dec. 20, 2002 at 384:21-386:24.  During "the course of preparation for depositions and interviews with employees in the time period between February and June 2002," and through "investigations that went on" at the same time, Philip Morris learned that certain employees "lost some email in electronic form due to the IS system clean-up process and the failure to follow the print and retain policy." *Id.* at 386:19-21, 388:14, 389:21-24.  Despite first learning of the problem in February, Philip Morris undertook its monthly system-wide deletion in February and again on March 17, 2002. *Id.*, Dec. 19, 2002 at 110:10-12, Dec. 20, 2002 at 340:16-19, 341:11-18.  Despite first learning of the problem in

February, Philip Morris waited until April 2002 to make and retain a back-up of email on its

servers. *Id.*, Dec. 20, 2002 at 352:10-14.  By that time, the February and March system purges

had deleted old mail from users system-wide, including those users who had failed to print and

retain email subject to the Preservation Order.  And despite first learning of the problem in

February, Philip Morris did not disseminate any communication to its employees until June 19,

2002, four months after its employees' failure to print and retain email subject to the Preservation

Order first became known to Philip Morris.  *Id.* at 409:15-410:24.  *See also* June 19, 2002 email

from PMUSA Desktop Distribution, 2067540024-0025 (Ex. 39 to Wallmeyer Dep.).

**2.    Numerous High-Level Witnesses, All Involved in Activities at Issue in This Action, Failed to Retain Email Subject to the Preservation Order**

Philip Morris identified eleven employees as those who failed to follow the company's

print and retain policy, leading to the violation of the Preservation Order that was first reported to

the Court on June 19, 2002.  *Id.*, Dec. 19, 2002 at 127:12-128:1, 136:16-137:2.  Each employee

held a high-level position of significant responsibility within the company and worked on

scientific, marketing and corporate and public affairs issues that are relevant to this lawsuit, and

all but one of the employees, Brian Schuyler, was identified for deposition by the United States:

- Hector Alonso is the Vice President of Product Development and Technology at Philip Morris USA and has worked for Philip Morris since 1979.  In his current position, Mr. Alonso is responsible for research on potentially less harmful cigarette products, as well as new cigarette product design and development.  Dep. of Hector Alonso, June 21, 2002 ("Alonso Dep.") at 14:4-33:6 (attached as Ex. 13).

- Elizabeth Culley is the Director of Corporate Responsibility, Planning and Programs at Philip Morris USA.  In that position, Ms. Culley has responsibility for advertising and communication of Philip Morris's positions on tobacco related issues, including the Master Settlement Agreement and environmental tobacco smoke.  Dep. of Elizabeth Culley, June 20, 2002 ("Culley Dep.") at 10:21-19:8, 50:4-54:19 (attached as Ex. 14).

-19-

- Christina Hollis is a Senior Research Analyst in the Market Information and Planning Department at Philip Morris USA.  In that position, Ms. Hollis performs research for Philip Morris's continuous tracking database, which tracks cigarette brand demographics such as the age and race of smokers as well as where they lived and where they purchased their cigarettes.  Ms. Hollis also worked as a Research Analyst in the Youth Smoking Prevention (YSP) Department at Philip Morris from 1998-2001 where she had responsibility for the Teenage Attitude and Behavior (TAB) tracking study and performed qualitative research for Philip Morris YSP television and print advertisements, setting up and organizing focus groups of children.  Dep. of Christina Hollis, Feb. 15, 2002 ("Hollis Dep.") at 16:25-17:4, 19:12-20:04, 23:23-39:5 (attached as Ex. 15).

- Suzanne LeVan is the Vice President of Marlboro and formerly was the Vice President of Philip Morris Premium Brands from 1991-2001.  Ms. LeVan has had responsibilities for Philip Morris's marketing efforts for all of Philip Morris's major domestic brands, including but not limited to Marlboro, Virginia Slims, Merit, Parliament, and Benson & Hedges.  As current head of the Marlboro brand group, Ms. LeVan is the highest level person at Philip Morris who is responsible for marketing Marlboro.  Dep. of Suzanne Levan, June 25, 2002 ("LeVan Dep.") at 11:19-12:13, 14:4-17:17 (attached as Ex. 16).

- Peter Lipowicz is a Senior Principal Scientist in Research, Development & Engineering at Philip Morris USA.  Dep. of Peter Lipowicz, July 18, 2002 ("Lipowicz Dep.") at 9:11-15 (attached as Ex. 17).  Dr. Lipowicz has been identified by joint defendants as an expert witness in this case to testify as to, *inter alia*, Philip Morris's efforts to reduce tar and nicotine levels in cigarettes; the design, function, construction and components of conventional and non-conventional cigarettes; the reduction of harmful and potentially harmful smoke constituents; the FTC method of measuring tar and nicotine; the use of ammonia compounds in cigarettes by Philip Morris; the relationship between ammonia compounds and nicotine absorption; the formation and composition of smoke; the combustion process; and pyrolysis, filtration, ventilation, and cigarette paper. Joint Defendants' Expert Disclosure for Peter J. Lipowicz, Ph.D. (R. 815; February 1, 2002), Statement of Opinions at 1.

- Nancy Lund is the Senior Vice President for Marketing at Philip Morris.  In that position, Ms. Lund has responsibility for Philip Morris's marketing efforts for all of its major domestic brands, including the review of yearly marketing plans.  Ms. Lund further has responsibility for new product development, such as the SCoR "less hazardous" cigarette project.  Dep. of Nancy Lund, June 27, 2002 ("Lund Dep.") at 16:7-20:5, 90:4-12 (attached as Ex. 18).

- Ellen Merlo was the Senior Vice President of Corporate Affairs at Philip Morris USA until retiring on March 1, 2003, and now works as a consultant for the company.  In her position as Senior Vice President, Ms. Merlo was responsible for

among other things, helping set Philip Morris's profit and growth objectives and
improving company performance generally, as well as communicating Philip
Morris's positions to the media on tobacco-related issues.  Ms. Merlo also was
tasked with achieving Philip Morris's "mission of responsibility," which included
creating communications to Philip Morris employees to "ensure that they
understand the mission, the goals, the kind of strategic imperatives of the
company."  Dep. of Ellen Merlo ("Merlo Dep."), June 11, 2002 at 16:11-17:23
(attached as Ex. 19), June 26, 2003 at 702:18-704:22 (attached as Ex. 21).

- Mike Pfeil, Vice President of Communications and Public Affairs at Philip Morris
  USA, has worked for Philip Morris since 1977.  In his current position, Mr. Pfeil
  is responsible for Philip Morris's public affairs, media affairs, and issues
  management functions, a portion of the consumer affairs department, and Philip
  Morris's internal communications generally.  Mr. Pfeil also is responsible for all
  press releases that are issued by Philip Morris USA regarding Philip Morris's
  business policies and positions.  Dep. of Mike Pfeil, April 10, 2002 ("Pfeil Dep.")
  at 7:3-7, 31:2-34:6,114:4-115:13 (attached as Ex. 22).

- Steve Sampson is a Senior Brand Manager for Marlboro at Philip Morris USA.  In
  that position, Mr. Sampson has responsibility for planning, creating, and
  executing Marlboro event programs, such as the Marlboro Bar Program, the
  Marlboro Party at the Ranch Program, and the Marlboro Racing School, as well as
  managing and training Philip Morris's event vendors on topics such as Master
  Settlement Agreement compliance.  Dep. of Steve Sampson, April 12, 2002
  ("Sampson Dep.") at 63:10-81:24 (attached as Ex. 23).

- Brian Schuyler is the General Manager for United States Possessions and Military
  Sales at Philip Morris USA.  In that position, Mr. Schuyler is responsible for
  among other things, marketing and selling Philip Morris cigarettes to U.S. military
  personnel.  Joint Defendants' Initial List Fact Witnesses, Dec. 3, 2001 at 13
  (attached as Ex. 24).

- Shari Teitelbaum is the Director of Marketing and Sales Decision Support at
  Philip Morris USA and has worked for Philip Morris since 1985.  In her current
  position, Ms. Teitelbaum's Department has responsibility for conducting both
  primary research (consumer research conducted on individual smokers through
  means such as interviews and focus groups) and secondary research (using Philip
  Morris databases which track cigarette market share figures such as industry
  shipments and retail take away) to support Philip Morris's marketing initiatives.
  Dep. of Sherry Teitelbaum, April 16, 2002 ("Teitelbaum Dep.") at16:22-29:3
  (attached as Ex. 25).

Philip Morris has not been able to recover the email deleted by these important witnesses

who failed to print and retain email subject to the Preservation Order.  Instead, Philip Morris has

discovered only a minimal volume of email from a limited and uncertain time period and a

limited number of employees, from two sources: (1) existing back-up tapes from the time that

system deletions were suspended in April 2002 (containing email on the Philip Morris computer

system from October 2001 to April 2002); and (2) 54 tapes located by personnel from Philip

Morris's Information Technology Service Center (ITSC).  *See* July 17, 2002 letter from Frederick

to Brooker and Goldfarb (attached as Ex. 26) at 7.[7]

Philip Morris utilized search terms to select and make email available from the limited

time frame contained on the existing back-up tapes, which the United States reviewed in October

2002.  *See, e.g.,* Joint Submission of PM USA and the United States Regarding PM USA's

Electronic Mail Production (R. 1713; October 24, 2002).  Almost a year later, Philip Morris was

able to recover some email from approximately half of the 54 tapes found by the ITSC, but Philip

Morris was able to identify mail from only eight email users on the tapes whose email boxes

could contain email potentially relevant to this litigation.  *See* September 11, 2003 letter from

Frederick to Brody and Goldfarb (attached as Ex. 27) at 2.  From those 8 users, who were not

identified, Philip Morris produced 1,239 responsive, non-privileged documents to the United

States on September 16, 2003.  *Id.*; September 16, 2003 letter from Schwarzschild to Brooker

(attached as Ex. 28).  As explained below, however, the 1,239 documents produced on

September 16, 2003 reveal that the destruction of email subject to the Preservation Order was not

limited to the eleven high level witnesses specifically identified by Philip Morris.

---

[7] The July 17, 2003 letter identified a third potential source for Philip Morris's attempt to recover lost email and attachments – electronic data that had been stored on the hard drives of users from whom documents were collected in summer 2001, *see* July 17, 2003 letter at 7-8, but there has been no indication that the effort proved successful in identifying lost email.  *See, e.g.,* Wallmeyer Dep., Dec. 20, 2002 at 402:18-22.

3.      **The Deletion of Email in Violation of the Preservation Order Involved More Than the Eleven Employees Specifically Identified by Philip Morris**

By letter of July 17, 2002, counsel for Philip Morris indicated that "[b]ecause there are thousands of email users in the Philip Morris email system . . . Philip Morris has not attempted to determine the status of each and every user's printing or other means of preserving email from periodic system deletion."  July 17, 2002 letter from Frederick to Brooker and Goldfarb at 2. Two months later, Philip Morris asserted that it still did "not know the identity of all such persons."  September 4, 2002 letter from Cecil to Brody (attached as Ex. 29) at 3.  And while Philip Morris's Rule 30(b)(6) designee specifically identified the eleven persons identified above in section II.B.2 at the December 19-20, 2002 deposition on email destruction issues, subsequent production of email and attachments by Philip Morris revealed that the loss of email spread well beyond the eleven high level witnesses previously disclosed.

