## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA,

                    Plaintiff,

                    v.

PHILIP MORRIS USA INC., et al.

                    Defendants.
_____

Civil Action No. 99-2496 (GK)

Next Scheduled Court Date:
January 29, 2004

---

### DEFENDANTS PHILIP MORRIS USA INC.'S AND ALTRIA GROUP, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO UNITED STATES' MOTION FOR EVIDENTIARY AND MONETARY SANCTIONS AGAINST PHILIP MORRIS USA AND ALTRIA GROUP DUE TO SPOLIATION OF EVIDENCE

---

## TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................... 1

II.  FACTS .................................................................................................................... 5

   A.  PM USA Employs a Comprehensive Document Management Program
       that Has Long Been Part of the Company's Infrastructure................................... 5

       1.  PM USA's Document Retention Practices Were Robust. ......................... 5

       2.  PM USA's Document Retention Practices Were Reasonably
           Calculated to Preserve Evidence in this Case. .......................................... 8

       3.  PM USA Vigorously Monitors and Reinforces Compliance with its
           Document Retention Policies..................................................................... 10

   B.  PM USA's Uses a Well-Recognized Approach to Managing System
       Storage Capacity and Protecting Against Catastrophe. ....................................... 12

   C.  Any Loss of E-mail in This Case Was Inadvertent............................................... 17

   D.  PM USA Took Comprehensive Steps to Recover Potentially Lost E-mail
       and Implement Cutting Edge Procedures to Facilitate Compliance with the
       Court's Document Preservation Order.................................................................. 21

   E.  PM USA's Offer to Reimburse the Government for Costs. ................................... 24

III.  ARGUMENT ....................................................................................................... 25

   A.  Standards Governing the Court's Consideration of the Government's
       Motion for Sanctions.......................................................................................... 26

       1.  In Order to Obtain an Adverse Inference, the Government Must
           Show Either Conduct Amounting to Bad Faith, or Present Extrinsic
           Evidence that E-mail Was Lost that Would Have Been Helpful to
           its Case. .................................................................................................... 28

           a.  To Obtain an Adverse Inference the Government Must
               Show Intentional Misconduct or Bad Faith. ................................ 28

           b.  Absent Evidence of Bad Faith, the Government Must
               Establish, Through Extrinsic Evidence, that It Has Been
               Prejudiced. .................................................................................. 30

       2.  In Order to Preclude Evidence of Compliance with the MSA or
           Prohibit Dr. Lipowicz from Offering Testimony in this Case, the

Government Must Show Severe Prejudice or "Flagrant or Egregious" Misconduct............................................................................ 31

B.    Beyond Reimbursing the Government for Expenses Incurred – which PM USA has Already Offered to Do – PM USA's Conduct Does Not Warrant Sanctions. ................................................................................................... 32

1.    The Government Has Not Established Its Entitlement to Any Adverse Inferences, Let Alone the Sweeping Adverse Inferences it Seeks. ..................................................................................................... 38

2.    The Government's Requests to Preclude the Assertion of a Defense and the Testimony of a Key Fact and Expert Witness Should Be Rejected. .......................................................................................... 43

3.    The Government's Request for $2,995,000 in Monetary Sanctions Should Be Denied. .................................................................................. 46

IV.   Conclusion ............................................................................................................ 48

# TABLE OF AUTHORITIES

**Pages**

## FEDERAL CASES

*Aramburu v. Boeing Co.*,
 112 F.3d 1398 (10th Cir. 1997) ............................................................29, 30

*Bashir v. Amtrak*,
 119 F.3d 929 (11th Cir. 1997) ....................................................................29

*Black Panther Party v. Smith*,
 661 F.2d 1243 (D.C. Cir. 1981) ...................................................................27

*Bonds v. District of Columbia*,
 93 F.3d 801 (D.C. Cir. 1996) ...................................................26, 27, 32, 44

*Brewer v. Quaker State Oil Refining Corp.*,
 72 F.3d 326 (3d Cir. 1995)...........................................................................29

*Butera v. District of Columbia*,
 235 F.3d 637 (D.C. Cir. 2001) ..............................................................32, 44

*Caprotta v. Entergy Corp.*,
 168 F.3d 754 (5th Cir. 1999) .......................................................................29

*Eaton Corp. v. Appliance Valves Corp.*,
 790 F.2d 874 (Fed. Cir. 1986).....................................................................29

*Favors v. Fisher*,
 13 F.3d 1235 (8th Cir. 1994) .......................................................................29

*Friends For All Children, Inc. v. Lockheed Aircraft Corp.*,
 587 F. Supp. 180, 190-91, 208-09, *modified*, 593 F. Supp. 388 (D.D.C. 1984)...............28

*Hicks v. Gates Rubber Co.*,
 833 F.2d 1406 (10th Cir. 1987) ..............................................................29, 30

*Insurance Corp. v. Compagnie des Bauxites de Guine*,
 456 U.S. 694 (1982)......................................................................................27

*Johnson v. Washington Metro. Area Transit Auth.*,
 764 F. Supp. 1568 (D.D.C. 1991) ...............................................................28

*Mathis v. John Morden Buick, Inc.*,
 136 F.3d 1153 (7th Cir. 1998) .....................................................................29

*Monroe v. Ridley*,
 135 F.R.D. 1 (D.D.C. 1990)..........................................................................27

*National Hockey League v. Metropolitan Hockey Club, Inc.*,
    427 U.S. 639 (1976)........................................................................................26

*Outley v. City of New York*,
    837 F.2d 587 (2d Cir. 1988)........................................................................44

*Perkinson v. Gilbert/Robinson, Inc.*,
    821 F.2d 686 (D.C. Cir. 1987)........................................................29, 31, 42

*In re Prudential Ins. Co.*,
    169 F.R.D. 598 (D.N.J. 1997)........................................................46, 47, 48

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
    306 F.3d 99 (2d Cir. 2002)................................................................30, 39

*Shea v. Donohoe Constr. Co.*,
    795 F.2d 1071 (D.C. Cir. 1986)....................................................................27

*Shepherd v. American Broad. Cos.*,
    62 F.3d 1469 (D.C. Cir. 1995)......................................................................29

*Shipley v. Dugan*,
    874 F. Supp. 933 (S.D. Ind. 1995)..............................................................29

*Smith v. Schlesinger*,
    513 F.2d 462 (D.C. Cir. 1975)......................................................................32

*Socite Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*,
    357 U.S. 197 (1958)......................................................................................26

*Synanon Church v. United States*,
    820 F.2d 421 (D.C. Cir. 1987)................................................................28-29

*Tot v. United States*,
    319 U.S. 463 (1943)......................................................................................31

*Turner v. Hudson Transit Lines, Inc.*,
    142 F.R.D. 68 (S.D.N.Y. 1991)....................................................................30

*Update Art, Inc. v. Modiin Publ'g., Ltd.*,
    843 F.2d 67 (2d Cir. 1988)..........................................................................32

*Valentino v. United States Postal Serv.*,
    674 F.2d 56 (D.C. Cir. 1982)........................................................................29

*Vick v. Texas Employment Comm'n*,
    514 F.2d 734 (5th Cir. 1975)..................................................................28, 29

*Vodusek v. Bayliner Marine Corp.*,

71 F.3d 148 (4th Cir. 1995) ............................................................................30

*Webb v. District of Columbia*,
    146 F.3d 964 (D.C. Cir. 1998) ................................................................ *passim*

## DOCKETED CASES

*Concord Boat Corp. v. Brunswick Corp.*,
    No. LR-C-95-781, 1997 WL 33352759 (E.D. Ark. Aug. 29, 1997).....................41, 42, 43

*Thompson v. United States Dep't of Hous. & Urban Dev.*,
    --- F.R.D. ---, No. CIV.A.MJG-95-309, 2003 WL 22963931
    (D. Md. Dec. 12, 2003) ............................................................................28

*Zubulake v. UBS Warburg, LLC*,
    No. 02 Civ. 1243, 2003 WL 22410619 (S.D.N.Y. Oct. 22, 2003) ............................27, 30

## RULES & STATUTES

Fed. R. Civ. P. 16(f) ............................................................................26

Fed. R. Civ. P. 37(b)(2)............................................................................26

I.      **INTRODUCTION**

As Philip Morris USA Inc. (PM USA) informed this Court in June of 2002, during the course of discovery in this case, PM USA learned that the manner in which some employees handled electronic mail ("e-mail") failed to comply with PM USA's then-existing document retention/disposal suspension policies.  As a result, certain e-mail records that may not have been printed and retained by those employees could have been lost when the electronic versions of those records were deleted during routine system maintenance.  Consequently, PM USA suspended its routine system maintenance practices and embarked upon thorough, costly, and partially successful recovery efforts.  As we informed the Court, although e-mail sent by one employee is often printed and retained by other employees, PM USA cannot say with certainty that all disposal suspended electronic records were preserved in paper form.  Nevertheless, the Government has not presented this Court with any evidence (as opposed to rhetoric) that any e-mail was actually lost as a result of bad faith or misconduct on the part of PM USA or its employees.  Nor has the Government presented the Court with any extrinsic evidence to support a conclusion that it has been prejudiced.

At the threshold, the Government goes to great pains to convince this Court that PM USA's e-mail problem was the product of a highly culpable state of mind.  The Government accusations run the gamut, variously describing PM USA's e-mail issue as the product of "bad faith" (Pl's. Mem. at 36), "gross indifference" (*id*. at 34), "reckless disregard" (*id*.), and "deliberate destruction" (*id*.).  As explained herein – and, when stripped of the Government's pejorative characterizations – the facts simply do not bear any of the Government's negative constructions.  What the facts do reveal is a company that has long been acutely aware of its obligations to preserve evidence in litigation, a company that has repeatedly revised and updated

its document retention and disposal suspension systems to reflect an ever-changing information environment, and a company that, upon discovery of a problem in this case, voluntarily approached the Court and spared no expense in attempting to put matters right. *See* Section II, *infra*. There is no evidence to suggest that the isolated failures of certain employees to adhere to the company's document retention and disposal suspension policies were anything other than honest mistakes to which human beings are inherently prone. They were not, as the Government charges, the product of an intentional effort on the part of Altria Group, Inc. ("Altria") and PM USA to "design[] policies that they knew would and did cause the destruction of relevant evidence." Pl's. Mem. at 34.

Once this Court concludes, as it must, that any lost e-mail in this case was not the subject of intentional destruction, bad faith, or other highly culpable conduct, the legal justifications for the Government's requested sanctions evaporate. Absent such a finding, there is no basis for the imposition of adverse inferences, let alone the sweeping adverse inferences that the Government seeks. Although, as explained herein, the D.C. Circuit has yet definitively to establish the precise degree of culpability that would, if proven, permit this Court to impose an adverse inference sanction, past decisions of that court, as well as other highly persuasive authorities, strongly suggest that some showing of intentional misconduct or bad faith must be made. *See* Section III.A.1.a, *infra*. Consistent with those authorities, this Court should reject the requested adverse inference sanctions based on the absence of such culpability here.

Further, regardless of the degree of culpability required to impose an adverse inference, in circumstances where, as here, there is no bad faith or intentional misconduct, the Government must – at the very least – support its request for adverse inferences with a showing that it has suffered prejudice. Here, the Government has failed to demonstrate prejudice insofar as it has

produced no "extrinsic evidence" that any lost e-mail would have been helpful to its case.  As an initial matter, PM USA has made available millions upon millions of documents in this case, including reams upon reams of e-mail.  Moreover, the eleven individuals in question have authored substantial quantities of e-mail that have been made available during the course of discovery.  In addition, after becoming aware of a problem, PM USA subsequently recovered, in electronic form, thousands of e-mails that it made available to the Government.  All told, the Government has been provided between 20,000 and 30,000 pages of e-mail authored by the eleven individuals in question.  Significantly, the Government has not identified any evidence from any source (including any e-mail communications) in support of its claim for adverse inferences regarding PM USA's post-October 19, 1999 conduct – inferences that could prove dispositive on critical aspects of the Government's case.

