UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------X

UNITED STATES OF AMERICA, :
:
Plaintiff, :
: Case Number
vs. : 99-2496 (GK)
:
PHILIP MORRIS INCORPORATED, :
et al., :
:
Defendants. :

-------------------------------x

Washington, D.C.
Thursday, June 20, 2002

Videotape Deposition of:

J. HOWARD BEALES, III,

the witness, was called for examination by counsel for Defendant R.J. Reynolds, pursuant to notice, commencing at 9:09 a.m., at the law offices of Collier Shannon Scott, PLLC, 3050 K Street, Northwest, Suite 400, Conference Room 5, Washington, D.C., before Dawn A. Jaques, Certified Shorthand Reporter and Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

APPEARANCES:

On behalf of the Plaintiff:
DAVID S. KLONTZ, ESQ.
United States Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Room 10016
Washington, D.C. 20530
(202) 514-6748

On behalf of Defendant R.J. Reynolds:

WILLIAM C. MacLEOD, ESQ.
JEFFREY A. KAUFFMAN, ESQ.
JOHN WILLIAMS, ESQ.
Collier Shannon Scott, PLLC
3050 K Street, N.W.
Suite 400
Washington, D.C. 20007-5108
(202) 342-8811

On behalf of Defendant Philip Morris:
KEVIN M. GREEN, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6417

ALSO PRESENT:
JOHN ANDREW SINGER, ESQ.
United States Federal Trade Commission
Office of the General Counsel
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-3234

ROBERT N. FENILI, Ph.D. Economist
DAVID ROSEN
Georgetown Economic Services, LLC
3050 K Street, N.W.
Washington, D.C. 20007-5108
(202) 945-6677



I-N-D-E-X

WITNESS: PAGE:
J. HOWARD BEALES
Direct Examination by Mr. MacLeod 5
Cross Examination by Mr. Klontz 39
Redirect Examination by Mr. MacLeod 70

-oOo-

E-X-H-I-B-I-T-S

BEALES DEPOSITION EXHIBIT: PAGE:
No. 1 June 11, 2001 FTC press release .... 6
No. 2 Curriculum Vitae of J. Howard Beales 7
No. 3 April 3, 1992 letter to Lois Greisman from J. Howard Beales attaching evaluation of JAMA articles ........ 16
No. 4 White paper, "Advertising and the Determinants of Teenage Smoking Behavior" .......................... 19
No. 5 May 10, 1993 letter to Judith Oldham from Judith Wilkenfeld attaching draft Complaint and Order .......... 20
No. 6 March 2, 1994 letter to Judith Oldham from Judith Wilkenfeld attaching revised draft Complaint and Order .. 23
No. 7 "Presentation of R.J. Reynolds Tobacco Company Concerning the Marketing of Camel Cigarettes" .................. 24
No. 8 June 7, 1994 press release ......... 33
No. 9 Respondent's Final Witness List .... 36



PROCEEDINGS

THE VIDEOGRAPHER: This is the deposition of Howard Beales, noticed by Defendant, in case number 99-2496 (GK), entitled United States of America v. Philip Morris Incorporated, et al., the United States District Court for the District of Columbia.

My name is Brian Halma, and I am the certified legal video specialist operating the equipment for this deposition. I am employed by Spherion.

This deposition is being taken on Thursday, June 20th, 2002, at the offices of Collier Shannon Scott, 3050 K Street, Northwest, Washington, D.C., at the time indicated at the lower portion of the television screen. The time on the screen is 9:09:07.

I will now ask counsel to please identify themselves and indicate the parties they represent.

MR. MacLEOD: I am Bill MacLeod, representing R.J. Reynolds. With me this morning is Jeff Kauffman and Robert Fenili.

MR. GREEN: I am Kevin Green on behalf of Philip Morris.



MR. KLONTZ: David Klontz, United States Department of Justice.

MR. SINGER: John Andrews Singer from the Federal Trade Commission, and I would just like to emphasize that Dr. Beales is here in his private capacity, but I am representing whatever interests the FTC may have to the extent there might be questioning about his current capacity with the FTC.

THE VIDEOGRAPHER: The court reporter, Dawn Jaques from Spherion, will administer the oath to the witness.

Whereupon,

J. HOWARD BEALES, III,

was called as a witness and, after having been first duly sworn by the Notary Public, was examined and testified, as follows:

DIRECT EXAMINATION BY COUNSEL FOR R.J. REYNOLDS

BY MR. MacLEOD:

Q Good morning, Dr. Beales.

A Good morning.

Q You have been deposed before, I believe. Is there any question that you have regarding the deposition today before we begin?

A I don't think so.

Q. Okay, good. Let me begin by asking you for your full name for the record, please.
A. I am J. Howard Beales the Third.
Q. And your current position?
A. I'm the Director of the Bureau of Consumer Protection at the Federal Trade Commission.
MR. MacLEOD: I'd like to mark Exhibit 1 for identification.
(Beales Deposition Exhibit No. 1 was marked for identification.)
BY MR. MacLEOD:
Q. Dr. Beales, do you recognize this document?
A. I do.
Q. Can you describe what this document is saying?
A. It's a press release announcing my appointment as Director of the Bureau.
Q. This press release states that J. Howard Beales, Director of the Bureau of Consumer Protection, previously served at the Commission from 1977 to 1987 in positions ranging from Associate Director for Policy and Evaluation, Acting Deputy Director, and Assistant



to the Director in the Bureau of Consumer Protection to economist in the Bureau of Economics. During his tenure, he was instrumental in developing Commission policies that prevail today including, the Deception Policy Statement, the Advertising Substantiation Policy Statement. He was also instrumental in developing the Credit Practices Rule. Most recently, Beales was an associate professor of strategic management and public policy at The George Washington University."
Is that an accurate statement of your background at the Federal Trade Commission?
A. Yes, it is.
MR. MacLEOD: I'd like to mark Beales Exhibit 2 for identification.
(Beales Deposition Exhibit No. 2 was marked for identification.)
BY MR. MacLEOD:
Q. Dr. Beales, do you recognize the document that has been marked as Beales Exhibit 2?
A. I do. It's my resume.
Q. What I would like to do is to ask you to describe for us, starting with your education,



the salient points on the curriculum vitae leading up to the work experience indicated 1988 to present. Could you do that for me?
MR. KLONTZ: Objection.
THE WITNESS: I was -- I received my BA degree from Georgetown University in 1972. I graduated magna cum laude, Phi Beta Kappa, with a major in economics. I got my Ph.D. in economics from the University of Chicago in 1978, and most recently, before going to the FTC, I was the associate professor of strategic management in public policy at George Washington University.
Do you want me to go through the rest of it, or --
BY MR. MacLEOD:
Q. Can you describe in some more detail the positions that you held prior to your position of professor at George Washington University?
A. I was the chief of the Human Resources and Housing Branch at the Office of Information and Regulatory Affairs at the Office of Management and Budget. I held that position for about a year and was in charge of reviewing rules under the executive order on costs and benefits



of regulation.
Prior to that, I was the Associate Director for Policy and Evaluation in the Bureau of Consumer Protection at the FTC from August of '83 to June of '87. The Associate Director for Policy and Evaluation was essentially in charge of review of case selection for the Bureau of Consumer Protection at the time. I also served as Acting Deputy Director of the Bureau of Consumer Protection from October of '85 to July of '86.
Prior to the Policy and Evaluation post, I was an assistant to the Director in the Bureau of Consumer Protection from November of '81 to August of 1983; and prior to that, I was an economist in the Bureau of Economics working on both some research and on consumer protection matters.
Q. Without describing any information that is privileged under any privilege the Commission might assert, can you describe in some more details the responsibilities that you held while at the Federal Trade Commission?
MR. SINGER: I'm going to object, but you may answer.

THE WITNESS: In which position?
BY MR. MacLEOD:
Q. Starting with the position that you last held at the Federal Trade Commission.
A. The Division of Policy and Evaluation reviewed recommendations for the Bureau Director on investigations that the staff wanted to pursue of unfair deceptive practices and made a recommendation to the Bureau Director about whether that was an investigation that should go forward or not.
It similarly made recommendations on whether or not the staff should be authorized to engage in consent negotiations in a particular case; and it also handled broader policy issues, such as the development of the Commission's Deception Policy Statement and its policy statement on advertising substantiation.
Q. As Acting Director, can you describe your responsibilities?
A. Well, jointly with the Bureau Director, I essentially managed the Bureau's staff of -- at the time, it was about 145 lawyers. I was primarily responsible for law enforcement activities that involved consumer credit or



marketing practices, and also energy advertising.
I had primary responsibility for rule making activities, rule making proposals and reviews of existing rules, and managed the consumer protection activities in the FTC's regional offices.
Q. And as assistant to the Director?
A. It was particular projects as assigned. I assisted in the review of proposed definition of deceptive acts or practices, including the proposed statutory definition, and also the beginning stages of the FTC's Deception Policy Statement was done while I was an assistant to the Director.
I had primary responsibility for supervising the review of the Commission's advertising substantiation doctrine. I assisted in developing evidentiary standards for rule makings, and applied those standards in particular rule makings involving food advertising and the Credit Practices Rule.
Q. What is the Commission's Deception Policy Statement?
MR. SINGER: Objection. You may answer.



THE WITNESS: It was in the form of a letter to Congressman Dingle analyzing the Commission's deception jurisdiction and articulating the criteria that the Commission used to determine whether an act or practice is deceptive.
BY MR. MacLEOD:
Q. What was the Substantiation Policy Statement?
MR. SINGER: Objection. You may answer.
THE WITNESS: The Substantiation Policy Statement was a Commission federal register notice that resulted from the review of the substantiation program, and articulated the Commission's policy on the amounts of evidence that would be required to constitute a reasonable basis.
BY MR. MacLEOD:
Q. Did you receive any awards or recognitions while at the Federal Trade Commission?
A. I did. I received an award for excellence while I was an assistant to the Director. I received the Commission's award for



distinguished service in 1987, and I received Senior Executive Service awards for management in 1984 and 1986.
Q. Can you describe your responsibilities at the Office of Management and Budget?
A. The branch handled all transactions with, I think it was five different cabinet agencies: Labor, HHS, Housing and Urban Development, Treasury, and some smaller agencies.
It was responsible for approving Agency paperwork requests under the Paperwork Reduction Act. It was responsible for reviewing proposed and final rules under the executive order that required regulations to have benefits in excess of their costs to the extent possible.
Q. What was your role in these activities?
A. I was the branch chief supervising the work of a group of desk officers. They would come to me with recommendations. In some cases, they were decisions that I could make on my own, as in most of the paperwork matters; in other cases, we formulated a recommendation to the administrator of OIRA, who made the final decision.
Q. Without divulging any privileges that

the Commission would assert, can you describe for me any role that you had in reviewing tobacco advertising or marketing practices while at the Commission?
MR. SINGER: Objection. You may answer.
THE WITNESS: I was involved in several cigarette matters. I was involved in the recommendation for rotational warnings that the FTC made in -- or that the Bureau Director made in the -- I guess it was about 1982.
I was involved in the approval of the plans for rotational warnings that companies had to submit once that statute was enacted.
I was involved in the review of the tar and nicotine measurement system in the investigation of Barclay cigarettes that led to the FTC's case against Brown & Williamson. I mean, any tobacco advertising matter that the Commission did at that time would have been -- while I was Associate Director for Policy and Evaluation would have been something that would have come through my office.
BY MR. MacLEOD:
Q. After you left the Office of Management



and Budget, did you have occasion to study advertising issues in tobacco again?
A. I did.
Q. Do you recall what occasion that was?
A. I consulted on a number of cigarette matters, including most prominently the Joe Camel -- the FTC's investigation of Joe Camel.
Q. Can you describe how your involvement in that began?
A. I was contacted by Collier Shannon shortly after a series of articles appeared in the Journal of the American Medical Association that were critical of the Joe Camel advertising campaign and asked to review those articles.
Q. Did you conduct that review?
A. I did.
Q. Did you draw any conclusions from your review?
A. I wrote an analysis of the articles that concluded that -- basically that the articles didn't provide a basis for thinking that the Joe Camel advertising campaign caused any particular problem.
MR. MacLEOD: I'd like to mark this next exhibit for identification.



(Beales Deposition Exhibit No. 3 was marked for identification.)
BY MR. MacLEOD:
Q. Dr. Beales, do you recognize the document marked as Beales Exhibit 3 for identification?
A. I do. It's the paper I prepared in evaluating the JAMA articles.
Q. Can you describe in a little more detail the conclusions that you reached and recorded in that document?
MR. KLONTZ: Objection.
MR. SINGER: I'll object as well, but you may answer.
THE WITNESS: Fundamentally, I concluded that the JAMA studies provide no basis for inferring a causal relationship between advertising and the decision to smoke.
BY MR. MacLEOD:
Q. Did you draw any other conclusions from that?
MR. SINGER: Objection. You may answer.
THE WITNESS: I concluded that the studies drew erroneous inferences from the



available data; that they used inadequate measures in order to try to examine the effects of advertising.
I would have to review it in more detail or find the conclusions to tell you more about what I concluded at the time.
I thought the studies were consistent with other marketing evidence that teens are more attentive to advertising for a variety of products than adults and not sufficient to provide evidence of a causal relationship between advertising and smoking decisions, or the Camel advertising campaign in particular and smoking decisions.
BY MR. MacLEOD:
Q. Did you communicate these views to the Federal Trade Commission?
MR. KLONTZ: Objection.
THE WITNESS: Yes, I did. The paper was submitted to the FTC, and there were at least a couple of meetings with the FTC staff to discuss the articles and the problems that I saw with them.
BY MR. MacLEOD:
Q. What happened at those meetings?

A. I presented my conclusions, answered their questions, and left.
Q. The staff had questions for you?
A. I believe they did. I can't recall in detail.
Q. Do you recall what happened after those meetings?
A. Well, what I did after those meetings was Reynolds obtained the underlying data from one of the JAMA studies, the Pierce study, was from the California Tobacco Survey in 1990, and Reynolds provided me with data on advertising expenditures in different regions of California.
I used that data to prepare an analysis of the factors that lead teenagers to smoke cigarettes, and to examine the role of advertising in that decision.
Q. Can you tell me what you concluded as a result of that analysis?
MR. SINGER: Objection. You may answer.
THE WITNESS: I concluded that there was no evidence that advertising caused or significantly influenced teenage smoking decisions.



BY MR. MacLEOD:
Q. Were there any other conclusions that you drew?
MR. SINGER: Objection. You may answer.
MR. KLONTZ: Objection also.
THE WITNESS: There may have been. That was certainly the -- well, I drew conclusions about the factors that do influence kids to smoke.
The most important factor that influences a teenager smoking decisions is the behavior of their peers. The influence of siblings who smoke is also important. Smoking decisions respond to teens' perceptions of the benefits and risks of smoking, and those are the primary factors that influence smoking decisions.
MR. MacLEOD: I'd like to mark this as the next Beales exhibit.
(Beales Deposition Exhibit No. 4 was marked for identification.)
BY MR. MacLEOD:
Q. Dr. Beales, do you recognize the document marked as Beales Exhibit 4?
A. I do. It's a paper I wrote on



advertising and determinants of teenage smoking behavior.
Q. Is this the report that you just described?
A. Yes, I believe it is.
Q. Was this report submitted to the Federal Trade Commission?
A. There were different versions, slightly different versions at different times. I believe this report was submitted to the FTC.
Q. What was the context in which that report was submitted to the FTC?
MR. KLONTZ: Objection.
THE WITNESS: The staff was again interested in pursuing the Joe Camel advertising campaign, and the paper was presented to the FTC as part of that investigation in response to that investigation.
MR. MacLEOD: I'd like to mark this as the next exhibit.
(Beales Deposition Exhibit No. 5 was marked for identification.)
BY MR. MacLEOD:
Q. Dr. Beales, do you recognize the document that is marked as Beales Exhibit No. 5?



