April 3, 1992

Lois C. Greisman, Esq.                                          **CONFIDENTIAL**
Division of Advertising Practices
Federal Trade Commission
Room 4412
601 Pennsylvania Ave., N.W.
Washington, D.C. 20580

        Re:    R.J. Reynolds Tobacco Company -- Camel Cigarettes

Dear Ms. Greisman:

        As a follow-up to R.J. Reynolds Tobacco Company's presentation to the FTC staff
on February 26, 1992 regarding the JAMA articles, I am enclosing a memorandum that
details the problems in those studies.  It includes the calculations I employed to
determine some of the statistical information that was included in the presentation.
Please note that I have not addressed in this memorandum the more recent Teenage
Attitudes and Practices Survey (TAPS) data that was published by CDC last month;
nevertheless, I have briefly reviewed that data and it does not appear to alter the
conclusions that I reached.

        Should you have any questions concerning the attached memorandum, please call
Judith L. Oldham (at (202) 342-8445) or T. Michael Jankowski (at (202) 342-8415).

                                        Sincerely,

                                        J. Howard Beales

/sf
cc:     Guy M. Blynn, Esq.
        Judith L. Oldham, Esq.
        T. Michael Jankowski, Esq.

DEPOSITION
EXHIBIT 3
Beales
6-20-02   o.r.

X

-- **CONFIDENTIAL** --

## AN EVALUATION OF THE JAMA ARTICLES
## ON THE EFFECTS OF THE SMOOTH CHARACTER CAMPAIGN

Prepared by

**J. Howard Beales, III**
Associate Professor of Strategic Management
and Public Policy
George Washington University

on behalf of the

**R.J. Reynolds Tobacco Company**

April 2, 1992

This paper examines the December, 1991 JAMA articles that assessed the impact of Camel's Smooth Character campaign. Section I addresses the erroneous inferences that the study authors draw. It begins with a discussion of the lack of any established relationship between the advertising measures that the studies employ and either brand choice or the decision to smoke. It then considers far more reliable evidence indicating that the overwhelming majority of Camel smokers are of legal age.

Section II evaluates the methodological problems in the JAMA studies. The studies are based on unrepresentative samples. Their definitions of smokers and analysis of the differences between smokers and nonsmokers are frequently inappropriate. They base their conclusions on market share growth rate, which is meaningless as an indicator of smoking initiation. Moreover, they suffer from a variety of other methodological deficiencies.

-- CONFIDENTIAL --

Section III concludes that the JAMA studies provide no basis for inferring a causal relationship between advertising and the decision to smoke.

I.   **THE JAMA STUDIES DRAW ERRONEOUS INFERENCES FROM THE AVAILABLE DATA**

A.   **There is No Established Relationship Between the Advertising Measures Employed and Either Brand Choice or the Decision to Smoke**

1.   **The Measures Employed Are Not Related to Choices**

Each of the JAMA studies employs a different measure of the impact of advertising, and each assumes that its selected measure is an accurate predictor of the decision to smoke and of the brand that smokers will choose. Fischer measures brand logo recognition, Pierce measures assessment of the most heavily advertised cigarette brand, and DiFranza measures recognition and liking in a forced-exposure setting. None of the studies, however, provides any basis for the assumption that the selected measure is related to choices in the marketplace.

The Fischer study employs as an advertising measure children's ability to match a product logo with a picture of the product. At best, it measures recognition. Recognition, however, says nothing about liking or future purchase behavior. Clearly, children and adults are able to recognize brand logos of large numbers of brands they do not use, as well as logos of products they do use. Awareness that a particular choice exists simply does not imply that the choice will be made.

The Pierce study does not even measure exposure to advertising. Rather, it assumes that subjects have indeed seen (and remembered) cigarette advertising, and then asks them to give a best estimate about the relative frequency of advertising for different

- 2 -

-- CONFIDENTIAL --

brands. Thus, the measurement combines recall and best estimates. Differences in the measure may reflect differences in exposure or recall, but they may equally well reflect differences in the estimates given.

The weaknesses in the relationship between judgements about relative amounts of advertising and brand choice are apparent in Pierce's data for Marlboro. Among teens, 41.8% identify Marlboro as the most heavily advertised brand, but 55% of boys and 63% of girls report that they smoke Marlboro. Boys are more likely to identify Marlboro as most advertised, but girls are more likely to smoke Marlboro. Given the small sample sizes for smokers these differences may not be statistically significant. But if the pattern of advertising recognition is to serve as a predictor of brand choice, there should be a significant relationship in the other direction, i.e., boys should be more likely to choose Marlboro if they are more likely to identify it as most advertised. For most age groups, Marlboro's share of smokers exceeds the fraction of respondents who identify the brand as most advertised. In addition to Marlboro, five other brands (Winston, Salem, Doral, Kool, and Newport) had national market shares at least as large as Camel in 1990, but none of them is mentioned by even 3% of adult respondents as the most heavily advertised.

