**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

LAURA ZUBULAKE,                          :          **OPINION AND ORDER**

                  Plaintiff,          :          02 Civ. 1243 (SAS)

  - against -                         :

UBS WARBURG LLC, UBS WARBURG,  :
and UBS AG,

                       :

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SHIRA A. SCHEINDLIN, U.S.D.J.:

Commenting on the importance of speaking clearly and listening closely, Phillip Roth memorably quipped, "The English language is a form of communication! . . . Words aren't only bombs and bullets — no, they're little gifts, containing meanings!"[1] What is true in love is equally true at law: Lawyers and their clients need to communicate clearly and effectively with one another to ensure that litigation proceeds efficiently. When communication between counsel and client breaks down, conversation becomes "just crossfire,"[2] and there are usually casualties.

---

[1]    PHILIP ROTH, PORTNOY'S COMPLAINT (1967).

[2]    *Id.*

1

## I.   INTRODUCTION

This is the fifth written opinion in this case, a relatively routine employment discrimination dispute in which discovery has now lasted over two years.  Laura Zubulake is once again moving to sanction UBS for its failure to produce relevant information and for its tardy production of such material.  In order to decide whether sanctions are warranted, the following question must be answered:  Did UBS fail to preserve and timely produce relevant information and, if so, did it act negligently, recklessly, or willfully?

This decision addresses counsel's obligation to ensure that relevant information is preserved by giving clear instructions to the client to preserve such information and, perhaps more importantly, a client's obligation to heed those instructions.  Early on in this litigation, UBS's counsel — both in-house and outside — instructed UBS personnel to retain relevant electronic information. Notwithstanding these instructions, certain UBS employees deleted relevant e-mails.  Other employees never produced relevant information to counsel.  As a result, many discoverable e-mails were not produced to Zubulake until recently, even though they were responsive to a document request propounded on June 3,

2002.[3]  In addition, a number of e-mails responsive to that document request were deleted and have been lost altogether.

Counsel, in turn, failed to request retained information from one key employee and to give the litigation hold instructions to another.  They also failed to adequately communicate with another employee about how she maintained her computer files.  Counsel also failed to safeguard backup tapes that might have contained some of the deleted e-mails, and which would have mitigated the damage done by UBS's destruction of those e-mails.

The conduct of both counsel and client thus calls to mind the now-famous words of the prison captain in *Cool Hand Luke*: "What we've got here is a failure to communicate."[4]  Because of this failure by *both* UBS and its counsel, Zubulake has been prejudiced.  As a result, sanctions are warranted.

---

[3]     *See Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 312 (S.D.N.Y. 2003) (*"Zubulake I"*) (quoting Zubulake's document request, which called for "[a]ll documents concerning any communications by or between UBS employees concerning Plaintiff," and defining "document" to include "without limitation, electronic or computerized data compilations.").

[4]     Captain, Road Prison 36, in COOL HAND LUKE (1967), found at http://ask.yahoo.com/ask/20011026.html.

## II.   FACTS

The allegations at the heart of this lawsuit and the history of the parties' discovery disputes have been well-documented in the Court's prior decisions,[5] familiarity with which is presumed.  In short, Zubulake is an equities trader specializing in Asian securities who is suing her former employer for gender discrimination, failure to promote, and retaliation under federal, state, and city law.

### A.   Background

Zubulake filed an initial charge of gender discrimination with the EEOC on August 16, 2001.[6]  Well before that, however — as early as April 2001 — UBS employees were on notice of Zubulake's impending court action.[7]  After

---

[5]      *See Zubulake I*, 217 F.R.D. 309 (addressing the legal standard for determining the cost allocation for producing e-mails contained on backup tapes); *Zubulake v. UBS Warburg LLC*, No. 02 Civ. 1243, 2003 WL 21087136 (S.D.N.Y. May 13, 2003) ("*Zubulake II*") (addressing Zubulake's reporting obligations); *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280 (S.D.N.Y. 2003) ("*Zubulake III*") (allocating backup tape restoration costs between Zubulake and UBS); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003) ("*Zubulake IV*") (ordering sanctions against UBS for violating its duty to preserve evidence).

