UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 99-CV-2496 (GK) |
| ) | |
| ) | Next Scheduled Court Appearance |
| PHILIP MORRIS USA INC. (f/k/a ) | March 14, 2005 |
| PHILIP MORRIS INCORPORATED), et al., ) | |
| ) | |
| Defendants. ) | |

**JOINT DEFENDANTS' RESPONSE TO UNITED STATES'
OBJECTIONS TO THE WRITTEN DIRECT EXAMINATION OF
WILLIAM E. WECKER PH.D. AND EXHIBITS SUBMITTED THEREWITH**

There is no dispute that Dr. Wecker is a statistician. Statisticians are experts in the design, implementation, and interpretation of appropriate statistical analyses in order to answer specific questions based on data. As the density of his written direct attests and as detailed below, that is precisely what Dr. Wecker has done in this case. It is in the wheelhouse of his expertise, and, frankly, outside of the expertise of medical doctors, such as Dr. Burns, who hired two individuals with masters degrees in statistics to do statistical analyses for him.

The Government complains that Dr. Wecker's opinions were not previously disclosed. This is nonsense. Every single statistical analysis contained in his written direct was produced to the Government with one exception. He was deposed on no fewer than three occasions for a total of four days. He provided an expert report for which Rule 26(e) supplements were provided on multiple occasions.

The Government then asserts that it was deprived of an opportunity to conduct a meaningful deposition of Dr. Wecker and the opportunity to file rebuttal reports. Again, it has

had extensive discovery of Dr. Wecker, and any failure to conduct a meaningful deposition or to respond to Dr. Wecker's analyses was entirely of the Government's own making.

**ISSUE #1: Dr. Wecker Has The Expertise To Present To The Court The Results Of His Own Computations Of The Extent Of Compensation From The Available Data.**

Dr. Wecker's written direct makes it painfully clear to the lay reader that he has done nothing more than apply well-established principles of statistics to analyze data to answer specific questions based on the data:

> First, despite promising that "the degree of compensation will be reported for the various studies discussed in subsequent sections," Monograph 13, Chapter 3 nowhere calculates the percent compensation for any of the cross-sectional studies included in Table 3-1 or for the Lynch and Benowitz spontaneous brand switching study. What was the percent compensation in those studies? Dr. Wecker calculated it from the data in the underlying articles. He reports his results. He comments on the relative strengths and weaknesses of the different kinds of studies from a statistical perspective. Wecker Written Direct at 4:7-16:5.
> 
> Second, Monograph 13, Chapter 4 presents, in Figure 4-7, an analysis purporting to show that, in the American Cancer Society's Cancer Prevention Survey I ("CPS-I"), smokers who switched to lower tar and nicotine cigarettes increased the number of cigarettes smoked per day. Dr. Wecker testifies:
> 
>> a. The analysis that was actually done by the authors of Monograph 13 to generate this Figure (a) was not appropriate statistically; and (b) differed from the analysis that the authors of Monograph 13 have said in sworn testimony that they intended to do. Wecker Written Direct at 18:4-26:4.
>> 
>> b. When the analysis is done in a statistically appropriate manner and to conform to what the authors of Monograph 13 have said in sworn testimony that they intended to do, the results are different. Wecker Written Direct at 26:5-27:6.
>> 
>> c. The new corrected results, as well as results previously reported in the peer-reviewed literature by scientists for the American Cancer Society using these same CPS-I data, show no increase, on average, in the numbers of cigarettes smoked per day by smokers who switched to lower yield cigarettes. Wecker Written Direct at 26:5-31:14.
> 
> Third, Monograph 13, Chapter 4 presents, in Figure 4-9, an analysis of the 1996 California Tobacco Survey data that purports to show that smokers of lower tar cigarettes smoke more cigarettes per day than smokers of higher tar cigarettes. Dr. Wecker testifies that this result is due to the inclusion of ultra-low tar cigarettes. When the analysis is restricted to cigarettes that account for the bulk of the cigarettes sold, there is no increase in cigarettes smoked per day with declining tar and nicotine yields. Moreover, the results reported for the 1996 California Tobacco Survey are not reproducible in the 1999

> California Tobacco Survey data, which show no increase in cigarettes smoked per day with declining tar and nicotine yields. Wecker Written Direct at 27:7-34:13.

