## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                             )
**UNITED STATES OF AMERICA,**                )
                                             )
                    **Plaintiff,**           )        **Civil Action No. 99-2496 (GK)**
                                             )
          **v.**                             )
                                             )
**PHILIP MORRIS USA INC.,** *et al.***,**    )
                                             )
                    **Defendants.**          )
_____)

## DEFENDANTS' RESPONSE TO THE GOVERNMENT'S
## PROPOSED CORRECTIVE STATEMENTS

In August 2006, this Court ordered Defendants to make corrective statements regarding the health effects and addictiveness of smoking. Defendants received five proposed corrective statements and an expert report from the Government on February 4, 2011. This Court now asks Defendants to respond to those statements.

Defendants have no objection to providing consumers with factual and noncontroversial information about the health effects and addictiveness of smoking. Defendants have several objections, however, to the inflammatory and inaccurate corrective statements proposed by the Government.

First, as detailed in their Motion for Vacatur also filed today, the Family Smoking Prevention and Tobacco Control Act ("Act"), Pub. L. No. 111-31, 123 Stat. 1776 (2009)—which gives the Food and Drug Administration ("FDA") sweeping authority to regulate the content of communications concerning the health effects and addictiveness of smoking— eliminates this Court's jurisdiction to order *any* corrective statements. At the very least, this Court should defer

to the primary jurisdiction of the FDA rather than compel disclosures that may impair the agency's congressionally imposed regulatory mandate.

Second, even if it remains appropriate for this Court to order corrective statements at all, Statements A – D proposed by the Government are impermissible, inappropriate, and unconstitutional because, among other things, they are not "purely factual and uncontroversial," as mandated by the D.C. Circuit. *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1144 (D.C. Cir. 2009) (internal quotation marks omitted).  Even those portions of the statements that address public-health issues are improperly prefaced by inflammatory, confessional, and vilifying language about Defendants' past conduct that bears no resemblance to the factual and uncontroversial statements contemplated by the D.C. Circuit.

Moreover, the Government's proposed Statements A – D—which are designed to shame and denigrate Defendants—are not geared towards preventing future consumer deception and thus would exceed this Court's jurisdiction under RICO.  One example is the Government's proposed Corrective Statement C about light cigarettes.  The Government asks this Court to compel Defendants to state that they "falsely marketed low tar and light cigarettes as less harmful than regular cigarettes"—even though the Act now prohibits Defendants from using descriptors such as "low tar" and "light" (in the absence of FDA authorization).  The Government's proposed statement would inevitably generate consumer confusion about the use of descriptors and is facially inconsistent with the FDA's goal of removing the terms "low tar" and "light" from the cigarette vernacular.

Compounding these problems is the Government's nearly 100-page expert report— which, according to the Government, forms the "foundation" for its proposed corrective statements.  Despite the length of the report, as well as the accompanying appendices and

exhibits, the report does not support the corrective statements proposed by the Government. Indeed, it appears to be fundamentally flawed, unreliable, and contrary to the Government's own survey design. The survey, for example, was designed to use quantitative measures to determine which of the various corrective statements under consideration—those proposed by the Government, by each of the Defendants, or by Intervenors—were the most effective. Yet the survey does not do that. The Government only measured the proposed statements against the Surgeon General's current warnings. Even with this flawed methodology, the expert report reveals that certain statements proposed by Defendant Philip Morris USA Inc. in 2006 and some of the Surgeon General's warnings performed as well or even *better* in the quantitative survey than did some of the statements ultimately endorsed by the Government's expert.

Because the corrective statements proposed by the Government suffer from manifest and fatal legal defects, they can be rejected as a matter of law without further briefing, an evidentiary hearing, or discovery. If the Court nevertheless concludes that further factual development is warranted—and if the Government insists on relying on its flawed expert report to justify its proposed statements—then Defendants request an evidentiary hearing and limited discovery along the lines set forth below.

## RESPONSE TO ORDER #14

By Order #14, the Court directed Defendants to address at least the following four issues: (1) any arguments that the United States' recommended statements are not factual or are improperly "controversial"; (2) a specification of the issues, if any, that they believe require briefing, and proposed briefing schedules; (3) a specification of the factual disputes, if any, on which they believe this Court will need to make factual findings before being able to issue "appropriate orders" under the RICO statute, 18 U.S.C. § 1964(a), concerning the corrective-statement remedy; and (4) a specification of the topics, if any, on which they believe the Court

should hold an evidentiary hearing to resolve factual disputes concerning the corrective-statement remedy, and an explanation of why an evidentiary hearing will be needed on those topics.  The Court also indicated that Defendants could seek additional, limited discovery on these issues, if they deemed it necessary to do so.  Defendants address each of the Court's questions in turn.

ISSUE ONE:  THE GOVERNMENT'S RECOMMENDED STATEMENTS ARE NOT FACTUAL AND ARE IMPROPERLY CONTROVERSIAL, AND ARE UNLAWFUL IN NUMEROUS OTHER RESPECTS.

As the D.C. Circuit squarely held, any corrective statements ordered by this Court must be limited to "'purely factual and uncontroversial information.'"  *Philip Morris USA Inc.*, 566 F.3d at 1144 (quoting *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985)).  The Government's proposed Corrective Statements A – D do not meet this clear standard.  Far from conveying "purely factual and uncontroversial information," they would require Defendants to publicly declare themselves to be wrongdoers on the basis of findings with which Defendants vigorously disagree and that are inconsistent with those of many other tribunals.  These inflammatory statements are not designed to "prevent and restrain" future RICO violations but, rather, to shame and humiliate Defendants.  The D.C Circuit has *never* upheld a corrective communication that would have required a company to confess past wrongdoing.  *See Warner-Lambert Co. v. FTC*, 562 F.2d 749, 752 (D.C. Cir. 1977) (striking from corrective statement the prefatory phrase, "[c]ontrary to prior advertising").  In short, proposed Corrective Statements A – D are highly controversial and blatantly unlawful.

For these reasons (among others), Corrective Statements A – D not only contravene the D.C. Circuit's mandate, but also violate the requirements of the First Amendment and RICO because they are not narrowly tailored to further a compelling governmental interest and are not designed to "prevent and restrain" future RICO violations.  18 U.S.C. § 1964(a).  Shaming

Defendants as a remedy for a civil finding of fraud would also violate the requirements of due process because this punitive sanction cannot be imposed in the absence of the procedural protections applicable in a criminal trial.  Accordingly, even apart from Defendants' Motion for Vacatur filed simultaneously with this brief, the Government's proposed Corrective Statements A – D are unlawful.

Because it is impossible to sever the legally deficient aspects of Statements A, B, C, and D from the remainder of the Statements, those four Statements should be rejected in their entirety.[1]

### A. Proposed Corrective Statements A – D Violate The D.C. Circuit's Mandate Because They Are Controversial, Are Not Aimed At Preventing Future Consumer Deception, And Include Nonfactual Elements.

