UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 99-CV-2496 (GK) |
| | ) | Next scheduled court appearance: NONE |
| and | ) | |
| | ) | |
| TOBACCO-FREE KIDS ACTION FUND, *et al.*, | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PHILIP MORRIS USA, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## PUBLIC HEALTH INTERVENORS' RESPONSE IN SUPPORT OF THE UNITED STATES' MOTION FOR CLARIFICATION REGARDING DISAGGREGATED MARKETING DATA

The Public Health Intervenors support the government's request to clarify that the Court's Final Judgment and Remedial Order (Order # 1015) authorizes the Department of Justice to obtain any marketing data reports in Defendants' possession, and to share marketing data and reports with other agencies within the federal government, subject to appropriate confidentiality restrictions. As explained below, given Defendants' extensive, unlawful marketing efforts – including, in particular, marketing to youth and disadvantaged communities – this remedy is essential to help prevent and restrain further misconduct.

## **Background**

Among the Court's thousands of factual findings in this case, the Court found that Defendants engaged in extensive marketing in furtherance of their fraud, particularly marketing directed at youth.  See generally Finding of Fact ("FF") 2630 – FF3302.  Explaining that "Defendants know that marketing their cigarettes to youth is essential to each company's success and longevity, and for that reason [they] create marketing campaigns designed to increase youth consumption," FF 2639, the Court found that Defendants spent more than $12 billion on advertising and promotion in 2002, the last year for which data was available.  FF 2639; see also Amended Final Opinion (DN 5750) ("Op.") at 1521 (discussing $15 billion spent annually on Defendants' marketing efforts).  The Court further found that these marketing campaigns play a "key role in the process of recruiting young, new smokers by exposing young people to massive amounts of imagery associating positive qualities with cigarette smoking."  FF 2647; see also id. ("Defendants' own statistics demonstrate how successful they have been in marketing their three main youth brands: Philip Morris's Marlboro, RJR's Camel, and Lorillard's Newport.").

The Court further found that Defendants engage in sophisticated research and marketing techniques in order "to start young people smoking and to keep them smoking."  FF 2717. Although Defendants emphatically denied that their extensive research tracking youth, "especially those under eighteen," is conducted to "determine youth preferences and behaviors," the Court concluded that "Defendants tracked youth in order to determine how best to induce them to start, and continue, smoking cigarettes."  Id.  The Court went on to provide numerous examples of this research and marketing by each of the companies.  FF 2718 – FF 3156; see also FF 2892 ("Defendants have utilized the vast amount of research and tracking data they

accumulated on youth smoking initiation, tastes and preferences by employing themes which

resonate with youth in their marketing campaigns").  This includes not only targeting specific

brands – e.g., Joe Camel, Newport, Kool – at youth, but also additional campaigns, such as price

promotions,[1] direct mail,[2] retail promotions,[3] and promotional items and sponsorships.[4]  See also,

e.g., FF 2674 ("Defendants intentionally exploit adolescents' vulnerability to imagery by creating

advertising that utilizes the themes of independence, adventurousness, sophistication, glamour,

athleticism, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and being

'cool.'").

    The Court also made specific findings that Defendants falsely deny that they engage in

youth marketing, concluding that "[t]he evidence is clear and convincing – and beyond any

reasonable doubt – that Defendants have marketed to young people twenty-one and under while

consistently, publicly, and falsely, denying they do so."  FF 3296.  As the Court explained:

---

[1]    FF 2991 ("price reductions, initiated by the cigarette company Defendants, such as sharply dropping the wholesale price of cigarettes most popular with young people, have . . . contributed to the increases in youth smoking incidence and prevalence observed during much of the 1990s"); see also FF 2992 – FF 3023.

[2]    FF 3089 ("Defendants have made extensive use of direct mail marketing to many millions of individuals to send them coupons, t-shirts, sporting goods, mugs, and magazines, all promoting their brand of cigarettes"); see also FF 3090 – FF 3109.

[3]    FF 3110 (explaining that "[t]he retail store has become one of Defendants' central vehicles for communication of brand imagery and promotional offers" and that Defendants use "retail promotion techniques including cash/rebates, free products, display cases to dealers, and special value added offers such as 'two-for-one' to consumers, to encourage retailers to create tobacco friendly environments," environments that are often "frequented by teenagers"); see also FF 3111– FF 3129.

[4]    FF 3130 – FF 3156 (discussing, inter alia, "'bar nights' that reach youth"; band competitions; and race car sponsorships).

