UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | )<br>)<br>)<br>) | |
| | ) | Civil No. 99-CV-02496 (GK) |
| v. | )<br>) | |
| PHILIP MORRIS USA INC.,<br>    f/k/a PHILIP MORRIS INC., et al.,<br>Defendants. | )<br>)<br>)<br>) | |

## UNITED STATES' REPLY IN SUPPORT OF ITS MOTION FOR CLARIFICATION REGARDING DEFENDANTS' OBLIGATION TO DISCLOSE DISAGGREGATED MARKETING DATA

**Defendants misunderstand what sort of data must be produced under the Court's Order**

Defendants do not recognize the mismatch between the data they give the FTC and what the Court has ordered regarding disaggregating marketing data. Their response brief makes clear that they intend—if the Court lets them—to shrink the disaggregated marketing data the Court intended be no more than precisely the limited data they have historically given the FTC. Because the data that Defendants give the FTC is not sufficient to accomplish the Court's objective of ensuring transparency in "Defendants' marketing efforts, particularly those directed towards youth, and what effect such efforts are having," *United States v. Philip Morris USA Inc.*, 449 F. Supp. 2d 1, 932 (D.D.C. 2006), *aff'd in part & vacated in part*, 566 F.3d 1095 (D.C. Cir. 2009) (per curiam), *cert. denied*, 561 U.S. ___, 130 S. Ct. 3501 (2010), the United States respectfully urges the Court to grant the United States' motion for clarification.

The Court's Final Decision and Glossary overstate how much data the Defendants give the FTC. The Glossary defines "Disaggregated Marketing Data" thus:

> **Disaggregated Marketing Data:** Data that has been broken down by type of marketing (including sales data), brand, geographical region (to the smallest level of geographic specificity maintained by each Defendant), type of promotion or marketing used, number of cigarettes sold, advertising in stores and any other category of data collected and/or maintained by or on behalf of each Defendant. This breakdown of marketing data is required by the FTC but kept confidential. The FTC only publishes only the aggregated data.

449 F. Supp. 2d at 946-47. The Glossary's second sentence defines the data that the Court mistakenly understood that Defendants provide to FTC as including all of the data referred to in the first sentence. Similarly, the text of the Court's Final Decision mistakenly reflects that the FTC collects all of the disaggregated marketing data that the Court defined in its footnote on the relevant page. 449 F. Supp. 2d at 932 & n.90 (stating that "[t]he FTC requires Defendants to maintain disaggregated marketing data and to submit it at regular intervals, under strict confidentiality, pursuant to that agency's schedule for disclosure. . . . Disaggregated data is data broken down by type of marketing, brand, geographical region, number of cigarettes sold, advertising in stores, and any other category of data collected and/or maintained by or on behalf of each Defendant regarding their cigarette marketing efforts.").

Rather than acknowledge any ambiguity in these statements, Defendants' opposition twists itself into asserting that the Court defined "disaggregated marketing data" to *mean* the data that that they provide the FTC. Defs.' Resp. at 1-2 (mis-citing 449 F. Supp. 2d at pages 196 and 9; apparently referring to pages 932 and 947, respectively). Defendants imply that there is no mismatch between the Court's referring to disaggregated data as including sales and expenditure data disaggregated "by geographical location (to the smallest level of geographic specificity maintained by each Defendant)," 449 F. Supp. 2d at 946-47, and the data that Defendants actually give the FTC, which is not disaggregated by any geographic region. The undisputed evidence at trial was that the data collected by the FTC, "while disaggregated for company and

2

brand, is not disaggregated by geographic location." Eriksen (Remedies) WD 15:12-14 (R. 5371-1; filed 5/9/05); *see also id.* at 17:8-9 ("the tobacco companies do not provide any geographically disaggregated data to the FTC"). Defendants go out of their way to imply that they give the FTC all the marketing data the Court contemplated, emphasizing that the FTC requires "more than 50 data fields of information." Defs.' Resp. at 6. Although the data the FTC gathers has value, it is limited in scope, and in particular, it does not include any sales information broken down by "type of marketing," "geographic regional," or "type of promotion." 449 F. Supp. 2d at 932; *cf.* Exhibit 1 to this brief (furnishing a detailed explanation of the information Defendants do (and do not) provide the FTC).

