UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 99-CV-2496 (GK) |
| ) | Next scheduled court appearance: NONE |
| and ) | |
| ) | |
| TOBACCO-FREE KIDS ACTION FUND, ) | |
| *et al.*, ) | |
| ) | |
| Plaintiff-Intervenors, ) | |
| ) | |
| v. ) | |
| ) | |
| PHILIP MORRIS USA, INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**PUBLIC HEALTH INTERVENORS' REPLY TO DEFENDANTS' RESPONSE TO
THE GOVERNMENT'S PROPOSED CORRECTIVE STATEMENTS**

Asserting that the Government's proposed corrective statements are "inflammatory,"

"vilifying " and "inaccurate,"  Def. Rep. to Gov'ts. Proposed Corr. Stmts. ("Def. Resp.") (DN

5881) at 1-2, Defendants urge the Court to vacate its corrective statements remedy in this case,

or, at minimum, to require Defendants simply to issue the warnings already mandated by the

Family Smoking Prevention and Tobacco Control Act ("Family Smoking Prevention Act"), Pub.

L. No. 111-31, § 201(a), 123 Stat. 1776 (June 22, 2009).  The Defendants mischaracterize the

proposed corrective statements and are blind to the factual record upon which they are based.

The Court should reject Defendants' arguments, which are based on false premises

concerning the Court's authority in fashioning appropriate corrective statements, and ignore the

extraordinary factual record and context in which they are being Ordered to make these

statements.  In light of an overwhelming evidentiary record demonstrating Defendants' massive

campaigns of deception, the proposed statements are factual, accurate, and "sufficiently narrowly tailored to achieve a substantial Government interest." *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1144 (D.C. Cir. 2009).

After an extensive trial and thousands of factual findings, the Court has concluded that Defendants engaged in a decades-long campaign to, *inter alia*, "repeatedly, consistently, vigorously – and falsely – den[y] the existence of any adverse health effects from smoking," Finding of Fact ("FF") ¶ 824; *see also* Int. Resp. to U.S. Submission ("Int. Resp.") (DN 5883) at 3 and n.4 (highlighting findings on multiple deceptive campaigns).  Given these conclusions, *directly worded* corrective statements – *i.e.*, the statements proposed by the Government, and the Intervenors' proposal for second-hand smoke – are absolutely necessary to prevent and restrain Defendants' concerted efforts to "lie[ ], mis-represent[ ], and deceive[ ] the American public" regarding the adverse health effects of smoking, secondhand smoke, and "light" cigarettes, the nature of addiction, and their manipulation of nicotine levels to maximize addiction.  *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 852 (D.D.C. 2006).  While, at every turn, Defendants seek to relitigate the merits of this case, the Court has concluded not only that Defendants committed large scale RICO violations, but that these companies – most of which the Court found continue to have largely the same corporate officers (*e.g.* FF ¶ 4078-4082) – will continue to do so.  *Philip Morris USA, Inc.*, 449 F. Supp. 2d at 909-10.  In this context, the proposed statements are "sufficiently narrowly tailored" to "achieve [the] substantial government interest[s]" at stake,  *Philip Morris USA, Inc.*, 566 F.3d at 1144, while Defendants alternatives plainly are not.

2

As further explained below, Defendants' efforts to portray the proposed statements as factually inaccurate – and otherwise to attack the Government's Expert Report – are completely unavailing.  Each proposed statement is supported by the overwhelming factual findings made in this case.  Defendants also put forward no sound reason for the Court either to reject the conclusions in the Government's Expert Report, or to allow Defendants to continue to delay this process with unnecessary discovery and further proceedings.

