# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA,    )

            )

          Plaintiff,    )     Civil Action No. 99-2496 (GK)

            )

         v.    )

            )

PHILIP MORRIS USA INC., *et al.*,    )

            )

         Defendants.    )

_____)

## DEFENDANTS' REPLY IN SUPPORT OF RESPONSE TO THE GOVERNMENT'S PROPOSED CORRECTIVE STATEMENTS

Defendants respectfully submit this Reply in support of their Response to the Government's Proposed Corrective Statements.[1]

The submissions of the Government and Intervenors confirm that the controversial, inflammatory, and factually unsubstantiated language of proposed Corrective Statements A – D is wholly unprecedented, unlawful under RICO, and patently unconstitutional. Indeed, neither the Government nor Intervenors are able to cite even a *single* case where a court has upheld corrective statements that require a defendant to confess that it has engaged in past wrongdoing. The cases and administrative orders on which the Government relies uniformly involve corrective statements in which a finding of wrongdoing is truthfully attributed to a court or

---

[1] Defendants file this reply pursuant to LCvR 7(d). The Government filed its proposed corrective statements and expert report under seal on February 4, 2011, without briefing in support of its proposed statements. D.E. 5858. Defendants and Intervenors filed their opening responses—the first briefs presenting legal arguments regarding the Government's proposed corrective statements—on March 3, 2011. D.E. 5881, 5883. The Government, Defendants, and Intervenors filed their replies to those opening responses on March 16, 2011. D.E. 5889, 5890, 5891. Defendants now file this reply in support of their opening response.

agency—for example, "'*The National Labor Relations Board* has found that we violated Federal labor law.'"  Gov't Reply 2 (quoting *Guardsmark, LLC*, 344 N.L.R.B. 809, 814 (2005)) (emphasis added).  Such statements are a far cry from those proposed by the Government in this case, which would compel Defendants in their own words to publicly confess past wrongdoing— including that "[w]e falsely marketed low tar and light cigarettes as less harmful than regular cigarettes to keep people smoking and sustain our profits," and that, "[f]or decades, we denied that we controlled the level of nicotine delivered in cigarettes."  In so doing, Defendants would be required to embrace factual findings that they strenuously dispute and with which numerous other triers of fact disagree.

These self-vilifying statements—which are unquestionably designed to shame and humiliate Defendants and which are pervaded by factual inaccuracies—are flatly at odds with the D.C. Circuit's mandate.  The court of appeals made clear that, in order to comply with the requirements of the First Amendment and RICO, any corrective statements ordered by this Court must be restricted to "'purely factual and uncontroversial information'" and aimed at prohibiting future RICO violations.  *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1144 (D.C. Cir. 2009).  Because proposed Statements A – D satisfy none of these requirements—and therefore violate not only the D.C. Circuit's mandate, but also the First Amendment, RICO, and due process—they should be rejected in their entirety.

## ARGUMENT

The Government must meet a heavy burden whenever it compels a person to speak because the First Amendment protects not only "the choice to speak" but also "the choice of what not to say."  *Pac. Gas & Elec. Co. v. Pub. Utils Comm.*, 475 U.S. 1, 16 (1986) (plurality opinion).  To confine any corrective statements within the narrow bounds of the First

Amendment and this Court's limited jurisdiction under Section 1964(a) of RICO, the D.C.

Circuit set forth three requirements:  The statements must be limited to "'purely . . .

uncontroversial information'"; they must be "'purely factual'"; and they must be "geared

towards thwarting prospective efforts by Defendants to either directly mislead consumers or

capitalize on their prior deceptions by continuing to advertise in a manner that builds on

consumers' existing misperceptions."  *Philip Morris USA Inc.*, 566 F.3d at 1144-45 (quoting

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985)).  The Government has not

met its burden of establishing that its proposed Statements A – D satisfy any of these stringent

requirements.

