UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>and )<br><br>TOBACCO-FREE KIDS ACTION FUND,<br>*et al.*, )<br><br>Plaintiff-Intervenors, )<br><br>v. )<br><br>PHILIP MORRIS USA, INC., *et al.*, )<br><br>Defendants. ) | Civil Action No. 99-CV-2496 (GK)<br>Next scheduled court appearance: NONE |

---

**PUBLIC HEALTH INTERVENORS' OPENING BRIEF ON DEFENDANTS' RULE
60(b) MOTION REGARDING THE MINNESOTA DEPOSITORY**

The Public Health Intervenors support the United States' submission concerning the

Minnesota Depository.  Rather than repeat those arguments, Intervenors wish simply to highlight

the legal standard that applies, and to summarize for the Court an additional attached declaration

detailing the ongoing importance of the Depository.

1.      In two recent Orders the Court has recognized that any request to amend the

Court's remedial Order with respect to the Minnesota Depository would be subject to Federal

Rule of Civil Procedure 60(b).  *See* Order # 7 (Dec. 22, 2010) (DN 5846) at 2 ("[i]f there is to be

any litigation regarding the Minnesota Depository – a subject discussed at some length at this

Status Conference – Defendants must file an appropriate motion under Federal Rule of Civil

Procedure 60(b)"); Order # 14 (Feb. 25, 2011) (DN 5878) at 2 ("all parties shall file their opening

briefs on Defendants' Motion under Federal Rule of Civil Procedure 60(b) regarding the status of

the Minnesota Depository . . ..").  Under well-established precedents, to prevail on such a motion

under Rule 60(b)(5), the Defendants must meet a heavy burden to demonstrate that "'a

significant change either in factual conditions or in law' renders continued enforcement [of this

aspect of the Court's decree] 'detrimental to the public interest.'"  *Horne v. Flores*, 129 S. Ct.

2579, 2593 (2009) (quoting *Rufo v. Inmates of the Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1991));

*see also Salazar v. District of Columbia*, No. 07-7031, 2011 WL 403448, *4, _ F.3d _ (D.C. Cir.

Feb. 8, 2011) (noting the movant's burden to demonstrate "extraordinary circumstances" to

obtain relief under Rule 60(b)(6)) (citations omitted).[1]

     Defendants can demonstrate no such changed circumstances here.  Their complaints

about the Minnesota Depository do not raise new arguments or circumstances that did not exist

before this Court's ruling.  *See, e.g.,* Def. Praecipe Regarding the Court's Aug. 12, 2010 Order at

7 (DN 5826) (Sept. 7, 2010) (claiming the Depository is "antiquated, rarely used, and

inconveniently located" and that the defendants' websites "make[ ] the continued retention and

storage of hard copies superfluous and unwarranted").  As demonstrated by the materials the

parties recently received from the Minnesota Court, the Minnesota Depository is not utilized

significantly less than it was before the Court's ruling.  To the contrary, there continue to be

---

[1]    Although it is of course unclear what specific arguments Defendants will make in support of their Rule 60(b) motion, Intervenors assume Defendants will not also argue that this remedy is not appropriate because Defendants are unlikely to commit further RICO violations – claims this Court, and the Court of Appeals, have already emphatically rejected. *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 908-15 (D.D.C. 2006); *United States v. Philip Morris USA, Inc.,* 566 F.3d 1095, 1131-35 (D.C. Cir. 2009); *see also United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1203 (D.C. Cir. 2005) (Williams, J., concurring) (noting that "[t]he equity court, empowered under § 1964(a) to 'prevent and restrain' future violations, . . . [can] impose transparency requirements so that future violations will be quickly and easily identified").

numerous inquiries concerning the materials in the Depository in recent years, and there was

even a marked *increase* in those inquiries as recently as 2009.  *See* Attachment 1 (March, 2011

Report from Cindie Smart, Manager of the Minnesota Tobacco Depository).   Defendants'

reliance on their own websites as a substitute for what is available to the public via the

Depository also raises no extraordinary changed circumstance, since *both* the Depository *and*

websites were among the Court's original remedies in this case.

Accordingly, since Defendants cannot demonstrate the requisite "changed circumstances"

since this Court's ruling that would warrant removing this critical transparency-enhancing

measure from the Court's remedial decree designed to prevent and restrain further RICO

violations, the Public Health Intervenors do not believe the Court needs to – or should –

separately consider whether, with further information, the Court would have imposed this remedy

in 2006.  In short, because Defendants could have presented these arguments either before the

Court's ruling, in a timely post-judgment motion pursuant to Rule 59(e), *see* Fed. R. Civ. P.

59(e), or, at bare minimum, during the appeal in this case, they cannot satisfy their burden to

obtain a change in the Court's Minnesota Depository remedy at this juncture.  *See, e.g., Salazar*,

2011 WL 403448 at * 9 ("Rule 60(b) relief is not a 'substitute for appeal'" (other citations

omitted)).

