# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ( | |
| **Plaintiff,** | ( | |
|  | ( | **Civil Action No. 99-2496 (GK)** |
| **v.** | ( | |
|  | ( | |
| **PHILIP MORRIS USA INC.,** *et al.*, | ( | |
| **Defendants.** | ( | |

---

## DECLARATION OF MONIQUE ELIZABETH MUGGLI, J.D., M.P.H.

1. My name is Monique Elizabeth Muggli, and I am over the age of 18.

2. I have a Masters in Public Health from the University of Minnesota (1999) and I received my Juris Doctorate from William Mitchell College of Law in 2009.

3. Currently, I am a Legal Advisor at the Tobacco-Free Kids Action Fund. In that position, I provide legal assistance in form of legislative, litigation and advocacy support to lawyers, civil society, and governments worldwide in an effort to promote strong, evidenced-based tobacco control policies. Prior to that, I worked as a research and litigation consultant to international and domestic groups on matters relating to internal tobacco company documents.

4. I have extensive experience in researching and publishing findings from internal tobacco industry documents housed at the Minnesota and Guildford Depositories and available through online collections of tobacco documents. My research interests have focused on the tobacco industry's efforts to subvert public health measures aimed at protecting the public from the harmful effects of tobacco use and tobacco smoke exposure.

1

5.  I continue to use the tobacco documents from all available sources in my current work. For example, I have presented key findings from the documents to lawyers and tobacco control advocates from around the world to inform and support domestic implementation of key policies embodied in the WHO Framework Convention on Tobacco Control. Examples of my presentations to such audiences include *Butt Out:The Importance of Neutralizing the Tobacco Industry to Promote Strong Tobacco Control Policy* (2009, 2010) and *The Tobacco Industry as the Cause of a Tobacco Epidemic* (2010). Attendees of these presentations included individuals from several different countries including: Brazil, Bangladesh, Cambodia China, Egypt, India, Indonesia, Jordan, Philippines, Russia, and Ukraine.

6.  I have co-authored over 25 peer-reviewed articles or reports on the tobacco industry, and the vast majority of them relied on documents housed at the Minnesota and Guildford Depositories. I have presented my research at international conferences, including the 10th, 11th, and 12th World Conferences on Tobacco OR Health, and at several national public health conferences, where I have specifically highlighted the importance of findings from the tobacco documents housed at the Minnesota and Guildford Depositories.

7.  I have served as a scientific reviewer for numerous research articles based on internal tobacco documents for at least seven peer-reviewed public health and medical journals, including *The Lancet*, *American Journal of Public Health*, *Nicotine and Tobacco Research*, and *Tobacco Control*. I have also served as a member of the International Award Selection Committee of the Public Health Advocacy Institute and University of California, San Francisco, Center for Tobacco Control Research and Education

International Award for Outstanding Use of Tobacco Industry Documents, which recognizes individuals who make significant public health contributions by using the internal tobacco documents.

8. I also served as a reviewer for the National Cancer Institute's Monograph 19. National Cancer Institute, *The Role of the Media in Promoting and Reducing Tobacco Use*, Tobacco Control Monograph No. 19. Bethesda, MD: U.S. Department of Health and Human Services, National Institutes of Health, National Cancer Institute. NIH Pub. No. 07-6242 (June 2008).

9. I have conducted tobacco document research as a public visitor at the Minnesota Depository on behalf of at least 13 different organizations based in at least 6 different countries over the past 13 years, since the Minnesota Depository opened to the public in 1998. My organizational clients have included  World Health Organization, Headquarters; World Health Organization, Western Pacific Regional Office; World Health Organization, Pan American Health Organization Regional Office; World Health Organization, Eastern Mediterranean Regional Office; Minnesota Department of Health; Blue Cross Blue Shield Minnesota; and the U.S. Justice Department (as a paid, part-time non-testifying expert consultant in relation to this case for about five months during 2003-04).

