UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 99-CV-2496 (GK) |
| | ) | Next scheduled court appearance: NONE |
| and | ) | |
| | ) | |
| TOBACCO-FREE KIDS ACTION FUND, | ) | |
| *et al.*, | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PHILIP MORRIS USA, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**PUBLIC HEALTH INTERVENORS' OPENING BRIEF
REGARDING CORRECTIVE STATEMENTS IN POINT-OF-SALE DISPLAYS**

In determining the appropriate vehicles Defendants would be required to use to disseminate corrective statements in this case, the Court explained that it would "structure a remedy which uses the same vehicles which Defendants have *themselves historically used to promulgate false smoking and health messages.*" *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 1, 928 (D.D.C. 2006) (emphasis added). Thus, the Court directed that Defendants publish "corrective statements in newspapers and disseminate them through television, advertisements, onsets, *in retail displays*, and on their corporate websites . . . ." *Id.; see also* Order # 1015, ¶ III(B)(7)(b) (emphasis added).

Although remanding this particular remedy for further consideration, the D.C. Circuit did not disturb this Court's findings that retail displays have been an important vehicle for Defendants to communicate their false messages, and thus are an appropriate and important place

for corrective statements.  *United States v. Philip Morris USA, Inc.,* 566 F.3d 1095, 1141-42 (D.C. Cir. 2009).  Rather, the Court of Appeals simply sought to ensure that, in imposing this remedy the Court appropriately considers its implications for the retailers who would have to actually post the displays.  *Id.*

As discussed below, any slight burden on these retailers from this remedy pales in comparison to the vital importance of including corrective statements at the point-of-sale environment, to ensure that smokers and prospective smokers – who have been the target of Defendants' long-standing efforts to communicate their deceptive messages in this venue – now receive the Court-imposed corrective statements, which will, in turn, "prevent and restrain [Defendants] from making fraudulent public statements on smoking and health matters in the future."  449 F. Supp. 2d at 926.  Thus, Intervenors maintain that, upon considering the "'rights of innocent persons,'" 566 F.3d at 1141-42 (quoting 18 U.S.C. § 1964(a)), the Court should continue to require this important remedy, and that, to address the Court of Appeals' concern with "duplicative displays," *id.*, each Defendant should be required to arrange for the posting of a *single* countertop and header display at any one time, rotated among the Defendants.

## BACKGROUND

In deciding this case, this Court made numerous findings regarding the vital importance of convenience stores and point-of-sale displays as a means for Defendants to communicate their deceptive messages to smokers and the public, and *especially youth* – findings which were not even *appealed* by Defendants.  Thus, the Court found that retail stores are "one of Defendants' *central vehicles* for communication of brand imagery and promotional offers," Finding of Fact ("FF") 3110, and that "*[i]n-store placement displays and signs"* at these stores "*are a key*

2

*method by which Defendants communicate brand information and communicate a brand's central message or image*." FF 3111 (emphasis added).  The Court similarly found that these locations, "*frequented by teenagers*," are used by Defendants to "create tobacco friendly environments containing enticing displays . . . and *visible point-of-sale advertising*."  FF 3110 (emphasis added); FF 3114 (noting a Philip Morris study which "found that the best, most visible, point of sale spots were 'on the counter, behind the counter or cashier, and on and around the door'"); *see generally* FF 3110-3129.

It was against this backdrop that this Court included point-of-sale displays among the vehicles through which corrective statements would be required.  Explaining that "[t]he trial record amply demonstrates that Defendants have made false, deceptive, and misleading public statements about cigarettes and smoking" for decades, that "certain of Defendants' public statements . . . *continue* to omit material information," and that "Defendants *continue* to make affirmative statements on smoking and health issues that are fraudulent," the Court directed Defendants to publish corrective statements – including displays at points-of-sale – to "prevent and restrain [Defendants] from making fraudulent public statements on smoking and health matters in the future."  449 F. Supp. 2d at 926; *see also* Order # 1015, ¶ II(B)(6)(b).[1]

After the Court's judgment, Defendants filed a motion for a stay pending appeal raising arguments concerning, *inter alia*, the point-of-sale displays remedy.  Defendants' Motion for

---

[1]    Specifically, the Court directed Defendants to arrange for retailers who sell their products, for two years, to post a countertop display – "[a] free-standing display with a minimum height of 30 inches and a minimum width of 18 inches that is placed on the counter at retail shops within the line-of-sight of any customer who is standing in line for the register" – and a header display – a "banner that is displayed by a retailer at the top of a cigarette display case . . . ."  449 F. Supp. 2d at 946-47.

