UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,     )<br>                                             )<br>      Plaintiff,                )<br>                                             )<br>      and                      )<br>                                           )<br>TOBACCO-FREE KIDS ACTION FUND,  )<br>*et al*.,                                     )<br>                                           )<br>      Plaintiff-Intervenors,   )<br>                                         )<br>      v.                        )<br>                                         )<br>PHILIP MORRIS USA, INC., *et al.*,   )<br>                                         )<br>      Defendants.        )<br>_____) | Civil Action No. 99-CV-2496 (GK)<br>Next scheduled court appearance: NONE |

**PUBLIC HEALTH INTERVENORS' RESPONSE TO DEFENDANTS' SUBMISSION
REGARDING CORRECTIVE STATEMENTS IN POINT-OF-SALE DISPLAYS**

      Misrepresenting the D.C. Circuit's straightforward ruling that "'the rights of innocent persons'" should be considered before a point-of-sale display remedy is imposed to address Defendants' massive violations of RICO, *United States v. Philip Morris USA, Inc.,* 566 F.3d 1095, 1141-42 (D.C. Cir. 2009) (quoting 18 U.S.C. § 1964(a)), Defendants insist that the Court of Appeals has already decided that this particular remedy "*cannot* lawfully be imposed." Defs. Submission Concerning Point-Of-Sale Display Requirement (DN 5906) ("Defs. Br.") at 1 (emphasis added). Based on this entirely false premise, Defendants argue that the Court must abandon this remedy, while they simultaneously acknowledge how critically important this particular venue is to communicate messages to smokers and potential smokers. *Id.* at 6, n.2 (explaining the "essential role" point-of-sale displays play in Defendants' marketing efforts).

Although the D.C. Circuit vacated this remedy to allow the Court to consider the rights of affected retailers – which the Court is now doing (*see* Order # 19-remand (DN 5916)) – the Court of Appeals certainly did *not* state that this remedy is no longer appropriate or permissible. Particularly given that Defendants' submission further highlights why it is "essential" that the Court continue to require corrective statements in this particular venue, Defendants certainly have not demonstrated that the Court should abandon this remedy because it would be unduly burdensome on innocent third parties or for any other reason.

## DISCUSSION

Before turning to Defendants' specific arguments, it is critical to highlight the area on which the parties agree: point-of-sale displays are a central vehicle for tobacco companies to communicate their messages. Plaintiffs' opening briefs summarized the Court's myriad findings on this point, and the ample scientific literature demonstrating Defendants' use of point-of-sale displays to reach their target audiences – including youth, minorities, and smokers trying to quit. Int. Opening Br. Regarding Point-of-Sale Displays ("Int. Point-of-Sale Br.") (DN 5903) at 2-3; 6-10; *see also* United States' Opening Brief Regarding Point-of-Sale Displays (DN 5905) at 3-6.

Defendants do not dispute this point. To the contrary, in their effort to convince the Court to abandon this remedy, Defendants echo the same overall theme, emphasizing how vital point-of-sale messages are to their ability to market their products and communicate with the public. *See, e.g.*, Defs. Br. at 6, n.2 (discussing point-of-sale displays' "essential role in Defendants' ability to promote their products"). Thus, Defendants complain that requiring corrective statements in these venues would "seriously impair one of the few *remaining avenues for Defendants to communicate with consumers* . . .." Defs. Br. at 19 (emphasis added); *see also*

*id.* Defs. Br., Decl. of Miguel Martin, ¶ 10 ("The Retail Leaders Program plays an *essential role in PM USA's ability to promote its products* and communicate with adult smokers in a meaningful way") (emphasis added).

This, of course, is precisely why it is so vital that the Court *not* abandon this remedy. The Court has found – and the D.C. Circuit has affirmed – that Defendants for decades have misrepresented, *inter alia*, the adverse health effects of smoking and the nature of addiction, and, for this reason, the Court has directed that corrective statements be communicated using the same venues "Defendants have themselves historically used to promulgate false smoking and health messages." *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 1, 928 (D.D.C. 2006). Given that there is no dispute that point-of-sale displays are an "essential" component of Defendants' communications arsenal, it could not be clearer that the Court must maintain this remedy in order for the corrective statements to fulfill their objective to "prevent and restrain [Defendants] from making fraudulent public statements on smoking and health matters in the future." 566 F.3d at 1140; *id.* at 1144-45 (corrective statements will "thwart[ ] prospective efforts by Defendants to either directly mislead consumers or capitalize on their prior deceptions by continuing to advertise in a manner that builds on consumers' existing misperceptions").

