# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA,

                         **Plaintiff,**

                **v.**

PHILIP MORRIS USA INC., *et al.*,

                **Defendants.**
_____

    **Civil Action No. 99-2496 (GK)**

## <u>DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR VACATUR</u>

The Government's and Intervenors' arguments against vacatur proceed largely as though the Family Smoking Prevention and Tobacco Control Act ("Act"), Pub. L. No. 111-31, 123 Stat. 1776 (2009), were not the law or, at most, a loophole-riddled piece of legislation.  Gov't Opp., D.E. 5907; Intervenors' Opp., D.E. 5908.  But the Government and Intervenors cannot so easily ignore the legislative and regulatory transformation effected by Congress.  The Government chose to bring this case under a single, narrow provision of RICO that, as the D.C. Circuit has now held several times, is strictly limited to prospective equitable relief.  Both Article III of the Constitution and RICO squarely preclude any kind of relief if past RICO violations are not likely to recur in the future.  That inquiry does not permit the Government to sidestep or minimize a new statutory regime of supervision over virtually every aspect of Defendants' businesses— including far-reaching authority over Defendants' manufacturing, distribution, and marketing of cigarettes—particularly where Congress, as the Government concedes, instituted that regime in response to and reliance on this Court's findings and presumably to prevent their future recurrence.  That legislative response to the problems identified by this Court requires a more

cogent response from the Government than its rote incantation that Defendants' "proclivity" for wrongdoing will cause them to evade any and all restraints that might be placed upon their conduct.

In an effort to minimize the legal and practical implications of the new legislation, the Government places heavy emphasis on Section 4 of the Act, which provides that "[n]othing" in its provisions "shall be construed to . . . affect any action pending in Federal, State, or tribal court." § 4(a)(2). But the Government's contention that Section 4 preserves this Court's jurisdiction over this case is simply wrong. Congress lacks the authority to alter the jurisdictional requirements imposed by Article III and, as the Government itself acknowledges, "nothing in the Act purports to modify the provisions of RICO." Gov't Opp. 9-10. The Government nevertheless reads Section 4 as expanding Article III jurisdiction to permit injunctive relief even in the absence of a "realistic threat" that the enjoined conduct would recur in the "reasonably near future" (*City of Los Angeles v. Lyons*, 461 U.S. 95, 106 n.7, 108 (1983)) and expanding RICO jurisdiction to authorize injunctive remedies beyond those that "prevent and restrain" future RICO violations. 18 U.S.C. § 1964(a). That reading of the Act is unconstitutional and untenable. Although the Act does not change the substantive law governing pending actions, it does change the backdrop against which pending actions must be adjudicated. In this case, the Act concededly does not change RICO—and cannot constitutionally change the jurisdictional requirements of Article III—but does render remote any realistic threat of future RICO violations.

The Government also repeatedly speculates that Defendants will not adhere to the Act. Gov't Opp. 10-15. But the Government never disputes the Act's far-reaching impact on Defendants' business or the formidable and well-funded enforcement tools it affords the FDA.

Nor does the Government contest that Defendants have fully abided by the Act's requirements to date. Instead, the Government relies primarily on the purported inability of the Master Settlement Agreement ("MSA") to prevent and restrain all future RICO violations by Defendants. *Id.* at 13-14 (citing *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1132-33 (D.C. Cir. 2009) (per curiam)). This Court found that even though "the MSA has made significant strides towards *preventing* Defendants' fraudulent activities," the MSA "*alone* cannot remove the reasonable likelihood" of all future RICO violations. *United States v. Philip Morris USA Inc.*, 449 F. Supp. 2d 1, 913 (D.D.C. 2006) (emphases added); *see also* 566 F.3d at 1133. In passing the Act, Congress explicitly recognized the MSA's limitations, § 2(48), and filled any remaining gaps in the MSA's provisions. Thus, whatever reasonable possibility of future RICO violations may have existed after the MSA went into effect, no such possibility persists today.

