**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 99-2496 (GK)** |
| **v.** | ) | |
| **PHILIP MORRIS USA INC., *et al.*,** | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' RESPONSE TO THE UNITED STATES' AND PUBLIC HEALTH INTERVENORS' SUBMISSIONS CONCERNING ORDER #1015'S POINT-OF-SALE DISPLAY REQUIREMENTS**

Pursuant to Order #14, Defendants respectfully submit this response to the United States' Opening Brief on Retail Point-of-Sale [D.E. 5905] ("U.S.' Br."), and Public Health Intervenors' Opening Brief Regarding Corrective Statements At Retail Point-of-Sale [D.E. 5903] ("Intervenors' Br.").

The Government writes as if this Court were considering the issue of point-of-sale (POS) displays on a clean slate. It is not. Faced with an order that cannot reasonably be distinguished from what the Government now proposes—*i.e.*, a requirement that Defendants use their merchandising contracts with retailers to ensure that retailers adopt POS displays—the D.C. Circuit concluded that the order invaded the rights of innocent third-party retailers who are not parties to the litigation and who faced substantial economic harm if the requirements are imposed. Because the D.C. Circuit considered—and rejected—many of the same arguments the Government and Intervenors raise now, the most reasonable conclusion is that neither of them has found a credible way to impose the POS requirements in a manner that respects the D.C.

Circuit's mandate. The Court should reject the Government's and Intervenors' proposals on that basis alone.

In any event, neither the Government nor Intervenors even mention, let alone grapple with, the enormous complexities that would be associated with implementing the POS requirements in an efficient, even-handed manner consistent with due process. For the hundreds of thousands of diverse retailers who would be covered, their ability to comply with the POS requirements would vary dramatically, depending on the size and layout of their store's floor and countertop space as well as the nature of their workforce. As one example, some stores may simply lack the countertop space necessary to accommodate the 30 x 18 Countertop Display mandated by the Court's previous order. The lack of any such clear mechanism for ensuring the consistent and equitable application of the POS requirements across all affected retailers—something that is impossible as a practical matter—renders the POS requirements unworkable, unmanageable and unconstitutional.

Given the innumerable legal and factual problems with implementing the POS requirements, as identified below and in Defendants' opening brief, the Court should follow the D.C. Circuit's mandate and decline to impose any POS requirements.

## ARGUMENT

### I. THE GOVERNMENT IGNORES THE D.C. CIRCUIT'S MANDATE

In arguing that the Court should "retain" the POS requirements, the Government pretends that the Court is considering the issue anew. But in striking the POS requirements, the D.C. Circuit was clear that, even if directed nominally at Defendants alone and even if implemented through contracts in which retailers could demand Defendants bear any costs, the POS requirements impair the rights of third-party retailers. Far from addressing these problems now, the Government proceeds as if they do not exist.

### A. The Government Attempts to Reargue Legal Issues That Were Decided by the D.C. Circuit

On appeal, Defendants and the National Association of Convenience Stores ("NACS"), appearing as *amicus*, argued that the POS requirements are unconstitutional because, among other reasons, they would impair the economic and First Amendment rights of nonparty retailers. *See* Appellants' Br. 130-32; Appellants' Reply Br. 82-83; NACS Amicus Br. 7-25. The POS requirements would mandate that, as a condition of their participating in Defendants' merchandising programs, retailers must post large countertop and header displays that carry certain corrective statements ordered by the Court. *See Philip Morris USA, Inc.*, 449 F. Supp. 2d at 939 (¶ 7(b)). As NACS argued to the D.C. Circuit, the requirements would place retailers in an untenable position. "If retailers decide not to alter their existing contracts [with Defendants] and/or agree to a new contract" they would suffer "a significant loss in revenue . . . ." NACS Amicus Br. 5-6. Yet, if retailers agree to comply with the POS requirements, they would lose control over "the most valuable marketing space in their stores and that will reduce sales." *Id*. at 6. In addition, NACS argued, the POS requirements would unduly burden retailers' constitutional rights, including by compelling them to convey corrective statements with which they may not agree and in all events do not wish to convey. *Id*. at 19.

