## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil No. 99-CV-02496 (GK)** |
| **v.** | ) | |
| | ) | **Next scheduled court appearance:** |
| **PHILIP MORRIS USA INC.,** | ) | **None** |
| **f/k/a PHILIP MORRIS INC., et al.,** | ) | |
| **Defendants.** | ) | |
| | ) | |

## UNITED STATES' RESPONSE BRIEF ON RETAIL POINT OF SALE

### Table of Contents

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

1.  THE D.C. CIRCUIT DECISION DIRECTED THIS COURT TO CONSIDER THE IMPACT OF A POINT-OF-SALE REQUIREMENT ON RETAILERS; IT DID NOT PROHIBIT SUCH A REMEDY. . . . . . . . . . . . 2

2.  THE COURT'S CORRECTIVE-STATEMENT REMEDIES ARE NECESSARY AND APPROPRIATE, AND POINT-OF-SALE IS CRUCIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

3.  MILDLY COMPLEX CONTRACTS ARE WELL WITHIN THE COMPETENCE OF THE FEDERAL COURTS, AND THIS COURT IN PARTICULAR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4.  ANY BUSINESS-RELATED HARMS TO RETAILERS ARE SMALLER THAN DEFENDANTS CLAIM; AND CAN IN ANY EVENT BE SHIFTED TO DEFENDANTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5.  DEFENDANTS HAVE WAIVED ANY ARGUMENT THAT THE POINT-OF-SALE REQUIREMENTS MIGHT HURT THEM; AND IN ANY EVENT, SUCH ARGUMENTS ARE NOT CREDIBLE. . . . . . . . 13

6.  A RETAIL POINT-OF-SALE COMPONENT FOR CORRECTIVE STATEMENTS WILL NOT HARM THE PUBLIC HEALTH.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

7.  DEFENDANTS' FIRST AMENDMENT ARGUMENTS ON RETAILERS' BEHALF ARE MISPLACED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

8.  THE D.C. CIRCUIT'S MANDATE REQUIRES THIS COURT TO CONSIDER THE EFFECTS OF ITS ORDER ON INNOCENT PERSONS, NOT TO AVOID ANY AND ALL ADVERSE EFFECTS. . . . . . . 20

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## INTRODUCTION

Defendants' brief on retail point-of-sale corrective statements features a parade of horribles that would allegedly arise if they are obliged to communicate the Court's corrective-statement remedies with the same retail-program contracts that have long been one of their "key methods [to] communicate brand information and communicate a brand's central message or image." *United States v. Philip Morris USA Inc.*, 449 F. Supp. 2d 1, 660 at ¶ 3111 (D.D.C. 2006), *aff'd in part & vacated in part*, 566 F.3d 1095 (D.C. Cir. 2009) (per curiam), *cert. denied*, 561 U.S. ___, 130 S. Ct. 3501 (2010).  Defendants' parade of horribles focuses on the prospect that retailers—especially retailers whose success in business requires payments from Defendants—might suffer if the Court takes effective action to prevent and restrain continued fraud and deception and correct past misrepresentations.

But Defendants make no claim that the Court lacks authority to make them pay retailers for whatever financial disruption might occur.  Instead, Defendants' filing reveals that their true objection (in the words of R.J. Reynolds' Senior Director for Retail Strategy) is that Court-ordered corrective statements would "tell[] consumers, in essence, not to buy cigarettes" and "instruct consumers not to purchase."  3/31/2011 John D. Boehm Decl. ¶ 18 (Ex. 2 to Defs.' Br. Re. Order #1015's Point-of-Sale Display Reqmt's, R. 5906; filed 4/1/2011).  The recommended corrective statements before the Court say no such thing, of course.  To whatever extent point-of-sale displays of corrective-statements did "the opposite" of "help[ing] . . . sell our products," *id.* ¶ 19, it would presumably be because Defendants' (and retailers') sales count on Defendants' "continuing to disseminate fraudulent public statements and marketing messages."  449 F. Supp. 2d at 927.

1

An even deeper problem is that consumers would predictably be harmed if the Court further restricts its efforts—already "narrowly tailored," *id.*— to prevent and restrain fraud.  As the Court found, "[t]he clear weight of the evidence shows that Defendants took advantage of and exploited their customers' lack of knowledge concerning cigarette use and nicotine addiction." *Id.* at 900.  The Court found that Defendants' "continuing conduct misleads consumers *in order to maximize Defendants' revenues* by recruiting new smokers (the majority of whom are under the age of 18), preventing current smokers from quitting, and thereby sustaining the industry." *Id.* at 910 (emphasis added).  The consumers whom Defendants seek to keep from receiving effective point-of-sale communications must be considered in addition to the retailers Defendants pay to communicate their messages and sell their products.

