1   Gregory P. Stone (State Bar No. 78329)
    MUNGER, TOLLES & OLSON LLP
2   355 South Grand Avenue, 35th Floor
    Los Angeles, California  90071-1560
3   Telephone:  (213) 683-9100

4   Patrick J. Cafferty, Jr. (State Bar No. 103417)
    Martin D. Bern (State Bar No. 153203)
5   Karin S. Schwartz (State Bar No. 209455)
    MUNGER, TOLLES & OLSON LLP
6   33 New Montgomery Tower, 19th Floor
    San Francisco, California  94105-9781
7   Telephone:  (415) 512-4000

8   Gerald L. McMahon (State Bar No. 36050)
    Daniel E. Eaton (State Bar No. 144663)
9   SELTZER, CAPLAN, McMAHON & VITEK
    750 B Street, Suite 2100
10  San Diego, California 92101-8122
    Telephone:  (619) 685-3003

11

12  Attorneys for Defendant
    PHILIP MORRIS INCORPORATED and
13  as DEFENDANTS' LIAISON COUNSEL

14              SUPERIOR COURT OF THE STATE OF CALIFORNIA

15                   CITY AND COUNTY OF SAN DIEGO

16

17  Coordination Proceedings              JCCP NO. 4042
    Special Title (Rule 1550(b))
18                                        CLASS ACTION
    In re TOBACCO CASES II
19                                        **SUPPLEMENTAL DECLARATION OF**
    This document relates to:            **KENT M. LANCASTER, Ph.D.**
20
    Willard R. Brown, et al. v. The       Date:     December 17, 2001
21  American Tobacco Co., Inc. et al (San  Time:     3:00 p.m.
    Diego Superior Court Case No. 711400)  Dept. 69  Hon. Ronald S. Prager
22
              [SERVICE LIST D/G]         [Telephonic Ruling – No Appearance Necessary]
23

24

25

26

27

28

[785850.1]

SUPPLEMENTAL DECLARATION OF KENT M. LANCASTER, Ph.D.

I, Kent M. Lancaster, Ph.D., declare and state as follows, based upon my personal knowledge:

1.      I am an Adjunct Professor of Advertising in the School of Communication at the University of Miami and President of Media Research Institute, Inc., Miami, Florida. Previously, I was Professor of Advertising at the University of Florida for 12 years, where I also served as the Gannett Distinguished Visiting Professor of Advertising.  Before that I was Professor of Advertising at the University of Illinois for 10 years.  I have a Ph.D. in Mass Media, an M.A. in Advertising from Michigan State University, and a B.S. in Business Administration (Advertising) from Ferris State University.  I have served on the editorial boards of the *Journal of Media Planning*, the *Journal of Advertising* and the *Journal of Interactive Advertising,* and as Treasurer of the American Academy of Advertising.

2.      My teaching and research focus is on advertising media planning and advertising research and, in particular, on computer-based media planning and evaluation.  I have published two textbooks and more than 60 research reports on these subjects.  I also am a consultant in advertising media planning, budgeting and market analysis.  I have designed, helped to develop, and currently support several media planning computer programs distributed worldwide by Telmar Information Services Corp.  These programs allow advertisers, agencies, and media organizations to evaluate the effectiveness of proposed advertising campaigns.  The ADplus™ computer program which I have authored, for example, has been distributed by Telmar for eight years and more than 2,000 copies are now in use throughout the advertising industry.

3.      I have served as a class action notice expert in approximately 14 state and federal cases and have recently co-authored a peer-reviewed article published in the *Journal of Public Policy and Marketing* on "The Critical Role of Advertising Media Planning in Federal 'Rule 23' Class Action Notice."  A copy of my curriculum vitae has been provided along with an earlier declaration in this case.

4.      I have previously submitted a declaration in this case dated August 2, 2001, which described large segments of the class that are not likely to see or read the published notice if the Plaintiffs' proposed notice plan is utilized.  Subsequently, I have been asked to review

"Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Proposed Form and Method of Class Notice" dated November 19, 2001.  This document includes the "Affidavit of Todd B. Hilsee on Defendants' Opposition to Plaintiffs' Proposed Form and Method of Class Notice" also dated November 19, 2001.

### Key Points

5.      Plaintiffs' reply provides no defensible rationale for the large gaps in class notice coverage that exist in their proposed notice plan.  These deficits remain in their proposal.

A) Plaintiffs continue to overstate likely notice reach at 76% to 80% of the class by focusing on publication exposure only, and not on the well-documented lower probability that those who are exposed to publications actually see and read particular messages within those publications.

