UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>        Plaintiff,<br><br>        and<br><br>TOBACCO-FREE KIDS ACTION FUND, *et al.*,<br>        Plaintiff-Intervenors<br><br>        v.<br><br>PHILIP MORRIS USA, INC., *et al.*,<br>        Defendants. | Civil Action No. 99-CV-2496 (GK)<br><br>Next scheduled court appearance:<br><br>October 15, 2012 |

**UNITED STATES' OPENING SUPPLEMENTAL BRIEF CONCERNING
CORRECTIVE STATEMENTS**

On January 4, 1954, defendants published their "Frank Statement"—also known as

"Racketeering Act One"—in hundreds of newspapers across the country.  It said in part:

---

### A FRANK STATEMENT TO CIGARETTE SMOKERS

        RECENT REPORTS on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings.

        Although conducted by doctors of professional standing, these experiments are not regarded as conclusive in the field of cancer research. However, we do not believe that any serious medical research, even though its results are inconclusive should be disregarded or lightly dismissed.

                        *        *        *

        We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business.

        We believe the products we make are not injurious to health.

        We always have and always will cooperate closely with those whose task it is to safeguard the public health.

                        *        *        *

        — "Frank Statement," as quoted in *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 39-40 (Finding of Fact ¶ 19) (D.D.C. 2006), *aff'd in relevant part*, 566 F.3d 1095 (D.C. Cir. 2009) (*per curiam*), *cert. denied*, 561 U.S. ___, 130 S. Ct. 3501 (2010)

---

As the D.C. Circuit explained, the Frank Statement, a/k/a Racketeering Act One, " 'set forth the industry's 'open question' position that it would maintain for more than forty years— that cigarette smoking was not a proven cause of lung cancer; that cigarettes were not injurious to health; and that more research on smoking and health issues was needed.' " *United States v. Philip Morris USA, Inc.* ("Affirmance Opinion"), 566 F.3d 1095, 1106 (D.C. Cir. 2009) (*per curiam*) (quoting 449 F. Supp. 2d at 39, ¶ 18), *cert. denied*, 561 U.S. ___, 130 S. Ct. 3501 (2010). Defendants issued the Frank Statement to address what they considered the "only" problem: "[C]onfidence, and how to establish it; public assurance, and how to create it." 449 F. Supp. 2d at 37, ¶ 11 (quoting internal Hill & Knowlton public relations planning memorandum). As planned, defendants went on to perpetrate what may be the largest confidence job in history: "[O]ver the course of more than 50 years, Defendants lied, misrepresented, and deceived the American public . . . in order to achieve their goal—to make money with little, if any, regard for individual illness and suffering, soaring health costs, or the integrity of the legal system." *Id.* at 852.

To prevent defendants from continuing to engage in racketeering through fraud and deception, the Court imposed a multi-pronged permanent injunction. 449 F. Supp. 2d at 923-33, 938-45. The most publicly visible element of these remedies will be "corrective statements" that defendants will be ordered to disseminate on five specified topics. *Id.* at 938-41. Although it is to be expected that the corrective statements here will help "correct Defendants' campaign of deceptive marketing," Affirmance Opinion, 566 F.3d at 1139, their purpose is not limited to that effort. Rather, as the D.C. Circuit indicated, the reason that corrective statements are being ordered here is that, "as the district court observed and the intervenors here argue, requiring Defendants to issue corrective statements will 'prevent and restrain them from making fraudulent public statements on smoking and health matters in the future.' " *Id.* at 1140 (quoting 449 F.

Supp. 2d at 926).  The corrective statements in this case are to be "geared towards thwarting

prospective efforts by Defendants to either directly mislead consumers or capitalize on their prior

deceptions by continuing to advertise in a manner that builds on consumers' existing

misperceptions," *id.* at 1144-45, and will thereby "prevent and restrain [defendants] from

disseminating false and misleading statements, thereby violating RICO, in the future," and not

(just) "seek to correct Defendants' campaign of deceptive marketing."  *Id.* at 1139, 1140.  The

corrective statements will thus serve an important "preventive" role, in addition to their

"corrective" role.