When Philip Morris recovered information from 27 of 54 tapes located by the ITSC, it used search terms in order to identify responsive documents and then produced 1,239 documents – email and attachments – not previously produced to the United States.  *See* September 16, 2003 letter from Schwarzschild to Brooker.  The majority of the email and attachments produced by Philip Morris from the back-up tapes was not sent from or to (or copied to) any of the eleven high level witnesses specifically identified in December 2002.  For example, the 1,239 documents included communications involving Doug Miller, Mark Van Malssen, Lewis Cummings and Kim Freed, *see* PM3101600024 (attached as Ex. 30), as was email sent by and between Kimberlie Farlow, Bennie Darden and James Warren.  PM3100900159 (attached as Ex. 31).  There are dozens of additional examples.

-23-

The inclusion of email from these varied Philip Morris employees, found and produced only after recovery efforts were undertaken to restore information found on 27 back-up tapes with mail from eight email users, indicates widespread non-compliance with Philip Morris's print and retain policy.  Specifically, this is email that was not produced to the United States when collected from the files of employees who were obligated to print and retain relevant and potentially relevant email and other electronic documents.  It was, most likely, never printed by these employees prior to its deletion in system-wide purges.  The email was only available for production as a result of the restoration efforts conducted on a set of back-up tapes containing a limited volume of email from a short time period and a mere *eight* employees.  But "there are thousands of email users in the Philip Morris email system."  July 17, 2002 letter from Frederick to Brooker and Goldfarb at 2.  Email deleted from the files of the thousands of other employees at Philip Morris – email that was never recovered due to the Philip Morris policy requiring that back-up tapes be recycled every three weeks – is irretrievable.

## C.     Email Is An Integral Part Of Philip Morris's Business

The significance of the email deleted from the files of eleven specifically identified, high level witnesses and an undetermined number of the thousands of other email users at Philip Morris is demonstrated by the integral part that email plays in Philip Morris's business.  In fact, Philip Morris's 2000 Electronic Communications Policy begins with the statement that "Philip Morris Companies, Inc., its operating companies, subsidiaries, divisions and related companies and affiliates ("the Company") recognize that electronic mail ("e-mail") and voice mail play a significant role in the Company's business communications."  The Policy makes it clear that email is provided to employees strictly for "the purpose of conducting official Company business" and warns employees that emails are "business documents and not personal

-24-

communications." 2082787879-7882 at 7879-7880 (attached as Ex. 32). Philip Morris

employees use email extensively to carry out their job responsibilities, sending an average of

20,300 email messages per day as early as 1995. 2075067209-7244 at 7235 (attached as Ex. 33).

Email at Philip Morris is used for myriad purposes. The email system at Philip Morris not only

allows for virtually instantaneous communication among and between employees in Philip

Morris's various offices and departments, but also allows for communications with email users

outside of Philip Morris. In addition to the words written in the emails themselves, evidence

shows that employees at Philip Morris frequently use email to distribute attached draft reports,

studies, and presentations to one another for review and comment.

Evidence further shows that the eleven witnesses specifically identified by Philip Morris

as those who failed to follow the print and retain policy consistently have used, and continue to

use, email in the performance of job duties which are directly relevant to allegations in this

litigation. For example:

- Evidence shows that Hector Alonso uses email in his work on potentially less
  hazardous cigarettes at Philip Morris. For example, in an email dated March 21,
  2001 entitled "Findings from Independent Human Accord Studies" Mr. Alonso
  discussed with Robert Elves, a Senior Principal Scientist at Philip Morris, the
  results of a Philip Morris study measuring the "withdrawal suppression" of Philip
  Morris's Accord cigarette compared with another Philip Morris cigarette brand
  and denicotinized cigarettes. 2081699897-9898 (attached as Ex. 34); Alonso Dep.
  at 65:15-69:21. Similarly, in an email dated May 15, 2001 entitled "Risk
  Management and Release Meeting," Mr. Alonso discussed with William Griffin,
  an employee in the Philip Morris Risk Management and Business Planning
  Department, the risk assessment meeting regarding the electrically heated
  cigarette program, which was "a management review of all the studies to sort of
  make the final decision as to whether the product is ready for release or not."
  2081700166-0166A (attached as Ex. 35); Alonso Dep. at 88:9-91:10.

- Elizabeth Culley uses email in her work creating Philip Morris media
  communications. For example, in an email dated March 27, 2001 entitled
  "Advertising meeting," Ms. Culley discussed the target audiences and mode of
  communications to be used for Philip Morris advertising related to the Master

Settlement Agreement.  2085129568-9570 (attached as Ex. 36); Culley Dep. at 13:5-19:8.  In an email dated July 27, 2000 from Ms. Culley to Ellen Merlo entitled "Shared Understanding," Ms. Culley discussed Philip Morris's "public place smoking strategy" with respect to minimizing the effects of environmental tobacco smoke.  2080993271 (attached as Ex. 37); Culley Dep. at 55:7-67:10.

•   Christina Hollis testified at her February 15, 2002 deposition in this case that she used email during her tenure in the Youth Smoking Prevention (YSP) Department at Philip Morris typically to "[a]sk a question, answer a question, look for some information."  Culley Dep. at 80:16-82:12.

•   Suzanne LeVan uses email in her work marketing Marlboro cigarettes.  For example,

**REDACTED**

2714401547-1548 (attached as Ex. 38); LeVan Dep. at 366:5-373:8.  Similarly, in a July 9, 2001 email entitled

**REDACTED**

2702000001-0002 (attached as Ex. 39); LeVan Dep. at 295:13-313:24.

•   Nancy Lund uses email in her work with Philip Morris's marketing efforts.  In an e-mail dated September 21, 2000 entitled "CONFIDENTIAL NOTE FROM NANCY LUND," Ms. Lund discussed with colleagues the decisions of a Philip Morris Senior Team Meeting regarding such topics as the Marlboro SCoR project, Accord, Focus on Four, and the national launch of Parliament.  2085200617 (attached as Ex. 40); Lund Dep. at 104:10-109:10.  Similarly, an email addressed to Ms. Lund dated

**REDACTED**

2085786959A-6960 (attached as Ex. 41); Lund Dep. at 113:15-116:12.

•   Ellen Merlo uses email in her work creating Philip Morris's media communications on tobacco-related issues.  For example, a November 26, 2002 email entitled "Draft parent brochure Q&A/letters" sent to Ms. Merlo from Brendan McCormick delivered proposed Philip Morris "message points and Q&A for use in response to likely media inquiries" regarding a Philip Morris brochure for parents on youth smoking prevention.  2085799973-9979 (attached as Ex. 42); Merlo Dep., June 12, 2002 at 368:22-371:20 (attached as Ex. 20).  Similarly, in an October 31, 2000 email, Ms. Merlo wrote to colleagues about creating a "message

-26-

track" for responding to the American Legacy Foundation's "Truth" advertising campaign which she described as "totally untrue" and "slanderous of our company and our employees." 2085802441B, 2085802439C (attached as Ex. 43); Merlo Dep., June 12, 2002 at 376:3-385:20.

• Evidence shows that Steve Sampson uses email in his work on Marlboro event programs. For example, in an email dated

**REDACTED**

2085149218 (attached as Ex. 44); Sampson Dep. at 166:22-169:24.

The importance of email as evidence of Philip Morris's conduct, particularly after the entry of the Preservation Order on October 19, 1999, cannot be understated.

## III. ARGUMENT

### A. The Court May Impose Sanctions For Failure To Preserve Relevant Evidence And Failure To Comply With Court Preservation Orders

#### 1. Federal Rules of Civil Procedure 16 and 37 Authorize the Imposition of Sanctions Against Philip Morris

Philip Morris's failure to comply with the Court's Preservation Order and the deletion of potentially relevant email is a violation of a scheduling and pretrial order subjecting the company to sanctions under Federal Rules of Civil Procedure 16(f) and 37(b)(2). Rule 16(f) provides that if a party or party's attorney fails to obey a scheduling or pretrial order:

> the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D). In lieu of or in addition to any other sanction, the judge shall require the party or the attorney representing the party or both to pay the reasonable expenses incurred because of any noncompliance with this rule, including attorney's fees, unless the judge finds that the noncompliance was substantially justified or that other circumstances make an aware of expenses unjust.

-27-

Fed. R. Civ. P. 16(f).  *See In re Prudential Insurance Co.*, 169 F.R.D. 598, 614 (D.N.J. 1997)

(Rule 16(f) provides for sanctions when a party fails to obey a pre-trial order).  This Court

recently reaffirmed the extent of the Court's authority to enter sanctions under Rule 16(f), noting

that the Rule "authorizes a court to sanction a party for failure to follow a scheduling or pretrial

order, by imposing any of the sanctions authorized by Rule 37(b), as appropriate."  *Young v.*

*Office of the United States Senate Sergeant at Arms*, 217 F.R.D. 61, 65 (D.D.C. 2003); *see also*

*Martin v. Heco/Nostalgia Enterprises Co.*, 186 F.R.D. 601, 602 (E.D. Cal. 1999) ("Under Rule

16(f) courts have 'very broad discretion to use sanctions where necessary to insure not only that

lawyers and parties refrain from contumacious behavior, already punishable under the various

other rules and statutes, but that they fulfill their high duty to insure the expeditious and sound

management of the preparation of cases for trial'" (*quoting Matter of Sanction of Baker*, 744 F.2d

1438, 1440 (10th Cir. 1984) (en banc)); Fed. R. Civ. P. 16(f) advisory committee notes

("[E]xplicit reference to sanctions reinforces the rule's intention to encourage forceful judicial

management").

Federal Rule 37(b)(2) expressly authorizes the Court to enter sanctions such as "[a]n

order refusing to allow the disobedient party to support or oppose designated claims or defenses,

or prohibiting that party from introducing designated matters in evidence," an order "striking out

pleadings or parts thereof . . . . or dismissing the action or proceeding or any part thereof, or

rendering a judgment by default against the disobedient party," or "an order treating as contempt

of court the failure to obey any orders."  Fed. R. Civ. P. 37(b)(2).  In *Young*, this Court noted that

"Rule 37(b)(2) permits a court to issue such orders 'as are just' to sanction a party who fails to

obey an order to provide or permit discovery," including "taking certain facts as established,

prohibiting the introduction of certain evidence, striking pleadings or parts thereof, staying

further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof and/or rendering a judgment by default against the disobedient party." *Young*, 217 F.R.D. at 65.  Rule 37 is "intended to encourage and enforce strict adherence to the 'responsibilities counsel owe to the Court and to their opponents.'" *Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees and Restaurant Employees Int'l Union*, 212 F.R.D. 178, 219 (S.D.N.Y. 2003) (quoting *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 640 (1976)). Rule 37 "authorizes imposition of sanctions for negligence or tactical intransigence as well as willful or intentional wrongs." *Metropolitan Opera Ass'n*, 212 F.R.D. at 219.