Indeed, in support of its contention that it has been prejudiced, the Government merely recites employees' positions and seniority levels.  Clearly, such recitations are insufficient to justify an inference that PM USA has, since October 19, 1999, marketed to youth, manipulated nicotine content to sustain addiction, or failed to market less hazardous cigarettes.  As set forth in section III.B.1, *infra*, given the absence of any produced e-mail (or any other evidence) bearing on these critical issues, (and the lack of any evidence of bad faith or intentional destruction), the relief the Government seeks is not only disproportionate to the nature of the offense, but also is wholly inconsistent with the other evidence in this case.

Similarly, the Government has not offered any evidence that would justify stripping PM USA of a principal defense to the Government's RICO case for injunctive relief – that relating to the effect of the Master Settlement Agreement ("MSA") – or excluding the testimony of Dr. Peter Lipowicz.  Although phrased in terms of evidentiary bars, the sanctions the Government

seeks are components critical to the determination of (1) this Court's jurisdiction to issue injunctive relief and (2) the Government's allegations regarding marketing, nicotine manipulation, and less hazardous cigarettes.  As explained in section III.A.2, *infra*, given the severe nature of the sanctions sought, the Government is held to an even more stringent burden of proof, one that requires evidence not only of bad faith, but of flagrant and egregious misconduct, or evidence that it has been *severely* prejudiced in its ability to present its case. Here, the Government has offered no evidence whatsoever of flagrant or egregious misconduct, let alone evidence to establish severe prejudice.  *See* Section III.B.2, *infra*.

Finally, consistent with its uniformly heavy-handed approach, the Government seeks a whopping $2,995,000 in monetary sanctions.  As explained in section III.B.3*, infra*, the requested amount is both arbitrary and excessive.

*       *       *

In view of all the facts, it is clear that the Government seeks a host of sanctions that are so far removed from the realm of proportionality as to bespeak a not insignificant level of desperation.  Given the millions of pages of documents made available in this case, the hundreds of fact witnesses deposed, and the plethora of experts identified by the Government, it strains credulity to surmise that, at the end of the day, significant issues in this case should turn on the content of a theoretical handful of e-mails, all of which post-date the filing of this lawsuit. Indeed, it bears emphasizing that, for all the Government's bluster, the electronic records at issue – all of which postdate October 19, 1999 – do not bear on the *merits* of the RICO violations the Government alleges in its complaint, which rest upon purported activities of an enterprise.  The Government's motion is thus a not-so-thinly-veiled effort to establish through discovery sanctions that which it fears it will be unable to establish with cold hard facts.

- 4 -

The Court should reject the Government's invitation to hasten a significant aspect of the Government's case to judgment by means of discovery sanctions.  To the extent the Government's claims survive summary judgment, it should be through trial that the Government's claims either rise or fall.  Both PM USA and Altria stand ready to reimburse the Government for costs incurred as a result of the e-mail issue addressed on this motion.  Beyond that, sanctions are unwarranted.

## II.	FACTS

### A.	PM USA Employs a Comprehensive Document Management Program that Has Long Been Part of the Company's Infrastructure.

#### 1.	PM USA's Document Retention Practices Were Robust.

Since the early 1980s, both Altria and PM USA have had in place document management procedures that prevent the destruction and loss of important business records.  *See, e.g.,* Philip Morris Guide to Records Management (1981) (1002340105-0112) (Ex. 1); Philip Morris Policy Guide: Policy Records Management (1984) (2024940168-0175) (Ex. 2); Philip Morris Records Management Manual (1993) (2054591002-1049) (Ex. 3) (hereinafter "RMM").  Since their original implementation, the document management policies, practices and procedures have evolved to meet the companies' ever-changing needs.

In 1990, Altria created and PM USA implemented a records management program.  That program, building on those that came before, is embodied in the RMM and controls the retention and disposition of all PM USA records.[1]  *See* RMM at 4-1 (250073009-3058).  Currently, the records management program targets two types of documents: records that are deemed important

---

[1]	Neither has the current records management program been static, but has itself continued to evolve as technological and informational needs change.  *See, e.g.,* p.8, *infra*.

for business purposes ("primary records"), which must be retained, and records that have only temporary business value ("transient records"), and need not be retained unless, as described directly below, they are subject to disposal suspension for purposes of litigation.  *See* Lynch Dep., 4/26/02, at 96-98, 100-102 (Ex. 4).   PM USA has "devoted substantial time, effort and resources to ensure that its retention and preservation directives were sufficient to provide employees with notice of how to retain and preserve records." Decl. of Randolph A. Kahn (1/15/04) at ¶ 6 ("Kahn Decl.") (Ex. 5); *see also id.* at Ex. 1, Evaluation and Report (01/15/04) at 12 (PM USA has "emphasize[d] the importance of records retention and preservation" through its records management program).

As mentioned above, in addition to requiring employees to retain important business records for business purposes, employees, pursuant to the RMM, are also obligated to retain documents relating to the subject matters covered by ongoing litigation.  *See* RMM, at 2-1 (stating that "[i]t is imperative that all Company personnel understand and comply with this Manual's instructions pertaining to records subject to Disposal Suspension").  To this end, both primary and transient records that may be relevant to litigation are placed on "disposal suspension." Lynch Dep., 4/26/02, at 96-98, 100-102.  Disposal suspension is "[a] procedure to stop, temporarily or permanently, the disposal of records . . . because they might be needed for an audit, investigation, court case or other specified reason."  RMM, at 10-1.   Upon becoming subject to disposal suspension, "disposal procedures are immediately suspended [for those documents.]"  RMM, at 7-6.  Documents subject to disposal suspension may not be "disposed of, mutilated, or altered in any way."  RMM, at 7-6.  Additionally, the manual explicitly provides that PM USA's records management program applies to e-mail.  *See* RMM, at 8-1, 8-2; Wallmeyer Dep., 12/19/02, at 207-09 (Ex. 6).  Necessarily, PM USA's records management

policy regarding e-mail has and continues to evolve over time as PM USA's technological and e-mail needs change.

Under the records management program in place at the time the Court entered its document preservation order, employees were required to retain e-mails containing information subject to disposal suspension by "printing and retaining a paper copy only, in accordance with the usual retention practice . . . ."  Modification of May 4, 1994 Document Disposal Suspension Notice Requiring Retention of Electronic Mail and Other Electronic Records in Their Original Electronic Media, 7/28/94, at 1 (2065378088-8089) (Ex. 9); *See also* RMM, at 8-1, 8-2; Wallmeyer Dep., 12/19/02, at 159.  There was and is nothing unusual or inappropriate in PM USA's reliance upon employees who generate and receive records to ensure the preservation of those records.[2]  *See* Kahn Decl. at Exhibit 1, Evaluation and Report at 14 ("records management programs have always relied on people who generate and receive records to ensure that such records are properly identified, retained, and preserved," and PM USA has provided appropriate directives to ensure employees are on notice of their responsibilities).  PM USA's policy required that employees print and retain disposal suspended e-mail they author.  If e-mail was modified or forwarded by an employee, that employee was deemed to have generated a new record and, accordingly, the modifying or forwarding employee was also required to print and retain a copy.  Additionally, recipients of disposal suspended e-mail originating from outside PM USA were under obligations with respect to the preservation of such e-mail.  *See* Reformulation of Records Management Procedures Governing Retention of Identical Copies of Disposal-

---

[2]    As discussed in Section II-D, *infra*, PM USA has implemented new disposal suspension practices with respect to e-mail that bring greater automation to the retention of e-mail.  *See also* Letter of 7/17/03 from T. Frederic to R. Brooker (Ex. 7); Tr. of 7/24/03 Status Conf., at 56-57 (Ex. 8).

Suspended Record, 4/1/98 (2063568613-8614) (Ex. 10); RMM, at 7-7; Brandt Dep., 6/17/03, at 29 (Ex. 11); Wallmeyer Dep., 12/19/02, at 159-60.

**2.      PM USA's Document Retention Practices Were Reasonably Calculated to Preserve Evidence in this Case.**

At the time it was implemented, the print and retain policy was state of the art. *See* Brandt Dep., 6/17/03, at 291-92. "The print to paper approach to email records retention and preservation has been used by many institutions, *including the federal government*, and during the period of time in which PMUSA used such an approach, I have advised clients to utilize such an approach." *See* Kahn Decl. at Exhibit 1, Evaluation and Report at 22 (emphasis added). There were no viable methods other than the print and retain approach available at the relevant time to preserve e-mails that did not raise inherently difficult issues. *See* Brandt Dep., 6/17/03, at 291-92. In short, "[t]he use of a print to paper method of retention by PMUSA was appropriate during the time period they used it, especially given the state of information technology tools for email and electronic records management available at the time." *See* Kahn Decl. at Exhibit 1, Evaluation and Report at 23. As discussed in Section II.D, *infra*, PM USA's print and retain policy continues to evolve with changing technology and the needs of the company.

In order to ensure compliance with the records management policy, PM USA regularly distributes document disposal suspension notices to inform employees concerning the nature and types of documents that must be preserved. PM USA's processes in this regard are entirely reasonable. *See See* Kahn Decl. at Exhibit 1, Evaluation and Report at 18 ("PMUSA's directives to employees are as comprehensive and exhaustive regarding preservation responsibilities as others I have seen"). Since 1994, PM USA has used a uniform format with plain and simple language to provide clear guidance regarding employee responsibility for preserving electronic

records.  *See* Modification of May 4 Document Disposal Suspension Notice Requiring Retention

of Electronic Mail and Other Electronic Records in Their Original Electronic Media, 7/28/94

(2065378008); *See* Kahn Decl. at Exhibit 1, Evaluation and Report at 19 (stating that

preservation notices should be clear, use minimal legal language, and avoid using court orders

and legal documents, and finding PM USA's notices to be clearly written so that employees will

likely read them and understand their preservation responsibilities).

Depending upon the scope of materials covered by the disposal suspension notice,

distribution is made broadly, or is targeted to the specific individuals or departments affected by

the notice.  *See* Wallmeyer Dep., 12/20/02, at 297 (Ex. 12).  Such notices are distributed by

records management.  *See id.* at 297-98.  From 1994 until very recently,[3] the notices explicitly

incorporated the print and retain policy by including the following instruction: "electronic

documents [e-mail] that can be printed must be retained in printed form."  *See, e.g.,* Nov. 8, 1999

Records Disposal Suspension Notice (2072513915-3916) (Ex. 13).  Furthermore, each notice

also provides employees with information on how they may seek clarification of their document

retention obligations.  *See* Kahn Decl. at Exhibit 1, Evaluation and Report at 20.  Based on the

Court's Document Preservation Order in this case, a document disposal suspension notice was

issued on November 8, 1999 that explicitly referenced this litigation and summarized the

smoking and health topics to which disposal suspension requirements applied.  *See* Nov. 8, 1999

Records Disposal Suspension Notice (2072513915-3916); Brandt Dep., 6/17/03, at 23-24.

---

[3]     As a consequence of PM USA's move from print and retain to a more automated approach to e-mail retention, *see* Section II.D, *infra*, disposal suspension notices no longer incorporate references to the print and retain policy.

### 3.   PM USA Vigorously Monitors and Reinforces Compliance with its Document Retention Policies

PM USA uses a variety of mechanisms to enforce its print and retain policy.  *See* Kahn Decl. at Exhibit 1, Evaluation and Report at 10 ("[t]he apparent time, effort and resources expended in providing employees with company directives at PMUSA surpass efforts made at just about any large institution that I am aware of"); *see also id*. at ¶ 6.  For the last decade, PM USA employees were repeatedly and comprehensively reminded in various ways of the existence of, and required compliance with, PM USA's disposal suspension requirements, including the print and retain rule for e-mail subject to disposal suspension.  *See* Wallmeyer Dep., 12/19/02, at 207-09; Letter of 7/17/02 from T. Frederick to R. Brooker (Ex. 14); Kahn Decl. at Exhibit 1, Evaluation and Report at 18, 21.