A. I do. It's a draft of the FTC's complaint from -- or proposed complaint, the staff's proposed complaint from 1993.
Q. Did you have any role in responding to that draft complaint?
MR. KLONTZ: Objection.
THE WITNESS: I did. I assisted in the preparation of the white paper addressing the complaint and the facts in the investigation, and I met with the staff in presenting both the white paper and the results of my own work on teenage smoking, and I met with the commissioners towards that same end.
BY MR. MacLEOD:
Q. Do you recall what you presented to the staff and the commissioners?
A. Basically I presented the conclusions of my empirical work and the work itself.
Q. Was there any particular allegation in the complaint to which you were addressing your presentations?
A. Well, the fundamental allegation in this particular version of the complaint was that the advertising campaign appealed to children and adolescents below the 18, with the result that

many of those children and adolescents did begin to smoke Camel cigarettes, and that was precisely the question that my research had addressed and found no such relationship.

Q. Did that complaint ever issue as a formal complaint from the Federal Trade Commission?

A. It did not. The Commission determined to close the investigation.

Q. After you had your meetings discussing that draft complaint, what did you do next, if anything, in the context of tobacco advertising?

A. Well, at some point, I'm not sure whether it was before or after, I think it was probably before the appearance of the draft complaint, I had submitted my paper for publication, and I had made various revisions and additional analyses of the data set in response to suggestions from referees and criticisms of the work.

Q. Did you have any more encounters with the Federal Trade Commission over cigarette advertising?

MR. SINGER: Objection to form. You may answer.



MR. KLONTZ: Objection.

THE WITNESS: In, I believe it was in 1996, the staff reopened the investigation of the Camel advertising campaign on a slightly different theory than articulated in this complaint, and I again presented the results of my empirical work to the staff and to commissioners in response to that investigation.

MR. MacLEOD: I'd like to mark this next document Beales 6.

(Beales Deposition Exhibit No. 6 was marked for identification.)

BY MR. MacLEOD:

Q. Do you recognize the document that is marked Beales Exhibit 6?

A. I do. This is the 1994 version of the staff's draft complaint.

Q. Is this version different from the 1993 version we just looked at?

MR. KLONTZ: Objection.

THE WITNESS: Yes, it is. The 1993 version alleged that the advertising caused children and adolescents to begin to smoke. In the 1994 version, the allegation is that -- if I could characterize it, I think this is the



disproportionate appeal theory and alleges that the choice of many of these children and adolescents to smoke Camel cigarettes was also a choice to begin smoking.

BY MR. MacLEOD:

Q. Did you perform any work in connection with the allegations raised in this draft complaint?

MR. KLONTZ: Objection.

MR. SINGER: Object to form.

THE WITNESS: I did. I'm not -- I believe this was part of essentially the same investigation as the 1993 one, although I'm not clear about the timing of when it was closed and then reopened, but -- and the white papers -- I'm not sure about the timing of white papers, whether there was a separate white paper and response to this complaint, or whether it was part of the same matter as the May 1993 complaint.

(Beales Deposition Exhibit No. 7 was marked for identification.)

BY MR. MacLEOD:

Q. Do you recognize this document, Dr. Beales?



A. I do. This was a presentation that Reynolds submitted to the Commission and to the commissioners that was the basis for presentations to the commissioners about the 1994 version of the complaint.

Q. Did you have a role in preparing this document?

A. I did. I conducted some of the statistical analyses that are included in it based on. I believe it was probably the preliminary TAPS II data at the time.

Q. I am going to ask a number of questions about this document, and if you would like some time to review it more fully before we go through it, I would be glad to take a break and allow you to do that.

MR. SINGER: Mr. MacLeod, if you wouldn't mind, I wouldn't mind taking about a two-minute break.

MR. MacLEOD: Why don't we go off the record.

THE VIDEOGRAPHER: We are going off the record. The time on the screen is 9:45:55.

(A break was taken.)

THE VIDEOGRAPHER: We are back on the

record. The time on the screen is 9:58:07.

BY MR. MacLEOD:

Q. Dr. Beales, could you start at the beginning of this document and explain the facts that are described in the document.

MR. KLONTZ: Objection.

MR. SINGER: Join in the objection. You may answer.

BY MR. MacLEOD:

Q. And let me rephrase the question. To the extent that you have knowledge of the information that is described in this document, could you please describe for us the information in your own words?

MR. KLONTZ: Objection.

MR. SINGER: Join in the objection. You may answer.

THE WITNESS: In tab 1 of the document goes through the different theories that the staff had explored in the Joe Camel investigation, beginning with the theory of deliberate targeting; that was staff's review of the Reynolds documents didn't support.

In 1991, its theory was based on the JAMA articles, but those were discredited.



In 1993, its theory was based on disproportionate sales and appeal, but -- to teens as opposed to young adult smokers, but neither of those was consistent with the facts.

And the 1994 complaint tried to plead causation by alleging that it induced children and adolescents to begin smoking or significantly increase the risk.

Tab 2 examines trends in smoking as revealed in the University of Michigan in-class survey of high school seniors and in the TAPS II study. The TAPS II data was preliminary data that was obtained, I believe, and like other household surveys, it shows significantly different trends from -- and levels of smoking than shows up in school-based surveys. It argues that if there's no increase in smoking after the campaign, as the TAPS II data would suggest there's not, then Camel couldn't of -- the Camel advertising couldn't have caused kids to smoke.

The staff had advanced a theory that the advertising somehow influenced the intensity of smoking, if not the fact of smoking. Tab 4 examines one measure of intensity of smoking, which is how many days of the past 30 smokers,



teenage smokers, smoked. It indicates that Camel smokers don't smoke on any more days. I'm sorry, I think that's Tab 3.

Tab 4 illustrates that Camel smokers are more likely to smoke lights, Camel Light, as opposed to Marlboro smokers, who are more likely to smoke Marlboro regular.

The next tab looks at the number of cigarettes per day for smokers of different brands and illustrates that Camel underage smokers smoke fewer cigarettes per day.

MR. KLONTZ: Which tab is that, please?

THE WITNESS: Tab 5.

MR. KLONTZ: Thank you.

THE WITNESS: Tab 6 looks at the number of cigarettes smoked per day in a different way. It's based on a regression analysis of the number of cigarettes smoked per day and looks at the calculated number of cigarettes without taking into account advertising and with taking into account advertising, and shows that the advertising -- or illustrates that advertising does not increase the number of cigarettes smoked per day.

Tab 7 is based on my analysis of the



California and also the TAPS data on the factors that do influence teenage smoking behavior. The most important influences are peer influences, parental smoking, sibling smoking, perceptions of risks and benefits of smoking. The advertising effects are illustrated, but they are not significant.

Tab 8 looks at several different criticisms that the staff had advanced of my research, that 6 months of advertising wasn't enough to reveal an effect, but I had also looked at advertising over the whole 3-year period of the Camel campaign and still found no effects.

The second criticism was that you could only detect the influence of the campaign among teens who started smoking after the campaign, but I looked separately at teens who smoked their first cigarette before and after the campaign and found no influence of advertising in either case.

The third criticism was that Camel smokers who had started since the campaign were somehow uniquely susceptible, but the factors that account for teenage smoking decisions actually accounted better for the decisions of Camel smokers who started after the campaign than

they did for teens in general.

Tab 9 addresses another possible way that advertising might have an influence, which is by influencing the perceived benefits of smoking. What it illustrates is that -- and, again, none of these effects -- I believe none of these effects were statistically significant, but Camel advertising in particular was not associated with an increased perception of benefits. The one measure of benefits that was related was smoking in social situations, but that benefit measure was actually associated with a reduction in smoking behavior.

Tab 10 addresses the staff's notion that the decision to smoke Camel was also a decision to smoke cigarettes. It looks at teens who smoked their first cigarette in the year preceding the survey, and most of those teens don't buy cigarettes, another chunk of them buy other brands, a small fraction of them buy Camel.

Tab 11 looks at in the same survey Camel's share among young adult smokers, 18 to 22, at the time of the interview in 1993, and compares it to their share among 14 to 17-year-old smokers in 1993, and shows Camel's



share was virtually identical. Marlboro and Newport had slightly higher shares of underage smokers.

Tab 12 looks at data from the DiFranza study in the journal of the American Medical Association. It is an analysis of that data that includes all of the respondents. The DiFranza data in the published version had omitted certain age groups. When all of those -- when all of the data is considered, what the appeal measures that DiFranza used show is that the Camel advertising campaign had more appeal to young adult smokers than it did to people in the student sample.

Tab 13 addresses a study of recognition of the Camel logo, and what it illustrates is that teens who associated the Camel logo with cigarettes had negative views of cigarettes, not positive views.

And Tab 14 argues that the prerequisite of unfairness is to demonstrate substantial injury, and that states the conclusion that there wasn't evidence of substantial injury in front of the Commission.

BY MR. MacLEOD:

Q. Dr. Beales, can I ask you to return to



Tabs 4 and 5 for a moment, and I would like to ask you whether the language in those two tabs matches the charts in those two tabs?

MR. KLONTZ: Objection.

THE WITNESS: It does not. The text of Tab 4 should go with the chart of Tab 5, I believe, and the text at Tab 5 should go with the chart at Tab 4.

BY MR. MacLEOD:

Q. Do the charts in those two tabs reflect work that you had done?

MR. KLONTZ: Objection.

THE WITNESS: Yes, they reflect analyses that I had done in the TAPS II re-interview sample of people who had also been included in the TAPS I study.

These were preliminary data, I believe. Reynolds obtained the data prior to its public release, and they had not been completely edited. In the final TAPS II sample that was publicly released, you got essentially the same results.

BY MR. MacLEOD:

Q. Does the text in those two tabs accurately reflect the charts but for the fact that the charts are reversed in the two tabs?



MR. KLONTZ: Objection.

THE WITNESS: I believe it does.

BY MR. MacLEOD:

Q. Was this document presented to the Federal Trade Commission?

A. Yeah, this document was the presentation that was made to commissioners on April 1st and April 5th of 1994.

Q. Do you recall what the Commission did after these presentations with respect to the Joe Camel campaign?

A. I believe it was after these presentations that the Commission voted to close the investigation.

(Beales Deposition Exhibit No. 8 was marked for identification.)

BY MR. MacLEOD:

Q. Do you recognize the statements, Dr. Beales, that are on Beales Exhibit 8?

A. I have seen them before, yes.

Q. Can you tell me what these statements are?

A. They are the statements by various commissioners upon explaining their reasoning and the decision to close the investigation.

Q. Could you read, please, the last paragraph of the majority statement?
A. The joint statement of Azcuenaga, Owen and Starek?
Q. Yes.
A. "If intuition and concern for children's health were a sufficient basis under the law for bringing a case, we have no doubt that a unanimous Commission would have taken that action long ago. The dispositive issue here, however, was whether the record showed a link between the Joe Camel advertising campaign and increased smoking among children, not whether smoking has an effect on children or whether the health of children is important. Indeed, our concern about the health of children led us to consider every possible avenue to a lawsuit before reaching today's decision."
Q. Could you read, please, the last sentence in the paragraph just prior to this paragraph?
A. "Because the evidence in the record does not provide reason to believe that the law has been violated, we cannot issue a complaint."
Q. After this decision from the Federal



Trade Commission, Dr. Beales, did you have any more occasion to involve -- to be involved in Commission investigations of Joe Camel advertising?
MR. SINGER: Objection just as to form as to whether whose -- whether it was with the Commission or with the defendants or --
MR. MacLEOD: Let me restate the question.
MR. SINGER: Thank you.
BY MR. MacLEOD:
Q. After this decision, Dr. Beales, did you have any further occasion while at George Washington University to be involved in an investigation of Joe Camel advertising?
A. I did. The investigation was subsequently reopened, I believe in 1996, and I was involved in further analysis and further presentations on the effects of the advertising campaign on teenage smoking.
Q. Can you tell us what conclusions you reached during the course of that investigation?
MR. KLONTZ: Objection.
MR. SINGER: Objection. You may answer.



THE WITNESS: I concluded that there was still no evidence that the Camel advertising influenced teenage smoking decisions.
BY MR. MacLEOD:
Q. Did you communicate these conclusions to the Federal Trade Commission?
A. I did.
Q. What was the result of that subsequent investigation?
A. The Commission --
MR. KLONTZ: Objection. Sorry.
THE WITNESS: The Commission voted to issue a complaint.
BY MR. MacLEOD:
Q. Did you have any role in the litigation that -- let me strike that.
What happened after the Commission issued the complaint?
A. I was involved on Reynolds' behalf in analysis of the data to both -- both to criticize the FTC's position and to develop Reynolds' defense.
(Beales Deposition Exhibit No. 9 was marked for identification.)
BY MR. MacLEOD:



Q. Dr. Beales, do you recognize the document that is marked as Beales Exhibit 9?
A. I do.
Q. Can you tell me what that document is?
A. It's the Respondent's final witness list in the FTC's administrative proceeding against R.J. Reynolds.
Q. Can you tell me what that document describes, if anything, pertaining to you?
A. It describes my expected testimony in the litigation.
Q. Can you read for us, Dr. Beales, paragraph 2 of that description?
MR. KLONTZ: Objection.
THE WITNESS: "Dr. Beales' testimony will discuss his research concerning youth smoking behavior. He will discuss the model that he has developed regarding that behavior. Dr. Beales will testify that his research confirms that neither advertising nor advertising expenditures affect teenage smoking decisions. Dr. Beales will testify concerning the risk factors, predictors, and determinants of underage smoking. He will testify that there is no statistically significant relation between youth

smoking initiation and cigarette advertising in general, and no statistically significant relation between youth smoking and Joe Camel advertising in particular. He will also discuss the evidence relating to brand-switching."

BY MR. MacLEOD:

Q. Is that statement an accurate description of the testimony you had planned to give?

MR. KLONTZ: Objection.

THE WITNESS: Yes, it is.

BY MR. MacLEOD:

Q. Did you provide that testimony in a hearing on the Joe Camel case?

MR. KLONTZ: Objection.

THE WITNESS: I did not. The case was dismissed or -- I believe it was dismissed prior to Reynolds presenting its defense.

MR. MacLEOD: I'd like to take a break off the record for a moment.

THE VIDEOGRAPHER: This marks the end of videotape 1 of the deposition of Howard Beales. We are going off the record. The time on the screen is 10:21:46.

(A break was taken.)



THE VIDEOGRAPHER: This marks the beginning of videotape 2 in the deposition of Howard Beales. We are back on the record. The time on the screen 10:24:52.

MR. MacLEOD: That concludes my direct examination.

MR. KLONTZ: Does anyone else have any questions before me?

MR. GREEN: No.

MR. KLONTZ: May we switch seats, please? I don't want him looking towards me when I'm asking questions. Can we go off the record while we switch seats here?

THE VIDEOGRAPHER: We are going off the record. The time on the screen is 10:25:50.

(Pause in the proceedings.)

THE VIDEOGRAPHER: We are back on the record. The time on the screen is 10:26:02.