The lack of any association between the advertising measure and smoking initiation is even more apparent. Evidently everyone chooses some brand as most heavily advertised, but only 4.6 percent of California teens smoke at all. More than 1,400 teens identified Camel as the most heavily advertised brand, but only 54 teens smoke Camel.

- 3 -

-- CONFIDENTIAL --

### 2.   Advertising Awareness is an Inadequate Measure

At best, the fraction identifying a particular brand as most advertised is a measure of brand awareness. As an advertising awareness measure, however, the question is deficient because it forces a response -- individuals are asked to name a brand even if they do not remember any cigarette advertising at all. If there is significant nonresponse or "don't know" response to the question, Pierce does not report it. The forced nature of the judgement is likely to be quite significant. When consumers are asked a very similar question to determine which advertising they think is "most outstanding," 74% cannot think of any advertising campaign at all. Less than 20% remember both an ad and a brand name.[1]

Seen as a measure of brand awareness, there is little basis for attributing Pierce's results to advertising. Awareness is likely to be high for brands with large market shares even in the absence of advertising. Hershey's chocolate bars, for example, were for a

---

[1]   Commercial Break, May 1991 at 6. Based on responses of 24,000 readers in Video Storyboard Tests. Respondents in Video Storyboard Tests are asked:

> Think of all the advertisements you've seen in magazines and newspapers in the past four weeks; Which one do you consider most outstanding?

The Pierce question is closely parallel:

> Think back to the cigarette advertisements you have recently seen on billboards or in magazines. What brand of cigarette was advertised the most?

To answer the Video Storyboards question respondents must name a particular advertising campaign, but to answer the Pierce question respondents need only be able to name a cigarette brand; they can guess about which brand advertised most. Moreover, the Pierce question obviously has an objective answer; the Video Storyboard question does not.

- 4 -

FTCDOCS-0279-1558

-- CONFIDENTIAL --

long time not advertised, but they nonetheless had a high level of brand awareness and a large share of the candy bar market. More generally, teens are widely aware of major brands of various products, regardless of advertising. Boddewyn examined awareness of cigarette brands, chocolate brands, and beer brands across 16 different countries. He found high levels of brand awareness for all of these products. Moreover, awareness of cigarettes was high in all countries surveyed, whether they allowed advertising or not.[2]

Even if the Pierce data provided a valid measure of advertising awareness or recognition, there is no basis for assuming that such recognition translates into success in the marketplace. A Canadian government study introduced during the litigation over the Canadian advertising ban found 3 of the 5 most recognized cigarette brands were U.S. brands. Collectively, however, U.S. brands have less than 1% of the Canadian market.[3]

Even the patterns that Pierce purports to identify are weak and inconsistent. Camel is apparently more often identified by teens (28.5%) than by 18-24 year olds (19.8%) as the most advertised brand. Although the difference may be statistically significant, Pierce does not test that assumption. Instead, he emphasizes the seemingly

2/    Boddewyn, Ed., Juvenile Smoking Initiation and Advertising (March, 1989), p. 14.

3/    Colin K. Irving, Memorandum re Journal of the American Medical Association, at 11. The study was introduced in the Canadian litigation as Exhibit RJR-76, and was entitled "Smoking and Non-Smoking -- A Study of Canadians' Behaviours and Attitudes."

- 5 -

FTCDOCS-0279-1559

-- CONFIDENTIAL --

sharp drop in Camel's share of smokers between teens and 18-24 year olds.[4/]  That difference, however, is misleading, given the substantial uncertainty about the market share among teens reflected in the confidence intervals that Pierce reports.  Indeed, among females, the confidence intervals overlap.  Camel's share among female teens could be as low as 8.0%, and its share among females 18-24 could be as high as 8.7%.  Thus, for females, Pierce's data are consistent with the hypothesis that **there is no difference in the brand choices of female teens and young adults.**[5/]

3.  <u>Advertising Appeal is an Inadequate Measure</u>

DiFranza's measure of advertising appeal is no better.  This study relies on a forced exposure test of the appeal of Joe.  Study participants were shown a picture of Joe and a series of six Joe advertisements,[6/] and asked four questions intended to

---

[4/]  Part of that drop may be due to the fact that the definition of smoker changes between these two groups.  Teens are considered smokers if they smoked once in the last 30 days, clearly an overly inclusive standard.  Adults are only considered smokers if they have smoked at least 100 cigarettes in their lifetime, and currently smoke, which is never defined.  Brand choice information is likely to be far more reliable for the adults, who may make the choice regularly, than it is for the teens, who may not have made a choice for weeks, if at all.

[5/]  For males, the confidence intervals almost overlap.  Camel's share among male teens could be as low as 16.5%, and its share among males 18-24 could be as high as 16.3%.

[6/]  From the report of the study, it is not possible to determine how the responses to individual advertisements were treated.  Pooling the answers for all six ads would violate the assumption of independent responses that underlie all of the statistical tests.  Examining any advertisement after the first would artificially inflate the responses because of increased familiarity from the prior forced exposure.  Analyzing only the first advertisement would make the other five irrelevant, serving only to further bias the question about brand preference at the end.