[6]      *See Zubulake I*, 217 F.R.D. at 312.

[7]      *See Zubulake IV*, 220 F.R.D. at 217 ("Thus, the relevant people at UBS anticipated litigation in April 2001.  The duty to preserve attached at the time that litigation was reasonably anticipated.").

4

she received a right-to-sue letter from the EEOC, Zubulake filed this lawsuit on February 15, 2002.[8]

Fully aware of their common law duty to preserve relevant evidence, UBS's in-house attorneys gave oral instructions in August 2001 — immediately after Zubulake filed her EEOC charge — instructing employees not to destroy or delete material potentially relevant to Zubulake's claims, and in fact to segregate such material into separate files for the lawyers' eventual review.[9] This warning pertained to both electronic and hard-copy files, but did *not* specifically pertain to so-called "backup tapes," maintained by UBS's information technology personnel.[10] In particular, UBS's in-house counsel, Robert L. Salzberg, "advised relevant UBS employees to preserve and turn over to counsel all files, records or other written memoranda or documents concerning the allegations raised in the [EEOC] charge or any aspect of [Zubulake's] employment."[11] Subsequently — but still in August 2001 — UBS's outside counsel met with a number of the key players in the litigation and reiterated Mr. Salzberg's instructions, reminding them

---

[8]     *See Zubulake I*, 217 F.R.D. at 312.

[9]     *See Zubulake IV*, 220 F.R.D. at 215.

[10]    *See id.*

[11]    *See* 10/14/03 Letter from Norman Simon, counsel to UBS, to the Court ("10/14/03 Simon Ltr.") at 1.

to preserve relevant documents, "including e-mails."[12] Salzberg reduced these instructions to writing in e-mails dated February 22, 2002[13] — immediately after Zubulake filed her complaint — and September 25, 2002.[14] Finally, in August 2002, after Zubulake propounded a document request that specifically called for e-mails stored on backup tapes, UBS's outside counsel instructed UBS information technology personnel to stop recycling backup tapes.[15] *Every* UBS employee mentioned in this Opinion (with the exception of Mike Davies) either personally spoke to UBS's outside counsel about the duty to preserve e-mails, or was a recipient of one of Salzberg's e-mails.[16]

---

[12] *Id.* at 1 n.1.

[13] *See* Ex. A to 10/14/03 Simon Ltr.

[14] *See* Ex. C to 10/14/03 Simon Ltr.

[15] *See Zubulake IV*, 220 F.R.D. at 215. *See also* 10/14/03 Simon Ltr. at 2 ("In late August 2002, plaintiff first requested backup e-mails from certain UBS employees. Thereafter, I advised UBS's information technology personnel to locate and retain all existing backup tapes for employees identified by plaintiff. I re-emphasized that directive and confirmed that these tapes continued to be preserved both orally and in writing on several subsequent occasions.").

[16] Specifically, UBS's outside counsel spoke with Matthew Chapin on August 29, 2001, with Joy Kim and Andrew Clarke on August 30, 2001, and with Jeremy Hardisty, John Holland, and Dominic Vail on August 31, 2001. *See* 10/14/03 Simon Ltr. at 1 n.1. Holland, Chapin, Hardisty, Brad Orgill, James Tregear, Rose Tong, Vail, Barbara Amone, Joshua Varsano, and Rebecca White were all direct recipients of Salzberg's e-mails. *See* Ex. A to 10/14/03 Simon Ltr.

## B.   Procedural History

In *Zubulake I*, I addressed Zubulake's claim that relevant e-mails had been deleted from UBS's active servers and existed only on "inaccessible" archival media (*i.e.*, backup tapes).[17]  Arguing that e-mail correspondence that she needed to prove her case existed only on those backup tapes, Zubulake called for their production.  UBS moved for a protective order shielding it from discovery altogether or, in the alternative, shifting the cost of backup tape restoration onto Zubulake.  Because the evidentiary record was sparse, I ordered UBS to bear the costs of restoring a sample of the backup tapes.[18]

After the sample tapes were restored, UBS continued to press for cost shifting with respect to any further restoration of backup tapes.  In *Zubulake III*, I ordered UBS to bear the lion's share of restoring certain backup tapes because Zubulake was able to demonstrate that those tapes were likely to contain relevant information.[19]  Specifically, Zubulake had demonstrated that UBS had failed to maintain all relevant information (principally e-mails) in its active files.  After

---

[17]     *See generally Zubulake I*, 217 F.R.D. 309.