Even Plaintiff concedes "he can testify about conducting statistical analyses of these studies." (Gov't Br. at 2-3).

Plaintiff nonetheless complains that Dr. Wecker lacks the expertise to critique these underlying studies from a design standpoint. Not so. He certainly has that expertise from a statistical perspective. Moreover, to the extent that the Government is suggesting the underlying studies were otherwise flawed, it ignores that its experts, Drs. Benowitz and Burns, chose to include in Monograph 13. Dr. Wecker did not select them.

Plaintiff complains that Dr. Wecker did not consult with experts in other fields, such as nicotine pharmacology. That is beside the point. It also overlooks the fact that, in many instances, Dr. Wecker used the testimony of the very authors of Monograph 13 to implement statistical analyses or mathematical computations that they said they intended to do but either did not execute at all or did not execute properly.

It is true that Dr. Wecker attempted to answer the same question that the American Cancer Society researchers did in their peer-reviewed publications: do smokers who switch, on average, increase the number of cigarettes they smoke per day? Whereas Dr. Burns, without telling the reader of Monograph 13 and using an inappropriate statistical analysis, now claims that he was attempting to answer a different question: among smokers who switched <u>and</u> changed the number of cigarettes they smoke per day, what is the magnitude of the change in cigarettes smoked per day? But that is hardly a basis for the exclusion of Dr. Wecker's testimony.

The Government finally complains that Dr. Wecker's analyses were done for litigation and were not peer-reviewed. But the Government must know that the University of California produced the computer materials underlying Chapter 4 of Monograph 13 to certain Defendants with the express requirement that "Defendants agree that their use of the material shall be limited

to litigation. Defendants agree not [to] use the material for any commercial purpose and agree not to publish any article based on any of the material." *See* Exhibit A at 4.[1]

**Issue #2: Dr. Wecker Has The Requisite Expertise To Assess Whether There Is A Consistent, Statistically Significant Association Between "Receptivity" To Advertising And Promotion At Baseline And Subsequent Smoking At Follow-up.**

Pierce reports a statistically significant relationship in California data between "receptivity" among baseline nonsusceptible never smokers and subsequent "progress toward smoking." Dr. Wecker obtained the data, he replicated Pierce's results, and he extended the analyses. Specifically, using Pierce's data and model, he found no statistically significant relationship between baseline receptivity and subsequent actual smoking, including experimentation, frequent smoking, daily smoking or the number of cigarettes smoked per day.

Biener does report a statistically significant relationship in Massachusetts data between baseline "receptivity," among never smokers and experiments, and subsequent established smoking. Dr. Wecker, using Biener's model, attempted to replicate Biener's results in Pierce's California data. He found no statistically significant relationship between baseline receptivity, as defined by Biener, among never smokers and experimenters, and subsequent established smoking.

He concludes, on the basis of the literature and his own analyses, that there are no "consistently reproducible associations between 'receptivity to marketing and actual establishment of smoking.'" Wecker Written Direct at 63:2-4. That is an empirical, statistically-based conclusion. He is well within his expertise.

---

[1] Plaintiff also cites some deposition testimony by Dr. Wecker in which he expressed some uncertainty about some of the details of his analyses of the extent of compensation in certain studies. That issue is fully addressed below in response to Legal Issue #5.

**ISSUE #3: Dr. Wecker's Undoubted Expertise In Statistics, Coupled With His Analysis Of The Literature And The Underlying Data, Permit Him To Opine That The Community Intervention For Smoking Cessation Failed To Achieve A Statistically Significant Higher Quit Rate In The Cities That Received The Stop Smoking Intervention.**

Based on the literature and his own examination of the underlying data, Dr. Wecker testifies that the Community Intervention Trial For Smoking Cessation ("COMMIT") did not result in statistically significant increase in smoking cessation in the cities that were randomly assigned to receive the stop smoking intervention.

He is eminently qualified to offer this opinion. The argument advanced by the Government -- that *only* a physician, an expert in youth smoking,[2] or an expert on smoking cessation programs can testify about the statistical significance of the observed difference in cessation rates in a randomized experiment -- is frivolous.