Even before Congress significantly changed the legal landscape by adopting the Act, the D.C. Circuit approved this Court's proposed corrective statements remedy on a very narrow basis.  The D.C. Circuit directed this Court to "confine [any corrective] statements to 'purely factual and uncontroversial information,' geared towards thwarting prospective efforts by Defendants to either directly mislead consumers or capitalize on their prior deceptions by continuing to advertise in a manner that builds on consumers' existing misperceptions."  *Philip Morris USA Inc.*, 566 F.3d at 1144-45 (quoting *Zauderer*, 471 U.S. at 651).  The requirements imposed by the D.C. Circuit ensure that any corrective statements ordered by this Court are consistent with the First Amendment and with this Court's jurisdiction under RICO.  They

---

[1] For the Court's convenience, the principal legal flaws in proposed Corrective Statements A – D are summarized in the Appendix to this brief.  Defendants are not challenging Proposed Corrective Statement E except on the basis that the Act eliminates this Court's jurisdiction to order *any* corrective statements and vests primary jurisdiction in the FDA, but reserve the right to suggest modifications at the appropriate time to accommodate any issues that may arise with respect to implementation given media restrictions.

embody the settled First Amendment principle that compelled commercial disclosures are appropriate only when they are not "unjustified or unduly burdensome" (*Zauderer*, 471 U.S. at 651) and reflect the fact that this Court's jurisdiction under RICO is limited to "prevent[ing] and restrain[ing]" *future* RICO violations.  18 U.S.C. § 1964(a).

Proposed Corrective Statements A, B, C, and D conflict with the D.C. Circuit's mandate in numerous respects.

### 1.      Statements A, B, C, and D Are Controversial.

The inflammatory confessional elements of proposed Corrective Statements A, B, C, and D—which would require Defendants to admit deceiving the American public about the health effects and addictiveness of smoking—conflict with the D.C. Circuit's instruction that any corrective statements ordered by this Court be limited to "'purely factual and *uncontroversial* information.'"  566 F.3d at 1144 (quoting *Zauderer*, 471 U.S. at 651) (emphasis added).

The requirement that the corrective statements be limited to "uncontroversial information" is mandated by the Supreme Court's decision in *Zauderer v. Office of Disciplinary Counsel*.  In *Zauderer*, the Court upheld a state-law requirement that attorneys include in their advertisements "information about the terms under which [their] services will be available," such as whether a client would need to pay his own costs if he hired the attorney.  471 U.S. at 651.  In reaching that conclusion, the Court emphasized that requirements to disclose "purely factual and uncontroversial" information "trench much more narrowly on an advertiser's interests" under the First Amendment than do other restrictions on speech.  *Id.*

In light of *Zauderer*—and the First Amendment principles that it embodies—the D.C. Circuit has *never* upheld a corrective communication requiring defendants to confess past wrongdoing.  In *Warner-Lambert Co. v. FTC*, for example, the D.C. Circuit struck language

from a corrective communication that would have required a manufacturer to admit that prior advertising about the health effects of its products was misleading.  562 F.2d at 763.  The Federal Trade Commission ("FTC") had ordered the manufacturer to inform consumers that, "*[c]ontrary to prior advertising*, Listerine will not help prevent colds or sore throats or lessen their severity." *Id.* (emphasis added).  The D.C. Circuit struck the prefatory language—"[c]ontrary to prior advertising"—from the corrective statement.  It did so even though the manufacturer had been "misrepresenting the efficacy of Listerine against the common cold" for 100 years and had been spending an average of $10 million a year disseminating that false message.  *Id.* at 752 & n.1. The FTC found—and the D.C. Circuit agreed—that "a hundred years of false cold claims have built up a large reservoir of erroneous consumer belief which would persist, unless corrected, long after [the manufacturer] ceased making the claims."  *Id.* at 756.  The D.C. Circuit nevertheless deemed the confessional aspect of the corrective statement to be improper.  *Id.* at 763.  The court explained that requiring the "confessional preamble" could "serve only two purposes:  either to attract attention that a correction follows or to humiliate the [defendant]."  *Id.* The FTC attempted to defend the confessional language on the former ground, but the court concluded that the other aspects of the statement were adequate to "attract the notice of readers" and that the "order should not be more intrusive than necessary to achieve fulfillment of the governmental interest."  *Id.* at 763 & n.68 (citing *United States v. Nat'l Soc'y of Prof'l Eng'rs*, 555 F.2d 978 (D.C. Cir. 1977), *aff'd*, 435 U.S. 679 (1978)).

In fact, all of the corrective statements approved by the D.C. Circuit have been uniformly focused on the attributes of the product at issue—not on the speaker's past conduct.  In *Novartis Corp. v. FTC*, 223 F.3d 783 (D.C. Cir. 2000), the court affirmed an FTC order requiring the defendant to inform consumers that, "[a]lthough Doan's is an effective pain reliever, there is no

evidence that Doan's is more effective than other pain relievers for back pain." *Id.* at 786.  The FTC had found that the manufacturer had engaged in an eight-year, $65 million advertising campaign that deceptively marketed Doan's as "more effective at relieving back pain than other over-the-counter products." *Id.* at 785.  The D.C. Circuit upheld the finding of deception and the FTC's corrective statement because "the challenged advertising played a 'substantial role' in creating or reinforcing a false belief . . . in the products' superiority" and because "the advertisements' effects [were] likely to linger" even after the false advertising campaign had been discontinued.  *Id.* at 788.

Together, *Warner-Lambert* and *Novartis* make clear that a corrective statement need not malign the manufacturer to be effective—even where the deceptive advertising campaign was prolonged, was well-funded, and generated lingering effects.  Indeed, the prefatory language to the corrective statement ordered in *Novartis* placed the defendant in a *positive* light.  And in *Warner-Lambert*, the D.C. Circuit *invalidated* the comparatively mild prefatory statement, "[c]ontrary to prior advertising."  By contrast, Corrective Statements A – D proposed by the Government each would compel Defendants to vilify themselves through sensational and gratuitous confessions of past wrongdoing.  This inflammatory language—which is plainly designed solely to shame and humiliate Defendants—is far from "uncontroversial" and therefore contravenes the D.C. Circuit's mandate in this case and the unbroken line of First Amendment jurisprudence on which it rests.

Statements A – D each include language that requires Defendants to imply or directly admit that they committed serious fraud or engaged in other past wrongdoing.  Statement A, for example, would require Defendants to state that "[a] Federal court is requiring tobacco companies to tell the truth about cigarette smoking.  Here's the truth."  The unmistakable

implication of this language is that, in the absence of a court order, Defendants would not "tell the truth" about smoking—even though, by the terms of this Court's injunctions, Defendants would be required to do so irrespective of any corrective statements.

Statements B, C, and D are even more egregious, as each would require an unambiguous confession of past wrongdoing by Defendants. Statement B, for example, would require a manufacturer to state "[w]e told Congress under oath that we believed nicotine is not addictive. We told you that smoking is not an addiction and all it takes to quit is willpower. Here's the truth." In Statement B, Defendants would be required to expressly admit lying to Congress and to the American people.

Similarly, Statement C provides: (i) "We falsely marketed low tar and light cigarettes as less harmful than regular cigarettes to keep people smoking and sustain our profits" and (ii) "We knew that many smokers switch to low tar and light cigarettes rather than quitting because they believe low tar and lights are less harmful. They are NOT. Here's the truth." And the confessional element of Statement D would compel Defendants to admit that, "[f]or decades, we denied that we controlled the level of nicotine delivered in cigarettes. Here's the truth." Defendants would also be required to state that "[c]igarettes are a finely-tuned nicotine delivery device designed to addict people," that "[w]e control nicotine delivery to create and sustain smokers' addiction, because that's how we keep customers coming back," and that "[w]e also add chemicals, such as ammonia, to enhance the impact of nicotine and make cigarettes taste less harsh."