> [T]he overwhelming evidence set forth in this Section – both Defendants' internal documents, testimony from extraordinarily qualified and experienced experts called by the United States, and the many pictorial and demonstrative exhibits used by the Government – prove that, historically, as well as currently, Defendants do market to young people, including those under twenty-one, as well as those under eighteen. Defendants' marketing activities are intended to bring new, young, and hopefully long-lived smokers into the market in order to replace those who die (largely from tobacco-caused illnesses) or quit. Defendants intensively researched and tracked young people's attitudes, preferences, and habits. As a result of those investigations, Defendants knew that youth were highly susceptible to marketing and advertising appeals, would underestimate the health risks and effects of smoking, would overestimate their ability to stop smoking, and were price sensitive. Defendants used their knowledge of young people to create highly sophisticated and appealing marketing campaigns targeted to lure them into starting smoking and later becoming nicotine addicts.

FF 3298; see also Op. at 861-64 (conclusions of law on youth marketing). The Court made similar findings as to Defendants' marketing to minority communities. See, e.g., FF 2952 (discussing Kool Mixx Campaign, which targeted African-American youth); FF 2961 (discussing another Defendant's efforts "to develop a cigarette brand, 'Uptown,' targeted at young adult less well educated African Americans").[5]

---

[5]     As the Court predicted, these marketing efforts have continued. For example, in 2007 R.J. Reynolds introduced "Camel No. 9," a new version of its flagship brand aimed at girls and young women. Camel No. 9 "ladies nights" were held in bars across the country, offering women facials, manicures, makeup, hair styling, and free cigarettes. Promotional giveaways at these events included flavored lip balm, cell phone jewelry, and tiny purses, all in hot pink. After this short-lived, but very effective campaign, one study found that the percentage of teenage girls who reported having a favorite cigarette advertisement increased by 10 percentage points, with Camel accounting for nearly all of this increase, while no similar increase was found among teenage males during the same period. Moreover, almost half of the teen girls who had specified Camel as their favorite cigarette ad had not indicated any favorite ad previously. See John P. Pierce et al., Camel No. 9 Cigarette-Marketing Campaign Targeted Young Teenage Girls, 125 Pediatrics 619 (2010); see also Rosanne Spector, "Point-of-sale advertising major cause of teen smoking, study shows," Stanford School of Medicine News, July 18, 2010, (available at http://med.stanford.edu/ism/2010/july/smoke.html) (last visited Mar. 3, 2011) (finding that students who regularly visited convenience stores, gas stations and small grocery stores were at least twice as likely to try smoking as those who visited infrequently); Andrew B. Seidenberg et al., Storefront Cigarette Advertising Differs by Community Demographic Profile, Am. J. Health

It was against this backdrop that the Court imposed the disaggregated marketing data remedy.  Op. at 1636-1643.  Explaining that "Defendants' suppression and concealment of information has been integral to the Enterprise's overarching scheme to defraud," id. at 1636, and finding that this information "will prevent and restrain Defendants from continuing to make false denials about their youth marketing efforts and will enable the Government to monitor such activities," the Court directed that Defendants disclose "their disaggregated marketing data to the Government," in order "to ensure transparency of Defendants' marketing efforts, particularly those directed at youth, and what effects such efforts are having . . . ."  Op. at 1643.  The Court's Opinion indicates this data is also provided to the Federal Trade Commission ("FTC"), but the Court's Remedial Order also expressly provides that "all reports generated from such Disaggregated Marketing Data shall be made available to the Government."  See Order #1015 at 16-17 (emphasis added).

### Discussion

In light of the Court's overwhelming findings, the Public Health Intervenors urge the Court to both (1) authorize the Department of Justice access to all of Defendants' marketing data reports as provided in the Court's 2006 Remedial Order – not just information provided to the FTC – and (2) allow that access to other government agencies, who will assist in efforts that will help prevent and restrain further legal violations by Defendants.

1.      The Federal Trade Commission Act, 15 U.S.C. §§ 41-58, authorizes the Commission to direct that businesses file "answers in writing to specific questions, furnishing to

---

Promotion, July-Aug. 2010, at e26 (study finding that a low-income, minority community had more tobacco retailers and advertisements were more likely to be larger and promote menthol products as compared to a high-income, non-minority community).

the Commission such information as it may require as to the organization, business, conduct,

practices . . . of the respective persons, partnerships, and corporations filing such reports or

answers in writing."  15 U.S.C. § 46(b).  Pursuant to that authority, the FTC collects certain

marketing data from Defendants, which are subsequently provided to the public in aggregated

form.  See, e.g., FTC Cigarette Report for 2006 (available at

http://www.ftc.gov/os/2009/08/090812 cigarettereport.pdf) (last visited Feb. 28, 2011).