It appears to the United States that the Court intended that Defendants would provide the United States with access to "[d]ata that has been broken down by type of marketing (including sales data), brand, geographical region (to the smallest level of geographic specificity maintained by each Defendant), type of promotion or marketing used, number of cigarettes sold, advertising in stores and any other category of data collected and/or maintained by or on behalf of each Defendant," because that is how the Court defined "disaggregated marketing data" in the first sentence of its Glossary. 449 F. Supp. 2d at 946-47. As Defendants explain, they take great care to prepare spreadsheets for the FTC that have only the specific disaggregated expenditure data the FTC requires; and then avoid generating any reports or analyses from those specific spreadsheets that (they believe) would be vulnerable to access by the United States under Paragraph 17. 3/3/11 Decl. of Brian Tharp, ¶¶ 7, 9-10 (R. 5882-1, Ex. 1; filed 3/3/10); 3/2/11 Decl. of R. Michael Leonard, ¶¶ 7, 9-10 (*id.* Ex. 2); 3/2/11 Decl. of Vincent M. Losito, ¶¶ 5-6 (*id.* Ex. 3). Due to this practice, Defendants read Paragraph 16 of the Court's remedial order to limit the United States to the information they give the FTC (which, as shown in Exhibit 1,

includes with expenditure information disaggregated by brand, but not by geographic region; includes sales information that is disaggregated only by brand, but not by geographic region or by marketing or promotional type; and does not include any evaluations or reports on the effectiveness of any of Defendants' marketing or promotional efforts). They say there are no "reports generated from such Disaggregated Marketing Data [to] be made available to the Government" under Paragraph 17; and they say that the marketing information subject to the Court's Final Order does not include "data broken down by type of marketing, brand, geographical region, number of cigarettes sold, advertising in stores, and any other category of data collected and/or maintained by or on behalf of each Defendant regarding their cigarette marketing efforts," 449 F. Supp. 2d at 932 n.90, or "[d]ata that has been broken down by type of marketing (including sales data), brand, geographical region (to the smallest level of geographic specificity maintained by each Defendant), type of promotion or marketing used, number of cigarettes sold, advertising in stores and any other category of data collected and/or maintained by or on behalf of each Defendant," *id.* at 946-47 (Glossary).

The fundamental disagreement between the parties requires clarification of the Court's Final Order. The clarification the Court expresses should be based upon the remedy that it envisioned—"to ensure transparency of Defendants' marketing efforts, particularly those directed towards youth, and what effect such efforts are having," 449 F. Supp. 2d at 932—and whether the Court intended that remedy to include "data broken down by type of marketing, brand, geographical region, number of cigarettes sold, advertising in stores, and any other category of data collected and/or maintained by or on behalf of each Defendant regarding their cigarette marketing efforts," *id.* at n.90.

In the United States' view, the Court should clarify the Final Order to ensure access to a wider, rather than narrower, body of information to effectuate the Court's stated goal of ensuring transparency—especially transparency about the *effect* "Defendants' marketing efforts . . . are having," "particularly those directed towards youth." 449 F. Supp. 2d at 932. The Court cited numerous internal analyses by Defendants about the effectiveness of their marketing. *See, e.g.*, 449 F. Supp. 2d at 588, ¶ 2756 (Philip Morris "Business Update," stating, "The growth in discount cigarettes is reducing our premium sales and we are not obtaining our historic share of entry-level adult smokers"; discussing strategies to "[a]ssure PM USA's long term prospects by obtaining our historic share amongst entry-level adult smokers"); *id.* ¶ 2757 ("Philip Morris USA 1994-1998 Plan Overview," providing disaggregated sales data showing that, in the Court's words, Marlboro's "share of young smokers was disproportionate to Marlboro's overall market share of 42%"); 614, ¶ 2875 (RJR "Marketing Plans Presentation," stating that "teenage smokers were 'tomorrow's cigarette business' and accounted for 'a key share of the total cigarette volume—for at least the next 25 years.'"); 638, ¶ 2985 (RJR "compilation of Camel market data that included data on twelve to seventeen year olds," including "Total Cigarettes Smoked Per Year—Underage," "Camel's Share-of-Market Among Underage Smokers," "Total Camels Purchased by Underage Smokers," and "Percentage of Camels Bought by Underage Smokers."); at 600, ¶ 2808 (B&W memorandum, reporting that "Kool has shown little-or-no-growth in share of users in the 26+ age group. Growth is from 16–25 year olds. At the present rate, a smoker in the 16–25 year age group will soon be three times as important to Kool as a prospect in any other broad age category.") (emphasis omitted); 663, ¶ 3127 (discussing Philip Morris document titled "Promotions," showing disaggregated spending data revealing that "Philip Morris's spending on Marlboro promotion at retail increased more than a hundred-fold between 1987 and 1997, and

5

then doubled again from 1997 to 2000" (citing 2085296400-6461 at 6412 (U.S. 45702); same trial exhibit discusses "What were the characteristics of Adventure Team [Marlboro marketing] that led to it[]s success?", U.S. 45702 at 6410)).