## DISCUSSION

**A.**   **Defendants Misstate The Appropriate Legal Standard.**

This Court has broad discretion in fashioning corrective statements in this case. Defendants' heavy reliance on past cases considering corrective statements is a red herring. Unlike in *any* of those cases, this Court has found that Defendants engaged in a decades-long campaign of *deliberate fraud*.  *See, e.g. Philip Morris, USA, Inc.*, 449 F. Supp. 2d at 852 (finding that "Defendants lied, mis-represented, and deceived the American public . . . about the devastating health effects of smoking and environmental tobacco smoke, they suppressed research, they destroyed documents, they manipulated the use of nicotine so as to increase and perpetuate addiction, they distorted the truth about low tar and light cigarettes so as to discourage smokers from quitting, and they abused the legal system").  Moreover, the Court found that the evidence "clearly establishes" that this fraud "*continues to this day*."  *Id.* at 910 (emphasis added).

The cases on which Defendants rely concerned no such findings; rather the corrective statements were designed simply to correct inaccurate information, without any findings of deliberate deception or fraud.  *E.g. Warner-Lambert Co. v. F.T.C.,* 562 F.2d 749, 763-64 (D.C.

Cir. 1977); *Novartis Corp. v. F.T.C.*, 223 F.3d 783, 786 (D.C. Cir. 2000). It was precisely because there was no evidence of deliberate deceit that the Court in *Warner-Lambert* determined that the introductory phrase, "contrary to prior advertising" was not appropriate, because it suggested that the defendant had deliberately misled consumers. 562 F.2d at 762-63.

On the other hand, the D.C. Circuit specifically noted that such language "might be called for *in an egregious case of deliberate deception*," *id.* – precisely what has happened in this case, where there is overwhelming evidence that Defendants *did* deliberately mislead consumers, and potential consumers (particularly youth) in myriad ways. The companies were not found responsible just for making a deadly product; they were found to have *deceived consumers* about the product. They were not found responsible just for making an addictive product; they were found to have *denied that it was addictive*. They were not found responsible just for making a product that harmed non-smokers; they were found to have *denied that harm*. In this context, under *Warner-Lambert*, it is entirely appropriate – and necessary – for the corrective statements to not only tell the truth, but to include introductory statements explaining the deceptions that the corrective statements are designed to address.

Indeed, in light of the Court's extensive factual findings, if this is not a case where the "deliberate deception[s]" at issue are so egregious as to warrant the prefatory statements proposed by the Government, there will never be such a case. *Warner-Lambert*, 562 F.2d at 763. In short, while Defendants complain mightily that the proposed statements are "wholly unprecedented in American law," Def. Resp. at 9, not only has the Court of Appeals for this Circuit sanctioned such corrective language in appropriate circumstances, Defendants ignore entirely that their *massive campaign of deception is unprecedented*. Accordingly, under *Warner-*

4

*Lambert* and this Court's extensive findings – all of which have been affirmed by the Court of Appeals – such statements are necessary to correct the deceptions that have occurred and prevent and restrain further misconduct.[1]

Defendants also place far too much emphasis on the Supreme Court's characterization of a state law in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985), where the Court noted that the state law required an attorney "to include in his advertising purely *factual and uncontroversial* information about the terms under which his services will be available." *Id.* (emphasis added).  The D.C. Circuit's reference to this language, 566 F.3d at 1144, does not mean that the Court is somehow limited to "noncontroversial" statements with which all the parties, including Defendants, agree.

Rather, as the Court articulated in *Zauderer*, and the D.C. Circuit reiterated, the appropriate legal test is whether the required statements are "reasonably related to the [governmental] interest."  471 U.S. at 651; *see also Philip Morris USA, Inc.*, 566 F.3d at 1143 (explaining that "the Supreme Court's bottom line is clear: the government must affirmatively demonstrate its means are 'narrowly tailored' to achieve a substantial government goal").

---

[1]    It also bears emphasizing, in comparing the corrective statements remedy here to that in *Warner-Lambert*, that the *scope* of the corrective advertising there was delimited by the scope of the misstatements over a ten year period, which translated into $10 million of advertising.  562 F.2d at 752, n.1.  This reinforces the highly *limited* scope of this Court's corrective statements remedy, which will not even begin to approach Defendants' annual marketing expenditures.  FF ¶ 2639 (discussing more than $12 billion in annual marketing); *see also Warner-Lambert*, 562 F.2d at 771 (approving approach of "tying the quantity of correction required to the investment in deception"); *accord Novartis Corp.*, 223 F.3d at 786 (requiring corrective statements to continue until company "has expended on Doan's advertising a sum equal to the average spent annually during the eight years of the challenged campaign").