     **A.**     **Proposed Corrective Statements A – D Should Be Rejected Because They Are Legally Flawed In Numerous Respects.**

     The Government contends that the inflammatory and self-denigrating confessional

language of Statements A – D—which would compel Defendants to make public admissions of

past wrongdoing—is legally appropriate because various courts and administrative agencies have

required parties to disseminate public notices reciting the fact that they have been found to be in

violation of the law.  But the vast majority of decisions and administrative orders cited by the

Government did not analyze *any* First Amendment issues and therefore provide no guidance at

all on the constitutional infirmities in proposed Statements A – D.  *See Cooper Indus., Inc. v.

Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither

brought to the attention of the court nor ruled upon, are not to be considered as having been so

decided as to constitute precedents.") (internal quotation marks omitted).  In any event, the

statements to which the Government points are far different from those proposed here because

those statements uniformly make clear that it was an administrative agency or court that found

the violation and do not require the defendant itself to admit wrongdoing.  The statements in

those cases therefore are not even remotely as inflammatory and objectionable as the Government's proposed statements here.

In *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), for example, the Supreme Court affirmed an injunction that required the defendant newspaper to publish "a notice which shall fairly and fully apprise the readers thereof of the substantive terms of" a judgment finding that it had attempted to monopolize interstate commerce. *Id.* at 158 (Appendix); *see also id.* at 149, 157. The decision preceded modern precedent imposing restrictions on compelled speech and did not address whether the injunction was consistent with the freedom of speech guaranteed by the First Amendment. Moreover—contrary to the Government's characterization of the opinion—the newspaper was not required to state that it had engaged in "bold, relentless, and predatory commercial behavior" (Gov't Reply 6) but simply to convey "the substantive terms of th[e] judgment." 342 U.S. at 158; *see also id.* ("'Commencing fifteen (15) days after the entry of this judgment and at least once a week for a period of twenty-five weeks thereafter the corporate defendant shall insert in the newspaper published by it a notice which shall fairly and fully apprise the readers thereof of the substantive terms of this judgment.'").

Similarly, in *Conair Corp. v. NLRB*, 721 F.2d 1355, 1385-87 (D.C. Cir. 1983), the D.C. Circuit upheld an order requiring a company president to read to assembled employees a notice stating "the National Labor Relations Board found that we have violated the National Labor Relations Act." 261 N.L.R.B. 1189, 1199 (1982); *see also Monfort of Colo., Inc.*, 284 N.L.R.B. 1429, 1430 (1987) (same), *aff'd sub nom. United Food & Commercial Works Int'l Union, AFL-CIO v. NLRB*, 852 F.2d 1344 (D.C. Cir. 1988). The D.C. Circuit did not consider the First Amendment implications of the agency's order. In any event, an order requiring a company to inform the public that an administrative agency has found it violated the law is not even arguably

comparable to the corrective statements proposed by the Government, which would require

Defendants to admit, *in their own words*, that they lied to Congress under oath (Statement B);

"manipulated cigarettes to make them more addictive" (Statement B); "falsely marketed low tar

and light cigarettes as less harmful than regular cigarettes" (Statement C); and falsely "denied

[they] controlled the level of nicotine delivered in cigarettes" (Statement D).  Neither *Conair* nor

any other case cited by the Government and Intervenors upholds a requirement that a defendant

publicly confess that it has engaged in wrongdoing.[2]

Both the Government and Intervenors emphasize that *Warner-Lambert Co. v. FTC*, 562

F.2d 749 (D.C. Cir. 1977), noted that a corrective communication intended "to humiliate the

advertiser . . . might be called for in an egregious case."  *Id.* at 763.  But, apart from the fact that

the D.C. Circuit did not squarely consider the First Amendment and due process implications of

requiring a civil defendant to publicly confess past wrongdoing in that decision, the court *struck*

language from a corrective communication that would have required a manufacturer to admit

that prior advertising about its products was false—even though the manufacturer had included

the false claim in its advertising for *100 years*.  *Id.*  And because *Warner-Lambert* was an FTC

action, it did not address whether such a backward-looking punitive measure could be reconciled