2.     Attached is a declaration from Monique E. Muggli.  *See* Attachment 2.  Ms.

Muggli, who has a Masters in Public Health, and is also an attorney, has worked extensively with

Defendants' documents – including, in particular, the documents included in the Minnesota

Depository – over the past thirteen years.  *Id.* ¶¶ 2-13.  She has served as a research and litigation

consultant to a number of international and domestic organizations working on tobacco control

and related public health issues, and is presently employed as a legal advisor for the Intervenor

Tobacco-Free Kids Action Fund.  *Id.* ¶ 3.

As Ms. Muggli explains, she has extensively utilized the materials in the Minnesota

Depository since the late 1990s, conducting "tobacco document research as a public visitor at the

Minnesota Depository on behalf of at least 13 different organizations based in at least 6 different

countries over the past 13 years," including the World Health Organization ("WHO"),

headquartered in Geneva and many of its regional offices throughout the world; the Minnesota

Department of Health; and Blue Cross Blue Shield Minnesota.  *Id.* ¶ 9.  As she further explains,

in doing this work she has "visited and reviewed materials at the Minnesota Depository likely

hundreds of times," most recently in January 2011.  *Id.* ¶ 10; *see also id.* ("At times, I have spent

months conducting research at the Minnesota Depository *on a daily basis*.")(emphasis added).

This extensive use of the Depository has been critical to Ms. Muggli's participation in,

and authorship of, more than "25 peer-reviewed articles or reports on the tobacco industry," "the

vast majority [of which] relied on documents housed at the Minnesota and Guildford

Depositories."  *Id.* ¶ 6; *see also id.* ¶ 13 (listing 17 such publications).  Ms. Muggli also utilized

"documents unearthed from the Depositories and online collections" for "several seminal WHO

publications," *id.* ¶ 14, including an effort to consider "whether the tobacco companies sought to

undermine tobacco control efforts by WHO or other United Nations agencies."  *Id.*; *see also id.*

¶¶ 7-8, 15 (discussing Ms. Muggli's further participation as (a) a 'scientific reviewer for

numerous research articles based on internal tobacco documents for at least seven peer-reviewed

public health and medical journals, including *The Lancet, American Journal of Public Health,*

*Nicotine and Tobacco Research*, and *Tobacco Control*"; (b) "a reviewer for the National Cancer

4

Institute's Monograph 19" ("The Role of the Media in Promoting and Reducing Tobacco Use"); and (c) a contributing editor to additional WHO reports); *id.* ¶ 16 (discussing the U.S. Surgeon Generals' reliance on Ms. Muggli's research in their own reports).

As Ms. Muggli also explains, she "continue[s] to use the tobacco documents from all available sources in [her] current work," *id.* ¶ 5, and she is "personally aware" that it has been used by many other "journalists, researchers, legislators, students, litigants and advocates to publicly expose, among other things, the tobacco industry's inner workings related to its secret acknowledgment of the health harms and addictiveness of smoking." *Id.* ¶ 17; *see also id.* (*"My understanding is that the Minnesota Depository continues to be used by members of the public, including students, researchers and litigants, and I believe that given the ongoing document production obligations imposed by this Court until 2021, that it will continue to be used in the future in this manner"*).

Based on these extensive experiences using and relying upon materials in the Minnesota Depository, Ms. Muggli offers several observations regarding the ongoing utility of the Depository, which she maintains "is an extraordinarily unique and beneficial resource that adds tremendous value to the other existing tobacco document sources such as the Guildford Depository and the Defendants' tobacco document websites." *Id.* ¶ 18.

*First*, Ms. Muggli explains that, in her experience, "specific search techniques available *only* at the Minnesota Depository allow for more comprehensive research and research findings." *Id*. ¶ 18 (emphasis added).  In particular:

> The ability to review one or more hard copy documents, in the context of the file and box in which it or they were produced into the Minnesota or Guildford Depositories, is a feature that I have frequently used in my research.  *I have found*

> *that reviewing a document among other documents that likely originated from the*
> *same individual's files or that are related to the same subject matter provides a*
> *much better understanding of the document itself.*  I have also found that
> searching all boxes produced by Defendants in a specific litigation allows for a
> much richer understanding of the material that I am reviewing because I more
> readily understand the relationships among the individuals, entities, and subject
> matter areas that are repeated throughout a collection.