10. I have visited and reviewed materials at the Minnesota Depository likely hundreds of times since it opened in April 1998. At times, I have spent months conducting research at the Minnesota Depository on a daily basis. Most recently, I visited the Depository in January 2011 to check on information relating to the production dates and jurisdiction of newly produced documents.

11. I first became familiar with the tobacco documents during the Minnesota tobacco trial in 1998, where I observed portions of the trial as a graduate student in public health. During late 1998 and throughout 1999, I spent months researching tobacco industry documents at the Minnesota Depository for my Master's thesis entitled, *The Smoke You Don't See: Uncovering Tobacco Industry Scientific Strategies Aimed at Environmental Tobacco Smoke and the U.S. Environmental Protection Agency*. This research formed the basis of two subsequent peer-reviewed publications (identified in the list of publications two paragraphs below).

12. Also in 1999, I was a member of a research team for former U.S. FDA Commissioner David Kessler, working to find documents deposited in Minnesota that disclosed the tobacco industry's efforts to publicly discredit the U.S. FDA and thwart its efforts to regulate tobacco products in the mid 1990s. Many of the documents that we found in the Minnesota Depository were incorporated into Dr. Kessler's book, *A Question of Intent: A Great American Battle with a Deadly Industry* (2001).

13. The following are examples of my research conducted at the Minnesota and Guildford Depositories that have led to peer-reviewed publications exposing, what I view as, the tobacco industry's decades-long efforts to defraud and mislead consumers and manipulate public health policy to sustain profits:

    a. Muggli ME, Forster JL, Hurt RD, Repace JL. The smoke you don't see: uncovering tobacco industry scientific strategies aimed against environmental tobacco smoke. *American Journal of Public Health* 91(9):1419-1423, 2001.

    b. Muggli ME, Pollay RW, Lew R, et al. Targeting of Asian Americans and Pacific Islanders by the tobacco industry: results from the Minnesota Tobacco Document Depository. *Tobacco Control* 2002; 11:201-9.

    c. Muggli ME, Hurt RD. Tobacco industry strategies to undermine the 8th World Conference on Tobacco or Health. *Tobacco Control* 12(2):195-202, 2003.

4

d. Muggli ME, Hurt RD, Blanke DD. Science for hire: a tobacco industry strategy to influence public opinion on secondhand smoke. *Nicotine Tobacco & Research* 5:303-314, 2003.

e. Muggli ME, Hurt RD. A cigarette manufacturer and a managed care company collaborate to censor health information for employees. *American Journal of Public Health* 94(8):1307-1311, 2004.

f. Muggli ME, Hurt RD, Becker LB. Turning free speech into corporate speech: Philip Morris' efforts to influence U.S. and European journalists regarding the U.S. EPA report on secondhand smoke. *Preventive Medicine* 39(3):568-580, 2004.

g. Muggli ME, Hurt RD, Repace J. The tobacco industry's political efforts to derail the EPA report on ETS. *American Journal Preventive Medicine* 26:167-177, 2004.

h. Muggli MM, LeGresley EM, Hurt RD. Big tobacco is watching: British American Tobacco's surveillance and information concealment at the Guildford depository. *The Lancet* 363:1812-1819, 2004.

i. Joseph AM, Muggli ME, Pearson KP, Lando H. The cigarette manufacturers' efforts to promote tobacco to the U.S. military. *Military Medicine* 170:874, 2005.

j. LeGresley EM, Muggli ME, Hurt RD. Playing hide-and-seek with the tobacco industry. *Nicotine Tobacco & Research* 7(1):27-40, 2005.

k. Leavell NR, Muggli ME, Hurt RD, Repace J. Blowing smoke: British American Tobacco's air filtration scheme. *British Medical Journal* 332(7535):227-9, 2006.

l. Otanez MG, Muggli ME, Hurt RD, Glantz SA. Eliminating child labour in Malawi: a British American Tobacco corporate responsibility project to sidestep tobacco labour exploitation. *Tobacco Control* 15(3):224-30; 2006.

m. LeGresley EM, Muggli ME, Hurt RD. Movie moguls: British American Tobacco's covert strategy to promote cigarettes in Eastern Europe. *European Journal of Public Health* 16(5):505-8; 2006.