Stay (DN 5746).  Defendants themselves self-servingly argued that the requirement would

"reduce the [retail merchandizing] Program's economic value to the retailer," *id.*, Declaration of

David Beran ("Beran Decl.") (a Philip Morris Vice-President), ¶ 33, and they also submitted

declarations from the convenience store industry, including one claiming that losing "one square

foot of countertop space could cost the industry $82 million in sales per year." *Id.*, Declaration

of Lyle Beckwith (a National Association of Convenience Stores ("NAACS") Senior Vice-

President), ¶ 10.

In that submission, Defendants estimated that "approximately 350,000 retailers sell

cigarettes in the country." *Id.*, Declaration of Brice O'Brien, ¶ 20.  Based on the NAACS' $82

million per square-foot/year figure, this would translate into an annual cost of approximately

$234 per square-foot/store ($82 million/350,000), or less than 65 cents each day per square-foot/

store ($234/365 days).  Using these numbers, a single countertop sign – which would be 3.75

square feet[2] – would thus cost the average retailer less than $2.50/day of lost revenue (65 cents x

3.75).[3]

In rejecting the stay motion, the Court explained that, while there may be costs to retailers

and others in implementing the Court's remedies, "there is no question that far more people will

be protected than would be adversely affected by compliance with the Order's provisions."  Sept.

28, 2006 Mem. Op. (DN 5767) at 3, n.3; *see also id.* ("[T]he public interest in enuring that

---

[2]     *See* 449 F. Supp. 2d at 946 (requiring signs of 30 x18 inches, which translates into 540 square inches, or 3.75 square feet (540 divided by 144 (the size of one square foot (12x12)).

[3]     This figure assumes the display is placed horizontally on the countertop.  If placed vertically, as countertop displays are typically oriented, the figure would presumably be significantly less.

Defendants do not continue to engage in activities which this Court found constituted a 50-year conspiracy to deceive the American public about the addictiveness of nicotine and the health effects of smoking, second-hand tobacco smoke, and so-called 'low tar' cigarettes, simply cannot be overstated"); *id.* at 5 (finding that "there is a very substantial likelihood that many individuals (particularly impressionable youth, and the vulnerable very young and very old exposed to ETS) will be harmed" unless the remedies go into effect, which "far outweigh[s] Defendants purely economic concerns").

On appeal, Defendants continued to argue against this remedy on various grounds, and the National Association of Convenience Stores filed an Amicus brief addressing purported burdens this requirement would pose to its members. *See* 566 F.3d at 1141. Recognizing that the court should "'mak[e] due provisions for the rights of innocent persons'," the D.C. Circuit remanded the point-of-sale remedy with instructions for this Court to simply "consider the rights of retailers" in fashioning this remedy. *Id.* (quoting 18 U.S.C. § 1964(a)). However, significantly, the D.C. Circuit in no manner indicated that, upon considering the retailer's rights, the Court could not, or should not, continue to impose this important remedy. To the contrary, the Court simply indicated that the Court should consider "crafting a new version reflecting the rights of third parties," 566 F.3d at 1142, and that, in so doing, the Court should clarify that the remedy does not "require duplicative displays," *id.* – *i.e.*, does not require "the same retail store to display substantively identical, but separate, signs" from each Defendant at the same time. *Id.*

5

## **DISCUSSION**

A host of studies and reports support the Court's central findings regarding the vital

importance of retail display space as a venue for Defendants to communicate their messages

(especially to youth) – and hence a critical location for the Court to continue to require corrective

statements.  Indeed, as explained in the National Cancer Institute's ("NCI") Monograph 19, the

importance and use of these locations has increased dramatically as tobacco advertising has been

restricted elsewhere:

> Cigarette advertising and promotion are heavy in volume and high in visibility at
> the point of sale, particularly in convenience stores.  Cigarette marketing at the
> point of sale increased substantially after the 1998 Master Settlement Agreement,
> which included a ban on cigarette advertising on billboards.  *About 60% of all
> cigarettes sold in the United States are purchased in convenience stores, where
> cigarettes are the top in-store product category in terms of consumer sales.*

U.S. Dep't of Health & Human Services, National Cancer Institute, *The Role of the Media in

Promoting and Reducing Tobacco Use, Tobacco Control Monograph No. 19* 14 (Ronald M.