Indeed, in considering the "rights of innocent persons" here, the Public Health Intervenors urge the Court to bear in mind the rights of the millions of innocent *consumers* who have been, and continue to be, bombarded with Defendants' misrepresentations, including at point-of-sale displays. *See Cook, Inc. v. Boston Sci. Corp.*, 333 F.3d 737, 744 (7th Cir. 2003) (instructing that potential negative effects of injunction on innocent persons should "be balanced against the harm . . . from narrowing the injunction"). As the Court has already recognized, in light of

Defendants' massive misconduct, these interests far outweigh any minor economic interests that may be at stake in imposing this remedy.  *See* Sept. 28, 1006 Mem. Op. (DN 5767) (rejecting requested stay on remedies, including point-of-sale displays due to the "substantial likelihood that many individuals (particularly impressionable youth, and the vulnerable very young and very old exposed to ETS) will be harmed," which "far outweigh[s] Defendants purely economic concerns").

None of Defendants' specific arguments here – *e.g.*, that the D.C. Circuit prohibited the point-of-sale displays remedy; that the remedy is no longer warranted or is otherwise inappropriate in light of its impact on Defendants; and that it must be abandoned in light of adverse impacts on retailers – change this result.

*First,* the D.C. Circuit did not "squarely reject" the point-of-sale remedy, and, accordingly, in urging the Court to maintain this essential venue for communicating corrective statements the United States and Public Health Intervenors are not attempting to "circumvent" or "evade the mandate" of the Court of Appeals.  Defs. Br. at 2, 7.  Indeed, Defendants mischaracterization of the D.C. Circuit ruling on this score is stunning.  For example, although the Court noted that under certain circumstances "third parties *may* be so adversely affected by an injunction as to render it improper," the Court did *not* decide that this was such a case; rather it remanded the matter for *this Court* to "evaluate and, mak(e) due provision for the rights" of the retailers, "by either abandoning this part of the remedial order *or by crafting a new version reflecting the rights of third parties."* 566 F.3d at 1141-42 (emphasis added).

Surely the Court of Appeals would not have suggested that this Court could "craft[ ] a new version" of this remedy if, as Defendants claim, the Court of Appeals vacated the remedy

4

*because* it "would so adversely affect these third-party retailers 'as to render (the requirements) improper.'" Defs. Br. at 9; *id.* at 10 (claiming that the point-of-sale remedy was "rejected as an impermissible impairment of nonparties' rights"); *id.* at 13 (claiming the D.C. Circuit "recognized when it vacated" this remedy that it is "unlawful and unconstitutional"). On the contrary, consistent with the plain language of 18 U.S.C. § 1964(a), the Court of Appeals merely instructed this Court to consider the retailers' interests before finalizing a remedy regarding their obligations to include Defendants' corrective statements in point-of-sale displays.[1]

*Second,* the Court should reject out of hand Defendants' arguments regarding purported harms to *Defendants themselves* from the point-of-sale remedy. *E.g.* Defs. Br. at 7 (arguing that the remedy will "have an adverse impact on the value of merchandising contracts for Defendants"); *id.* at 19-20. Defendants had a full and fair opportunity to press arguments against point-of-sale displays and other aspects of the corrective statements remedies before this Court issued its final ruling, and another opportunity in the D.C. Circuit. *E.g.* 566 F.3d at 1138-39 (rejecting the argument that Defendants were denied the opportunity to challenge corrective statements remedies). The only grounds for the Court of Appeals' remand was for further consideration of potential impacts on *third parties*, who, unlike Defendants, did not have that opportunity. *See* 566 F.3d at 1141-42 (explaining concern that the district court had "failed to

---

[1]   As Intervenors have explained, in light of the objections that have been raised thus far, the only modification necessary is to make clear that "duplicative displays" are not required. Int. Point-of-Sale Br. at 13. Should the retailers raise any other legitimate concerns, *see infra* at 10, those can be addressed at that time.

consider the rights of retailers" who were "*not parties to or otherwise heard in the district court proceedings*") (emphasis added).[2]