Finally, the Government claims that certain Defendants' carefully circumscribed challenges to limited provisions of the Act before other tribunals preserve this Court's jurisdiction. Gov't Opp. 15-17. The Government vastly overstates the nature and scope of those challenges in order to bolster its case here, and also neglects to note that it is vigorously defending the components of the Act being challenged in that litigation and thus far has been largely successful in doing so. Moreover, any challenge to the Act can only succeed to the extent that its provisions are found to violate the First Amendment; the enforcement of constitutional protections in this manner is a curious basis for tarring anyone with a "proclivity" toward crime. More fundamentally, even if those Defendants ultimately succeed in their challenges, the question before this Court would remain the same. The broad supervisory regime established by Congress—the point here—would remain largely in place. In any event, this Court must evaluate its jurisdiction based on the law as it stands now; speculation regarding the

outcome of ongoing litigation cannot resurrect this Court's congressionally extinguished jurisdiction.

In sum, by imposing extensive federal regulation on tobacco manufacturers and arming the FDA with potent enforcement authority, Congress eliminated any reasonable likelihood of future racketeering activity and extinguished this Court's jurisdiction to issue forward-looking injunctive relief under Article III and RICO.  At a minimum, it placed primary jurisdiction over smoking and health issues within the expert regulatory authority of the FDA.

**ARGUMENT**

**I.     THE COURT LACKS JURISDICTION UNDER ARTICLE III AND RICO.**

The Act extinguishes this Court's jurisdiction under both Article III and RICO by eliminating any reasonable likelihood that Defendants will engage in the types of future joint racketeering activity targeted by this Court's injunctions.  Defs.' Mot. for Vacatur 14-18, D.E. 5880.  The attempts of the Government and Intervenors to manufacture continuing jurisdiction in this Court are unavailing.

**A.     The Act Extinguishes This Court's Jurisdiction By Eliminating Any Reasonable Likelihood Of Future RICO Violations.**

A case is moot when there is "no reasonable expectation that the wrong [at issue] will be repeated."  *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (internal quotation marks omitted).  The Act mooted this case by imposing sweeping federal regulatory requirements on virtually every aspect of Defendants' business that eliminated any "reasonable threat" that the past conduct that formed the basis for this Court's prospective relief could recur in "the reasonably near future."  *Lyons*, 461 U.S. at 106 n.7, 108.  Maintaining the Court's injunctions would "do what Congress has already mandated," and thus constitute the type of "academic exercise" prohibited by Article III.  *Bethany Med. Ctr. v. Harder*, 693 F. Supp. 968, 975 (D. Kan.

1988); *see also Harper v. Miller*, 491 F. Supp. 217, 220-22 (D.D.C. 1980) (holding that a case was moot even though challenged conduct was "not impossible of occurrence" because no "cognizable danger of recurrent violation" existed) (internal quotation marks omitted).  It would also overstep the bounds of this Court's jurisdiction under RICO, which is limited to issuing "forward-looking remedies that are aimed at future violations" of the statute.  *United States v. Philip Morris USA Inc.*, 396 F.3d 1190, 1198 (D.C. Cir. 2005).

The *sole* controversy in this case relates to the propriety of prospective relief.  Yet the Government and Intervenors contend that this profound regulatory transformation leaves this Court's jurisdiction intact because the Act provides that "[n]othing" in its provisions "shall be construed to . . . affect any action pending in Federal" (or state or tribal) court.  § 4(a)(2); *see* Gov't Opp. 1, 2, 7, 9, 22, 26; *see also* Intervenors' Opp. 7, 12.  But Congress cannot legislatively alter the requirements of Article III.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 n.24 (1982) (no "congressional enactment . . . can lower the threshold requirements" of Article III); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979) ("In no event . . . may Congress abrogate the Art. III minima.").  Thus, this Court's Article III jurisdiction turns on the likelihood of future RICO violations after the enactment of the Act's operative provisions, not on whether the text of the Act states that Article III jurisdiction subsists regardless of those changes, which, of course, Section 4 does not remotely say.  The Government's interpretation of Section 4 disregards this well-settled constitutional rule.  By eliminating any reasonable likelihood that Defendants will commit future RICO violations of the type found by this Court, the Act extinguishes this Court's Article III jurisdiction.  Nothing in the Act itself—or any other act of Congress, for that matter— can expand Article III to reach this now-defunct controversy.