The Government responded by arguing that the POS requirements "do[] not impose any direct obligations on third party retailers" and "leave[] retailers who choose to do business with defendants free to demand additional compensation to meet additional costs." Appellee's Br. 210. In vacating the POS requirements, however, the D.C. Circuit necessarily concluded that the POS requirements, as envisioned, did not adequately consider and protect the rights of third-party retailers. It was insufficient, in the D.C. Circuit's view, that Defendants and retailers could seek to ameliorate any economic harm to retailers by renegotiating existing contracts and shifting

the costs associated with compliance to Defendants. Such an approach could not overcome the fundamental constitutional problem of imposing the requirements on innocent third parties who were strangers to the litigation. *See Philip Morris USA*, 566 F.3d 1095, 1142 (D.C. Cir. 2009).

Undeterred, the Government now repeats the same legal arguments it presented to the D.C. Circuit—unsuccessfully—all the while failing to adequately address the central legal infirmity identified by the D.C. Circuit.

*First*, and most significantly, the Government refuses to come to terms with the fact that the POS requirements cannot lawfully be imposed because they would significantly impair the rights of innocent third-party retailers, who are not (and have never been) parties to this case. The D.C. Circuit struck down the POS requirements because the affected third-party retailers were not "involved in the litigation in any way" and thus "did not receive notice of th[e] remedy or an opportunity to present evidence or arguments . . . regarding the impact the injunction would have on their businesses." *Philip Morris USA*, 566 F.3d at 1141. These retailers are still not parties to this litigation. Nor has the Government ever suggested that they are in privity or concert with Defendants—which they are not—such that they can be bound under Federal Rule of Civil Procedure 60(d). *See* NACS Amicus Br. 10-12.

The Government barely addresses this fundamental shortcoming, except to suggest that it can be remedied simply by "invit[ing] submissions from appropriate trade groups." U.S.' Br. 14. But even if particular retailers or trade groups were to participate in this case as *amicus*, their participation could not transform them into "parties" who can appropriately be bound by an order from this Court. As the Supreme Court explained, "a party seeking a judgment binding on another cannot obligate that person to intervene; he must be joined." *Martin v. Wilks*, 490 U.S. 755, 763 (1989); *see also, e.g.*, *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 813 (D.C. Cir.

2002) ("Joinder as a party, rather than knowledge of a lawsuit and an opportunity to intervene, is the method by which potential parties are . . . bound by a judgment or decree.") (internal quotations omitted). Absent proper joinder (which even the Government does not suggest and scarcely would be appropriate at this late juncture), due process prohibits this Court from adjudicating the rights of any third-party retailers or granting any order that, either directly or indirectly, would impair their rights. *See, e.g.*, *Regal Knitware Co. v. NLRB*, 324 U.S. 9, 13 (1945); *Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 441 (1934).[1]

*Second*, rather than heed the D.C. Circuit's clear mandate, the Government repeats its argument that this Court should retain the same POS requirements because "the Court's Order does not compel retailers to do anything; rather it compels Defendants to change the terms that they offer in their contracts." U.S.' Br. 13. If this were remotely a persuasive argument, the D.C. Circuit would have affirmed this aspect of the injunction. Instead, the D.C. Circuit *rejected* it, holding that it was irrelevant that the requirements do not impose any "direct" obligations on innocent third-party retailers, and stating that "[e]ven though not explicitly bound by the terms of an injunction on pain of contempt, third parties may be so adversely affected by an injunction as to render it improper." *Philip Morris USA*, 566 F.3d at 1142. The D.C. Circuit expressly recognized NACS' arguments that the POS requirements could "cost retailers substantial