## DISCUSSION

1.    **THE D.C. CIRCUIT DECISION DIRECTED THIS COURT TO CONSIDER THE IMPACT OF A POINT-OF-SALE REQUIREMENT ON RETAILERS; IT DID NOT PROHIBIT SUCH A REMEDY**

Defendants dedicate several pages of their brief to the mistaken notion that the D.C. Circuit decision prohibits a point-of-sale component to the Court's corrective-statement remedy.  Defs.' Br. at 1-2, 4, 7-8, 9, 10, 13.  To the contrary, the D.C. Circuit held only that the Court had erred "by failing to *consider* the rights of retailers" before issuing its 2006 Final Order.  *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1141 (D.C. Cir. 2009) (*per curiam*) (emphasis added), *cert. denied*, 561 U.S. ___, 130 S. Ct. 3501 (2010).  The D.C. Circuit "remand[ed] for the district court to *evaluate* and '*mak[e] due provision for* the rights of innocent persons,' either by abandoning this part of the remedial order or *by crafting a new version reflecting the rights of third parties*." *Id.* at 1142 (emphases added).  The D.C. Circuit did not "squarely reject[] the precise approach urged by the

2

Government," Defs.' Br. at 7; it made no "holding" (much less a "clear holding") "that the POS requirements impermissibly infringe the rights of third-party retailers," *id.* at 10; it did not "reject[]" as an impermissible impairment of nonparties' rights" an order that would oblige Defendants "to modify their retailer contracts to include provisions requiring [participating] retailers to post POS signage," *id.* at 10; and it did not "recognize[]" that "the POS requirements of Order #1015 . . . are unlawful and unconstitutional," *id.* at 13. (Defendants' brief does not cite the D.C. Circuit decision to support *any* of these assertions about what that decision rejected, held, and recognized.) What the D.C. Circuit did do, in its own words, was "remand for the district court to make due provision for the rights of innocent third parties." *Philip Morris USA, Inc.*, 566 F.3d at 1150. The D.C. Circuit did not state that an injunction is prohibited if it will have an adverse effect on innocent persons; instead, it stated that "[e]ven though not explicitly bound by the terms of an injunction on pain of contempt, third parties *may* be *so* adversely affected by an injunction as to render it improper." *Id.* at 1142 (emphases added).

As discussed in the United States' (and Intervenors') opening briefs, and as discussed further below, the retail point-of-sale remedy would have rather small effects on retailers—calculated by the United States as $5 million in lost profits industry-wide per year, and by Intervenors as less than 5 cents per store per day—and in any event, the Court can and should shift to Defendants whatever financial costs retailers might face. U.S. Opening Br. on Retail Point of Sale at 22-23 (R. 5905; filed 4/1/2011); Intervenors' Opening Br. Re. Corrective Stmts. in Point-of-sale Displays at 4, 12 (R. 5903; filed 4/1/2011); *United States v. Sasso*, 215 F.3d 283, 292 (2d Cir. 2000) (affirming order for RICO defendant to pay portion of costs of court-ordered monitor so that innocent union members would not bear the entire cost).

3

2.    **The Court's corrective-statement remedies are necessary and appropriate, and point-of-sale is crucial**

Defendants use their current brief on retail point-of-sale corrective-statement displays to recycle their previous arguments that the new tobacco legislation makes corrective statements unnecessary in general, and makes point-of-sale corrective statements in particular unnecessary. Defs.' Br. at 11-13.   The United States has previously addressed the bulk of the arguments Defendants repeat here.   *See* U.S. Opp'n to Defs.' Mot. for Vacatur (R. 5907; filed 4/4/2011).   Only a few of Defendants' particular claims require attention here.   First, contrary to Defendants, the "objectives of this Court's POS requirements," Defs.' Br. at 11, are "to prevent Defendants from continuing to disseminate fraudulent public statements and marketing messages," 449 F. Supp. 2d at 927.   The corrective-statement remedy is "narrowly tailored" to prevent and restrain future fraud and deception.   *Id.*   By contrast, the new legislation "address[es] the public health crisis created by actions of the tobacco industry," Family Smoking Prevention and Tobacco Control Act of 2009 (Tobacco Control Act), Pub. L. No. 111-31, § 2(29), 123 Stat. 1776, 1778, and authorizes FDA to issue regulations restricting the advertising and promotion of tobacco products if the Secretary of Health and Human Services determines such restrictions are "appropriate for the protection of the public health," *id.* § 101(b), sec. 906(d)(1), 123 Stat. at 1796.   Defendants are simply mistaken to claim that "[t]he objectives of this Court's POS requirements are already fulfilled" by virtue of the new public-health statute.   Defs.' Br. at 11.

Even more mistaken is Defendants' suggestion that the aim of the corrective-statement remedy is "for the Government to disseminate *public-health* information to *smokers*."   *Id.* at 16 (emphases added).   The remedy, although proposed by the United States, was imposed by the Court,

4

and affirmed by the D.C. Circuit; its purpose is not to disseminate public-health information, but to correct fraud and deception and especially to prevent future fraud and deception; and smokers are far from its only audience.

Second, even as Defendants ask this Court not to impose any corrective statements due to the new public-health warnings that will be required under the Tobacco Control Act, they are simultaneously arguing in other forums that those same new public-health warnings will be unconstitutional. *See* U.S. Opp'n to Defs.' Mot. for Vacatur at 15-16 (R. 5907; filed 4/4/2011).