B) If the Court were to utilize Plaintiffs' proposed notice plan, only approximately 52% of California adults would be likely to see the class notice itself, and only 27% would be likely to read the notice.   Furthermore, approximately 21% of California adults would not even receive a publication containing the notice.

C) The publication plan does not target major segments of the population who do not speak or read English, such as Hispanics, Latinos and Asians, nor does it specifically target African Americans.  Together these groups account for approximately half of all California smokers.

D) Notice publication frequency of four times per publication appears to conform to relevant California Civil and Government Codes only in the San Diego area. Plaintiffs' proposed notice publication frequency is only one or two times in the remaining publications.

E) There is no television component to reach those class members who do not read publications listed in the Plaintiffs' proposed notice plan or to reach the 4.5 million California residents who are functionally illiterate and cannot read newspapers and magazines.

F)  Recent US Postal Service data, which Plaintiffs also cite, show that approximately 78% of households read or scan advertisements they receive in the mail.  Therefore, mailed notice on official Court stationary is likely to achieve even higher penetration among those who receive it.

**Estimating Notice Exposure and Readership**

6.      Plaintiffs estimate that approximately 76% of class members are likely to be exposed to at least one publication issue in their notice plan that contains a copy of the notice. That is, 76% of class member will have <u>only an opportunity</u> to see and read the notice, but may or may not do so because they may not read a particular publication issue at all, they may not turn to the section or page containing the notice, or they may not actually see or attend to the notice even if they turn to the page containing it.  Plaintiffs' methodology cannot provide the Court with realistic estimates of notice reach that also take into account the well-documented and substantially lower probability that those who are exposed to a publication also will see or read a particular message within that publication.

7.      Applying well-established procedures to the Plaintiffs' proposed notice plan that take these factors into account, I have estimated that only approximately 52% of class members are likely to <u>see the notice itself</u> and that 27% are likely to <u>read the notice</u>.  I also have estimated that an expanded plan designed to overcome the large gaps that exist in the Plaintiffs' proposal will lead approximately 90% of California adults to see the full print or abbreviated television notice, while approximately 60% of California adults would be likely to read the notice.

8.      Plaintiffs erroneously argue that estimating the probability that class members will see or read the notice itself cannot be done because "subjective audience reduction methods" are used and such "methods are not supported by data or standards of practice in the broader advertising community."  Plaintiffs emphasize similar points several times throughout their documents.  These contentions are not correct.  Extensive data have been available for years and in many cases, decades, on the probability of advertisement message exposure and effects given publication or program exposure.  Indeed, such data have been available for print media for

1   approximately 75 years.  Furthermore, mainframe computer programs used in the advertising

2   industry have had the ability to analyze advertisement exposure probabilities for approximately

3   40 years.  Six or more such mainframe computer programs became available throughout the

4   1960s.  Many more have been introduced and utilized within the advertising industry ever since

5   on mainframe and personal computers and via web delivery mechanisms.

6           9.      One major influence on the adoption of multiple measures of advertising

7   performance was provided by the Advertising Research Foundation's historic 1961 monograph:

8   "Toward Better Media Comparisons."  The fundamental relations among various measures of

9   media performance described in this document have permeated the advertising literature over the

10  past 40 years and this basic framework has been re-affirmed and updated in April of 2001.  It

11  continues to be important to the advertising industry because it outlines and details <u>eight levels at</u>

12  <u>which media performance is measured</u>.  The first five levels of measurement are directly relevant

13  to this case and include vehicle distribution, vehicle exposure, message exposure, message

14  attentiveness and message communication.  Plaintiffs clearly focus only on the first two levels,

15  which are necessary but not sufficient for assessing likely class notice reach.

16          10.     Over the past 30 years Interactive Market Systems has been one of the

17  major distributors of media planning software.  Beginning in 1982, I personally used many of

18  their well-established, mainframe systems for a variety of media in my teaching and research at

19  the University of Illinois.  At that time we used these systems to analyze publication and program

20  data as well as message exposure and effectiveness data.  The oldest computer program among

21  these had this capability since 1971.

22          11.     Details on the extent to which media professionals use these data and tools

23  to estimate <u>message</u> exposure and other message effects in all major media was demonstrated as

24  early as 1986 in a <u>Journal of Advertising</u> article which I co-authored and which Plaintiffs have

25  cited in this case.  In that study approximately one-third of major advertising agency media

26  directors claimed to use the more sophisticated procedure of evaluating message exposure or

27  effects approximately two-thirds of the time.  One reason often cited by media professionals in

28  this study for not using such procedures was that "Clients do not require such sophistication."