Late last year, the tobacco companies urged this Court to postpone acting on the

corrective-statement remedy until the resolution of a separate lawsuit that challenges the

constitutionally of a generally-applicable Food and Drug Administration rule, promulgated in

June 2011, that implements Congress's directive to require graphics as an element of cigarette

health warnings.  Defs.' Resp. to Order of Nov. 17, 2011 ("Defs.' Deferral Br.") (R. 5954; filed

12/20/2011).  The D.C. Circuit recently issued a decision in that litigation, *R.J. Reynolds*

*Tobacco Co. v. FDA*, ___ F.3d ___, Nos. 11-5352 & 12-5063, 2012 WL 3632003 (D.C. Cir.

Aug. 24, 2012) ("*RJR v. FDA*"), and this Court has set oral argument for October 15, 2015, to

discuss the corrective-statement remedy in this case.  Order #31-Remand (R. 5978; issued

8/27/2012); Order #32-Remand (R. 5980; issued 8/30/2012) (rescheduling argument date).  The

parties are filing opening supplemental briefs today, and will file supplemental responses on

October 4, 2012.  Order #33-Remand (R. 5982; issued 9/12/2012).

In the recent *RJR v. FDA* decision, the divided panel invalidated the FDA rule, and held

that graphics cannot be required unless FDA can show that they have directly caused a material

decrease in smoking rates in any of the countries that now require them.  *RJR v. FDA*, 2012 WL

3632003, at *10.  That ruling in no way calls into question the corrective statements submitted

by the United States in this case.  Indeed, the *RJR v. FDA* majority expressly distinguished this litigation when it discussed defendants' history of deception.  *See id.* at *7 & n.10.

The D.C. Circuit decision this summer that is far more important to the pending corrective-statement issues before this Court is its unanimous decision, affirming this Court's decision last summer, decisively holding that Congress's enactment of the 2009 Tobacco Control Act does not moot this action, and does not erase the need for the judicial system to keep a permanent injunction in place to keep the defendants from continuing to engage in fraud and racketeering.  *United States v. Philip Morris USA Inc.*, 686 F.3d 832, 835-38 (D.C. Cir. 2012) ("Vacatur Opinion") (affirming *United States v. Philip Morris USA Inc.*, 787 F. Supp. 2d 68 (D.D.C. 2011)).  The Court of Appeals pointedly observed that whether it remains "still reasonably likely that the defendants would commit future RICO violations despite the passage of the Tobacco Control Act" is a question "squarely within [the district court's] area of expertise; 13 years of litigation, nine months of trial, and 4000 findings of fact surely gave it unique insight into the defendants' tendency to circumvent or ignore the law." *Id.* at 838.  Moreover, as the Court of Appeals observed, "claims based upon fraud or deceit" are "within the conventional competence of courts." *Id.* (internal quotation marks and citation omitted).[1]

---

[1] The defendants' opening brief on the current recommended corrective statements, filed in 2011, highlights their continuing propensity to engage in frauds.  It is an established finding of fact, sustained on appeal, that "Defendants. . . in fact manipulate cigarettes to provide sufficient nicotine delivery to create and sustain addiction."  449 F. Supp. 2d at 923 (citing expert testimony from Dr. David Burns and National Cancer Institute Monograph 13); *see also id.* at 451, ¶ 2129 ("The Court finds that the testimony of Dr. Burns is totally credible and persuasive on each of the issues which he discussed"); Affirmance Opinion, 566 F.3d at 1134 ("[D]espite the MSA Defendants still . . . falsely denied manipulating nicotine delivery and marketing to youth.  Defendants offer no rebuttal to these factual findings . . .") (citing 449 F. Supp. 2d at 910).  And it is an established finding, affirmed on appeal, that defendants "falsely deny[] that they manipulated cigarette design and composition so as to assure nicotine delivery levels that create and sustain addiction."  Affirmance Opinion, 566 F.3d at 1108 (citing 449 F. Supp. 2d at 858); *id.* at 1122 (citing 75 pages of this Court's factual findings to support the Court of Appeals' determination that "Defendants' false statements on other topics, including . . . whether

The tobacco companies have claimed that the recommended corrective statements in this case are improper appeals to emotion. Defs.' Deferral Br. at 3. But the only specific language that they identify as doing so is the part of Recommended Statement A that says, "Smoking kills 1,200 Americans. Every day." This language, they assert, "sacrifice[s] accuracy in order to maximize emotional impact." Defs.' Resp. to Gov't's Proposed Corrective Stmts. ("Defs.' Resp. Br.") at 18 (R. 5881; filed 3/3/2011). But defendants' only reason for claiming that this language "sacrifice[s] accuracy" is that "the calculation is based on a rough estimate of the number of Americans who die each year from smoking-related illnesses, not each day," and to assert, without further explanation, that the "inaccurate" language is used "in order to maximize emotional impact." *Id*. But the Court has already found that "[c]igarette smoking and exposure to secondhand smoke kills 440,000 Americans every year, or more than 1,200 every single day." 449 F. Supp. 2d at 854-55. Defendants' objection to the only specific language that they claim constitutes an improper appeal to emotion makes little sense on its face, and is in any event foreclosed by the Court's findings of fact, not challenged on appeal.