Courts are afforded broad discretion in determining appropriate sanctions under Rule 37, and a district court's decision to award sanctions pursuant to Rule 37 is reviewed only for abuse of discretion. *National Hockey League*, 427 U.S. at 642 ("[t]he question, of course, is not whether this Court, or whether the Court of Appeals, would as an original matter have dismissed the action; it is whether the District Court abused its discretion in so doing").  Courts routinely enter orders precluding the entry of certain evidence as a sanction for discovery abuses. *See, e.g., Donato v. Fitzgibbons*, 172 F.R.D. 75, 84 (S.D.N.Y 1997) (precluding defendant town from introducing any expert testimony about state of headlights on police cruiser involved in automobile collision and submitting adverse inference instruction to jury due to defendant's gross negligence in failing to preserve headlights in violation of court preservation order); *Ohio v. Arthur Anderson & Co.*, 570 F.2d 1370 (10th Cir. 1978) (affirming trial court's order forbidding defendant from opposing two of State of Ohio's claims and awarding State $60,000 in fees and expenses for defendant's dilatory compliance with the court's document production orders); *Adolph Coors Co. v. Amer. Ins. Co.*, 164 F.R.D. 507 (D. Colo. 1993) (prohibiting defendant insurance company from denying existence of duty to defend plaintiff in underlying

-29-

environmental litigation as sanction for failing to comply with court's document production orders); *Hammond v. Coastal Rental & Equip. Co., Inc.*, 95 F.R.D. 74 (S.D. Tex. 1982) (ordering that audit prepared by plaintiffs be taken as true and prohibiting defendants from contesting sums claimed in audit after payroll records improperly withheld from production by defendant were destroyed in fire).

> **2.      Violation of the Duty to Preserve Evidence That Exists Independently and Apart From Specific Preservation Orders is Sanctionable**

The deletion of email also amounts to a failure to comply with the duty to preserve potentially relevant evidence that exists independently and apart from the Preservation Order. Even without a specific preservation order, a party has a duty to preserve potentially relevant evidence; once a party is on notice that litigation has been filed, courts uniformly impose such an obligation. *See, e.g.*, *William T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. 1443, 1445 (C.D. Cal. 1984), *aff'd* 104 F.R.D. 119 (C.D.Cal. 1985) (litigant "is under a duty to preserve what it knows, or reasonably should know, is relevant to the action, is reasonably calculated to lead to discovery of admissible evidence, is reasonably likely to lead to discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request"); *Howell v. Maytag*, 168 F.R.D. 502, 505 (M.D. Pa. 1996) ("A party which reasonably anticipates litigation has an affirmative duty to preserve relevant evidence").  In circumstances such as those present here, courts have entered default judgments and granted both evidentiary and monetary sanctions for the failure to preserve potentially relevant evidence.  *See William T. Thompson Co.*, 593 F. Supp. at 1455 (Courts have the power to impose sanctions "against a litigant who is on notice that documents and information in its possession are relevant

to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information").

In addition to the sanctioning authority provided by the Federal Rules, it is well-established in the District of Columbia Circuit that when "rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process," courts have an inherent power to impose sanctions for abusive litigation practices. *Shepherd v. Amer. Broadcasting Co.*, 62 F.3d 1469, 1472 (D.C. Cir. 1995); *see also Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) ("A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence" which includes "the power where appropriate to order the exclusion of certain evidence"); *Young*, 217 F.R.D. at 65. The court's inherent authority is most commonly invoked when there is no court order in place regarding the conduct at issue. *See, e.g. Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2nd Cir. 2002) ("even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent powers to manage its own affairs"). The Supreme Court has explained that a court's inherent powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. PASCO, Inc.*, 501 U.S. 32, 43 (1991).

A court's inherent authority enables the court to enter a wide variety of sanctions against the disobedient party, ranging from fines, fees, and costs, to "drawing adverse evidentiary inferences or precluding the admission of evidence" or even entering default judgment. *Shepherd*, 62 F.3d at 1474-75; *see also Young*, 217 F.R.D. at 70 (noting for example that "the Court in this case could bar Plaintiff from introducing any evidence of her emotional disability

claims because of her failure to provide medical records and cooperate in the independent medical evaluation").  A district court's exercise of its inherent powers is reviewed only for abuse of discretion.  *Shepherd*, 62 F.3d at 1475.

**B.    Philip Morris's Failure To Preserve Relevant Evidence Warrants The Imposition Of Sanctions**

As set out above, numerous Philip Morris employees, including eleven high level witnesses involved in matters directly relevant to the United States' claims in this action, failed to preserve email and attachments that were subject to the Preservation Order.  The only question to be decided by the Court, therefore, is whether or not to impose a sanction, and if so, what sanction.  Although the Federal Rules and the Court's inherent powers supply the authority for the Court to sanction Philip Morris for its violation of Order #1 and failure to preserve relevant evidence, the common law of spoliation is instructive in assessing Philip Morris's conduct and determining the appropriate sanction for the violation.  The District of Columbia Court of Appeals has made clear that "a plaintiff has a legally protectable interest in the preservation of evidence required for securing recovery in a civil case."  *Holmes v. Amerex Rent-A-Car*, 710 A.2d 846, 848 (D.C. 1998).  In *Battocchi v. Washington Hosp. Ctr.*, 581 A.2d 759, 766 (D.C. 1990), the Court of Appeals noted that the rule of spoliation "derives from the common sense notion that if the evidence was favorable to the non-producing party's case, it would have taken pains to preserve and come forward with it."  *Battocchi*, 581 A.2d at 766.  As another Federal District Court elaborated, "[r]ecognizing acts of spoliation and punishing the spoliators is the result of judicial recognition that the 'spoliated physical evidence' is often the best evidence as to what has really occurred and that there is an inherent unfairness in allowing a party to destroy

-32-

evidence and then to benefit from that conduct." *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 284 (E.D. Va. 2001).

This is particularly true of communications made by email.  As Philip Morris's Guide to Effective Information Management observes, "E-mail is spontaneous, informal, and easy to circulate instantaneously, and it usually draws a quick response. . . . And e-mail users do not have the benefit of the 'cooling off' period – a second opportunity to reflect on what they have written before transmitting it – that reviewing a written draft of a letter or memorandum provides."  A Guide to Effective Information Management (Ex. 41 to Wallmeyer Dep.) at 2085184518. Sanctions for spoliation are necessary because "[t]he destruction of evidence can lead to manifest unfairness and injustice, for it increases the risk of an erroneous decision on the merits of the underlying cause of action and can increase the costs of litigation as parties attempt to reconstruct the destroyed evidence or to develop other evidence that may be less persuasive, less accessible, or both." *Trigon Ins. Co.*, 204 F.R.D. at 285.

Spoliation claims in the District of Columbia are divided into two types: the deliberate destruction of evidence and the failure to preserve evidence.  *Battocchi*, 581 A.2d at 765; *see also Rice v. United States*, 917 F. Supp. 17, 19-20 (D.D.C. 1996) (following *Battocchi* and directing adverse inference instruction as sanction for defendant's destruction of evidence done with gross indifference or reckless disregard).  The former category encompasses the deliberate destruction of evidence as well as the destruction of evidence with reckless disregard for its relevance.  Both of these behaviors mandate that the court enter a strong inference that production of the destroyed evidence would have been unfavorable to the party responsible for its destruction.  The latter category includes destruction of evidence that was not done intentionally or recklessly, in which case the imposition of an adverse inference is within the court's discretion. *Battocchi*, 581

-33-

A.2d at 767.  In the present case, Philip Morris's conduct, as detailed in Section II above and further discussed below, demonstrates that Philip Morris USA and Altria Group designed policies that they knew would and did cause the destruction of relevant evidence subject to the Preservation Order and took none of the easy steps that would have preserved the evidence, thereby amounting to the deliberate destruction of evidence or, at the very least, the destruction of evidence with gross indifference or reckless disregard for its relevance.

In fashioning an appropriate sanction for spoliation, the Second Circuit recently held that a party seeking an adverse inference instruction based on the destruction of evidence must establish: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact would find that it would support the claim or defense." *Residential Funding Corp.*, 306 F.3d at 107; *see also Trigon Ins. Co.*, 204 F.R.D. at 286 (noting that in the Fourth Circuit, once the movant has shown that the adverse party had a duty to preserve the allegedly spoiled documents and that they were intentionally destroyed, "the degree of culpability and the prejudice suffered by the moving party will guide the Court in its formulation of remedial and punitive action"); *Republic of the Philippines v. Westinghouse Electric Corp.*, 43 F.3d 65, 74 (3rd Cir. 1995) (setting forth a two-part test, where the trial court must first consider conduct at issue and explain why sanctions are warranted and then consider a range of permissible sanctions and explain why it chose a particular sanction from the range of alternatives available).

1.      **Philip Morris's Failure to Preserve Email Was a Direct and Foreseeable Result of Official Company Policies**

As indicated above, the primary focus of a court's analysis in determining appropriate sanctions is on the spoliating party's actual conduct, particularly the party's state of mind with regard to the evidence destruction.  As *Battocchi* made clear, the court does not need to find that the spoliating party acted in bad faith to impose sanctions, rather it is within the court's discretion to award sanctions even for negligent spoliation.  *Battocchi*, 581 A.2d at 767; *accord Residential Funding*, 306 F.3d at 101 ("discovery sanctions, including an adverse inference instruction, may be imposed where a party has breached a discovery obligation not only through bad faith or gross negligence, but also through ordinary negligence");  *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) ("[w]e reject the argument that bad faith is an essential element of the spoliation rule); *Glover*, 6 F.3d at 1329 (a finding of bad faith is not required for spoliation sanctions); *Trigon Insurance Co.*, 204 F.R.D. at 286 ("proof of bad faith is not necessary to obtain relief for spoliation"); *Martin*, 186 F.R.D. at 604 (reviewing cases and concluding that "[b]oth courts and commentators agree that sanctions may be imposed for a party's unexcused failure to comply with a Rule 16 order, even if that failure was not made in bad faith").  In fact, subsequent to *Battocchi*, the Court of Appeals held that the merely negligent or reckless spoliation of evidence constituted an independent and actionable tort in the District of Columbia. *See Holmes*, 710 A.2d at 847.

As the Court in *Donato* explained, the sanction of an adverse inference should be available even for the negligent destruction of evidence if it is necessary to further the remedial purpose of the inference, because it:

> 'makes little difference to the party victimized by the destruction of the evidence
> whether that act was done willfully or negligently.  The adverse inference

provides the necessary mechanics for restoring the evidentiary balance.  The inference is adverse to the destroyer not because of any moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss.'

*Donato*, 172 F.R.D. at 83 (*quoting Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75 (S.D.N.Y. 1991)).  The Second Circuit's decision in *Residential Funding* is instructive on the issue of determining whether a party destroyed evidence with a "culpable state of mind."  The Second Circuit concluded that "the 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or *negligently*.'"  *Residential Funding Corp.*, 306 F.3d at 108 (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 109 (2nd Cir. 2001) (emphasis in original)).