Apart from distributing disposal suspension notices, which remind employees that they must keep documents subject to disposal suspension, PM USA takes steps to ensure compliance with the policy, including:  (i) comprehensive employee training; (ii) publication of policies and guides pertaining to record retention and disposal suspension; and (iii) designation of records coordinators in each department to assist the employees in understanding and following the policy.[4]  *See* Lynch Dep., 4/26/02, at 144, 182, 195-96.  Additionally, PM USA's records manager informally "benchmarks" the PM USA program with other companies' document retention programs, as well as those of its sister operating companies, to ensure that it is up to date.  *Id.* at 144.

*First*, to assist employees in complying with its records management policy, PM USA offers comprehensive training to its employees on records management, including disposal

---

[4]    In addition, PM USA has a centralized compliance department that is responsible for assuring that PM USA's compliance program is integrated and effective.

suspension.  *See* Brandt Dep., 6/17/03, at 225-26; Wallmeyer Dep., 12/19/02, at 240-41.  All

employees are required to complete records management training either in live Q&A sessions or

intranet-based training sessions.  For example, in 2001 the records management department

conducted over 80 separate Q&A sessions on records management policies and practices.  *See*

Wallmeyer Dep., 12/19/02, at 241.  Furthermore PM USA issues memoranda to employees

reminding them of the need to comply with the company's document retention and disposal

suspension policies.  For example, after becoming aware of a problem in this case, PM USA

issued a memorandum to all e-mail users specifically emphasizing employees' obligations with

respect to the retention of disposal suspended e-mail.  *See* Memo of 6/19/02 from G. Cummings

to All Philip Morris U.S.A. E-mail Users (2067540024-25) (Ex. 15).

 *Second*, in addition to compulsory employee training and routine reminders regarding

obligations, PM USA has made numerous publications regarding the records management policy

readily available to all employees.  Records management manuals, as well as any revisions or

updates to the manuals, have been made available to PM USA employees.  The current manual

entitled the Guide to Effective Information Management is also available to employees.  *See*

Wallmeyer Dep., 12/19/02, at 207-09.  The RMM includes a list of disposal suspended topics

called "Appendix B," which is also available to – and required reading for – all employees.  *See*

Wallmeyer Dep., 12/20/02, at 303.  Similarly, the Legal Guide for Employees (2082805846-

5887) (Ex. 16) and the Business Conduct Policy (2072123216-3223) (Ex. 17) have been readily

available to all employees.  The Legal Guide explicitly requires employees to be in compliance

with disposal suspension requirements.  *See* Wallmeyer Dep., 12/19/02, at 207-10.

 Moreover, PM USA maintains a company intranet site.  This website contains extensive

information regarding the company's records management department.  The information

available on this site includes the current records management manual, copies of the records management policy (including the disposal suspension policy), and answers to frequently asked questions. *See* Wallmeyer Dep., 12/19/02, at 207-09. As noted in the Evaluation Report of Randolph Kahn, PM USA's materials amply serve to communicate employee responsibilities concerning the preservation of documents for litigation. *See* Kahn Decl. at Exhibit 1, Evaluation and Report at 21 (the materials "seem clear and reasonably calculated to tell employees what is expected of them in order to preserve needed records in the context of litigation").

*Third*, each department within PM USA has at least one designated records coordinator whose function it is to assist employees in understanding and adhering to records management policies. *See* Wallmeyer Dep., 12/19/02, at 224, 240-41. These individuals are available to answer specific questions from employees regarding disposal suspended documents or the records management policy. *Id.* at 207-09. In addition to the mandatory training received by all employees, records coordinators are provided with additional in-depth records management training to help them better assist other employees to understand their obligations under the company's records management program. *Id.* at 240-41.

**B.**      **PM USA's Uses a Well-Recognized Approach to Managing System Storage Capacity and Protecting Against Catastrophe.**

In addition to its document retention policy, PM USA utilizes a policy for system maintenance that includes periodic e-mail deletion and backup tape recycling. With respect to e-mail, PM USA has a regular process instituted several years ago by the company's Information Systems personnel whereby e-mail beyond a certain age is periodically deleted from the servers on which the company's e-mail system operates. PM USA implemented this policy as a "pure storage and system functionality issue in an environment in which the company email system [is]

already over-burdened." Kahn Decl. at Exhibit 1, Evaluation and Report at 24. Specifically, PM

USA deletes e-mail more than 60 days old from employees' in-boxes, sent items and deleted

items folders on a monthly basis. *See* Wallmeyer Dep., 12/20/02, at 341. Items that are moved

to local folders on a user's computer are not subject to the deletion process. Those system

deletions occur as part of a regular and accepted business practice that has been employed for

several years for the purpose of alleviating capacity constraints on the company's servers,

without which the servers' memory capacity would become overloaded, causing the servers to

malfunction.[5] *See* Wallmeyer Dep., 12/19/02, at 159-61, 68-69; Letter of 6/19/02 from T.

Frederick to Hon. Gladys Kessler (Ex. 18); Letter of 7/17/02 from T. Frederick to R. Brooker.

PM USA's process is not unlike that used by other large organizations. *See* Kahn Decl. at Exhibit

1, Evaluation and Report at 24 ("[i]n order to deal with the volume of email it is not uncommon

for institutions to purge the content of the email system to increase functionality"). PM USA

does not conduct its monthly system-wide e-mail deletions without first providing advance

notice to all employees whose e-mail is subject to the periodic deletion process. *See* Kahn Decl.

at Exhibit 1, Evaluation and Report at 18-20.

Separate and apart from its records management procedures, PM USA, like many

companies, regularly replicates its electronic records by copying them to backup tapes as a

---

[5]     Once an e-mail is deleted from a user's sent, in-box and deleted folders through the periodic system deletion
process, it does not immediately disappear from the PM USA computer system. After being removed from a user's
mailbox, the deleted e-mail is stored in the computer's "system clean up folder" for a period of at least 15 days.
When the e-mail is removed from the system clean up folder, it is sent to a "ghost deleted" file for a period of 30
days. Wallmeyer Dep. 12/20/02 at 379-381. Once the e-mail is removed from the "ghost deleted" folder, it remains
available for restoration for a period of three weeks on the disaster recovery backup tapes. Depending on how old
the e-mail was when the deletion process was run, the total storage period for e-mail subject to the system deletion
process can be as long as 156 days. *See* Kahn Decl. at Ex. 1 Evaluation and Report at Appendix G.

method to facilitate disaster recovery.[6]  *See* Wallmeyer Dep., 12/19/02, at 14.  Importantly, the use of backup tapes is in no way related to document retention and preservation – it serves a different purpose altogether.  *See* Kahn Decl. at Exhibit 1, Evaluation and Report at 27 (the purpose of a backup system is to prevent loss of records through system failures, not to supplement a records management program).  The company's policy requires that backup tapes be recycled every three weeks. Wallmeyer Dep., 12/19,02, at 169-170, 175; Financial Policy Guide:  Providing E-mail Services (2067540083-0085) (Ex. 19).  "Given that PMUSA was properly relying on its email backup tapes for disaster recovery purposes, and not for records management purposes, *PMUSA's schedule for recycling email system backup tapes was appropriate and in line with industry practices.*" *See* Kahn Decl. at Exhibit 1, Evaluation and Report at 30 (emphasis added).

Significantly, it was also in line with the government's own practices, including those of the Executive Office of the President ("EOP").  Perhaps hoping to play on the common confusion between records management/document retention programs and disaster recovery systems, the Government offered the following foreboding assessment at the January 17, 2003 status conference before the Court:

> MR. BRODY:  . . . It seems to be an unfortunate situation, but the company has a policy where backup tapes that are run on their system are, pursuant to policy, overwritten after three weeks, or available to be overwritten after three weeks. . . . Due to that policy -- and it is kind of an odd policy to have a situation where you delete your whole system every month.
>
> THE COURT:  It certainly is.

---

[6]     As the Government itself notes, the policy regarding the creation of backup tapes was instituted in response to a server crash PM USA experienced in 1998.  *See* Pl's. Mem. at 14 n.3, citing Ex. 10 to Brandt Dep. (2082425165). Its genesis had nothing to do with document retention or disposal suspension.

MR. BRODY:  But you delete the backup tapes every three weeks.

THE COURT:  It certainly is I have to say.  Three weeks is no time at all. . . .

Jan. 17, 2003 Tr. at 36 (Ex. 20).

Unfortunately, what the Government failed to note for the Court's benefit is that a three-week disaster recovery cycle is a "standard industry practice" that is also employed by the EOP. As an April 21, 2001 General Accounting Office ("GAO") report on the EOP's loss of email noted:  "Northrop Grumman [the EOP's contractor] followed a standard industry practice of economical tape recycling.  This involved retaining the tapes for 3 weeks and then recycling them – resulting in either overwriting the data on the tapes or destroying the used tape and replacing it with a new tape."  GAO, Electronic Records:  Clinton Administration's Management of Executive Office of the President's E-mail System at 8 (April 2001) (emphasis added) (Ex. 21).  Obviously, the Government cannot seriously claim that there is something "wrongful" or "negligent" about PM USA's three-week recycling period for disaster backup recovery tapes, when it is not just the industry standard, but *the very same practice employed by the EOP for recycling its own disaster recovery tapes.*

Nor does the Government's assertion that PM USA "deletes [its] whole system every month" remotely reflect reality.  Jan. 17, 2003 Tr. at 36.  Backup tapes, being for the purpose of disaster recovery, have an exceedingly short period of useful life.  Having a complete copy of the PM USA computer system that is three months old is useless for purposes of replacing current computer information after a disaster.  To effectively restore the computer system after a disaster, PM USA needs a picture of that system as it existed at the time of the disaster, or a picture as close to that time as is possible.  Importantly, a tape backup is not merely a snapshot of data that came into existence in the three weeks since the last backup, but of the *entire* system as

it exists at that point in time.  Thus, when PM USA overwrites a three-week old backup tape, it captures from the e-mail system not only changes to the system effected since the prior backup, but also all of the old email that remains on the system at the time of the new backup.  In short, e-mail records are never lost as a result of recycling backup tapes alone.  Rather, independent intervening events, such as the periodic system deletions, have resulted in changes to the system in the time since the prior backup was generated.

The Government contends that PM USA could have avoided the inadvertent loss of e-mail by opting to create fresh backups of its system each time it backed up that system.  It claims that the cost of doing so would have been paltry.  Yet, as noted above, PM USA's use of backup tapes was in no way related to its document retention/disposal suspension practices.  Moreover, not only does backup tape become fragile over time, but the cost associated with using backup tape as a means of document retention is not the merely cost of the tape itself, but the cost of actually recovering a system from backup tape. *See* Kahn Decl. at Exhibit 1, Evaluation and Report at 28 ("[r]elying on backup tapes for records management purposes is neither efficient nor economical, and can result in significant costs, particularly in the litigation and discovery context"). The costs of using disaster recovery backup tapes include not only the tapes itself, but the necessary hardware, backup and recovery software (all of which evolve over time, making earlier versions incompatible with later versions) and the technological expertise associated with the restoration process.  *See* Kahn Decl. at Ex. 1, Evaluation and Report at 27-28.  As PM USA's recovery efforts in this case demonstrate, recovery is an expensive and time-consuming proposition, not merely a matter of inserting a tape in a drive and pressing a button, as the Government would have this Court mistakenly believe.  Contrary to the Government's

assertions, backup tapes are neither a reliable, nor a realistic, means of long-term document preservation.