CROSS-EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. KLONTZ:

Q. Good morning, Dr. Beales. I'm David Klontz from the Department of Justice.

A. Good morning.

Q. I don't know if we got this on the record. You are appearing today without counsel;



is that correct?

A. That's correct.

Q. And you're appearing in your personal capacity, not as an FTC or U.S. Government employee; is that correct?

A. That's correct.

Q. Were you served with a subpoena for today's deposition?

A. Yes, I was.

Q. Was a witness fee tendered with that subpoena?

A. No, it wasn't.

Q. Did you request a witness fee?

A. No, I didn't.

Q. Were you offered a witness fee?

A. No, I wasn't.

Q. Are you receiving any other payments for your testimony today?

A. No, I'm not.

MR. MacLEOD: Objection.

BY MR. KLONTZ:

Q. Prior to appearing here today to testify, did you discuss your anticipated testimony with anyone?

A. I did. I discussed it with our general



counsel's office, I discussed it with Mr. MacLeod.

Q. What were your discussions with Mr. MacLeod?

A. We talked about different matters that he might want to cover in the deposition, and what I remembered about the investigation and my roles in it.

Q. How many discussions did you have with Mr. MacLeod?

A. It was probably three or four different telephone conversations.

Q. Did he provide you with any documents prior to your deposition?

A. He sent over a series of -- yes, he did.

Q. Which documents?

A. He sent a set of white papers and presentations that had been previously presented to the FTC. I believe there was the FDA's -- or a portion of the FDA's Federal Register Notice on the rule making. There was some correspondence with the Commission or commissioners that reflected some of my work.

Q. Did he send to you copies of all the

documents that have been marked as exhibits today?
A. He did not.
Q. In your discussions with Mr. MacLeod, did he discuss possible question areas that he, in fact, did not ask about today?
A. He may have.
Q. Do you recall any?
A. He discussed not asking about some things that he, in fact, did not ask about.
Q. What were those things?
A. I had done -- as part of the investigation, I had done numerous additional regression analyses as part of the litigation that were all produced to the FTC, and we discussed not discussing them.
Q. Who first contacted you about your giving a deposition in this proceeding?
A. I believe my first contact was a subpoena that arrived in the mail -- or wouldn't have been the subpoena. It would have been a notice from the joint defendants that they wanted my testimony, along with a couple of other FTC witnesses.
Q. Had you had any conversations about



your testifying prior to your receiving that document?
A. No.
Q. Did you have any conversations with anybody who represented the defendants in this case after you received the document as to why they wanted your testimony?
A. I did.
Q. What were those conversations?
A. I talked to John Williams about why they wanted my deposition.
Q. What did he tell you?
A. He told me they wanted to get into the record some of the work that I had done on the Joe Camel investigation.
Q. Did you ask them why they wanted to do that?
A. I asked him why it was necessary, and he said it wasn't clear they could get the work into the record otherwise.
Q. Did he tell you what their intended purpose was for getting the work into the record?
A. No, he didn't.
Q. Did you ask?
A. No, I didn't.



Q. In your discussions with Mr. MacLeod, did you discuss anything other than your anticipated testimony in your deposition here today?
A. I've had other discussions with Mr. MacLeod that were separate conversations, but in the conversations about this matter, it's been strictly about the deposition today.
Q. The other conversations, did they relate at all to the case in which you're testifying today?
A. No, they didn't.
Q. During the time period about which you've testified today, which I believe runs from the early 1990s to about 1999 or 1998 -- would that be a fair characterization?
A. Yes.
Q. During that time period, were you compensated for the work that you did on behalf of R.J. Reynolds?
A. I was certainly compensated for the work I did on behalf of R.J. Reynolds. There was some of the -- some of the work that was done on my own as an academic.
Q. Can you give me an estimate of how much



you were paid by R.J. Reynolds, either directly or indirectly, for the work that you did for them during that time period?
A. I really don't know.
Q. Was it over $100,000?
A. It could have been.
Q. During that time period, did you have a written agreement for the work that you did for R.J. Reynolds?
A. No, I didn't.
Q. You were first contacted by the law firm, were you not, to do the work for R.J. Reynolds?
A. I believe so, yes.
Q. The law firm of Collier -- at the time it was Collier, Shannon, Rill & Scott; is that correct?
A. It may have been Collier, Shannon & Scott then because Rill was at the Justice Department. I'm not clear about the timing, but --
Q. When you were paid --
A. But same firm.
Q. When you were paid for your work that you did for R.J. Reynolds, who paid you?

A. Collier Shannon.
Q. Did you have any discussions with them as to why your relationship was with them rather than directly with R.J. Reynolds?
A. No. It was -- I did other consulting with Collier Shannon, and that was -- that was the general arrangement.
Q. You never asked why that was the arrangement?
A. Not that I recall.
Q. Were you aware of the federal lawsuit that forms the basis for this case when it was filed?
A. I saw the press stories at the time, yes.
Q. Did you have any discussions with anybody from the defendants or who spoke on behalf of the defendants concerning that lawsuit after it was filed?
A. Not in any substantive way. It may have been mentioned in conversation, but I was -- I mean, I was never involved in the lawsuit.
Q. For your current position with the FTC, were you required to be confirmed by the senate?
A. I was not.



Q. At the FTC, are you now recused from considering certain matters relating to cigarettes and smoking?
MR. SINGER: I'm going to object to the extent it might call for -- or caution you not to go into any confidential discussions you may have had with General Counsel's office. However, you can answer factually what you do.
THE WITNESS: I am recused on certain cigarette advertising matters.
BY MR. KLONTZ:
Q. State for me as fully as you can what the matters are from which you are recused.
MR. SINGER: I would object and instruct you, to the extent that wouldn't involve disclosure of nonpublic information about investigations that you might know about, but are not working on, to not respond to that question. To the extent it is public information, you may.
THE WITNESS: There is a letter to Matt Meyers, I believe it's from me, that states the matters on which I had decided to recuse myself on any cigarette or tobacco matters.
My practice has been to consult with the General Counsel's office on each matter as to



whether there was any conflict or appearance of conflict in that particular matter.
BY MR. KLONTZ:
Q. Is the Mr. Meyers you just referred to with the campaign for tobacco-free kids?
A. I believe he is, yes.
Q. Was that letter sent by you as an employee of the Federal Trade Commission?
A. Yes, it was.
MR. KLONTZ: Counsel, may we have a copy of that letter?
MR. SINGER: I don't have a copy of it. I will take it into consideration as to whether I can find it, and you'll get it.
BY MR. KLONTZ:
Q. Do you have a copy of that letter at your office?
A. I presume I do somewhere.
Q. We would ask for a copy.
Whose decision was it that you would recuse yourself from these matters?
A. It was mine.
Q. Prior to your sending the letter to Mr. Meyers, did you discuss with anyone at the FTC the recusal decision?



A. I did. I discussed it with the General Counsel's office. I discussed it with the chairman.
Q. Are there presently ongoing matters at the FTC from which you are recused?
MR. SINGER: I would instruct you that you can respond to that as a yes or no, but you cannot -- if they're nonpublic matters, not to identify those matters.
THE WITNESS: Yes, there are.
BY MR. KLONTZ:
Q. Are there any public matters as to which you are presently recused?
A. There are. The Commission's cigarette advertising report I did not participate in.
Q. Is that a report that is already issued?
A. Yes, it is.
Q. When was it issued?
A. I don't know precisely. Within the last couple of months.
Q. Any other public matters?
A. I'm not sure if they're public or not.
Q. Are there nonpublic matters as to which you are presently recused?

MR. SINGER: You may answer that yes or no.
THE WITNESS: I believe there are.
BY MR. KLONTZ:
Q. How many?
A. The reason I say I believe is that I don't have, and I don't have a number, because if I'm recused from it, I'm not involved in it, and so I don't hear about it, and I don't have a count of how many such matters there might be.
Q. How is the decision made for you to be recused as to each of those matters?
MR. SINGER: I'm going to object and instruct you that you may answer that to the extent it doesn't give away any privileged communications you've had with the General Counsel's office concerning that decision, but if you can describe it generally without confidential information being disclosed, you may do so.
THE WITNESS: Some matters are -- some matters I have recused myself from because of the scope of the recusal that was stated in the letter to Matt Meyers. My deputies know about that, and on any matter that would fall within



the scope of that recusal, there's no need to consult with me. You know, the decision is already made, and so there is no consultation.
My general practice on other matters where there might be a conflict issue has been to explain my possible contact to whichever of the deputy directors knows about the matter, and then, in the first instance, they've talked to the General Counsel's office about whether my involvement would be appropriate, and then if it seemed okay, I would talk further with the General Counsel's office about whether there is or isn't a conflict in a particular case.
BY MR. KLONTZ:
Q. Is it fair to say, then, that in some instances in which you are presently recused, you have had discussions about the nature of the proceeding prior to your decision to recuse yourself?
A. There are -- there were some matters like that. There were -- I mean, when I -- particularly in the first year I was there, there were a number of matters where I was recused because of who was representing someone, and particularly in those cases, I may have known a



great deal about the substance of the matter before finding out that there was a recusal issue.
Q. What do you mean when you say who was representing someone?
A. Well, under the ethics rules, I had a financial relationship with Collier Shannon, and anyone that Collier Shannon represents I'm not automatically recused from, but on anyone Collier Shannon represents, I need a waiver in order to participate -- I needed a waiver in the first year in order to participate.
Q. Do you still have a financial relationship with Collier Shannon?
A. No.
Q. When did that end?
A. It ended a year ago, June 4th.
Q. What was that relationship?
A. Collier Shannon had hired me as a consultant on a number of matters.
Q. All relating to cigarettes?
A. No.
Q. Did some of them relate to cigarettes?
A. I think the last thing related to cigarettes was considerably more than a year ago,



but I don't know precisely.
Q. When did you assume your present position at the FTC?
A. On June 4th of last year.
Q. Why are you recused from certain matters at the FTC?
MR. SINGER: I'll object again to the extent it might call for confidential communications with the General Counsel's office or other counsel, but you may answer to the extent you can.
THE WITNESS: It varies. There's some matters I'm recused on because I had worked on -- because I had worked for the defendant in those matters. There are -- in the particular -- in a case.
There are other matters that I'm recused on because of the potential for an appearance of a conflict of interest.
BY MR. KLONTZ:
Q. And what is that appearance in your mind?
MR. SINGER: Objection. You may answer.
THE WITNESS: In my mind, it's a prior

financial relationship might color, or might appear to color my judgment about a particular matter.

BY MR. KLONTZ:

Q. Have you ever worked for any cigarette company, been an employee of?

A. No.

Q. Have you ever been an employee of any advertising agency?

A. No.

Q. Your testimony this morning was that after you prepared the document marked as Exhibit 3, the April 3, 1992 -- April 2, 1992 report, you were given certain data by R.J. Reynolds; is that correct?

A. Yes.

Q. What data had you relied upon to prepare what has been marked as Exhibit 3?

A. Exhibit 3 is based -- there may be some published data that was employed in that. I'd have to look through it more carefully, but Exhibit 3 is essentially based on an analysis of the published studies themselves and the data that they presented in the published versions of those studies.



Q. So your analysis in Exhibit 3 did not go beyond the studies themselves? You did not look at the actual data that was used to prepare those studies?

A. At that time, I did not have access to the actual data that was used to prepare those studies.

Q. And what was the data that you were given by RJR after you had prepared Exhibit 3?

A. It was RJR that acquired the tape of the California tobacco data, the California tobacco survey data, and R.J. Reynolds provided advertising expenditure data for California, for different geographic regions in California, for Camel, for Marlboro, for Newport, and for the cigarette industry as a whole.

Q. Do you still have that data?

A. I have a machine readable version of that data. I don't know whether I have a paper version or not.

Q. And which of the exhibits that have been marked today were prepared using the data that RJR presented to you?

A. Exhibit 4, and at least some of the tabs in Exhibit 7.



Q. I take it you prepared other versions of Exhibit 4 using that data also?

A. Yes.

Q. Was Exhibit 3 reviewed by Collier Shannon prior to its submission to the FTC?

A. Yes, it was.

Q. Did Collier Shannon make suggested edits to that document before the version that was presented, in fact, was presented?

A. I can't recall specifically, but that's quite likely.

Q. To your knowledge, did anyone at R.J. Reynolds review Exhibit 3 prior to its presentation to the FTC in the form that it appears here?

A. I don't know.

Q. During the time that you did work for R.J. Reynolds, did you have meetings and discussions with personnel from R.J. Reynolds?

A. Yes, I did.

Q. Did you have meetings and discussions with lawyers from R.J. Reynolds as opposed to outside attorneys?

A. Yes, I did.

Q. Now, if you look at Exhibit 4, the



first footnote at the bottom of the first page, the third to last sentence says, "The article was drafted independently, and was not reviewed by Reynolds prior to submission."

Is that statement correct?

A. Yes, it is.

Q. What did you mean by "drafted independently," as you use those terms in this article?

A. I mean I wrote it on my own without consultation.

Q. Did you receive payment from R.J. Reynolds, at least in part, for the preparation of this article?

A. For the preparation of the article? No.

Q. Did you receive payment from R.J. Reynolds for any of your work in connection with the preparation of this article?

A. I received pavement from Reynolds for some of the underlying statistical analyses that are reflected in this article. There were other analyses that were run at different times for which I did not receive payment.

Q. Who are the two people identified in

the second to last sentence in the footnote on the first page of this article?
A. Theresa Burke was a research assistant at Georgetown Economic Services. Tim Muris is a -- was a professor at George Mason Law School at the time this was done.
Q. What position does Mr. Muris hold now?
A. He's the Chairman of the Federal Trade Commission.
Q. Do you know what position Ms. Burke holds now?
A. I do not.
Q. The documents marked as Exhibits 3 and 4 can fairly be characterized as cross sectional as opposed to longitudinal studies; is that correct?
MR. MacLEOD: Objection.
MR. SINGER: I'll join the objection. You may answer.
THE WITNESS: Yes, they are.
BY MR. KLONTZ:
Q. Were either of these presentations or articles peer reviewed prior to their publication or presentation to the FTC?
MR. SINGER: I'm going to object to



form, it's compound, because it might be different answers for --
BY MR. KLONTZ:
Q. Let's strike the question. Were either of these articles peer reviewed prior to their submission to the FTC?
A. Exhibit 3 was not. Exhibit 4 had been submitted for publication prior to its submission to the FTC. Whether it had been -- I don't recall the timing as to when I got a peer review, whether that was before or after it was submitted to the FTC. It was submitted for publication prior to its submission to the FTC.
Q. Was it published?
A. It was not.
Q. Was there a peer review of this article at any time?
A. Yes, there was.
Q. By whom?
A. I -- well, as is typical of the peer review process, they're anonymous.
Q. To which publication did you submit the article for publication?
A. I submitted it initially to the Journal of Law and Economics.