- 6 -

FTCDOCS-0279-1560

-- CONFIDENTIAL --

measure the "appeal" of the advertising. The assumption is that recognizing and liking an ad imply that students will choose to smoke and will smoke Camel in particular. The data indicate the weakness of that assumption. Although Joe is almost universally recognized among teens, and although the article claims that teens find him appealing, most teens do not smoke[7] and most teen smokers do not report smoking Camel, even after examining six Joe advertisements in a row. Indeed, the school with the highest reported market share for Camel has the lowest reported recognition rate and appeal score among students (New Mexico).

As a measure of the appeal of advertising, the DiFranza methodology is seriously flawed. "Appeal" was measured based on the answers to four binary choice questions, two of which focused on "cool." These two questions tended to produce opposite responses, particularly among teens. Fifty eight percent thought the ads look cool, but 57% though Joe was not cool. Completely random answers to the questions would produce an appeal score of 2.0, virtually identical to the average appeal score for the students (2.1). Moreover, the questions were clearly written with children in mind, even though the study was designed to compare teens and adults. Regardless of how likable Joe may be, teens seem far more likely than adults to be willing to tell an interviewer that Joe was someone they would like as a friend. Even so, only 35% of teens did so. This may be higher than the corresponding figure for Massachusetts adults (14.4%) only

---

[7]    Smoking participation is either 24.7% of the student sample based on the data in the table, or 29% based on the text. Camel's share of teen smokers is either 32.8% (*text*) *or* 33% (table), *or* 8.15% of all teens in the study.

FTCDOCS-0279-1561

– CONFIDENTIAL –

because adults realize its silly to have a camel for a friend.  Finally, the intentional, repeated exposure to variations on the Joe theme virtually guaranteed that the purpose of the study would be apparent to anyone who participated, and it is well established that respondents will tend to give the answers that an interviewer wants to hear.

4.    **"Patterns" Identified in the Articles Do Not Establish a Relationship**

Given the obvious weaknesses of their measures as predictors of smoking behavior in any absolute sense, both Pierce and DiFranza prefer to emphasize "patterns" in their results.  The primary pattern that both identify is higher scores of Camel on the advertising measures among younger respondents, which they then assert is related to higher shares of Camel among younger smokers.

DiFranza emphasizes that teens as a group, including both those who may smoke and those who may not, are more likely to recognize Joe and more likely to find him appealing, compared to adults over age 21 (average age:   40).  In contrast, Pierce emphasizes that the fraction of respondents who identify Camel as the most advertised brand appears to decline smoothly as age increases, at least within the teenage group.

The observed age-related differences in the advertising measures in both studies may simply arise from greater sensitivity of younger respondents to all advertising. Indeed, independent marketing experts maintain that the young recall nearly all advertising better than older people.[8/]  The same pattern is apparent in responses to Video Storyboard tests, with younger respondents more likely to retain features related

---

[8/]    J. Dubow, "A Camel Wronged," Food and Beverage Marketing, February 1992, at 13.

FTCDOCS-0279-1562

-- CONFIDENTIAL --

to ad execution than older ones.[9]  There is no basis at all for attributing the differences in Camel's share of smokers of different ages to anything unique about Camel's advertising.

Indeed, the Pierce study is quite consistent with this hypothesis.  Although the article does not report sufficient data to make precise comparisons, it seems apparent from Pierce's Figure 1 that awareness of Marlboro ads among 12-19 year olds (the DiFranza students) is greater than awareness among a group of adults over 21 with an average age of 40.  Thus, Pierce's data contradicts DiFranza's assumption that the difference in ad recognition between teens and adults is due to some unique appeal of Joe.  Because the DiFranza study did not include any control advertisement at all, it is impossible to test the hypothesis directly in his data.

Similarly, Pierce's emphasis on the pattern of recognition of Camel advertising is not consistent with DiFranza's data.  The extremely high recognition of Joe among teens (97.7% overall) virtually precludes any possible pattern of greater recognition among younger respondents.

Independent data on Camel's advertising make clear that the Smooth Character campaign has substantial appeal to adults.  The Pierce data point to the same conclusion.  In each age group (with the possible exception of the over 45s), Camel's share of those who think it is most advertised is greater than its market share.  That is true of teens

---

[9]    Commercial Break, May, 1991, at 6.   72% of respondents under 35 retained elements of advertising execution, compared to 60% of respondents over 35.  Joe, of course, is just such an element of execution.

FTCDOCS-0279-1563

-- CONFIDENTIAL --

as well. Among teens, Camel's recognition is 1.22 times its market share. Among those 18-24, the corresponding figure is 2.09.[10]

Other evidence also demonstrates the Smooth Character campaign's wide appeal to adults. Since 1988, the first full year of the campaign, Camel has ranked in the top 5 print campaigns each year.[11] Joe is the primary reason readers recall the ads. Moreover, the campaign has enhanced perception of the cigarette's taste, a message that is both valuable information for smokers and very difficult to convey effectively. Given this clear appeal to adults, there is no basis for inferring "targeting" of young people based on transitory and inconsistent "patterns" in arbitrary measures of appeal to teens.