[18]     *See id.* at 324.

[19]     *See Zubulake III*, 216 F.R.D. at 289.

*Zubulake III*, Zubulake chose to restore sixteen backup tapes.[20] "In the restoration effort, the parties discovered that certain backup tapes [were] missing."[21] They also discovered a number of e-mails on the backup tapes that were missing from UBS's active files, confirming Zubulake's suspicion that relevant e-mails were being deleted or otherwise lost.[22]

       *Zubulake III* begat *Zubulake IV*, where Zubulake moved for sanctions as a result of UBS's failure to preserve all relevant backup tapes, and UBS's deletion of relevant e-mails. Finding fault in UBS's document preservation strategy but lacking evidence that the lost tapes and deleted e-mails were particularly favorable to Zubulake, I ordered UBS to pay for the re-deposition of several key UBS employees — Varsano, Chapin, Hardisty, Kim, and Tong — so that Zubulake could inquire about the newly-restored e-mails.[23]

### C.   The Instant Dispute

       The essence of the current dispute is that during the re-depositions required by *Zubulake IV*, Zubulake learned about more deleted e-mails and about

---

[20]     4/22/04 Oral Argument Transcript ("Tr.") at 29-30.

[21]     *Zubulake IV*, 220 F.R.D. at 215.

[22]     *See id.*; *see also Zubulake III*, 216 F.R.D. at 287.

[23]     *See Zubulake IV*, 220 F.R.D. at 222 (finding that spoliation was not willful and declining to grant an adverse inference instruction).

the existence of e-mails preserved on UBS's active servers that were, to that point, never produced.  In sum, Zubulake has now presented evidence that UBS personnel deleted relevant e-mails, some of which were subsequently recovered from backup tapes (or elsewhere) and thus produced to Zubulake long after her initial document requests, and some of which were lost altogether.  Zubulake has also presented evidence that some UBS personnel did not produce responsive documents to counsel until recently, depriving Zubulake of the documents for almost two years.

### 1.   Deleted E-Mails

Notwithstanding the clear and repeated warnings of counsel, Zubulake has proffered evidence that a number of key UBS employees — Orgill, Hardisty, Holland, Chapin, Varsano, and Amone — failed to retain e-mails germane to Zubulake's claims.  Some of the deleted e-mails were restored from backup tapes (or other sources) and have been produced to Zubulake, others have been altogether lost, though there is strong evidence that they once existed. Although I have long been aware that certain e-mails were deleted,[24] the re-depositions demonstrate the scope and importance of those documents.

---

[24]    *See Zubulake III*, 216 F.R.D. at 287.

### a.    At Least One E-Mail Has Never Been Produced

At least one e-mail has been irretrievably lost; the existence of that e-mail is known only because of oblique references to it in other correspondence. It has already been shown that Chapin — the alleged primary discriminator — deleted relevant e-mails.[25] In addition to those e-mails, Zubulake has evidence suggesting that Chapin deleted at least one other e-mail that has been lost *entirely*. An e-mail from Chapin sent at 10:47 AM on September 21, 2001, asks Kim to send him a "document" recounting a conversation between Zubulake and a co-worker.[26] Approximately 45 minutes later, Chapin sent an e-mail complaining about Zubulake to his boss and to the human resources employees handling Zubulake's case purporting to contain a verbatim recitation of a conversation between Zubulake and her co-worker, as overheard by Kim.[27] This conversation allegedly took place on September 18, 2001, at 10:58 AM.[28] There is reason to believe that immediately after that conversation, Kim sent Chapin an e-mail that

---

[25]    *See id.* (finding that Chapin "was concealing and deleting especially relevant e-mails").