**ISSUE #4: All Of Dr. Wecker's Opinions And Analyses Were Properly Disclosed Except One, And In That Instance, There Is No Prejudice.**

The touchstone in determining whether or not an expert opinion or analysis should be excluded from evidence on the basis of alleged inadequate disclosure is whether a party was prejudiced. F.R.C.P. 26(e) and 37(c)(1); *Kinser v. Gehl Co.,* 1998 WL 231065 (D. Kan. 1998) (no undue prejudice from admission of new expert opinions); *cf. United States v. Mendoza-Paz,* 286 F.3d 1104 (9th Cir. 2002) (sufficient notice and no undue prejudice from admission of additional expert opinions); *Kelly v. MTS, Inc.,* 2001 U.S. App. LEXIS 4379, at *3-5 (9th Cir. 2001) (failure to make timely expert disclosure harmless where opponent had notice of expected testimony weeks before trial).

Indeed, this Court recognized as much on multiple occasions in Plaintiff's case. For instance, the Court permitted Dr. Burns to testify about his new opinion on a nationwide smoking cessation program, despite the lack of disclosure, on the grounds that certain Defendants had an opportunity to depose him about a state-specific smoking cessation program

---

[2] COMMIT involved smoking cessation among adults, not smoking initiation.

in an earlier case. (Trial Tr. at 13238:12-19.) Likewise, the Court permitted Dr. Samet to testify about the 2004 Surgeon General's Report (U.S. Ex. 88,847) and the 2004 Report of the International Agency On Cancer (U.S. Ex. 86,746), neither of which were on Dr. Samet's reliance list in this case, because Defendants were aware of the reports and there was no unfair prejudice. (Trial Tr. at 1059:2-7.)

> **1. There is no Prejudice to the Government Flowing From the Admission of Dr. Wecker's Opinions Regarding Experimental Switching Studies.**

Monograph 13 (U.S. 58,700 at 45-49) reports the extent of compensation in the experimental switching studies. Dr. Wecker *agrees* (written direct at 5:10-21) based on Monograph 13 itself, which is on his reliance list, and his own independent confirmation of those estimates.

Defendants thought Dr. Wecker's independent confirmation of the results reported in Monograph 13 concerning these experimental studies had been produced in the course of discovery along with his other analyses of Monograph 13. That turns out not to be true; it was an oversight. But that is not dispositive here for two independent reasons. First, Monograph 13 itself provides a basis for Dr. Wecker's testimony. Second, unless the Government intends to take issue with Monograph 13's estimates of the percent compensation in the experimental studies, with which Dr. Wecker agrees, there is absolutely no prejudice here.

> **2. The Opinions and Analyses Regarding the "Best Way To Assess" Lynch and Benowitz Were Disclosed to the Government.**

Dr. Wecker, in discussing the Lynch and Benowitz spontaneous brand switching study in his supplemental disclosure in this case repeatedly compares the nicotine intake of the individuals who switched cigarette brands to the nicotine intake of the control group of smokers who did not switch brands:

> "Lynch and Benowitz (1987) shows that smokers who switched to a lower yield cigarette. . . (2) reduced their overall nicotine intake <u>compared to a control group of smokers</u> who did not switch brands and had approximately the same nicotine intake in the baseline survey; (3) reduced their nicotine intake per cigarette by 72 percent <u>compared to a control group of smokers</u> who did not switch brands and had

approximately the same nicotine intake per cigarette in the baseline survey. . . Lynch and Benowitz (1987) also shows that smokers who switched to a higher yield cigarette. . . increased their overall nicotine intake <u>compared to a control group of smokers</u> who did not switch brands."

(*Turner* Rep. at 2-3) (emphasis added).

Notwithstanding Dr. Wecker's repeated comparison to the control group and notwithstanding his deposition testimony in this case that use of the control group was a "good idea" and explaining why,[3] the Government now feigns surprise and claims undue prejudice because Dr. Wecker testified in his written direct (at 9:4-11:2) that making the comparison to the control group, as he did in his disclosure and as he testified in his deposition, is the best way to evaluate the data from a statistical perspective.

### 3.     Dr. Wecker Disclosed His Analyses Regarding Cigarettes Per Day Equivalents.

The Government first misunderstands the testimony presented in Dr. Wecker's written direct testimony at 16:6-17:18. Dr. Wecker is <u>not</u> testifying about an original analysis of the data in the Coultas article. If he were, then the Government would be correct that that was not produced.