The use of such compelled admissions of past wrongdoing to prevent future misstatements about a product is wholly unprecedented in American law and well outside the bounds of the First Amendment. Indeed, the confessional language struck by the D.C. Circuit in

*Warner-Lambert*—which was designed to remedy 100 years of deceptive advertising—was subdued in comparison with the inflammatory and over-the-top admissions that the Government would have Defendants make in this case.  The fact that the D.C. Circuit invalidated even that comparatively mild statement leaves no doubt that the confessional aspects of Statements A – D—which would require Defendants to admit perpetrating a massive, decades-long fraud on the American public—are highly controversial and blatantly unlawful.

Moreover, Statements A – D are controversial not only because they are designed to shame and humiliate Defendants but also because the admissions of wrongdoing they would compel Defendants to make are inconsistent with the findings of numerous other courts.  In fact, a large number of judges and juries have rejected allegations of fraud against Defendants identical to those advanced by the Government in this case.  For example, Defendants have prevailed in a number of trials involving allegations that they concealed the health risks of smoking.  *See, e.g.*, *In re Tobacco Litig.:  C. Blankenship/J. McCune*, No. 2:97-0204 (W. Va. Cir. Ct.); *Hall v. R.J. Reynolds Tobacco Co.*, No. 00-1061 (Fla. Cir. Ct.); *Tune v. Philip Morris Inc.*, No. 97-4678 (Fla. Cir. Ct.).  And, juries have refused to impose any liability against Defendants in at least eight cases involving alleged fraud relating to low tar cigarettes.  *See, e.g.*, *Welch v. Brown & Williamson Tobacco Corp.*, No. 00-CV-209292 (Mo. Cir. Ct.); *Inzerilla v. Am. Tobacco Co.*, No. 011754/96 (N.Y. Sup. Ct.); *Lucier v. Philip Morris Inc.*, No. 02AS01909 (Cal. Super. Ct.).  Notably, at least one of those cases involved federal RICO claims identical in many respects to the claims in this case.  In *Blue Cross & Blue Shield of New Jersey Inc. v. Philip Morris, Inc.*, No. 98-cv-3287 (E.D.N.Y.), the largest health insurer in New York brought federal RICO claims (along with a variety of state-law claims) that accused tobacco companies of defrauding the American public regarding the health effects of smoking, including through

making misleading statements about the health effects of low tar cigarettes.  The trial lasted

seventy-five days, and involved many of the same witnesses as this case.  Yet, the *Blue Cross*

jury reached the opposite conclusion from this Court and returned a verdict in favor of the

*defendants* on the RICO claims.  *See also Iron Workers Local Union No. 17 Ins. Fund v. Philip*

*Morris, Inc.*, No. 1:97-cv-1422 (N.D. Ohio) (verdict in favor of the defendants in a state-law

RICO claim brought by a class of union trust funds).[2]

    In light of the many cases in which Defendants have prevailed against allegations

identical to those advanced in this case, courts have uniformly rejected efforts by plaintiffs in

other cases to invoke this Court's findings as collateral estoppel.  *See In re Light Cigarettes*

*Mktg. Sales Practices Litig.*, 691 F. Supp. 2d 239 (D. Me. 2010); *Schwab v. Philip Morris USA*

*Inc.*, 449 F. Supp. 2d 992, 1079 (E.D.N.Y. 2006), *rev'd on other grounds sub nom.*, *McLaughlin*

*v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008); *City of St. Louis v. Am. Tobacco Co.*, No.

22982-09652-01 (Mo. Cir. Ct. June 2, 2010); *Curtis v. Altria Group, Inc.*, 2009 WL 5820516

(Minn. Dist. Ct. Oct. 14, 2009), *aff'd in relevant part*, 792 N.W.2d 836 (Minn. Ct. App. 2010).

    The fact that numerous courts have reached conclusions different from those of this Court

underscores the highly controversial—and patently improper—nature of the compelled

confessions of wrongdoing proposed by the Government.  *See Entm't Software Ass'n v.*

*Blagojevich*, 469 F.3d 641, 652-53 (7th Cir. 2006) (invalidating a state law that required

videogame retailers to post signs and display brochures explaining videogame rating standards

---

[2]  In addition to its defense verdict on plaintiffs' RICO claims, the *Blue Cross* jury returned a
verdict in favor of the plaintiffs on a separate state-law claim, although at a fraction of the
damages sought by the plaintiffs.  That plaintiffs' verdict was subsequently overturned on
appeal, and judgment was entered in favor of the defendants on the entirety of the plaintiffs'
claims.  *See Empire Healthchoice, Inc. v. Philip Morris USA Inc.*, 393 F.3d 312 (2d Cir. 2004)
(per curiam).

because the law required retailers "to communicate that any video games in the store can be properly judged pursuant to th[ose] standards," which was an assertion that remained subject to dispute). The confessional elements of Statements A – D would require Defendants to publicly declare themselves to be wrongdoers on the basis of findings that are inconsistent with those of many other tribunals. Such sensational, inflammatory, and disputed statements bear no resemblance to the "uncontroversial" corrective statements authorized by the D.C. Circuit.

Finally, these statements are also controversial because they are completely lacking in any context, rendering them overbroad and open to misinterpretation. As a result, they are controversial (and nonfactual) because they imply that Defendants engaged in wrongdoing that exceeds that supported by this Court's specific findings of fact. For example, the prefatory language in Statement A—"A Federal court is requiring tobacco companies to tell the truth about cigarette smoking. Here's the truth."—does not explain the time period during which this Court concluded that Defendants wrongfully denied that smoking caused certain illnesses. In fact, all Defendants have for many years agreed that cigarette smoking causes disease. This prefatory language likewise falsely implies that Defendants denied the "truth" of all that follows, even though this Court made no findings that Defendants denied the truth as to many of the illnesses listed therein.

The same is true of the prefatory language of Statement B—"We told you that smoking is not an addiction and all it takes to quit is willpower." Again, this statement provides no context, including, for example, the historical debate over the meaning of the term "addiction" or the fact that all Defendants have for years agreed that smoking is "addictive." Statements C and D are similarly lacking in any context, rendering them overbroad and open to misinterpretation. This Court must ensure that the context and nuance are included to render the proposed statements

accurate and uncontroversial.  As the D.C. Circuit made clear, a claim that such factual "detail" will detract from the statements' impact is no excuse where, as here, Defendants' First Amendment rights are at stake.[3]

### 2.  Statements A, B, C, and D Are Not Geared Towards Preventing Future Consumer Deception.

Proposed Corrective Statements A – D are also inconsistent with the D.C. Circuit's requirement that any such statements be "geared towards thwarting prospective efforts by Defendants to either directly mislead consumers or capitalize on their prior deceptions."  *Philip Morris USA Inc.*, 566 F.3d at 1144-45.

Every corrective statement upheld by the D.C. Circuit in other cases has been designed to eliminate consumer misperceptions by disseminating "essential information to correct a widely held, mistaken belief . . . cultivated by [a defendant's] past advertising."  *Warner-Lambert*, 562 F.2d at 759 n.52; *see also id.* at 763 ("Listerine will not help prevent colds or sore throats or lessen their severity."); *Novartis Corp.*, 223 F.3d at 786 ("Although Doan's is an effective pain reliever, there is no evidence that Doan's is more effective than other pain relievers for back pain.").  The D.C. Circuit has rigorously enforced this limitation on the use of corrective statements because the "legitimate governmental interest" served by corrective statements is "correcting public misimpressions," not gratuitously punishing the speaker.  *Warner-Lambert*, 562 F.2d at 771 (Supplemental Opinion on Petition for Rehearing); *see also Pub. Citizen, Inc. v.*

---

3 Moreover, the language in Statements B and D that "[w]hen you smoke, the nicotine actually changes the brain—that's why quitting is so hard" is also controversial and inflammatory.  That language suggests that changes to the brain caused by nicotine prevent the smoker from quitting.  Defendants do not dispute that nicotine in tobacco products is addictive and that quitting smoking can be difficult.  This does not mean, however, that smokers cannot quit smoking because of changes to the brain caused by smoking.