Apparently, this data does not nearly reflect the breadth and depth of data the tobacco

companies collect in order to further their marketing efforts.  Thus, as Dr. Michael Ericksen

explained in his written direct testimony in this case, disaggregated marketing data includes, inter

alia, "[m]arketing and sales data disaggregated by geographic location, down to the smallest level

of geographic specificity possible, such as zip codes, census tract, neighborhood or block, or even

individual store," as well as "disaggregated by brand, geographical region, type of promotion

used, number of cigarettes sold, advertising in stores and other factors. . . ."  Ericksen WD 11:18-

23 - 12:1-7 (available at http://www.justice.gov/civil/cases/tobacco2/01_Eriksen

%20FINAL%20Written%20Direct%20Testimony.pdf) (last visited Mar. 2, 2011).  As he further

explained, it appears that Defendants maintain such data, some of which was produced in this

case.  Id. at 15:19-20.

In light of the Court's overwhelming findings concerning Defendants' use of deceptive

marketing and promotions to further their fraudulent scheme, the Court should give full effect to

the provision in Order #1015 providing that "all reports generated from [Defendants']

Disaggregated Marketing Data shall be made available to the government."  Order #1015, ¶ 17.

Since – as the Court has already found is likely – Defendants will continue to "track[ ] the

smoking behavior and brand preferences of youth," Op. at 1521, "studying why youth start

smoking [and] designing their marketing campaigns to appeal to the psychological needs of

adolescents," id., the Government's access to all of Defendants' marketing data reports – not just

the data provided to the FTC – is a critical transparency-enhancing measure that will help to

prevent and restrain further legal violations.  See, e.g., United States v. Philip Morris USA, Inc.,

396 F.3d 1190, 1203-04 (D.C. Cir. 2005) (Williams, J., concurring) (endorsing

"transparency-enhancing orders" because they help ensure that "future violations will be quickly

and easily identified").  Indeed, since it is evident that any such reports will be used by Defendants

for their continuing marketing campaigns, it is essential that the Court permit the government to

have access to these reports and analyses as just such a "transparency-enhancing order[ ]."  Id.

     2.     This information should also be available to relevant government agencies, not just

the Department of Justice.  Any confidentiality concerns would be addressed by compliance with

the Court's standing confidentiality Orders, as the Court has already directed.  Order #1015, ¶ 19

("All Disaggregated Marketing Data shall be deemed 'confidential' and 'highly sensitive trade

secret information,' as defined in Orders #7 and #36, and shall be subject to the provisions of

those Orders").  But access to other agencies is vitally important.

     First and foremost, the Department of Justice will need to consult with expert agencies to

interpret and respond to the data.  Certainly, Justice Department lawyers' access to relevant

expertise in order to monitor and enforce the Court's decree should not be curtailed in the manner

Defendants have suggested.

     Moreover, other federal agencies may also be in a position to prevent and restrain further

marketing deceptions by Defendants.  For example, understanding how different brands are

targeted to different populations in certain geographic areas would help the Centers for Disease Control and Prevention ("CDC") to develop and implement targeted interventions for at-risk populations.  CDC could implement a campaign, partnering with states and local communities, with messages targeted directly at the same youth, ethnic minority and other sub-populations that are the focus of specific industry marketing.   CDC would thus be able to more effectively ensure that government expenditures on tobacco prevention efforts, including counter-marketing and public education efforts, are used effectively and efficiently – which would further prevent and restrain deceptive marketing by Defendants.

These data could also be effectively used by the Food and Drug Administration ("FDA") in preventing and restraining further violations in implementing the Family Smoking Prevention and Tobacco Control Act, Pub. L. No. 111-31, 123 Stat. 1776 (June 22, 2009).   The information will help the agency understand the targeting of certain groups and its impact, which will inform marketing restrictions the FDA may find necessary to prevent further deceptions.  Similarly, the data will allow FDA to combat industry efforts to take advantage of new marketing and promotion schemes and loopholes in existing regulations – which, again, will help to further prevent and restrain additional violations by Defendants.

### Conclusion

For the foregoing reasons, the Public Health Intervenors urge that the Court grant the

government's motion for clarification regarding Defendants' obligations to disclose disaggregated

marketing data.

Respectfully submitted,

*/s/ Howard M. Crystal*
Howard M. Crystal
(D.C. Bar No. 446189)

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Avenue, Suite 700
Washington, DC 20009
202-588-5206
hcrystal@meyerglitz.com

March 3, 2011                                      Attorney for the Public Health Intervenors

9