The data the Defendants collect and analyze also allow them to generate numerous reports and analyses; Defendants are able, for example, to evaluate "The Changing Geography of Menthol and the Threat Posed by Newport," 449 F. Supp. 2d at 585, ¶ 2744 (Philip Morris), to conduct a "Regional Analysis of 18-28 Year Old Women," *id.* at 591, ¶ 2767 (Philip Morris), to determine "the dominant entry brand in the inner city," *id.* at 595, ¶ 2788 (Lorillard), and to segment marketing efforts by "Priority Regions" versus "Other Regions," *id.* at 615, ¶ 2882 (RJR). But the marketing expenditure data that Defendants give the FTC is broken down only by brand, not by geography; the sales data that Defendants give the FTC is not broken down either by geography or by marketing or promotion type; and the information the Defendants give the FTC includes no reports or evaluations of the effectiveness of Defendants' marketing efforts.

**Defendants mistakenly read the Order to limit the data produced**

This mismatch between the data obtained by the FTC and the data required by the United States to verify Defendants' compliance with the Final Order, discussed above, is only exacerbated by Defendants' limited reading of who can review the data required under the Final Order "[i]n order ensure transparency of Defendants' marketing efforts, particularly those directed towards youth, and what effect such efforts are having." 449 F. Supp. 2d at 932. Defendants give no substantive reason that this information should be confined to the United States' lawyers and their supporting personnel in the Justice Department, without the ability to consult with economic, marketing, communications, statistical, and other experts in other Executive Branch components, or even Department of Justice expert witnesses. We note that

Paragraph 19 of the Court's Final Order already provides that people with access to the data will be bound by the confidentiality requirements of Order #7 and Order #36.

Finally, Defendants mistakenly read the Final Order's requirement to provide access to disaggregated data "for a period of ten years from the date of this Final Judgment and Remedial Order," Paragraph 16—stayed at their request on appeal from 2006 through 2010—as requiring them to provide access only for the next six years.  The Court should order each Defendant to provide access to the data they provide the FTC for ten years from the dates they first did so in late 2010, following the D.C. Circuit's remand to this Court; and for whatever additional marketing data the Court clarifies are subject to its Order for ten years from the date of the Court's order on the United States' clarification motion.

Dated: March 14, 2011          Respectfully submitted,
       Washington, D.C.
                                      TONY WEST
                                      Assistant Attorney General

                                      EUGENE M. THIROLF, Director
                                      Office of Consumer Litigation

                                      ___/s/_____
                                      DANIEL K. CRANE-HIRSCH
                                      Trial attorney
                                      Office of Consumer Litigation, Civil Division
                                      United States Department of Justice
                                      PO Box 386
                                      Washington, DC 20004-0386
                                      Telephone: 202-616-8242
                                      Facsimile: 202-514-8742
                                      E-mail address: daniel.crane-hirsch@usdoj.gov

**Exhibit 1—Summary of Data Collected by FTC**

The FTC requests a spreadsheet providing marketing expenditure information at the brand level, and sales data for each variety within a given brand. FTC Order to File Special Report (enclosure to 2/17/10 ltr., Modell to Keane, Ex. A to 3/3/11 Brian Tharp Decl.), at 5. Each company thus gives the FTC a spreadsheet with a row giving sales information for each cigarette variety it sells, and a row giving marketing expenditure information for each of its brands. The first five columns are the year for which information is provided, the company code for the company providing the information, the company's 2-digit code for the brand, the company's 2-digit code for the variety within the brand, and the number of cigarettes within each pack of the relevant variety. *Id.* at 6-7 (fields 1-5). The next eight fields define the variety, with fields for the brand name, length, filter, packaging, strength, flavor, style, and other variations. *Id.* at 7 (fields 6-13). The next three fields call for the number of cigarettes sold and given away, and the dollar value of the cigarette sales. *Id.* at 7-8 (fields 14-16). Companies are instructed to enter "0" in the next column (used by the FTC to calculate variety unit sales). *Id.* (field 17). The next four fields call for variety information similar to that gathered in fields 6-13, with columns to specify length and to provide codes for filter, flavor, and packaging. *Id.* (fields 18-21). After a column to provide the date the variety was last sold (if the variety was discontinued during the year being reported on) come three fields to record tar, nicotine, and carbon monoxide. *Id.* (fields 22-25).

There are 28 fields to gather marketing expenditure information (as noted above, only at the brand level, rather than for each specific variety, *id.* at 5). There are 26 fields for different types of marketing expenditures, dubbed "Category-A Expenses" through "Category-Z Expenses," followed by a "Total Reportable Expenditures" column that adds Categories A

through Category Z, and then a column asking for expenditures on sports and sporting events. *Id.* at 9-13 (fields 26-53).

The last half-dozen columns include two columns that ask whether the variety's pack disclosed its tar and nicotine ratings, followed by two columns in which companies are directed to enter "0" (used by the FTC to calculate brand unit sales and brand dollar sales). *Id.* at 13-14 (fields 54-57). The final two fields collect additional variety-specific identifier data. *Id.* at 14 (fields 58-59).