Here, the D.C. Circuit already has already reviewed the Court's findings, and recognized the Government's strong interest in these statements, in light of findings that (a) "for over fifty years, Defendants violated RICO by making false and fraudulent statements to consumers about their products," and (b) Defendants are "reasonably likely to commit similar violations in the future." *Id.* at 1144. In this context, the proposed corrective statements fall well within the Court's broad discretion. *See also Warner-Lambert*, 562 F.2d at 769 (rejecting First Amendment arguments because "reality counsels that such advertisements cannot be viewed in isolation; they must be seen against the background of over 50 years in which Listerine has been proclaimed – and purchased – as a remedy for colds").[2]

## B.   The Proposed Corrective Statements Are Not Controversial.

Relying on tobacco decisions from other cases, Defendants argue that the proposed corrective statements are improperly controversial because Defendants have been found not liable for fraud in other fora. Def. Resp. at 10-11. This argument is also without merit.

This Court made thousands of findings regarding Defendants' massive campaigns of deception over decades, a campaign that continues to this day. None of those findings was disturbed on appeal. It is thus irrelevant that Defendants have managed to escape liability for their misconduct in *other* cases, where their deceptions may have succeeded. In sum, the relevant question here is whether, in light of *this* Court's findings, the proposed statements are

---

[2]     The recent Fifth Circuit decision cited by Defendants, Def. Resp. at 14, does not support any different result, since that case also involved no deliberate misconduct. *Pub. Citizen v. La. Att'y Disciplinary Bd.*, 2011 WL 285226 (5th Cir. Jan. 31, 2011) (considering challenge to Louisiana rules for attorney advertising); *see also United States v. Nat'l Soc. of Prof. Eng'rs.*, 555 F.2d 978 (D.C. Cir. 1977) (cited at Def. Resp. at 22, but also involving no deliberate misconduct).

appropriate, not whether – as Defendants would have it – jurors or judges in other cases reached the same conclusions.

Moreover, these arguments – that Defendants "vigorously disagree" with the Court's findings, Def. Resp. at 4, and have convinced, and will continue to try to convince, others that they have *not* engaged in any misconduct – simply reinforce the need here for the *strongest possible* corrective statements.  It would be one thing if Defendants demonstrated that, in light of certain, specific institutional reforms they were *less likely* to continue their deceptions in the future.  But, to argue that strong statements are inappropriately "controversial" because *Defendants* continue to dispute the Court's underlying findings – and may have succeeded in deceiving others that the massive campaign of deception that this Court found does not really exist – only serves to highlight that Defendants *will continue* to engage in the same activities (since they apparently do not believe they have done anything wrong) unless this Court, under its authority to impose all "appropriate orders," 18 U.S.C. § 1964(a), requires, *inter alia*, corrective statements that will successfully serve to "thwart[] prospective efforts by Defendants to either mislead consumers or capitalize on their prior deceptions by continuing to advertise in a manner that builds on consumers' existing misperceptions." *Philip Morris USA, Inc.*, 566 F.3d at 1145; *see also Warner-Lambert*, 562 F.2d at 759 ("under certain circumstances an advertiser may be required to make affirmative disclosure of unfavorable facts").

**C.**     **The Proposed Corrective Statements Are Factually Accurate.**

Defendants' complaints about factual accuracy are also misplaced.  Intervenors' opening brief provided the Court with a citation for every assertion included in the proposed statements. Int. Resp. at 8, 13-14, 21.  Defendants' objections to particular language in certain of the statements have no merit.

For example, Defendants complain that the statement "Smoking kills 1,200 Americans. Every day" is false because it "is based on a rough estimate of the number of Americans who die each year from smoking-related illnesses, not each day."  Def. Resp. at 18.  But the Court has already concluded that smoking "kills 440,000 Americans every year, or *more than 1,200 every single day*."  *Philip Morris USA, Inc.*, 449 F. Supp. 2d at 855 (emphasis added).