---

[2]  The First Amendment defects in this confessional language are exacerbated by the fact that numerous aspects of the Government's Proposed Statements A – D are not supported by this Court's findings.  *See* Appendix to Defs.' Response.  For example, Statement B would require *all* Defendants to admit that their CEOs lied under oath when they testified before Congress that they believed that nicotine is not addictive.  However, the Government does not dispute that the Court made no finding that BATCo testified before Congress regarding its views on nicotine. *See* Defs.' Response 18 n.6.  Moreover, the Government acknowledges that the Court found the testimony of the other Defendants' CEOs at the 1994 Waxman Hearings to be constitutionally protected under the *Noerr-Pennington* doctrine.  Gov't Reply 22.  And while the Government points to other congressional testimony by certain Defendants on the topic of addiction, it is unable to identify *any* such testimony that was found by this Court to be false and fraudulent.  *Id.*

with RICO's requirement that any injunctive relief be limited to "prevent[ing] and restrain[ing]" *future* RICO violations.  18 U.S.C. § 1964(a).  The D.C. Circuit's decisions in this litigation make clear that such relief is not available under RICO.  *See United States v. Philip Morris USA Inc.*, 396 F.3d 1190, 1198 (D.C. Cir. 2005) (Section 1964(a) does not authorize a "backward-looking remedy focused on remedying the effects of past conduct").

The other cases cited by the Government are equally inapposite.  In *United States v. Bell*, 414 F.3d 474 (3d Cir. 2005), and *United States v. Schiff*, 379 F.3d 621 (9th Cir. 2004), the courts affirmed orders requiring the defendants to post on their websites preliminary injunctions that had been entered against them.  *See Bell*, 414 F.3d at 484-85; *Schiff*, 379 F.3d at 631.  Neither decision compelled the defendant to admit, in its own words, that it had engaged in wrongdoing. And, the FTC's order in *Daniel Chapter One*, No. 9329, 2010 WL 387917, *petition for review denied*, *Daniel Chapter One v. FTC*, 2010 WL 5108600 (D.C. Cir. Dec. 10, 2010), did not mandate that the petitioner disseminate a self-denigrating confession of past misconduct.  It instead required the company to state that "the Federal Trade Commission ('FTC') has found our advertising claims for these products to be deceptive."  Gov't Reply Ex. 3, at 7.

The remaining agency orders cited by the Government—none of which analyzes the First Amendment—are to similar effect.  *See, e.g.*, *Auto. Breakthrough Scis., Inc.*, 126 F.T.C. 229, 324 (1998) ("The Federal Trade Commission has determined . . . ."); *Brake Guard Prods., Inc.*, 125 F.T.C. 138 (1998) (same); *Sw. Sunsites, Inc.*, 105 F.T.C. 7, 189 (1985) ("[T]he Commission concluded . . . ."); *Parkwood Dev. Ctr.*, 347 N.L.R.B. 974, 978 (2006) ("The National Labor Relations Board has found . . . ."); *Cintas Corp.*, 344 N.L.R.B. 943, 944 (2005) (same); *Guardsmark, LLC*, 344 N.L.R.B. at 814; *Smithfield Packing Co.*, 344 N.L.R.B. 1, 18 (2004). Moreover, the audience for these statements was far more carefully selected than the

indiscriminate, nationwide distribution of the compelled public confessions that the Government proposes in this case. *See Auto. Breakthrough*, 126 F.T.C. at 317-18 (requiring that letters be mailed only to resellers and purchasers of brake products); *Brake Guard Prods.*, 125 F.T.C. at 259-60 (same); *Sw. Sunsites*, 105 F.T.C. at 189 (requiring that letters be mailed only to purchasers of land); *Amrep Corp.*, 102 F.T.C. 1362, 1698 (1983) (same); *Parkwood*, 347 N.L.R.B. at 978 (requiring that notice be posted only for company employees); *Cintas*, 344 N.L.R.B. at 944 (same); *Guardsmark*, 344 N.L.R.B. at 812; *Smithfield Packing*, 344 N.L.R.B. at 15-16.