*Id.* ¶ 19 (emphasis added).  As Ms. Muggli further explains, "[c]urrently, there is no way to

accomplish a similar search across all Defendants' document websites," and even if there were,

in her view, "the extended amount of time that it would take to click through and view each

individual document would be overly time-consuming and ultimately counterproductive to the

research when compared with the speed that a researcher can flip through and skim hard copy

documents in a physical box at the Minnesota Depository."  *Id.* ¶ 20.[2]

As Ms. Muggli details, by "reviewing boxes of documents, page by page, at the

Minnesota Depository, I have made *serendipitous and important findings that I would have not*

*found on the tobacco document websites*."  *Id.* ¶ 25 (emphasis added).  For example, she explains

that using this approach she discovered documents:

> which ultimately resulted in a peer-reviewed publication [detailing] Philip Morris'
> practice from at least 1996-1998 of *censoring information about smoking and*
> *health (e.g., the information that exposure to tobacco smoke can trigger asthma*
> *and middle ear infections in children) from quarterly CIGNA health newsletters*
> *sent to thousands of employees* – not only the employees of Philip Morris USA,

---

[2]      *See also id.* ¶ 22 ("To conduct the most comprehensive search possible using
internal tobacco documents, I have generally integrated all sources of tobacco documents into my
search strategies.  For example, I have frequently identified an initial 'seed' document on one of
the Defendants' tobacco document websites, and subsequently used the 4(b) Indices at the
Minnesota Depository to find the same document in the relevant physical box.  I will then review
that entire box and multiple boxes with numerical identifiers preceding and following the
original identified box.  This process allows me *both to better understand the original "seed"*
*document and to identify additional relevant documents perhaps pertaining to a similar subject*
*matter or authored by the same individual*.") (emphasis added).

but also the employees of its then-affiliate companies, Miller Brewing Companies and Kraft General Foods.  (Muggli ME, Hurt RD. A cigarette manufacturer and a managed care company collaborate to censor health information for employees. *Am J Public Health* 94(8):1307-1311 (2004)).

*Id.* (emphasis added).  As Ms. Muggli further explains, "[i]t is my opinion that my efforts in reviewing boxes of documents produced by Philip Morris USA in a specific case, and housed at the Minnesota Depository, resulted in this information being discovered and disclosed to the public, because *I would have never thought to use a term such as 'CIGNA' as a search term on Philip Morris' tobacco document website*."  *Id.* (emphasis added).[3]

*Second*, Ms. Muggli explains that "[a] crucial aspect of the Minnesota Depository is that it includes searchable electronic indices that list every single document that the tobacco companies (with a few exceptions such as documents produced by BATCo, BAT Industries, pls., Liggett Group, and a few other collections) have produced to the Depository."  *Id.* ¶ 21.  These Indices – called the 4(b) Indices "after paragraph 4(b) in the applicable [Minnesota] court order" – "were initially created by the tobacco defendants in [the Minnesota litigation] as a reference list for all documents housed at the Minnesota Depository," and are, under the terms of the Minnesota Consent Judgment, supplemented as Defendants "make new productions of

---

[3]      *See also id.* ¶ 26 ("In another instance, *I was able to provide the U.S. House of Representatives' Government Reform Committee with an internal tobacco document that I found at the Minnesota Depository (and that was available only at the Depository) that informed the Committee's investigation into so-called reduced risk tobacco products*.  The document disclosed a senior BATCo research scientist's doubts in 2000 about the notion that '. . . the technology exists to make cigarettes which are appreciably less lethal. . .'  (Email from Derek Irwin to Graham Read (May 2, 2000), *quoted in* Minority Staff of H. Comm. on Government Reform, 108th Cong., The Lessons of "Light" and "Low Tar" Cigarettes: Without Effective Regulation, "Reduced Risk" Tobacco Products Threaten the Public Health at 8 (June 3, 2003) (prepared for Reps. Henry A. Waxman and Janice D. Schakowsky")) (emphasis added)).

documents to the Minnesota Depository." *Id.* As Ms. Muggli explains, "[a]s I understand it, the staff of the Minnesota Depository conduct cross-referencing and internal checks on every new shipment they receive of tobacco industry documents, and work with the tobacco companies to ensure that there is a perfect match between the 4(b) Indices and the actual hard copy documents that are actually shipped to and available at the Minnesota Depository." *Id.*

*Third*, Ms. Muggli explains that using the materials physically located at the Minnesota and Guildford Depositories "has also *assisted [*her] *in understanding the meaning of Defendants' code names highlighted by this Court*, which I believe would have been much more difficult if the only sources available to research tobacco documents were the tobacco companies' document websites." *Id.* ¶ 23 (emphasis added). As she explains:

> In my view, the very nature of Defendants' use of code names to identify young or underage smokers (such as "YAS," "FUBYAS" and "ASU30") and internal research projects studying nicotine addiction (such as "HIPPO," "MAD HATTER," and "ARIEL") were designed in part to prevent the public from understanding the true meaning of internal tobacco documents should they ever become public. This is particularly true when the code is viewed in isolation in a single document.