n. LeGresley E, Lee K, Muggli ME, Patel P, Collin J, Hurt RD. British American Tobacco and the "insidious impact of illicit trade" in cigarettes across Africa. *Tobacco Control* 2008, Oct; 17(5):339-346.

o. Muggli ME, Lee K, Gan Q, Ebbert JO, Hurt RD. "Efforts to reprioritise the agenda" in China: British American Tobacco's efforts to influence public policy on secondhand smoke in China. *PLoS Medicine* 2008, Dec 23; 5(12):1729-069.

p. Hurt RD, Ebbert JO, Muggli MM, Lockhart NJ, Robertson CR. Open doorway to truth: Legacy of the Minnesota Tobacco Trial. *Mayo Clinic Proceedings* 2009; 84(5):446-456.

5

q. Muggli ME, Ebbert JO, Robertson C, Hurt RD.  Waking a sleeping giant:  the tobacco industry's response to the polonium-210 issue.  *American Journal of Public Health* 2008; 98(9):1643-50.

14. In addition to peer-reviewed publications, I have been a research member of several seminal WHO publications. During 2000, I was one of six research staff assigned to a Committee of Experts appointed by WHO's Director-General at the time, Gro Harlem Brundtland, and I was responsible for researching documents housed at the Minnesota and Guildford Depositories. The Committee was charged with conducting a preliminary inquiry into whether the tobacco companies sought to undermine tobacco control efforts by WHO or other United Nations agencies.  Based on documents unearthed from the Depositories and online collections, the Committee concluded that:

> "At the most fundamental level, this inquiry confirms that tobacco use is unlike other threats to global health. Infectious diseases do not employ multinational public relations firms. There are no front groups to promote the spread of cholera. Mosquitoes have no lobbyists. The evidence presented here suggests that tobacco is a case unto itself, and that reversing its burden on global health will be not only about understanding addiction and curing disease, but, just as importantly, about overcoming a determined and powerful industry."

Committee of Experts on Tobacco Industry Documents, World Health Organization, *Tobacco Company Strategies to Undermine Tobacco Control Activities at the World Health Organization* (July 2000), available at WHO Tobacco Control Papers, Center for Tobacco Control Research and Education, UC San Francisco, http://www.escholarship.org/uc/item/83m9c2wt, at 244.

15. I have also been a contributing researcher to two other published WHO reports: *Profits over People: Tobacco Industry Activities to Market Cigarettes and Undermine Public Health in Latin America and the Caribbean*. Pan American Health Organization (2002); and *The Tobacco Industry Documents: What They Are, What They Tell Us, and How to Search Them--A Practical Manual*. WHO Regional Office for the Eastern Mediterranean (2002).  I have also authored a report for WHO, Western Pacific Regional Office in 2000,

6

which highlighted the tobacco industry's marketing and policy strategies in the region. Once again, my research at the Minnesota and Guildford Depositories helped make my contributions to these reports possible.

16. Other individuals and groups, including the U.S. Surgeon General, have relied on my research conducted at the Depository in preparing their own reports (U.S. Department of Health and Human Services. *The Health Consequences of Involuntary Exposure to Tobacco Smoke: A Report of the Surgeon General*. U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health at 659. (2006)).

17. I understand that on March 28, 1998 Judge Fitzpatrick, who presided over *State of Minnesota, et. al. v. Philip Morris, et. al.*, and who has since retired, ordered the Minnesota Depository to open to the public 15 days later, beginning on April 13, 1998. Once the Depository was opened to the public, I am personally aware that it has been used by journalists, researchers, legislators, students, litigants and advocates to publicly expose, among other things, the tobacco industry's inner workings related to its secret acknowledgment of the health harms and addictiveness of smoking. My understanding is that the Minnesota Depository continues to be used by members of the public, including students, researchers and litigants, and I believe that given the ongoing document production obligations imposed by this Court until 2021, that it will continue to be used in the future in this manner.