Davis *et al.*, eds., June 2008), http://cancercontrol.cancer.gov/tcrb/monographs/19/

m19_complete.pdf ("Monograph 19") (providing conclusion 5 from Chapter 4) (emphasis

added); *see also* Lisa Henriksen *et al.*, *A Longitudinal Study of Exposure to Retail Cigarette

Advertising and Smoking Initiation*, 126 Pediatrics 232, 233 (2010), *available at*

http://www.pediatrics.org/cgi/content/full/126/2/232 (explaining that "[p]oint of sale has become

the *dominant channel for tobacco advertising in the United States*, representing 90% of the

tobacco industry's $12.5 billion marketing budget in 2006") (emphasis added).

Defendants heavily rely on point-of-sale displays because they are incredibly effective:

one study explains that "[a]dvertising industry data from the US suggests POS [point-of-sale]

displays *increase tobacco sales by 12% to 28%*." O.B.J. Carter *et al.*, *The Effect of Retail Cigarette Pack Displays on Unplanned Purchases: Results from Immediate Post-Purchase Interviews*, 18 Tobacco Control 218, 218 (2009), *available at* http://cbrcc.curtin.edu.au/ reports/journal%20articles/tc%2018%20218-221.pdf; April Roeseler *et al.*, *Tobacco Marketing in California and Implications for the Future*, 19 Tobacco Control i21, i22 (2010), *available at* http://tobaccocontrol.bmj.com/content/19/Suppl_1/i21.full (explaining that "[n]umerous studies document the influence of point-of-purchase tobacco marketing and price promotions on smoking initiation, movement along the smoking continuum to a regular smoker and undermining of quit efforts").

Defendants' heavy utilization of this communications environment, as well as the empirical evidence on these displays' effectiveness, all serve to demonstrate that *people pay attention* to the messages provided there – and thus why the perpetuation of Defendants' fraud in these particular locations has profited both Defendants and the convenience stores where these displays have been used and Defendants' cigarettes are sold. Indeed, the communicative value of these venues has also been demonstrated by a host of studies on *other* products, which have shown that people pay attention to messages at these locations. *See, e.g.,* Dara Bergen & Ming-Chen Yeh, *Effects of Energy-Content Labels and Motivational Posters on Sales of Sugar-Sweetened Beverages: Stimulating Sales of Diet Drinks Among Adults Study*, 106 J. Am. Dietetic Ass'n 1866 (2006), *available at* http://www.ncbi.nlm.nih.gov/pubmed/17081839

(finding that placing information regarding healthy beverage labels and motivational posters at

the point of sale significantly increased the number of healthier drinks purchased).[4]

As the Court also found, this particular venue is especially important for communicating

messages to *youth*.  Thus, as one recent study concluded, "young people's exposure to tobacco

displays at the POS [point-of-sale] is significantly associated with being susceptible to smoking,

experimenting with smoking and current smoking."  J. Paynter *et al.*, *Point of Sale Tobacco*

*Displays and Smoking Among 14-15 Year Olds in New Zealand: A Cross Sectional Study*, 18

Tobacco Control 268, 272 (2009), *available at* http://www.parliament.nz/NR/rdonlyres/

89AF963E-DA67-4FD0-975F-59C214D39858/187592/49SCHE_EVI_00DBHOH_BILL10487_

1_A175283_JanetHoekSu.pdf; *see also* Sandy J. Slater *et al.*, *The Impact of Retail Cigarette*

*Marketing Practices on Youth Smoking Uptake*, 161 Arch. Ped. Adolescent Med. 440 (May