*Third*, many of Defendants' arguments should be rejected here because they are already at issue in other motions that are pending before the Court. For example, Defendant argue at length that the "POS [point-of-sale] requirements are wholly unnecessary and unwarranted" in light of the Family Smoking Prevention and Tobacco Control Act, Pub. Law No. 111-31 ("Family Smoking Prevention Act"), detailing the Act's provisions and FDA's implementation. *See, e.g.* Defs. Br. at 11-12. This same argument is, of course, the basis for Defendants' pending motion for vacatur of this Court's entire ruling and remedies, *see* DN 5880 – and thus Defendants' argument on that score with respect to the point-of-sale remedy should be rejected for all of the same reasons that the United States and the Public Health Intervenors have put forward in responding to that motion. DN 5907; DN 5908; *see also* Defs. Br. at 1, n.1 (rehashing FDA Act argument). Similarly, Defendants' arguments that the point-of-sale requirement is an unconstitutional infringement on Defendants' free-speech rights, Defs. Br. at 8, n.3, simply rehash arguments Defendants are making against the entire corrective statements remedy – to which the government and Intervenors have also responded. DN 5890; DN 5891.

*Finally*, with respect to purported harms to retailers, the Court has invited retailers to explain their concerns, *see* Order #19-remand, and Intervenors would ask for an opportunity to respond to any additional arguments or evidence retailers may put forward regarding the impacts

---

[2] Defendants also ignore that the remedy is time-limited: Defendants are only required to display these messages for twenty months over a two year period. Order #1015, ¶ II(B)(6)(b). Nor are Defendants inhibited from continuing to display their *own* point-of-sale advertising during this time.

that the point-of-sale remedy may have on them. However, as regards the arguments by Defendants *on behalf* of the retailers, none of Defendants' claims demonstrate any undue hardship to retailers from this remedy. As Intervenors have explained, the remedy will impose extremely minor costs on individual retailers – costs that pale in comparison to the funds retailers receive through their retail marketing agreements with Defendants, as well as the revenues they obtain from cigarette sales. *See* Int. Point-of-Sale Br. at 12-13.[3]

Defendants do not demonstrate otherwise. While they vaguely claim that the remedy "would impose substantial economic burdens" on retailers, Defs. Br. at 13, they provide no evidence, as opposed to pure speculation, as to lost revenues or profits – if any – that might be associated with the remedy. *See also, e.g.,* Defs. Br. at 14 (lost countertop space "*could* significantly decrease retailers' sales revenues"). Indeed, nothing in their submission undermines Intervenors' conclusion that the remedy would have only a *de minimis* cost to retailers, particularly in the absence of duplicative, concurrent displays.

In this regard, while the D.C. Circuit emphasized that on remand this Court must properly consider the rights of retailers, the Court of Appeals did not indicate that there could be *no burden at all* on third parties associated with the Court's remedies. 566 F.3d at 1141-42. Rather, the Court was concerned about a remedy that would be a "serious detriment" to innocent persons. *Id.* Given how little cost this remedy would actually impose – particularly balanced against the tremendous benefits these retailers accrue from both the retail merchandising program and the sale of Defendants' cigarettes – the remedy poses no such "serious detriment." *See Cook Inc.*,

---

[3] Indeed, to the extent retailers lose cigarette sales because consumers make different purchasing decisions once they receive truthful information about cigarettes, this simply means that those sales would presumably not have occurred absent Defendants' massive fraud.

333 F.3d at 744 (instructing that court should consider both negative and positive effects of injunctive relief and arrive at an appropriate balance); *see also, e.g., Hecht Co. v. Bowles*, 321 U.S. 321, 329-30 (1940) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims").

Moreover, as the United States has explained, even as to this small burden, it would be entirely appropriate and consistent with RICO for the Court to require *Defendants*, who are the parties responsible for the misconduct that has necessitated this particular remedy, to reimburse retailers for any such costs incurred in posting corrective statements crafted to prevent such unlawful conduct from continuing. United States' Opening Brief on Point of Sale (DN 5905) at 19-23 (citing *United States v. Sasso*, 215 F.3d 283, 292 (2d Cir. 2000)). Indeed, since Defendants spend *billions* on their marketing efforts, any such costs would be extremely minor for them.[4]

Defendants' concerns with retailers' First Amendment rights are also without merit. Defs. Br. at 8; 15-17. As a threshold matter, this argument makes little sense since Defendants do not even purport to know that retailers object to the content of the mandated messages. *Id.*

---

[4] *See, e.g.* Lisa Henriksen *et al.*, *A Longitudinal Study of Exposure to Retail Cigarette Advertising and Smoking Initiation*, 126 Pediatrics 232, 233 (2010), *available at* http://www.pediatrics.org/cgi/content/full/126/2/232 (noting that retail store-related marketing efforts represented "90% of the tobacco industry's $12.5 billion marketing budget in 2006"); *see also* Federal Trade Commission Cigarette Report for 2006, *available at* http://www.ftc.gov/os/2009/08/090812cigarettereport.pdf (same).