Moreover, Section 4, properly interpreted, has nothing to do with the constitutional or statutory jurisdiction of federal courts; it is concerned with the governing law and rules of decision that apply to cases that were pending at the time of enactment in *any* court, including "tribal" and "state" courts.  The Act does not change those rules of decision and therefore has no impact *on the substantive law* applied to pending actions.  Indeed, the Act's focus on "actions pending" in any court is best read in light of longstanding authority that addresses the effect of new legislation on pending litigation and that focuses on whether a new law would retroactively alter the rules and penalties that obtained when the primary conduct at issue occurred.  *See, e.g.*, *Republic of Austria v. Altmann*, 541 U.S. 677, 693-97 (2004) (discussing *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994)); *see also Lytes v. D.C. Water & Sewer Auth.*, 572 F.3d 936, 939-40 (D.C. Cir. 2009) (same).  Section 4 thus makes clear, in accordance with settled retroactivity doctrine, that the Act does not defeat existing rights to monetary recovery, "increase a party's liability for past conduct, or impose new duties with respect to [completed] transactions."  *Lytes*, 572 F.3d at 939 (alteration in original; internal quotation marks omitted).

At the same time, however, Section 4 hardly gives the Government or this Court license to pretend that the Act does not exist in determining the existence of Article III or statutory jurisdiction over this action.  The Act quite plainly governs, controls, and supervises Defendants' future conduct—including, most especially, their ability to engage in future RICO violations. The Act therefore has dispositive significance here, where the Government must show a realistic future likelihood of RICO violations.  Because Article III jurisdiction "must be extant at all stages" of the case, *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974), and because that authority here "is dependent upon the likelihood of recurrence of the allegedly unlawful

conduct," *Lyons*, 461 U.S. at 107 n.8, the Act's prospective provisions necessarily control that inquiry and require the conclusion that jurisdiction has ceased.

The same considerations govern the question of statutory jurisdiction.  The Government *concedes* that the Act does not modify RICO's jurisdictional requirements.  Gov't Opp. 9-10. Accordingly, there is no question that the limits on this Court's statutory jurisdiction under RICO remain in place.  And, as with the Court's Article III jurisdiction, those settled limits foreclose this Court from continuing to exercise jurisdiction over a dispute that has been resolved by federal statute.  To put the point another way, Section 4 of the Act leaves the doctrinal requirements of both Article III and RICO as they stood when Congress enacted the Act, while fundamentally changing the level of monitoring, supervision, and enforcement that will henceforth apply to Defendants' conduct.  Those fundamental changes, considered in light of preexisting Article III and RICO requirements, compel the conclusion that the Court lacks jurisdiction to impose the only relief the Government may lawfully seek in this narrow action: an injunction.

    **B.**    **The Act Establishes Far-Reaching Requirements And Enforcement Tools Absent From The MSA.**

The Government relies extensively on Defendants' alleged violations of the MSA in an effort to generate some "reasonable likelihood" of future RICO violations.  Gov't Opp. 13-14; *see also* Intervenors' Opp. 18.  This Court previously concluded that, although the MSA "made significant strides towards preventing Defendants' fraudulent activities," it "*alone* cannot remove the reasonable likelihood of Defendants' future RICO violations."  449 F. Supp. 2d at 913 (emphasis added).  But the MSA no longer stands alone; the comparatively circumscribed requirements of the MSA are now supplemented by the extensive federal regulatory oversight and powerful enforcement tools established by the Act.  Whatever the likelihood of future

violations that may have remained after the MSA initially went into effect, no reasonable

likelihood can persist in the face of the Act's stringent regulatory requirements.

Signed in 1998, the MSA was a settlement agreement between Defendants and the States

that "prohibited, *inter alia*, youth marketing, any material misrepresentations regarding the

health consequences of tobacco use, agreements between manufacturers to limit either

competition or the distribution of information about the health effects associated with smoking,

and other specific marketing techniques (e.g., cartoon characters and billboards)."  566 F.3d at

1131-32.  The MSA also required the dissolution of the Tobacco Institute and Council for

Tobacco Research, established a foundation to reduce youth smoking, and required the tobacco

companies to make large payments to the States.  State of Cal. Dep't of Justice, Office of the

Attorney Gen., Tobacco Master Settlement Agreement Summary, http://ag.ca.gov/tobacco/

resources/msasumm.htm (last visited Apr. 14, 2011).  The MSA did not provide the States with

the authority to oversee the design and manufacturing of cigarettes or the ingredients used in

those processes, did not authorize the States to impose new cigarette warning labels, and did not

designate any particular body to regulate the industry and enforce the agreement's provisions.