---

[1] The Government's attempt to distinguish the Seventh Circuit's decision in *Cook Inc. v. Boston Sci. Corp.*, 333 F.3d 737 (7th Cir. 2003), is misplaced. The D.C. Circuit cited *Cook* for the basic proposition that "[e]ven though not explicitly bound by the terms of an injunction on pain of contempt, third parties may be so adversely affected by an injunction as to render it improper." *Philip Morris USA*, 566 F.3d at 1142 (citing 333 F.3d at 744). The Government apparently finds it "[i]mportant[]" that the court "did not hold that an injunction with negative effects on innocent persons is improper *per se*, or that such an injunction should be invalidated for that reason alone." U.S.' Br. 20. But the D.C. Circuit's opinion was not based on some *per se* invalidity; rather, after careful consideration of the specific injunction in question, the D.C. Circuit concluded that the POS requirements would impose a "potentially serious detriment" on innocent third-party retailers who had no involvement in the litigation. *Philip Morris USA Inc.*, 566 F.3d at 1141-42.

revenue," notwithstanding that they do not impose obligations on retailers directly. *Id*. at 1141 (stating that retailers must either turn over their countertop space and forego significant sales revenue or forfeit the payments earned under their merchandising contracts with Defendants) (citing NACS affidavit).

Furthermore, purporting to respond to the same due process argument raised by NACS on appeal, the Government makes much of the fact that retailers' contracts with Defendants can be terminated or amended on short notice. *See* U.S.' Br. 13-16. But here, again, the Government fails to grapple with the D.C. Circuit's ruling. The D.C. Circuit concluded that the POS requirements prejudiced the rights of absent third parties notwithstanding the Government's argument that the requirements would not violate retailers' rights: retailers were free simply not to contract with Defendants or to demand increased compensation. *See Philip Morris USA*, 566 F.3d at 1142. Nothing has changed: the ability to amend or terminate Defendants' merchandising contracts (much like the ability to merely renegotiate them) in no way lessens the potentially substantial economic burden the POS requirements impose on third-party retailers, and that the D.C. Circuit itself recognized in striking them. *Id*. ("Yet if the retailers choose not to carry the countertop displays, Defendants must suspend them from their retailer merchandising program for one year, which one retailer asserted would cost ten to fifteen percent of his convenience stores' annual profits.").

*Finally*, far from NACS being "mistaken," U.S.' Br. 17, the D.C. Circuit recognized NACS' concern that the POS requirements could constitute an unconstitutional taking of retailers' property rights, confirming that, aside from being legally deficient on other grounds, the POS requirements could "only affect contracts entered after the injunctive order issues." *Philip Morris USA*, 566 F.3d at 1142 (citing *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 315

(D.C. Cir. 1987)). The Government would nevertheless force Defendants to terminate existing merchandising contracts or impose new terms on existing contracts—both of which would "affect" such contracts—ignoring the D.C. Circuit's clear direction.[2]

### B. This Court's Factual Findings Do Not Address the D.C. Circuit's Legal Concerns

The Government and Intervenors spend much of their respective submissions reciting this Court's findings on the importance of POS marketing (as well as social science research, purporting to underscore the same). *See* U.S.' Br. 1-10; Intervenors' Br. 1-12. Yet none of these findings, which were fully available to the D.C. Circuit on appeal, goes to the legal issue identified by the D.C. Circuit. In striking the POS requirements, the critical issue for the D.C. Circuit was the potentially significant and detrimental impact the POS requirements would have on the rights of absent third-party retailers, not the relative importance of POS advertising in some abstract sense. *Philip Morris USA*, 566 F.3d at 1142. The latter should carry no more weight on remand. The consent decree at issue in *Martin v. Wilks*, too, had addressed concededly important matters, but as the Supreme Court held, that was an insufficient basis to invade the rights of non-parties. *See* 490 U.S. at 763. Indeed, no findings about *Defendants'*