Defendants' third argument is that a corrective-statement remedy is unnecessary because the FDA has sought funding for public-health education efforts. *Id.* at 12. To the extent that such appropriation requests have been funded and implemented, they are neither narrowly tailored to prevent continued fraud and deception, nor targeted exclusively at consumers. *See, e.g.*, Center for Tobacco Products, FDA, "Compliance Training for Tobacco Retailers Webinars," http://www.fda. gov/TobaccoProducts/ResourcesforYou/ForIndustry/Retailer/ucm220111.htm (hour-long web-based seminars about retailers' requirements under the new law) (page last updated 4/14/2011) (last visited 4/14/2011); Center for Tobacco Products, FDA, "FDA Center for Tobacco Products Clearinghouse," https://secure.mmgct.com/tobaccomaterials/?ref=fda (discussing "FDA's newest campaign to educate retailers and raise awareness about tobacco product regulations," called "Break the Chain of Addiction") (page last updated 3/4/2011) (last visited 4/14/2011). In any event, the scope of FDA's retailer-education and public-health education programs, even if fully funded at the requested level of $45 million per year, would be about 0.3% of the $12.5 *billion* that Defendants spend on marketing annually. Federal Trade Commission, *Cigarette Report for 2006*, at 1 (2009).

Defendants' final argument is more specific to the point-of-sale issue: Because the Court ordered corrective statements to be disseminated through several media, Defendants assert, "there is simply no need for an additional requirement that the corrective statements also be displayed on countertops and headers at the point of sale." Defs.' Br. at 12 (emphasis omitted). Defendants' suggestion that communicating to consumers at the retail point-of-sale is superfluous and unnecessary would be more persuasive if there was any evidence that they believed their own point-of-sale communication efforts were superfluous and unnecessary. To the contrary, "[i]n-store placement displays and signs are . . . coordinated with other advertising to display consistent images. Because of these synergies, advertising and promotion messages in one medium reverberate in another medium. Storefront and in-store advertising can remind the consumer of an overall message or theme encountered in other media and therefore stimulate purchase." 449 F. Supp. 2d at 660, ¶ 3111. Just as the various media Defendants use for marketing reinforce and complement one another, so too should the media the Court has ordered for corrective statements.[1]

All parties' opening briefs discussed at some length the importance of the retail environment for effective communication to consumers. U.S. Opening Br. at 3-6; Intervenors' Opening Br. at 2-3, 6-12; Defs.' Br. at 6 n.2, 7; 3/31/2011 Martin Decl. ¶ 12 (Ex. 1 to Defs.' Opening Br.) ("PM USA views the retail environment as an essential opportunity to communicate with adult smokers—

---

[1] The Court's 2006 Final Order omits at least three major forms of media that Defendants are currently using to market their products: Direct mail, Internet banner and pop-up ads, and e-mail messages. As the Court previously found, "Defendants have made extensive use of direct mail marketing to many millions of individuals," 449 F. Supp. 2d at 656, ¶ 3089; Philip Morris alone "has sent Marlboro Unlimited to tens of millions of individuals on its Direct Mail Marketing Database," *id.*, ¶ 3093.

Nor does the Court's order currently require Defendants to transmit the corrective statements through Internet or pop-up ads, or e-mail messages; it does, however, require Defendants' own websites to include the corrective statements. A study conducted from 2001 to 2005 found that among adults who reported seeing tobacco products advertised on the Internet, 60.7% reported seeing them via Internet pop-up or banner ads; 24.6% by e-mail messages; and only 14.9% on websites. Mary Hrywna, Cristine D. Delnevo & M. Jane Lewis, *Adult Recall of Tobacco Advertising on the Internet*, 9 Nicotine & Tobacco Research 1103, 1106 (2007).

6

including smokers of competing brands—about its products"); 3/31/2011 Boehm Decl. ¶ 12 (Ex. 2 to Defs.' Opening Br.) ("The retail environment provides a vital opportunity for RJRT to communicate with adult consumers. . . .  The retail environment provides RJRT's last opportunity to communicate with an adult consumer before that consumer makes a brand decision at the point of purchase.").  Point-of-sale marketing leads children and young people to "grow up seeing tobacco as . . . on a par with milk and bread and come to underestimate its risks," in part because they see the marketing every time they go to a retail outlet.  Richard W. Pollay, *More Than Meets the Eye: On the Importance of Retail Cigarette Merchandising*, 16 Tobacco Control 270, 274 (2007), *available at* http://tobaccocontrol.bmj.com/content/16/4/270.full.html.  Another peer-reviewed study, reported in *Preventive Medicine* in 2004, found a "strong relationship between the amount of money received from participation in these types of [retail] programs and the amount of [cigarette] marketing materials in the stores.  Those retailers who were in the highest quartile of money received had over three times as many branded cigarette company ads and promotional materials as those in the lowest quartile."  Ellen C. Feighery, Kurt M. Ribisl, Nina C. Schleicher, et al., *Retailer Participation in Cigarette Company Incentive Programs Is Related to Increased Levels of Cigarette Advertising and Cheaper Cigarette Prices in Stores*, 38 Preventive Med. 876, 883 (2004).