1  Indeed, it typically is in the self-interest of media practitioners to use the largest available

2  exposure numbers in order to sell clients on proposed plans.  This article was brought to the

3  attention of Plaintiffs' notice expert Todd B. Hilsee in a previous case in which he also argued

4  that these data, methods and procedures are not used in the advertising industry.

5        12.    To help analyze the likely effectiveness of class notice options in this case,

6  I have utilized media evaluation systems provided by Telmar.  Telmar has been in business since

7  1968 and is the world's largest distributor of media planning software with approximately 3,000

8  clients in 25 countries, including 95% of the world's top advertising agencies.  I designed and

9  developed the ADplus$^{TM}$ media evaluation system, which Telmar purchased from me in 1993.

10  Since then, I have been the primary developer for this and approximately six other Telmar

11  systems.  All of the Telmar media evaluation programs that I have helped to develop and support

12  include the ability to analyze message exposure and effectiveness data.  Furthermore, all of the

13  other Telmar media evaluation systems that I have worked with, but do not directly help to

14  develop and support, also include the ability to analyze message exposure and effectiveness data.

15  Among the top management of Telmar around the globe, and for many of their key clients, this

16  capability in all major media categories is of fundamental importance.

17          **Reaching Minorities**

18        13.    The Plaintiffs' notice plan still does not contain publications that target

19  those who do not or cannot read English-language publications.  Mr. Hilsee argues against this

20  because he says such publications are of "lower quality," because they have no readership or

21  audited circulation statistics, because of his asserted "clear sense" of when such publications are

22  required, and because he believes other U.S. class action certification notice programs rarely

23  include foreign language notice.  Mr. Hilsee's position is incorrect because a) it ignores the due

24  process rights of class members who do not or cannot read English-language publications, b) it

25  passes judgment on the relative quality of publications that class members choose to read, c)

26  syndicated readership data generally is available for only top newspapers in the top 50-60

27  markets, d) approximately 30 of the minority publications offered as possibilities have audited

28  circulation figures totaling nearly 2.5 million copies in 27 California cities, and e) this class action

1   is unique and is not constrained to be like others with which Mr. Hilsee claims to have

2   experience.

3                           **Reaching Non-Readers**

4           14.     Because of the limited number of publications in the Plaintiffs' notice plan,

5   and the low frequency with which most of them are utilized, approximately 21% of class

6   members will not have an opportunity to receive a publication containing the class notice.  Also,

7   there are estimated to be 4.5 million functionally illiterate California adults who cannot read

8   newspapers or magazines.  Therefore, I have recommended that television announcements be

9   used to supplement the Plaintiffs' proposed print notice program and that the announcements

10  include an 800-number and a web address to guide class members to the full text of the notice.

11          15.     However, Mr. Hilsee chooses to ignore these solid reasons for using

12  television to enhance notice <u>reach</u>.  Instead, apparently without analyzing the reach or frequency

13  of the proposed television schedule, Mr. Hilsee simply declares that it would produce excessive

14  notice frequency.   This contradicts Mr. Hilsee's argument that television would be ineffective

15  because people do not notice all television advertisements.

16          16.     Over Mr. Hilsee's objections in a very similar case, the Court in *Scott v.*

17  *American Tobacco* ordered the use of television notice to supplement the reach of the publication

18  notice schedule, which the Court also expanded.  In light of Mr. Hilsee's opposition to the use of

19  television in the first place and his inability to actually analyze the message reach and frequency

20  of the television component of the notice plan, it is not surprising that he now concludes that

21  television in *Scott* did not enhance reach and instead resulted in "an enormous amount of

22  excessive frequency of <u>notice exposure</u>" (emphasis added).  Furthermore, he incorrectly bases his

23  conclusions as to television notice reach and excessive frequency on the number of phone calls

24  and opt outs.  Mr. Hilsee simply has no data, methods or procedures that would allow him to

25  assess notice exposure or effectiveness, either before or after this notice program is implemented.

26          I declare under penalty of perjury under the laws of the State of California that the

27  foregoing is true and correct.

28

1

Executed this 7th day of December 2001, at Miami, Florida.

2

3
　　　　　　　　　　　　　　_/s/ *Kent M. Lancaster*_
　　　　　　　　　　　　　　Kent M. Lancaster, Ph.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPPLEMENTAL DECLARATION OF KENT M. LANCASTER, Ph.D.