---

Defendants manipulated their cigarettes to control nicotine delivery" were material frauds) (citing 449 F. Supp. 2d at 308-84).

But despite these numerous findings about nicotine manipulation, defendants objected in their March 2011 filing before this Court to a passage in one of the recommended statements that says, "Here's the truth: . . . We manipulated cigarettes to make them more addictive." "In fact," they asserted, "Defendants' manufacturing processes reduce the level of nicotine and *only* in that sense is nicotine 'manipulated.' " Defs.' Resp. at 19 (emphasis in original). This denial of nicotine manipulation is, as this Court and the Court of Appeals have determined, fraudulent. Defendants cite no authority for renewing their fraudulent denial of nicotine manipulation.

It is worth mentioning that, according to defendants, the statement that they "manipulate cigarettes to provide sufficient nicotine delivery to create and sustain addiction" "would mislead people into thinking that they spike cigarettes with exogenous nicotine. Defs.' Resp. Br. at 18-19. Defendants cited no authority for this claim, and it is contrary to the focus-group reports, where participants said that this statement "most clearly communicates the addictiveness of smoking and nicotine" among all tested statements on this topic because, *e.g.*, "they actually did, they manipulated the cigarettes to make them more addictive and that's profit in their pocket." Ex. 1 at 4 (quoting Baltimore Focus Group 3 (never/former smokers, low socioeconomic status), at 30-31 (U.S. Reply Ex. 14 (R. 5981-14))).

Likewise unaffected by the recent *RJR v. FDA* decision is defendants' repeated assertion that the United States' recommended statements in this case are "designed solely to shame and humiliate Defendants."  Defs.' Resp. Br. at 8; *see also id.* at 2, 4, 10 (similar); Defs.' Deferral Br. at 3 (similar); Defs.' Reply in Support of Defs.' Resp. to the Gov't's Proposed Corrective Stmts. ("Defs.' Reply Br.") at 2, 10 (R. 5893; filed 3/22/2011) (similar).  But despite repeating seven times in three filings that the statements are "designed" to shame and humiliate them, defendants cite no authority for the claim from the United States' hundred-page expert report, 400+ pages of appendices, and voluminous additional materials the United States provided defendants at their request.  *See, e.g.*, U.S. Submission of Proposed Corrective Stmts. & Expert Report of Kelly Blake, Sc.D. (R. 5875 and R. 5875-1 ("Blake Rep."); filed 2/23/2011)[2]; 2/11/2011 ltr., Crane-Hirsch to Wilkinson, et al. (Ex. 2); 2/18/2011 email, Thirolf to Frederick, et al. (Ex. 3); 2/25/2011 email, Crane-Hirsch to Wilkinson, et al. (Ex. 4); 3/1/2011 email, Crane-Hirsch to Wilkinson, et al. (Ex. 5).

Defendants' unsupported claims that the recommended statements are "designed" to shame and humiliate them are flatly contradicted by the evidence before the Court.  The United States undertook considerable research to evaluate every corrective statement proposed by every defendant in 2006; a modified version of the corrective statements proposed by the public-health intervenors in 2006; and an additional set of potential statements developed under the supervision of the National Cancer Institute.  Blake Rep. at 32, ¶ 88.  This research used a host of

---

[2] At defendants' insistence, the United States lodged its submission under seal on February 4, 2011, and the tobacco companies delayed public access for nearly three weeks.  *See, e.g.*, Brent Kendall, *Justice Department Wants Public Release of Tobacco Warnings*, Wall St. J., Feb. 3, 2011; Duff Wilson, *U.S. Presses Tobacco Firms to Admit to Falsehoods About Light Cigarettes and Nicotine Addiction*, N.Y. Times, Feb. 24, 2011, at B4 ("Judge Gladys Kessler of the United States District Court in Washington denied a request by the tobacco companies that the recommendations, by the Justice Department, be kept secret until they submitted a response.").