In this case, Philip Morris USA and Altria were not merely negligent, but acted in bad faith by continuing monthly system-wide email deletions and recycling back-up tapes after entry of the Preservation Order.  Philip Morris was aware that its employees found company policies for the retention of email and electronic records to be unclear, resulting in the loss of email during monthly deletions, but did not take easily identifiable and cost-efficient steps to insure preservation of evidence that was relevant to the United States' claims in this action.

More specifically, as explained in Section II above, Philip Morris policy placed the obligation to retain email and attachments on its employees through the "print and retain" policy, but placed the "print and retain" requirement within myriad "intertwining" records retention manuals, notices, communications policies and other guidelines that employees found unclear and confusing.  *See e.g.,* Wallmeyer Dep., Dec. 19, 2002 at 222:7-11.  Philip Morris's senior management knew that employees found policies unclear and knew well before this action was filed and prior to entry of the Preservation Order that employees were handling email in a way

-36-

that led to its deletion and irretrievable loss.  *See* § II.A.4, *supra*.  Nevertheless, Philip Morris implemented and adhered to policies and practices that insured that its employees' confusion and corresponding records handling practices would continue to result in the irretrievable loss of email.  *See* §§ II.A.3.a and b, *supra*.  These policies were designed in a manner that guaranteed that no electronic archive of company email would ever exist.

When the Court entered the Preservation Order in this case, Philip Morris did not provide a copy of the Order to its employees, but instead only sent out a Disposal Suspension Notice, one of dozens that existed and indicated varying degrees of applicability to varying groups of employees at the company.  *See e.g.,* Brandt Dep. at 22:14-24:2; Wallmeyer Dep., Dec. 19, 2002 at 36:12-38, 222:7-11, Dec. 20, 2002 at 301:23-304:6.  Philip Morris continued system-wide deletions of email after entry of the Preservation Order, *purging its system 29 separate times after the Court required Philip Morris to preserve all relevant and potentially relevant documents*.  Wallmeyer Dep., Dec. 20, 2002 at 341:11-18 (indicating that deletions occurred on a monthly basis between October 1999 and April 2002).  At the same time, Philip Morris elected not to take inexpensive steps that could have insured compliance with the Preservation Order by guaranteeing the retention of all company email.  *See* § II.A.5, *supra*.

The combination of monthly system-wide deletions with a back-up retention period of only three weeks is an extraordinarily aggressive document management system.  The policy was almost certainly designed and implemented with litigation in mind, for it has the effect of insuring that an electronic archive of Philip Morris's email will never exist (and will never be available for discovery in litigation).  Philip Morris policy also insures that documents that are destroyed, whether inadvertently or intentionally, can never be recovered.  Whether designed and implemented with an eye toward litigation or not, however, the impact of the aggressive system

-37-

on Philip Morris's ability to retain documents for discovery was well-known at the highest levels of the company.  And Philip Morris designed and implemented this system, holding back-up tapes for only 21 days, while relying on individual employees to effectuate the task of preserving documents subject to court preservation orders or otherwise relevant to discovery.  Evidence demonstrates, however, that employees' obligations were communicated to them in such a confusing and ineffective manner that destruction of evidence in violation of the Preservation Order was guaranteed.  *See* §§ II.A.2 and II.A.3.[8]

Not only was Philip Morris aware that its policies and practices would likely lead to document destruction, but the policies and practices *did* lead to document destruction in a foreseeable manner.  Email of high level witnesses was deleted and irretrievably lost because employees "thought that their email was being retained, [but the loss of their email was caused by] their lack of understanding of how the IS system clean-up really worked coupled with the failure to fully follow the print and retain policy."  Wallmeyer Dep., Dec. 20, 2002 at 397:9-13.  The facts here, without more, demonstrate Philip Morris's culpability and the need for significant sanctions.  Moreover, the culpability and need for sanctions is reinforced even further as a result of two other factors: Philip Morris's status as an experienced and continual party to litigation and its prior discovery behavior in this action.

---

[8] For example, as set out above, notifications sent to employees prior to system-wide email deletions that were used both before and after the Court entered the Preservation Order contained no reference to the Court's Preservation Order in this case.  Wallmeyer Dep., Dec. 20, 2002 at  345:15-18, 346:7-12.  The notifications did not even inform employees of the print and retain policy, nor did they reference the company's obligation to otherwise preserve documents and information for litigation.  It was not until more than two years after this action was filed that Philip Morris changed the notification to specifically remind employees of the print and retain requirement for disposal suspended records.  Ex. 33 to Wallmeyer Dep. at 2067540183, 0185; Wallmeyer Dep., Dec. 20, 2002 at 345:19-346:24.

a.    **As an Experienced Litigant With Experienced Counsel, Philip Morris Should Have Taken Steps to Avoid the Destruction of Evidence**

Philip Morris's status as an experienced and continual party to litigation increases its

culpability in this instance.   The *Donato* court, for instance, noted:

> The failure of Defendant Orangetown to safeguard this evidence is
> even more egregious because the Orangetown Police Department
> is, or should be, in the business of ensuring that evidence is
> handled properly.  This is not a situation where an organization
> unaccustomed to the requirements of maintaining a chain of
> custody and retaining important evidence has failed to preserve and
> protect items relevant to litigation.  Rather the town of
> Orangetown, through its Police Department, is experienced, and
> has procedures in place, with regard to retaining and safeguarding
> evidence.  There is no excuse for their failure in this instance.

*Donato*, 172 F.R.D. at 80 (finding gross negligence on part of defendant Orangetown in failure to

preserve evidence); *see also Jeanblanc v. Oliver Carr Co.*, Civ. A. No. 91-0128 (JHG), 1992 WL

189434, *2 (D.D.C. July 24, 1992) (emphasizing that the spoliating party was an attorney who

had worked as a professor of law for 20 years and had practiced law for another 20 years).

Leslie A. Braun, the Director, Legal Financial Policy and Analysis for Altria Corporate

Services, Inc. (formerly Philip Morris Management Corporation), submitted a Declaration in this

action in which she indicated that "[t]he Philip Morris defendants regularly have been in

litigation involving smoking and health issues since 1954, and have defended themselves in

thousands of smoking and health actions since then, filed in federal and state courts across the

United States."  Declaration of Leslie A. Braun (attached as Ex. 45), ¶ 4 at 2. Ms. Braun further

avers:

> [A]s of December 31, 2002, there were approximately 1,350
> smoking and health cases filed and served on behalf of individual
> plaintiffs in the United States against one or both of the Philip
> Morris defendants.  Moreover, in certain jurisdictions, individual
> smoking and health cases have been aggregated for trial in a single

proceeding; the largest such proceeding aggregates 1,250 cases in West Virginia, and is currently scheduled for trial in June 2003. Approximately 2,800 additional individual cases by current and former flight attendants claiming personal injuries allegedly related to ETS were pending in Florida. There were also an estimated 40 smoking and health putative class actions pending in the United States against one or both of the Philip Morris defendants. Finally, there were an estimated 41 health care cost recovery actions pending in the United States against one or both of the Philip Morris defendants.

*Id.*, ¶ 5 at 2.

Moreover, as the Court is aware, Philip Morris is represented by experienced counsel in its litigation. In this action alone, five major law firms are actively acting as counsel for Philip Morris USA and Altria Group: Arnold & Porter; Hunton & Williams; Paul, Weiss, Rifkind, Wharton & Garrison; Wachtell, Lipton, Rosen & Katz; and Winston & Strawn. There is no question that litigation has been and continues to be a part of doing business for Philip Morris. As an experienced litigant with experienced counsel, Philip Morris should have recognized the need to take sufficient affirmative steps to preserve its email. Philip Morris did not do so. Moreover, evidence shows that Philip Morris could have easily prevented the failure to comply with the Preservation Order, but adhered to policies and practices that it knew were virtually guaranteed to lead to the loss of relevant evidence.

> **b.    The Record of Philip Morris's Behavior Throughout the Discovery Phase of This Action Provides Further Support for the Imposition of Sanctions**

In addition, when determining what sanction to enter pursuant to Rule 37, courts consider the behavior of the disobedient party throughout the entire discovery phase. As the court noted in *Adolph Coors Co.*, "the specific discovery dispute underlying [the moving party's] current motion for sanctions must be viewed against the background of [the disobedient party's] other

behavior during the discovery phase of this lawsuit." 164 F.R.D. at 509; *see also Republic of the Philippines*, 43 F.3d at 74 ("[o]bviously, a pattern of wrongdoing may require a stiffer sanction than an isolated event"); *GTFM, Inc. v. Wal-Mart Stores, Inc.*, No. 98 CIV. 7724 RPP, 2000 WL 335558, *3 (S.D.N.Y. Mar. 30, 2000) (awarding 37(b)(2) sanctions for defendant's failure to timely produce computer records and noting that "defendant's track record on compliance with discovery requests has been poor both in this case and in other cases. Hopefully, these sanctions will serve as a deterrent against further discovery abuses by defendant in this case and in future cases").

The Court is acutely familiar with Philip Morris's behavior throughout discovery in this action. Most notably, that behavior included the production of more than 2.5 million pages of documents after the Court's deadline for the completion of document production in this case. Tens of thousands of pages of those documents were not only provided after the production deadline, but after the close of fact discovery, even after the fact discovery deadline was extended by more than a year. *See* Order #230. Philip Morris's behavior also necessitated the entry of Orders #375 and #384, which were required due to Philip Morris's stated intention to undertake an archive review process that, without the Court's intervention, would have resulted in continued production of documents beyond the start of trial. *See* Memorandum Order #375 at 2. And Philip Morris failed even to comply with the Court's direction in Order #384 when it did not complete the review of archived documents by September 8, 2003 and did not complete the production of documents identified in the review process until September 26, 2003. Yet Philip Morris did not notify the Court of its inability to comply or request an extension of time to complete what the Court's orders required.

The lack of candor evidenced by the foregoing behavior extended to the circumstances surrounding Philip Morris's failure to comply with the Preservation Order.  As detailed at length above, Philip Morris waited until four months after it first discovered the deletion of employee email before it notified the Court and the United States of the document destruction.  *See* § II.B.1, *supra*.  Despite learning of the deletion of certain employees' email during "the course of preparation for depositions and interviews with employees in the time period between February and June 2002," Wallmeyer Dep., Dec. 20, 2002 at 386:19-21, Philip Morris twice refused to identify the eleven high level witnesses upon inquiry from the United States.  *See* July 17, 2002 letter from Frederick to Brooker and Goldfarb at 2; September 4, 2002 letter from Cecil to Brody at 3.  In the end, Philip Morris did not identify the particular employees at issue until December 2002, *after* the United States had taken the depositions of the ten employees.[9]

2.      **The Irretrievable Loss of Email Is An Insoluble Problem and Prejudices the United States' Ability to Pursue Its Claims in This Action**

Email provides employees with a "quick and simple" means to communicate internally within the company or with other companies.  Matthew J. Bester, *A Wreck on the Info-Bahn: Electronic Mail and the Destruction of Evidence*, 6 Comm. L. Conspectus 75, 75-76 (1998). Email is recognized as "the dominant form of business communication today."  Chris O'Reilly & Jason Derting, *Technolawyer.com: True Electronic Discovery Has Come of Age*, 5 No. 2 Lawyers J. 4, Jan. 24, 2003.  White collar workers send/receive an average of 30 e-mails per day. *Id.*  Documents show that as early as 1995, daily email volume at Philip Morris had reached 20,300 messages.  Electronic File Room Project, September 19, 1995 at 2075067235.