### C.     Any Loss of E-mail in This Case Was Inadvertent.

There is no dispute that PM USA reported to the Court in June 2002 that it had learned that some employees did not follow its print and retain policy.  Had that policy been followed, the deletion of electronic records resulting from routine system maintenance processes would have occurred in parallel with the preservation, in paper form, of all disposal suspended e-mail. Indeed, as noted above, the Government itself adheres to practices virtually identical to those that it alleges led to PM USA's loss of electronic records.  *See* GAO, Electronic Records: Clinton Administration's Management of Executive Office of the President's E-mail System at 8 (April 2001).  Despite the Government's repeated and reckless characterizations of PM USA's policies and processes (reckless insofar as the Government, in the same breath, is impugning the approach of certain federal agencies to document preservation) there is not a shred of evidence to suggest that any loss of e-mail was either intentional or grossly negligent; rather, any loss was wholly and purely inadvertent.  *See* Wallmeyer Dep., 12/19/02, at 127-136; Wallmeyer Dep., 12/20/02, at 397, 408, 425-26; Brandt Dep., 6/17/02, at 272-76; Letter of 6/19/02 from T. Frederick to Hon. Gladys Kessler; Letter of 7/17/02 from T. Frederick to R. Brooker; *see also* Kahn Decl. at Exhibit 1, Evaluation and Report at 10 ("even the best records management and preservation program cannot guarantee perfect adherence to that program").

During the course of deposition discovery in this action, counsel for PM USA and counsel for the Government received, *at the same time*, information indicating that at least some PM USA employees had not printed and retained all e-mail on disposal-suspended topics, as required by the company's policy.  *See* Wallmeyer Dep., 12/19/02, at 127, 136; Wallmeyer Dep.,

12/20/02, at 383-88; Hollis Dep., 2/15/02, at 90-91 (Ex. 22).  Specifically the Government and

PM USA learned during a deposition in February 2002 – nearly two full years before the

Government filed the instant motion – that at least one PM USA deponent in this case had failed

fully to comply with the print and retain policy pertaining to e-mails.  *See* Hollis Dep., 2/15/02,

at 90-91.  As a result of this knowledge, PM USA inquired whether other deponents in this case

had fully complied with company policy regarding e-mail retention, specifically the print and

retain policy.  From these inquiries the company learned that additional PM USA witnesses had

experienced varying periods of non-compliance.  Eventually, eleven employees (ten of whom

have been deposed in this case) were identified as having been, at varying points, non-compliant

with the e-mail retention policy.  *See* Wallmeyer Dep., 12/19/02, at 127, 136; Wallmeyer Dep.,

12/20/02, at 383-88.

Subsequently, PM USA determined that some e-mail possibly subject to the Court's

Document Preservation Order may have been lost due to the fact that the employees in question

had failed to manage their e-mail by printing and retaining that e-mail or by migrating it to safe

folders not subject to deletion in advance of the periodic system deletions.[7]  *See* Wallmeyer Dep.,

12/19/02, at 127, 136; Wallmeyer Dep., 12/20/02, at 383-88; Letter of 6/19/02 from T. Frederick

to Hon. Gladys Kessler; Letter of 7/17/02 form T. Frederick to R. Brooker.  In April 2002, upon

becoming aware of the scope of the problem, PM USA suspended its periodic system

maintenance procedures, including the periodic deletion of e-mail.  *See* Wallmeyer Dep.,

12/20/02, at 348; Letter of 7/17/02 from T. Frederick to R. Brooker.  As described in the section

---

[7]   As indicated above, because e-mail sent by one employee is often printed and retained by other employees, PM USA cannot say that any e-mail was actually lost.  Nevertheless, because there is no feasible way to verify that other employees printed and retained paper copies of all e-mail that was not retained, in paper form, by the eleven employees in question, PM USA cannot say that paper copies of all inadvertently deleted e-mail were preserved.

to follow, after suspension of the periodic deletions, PM USA considered methods by which to recover previously deleted electronic records.  In June 2002, after determining that it would be unable to say with certainty that it had recovered electronically, or held in paper form, all e-mail at issue, PM USA voluntarily disclosed the issue to the Court.  *See* Letter of 6/19/02 from T. Frederick to Hon. Gladys Kessler.

Compliance with the company's print and retain policy would have ensured compliance with the Court's Document Preservation Order.  *See* Letter of 6/19/02 from T. Frederick to Hon. Gladys Kessler; Letter of 7/17/02 from T. Frederick to R. Brooker; Kahn Decl. at Exhibit 1, Evaluation and Report at 14 (finding that PM USA developed sufficient directives and infrastructure to provide adequate notice to employees regarding their responsibility for records retention and preservation).  Importantly, reams upon reams of e-mail have been made available to the Government in this case.  *See* Letter of 7/17/02 from T. Frederick to R. Brooker.  Indeed, as a consequence of PM USA's robust print and retain policy many pages of e-mail authored by one employee have been made available to the Government from the files of multiple employees. *See* Wallmeyer Dep., 12/20/02, at 416-17; Letter of 7/17/02 from T. Frederick to R. Brooker.

Significantly, when it comes to evidence of what, if anything, was lost, the only evidence before the Court is evidence that PM USA *voluntarily* provided to the Court.  *See* Letter of 6/19/02 from T. Frederick to Hon. Gladys Kessler.  Despite its simultaneous awareness of the fact that at least one PM USA employee had failed to follow the print and retain policy, the Government, for reasons known only to it, hardly bothered to explore the issue at all during subsequent depositions.  The Government now asks this Court to presume that it has been deprived of evidence helpful to its case, but the fact of the matter is that the Government had every opportunity to build a record in that regard and *declined* to do so.  Although PM USA

cannot say with certainty that e-mail subject to this Court's document preservation order was not

lost, the Government has done nothing to establish that it was.

Specifically, of the eleven employees at issue, ten were deposed in this case.  Of the ten

employees that were deposed, only Christina Hollis and Steve Sampson – the *first two* of the ten

to be deposed – were questioned regarding the subject of document retention/disposal suspension

at all.  *See* Hollis Dep., 2/15/02, at 81, 88-89, 90-92; Sampson Dep., 4/12/02, at 87-90 (Ex. 23)

(indicating understanding that current document retention policy required him to keep all

documents); *see also* Teitelbaum Dep., 4/16/02 (containing no testimony relevant to the subject

of document/e-mail retention; Pfiel Dep., 4/20/02 (same); Merlo Dep., 6/11/02 (same); Merlo

Dep., 6/12/02 (same); Culley Dep., 6/20/02 (same); Alonso Dep., 6/21/02 (same); LeVan Dep.,

6/25/02 (same); LeVan Dep., 6/27/02 (same); Lipowicz Dep., 7/18/02 (same); Lipowicz Dep.,

7/19/02 (same); Lund Dep., 7/27/02 (same).  Indeed, the Government first deposed five of the

ten employees (Culley, Alonso, LeVan, Lipowicz and Lund) *after* PM USA alerted the Court to

its email issue on June 19, 2002.  Additionally, the Government had the opportunity to question

Ms. Merlo and Dr. Lipowicz on this subject as recently as July of 2003 and again declined to ask

relevant questions, a failing that is glaring in view of the Government's request that Dr.

Lipowicz be excluded as a witness in this case.  *See* Merlo Dep., 6/26/03 (containing no

testimony relevant to the subject of document/e-mail retention); Lipowicz Dep., 7/22/03 (same).

In its defense, the Government asserts that, it was first made aware of the identities of the

eleven individuals who lost e-mail in December 2002, "*after* the United States had taken the

depositions of the ten employees."  Pl's. Mem. at 42.  Additionally, the Government asserts that,

when it re-deposed Ms. Merlo in June 2003 and Dr. Lipowicz in July 2003, it did not then

inquire about lost e-mail because "of the restrictions contained in Order #302."  Pl's. Mem. at 42

n.9.  Given the Government's extensive contentions regarding the importance of e-mail (*see* Pl's.

Mem. at 19-27, 42-48), and the severity of the sanctions it now seeks, its stated reasons for not

questioning witnesses regarding the retention of e-mail ring hollow.  It did not question more

than a handful of PM USA witnesses on the subject of document retention at all – not after it

became aware that one employee had failed to comply with the print and retain policy in January

of 2002; not after PM USA informed the Court about its e-mail problem in June 2002; and not

after learning the identities of the eleven individuals in question in December 2002.  Nor did the

Government ever approach the Court and seek additional discovery on this topic.  Even more

plainly, Order #302 did not prohibit the Government from putting the relevant questions to Ms.

Merlo and Dr. Lipowicz in June and July of 2003.  Had PM USA objected to the questioning

(which it would not have) PM USA could have placed its objection on the record, leaving it for

the Court to decide whether Order #302 prohibited such testimony.  The fact of the matter is that

Government eschewed every opportunity to make its record, and virtually all evidence

concerning this issue is evidence that PM USA voluntarily provided to the Court.  As the

Government informed this Court in July of 2002, the Government possessed – and continues to

possess – no evidence of "intent or targeted deletion" on the part of PM USA or its employees.

*See* Tr. of 7/26/02 Status Conference at 78 (Ex. 24).

> **D.     PM USA Took Comprehensive Steps to Recover Potentially
> Lost E-mail and Implement Cutting Edge Procedures to
> Facilitate Compliance with the Court's Document Preservation
> Order.**

After discovering the email problem at issue on this motion, PM USA took

comprehensive steps to identify means by which it might attempt to retrieve electronic records

that might not have been preserved in paper form.  In addition, PM USA suspended periodic

system deletions in April 2002, thereby jeopardizing the viability of its information systems rather than risk any loss of e-mail.  *See* Wallmeyer Dep., 12/19/02, at 111-12, 115-26; Wallmeyer Dep., 12/20/02, at 401-406; Letter of 9/13/02 from C. Cecil to S. Brody (Ex. 25); Letter of 12/18/02 from C. Cecil to A. Goldfarb (Ex. 26); Letter of 1/31/03 from T. Frederick to S. Brody (Ex. 27); Letter of 9/11/03 from T. Frederick to S. Brody (Ex. 28); Letter of 10/8/03 from P. Schwarzschild to S. Brody (Ex. 29).  Furthermore, in June 2002, PM USA's Senior Vice President for Compliance issued a reminder to all PM USA e-mail users, emphasizing the ongoing need for rigorous compliance with the company's print and retain policy for e-mail.  *See* Memo of 6/19/02 from G. Cummings to All Philip Morris U.S.A. E-mail Users (2067540024-25).  Additionally, with respect to the eleven individuals in question, those individuals were placed in the first groups scheduled to receive training on PM USA's newly implemented disposal suspension system.

    As noted above, PM USA dedicated substantial efforts and resources to exploring retrieval options, including, but not limited to, attempting to recover electronic records residing on backup tapes and computer harddrives.  To this end, PM USA suspended the recycling of backup tapes and retrieved the current backup tapes in full.  Those backup tapes contained inbox and sent e-mail dating back to October 2001.  From those tapes, PM USA identified and made available to the Government thousands of electronic e-mail records, irrespective of whether those same records had previously been made available in paper form during discovery.

    In addition to retrieval of the full existing backup, PM USA conducted a thorough search of its facilities and located 54 additional backup tapes that potentially contained electronic records of e-mail.  After attempting to restore the backup tapes in-house, PM USA retained an outside forensic expert (Kroll) for purposes of attempting to restore the 54 backup tapes and

recover any potentially relevant electronic records contained on the 54 additional backup tapes.
*See* Wallmeyer Dep., 12/19/02, at 115-26; Wallmeyer Dep., 12/20/02, at 401-406; Letter of
9/13/02 from C. Cecil to S. Brody; Letter of 12/18/02 from C. Cecil to A. Goldfarb; Letter of
1/2/03 from C. Cecil to A. Goldfarb (Ex. 30); Letter of 1/31/03 from T. Frederick to S. Brody;
Letter of 9/11/03 from T. Frederick to S. Brody; Letter of 10/8/03 from P. Schwarzschild to S.
Brody.  Even though "[b]ackup systems are designed for the mass storage of data, not for
selective searching and production of specific documents," PM USA readily and voluntarily
undertook this "expensive and laborious" recovery effort. *See* Kahn Decl. at Exhibit 1,
Evaluation and Report at 28.