Q. To anyone else?
A. It was submitted to Economic Inquiry. I believe it was -- it would have been a subsequent version that was submitted to Economic Inquiry. The only place this particular version was submitted was the Journal of Law and Economics.
Q. Looking at all the different versions of this article, were there any other publications to which any of those versions was submitted other than the ones you've identified already?
A. Yes, there were, but I would have to check as to exact -- I don't recall for certain exactly where I sent it.
Q. Were any of the versions published by any publication?
A. They were not.
Q. Were you advised of the reasons for nonpublication by any of the publications to whom you submitted it?
A. Yes, I was.
Q. What were those reasons?
A. The one I like best was from the Journal of Law and Economics, which said the



conclusions were obvious and it wasn't sufficiently related to the ongoing policy debate. There were other reasons from other publications.
Q. Do you recall what those reasons were?
A. Not in detail, no.
Q. How about in general?
A. There were criticisms of the specification, of the model, and I guess that's probably the best general characterization.
Q. To your knowledge, have there been articles published in any publications concerning the effect of the Joe Camel advertising campaign on underage smoking?
A. There have been, yes.
Q. Looking again at Exhibit 4, the very last sentence of footnote 1, I see a reference to remaining errors. Are there other errors in this article to which this footnote refers?
MR. MacLEOD: Objection.
MR. SINGER: Objection to form.
BY MR. KLONTZ:
Q. Let me withdraw the question and ask you a different question.
What did you mean by this particular

sentence in this footnote?
A. This is a customary kind of assumption of responsibility on the part of an author, in the economics profession at least. Other people may have helped, but if there's problems, it's my fault.
Q. Wouldn't it be a fair reading of this sentence to suggest that certain errors in this publication are not your responsibility?
MR. SINGER: Objection.
MR. MacLEOD: Objection.
THE WITNESS: I don't think so.
BY MR. KLONTZ:
Q. What is the purpose of the term "remaining" as it is used in that sentence, then?
A. Well, one hopes that errors are corrected along the way.
Q. Have you prepared any publications or documents that, in your view, are in any way critical of the tobacco industry?
MR. SINGER: Objection. You may answer.
MR. MacLEOD: Objection.
THE WITNESS: Yes, I have.
BY MR. KLONTZ:



Q. What are those?
A. It's work I did for the Federal Trade Commission when I was there in the 1980s.
Q. Describe for me as best you can what those documents were.
MR. SINGER: I'm going to object and instruct you that to the extent that might call for nonpublic information, I'm instructing you not to answer. To the extent that is public, you may respond.
THE WITNESS: I drafted the letter that became the Bureau Director's letter to Congress recommending the rotational warning legislation.
BY MR. KLONTZ:
Q. Have you heard of the term "hierarchy of effects"?
A. I have.
Q. What does that term mean to you?
MR. SINGER: Objection. You may answer.
THE WITNESS: You need to give me a context because its meaning could depend on the context.
BY MR. KLONTZ:
Q. Does it have any meaning to you in the



context of cigarette smoking and advertising?
MR. SINGER: Objection. You may answer.
THE WITNESS: Well, there's models that are sometimes characterized as hierarchy of effects models of -- at least in the economics literature, of where there may be effects at different levels in a decision-making process.
BY MR. KLONTZ:
Q. Does the term to you have any application to the issue of whether cigarette advertising has any effect on the decision to smoke by underage smokers?
MR. SINGER: Objection. You may answer.
MR. MacLEOD: Objection.
THE WITNESS: I don't think it's a particularly useful way to think about the issue.
BY MR. KLONTZ:
Q. The conclusions you drew in Exhibits 3 and 4 and in your other presentations to the FTC on behalf of R.J. Reynolds were that the Joe Camel advertising campaign did not have an effect upon or induce underage smokers to smoke Camel cigarettes, is that a fair characterization?



MR. SINGER: Objection.
THE WITNESS: No, it's not.
BY MR. KLONTZ:
Q. Recharacterize that for me, if you could, please.
MR. SINGER: Objection.
THE WITNESS: I concluded that it didn't cause them to smoke cigarettes.
BY MR. KLONTZ:
Q. You concluded that there were other factors that caused underage cigarette smokers to smoke cigarettes; is that correct?
MR. SINGER: Objection.
THE WITNESS: That's correct.
BY MR. KLONTZ:
Q. Did you make any attempt to determine whether the Joe Camel advertising campaign, when viewed by persons under 18, caused them to begin smoking R.J. Reynolds' cigarettes once they turned 18?
MR. SINGER: Objection. You may answer.
THE WITNESS: I'm not sure I understand the question.
BY MR. KLONTZ:

Q. Do you believe it is possible that advertising may influence a person who sees that advertising to try that product, but not immediately?
MR. MacLEOD: Objection.
MR. SINGER: Objection.
THE WITNESS: It's certainly possible, that's the reason for looking at either cumulative advertising over a long period of time or at lagged advertising at prior times in order to allow for that kind of a possibility.
BY MR. KLONTZ:
Q. In connection with the preparation of the studies that led to Exhibits 3 and 4, did you make any attempt to determine, as to persons who began smoking at age 18 or later, what caused them to begin smoking?
MR. SINGER: Objection.
THE WITNESS: I didn't do any independent analyses of that question. In some of the work -- well, let me take that back.
The TAPS sample, the Teenage Attitudes and Practice sample, that is in -- that was also used in the preparation of Exhibit 4, is a sample that certainly had 18 and 19-year-olds, and at



least some of them would have started smoking at 18 or 19.
BY MR. MacLEOD:
Q. And did that study attempt to determine what caused those 18 and 19-year-olds to begin smoking?
A. It did. They're part of the sample, and the factors that influence their smoking decisions are reflected in the regression results, just as the decisions of younger teens are reflected.
Q. Which page? Is that Table 3 you're referring to?
A. The one I was looking at was Table 2.
Q. That's on page 19?
A. Yes, sir, but any of the TAPS samples -- any of the results that include results from TAPS would also include some 18 and 19-year-olds.
Q. And looking at Table 2 on page 19, where is the effect of advertising mentioned on that table?
MR. MacLEOD: Objection.
THE WITNESS: Advertising is not included in those models.



BY MR. KLONTZ:
Q. Look at Exhibit 7, please, Tab 2, the first bullet point under the chart. Do you believe today that that is a fair conclusion?
MR. SINGER: Objection.
MR. MacLEOD: Objection.
THE WITNESS: That if the campaign caused youth to smoke, there should be an increase in underage smoking after the campaign began at a minimum. Yes, that is a necessary, but not sufficient condition.
BY MR. KLONTZ:
Q. Let me ask you to posit this scenario then, that absent the campaign, there would have been a dramatic decrease in underage smoking.
MR. SINGER: Objection.
MR. MacLEOD: Objection.
MR. KLONTZ: There's not a question yet, so there's nothing to object to.
MR. SINGER: Oh, sorry.
BY MR. KLONTZ:
Q. If we make that assumption, is it possible that the campaign induced underage youth to smoke even though there was not an increase in underage smoking?



MR. SINGER: Objection.
MR. MacLEOD: Objection.
THE WITNESS: The issue is an increase compared to what, and the right compared to what is compared to what it would have been in the absence of the campaign.
BY MR. KLONTZ:
Q. And was that determination made of that particular question? Was an answer found as to that particular question?
MR. MacLEOD: Objection.
MR. SINGER: Objection.
THE WITNESS: Well, that's the thrust of the ordered logistic models and the analysis of the California advertising data, is that advertising exposure doesn't influence the incidence of smoking.
BY MR. KLONTZ:
Q. So advertising is just a waste of money?
MR. SINGER: Objection.
THE WITNESS: No, advertising is useful to consumers and profitable to manufacturers because it provides information that's relevant to brand choice.

BY MR. KLONTZ:
Q. Was the Joe Camel advertising by R.J. Reynolds in any way useful to under age 18 consumers in California?
MR. SINGER: Objection.
MR. MacLEOD: Objection.
THE WITNESS: I don't know.
MR. KLONTZ: I don't have any other questions. Thank you, Dr. Beales. Time? Are we finished?
MR. MacLEOD: I have some redirect.
THE VIDEOGRAPHER: Would you like this off the record?
MR. KLONTZ: Yes, please, so I can note my time.
THE VIDEOGRAPHER: Okay. We're going off the record. The time on the screen is 11:08:46.
(Pause in the proceedings.)
THE VIDEOGRAPHER: We are back on record. The time on the screen is 11:09:26.
REDIRECT EXAMINATION BY COUNSEL FOR R.J. REYNOLDS
BY MR. MacLEOD:
Q. Dr. Beales, did your appointment as Bureau Director involve the approval of any



person or agency?
A. I believe it was just the Chairman's decision.
Q. Can we return to Beales Exhibit 1, please? Could you please read the first paragraph of Exhibit 1?
A. "Federal Trade Commission Chairman Timothy J. Muris, with the concurrence of his fellow Commissioners, has named a senior staff team with extensive experience in the private sector, in academia, and at the FTC."
Q. Did the commissioners vote on your appointment as Bureau Director?
MR. KLONTZ: Objection.
MR. SINGER: You may answer.
THE WITNESS: I guess so. I don't know.
BY MR. MacLEOD:
Q. Dr. Beales, did you look at the possibility that advertising could cause a delayed decision to smoke in any work that you did in connection with this matter -- I beg your pardon. Let me restate that.
Did you look at the possibility of advertising causing a delayed decision to smoke



in your work on the R.J. Reynolds matter?
A. I did. In various analyses, I used advertising over the 3-year history of the Camel campaign, both total advertising over that period and in 6-month increments throughout that period, to allow for any delayed effect of advertising on subsequent decisions.
Q. What did you find?
A. I didn't --
MR. SINGER: Objection. You may answer.
BY MR. MacLEOD:
Q. Did you find -- did you reach any conclusions as a result of that work?
A. I did not find any evidence of lagged effects of advertising on smoking decisions.
MR. MacLEOD: No further questions.
MR. KLONTZ: No other questions.
THE VIDEOGRAPHER: This marks the end of the deposition of Howard Beales. We are going off the record. The time on the screen is 11:12:22.
MR. KLONTZ: You have the right to read your deposition and make any changes. Do you want to do that?



MR. SINGER: It's up to you if you want to make sure it's accurate. I would recommend that you do. I'm not your counsel, but I generally recommend that to people.
THE WITNESS: Yeah, I suppose I do.
MR. KLONTZ: I'd like to also note on the record the time used by each side here since we're keeping careful track of time used, so I don't know if anyone else has done the calculation, but I've got 70 minutes for your side and 45 for mine.
MR. MacLEOD: I would like to note for the record that the court reporter has been keeping track of the time; is that correct?
THE VIDEOGRAPHER: I have not, but I can do it real quick.
MR. MacLEOD: I would ask the court reporter to please --
THE VIDEOGRAPHER: I'm the videographer. I apologize.
MR. MacLEOD: Videographer. With the stipulation that I assume it is a good faith estimate of the time that has passed, I am willing to accept for present purposes, subject to verification, the time periods that counsel

for the Department of Justice has announced.

MR. KLONTZ: Fine. That's it?

MR. MacLEOD: That's it.

(Whereupon, at 11:15 A.M., the taking of the instant deposition was concluded.)



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------X

UNITED STATES OF AMERICA, :

Plaintiff, :

vs. : Case Number 99-2496 (GK)

PHILIP MORRIS INCORPORATED, et al., :

Defendants.

---------------------------x

ACKNOWLEDGMENT OF DEPONENT

I, J. HOWARD BEALES, do hereby acknowledge that I have read and examined pages 4 through 74, inclusive, of the transcript of my deposition taken on Thursday, June 20, 2002, and that:

*(Check appropriate box):*

( ) the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

( ) except for the changes noted in the attached errata sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

------------- ------------------------------
DATE SIGNATURE



CERTIFICATE OF NOTARY PUBLIC

I, DAWN A. JAQUES, a Notary Public in and for the District of Columbia, before whom the foregoing deposition was taken, do hereby certify that witness whose testimony appears in the foregoing pages was duly sworn by me; that the testimony of said witness was taken by me in shorthand at the time and place mentioned in the caption hereof and thereafter reduced to typewriting under my supervision; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition is taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the actions.

-----------------------
Dawn A. Jaques, C.S.R.
Notary Public in and for
District of Columbia

My commission expires:
December 14, 2004.

**A**

**about** 5:8 8:24 10:9,23 14:11 17:6 19:9 24:14,16 25:4,13,18 34:16 41:5,7 42:6,9 42:10,17,25 43:10 44:7,8,13,15 45:20 47:16,17 50:9,24 51:7 51:9,12,17 52:1 54:2 61:7 64:18
**absence** 69:6
**absent** 68:14
**academia** 71:11
**academic** 44:24
**accept** 73:24
**access** 55:5
**account** 28:20,21 29:23
**accounted** 29:24
**accurate** 7:12 38:7 73:2
**accurately** 32:24
**acknowledge** 75:12
**ACKNOWLEDGM...** 75:9
**acquired** 55:10
**act** 12:5 13:12
**Acting** 6:25 9:9 10:19
**action** 34:10 76:15
**actions** 76:19
**activities** 10:25 11:3,5 13:16
**acts** 11:10
**actual** 55:3,6
**actually** 29:24 30:12
**additional** 22:18 42:13
**addressed** 22:3
**addresses** 30:2,14 31:14
**addressing** 21:8,20
**administer** 5:11
**administrative** 37:6
**administrator** 13:23
**adolescents** 21:25 22:1 23:23 24:3 27:7
**adult** 27:3 30:22 31:12
**adults** 17:10
**advanced** 27:21 29:9
**advertising** 3:16 7:6 10:18 11:1,17,21 14:3 14:19 15:2,13,22 16:18 17:3,9,12,13 18:12,17,23 20:1,15 21:24 22:12,23 23:4 23:22 27:20,22 28:20 28:21,22,22 29:5,10 29:12,19 30:3,8 31:11 34:12 35:4,15,19 36:2 37:20,20 38:1,4 47:10 49:15 54:9 55:13 61:13 64:1,12,23 65:17 66:2,3,9,10 67:21,24 69:15,16,19 69:22 70:2 71:20,25 72:3,4,6,16
**advised** 60:19
**Affairs** 8:22
**affect** 37:21
**after** 5:15 14:25 15:11 18:6,8 22:10,14 27:17 29:16,18,25 33:10,12 34:25 35:12 36:17 43:6 46:19 54:12 55:9 59:11 68:9
**again** 15:2 20:14 23:6 30:6 53:7 61:16
**against** 14:18 37:7
**age** 31:9 66:16 70:3
**agencies** 13:8,9
**agency** 13:10 54:9 71:1
**ago** 34:10 52:17,25
**agreement** 45:8
**al** 1:7 4:6 75:6
**allegation** 21:19,22 23:24
**allegations** 24:7
**alleged** 23:22
**alleges** 24:1
**alleging** 27:6
**allow** 25:15 66:11 72:6
**along** 42:23 62:17
**already** 49:16 51:3 60:12
**although** 24:13
**america** 1:3 4:5 75:3
**American** 15:12 31:5
**among** 29:15 30:22,24 34:13
**amounts** 12:16
**analyses** 22:18 25:9 32:14 42:14 57:21,23 66:20 72:2
**analysis** 15:19 18:14,19 28:17,25 31:6 35:18 36:20 54:22 55:1 69:14
**analyzing** 12:2
**ANDREW** 2:18
**Andrews** 5:3
**announced** 74:1
**announcing** 6:18
**anonymous** 59:21
**another** 30:2,19
**answer** 9:25 11:25 12:11 14:6 16:14,23 18:21 19:5 22:25 26:8,17 35:25 47:8 50:1,14 53:10,24 58:19 62:22 63:9,20 64:3,15 65:22 69:9 71:15 72:11
**answered** 18:1
**answers** 59:2 75:17,21
**anticipated** 40:23 44:3
**anybody** 43:5 46:17
**anyone** 39:7 40:24 48:24 52:8,9 56:12 60:1 73:9
**anything** 22:12 37:9 44:2
**apologize** 73:20
**appeal** 24:1 27:2 31:10 31:12
**appealed** 21:24
**appear** 54:2
**appearance** 22:15 48:1 53:19,21
**APPEARANCES** 2:1
**appeared** 15:11
**appearing** 39:25 40:3 40:22
**appears** 56:15 76:6
**application** 64:11
**applied** 11:19
**appointment** 6:19 70:24 71:13
**appropriate** 51:10 75:16
**approval** 14:12 70:25
**approving** 13:10
**April** 3:14 33:8,8 54:13 54:13
**areas** 42:5
**argues** 27:16 31:19
**Arnold** 2:14
**arrangement** 46:7,9
**arrived** 42:20
**article** 57:2,9,14,15,19 57:22 58:2 59:16,23 60:9 61:19
**articles** 3:15 15:11,14 15:19,21 16:8 17:22 26:25 58:23 59:5 61:12
**articulated** 12:15 23:5
**articulating** 12:4
**asked** 15:14 43:18 46:8
**asking** 6:1 39:12 42:9
**assert** 9:21 14:1
**assigned** 11:8
**assistant** 6:25 9:13 11:7 11:13 12:24 58:3
**assisted** 11:9,17 21:7
**associate** 6:24 7:9 8:11 9:2,5 14:21
**associated** 30:9,12 31:16
**Association** 15:12 31:6
**assume** 53:2 73:22
**assumption** 62:2 68:22
**attached** 75:20
**attaching** 3:14,18,20
**attempt** 65:16 66:15 67:4
**attentive** 17:9
**Attitudes** 66:22
**attorney** 76:17
**attorneys** 56:23
**August** 9:4,15
**author** 62:3
**authorized** 10:13
**automatically** 52:9
**available** 17:1
**avenue** 2:19 34:17
**award** 12:23,25
**awards** 12:20 13:2
**aware** 46:11
**away** 50:15
**Azcuenaga** 34:3
**a.m** 1:17 74:4