   B.   The Vast Majority of Camel Smokers Are of Legal Age

The JAMA studies are all based on samples that are not representative of the U.S. teenage population. For that reason, they provide no reliable basis for estimating Camel's share of teenage smokers, or the fraction of Camel sales to underage youth. Although RJR does not collect data or conduct market research on smoking by those under 18, nationally projectible data on shares of teenage smokers are available from the Office of Smoking and Health's Teenage Attitudes and Practices Study ("TAPS"). This study, conducted during 1988-89, examined smoking behavior and brand choice in a

---

10/   Camel's share of smokers in the Pierce study is calculated as the weighted average of the shares for males and females, using the sample sizes as weights. This procedure should be exact for the teenage sample (which is not weighted), but it is only approximate for other age groups because of the weighted nature of the sample.

11/   Commercial Break, May 1991. The Video Storyboard Test samples presumably include teens, but are likely dominated by adults.

- 10 -

FTCDOCS-0279-1564

-- CONFIDENTIAL --

representative sample of teens aged 12-18.  Because the sample was based on households, it includes both students and nonstudents.

Of the three brands most popular among underage smokers, Camel ranked third, with 8.0% of 12-18 year old smokers.  As a fraction of all 12-18 year olds, only 1.3% smoke Camel.  In contrast, Marlboro has 66.5% of this group, and Newport has 9.3%.[12] Moreover, underage usage accounts for a smaller fraction of Camel sales than for either of the other brands.  Underage usage is an estimated 3.1% of Marlboro's sales, 2.4% of Newport's sales, and only 2.3% of total Camel sales.[13]  Thus, nationally projectible data

---

[12]   An abstract presenting portions of the TAPS data gives the shares of various cigarette brands among black and white teenage smokers.  The share reported in the text is the weighted average of these shares.  The weight for blacks, for example, is equal to

$$\frac{(\% \text{ black smokers}) \times (\% \text{ blacks})}{(\% \text{ black smokers}) \times (\% \text{ blacks}) + (\% \text{ white smokers}) \times (\% \text{ whites})},$$

where % black smokers is the fraction of black teens who smoked in the last 30 days (from TAPS), and % blacks is the fraction of black teens in the U.S. teenage population (from the 1990 Census).  The implicit assumption is that brand choice among other, unreported ethnic groups is no different from the weighted average choices of blacks and whites.

[13]   The fraction of each brand's sales attributable to underage smokers is calculated as follows.  First, total cigarette sales to underage smokers were estimated as 1.2% of the U.S. market.  The National Institute of Drug Abuse ("NIDA") estimated that there were 2,389,000 teens aged 12-17 who smoked at least once in the previous 30 days, based on the 1988 National Household Survey on Drug Abuse.  NIDA also estimated that high school seniors in the class of 1990 who smoked in the previous 30 days smoked an average of 7.445 cigarettes per day.  The number of smokers times average daily consumption times 365 days implies that underage smokers accounted for 1.2% of total sales in 1990.  Second, the fraction of a brand's sales to teenage smokers is equal to 1.2% times the brand's share of the teenage market calculated in the previous footnote, divided by the brand's share of the total U.S. market.  Share of the total U.S. market was calculated as the average of Maxwell's data for 1988 and 1989.

- 11 -

-- CONFIDENTIAL --

indicate that Camel is a far less popular brand among young people than the JAMA articles would suggest.[14]

Thus, the appeal of the advertising, as measured by its effect on individual behavior, is predominately to smokers of legal age.  More than 40 times as many adults as non-adults smoked Camel; more than 8 times as many non-adults choose Marlboro over Camel.

Even using the data in the JAMA studies, the vast majority of Camel smokers are of legal age.  In the Pierce study, for example, it is possible to examine at least roughly the age distribution of Camel's share gain.[15]  For those 18 and over, Camel "converts" in each age group are the additional Camel smokers over what would have been

---

14/    DiFranza uses his own estimate that sales to underage smokers account for 3.3% of total cigarette sales.  This estimate is far too high.  His "conservative" case is based on a higher number of daily smokers than NIDA's estimate for those who smoked in the previous 30 days.  His "comprehensive" case then adjusts this inflated number upwards to account for less than daily smokers.  In both cases, he assumes that 75% of dropouts smoke daily.  TAPS, however, found that only 43% of white dropouts and 17% of black dropouts smoked in the previous 30 days.  The 3.3% number is based on an average of the "conservative" and the "comprehensive" estimates, each of which is too high. DiFranza then uses an estimate derived from a Canadian survey that the average teenage smoker consumes 13.73 cigarettes per day, which he then multiplies by 1.2 to account for underreporting.  The result is an estimated cigarette consumption that is more than twice the NIDA estimate.  Even using DiFranza's inflated estimate, the relative rankings of the three brands would not change, although the levels of underage consumption of all three brands would increase.