[26]    *See* 9/21/01 e-mail from Chapin to Kim, UBSZ 001400.

[27]    7/21/01 e-mail from Chapin to Holland, Varsano and Tong, UBSZ 001399.

[28]    *See id.*

10

contained the verbatim quotation that appears in Chapin's September 21 e-mail —

the "document" that Chapin sought from Kim just prior to sending that e-mail —

and that Chapin deleted it.[29]  That e-mail, however, has never been recovered and

is apparently lost.

Although Zubulake has only been able to present concrete evidence

that this one e-mail was irretrievably lost, there may well be others.  Zubulake has

presented extensive proof, detailed below, that UBS personnel were deleting

relevant e-mails.  Many of those e-mails were recovered from backup tapes.  The

UBS record retention policies called for monthly backup tapes to be retained for

three years.[30]  The tapes covering the relevant time period (circa August 2001)

should have been available to UBS in August 2002, when counsel instructed

UBS's information technology personnel that backup tapes were also subject to

---

[29]     Kim sent an e-mail at 11:19 AM on September 18, bearing the subject
"2," which appears to contain a *different* verbatim quotation from Zubulake.  *See*
UBSZ 004047.  The e-mail containing the quotation that Chapin used in his
September 21 e-mail would have borne the subject "1" and been sent sometime
between 10:58 AM and 11:19 AM.  *See also* 2/6/04 Deposition of Matthew
Chapin at 565 (Chapin testifying that he might have pasted the quotation from
another document); *id.* at 587 (Chapin testifying that he wasn't sure whether the
quotation was a paraphrase or pasted from another e-mail).

[30]     *See Zubulake I*, 217 F.R.D. at 314 ("Nightly backup tapes were kept
for twenty working days, weekly tapes for one year, and monthly tapes for three
years.  After the relevant time period elapsed, the tapes were recycled.").

11

the litigation hold.

Nonetheless, many backup tapes for the most relevant time periods are missing, including: Tong's tapes for June, July, August, and September of 2001; Hardisty's tapes for May, June, and August of 2001; Clarke and Vinay Datta's tapes for April and September 2001; and Chapin's tape for April 2001.[31] Zubulake did not even learn that four of these tapes were missing until after *Zubulake IV*. Thus, it is impossible to know just how many relevant e-mails have been lost in their entirety.[32]

_____

[31]    *See* Current List of Missing Monthly Backup Tapes, Ex. E to 5/21/04 Reply Affirmation of James A. Batson, counsel to Zubulake ("Batson Reply Aff."). UBS does have some weekly backup tapes for portions of these times for everyone but Tong. *See id.* n.1.

[32]    In *Zubulake IV*, I held that UBS's destruction of relevant backup tapes was negligent, rather than willful, because whether the duty to preserve extended to backup tapes was "a grey area." 220 F.R.D. at 221. I further held that "[l]itigants are now on notice, at least in this Court, that backup tapes that can be identified as storing information created by or for 'key players' must be preserved." *Id.* at 221 n.47.

Because UBS lost the backup tapes mentioned in this opinion well before *Zubulake IV* was issued, it was not on notice of the precise contours of its duty to preserve backup tapes. Accordingly, I do not discuss UBS's destruction of relevant backup tapes as proof that UBS acted willfully, but rather to show that Zubulake can no longer prove what was deleted and when, and to demonstrate that the scope of e-mails that have been irrevocably lost is broader than initially thought.

12

b.    **Many E-Mails Were Deleted and Only Later
Recovered from Alternate Sources**

Other e-mails were deleted in contravention of counsel's "litigation

hold" instructions, but were subsequently recovered from alternative sources —

such as backup tapes — and thus produced to Zubulake, albeit almost two years

after she propounded her initial document requests.  For example, an e-mail from

Hardisty to Holland (and on which Chapin was copied) reported that Zubulake

said "that all she want[ed] is to be treated like the other 'guys' on the desk."[33]

That e-mail was recovered from Hardisty's August 2001 backup tape — and thus

it was on his active server as late as August 31, 2001, when the backup was

generated — but was not in his active files.  That e-mail therefore *must have* been

deleted subsequent to counsel's warnings.[34]

Another e-mail, from Varsano to Hardisty dated August 31, 2001 —

the very day that Hardisty met with outside counsel — forwarded an earlier

message from Hardisty dated June 29, 2001, that recounted a conversation in

which Hardisty "warned" Chapin about his management of Zubulake, and in

---

[33]    7/23/01 e-mail from Hardisty to Holland, UBSZ 002957.