Instead, the Coultas article's reported results may be used to conduct a new analysis to estimate cigarette per day equivalents. That is what Dr. Wecker did. And, it was disclosed fully to the Government. Specifically, the Coultas article itself is on his reliance list. The new analyses to estimate cigarette per day equivalents using the published results from the Coultas article were produced to the Government as tab 112 of Dr. Wecker's disclosure in this case and tab 23 of the materials accompanying the *Turner* report, which were also provided to the Government in this case. Finally, Dr. Wecker discusses cigarette per day equivalents at some length at 19-22 of the *Turner* report which was provided to the Government in this case.

---

[3]     Wecker Dep., 12/17/04, at 186:4-22.

### 4. The Analyses Relating to Dr. Burns' Criticisms Were Disclosed.

The analysis inspired by Dr. Burns' February 12, 2003 criticisms discussed at 45:1-49:11 of Dr. Wecker's written direct was produced to the Government, and the two demonstratives in the portion of Dr. Wecker's testimony to which the Government objects are exact replicas of the figures displayed in the *Turner* report. Indeed, JDEM-060537 is an exact replica of Figure 6 on page 13 of the *Turner* report and JDEM-060538 is an exact replica of Figure 7 on page 14 of the *Turner* report. Moreover, each of these demonstratives cite to the specific page of the *Turner* report where the figure is depicted. And the *Turner* report identifies the computer program containing the underlying analyses, including the analysis which generates JDEM-060536. In short, these analyses were fully disclosed to the Government.

### 5. Dr. Wecker's Analyses of the Longitudinal Advertising Studies Were Disclosed.

On May 13, 2002, defense counsel sent a letter to counsel for the Government concerning Dr. Wecker's analysis of the Pierce and Biener studies that had been inadvertently omitted from the electronic materials accompanying Dr. Wecker's expert report served three days earlier, on May 10, 2002. The cover letter explained that the enclosed electronic materials supported a specific, previously-expressed opinion in Dr. Wecker's formal May 10, 2002 report and went on to explain:

> "Specifically, Dr. Wecker has replicated and performed a sensitivity analysis of (a) Pierce, J.P., et al, "Tobacco Industry Promotion of Cigarettes and Adolescent Smoking," *JAMA* 279(7):511-515 (February 18, 1998) and (b) Biener, L. and Siegel, M., "Tobacco Marketing and Adolescent Smoking: More Support for a Causal Inference," *Am. J. Pub. Health* 90(3)407-411 (2000). His analyses show that there is no evidence that the defendants' alleged wrongdoing increased cigarette consumption among adolescents."

Despite having deposed Dr. Wecker on three separate occasions since this disclosure, the Government asserts that this is "hardly adequate notice" and moves to exclude the testimony. That's preposterous. There's no conceivable prejudice here.

Second, the Government, apparently having forgotten Dr. Eriksen's testimony (Trial Tr. at 11488-11864) in the liability phase of the trial on these very studies, now takes the position that Dr. Wecker's testimony about them is irrelevant to the liability phase of the trial.  Third, the Government notes that Dr. Wecker, since the close of expert discovery, has also looked at two additional studies -- Choi (U.S. Ex. 74,019) and Sargeant (JD 065832).  That's true.  But that is *all* that Dr. Wecker says about Choi and Sargeant in his written direct at 54:21-22.  There's nothing to exclude.[4]

### 6. Dr. Wecker's Analyses of the Statistical Significance Calculation For COMMIT Was Disclosed.

Dr. Wecker's May 10, 2002 report stated:  "Results from the COMMIT intervention show that it had no effect on smoking quit rates."  This sentence was accompanied by a footnote which cited to the underlying literature and to Dr. Wecker's accompanying computer programs which demonstrate that the results were not statistically significant.

This is simply not a new opinion.  Nor is there any prejudice.  Indeed, if, despite its review of the accompanying analyses showing no statistically significant effect, the Government was in the least bit uncertain about whether "no effect" was equivalent to "no statistically significant effect," it could have asked Dr. Wecker about it in any of his subsequent, three depositions, but it did not.