*La. Att'y Disciplinary Bd.*, __ F.3d __, 2011 WL 285226, at *14 (5th Cir. Jan. 31, 2011)

(*Zauderer* requires evidence that the proposed disclaimer would "effectively prevent consumer

deception").[4]

      In conflict with the D.C. Circuit's mandate—and in contrast with the corrective

statements previously upheld by the D.C. Circuit—the confessional elements of Statements A –

D are not aimed at preventing any prospective efforts by Defendants to mislead consumers or to

capitalize on past deception.  Statements A – D are instead designed to publicly denigrate and

humiliate Defendants through compelled confessions of past wrongdoing.

      Even the flawed Expert Report of Kelly Blake submitted in support of the Government's

proposed statements confirms that the sensational language of Statements A – D has little or no

benefit.  For example, even on its face, the Blake Report establishes that the confessional

elements of Statements A – D are, at best, only marginally effective at attracting consumer

attention and that other elements of the Statements likely already attract sufficient attention to

serve the Government's interest in disseminating information about the health effects of

smoking.  *See* Blake Report ¶¶ 217-18.[5]  The inflammatory confessional language in Statements

A – D thus has, at best, only the most minimal incremental value in attracting consumer

attention—and whatever marginal value it might have is vastly outweighed by its highly

---

  [4] In *Warner-Lambert*, the D.C. Circuit left open the possibility that an FTC order intended "to
humiliate the advertiser . . . might be called for in an egregious case."  562 F.2d at 763.  That
punitive purpose, however, is foreclosed by RICO, pursuant to which the Government may seek
only to "prevent and restrain" *future* RICO violations, as well as by the Due Process Clause.  *See
infra* Parts I.C, I.D.

  [5] As explained below, the Blake Report appears to contain numerous flaws, and Defendants
have lacked either the time or information necessary to evaluate it fully.  *See infra* Issues 2-5.

controversial and nonfactual content and its "unjustified" and "unduly burdensome" effects on

Defendants. *Zauderer*, 471 U.S. at 651.

In addition to highlighting the marginal efficacy of the confessional language, the Blake

Report reveals other flaws in the Statements' ability to prevent future consumer deception.  For

example, the Blake Report indicates that the Government selected its proposed statements at

least in part because they may affect "behavioral intentions around quitting smoking and staying

quit in current and former smokers."  Blake Report ¶ 11; *see also id.* ¶ 227 (Statement A chosen

partly because "[i]t was . . . positively associated with behavioral intentions to stay quit among

former smokers"); *id.* ¶¶ 226, 228 (Statement B chosen partly based on stay-quit intentions).  But

increasing "quit intentions" is not preventing future fraud or consumer misperception.  Instead,

in conception and execution, it is no different from the type of "cessation" remedy that both this

Court and the D.C. Circuit rejected.  *See Philip Morris USA Inc.*, 566 F.3d at 1149 ("section

1964(a) . . . authorizes the district court to order injunctions to prevent and restrain fraudulent

statements about smoking and health and addiction, not to prevent Defendants from marketing

and selling their products at all").  Under the D.C. Circuit's mandate, any corrective statements

must be "geared towards thwarting prospective efforts by Defendants" to defraud the public (*id.*

at 1144)—rather than encouraging consumers to quit smoking or to stay quit.  The Family

Smoking Prevention and Tobacco Control Act vests that public-health function in the FDA, not

in the Department of Justice or this Court.  *See* § 3(1) (the FDA is to be the "primary Federal

regulatory authority with respect to the manufacture, marketing, and distribution of tobacco

products").

Moreover, the Government inexplicably chose not to test the efficacy of *any* of its

proposed corrective statements relative to the new warning labels established under the Act.

Those warnings, which had been available in their statutorily mandated textual format for 18 months at the time the Government conducted its analysis, are slated to appear on cigarette packages beginning in September 2012.  Because, under Order #1015, any corrective statements would appear for a period of two years—and thus would necessarily overlap in time with the new warnings—it would have been logical for the Government to test whether the new warnings are themselves sufficient to accomplish the Government's aims.  Instead,  the Government chose to use as its "control" one of the old textual warnings that have been superseded by the Act.  Thus, Statement A on the health effects of smoking was not tested against the new statutory warnings that "Cigarettes cause fatal lung disease," "Cigarettes cause cancer," "Cigarettes cause strokes and heart disease," "Smoking can kill you," and "Quitting smoking now greatly reduces serious risks to your health."  Similarly, Statement B on nicotine and addiction was not tested against the new warning that "Cigarettes are addictive."  The Government therefore has no evidence that the Statements will have any marginal effect on the prevention of consumer deception beyond that of the new congressionally imposed warning labels, which the FDA plans to implement not only as text, but also in conjunction with a series of graphic warnings on cigarette packages and advertisements.  *See* Required Warnings for Cigarette Packages and Advertisements, 75 Fed. Reg. 69,524 (Nov. 12, 2010).

Finally, the Blake Report indicates that other proposed corrective statements—including some proposed by Defendants—outperformed the Government's proposed statements on a number of the metrics employed by the Government.  Statement B, for example, performed poorly on the study's proxy for preventing future fraud.  More people believed PM USA's proposed corrective statement on the addictiveness of nicotine than Statement B.  App'x C2, Tbl. 4B.  The results for Statement C were similar.  PM USA's proposed statement was the only

proposal that was "positively associated with increasing accurate knowledge among smokers."

Blake Report ¶ 229.  And the PM USA statement was comparable to Statement C on

measurements of attention, public impact, and credibility.  App'x C3, Tbl. 2C.  Indeed, the

Government chose Statement C largely because of qualitative results (*i.e.*, the results of a focus

group), rather than on the type of hard consumer-protection survey data generally used to

determine the efficacy of corrective statements.  Blake Report ¶ 229.  Moreover, "[t]here was

little indication that any of the statements"—including those proposed by Defendants—"would

spark negative unintended consequences such as encouraging nonsmokers or former smokers to

smoke"—and "[p]articipants generally reported that after reading the statements"—again,

including those proposed by Defendants—"they would be unlikely to believe opposite future

claims."  *Id.* ¶¶ 100-101; *see also* D.E. 5827 at 3 n.1 (Sept. 7, 2010) (Government explaining that

the Corrective Statements needed to be "carefully designed and tested" in order to prevent them

from being "ineffective or, worse yet, backfir[ing]").

Thus, even putting aside the new Act and the warning statements it mandates—which

cannot lawfully be assumed out of the constitutional analysis—the Government could have

selected alternative statements that were *at least as effective* as Statements A – D on the metrics

measured in the Blake Report and that suffered from none of the legal deficiencies of the

Government's proposed statements.  Instead, the Government chose the statements most likely to

prolong this litigation and prevent the speedy implementation that the Government claims to

want.  The Government's decision thus makes clear that it is more interested in punishing and

publicly shaming Defendants than providing the public with health-related information about

smoking geared towards the prevention of future consumer deception.

3.       **Several Aspects Of The Government's Proposed Corrective Statements Are Not Factual.**

Several elements of Statements A, B, and D also suffer from the additional flaw that they are not "'factual.'"  *Philip Morris USA Inc.*, 566 F.3d at 1144.