Moreover, any corrective statement must appropriately balance the quantity of information relayed with the reader's ability to absorb the message.  Here, Defendants plainly would prefer additional, immaterial "facts" that will inevitably diminish the "impact," Def. Resp. at 18, of the message, and thus its effectiveness at restraining Defendants from continuing their deceptions regarding the adverse health effects of smoking.  In any event, the Court and parties are left to guess what version of this statement Defendants would find acceptable, since they offer no alternative other than the Court rejecting the Government's proposals *in toto*.[3]

---

[3]     On the other hand, the statement would be *more* effective if it read, "Smoking *murders* 1,200 Americans every day."  Defendants would no doubt complain that this is even more inappropriate, but the fact that the proposed statement is more tame only demonstrates that the proposal finds the right balance between immaterial factual "accuracy" and the effectiveness of the message.  As Intervenors have noted, none of the Government's proposed statements are as hard-hitting as those originally proposed by Intervenors.  Int. Resp. at 2, n.2.

Defendants lodge a similar objection to a number of other proposed statements, contending that the statements are impermissible without additional "context," such as specific "time periods." Def. Resp. at 12. However, again, providing a host of additional details will only serve to diminish the *effectiveness* of the statements. Since the statements are factual, and tell the readers the essential facts they need in order to thwart Defendants' efforts at continuing their deceptions, nothing more is needed.

Defendants also complain about the statement "We manipulated cigarettes to make them more addictive." Def. Resp. at 18. To Defendants this is the same as saying, "Defendants spike cigarettes with additional nicotine." *Id.* But of course, that is not what this statement says, and the fact that Defendants manipulated the nicotine content in cigarettes to make them more addictive is also supported by many of the Court's factual findings. FF ¶ 1366-1763; FF ¶ 1759 ("As established by the Findings of Fact set forth in this section, cigarette company Defendants researched, developed and implemented many different methods and processes to control the delivery and absorption of the optimum amount of nicotine that would create and sustain a smoker's addiction").[4]

The introductory phrases to the proposed statements – which are vitally important, *see supra* at 4 – are also entirely factual. While Defendants object to the introductory statement "We told Congress under oath that we believed nicotine is not addictive," Def. Resp. at 18, they do not disagree with the indisputable fact that this *is* what they told Congress; rather they complain the

---

[4]        Defendants' assertion that it is inappropriate to call cigarettes a "nicotine deliver device," Def. Resp. at 19, is also off the mark in light of the Court's findings. *E.g.* FF ¶ 829 ("cigarettes are drug delivery devices"); FF ¶ 882 ("cigarettes are a nicotine delivery device").

statement is inaccurate because this Court did "*not* find this testimony to be fraudulent . . . ." *Id.* (emphasis in original).

The audacity of this argument is stunning.  The Court made *hundreds* of factual findings that smoking is addictive; that Defendants *knew* smoking was addictive; and that they not only publicly denied this fact, but also "concealed and suppressed research data and other evidence that nicotine is addictive." *Philip Morris USA, Inc.*, 449 F. Supp. 2d at 289; *see also* FF ¶ 1266 ("Defendants intentionally withheld from the public health community, and from government authorities, accurate and important information regarding the addictiveness of nicotine in cigarettes").  The Court also made findings about this very Congressional testimony.  FF ¶ 1706-1730; *E.g.* FF ¶ 1707 (Philip Morris CEO "denied that nicotine is addictive, denied that Philip Morris research establishes that smoking is addictive, and denied that Philip Morris manipulates the amount of nicotine contained in cigarettes").  Based on these findings – affirmed on appeal – this statement also is entirely accurate.[5]

The first introductory statement – "A Federal Court is requiring tobacco companies to tell the truth about cigarette smoking.  Here's the truth" – is also entirely factual.  Intervenors certainly understand that Defendants do not want the public to know that they are only telling