Finally, the Government contends that in *United States v. Young*, Cr. No. 98-850M-01 (JMF), 2000 WL 1210869, at *3 (D.D.C. May 24, 2000), this Court "rejected the Defendant's First Amendment arguments and ordered her to advise her employer of her conviction and probation, principally in order to deter possible future uttering, forgery, or theft by false pretenses." Gov't Reply 10 n.6. Of course, the entire point of criminal prosecutions is to inflict punishment. And even there, the defendant was not required to confess guilt, but rather, simply to inform her employer that she had in fact been convicted and was in fact on probation. 2000 WL 1210869, at *4. That the Government is compelled to resort to criminal cases to support its proposed corrective statements underscores the fact that, in the civil setting, there is *no* authority supporting the use of corrective statements that compel a party to confess past wrongdoing in its own words. Imposing such a punitive sanction without the protections afforded to criminal defendants would violate the requirements of due process.

Nor do the statutory provisions invoked by the Government lend support to its unprecedented corrective statements. *See* Gov't Reply 9-10. Like the cases and administrative orders cited by the Government, those statutes and accompanying regulations merely require a

party to disclose the fact that a court or administrative agency has found it to be in violation of the law. *See, e.g.*, *id.* at 9 ("'The Administrator of the National Highway Traffic Safety Administration has decided that a defect which relates to motor vehicle safety exists in (identified motor vehicles) . . . .'") (quoting 49 C.F.R. § 577.6(b)(1), (b)(2)(i)).  While the First Amendment may tolerate statutory provisions that require public notification of court or agency findings, the First Amendment problems generated by the Government's proposed corrective statements—which would require Defendants to confess wrongdoing in their own words—are far more acute.  *See United States v. Nat'l Soc'y of Prof'l Eng'rs*, 555 F.2d 978, 984 (D.C. Cir. 1977) (the First Amendment prohibits "forc[ing] an association of individuals to express as its own opinion judicially dictated ideas"), *aff'd*, 435 U.S. 679 (1978).

The Government is also unable to reconcile its proposed corrective statements with the fact that numerous courts have rejected the findings of wrongdoing to which Defendants would be required to confess.  The fundamental unfairness of binding a party to findings that are inconsistent with those of other courts is reflected in the limitations that the Supreme Court has imposed on the doctrine of offensive nonmutual collateral estoppel, which is not available where the findings in question contradict those of other fact-finders.  *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330 (1979) ("Allowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant.").  It is for precisely that reason that courts that have considered the question have uniformly refused to give collateral estoppel effect to this Court's findings.  *See* Defs.' Response 11.  Yet, the Government's proposed corrective statements would compel Defendants to admit to the world wrongdoing that other courts have

declined to find, either independently on the basis of their own factfinding after trials *or* derivatively by virtue of the claimed estoppel effect of this Court's findings.

In the absence of any contrary collateral-estoppel authority, the Government is left to disparage the findings in those cases decided in favor of Defendants by suggesting that they were rendered "without the benefit of the motions-practice and discovery in this case." Gov't Reply 13. Under that reasoning, however, the limitations imposed by the Supreme Court in *Parklane Hosiery* would be inapplicable whenever two cases involved discovery, witnesses, and legal filings that were not precisely identical. That is simply not the law. In any event, many of the cases in which factfinders have rejected fraud allegations against Defendants did involve very similar records. *See, e.g.*, *Blue Cross & Blue Shield of New Jersey Inc. v. Philip Morris, Inc.*, No. 98-cv-3287 (E.D.N.Y.) (verdict in favor of defendants in a federal RICO action after a seventy-five-day trial that involved many of the same witnesses as this case).

The D.C. Circuit's affirmance of this Court's findings does not eliminate their controversial nature. In affirming those findings, the D.C. Circuit expressly acknowledged that it "may not have reached all the same conclusions as the district court" but explained that it was required to affirm those findings "under the highly deferential clearly erroneous standard." *Philip Morris*, 566 F.3d at 1134. That equivocal endorsement of this Court's findings bears no resemblance to the "resounding[ ] affirm[ance]" that the Government portrays. Gov't Reply 6.