*Id.*[4]

*Finally*, Ms. Muggli explains her view that "the administrative and oversight function provided by the Minnesota Depository's management firm, Smart Legal Assistance, is crucial for

---

[4]     *See also id.* ¶ 24 ("Likewise, in my view, researching the tobacco industry's knowledge of and acquiescence to the illicit trade of tobacco products *would not have been possible by conducting targeted searches on Defendants' document websites* for 'smuggled cigarettes' or 'contraband' because the tobacco industry primarily used codes to describe these activities (e.g., 'GT,' 'General Trade,' 'DNP' and 'Duty Not Paid'). Further, the true meaning of the codes, for example, 'DNP', would not have been readily apparent to me if I had seen the phrase in isolation. Instead, in my view, reviewing entire files and boxes of files at the Minnesota and Guildford Depositories in context allowed for a clearer understanding of these and other terms) (emphasis added).

maintaining adequate public access to the growing universe of internal tobacco company

documents." *Id.* ¶ 29.  As she explains, "on numerous occasions during the past 13 years, the

Minnesota Depository has resolved multiple discrepancies at my request between what was on a

box index and what was actually in the box.  Specifically, when I have discovered that a

document should be included in the box, based on the box index, but is not in the box, the

Depository staff has worked to resolve the inconsistency with the Defendants' representative and

notified me of the resolution." *Id.*; *see also id.* ¶ 31 ("*On multiple occasions, the Minnesota*

*Depository staff has requested, on my behalf, that Defendants' representatives provide a clearer*

*or cleaner photocopy of a document than the available copy deposited in Minnesota*") (emphasis

added).  Indeed, Ms. Muggli utilized materials at the Minnesota Depository to identify "about

500,000 pages of documents that BATCo had produced in this case, but wrongly withheld from

deposit into Minnesota." *Id.* ¶ 33.

As Ms. Muggli further explains:

As part of their obligation under the Minnesota Consent Judgment to ensure
public access to the collections, the Minnesota Depository staff has also provided
me with an ongoing list of new productions into the Depository, listing the
producing Defendant, the box number(s), the date deposited in Minnesota, and the
jurisdiction in which the box was produced.  *I have routinely used such lists as a*
*check on what Defendants place on their tobacco document websites*; under the
1998 Master Settlement Agreement with the vast majority of State Attorneys
General, the Participating Manufacturers have 45 days to place a document
covered under that agreement online, while the Minnesota Consent Judgment
gives Defendants subject to its terms 30 days to deposit pertinent documents to
the Minnesota Depository.  These lists make it possible to keep tabs on new
documents as they are deposited in Minnesota, to alert other researchers and the
UCSF library on occasion that new documents should be posted to one or more
Defendants' websites, and to have some ability to discover that a Defendant
appears not to be complying with some portion of its document disclosure
obligations.  I believe that without the ability to maintain such a check, the
integrity of the tobacco document collections are at risk and ultimately the

Defendants may not be accountable for production deadlines, thus preventing the
public from viewing the documents.

*Id.* ¶ 32 (emphasis added).[5]

The Public Health Intervenors submit that in light of the indisputable ongoing utility of

the Minnesota Depository, as detailed by Ms. Muggli, and as further detailed in the United

States' submission and supporting materials, there is no basis for modifying the Court's remedial

decree regarding the Depository.

---

[5]      Ms. Muggli also explains that, using the materials at the Minnesota Depository
has allowed her to continue to work to insure the integrity and completeness of Defendants'
document productions.  *Id.* ¶ 35 (discussing use of a list from the Minnesota Depository of
hundreds of boxes at the Depository that were not on the 4(b) Index); *see also id.* ¶¶ 36-37
(explaining that "having a third-party neutral manage the contents and the operation of the
Minnesota Depository is also important to protect public health researchers, government
personnel charged with enforcing the Court's order, and members of the public from Defendants'
surveillance of their work for advantage in smoking-and-health-related litigation," and detailing
prior efforts by Defendant BATCo to "track[ ] the physical movement of one visitor outside and
in front of the [Guildford] Depository" – which is not operated by a third-party –  and to
"observe[ ] and note[ ] personal mobile phone use within the building (although outside of the
document review rooms")); *see also*  Monique E. Muggli, *et al.*, *Big Tobacco Is Watching:
British American Tobacco's Surveillance and Information Concealment at the Guildford
Depository*, 363 Lancet 1812-1819 (2004)).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to modify the Court's remedial order concerning the Minnesota Depository should be denied.

Respectfully submitted,

/s/ *Howard M. Crystal*
Howard M. Crystal
(D.C. Bar No. 446189)
Katherine A. Meyer
(D.C. Bar No. 244301)

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Avenue, Suite 700
Washington, DC 20009
202-588-5206
hcrystal@meyerglitz.com

March 24, 2011                  Attorneys for the Public Health Intervenors

11