18. In my opinion, the Minnesota Depository is an extraordinarily unique and beneficial resource that adds tremendous value to the other existing tobacco document sources such

as the Guildford Depository and the Defendants' tobacco document websites. In my experience, specific search techniques available only at the Minnesota Depository allow for more comprehensive research and research findings.

19. The ability to review one or more hard copy documents, in the context of the file and box in which it or they were produced into the Minnesota or Guildford Depositories, is a feature that I have frequently used in my research. I have found that reviewing a document among other documents that likely originated from the same individual's files or that are related to the same subject matter provides a much better understanding of the document itself. I have also found that searching all boxes produced by Defendants in a specific litigation allows for a much richer understanding of the material that I am reviewing because I more readily understand the relationships among the individuals, entities, and subject matter areas that are repeated throughout a collection.

20. Currently, there is no way to accomplish a similar search across all Defendants' document websites; only one of Defendants' document collections ("RJRT Public") even provides a coded field for a Minnesota Depository Box Number. However, even if a new coding field for the online documents would enable researchers to digitally reconstruct the contents of any given box deposited in Minnesota, I believe that the extended amount of time that it would take to click through and view each individual document would be overly time-consuming and ultimately counterproductive to the research when compared with the speed that a researcher can flip through and skim hard copy documents in a physical box at the Minnesota Depository.

21. A crucial aspect of the Minnesota Depository is that it includes searchable electronic indices that list every single document that the tobacco companies (with a few exceptions

such as documents produced by BATCo, BAT Industries, plc., Liggett Group, and a few other collections) have produced to the Depository.  These indices—called "4(b) Indices," after paragraph 4(b) in the applicable court order from the Minnesota tobacco litigation, were initially created by the tobacco defendants in that case as a reference list for all documents housed at the Minnesota Depository.  Under the terms of the Minnesota Consent Judgment, each tobacco company is required to supplement its 4(b) Index, as they make new productions of documents to the Minnesota Depository.  As I understand it, the staff of the Minnesota Depository conduct cross-referencing and internal checks on every new shipment they receive of tobacco industry documents, and work with the tobacco companies to ensure that there is a perfect match between the 4(b) Indices and the actual hard copy documents that are actually shipped to and available at the Minnesota Depository.

22. To conduct the most comprehensive search possible using internal tobacco documents, I have generally integrated all sources of tobacco documents into my search strategies. For example, I have frequently identified an initial "seed" document on one of the Defendants' tobacco document websites, and subsequently used the 4(b) Indices at the Minnesota Depository to find the same document in the relevant physical box.  I will then review that entire box and multiple boxes with numerical identifiers preceding and following the original identified box.  This process allows me both to better understand the original "seed" document and to identify additional relevant documents perhaps pertaining to a similar subject matter or authored by the same individual.

23. My research at the Minnesota and Guildford Depositories has also assisted me in understanding the meaning of Defendants' code names highlighted by this Court, which I

believe would have been much more difficult if the only sources available to research tobacco documents were the tobacco companies' document websites. In my view, the very nature of Defendants' use of code names to identify young or underage smokers (such as "YAS," "FUBYAS" and "ASU30") and internal research projects studying nicotine addiction (such as "HIPPO," "MAD HATTER," and "ARIEL") were designed in part to prevent the public from understanding the true meaning of internal tobacco documents should they ever become public. This is particularly true when the code is viewed in isolation in a single document.

24. Likewise, in my view, researching the tobacco industry's knowledge of and acquiescence to the illicit trade of tobacco products would not have been possible by conducting targeted searches on Defendants' document websites for "smuggled cigarettes" or "contraband" because the tobacco industry primarily used codes to describe these activities (e.g., "GT", "General Trade", "DNP" and "Duty Not Paid").  Further, the true meaning of the codes, for example, "DNP", would not have been readily apparent to me if I had seen the phrase in isolation.  Instead, in my view, reviewing entire files and boxes of files at the Minnesota and Guildford Depositories in context allowed for a clearer understanding of these and other terms.