2007), *available at* http://archpedi.ama-assn.org/cgi/reprint/161/5/440.pdf (study with results

suggesting that point-of-sale advertising is associated with encouraging youth to try smoking).[5]

---

[4]        *See also* Simone A. French, *et al.*, *Pricing and Promotion Effects on Low-Fat
Vending Snack Purchases: The CHIPS Study*, 91 Am. J. Pub. Health 112, 114-15 (2001),
*available at* http://ajph.aphapublications.org/cgi/reprint/91/1/112.pdf (finding that point-of-sale
signs promoting the purchase of low-fat snacks were associated with a statistically significant
increase in low-fat snack sales); Lisa A. Sutherland, *et al*., *Guiding Stars: The Effect of a
Nutrition Navigation Program on Consumer Purchases at the Supermarket*, 91 Am. J. Clinical
Nutrition (Supp.) 1090S, 1092S (2010), *available at* http://www.ajcn.org/content/early/
2010/02/10/ajcn.2010.28450C.full.pdf+html (finding that placing "star ratings" on healthy food
options not only "was effective at bringing about changes in food purchasing immediately after
implementation, but also continued to incrementally improve the purchasing of star-rated foods 1
and 2 [years] later").

[5]        *See also* Lisa Henriksen, *et al*., *Association of Retail Tobacco Marketing With
Adolescent Smoking*, 94 Am. J. of Pub. Health 2081, 2082 (2004), *available at*
http://ajph.aphapublications.org/cgi/reprint/94/12/2081.pdf (study of middle school students
finding that "weekly or more frequent exposure to retail tobacco marketing was associated with a
50% increase in the odds of ever smoking— nearly as much as the effect of exposure to a parent

Indeed, Defendants themselves focus their point-of-sale advertising at retailers *most likely to be frequented by adolescents*.  *See* Lisa Henriksen *et al*., *Reaching Youth at the Point of Sale: Cigarette Marketing is More Prevalent at Stores Where Adolescents Shop Frequently*, 12 Tobacco Control 315, 317 (2004), *abstract available at* http://www.ncbi.nlm.nih.gov/pmc/ articles/PMC1747887/ (finding that "stores popular among adolescents displayed more than three times as many cigarette marketing materials outside, and contained twice as much shelf space for Marlboro, Camel, and Newport").  It also is not surprising that research shows that students are more likely to smoke when their schools are *located near retailers with a high density of tobacco advertising*.  *See* Lisa Henriksen *et al.*, *Is Adolescent Smoking Related to the Density and Proximity of Tobacco Outlets and Retail Cigarette Advertising Near Schools?*, 47 Preventative Med. 210, 212 (2008), *available at* http://www.ncbi.nlm.nih.gov/pubmed/18544462; *see also* Melanie Wakefield *et al.*, *An Experimental Study of Effects on Schoolchildren of Exposure to Point-of-Sale Cigarette Advertising and Pack Displays*, 21 Health Educ. Res. 338, 345 (2006), *available at* http://her.oxfordjournals.org/content/21/3/338.full.pdf+html (showing that point-of-sale advertising of cigarettes weakens teenagers' resolve not to smoke)*.*

Retail displays are also correlated with negative effects on those trying to smoke less or to stop smoking altogether.  Melanie Wakefield *et al.*, *The Effect of Retail Cigarette Pack Displays*

---

or household member who smokes"); *see also id.* at 2081 ("In recent surveys, all 15- and 16-year-olds reported seeing point-of-purchase marketing for cigarettes, and teenaged smokers preferred whichever brand (Marlboro or Camel) was advertised most heavily in the convenience store nearest their school");  Lisa Henriksen, *et al.*, *A Longitudinal Study of Exposure to Retail Cigarette Advertising and Smoking Initiation*,  126 Pediatrics 232, *available at* http://pediatrics.aappublications.org/cgi/content/abstract/126/2/232 (study finding that, of students who initiated smoking, those "who visited convenience, liquor, or small grocery stores at least twice per week" were more than three times more likely to do so than those who visited such stores less than twice per month).