(objecting to messages with which retailers "*may*" not agree).  Moreover, the remedy does not require *retailers* to do or say anything – it simply requires that, if they want to participate in Defendants retail merchandising programs, they must make the point-of-sale venue available for corrective communications imposed on the *Defendants* designed to prevent and restrain further fraud.

Furthermore, once again, Defendants' First Amendment arguments simply rehash their pending submission against corrective statements, which the Court will address in resolving the matters raised in that briefing.  *See supra* at 6 (citing briefs).[5]  With respect to retailers rights, however, it bears noting that retailers have been displaying cigarette packs with mandated health messages on them for decades.  Indeed, as noted, one of Defendants' arguments *against* the point-of-sale remedy is that it is unnecessary because, under the Family Smoking Prevention Act, consumers will soon be seeing *other* "advertisements that appear at the point of sale," including various public health warnings and "graphic warnings that, according to the FDA, 'are designed to clearly and effectively convey the negative health consequences of smoking' to the public." Defs. Br. at 12 (quoting 75 Fed. Reg. 69,524, 69,526 (Nov. 12, 2010)).  As we have explained, these health warnings are entirely independent of corrective statements and serve different purposes, but as regards Defendants' First Amendment arguments, if there is no First

---

[5] For example, one of Defendants' arguments here is that the displays violate the First Amendment because the statements are "inflammatory," Defs. Br. at 17, but the *content* of the point-of-sale displays, and all other corrective statements venues, have already been briefed elsewhere.  Similarly, Defendants' assertion that the Court must independently evaluate whether there are "less burdensome ways for the Government to disseminate *public health information* to smokers," Defs. Br. at 16 (emphasis added), misstates the purpose of the corrective statements, which are not public health messages.  *See* Int. Response on Corrective Statements (DN 5890) at 11-12.

Amendment constraint on any of *those* messages being placed in retailers' stores – messages that Defendants erroneously claim are a suitable substitute for the point-of-sale remedy – there is certainly no First Amendment constraint in the point-of-sale remedy itself.

Defendants' other unsubstantiated concerns are equally meritless. Certainly vague allusions that the remedy could create "security problems" leading to "higher risks of theft and robbery," Defs. Br. at 7, are insufficient to justify abandoning the remedy. The Court did not direct precisely *where* the displays must be located, and there is no basis to assume that retailers could not find ways to display the required information without causing such problems – just as they have managed to set out Defendants' many point-of-sale displays for many years.

In any event, since these concerns – if they really exist – belong to the *retailers*, not the Defendants, they should be raised in the submissions the Court has invited retailers to submit by May 15, 2011. Order #19-remand. In the event retailers do make such submissions, raising additional arguments for altering this remedy, Intervenors urge the Court to allow Plaintiffs an opportunity to respond to those concerns at that time.[6]

---

[6] Similarly, in the event the Court decides that the point-of-sale remedy is too burdensome on retailers to be imposed in substantially its current form, the Public Health Intervenors respectfully request an opportunity to propose alternative corrective statements venues designed to reach the same target audiences – such as direct mail, email and other communication channels that will reach smokers and prospective smokers who already receive Defendants' marketing through these outlets.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | /s/ *Howard M. Crystal* |
|  | Howard M. Crystal |
|  | (D.C. Bar No. 446189) |
|  | Katherine A. Meyer |
|  | (D.C. Bar No. 244301) |
|  | MEYER GLITZENSTEIN & CRYSTAL |
|  | 1601 Connecticut Avenue, Suite 700 |
|  | Washington, DC 20009 |
|  | 202-588-5206 |
|  | hcrystal@meyerglitz.com |
| April 15, 2011 | Attorneys for the Public Health Intervenors |