In contrast, the Act imposes extensive federal regulation on every aspect of the design,

manufacturing, and advertising of cigarettes.  The Act authorizes the FDA to "regulate the levels

of tar, nicotine, and other harmful components of tobacco products," imposes detailed reporting

and disclosure requirements on Defendants, prohibits the use of descriptors, specifies new textual

warnings that must appear on all cigarette packs and all advertisements, and required the FDA to

promulgate regulations addressing an array of sale, distribution, labeling, and advertising

requirements.  §§ 3(3), 3(5), 102, 904(a)(1), 907(a)(4), 911(a)-(b); *see also* 21 C.F.R. § 1140.2.

Moreover, the Act provides the FDA with hundreds of millions of dollars in funding for its

tobacco programs (§ 919) and authorizes it to exercise a panoply of enforcement tools, including

civil penalties, mandatory information requests, no-tobacco-sale orders, and criminal

investigations.  §§ 103, 904(b); 21 U.S.C. § 331; *see also* Press Release, Office of Rep. Henry A.

Waxman, Chairman Waxman Praises Advances on First Anniversary of Tobacco Law (June 22,

2010) (describing, on the one-year anniversary of the passage of the Act, the "crucial protections

and benefits the law has provided" and emphasizing that the "FDA will continue its important

work and will make use of all its authorities" under the Act).

Thus, regardless of whether, standing alone, the MSA was sufficient to eliminate any

reasonable likelihood of future RICO violations, Congress has now stepped in to establish far-

reaching federal regulatory requirements that extend to numerous areas that the MSA did not and

that shore up the MSA's requirements in those areas that it did.  There can no longer be any

reasonable doubt that Defendants are unlikely to commit future RICO violations.

The Government nevertheless argues that Defendants purportedly have a "proclivity for

unlawful conduct" and that the Act therefore will not eliminate any reasonable likelihood that

Defendants will engage in future joint racketeering activity.  Gov't Opp. 2-3, 11-13 (internal

quotation marks omitted).  On the Government's theory, of course, this Court's injunctions

would be futile as well, since the Government's theory posits that Defendants are impervious to

all legal requirements; yet the Government expresses no doubt that the injunctions would prevent

and restrain future RICO violations.  More fundamentally, Congress relied on this Court's

findings to create the new federal regulatory framework established by the Act, § 2(47)-(49),

which Congress specifically designed as a remedy for the past "unlawful conduct" found by this

Court.  Congress gave the FDA far greater monitoring and enforcement resources than are

available to this Court in the ordinary course.  It makes no sense for this Court to erect—and

Article III does not permit—a duplicative, judicially imposed system of federal regulatory supervision aimed at preventing precisely the same conduct as that targeted by Congress.

### C.     Speculation About The Outcome Of Legal Challenges To Narrow Provisions Of The Act Cannot Preserve This Court's Jurisdiction.

The Government cannot satisfy its jurisdictional burden by pointing to the pending litigation in *Commonwealth Brands, Inc. v. United States*, where R.J. Reynolds, Lorillard, and other manufacturers and retailers have challenged several limited provisions of the Act.  *See* Gov't Opp. 3, 16; *see also* Intervenors' Opp. 8, 13.  Federal courts "do not have jurisdiction to become entangled in uncertain and contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Fourth Branch Assocs. (Mechanicville) v. FERC*, 253 F.3d 741, 746 (D.C. Cir. 2001) (internal quotation marks omitted).  As this Court is aware, the Government has been vigorously defending the Act in the *Commonwealth Brands* case and, to date, has largely been successful.  More importantly, however, this Court must assess its constitutional and statutory jurisdiction based on what the law is *now*, not what it might become in the *future*.

In any event, even if Congress had not included in the Act the provisions challenged in *Commonwealth Brands*, the Act would still be sufficient to eliminate any reasonable likelihood of future RICO violations by Defendants and to extinguish this Court's jurisdiction over this case.  The *Commonwealth Brands* suit focuses on "a number of restrictions that circumscribe [the manufacturers'] rights to communicate truthful information to adult consumers who have an interest in receiving such information."  Compl. ¶ 1, *Commonwealth Brands, Inc. v. United States*, No. 1:09CV-117-M (W.D. Ky. 2010).  Specifically, it challenges under the First Amendment the Act's ban on color or graphics in most advertising; the new warning labels; parts of the Modified Risk Tobacco Products Requirement; the restrictions on brand-name merchandise, brand-name sponsorships, continuity programs, and free samples; and the ban on

references to the efficacy of FDA regulations.  *See* Defs.' Mot. for Vacatur 9 n.3.  But whatever the outcome of those challenges, the FDA would retain the authority to oversee Defendants' design, manufacturing, and marketing of cigarettes and to invoke a powerful arsenal of enforcement tools to ensure that Defendants have no reasonable capability of committing the types of RICO violations found by this Court.  Thus, even if eventually successful, the *Commonwealth Brands* suit cannot resurrect this Court's jurisdiction.