[2] The cases cited in the Government's brief are inapposite, in any event. In each, courts refused to find a taking because prohibitions or bans made performance of the activity or contracts *impossible* and affected the contracts at issue only indirectly. *See, e.g.*, *Omnia Commercial Co. v. United States*, 261 U.S. 502, 511 (1923) (requisition of steel manufacturer's production in wartime rendered "performance of the contract . . . impossible."); *Huntleigh USA Corp. v. U.S.*, 525 F.3d 1370, 1380-82 (Fed. Cir. 2008), *cert. denied*, 129 S. Ct. 626 (2008) (post-9/11 law "transfer[red] security screening responsibilities from the airlines to the federal government" but took no "action with respect to any security screening contract"). The cases, in fact, distinguish as takings those situations, like here, where the Government would directly appropriate parties' rights under contracts for its own purposes. *See, e.g.*, *Omnia*, 261 U.S. at 513 ("[T]he effect of the requisition was to bring the contract to an end, not to keep it alive for the use of the government."); *Huntleigh*, 525 F.3d at 1380-82 (the government "assume[d] all security and screening functions at United States airports," it did "not appropriate[] for its own use any property owned by [the contractor]"). By targeting specifically third-party retailers' contracts, dictating specific terms and requiring them to convey the Government's corrective statements, the Government seeks to do precisely what these cases prohibit doing without compensation.

past behavior, nor any research on the role of POS advertising in *Defendants'* business (most of which was available at the time of this Court and the D.C. Circuit's opinions), could possibly bear on the central issue that the D.C. Circuit remanded for this Court to consider: the impact of the POS requirements on third-party retailers who have never been accused of, much less found liable for, any wrongdoing in this case.[3]

In any event, notably absent from the Government's and Intervenors' discussions of the current importance of POS advertising is any mention whatsoever of the Family Smoking Prevention and Tobacco Control Act ("FSPTCA"), Pub. L. No. 111-31, 123 Stat. 1776 (2009). As explained in Defendants' opening brief, because the FSPTCA granted the FDA extensive regulatory authority and fundamentally altered the framework governing public health communications about smoking, the Court's objectives underlying the POS requirements are otherwise satisfied. Indeed, regardless of how this Court resolves Defendants' Motion to Vacate [D.E. 5880], the FDA's extensive new public health programs and regulations—including the new required textual and proposed graphic warnings that will appear on packages and advertising at retail—to say nothing of the other means of disseminating any corrective statements under Order #1015, render the additional POS requirements unnecessary and unwarranted.

[3] If anything, the Government's and Intervenors' emphasis on the importance of POS advertising to Defendants only serves to underscore how the requirements would violate Defendants' First Amendment right by impairing one of the few remaining avenues for Defendants to communicate with consumers. *See* Defs.' Br. 18-20; *see also* Intervenors' Br. 2-3 ("the Court found that retail stores are 'one of Defendants' central vehicles for communication of brand imagery and promotional offers" and that "[i]n-store placement displays and signs" at these stores "are a key method by which Defendants communicate brand information and communicate a brand's central message or image").

## II. THE GOVERNMENT MISUNDERSTANDS AND UNDERSTATES THE ECONOMIC AND FIRST AMENDMENT BURDENS THE POS REQUIREMENTS WOULD IMPOSE ON INNOCENT THIRD-PARTY RETAILERS

### A. The POS Requirements Would Impose Substantial Economic Burdens on Retailers That Cannot Be Shifted To Defendants

The Government argues that the Court could easily accommodate the D.C. Circuit's mandate by shifting any economic burden on retailers to Defendants. *See* U.S.' Br. 21-23. Again, the D.C. Circuit already considered such a cost-shifting approach, finding insufficient the Government's suggestion that retailers could obtain from Defendants "additional compensation to meet additional costs." Appellee's Br. 210. But the Government's approach fails even on its own terms because it underestimates the direct and indirect costs the POS requirements would impose on the hundreds of thousands of diverse retailers throughout the country. It would simply be impossible to shift the entirety of retailers' economic harm to Defendants, as the Government suggests.

If retailers comply with the POS requirements, they will lose control over valuable space in their stores. Retailers' countertop space, for instance, is extremely valuable, and often is used by retailers to advertise and sell exclusively *non-tobacco* products like candy and gum. The Government is simply wrong when it asserts that "Defendants' contracts require retailers to display their signs and marketing materials [on the counter]." U.S.' Br. 6. For many retailers the opposite is true. *See* Martin Decl. ¶ 9 (explaining that many retailers "have chosen an option that *prohibits* . . . cigarette brand advertising on their countertops") (emphasis added); *see also* NACS Amicus Br. 3-4 ("a vast majority of independent businesses do not use countertop displays for tobacco products"). The POS requirements would invade this otherwise contractually imposed tobacco-free space, forcing retailers to post large displays which would displace other products.