Under the Court's order, retail point-of-sale is the *only* medium (other than Defendants' websites) where consumers—including non-smokers, smokers who are considering quitting or reducing the amount that they smoke, and youth who do not yet smoke—will see the Court's corrective statements every time they visit a particular site.  When useful for their own purposes (such as to defeat a proposed class-action notification plan), Defendants point out to courts that there are multiple measures of media performance, including vehicle distribution, vehicle exposure, and

7

message exposure.  Suppl. Decl. of Kent M. Lancaster, Ph.D., ¶ 9, *In re Tobacco Cases II*, JCCP No. 4042 (Cal. Super. Ct. Dec. 17, 2001) (copy attached as Reply Ex. 1).  Defendants here make no comparison of the comparative performance of point-of-sale versus other media; do not discuss the distribution or exposure of point-of-sale versus other media; and do not compare the reach, spread, or penetration of the Court's corrective statements with, versus without, a retail point-of-sale component.  *Cf. id.* ¶ 5(A) (criticizing plaintiffs' proposed class-action notification plan on grounds that plaintiffs overstated notice reach and did not account for people seeing but not reading class-action notice).  Defendants' present assertions that a retail point-of-sale component for the Court's corrective-statement remedy would be superfluous and unnecessary, and "would have little, if any, added benefit for consumers," Defs.' Br. at 16, are conspicuously unsupported.  In fact, Defendants' present assertions are contradicted by the declarations from their own in-house marketing personnel that the retail environment is an "essential opportunity to communicate with adult smokers," 3/31/2011 Martin Decl. ¶ 12, a "critical communication vehicle," *id.* ¶ 24, and a "vital opportunity . . . to communicate with an adult consumer," 3/31/2011 Boehm Decl. ¶ 12.  The Court should reject Defendants' claims that a retail point-of-sale platform is superfluous as contrary to the recent scientific evidence cited above and in the United States' and Intervenors' opening briefs; to the testimony and evidence on which the Court based its past findings of fact; to the Court's findings of fact; to Defendants' current declarations; and to common sense.

3.   **MILDLY COMPLEX CONTRACTS ARE WELL WITHIN THE COMPETENCE OF THE FEDERAL COURTS, AND THIS COURT IN PARTICULAR**

Defendants assert that "the complex contractual relationships between Defendants and retailers" present "innumerable logistical problems that would make imposing such burdensome

[retail point-of-sale] requirements unmanageable, unworkable, and unconstitutional." Defs.' Br. at 3. The only particular "complex contractual relationships" mentioned in Defendants' brief and declarations appear to be that R.J. Reynolds has one form of contract for "pack" outlets (such as convenience stores) and another for "carton" outlets. 3/31/2011 Boehm Decl. ¶ 7 & Exs. A & B. Other than that, it appears that Defendants are simply referring to the fact that their contracts give them an extraordinary amount of control over the size, number, content, and placement of signs and displays within participating retailers' stores, Defs.' Br. at 5, and that there are important variations among the retailers that they contract with, including, for example, that "[s]ome stores have very high counters, some have very low counters, and some have no counters at all," *id.* at 18.

The suggestion is thus that Defendants are able to prepare and use a very small number of form contracts to govern their relationships with hundreds of thousands of retailers, from those with very high counters to those with very low counters, and even those with no counters at all—but that, apparently, this Court would be unable to grasp the complexities involved, and thus should avoid what the Senior Vice President and General Manager of Altria Sales & Distribution calls a "critical communication vehicle." 3/31/2011 Martin Decl. ¶ 24. Defendants' past conduct belies their present claim; over five years of protracted antitrust litigation, they availed themselves of the federal courts' ability to read and understand the details of their retail-program contracts, including two published decisions with detailed discussions of those contracts. *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 60 F. Supp. 2d 502, 507-08 (M.D.N.C. 1999) (granting preliminary injunction in favor of R.J. Reynolds, Lorillard, and Brown & Williamson against certain aspects of Philip Morris's Retail Leaders program; discussing contract provisions in detail); *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 370-72 (M.D.N.C. 2002) (granting summary

9

judgment to Philip Morris; again discussing retail-program contracts and terms in detail), *aff'd*, 67 Fed. App'x 810 (4th Cir. 2003) (*per curiam*); *see also Liggett Group Inc. v. R.J. Reynolds Tobacco Co.*, 102 F. Supp. 2d 518 (D.N.J. 2000) (transferring similar antitrust lawsuit against R.J. Reynolds' "Every Day Low Price" retail program to Middle District of North Carolina; case appears to have eventually settled without further published decisions). Defendants' current brief seems to imply that other federal courts are competent to make sense of their retail-program contracts, but this Court is not.

**4.     ANY BUSINESS-RELATED HARMS TO RETAILERS ARE SMALLER THAN DEFENDANTS CLAIM; AND CAN IN ANY EVENT BE SHIFTED TO DEFENDANTS**

The bulk of Defendants' parade of horribles is premised on the notion that requirements for countertop and header displays would be logistically difficult for retailers to comply with; and that in any event, payments from Defendants are the lifeblood of retailers across the nation. Defs.' Br. at 13-15.

It is difficult to make sense of Defendants' complaint that requiring their retail-program contracts to include countertop and header displays of corrective statements would "fundamentally alter[] the physical layout of each retailer's store" and "prevent retailers from operating their businesses in what they deem to be the most revenue-maximizing way." *Id.* at 13. As Defendants elsewhere acknowledge, their own contracts already specify where participating retailers must place Defendants' signs and displays within retailers' stores. *Id.* at 5. Retailers interviewed as part of academic studies report that "tobacco company sales representatives had exclusive control over the placement of products and advertisements by virtue of the contracts. The tobacco company sales representatives visited the stores and placed signs according to their store-specific plan-o-grams,

10

with which storeowners had barely any involvement.  'They say they want to put up this new sign.