measures to gauge how well each of the 30 tested statements would "thwart[] prospective efforts by Defendants" to "mislead consumers."  Affirmance Opinion, 566 F.3d at 1144.  The research included both a qualitative or focus-group phase, and a quantitative phase that recruited 3,617 respondents to participate in a nationally representative survey.  Blake Rep. at 11, ¶ 14.  The evaluation was "based on a well-established formative research process that is broadly used within the field of health communication science," and based on that research, "the Court can feel confident that the recommended corrective statements are likely to capture attention, enhance accurate knowledge, have a positive impact on the public, and reduce the likelihood that consumers will believe potential future misrepresentations about the topics the Court identified." *Id.* at 98, ¶ 247.  As one example of how (contrary to defendants' unsupported claims) the recommended statements actually came to be recommended to the Court, one portion of the nationally representative quantitative study randomized the 3,617 respondents to be exposed to one statement (chosen at random) from three of the five topics (also chosen at random, and evaluated sequentially).  *Id.* at 68, fig. V16 ("Corrective Statement Survey Flow") ("Section 3"). For each statement, respondents were asked questions to assess the possibility of negative unintended consequences (increased smoking urges and reduced quit intentions) resulting from exposure; how much thinking about the statement made them agree with two questions assessing accurate knowledge; and two "future beliefs" questions.  *Id.*; *id.* App. E1 at 30-34 (PDF pages 231-35) (Q.11 through Q.19).  For Topic B, addiction, for example, the "accurate knowledge" questions for non-smokers asked, "How likely do you think it is that you would become addicted to nicotine if you started smoking cigarettes?", and how much they agreed with the statement, "If I started smoking, I could stop smoking easily if I wanted to."  *Id.*, App. E1 at 31 (PDF page 232) (Q.14b.1 and Q.14b.4).  For Topic B, addiction, the "Not Proven" future-belief question was:

> After seeing this statement, if you were later to hear that **it has not been proven** that smoking and nicotine are addictive, would you:
>
>   a. Believe that it is **not proven** that smoking and nicotine are addictive.
>   b. Believe that it is **proven** that smoking and nicotine are addictive.
>   c. This statement would have no impact on whether I believe that smoking and nicotine are addictive.
>   d. Not sure.

*Id.* (Q.19).  One portion of the quantitative phase of the research had the 30 proposed statements under review each evaluated by approximately 700 respondents.  *Id.* at 68, fig. V16 ("Corrective Statement Survey Flow") ("Section 3").  The questions about smoking urges and quit intentions assessed negative undesired consequences of the statements.  Blake Rep. at 11, ¶ 13.  The questions about accurate knowledge "are important markers of comprehension and should be used in considering the statements' potential to inoculate against future misinformation."  *Id.* at 18, ¶ 37; *see also id.* at 73, ¶ 182 (observing that measures for accurate knowledge, potential for public impact, and attention are also good indicators of future beliefs).  The measures by which the recommended statements were selected were closely tied to the criteria established by the D.C. Circuit, of "thwarting prospective efforts by Defendants to either directly mislead consumers or capitalize on their prior deceptions."  Affirmance Opinion, 566 F.3d at 1144-45.

The parts of the statements that defendants most dislike are their "preambles," which they particularly claim are "designed" to shame and humiliate them.  But another portion of the quantitative phase of the research protocol specifically evaluated the preambles proposed by each defendant, as well as the preamble proposed by the National Cancer Institute.  Blake Rep. at 68, fig. V16 ("Corrective Statement Survey Flow") ("Section 5"); *id.* at 69, ¶ 169 (discussing randomization of over 3,500 for exposure to one of five potential preambles, and one of five potential concluding sentences); id. at 87-89, ¶¶ 217-218 (describing effectiveness of different preambles on measures of grabbing attention and trust).  This part of the research found that of

8

those tested, the best-performing preamble on global rankings for attention and trust is one of those that Defendants insist was "designed" to shame and humiliate them: "A Federal court is requiring tobacco companies to tell the truth about smoking.  Here's the truth:"  *Id.* at 95, ¶¶ 234-235.[3]