---

[9] Certain of the employees were re-deposed in 2003, but the depositions were taken subject to the restrictions contained in Order #302.

-42-

Commentators have found that the unique nature of email makes it highly relevant and useful in litigation.  Specifically, employees tend to be more candid and revealing in their email messages because they view email as "'informal, confidential, and not permanent.'"  Samuel A. Thumma & Darrel S. Jackson, *The History of Electronic Mail in Litigation*, 16 Santa Clara Computer & High Tech. L.J., 1, 3 (1999).  As one commentator found, email is often considered to afford employees with an opportunity to "communicate more casually" and thus "employees often turn to e-mail to transmit messages that they once would have communicated via telephone."  Christopher V. Cotton, *Document Retention Programs for Electronic Records: Applying a Reasonableness Standard to the Electronic Era*, 24 J. Corp. L. 417, 426 (1999).  The "conversational tone often seen in email has caused liability for companies in lawsuits" because "e-mail users often do not realize their messages may be saved."  Bester, 6 Comm. L. Conspectus at 75.  Because e-mail authors "tend to be more informal and frank in e-mails within their organizations, these communications often reveal important information not available on paper."  Stephen Zovickian, *Electronic Discovery in Construction Litigation*, 18 Construction Law. 8 (July, 1998); *see also* Charles A. Lovell & Roger W. Holmes, *The Dangers of E-Mail: The Need for Electronic Data Retention Policies*, R.I.B.J., Dec. 1995, at 7 ("E-mail users often perceive their correspondence as ephemeral and, accordingly, do not exercise discretion in their communications").  In fact, this Court recognized the importance of e-mail evidence in the landmark case *United States v. Microsoft Corp.*, citing numerous admissions contained in internal emails authored by Microsoft executives as evidence of Microsoft's intent to engage in anti-competitive behavior.  No. CIV. A. 98-1232, 1998 WL 614485, at *4-6 (D.D.C. Sept. 14, 1998) (attached as Ex. 46).

This Court also has noted that where the spoliating party's destruction of evidence makes it difficult or impossible to make a precise showing of the nature of the prejudice suffered, it may not even be necessary for the Court to make a finding of prejudice to the litigant.  *See, e.g., Jeanblanc*, 1992 WL 189434, at *2.  In *Jeanblanc*, the plaintiff purposefully destroyed all documents relating to the subject matter of the case after the case had been filed, but before any discovery requests had been served.  The Court noted that "[b]y virtue of the total destruction, it is impossible to ascertain the volume or contents" of the destroyed documents.  *Id.* at *2. Notwithstanding this fact, the Court in *Jeanblanc* found that the defendant's case had been prejudiced by the document destruction because the defendant was not able to effectively cross examine the plaintiff regarding the documents.  As a result, the Court dismissed the part of the plaintiff's complaint that dealt with the documents the plaintiff destroyed.  Similarly, in *Monroe v. Ridley*, 135 F.R.D. 1, 6 (D.D.C. 1990), this Court found that it was "impossible to know how much plaintiff's case may have suffered because of defendant's obstructive tactics" and for that reason prejudice could be presumed even without a showing of actual prejudice.  As the Eighth Circuit aptly concluded, "[o]bviously the relevance of and resulting prejudice from destruction of documents cannot be clearly ascertained because the documents no longer exist.  Under the circumstances, [the culpable party] can hardly assert any presumption of irrelevance as to the destroyed documents."  *Alexander v. National Farmers Org.*, 687 F.2d 1173, 1205-06 (8th Cir. 1982) (citations omitted); *see also Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 557 (N.D. Ca. 1987) (inferring that destroyed documents were relevant to the action).

Here, due to Philip Morris's destruction and irretrievable loss of email the United States will never know what admissions the emails may have contained.  This is precisely why meaningful sanctions are necessary to address spoliation in litigation, particularly spoliation of

this magnitude, where the lost evidence results from an overwhelming degree of culpability on the part of Philip Morris and Altria Group and constitutes the email of high level witnesses who worked on issues that are vitally important to the United States' claims.

      As set out in Section II.B.2, the employees specifically identified by Philip Morris as those who failed to preserve relevant email include officers and supervisors with responsibility for virtually all aspects of Philip Morris's marketing and promotion of its cigarette brands, including the marketing and promotion of Marlboro, the cigarette brand most often smoked by underage youth (accounting for 55% of the youth market).  *See* Substance Abuse and Mental Health Services Administration 2001 National Household Survey on Drug Abuse (attached as Ex. 47).  Philip Morris deleted and irretrievably lost email of employees with responsibility for: (1) tracking cigarette brand demographics such as the age and race of smokers as well as where they lived and where they purchased their cigarettes;[10] (2) the review of yearly marketing plans;[11] (3) planning, creating, and executing Marlboro event programs, such as the Marlboro Bar Program, the Marlboro Party at the Ranch Program, and the Marlboro Racing School;[12] and (4) conducting consumer research on individual smokers through means such as interviews and focus groups and using Philip Morris databases which track cigarette market share figures to support Philip Morris's marketing initiatives.[13]  Philip Morris deleted and irretrievably lost email from employees serving as: (1) the highest level person at Philip Morris who is responsible for

---

[10] Hollis Dep. at 16:25-17:4, 19:12-20:4.

[11] Lund Dep. at 16:7-20:5, 90:4-12.

[12] Sampson Dep. at 63:10-81:24.

[13] Teitelbaum Dep. at 16:22-29:3

marketing Marlboro;[14] (2) the Senior Vice President for Marketing at Philip Morris;[15] (3) a Senior Brand Manager for Marlboro at Philip Morris USA;[16] and (4) the Director of Marketing and Sales Decision Support.[17]

As is also set out in Section II.B.2, the employees specifically identified by Philip Morris as those who failed to preserve relevant email include officers and supervisors with responsibility for corporate policy, Master Settlement Agreement compliance, media relations and public statements and positions on issues highly relevant to the United States' claims in this action, such as the health effects of exposure to cigarette smoke.  Philip Morris deleted and irretrievably lost email of employees with responsibility for: (1) communicating Philip Morris's positions to the media on tobacco-related issues, including, for example, message points for use in response to likely media inquiries regarding a Philip Morris brochure for parents on youth smoking prevention and a "message track" for responding to the American Legacy Foundation's "Truth" advertising campaign;[18] (2) all press releases that are issued by Philip Morris USA regarding Philip Morris's business policies and positions;[19] and (3) advertising and communication of Philip Morris's positions on tobacco related issues, including the Master Settlement Agreement

---

[14] LeVan Dep. at 14:4-17:17.

[15] Lund Dep. at 16:7-20:5, 90:4-12.

[16] Sampson Dep. at 63:10-81:24.

[17] Teitelbaum Dep. at 16:22-29:3.

[18] Merlo Dep., June 11, 2002 at 16:11-17:23, June 12, 2002 at 368:22-371:20, June 26, 2003 at 702:18-704:22; 2085799973-9979; 2085802441B-2441C.

[19] Pfeil Dep. at 114:4-115:13.

and environmental tobacco smoke.[20]  Philip Morris deleted and irretrievably lost email from employees serving as: (1) Director of Corporate Responsibility, Planning and Programs;[21] (2) Senior Vice President of Corporate Affairs;[22] and (3) Vice President of Communications and Public Affairs.[23]

The employees specifically identified by Philip Morris as those who failed to preserve relevant email also include officers and supervisors with responsibility for research on potentially less harmful cigarette products, as well as new cigarette product design and development.  In addition, Philip Morris's unsuccessful effort to retrieve documents destroyed in violation of the Preservation Order demonstrated that the loss of email spread well beyond the eleven high level witnesses specifically identified to an undeterminable percentage of the thousands of other email users at Philip Morris.  *See* § II.B.3, *supra*.

 Therefore, although the exact communications contained in the destroyed emails will never be known, it is clear that Philip Morris's destruction of email has forever foreclosed the United States from utilizing all relevant discovery affirmatively and from effectively deposing and cross-examining Philip Morris employees regarding their email communications.  *See Jeanblanc*, 1992 WL 189434, at *3; *see also William T. Thompson Co.*, 593 F. Supp. at 1456 (in determining the amount of prejudice suffered by the moving party, courts consider the materiality

---

[20] Culley Dep. at 10:21-19:8, 50:4-54:19.

[21] Culley Dep. at 10:21-19:8.

[22] Merlo Dep., June 26, 2003 at 702:18-704:22.

[23] Pfeil Dep. at 114:4-115:13.

and value of the suppressed evidence upon the moving party's ability to fully and fairly prepare

for trial).

**C.    The Court Should Impose Evidentiary And Monetary Sanctions Against Philip Morris USA And Altria Group**

   **1.    The Determination of an Appropriate Sanction is Left to the Court's Discretion**

As stated previously, a Federal District Court's available sanctions for spoliation of

evidence range across a wide spectrum, from the most extreme – dismissing the defendant's

answer and entering a default judgment – to the least effective – instructing a defendant never to

repeat such a practice.  *Donato*, 172 F.R.D. at 81; *see also Monroe*, 135 F.R.D. at 5 (noting that

Rule 37(b)(2) authorizes a "broad range of sanctions," from an order to pay reasonable attorney's

fees to default judgment and dismissal).  The "determination of an appropriate discovery sanction

is left to the discretion of the trial court."  *Hull v. Eaton Corp.*, 825 F.2d 448, 452 (D.C. Cir.

1987).  As the Court of Appeals noted in *Hull*, the trial court's decision can only be reversed if its

actions were ". . . clearly unreasonable, arbitrary or fanciful.'"  *Id.* at 452 (quoting *Northrop Corp.

v. McDonnell Douglas Corp.*, 751 F.2d 395, 399 (D.C. Cir. 1984)); *National Hockey League*,

427 U.S. at 642.

   **2.    Severe Evidentiary and Monetary Sanctions Should Are Necessary to Insure the Integrity of Judicial Proceedings in Cases Involving Spoliation of Evidence in Circumstances Such as Those Present Here**

Although courts routinely impose evidentiary sanctions pursuant to Rule 37 for various

violations of discovery orders, one decision in particular is especially instructive in deciding the

instant matter.  The case *In re Prudential Insurance Co.,* 169 F.R.D. 598, 599 (D.N.J. 1997)*,* is

instructive in the instant situation, although, as a discussion of the *Prudential* case makes clear,

Philip Morris is far more blameworthy than Prudential and the prejudice caused by Philip

-48-

Morris's actions is more severe than that resulting from the spoliation of evidence by Prudential.

*Prudential* should therefore be considered as a starting point for the development of sanctions to

be imposed against Philip Morris USA and Altria Group.