The so-called "Kroll" e-mail recovery project took nearly nine months to complete.  It
involved extensive software engineering of a now obsolete version of the Legato backup
software to circumvent problems that prevented routine restoration of the tapes, as well as
recreating PM USA's Microsoft Exchange™ e-mail servers and using Kroll's proprietary
software to examine the servers to determine if any mailboxes or e-mail could be recovered.  Of
the 54 backup tapes sent to Kroll, Kroll was able to determine that 27 contained data from one or
more of the PM USA Microsoft Exchange™ e-mail servers.  The Kroll recovery project resulted
in the production of an additional 1239 responsive pages of e-mail, irrespective of whether those
documents had previously been made available in paper form.  *See* Letter of 10/02/02 from C.
Cecil to S. Brody (Ex. 31); Letter of 10/11/02 from C. Cecil to S. Brody (Ex. 32); Letter of
10/16/02 from C. Cecil to S. Brody (Ex. 33); Letter of 11/22/02 from C. Cecil to S. Brody (Ex.
34); Letter of 9/16/03 from P. Schwarzschild to R. Brooker (Ex. 35).

As mentioned above, PM USA is currently in the process of implementing a new system
to facilitate the preservation of e-mails subject to disposal suspension.  On July 17, 2003, PM

USA advised the Court that it has begun the rollout of a new disposal suspension system.  Under

the new system, a user *must* indicate whether an e-mail is disposal suspended under PM USA's

document retention policy before the employee can send the e-mail.  If the e-mail is marked

disposal suspended, a copy of the e-mail is electronically forwarded to a separate and permanent

electronic repository.  Similarly, when a PM USA employee receives an e-mail from outside the

PM USA e-mail system, that user is automatically prompted to – and, as a matter of policy, must

– make a determination of the status of the e-mail.  If the e-mail is marked disposal suspended, it

is also sent to the permanent electronic repository.  *See* Letter of 7/17/03 from T. Frederick to R.

Brooker; Tr. of 7/24/03 Status Conf., at 56-57.

Lastly, PM USA's decision to suspend routine system maintenance deletions resulted in

the retention of millions of pages of e-mail that are neither relevant to this case nor subject to the

Court's Document Preservation Order.  Consequently, PM USA experienced a substantial

increase in the instability of its computer system.  With the rollout and implementation of the

computerized disposal suspension system, PM USA is in the process of reinstating periodic

system maintenance procedures.  *See* Letter of 7/17/03 from T. Frederick to R. Brooker;

Transcript of 7/24/03 Status Conf., at 56-57.  Although no system that incorporates the human

element is foolproof or failsafe, PM USA is confident that its new, cutting-edge, system will

effectively facilitate the preservation of e-mail subject to disposal suspension notices, and render

negligible the risk that e-mail will be lost due to routine system maintenance procedures.

### E.  PM USA's Offer to Reimburse the Government for Costs.

Shortly before filing its motion for sanctions, the Government, PM USA, and Altria

participated in a meet and confer.  During that session, PM USA and Altria probed the legal and

factual basis for the Government's requested sanctions.  Despite their conviction that the

Government's motion rested on unsound factual and legal footings, both PM USA and Altria offered to reimburse the Government for costs associated with the additional Rule 30(b)(6) deposition conducted with respect to document retention/disposal suspension policies.  Tr. of 11/24/03 Meet and Confer at 13 (Ex. 36).  The Government rejected that offer, opting instead to file the instant motion shortly thereafter.

## III.   ARGUMENT

On the basis that certain PM USA employees did not print and retain e-mail, the Government asks this Court to: (1) infer that, since October 19, 1999, PM USA has marketed cigarettes to youths, manipulated the nicotine content of its cigarettes to create and sustain smokers' addictions, and failed to market potentially less hazardous cigarettes; (2) preclude PM USA and Altria from introducing evidence of PM USA's compliance with the Master Settlement Agreement in defending against the Government's claims; (3) preclude PM USA and Altria from calling Dr. Peter Lipowicz as a fact or expert witness at trial; (4) order PM USA and Altria to pay a monetary sanction of $2,995,000; and (5) order PM USA and Altria to reimburse the Government for the costs associated with the Rule 30(b)(6) deposition of PM USA on e-mail related issues.

**A.     Standards Governing the Court's Consideration of the Government's Motion for Sanctions.**

Federal Rule of Civil Procedure 37(b)(2) provides:  "If a party . . . fails to obey an order

to provide or permit discovery . . . the court in which the action is pending may make such orders

in regard to the failure as are just . . . ."  The Supreme Court has held that in circumstances where

a party fails to comply fully with a discovery order issued by the district court, the court's power

to impose sanctions "depends exclusively upon Rule 37, which addresses itself with particularity

to the consequences of a failure to make discovery by listing a variety of remedies which a court

may employ as well as by authorizing any order which is 'just.'"  *Société Internationale Pour*

*Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 207 (1958).

Accordingly, the standards that apply under Rule 37 should govern this Court's consideration of

the Government's motion for sanctions.[8]

"Under Rule 37, the district court has broad discretion to impose sanctions for discovery

violations."  *Bonds v. District of Columbia*, 93 F.3d 801, 807 (D.C. Cir. 1996) (citing *Nat'l*

*Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642-43 (1976)).  However, a district

court's discretion is not unbridled.  *Webb v. District of Columbia*, 146 F.3d at 971 (orders

imposing severe discovery sanctions are subjected to "a thorough, not a cursory, [review]")

(citing *Bonds*, 93 F.3d at 808).

---

[8]     The Government's motion references three sources of authority:  Federal Rules of Civil Procedure 16(f) and 37(b)(2), and this Court's inherent power to manage its own affairs.  Pl.'s Mem. at 27-32.  Under the Supreme Court's holding in *Société*, only Rule 37 provides authority for sanctions in this context.  *Société*, 357 U.S. at 207.  In any event, as the D.C. Circuit instructs, the standards are "much the same" under Rule 37 and under the district court's inherent power.  *Webb v. District of Columbia*, 146 F.3d 964, 972 n.16 (D.C. Cir. 1998); *see id.* at 971-72.  Likewise, the standards governing the imposition of sanctions under Rule 16(f) are also similar to those under Rule 37.  *See* Fed. R. Civ. P. 16(f) ("If a party . . . fails to obey a scheduling or pretrial order, . . . the judge . . . may make such orders with regard thereto as are just, and among other things any of the orders provided in Rule 37(b)(2)(B), (C), (D).").

"The central requirement of Rule 37 is that 'any sanction be 'just[.]''" *Bonds*, 93 F.3d at

808 (quoting *Ins. Corp. v. Compagnie des Bauxites de Guinée*, 456 U.S. 694, 707 (1982)).  "The

choice of sanction should be guided by the 'concept of proportionality' between offense and

sanction," *Bonds*, 93 F.3d at 808, and "is necessarily a highly fact-based determination," *id.* at

804.  "In determining whether a severe sanction is justified, the district court may consider the

resulting prejudice to the other party, any prejudice to the judicial system, and the need to deter

similar misconduct in the future."  *Id.* at 808 (citing *Shea v. Donohoe Constr. Co.*, 795 F.2d

1071, 1074 (D.C. Cir. 1986)); *accord Webb*, 146 F.3d at 971. Of course, consistent with these

principles, a federal court is free to conclude that, despite a violation, sanctions are unwarranted.[9]

---

[9]     Additionally, the Government's own conduct is a factor that the Court may consider in determining the present motion. *See, e.g., Black Panther Party v. Smith*, 661 F.2d 1243, 1280 (D.C. Cir. 1981) (court considering sanctions motion should give "some consideration" to conduct of party seeking sanctions), *vacated by* 458 U.S. 1118 (1982); *Monroe v. Ridley*, 135 F.R.D. 1, 6 (D.D.C. 1990) (citing *Black Panther Party* for the proposition that a court may consider the behavior of the other party when imposing sanctions). In this regard, the GAO has previously concluded that the Office of the Vice President ("OVP") suffered an "irretrievable loss of the electronic form of e-mail records while tapes were recycled between March 1998 and March 2000." GAO, Electronic Records:  Clinton Administration's Management of Executive Office of the President's E-mail System at 10-11 (April 2001) (emphasis added).  The OVP played a major part in the consideration of the smoking and health issues and injunctive relief measures that lie at the heart of this litigation.  *See, e.g.,* Declaration of Elizabeth M. Brown ¶ 3 (Counsel to Vice President Gore) ("The Clinton/Gore Administration included as one of its priorities, and initiated and supported a number of significant initiatives and actions, to reduce the incidence of cigarette smoking in the United States, especially among youth. . . .  Vice President Gore in turn directed me and certain other members of his staff to become involved in those tobacco-related initiatives and actions.") (Ex. 46).  The Government had this lawsuit under consideration during the time period when the OVP suffered its "irretrievable loss" of e-mail (*see, e.g.,* Lindsey Dep. (7/31/03) at 37 (Ex. 47)), which imposed on the Government a duty to preserve such potentially relevant evidence for use in this case.  *See, e.g., Zubulake v. UBS Warburg, LLC,* 2003 WL 22410619, at \*2.  A separate, independent duty to preserve the OVP e-mail records likewise arose from the Court's entry of its document preservation order on October 19, 1999.  *See* Order #1, ¶ 7.  The Government's apparent failure to comply with its own document preservation obligations is among the factors to be considered in determining whether the sanctions sought by the Government on the present motion would be 'just.'  *Bonds*, 93 F.3d at 808.

1.      **In Order to Obtain an Adverse Inference, the**
        **Government Either Must Show Conduct Amounting to**
        **Bad Faith, or Present Extrinsic Evidence that E-mail**
        **Was Lost that Would Have Been Helpful to its Case.**

As a preliminary matter, the Government's requests for adverse inferences are

inappropriate in light of the fact that it is the Court, and not a jury, that will sit as the trier of fact

in this case.  *See Thompson v. United States Dep't of Hous. & Urban Dev.*, --- F.R.D. ---, No.

CIV.A.MJG-95-309, 2003 WL 22963931, at *11 (D. Md. Dec. 12, 2003) (Grimm, M.J.) ("An

adverse inference instruction . . . [is] not appropriate for the simple fact that this is a bench trial,

and [the court] will be aware of these proceedings and certainly will be able to draw reasonable

inferences from the Local Defendants' failure to preserve and produce e-mail records as

ordered.").  As in *Thompson*, this Court will be fully aware of the circumstances relating to the e-

mail issues discussed here as it receives and considers evidence in this matter.  It would be a

pointless exercise for this Court to issue an order instructing itself, in advance of trial, and

without the benefit of a complete record, to draw sweeping (and, on certain critical issues,

potentially dispositive) inferences against PM USA.

a.      **To Obtain an Adverse Inference the Government**
        **Must Show Intentional Misconduct or Bad Faith.**

To draw an adverse inference as a sanction for the failure to preserve evidence, courts

generally require a showing of willfulness or bad faith on the part of the spoliator.  *Johnson v.*

*Wash. Metro. Area Transit Auth.*, 764 F. Supp. 1568, 1579-80 (D.D.C. 1991) (Oberdorfer, J.)

("Normally, [adverse] inferences are not drawn unless there is evidence of 'evil intent, bad faith

or willfulness.'") (citing *Vick v. Tex. Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975));

*Friends For All Children, Inc. v. Lockheed Aircraft Corp.*, 587 F. Supp. 180, 190-91, 208-09,

*modified*, 593 F. Supp. 388 (D.D.C. 1984) (Oberdorfer, J.); *see also Synanon Church v. United*

*States*, 820 F.2d 421, 428 n.18 (D.C. Cir. 1987) ("Willful destruction of evidence by a party properly raises the inference that the materials destroyed were adverse to the party which brings about the destruction.") (citation omitted).  Indeed, six Circuits have held that a showing of bad faith or intentional misconduct is always required before an adverse inference may be drawn, on the ground that such an inference presupposes that consciousness of wrongdoing motivated the spoliation.[10]  While the D.C. Circuit has yet to clearly establish the degree of culpability necessary to support an adverse inference sanction, it has held that lack of evidence of bad faith is, at a minimum, an important factor for the district court to consider.  *Perkinson v. Gilbert/Robinson, Inc.*, 821 F.2d 686, 691 & n.7 (D.C. Cir. 1987) (affirming district court's denial of adverse inference instruction where, among other things, there was "substantial uncertainty as to whether the documents were lost through inadvertence or because of actions taken in bad faith"); *accord Valentino v. United States Postal Serv.*, 674 F.2d 56, 73 n.31 (D.C. Cir. 1982) (affirming district court's denial of adverse inference where "the circumstances of the destruction . . . provide no basis for attributing bad faith to USPS") (citing *Vick*, 514 F.2d at 737); *see also Shepherd v. American Broad. Cos.*, 62 F.3d 1469, 1481 (D.C. Cir. 1995) ("A sanction for failure to preserve evidence is appropriate only when a party has consciously disregarded its obligation to do so.").[11]

---

[10]   *See, e.g.*, *Caprotta v. Entergy Corp.*, 168 F.3d 754, 756 (5th Cir. 1999); *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998); *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997); *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997); *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995); *Eaton Corp. v. Appliance Valves Corp.*, 790 F.2d 874, 878 (Fed. Cir. 1986).