**B**

**BA** 8:5
**back** 25:25 39:3,17 66:21 70:20
**background** 7:13
**Barclay** 14:17
**based** 25:10 26:24 27:1 28:17,25 54:19,22
**basically** 15:20 21:17
**basis** 12:18 15:21 16:16 25:3 34:7 46:12
**beales** 1:14 3:3,11,13 3:14 4:3 5:5,14,20 6:3,10,13,21 7:9,15 7:17,20,21 16:1,4,5 19:19,20,23,24 20:21 20:24,25 23:10,11,15 24:21,25 26:3 31:25 33:15,19,19 35:1,12 36:23 37:1,2,12,15,19 37:22 38:23 39:3,21 70:9,24 71:4,19 72:20 75:11
**became** 63:12
**before** 1:20 5:22,24 8:10 22:14,15 25:14 29:18 33:20 34:18 39:8 52:2 56:8 59:11 76:4
**beg** 71:22
**began** 15:9 66:16 68:10
**begin** 5:24 6:1 22:1 23:23 24:4 27:7 65:18 66:17 67:5
**beginning** 11:12 26:4 26:21 39:2
**behalf** 1:23 2:2,7,13 4:24 36:19 44:19,22 46:18 64:22
**behavior** 3:17 19:13 20:2 29:2 30:13 37:17,18
**being** 4:12 50:19
**believe** 5:23 18:4 20:5,9 23:2 24:12 25:10 27:13 30:6 32:7,17 33:2,12 34:23 35:17 38:17 41:20 42:19 44:14 45:14 47:21 48:6 50:3,6 60:3 66:1 68:4 71:2
**below** 21:25
**benefit** 30:12
**benefits** 8:25 13:14 19:16 29:5 30:4,10,10
**best** 60:24 61:10 63:4
**Beta** 8:7
**better** 29:24
**between** 16:17 17:11 34:12 37:25 38:3
**beyond** 55:2
**Bill** 4:21
**both** 9:17 21:10 36:20 36:20 72:4
**bottom** 57:1
**box** 75:16
**branch** 2:4 8:21 13:6 13:17
**brand** 69:25
**brands** 28:10 30:20
**brand-switching** 38:5
**break** 25:15,19,24 38:19,25
**Brian** 4:8
**bringing** 34:8
**broader** 10:15
**Brown** 14:18
**Budget** 8:23 13:5 15:1
**bullet** 68:3
**Bureau** 6:5,19,21 7:1,2 9:3,7,9,14,16 10:6,9 10:21 14:10 63:12 70:25 71:13
**Bureau's** 10:22
**Burke** 58:3,10
**buy** 30:19,19,20

**C**

**C** 2:8 4:1
**cabinet** 13:7
**calculated** 28:19
**calculation** 73:10
**California** 18:11,13 29:1 55:11,11,13,14 69:15 70:4
**call** 47:5 53:8 63:7
**called** 1:15 5:15
**Camel** 3:23 15:7,7,13 15:22 17:12 20:15 22:2 23:4 24:3 26:20 27:19,19 28:1,4,5,10 29:13,20,25 30:8,15 30:20 31:11,15,16 33:11 34:12 35:3,15 36:2 38:3,14 43:15 55:15 61:13 64:23,24 65:17 70:2 72:3
**Camel's** 30:22,25
**campaign** 15:14,22 17:13 20:16 21:24 23:4 27:18 29:13,15 29:16,18,21,25 31:12 33:11 34:12 35:20 48:5 61:13 64:23 65:17 68:7,9,14,23 69:6 72:4
**capacity** 5:6,8 40:4
**caption** 76:10
**careful** 73:8
**carefully** 54:21
**case** 1:5 4:4 9:7 10:15 14:18 29:19 34:8 38:14,16 43:6 44:10 46:12 51:13 53:16 75:4
**cases** 13:19,22 51:25
**causal** 16:17 17:11
**causation** 27:6
**cause** 65:8 71:20
**caused** 15:22 18:23 23:22 27:20 65:11,18 66:16 67:5 68:8

causing 71:25
caution 47:5
certain 31:8 47:2,9 53:5 54:14 60:14 62:8
certainly 19:8 44:21 66:7,25
CERTIFICATE 76:1
certified 1:21 4:9
certify 76:5
chairman 49:3 58:8 71:7
Chairman's 71:2
changes 72:24 75:19
characterization 44:16 61:10 64:25
characterize 23:25
characterized 58:14 64:5
charge 8:24 9:6
chart 32:6,8 68:3
charts 32:3,10,24,25
check 60:14 75:16
Chicago 8:9
chief 8:20 13:17
children 21:24 22:1 23:23 24:2 27:6 34:13,14,15,16
children's 34:7
choice 24:2,4 69:25
chunk 30:19
cigarette 14:8 15:5 22:22 29:18 30:17 38:1 47:10,23 49:14 54:5 55:16 64:1,11 65:11
cigarettes 3:23 14:17 18:16 22:2 24:3 28:9 28:11,16,18,19,23 30:16,19 31:17,17 47:3 52:21,23,25 64:25 65:8,12,19
Civil 2:4
clear 24:14 43:19 45:20
close 22:9 33:13,25
closed 24:14
Collier 1:18 2:10 4:14 15:10 45:15,16,18 46:1,6 52:7,8,9,14,19 56:4,7
color 54:1,2
columbia 1:1,22 4:7 75:1 76:4,22
come 13:19 14:23
commencing 1:17
Commercial 2:4
commission 2:18 5:4 6:7,23 7:4,13 9:20,23 10:4 12:4,13,22 14:1 14:4,20 17:17 20:7 22:7,8,22 25:2 31:23 33:5,9,13 34:9 35:1,3 35:7 36:6,10,12,17 41:23 48:8 58:9 63:3 71:7 76:24
commissioners 21:12
21:16 23:8 25:3,4 33:7,24 41:23 71:9,12
Commission's 10:16 11:16,22 12:3,16,25 49:14
communicate 17:16 36:5
communications 50:16 53:9
companies 14:13
company 3:22 54:6
compared 69:4,4,5
compares 30:24
compensated 44:19,21
complaint 3:19,21 21:2 21:2,3,5,9,20,23 22:5 22:6,11,16 23:6,17 24:8,18,20 25:5 27:5 34:24 36:13,18
complete 75:17,20
completely 32:19
compound 59:1
concern 34:6,16
concerning 3:22 37:16 37:22 46:18 50:17 61:12
concluded 15:20 16:16 16:24 17:6 18:18,22 36:1 65:7,10 74:6
concludes 39:5
conclusion 31:21 68:4
conclusions 15:17 16:10,20 17:5 18:1 19:2,9 21:17 35:21 36:5 61:1 64:20 72:14
concurrence 71:8
condition 68:11
conduct 15:15
conducted 25:8
Conference 1:19
confidential 47:6 50:19 53:8
confirmed 46:24
confirms 37:20
conflict 48:1,2 51:5,13 53:19
Congress 63:12
Congressman 12:2
connection 24:6 57:18 66:13 71:22
consent 10:14
consider 34:17
considerably 52:25
consideration 48:13
considered 31:10
considering 47:2
consistent 17:7 27:4
constitute 12:17
consult 47:24 51:2
consultant 52:20
consultation 51:3 57:11
consulted 15:5
consulting 46:5
consumer 6:6,22 7:1 9:4,8,10,14,17 10:25
11:5
consumers 69:23 70:4
contact 42:19 51:6
contacted 15:10 42:17 45:11
context 20:11 22:12 63:22,23 64:1
conversation 46:21
conversations 41:12 42:25 43:4,9 44:6,7,9
copies 41:25
copy 48:11,12,16,19
correct 40:1,2,5,6 45:17 54:15 57:5 58:16 65:12,14 73:14 75:17,20
corrected 62:17
correspondence 41:22
costs 8:25 13:15
counsel 1:16 2:19 4:18 5:18 39:19,25 48:10 53:10 70:22 73:3,25 76:13,17
counsel's 41:1 47:7,25 49:2 50:17 51:9,12 53:9
count 50:10
couple 17:21 42:23 49:21
course 35:22
court 1:1 4:7 5:10 73:13,17 75:1
cover 41:6
credit 7:8 10:25 11:21
criteria 12:4
critical 15:13 62:20
criticism 29:14,20
criticisms 22:19 29:9 61:8
criticize 36:20
cross 3:5 58:14
CROSS-EXAMINA... 39:19
cum 8:7
cumulative 66:9
current 5:8 6:4 46:23
curriculum 3:13 8:1
customary 62:2
C.S.R 76:21

D

D 4:1
data 17:1 18:9,12,14 22:18 25:11 27:12,12 27:18 29:1 31:4,6,8 31:10 32:17,18 36:20 54:14,17,20,23 55:3,6 55:8,11,12,13,17,19 55:22 56:2 69:15
DATE 75:24
david 2:3,22 5:1 39:21
dawn 1:20 5:11 76:3,21
day 28:9,11,16,18,24
days 27:25 28:2
deal 52:1
debate 61:3
December 76:25
deception 7:5 10:17 11:12,22 12:3
deceptive 10:8 11:10 12:6
decided 47:22
decision 13:24 16:18 18:17 30:15,16 33:25 34:18,25 35:12 48:20 48:25 50:11,17 51:2 51:18 64:12 71:3,21 71:25
decisions 13:20 17:12 17:14 18:25 19:12,15 19:17 29:23,24 36:3 37:21 67:9,10 72:7,16
decision-making 64:8
decrease 68:15
defendant 1:16 2:7,13 4:4 53:14
defendants 1:8 35:7 42:22 43:5 46:17,18 75:7
defense 36:22 38:18
definition 11:9,11
degree 8:6
delayed 71:21,25 72:6
deliberate 26:22
demonstrate 31:20
Department 2:3 5:2 39:22 45:20 74:1
depend 63:22
DEPONENT 75:9
deposed 5:22
deposition 1:13 3:11 4:3,10,12 5:24 6:10 7:17 16:1 19:20 20:21 23:11 24:21 33:15 36:23 38:22 39:2 40:8 41:6,14 42:18 43:11 44:3,8 72:20,24 74:5 75:14 76:5,12,15
deputies 50:24
deputy 6:25 9:9 51:7
describe 6:16 7:25 8:16 9:21 10:19 13:4 14:1 15:8 16:9 26:13 50:18 63:4
described 20:4 26:5,12
describes 37:9,10
describing 9:19
description 37:13 38:8
desk 13:18
detail 8:16 16:10 17:5 18:5 61:6
details 9:22
detect 29:15
determinants 3:16 20:1 37:23
determination 69:8
determine 12:5 65:16 66:15 67:4
determined 22:8
develop 36:21
developed 37:18
developing 7:4,8 11:18
development 10:16 13:9
different 13:7 18:13 20:8,9,9 23:5,18 26:19 27:15 28:9,16 29:8 41:5,11 55:14 57:23 59:2 60:8 61:24 64:8
DiFranza 31:4,7,11
Dingle 12:2
direct 3:4 5:18 39:5
directly 45:1 46:4
Director 6:5,19,21,24 6:25 7:1 9:3,5,9,13 10:6,9,19,21 11:7,14 12:25 14:10,21 70:25 71:13
directors 51:7
Director's 63:12
disclosed 50:19
disclosure 47:16
discredited 26:25
discuss 17:22 37:16,17 38:4 40:23 42:5 44:2 48:24
discussed 40:25 41:1 42:9,16 49:1,2
discussing 22:10 42:16
discussions 41:3,9 42:4 44:1,5 46:2,16 47:6 51:17 56:19,21
dismissed 38:17,17
dispositive 34:10
disproportionate 24:1 27:2
distinguished 13:1
district 1:1,1,22 4:6,7 75:1,1 76:4,22
Division 2:4 10:5
divulging 13:25
doctrine 11:17
document 6:14,16 7:21 16:5,11 19:24 20:25 23:10,14 24:24 25:7 25:13 26:4,5,12,18 33:4,6 37:2,4,8 43:2,6 54:12 56:8
documents 26:23 41:13 41:17 42:1 58:13 62:19 63:5
done 11:13 32:11,14 42:12,13 43:14 44:23 58:6 73:9
doubt 34:8
Dr 5:5,20 6:13 7:20 16:4 19:23 20:24 24:25 26:3 31:25 33:19 35:1,12 37:1,12 37:15,19,22 39:21 70:9,24 71:19
draft 3:19,21 21:1,5 22:11,15 23:17 24:7
drafted 57:3,7 63:11
dramatic 68:15
draw 15:17 16:20

drew 16:25 19:3,8 64:20
duly 5:16 76:7
during 7:3 35:22 44:13 44:18 45:3,7 56:17
D.C 1:10,20 2:6,11,15 2:20,23 4:15