15/    These calculations use the reported sample sizes to combine data from different categories.  Because the sample is a weighted sample, this procedure may not be strictly appropriate, but it should be approximately correct.  Estimates using this approach of the market shares of Marlboro and Camel in 18-29 year olds, which requires pooling two groups, differ by not more that 0.4 percentage points from the values that the study reports in Table 2.  More accurate calculations would be possible with the underlying data.

- 12 -

-- CONFIDENTIAL --

expected given Camel's 1986 market share.[16]   The precise results depend on an assumption about Camel's  unknown 1986 share among 12-17 year olds.  If all of the teenage Camel smokers were "converts" (i.e., if Camel's 1986 share among this group was zero), 82% of male smokers and 74% of female smokers who converted to Camel were 18 or over.[17]  If the ratio of Camel's market share in 1990 to its share in 1986 (the "rate ratio" in Table 2) were the same for teens and young adults,[18] then 89% of male converts and 79% of female converts to Camel were over 18.[19]   Overall, 86% of converts to Camel were adults.[20]

Similarly, DiFranza's unrepresentative sample and serious methodological errors substantially overstate Camel's share among teens.  A more appropriate methodology is to use DiFranza's data to estimate Camel's market share of youth relative to its adult

---

16/   As discussed in more detail below, this assumption overstates Camel's growth considerably, because Camel's market share in California was higher than its national share to begin with.

17/   For adults, the number of Camel "converts" is the increase in Camel's market share times the sample size.  For example, for males 18-29, Table 2 reports Camel's share in 1990 as 13.2%, versus 5.8% for 1986.  The market share increase of 7.4 percentage points times the sample size of 1037 yields an estimate of 77 Camel converts in this age group.

18/   The "rate ratio" is simply Camel's market share in the 1990 data divided by its market share in the 1986 data.  For males 18-29, the ratio was 2.3.  If the ratio was the same for males 12-17, then Camel's share in 1986 for 12-17 year old males would have been 10.65%.  The increase in market share times the sample size yields an estimate of 18 Camel converts in this age group.

19/   These figures correct an arithmetic error in our earlier presentation of this data.

20/   Calculated by adding the male and female converts in each age group.

FTCDOCS-0279-1567

– CONFIDENTIAL –

market share.[21/]   We can then apply that ratio to the known national market share to estimate Camel's share among youth.   If we use the entire sample to estimate the ratio, Camel's market share among youth would be 15.2%, not 32.8%.[22/]   If we use only the Massachusetts students to estimate the ratio, rather than all students (probably a more appropriate method, since the data on adults is only Massachusetts adults), Camel's share among youth is 10.5%.[23/]   Even these numbers are overstated, because they exclude entirely 19 and 20 year olds, and seemingly count 18 year olds as students.  Including this group as adults would increase Camel's adult market share, and reduce the ratio.

These data also imply that a much larger fraction of Camel smokers are adults. Using DiFranza's estimate of Camel's adult market share as 3.4%, Camel's share among

---

21/    Assuming that the ratio of youth to adult Camel smokers is the same in the sample as in the national population is a weaker assumption than assuming that the particular value in this sample is representative.  Moreover, using the ratio allows us to make use of the known national market share of Camel to anchor the results.

22/    Let Camel's adult market share be s, and the ratio of its market share among youth to its market share among adults be r.  Then Camel's market share among youth is just rs.  Its adult market share is s = $[(.044) - .033(rs)]/(1 - .033)$, where .044 is (according to the article) Camel's national market share and .033 is DiFranza's estimate of the fraction of all cigarette sales to youth.  The numerator is the fraction of all Camels sold to adult smokers, and the denominator is the fraction of all cigarettes sold to adults.  Using the entire sample, r = 32.8/8.7 = 3.77.  Solving for s, Camel's adult market share is 4.03%, and its market share among youth is 15.2%.  This is apparently the formula that the authors used to calculate Camel's adult market share, except that they used the sample result to estimate the youth market share (i.e., rs) directly.  As discussed, that approach overestimates Camel's market share among youth.  Using the estimate developed above that underage smokers account for 1.2% of total cigarette sales, Camel's share among youth would be 16.1%.

23/    The ratio is then 21.8/8.7 = 2.51.  Using the estimate that 1.2% of total cigarette sales are to underage smokers, Camel's share among youth would be 10.8%.

- 14 -

FTCDOCS-0279-1568

-- CONFIDENTIAL --

adults is 77.3% of its national market share.  Using the more appropriate estimates in
the previous paragraph, Camel's adult share is 91.6% of its total share, estimating the
ratio from the entire sample, and 95.3% if we only use the data on Massachusetts
students.[24]

## II.   THE JAMA ARTICLES SUFFER FROM SERIOUS METHODOLOGICAL PROBLEMS

### A.   The Studies Employ Unrepresentative Samples

The JAMA studies are not based on representative samples.  Moreover, the nature
of the particular samples used and the analytical techniques employed leads to seriously
misleading estimates of the effects of the Smooth Character campaign.