[34]    Because the e-mail was dated July 23, 2001, the same cannot be said
of Chapin or Holland.  Although they had a duty to preserve relevant e-mails
starting in April 2001, counsel did not specifically warn them until August 2001.
Chapin and Holland might have deleted the e-mail prior to counsel's warning.

13

which Hardisty reminded Chapin that Zubulake could "be a good broker."[35]  This

e-mail was absent from UBS's initial production and had to be restored from

backup; apparently neither Varsano nor Hardisty had retained it.[36]  This deletion is

especially surprising because Varsano retained the June 29, 2001 e-mail for over

two months before he forwarded it to Hardisty.[37]  Indeed, Varsano testified in his

deposition that he "definitely" "saved all of the e-mails that [he] received

concerning Ms. Zubulake" in 2001, that they were saved in a separate "very

specific folder," and that "all of those e-mails" were produced to counsel.[38]

As a final example, an e-mail from Hardisty to Varsano and Orgill,

dated September 1, 2001, specifically discussed Zubulake's termination.  It read:

"LZ — ok once lawyers have been signed off, probably one month, but most

---

[35]    8/31/01 e-mail from Varsano to Hardisty, UBSZ 002968.  Because the header information from Hardisty's June 29, 2001 e-mail was cropped when Varsano forwarded it, it is not clear who — besides, presumably, Varsano — received that message.

[36]    *See* Example of Relevant E-Mails, in Chronological Order, That Were Restored From April to October 2001 Backup Tapes, Ex. I to the 4/30/04 Affirmation of James A. Batson ("Batson Aff.").  This chart does not clearly indicate from which backup tape the e-mail was restored.

[37]    *See id.*; *see also* 6/29/01 e-mail from Hardisty to Holland, Amone and Varsano, UBSZ 004097 (the underlying e-mail, also restored from a backup tape).

[38]    1/26/04 Deposition of Joshua Varsano ("Varsano Dep.") at 289-90.  If Varsano's testimony is credited, then counsel somehow failed to produce those e-mails to Zubulake.

easily done in combination with the full Asiapc [downsizing] announcement. We will need to document her performance post her warning HK. Matt [Chapin] is doing that."[39] Thus, Orgill and Hardisty had decided to terminate Zubulake as early as September 1, 2001. Indeed, two days later Orgill replied, "It's a pity we can't act on LZ earlier."[40] Neither the authors nor any of the recipients of these e-mails retained any of them, even though these e-mails were sent within days of Hardisty's meeting with outside counsel. They were not even preserved on backup tapes, but were only recovered because Kim happened to have retained copies.[41] Rather, all three people (Hardisty, Orgill and Varsano) deleted these e-mails from their computers by the end of September 2001. Apart from their direct relevance to Zubulake's claims, these e-mails may also serve to rebut Orgill and Hardisty's deposition testimony. Orgill testified that he played no role in the

---

[39]     9/3/01 e-mail from Orgill to Hardisty and Varsano (replying to and attaching 9/1/01 e-mail from Hardisty to Varsano and Orgill), UBSZ 002965.

[40]     *Id.*

[41]     These e-mails were some of the ones fortuitously recovered from Kim's active files, as discussed below. *See* Memorandum of Law in Support of Plaintiff's Motion for Sanctions ("Pl. Mem.") at 6 n.18. And, indeed, Kim did not have all of the original e-mails, but retained only the last e-mail in the chain of correspondence, which had the earlier e-mails in the same chain embedded in it. It is not clear why or how she obtained this e-mail.

15