**ISSUE #5:   As The Court Has Already Ruled, "Allowing Dr. Wecker's Testimony Relating To NCI Monograph 13 Will Not Unduly Prejudice The Government, If At All." (Order #642).**

In a last ditch effort to preclude Dr. Wecker from testifying about his analyses concerning Monograph 13, the Government recycles arguments of prejudice from its previously-filed motion in limine.[5]  In Order #642, dated September 6, 2004, this Court, having reviewed

---

[4]   The *sole* purpose of noting Dr. Wecker's subsequent review of these two studies was to provide the Government with fair notice that, if it inquired about those two studies, it was going to open the door to answers based on Dr. Wecker's subsequent review.

[5]   United States' Motion In Limine And Incorporated Memorandum Of Law To Exclude Testimony Of William Wecker Relating To National Cancer Institute Monograph 13.  In what appears to be revisionist history, the

essentially the same arguments, denied the Government's motion, finding that "[a]llowing Dr. Wecker's testimony relating to NCI Monograph 13 will not unduly prejudice the Government, if at all."[6]

Since September 6, 2004, any claim of undue prejudice by the Government has, if anything, gotten even more untenable. Specifically, the Government separately had moved to preclude Dr. Wecker from testifying about supplemental disclosures made in October and December 2003 concerning disgorgement related issues. The Court denied that motion, but allowed the Government to take its third deposition of Dr. Wecker. (Order #627, dated August 16, 2004.)

Prior to the deposition, defense counsel advised Dr. Wecker that the scope of the deposition was to be limited to the October and December 2003 supplemental disclosures, not earlier disclosures, including the earlier disclosures concerning Monograph 13. Dr. Wecker prepared accordingly.

At the December 17, 2004 deposition, the Government sought to expand the scope of its examination beyond the October and December 2003 supplemental disclosures to include, *inter alia*, the analyses of Monograph 13. Defense counsel instructed Dr. Wecker not to answer. The

---

Government's current objections seems to suggest that its previously-filed motion in limine raised only procedural issues, but it was squarely predicated on allegations of undue prejudice. *See* United States' Reply Memorandum In Support of Motion in Limine To Exclude Testimony of William Wecker Relating to National Cancer Institute Monograph 13, at 5 (stating that "[t]he admission at the trial of this case of the expert reports and testimony relating to Monograph 13 that Wecker prepared for the Miles and Turner cases would clearly prejudice the Unites States.").

[6]   The factual background prior to entry of Order #642 is fully detailed in Defendants' Brief In Opposition To The Government's Motion In Limine To Exclude Testimony Of Dr. William Wecker Relating To Monograph 13, filed June 7, 2004. That factual background will not be repeated here except to note the following:

(1)   Defendants disclosed Dr. Wecker's analyses of Monograph 13 on April 8, 2003 and July 28, 2003.

(2)   Months later, on October 22, 2003, the Government took a supplemental deposition of Dr. Wecker.

(3)   At his October 22, 2003 deposition, Dr. Wecker was fully prepared to respond to questions about his analyses of Monograph 13, but the Government chose not to ask him any questions about those analyses.

(4)   The Government's motion in limine did not seek, in the alternative, a further deposition of Dr. Wecker on his analyses of Monograph 13.

parties called the Court, and the Court ruled that, since there was no prejudice to Defendants, Dr. Wecker should answer questions related to his analyses of Monograph 13.

Dr. Wecker was understandably cautious about responding to detailed questions for which he had not prepared and prefaced his answers with qualified language that the Government liberally quotes. What the Government does not tell the Court, however, is that Dr. Wecker went on to answer questions substantively. For example:

> The Government excerpts (Br. at 11 n.3) the beginning of Dr. Wecker's answer and, without using ellipses, omits the substantive portion of his answer. (12/17/04 Dep. at 131:10-132:1.)
>
> The Government complains (Br. at 12) that, at his deposition, Dr. Wecker couldn't even find the discussion of the spontaneous brand switching study, Lynch and Benowitz, in his *Turner* report. Initially, that was true. Once he got his bearings, however, he answered questions about this study for next seven pages of the transcript. 12/17/04 Dep. at 183:23-190:22, including opining that using a control group of smokers who did not switch was a good idea from a statistical perspective because it enabled one to isolate the effect of switching specifically on nicotine intake (186:4-22) and agreeing that, if one were to ignore the control group and examine nicotine intake per cigarette, as opposed to daily nicotine intake, then Lynch and Benowitz reports no statistically significant change in per cigarette nicotine intake among the individuals who switched to lower tar cigarettes (187:15-188:14).