Statement A provides that "[s]moking kills 1,200 Americans.  Every day."  This statement is inaccurate because the calculation is based on a rough estimate of the number of Americans who die each year from smoking-related illnesses, not each day.  The Government should not be permitted to sacrifice accuracy in order to maximize emotional impact.

Statement B is factually inaccurate in several respects.  The confessional element of that Statement provides that "[w]e told Congress under oath that we believed nicotine is not addictive. . . .  Here's the truth."  This Statement would require Defendants to admit that their CEOs lied to Congress during the 1994 Waxman Hearings when they stated their personal opinions that nicotine is not addictive.  But this Court did *not* find this testimony to be fraudulent, and instead deemed it constitutionally protected under the *Noerr-Pennington* doctrine.  *See United States v. Philip Morris USA Inc.*, 449 F. Supp. 2d 1, 272-73, 887 (D.D.C. 2006).  Defendants cannot be compelled to make "corrective" statements regarding this constitutionally protected, nonfraudulent testimony.[6]

Statement B would also require Defendants to admit that they "manipulated cigarettes to make them more addictive."  This language is misleading because it suggests that Defendants spike cigarettes with additional nicotine.  This Court made no finding to that effect, and the Government expressly disclaimed any such theory of liability before the D.C. Circuit.  *See* Brief

---

[6]  Moreover, BATCo has never testified before Congress regarding its views on nicotine, and this Court made no such findings.  Nor has BATCo ever told the American public that smoking is not an addiction and all it takes to quit is willpower.  Again, the Court made no such findings.

for the United States at 38 (D.C. Cir. filed May 19, 2008) ("Nicotine manipulation is not synonymous with the 'spiking' of cigarettes by adding extraneous nicotine.") (internal quotation marks omitted).  In fact, Defendants' manufacturing processes reduce the level of nicotine and *only* in that sense is nicotine "manipulated."  As explained above, the First Amendment does not permit the Government to ignore the context and nuance necessary to render its proposed statements accurate.

Statement D suffers from similar flaws.  It would require Defendants to state that "[c]igarettes are a finely-tuned nicotine delivery device designed to addict people."  But it is inaccurate to suggest that Defendants design or market their cigarettes as "nicotine delivery device[s]."  If cigarettes were simply devices for the delivery of nicotine to initiate and then treat addiction, they would have been subject to regulation by the FDA even before the enactment of the Family Smoking Prevention and Tobacco Control Act (*see* 21 U.S.C. § 321(h))—a proposition that the Supreme Court squarely rejected.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 135, 137 (2000) ("if tobacco products were 'devices' under the FDCA, the FDA would be required to remove them from the market," which is a decision that "Congress . . . has foreclosed").  The language is therefore wrong both as to Defendants' intent and as to the legal status of cigarettes.  This pejorative terminology is also far from the "purely . . . uncontroversial" type of statement required by the D.C. Circuit and the First Amendment.

Statement D would also require Defendants to state that "[w]e control nicotine delivery to create and sustain smokers' addiction, because that's how we keep customers coming back," and that "[w]e also add chemicals, such as ammonia, to enhance the impact of nicotine and make cigarettes taste less harsh."  This language exceeds the scope of the D.C. Circuit's mandate because it is confessional and self-denigrating, and thus does not convey purely factual

information about cigarettes.  Moreover, the language is misleading because, like the similarly

deficient language in Statement B, it inaccurately suggests that Defendants spike cigarettes to

make them more addictive.  This Court made no findings to that effect—nor could it plausibly

have done so, as Defendants actually *remove* nicotine from cigarettes during the manufacturing

process.  Finally, this statement is false.  Regardless of what the Court found in the past—and

Defendants respectfully but vigorously disagree with those findings—the Government's proposal

is framed in the *present* tense.  And for the reasons explained in Defendants' Motion for Vacatur,

the FDA's extensive regulatory oversight of Defendants prevents them from *presently* engaging

in the conduct alleged in the Government's proposed statement.

**B.      Statements A, B, C, and D Violate The First Amendment.**

Even if the D.C. Circuit had not already provided binding instructions in this case

regarding the scope of any corrective statements ordered by this Court, Statements A – D

proposed by the Government would still be invalid.  The D.C. Circuit's requirement that the

corrective statements be limited to "'purely factual and uncontroversial information,' geared

towards thwarting prospective" fraud embodies the restrictions that the First Amendment

imposes on compelled corrective communications.  *Philip Morris USA Inc.*, 566 F.3d at 1144

(quoting *Zauderer*, 471 U.S. at 651).  Because the statements are highly controversial, are not

aimed at preventing consumer deception, and are factually inaccurate in several respects, they

fall outside the narrow realm of permissible corrective speech.  Accordingly, the statements must

withstand the traditional requirements of strict scrutiny that apply when the Government hinders

the "right to speak freely [or] the right to refrain from speaking at all."  *Wooley v. Maynard*, 430

U.S. 705, 714 (1977).  Statements A – D do not come close to meeting those exacting requirements.[7]

Statements A, B, C, and D violate the First Amendment because they are not narrowly tailored to promote a compelling governmental interest.  The First Amendment demands that the Government select the alternative that minimizes the burden on Defendants' freedom of speech, which encompasses both "the choice to speak" and "the choice of what not to say."  *Pac. Gas & Elec. Co. v. Pub. Utils. Comm.*, 475 U.S. 1, 16 (1986) (plurality opinion); *see also Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004) ("When plaintiffs challenge a content-based speech restriction, the burden is on the Government to prove that the proposed alternatives will not be as effective as the challenged statute.").  The Government unquestionably has not done so here.  There are numerous less burdensome alternatives through which the Government could further its interest in preventing Defendants from committing future fraud.  For example, the Blake Report indicates that prefatory language attributing generic corrective statements to the Surgeon General attracted almost as much viewer attention, and was seen as being nearly as credible, as the

---

[7]  Strict scrutiny—rather than the lower standard of scrutiny that sometimes applies to commercial speech (*see, e.g.*, *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980))—is appropriate in this case because the Government's proposed corrective statements are not "purely factual and uncontroversial" and therefore not governed by the lower standard articulated in *Zauderer*.  The statements instead compel Defendants to publicly denigrate themselves by confessing to past wrongdoing.  Such compelled public shaming—which is wholly foreign to the American legal tradition—is subject to the most stringent constitutional scrutiny.  *See Wooley*, 430 U.S. at 714.  The Government's proposed statements are also subject to strict scrutiny because, unlike the corrective statements in *Novartis* and *Warner-Lambert*, which were required to be included only in advertisements, the corrective statements here are freestanding communications untethered to the proposal of a commercial transaction.  In any event, for the reasons set forth in the text, the statements could not withstand even *Central Hudson* scrutiny because there are obvious, less restrictive alternatives through which the Government could further its interest in preventing future public deception.  *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371 (2002) (explaining *Central Hudson* test).

inflammatory confessional language in the Government's proposed statements.  Blake Decl. ¶¶ 217-18.  Thus, by substituting language attributing the corrective statements to the Surgeon General, the Government could have effectively promoted its antifraud objective while diminishing the imposition on Defendants' First Amendment rights.  More generally, for every category tested in the Blake Report, there were at least some statements proposed by Defendants that performed comparably well to the Government's proposals and posed no credible risk of negative unintended consequences.