_____

[5]    Although Defendants also complain that telling readers that "nicotine actually changes the brain" is inappropriate, Def. Resp. at 13, n.3, this also ignores the Court's findings. FF ¶ 836 (explaining "changes in the brain's structure" from smoking, whereby an individual "becomes tolerant to the effects of nicotine and needs even greater amounts of it to produce the same effects").  This problem permeates many of Defendants' objections. *Compare, e.g.,* Def. Resp. at 19 (complaining about statements that Defendants "control nicotine delivery to create and sustain smokers' addiction" and "add chemicals, such as ammonia" to cigarettes) *with* FF ¶ 1366 ("Defendants have designed their cigarettes to precisely control nicotine delivery levels"); FF ¶ 1368 ("Other cigarette design features used by Defendants to control nicotine delivery include filter design, paper selection and perforation, ventilation holes, leaf blending, and use of additives (such as ammonia) to control the PH of cigarette smoke").

these truths because a Court is requiring them to do so, but *that is a fact*, based on thousands of findings. *See Warner-Lambert*, 562 F.2d at 759 ("under certain circumstances an advertiser may be required to make affirmative disclosure of unfavorable facts").[6]

**D.      Defendants' Attacks On The Government's Expert Report Are Groundless.**

> **1.      The Report Supports The Government's Proposals.**

Contrary to Defendants' arguments, the Government's Expert Report supports each of the proposed statements. Defendants' complaint that the Government failed to test the statements mandated by the Family Smoking Prevention Act, Def. Resp. at 15-16, is particularly ironic. As Defendants note, the new statute establishes measures for "encouraging consumers to quit smoking or to stay quit." Def. Resp. at 15; *see also* Family Smoking Prevention Act, § 3(a) (setting forth purpose "to promote cessation to reduce disease risk and the social costs associated with tobacco-related diseases"). Had the Government proposed the statute's warnings as corrective statements here, Defendants would no doubt have argued against them on the grounds that they seek to achieve an impermissible cessation objective. *See* Def. Resp. at 15 (complaining that aspects of the proposed statements are "no different from the type of 'cessation' remedy that both this Court and the D.C. Circuit rejected"). In short, the new

---

[6]      The fact that, "by the terms of this Court's injunction," Defendants are already required to "tell the truth," Def. Resp. at 9, is also irrelevant, given that the Court has concluded that Defendants' deceptions are likely to continue. *Philip Morris USA, Inc.*, 449 F. Supp. 2d at 909-10; *see also Warner-Lambert*, 562 F.2d at 753 (enjoining the misconduct in addition to requiring corrective statement).

Congressional warnings serve a very different purpose than the corrective statements required here.[7]

Intervenors have already explained the importance – and appropriateness – of the introductory portions of each statement. *Supra* at 9-11. Defendants' objection that these portions are too "marginally effective" to be warranted, Def. Resp. at 14, is not supported by the Expert Report, which largely discusses the efficacy of each *entire statement*, not individual parts.

Defendants' objection to the Government's consideration of the *effects* of the proposed statements on the reader's future behavior, Def. Resp. at 15, is also off the mark. The Report makes clear that the primary purpose of the statements is to "capture attention, enhance accurate knowledge, have positive public impact, and reduce the likelihood that consumers will believe potential future misrepresentations about the topics the court identified." Expert Report ¶ 43. These are precisely the metrics needed to insure the corrective statements are effective at restraining further fraud. *See Philip Morris USA, Inc.*, 566 F.3d at 1145 (corrective statements should "thwart[] prospective efforts by Defendants to either mislead consumers or capitalize on their prior deceptions by continuing to advertise in a manner that builds on consumers' existing misperceptions").

---

[7]    It was also entirely appropriate for the Government to use the Surgeon General's warning as a control for all of the statements tested, which effectively allowed the proposed statements to all be tested against one another. This well-accepted methodology avoids order effects and other problems that would make results difficult to interpret, and is a standard method for testing various versions of communications. *See, e.g.*, Frederic F. Brunel & Michelle R. Nelson, "Message Order Effects and Gender Differences in Advertising Persuasion," 43 J. Advertising Res. 330 (2003) (describing effects resulting from the order in which messages are presented to research subjects). In addition to testing each statement on each topic against the same control, the researchers also had respondents rank all of the statements on each topic on an overall basis, thus providing a direct comparison of the versions considered.