Because the Government's proposed Statements A – D are inflammatory, punitive, and nonfactual, the Government is wrong that the "First Amendment requires only that there be a 'reasonable relationship' between any given corrective statement and the Court's goal of preventing future fraud and deception." Gov't Reply 4. This "reasonable relationship" test applies only to commercial disclosures of "purely factual and uncontroversial information."

*Zauderer*, 471 U.S. at 651; *see also id.* (upholding requirement that attorneys include in their advertisements "information about the terms under which [their] services will be available," such as whether a client would need to pay his own costs if he hired an attorney).  The self-vilifying language of Proposed Statements A – D bears no similarity to such compelled commercial disclosures.  The statements therefore must meet the traditional requirements of strict scrutiny. The Government cannot—and does not even attempt to—meet that exacting standard because there are numerous less burdensome means for it to further its antifraud objective.

The Government also makes little effort to demonstrate that the confessional language in proposed Statements A – D is intended to prevent and restrain future RICO violations—rather than to publicly shame Defendants.  The Government acknowledges that the Family Smoking Prevention and Tobacco Control Act prohibits Defendants from using "light" and "low tar" descriptors in the marketing of their cigarettes.  It argues, however, that proposed Statement C regarding "light" and "low tar" cigarettes is consistent with RICO's remedial requirements because "Defendants almost uniformly continue to market 'light' and 'low-tar' cigarettes that were a central subject of this litigation, minus the low-tar descriptors, and appear to have preserved the visual appearance of the packs; *see, e.g.*, Philip Morris's marketing materials telling Marlboro Lights consumers to 'ask for Marlboro Gold.' Ex. 10."  Gov't Reply 18 n.11. But neither the Act nor this Court's opinion prohibits Defendants from using coloring on their cigarette packages to allow the trade or consumers to distinguish products from each other or to distinguish cigarettes based on taste.  Moreover, the package onset to which the Government cites—which is appended to its brief as Ex. 18 (not Ex. 10)—includes the clear disclaimer that "Terms such as 'Lights' and 'Ultra Lights' do NOT mean safer.  These terms refer to taste. These cigarettes will NOT help you quit smoking."  And, the package to which the onset was

attached was wrapped in tear tape that carried the message: "Lights does not mean safer.  It refers to taste.  Lights won't help you quit smoking."  Together, the requirements imposed by the Act—and the disclaimers voluntarily used by Defendants—make clear that Statement C is a purely backward-looking, punitive measure that is not remotely designed to prevent *future* RICO violations.[3]

### B. The Research And Data Cited By The Government Exacerbate The Legal Deficiencies In Proposed Statements A – D.

The Government claims that its proposed statements are supported by "extensive research" and "data."  Gov't Reply 14; *see also id.* at 15-25.  The Government's heavy reliance on its evidentiary submission underscores the fact that Defendants are entitled to additional limited discovery regarding those materials; the opportunity to depose Dr. Blake and any other experts, as necessary; and the opportunity to designate their own experts.  Defendants cannot respond fully to the Government's evidentiary arguments without further information about the basis for those arguments.  In any event, even the information made available to Defendants thus far makes clear that the Government's "research" and "data" are insufficient to salvage its unlawful and unconstitutional corrective statements.

Tellingly, the Government relies almost exclusively on the results of focus groups to justify its selection of proposed Statements A – D.  *See* Gov't Reply 19-22.  It barely mentions the quantitative analysis that purportedly provides the scientific backbone for Dr. Blake's

---

[3] Even apart from the confessional prefatory language, the Government's proposed statements are filled with nonfactual and controversial statements that render them impermissible under the D.C. Circuit's mandate, the First Amendment, RICO, and due process.  At a minimum, however, the flaws in the prefatory language could be ameliorated by using the following introductory language in place of the confessional language proposed by the Government:  "A Federal District Court has found—in disagreement with the findings of other courts—that . . . ."

recommendations.  But the Government grossly exaggerates the probative value of the focus

group results.  As Dr. Blake conceded, the conduct and analysis of the focus groups are "not . . .

quantifiable," are "exploratory in nature," and are "not . . . 'projectable' to a stated population."