25. By using the search strategies described above and reviewing boxes of documents, page by page, at the Minnesota Depository, I have made serendipitous and important findings that I would have not found on the tobacco document websites. One such example, which ultimately resulted in a peer-reviewed publication, detailed Philip Morris' practice from at least 1996-1998 of censoring information about smoking and health (e.g., the information that exposure to tobacco smoke can trigger asthma and middle ear infections

in children) from quarterly CIGNA health newsletters sent to thousands of employees—
not only the employees of Philip Morris USA, but also the employees of its then-affiliate
companies, Miller Brewing Companies and Kraft General Foods. (Muggli ME, Hurt RD.
A cigarette manufacturer and a managed care company collaborate to censor health
information for employees. *Am J Public Health* 94(8):1307-1311 (2004)). It is my
opinion that my efforts in reviewing boxes of documents produced by Philip Morris USA
in a specific case, and housed at the Minnesota Depository, resulted in this information
being discovered and disclosed to the public, because I would have never thought to use a
term such as "CIGNA" as a search term on Philip Morris' tobacco document website.

26. In another instance, I was able to provide the U.S. House of Representatives'
Government Reform Committee with an internal tobacco document that I found at the
Minnesota Depository (and that was available *only* at the Depository) that informed the
Committee's investigation into so-called reduced risk tobacco products. The document
disclosed a senior BATCo research scientist's doubts in 2000 about the notion that ". . .
the technology exists to make cigarettes which are appreciably less lethal. . ." (Email
from Derek Irwin to Graham Read (May 2, 2000), *quoted in* Minority Staff of H. Comm.
on Government Reform, 108th Cong., *The Lessons of "Light" and "Low Tar"*
*Cigarettes: Without Effective Regulation, "Reduced Risk" Tobacco Products Threaten*
*the Public Health* at 8 (June 3, 2003) (prepared for Reps. Henry A. Waxman and Janice
D. Schakowsky)).

27. In my view, it is essential that the contents of the Minnesota Depository be preserved in
hard copy because there is no certainty that every publicly available document is also
available on the tobacco company document websites.

28. I understand that there is a separate, non-public locked room within the Minnesota Depository that holds documents segregated from the rest of the document population because they are protected in some way. I do not believe these documents are available online, since they are not publicly available at the Depository. Pursuant to a 1999 Court Order in the Minnesota litigation, the Minnesota Defendants were entitled to remove documents from the publicly available portions of the Depository's holdings to this secure area under certain conditions, and Defendants in other litigation are also permitted to do so. If the Depository closes, any possibility for researchers or others to access to these materials could be lost.

29. In my opinion, the administrative and oversight function provided by the Minnesota Depository's management firm, Smart Legal Assistance, is crucial for maintaining adequate public access to the growing universe of internal tobacco company documents.

30. On numerous occasions during the past 13 years, the Minnesota Depository has resolved multiple discrepancies at my request between what was on a box index and what was actually in the box. Specifically, when I have discovered that a document should be included in the box, based on the box index, but is not in the box, the Depository staff has worked to resolve the inconsistency with the Defendants' representative and notified me of the resolution.

31. On multiple occasions, the Minnesota Depository staff has requested, on my behalf, that Defendants' representatives provide a clearer or cleaner photocopy of a document than the available copy deposited in Minnesota.

32. As part of their obligation under the Minnesota Consent Judgment to ensure public access to the collections, the Minnesota Depository staff has also provided me with an ongoing

list of new productions into the Depository, listing the producing Defendant, the box number(s), the date deposited in Minnesota, and the jurisdiction in which the box was produced. I have routinely used such lists as a check on what Defendants place on their tobacco document websites; under the 1998 Master Settlement Agreement with the vast majority of State Attorneys' General, the Participating Manufacturers have 45 days to place a document covered under that agreement online, while the Minnesota Consent Judgment gives Defendants subject to its terms 30 days to deposit pertinent documents to the Minnesota Depository. These lists make it possible to keep tabs on new documents as they are deposited in Minnesota, to alert other researchers and the UCSF library on occasion that new documents should be posted to one or more Defendants' websites, and to have some ability to discover that a Defendant appears not to be complying with some portion of its document disclosure obligations. I believe that without the ability to maintain such a check, the integrity of the tobacco document collections are at risk and ultimately the Defendants may not be accountable for production deadlines, thus preventing the public from viewing the documents.