9

*on Impulse Purchase*, 103 Addiction 322, 325 (2007), *abstract available at*

http://onlinelibrary.wiley.com/doi/10.1111/j.1360-0443.2007.02062.x/abstract (finding that

"cigarette displays stimulate impulse purchases among smokers" and that "[t]hose trying to avoid

smoking commonly experience urges to purchase cigarettes when confronted with cigarette

displays"); Janet Hoek *et al.*, *How Do Tobacco Retail Displays Affect Cessation Attempts?*

*Findings from a Qualitative Study*," 19 Tobacco Control 334 (2010), *abstract available at*

http://tobaccocontrol.bmj.com/content/19/4/334.abstract (reporting on study with findings that

"suggest that tobacco retail displays promote smoking and undermine cessation attempts").  It is

also clear that Defendants heavily focus retail displays in minority neighborhoods, where they are

also effective in attracting and maintaining smokers. *See* Brian A. Primack *et al*., *Volume of*

*Tobacco Advertising in African American Markets: Systematic Review and Meta-Analysis*, 122

Pub. Health Rep. 607, September/October 2007, *available at* http://www.publichealthreports.org/

archives/issueopen.cfm?articleID=1929 (study finding that there were 2.6 times more tobacco

advertisements per person in areas with an African American majority population compared to

white-majority areas); Robert John, *et al.*, *Point-of-Sale Marketing of Tobacco Products: Taking*

*Advantage of the Socially Disadvantaged?*, 20 J. Health Care for the Poor & Underserved 489

(2009), *available at* http://www.ncbi.nlm.nih.gov/pubmed/19395844 (study finding higher

tobacco advertising density in low income and minority communities than in higher income,

mostly white communities).

       Particularly in light of this abundant literature – which all supports the Court's core

findings in this case – there is no basis for Defendants' suggestion that the Court's remedy

requiring that corrective statements be provided at convenience stores and other point-of-sale

10

outlets "*should be abandoned*, on the grounds that it would both harm innocent persons – the retailers – and be administratively impractical, since it would involve attempting to impose this requirement upon hundreds of thousands of retailers throughout the United States."  Certain Def's. Status Report (DN 5841) at 15 (Nov. 24, 2010) (emphasis added).

To be sure, Intervenors are not suggesting that the Court require redundant corrective statement displays from multiple Defendants simultaneously – a burden Defendants highlighted in their motion to stay (*see* DN 5746-4) (picture showing three countertop display boards on one convenience store counter), but which the D.C. Circuit has already decided should not be imposed.  566 F.3d at 1142 (directing that the Court not require "multiple duplicative displays at each retail store").  Rather, given the minimum burden – if any – on retail outlets associated with non-duplicative displays, as compared to the importance of this particular venue as a vehicle to reach the audiences that need to see Defendants' corrective statements, the requirement for a *single* countertop and header display should continue to be required.

As regards the value of these displays, as noted, smokers, prospective smokers, and especially youth, see and understand the messages communicated at these venues –  precisely the reason Defendants rely so heavily on them.  Indeed, this corrective statements vehicle may be even more important than others the Court has identified, such as newspapers, given that these target audiences – who have already received, and are continuing to receive, Defendants' point-of-sale messages at these locations – may not see the messages elsewhere.  *See* Public Health Intervenors' Resp. On Corrective Statements (DE 5883) at 11 (explaining declines in newspaper readership) (citing Pew Ctr. for the People and the Press, *Americans Spending More Time*

*Following The News: Ideological News Sources, Who Watches and Why* (Sept. 12, 2010),

*available at* http://people-press.org/http://people-press.org/files/legacy-pdf/652.pdf ).

Thus, while a convenience store visitor may not read a newspaper, watch network

television, or have occasion to review Defendants' websites, *see* Order # 1015, ¶ III(B)(6),

7(c)and 7(d) (requiring corrective statements in these three venues), and would only see onserts

when they buy a pack of cigarettes during a limited time period, *id.* ¶ III(B)(7)(a) (requiring

onserts for six weeks/year), they will see the point-of-sale displays whenever they go to a retail

outlet that sells Defendants' cigarettes.  *Id.* ¶ III(B)(7)(b).  Given the Court's findings that these

displays are one of "Defendants' central vehicles" and "key method[s]" for communication, FF

3110-11, there can be no serious dispute that this particular remedy is vital to accomplish the

Court's goal to "prevent and restrain [Defendants] from making fraudulent public statements on

smoking and health matters in the future."  449 F. Supp. 2d at 926.