## II.   THIS COURT SHOULD DEFER TO THE FDA'S PRIMARY JURISDICTION OVER THE TOBACCO INDUSTRY.

Even if the Act does not extinguish this Court's jurisdiction, the Court should decline to exercise that jurisdiction and instead defer to the primary jurisdiction of the FDA over matters of smoking and health.  When, as here, "[a] court's disposition of an application for injunctive relief would seem to require at least some consideration" of issues entrusted to an agency, "such consideration would create the hazard of forbidden judicial intrusion into the administrative domain." *Arrow Transp. Co. v. S. Ry. Co.*, 372 U.S. 658, 669-70 (1963) (citing *Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 440-41 (1907)).  Thus, courts should "refrain from intermeddling" with an administrative agency's primary jurisdiction and "take no action calculated to interfere seriously with an agency's ability to apply its expertise to solve those technical and complex regulatory problems which have been entrusted to it." *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975).  To eliminate judicial interference with congressionally authorized agency prerogatives, courts should stand aside and allow the agency to bring its expert regulatory decision-making to bear.  *See id.* (reversing a district court's preliminary injunction that interfered with the primary jurisdiction of the Federal Maritime Commission).

The Government is mistaken that a court should defer to an agency's primary jurisdiction only when the agency must resolve an issue before the court can decide a pending dispute. Gov't Opp. 23. Rather, primary jurisdiction also applies when judicial action would interfere with an agency's ability to exercise the expert regulatory discretion delegated to it by Congress. In *Clark v. Actavis Group hf*, 567 F. Supp. 2d 711 (D.N.J. 2008), for example, the district court declined to exercise jurisdiction over a products-liability suit because Congress had vested the FDA with primary authority over product recalls and the FDA was in the process of recalling the drugs at issue in the litigation. *Id.* at 715-17. Invoking the primary jurisdiction doctrine, the district court denied the plaintiffs' request for an order requiring the manufacturers to send notice to potentially affected consumers and for an injunction requiring the manufacturers to preserve relevant evidence. *Id.* Had the court chosen to exercise jurisdiction and issue the requested injunction, it would have needed to "engage in the type of technical analysis conducted by the FDA"—an inquiry that would have "interfere[d] with the FDA's recall." *Id.* at 717-18; *see also Collins v. Olin Corp.*, 418 F. Supp. 2d 34, 44-45 (D. Conn. 2006) (dismissing plaintiffs' request for equitable relief because "the injunctive relief requested . . . involve[d] technical and policy considerations within the [agency's] field of expertise and discretion").

If this Court concludes that the Act did not extinguish its jurisdiction over this litigation, it should show the same deference to agency expertise in this case. This Court cannot order prospective relief against Defendants without injecting itself into matters of cigarette design, manufacturing, and marketing as to which the FDA is the "primary Federal regulatory authority." § 3(1). The issuance of ongoing injunctive relief against Defendants would permit litigants and this Court to second-guess the FDA's regulatory judgments in these areas and would inevitably interfere with the FDA's carefully calibrated tobacco policies. To preserve the

reticulated regulatory framework enacted by Congress—and the FDA's full discretion to implement that framework—the Court should decline to exercise any continuing jurisdiction it might possess.

### III. AT A MINIMUM, THE COURT SHOULD VACATE THE PORTIONS OF ITS INJUNCTION THAT DIRECTLY CONFLICT WITH THE ACT.

If this Court determines that it retains jurisdiction over some aspects of this case and need not defer entirely to the FDA's primary jurisdiction, the Court should modify those aspects of its injunctions that are most plainly jurisdictionally deficient or incompatible with the FDA's regulatory authority.  Defs.' Mot. for Vacatur 23-31.