The Government and Intervenors fixate on the loss of revenue attributable to countertop sales. They make much of the $82 million figure provided by the NACS in 2006, as a "conservative estimate," of the lost revenue per square foot of reduced countertop space, hailing it as proof that the economic harm from the requirements is minimal. But even if the Government's and Intervenors' estimates were accurate,[4] the D.C. Circuit made clear that this amount of loss was sufficient to render the POS requirements unlawful as applied to innocent third-party retailers. *See Philip Morris USA*, 566 F.3d at 1141 (citing NACS estimate as evidence that the requirements would "cost retailers substantial revenue"). In any event, while valuable, the countertop area is only one source of the significant economic harm that would be imposed on retailers by the POS requirements.

*First*, aside from altering the physical layout of the countertop area, the POS requirements would impose mandated headers on merchandising racks, which could separately undermine sales. *See* Martin Decl. ¶ 18; Boehm Decl. ¶ 13; Sparrow Decl. ¶ 7.

*Second*, the POS requirements would impose several indirect, and largely unseen, costs on retailers. The requirements would alter the look and feel of stores, potentially affecting the flow of consumers and impacting retailers' ability to market other products. *See* Martin Decl. ¶¶ 18, 29; Boehm Decl. ¶ 14; Sparrow Decl. ¶ 7. The requirements also would cause retailers to expend time and precious resources as they struggle to interpret and comply with the requirements' vague and ambiguous terms. *See* Defs.' Br. 18-19; *see also* Martin Decl. ¶ 33; Boehm Decl. ¶ 27; Sparrow Decl. ¶ 8. And, contrary to the Government's argument, the

[4] The Intervenors, for example, incorrectly estimate the per store cost. The NACS affidavit estimated that the loss of countertop space in 140,000 convenience stores would be roughly $82 million. The Intervenors, however, calculated the per store cost by dividing $82 million by 350,000.

requirements could cause retailers significant reputational harm, which could reduce patronage. *See* Martin Decl. ¶ 34 n.2.[5]

*Third*, many retailers would lose significant direct and indirect revenues as they conclude that they are simply unable or unwilling to comply with the burdensome POS requirements and must terminate or decline to renew their merchandising contracts with Defendants. For some retailers it will be impossible to comply with the POS requirements because of space or resource constraints. *See* Martin Decl. ¶¶ 26-27; Boehm Decl. ¶¶ 15-16; Sparrow Decl. ¶ 7. Others may have concerns that the size of the displays would severely impede store clerks' ability to view and monitor their stores. *See* Martin Decl. ¶¶ 28, 30; Boehm Decl. ¶¶ 16-17; Sparrow Decl. ¶ 7. And many other retailers may conclude that the burdens and costs associated with complying with the POS requirements outweigh the benefits of the merchandising contracts. *See* Martin Decl. ¶¶ 17-19; Boehm Decl. ¶ 13; Sparrow Decl. ¶ 9. Whatever their specific reason, all retailers who decide to forego their contracts with Defendants would lose not only the direct payments they receive from Defendants based on the number of cigarettes they purchase—which can represent a substantial portion of their expected annual revenue—but also indirect incentives, such as price promotions, which in turn can result in increased sales. *See* Martin Decl. ¶¶ 14, 17;

[5] While none of the proposed corrective statements refers to retailers by name, many could nonetheless create confusion about who is offering the statements. Statement C, for example, provides that: "*We* falsely marketed low tar and light cigarettes" and "*We* knew that many smokers switch to low tar and light cigarettes rather than quitting." (Emphasis added). The Government's claim that, even if these statements do diminish retailers' reputations, "they would not violate retailers' rights," U.S.' Br. 19, cannot be squared with the D.C. Circuit's concern for innocent third parties. Moreover, the one case the Government cites is support concerned only whether plaintiff's particular reputational injury could constitute a cognizable federal constitutional claim, *see Paul v. Davis*, 424 U.S. 693, 711-12 (1976): it has no bearing on whether it is permissible for an injunction to knowingly (and needlessly) tarnish the reputation of innocent third parties not involved in the litigation.