They literally come in and change our signs without us telling them. . . . We don't call them and ask

them to do it.' . . . (Caucasian female, manager, smoker, above average tier)."  Robert John, Marshall

K. Cheney, & M. Raihan Azad, *Point-of-Sale Marketing of Tobacco Products: Taking Advantage

of the Socially Disadvantaged?*, 20 J. Health Care for Poor & Underserved 489, 499 (2009).

"Tobacco companies exert substantial control over the retail environment by requiring retailers to

place their products in the most visible locations and to place specific amounts and types of

advertising in certain locations in the store."  E.C. Feighery, K.M. Ribisl, P.I. Clark et al., *How

Tobacco Companies Ensure Prime Placement of Their Advertising and Products in Stores:

Interviews with Retailers about Tobacco Company Incentive Programmes*, 12 Tobacco Control 184,

187 (2003).

If it truly were offensive, as Defendants imply, for external entities to "alter the physical

layout of retailers' stores and impair their abilities to conduct business as they wish within legal

boundaries," Defs.' Br. at 6, the source of the asserted offense is the massive amount of control

Defendants' own retail programs exert over retailers.  All that the Court's order would do is require

Defendants' retail-program contracts—which already control the size, number, placement, and

content of signs and displays within participating retailers' stores—to include particular corrective-

statement displays in two specific locations, namely, countertops and headers.

In any event, retailers who choose to leave the Defendants' retail programs are still free to

purchase Defendants' cigarettes at prevailing market prices.  In *R.J. Reynolds Tobacco Co. v. Market

Basket Food Stores, Inc.*, No. 5:05CV253-V, 2007 WL 319965, at *11, 2007 U.S. Dist. LEXIS 6737

(W.D.N.C. Jan. 30, 2007), the court held that participants in R.J. Reynolds' retail programs, accused

11

of defrauding R.J. Reynolds, would not suffer if the court enjoined them from purchasing R.J. Reynolds cigarettes through any "buy-down" or "discount" retail programs, either from R.J. Reynolds or anyone else, on grounds that they would remain free to purchase R.J. Reynolds' cigarettes at prevailing prices and continue selling them to their customers.

Defendants' next contention is that economic losses from complying with retail-program requirements for countertop and header displays might lead some retailers to drop out of the retail programs; and that this would cause economic harm to the retailers who choose to do so. *Id.* at 14. Relying on the affidavit that Defendants filed in this Court in 2006 from a National Association of Convenience Stores (NACS)[2] vice president, the United States previously calculated the economic loss to retailers from the Court's order as less than 0.4% of *revenue* from cigarette sales, and less than $5 million per year in lost *profits* across the entire industry. U.S. Opening Br. at 22-23. Making similar calculations, based on the same NACS affidavit, Intervenors calculated that the lost *revenue* would average less than $2.50 per day, per store, and the lost *profits* would average less than 5 cents per day, per store. Intervenors' Opening Br. at 4, 12. Defendants give no reason to think that retailers would lose so much money from selling "other products in that space (*e.g.*, gum, candy)," Defs.' Br. at 14, that many retailers would choose to sacrifice the "significant direct and indirect financial incentives," *id.* at 6, of Defendants' cigarette retail-program contracts, which "represent a substantial portion of their expected annual revenue," *id.* at 14, in order to sell gum and candy unimpeded from their countertops.

Moreover, if some retailers conclude that it is in their best financial interest to leave Defendants' retail-program contracts, the Court should respect their economic judgment. It simply

_____

[2] This organization now goes by the name Association for Convenience & Petroleum Retailing (NACS).

is not the law that the courts are prohibited from imposing corrective measures to prevent and restrain violations merely because doing so would diminish some (or even many) non-parties' profits. In *National Society of Professional Engineers v. United States*, 435 U.S. 679, 695 (1978), the Supreme Court upheld a ban on a professional organization's promulgating ethical rules that prohibited competitive bidding by its members, as part of an antitrust injunction designed to prevent and restrain violations. This was so even though the predictable result of the ban would be that engineers, previously prohibited by professional ethics rules, would begin engaging in competitive bidding, and thus the profits earned by the professional society's members—who were not parties to the lawsuit—would decline as a result of the injunction.

To whatever extent the Court finds that the space needed to display corrective statements at retail point-of-sale would reduce profits that retailers would otherwise earn from the same space, it can and should require Defendants to pay for the financial disruption. *Sasso*, 215 F.3d at 292.

5.   **DEFENDANTS HAVE WAIVED ANY ARGUMENT THAT THE POINT-OF-SALE REQUIREMENTS MIGHT HURT THEM; AND IN ANY EVENT, SUCH ARGUMENTS ARE NOT CREDIBLE**

Defendants plead that *they* might suffer economic harm if retailers leave their retail programs due to the point-of-sale requirements, Defs.' Br. at 6 n.2, 7 ("The POS requirements also would have an adverse impact on the value of merchandising contracts for Defendants"), 21 n.6 ("the POS requirements . . . are still unconstitutional because they are 'unjustified and unduly burdensome' in light of the substantial economic and other burdens placed on Defendants (and retailers)"); plead that the Court's order is so vague that it violates Rule 65's requirements for specificity, *id.* at 17-18; and further plead that a point-of-sale requirement will violate *their* First Amendment rights because there would be less retail-store space available for them to pay retailers to display *their* point-of-sale signs