It is therefore instructive that defendants' most specific explanation for claiming that the preambles (and the statements in their entireties) are "designed" to "shame and humiliate" them is to describe them as "compel[ling] Defendants to vilify themselves through sensational and gratuitous confessions of past wrongdoing.  This inflammatory language—which is plainly designed solely to shame and humiliate Defendants—is far from 'uncontroversial' . . ."  Defs.' Resp. at 8.  But other than trivial (1,200 deaths per day) or baseless (continuing to falsely deny nicotine manipulation) objections, defendants do not contest the factual accuracy of the recommended statements.  As noted above, the United States' research demonstrates that "the Court can feel confident that are likely to capture attention, enhance accurate knowledge, have a positive impact on the public, and reduce the likelihood that consumers will believe potential future misrepresentations about the topics the Court identified."  Blake Rep. at 98, ¶ 247.  As explained above, the research that was used to determine which statements were recommended

---

[3] These research findings are further informed by the focus-group discussions.  For example, participants in one group explained that they found that Recommended Statement B "most clearly communicates the addictiveness of smoking and nicotine" "because when you read the first sentence it gets your attention because it's saying that they lied, that they lied to [C]ongress."  Ex. 1 at 3 (quoting Baltimore Focus Group 3 at 30-31, U.S. Reply Ex. 14 (R. 5891-14)).  Participants in a second focus group found that Recommended Statement C "communicates the lack of any health benefit from smoking different kinds of cigarettes better [than the others]" "[b]ecause in this paper, this has been done under order by the District Court, done by the cigarette company itself and in it they are saying 'we falsely market these cigarettes.'  Just with that they are telling us, it's all a scam."  Ex. 1 at 7 (quoting Orlando Focus Group 1 at 32, U.S. Reply Ex. 11 (R. 5891-11)); *see also id.* at 9 (explaining that Recommended Statement C most clearly communicated the Court's message because "[t]he fact that it says we falsely marketed, low tar and low cigarettes, makes you want to look at it") (quoting Baltimore Focus Group 3 at 24, U.S. Reply Ex. 14 (R. 5891-14)).

thus advance the criteria established by the D.C. Circuit, of thwarting defendants' future efforts to defraud consumers.[4]  In the end, providing the "context and nuance," Defs.' Resp. Br. at 19, that led the Court to conclude that corrective (here, especially, "preventive") statements were necessary to prevent future frauds, is in itself vitally important to the statements' likelihood of thwarting defendants' ability to defraud consumers in the future.  The preambles, and the statements in their entireties, were not designed to "shame and humiliate" defendants.  Instead, defendants' difficulty is that their conduct has been so shameful that, as this Court found and the D.C. Circuit affirmed, preventive measures are necessary to protect the American public from future racketeering acts from an enterprise that since late 1953, if not earlier, has considered its "only" problem to be "confidence, and how to establish it; public assurance, and how to create it."  449 F. Supp. 2d at 37, ¶ 11 (quoting Hill & Knowlton 1953 memo).  From Racketeering Act One—the 1954 publication of the "Frank Statement"—up through defendants' continuing to deny nicotine manipulation before this Court in 2011, Defs.' Resp. at 18-19, the tobacco companies have amply borne out the D.C. Circuit's recent re-affirmation that, absent Court action, the defendants in this case remain reasonably likely to continue engaging in fraud and deception.  Vacatur Opinion, 686 F.3d at 835-37.

The substantial evidence before the Court demonstrates the falsity of defendants' repeated assertions that the recommended statements are designed to "shame and humiliate" them.  Nor does the recent *RJR v. FDA* opinion have any bearing on this Court's analysis of the recommended statements pending before it.

---

[4] In addition, as noted in the previous footnote, when focus-group participants were asked to explain why they judged the recommended statements to communicate the Court's desired message better than any other, several pointed specifically to the very aspects of the preambles that defendants most dislike.

Respectfully submitted,

Dated: September 24, 2012

STUART F. DELERY
Acting Assistant Attorney General

MAAME EWUSI-MENSAH FRIMPONG
Deputy Assistant Attorney General

MICHAEL BLUME, Director

____/s/_____
DANIEL K. CRANE-HIRSCH
Trial Attorney
Consumer Protection Branch, Civil Division
United States Department of Justice
PO Box 386
Washington, DC 20004-0386
Telephone: 202-616-8242
Facsimile: 202-514-8742
E-mail address: daniel.crane-hirsch@usdoj.gov

*Attorneys for Plaintiff United States of America*