At issue in *Prudential* was a claim by a class of Prudential policy holders that Prudential

had engaged in a scheme to sell life insurance through deceptive sales practices.  The court's

opinion in *Prudential* "addresse[d] the persistent and recurrent destruction of documents" by

agents and employees of the defendant.  *Id.* at 599.  The court in *Prudential* noted that:

> Because the preservation of documents and their availability for
> production is essential to the orderly and expeditious disposition of
> litigation, document destruction impedes the litigation process and
> merits the imposition of sanctions.  Notwithstanding the absence of
> willful document destruction, repeated destruction of potentially
> discoverable materials demands that this Court preserve and
> protect its jurisdiction and the integrity of the proceedings before it.

*Id.* at 599.

The *Prudential* decision contained a number of key factual similarities to the instant

situation, including the following: (1) as in this case, the court in *Prudential* issued a document

preservation order bearing identical language to Order #1, requiring, among other things, that "all

parties 'preserve all documents and other records containing information potentially relevant to

the subject matter of this litigation'" (*id.* at 600); (2) as in this case, plaintiffs' co-lead counsel

learned from Prudential's counsel that documents relevant to the litigation had been improperly

destroyed during the pendency of the litigation; (3) as in this case, Prudential did not dispute that

it had violated the court's document preservation order; (4) as in this case, Prudential claimed to

have had in place a "written policy concerning the proper handling and retention and/or

destruction of documents" (*id.* at 601); (5) as in this case, Prudential distributed its document

retention instructions to its employees on a number of occasions, principally through an e-mail

system (*id.* at 601-02); and (6) like Philip Morris, Prudential never provided its employees with a copy of the court's preservation order (*id.* at 612).

Unlike the situation here, Prudential's document preservation policies went further than Philip Morris's in several key respects.  For instance, unlike Philip Morris's document management policies and missives, Prudential's policy stated: "When in doubt about retaining a particular document, save it!"  *Id.* at 603.  Top management at Prudential recognized that the allegations in the case were "an extremely important part of Prudential's business" and that the company was required to preserve documents in connection with the litigation.  *Id.* at 604.  In fact, Prudential's Chief Executive Officer recognized that "in all communications, it's the obligation of management to insure that people understand that laws are to be followed, regulations are to be followed, and doing the right thing is to be followed."  *Id.* at 605.  Unlike Philip Morris, Prudential's Chief Financial Officer acknowledged the company's obligation went beyond merely advising employees of their court-ordered responsibilities, but included auditing their compliance – something that Philip Morris has failed to do, even after top management became aware that employees found the requirements for the retention of email to be unclear.  *See id.* at 605; § II.A.5, *supra*.  *See also Turnage*, 115 F.R.D. at 557-58 (noting that the "obligation to retain discoverable materials is an affirmative one; it requires that the agency or corporate officers having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials").  And, most significantly, Prudential, unlike Philip Morris, did not design, implement and adhere to unusually aggressive deletion policies and practices that it knew would result in the destruction of relevant evidence by employees.  In addition, the destruction by Philip Morris in this case resulted from the affirmative deletion of documents pursuant to official company policy – a 21-day back-up tape recycling requirement

-50-

that was almost certainly designed with an eye toward its ability to limit the amount of email available to litigation opponents in discovery.

The court in *Prudential* concluded that Prudential's document preservation policy failed to "preserve documents and to prevent their destruction" and was "ineffective and failed to implement this Court's document preservation Order." *Id.* at 613.  In reaching this conclusion, the *Prudential* court emphasized the fact that most of the preservation notices were never distributed in hard copy, and numerous witnesses testified that they received so many e-mails that they ignored any new e-mails they received.  Moreover, not all employees had access to e-mail, and therefore these employees never received certain document retention notices. *Id.* at 604, 613. In addition, the *Prudential* court noted that there was no evidence that Prudential had a written manual that would "evidence that Prudential possesses a clear and unequivocal document preservation policy capable of retention by Prudential employees and available for easy reference." *Id.* at 613.

Prudential's policies failed to establish "uniform guidelines and do not represent the systematic process necessary to preserve documents." *Id.* at 613.  The *Prudential* court further emphasized that despite Prudential's preservation policies, relevant documents were destroyed in at least four Prudential offices across the country. *Id.* at 613.  As is true in the instant case, the *Prudential* court noted that because Prudential failed to keep a "document destruction index" or similar procedure, "the Court and the litigants are currently unaware of the documents that were destroyed. . . ." and as a result "all concerned are forever foreclosed from the receipt of this information." *Id.* at 613.  The court also faulted Prudential for failing to have a simple and expedient procedure for identifying and reporting document destruction to senior management.

*Id.* at 614.  Weeks elapsed between discovery of the document destruction and notification of senior management and the court, *id.*; with Philip Morris, the period was months.

The court found that "[w]hile there is no proof that Prudential, through its employees, engaged in conduct intended to thwart discovery through the purposeful destruction of documents, its haphazard and uncoordinated approach to document retention indisputably denies its party opponents potential evidence to establish facts in dispute." *Id.* at 615.  The *Prudential* court applied the Third Circuit's two-part test found in *Republic of the Philippines*, and with respect to Prudential's conduct, found that although there was no evidence of willful misconduct, Prudential's "consistent pattern of failing to prevent unauthorized document destruction" warranted "the imposition of substantial sanctions." *Prudential* at 616.  With respect to the prejudice caused, the court emphasized that over 9,000 files were destroyed and that Prudential – like Philip Morris – was unable to specify what documents were destroyed or from which files the documents were taken.  Because the destroyed documents can never be retrieved, the court found that "the resultant harm is incalculable." *Id.* at 616.  The *Prudential* court further found that by virtue of the time devoted to the issue of document destruction, both in and out of court, Prudential's document destruction had "hindered and burdened the administration of justice" and that there were no mitigating factors.  *Id.* at 616.  With respect to the second part of the Third Circuit's test, namely the existence of less severe sanctions, the *Prudential* court decided that imposing seven different Rule 16(f) sanctions "befits Prudential's conduct and is absolutely necessary to remedy the waste of judicial resources that Prudential has caused and to protect the authority of the Court." *Id.*

Specifically, in addition to requiring Prudential to submit a written manual of the company's document preservation policy and to establish a telephone "hotline" to accommodate

anonymous reports of document destruction at the company, the *Prudential* court awarded the

moving party fees and costs and issued a monetary sanction of $1,000,000 against Prudential.

The monetary sanction was intended to:

> inform[] Prudential and the public of the gravity of repeated
> incidents of document destruction and the need of the Court to
> preserve and protect its jurisdiction and the integrity of the
> proceedings before it.  In the assessment of the monetary sanction,
> the Court has considered the financial worth of Prudential and the
> minimal financial impact this sanction will have on Prudential's
> financial stability.

*Id.* at 617.

The *Prudential* court further noted that "[i]t is not uncommon for large corporations with

vast resources to impede the discovery process through methods and processes that frustrate the

production of relevant and unprivileged documents.  Courts must be vigilant to prevent that type

of conduct when it occurs and must impose meaningful sanctions to protect the integrity of the

proceedings before it."  *Id.* at 617, n.15.   The monetary sanction also was necessary

because"[t]he imposition of lesser sanctions would serve to diminish the harm that occurred, as

well as the integrity of the proceedings before this Court."  *Id.* at 617.

Other courts have similarly stressed the importance of meaningful sanctions to protect the

integrity of judicial proceedings.  As the Supreme Court noted with regard to the ultimate

sanction of dismissal:

> the most severe in the spectrum of sanctions provided must be
> available to the district court in appropriate cases, not merely to
> penalize those whose conduct may be deemed to warrant such a
> sanction, but to deter those who might be tempted to such conduct
> in the absence of such a deterrent . . . it might well be that These
> respondents would faithfully comply with all future discovery
> orders entered by the District Court in this case.  But other parties
> to other lawsuits would feel freer than we think Rule 37

contemplates they should feel to flout other discovery orders of
other district courts.

*National Hockey League*, 427 U.S. at 643.

As the Second Circuit noted in *Update Art, Inc. v. Modiin Publishing, Ltd.*, compliance
with discovery orders is "necessary to the integrity of our judicial process." 843 F.2d 67, 73 (2nd
Cir. 1988) (affirming entry of terminating sanctions for defendants' repeated failure to comply
with discovery orders). A party who "flouts such orders does so at his peril." *Id.* A court
"'should not shrink from imposing harsh sanctions where . . . they are clearly warranted." *Cine
Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2nd
Cir. 1979). Sanctions such as preclusion of evidence and dismissal of the action are "necessary
to achieve the purpose of Rule 37 as a credible deterrent 'rather than a paper tiger.'" *Update Art,
Inc.*, 843 F.2d at 71 (quoting *Cine Forty-Second Street Theatre Corp.*, 602 F.2d at 1064). This
Court has not hesitated to enter even the ultimate sanction – default judgment – for a party's
failure to comply with discovery orders. *See, e.g. Monroe*, 135 F.R.D. at 5 (entering default
judgment and attorney's fees award against defendant for failure to comply with discovery
orders).

In this case, Philip Morris's failure to preserve relevant email from key witnesses must be
met with sanctions to protect the integrity of proceedings before the Court and to address the
prejudice to the United States resulting from Philip Morris's document destruction. Philip
Morris's conduct is more egregious than that of Prudential, and the loss of evidence more
significant. Accordingly, the Court should impose both evidentiary and monetary sanctions
against Philip Morris USA and Altria Group.

**3.    Evidentiary Sanctions Should Include Evidentiary Inferences and Preclusion**

      **a.    The Court Should Infer That Philip Morris Targeted Youth in its Marketing, Manipulated the Nicotine Levels in its Cigarettes and Failed to Market Potentially Less Hazardous Cigarettes After October 19, 1999**

As set out at length above, the Court, in its discretion, should respond to circumstances in which a party fails to present, loses, or destroys evidence.  *See Vodusek*, 71 F.3d at 156 (4th Cir.1995).  As further detailed above, a Court may consider default judgment or summary judgment, or permit an adverse inference to be drawn against a party, as a means to "level the evidentiary playing field and for the purpose of sanctioning improper conduct." *Vodusek,* 71 F.3d at 156.  The application of this rule "must take into account the blameworthiness of the offending party and the prejudice suffered by the opposing party."  *Anderson v. National R.R. Passenger Corp.*, 866 F.Supp. 937, 945 (E.D.Va. 1994).  Additionally, whether or not a party has notice of the evidence's relevance to a lawsuit must be considered. *See id.*  As noted above, where spoliation results from destruction of evidence done with gross indifference or reckless disregard, this Court has directed adverse inference instructions.  *Rice*, 917 F. Supp. at 19-20 (D.D.C. 1996) (following *Battocchi*).  *See also* Fed. R. Civ. P. 37(b)(2)(A) (Court may enter "an order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action").

The blameworthiness of Philip Morris USA and Altria Group is well-established.  Senior management at Philip Morris Companies (Altria Group) designed and implemented destruction policies throughout the Philip Morris Companies, including Philip Morris USA, despite the awareness that its policies and practices for the regular deletion of employee email led to the loss of relevant documents.  *See* §§ II.A.1-5, II.B.1-3.  Philip Morris and Altria took no legitimate

-55-

steps to insure compliance with the Preservation Order.  Philip Morris USA, pursuant to

company-wide policies, continued system-wide deletions even after the entry of the Preservation

Order, and deleted its employees' email 29 separate times over a period of two and a half years

following entry of Order #1.  Wallmeyer Dep., Dec. 20, 2002 at 341:11-18.  At the same time,

Philip Morris USA adhered to the requirement, imposed by Altria Group, that it recycle its back-

up tapes after only 21 days.