[11]   In one instance, the D.C. Circuit suggested that a court may grant an adverse inference instruction where the defendant intentionally destroyed documents in violation of EEOC regulations, even though there is no showing that the defendant acted in bad faith.  *Webb*, 146 F.3d at 974.  In support of this proposition, the court cited cases from other Circuits, all involving the intentional destruction of documents in violation of EEOC regulations, and indicated that in such cases an adverse inference instruction is "a common sanction."  *Id.* at 974 n.20 (citing *Favors v. Fisher*, 13 F.3d 1235, 1239 (8th Cir. 1994); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1419 (10th Cir. 1987); *Shipley v. Dugan*, 874 F. Supp. 933, 940 (S.D. Ind. 1995)).  Indeed, even those Circuits that have clearly held that a showing

Footnote continued on next page

**b.    Absent Evidence of Bad Faith, the Government
Must Establish, Through Extrinsic Evidence,
that It Has Been Prejudiced.**

In any event, even those courts that permit an adverse inference in the absence of bad

faith require that the moving party show that it has been prejudiced because the missing evidence

would likely have supported its claims.  Thus, "the party seeking an adverse inference instruction

must adduce sufficient *evidence* from which a reasonable trier of fact could infer that the

destroyed or unavailable evidence would have been of the nature alleged by the party affected by

its destruction."  *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir.

2002) (internal quotation marks, brackets and citation omitted) (emphasis added); *see also*

*Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995); *Zubulake v. UBS Warburg,*

*LLC*, 2003 WL 22410619, at *6.  The evidentiary burden is an important aspect of the moving

party's burden because, "[i]n practice, an adverse inference instruction often ends litigation – it is

too difficult a hurdle for the spoliator to overcome."  *Zubulake*, 2003 WL 22410619, at *5.

In *Zubulake*, a case with facts strikingly similar to those here, Judge Scheindlin explained

that where the defendant did not destroy any e-mails in bad faith, the plaintiff was required to

prove through "extrinsic evidence" that the destroyed e-mails "would have been unfavorable to

the spoliator."  *Id.* at *7, n.55 (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 77

(S.D.N.Y. 1991)).  As a practical matter, in cases where the conduct of the party losing evidence

does not rise to the level of bad faith, the extrinsic evidence requirement serves to provide a basis

---

Footnote continued from previous page

of bad faith is required to draw an adverse inference hold that it is unnecessary to make such a showing where there
has been an intentional destruction of documents in violation of EEOC regulations.  *Compare Aramburu*, 112 F.3d
at 1407 (bad faith required) *with Hicks*, 833 F.2d at 1419 & n.5 (bad faith not required where records were destroyed
according to document retention policies that violated EEOC regulations regarding document retention).
Accordingly, *Webb* is inapposite on the issue of the degree of culpability necessary to support an adverse inference;
PM USA's destruction of e-mails was neither intentional nor in violation of federal regulations.

for an inference regarding the nature of the lost evidence.  Simply put, the party seeking an

adverse inference must show through other evidence that the lost evidence would likely have

been harmful to the non-moving party's case "since . . . it cannot be inferred from the conduct of

the spoliator that the evidence would even have been harmful to him."  *Id.* at *7.  Similarly, the

D.C. Circuit held in *Perkinson* that the district court properly denied an adverse inference

instruction because not only had the moving party failed to demonstrate bad faith, but also "the

unavailability of the [documents] – the contents of which were unknown – did not clearly affect

the outcome [of the case]."  *Perkinson*, 821 F.2d at 691 n.7.

Broadly speaking, the D.C. Circuit has also made clear that an adverse inference must not

be inconsistent with the other evidence in the record or be otherwise unreasonable.  In *Webb*, for

example, the D.C. Circuit held that, even where an adverse inference instruction is warranted, the

district court should instruct the jury to draw "[t]he most reasonable inference . . . that would not

be inconsistent with other evidence."  146 F.3d at 974 n.20.  *Cf. Tot v. United States*, 319 U.S.

463, 467-68 (1943) ("[A] statutory presumption cannot be sustained [under the Due Process

Clause of the Fifth Amendment] if there be no rational connection between the fact proved and

the ultimate fact presumed, if the inference of the one from proof of the other is arbitrary because

of lack of connection between the two in common experience.").

> ### 2.   In Order to Preclude Evidence of Compliance with the MSA or Prohibit Dr. Lipowicz from Offering Testimony in this Case, the Government Must Show Severe Prejudice or "Flagrant or Egregious" Misconduct.

With regard to the other issue-related sanctions requested by the Government –

precluding PM USA and Altria from supporting a crucial defense to injunctive relief (*i.e.*, the

state of affairs post-dating the MSA) and from calling Dr. Peter Lipowicz as a fact and expert

witness with respect to certain of the Government's core allegations – the D.C. Circuit has often observed that such severe sanctions are akin to the entry of a default judgment. *See Butera v. District of Columbia*, 235 F.3d 637, 662 (D.C. Cir. 2001) ("In some cases, the preclusion of expert testimony would be tantamount to a default judgment, and thus constitute an abuse of discretion."); *Bonds*, 93 F.3d at 808-09 (order precluding defendant from offering any fact witnesses at trial "approaches a default judgment in its severity"); *Smith v. Schlesinger*, 513 F.2d 462, 467 n.11 (D.C. Cir. 1975) (order precluding defendant from denying or contradicting, through introduction of evidence, core allegations in complaint "is virtually equal to entry of default judgment"); *see also Update Art, Inc. v. Modiin Publ'g, Ltd.,* 843 F.2d 67, 71 (2d Cir. 1988) ("harshest sanctions available are preclusion of evidence and dismissal of the action").

For a discovery violation to warrant such severe sanctions, the moving party must establish that: (1) the violation has "severely hampered" its ability to present its case; (2) the violation has imposed an "intolerable burden" on the district court; or (3) the sanction is necessary to punish "conduct that is disrespectful to the court" and "to deter similar misconduct in the future." *Webb*, 146 F.3d at 971. Where such a severe sanction is based only on deterring future misconduct, the sanction must be "supported by a finding of flagrant or egregious misconduct by the defendant." *Bonds*, 93 F.3d at 808-09.

### B.   Beyond Reimbursing the Government for Expenses Incurred – which PM USA has Already Offered to Do – PM USA's Conduct Does Not Warrant Sanctions.

Neither PM USA nor Altria should be subjected to draconian evidentiary and monetary sanctions based on the inadvertent failures of certain employees to comply with PM USA's good faith efforts to honor its duty to preserve evidence in this case. Indeed, as explained above, the degree of PM USA's culpability for any loss of e-mail is a question that is broadly applicable to

the Government's requested sanctions.  Concerning that degree of culpability, the Government goes to great lengths to present the facts of PM USA's document retention and e-mail preservation policies in a negative light, even going so far as to claim that PM USA's policies were intentionally "designed [to] cause the destruction of relevant evidence."  Pl's. Mem. at 34. There is simply no evidence – *none* – to support this assertion.  As described at length above, when stripped of the Government's deprecating characterizations, the facts reveal a company that has long been acutely aware of its obligations in litigation and that has implemented policies and procedures that, had they been followed in all cases, would have been more than sufficient under Order No. 1.  Indeed, as noted above, in critical respects, PM USA's approach to document retention mirrors that of certain federal agencies.

The Government makes much of the fact that, over time, a handful of employees indicated confusion about PM USA's e-mail retention policies.  Clearly, such an outcome is hardly surprising in an organization including thousands of employees.  Indeed, that the employees to which the Government refers, *see* Pl's. Mem. at 12-15, aired their confusion with the persons responsible for document retention practices is far more indicative of an organization that is functioning effectively than of one where policies and procedures are ineffective. Specifically, the Government alleges that PM USA "acted in bad faith" because it "was aware that its employees found company policies for the retention of email and electronic records to be unclear, resulting in the loss of email during monthly deletions, but did not take easily identifiable and cost-efficient steps to insure preservation of evidence that was relevant to the United States' claims in this action."  Pl's. Mem. at 36.  None of the evidence referred to by the Government supports these allegations.

*First*, the Government cites the deposition of Dr. Michael Watkins, a former PM USA scientist and hostile witness in this case, referring to testimony that, in his view, "the implementation of the document policy was not clear to a lot of employees" and that "it wasn't clear what you could shred and what you couldn't." Pl's. Mem. at 12; Watkins Dep., 5/9/02, at 350-52 (Ex. 37). Viewed in context, however, these hearsay accounts do nothing to call into question PM USA's good faith in the implementation of its records management policy. Notably, Dr. Watkins testified that: (1) he personally retained copies of electronic documents in both paper and electronic form, Watkins Dep., 5/9/02, at 350-51; (2) he was unaware of anyone who destroyed records in violation of the policy, *id.* at 351, 357-58; and (3) PM USA records personnel met with the employees in the Banded Paper Program to respond to their questions regarding records retention, *id.* at 351.[12]

*Second*, the Government refers to two inquiries received by William Brandt, the director of records management for Philip Morris Management Corporation ("PMMC"), during his five-and-a-half year tenure at the company. Pl's. Mem. at 12-15. In January 1998, Brandt received an e-mail from Mi Wong, an employee in PMMC's Information Services department, seeking clarification regarding the policy for the retention of e-mails and other electronic records. Brandt Dep., 6/17/03, at 217-30 & Ex. 8. Specifically, Wong stated that she had heard three "variations" of the policy: (1) "print and retain a hard copy and delete the electronic form";

---

[12] Although Dr. Watkins stated that "[s]ome of the people doing the training didn't have the answers" to certain of the employees' questions, Watkins Dep., 5/9/02, at 351, there is no indication that any such questions that were not answered at the meeting related to the print and retain policy that is the basis of the Government's motion for sanctions. Indeed, there is no indication in Dr. Watkins' testimony that such questions related in any way to e-mail; instead, Dr. Watkins indicated that the questions related to whether particular paper documents fell within the scope of the records subject to disposal suspension. *See id.* at 351-52 ("[I]t wasn't clear what you could shred and what you couldn't[.]").