E

E 4:1,1
each 47:25 50:12 73:7
early 44:15
Economic 2:22 58:4 60:2,4
economics 7:3 8:8,8 9:16 59:25 60:7,25 62:4 64:6
economist 2:21 7:2 9:16
edited 32:19
edits 56:8
education 7:25
effect 29:11 34:14 61:13 64:12,23 67:21 72:6
effects 17:2 29:6,13 30:6,7 35:19 63:16 64:6,7 72:16
either 29:19 45:1 58:22 59:4 66:8
emphasize 5:5
empirical 21:18 23:7
employed 4:10 54:20 76:14,17
employee 40:5 48:8 54:6,8 76:17
enacted 14:14
encounters 22:21
end 21:13 38:21 52:16 72:19
ended 52:17
energy 11:1
enforcement 10:24
engage 10:14
enough 29:11
entitled 4:4
equipment 4:10
errata 75:20
erroneous 16:25
errors 61:18,18 62:8,16
ESQ 2:3,8,9,9,14,18
essentially 9:6 10:22 24:12 32:21 54:22
estimate 44:25 73:23
et 1:7 4:6 75:6
ethics 52:6
evaluating 16:8
evaluation 3:15 6:25 9:3,6,12 10:5 14:22
even 68:24
ever 22:5 54:5,8
every 34:17
evidence 12:16 17:8,11 18:23 31:22 34:22 36:2 38:5 72:15
evidentiary 11:18
exact 60:14
exactly 60:15
examination 1:15 3:4,5 3:6 5:18 39:6 70:22
examine 17:2 18:16
examined 5:17 75:12
examines 27:9,24
excellence 12:24
except 75:19
excess 13:14
executive 8:25 13:2,13
exhibit 3:11 6:9,10 7:16 7:17,22 15:25 16:1,5 19:19,20,24 20:20,21 20:25 23:11,15 24:21 33:15,19 36:23 37:2 54:13,18,19,22 55:1,9 55:24,25 56:2,4,13,25 59:7,7 61:16 66:24 68:2 71:4,6
exhibits 42:1 55:21 58:13 64:20 66:14
existing 11:4
expected 37:10
expenditure 55:13
expenditures 18:13 37:21
experience 8:2 71:10
expires 76:24
explain 26:4 51:6
explaining 33:24
explored 26:20
exposure 69:16
extensive 71:10
extent 5:7 13:15 26:11 47:5,15,19 50:15 53:8 53:11 63:7,9
E-X-H-I-B-I-T-S 3:10

F

fact 27:23 32:24 42:6 42:10 56:9
factor 19:11
factors 18:15 19:9,17 29:1,22 37:23 65:11 67:8
facts 21:9 26:4 27:4
factually 47:8
fair 44:16 51:15 62:7 64:25 68:4
fairly 58:14
faith 73:22
fall 50:25
fault 62:6
FDA's 41:20,21
federal 2:18 5:4 6:6 7:13 9:23 10:4 12:13 12:21 17:17 20:7 22:6,22 33:5 34:25 36:6 41:21 46:11 48:8 58:8 63:2 71:7
fee 40:10,13,15
fellow 71:9
fenili 2:21 4:23
fewer 28:11
filed 46:13,19
final 3:25 13:13,23 32:20 37:5
financial 52:7,13 54:1
financially 76:18
find 17:5 48:14 72:8,13 72:15
finding 52:2
Fine 74:2
finished 70:10
firm 45:12,15,23
first 5:16 29:18 30:17 42:17,19 45:11 51:8 51:22 52:11 57:1,1 58:2 68:3 71:5
five 13:7
follows 5:17
food 11:20
footnote 57:1 58:1 61:17,19 62:1
foregoing 76:5,7
form 12:1 22:24 24:10 35:5 56:14 59:1 61:21
formal 22:6
forms 46:12
formulated 13:22
forward 10:11
found 22:4 29:13,19 69:9
four 41:11
fraction 30:20
from 3:14,18,20 5:3,11 6:23,24 8:6,9 9:4,10 9:14 12:14 15:17 16:20,25 18:9,11 21:2 21:3 22:6,19 23:18 27:15 31:4 34:25 39:22 42:22 44:14 46:17 47:1,13,21 48:21 49:5 50:8,22 52:9 53:5 56:19,22 57:12,17,20 60:24 61:3 67:18
front 31:22
FTC 3:12 5:7,9 8:10 9:4 14:10 17:20,21 20:10,12,16 40:4 41:20 42:15,23 46:23 47:1 48:25 49:5 53:3 53:6 56:5,14 58:24 59:6,9,12,13 64:21 71:11
FTC's 11:5,12 14:18 15:7 21:1 36:21 37:6
full 6:2
fully 25:14 47:12
fundamental 21:22
Fundamentally 16:15
further 35:13,18,18 51:11 72:17 76:16

G

G 4:1
general 2:19 30:1 38:2 40:25 46:7 47:7,25 49:1 50:16 51:4,9,12 53:9 61:7,10
generally 50:18 73:4
geographic 55:14
George 7:11 8:12,18 35:13 58:5
Georgetown 2:22 8:6 58:4
getting 43:22
give 38:9 44:25 50:15 63:21
given 54:14 55:9 75:18 75:21 76:13
giving 42:18
GK 1:5 4:4 75:5
glad 25:15
go 8:13 10:10 25:14,20 32:6,7 39:12 47:6 55:2
goes 26:19
going 8:10 9:24 25:12 25:22 38:23 39:14 47:4 50:13 58:25 63:6 70:16 72:20
good 5:20,21 6:1 39:21 39:23 73:22
Government 40:4
graduated 8:7
great 52:1
green 2:14 4:24,24 39:9
Greisman 3:14
group 13:18
groups 31:9
guess 14:11 61:9 71:16

H

Halma 4:8
handled 10:15 13:6
happened 17:25 18:6 36:17
having 5:15
health 34:7,15,16
hear 50:9
heard 63:15
hearing 38:14
held 8:17,23 9:22 10:4
helped 62:5
hereof 76:10
HHS 13:8
hierarchy 63:15 64:5
high 27:11
higher 31:2
him 39:11 43:18
hired 52:19
history 72:3
hold 58:7
holds 58:11
hopes 62:16
household 27:14
Housing 8:21 13:8
howard 1:14 3:3,13,14 4:3 5:14 6:3,21 38:22 39:3 72:20 75:11
Human 8:20

I

identical 31:1
identification 6:9,11 7:16,18 15:25 16:2,6 19:21 20:22 23:12 24:22 33:16 36:24
identified 57:25 60:11
identify 4:19 49:9
II 25:11 27:11,12,18 32:14,20
III 1:14 5:14
illustrated 29:6
illustrates 28:4,10,22 30:5 31:15
immediately 66:4
important 19:11,14 29:3 34:15
inadequate 17:1
incidence 69:17
include 67:17,18
included 25:9 32:16 67:25
includes 31:7
including 7:5 11:10 15:6
inclusive 75:13
incorporated 1:6 4:6 75:6
increase 27:8,17 28:23 68:9,24 69:3
increased 30:9 34:13
increments 72:5
Indeed 34:15
independent 66:20
independently 57:3,8
indicate 4:19
indicated 4:15 8:2
indicates 28:1
indirectly 45:2
induce 64:24
induced 27:6 68:23
industry 55:16 62:20
inferences 16:25
inferring 16:17
influence 19:9,13,17 29:2,15,19 30:3 66:2 67:8 69:16
influenced 18:24 27:22 36:3
influences 19:12 29:3,3
influencing 30:4
information 8:21 9:19 26:12,13 47:16,19 50:19 63:8 69:24
initially 59:24
initiation 38:1
injury 31:21,22
Inquiry 60:2,5
instance 51:8
instances 51:16
instant 74:5
instruct 47:15 49:6 50:14 63:7
instructing 63:8
instrumental 7:4,7
intended 43:21
intensity 27:22,24
interest 53:19

**interested** 20:15 76:19
**interests** 5:7
**interview** 30:23
**intuition** 34:6
**investigation** 10:10 14:17 15:7 20:17,18 21:9 22:9 23:3,8 24:13 26:21 33:14,25 35:15,16,22 36:9 41:7 42:13 43:15
**investigations** 10:7 35:3 47:17
**involve** 35:2 47:15 70:25
**involved** 10:25 14:7,8 14:12,15 35:2,14,18 36:19 46:22 50:8
**involvement** 15:8 51:10
**involving** 11:20
**in-class** 27:10
**issue** 22:5 34:10,24 36:13 51:5 52:3 64:11,18 69:3
**issued** 36:18 49:17,19
**issues** 10:15 15:2
**I-N-D-E-X** 3:1

J

**J** 1:14 3:3,13,14 5:14 6:3,21 71:8 75:11
**JAMA** 3:15 16:8,16 18:10 26:25
**jaques** 1:20 5:11 76:3 76:21
**Jeff** 4:23
**JEFFREY** 2:9
**Joe** 15:6,7,13,22 20:15 26:20 33:10 34:12 35:3,15 38:3,14 43:15 61:13 64:22 65:17 70:2
**john** 2:9,18 5:3 43:10
**join** 26:7,16 58:18
**joint** 34:3 42:22
**jointly** 10:21
**journal** 15:12 31:5 59:24 60:6,25
**judgment** 54:2
**Judith** 3:18,18,20,20
**July** 9:10
**June** 1:11 3:12,24 4:13 9:5 52:17 53:4 75:14
**jurisdiction** 12:3
**just** 5:4 20:3 23:19 34:20 35:5 48:4 67:10 69:19 71:2
**Justice** 2:3 5:2 39:22 45:19 74:1

K

**K** 1:18 2:10,23 4:14
**Kappa** 8:7
**kauffman** 2:9 4:23
**keeping** 73:8,14
**kevin** 2:14 4:24
**kids** 19:10 27:20 48:5
**kind** 62:2 66:11
**klontz** 2:3 3:5 5:1,1 8:4 16:12 17:18 19:6 20:13 21:6 23:1,20 24:9 26:6,15 28:12,14 32:4,12 33:1 35:23 36:11 37:14 38:10,15 39:7,10,20,22 40:21 47:11 48:3,10,15 49:11 50:4 51:14 53:20 54:4 58:21 59:3 61:22 62:13,25 63:14,24 64:9,19 65:3 65:9,15,25 66:12 68:1 68:12,18,21 69:7,18 70:1,8,14 71:14 72:18 72:23 73:6 74:2
**know** 39:24 45:4 47:17 49:20 50:24 51:2 53:1 55:19 56:16 58:10 70:7 71:17 73:9
**knowledge** 26:11 56:12 61:11
**known** 51:25
**knows** 51:7

L

**L** 2:5
**Labor** 13:8
**lagged** 66:10 72:15
**language** 32:2
**last** 10:4 34:1,19 49:21 52:24 53:4 57:2 58:1 61:17
**later** 66:16
**laude** 8:7
**law** 1:17 10:24 34:8,23 45:11,15 58:5 59:25 60:6,25
**lawsuit** 34:17 46:11,18 46:22
**lawyers** 10:23 56:22
**lead** 18:15
**leading** 8:2
**least** 17:20 55:24 57:13 62:4 64:6 67:1
**led** 14:17 34:16 66:14
**left** 14:25 18:2
**legal** 4:9
**legislation** 63:13
**let** 6:1 26:10 35:8 36:16 61:23 66:21 68:13 71:23
**letter** 3:14,18,20 12:2 47:20 48:7,11,16,23 50:24 63:11,12
**Let's** 59:4
**levels** 27:15 64:8
**Light** 28:5
**lights** 28:5
**like** 5:5 6:8 7:15,24 15:24 19:18 20:19 23:9 25:13 27:13 32:1 38:19 51:21 60:24 70:12 73:6,12
**likely** 28:5,6 56:11
**link** 34:11
**list** 3:25 37:6
**literature** 64:7
**litigation** 2:4 36:15 37:11 42:14
**little** 16:9
**LLC** 2:22
**logistic** 69:14
**logo** 31:15,16
**Lois** 3:14
**long** 34:10 66:9
**longitudinal** 58:15
**look** 54:21 55:3 56:25 68:2 71:19,24
**looked** 23:19 29:11,17
**looking** 39:11 60:8 61:16 66:8 67:14,20
**looks** 28:8,15,18 29:8 30:16,21 31:4
**lower** 4:16

M

**M** 2:14
**machine** 55:18
**macleod** 2:8 3:4,6 4:21 4:21 5:19 6:8,12 7:15 7:19 8:15 10:2 12:7 12:19 14:24 15:24 16:3,19 17:15,24 19:1 19:18,22 20:19,23 21:14 23:9,13 24:5,23 25:17,20 26:2,9 31:24 32:9,22 33:3,17 35:8 35:11 36:4,14,25 38:6 38:12,19 39:5 40:20 41:2,4,10 42:4 44:1,6 58:17 61:20 62:11,23 64:16 66:5 67:3,23 68:6,17 69:2,11 70:6 70:11,23 71:18 72:12 72:17 73:12,17,21 74:3
**made** 10:8,12 13:23 14:10,10 22:17 33:7 50:11 51:3 69:8
**magna** 8:7
**mail** 42:20
**major** 8:8
**majority** 34:2
**make** 13:20 56:7 65:16 66:15 68:22 72:24 73:2
**making** 11:3,3 41:22
**makings** 11:19,20
**managed** 10:22 11:4
**management** 7:10 8:11 8:23 13:2,5 14:25
**manufacturers** 69:23
**many** 22:1 24:2 27:25 41:9 50:5,10
**March** 3:20
**mark** 6:8 7:15 15:24 19:18 20:19 23:9
**marked** 6:11 7:18,21 16:2,5 19:21,24 20:22 20:25 23:12,15 24:22 33:16 36:24 37:2 42:1 54:12,18 55:22 58:13
**marketing** 3:22 11:1 14:3 17:8
**marks** 38:21 39:1 72:19
**Marlboro** 28:6,7 31:1 55:15
**Mason** 58:5
**matches** 32:3
**Matt** 47:20 50:24
**matter** 14:19 24:19 44:7 47:25 48:2 50:25 51:7 52:1 54:3 71:22 72:1
**matters** 9:18 13:21 14:8 15:6 41:5 47:2 47:10,13,22,23 48:21 49:4,8,9,12,22,24 50:10,12,21,22 51:4 51:20,23 52:20 53:6 53:13,15,17
**may** 3:18 5:7 9:25 11:24 12:10 14:5 16:14,22 18:20 19:4,7 22:25 24:19 26:8,17 35:24 39:10 42:7 45:18 46:20 47:6,19 48:10 50:1,14,19 51:25 53:10,23 54:19 58:19 62:5,21 63:10 63:19 64:2,7,14 65:21 66:2 71:15 72:10
**mean** 14:19 46:22 51:21 52:4 57:7,10 61:25 63:18
**meaning** 63:22,25
**measure** 27:24 30:10 30:12
**measurement** 14:16
**measures** 17:2 31:10
**Medical** 15:12 31:5
**meetings** 17:21,25 18:7 18:8 22:10 56:18,21
**mentioned** 46:21 67:21 76:9
**met** 21:10,12
**Meyers** 47:21 48:4,24 50:24
**Michigan** 27:10
**might** 5:8 9:21 30:3 41:6 47:5,17 50:10 51:5 53:8 54:1,1 59:1 63:7
**mind** 25:18,18 53:22,25
**mine** 48:22 73:11
**minimum** 68:10
**minutes** 73:10
**model** 37:17 61:9
**models** 64:4,6 67:25 69:14
**moment** 32:1 38:20
**money** 69:20
**months** 29:10 49:21
**more** 8:16 9:21 16:9 17:4,5,8 22:21 25:14 28:2,5,6 31:12 35:2 52:25 54:21
**morning** 4:22 5:20,21 39:21,23 54:11
**morris** 1:6 2:13 4:5,25 75:6
**most** 7:8 8:9 13:21 15:6 19:11 29:3 30:18
**much** 44:25
**Muris** 58:4,7 71:8
**myself** 47:22 50:22

N

**N** 2:21 4:1
**name** 4:8 6:2
**named** 71:9
**nature** 51:17
**necessary** 43:18 68:10
**need** 51:1 52:10 63:21
**needed** 52:11
**negative** 31:17
**negotiations** 10:14
**neither** 27:4 37:20 76:13
**never** 46:8,22
**Newport** 31:2 55:15
**next** 15:25 19:19 20:20 22:11 23:10 28:8
**nicotine** 14:16
**none** 30:6,6
**nonpublic** 47:16 49:8 49:24 63:8
**nonpublication** 60:20
**Northwest** 1:19 4:14
**notary** 1:21 5:16 76:1,3 76:22
**note** 70:14 73:6,12
**noted** 75:19
**nothing** 68:19
**notice** 1:17 12:14 41:21 42:22
**noticed** 4:3
**notion** 30:14
**November** 9:14
**number** 1:5 4:4 15:5 25:12 28:8,15,17,19 28:23 50:7 51:23 52:20 75:4
**numerous** 42:13
**N.W** 2:5,10,15,19,23