Consider the Pierce study.  Although Pierce has a representative sample of
California, his conclusions are based heavily on a comparison of California data from
1990 with national data from 1986.  That comparison, however, is invalid, because Camel
had a considerably larger market share in California than it did nationwide, both before
and after the Smooth Character campaign.  In 1987, for example, Camel's share of the

---

[24]   These figures are simply the ratio of the market share among adults to the
aggregate market share.  It is also possible to use the approach developed above (see
notes 21 and 22 and accompanying text) to estimate the fraction of Camel sales
accounted for by adult smokers.  Using DiFranza's estimate that sales to underage
smokers constitute 3.3% of industry sales, and his claim that Camel's share among teens
is 32.8%, 75.4% of Camel sales are to adults.  Using the estimate developed above that
underage sales are 1.2% of the total, but DiFranza's estimate of Camel's share among
teens, 91.1% of Camel sales are to adults.  Using the entire sample to estimate the ratio
of the teen share to the adult share and DiFranza's estimate of industry sales to
underage smokers, 88.6% of Camel sales are to adults; 95.6% are adults using our
estimate of industry sales to underage smokers.  Estimating the ratio from the
Massachusetts students only implies that 92.1% (DiFranza underage estimate) to 97.1%
(our underage estimate) of sales are to adults.

- 15 -

FTCDOCS-0279-1569

– CONFIDENTIAL –

California market[25] was 6.9%, or 63% greater than its 1987 national market share of 4.2%. Marlboro too had a higher market share in California than nationally, but the overstatement is only 31% -- about half the overstatement for Camel. Of course, Camel showed dramatically greater "growth rates" than Marlboro did -- its base was more substantially understated.[26]

In fact, Camel's market share in California had actually declined slightly by 1990, to 6.8%, compared to its 1987 share of 6.9%. With a proper base, Camel's dramatic growth would, in the aggregate, have been a decline, a result that would obviously contradict the article's conclusions about the influence of Joe. Marlboro, in contrast, had grown substantially, from 31% of the California market in 1987 to 34.4% in 1990.

Consider the DiFranza study. The study uses a convenience sample of Massachusetts adults who were renewing their driver's licenses at a particular location. He reports Camel's share of adults over 21 as 8.7%, considerably greater than its national market share of 4.4%. Consistent with his hypothesis, DiFranza attributes this difference to the possibility that "Massachusetts adults may be more familiar with the Joe Camel campaign than adults in general." In fact, however, Camel's market share in Massachusetts is lower than its national share. In 1990, Camel had 3.6% of the Massachusetts market. Either DiFranza's convenience sample is not representative even of Massachusetts adults, or his methodology of exposing respondents to seven different

---

25/    State market share data are from Management Science Associates, Inc.

26/    National market share data are from Maxwell Consumer Reports.

FTCDOCS-0279-1570

-- CONFIDENTIAL --

versions of Joe before asking them about their preferred brand seriously biases the results.

DiFranza's student sample is no more likely to be representative. He uses students from five different high schools, geographically dispersed to be sure, but excluding any high school with a smoking prevention program focusing on advertising. Despite the evidence that there are in fact significant differences among the sampled schools, DiFranza has no hesitation about comparing the data to the unrepresentative sample of Massachusetts adults and generalizing to the population as a whole. There is no basis for doing so.

Like the Pierce study, DiFranza engages in the art of selective, inappropriate comparisons to past data. The base survey used for comparisons surveyed a younger age group (grades 7-12), in different geographic areas. Given DiFranza's acknowledgement of significant geographic differences in brand choice, such a comparison is clearly invalid. Moreover, some of the baseline surveys were apparently conducted in other countries. They are also old, dating from the late 1970's and early 1980's.[27]

Fischer too employs a convenience sample, of children in preschool in Augusta and Atlanta, Georgia. Moreover, the article's dramatic conclusion that Joe is as well recognized as Mickey Mouse is based on only 23 six year olds. The limited nature of the sample makes it impossible to generalize the results.

---

27/   See Dubow, supra note 8.

FTCDOCS-0279-1571

-- CONFIDENTIAL --

**B.**   Treatment of Differences Between Smokers and Nonsmokers

It is commonplace in marketing research to find that users of a product are more interested in advertising for that product and more attentive to it. That is hardly surprising, because it is users who are likely to have the greatest interest in the information that the advertising is conveying. The causal connection, if there is one, could be between product use and interest in the product's advertising. Thus, in the context of cigarette advertising, we should expect to find systematic differences between smokers and nonsmokers.

DiFranza finds such differences. Among the students, the article reports more appeal to smokers than nonsmokers (2.8 vs. 1.8 on the appeal score). On its face, that difference would seem to indicate that, if anything, the appeal of the advertising is to smokers, rather than to nonsmokers. Rather than reach that conclusion, DiFranza divides nonsmokers into those "who either were ambivalent about their future smoking intentions or expressed a definite intention to smoke," and other nonsmokers. The group of contemplators, however, must be quite small. The mean appeal score for contemplators was 2.6, but the mean for the other nonsmokers was 1.8. Since the average appeal score for all nonsmokers is also 1.8, the result is only consistent with the smokers vs. nonsmokers analysis if the subset of nonsmokers who are ambivalent is very small.