Moreover, Dr. Wecker promised, when he read and signed the transcript, to correct any mistakes he had made in his substantive responses concerning his analyses of Monograph 13.[7] He did, and, as to the Monograph 13 questions, all of his substantive answers turned out to be accurate, requiring no corrections.

Admittedly, this was an imperfect way in which to have proceeded, but the Government pushed forward, never once asking that the deposition be continued to permit Dr. Wecker to prepare more completely. The Government, in any event, indisputably knows more about Dr. Wecker's analyses of Monograph 13 today than it knew in September 2004 when the Court

---

[7]   12/17/04 Dep. at 178:6-13: "And a lot of these things you -- it's no surprise, I think, that because I didn't expect to be asked questions on this topic and haven't reviewed it, that I'm not up to speed on the details. But I will have a chance to do corrections, and where I'm not able -- where I'm able to do so, I may be able to supply you this information."

found that "[a]llowing Dr. Wecker's testimony relating to NCI Monograph 13 will not unduly prejudice the Government, if at all."[8]

---

[8] Moreover, the Government's decision to seize upon the understandably cautionary language in some of Dr. Wecker's answers in his December 2004 deposition on his Monograph 13 analyses to suggest that Dr. Wecker lacks expertise (Br. at 1-5) is just a cheap shot.

**Responses to Plaintiff's Objections to Exhibits**

| Exhibit | Response to Plaintiff's Objections to Exhibits |
|---|---|
| JD-000659 | *United States' Objection:* Hearsay. *Joint Defendants' Response:* Joint Defendants offer exhibit JD-000659 pursuant to the learned treatise exception in FRE 803(18). At 30:3-4 and 30:10-14 of the written direct testimony Dr. Wecker quotes from the learned treatise to support his expert testimony that smokers who switch to a lower tar and nicotine yield cigarette do not smoke more cigarettes per day. Additionally, this document was cited in the Defendants' Findings of Fact at Chapter 3 Paragraph 245 and Chapter 4 Paragraph 201 and is presumptively admissible under Orders 471(b) and 861. |
| JD-001162 | *United States' Objection:* Hearsay. *Joint Defendants' Response:* JD-001162 is not presented for the truth of the matter asserted. Rather, it is presented as proof that the authors of the article stated that they performed the analysis described by Dr. Wecker at 66:1-8 of his written direct testimony.<br>*United States' Objection:* Issue Objection #3. *Joint Defendants' Response:* Joint Defendants incorporate by reference their response to Issue Objection #3. |
| JD-062352 | *United States' Objection:* Hearsay. *Joint Defendants' Response:* JD-062352 is not presented for the truth of the matter asserted. Rather, it is presented as proof that the authors of the article stated that they performed the analysis described by Dr. Wecker at 64:1-65:22 and 66:9-18 of his written direct testimony.<br>*United States' Objection:* Issue Objection #3. *Joint Defendants' Response:* Joint Defendants incorporate by reference their response to Issue Objection #3. |
| JD-062670 | *United States' Objection:* Hearsay. *Joint Defendants' Response:* JD-062670 is not presented for the truth of the matter asserted. Rather, it is presented as proof that the authors of the article stated that they performed the analysis described by Dr. Wecker at 64:1-65:22 and 66:9-18 of his written direct testimony. |
| JD-063062 | *United States' Objection:* Hearsay. *Joint Defendants' Response:* Joint Defendants offer exhibit JD-063062 pursuant to the learned treatise exception in FRE 803(18). At 16:14-21 of the written direct testimony Dr. Wecker quotes from the learned treatise to support his expert testimony that smokers who switch to a lower tar and nicotine yield cigarette do not smoke more cigarettes per day. |
| JD-065832 | *United States' Objection:* Hearsay. *Joint Defendants' Response:* Joint Defendants withdraw exhibit JD-065832. |
| JD-065966 | *United States' Objection:* Hearsay. *Joint Defendants' Response:* The document in question is Dr. Wecker's Curriculum Vitae and is admissible. The Court routinely has admitted the Curriculum Vitaes of experts in this trial to establish the experts' qualifications, including: US 78528 (Dolan); US 78529 (Eriksen); US 78533 (Harris); US 78534 |