Indeed, the D.C. Circuit has repeatedly acknowledged the burden that is imposed on First Amendment freedoms by government requirements that compel a speaker "to argue a side of a controversy to which it is opposed."  *Encyclopaedia Britannica, Inc. v. FTC*, 605 F.2d 964, 973 (7th Cir. 1979) (describing *Nat'l Soc'y*, 555 F.2d 978).  In *National Society*, for example, the D.C. Circuit held that a district court had violated the First Amendment when it sought to compel a Sherman Act defendant found liable for prohibiting competitive bidding "to state in any publication of its Code of Ethics that the submission of price quotations for engineering services at any time and in any amount is not considered an unethical practice."  555 F.2d at 980 (internal quotation marks omitted).  The D.C. Circuit held that the order was unconstitutionally "overbroad" in "order[ing] the Society to state affirmatively that it does not consider competitive bidding to be unethical."  *Id.* at 984.  The court explained, "To force an association of individuals to express as its own opinion judicially dictated ideas is to encroach on that sphere of free thought and expression protected by the First Amendment."  *Id.*  The court concluded that a less onerous decree still would have served the Sherman Act's purposes.  *See id.*

Corrective Statements A – D proposed by the Government impose similar First Amendment burdens.  The Government asks this Court to order Defendants to admit that, among

other things, they lied to Congress under oath (Statement B); they "manipulated cigarettes to make them more addictive" (Statement B); they "falsely marketed low tar and light cigarettes as less harmful than regular cigarettes" (Statement C); and they falsely "denied that [they] controlled the level of nicotine delivered in cigarettes" (Statement D). These compelled public confessions are not statements of uncontroversial facts, but rather "judicially dictated ideas" that Defendants vigorously dispute (and that other courts have rejected). *Nat'l Soc'y*, 555 F.2d at 984; *see also supra* Part I.A. The public shaming of Defendants through compelled admissions of wrongdoing is not even remotely the least restrictive means of furthering the Government's antifraud objective.

### C. Ordering Defendants To Make Statements A, B, C, Or D Would Exceed This Court's Jurisdiction Under RICO.

An order requiring Defendants to make Statements A – D proposed by the Government would also exceed this Court's jurisdiction under RICO.

Section 1964(a) of RICO authorizes this Court to "prevent and restrain" RICO violations. 18 U.S.C. § 1964(a). As the D.C. Circuit has held, "Congress limited relief under section 1964(a) to forward-looking remedies aimed at preventing and restraining future RICO violations." *Philip Morris*, 566 F.3d at 1139. This Court therefore may not order relief that is focused "on remedying the effects of past conduct." *United States v. Philip Morris*, 396 F.3d 1190, 1198 (D.C. Cir. 2005) ("*Disgorgement Opinion*"); *see id.* (Section 1964(a) aims "to prevent or restrain *future* violations") (emphasis added). Indeed, it was for that reason (among others) that the D.C. Circuit directed this Court to "confine [any corrective] statements to 'purely factual and uncontroversial information,' geared towards thwarting *prospective* efforts by Defendants" to mislead the public. *Philip Morris USA Inc.*, 566 F.3d at 1144 (quoting *Zauderer*, 471 U.S. at 651) (emphasis added).

Compelling manufacturers to admit *past* wrongdoing is inconsistent with the "forward-looking nature of the [RICO] remedy." *Disgorgement Opinion*, 396 F.3d at 1198. Rather than prevent future fraud, Statements A – D are designed to shame and punish manufacturers for past conduct. Indeed, the Blake Report makes clear that "the effect of the proposed statements on *future* beliefs" had almost no role in the Government's selection of its proposed corrective statements because "tests of statistical significance revealed only limited evidence that some statements performed better than others on the future beliefs questions." Blake Report ¶ 182 (emphasis added). The confessional language in Statements A – D therefore must have been adopted by the Government for a reason other than its ability to prevent and restrain future RICO violations.

A backward-looking perspective pervades all four of the challenged Statements. For example, Statement C would compel Defendants to state that they "falsely marketed low tar and light cigarettes as less harmful than regular cigarettes." Because the Family Smoking Prevention and Tobacco Control Act now prohibits Defendants from using descriptors such as "low tar" and "light" (in the absence of FDA approval), that Statement is wholly backward-looking and cannot possibly "prevent and restrain" future RICO violations. Indeed, Statement C would inevitably confuse consumers and undermine efforts to communicate public-health information about smoking by reintroducing terminology that Defendants no longer use in marketing their products and have no plans to reintroduce in the future.

Statements A, B, and D suffer from similar flaws. The preamble to Statement A implies that, in the past, Defendants have failed to tell the truth about the health effects and addictiveness of smoking. The retrospective focus of Statement B is more explicit. Its preamble, for example, references what Defendant "*told* Congress," and its second bullet point requires Defendants to

admit that they "*manipulated* cigarettes to make them more addictive."  Statement D is also aimed almost exclusively at past conduct, requiring Defendants to state, among other things, that they "*denied* that [they] controlled the level of nicotine in cigarettes."  None of these backward-looking statements is consistent with the forward-looking remedial authority that this Court possesses under Section 1964(a).

### D. Statements A, B, C, And D Are So Punitive That They Cannot Be Imposed Outside Of A Criminal Setting.

Constitutionally mandated procedural protections forbid the imposition in a civil case of a sanction "so punitive that the proceeding must reasonably be considered criminal."  *Austin v. United States*, 509 U.S. 602, 608 n.4 (1993); *see also Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (a person may "not be punished prior to an adjudication of guilt in accordance with due process of law").  The confessional elements of Corrective Statements A – D proposed by the Government have an exclusively punitive purpose and thus cannot be adopted in this civil case.

The confessional elements would impose enduring and onerous burdens on Defendants. As just one example, plaintiffs in other cases might invoke the statements in an effort to foreclose Defendants from making legal arguments inconsistent with those statements or as an admission against interest under Rule 801(d)(2) of the Federal Rules of Evidence; in contrast, Defendants have successfully resisted all efforts to give this Court's findings preclusive effect in other litigation.  *See supra* Part I.A.  In addition, the statements do not leave Defendants free to conduct business as they please; they force Defendants to speak in certain places and at certain times against their will.  These punishments exceed the bounds of appropriate civil sanctions. *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963) (the fact that a "sanction involves an affirmative disability or restraint" indicates that it is punitive).  In order to avoid the serious

constitutional issues that arise from the imposition of criminal punishment in a civil case, the Court should reject the Government's proposed corrective statements.

ISSUE TWO:  CERTAIN ISSUES MAY REQUIRE ADDITIONAL BRIEFING.

Defendants believe that certain issues may require further briefing:

1.  Until this case was remanded by the D.C. Circuit, the Government—like Defendants—treated the validity of its proposed corrective statements as a pure question of law. Thus, when the Government first submitted proposed statements to the Court in 2006, it did not file an accompanying expert report.  On remand, however, the Government informed the Court that it was consulting with "counsel for the National Cancer Institute's Health Communication and Informatics Research Branch, the Center for Disease Control's Office of Smoking and Health, the Food and Drug Administration and others within the Department of Health and Human Services, regarding how to draft corrective statements that are appropriate to their audience and fully effective."  D.E. 5827 at 3 (Sept. 7, 2010).  According to the Government, one of the "problem[s]" in many "corrective advertising cases[ ] is that attorneys negotiate the terms of the disclosure."  *Id.* at 3 n.1 (internal quotation marks omitted).  "If not carefully designed and tested," the Government asserted, "corrective communications can easily be ineffective or, worse yet, backfire."  *Id.*  Thus, when the Government submitted its proposed corrective statements last month, it accompanied those proposals with a lengthy expert report and supporting materials.