The fact that the Government also sought to insure that corrective statements "are not likely to cause negative unintended consequences in the population," *id.*, can hardly be considered a flaw, as Defendants assert.  Def. Resp. at 15.  While the corrective statements should be effective for their *intended* purpose, it is also entirely appropriate to insure that they do not have unintended consequences, such as increasing the risks of smoking.  *See*, *e.g.,* Melanie Wakefield, *et al.*, *Effect of Televised, Tobacco Company-Funded Smoking Prevention Advertising on Youth Smoking-Related Beliefs, Intentions, and Behavior*, 96 Am. J. Pub. Health 2154, 2158 (2006) (finding that youth exposure to "tobacco company parent-targeted advertising . . . was associated with lower perceived harm of smoking, stronger approval of smoking, and a higher likelihood of having smoked in the past 30 days").

Finally, Defendants also erroneously claim that the Expert Report reveals Defendants' 2006 proposed statements to be superior to those proposed.  Def. Resp. at 16-17.  However, in making this arguments Defendants focus on single components of a multi-component analysis.  Thus, for example, it matters not that, comparing the Philip Morris and "Intervenors"[8] proposed statement on addictiveness (Statement B), 12% more people indicated that Philip Morris's language would lead them to "not believe the opposite claim."  Expert Report, Appendix C2-4 (Table 4B).  As the Expert Report explains, the "Intervenors" proposed statement on this topic was recommended because it was "significantly stronger than the control on garnering attention"; "had the second highest global ranking"; and "was positively associated with behavioral intentions . . . ."  Expert Report ¶ 228; *see also id.* ¶ 196 (finding a 65% reduction in "intentions

---

[8]   As we have explained, the Report's references to "Intervenors'" proposed statements are modified versions of the statements Intervenors proposed in 2006.  Int. Resp. at 2, n.2.

to quit" associated with Philip Morris's statement).  Thus, looking at *all* the measures considered, the Government appropriately rejected Philip Morris's 2006 proposal.[9]

Similarly, as to Defendants' objection to the chosen statement for light and low-tar (Statement C), Def. Resp. at 16-17, while other statements scored the same or better on other metrics, the Government chose the "Intervenors" statement because only that statement "had the potential to increase knowledge in current smokers and in low income populations," and "Intervenors statement far outranked" the others in the qualitative phase.  Expert Report ¶ 229. Thus, looking at the pertinent analyses as a whole, rather than fragmented details to which Defendants point, it is evident that the Government's proposals are well-supported.

### 2. The Court Does Not Need An Evidentiary Hearing To Impose Corrective Statements.

Defendants' claim that the Government is seeking to "prolong this litigation," Def. Resp. at 17, is highly disingenuous, given Defendants' argument that there must be an evidentiary hearing before the Court may impose corrective statements – especially in conjunction with the fact that Defendants *neither* proposed any corrective statements for the Government to test, *nor* put forward any alternative statements for the Court to consider.  In any event, none of Defendants' arguments for an evidentiary hearing to resolve factual disputes, Def. Resp. at 28-29, has any merit.

---

[9]     Even as to that one metric the Report does not conclude that "[m]ore people believed PM USA's proposed corrective statement on the addictiveness of nicotine than [proposed] Statement B," as Defendants claim.  Def. Resp. at 16.  Rather, the Table Defendants cite simply discusses which statement is most likely to result in a reader not believing an *opposite* claim.  Expert Report, Appendix C2-4 (Table 4B).

The Court needs no evidentiary hearing to determine whether the proposed statements are factual; while Defendants would no doubt like to relitigate this case, the Court's findings – and unassailable scientific studies in the record – amply support the statements as proposed.  *Cf. Philip Morris USA, Inc.*, 566 F.3d at 1138-39 (rejecting Defendants' arguments for additional hearings on remedial issues).