Blake Report ¶ 19.  Indeed, the focus groups were never intended or designed to generate data

that would be projectable or sufficient to form any scientific basis for concluding anything about

the corrective statements.  *See id.* at D1-11.

      The Government nevertheless attempts to bolster its proposed corrective statements with

cherry-picked quotations from its own summaries of the focus group sessions.  But the

Government has not provided Defendants with verbatim transcripts of those sessions, which we

understand do not exist, and has refused to provide Defendants with the audio tape recordings of

the sessions, which do exist.  Providing this information is standard practice, and for good

reason:  Without such information, it is impossible to know the age, smoking history, and other

relevant demographics of the speakers.  It is also impossible to know whether one or more active

speakers may have dominated the group.  The Government's self-serving summaries are thus

useless.[4]

---

[4]  In addition, for nearly every statement that the Government attributes to a focus group
participant, one can find an opposite statement from other focus group participants.  For
example, the Government selectively quotes focus group participants describing Intervenors'
proposed addiction statement as a "clear winner" because, among other things, "I like where it
says we manipulated you" and "[i]t's telling you that they lied to you and now it's telling you the
truth."  Gov't Reply 19.  But participants from that same group also said that Intervenors'
statements were "too long" and did not teach them anything new.  (Balt 1, 12-13).  Similarly, the
Government cites snippets from one focus group for the proposition that the confessional nature
of Intervenors' proposed statement on "light" cigarettes made it the most effective statement at
communicating the message about descriptors.  Gov't Reply 20.  But another group strongly
favored the statement proposed by PM USA statement as most clearly communicating the
message because "it's to the point" and "[i]t wasn't endorsed or . . . forced to be paid by
somebody."  (Balt 4, 36).

Moreover, the Government's evidentiary arguments fail even on their own terms. For example, the Government argues that its data show that the confessional language that precedes Corrective Statements A – D elicits attention and generates trust. Gov't Reply 15-16 (citing Blake Report ¶ 217 & Fig. V23). Under this theory, even the most sensational, exaggerated, and argumentative statements—those that are the very antithesis of "factual" and "uncontroversial"—can pull themselves into constitutional validity by their own bootstraps, since their very incendiary nature provides justification for them under the First Amendment. That is not the law. Even if this language may be marginally effective at drawing attention and increasing trustworthiness, that does not insulate it from First Amendment scrutiny. There is no exception to the First Amendment's stringent limitations on compelled speech for statements that are attention-grabbing and trust-inducing.

The Government also vastly understates the extent to which the Blake Report relies on impermissible considerations that have nothing to do with preventing future RICO fraud—such as increasing quit intentions—when selecting the corrective statements. While the Government asserts that data on quit intentions "did not play a primary role in forming the United States' recommendations" (Gov't Reply 16), the Blake Report itself states that "behavioral intentions around quitting smoking and staying quit in current and former smokers" were one of the three factors evaluated for every statement. *See, e.g.*, Blake Report ¶¶ 11, 24, 59, 61, 73, 150. In fact, the Government relies heavily on the statements' overall performance—not just on the "future beliefs" factor, which is the one metric designed to measure their ability to prevent consumers from believing future contrary statements and, hence, to "prevent and restrain" future RICO violations. Nowhere does the Report suggest that one of the other factors was given *less* weight than the "future beliefs" factor.

On this critical "future beliefs" metric, at least one of Defendants' proposed corrective statements on each topic performed just as well or better than the Government's proposed statements. Those results underscore the fact that considerations that have nothing to do with RICO's objectives were the deciding factor in the selection of the Government's proposed corrective statements. They also provide further evidence of the need for limited additional discovery to understand how Dr. Blake came to the conclusions that she did. At a minimum, they show that the Government could easily have chosen statements that would do just as well or better than the Government's proposed statements at preventing future fraud but would not suffer from the fatal legal flaws described above.[5]