33. Beginning in 2002, I began to review each box produced by BATCo into the Minnesota Depository. From February 2003 to March 2005, BATCo deposited nearly 360 boxes of documents in this action, *United States v. Philip Morris USA*, *et. al.* During this review, my use of the ongoing list of new productions into the Minnesota Depository as a check on Defendants' production obligations resulted in ultimately identifying about 500,000 pages of documents that BATCo had produced in this case, but wrongly withheld from deposit into Minnesota. I understand that BATCo eventually did produce these

documents into the Minnesota Depository as required under the 1998 Minnesota Consent Judgment.

34. It is significant to note that the Minnesota Depository's collection of documents that BATCo produced in this case, in particular, are not available on any tobacco company document website, because BATCo has no publicly accessible document website (and apparently has yet to create one under this Court's 2006 order). But under the terms of the Minnesota Consent Judgment, BATCo sent hundreds of thousands of pages of documents that it produced in this lawsuit to the Minnesota Depository, where those documents will remain available for researchers' use as long as the Depository remains accessible to the public.

35. In 2002, in accord with the Minnesota Depository's responsibilities to assist the public in accessing its contents, the Depository provided me with a list of all boxes that were physically at the Depository, but *not* listed on the Defendants' 4(b) Indices. This list, 32 single-space pages long, identified hundreds of boxes. (Depository staff advised me that the Defendants, and not Depository staff, were the responsible entities that uploaded information to their respective 4(b) Indices. My understanding is that over the coming months or years, the Depository staff sought to work with the Defendants to address these numerous discrepancies between their 4(b) Indices and what they had actually sent to the Depository.) Because the Depository Staff had alerted me that the current 4(b) Indices were not complete or accurate in this way, I was able to do targeted research on the boxes that had not been indexed and uploaded to the 4(b) Index at that time, and thus could not have been identified through any number of searches for key words or terms on the Defendant-supplied computerized indices. I am not familiar with any mechanism on

14

Defendants' websites to warn users that indices or other finding tools may be incomplete or inaccurate, and nothing in the Master Settlement Agreement requires Defendants to provide such notice to researchers using their document websites.

36.  In my view, having a third-party neutral manage the contents and the operation of the Minnesota Depository is also important to protect public health researchers, government personnel charged with enforcing the Court's order, and members of the public from Defendants' surveillance of their work for advantage in smoking  and health- related litigation. To be sure, I understand that the Minnesota Depository staff verifies the contents of each box after a user reviews it, to ensure that documents are not taken out of the boxes. However, during my research at the Guildford Depository, which BATCo owns, operates, and controls, I have seen video surveillance cameras in the document review rooms, and a two-way mirror for staff to view visitors.

37. With my co-authors, I have published findings in *The Lancet* on the topic of surveillance at the Guildford Depository.  BATCo's document productions into the Minnesota Depository, as required under the 1998 Minnesota Consent Judgment, suggest that BATCo monitored and tracked visitors' database searches on computerized indexes at the Guildford Depository, tracked the physical movement of one visitor outside and in front of the Depository, and observed and noted personal mobile phone use within the building (although outside of the document review rooms).  (Muggli ME, LeGresley EM, Hurt RD. *Big Tobacco Is Watching: British American Tobacco's Surveillance and Information Concealment at the Guildford depository*. Lancet 363:1812-1819 (2004)).  The structure and third-party management and operation of the Minnesota Depository should prevent the Defendants from even contemplating any such practices there.

I hereby sign this declaration under penalties of perjury pursuant to 28 U.S.C. § 1746.


Dated: March 23, 2011                    Respectfully submitted,


Monique Elizabeth Muggli, J.D., M.P.H.
Campaign for Tobacco-Free Kids
127 Orlin Ave SE
Minneapolis, MN 55414