On the other side of the coin, the government is fully addressing the contractual

arrangements between the retailers and Defendants, and why, in light of those arrangements, this

remedy is neither "administratively impractical," Certain Def's. Status Report (DN 5841) at 15

(Nov. 24, 2010), nor poses an unwarranted burden on third parties.  Intervenors would only add

that, using Defendants' own figures, it would appear that the cost to each retailer for the single

countertop display that would be required would be less than $2.50/day of lost revenue.  *See*

*supra* at 4.  Given that retailers generally earn no more than 2 percent profit on their sales, this

translates into *a lost profit of about 5 cents each day*.[6]

_____

[6]         *See Oversight Hearing on the Impact of Interchange Fees on Small Businesses Before the Subcommittee on Investigations of the H. Committee on Small Bus.*, 111th Cong. 3 (2010) (statement of Chris Newton, Pres., Tex. Petroleum Marketers & Convenience Store

This pales in comparison to the *profits* these stores reap from tobacco sales.  This, of course, includes significant profits they continue to reap as a result of their customers' misunderstandings about cigarettes and their effects – misunderstandings which the corrective statements are expressly designed to correct.  *See, e.g., Warner-Lambert Co. v. F.T.C.*, 562 F.2d 749, 763-64 (D.C. Cir. 1977) (explaining that the corrective statements at issue there could "not be viewed in isolation; they must be seen against the background of over 50 years in which Listerine has been proclaimed –and purchased – as a remedy for colds").[7]

Accordingly, Intervenors urge the Court not to abandon the point-of-sale remedy, as Defendants have requested.  Rather, Intervenors request that the Court continue to require this remedy, and, to address "duplicative displays," 566 F.3d at 1142, simply require each Defendant to post at each store a single countertop and header display one at a time, following the order the Court established for newspaper advertisements.  Order # 1015, ¶ II(B)(7)(c).  Thus, for example, the requirement would first run to Altria.  *Id.*  Since the Court originally intended each Defendant

---

Ass'n) (explaining that "for the convenience store industry . . . our retail profit margins average under 2 percent"), *available at* http://www.gpo.gov/fdsys/pkg/CHRG-111hhrg57522/pdf/CHRG-111hhrg57522.pdf)).

[7]     As compared to the potential for lost revenue, it bears noting that in recent years "[a]verage sales of cigarettes *per store were $576,354 . . . .*"  *See Ctr. For Tobacco Policy & Organizing, Cigarettes Generate Big Revenue for Convenience Stores: Analysis of 2010 State of the Industry Report* (Mar. 2011), *available at* http://www.center4tobaccopolicy.org/CTPO/_files/_file/Cigarettes%20Generate%20Big%20Revenue%20for%20Convenience%20Stores%20March%202011.pdf. (emphasis added).  Similarly, as compared to lost profits, one study concluded that retail stores' average monthly incentive payments from tobacco companies was $204.51, or over $2,400 per year.  *See* Ellen C. Feighery *et al.*, *Retail Trade Incentives: How Tobacco Industry Practices Compare With Those of Other Industries*, 89 Am. J. Pub. Health 1564, 1565 (1999), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1508800/pdf/amjph00010-0106.pdf.

13

to separately post displays for two years, Intervenors propose that each Defendant now be

required to individually post the displays for two years, after which the obligation would rotate

for the following two years to the next Defendant on the list.[8]


Respectfully submitted,

/s/ *Howard M. Crystal*
Howard M. Crystal
(D.C. Bar No. 446189)
Katherine A. Meyer
(D.C. Bar No. 244301)

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Avenue, Suite 700
Washington, DC 20009
202-588-5206
hcrystal@meyerglitz.com

April 1, 2011                                                    Attorneys for the Public Health Intervenors

---

[8]       Alternatively, the Court could limit the requirement for each Defendant to the number of months that would produce a *total* of two years of displays.  Assuming these obligations do not run to BATCo, *see* DN 5900 (Order # 16), this would mean approximately 5 months each.

14