#### A. The Injunction Prohibiting The Marketing Of "Light" And "Low Tar" Cigarettes Should Be Vacated.

The Government does not contest that, in accordance with the provisions of the Act, Defendants have stopped using "light" and "low tar" descriptors in their advertising and promotion of cigarettes.  *See* Gov't Opp. 19.  The Government nevertheless contends that this Court retains jurisdiction to issue an overlapping and wholly redundant prohibition on descriptors because there is purportedly "no basis for assuming defendants' compliance with the Act's requirements, given their long record of unlawful conduct."  *Id.* at 18.  But, under the Government's reasoning, Congress could *never* extinguish this Court's jurisdiction by enacting legislation prohibiting conduct that would be targeted by a court-ordered injunction because a defendant could *always* violate the legislation.  That is not the law.  Rather, when "[a] determination by th[e] Court of the legal issues tendered by the parties is no longer necessary to compel th[e] result" sought by the plaintiff, the court lacks authority to consider those issues. *DeFunis v. Odegaard*, 416 U.S. 312, 317 (1974) (per curiam).  And, even if Defendants were to violate the Act, the FDA is armed with powerful civil and criminal enforcement tools to punish the violation and deter future violations.  These tools are more than sufficient to prevent

Defendants from using "light" and "low tar" descriptors in their advertising and promotion of cigarettes, particularly since the use of such descriptors would easily be detected by the FDA. There is therefore no need—and no constitutional authority—for a "safety net" injunction to remain in place.

Intervenors argue that "Defendants have responded to this Court's injunction by switching to 'Marlboro Gold' and other colored packs to convey the same implicit health message." Intervenors' Opp. 15; *see also* Gov't Opp. 21. But Intervenors do not explain how Defendants would conceivably convey that "implicit health message" by selling cigarettes that bear the unambiguous health warnings mandated by Congress. Moreover, Defendants have made clear to consumers that neither descriptors nor colors communicate relative health risks. Package onserts that informed consumers that Marlboro Lights would soon be known as Marlboro Golds included the clear disclaimer that "Terms such as 'Lights' and 'Ultra Lights' do NOT mean safer. These terms refer to taste. These cigarettes will NOT help you quit smoking." D.E. 5891, Ex. 18. The package to which that onsert was attached was wrapped in tear tape that carried the message: "Lights does not mean safer. It refers to taste. Lights won't help you quit smoking." Following the introduction of Marlboro Golds, an insert appeared in packages, stating that: "Nothing about this cigarette or packaging, including color, should be interpreted to mean that any cigarette is safer than any other cigarette." And, currently, all packages of Marlboro Golds (and all other Marlboro packages), are wrapped in a tear tape, carrying the message that: "Nothing about this cigarette, packaging, or color should be interpreted to mean safer."

In response, Intervenors posit that "smokers do not buy 'light' cigarettes for 'taste,' but rather because they wrongly believe that doing so will have health benefits, and that, in fact, 'consumers prefer the taste of *regular* cigarettes.'" Intervenors' Opp. 16 (quoting 449 F. Supp.

2d at 476).  But the Act ensures that consumers will be able to make informed purchasing decisions among cigarette brands that bear unambiguous health warnings and that they will receive additional health-related information about smoking through amply funded FDA public-health programs.  This pervasive dissemination of information about smoking and health will eliminate any risk of potential consumer misperceptions about the health risks of smoking any particular brand or variety of cigarettes.  If consumers prefer the taste of one cigarette brand or variety over another, then they will be able to purchase those cigarettes without laboring under the misperception that some other brand or variety presents fewer health risks.[1]

Furthermore, even if this Court decides that it retains jurisdiction to issue an injunction prohibiting the use of descriptors, it should defer to the FDA's primary jurisdiction in order to avoid a clear conflict between the FDA's statutory authority and this Court's injunctions.  Under the Act, the FDA is permitted to authorize the use of descriptors after determining that several health-related conditions are satisfied.  § 911(g)(1).  Under the Court's injunction, however, Defendants are categorically "[f]orbidden" and "permanently enjoined" from "conveying any express or implied health message or health descriptor."  449 F. Supp. 2d at 938.  The Government attempts to downplay this conflict as "purely conjectural" (Gov't Opp. 18-19), but the inconsistency between this Court's injunctions and the Act could not be more clear—the Act expressly authorizes the FDA to do precisely what this Court's Order prohibits.  The fact that the FDA has not yet decided to authorize descriptors does not mean that it has lost its

---

[1]  In any event, the FDA sent a letter to PM USA requesting additional information about its use of colors in the marketing of cigarettes.  *See* Letter from Lawrence R. Deyton, Director, Center for Tobacco Products, to Denise F. Keane, Exec. Vice President & Gen. Counsel, Altria Group, Inc. (June 17, 2010), *at* http://www.fda.gov/TobaccoProducts/GuidanceCompliance RegulatoryInformation/ucm216154.htm.