Boehm Decl. ¶ 10; Sparrow Decl. ¶ 4. On the flipside, those retailers who continue to participate in Defendants' retail programs will be placed at a competitive disadvantage because, unlike the stores of non-participating retailers, their stores will be dominated by the corrective statements. The resulting display of corrective statements in some retail establishments but not others will, moreover, create consumer confusion about why some retailers post the corrective statements while others do not, wrongly implying that the retailers who do post the statements engaged in past wrongdoing and compounding the reputational harm referenced above.

Nowhere in the Government's or Intervenors' submission is there any recognition of these additional and significant economic burdens, nor any suggestion that they could be readily quantified and shifted to Defendants.[6] For the reasons stated above, they cannot.

**B. The Government Provides No Legitimate Basis for Compelling Third-Party Retailers to Convey Corrective Statements in Their Stores**

The POS requirements, whether imposed directly or indirectly, also would violate third-party retailers' First Amendment right not to be compelled to speak. *See* Defs.' Br. 15-17. The Government's arguments to the contrary are unconvincing.

The Government first argues that retailers have forfeited any First Amendment rights they may have because, under their contracts with Defendants, Defendants can "display whatever signs or displays" that they want. U.S.' Br. 12. Unsurprisingly, the Government cites no support

---

[6] Even if it was possible to shift costs to Defendants, the Government has cited no legal support for doing so. In the one case the Government cites, a RICO defendant was ordered to pay money to fund a monitorship that "plainly [was] to be used to prevent further [RICO] violations." *United States v. Sasso*, 215 F.3d 283, 291 (2d Cir. 2000). As Defendants state in their prior filings, however, the proposed corrective statements that would be displayed at POS are backward-looking and not geared towards preventing future deception. *See* Defs.' Resp. to the Gov't's Proposed Corrective Statements 13 [D.E. 5881]. And, while the district court in *Sasso* concluded "there is no question that additional funding . . . will help prevent the illegal conduct," *id*. 288, here, the FSPTCA eliminates any reasonable likelihood that Defendants will engage in the future in the type of RICO activity on which the corrective statements remedy is purportedly based. *See* Defs.' Mot. for Vacatur 28 [D.E. 5880].

for this assertion. The fact that retailers agree, as a private contractual matter, to permit Defendants to convey certain messages does not mean that they can be *compelled* to do so by the Government. *See, e.g., United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *United States v. Nat'l Soc'y of Prof'l Eng'rs*, 555 F.2d 978, 984 (D.C. Cir. 1977) (the First Amendment prohibits "forc[ing] an association of individuals to express as its own opinion judicially dictated ideas"), *aff'd*, 435 U.S. 679 (1978).[7]

Moreover, the content of the Government's proposed corrective statements have the opposite aim of the POS signage that retailers agree to display pursuant to their contracts with Defendants. Retailers presumably enter into agreements with Defendants because they believe the agreements are consistent with their economic interests. But whereas most of Defendants' signs and displays are designed to increase sales and revenues, the Government would compel retailers to display corrective statements designed to *discourage* sales and *decrease* revenues, thus imposing a significant burden on retailers.

The Government next argues that "the Court's Order does not compel retailers to do anything: rather it compels Defendants to change the terms that they offer in their contracts." U.S.' Br. 13. But, as discussed above, the D.C. Circuit rejected precisely this approach. *See Philip Morris USA*, 566 F.3d at 1142. Order #1015 already directs Defendants to use their contracts with retailers to require them to post POS displays. *See Philip Morris USA, Inc.*, 449 F. Supp. 2d at 939 (¶ 7(b)) (mandating that Defendants "require retailers who participate in [a Retail Merchandising Program] to display" corrective statements "in a position of prominent visibility," specifically on a "Countertop Display and Header Display at retail point-of-sale.").

[7] Furthermore, forcing Defendants to compensate retailers would in no way alleviate the First Amendment violation to third-party retailers (and Defendants) from being compelled to convey messages with which they may not agree. *See* Defs.' Br. 17 n.4.