13

and displays, *id.* at 19-20.  These pleas should fall on deaf ears.  "Regarding the specific means of disseminating the statements," Defendants argued on appeal "that the point-of-sale displays are duplicative and impose severe burdens on retailers." *Philip Morris USA, Inc.*, 566 F.3d at 1138.  The D.C. Circuit held that this Court will need to modify the order to avoid duplicative displays from multiple Defendants being displayed simultaneously, *id.* at 1142; and as discussed above, ordered this Court to consider the rights of innocent persons, *id.*  But Defendants made no argument that the point-of-sale requirement should be vacated because it might cause them economic harm, or was too unclear to be complied with, or would diminish the space available for them to pay for point-of-sale displays.  Defendants waived these arguments before, and make no claim that they are entitled to raise them now by virtue of clear error, new law, or significantly changed new circumstances.

Even on the merits, though, Defendants' special pleading is baseless.  If Defendants wish to retain current levels of retailer participation in their retail programs, they can offer to pay retailers more money.  As to the claim that a slight reduction in retail-store space available for their marketing materials would somehow violate their First Amendment rights, Defendants' factual premises are shaky even before considering the constitutional law issues that they did not timely present. Defendants themselves point out that 97% of the retailers who participate in Philip Morris's Retail Leader program accept its considerable financial incentives to keep their counters free of all cigarette-related marketing—both Philip Morris's, and all competitors'.  Defs.' Br. at 7, 13-14.[3]  By

---

[3] Because Marlboro is the market leader, Philip Morris may have decided that it is to its benefit to pay retailers not to let its competitors display marketing at the countertop, even at the cost of not having its own marketing at that location.

Philip Morris offers the inducement through its "Progressive Merchandising Option" (PMO).  A PMO retailer "agrees not to merchandise cigarettes or place Cigarette Signs, or brand imagery associated with cigarettes, on, above, or attached to the front of certain Selling Counters."  Philip Morris USA Inc., "Retail Leaders Program 2010 Agreement: Plan Groups I, H, and X" at Ex. B (9510000036/0072 at 0045) (hereafter "Philip Morris Retail Leaders Program: Plan (continued...)

Defendants' own figures, over 184,000 retail stores nationwide have accepted these financial inducements from Philip Morris (97% of the 190,000 that participate in Philip Morris's Retail Leader program, Defs.' Br. at 5); this is roughly 54% of the 340,000 retailers in the country that Defendants say sell their cigarettes, *id.* at 4. Thus, in well over half of the retail stores in the country that sell Defendants' cigarettes, Defendants have *no* signs or displays that could even possibly need to be moved so that a countertop corrective statement would be clearly visible.

More generally, the small number of countertop and header displays required for corrective statements would come nowhere near drowning out Defendants' opportunities to promulgate their messages in the retail environment. *Cf. Kovacs v. Cooper*, 336 U.S. 77 (1949) (finding no First Amendment right to use sound trucks to drown out other people's speech). A 2009 study of retailers in Oklahoma found that the average number of tobacco advertisements at stores ranged from 7.9 at supermarkets to 33.5 at chain convenience stores, 38.8 at local convenience stores, and all the way up to 40.0 at gas stations. John, Cheney & Azad, *Point-of-Sale Marketing of Tobacco Products*, 20 J. Health Care for Poor & Underserved at 492 tbl. 1. A 2004 study conducted in California found an average of 22.6 branded cigarette marketing materials and 123.8 cigarette product facings per store, and reported that among the stores most popular among teenagers, the averages were 31.0 for branded cigarette marketing materials per store and 153.1 product facings per store. L. Henriksen,

---

[3] (...continued)
Groups I, H, and X") (U.S. Opening Br. Ex. 1). Whether a retailer participates in the PMO determines whether it is in Plan I or I-, H or H-, and X or X-. *Id.*

The differences in direct and indirect benefits are huge; as examples, a Plan "I" store that selects Category Merchandising Option (CMO) 2, and that participates in the PMO by keeping its counters free of all cigarette marketing, receives a "merchandising payment" of 10 cents per carton—5 cents more than the 5 cents/carton offered to a Plan "I-" store at the same CMO 2 level (where the "-" indicates that the store has rejected the PMO in order to display cigarette marketing on its counters). *Id.* at 1 (9510000036/0072 at 0036). The magnitude of the difference is even greater for retailers in Plan "X" at the CMO 3 level, with stores in the PMO program receiving 40 cents/carton, while those outside the PMO program (in Plan "X-") receive 30 cents/carton. *Id.* All that a retailer at one of these levels needs to do to get an extra 5 or 10 cents per carton is *not* display cigarette marketing at its counters.

E.C. Feighery, N.C. Schleicher et al., *Reaching Youth at the Point of Sale: Cigarette Marketing is More Prevalent in Stores Where Adolescents Shop Frequently*, 13 Tobacco Control 315, 316 (2004). Requiring that a countertop display be within the line of sight of each customer in line for a cash register, and that header displays be displayed in an equivalent position with brand advertising header displays, will not "eviscerate" or "extinguish[]" Defendants' ability to have dozens of displays and signs at retail point-of-sale. Defs.' Br. at 20.