The prejudice suffered by the United States is also well-established.  As set out at length

above, email is recognized as "the dominant form of business communication today," O'Reilly &

Derting, *Technolawyer.com: True Electronic Discovery Has Come of Age*, one in which

employees tend to be more candid and revealing because they view email as "'informal,

confidential, and not permanent.'"  Thumma & Jackson, 16 Santa Clara Computer & High Tech.

L.J. at 3.  As further detailed above, the actions of Philip Morris USA and Altria Group led to the

irretrievable loss of potentially candid and revealing communications in this dominant form of

business communication from high level officers and supervisory witnesses in marketing,

research, and corporate and public affairs, all of whom were responsible for matters that are

highly relevant to the United States claims.  Philip Morris cannot deny knowledge of the

relevance of the work of these employees to this action, nor can it deny awareness of its

obligation to preserve the email.

A court has "broad discretion to permit a jury to draw adverse inferences from a party's

failure to present evidence, the loss of evidence, or the destruction of evidence." *Vodusek,* 71

F.3d at 156.  *See also Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir. 1993) ("A federal trial

court has the inherent discretionary power to make appropriate evidentiary rulings in response to

the destruction or spoliation of relevant evidence"); *Akiona v. United States,* 938 F.2d 158, 161

(9th Cir. 1991), *cert. denied,* 503 U.S. 962 (1992).  This inference suggests that the destroyed

evidence would have been unfavorable to the party responsible for its destruction.  *See Vodusek*

71 F.3d at 156; *Schmid v. Milwaukee Electric Tool Corp.,* 13 F.3d 76 (3rd Cir. 1994).  An

adverse inference may be appropriate even absent "bad faith" on the part of the party responsible

for destroying the evidence.  *See e.g., Glover,* 6 F.3d at 1329.   The adverse inference is based on

two rationales, one evidentiary and one prophylactic:

> The evidentiary rationale is nothing more than the common sense
> observation that a party who has notice that a document is relevant
> to litigation and who proceeds to destroy the document is more
> likely to have been threatened by the document than is a party in
> the same position who does not destroy the document.... The other
> rationale for the inference has to do with its prophylactic and
> punitive effects. Allowing the trier of fact to draw the inference
> presumably deters parties from destroying relevant evidence before
> it can be introduced at trial.

*Akiona,* 938 F.2d at 161 (quoting *Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.,* 692

F.2d 214, 218 (1st Cir. 1982)).

In this instance, the Court should tie evidentiary inferences to the substance of work

performed for Philip Morris by the employees specifically identified as those who failed to

preserve relevant email.  As set out above, those employees had integral responsibility for the

development and implementation of Philip Morris's marketing plans and supervised research

related to cigarette design and potentially less hazardous cigarettes.

As to marketing, the United States alleges, *inter alia*, that as part of the alleged scheme to

defraud, defendants, including Philip Morris, have used a full range of marketing tools available

to them to encourage trial and continuing purchase of their cigarette products by young people.

More specifically, the United States alleges that "[d]espite the illegality of sales to children, and

despite denying that they do so, [defendants] have engaged in a campaign to market cigarettes to

children."  First Amended Complaint, ¶ 94 at 39-40.  The United States further alleges that defendants "researched how to target their marketing at children and actively marketed cigarettes to children" through targeted advertising campaigns that are "intended to entice young people to smoke."  *Id.*, ¶¶ 95-96 at 40.

Due to the destruction of the email of officers and supervisory employees at Philip Morris USA with responsibility for cigarette marketing, the United States is forever foreclosed from the opportunity to fully evaluate the process by which these high level witnesses developed and implemented marketing initiatives.  For example, the United States will not be privy to the full record of communications concerning the review of annual Philip Morris marketing plans by Ms. Lund, the Senior Vice President for Marketing at Philip Morris.  The United State will never be able to review all of the email communications of Ms. Teitelbaum, the Director of Marketing and Sales Decision Support, and her work with primary and secondary research, including consumer research conducted on individual smokers through means such as interviews and focus groups to support Philip Morris' marketing initiatives.

The significance of the destruction of Ms. Teitelbaum's email is shown, for instance, by the fact that it precludes the United States from obtaining communications on the subject of the composition of focus research groups at Philip Morris that may be vital to countering statements such that made by Ms. Merlo, another employee who failed to preserve email, in deposition in this action.  Ms. Merlo asserted, "When we did focus groups or brought people together, it was always people who were 21 years of age or older."  Dep. of Ellen Merlo, June 12, 2002, 334:12-15.  The Court should infer that the email of Ms. Teitelbaum and Ms. Merlo would show that Philip Morris's focus groups, whether or not composed exclusively of persons 21 years of age or older, were used as research to develop advertising and marketing campaigns that target youth.

The Court should similarly infer that the additional lost email from other marketing employees, including the Vice President of Marlboro (who was formerly the Vice President of Philip Morris Premium Brands from 1991-2001), Suzanne LeVan, and Senior Brand Manager for Marlboro, Steve Sampson, shows that after October 19, 1999, the date of the Preservation Order, Philip Morris researched how to target its marketing at children and actively marketed cigarettes to youth through advertising and marketing campaigns that are intended to entice young people to initiate and continue smoking.

In addition, the Court should impose an evidentiary inference as a sanction for the failure to preserve email related to Philip Morris's research efforts.  Two of the eleven high level witnesses specifically identified by Philip Morris as those who failed to retain email subject to the Preservation Order are scientists: Hector Alonso and Peter Lipowicz.  Dr. Alonso and Dr. Lipowicz both have conducted research related to cigarette ingredients and design issues, including Philip Morris's research related to the development of potentially less hazardous products, areas that are directly relevant to the United States' allegations in this case.  With respect to cigarette ingredients, the United States alleges, *inter alia*, that defendants, including Philip Morris, "[a]t the same time they were denying the addictiveness of nicotine . . . were developing and using highly sophisticated technologies designed to deliver nicotine in precisely calculated ways that are more than sufficient to create and sustain addiction in the vast majority of individuals who smoke regularly."  First Amended Complaint, ¶ 77 at 34.  As to the failure to develop less hazardous products, the United States asserts that defendants, including Philip Morris, maintained a concerted plan not to make cigarettes less hazardous "by restraining, concealing and suppressing the research and marketing of less hazardous cigarettes."  *Id.*, ¶ 104 at 43.  More specifically, the United States asserts that "[d]espite their demonstrated ability to

design cigarettes that they believed were less hazardous, defendants have refused to test and/or actively promote such products, and have suppressed the marketing of such products by others." *Id.*, ¶ 108 at 44.

The Court should infer that the email deleted from the files of Dr. Alonso and Dr. Lipowicz, first, shows that Philip Morris manipulated the nicotine levels in its cigarettes in order to create and sustain smokers' addiction and, second, reveals efforts by Philip Morris to suppress the research and marketing of less hazardous cigarettes after October 19, 1999. Such inferences are directed to both the evidentiary and prophylactic rationales for the imposition of evidentiary inferences as a sanction for spoliation. *See Akiona,* 938 F.2d at 161; *Nation-Wide Check Corp.,* 692 F.2d at 218. The direction to the evidentiary rationale is demonstrated by the connection between the inference and both the work conducted at Philip Morris by Dr. Alonso and the subject matter of the expert testimony to be offered by Dr. Lipowicz, who is not only a designated expert but also a Philip Morris scientist.[24] The direction to the prophylactic rationale is apparent in the ability of these inferences to deter parties from destroying relevant evidence before it can be introduced at trial.

As caselaw instructs, however, the entry of the three evidentiary inferences requested by the United States here does not sufficiently address the magnitude of Philip Morris's spoliation of evidence. The Court should impose additional sanctions – including preclusion and monetary

---

[24] For example, Dr. Alonso detailed his involvement in Philip Morris's de-nic project, in which Philip Morris has manufactured a cigarette without nicotine, but denied that Philip Morris has the ability to control the amount of nicotine in its cigarettes independently of their tar levels. Alonso Dep. at 55:18-57:19. Dr. Alonso also testified that he spent much of his time in the year 2000, when he was Philip Morris's Vice-President of New Technology, working on the research related to the reduction of certain cigarette smoke constituents. Alonso Dep. at 27:10-13, 29:15-30:3. The United States was denied the opportunity to fully cross-examine Dr. Alonso with his email communications on these issues. Indeed, any admissions concerning Philip Morris's ability to control the amount of nicotine in conventional cigarettes independently of their tar levels are forever lost; admissions concerning the ability to remove constituents from cigarettes are similarly irretrievable.

sanctions – in order to fully address the design, implementation and adherence to policies by

Philip Morris USA and Altria Group that led to the foreseeable violation of the Preservation

Order through the deletion of highly relevant email.  The imposition of such sanctions befits

Philip Morris's "conduct and is absolutely necessary to remedy the waste of judicial resources . . .

caused and to protect the authority of the Court."  *Prudential*, 169 F.R.D. at 616.

> **b.    The Court Should Preclude Philip Morris From Calling Peter Lipowicz as a Fact or Expert Witness**

One of the eleven employees who failed to preserve email, resulting in its deletion by

Philip Morris, has been designated by joint defendants as an expert witness in this case.  As set

out above, Peter C. Lipowicz is a Senior Principal Scientist in Research, Development &

Engineering at Philip Morris USA, dep. of Peter Lipowicz, July 18, 2002 at 9:11-15, who has

been designated as an expert witness to testify as to, *inter alia*, the design, function, construction

and components of conventional and non-conventional cigarettes, particularly those sold by

Philip Morris, and Philip Morris's efforts to reduce tar and nicotine levels in cigarettes.  Joint

Defendants' Expert Disclosure for Peter J. Lipowicz, Ph.D. (R. 815; February 1, 2002), Statement

of Opinions at 1.

The deletion of email from Dr. Lipowicz's files in violation of the Preservation Order has

deprived the United States of the opportunity to fully examine Dr. Lipowicz in deposition and at

trial and, more importantly, to assess whether the opinions Dr. Lipowicz intends to offer at trial

are consistent with the opinions he has expressed in his electronic communications concerning

the subjects of his expert report.  These communications are forever lost; impeachment evidence

that may have existed within those lost communications cannot be recovered; and the United

States is severely prejudiced as a result of the actions and policies of Philip Morris USA and

Altria Group.  For this reason, neither Philip Morris USA nor Altria Group should be permitted

to call Dr. Lipowicz at trial, for to do so would allow the companies to profit from the failure to

preserve documents subject to the Preservation Order.  *See* Fed. R. Civ. P. 37(b)(2)(B) (Court

may prohibit disobedient party "from introducing designated matters into evidence").