(2) "print and retain a hard copy and keep the electronic form"; and (3) "keep and leave it in electronic form, whether its [*sic*] a hard drive, file server, or removable media." *Id.* at Ex. 8. Brandt promptly responded to Wong's inquiry, explaining that "[e]lectronic material subject to disposal suspension must be printed and retained in paper form for disposal suspension purposes." *Id.* He also had discussions with other employees in the Information Services department, and "endeavored as much as possible to make sure that everyone [in the department] heard the policy." *Id.* at 226-27. Neither Wong's isolated inquiry nor Brandt's conscientious response provides the slightest degree of support for the Government's allegation of bad faith on the part of PM USA.[13]

Seemingly at odds with its contention that PM USA's policies were inadequate is the Government's insistence that PM USA's comprehensive approach to document retention and disposal suspension was so comprehensive as to be intentionally confusing. *See, e.g.,* Pl's. Mem. at 2, 6-7, 12, 36-38. As the Government itself recognizes, *see* Pl's. Mem. at 39-40, PM USA is subjected to a great deal of litigation – litigation that involves numerous issues, many of which are entirely unrelated. It is therefore no small wonder that PM USA issues many disposal suspension notices covering a wide variety of documents and addressed to a varying array of business functions. This is what responsible corporations involved in litigation do, and despite the Government's characterizations, PM USA would be irresponsible – and open itself to similar

---

[13] The Government also refers to a conversation Brandt had with Johnny Nienow, a factory manager at PM USA's Blended Leaf plant in Richmond. Brandt Dep., 6/17/03, at 248-50. Brandt testified that, while visiting the plant, he had a passing conversation with Nienow, who "seemed a little unclear of his obligations regarding e-mail." *Id.* The only specific information that Brandt could recall from the conversation was Nienow's view that and "they didn't have enough printers in the factory." *Id.* at 249. The Government's suggestion that Nienow's comment regarding the number of printers in the factory somehow undermined the validity of the print and retain policy and gave rise to a duty on the part of PM USA to change its records management policy is far-fetched.

charges in other cases – were it to simply refuse to issue new disposal suspension notices on the entirely untenable ground that "enough is enough."  Moreover, as noted above, *see* section II.A, *supra*, PM USA's long-standing procedures in this regard were more than sufficient.  *See* Kahn Decl. at Exhibit 1, Evaluation and Report at 18 ("PMUSA's [disposal suspension] directives to employees are as comprehensive and exhaustive regarding preservation responsibilities as others I have seen."); *see also id*. ("It would seem that any PMUSA employee in receipt of PMUSA preservation directives and notices would have notice of their responsibility to preserve 'Disposal Suspended' records and information.").

Nor, as described above, and in the Evaluation and Report of Randolph Kahn, were PM USA's practices with respect to e-mail preservation and backup tape recycling at odds with best practices.  Indeed, PM USA's policies were the model of best practices – practices to which, in many respects, the Government itself adheres.  At the end of the day, corporations are nothing but organized groups of people, and people have always been, and will always be, susceptible to making entirely honest mistakes.  As Mr. Kahn indicates, PM USA's policies were sufficiently tailored to ensure the retention of relevant e-mail in this case.  Kahn Decl. at Exhibit 1, Evaluation and Report at 23 ("[t]he use of a print to paper method of retention by PMUSA was appropriate during the time period they used it, especially given the state of information technology tools for email and electronic records management available at the time").  As explained above, upon discovering that mistakes had been made, PM USA moved to isolate the problem, rectify it, and, to the fullest extent possible, retrieve any e-mails that might not have been printed.

It bears emphasizing that none of "evidence" on which the Government harps demonstrates that either Altria or PM USA, in the words of the Government, "designed policies

that they knew would and did cause the destruction of relevant evidence" in this case.  Pl's. Mem. at 34.  As the abundance of e-mail that has been made available to the Government in this case attests, had that been the goal, both failed, and failed utterly.

*       *       *

In short, this is not a case involving "deliberate destruction of evidence," nor a case in which PM USA acted with bad faith, as the Government repeatedly asserts.  Pl's. Mem. at 34. Indeed, the Government has offered no evidence to support these assertions.  Surely, the facts are inconsistent with a knee-jerk supposition that there is any lost e-mail harmful to PM USA.  Apart from failing to show any evidence of bad faith (let alone flagrant or egregious misconduct), the Government has similarly failed to present this Court with a shred of extrinsic evidence in support of the sweeping adverse inferences it seeks.  Yet the Government now asks this Court to presume in advance – even though this Court, as the trier of fact in this case, is fully capable of weighing the evidence at trial – that there is any lost e-mail that would have conclusively established that, since October 19, 1999, PM USA surreptitiously marketed to youth, manipulated nicotine, and refused to bring to market a viable less hazardous cigarette.  Here, once again the Government's requested sanctions are "unwarranted and totally disproportionate." Order #450 (Dec. 16, 2003).

The Government's over-reaching aside, as noted above, during the meet and confer which preceded the Government's filing, PM USA offered to reimburse the Government for the costs incurred in conducting the 30(b)(6) deposition pertaining to PM USA's e-mail issue.  Tr. of Meet and Confer at 13 (Nov. 24, 2003).  The Government declined PM USA's offer.  *Id*.  Still, in light of the record, and the absence of any evidence that the Government has been prejudiced beyond the expenses it incurred in conducting that deposition, PM USA believes that

reimbursement of costs is the only appropriate relief.  Beyond that, the Government's motion

should be denied.

> **1.    The Government Has Not Established Its Entitlement to**
> **Any Adverse Inferences, Let Alone the Sweeping**
> **Adverse Inferences it Seeks.**

The Government has not carried its burden with respect to establishing its entitlement to

any evidentiary inferences, let alone the far-reaching adverse inferences it seeks in its motion.

The Government has at best offered evidence that PM USA disclosed that a limited number of

employees did not print and retain their e-mail and that PM USA has not said with certainty that

all of the e-mail subject to the document preservation order was either printed by other

employees or made available via PM USA's subsequent retrieval and recovery efforts.  Yet the

Government now asks this Court to infer that since October 19, 1999 PM USA (1) targeted youth

in its marketing, (2) manipulated the nicotine levels in its cigarettes, and (3) failed to market

potentially less hazardous cigarettes.

As set forth in several of Defendants' pending summary judgment motions, the

government has no evidence that would support such inferences; indeed, the evidence is entirely

to the contrary.  *See* Defendants' Motion for Partial Summary Judgment on Claims that

Defendants Advertised, Marketed and Promoted Cigarettes to Youth and Fraudulently Denied

Such Conduct (Aug. 1, 2003); Defendants' Motion for Partial Summary Judgment with Respect

to the Government's Nicotine Manipulation and Addiction Allegations (Oct. 8, 2003);

Defendants' Motion for Partial Summary Judgment on Claims that Defendants Suppressed the

Development of Less Hazardous Cigarettes (Oct. 8, 2003).  It is obvious, therefore, that what the

Government hopes to do is substitute these inferences for its absent proof.  But not only are such

inferences unjustified as to PM USA for the reasons explained below, but the Court must

consider the impact they could have not just on PM USA, but on the remaining Defendants, who have no responsibility for or involvement in this issue.

This case involves RICO claims for alleged conspiracy and conducting the activities of an enterprise through a pattern of racketeering activities. Unilateral company conduct, even if independently wrongful, is relevant to these claims only if undertaken in furtherance of the alleged scheme to defraud that is purportedly the object of the alleged RICO enterprise and conspiracy. Thus, the inferences the Government asks this Court to draw against PM USA are only relevant to the Government's claims if the Court also finds that PM USA undertook the activities that are the subject of the requested inferences in furtherance of the alleged scheme to defraud. Because the use of such inferences for this purpose would be manifestly unfair to the other Defendants – who, as alleged co-conspirators, could be held liable for PM USA's actions – for this reason alone, they should not be imposed as sanctions by this Court.

There are other reasons why these inferences should not be imposed as sanctions on PM USA itself. As noted above (*see* Section III.A.1, *supra*) the party seeking an adverse inference generally has the burden of establishing that: (1) that the conduct of party against whom adverse inferences are sought amounts to bad faith or other highly culpable conduct; and (2) that the party seeking adverse inferences has been prejudiced by any loss of evidence. *See, e.g., Residential Funding*, 306 F.3d at 107. *First*, because the Government's motion is entirely devoid of evidence (as opposed to rhetoric) concerning culpable intent, this Court should deny its request for adverse inferences. As the facts clearly demonstrate, the e-mail issues presented here were inadvertent and random. PM USA's conduct in reporting the loss of e-mail to the Court further demonstrates its good faith. Indeed, as noted above, virtually the only evidence supporting the Government's motion is evidence that PM USA *voluntarily* provided. Although

the Government took numerous depositions after becoming aware that one employee had not fully complied with the print and retain policy, the Government, with very limited exceptions, did not bother to question witnesses regarding their individual compliance with the print and retain policy.  In short, the Government had every opportunity to make its record on this motion, and the Government declined every opportunity, contenting itself to rely only upon innuendo and invective.  Because the Government has not met its burden of proof with regard to showing intentional conduct that would be indicative of an intent to suppress the truth, any adverse inference against PM USA is inappropriate.

*Second*, the Government has failed to demonstrate that it has been prejudiced insofar has it has not provided this Court with any "extrinsic evidence" that any lost e-mail would have supported its claims.  *See* Section III.A.1.b, *supra*.  Throughout this litigation, PM USA has made available millions upon millions of documents, including between 20,000 and 30,000 pages of e-mail authored by the eleven employees whose e-mail handling forms the basis for the Government's motion.  In short, the Government has had a veritable wealth of evidence available to it from which it could establish the relevancy of any missing e-mails, if, that is, any such evidence existed.  Yet, in its 68-page motion, the Government does not identify so much as a *single* produced e-mail message from the eleven individuals at issue in support of its assertion that evidence was lost that would establish that, since October 19, 1999, PM USA has engaged in misconduct of the type alleged in the Complaint.  For that matter, the Government does not identify a single piece of evidence from *any* PM USA employee that would tend to support its contention that lost e-mails are in some way relevant to the issue of post-October 19, 1999 misconduct.

Apart from repeating the allegations in its complaint and broadly describing the business function of the eleven employees at issue, the Government offers nothing to satisfy its burden. Certainly these broad and unsubstantiated claims cannot warrant the imposition of such wide-ranging inferences:

> It would simply be inappropriate to give an adverse inference instruction based upon *speculation* that deleted e-mails would be unfavorable to Defendant's case. Without some evidence, direct or circumstantial, of the unfavorable content of the deleted e-mails, the Court simply cannot justify giving the adverse inference instruction.

*Concord Boat Corp. v. Brunswick Corp.*, No. LR-C-95-781, 1997 WL 33352759, at *7 (E.D. Ark. Aug. 29, 1997) (emphasis added).

In fact, as noted above, an abundance of evidence exists to *rebut* the Government's contention that it has been prejudiced by any loss of e-mail. All evidence on the topic of whether PM USA has targeted youth, manipulated nicotine, or refused to develop a less hazardous cigarette since October 19, 1999, is to the contrary. For example, with respect to the Government's allegation that PM USA has ever marketed to youth, millions of PM USA Marketing documents have been publicly available on the PM Docs website since the commencement of this lawsuit, and tens of thousands more have been made available to the Government in the course of discovery. These documents include the very brand marketing plans and marketing research reports the Government suggests may have been the subject of the e-mail at issue. Indeed, boxes of brand marketing plans and marketing research documents are among the materials recently disclosed as supplemental materials considered by several of the

Government's own marketing witnesses.[14]  As even the Governments' experts concede, not a single PM USA brand marketing plan identifies a strategy of targeting minors or non-smokers of any age, and not a single marketing research report in the last 30 years involves anyone under legal age.[15]  The requested inference is thus "inconsistent with other evidence" in this case, *Webb*, 146 F.3d at 974 n.20, and nothing more than a backdoor attempt to achieve through discovery sanctions that which is belied by the evidentiary record.

Finally, insofar as it cannot show either bad faith or relevance, the Government has failed to establish any cognizable prejudice at all. In *Concord Boat Corp.*, 1997 WL 33352759, at *8, plaintiffs sought adverse inferences based upon the loss of e-mail covering a nine-month period. The court, denying the requested inferences, found that in a case challenging the entire industry for the course of a decade, and where over one million documents were already produced, "[i]t is doubtful that e-mails deleted over a recent nine-month period would have that great of an effect upon the overall body of proof in this case." *Id.*; *see also Perkinson*, 821 F.2d at 691 n. 7

---

[14]   *See, e.g.,* Letter of 7/16/03 from R. Brooker to J. Redgrave (identifying supplemental reliance materials of Dr. Dean Krugman (including marketing plans)) (Ex. 38); Letter of 8/1/03 from R. Brooker to J. Redgrave (identifying additional supplemental reliance materials of Dr. Dean Krugman (including marketing research report)) (Ex. 39); Krugman Dep., 11/14/03, at 415 (Dr. Krugman reviewed 10-15 boxes of marketing plans) (Ex. 40); Krugman Dep., 11/14/03, at 407 (Dr. Krugman reviewed 10 boxes of marketing research materials).