O

**O** 4:1
**oath** 5:12
**object** 9:24 16:13 24:10 47:4,14 50:13 53:7 58:25 63:6 68:19
**objection** 8:4 11:24 12:10 14:5 16:12,22 17:18 18:20 19:4,6 20:13 21:6 22:24 23:1,20 24:9 26:6,7 26:15,16 32:4,12 33:1 35:5,23,24 36:11

37:14 38:10,15 40:20 53:23 58:17,18 61:20 61:21 62:10,11,21,23 63:19 64:2,14,16 65:1 65:6,13,21 66:5,6,18 67:23 68:5,6,16,17 69:1,2,11,12,21 70:5 70:6 71:14 72:10
**obtained** 18:9 27:13 32:18
**obvious** 61:1
**occasion** 15:1,4 35:2,13
**October** 9:10
**off** 25:20,22 38:20,23 39:12,14 70:13,17 72:21
**offered** 40:15
**office** 2:19 8:21,22 13:5 14:23,25 41:1 47:7,25 48:17 49:2 50:17 51:9,12 53:9
**officers** 13:18
**offices** 1:18 4:13 11:6
**Oh** 68:20
**OIRA** 13:23
**okay** 6:1 51:11 70:16
**Oldham** 3:18,20
**omitted** 31:8
**once** 14:14 65:19
**one** 18:10 24:13 27:24 30:10 60:24 62:16 67:14
**ones** 60:11
**ongoing** 49:4 61:2
**only** 29:15 60:5
**oOo** 3:8
**operating** 4:9
**opposed** 27:3 28:6 56:22 58:15
**order** 3:19,21 8:25 13:13 17:2 52:10,12 66:10
**ordered** 69:14
**other** 13:21 16:20 17:8 19:2 27:13 30:20 40:17 42:23 44:2,5,9 46:5 49:22 51:4 53:10,17 56:1 57:22 60:9,11 61:3,3,18 62:4 64:21 65:10 70:8 72:18
**otherwise** 43:20 76:18
**out** 52:2
**outcome** 76:19
**outside** 56:23
**over** 22:22 29:12 41:15 45:5 66:9 72:3,4
**Owen** 34:3
**own** 13:20 21:11 26:14 44:24 57:10

**P**

**P** 4:1
**page** 3:2,11 57:1 58:2 67:12,15,20
**pages** 75:12 76:7
**paid** 45:1,22,24,25
**paper** 3:16 16:7 17:19 19:25 20:16 21:8,11 22:16 24:17 55:19
**papers** 24:15,16 41:18
**paperwork** 13:11,11,21
**paragraph** 34:2,20,21 37:13 71:6
**pardon** 71:23
**parental** 29:4
**part** 20:17 24:12,19 42:12,14 57:13 62:3 67:7
**participate** 49:15 52:11 52:12
**particular** 10:14 11:8 11:20 15:23 17:13 21:19,23 30:8 38:4 48:2 51:13 53:15 54:2 60:5 61:25 69:9 69:10
**particularly** 51:22,25 64:18
**parties** 1:23 4:19 76:15 76:18
**passed** 73:23
**past** 27:25
**Pause** 39:16 70:19
**pavement** 57:20
**payment** 57:12,17,24
**payments** 40:17
**peer** 29:3 58:23 59:5,10 59:16,20
**peers** 19:13
**Pennsylvania** 2:19
**people** 31:13 32:15 57:25 62:4 73:4
**per** 28:9,11,16,18,24
**perceived** 30:4
**perception** 30:9
**perceptions** 19:15 29:4
**perform** 24:6
**period** 29:12 44:13,18 45:3,7 66:9 72:4,5
**periods** 73:25
**person** 66:2 71:1
**personal** 40:3
**personnel** 56:19
**persons** 65:18 66:15
**pertaining** 37:9
**Phi** 8:7
**philip** 1:6 2:13 4:5,25 75:6
**Ph.D** 2:21 8:8
**Pierce** 18:10
**place** 60:5 76:9
**plaintiff** 1:4 2:2 39:19 75:4
**planned** 38:8
**plans** 14:13
**plead** 27:5
**please** 4:18 6:2 26:13 28:12 34:1,19 39:11 65:5 68:2 70:14 71:5 71:5 73:18
**PLLC** 1:18 2:10
**point** 22:13 68:3
**points** 8:1
**policies** 7:4
**policy** 6:24 7:6,7,10 8:12 9:3,6,12 10:5,15 10:17,17 11:12,23 12:8,12,16 14:21 61:2
**Porter** 2:14
**portion** 4:16 41:21
**posit** 68:13
**position** 6:4 8:18,23 10:1,3 36:21 46:23 53:3 58:7,10
**positions** 6:23 8:17
**positive** 31:18
**possibility** 66:11 71:20 71:24
**possible** 13:15 30:2 34:17 42:5 51:6 66:1 66:7 68:23
**post** 9:13
**potential** 53:18
**practice** 12:5 47:24 51:4 66:23
**practices** 7:8 10:8 11:1 11:10,21 14:3
**preceding** 30:18
**precisely** 22:2 49:20 53:1
**predictors** 37:23
**preliminary** 25:11 27:12 32:17
**preparation** 21:8 57:13 57:15,19 66:13,24
**prepare** 18:14 54:18 55:3,6
**prepared** 16:7 54:12 55:9,22 56:1 62:18
**preparing** 25:6
**prerequisite** 31:19
**present** 1:23 2:17 8:3 53:2 73:24
**presentation** 3:22 25:1 33:7 56:14 58:24
**presentations** 21:21 25:4 33:10,13 35:19 41:19 58:22 64:21
**presented** 18:1 20:16 21:15,17 23:6 33:4 41:19 54:24 55:23 56:9,9
**presenting** 21:10 38:18
**presently** 49:4,13,25 51:16
**press** 3:12,24 6:18,20 46:14
**presume** 48:18
**prevail** 7:5
**previously** 6:22 41:19
**primarily** 10:24
**primary** 11:2,15 19:17
**prior** 8:17 9:2,12,15 32:18 34:20 38:17 40:22 41:14 43:1 48:23 51:18 53:25 56:5,13 57:4 58:23 59:5,8,13 66:10
**private** 5:6 71:10
**privilege** 9:20
**privileged** 9:20 50:15
**privileges** 13:25
**probably** 22:15 25:10 41:11 61:10
**problem** 15:23
**problems** 17:22 62:5
**proceeding** 37:6 42:18 51:18
**proceedings** 39:16 70:19
**process** 59:21 64:8
**produced** 42:15
**product** 66:3
**products** 17:10
**profession** 62:4
**professor** 7:9 8:11,18 58:5
**profitable** 69:23
**program** 12:15
**projects** 11:8
**prominently** 15:6
**proposals** 11:3
**proposed** 11:9,11 13:12 21:2,3
**protection** 6:6,22 7:2 9:4,8,10,14,17 11:5
**provide** 15:21 16:16 17:11 34:23 38:13 41:13
**provided** 18:12 55:12
**provides** 69:24
**public** 1:21 5:16 7:10 8:12 32:18 47:19 49:12,22,23 63:9 76:1 76:3,22
**publication** 22:17 58:23 59:8,12,22,23 60:17 62:9
**publications** 60:10,20 61:4,12 62:18
**publicly** 32:20
**published** 31:8 54:20 54:23,24 59:14 60:16 61:12
**purpose** 43:22 62:14
**purposes** 73:24
**pursuant** 1:16
**pursue** 10:7
**pursuing** 20:15

**Q**

**question** 5:23 22:3 26:10 35:9 42:5 47:18 59:4 61:23,24 65:24 66:20 68:18 69:9,10
**questioning** 5:8
**questions** 18:2,3 25:12 39:8,12 70:9 72:17,18 75:18,21
**quick** 73:16
**quite** 56:11

**R**

**R** 4:1
**raised** 24:7
**ranging** 6:23
**rather** 46:3
**reach** 72:13
**reached** 16:10 35:22
**reaching** 34:18
**read** 34:1,19 37:12 71:5 72:23 75:12
**readable** 55:18
**reading** 62:7
**real** 73:16
**really** 45:4
**reason** 34:23 50:6 66:8
**reasonable** 12:17
**reasoning** 33:24
**reasons** 60:19,23 61:3,5
**recall** 15:4 18:4,6 21:15 33:9 42:8 46:10 56:10 59:10 60:14 61:5
**receive** 12:20 57:12,17 57:24
**received** 8:5 12:23,25 13:1 43:6 57:20
**receiving** 40:17 43:1
**recently** 7:9 8:10
**Recharacterize** 65:4
**recognition** 31:14
**recognitions** 12:21
**recognize** 6:13 7:20 16:4 19:23 20:24 23:14 24:24 33:18 37:1
**recommend** 73:2,4
**recommendation** 10:9 13:22 14:9
**recommendations** 10:6 10:12 13:19
**recommending** 63:13
**record** 6:2 25:21,23 26:1 34:11,22 38:20 38:23 39:3,12,15,18 39:25 43:14,20,22 70:13,17,21 72:21 73:7,13 76:12
**recorded** 16:11 75:18 75:21
**recusal** 48:25 50:23 51:1 52:2
**recuse** 47:22 48:21 51:18
**recused** 47:1,9,13 49:5 49:13,25 50:8,12,22 51:16,23 52:9 53:5,13 53:18
**redirect** 3:6 70:11,22
**reduced** 76:10
**reduction** 13:11 30:13
**referees** 22:19
**reference** 61:17
**referred** 48:4
**referring** 67:13
**refers** 61:19
**reflect** 32:10,13,24

**reflected** 41:24 57:22 67:9,11
**regarding** 5:24 37:18
**regional** 11:6
**regions** 18:13 55:14
**register** 12:13 41:21
**regression** 28:17 42:14 67:9
**regular** 28:7
**regulation** 9:1
**regulations** 13:14
**Regulatory** 8:22
**relate** 44:10 52:23
**related** 30:11 52:24 61:2 76:14
**relating** 38:5 47:2 52:21
**relation** 37:25 38:3
**relationship** 16:17 17:11 22:4 46:3 52:7 52:14,18 54:1
**relative** 76:16
**release** 3:12,24 6:18,20 32:19
**released** 32:21
**relevant** 69:24
**relied** 54:17
**remaining** 61:18 62:15
**remembered** 41:7
**reopened** 23:3 24:15 35:17
**rephrase** 26:10
**report** 20:3,6,10,12 49:15,16 54:14
**reporter** 1:21 5:10 73:13,18
**represent** 4:20
**represented** 43:5
**representing** 4:22 5:6 51:24 52:5
**represents** 52:8,10
**request** 40:13
**requests** 13:11
**required** 12:17 13:14 46:24
**research** 9:17 22:3 29:10 37:16,19 58:3
**Resources** 8:20
**respect** 33:10
**respective** 1:23
**respond** 19:15 47:18 49:7 63:10
**respondents** 31:7
**Respondent's** 3:25 37:5
**responding** 21:4
**response** 20:17 22:18 23:8 24:18
**responsibilities** 9:22 10:20 13:4
**responsibility** 11:2,15 62:3,9
**responsible** 10:24 13:10,12
**rest** 8:13
**restate** 35:8 71:23
**result** 18:19 21:25 36:8 72:14
**resulted** 12:14
**results** 21:11 23:6 32:21 67:10,17,18
**resume** 7:23
**return** 31:25 71:4
**reveal** 29:11
**revealed** 27:10
**reversed** 32:25
**review** 9:7 11:9,16 12:14 14:15 15:14,15 15:18 17:4 25:14 26:22 56:13 59:10,16 59:21
**reviewed** 10:6 56:4 57:3 58:23 59:5
**reviewing** 8:24 13:12 14:2
**reviews** 11:4
**revised** 3:21
**revisions** 22:17
**reynolds** 1:16 2:7 3:22 4:22 5:18 18:9,12 25:2 26:23 32:18 36:19,21 37:7 38:18 44:20,22 45:1,9,13,25 46:4 54:15 55:12 56:13,18,19,22 57:4 57:13,18,20 64:22 65:19 70:3,22 72:1
**re-interview** 32:15
**right** 69:4 72:23
**Rill** 45:16,19
**risk** 27:8 37:22
**risks** 19:16 29:5
**RJR** 55:9,10,23
**robert** 2:21 4:23
**role** 13:16 14:2 18:16 21:4 25:6 36:15
**roles** 41:8
**Room** 1:19 2:5
**ROSEN** 2:22
**rotational** 14:9,13 63:13
**rule** 7:8 11:2,3,18,20,21 41:22
**rules** 8:24 11:4 13:13 52:6
**run** 57:23
**runs** 44:14
**R.J** 1:16 2:7 3:22 4:22 5:18 37:7 44:20,22 45:1,9,12,25 46:4 54:14 55:12 56:12,18 56:19,22 57:12,17 64:22 65:19 70:2,22 72:1