Pierce's data also indicate that smokers are more likely to report (accurately) that Marlboro is the most heavily advertised brand. His figure 2 indicates, however, that there are no significant differences in the fraction identifying Camel as the most advertised brand between current smokers and teens who have never smoked.

- 18 -

-- CONFIDENTIAL --

Pierce also examines recognition of Camel advertising among those who have never smoked but are contemplating smoking. The article points to the fact that teens contemplating smoking were slightly more likely to identify Camel as the most advertised brand than were smokers, from which it infers that those contemplating smoking are particularly vulnerable to advertising. In fact, however, the confidence intervals for the recognition rate among those contemplating smoking overlap the confidence intervals for current smokers. Thus, it is unlikely that the difference is statistically significant.

Moreover, Pierce's analysis is subtly shifted from the analysis of market share data. In considering market share, the article maintains that high brand identification rates imply increased smoking of Camels, and by inference, increased smoking. Applying that analysis to smoking status would suggest that, if Joe is convincing teens to smoke, recognition should be higher among smokers. In fact it is not. Rather than recognize the inconsistency with its fundamental hypothesis, the article shifts its focus to the "risk" implicit in the fact that non-smokers are more likely to recognize Camel.

Fischer fails to find any relationship between children's recognition of cigarette logos and the use of cigarettes in the home. That failure is itself surprising, because kids must be more likely to recognize the logo of the brand their parents smoke, at least as long as the logo is on the package. Thus, the Marlboro red roof, the "Camel" name, and the camel and pyramids should be more widely recognized by children from households in which those brands are used.

- 19 -

-- CONFIDENTIAL --

C.    Growth Rates in Market Share are Meaningless as an Indicator of Smoking
      Initiation

The ultimate concern of the JAMA articles is the assumption that somehow
advertising may induce children to smoke who would not otherwise do so.  The fraction
of teens who smoke, however, is essentially constant over the time interval that these
studies examine.  Moreover, given the extremely low incidence of smoking that the Pierce
study found in California, underage smoking in California was surely lower in 1990 than
it was in 1986.

Instead of focusing on smoking initiation, therefore, Pierce focuses on the growth
rate in Camel's market share.  By definition, however, market share is influenced by
shifts among brands of people who would have smoked anyway.

Even assuming a dubious focus on changes in market share, the real issue is the
number of children affected, not the percentage change in Camel's market share from
an extremely low base.  In terms of numbers affected, what matters is the percentage
point increase in market share.  That, however, is drastically greater for Marlboro.  For
18-29 year old males, Marlboro's share rose 17.2 percentage points, compared to 7.4
percentage points for Camel.  For females, Marlboro's share rose 19.6 percentage points,
versus 3.5 points for Camel.  Put another way, Marlboro captured 69.9% of the males
who gave up "other" brands and 84.8% of the females.  If the ratio of market shares in
the 12-17 year old groups is the same as in the 18-29 year olds, it is possible to make
similar calculations for the 12-17 year old groups.  For boys 12-17, Marlboro's share

- 20 -

increased 15.8 percentage points, compared to 13.8 points for Camel.  For girls, the increase was 21.1 points for Marlboro, versus 16.9 points for Camel.

To infer any problem caused by Joe, it is essential to assume that a meaningful fraction of the teen smokers are new smokers induced by advertising.  There is no basis for that assumption, and even if there were, there is no basis for assuming that effect is unique to Camel.  Marlboro's vastly greater market share implies that it attracts vastly more new smokers, even if its advertising is less memorable.

### D.    The JAMA Studies Suffer From Numerous Other Problems

The JAMA studies suffer from a wide variety of other deficiencies.  DiFranza, for example, included students who can legally smoke in his measures of presumably underage smokers.   In three of the states (Massachusetts, Nebraska, and Washington), the legal smoking age is 18.  If the typical high school senior is 18, around 25% of students in these states can legally smoke.  In Georgia, which has the highest reported incidence of teen smoking, the smoking age is 17; presumably as many as half of Georgia students can legally smoke.  And in New Mexico, which has the highest reported market share for Camel (53.5%), there is no legal smoking age.  Even excluding New Mexico, as many as 31% of the students in the sample can legally smoke.[28/]

In sharp contrast to his willingness to treat all students as illegal smokers, DiFranza is scrupulous in his efforts to make sure that the adult sample used for

---

28/    Each state is approximately 25% of the sample excluding New Mexico.  Around 25% of the sample is 18 year olds.  If another 25% of Georgia students are 17, they account for 6% (25% of 25%) of the total sample.  Including New Mexico, as many as 45% of the students in the sample can legally smoke.