| Exhibit | Response to Plaintiff's Objections to Exhibits |
|---|---|
|  | (Henningfield); US 78536 (Krugman); US 78540 (Samet); US 78546 (Brandt).<br>*United States' Objection:* Relevance. *Joint Defendants' Response:* Dr. Wecker's professional experience is relevant to his status as an expert in this case. |
| US-64696 | *United States' Objection:* Hearsay. *Joint Defendants' Response:* Joint Defendants offer exhibit US-64696 pursuant to the learned treatise exception in FRE 803(18). At 54:25-55:13; 55:20-23; 56:9-21 and 60:1-17 Dr. Wecker quotes from the learned treatise to support his opinion that an analysis of the available data linking "receptivity" to actual smoking shows that there is no consistently reproducible statistically significant relationship between "receptivity" and actual smoking.<br>*United States' Objection:* Issue Objections # 2 and 4. *Joint Defendants' Response:* Joint Defendants incorporate by reference their response to Issue Objections #2 and 4. |
| US-72922 | *United States' Objection:* Hearsay. *Joint Defendants' Response:* Joint Defendants offer exhibit US-72922 pursuant to the learned treatise exception in FRE 803(18). At 61:6-12 Dr. Wecker quotes from the learned treatise to support his opinion that an analysis of the available data linking "receptivity" to actual smoking shows that there is no consistently reproducible statistically significant relationship between "receptivity" and actual smoking.<br>*United States' Objection:* Issue Objections # 2 and 4. *Joint Defendants' Response:* Joint Defendants incorporate by reference their response to Issue Objections #2 and 4.<br>*Global Response:* US-72922 was previously admitted. |
| US-74019 | *United States' Objection:* Hearsay. *Joint Defendants' Response:* US-72922 was previously admitted. |
| JDEM-060513 | *United States' Objection:* Lack of bates numbers. *Joint Defendants' Response:* The source of JDEM-060513 is specifically identified as a United States exhibit, US-58700 and the information displayed appears on page 44 of the exhibit. Accordingly, the objection should be overruled. |
| JDEM-060514 | *United States' Objection:* Issue Objection #1. *Joint Defendants' Response:* Joint Defendants incorporate by reference their response to Issue Objection #1.<br>*United States' Objection:* Hearsay. *Joint Defendants' Response:* JDEM-060514 should be admitted for three reasons: (a) The exhibits are part and parcel of Dr. Wecker's testimony. The only meaningful way to express the results of a statistical analysis is through the depictions included in these exhibits. (b) The exhibits reflect the results of the underlying analyses and in that respect are essentially a summary exhibit admissible under FRE 1006. (c) Without the exhibits the underlying statistical analyses would be largely unintelligible to |

| Exhibit | Response to Plaintiff's Objections to Exhibits |
|---|---|
| | the Court and to any Appellate Court should they not be admitted. |
| JDEM-060552 | *United States' Objection:* Issue Objection #2. ***Joint Defendants' Response:*** Joint Defendants incorporate by reference their response to Issue Objection #2.<br>*United States' Objection:* Hearsay. ***Joint Defendants' Response:*** Additionally, in response to the objection based on FRE 802, JDEM-060552 should be admitted for three reasons: (a) The exhibits are part and parcel of Dr. Wecker's testimony. The only meaningful way to express the results of a statistical analysis is through the depictions included in these exhibits. (b) The exhibits reflect the results of the underlying analyses and in that respect are essentially a summary exhibit admissible under FRE 1006. (c) Without the exhibits the underlying statistical analyses would be largely unintelligible to the Court and to any Appellate Court should they not be admitted. |
| JDEM-060516; JDEM-060517; JDEM-060518; JDEM-060519; JDEM-060520; JDEM-060521; JDEM-060523; JDEM-060524; JDEM-060527; JDEM-060529; JDEM-060530; JDEM-060531; JDEM-060532; JDEM-060533; JDEM-060534; JDEM-060535; JDEM-060526; JDEM-060527; JDEM-060528; JDEM-060547; JDEM-060548; JDEM-060549; JDEM-060554; JDEM-060558; JDEM-060559; JDEM-060560; JDEM-060561; JDEM-060562; JDEM-060563; JDEM-060564; JDEM-060565; | *United States' Objection:* Hearsay. ***Joint Defendants' Response:*** Each of the exhibits identified with a JDEM prefix to which the United States has objected on the basis of FRE 802 should be admitted for three reasons: (a) The exhibits are part and parcel of Dr. Wecker's testimony. The only meaningful way to express the results of a statistical analysis is through the depictions included in these exhibits. (b) The exhibits reflect the results of the underlying analyses and in that respect are essentially a summary exhibit admissible under FRE 1006. (c) Without the exhibits the underlying statistical analyses would be largely unintelligible to the Court and to any Appellate Court should they not be admitted. |