Defendants disagree with the Government's apparent position that the validity of their proposed corrective statements cannot be resolved as a matter of law without reference to expert reports and other supporting materials.  If the Court does not invalidate the Government's proposed corrective statements as a matter of law, the Government cannot be permitted to rely on the Blake Report to support its proposed statements unless Defendants are given additional,

limited discovery (including a deposition of Dr. Blake), an evidentiary hearing, and the opportunity to submit supplemental briefs on the propriety of the Government's proposed statements in light of that record.  It would be fundamentally unfair to allow the Government to rely on the Blake Report as evidentiary support for its proposed Corrective Statements when Defendants have not had an opportunity to take the expert's deposition, obtain other discovery, or present fully their evidentiary challenges to that report.

2.  In addition, the Government has not come forward with a proposal on implementation of the corrective statements.  Nor have the parties had any discussion of implementation.  Further briefing, negotiation, and mediation may be necessary on this issue, which may require further refinement of the length and form of the corrective statements ultimately ordered by the Court. The Government and the parties have agreed that discussion of implementation should await a decision on the substance of the statements.

3.  If the Court does not reject the Government's proposed corrective statements as a matter of law, then additional briefing (and an evidentiary hearing) may be necessary on the factual underpinnings of Defendants' First Amendment and other legal arguments.  For example, under *Zauderer*, even a statement that is "purely factual and uncontroversial" is unconstitutional if it is "unjustified and unduly burdensome."  471 U.S. at 651; *see also, e.g.*, *Ibanez v. Fl. Dep't of Bus. & Prof'l Reg.*, 512 U.S. 136, 146 (1994).  Whether a speech restriction is "unduly burdensome" involves balancing the burden the speech restriction imposes on Defendants against the public-health benefit of the restriction.  And that issue, as well as other elements of the potentially relevant First Amendment standards, may warrant further factual development and briefing.

ISSUE THREE:  THERE MAY BE FACTUAL DISPUTES FOR THE COURT TO RESOLVE.

Defendants believe that this Court can and should reject the Government's proposed Corrective Statements as a matter of law.  To the extent that the Court considers the Government's entire submission at this time, however, we identify the following factual issues that the Court will be required to resolve before concluding that the Government's proposed corrective statements constitute "appropriate orders" under the RICO statute:

1.  Whether the Government's proposed corrective statements are "purely factual," as required by the D.C. Circuit and not "unjustified and unduly burdensome," as required by the First Amendment.  As explained above, Defendants maintain that several elements of the proposed corrective statements are controversial, unduly burdensome, and factually untrue.  Thus, to the extent the Government persists in its proposed statements, the Court would need to resolve these factual disputes.

2.  Whether there are less burdensome means for the Government to achieve its interest in preventing future consumer deception than by requiring its proposed corrective statements, including reliance on recent, statutorily prescribed warnings.

3.  Whether the Government's expert report is reliable, valid, and supportive of the Government's proposed corrective statements.


ISSUE FOUR:  IF THE COURT DOES NOT INVALIDATE THE GOVERNMENT'S PROPOSED CORRECTIVE STATEMENTS AS A MATTER OF LAW, THEN IT SHOULD HOLD AN EVIDENTIARY HEARING TO DETERMINE THE VALIDITY AND RELIABILITY OF THE GOVERNMENT'S SURVEY AND EXPERT REPORT AND TO EVALUATE ANY ADDITIONAL EVIDENCE RELEVANT TO DEFENDANTS' FIRST AMENDMENT AND OTHER ARGUMENTS.

As noted above, Defendants believe that the Court can and should reject the Government's proposed corrective statements as a matter of law.  However, to the extent the

Court takes the Blake Report and related materials into account in evaluating those statements, the Court should hold an evidentiary hearing on the validity and reliability of that report.  In addition, as explained above, there are factual issues that may be relevant to Defendants' legal claims, such as whether the Government's proposed statements are "unjustified and unduly burdensome."

ISSUE FIVE.  LIMITED ADDITIONAL DISCOVERY MAY BE NECESSARY.

To the extent the Court plans to consider the Blake Report and related materials, some additional limited discovery of those materials is necessary.  Following the February 24, 2011 status conference with the Court, the Government provided Defendants with some of the additional reliance materials that Defendants requested.  In light of this, Defendants do not think that extensive additional discovery is necessary.  The additional discovery Defendants envision seeking at this time is for the audiotapes of the focus group sessions, the final survey in the form presented to participants, and the deposition of Dr. Blake and any other experts, as deemed necessary.  Defendants reserve their right, however, to request additional discovery after reviewing the materials recently provided by the Government.

Dated:  March 3, 2011                               Respectfully submitted,


                                                    /s/ Beth A. Wilkinson
                                                    Beth A. Wilkinson (D.C. Bar No. 462561)
                                                    PAUL, WEISS, RIFKIND, WHARTON &
                                                    GARRISON LLP
                                                    2001 K Street, N.W.
                                                    Washington, D.C.  20006-1047
                                                    Telephone:  (202) 223-7300
                                                    Fax:  (202) 223-7420

Miguel A. Estrada (D.C. Bar No. 456289)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Telephone:  (202) 955-8257
Fax:  (202) 530-9016


Thomas J. Frederick
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601-9703
Telephone: (312) 558-6700
Fax:  (202) 558-5700

*Attorneys for Defendants*
*Altria Group Inc. and Philip Morris USA Inc.*


/s/ Beth A. Wilkinson *for*
Robert F. McDermott (D.C. Bar No. 261164)
Peter J. Biersteker (D.C. Bar No. 358108)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone: (202) 879-3939
Fax: (202) 626-1700

*Attorneys for Defendant*
*R.J. Reynolds Tobacco Company,*
*individually and as successor by*
*merger to Brown & Williamson*
*Tobacco Corporation*


/s/ Beth A. Wilkinson *for*
Michael B. Minton
THOMPSON COBURN LLP
One US Bank Plaza, Suite 3500
St. Louis, Missouri 63101-1693
Telephone: (314) 552-6000
Fax: (314) 552-7597

*Attorneys for Defendant*
*Lorillard Tobacco Company*

/s/ Beth A. Wilkinson *for*
David L. Wallace
CHADBOURNE & PARKE LLP
30 Rockefeller Plaza, 34th Floor
New York, New York 10112-0219
Telephone: (212) 408-5100

*Attorneys for Defendant*
*British American Tobacco (Investments)*
*Limited (f/k/a British-American Tobacco*
*Company Limited)*

# APPENDIX

For ease of reference, this appendix summarizes the principal grounds on which the Government's proposed corrective statements are legally improper.  All five of the Government's proposed statements are legally flawed in their entirety because the Family Smoking Prevention and Tobacco Control Act eliminates any reasonable likelihood that Defendants will engage in future RICO violations, and therefore extinguishes this Court's jurisdiction over this case, including its authority to order any corrective statements.  In the event that the Court determines that it retains jurisdiction over this case—and decides not to defer to the primary jurisdiction of the Food and Drug Administration over matters of smoking and health—Defendants' challenges to particular portions of the Government's statements are highlighted below.

## Proposed Statement on Topic A—Corrective Statements for Negative Health Effects of Smoking:

> A Federal court is requiring tobacco companies to tell the truth about cigarette smoking.  Here's the truth:
>
> - Smoking reduces circulation, triggers asthma, and can cause infertility and erectile dysfunction.
> - Smoking during pregnancy can cause stillbirth, low birth weight, and sudden infant death syndrome.
> - Smoking causes heart disease, emphysema, chronic bronchitis, acute myeloid leukemia, and cancers of the mouth, esophagus, throat, voice box, lung, stomach, kidney, bladder, pancreas, cervix and uterus.
> - Smoking kills 1,200 Americans.  Every day.