Defendants are also not entitled to an evidentiary hearing on whether there is a "less burdensome" approach than the proposed corrective statements.  Def. Resp. at 28.  As we have explained, the Court has broad discretion in ordering corrective statements, and determining precisely what is appropriate does not require any more fact-finding.  Indeed, in ordering corrective statements in other contexts, agencies and courts have not held *separate* evidentiary hearings on the ideal statements; rather, they have relied on the existing evidentiary record to determine which statements were appropriate.  *See, e.g., Warner-Lambert*, 562 F.2d at 752 (discussing single evidentiary hearing prior to ruling); *Novartis*, 223 F.3d at 785-86 (same).[10]

Finally, Defendants offer no basis for an evidentiary hearing on the reliability and validity of the Expert Report.  As on appeal, Defendants point to no specific "factual disputes they would [address]" in an evidentiary hearing.  *Philip Morris*, 566 F.3d at 1138-39.  In short, their generic plea for more process should not delay this Court's resolution of the corrective statements remedy.

---

[10]     Indeed, in this case Defendants were already provided a "fourteen day, fully briefed remedies trial, at which thirteen witnesses testified and were subject to cross-examination, including at least one Government witness who testified about corrective statements" *Philip Morris USA, Inc.*, 566 F.3d at 1139.  No more evidentiary hearings are necessary.  *Id.* (concluding that there is "no reason to believe Defendants in this case – who enjoyed pre-trial notice and a lengthy remedies trial, and have shown no prejudice – suffered from a denial of due process").

**E.**   **Defendants' Remaining Objections Also Have No Merit.**

The D.C. Circuit has already rejected Defendants' arguments, repeated here, that corrective statements are somehow punitive or otherwise fail to prevent and restrain further RICO violations.  Def. Resp. at 23-24.  Thus, in response to the argument that corrective statements are impermissible "because they seek to correct Defendants' campaign of deceptive marketing,"  *Philip Morris USA, Inc.,* 566 F.3d at 1139, the Court of Appeals explained that, "requiring Defendants to issue corrective statements will prevent and restrain them from making fraudulent public statements on smoking and health in the future."  *Id.* at 1140; *see also id.* ("Requiring Defendants to reveal the previously hidden truth about their products will prevent and restrain them from disseminating false and misleading statements, thereby violating RICO, in the future").[11]

Defendants' remaining First Amendment objections get them no farther.  The D.C. Circuit has already determined that the standards for commercial speech apply here, since "Defendants disseminate their fraudulent representations about the safety of their products, both in formats that do and those that do not explicitly propose a particular commercial transaction, in attempts to persuade the public to purchase cigarettes."  *Philip Morris USA, Inc.*, 566 F.3d at 1144.[12]

---

[11]   Defendants' complaint that these statements are an impermissible "punitive sanction [that] cannot be imposed in the absence of the procedural protections applicable in a criminal trial," Def. Resp. at 25-26, also seeks to relitigate issues Defendants already lost. *United States v. Philip Morris USA, Inc.*, 273 F. Supp. 2d 3 (D.D.C. 2002) (rejecting Defendants' arguments for a jury trial).

[12]   Strict scrutiny does not apply here, Def. Resp. at 21, n.7, as the Court of Appeals has already determined that the standards for commercial speech are applicable.  566 F.3d at 1142-1145.

Thus, as noted, the D.C. Circuit articulated the appropriate standard as whether "the remedy is sufficiently narrowly tailored to achieve a substantial government interest – in this case, preventing Defendants from committing future RICO violations." *Id.* Recognizing Defendants' massive fraud, *id.* (explaining that "for over fifty years, Defendants violated RICO by making false and fraudulent statements to consumers"), the Court of Appeals expressly found that any statement "*addressing Defendants' false assertions is adequately tailored to preventing Defendants from deceiving consumers.*" *Id.* (emphasis added).