Nor is the Government able to provide an adequate justification for the Blake Report's failure to test the proposed corrective statements against the new health warnings mandated by the Family Smoking Prevention and Tobacco Control Act. The Government's explanation that the "proposed corrective statements are not meant to be a general public health warning" is not only wrong but completely misses the point. Gov't Reply 16. The proposed statements are not

---

[5] The Government accuses Defendants of "cherry-picking some individual data points" to suggest that PM USA's proposed Low Tar Statement performed better than the statement proposed by the Government. Gov't Reply 17. But, far from using isolated data, the data points Defendants cited—that "[t]he Philip Morris statement was the only statement to be positively associated with increasing accurate knowledge compared to control," Blake Report ¶ 229—are the same data points considered determinative by Dr. Blake when deciding among otherwise similarly performing statements for Topic A (Negative Health Effects). *Id.* ¶ 227. Furthermore, the Government mischaracterizes Dr. Blake's findings regarding the performance of Intervenors' proposed statement, which she ultimately selected. The Government contends that this statement "was significantly more likely to increase accurate knowledge among current smokers and low income populations." Gov't Reply 17-18. That is false. According to Dr. Blake, the PM USA statement was the only one that left individuals "significantly more likely to endorse the correct answer." Blake Report ¶ 198. Dr. Blake's comments regarding Intervenors' statement were instead based on what she called "[e]xploratory analyses"—a basis her Report does not explain. *Id.*

more and not less a "general public health warning" than the newly prescribed statutory warnings—both are aimed at the same population of smokers and potential smokers.  More importantly, the warnings established by the Act—which requires new textual statements and graphic imagery on cigarette packages and advertisements—fundamentally alter the information environment in which this Court's corrective statements will be disseminated.  The ability of the various proposed statements to prevent the public from crediting misleading information about the health effects and addictiveness of smoking can only be determined by evaluating those statements against the public health information that will be available at the time the statements are distributed.

Thus, rather than support the Government's proposed statements, the Government's "research" and "data" further undercut its proposals.  Even if the legal basis for the Statements were sound—and it is not—the Statements therefore should be rejected for lack of an evidentiary foundation.  At the very least, if the Court does not reject the Government's research and data out of hand, limited discovery is necessary to understand and examine the Government's evidentiary submission in further detail.

## CONCLUSION

This Court should reject the Government's proposed Corrective Statements A – D in their

entirety.

Dated:  March 22, 2011                     Respectfully submitted,


/s/ Beth A. Wilkinson
Beth A. Wilkinson (D.C. Bar No. 462561)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, N.W.
Washington, D.C.  20006-1047
Telephone:  (202) 223-7300
Fax:  (202) 223-7420


Miguel A. Estrada (D.C. Bar No. 456289)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Telephone:  (202) 955-8257
Fax:  (202) 530-9016


Thomas J. Frederick
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601-9703
Telephone: (312) 558-6700
Fax:  (202) 558-5700

*Attorneys for Defendants*
*Altria Group Inc. and Philip Morris USA Inc.*

/s/ Beth A. Wilkinson *for*
Robert F. McDermott (D.C. Bar No. 261164)
Peter J. Biersteker (D.C. Bar No. 358108)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone: (202) 879-3939
Fax: (202) 626-1700

*Attorneys for Defendant*
*R.J. Reynolds Tobacco Company,*
*individually and as successor by*
*merger to Brown & Williamson*
*Tobacco Corporation*


/s/ Beth A. Wilkinson *for*
Michael B. Minton
THOMPSON COBURN LLP
One US Bank Plaza, Suite 3500
St. Louis, Missouri 63101-1693
Telephone: (314) 552-6000
Fax: (314) 552-7597

*Attorneys for Defendant*
*Lorillard Tobacco Company*


/s/ Beth A. Wilkinson *for*
David L. Wallace
CHADBOURNE & PARKE LLP
30 Rockefeller Plaza, 34th Floor
New York, New York 10112-0219
Telephone: (212) 408-5100

*Attorneys for Defendant*
*British American Tobacco (Investments)*
*Limited (f/k/a British-American Tobacco*
*Company Limited)*