congressionally delegated discretion to do so in the future.  To preserve that discretion, this

Court should not reissue its descriptors injunction.  *See Garner v. Teamsters*, 346 U.S. 485, 498-

99 (1953) (invalidating state court's injunctive relief due to imminent conflict with federal

remedy).[2]

> **B.  The Injunction Requiring Defendants To Make Corrective Statements Should Be Vacated.**

The Government contends that its proposed corrective statements are consistent with, and

will complement, the public-health warnings mandated by the Act and the FDA's sophisticated

and well-funded public-health campaign about the health risks of smoking.  Gov't Opp. 20-21.

But even if that were true—which it is not—this Court would still lack continuing jurisdiction to

order corrective statements because the Act, through its warning labels and delegation of

authority to the FDA to disseminate additional information about smoking and health, eliminates

any reasonable likelihood that Defendants will mislead consumers about the health risks or

addictiveness of smoking in the future.

Intervenors argue that the corrective-statements injunction should stand because the Act's

public health warnings "serve distinct purposes and goals" from the corrective statements.

Intervenors' Opp. 18 n.9.  But, whatever their purpose, the practical implications of the new

health warnings are unmistakable.  Under the Act, Defendants are required to state in clear and

unambiguous terms on all their packs and in all their advertisements that, among other things,

---

[2] Intervenors also argue that this Court retains jurisdiction because "the Act does not give the FDA the authority to enforce RICO."  Intervenors' Opp. 18.  But the pertinent jurisdictional question is whether the Act eliminates any reasonable likelihood of future RICO violations— which it unquestionably does—not whether the FDA itself can enforce RICO.  The FDA's formidable authority to enforce the Act forecloses any reasonable possibility that, in the future, Defendants will commit the type of RICO violations found by this Court.

"Cigarettes are addictive," "Cigarettes cause cancer," and "Cigarettes can kill you."  These plain and powerful textual warnings will make it impossible for Defendants simultaneously to disseminate untruthful information about the health risks and addictiveness of smoking.  No reasonable person would believe such misstatements in the face of the congressionally mandated warning labels.

Nor does Defendants' participation in the FDA's rulemaking process resurrect this Court's jurisdiction to order corrective statements.  Defendants have filed a variety of comments on the FDA's proposed regulations implementing the Act's warning requirements, some of which challenge those proposed regulations on constitutional and other grounds.  *See* Required Warnings for Cigarette Packages and Advertisements, 75 Fed. Reg. 69,524 (Nov. 12, 2010).  But none of those comments challenges the substance of the textual warnings prescribed by the Act. For example, the comment letter filed by PM USA discusses the constitutional standards applicable to government-imposed warning labels and constitutional issues raised by the requirement that graphic warnings be placed on the top 50% of the front and back of all cigarette packages.  *See* Gov't Opp., Ex. 1, at 5-14; *see also id.* at 5 (noting also that some of the proposed graphic images could potentially violate the First Amendment).[3]  Similarly, the comments filed by R.J. Reynolds and Lorillard challenge the non-factual and controversial nature of the FDA's proposed graphics, as well as the size and other aspects of the proposed warnings.  *See* Comments of R.J. Reynolds Tobacco Co., Lorillard Tobacco Co., and Commonwealth Brands, Inc. on Docket No. FDA-2010-N-0568, at 1-3 (Jan. 11, 2011).  Thus, even if the FDA accepted

---

[3]  The Government erroneously attributes the comment letter submitted by PM USA to both Altria and PM USA.  *See* Gov't Opp. 16 ("Altria and Philip Morris, in comments to FDA . . . .").  That comment letter was submitted on behalf of PM USA only, through Altria Client Services, which provides regulatory affairs services to PM USA.  *See* Gov't Opp., Ex. 1, at 1 n.1.

Defendants' arguments challenging certain aspects of the FDA's proposed warning labels, the Act's congressionally imposed textual warnings would still eliminate any need for overlapping, court-ordered corrective statements.  In any event, in assessing its jurisdiction, this Court must look to the provisions of the Act as they stand today, rather than speculating about the outcome of pending legal challenges.  Nor can it rest a finding that Defendants are likely to commit joint acts of racketeering in the future on any potential success that Defendants might have in those challenges.  A party cannot be deemed a likely future racketeer simply because it refuses to passively acquiesce in unconstitutional government regulation.