The D.C. Circuit held that the POS requirements improperly invaded the rights of absent third parties—even if formally directed only at Defendants. *Id.* at 1142.

Finally, the Government asserts that under the relaxed standard in *Zauderer v. Office of Disciplinary Counsel for the Supreme Court of Ohio*, 471 U.S. 636, 651 (1985), this Court is free to impose corrective statements on retailers because the statements contain only "factual information." U.S.' Br. 13. This is not the case. As Defendants make clear in their prior filings, the proposed statements are not "purely factual and uncontroversial," as *Zauderer* requires, especially where, as discussed above, they wrongly imply that the *retailers* have engaged in past misconduct. *See* Defs.' Resp. to the Gov't's Proposed Corrective Statements 6-13, 18-23 [D.E. 5881]; Defs.' Reply in Support of Resp. to the Gov't's Proposed Corrective Statements 1-11 [D.E. 5893]. But even if the statements were purely factual and uncontroversial (they are not), the Government cannot justify imposing such an undue burden on retailers in light of the numerous other and less burdensome avenues available for disseminating the Governments' message. Indeed, the narrow exception recognized in *Zauderer* applies only if the disclosures at issue are "reasonably related to [the Government's] interest in preventing deception of consumers" and do not impose restrictions that are "unjustified or unduly burdensome." 471 U.S. at 651. Since the time the Court issued Order #1015, however, the FDA has undertaken an extensive public health campaign and an entirely new regulatory regime exists under the FSPTCA, which includes new textual and proposed graphic warnings that will appear on all cigarette packages and advertising at retail locations. These measures are all in addition to the other means available for communicating any corrective statements outside of the POS context. The POS requirements thus would have little, if any, added benefit for consumers, and any added

benefit is far outweighed by the significant First Amendment and economic burdens imposed on innocent third-party retailers.

## III. THE GOVERNMENT DOES NOT ACKNOWLEDGE, LET ALONE ADDRESS, THE SIGNIFICANT PROBLEMS WITH IMPLEMENTING AND ENFORCING THE POS REQUIREMENTS

In addition to the legal impediments identified above, it also would be impossible to implement the POS requirements in an efficient and equitable manner consistent with Federal Rule of Civil Procedure 65(d) and due process. *See* Defs.' Br. 18.

By their terms, the POS requirements would apply only to some retailers throughout the country, while others would remain free to sell exactly the same products but without the burdens of the POS requirements. This is so because many retailers do not participate in any Defendants' merchandising program and thus are not covered by Order #1015. *See Philip Morris USA, Inc.*, 449 F. Supp. 2d at 939 (¶ 7(b)). Even among those who have historically participated in such programs, for the reasons discussed above, some likely would feel compelled to discontinue their existing contracts in light of the requirements' impact on their businesses.

Of those retailers otherwise willing to accept the POS requirements, the practical difficulties in implementing compliance would be staggering. Defs.' Br. 19. Among other things, retailers vary in terms of the size and layout of their floor and countertop space and the number of employees on staff. *See* Martin Decl. ¶ 26; Boehm Decl. ¶ 15; Sparrow Decl. ¶ 7. They also vary with respect to whether they have merchandising contracts with one or more Defendants. *See* NACS Amicus Br. 6.

As a result of this variety, depending on each individual store's specifications, circumstances and resources, some retailers would not be able to comply with the precise POS requirements and some, despite their best efforts, would be unable to comply at all. *See* Martin

Decl. ¶¶ 26-27; Boehm Decl. ¶ 15; Sparrow Decl. ¶ 7. Some stores, for example, may not have sufficient (if any) countertop space to accommodate the type of 30 x 18 Countertop Display mandated by the Court's order. *Id*. Further, while many stores likely can erect such a large display without it resulting in any practical problems for their business, in some stores, the Countertop Display would impede clerks' ability to view and monitor the stores' happenings. *See* Martin Decl. ¶¶ 27-28, 30; Boehm Decl. ¶¶ 16-17; Sparrow Decl. ¶ 7.