6.      **A RETAIL POINT-OF-SALE COMPONENT FOR CORRECTIVE STATEMENTS WILL NOT HARM THE PUBLIC HEALTH**

Defendants make the curious suggestion that the Court's corrective-statement remedy should avoid a point-of-sale component because Defendants currently pay some retailers to use the same space for their "We Card" program, which contains messages about selling cigarettes to underage consumers. Defs.' Br. at 7. The Court's order does not interfere with Defendants' ability to place "We Card" or any other signs on storefronts; store doors; the vertical surfaces of counters; and numerous other locations within and outside retail stores. Moreover, as this Court found, there is "no evidence that any Defendant has evaluated whether tobacco outlets participating in the We Card Program were actually not selling tobacco to young people or whether the program reduced the overall adolescent smoking prevalence rate." 449 F. Supp. 2d at 669, ¶ 3165. There may be good reason for this lack of self-scrutiny: A recent article found considerable evidence from Defendants' internal documents that the program's goals from the outset were "first, to improve the industry's image through publicity, and second, to reduce regulation and law enforcement activity focused on tobacco control, particularly stings of retail outlets that revealed the extent of sales to minors." Dorie E. Apollonio & Ruth E. Malone, *The "We Card" Program: Tobacco Industry "Youth Smoking*

*Prevention" as Industry Self-Preservation*, 100 Am. J. Pub. Health 1188, 1194 (2010).  When Philip

Morris declared the We Card program "a national success" in 2000, it was not because the program

reduced sales to underage buyers, but because Philip Morris tests of advertising effectiveness found

that We Card commercials were "an extremely positive influence on attitudes toward the tobacco

industry generally and PM specifically"; "reviews of the program within Philip Morris explicitly

stated that We Card was a form of corporate advertising."  *Id.* (internal quotation marks omitted).

The Court need have no fear that the retail point-of-sale component of its corrective-statement

remedy would disrupt a meaningful public-health program.

**7.    DEFENDANTS' FIRST AMENDMENT ARGUMENTS ON RETAILERS' BEHALF ARE MISPLACED**

Some retailers who participate in Defendants' retail programs express "personal views

against advertising tobacco products."  John, Cheney & Azad, *Point-of-Sale Marketing of Tobacco*

*Products*, 20 J. Health Care for Poor & Underserved at 501.  Defendants' current brief asserts

(though without citing evidence) that other retailers "may not agree" with the Court's corrective

statements; and goes on to claim that requiring corrective statements to be part of Defendants' retail-

program contracts would therefore violate retailers' First Amendment rights.  Defs.' Br. at 15.  The

fundamental confusion in Defendants' argument is that there is no government compulsion.

Retailers who find the content of the required displays and signs offered under Defendants' current

retail programs disagreeable are free not to enroll; retailers who find the content of the required

displays and signs offered under the programs as modified by Court order will be equally free not

to enroll.  The Federal Cigarette Labeling and Advertising Act (FCLAA) requires that the labels on

Defendants' cigarette packs bear the current Surgeon General public-health warnings, 15 U.S.C.

§ 1333(a)(1); to the extent that retailers stock Defendants' products, all retailers, not just those that

17

participate in Defendants' retail programs, must host such "speech" on their premises.  Retailers that

do join Defendants' retail programs, or otherwise display signs and advertisements for Defendants'

cigarette brands, are likewise required to display the current Surgeon General public-health warnings,

15 U.S.C. § 1333(a)(2), which in the ordinary course of business are generally provided by

Defendants or their agents.  There simply is no choice; retailers who do not wish to display signs or

displays with these public-health warnings cannot participate in any retail programs that require them

to display Defendants' signs or displays.

Nor can there be any genuine claim that it would violate retailers' First Amendment rights

for participants in Defendants' retail programs to be required to display a different mix of mandated

messages than they currently do.  The Tobacco Control Act will change the required public-health

warning component of FCLAA with respect to cigarettes; once those new warnings are in effect, the

mandatory content of the cigarette displays and signs required of participants in Defendants' retail

programs will automatically change.  Defendants make no claim that the First Amendment protects

retailers from being required to change from displaying the current Surgeon General public-health

warnings to something new (and it is difficult to see how changing the nature of the compelled

public-health warnings could, standing alone, violate the First Amendment, without any reference

to the content of the new public-health warnings).  In the same way, this Court's requiring

Defendants' retail programs to include corrective statement displays will not, standing alone, violate

retailers' First Amendment rights either; a valid First Amendment objection on retailers' behalf, if

any, would be based on the statements' content, not the bare fact that the Court ordered Defendants'

retail programs to require corrective statement displays.