This preclusion will not, of course, completely address the prejudice caused to the United

States by the deletion of email from Dr. Lipowicz, because the United States is not only denied

the ability to use the lost evidence on cross-examination, but is also denied the opportunity to

make affirmative use of Dr. Lipowicz's email.  Precluding the Philip Morris defendants from

calling Dr. Lipowicz at trial should therefore be just one of the sanctions imposed against Philip

Morris by the Court.  The evidentiary inferences, additional preclusion, fine and reimbursement

requested by the United States should also be granted.

> **c.     The Court Should Preclude Philip Morris From Asserting
> Compliance With the Master Settlement Agreement as a Defense to
> the United States' Claims**

The Master Settlement Agreement (MSA) specifically precludes defendants from offering

the MSA into evidence in this action.  Section XVIII(f) of MSA provides in pertinent part:

"Neither this Agreement nor any public discussions, public statements or public comments with

respect to this Agreement by any Settling State or Participating Manufacturer or its agents shall

be offered or received in evidence in any action or proceeding for any purpose other than in an

action or proceeding arising under or relating to this Agreement."  MSA, §  XVIII(f) (attached as

Ex. 48).  For this reason, as well as the additional reasons set out in support of the United States

Motion for Partial Summary Judgment Dismissing Defendants' Affirmative Defenses Asserting

Res Judicata, Collateral Estoppel, Release, Accord and Satisfaction, and Mootness (R. 2579;

October 8, 2003),[25] the Court should enter summary judgment dismissing the affirmative defenses of all defendants that rest on the doctrine of mootness.

Even if the Court does not grant summary judgment dismissing mootness claims of all defendants, the loss of relevant email from high level employees, many of whom were directly responsible for matters such as marketing, research and public statements, should result in Philip Morris USA and Altria Group being precluded from arguing that their compliance with the MSA is a defense to the United States' claims.[26]  The MSA contains provisions addressing: the targeting of youth "in the advertising, promotion or marketing of Tobacco Products" (MSA § III(a)); actions "the primary purpose of which is to initiate, maintain or increase the incidence of Youth smoking within any Settling State" (*Id.*); the number of brand name sponsorships permitted each signatory (MSA § III(c)(2)); material misrepresentations of fact regarding the health consequences of smoking (MSA § III(r)); and limiting or suppressing research into the marketing or development of new products (MSA § III(q)).  Philip Morris USA and Altria Group should be precluded from benefitting from the destruction of email from the files of employees who not only oversaw marketing, research and public relations efforts, but also held specific responsibility for public communications concerning the MSA and managed and trained Philip

---

[25] Those additional reasons are, first, as a matter of law, the United States has independent and distinct sovereign interests which cannot be extinguished by the settlement and consent decrees entered into by certain defendants and the settling States.  Second, the United States seeks relief to vindicate its interests that is not covered by the MSA, and, even if the Court were to deny as moot the injunctive relief sought by the United States, the United States is still entitled to equitable disgorgement of defendants' ill-gotten gains.

[26] Altria Group was not a party to the MSA.  Nevertheless, it joined in the summary judgment motion filed by all defendants arguing that the United States has not developed evidence showing a likelihood of future RICO violations.  *See* Defendants' Motion for Summary Judgment on the Grounds That There is No Reasonable Likelihood of Future RICO Violations (R. 2394; August 1, 2003).  In support of the motion, defendants, including Altria Group, relied heavily on the assertion that the MSA acted to eliminate the likelihood of future RICO violations.  *See id.*, supporting Memorandum at 9-16.

Morris's event vendors on MSA compliance.  Culley Dep. at 50:4-54:19; Sampson Dep. at 63:10-81:24.

In fact, it would be fundamentally unfair and prejudicial to the United States if Philip Morris USA and Altria Group were permitted to argue that their compliance with the MSA defeats the United States' claims for relief while the United States is unable to utilize lost evidence from critical witnesses – lost evidence that is, under case law, presumed to be damaging to Philip Morris.  Entry of an order precluding any assertion by Philip Morris USA or Altria Group that compliance with the MSA rebuts the United States' claims will address some, but not all, of the prejudice suffered by the United States as a result of Philip Morris's failure to comply with the Preservation Order.  It will also, in conjunction with the other sanctions requested in this motion, work to "achieve the purpose of Rule 37 as a credible deterrent 'rather than a paper tiger.'"  *Update Art, Inc.*, 843 F.2d at 71 (quoting *Cine Forty-Second Street Theatre Corp.*, 602 F.2d at 1064).  *See also* Fed. R. Civ. P. 37(b)(2)(B) (Court may enter "order refusing to allow the disobedient party to support or oppose designated claims or defenses").

### 4. Monetary Sanctions Should Include a Fine and Reimbursement of Certain Expenses Incurred by the United States

#### a. The Court Should Fine Philip Morris Not Less Than $2,995,000

As set out above, addressing spoliation that occurred as a result of far less culpability on the part of Prudential than that attributable to Philip Morris USA and Altria Group here, the *Prudential* court ordered Prudential to pay $1,000,000 as a sanction.  169 F.R.D. at 617.  The court explained that the "sanction recognizes the unnecessary consumption of the Court's time and resources in regard to the issue of document destruction.  Moreover, this sanction informs Prudential and the public of the gravity of repeated incidents of document destruction and the

need of the Court to preserve and protect its jurisdiction and the integrity of the proceedings

before it." *Id.* The court further indicated that it had "considered the financial worth of

Prudential and the minimal financial impact this sanction will have on Prudential's financial

stability." *Id.*

Like the Prudential court, this Court should impose a monetary sanction against Philip

Morris USA and Altria Group in order to inform both the companies and the public of the gravity

of the destruction of documents and the need to preserver and protect the integrity of the

proceedings before the Court in this case.  Indeed, in this instance, evidence shows that, unlike

Prudential management, which engaged in no willful conduct, senior management at Altria

Group knew that its document destruction policies, which required monthly system-wide email

deletions while recycling back-up tapes every three weeks, would lead to the deletion of email

that was subject to the Preservation Order and highly relevant to this case.  But neither Altria nor

Philip Morris stopped the monthly deletions or suspended the recycling of back-up tapes after the

Court entered the Preservation Order.  For this reason, and the additional evidence of the impact

of the policies and practices of Altria and Philip Morris detailed above, a monetary sanction

should be imposed in addition to the evidentiary inferences and preclusion of evidence requested

in this motion.

The United States submits that the fine to be imposed here should be commensurate with

that imposed against Prudential in January 1997.  In 1996, the year immediately prior to the entry

of the $1,000,000 fine against Prudential, the company had net revenues of $29,922,000,000 and

an operating income of 3,565,000,000 before payment of dividends to policyholders.  *See*

Prudential 1996 Annual Report (attached as Ex. 49) at 35.  By contrast, in 2002, Altria Group

had net revenues of $80,408,000,000 and operating income of $17,291,000,000.  *See* Altria

Group 2002 Annual Report (attached as Ex. 50) at 3.  Of those figures, Altria collected

$47,649,000,000 in net revenue and $10,677,000,000 in operating income from its tobacco

business.  *Id.*  A fine commensurate to that imposed against Prudential will therefore equal

$2,687,000 if calculated against Altria's net revenue; $4,850,000 if calculated against total

operating income; $1,592,000 when using net revenue from the tobacco business; or $2,995,000

if the tobacco business operating income is used for the calculation.  A sanction in one of these

amounts will have a minimal financial impact on Altria Group's financial stability, but will be

sufficient, in combination with the other relief requested by the United States in this motion, to

address failure by Altria Group and Philip Morris USA to preserve potentially critical evidence.

The United States suggests that the Court, in its discretion, impose a fine of $2,995,000.[27]

> **b.**     **The Court Should Order Altria Group and Philip Morris to Reimburse the United States for Costs Associated With the December 19-20, 2002 Deposition of Philip Morris on Email Destruction Issues**

In addition to ordering Altria Group and Philip Morris USA to pay a fine as a sanction,

the Court should require the companies to reimburse the United States for the costs associated

with the December 19-20, 2002 deposition of Philip Morris pursuant to Rule 30(b)(6) on email

destruction issues.  While these costs represent but a small fraction of the time and expense

incurred by the United States as a result of Philip Morris's destruction of documents in violation

of the Preservation Order, some reimbursement is appropriate.  Indeed, the *Prudential* court

ordered an award that was broader in scope, requiring Prudential to "promptly reimburse

plaintiffs' counsel for all fees and costs associated with the motion for sanctions, the order to

---

[27] This amount is only 6.3% of Altria's daily operating income for 2002.

show cause, the depositions and discovery in preparation for the depositions, and the preparation

and distribution of the Report of Investigation to the Court and Counsel."  169 F.R.D. at 617.

The United States only asks that the Court order Altria and Philip Morris to reimburse the

United States for the costs paid to the court reporter and videographer at the deposition and the

travel expenses incurred by the primary attorneys attending the deposition.  These costs are

itemized in the invoices and travel voucher summaries attached as exhibits 51-55.  *See* Spherion

Invoice #5378104823 (court reporter costs for Dec. 19, 2002 transcript, attached as Ex. 51);

Spherion Invoice #5378104825 (court reporter costs for Dec. 20, 2002 transcript, attached as Ex.

52); Halasz Reporting Invoice #03-GMH019 (videographer costs for Dec. 19-20 deposition,

attached as Ex. 53); Travel Voucher Summary for Stephen D. Brody (attached as Ex. 54); Travel

Voucher Summary for Aaron H. Mendelsohn (attached as Ex. 55).  The costs total $5,027.48.

## IV.  CONCLUSION

For the foregoing reasons, the United States' Motion for Evidentiary and Monetary

Sanctions Against Philip Morris USA and Altria Group Due to Spoliation of Evidence should be

granted, and the Court should: (1) infer that Philip Morris has researched how to target its

marketing at youth and actively marketed cigarettes to youth through advertising and marketing

campaigns that are intended to entice young people to initiate and continue smoking,

manipulated the nicotine content of its cigarettes in order to create and sustain smokers'

addiction, and failed to market potentially less hazardous cigarettes after October 19, 1999; (2)

preclude Philip Morris from calling Peter Lipowicz as a fact or expert witness at trial; (3)

preclude Philip Morris and Altria Group from asserting Philip Morris's compliance with the

Master Settlement Agreement as a defense to the United States' claims; (4) order Philip Morris

and Altria Group to pay a monetary sanction of $2,995,000 to the Court's Registry; and (5) order

Philip Morris and Altria Group to reimburse the United States for the costs associated with the deposition of Philip Morris pursuant to Rule 30(b)(6) on email destruction issues, taken December 19-20, 2002.

Respectfully submitted,

PETER D. KEISLER, Jr.
Assistant Attorney General


/s/ Sharon Y. Eubanks
SHARON Y. EUBANKS (DC Bar # 420147)
Director, Tobacco Litigation Team


/s/ Stephen D. Brody
STEPHEN D. BRODY (DC Bar # 459263)
Deputy Director, Tobacco Litigation Team


/s/ Robert P. Williams
ROBERT P. WILLIAMS (DC Bar # 474730)
Trial Attorney, Tobacco Litigation Team

United States Department of Justice
Post Office Box 14524
Ben Franklin Station
Washington, DC  20044-4524
(202) 616-4185

Attorneys for Plaintiff
November 25, 2003                    United States of America