[15]   *See, e.g.,* Krugman Dep., 11/14/03, at 441-43 (Dr. Krugman cannot identify a Philip Morris marketing plan that contains a strategy of using advertising and marketing to attract people under 18 to smoke); Krugman Dep. 11/14/03, at 485-86 (no marketing research by Philip Morris among anyone under age 18 since 1974); Biglan Dep., 12/5/03, at 383-85, 518-22, 565-68 (Dr. Biglan can identify no company document reflecting a specific intent to market to youth) (Ex. 41); Biglan Dep., 12/5/03, at 538 (Dr. Biglan cannot recall seeing evidence of a single instance of Philip Morris or any tobacco company conducting qualitative marketing research among anyone under 18); Chaloupka Dep., 12/17/03, at 625-27 (Dr. Chaloupka is unable to identify a single Philip Morris marketing document, out of the thousands he has reviewed, that articulated a strategy of using a marketing practice to influence anyone under 18 to smoke or to smoke a Philip Morris brand) (Ex. 42); Dolan Dep., 5/10/02, at 321-22 (Ex. 43); Dolan Dep., 12/18/03, at 421-22 (Dr. Dolan cannot identify a single specific company document that expressly states an intent to market to youth) (Ex. 44);Dolan Dep., 12/18/03, at 533-34 (Out of the "trailer loads" of marketing research reports generated by Philip Morris, Dr. Dolan can think of "only a few" that included anyone under 18, none of which he can identify as having occurred in the last 30 years); Eriksen Dep., 12/3/03, at 710 (Industry documents do not explicitly state the belief that marketing causes people to start to smoke, or the intent of the tobacco companies to target adolescents) (Ex. 45).

(affirming denial of adverse inference instruction because, among other things, "the unavailability of the destroyed [documents] – the contents of which were unknown – did not clearly affect the outcome" of the case).

The present situation is even more compelling.  The Government's case challenges the conduct of the entire tobacco industry over the course of the last half-century.  PM USA and its co-defendants have made available millions upon millions of documents related to all aspects of their businesses.  Hundreds of fact witnesses have been deposed and this case has involved perhaps more extensive expert discovery than any case in the history of recorded jurisprudence. Much as was the case in *Concord Boat*, the outcome of this case is unlikely to be determined based "upon the content of a few e-mails."  *Id.*  The Government has made no showing as to why it is that, out of the tens of millions of pages of document and deposition discovery it has taken, these inadvertently lost e-mails represent the only means by which it could prove its entitlement to relief.  Because the Government has failed to show it has suffered any actual prejudice, the Court must deny its request for adverse evidentiary inferences.

> **2.      The Government's Requests to Preclude the Assertion**
> **of a Defense and the Testimony of a Key Fact and**
> **Expert Witness Should Be Rejected.**

The Government seeks to exclude two types of evidence.  *First*, because the e-mail at issue was in the e-mail systems of individuals having responsibilities for areas that are broadly subject to the terms of the Master Settlement Agreement, the Government requests that this Court prohibit PM USA from introducing any evidence whatsoever concerning its compliance with the Master Settlement Agreement.  *See* Pl's. Mem. at 62-64.  As a practical matter, the Government seeks an order striking one of PM USA's principal defenses to the injunctive relief the Government seeks in this case.  *Second*, the Government seeks an order precluding Dr. Peter

Lipowicz from offering any fact or expert testimony concerning PM USA's efforts to develop a less hazardous cigarette.  Here, the order the Government seeks would have the practical effect of denying PM USA the opportunity to rebut central allegations contained in the Government's complaint.  Such relief would be disproportionate and unjust.

Both of the requested sanctions are a potentially dispositive on important issues in this litigation, and, as explained above (*see* Section III.A.2, *infra*) the Government must be held to a lofty burden of proof – a burden that requires the Government to demonstrate either severe prejudice or "flagrant or egregious misconduct." *Webb*, 146 F.3d at 975; *see also Butera*, 235 F.3d at 661.  Under the standards of *Webb,* in considering the Government's request, the Court should reject the request unless the Government establishes (1) that the failure to print and retain e-mail by certain PM USA employees has "severely hampered" the Government's ability to present its case; (2) that the failure has "put an intolerable burden on the district court;" or (3) that the sanction is necessary to address conduct that is "disrespectful to the court and to deter similar misconduct in the future." *Webb*, 146 F.3d at 971.  Moreover, the Court should "give adequate consideration to 'whether lesser sanctions would be more appropriate for the particular violation.'" *Id.*; *see also Bonds*, 93 F.3d at 808-809 (finding that "[t]he broad preclusion order under review approaches a default judgment in its severity," and requiring a judge to consider less drastic responses "'[b]efore the extreme sanction of preclusion may be used'") (quoting *Outley v. City of New York*, 837 F.2d 587, 591 (2d Cir. 1988)).

*First*, the Government has not demonstrated that its case has been hampered in any respect, let alone "severely hampered" such that a potentially case dispositive sanction would be appropriate.  As is the case with respect to the adverse inferences that the Government seeks, the Government has failed to offer any extrinsic evidence tending to indicate that any lost e-mail

would have been favorable to its claims concerning compliance with the MSA or the development of less hazardous cigarettes.  To the contrary, the Government has conducted unfettered discovery into PM USA's actions on both issues.[16]  Such being the case, the Government's request should be denied.

*Second*, the only burden placed on the Court is the resolution of the Government's motion.  The Court is not called upon to "modify its own docket and operations in order to accommodate" any delay.  *Webb*, 146 F.3d at 971.  Thus, the burden here does not rise to the level of that required by *Webb* to impose a potentially case dispositive sanction.

*Third*, there is no evidence that deterrence is necessary.  The record shows plainly that PM USA and Altria were aware of the need and importance of retaining documents for litigation and had implemented processes and training to meet that need.  The record also shows that PM USA came forward when the problem was identified and undertook substantial efforts to ameliorate the problem and prevent its recurrence.  Importantly, under *Webb*, the conduct to be deterred is not mere inadvertence, as transpired here, nor even that of negligence, but rather "flagrant or egregious misconduct by the defendant."  *Id*. at 975.   Because the Government has not carried its burden with respect to the preclusion it seeks, the Government's request should be rejected.

---

[16]     Indeed, with regard to the work of Dr. Lipowicz, the Government is in possession of copious amounts of evidence – evidence that supports the opposite inference.  PM USA has not only made available voluminous records regarding its efforts to commercialize a less hazardous cigarette, it has made available volumes of e-mails as well.  These documents detail the extraordinary efforts by PM USA to commercialize a less hazardous cigarette, including the Accord and numerous other projects.  For example, PM USA has provided documents illustrating these efforts in detail, including: component technologies of a less hazardous cigarette, prototype descriptions, scientific data and test results, internal meeting minutes, timelines, budgets, yearly plans and development and marketing plans.  From these documents, the Government has not identified a single record in support of its assertion that it has been deprived of impeachment evidence on the issue of PM USA's efforts to bring to market a viable less hazardous cigarette.

### 3.  The Government's Request for $2,995,000 in Monetary Sanctions Should Be Denied.

The Government's request for $2,995,000 in monetary sanctions is utterly arbitrary and wholly unwarranted in light of the facts.  Relying on a readily distinguishable case from another district, the Government attempts to persuade this Court to issue a sanction that is wildly disproportionate to the conduct at issue.  Yet the Government fails to produce any evidence to support its request; instead, the Government engages in a specious mathematical exercise. Because the Government has failed to present any fact that would justify its request for such an exorbitant sanction, the Court should reject its request.

The Government's attempt to analogize the facts in this case to the facts underlying the monetary sanction awarded in *In re Prudential Ins. Co.*, 169 F.R.D. 598 (D.N.J. 1997) is unavailing.  There the court addressed "the persistent and recurrent destruction of documents" by agents and employees of Prudential subsequent to the court's document preservation order.  *Id.* at 599.  Specifically, despite the clear document preservation order in *Prudential*, the defendant nonetheless (1) failed to ever establish any comprehensive document retention policy; (2) failed to prepare and distribute any written document preservation manual; and (3) failed to ever inform its employees of the existence of the court's document preservation order or set any policy in place to ensure compliance.  *Id.* at 612-13.  Coupled with a company-wide document destruction policy that was never suspended, the result was the destruction of documents by four separate offices.  *Id.* at 601, 613.  At one office, 9000 client files were cleansed and eighty folders of documents were destroyed.  *Id.* at 613.  Another office destroyed 150 documents from 200 files. *Id.* at 614.  Still another office employed a general manager who ordered that documents be destroyed and personally concealed evidence.  *Prudential*, 169 F.R.D. at 611-12.  Despite their

numerous and widespread nature, Prudential did not promptly discover or notify the court of these problems.  *Id.* at 614.

The court determined that "[w]hen senior management fails to establish and distribute a comprehensive document retention policy, it cannot shield itself from responsibility because of field office actions."  *Prudential*, 169 F.R.D. at 615.  The court found that the defendant lacked internal coordination as to its document retention policies, and that its efforts "represented a haphazard response to a serious problem of judicial administration."  *Id.* at 616.  In the end, the Court sanctioned the defendant because of its "consistent pattern of failing to prevent unauthorized document destruction."  *Id.*

The conduct leading to monetary sanctions in *Prudential* was far different in nature than the inadvertence at issue here.  The sanction in *Prudential* was based on a repeated pattern of failure to preserve documents that spanned multiple offices.  In this instance, the problem is hardly due to any failure by PM USA to implement appropriate policies.  Also, Prudential failed to ever initiate a comprehensive document preservation plan and distribute it to employees; PM USA, on the other hand, has demonstrated a long-standing commitment to document preservation and has allocated massive amounts of time and resources to ensure compliance with that policy.  Ultimately, the court sanctioned Prudential for its "haphazard and uncoordinated approach to document retention" and its failure to ever attempt to address these problems despite recurring themes of document destruction from the inception of litigation.  *Prudential*, 169 F.R.D. at 614-15.  PM USA's conduct here is hardly comparable to the factual scenario presented in *Prudential*.  To the contrary, PM USA has continued to engage in company-wide efforts to ensure compliance not only with its comprehensive document retention and disposal suspension policies but also specifically with this Court's orders.

- 47 -

The Government reliance on *Prudential* is nothing more than an attempt to receive a sum disproportionate to PM USA's actions.  Because it has not established anything close to the pervasive disorder and disarray at issue in *Prudential*, the Government has shown no reason why it is entitled to nearly $3 million in sanctions.  Its request should be rejected.

**IV.    CONCLUSION**

For all the foregoing reasons, the Government's Motion for Evidentiary and Monetary Sanctions Against Philip Morris USA and Altria Group Due to Spoliation of Evidence should be denied to the extent it seeks relief beyond the reimbursement of costs.

Dated:  January 16, 2004                         Respectfully submitted,

                                                 /s/ David Eggert *for*
                                                 Timothy M. Broas (D.C. Bar No. 391145)
                                                 WINSTON & STRAWN LLP
                                                 1400 L Street, N.W.
                                                 Washington, D.C.  20005-3502
                                                 Telephone:  (202) 371-5700

                                                 Dan K. Webb
                                                 Thomas J. Frederick
                                                 WINSTON & STRAWN LLP
                                                 35 West Wacker Drive
                                                 Chicago, Illinois  60601-9703
                                                 Telephone:  (312) 558-5700

                                                 David S. Eggert (D.C. Bar. No. 384641)
                                                 Jonathan L. Stern (D.C. Bar No. 375713)
                                                 Eric Suter (D.C. Bar No. 463799)
                                                 ARNOLD & PORTER
                                                 555 12th Street, N.W.
                                                 Washington, D.C.  20004-1206
                                                 Telephone:  (202) 942-5000

                                                 Attorneys for Defendants

- 48 -

Altria Group, Inc. (formerly known as
Philip Morris Companies Inc.) and
Philip Morris USA Inc. (formerly known
as Philip Morris Incorporated)