S

**S** 2:3 4:1
**sales** 27:2
**salient** 8:1
**same** 21:13 24:12,19 30:21 32:21 45:23 75:17,20
**sample** 31:13 32:15,20 66:22,23,24 67:7
**samples** 67:17
**saw** 17:22 46:14
**saying** 6:17
**says** 57:2
**scenario** 68:13
**school** 27:11 58:5
**school-based** 27:16
**scope** 50:23 51:1
**Scott** 1:18 2:10 4:14 45:16,19
**screen** 4:16,17 25:23 26:1 38:24 39:4,15,18 70:17,21 72:21
**seats** 39:10,13
**second** 29:14 58:1
**sectional** 58:14
**sector** 71:11
**see** 61:17
**seemed** 51:11
**seen** 33:20
**sees** 66:2
**selection** 9:7
**senate** 46:24
**send** 41:25
**sending** 48:23
**senior** 13:2 71:9
**seniors** 27:11
**sent** 41:15,18 48:7 60:15
**sentence** 34:20 57:2 58:1 61:17 62:1,8,15
**separate** 24:17 44:6
**separately** 29:17
**series** 15:11 41:15
**served** 6:22 9:8 40:7
**service** 13:1,2
**Services** 2:22 58:4
**set** 22:18 41:18
**several** 14:7 29:8
**Shannon** 1:18 2:10 4:14 15:10 45:16,18 46:1,6 52:7,8,10,14 52:19 56:5,7
**share** 30:22,24 31:1
**shares** 31:2
**sheet** 75:20
**shorthand** 1:21 76:9
**shortly** 15:11
**show** 31:11
**showed** 34:11
**shows** 27:14,16 28:21 30:25
**sibling** 29:4
**siblings** 19:14
**side** 73:7,11
**SIGNATURE** 75:24
**significant** 29:7 30:7 37:25 38:2
**significantly** 18:24 27:7 27:14
**similarly** 10:12
**since** 29:21 73:7
**singer** 2:18 5:3,3 9:24 11:24 12:10 14:5 16:13,22 18:20 19:4 22:24 24:10 25:17 26:7,16 35:5,10,24 47:4,14 48:12 49:6 50:1,13 53:7,23 58:18 58:25 61:21 62:10,21 63:6,19 64:2,14 65:1 65:6,13,21 66:6,18 68:5,16,20 69:1,12,21 70:5 71:15 72:10 73:1
**sir** 67:16
**situations** 30:11
**slightly** 20:8 23:4 31:2
**small** 30:20
**smaller** 13:9
**smoke** 16:18 18:15 19:10,14 22:2 23:23 24:3 27:20 28:2,5,7 28:11 30:15,16 64:13 64:24 65:8,12 68:8,24 71:21,25
**smoked** 28:1,16,18,23 29:17 30:17
**smokers** 27:3,25 28:1,2 28:4,6,9,11 29:21,25 30:22,25 31:3,12 64:13,24 65:11
**smoking** 3:16 17:12,13 18:24 19:12,14,16,17 20:1 21:12 24:4 27:7 27:9,15,17,23,23,24 29:2,4,4,5,16,23 30:5 30:11,13 34:13,14 35:20 36:3 37:17,21 37:24 38:1,3 47:3 61:14 64:1 65:19 66:16,17 67:1,6,8 68:9,15,25 69:17 72:16
**social** 30:11
**some** 8:16 9:17,21 13:9 13:19 22:13 25:8,13 41:22,24 42:9 43:14 44:23,23 50:21,21 51:15,20 52:23 53:12 54:19 55:24 57:21 66:20 67:1,18 70:11
**somehow** 27:22 29:22
**someone** 51:24 52:5
**something** 14:22
**sometimes** 64:5
**somewhere** 48:18
**sorry** 28:2 36:11 68:20
**specialist** 4:9
**specifically** 56:10
**specification** 61:9
**Spherion** 4:11 5:11
**spoke** 46:17
**staff** 10:7,13,22 17:21 18:3 20:14 21:10,16 23:3,7 26:20 27:21 29:9 71:9
**staff's** 21:3 23:17 26:22 30:14
**stages** 11:12
**standards** 11:18,19
**Starek** 34:4
**start** 26:3
**started** 29:16,21,25 67:1
**starting** 7:25 10:3
**State** 47:12
**stated** 50:23
**statement** 7:6,7,12 10:17,18 11:13,23 12:9,13 34:2,3 38:7 57:5
**statements** 33:18,21,23
**states** 1:1,3 2:3,18 4:5,6 5:2 6:20 31:21 47:21 75:1,3
**statistical** 25:9 57:21
**statistically** 30:7 37:25 38:2
**statute** 14:14
**statutory** 11:11
**still** 29:13 36:2 52:13 55:17
**stipulation** 73:22
**stories** 46:14
**strategic** 7:10 8:11
**Street** 1:19 2:5,10,15 2:23 4:14
**strictly** 44:8
**strike** 36:16 59:4
**student** 31:13
**studies** 16:16,25 17:7 18:10 54:23,25 55:2,4 55:7 58:15 66:14
**study** 15:1 18:10 27:12 31:5,14 32:16 67:4
**subject** 73:24
**submission** 56:5 57:4 59:6,8,13
**submit** 14:14 59:22
**submitted** 17:20 20:6 20:10,12 22:16 25:2 59:8,11,12,24 60:2,4 60:6,11,21
**subpoena** 40:7,11 42:20,21
**subsequent** 36:8 60:4 72:7
**subsequently** 35:17
**substance** 52:1
**substantial** 31:20,22
**substantiation** 7:6 10:18 11:17 12:8,12 12:15
**substantive** 46:20
**sufficient** 17:10 34:7 68:11
**sufficiently** 61:2
**suggest** 27:18 62:8
**suggested** 56:7
**suggestions** 22:19
**Suite** 1:19 2:11
**supervising** 11:16 13:17
**supervision** 76:11
**support** 26:23
**suppose** 73:5

**sure** 22:13 24:16 49:23 65:23 73:2
**survey** 18:11 27:11 30:18,21 55:12
**surveys** 27:14,16
**susceptible** 29:22
**switch** 39:10,13
**sworn** 5:16 76:7
**system** 14:16

**T**

**tab** 26:18 27:9,23 28:3 28:4,8,12,13,15,25 29:8 30:2,14,21 31:4 31:14,19 32:6,6,7,8 68:2
**table** 67:12,14,20,22
**tabs** 32:1,2,3,10,23,25 55:25
**take** 25:15 38:19 48:13 56:1 66:21
**taken** 4:12 25:24 34:9 38:25 75:14 76:5,8,16
**taking** 25:18 28:19,20 74:4
**talk** 51:11
**talked** 41:5 43:10 51:8
**tape** 55:10
**TAPS** 25:11 27:11,12 27:18 29:1 32:14,16 32:20 66:22 67:16,18
**tar** 14:15
**targeting** 26:22
**team** 71:10
**teenage** 3:16 18:24 20:1 21:11 28:1 29:2 29:23 35:20 36:3 37:21 66:22
**teenager** 19:12
**teenagers** 18:15
**teens** 17:8 19:15 27:3 29:16,17 30:1,16,18 31:16 67:10
**telephone** 41:12
**television** 4:16
**tell** 17:5 18:18 33:21 35:21 37:4,8 43:12,21
**tendered** 40:10
**tenure** 7:3
**term** 62:14 63:15,18 64:10
**terms** 57:8
**testified** 5:17 44:14
**testify** 37:19,22,24 40:23
**testifying** 43:1 44:11
**testimony** 37:10,15 38:8,13 40:18,24 42:23 43:7 44:3 54:11 76:6,8,12
**text** 32:5,7,23
**Thank** 28:14 35:10 70:9
**their** 13:15 18:2 19:13 29:17 30:17,24 33:24 43:21 58:23 59:5
67:8
**themselves** 4:19 54:23 55:2
**theories** 26:19
**theory** 23:5 24:1 26:21 26:24 27:1,21
**Theresa** 58:3
**thereto** 76:18
**thing** 52:24
**things** 42:10,11
**think** 5:25 13:7 22:14 23:25 28:3 52:24 62:12 64:17,18
**thinking** 15:21
**third** 6:3 29:20 57:2
**though** 68:24
**thought** 17:7
**three** 41:11
**through** 8:13 14:23 25:14 26:19 54:21 75:13
**throughout** 72:5
**thrust** 69:13
**Thursday** 1:11 4:13 75:14
**Tim** 58:4
**time** 4:15,16 9:8 10:23 14:20 17:6 25:11,14 25:23 26:1 30:23 38:23 39:4,15,18 44:13,18 45:3,7,15 46:14 55:5 56:17 58:6 59:17 66:9 70:9 70:15,17,21 72:21 73:7,8,14,23,25 76:9
**times** 20:9 57:23 66:10
**timing** 24:14,16 45:20 59:10
**Timothy** 71:8
**tobacco** 3:22 14:2,19 15:2 18:11 22:12 47:23 55:11,12 62:20
**tobacco-free** 48:5
**today** 5:24 7:5 39:25 40:18,22 42:2,6 44:4 44:8,11,14 55:22 68:4
**today's** 34:18 40:8
**told** 43:13
**total** 72:4
**towards** 21:12 39:11
**track** 73:8,14
**Trade** 2:18 5:4 6:6 7:13 9:23 10:4 12:21 17:17 20:7 22:6,22 33:5 35:1 36:6 48:8 58:8 63:2 71:7
**transactions** 13:6
**transcript** 75:13
**transcription** 75:17,21
**Treasury** 13:9
**trends** 27:9,15
**tried** 27:5
**true** 75:17,20 76:12
**try** 17:2 66:3
**turned** 65:20
**Twelfth** 2:15
**two** 32:2,3,10,23,25 57:25
**two-minute** 25:19
**typewriting** 76:11
**typical** 59:20

**U**

**unanimous** 34:9
**under** 8:25 9:20 13:11 13:13 34:7 52:6 65:18 68:3 70:3 76:11
**underage** 28:10 31:2 37:23 61:14 64:13,24 65:11 68:9,15,23,25
**underlying** 18:9 57:21
**understand** 65:23
**unfair** 10:8
**unfairness** 31:20
**uniquely** 29:22
**united** 1:1,3 2:3,18 4:5 4:6 5:1 75:1,3
**University** 7:11 8:6,9 8:12,19 27:10 35:14
**Urban** 13:8
**use** 57:8
**used** 12:5 17:1 18:14 31:11 55:3,6 62:15 66:24 72:2 73:7,8
**useful** 64:18 69:22 70:3
**using** 55:22 56:2
**U.S** 40:4

**V**

**v** 4:5
**varies** 53:12
**variety** 17:9
**various** 22:17 33:23 72:2
**verification** 73:25
**version** 21:23 23:16,18 23:19,22,24 25:5 31:8 55:18,20 56:8 60:4,5
**versions** 20:8,9 54:24 56:1 60:8,10,16
**very** 61:16
**video** 4:9
**videographer** 4:2 5:10 25:22,25 38:21 39:1 39:14,17 70:12,16,20 72:19 73:15,19,20,21
**videotape** 1:13 38:22 39:2
**view** 62:19
**viewed** 65:18
**views** 17:16 31:17,18
**violated** 34:24
**virtually** 31:1
**vitae** 3:13 8:1
**vote** 71:12
**voted** 33:13 36:12
**vs** 1:5 75:5

**W**

**waiver** 52:10,11
**want** 8:13 39:11 41:6
72:25 73:1
**wanted** 10:7 42:22 43:7 43:11,13,16
**warning** 63:13
**warnings** 14:9,13
**Washington** 1:10,20 2:6,11,15,20,23 4:15 7:11 8:12,18 35:14
**wasn't** 29:10 31:22 40:12,16 43:19 61:1
**waste** 69:19
**way** 28:16 30:2 46:20 62:17,19 64:18 70:3
**well** 10:21 16:13 18:8 19:8 21:22 22:13 52:6 59:20 62:16 64:4 66:21 69:13
**were** 1:22 13:20 15:13 17:7,20 19:2 20:8 21:20 26:25 29:21 30:7 32:17 34:7 40:7 40:15 41:3 42:11,15 43:9 44:6,18 45:1,11 45:12,22,24 46:11,24 51:20,21,23 54:14 55:8,22 57:22,23 58:22 59:4 60:9,13,16 60:18,19,23 61:1,3,5 61:8 63:5 64:22 65:10
**we're** 70:16 73:8
**whichever** 51:6
**while** 9:22 11:13 12:21 12:24 14:3,21 35:13 39:13
**white** 3:16 21:8,10 24:15,16,17 41:18
**whole** 29:12 55:16
**Wilkenfeld** 3:18,20
**WILLIAM** 2:8
**williams** 2:9 43:10
**Williamson** 14:18
**willing** 73:24
**withdraw** 61:23
**witness** 1:15 3:2,25 5:12,15 8:5 10:1 12:1 12:12 14:7 16:15,24 17:19 18:22 19:7 20:14 21:7 23:2,21 24:11 26:18 28:13,15 32:5,13 33:2 36:1,12 37:5,15 38:11,16 40:10,13,15 47:9,20 49:10 50:3,21 53:12 53:25 58:20 62:12,24 63:11,21 64:4,17 65:2 65:7,14,23 66:7,19 67:24 68:7 69:3,13,22 70:7 71:16 73:5 76:6 76:8,13
**witnesses** 42:24
**words** 26:14
**work** 8:2 13:18 21:11 21:18,18 22:20 23:7 24:6 32:11 41:24 43:14,19,22 44:19,22
44:23 45:2,8,12,24 56:17 57:18 63:2 66:21 71:21 72:1,14
**worked** 53:13,14 54:5
**working** 9:16 47:18
**wouldn't** 25:18,18 42:20 47:15 62:7
**written** 45:8
**wrote** 15:19 19:25 57:10

**X**

**x** 1:3,8 75:2,8

**Y**

**Yeah** 33:6 73:5
**year** 8:24 30:17 51:22 52:12,17,25 53:4
**young** 27:3 30:22 31:12
**younger** 67:10
**youth** 37:16,25 38:3 68:8,23

**$**

**$100,000** 45:5

**1**

**1** 3:12 6:9,10 26:18 38:22 61:17 71:4,6
**1st** 33:8
**10** 3:18 30:14
**10:21:46** 38:24
**10:24:52** 39:4
**10:25:50** 39:15
**10:26:02** 39:18
**10016** 2:5
**11** 3:12 30:21
**11:08:46** 70:18
**11:09:26** 70:21
**11:12:22** 72:22
**11:15** 74:4
**1100** 2:5
**12** 31:4
**13** 31:14
**14** 30:24 31:19 76:25
**145** 10:23
**16** 3:15
**17-year-old** 30:25
**18** 21:25 30:22 65:18 65:20 66:16,25 67:2,5 67:18 70:3
**19** 3:17 67:2,15,20
**19-year-olds** 66:25 67:5,19
**1972** 8:6
**1977** 6:23
**1978** 8:9
**1980s** 63:3
**1982** 14:11
**1983** 9:15
**1984** 13:3
**1986** 13:3
**1987** 6:23 13:1
**1988** 8:2
**1990** 18:11
**1990s** 44:15

**1991** 26:24
**1992** 3:14 54:13,13
**1993** 3:18 21:3 23:18 23:21 24:13,19 27:1 30:23,25
**1994** 3:20,24 23:16,24 25:4 27:5 33:8
**1996** 23:3 35:17
**1998** 44:15
**1999** 44:15

**2**

**2** 3:13,20 7:16,17,22 27:9 37:13 39:2 54:13 67:14,20 68:2
**20** 1:11 3:19 75:14
**20th** 4:13
**20004-1206** 2:15
**20007-5108** 2:11,23
**2001** 3:12
**2002** 1:11 4:13 75:14
**2004** 76:25
**202** 2:6,12,16,20,24
**20530** 2:6
**20580** 2:20
**22** 30:23
**23** 3:21
**24** 3:23

**3**

**3** 3:14,14 16:1,5 28:3 54:13,13,18,19,22 55:1,9 56:4,13 58:13 59:7 64:20 66:14 67:12
**3-year** 29:12 72:3
**30** 27:25
**3050** 1:18 2:10,23 4:14
**326-3234** 2:20
**33** 3:24
**342-8811** 2:12
**36** 3:25
**39** 3:5

**4**

**4** 3:16 19:20,24 27:23 28:4 32:1,6,8 55:24 56:2,25 58:14 59:7 61:16 64:21 66:14,24 75:12
**4th** 52:17 53:4
**400** 1:19 2:11
**45** 73:11

**5**

**5** 1:19 3:4,18 20:21,25 28:13 32:1,6,7
**5th** 33:8
**514-6748** 2:6
**555** 2:15

**6**

**6** 3:12,20 23:10,11,15 28:15 29:10
**6-month** 72:5
600 2:19

**7**

**7** 3:13,22,24 24:21 28:25 55:25 68:2
**70** 3:6 73:10
**74** 75:13

**8**

**8** 3:24 29:8 33:15,19
**81** 9:15
**83** 9:5
**85** 9:10
**86** 9:11
**87** 9:5

**9**

**9** 3:25 30:2 36:23 37:2
**9:09** 1:17
**9:09:07** 4:17
**9:45:55** 25:23
**9:58:07** 26:1
**942-6417** 2:16
**945-6677** 2:24
**99-2496** 1:5 4:4 75:5

**UNITED STATES OF AMERICA V PHILIP MORRIS, INC.**

**WITNESS: J. HOWARD BEALES, III**

**DATE: JUNE 20, 2002**

**EXHIBITS: # 1-9**

**SPHERION DEPOSITION SERVICES**
**545 FIFTH AVENUE, SUITE 900**
**NEW YORK, NEW YORK 10017**