-- CONFIDENTIAL --

comparison is only adults over 21. Seventy of 415 in the original "adult" sample were excluded from the results because they were under 21. Partly as a result, the average age in the adult sample is just over 40. Data from the younger adults were collected, but are not presented except at one point. The only thing we know about these individuals is that 23.1% of 19 and 20 year old smokers gave Camel as the preferred brand, slightly greater than the 21.8% of Massachusetts students who did so.

Given DiFranza's interest in identifying Camel's intended audience, the obvious approach would have been to compare the ad's appeal to the intended audience of 18-24 year olds with its appeal to those who are not in this audience. Instead, as much as 25% of DiFranza's "underage" group was part of the intended audience. His adult group is, on average, outside of this market, even broadly defined. Even if Joe's appeal was exclusively to 18-24 year olds, DiFranza's approach would find greater appeal to teens than to adults.

The Fischer study also suffers from significant deficiencies. Most important, although the study collected data on children's recognition of other adult products, it did not use that data as a control in the crucial comparison between Joe and Mickey Mouse. Given the fact that there is virtually no difference among six year olds in recognition scores for cigarette brands and adult brands, it is extremely likely that they would also do quite well on the best known adult logo, Chevrolet. In fact, Chevrolet is more widely recognized among all children than is Joe. "Chevrolet is as well recognized as Mickey Mouse," however, doesn't have quite the same punch. By age 6, kids may be able to recognize most logos.

- 22 -

– CONFIDENTIAL –

The Fischer study may also understate recognition of "children's brands" and adult brands because of the logos used. For example, the generic "Kellogg's" is not necessarily a very good proxy for particular Kellogg's cereals that are promoted to children. Moreover, all but one of the children's logos (Disney Channel) include a word as part of the logo, which may tend to reduce correct matching rates. The adult products included two computers and two television networks, which had to be matched with a television. It seems likely that children would confuse the "product" pictures of a TV and a computer, since the dominant feature of a picture of a computer is the TV monitor. For these reasons, recognition rates of cigarettes compared to other products are probably overstated.

There are other problems as well. Parents were told about the study and asked about their own use of only one product, cigarettes. If they discussed the study with their children, recognition of cigarettes may have been artificially inflated. It is unclear how well children understood the basic directions for the study, since whether the sample match was correct or incorrect, children were told "that's good." An incorrect sample match could be because the child did not recognize the sample item, or it could be because the child did not understand the directions.

Neither Fischer nor Pierce provided respondents with a "don't know" option. Pierce's respondents had to select a most advertised brand, and Fischer's children had to take a guess at which product could match a particular logo. Lack of such an option, however, has been shown to bias and inflate recognition scores.

- 23 -

-- CONFIDENTIAL --

Fischer attempted to control for the possibility of guessing by comparing recognition rates to what would be expected due to chance. Pure chance, however, is an inappropriate comparison. Children are likely to be able to rule out many of the possibilities (e.g., Joe is not a pizza or a car) and guess among the remaining options. Thus, the expected responses due to guessing are higher than the estimate based on purely random choices.

### III.   THE JAMA STUDIES PROVIDE NO BASIS FOR INFERRING A CAUSAL RELATIONSHIP BETWEEN ADVERTISING AND THE DECISION TO SMOKE

At least three elements are essential to a conclusion that two variables are causally related.[29] Even at face value, the JAMA studies address only one of the three elements. Thus, they provide no basis for inferring that advertising causes young people to smoke.

First, the two variables must be empirically correlated with each other. At best, this is all the JAMA articles address. Even as evidence of a correlation, however, they fall considerably short of establishing a relationship. Rather, each study focuses on a particular "pattern" that it purports to find in the data, often ignoring inconsistent patterns in that same data. Moreover, the "patterns" they discern relate advertising measures and brand choice. None of the studies even attempts to measure the relationship between advertising recognition and the decision to smoke. That, however, is the effect in which they are interested.

---

[29] These elements are taken from Earl Babbie, The Practice of Social Research, 1992.

- 24 -

— CONFIDENTIAL —

Second, the presumed cause must precede the effect. The JAMA studies, however, are cross sectional in nature. They do not provide any basis for assuming that advertising recognition or advertising appeal causes the decision to smoke. Thus, despite frequent assertions to the contrary by the authors, there can be no logical basis for concluding that the cause came first. Indeed, it is perfectly plausible that brands with high market shares generate high measures of advertising recognition or brand awareness.

Third, it is only possible to conclude that an observed relationship is causal if the evidence rules out the possibility that some other factor is influencing both variables to produce the apparent relationship. The JAMA studies, however, are generally uncontrolled. Even where controls were available, they were not always used.

The evidence in the JAMA studies is quite consistent with other marketing evidence that indicates teens are more attentive to advertising for a variety of products than are adults. They are consistent with the fact that Camel's advertising sought to reach young adults, and primarily appealed to young adults. They provide no basis for concluding that Camel "targeted" underage smokers, or that even by inadvertence, Joe induced children to smoke.

- 25 -