| Exhibit | Response to Plaintiff's Objections to Exhibits |
|---|---|
| JDEM-060566; JDEM-060567; JDEM-060568; JDEM-060570; JDEM-060571 | |

Dated: March 10, 2005                                    Respectfully submitted,

    /s/ Jonathan M. Redgrave
Robert F. McDermott, Jr. (D.C. Bar No. 261164)
Peter J. Biersteker (D.C. Bar No. 358108)
Jonathan M. Redgrave (D.C. Bar No. 474288)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:   (202) 626-1700

Robert C. Weber
Paul G. Crist
David B. Alden
JONES DAY
North Point 901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone:  (216) 586-3939
Facsimile:   (216) 579-0212

Attorneys for Defendant
R.J. Reynolds Tobacco Company

  /s/ Jonathan M. Redgrave *for*
Timothy M. Broas (D.C. Bar No. 391145)
WINSTON & STRAWN LLP
1400 L Street, N.W.
Washington, D.C.  20005-3502
Telephone:  (202) 371-5700

Dan K. Webb
Thomas J. Frederick
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601-9703
Telephone:  (312) 558-6700

Theodore V. Wells, Jr. (D.C. Bar No. 468934)
James L. Brochin (D.C. Bar No. 455456)
PAUL, WEISS, RIFKIND, WHARTON &
 GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000

Attorneys for Defendants
Philip Morris USA Inc.
(f/k/a Philip Morris Incorporated) and
Altria Group, Inc.
(f/k/a/ Philip Morris Companies Inc.)


  /s/ Jonathan M. Redgrave *for*
Kenneth N. Bass (D.C. Bar No. 386070)
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Suite 1200
Washington, D.C.  200005
Telephone:  (202) 879-5000

David M. Bernick
Stephen R. Patton
KIRKLAND & ELLIS LLP
200 East Randolph Drive, Suite 5900
Chicago, Illinois  60601
Telephone:  (312) 861-2000

Attorneys for Defendant
Brown & Williamson Holdings, Inc.

         <u> /s/ Jonathan M. Redgrave *for*  </u>
        J. William Newbold
        Michael B. Minton
        Richard P. Cassetta (D.C. Bar No. 457781)
        THOMPSON COBURN LLP
        One US Bank Plaza, Suite 3500
        St. Louis, Missouri  63101-1693
        Telephone:  (314) 552-6000

        OF COUNSEL:

        Gene E. Voigts
        Richard L. Gray
        SHOOK, HARDY & BACON LLP
        2555 Grand Blvd.
        Kansas City, Missouri  64108-2613
        Telephone:  (816) 474-6550

        Attorneys for Defendant
        Lorillard Tobacco Company


         <u> /s/ Jonathan M. Redgrave *for*  </u>
        David L. Wallace
        Jessica L. Zellner
        CHADBOURNE & PARKE LLP
        30 Rockefeller Plaza, 34th Floor
        New York, New York  10112-0219
        Telephone:  (212) 408-5100

        Attorneys for Defendant
        British American Tobacco (Investments)
        Limited (f/k/a British-American Tobacco
        Company Limited)

   /s/ Jonathan M. Redgrave *for*
J. William Newbold
Michael B. Minton
Richard P. Cassetta (D.C. Bar No. 457781)
Jason A. Wheeler
THOMPSON COBURN LLP
One US Bank Plaza, Suite 3500
St. Louis, Missouri 63101-1693
Telephone: (314) 552-6000

Steven Klugman
Steven S. Michaels
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-6000

Attorneys for Defendant
The Council for Tobacco Research-U.S.A., Inc.


   /s/ Jonathan M. Redgrave *for*
James A. Goold
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
Telephone: (202) 662-6000

Attorneys for Defendant
The Tobacco Institute, Inc.