*Legal Challenges*

- The confessional element:  (a) violates the D.C. Circuit's mandate because it is not "purely factual and uncontroversial" and is not aimed at preventing future consumer deception; (b) violates the First Amendment under strict scrutiny, *Central Hudson* scrutiny, or *Zauderer* scrutiny because it is not the least restrictive means of furthering the Government's antifraud objective and is not "purely factual and uncontroversial"; (c) exceeds this Court's authority under RICO because it is not aimed at preventing and restraining future RICO violations; and (d) is so punitive that it cannot be imposed in a civil setting.

- The entire Statement is improper because Congress removed the Court's jurisdiction over this case, or at least its jurisdiction to order Defendants to make corrective statements, by enacting the Family Smoking Prevention and Tobacco Control Act.  Alternatively, the Court should defer to the FDA's primary jurisdiction over matters of smoking and health, and refrain from issuing an overlapping set of federal tobacco regulations.

- The phrase "Every day" is inaccurate because it is based on an annual number.

**Proposed Statement on Topic B—Corrective Statements for Addictiveness of Smoking and Nicotine:**

We told Congress under oath that we believed nicotine is not addictive.  We told you that smoking is not an addiction and all it takes to quit is willpower.  Here's the truth:

- Smoking is very addictive.  And it's not easy to quit.
- We manipulated cigarettes to make them more addictive.
- When you smoke, the nicotine actually changes the brain—that's why quitting is so hard.

Paid for by [Cigarette Manufacturer Name] under order of a Federal District court.

*Legal Challenges*

- The confessional element:  (a) violates the D.C. Circuit's mandate because it is not "purely factual and uncontroversial" and is not aimed at preventing future consumer deception; (b) violates the First Amendment under strict scrutiny, *Central Hudson* scrutiny, or *Zauderer* scrutiny because it is not the least restrictive means of furthering the Government's antifraud objective and is not "purely factual and uncontroversial"; (c) exceeds this Court's authority under RICO because it is not aimed at preventing and restraining future RICO violations; and (d) is so punitive that it cannot be imposed in a civil setting.

- The entire Statement is improper because Congress removed the Court's jurisdiction over this case, or at least its jurisdiction to order Defendants to make corrective statements, by enacting the Family Smoking Prevention and Tobacco Control Act.  Alternatively, the Court should defer to the FDA's primary jurisdiction over matters of smoking and health, and refrain from issuing an overlapping set of federal tobacco regulations.

- The statement "[W]e told Congress under oath that we believe nicotine is not addictive. . . .  Here is the truth" is not tied to a finding of fraud by this Court.

- The second bullet point is misleading because it suggests that Defendants spike cigarettes with additional nicotine.  There is no finding to that effect.  In fact, Defendants' manufacturing processes reduce the level of nicotine and only in that sense is nicotine "manipulated."

- The third bullet point is controversial and inflammatory because it suggests that changes to the brain caused by nicotine prevent the smoker from quitting.   Defendants do not dispute that nicotine in tobacco products is addictive and that quitting smoking can be

difficult.  This does not mean, however, that smokers cannot quit smoking because of changes to the brain caused by smoking.

**Proposed Statement on Topic C—Corrective Statements for Lack of Health Benefit from "Low Tar," "Light," "Ultra Light," "Mild," and "Natural" Cigarettes:**

<mark>We falsely marketed low tar and light cigarettes as less harmful than regular cigarettes to keep people smoking and sustain our profits.</mark>

<mark>We knew that many smokers switch to low tar and light cigarettes rather than quitting because they believe low tar and lights are less harmful.  They are NOT.</mark>

<mark>Here's the truth:</mark>

- Just because lights and low tar cigarettes feel smoother, that doesn't mean they are any better for you.  Light cigarettes can deliver the same amounts of tar and nicotine as regular cigarettes.
- ALL cigarettes cause cancer, lung disease, heart attacks and premature death—lights, low tar, ultra lights, and naturals.

Paid for by [Cigarette Manufacturer Name] under order of a Federal District court.

*Legal Challenges*

- The confessional element:  (a) violates the D.C. Circuit's mandate because it is not "purely factual and uncontroversial" and is not aimed at preventing future consumer deception; (b) violates the First Amendment under strict scrutiny, *Central Hudson* scrutiny, or *Zauderer* scrutiny because it is not the least restrictive means of furthering the Government's antifraud objective and is not "purely factual and uncontroversial"; (c) exceeds this Court's authority under RICO because it is not aimed at preventing and restraining future RICO violations; and (d) is so punitive that it cannot be imposed in a civil setting.

- The entire Statement is improper because Congress removed the Court's jurisdiction over this case, or at least its jurisdiction to order Defendants to make corrective statements, by enacting the Family Smoking Prevention and Tobacco Control Act.  Alternatively, the Court should defer to the FDA's primary jurisdiction over matters of smoking and health, and refrain from issuing an overlapping set of federal tobacco regulations.

**Proposed Statement on Topic D—Corrective Statements for Cigarette Design Manipulation:**

For decades, we denied that we controlled the level of nicotine delivered in cigarettes.  Here's the truth:

- Cigarettes are a finely-tuned nicotine delivery device designed to addict people.
- We control nicotine delivery to create and sustain smokers' addiction, because that's how we keep customers coming back.
- We also add chemicals, such as ammonia, to enhance the impact of nicotine and make cigarettes taste less harsh.
- When you smoke, the nicotine actually changes the brain—that's why quitting is so hard.

Paid for by [Cigarette Manufacturer Name] under order of a Federal District court.

*Legal Challenges*

- The confessional element:  (a) violates the D.C. Circuit's mandate because it is not "purely factual and uncontroversial" and is not aimed at preventing future consumer deception; (b) violates the First Amendment under strict scrutiny, *Central Hudson* scrutiny, or *Zauderer* scrutiny because it is not the least restrictive means of furthering the Government's antifraud objective and is not "purely factual and uncontroversial"; (c) exceeds this Court's authority under RICO because it is not aimed at preventing and restraining future RICO violations; and (d) is so punitive that it cannot be imposed in a civil setting.

- The entire Statement is improper because Congress removed the district court's jurisdiction over this case, or at least its jurisdiction to order Defendants to make corrective statements, by enacting the Family Smoking Prevention and Tobacco Control Act.  Alternatively, the district court should defer to the FDA's primary jurisdiction over matters of smoking and health, and refrain from issuing an overlapping set of federal tobacco regulations.

- The first bullet point is inaccurate.  Defendants do not design or market their cigarettes as nicotine delivery devices.  If cigarettes were simply nicotine delivery devices, they would have been subject to regulation by the FDA even before the new legislation authorizing the FDA to regulate tobacco products.  This statement is therefore wrong both as to Defendants' intent and as to the status of cigarettes under the law.

- The second and third bullet points are misleading because they suggest that Defendants spike cigarettes to make them more addictive.  There is no finding to that effect.  In fact, Defendants' manufacturing processes reduce the level of nicotine and only in that sense is nicotine "manipulated."

- The fourth bullet point is controversial and inflammatory because it suggests that changes to the brain caused by nicotine prevent the smoker from quitting.  Defendants do not dispute that nicotine in tobacco products is addictive and that quitting smoking can be difficult.  This does not mean, however, that smokers cannot quit smoking because of changes to the brain caused by smoking.