That is exactly what the proposed corrective statements do. Indeed, despite their hyperbole, Defendants do not actually contest much of the proposed statements, concurring that *seven* of the fourteen bullet points contained in the Government's proposal are not objectionable. *see* Def. Mem., Appendix (not objecting to: the first three bullets under Topic A; the first bullet under Topic B; both bullets under Topic C; and the one bullet under Topic E). As to these bullets, Defendants concede that they are satisfactory even under *their* standard. Since, as explained, the remaining statements are also entirely accurate, Defendants' objections should be rejected.[13]

Finally, Defendants' arguments for vacatur of the corrective statements remedy in light of the Family Smoking Prevention Act must also be rejected. As we will explain in detail in opposing Defendants' vacatur motion, that Statute – passed by a Congress very familiar with this Court's ruling – was not designed to substitute for this Court's remedial Order, and does not do so. Moreover, because the vacatur issues are being briefed on a separate schedule – with

---

[13]     Whether the proposed statements "shame and humiliate Defendants," Def. Resp. at 4, is of no moment, since the need for the statements is simply the result of their own decades-long unlawful behavior.

opposition briefs due April 4, 2011, *see* Order # 14 at 2 (DN 5878) – Defendants' arguments on this score are at best premature.

Defendants' particular argument that there should be no corrective statement for "light" and "low tar" cigarettes because they are banned by the Family Smoking Prevention Act, Def. Resp. at 24, is also entirely disingenuous, because Defendants continue to purvey their deadly "lights" products, albeit under a new name. Thus, as the Intervenors have previously noted, Defendants have responded to the ban on "light" and "low tar" cigarettes by informing retail stores and consumers that the same cigarettes can be found in the "colored packs." *See* Int. Sept. 7, 2010 Status Rep. (DN 5828) at 5. For example, consumers who previously smoked Marlboro Lights can now purchase "Marlboro Gold" and "Marlboro Silver." *See, e.g.* Duff Wilson, "Coded to Obey Law, Lights Become Marlboro Gold," N.Y. Times, Feb. 18, 2010 ("Marlboro Lights, the nation's best-selling brand, from Philip Morris, will be renamed Marlboro Gold, according to a flier the company recently sent to distributors. Likewise, Marlboro Ultra Lights will change into Marlboro Silver"). Indeed, "notes [were] placed on the last packs of Marlboro Lights reading, 'Your Marlboro Lights package is changing, *but your cigarette stays the same*,' and explaining, '[i]n the future, ask for Marlboro in the gold pack." Duff Wilson, "F.D.A. Seeks Explanation of Marlboro Marketing," N.Y. Times, June 17, 2010 (emphasis added). Other Defendants have similarly substituted their "lights" brands for colored brands. *Id.*; *see also* http://www.nytimes.com/imagepages/2010/06/18/business/18tobacco_1.html (graphic image of note inserted in packs) (last visited Mar. 16, 2011)

Particularly given this reality, there is no basis for even considering relieving Defendants of the Court Order for an appropriate corrective statement concerning "light" and "low tar"

cigarettes.  *See also*  FF ¶ 2209-2629; FF ¶ 2267-69 ("Defendants have known for decades that

there is no clear health benefit from smoking low tar/low nicotine cigarettes [but] [d]espite this

knowledge, Defendants extensively – and successfully – marketed and promoted their low

tar/light cigarettes as less harmful alternatives . . ..").  To the contrary, if the Court is going to

take into account developments since enactment of the Family Smoking Prevention Act in

crafting this statement, the Court should consider requiring Defendants to include language

explaining that cigarettes with colored names *also* are no healthier than regular cigarettes.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Public Health Intervenors urge the Court to adopt the

Government's proposed corrective statements for Topics A-D, and the Intervenors proposal for

Topic E.

Respectfully submitted,

/s/ *Howard M. Crystal*
Howard M. Crystal
(D.C. Bar No. 446189)
Katherine A. Meyer
(D.C. Bar No. 244301)

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Avenue, Suite 700
Washington, DC 20009
202-588-5206
hcrystal@meyerglitz.com

March 16, 2011                                              Attorneys for the Public Health Intervenors