Finally, the Government all but admits that the requirement that corrective statements be disseminated on package onserts conflicts with the statutory requirement that warning labels comprise the top half of the front and back of cigarette packages.  The Government states only that, "*[a]t present*, . . . there are no grounds to vacate" the onsert requirement because the Government "will review this Court's order and, if a need develops, apply for an appropriate modification of the Court's order at that time."  Gov't Opp. 22 (emphasis added).  But there is no ambiguity on what the statute requires nor is there doubt *now* that the "correction" sought by the Government will impede the statutory requirement.  Since the content and implementation requirements for the corrective statements are yet to be fully litigated (much less prescribed), there is little force in the Government's plea for the proverbial can to be kicked down the road only to "reconsider" the issue later on the basis of what everyone already concedes.  That conflict with the FDA's regulatory authority should be remedied now—not at some indeterminate point in the future.

**C.      The Injunction Prohibiting Defendants From Making False Statements Should Be Vacated.**

The injunction prohibiting Defendants from making false statements about the health

effects of smoking must also be vacated because the Act affords the FDA broad and well-funded

authority to determine whether cigarette labeling and advertising are "false or misleading in any

particular" and arms the FDA with powerful tools to monitor compliance and remedy violations.

The Government responds that these sweeping measures are not sufficient to extinguish this

Court's jurisdiction because the Court's false-statement injunction "was not limited to 'labeling'

and 'advertising'" and therefore remains necessary to prevent Defendants from making false or

misleading statements in other forums.  But this Court's findings of fraud relate solely to

Defendants' advertising and promotional activities.  Accordingly, any injunction prohibiting

future fraud must be limited to statements made in the advertising and promotion of cigarettes.

This result is mandated by the D.C. Circuit.  As that court recognized on appeal, the

injunctions must be "read" "in the context of the district court's legal conclusions and 4,088

findings of fact."  566 F.3d at 1137.  Indeed, the Government has acknowledged that the

injunctions are "limited to the type of conduct for which the defendants have here been found

liable, as is explicitly detailed in the Court's findings of fact."  Mem. in Opp. to Certain Defs.'

Mot. for Clarification 3, D.E. 5750 (Sept. 8, 2006).  Reading the injunctions more broadly would

violate Defendants' constitutional rights because an injunction that is not precisely limited to

statements previously determined to be fraudulent violates the First Amendment.  *See Overstreet*

*v. United Bhd. of Carpenters*, 409 F.3d 1199, 1218 (9th Cir. 2005) ("While the First Amendment

does not protect fraud, an injunction issued before an adequate determination that it is

unprotected by the First Amendment presents the special vice of a prior restraint.") (internal

quotation marks, citation, and alteration omitted).  Because the Act eliminates any reasonable

likelihood that Defendants will make future misstatements in their advertising or labeling of cigarettes, the injunction targeting that conduct cannot stand.

## CONCLUSION

This Court should vacate its injunctions and factual findings, and dismiss this suit in its entirety.

Dated:  April 15, 2011                         Respectfully submitted,


/s/ Beth A. Wilkinson
Beth A. Wilkinson (D.C. Bar No. 462561)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, N.W.
Washington, D.C.  20006-1047
Telephone:  (202) 223-7300
Fax:  (202) 223-7420

Miguel A. Estrada (D.C. Bar No. 456289)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5306
Telephone:  (202) 955-8257
Fax:  (202) 530-9016

Thomas J. Frederick
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601-9703
Telephone: (312) 558-6700
Fax:  (202) 558-5700

*Attorneys for Defendants*
*Altria Group Inc. and Philip Morris USA Inc.*

/s/ Beth A. Wilkinson *for*

Robert F. McDermott (D.C. Bar No. 261164)
Peter J. Biersteker (D.C. Bar No. 358108)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone: (202) 879-3939
Fax: (202) 626-1700

*Attorneys for Defendant*
*R.J. Reynolds Tobacco Company,*
*individually and as successor by*
*merger to Brown & Williamson*
*Tobacco Corporation*


/s/ Beth A. Wilkinson *for*

Michael B. Minton
THOMPSON COBURN LLP
One US Bank Plaza, Suite 3500
St. Louis, Missouri 63101-1693
Telephone: (314) 552-6000
Fax: (314) 552-7597

*Attorneys for Defendant*
*Lorillard Tobacco Company*