Application of the POS requirements also would vary because of how individual retailers and Defendants interpret and apply the requirements' vague and ambiguous terms. *See* Defs.' Br. 19. For example, retailers likely would have differing views, depending on the look and feel of their store, about whether a given display is "in a position of prominent visibility." *Philip Morris USA, Inc.*, 449 F. Supp. 2d at 939 (¶ 7(b)). Likewise, under the Court's order, the determination of whether a Header Display is "in an equivalent position with any other brand advertising header," *id*. at 939-40 (¶ 7(b)), would need to be made on a store-by-store basis, which would be further complicated by the fact that stores may have several of the fixtures that contain these headers in varying shapes and sizes. *See* Sparrow Decl. ¶ 8.

Thus, as envisioned, the POS requirements would result in a never-ending series of wholly subjective determinations relating to hundreds of thousands of differently situated retailers across the country.[8] Compounding this is the reality that retailers rearrange displays and counter space frequently, sometimes on a daily basis, to respond to changing business conditions or other considerations. *See* Martin Decl. ¶ 33; Boehm Decl. ¶ 18. And these changes are

[8] The Intervenors' proposal of having each Defendant post displays for consecutive two-year periods would only compound these problems. *See* Intervenors' Br. 12. Far from minimizing the burdens on innocent third-party retailers, extending the period of the POS requirements as the Intervenors suggest would increase that burden at least threefold.

usually undertaken by new and transient employees who may not have a full appreciation of the POS requirements or stores' historical efforts to comply with them. *See* Martin Decl. ¶ 33.

Despite all of the complexities and practical problems with implementing the POS requirements across such a varied community of businesses, neither this Court nor the Government has described any process or standard by which Defendants' or retailers' compliance would be judged. For example, Order #1015 states only that "[e]ach Defendant shall suspend from its Retail Merchandising Program for a period of one year any retailer that fails to comply with this provision." *Philip Morris USA, Inc.*, 449 F. Supp. 2d at 939 (¶ 7(b)). The Order says nothing about how violations of the POS requirements would be determined.

The lack of clear standards is especially problematic given that retailers face significant hardship and stand to lose a substantial percentage of their revenues if suspended. As noted, there are several reasons why retailers could be in technical noncompliance with Order #1015 despite their best, good-faith efforts to follow the vague POS requirements. Yet it also is not clear that the POS requirements leave Defendants even the slightest discretion to permit retailers to remedy innocent or inadvertent noncompliance to avoid suspension. Nor is there any process by which retailers could appeal any finding of noncompliance before suspension takes effect.

Absent a clear mechanism and set of procedures for ensuring that the POS requirements are imposed consistently and equitably—which Defendants submit are not possible—the POS requirements would be unworkable and unconstitutional.

**CONCLUSION**

For these reasons, and for the reasons set forth in Defendants initial submission, Defendants respectfully request that the Court decline to impose Order #1015's POS requirements.

Dated: April 15, 2011

Respectfully submitted,

/s/ Beth A. Wilkinson

Beth A. Wilkinson (D.C. Bar No. 462561)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, DC 20006-1047
Telephone: (202) 223-7300
Fax: (202) 223-7420

Miguel A. Estrada (D.C. Bar No. 456289)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 955-8257
Fax: (202) 530-9016

Thomas J. Frederick
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601-9703
Telephone: (312) 558-6700
Fax: (202) 558-5700

*Attorneys for Defendants*
*Altria Group Inc. and Philip Morris USA Inc.*

/s/ Beth A. Wilkinson *for*

Robert F. McDermott (D.C. Bar No. 261164)
Peter J. Biersteker (D.C. Bar No. 358108)
JONES DAY
51 Louisiana Avenue, N. W.
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Fax: (202) 626-1700

*Attorneys for Defendant*
*R.J. Reynolds Tobacco Company,*
*individually and as successor to*
*Brown & Williamson Tobacco Corporation*

/s/ Beth A. Wilkinson *for*
Michael B. Minton
THOMPSON COBURN LLP
One US Bank Plaza, Suite 3500
St. Louis, Missouri 63101-1693
Telephone: (314) 552-6000
Fax: (314) 552-7597

*Attorneys for Defendant*
*Lorillard Tobacco Company*