The rest of the First Amendment arguments that Defendants assert on retailers' behalf are much the same as those they have already asserted on their own behalf, which are being addressed in the briefing on the United States' recommended corrective statements. It bears mentioning, however, that Defendants mis-state the standard the Court should apply, wrongly claiming that "compelled speech is subject to strict scrutiny, and is therefore unconstitutional unless it furthers a compelling governmental interest by the least restrictive means available." Defs.' Br. at 16. Neither of the Supreme Court cases that Defendants cite says any such thing; both of them, in fact, addressed content-based regulations on speech, rather than government-compelled speech. *Playboy Entertainment* addressed requirements for sexually-oriented cable-television programming either to be fully scrambled, or restricted to certain late-night hours; the Court held, at the page Defendants cite, that "[i]f a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest. If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000) (cited in Defs.' Br. at 16). Likewise, *Sable Communications* addressed restrictions against so-called "dial-a-porn" phone calls; at the page Defendants cite, the Court held that "[t]he Government may, however, regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) (cited in Defs.' Br. at 16).[4]

---

[4] Only one of the three cases that Defendants cite as mandating strict scrutiny review of compelled speech actually refers to strict scrutiny as part of a discussion of compelled speech. *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 653 (7th Cir. 2006) (evaluating Illinois statute that required warning labels on sexually explicit video games) (cited at Defs.' Br. at 16). But what the Seventh Circuit actually said was that the message that a particular video-game's content is sexually explicit is "subjective and highly controversial," and that the statute was therefore subject to strict

(continued...)

8.   **THE D.C. CIRCUIT'S MANDATE REQUIRES THIS COURT TO CONSIDER THE EFFECTS OF ITS ORDER ON INNOCENT PERSONS, NOT TO AVOID ANY AND ALL ADVERSE EFFECTS**

As discussed above, Defendants are mistaken to claim that the D.C. Circuit held that "the POS requirements of Order #1015 . . . are unlawful and unconstitutional." Defs.' Br. at 13.  What the D.C. Circuit required is that this Court consider the effect of its order on innocent third parties, bearing in mind that "[e]ven though not explicitly bound by the terms of an injunction on pain of contempt, third parties *may* be so adversely affected by an injunction as to render it improper." *Philip Morris USA, Inc.*, 566 F.3d at 1142 (emphasis added; citing *Cook Inc. v. Boston Sci. Corp.*, 333 F.3d 737, 744 (7th Cir. 2003)).  Neither the D.C. Circuit decision, nor the *Cook* decision on which it relied, holds that an adverse effect on non-parties makes an injunction impermissible; indeed, it would be a rare injunction to have no effect at all on parties not before a court.  Instead, what the law requires is that an injunction's adverse effects upon innocent persons "must be balanced against the harm . . . from narrowing the injunction" to avoid such adverse effects.  *Cook*, 333 F.3d at 744.  As discussed above, the financial impact of losing countertop space for counter displays of corrective statements is not large, and in any event, can be shifted from retailers to Defendants.

What the Court cannot lose sight of, though, is that retailers are not the only innocent persons with interests that will be affected by the contours of the Court's corrective-statement remedy.  Defendants forthrightly describe the retail environment as a "critical communication vehicle."  3/31/2011 Martin Decl. ¶ 24.  It is critical precisely because it is such an important vehicle for

---

[4] (...continued)
scrutiny, rather than the "reasonable relation" standard for compelled speech under *Zauderer. Id.* at 652 (citing *Zauderer v. Office of Disciplinary Counsel for Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985).  The *Entertainment Software* decision then explicitly contrasted the "subjective and highly controversial message—that the game's content is sexually explicit" against "a surgeon general's warning of the carcinogenic properties of cigarettes." *Id.*  Defendants' assertions that it is "subjective and highly controversial" to say that, for example, they fraudulently denied manipulating the amount of nicotine delivered by their cigarettes, are being addressed in the corrective-statement briefing.

reaching consumers—those too young to purchase cigarettes legally, but capable of growing up to think of cigarettes as on a par with milk and bread; those trying to quit or reduce the level of their smoking; the ex-smoker tempted to relapse and resume smoking; and current smokers who are reminded and cued to smoke now and more often.  Richard W. Pollay, *More Than Meets the Eye: On the Importance of Retail Cigarette Merchandising*, 16 Tobacco Control at 274, *available at* http://tobaccocontrol.bmj.com/content/16/4/270.full.html.   These consumers are surely as much "innocent persons" as retailers.  The reason the Seventh Circuit modified the injunction in the *Cook* case was not to reduce adverse consequences for non-parties who had contracts with the defendant, but to protect the interests of consumers who would have been hurt by the injunction as originally framed.   *Cook*, 333 F.3d at 744.   The Court should consider the effects of its injunction on consumers as well as on retailers.

<u>**CONCLUSION**</u>

For the reasons addressed above and in our opening brief, the United States respectfully urges the Court to retain the retail-display component of the corrective-statement remedy.   Given Defendants' current extensive use of direct mail, Internet banner and pop-up advertising, and email, *see* footnote 1 at page 6, *supra*, the Court should also consider requiring each Defendant to send each corrective statement to all persons on its direct mailing lists and email lists; and to purchase banner advertising for the corrective statements—and should absolutely impose those requirements if it decides to do away with the retail point-of-sale requirement.

Dated: April 15, 2011
        Washington, D.C.

Respectfully submitted,

TONY WEST
Assistant Attorney General

MAAME EWUSI-MENSAH FRIMPONG
Acting Deputy Assistant Attorney General

EUGENE M. THIROLF, Director
Office of Consumer Litigation

___/s/_____
DANIEL K. CRANE-HIRSCH
Trial Attorney
Office of Consumer Litigation, Civil Division
United States Department of Justice
PO Box 386
Washington, DC 20004-0386
Telephone: 202-616-8242
Facsimile: 202-514-8742
E-mail address: daniel.crane-hirsch@usdoj.gov