UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES OF AMERICA,           :
                                    :
                Plaintiff,          :
                                    :    Civil Action No.
          v.                        :    99-2496 (GK)
                                    :
PHILIP MORRIS USA, INC.,            :
et al.                              :
                                    :
                Defendants.         :
```

MEMORANDUM OPINION

Back in 2006, the Court issued its Final Judgment and Remedial Order #1015 [Dkt. No. 5733], mandating that Defendants publish corrective statements on each of five topics on which the Court found they had made false and deceptive statements. These topics are: "(a) the adverse health effects of smoking; (b) the addictiveness of smoking and nicotine; (c) the lack of any significant health benefit from smoking 'low tar,' 'light,' 'ultra light,' 'mild,' and 'natural,' cigarettes; (d) Defendants' manipulation of cigarette design and composition to ensure optimum nicotine delivery; and (e) the adverse health effects of exposure to secondhand smoke." United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1, 938-39 (D.D.C. 2006) ("Original Opinion"). Upon consideration of the briefs, the oral argument, and the entire record herein, the Court herein finalizes the text of the corrective messages to be published. See infra Section II.A-E.

I.   **Background**

On September 22, 1999, the United States filed this civil suit against Defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. After nearly five years of discovery, motions, and other pretrial proceedings, trial began in September 2004. The bench trial lasted nine months and on August 17, 2006, this Court issued a lengthy opinion finding that all Defendants "(1) have conspired together to violate the substantive provisions of RICO, pursuant to 18 U.S.C. § 1962(d), and (2) have in fact violated those provisions of the statute, pursuant to 18 U.S.C. § 1962(c)." Original Opinion, 449 F. Supp. 2d at 26. In particular, the Court concluded that Defendants "knowingly and intentionally engaged in a scheme to defraud smokers and potential smokers, for purposes of financial gain, by making false and fraudulent statements, representations, and promises." Id. at 852.

A.   **Factual Findings**

The Court made detailed Findings of Fact on each of the various topics on which Defendants made their false, deceptive, and misleading public statements. Id. at 146-839. First, the Court found that "each and every one of these Defendants repeatedly, consistently, vigorously - and falsely - denied the existence of any adverse health effects from smoking," despite "the massive documentation in their internal corporate files from their own

-2-

scientists, executives, and public relations people" that confirmed that there was little evidence supporting their claims. Id. at 208. Specifically, Defendants "knew there was a consensus in the scientific community that smoking caused lung cancer and other diseases" by at least January 1964. Id. at 180. Despite this internal knowledge, the Defendants embarked on a "campaign of proactive and reactive responses to scientific evidence that was designed to mislead the public about the health consequences of smoking." Id. at 187-88.

Second, the Court found that Defendants "have publicly denied and distorted the truth as to the addictive nature of their products for several decades." Id. at 209. Defendants "knew and internally acknowledged that nicotine is an addictive drug," id. at 218, but "publicly made false and misleading denials of the addictiveness of smoking, as well as nicotine's role in causing that addiction." Id. at 271. The Court found that this conduct was continuing, observing that "no Defendant accepts the Surgeon General's definition of addiction, no Defendant admits that nicotine is the drug delivered by cigarettes that creates and sustains addiction, and no Defendant acknowledges that the reason quitting smoking is so difficult, and not simply a function of individual will power, is because of its addictive nature." Id. at 286.

Third, the Court found that "Defendants have designed their cigarettes to precisely control nicotine delivery levels and provide doses of nicotine sufficient to create and sustain addiction." Id. at 309. Specifically, most cigarettes are "manufactured using reconstituted tobacco material, additives, burn accelerants, ash conditioners, and buffering substances, all of which affect nicotine levels and delivery." Id. "Other cigarette design features used by Defendants to control nicotine delivery include filter design, paper selection and perforation, ventilation holes, leaf blending, and use of additives (such as ammonia) to control the PH of cigarette smoke." Id. However, the Defendants "denied, repeatedly and publicly, that they manipulate nicotine content and delivery in cigarettes in order to create and sustain addiction." Id. at 374.

Fourth, the Court found that, for several decades, Defendants marketed and promoted "low tar brands" as less harmful than conventional cigarettes. Id. at 430. Defendants knew that "smokers of low tar cigarettes modify their smoking behavior, or 'compensate,' for the reduced nicotine yields by taking more frequent puffs, inhaling smoke more deeply, holding smoke in their lungs longer, covering cigarette ventilation holes with fingers or lips, and/or smoking more cigarettes." Id. at 431. Based on their sophisticated understanding of compensation, Defendants understood that low tar/light cigarettes offered no clear health benefits. Id.

at 456-75. However, they "concealed that knowledge and disseminated false and misleading statements to downplay its existence and prevalence." Id. at 500. Defendants "continue to make[] false and misleading statements regarding low tar cigarettes in order to reassure smokers and dissuade them from quitting." Id. at 507-08.

Fifth, the Court found that "Defendants crafted and implemented a broad strategy to undermine and distort the evidence indicating passive smoke as a health hazard."[1] Id. at 693. Research funded by Defendants provided evidence confirming that "nonsmokers['] exposure to cigarette smoke was a health hazard." Id. at 709. However, Defendants made "numerous public statements denying the linkage" between secondhand smoke and disease in nonsmokers. Id. at 788. The Court found that the Defendants' conduct was continuing, noting that "currently no Defendant publicly admits that passive exposure to cigarette smoke causes disease or other adverse health effects." Id. at 693.

## B.  Remedies

Based on these findings, as well as many others, the Court imposed a number of injunctive measures in order to prevent and restrain future violations of RICO. Id. at 937-45; see also id. at 908-09 (recognizing that 18 U.S.C. § 1964(a) limits remedies to

---

[1] Secondhand smoke, "also called passive smoke or environmental tobacco smoke ('ETS'), is a mixture of mostly sidestream smoke given off by the smoldering cigarette and some mainstream smoke exhaled by smokers." Id. at 693.

those which "prevent and restrain violations of section 1962"). The Court concluded that there was a reasonable likelihood that Defendants would continue to violate RICO in the future. Id. at 908-19. The Court also found that the "evidence in this case clearly establishes that Defendants," with the exception of several parties who have since been dismissed, "have not ceased engaging in unlawful activity." Id. at 910. Further, "[e]ven after the Complaint in this action was filed in September 1999, Defendants continued to engage in conduct that is materially indistinguishable from their previous actions, activity that continues to this day." Id.

One of the injunctive measures ordered Defendants to make corrective statements on each of the five topics on which they had historically made (and were currently making) false and deceptive statements. Id. at 925-26. These statements were necessary to prevent and restrain "Defendants from continuing to disseminate fraudulent public statements and marketing messages by requiring them to issue truthful corrective communications." Id. at 927. The statements are to be published in newspapers and disseminated "through television, advertisements, onserts, in retail displays, and on their corporate websites." Id. at 928; see also id. at 938-41. The Court stated that it would receive proposals from the parties "for the exact wording of such corrective statements, with any supporting materials deemed necessary." Id. at 939.

**C.    Post-Trial Rulings of the Court of Appeals**

On May 22, 2009, the Court of Appeals affirmed this Court's judgment of liability and affirmed major provisions in its Remedial Order.[2] United States v. Philip Morris USA, Inc., 566 F.3d 1095, 1150 (D.C. Cir. 2009) ("Affirmance Opinion"). The Court of Appeals specifically affirmed many of the individual Findings of Fact discussed above, including that Defendants made false and misleading statements: (1) denying the addictive properties of nicotine; (2) suggesting that "light" and "low tar" cigarettes were less harmful than regular cigarettes; and (3) denying the health hazards of secondhand smoke. 566 F.3d at 1124-26, 1126-27, 1127-28. In addition, the Court upheld the finding that there was a reasonable likelihood that Defendants would commit future RICO violations and concluded that corrective statements were appropriate "to counteract these anticipated violations." Id. at 1131-34, 1144. Defendants petitioned for a writ of certiorari, which was denied. 130 S. Ct. 3501 (2010).

Since then, the Court of Appeals has issued two additional opinions upholding this Court's post-remedial decisions.[3] First, the Court of Appeals affirmed this Court's broad remedial powers

---

[2] The Court of Appeals remanded the case with directions to address four discrete matters not at issue in this opinion.

[3] Those decisions by this Court can be found at 778 F. Supp. 2d 8 (D.D.C. 2011) (disaggregated marketing data decision) and 787 F. Supp. 2d 68 (D.D.C. 2011) (denying motion for vacatur).

when it declined to overturn its clarification of its disaggregated marketing disclosure remedy. United States v. Philip Morris USA Inc., 686 F.3d 839 (D.C. Cir. 2012). Second, the Court of Appeals upheld this Court's determination that the passage of the Family Smoking Prevention and Tobacco Control Act ("TCA" or "Act"), Pub. L. No. 111-31, 123 Stat. 1776 (2009), did not eliminate the reasonable likelihood that Defendants would commit future RICO violations. United States v. Philip Morris USA Inc., 686 F.3d 832, 837 (D.C. Cir. 2012). In affirming this Court's decision not to assume that the Defendants would comply with the TCA, the Court of Appeals noted that the Act did not establish penalties as broad as those available under RICO, and observed that, "[i]f the defendants were not deterred by the possibility of RICO liability, the district court reasonably found the defendants were not likely to be deterred by the Tobacco Control Act either." Id. at 836-37.[4]

Thereafter, this Court ordered briefing from the parties on whether it should defer consideration of the issue of corrective statements pending the resolution of various challenges to the regulations promulgated by the Food and Drug Administration under the TCA. Order, Nov. 17, 2011 [Dkt. No. 5950]. After considering

---

[4] This finding is corroborated by the continuing legal challenges being brought by tobacco companies, including many of the Defendants, against various provisions of the Tobacco Control Act. See, e.g., Discount Tobacco City & Lottery, Inc. v. United States, 674 F.3d 509 (6th Cir. 2012) (refusing to grant facial challenge under the First Amendment to FDA's authority to require graphic warning labels), pet. for cert. filed, Oct. 26, 2012.

the submissions of the parties, this Court decided not to defer a decision pending a final resolution of R.J. Reynolds Tobacco Co. v. Food & Drug Administration, 823 F. Supp. 2d 36 (D.D.C. 2011), then pending on appeal. However, mindful of the expedited manner in which the Court of Appeals was handling that case and mindful of the possibility that a ruling in that case might have a substantial impact on its corrective statements ruling in this case, this Court took no action until the Court of Appeals ruled on Aug. 24, 2012 in R.J. Reynolds Tobacco Co. v. Food & Drug Administration, 696 F.3d. 1205 (D.C. Cir. 2012) ("Reynolds").

## II.  Corrective Statements

Each party submitted proposed corrective statements. After carefully evaluating the submissions, the Court concludes that the following Corrective Statements will most effectively prevent and restrain future violations of RICO. Appendix A directs the reader to the citations in the Original Opinion supporting each of these Statements.

### A.    Adverse Health Effects of Smoking

A Federal Court has ruled that the Defendant tobacco companies deliberately deceived the American public about the health effects

of smoking, and has ordered those companies to make this statement.

Here is the truth:[5]

- Smoking kills, on average, 1200 Americans. Every day.

- More people die every year from smoking than from murder, AIDS, suicide, drugs, car crashes, and alcohol, **combined.**

- Smoking causes heart disease, emphysema, acute myeloid leukemia, and cancer of the mouth, esophagus, larynx, lung, stomach, kidney, bladder, and pancreas.

- Smoking also causes reduced fertility, low birth weight in newborns, and cancer of the cervix and uterus.

**B. Addictiveness of Smoking and Nicotine**

A Federal Court has ruled that the Defendant tobacco companies deliberately deceived the American public about the addictiveness of smoking and nicotine, and has ordered those companies to make this statement. Here is the truth:

- Smoking is highly addictive. Nicotine is the addictive drug in tobacco.

- Cigarette companies intentionally designed cigarettes with enough nicotine to create and sustain addiction.

- It's not easy to quit.

- When you smoke, the nicotine actually changes the brain - that's why quitting is so hard.

---

[5] Each Statement begins with similar language declaring that a court has ruled the Defendants deceived the public about a particular topic and has ordered them to make corrective statements. These introductory sentences will be referred to as the "preamble."

C. **Lack of Significant Health Benefit from Smoking "Low Tar," "Light," "Ultra Light," "Mild," and "Natural" Cigarettes**

A Federal Court has ruled that the Defendant tobacco companies deliberately deceived the American public by falsely selling and advertising low tar and light cigarettes as less harmful than regular cigarettes, and has ordered those companies to make this statement. Here is the truth:

- Many smokers switch to low tar and light cigarettes rather than quitting because they think low tar and light cigarettes are less harmful. They are **not**.

- "Low tar" and filtered cigarette smokers inhale essentially the same amount of tar and nicotine as they would from regular cigarettes.

- **All** cigarettes cause cancer, lung disease, heart attacks, and premature death - lights, low tar, ultra lights, and naturals. There is no safe cigarette.

D. **Manipulation of Cigarette Design and Composition to Ensure Optimum Nicotine Delivery**

A Federal Court has ruled that the Defendant tobacco companies deliberately deceived the American public about designing cigarettes to enhance the delivery of nicotine, and has ordered those companies to make this statement. Here is the truth:

- Defendant tobacco companies intentionally designed cigarettes to make them more addictive.

- Cigarette companies control the impact and delivery of nicotine in many ways, including designing filters and selecting cigarette paper to maximize the ingestion of nicotine, adding ammonia to make the cigarette taste less harsh, and controlling the physical and chemical make-up of the tobacco blend.

- When you smoke, the nicotine actually changes the brain - that's why quitting is so hard.

**E.   Adverse Health Effects of Exposure to Secondhand Smoke**

A Federal Court has ruled that the Defendant tobacco companies deliberately deceived the American public about the health effects of secondhand smoke, and has ordered those companies to make this statement. Here is the truth:

- Secondhand smoke kills over 3,000 Americans each year.

- Secondhand smoke causes lung cancer and coronary heart disease in adults who do **not** smoke.

- Children exposed to secondhand smoke are at an increased risk for sudden infant death syndrome (SIDS), acute respiratory infections, ear problems, severe asthma, and reduced lung function.
- There is no safe level of exposure to secondhand smoke.

**III. The Court Has Broad Discretion to Formulate Corrective Statements**

The parties are in agreement that this Court has broad discretion to determine the content of the Corrective Statements in order to most effectively prevent and restrain future RICO violations. See Hr'g. Tr., Oct. 15, 2012. The Court can, but is not obligated to, receive additional evidence. See United States v. Local 1804-1, Int'l Longshoremen's Ass'n, 812 F. Supp. 1303 (S.D.N.Y. 1993), modified by 831 F. Supp. 177, 182-84 (S.D.N.Y. 1993) (evaluating whether to admit additional evidence in remedial phase of RICO litigation and determining not to admit it after

deeming it irrelevant on the questions of fact at issue). The parties have submitted twenty-five briefs related to the content of these Corrective Statements, and the Court heard oral argument on October 15, 2012.

Naturally, this Court's equitable power is limited by the terms of the underlying statute, as well as the Constitution. <u>See</u> <u>United States v. Philip Morris USA, Inc.</u>, 396 F.3d 1190, 1197 (D.C. Cir. 2005). While RICO provides a district court with jurisdiction to issue orders that "prevent and restrain" RICO violations, our Court of Appeals made it clear that this language limits a court's equitable discretion to "forward looking remedies that are aimed at future violations." 396 F.3d at 1198.

In its Affirmance Opinion, the Court of Appeals upheld this Court's determination that corrective statements, targeted at "reveal[ing] the previously hidden truth" about cigarettes and "correct[ing] Defendants' campaign of deceptive marketing," will prevent and restrain future RICO violations. <u>Id.</u>; <u>see also</u> <u>Reynolds</u>, 696 F.3d at 1216 & n.10 (observing that this case requires statements in order "to correct any false or misleading claims made by cigarette manufacturers in the past"). Thus, the corrective statements remedy has been upheld as within the scope of this Court's discretion, presuming that the Statements are targeted at correcting the fraud perpetuated by the Defendants.

## IV.   First Amendment Analysis

As already noted, even though the Court has a significant amount of equitable discretion under RICO, its discretion is also cabined by the provisions of the Constitution. The Defendants argue that certain portions of the Statements violate the First Amendment because they exceed the scope of permissible governmental restrictions on commercial speech. After reviewing the Supreme Court's development of the commercial speech doctrine and in light of recent cases decided by the Supreme Court and our Court of Appeals, this Court concludes that the Statements pass constitutional muster.

### A.   Historical Development of "Commercial Speech" Protection

The First Amendment prohibits the government from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content." <u>Brown v. Entm't Merchs. Ass'n</u>, 131 S. Ct. 2729, 2733 (2011) (quoting <u>Ashcroft v. A.C.L.U.</u>, 535 U.S. 564, 573 (2002)). Content-based restrictions on protected speech are entitled to "strict scrutiny" when reviewed by courts. <u>Id.</u> at 2738. This heightened scrutiny invalidates a government restriction on speech "unless it is justified by a compelling government interest and is narrowly drawn to serve that interest." <u>Id.</u> (citing <u>R.A.V. v. City of St. Paul</u>, 505 U.S. 377, 395 (1992)). However, certain types of speech, such as obscenity, incitement, and fighting words, have been deemed unworthy of such heightened

-14-

scrutiny, and are considered "unprotected speech." See Brown, 131 S. Ct. at 2733 (discussing categories of unprotected speech). Thus, when the government restricts speech, the court must evaluate what kind of speech it is and what level of protection is due that type of speech.

Over the years, the Supreme Court has sought to identify how much and what level of protection the First Amendment provides for so-called "commercial speech," defined as "expression related solely to the economic interests of the speaker and its audience." Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 562 (1980). Initially, the Court indicated that "purely commercial advertising" might be entirely unprotected. Valentine v. Chrestensen, 316 U.S. 52, 54 (1942) (observing that "the Constitution imposes no . . . restraint on government as respects purely commercial advertising"). However, a quarter of a century later, the Court decided that commercial speech was not outside the realm of constitutional protection, observing that "speech does not lose its First Amendment protection because money is spent to project it." Virginia Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 761 (1976). While the Court did not specify what level of protection commercial speech was entitled to, it did conclude that "whatever may be the proper bounds" of permissible government restrictions, they were "plainly exceeded" in that case. Id. at 771.

A few years later, the Court set forth a general framework for evaluating whether a particular government restriction on commercial speech was constitutional. See Central Hudson, 447 U.S. at 566. The Court established a four-step test:

> For commercial speech to come [under the First Amendment], it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

Id. at 566. This standard, which is often referred to as an "intermediate" level of scrutiny, is less demanding than the strict scrutiny standard applied to traditionally protected speech. See Brown, 131 S. Ct. at 2733 (defining strict scrutiny); see also Reynolds, 696 F.3d at 1212 (describing Central Hudson test as "not quite as demanding" as strict scrutiny).

In 1985, the Supreme Court then established an even lower level of scrutiny for government restrictions aimed at commercial speech that is false or misleading. In Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626 (1985), the Court analyzed the constitutionality of various Ohio state disciplinary rules, including a rule requiring an attorney to affirmatively disclose that clients may be responsible for legal costs regardless of the outcome of their case. Id. at 629-30.

The Court began by observing that an advertiser has only a "minimal" constitutional interest in <u>not</u> providing any particular "purely factual and uncontroversial" information. <u>Id.</u> at 651. Thus, given that the interests of the advertiser are less pressing, warnings or disclaimers "might be appropriately required" to avoid "consumer confusion or deception." <u>Id.</u> (citing <u>In re R.M.J.</u>, 455 U.S. 191, 201 (1982)).

The Court then concluded that "an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." 471 U.S. at 651. It specified in a footnote that such disclosure requirements were not subject to a "least restrictive means" analysis. <u>Id.</u> at 651 n.14. However, the Court also noted that "unjustified or unduly burdensome" disclosure requirements might offend the First Amendment if they "chill[ed] protected commercial speech." <u>Id.</u> at 651.

**B.   Choosing the Appropriate Standard of Review**

   **1.   Recent Cases Discussing Which Commercial Speech Standard Applies**

      **a.   Affirmance Opinion**

Courts have long struggled on a case-by-case basis with whether <u>Central Hudson</u> or <u>Zauderer</u> applies to particular governmental restrictions on commercial speech. In the Affirmance Opinion, the Court of Appeals directly addressed the question of

what level of First Amendment scrutiny should be applied to the corrective statements in this case. 566 F.3d at 1142-45.

The Court began by acknowledging that several standards exist for evaluating commercial speech restrictions under the First Amendment. Id. at 1142. It went on to observe that, whatever standard was applicable, the "fit" required between the means and the end was the same: such restrictions must be "narrowly tailored to achieve a substantial government goal." Id. at 1143 (citing Bd. of Trustees v. Fox, 492 U.S. 469, 480 (1989)).[6]

The Court of Appeals rejected the Defendants' argument that the corrective statements should not be considered "commercial speech," id. at 1143, and then analyzed whether the corrective statements remedy was appropriately tailored to the government's interest as required by the various commercial speech standards. Id.

The Court of Appeals began by discussing this Court's Factual Findings, observing that Defendants had "violated RICO by making false and fraudulent statements to consumers about their products," and were "reasonably likely to commit similar violations in the future." Id. It also emphasized this Court's determination that a corrective statements remedy was "necessary to counteract these

---

[6] It is clear that strict scrutiny does not apply in this case, although Defendants have preserved the issue for appellate review. See Hr'g. Tr., Oct. 15, 2012; see also Defs.' Supplemental Br. Regarding the Gov't's Proposed Corrective Statements, 6 n.2 [Dkt. No. 5985] (raising strict scrutiny argument).

anticipated violations." Id. The Court of Appeals concluded, based on this Court's Findings, that the corrective statements remedy was narrowly tailored to achieve the substantial governmental interest of "preventing Defendants from committing future RICO violations." Id. at 1144.

The Court of Appeals then directed this Court to develop statements that would satisfy the Zauderer requirements. Id. It cautioned that this Court "must confine the statements to purely factual and uncontroversial information, geared towards thwarting prospective efforts by Defendants to either directly mislead consumers or capitalize on their prior deceptions by continuing to advertise in a manner that builds on consumers' existing misperceptions." Id. at 1144-45 (citations and internal quotations omitted). This statement echoes the key requirements of Zauderer, which, as discussed above, apply to the review of mandatory disclosures of purely factual and uncontroversial information directed towards preventing consumer deception. Zauderer, 471 U.S. at 651.

In sum, the Court of Appeals' discussion of the corrective statements remedy in the Affirmance Opinion established two important guidelines. First, the Court has established that, regardless of which commercial-speech standard applies, the test regarding the "fit" is the same and is satisfied in this case. Second, the Court of Appeals directed this Court to develop

-19-

statements that would satisfy the requirements of <u>Zauderer</u>, thereby indicating that the <u>Zauderer</u> test was the appropriate standard of review.

### b.    Cases Decided Since the Affirmance Opinion

Several cases decided by the Supreme Court and our Court of Appeals since the issuance of the Affirmance Opinion in 2009 underscore the appropriateness of applying <u>Zauderer</u> to these Corrective Statements.

First, in 2010, the Supreme Court considered whether <u>Central Hudson</u> or <u>Zauderer</u> review applied to federal regulations that required a law firm to identify itself as a "debt relief agency." <u>Milavetz, Gallop & Milavetz, P.A. v. United States</u>, 130 S. Ct. 1324 (2010). Emphasizing the fact that the disclosure requirements were directed at misleading commercial speech, <u>id.</u> at 1339, the Court concluded that <u>Zauderer</u> review was appropriate and then re-affirmed the <u>Zauderer</u> analysis:

> Unjustified or unduly burdensome disclosure requirements offend the First Amendment by chilling protected speech, but "an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."

<u>Id.</u> at 1339-40 (citing <u>Zauderer</u>, 471 U.S. at 651).

Second, our Court of Appeals recently applied <u>Zauderer</u> to a final rule issued by the Department of Transportation ("DOT") requiring that the most prominent figure on airline print

-20-

advertisements and websites be the final price, including taxes, in order to avoid consumer confusion. Spirit Airlines, Inc. v. Dep't of Transp., 687 F.3d 403, 408 (D.C. Cir. 2012). The Court noted that, as in Milavetz, the regulation required a disclosure of accurate information targeted at correcting misleading or confusing commercial speech. Id. at 412-13 (describing rule in Zauderer as requiring a "clarifying" disclosure). The Court also held that the DOT rule was reasonably related to the goal of "prevent[ing] consumer confusion" about the total price consumers would have to pay. Id. at 414.

In addition, the Court of Appeals analyzed the DOT rule under Central Hudson, and summarized the Central Hudson analysis as follows:

> First, is the asserted government interest substantial? . . . The second and third inquiries are related: whether the regulation directly advances the governmental interest asserted, and whether the fit between the government's ends and the means chosen to accomplish those ends is not necessarily perfect, but reasonable.

687 F.3d at 415 (citing Pearson v. Shalala, 164 F.3d 650, 656 (D.C. Cir. 1999) (internal quotation and citation omitted)). Remarking that the analysis was "easy," the Court first declared that there was no question that the government's interest in "ensuring the accuracy of commercial information in the marketplace is substantial." Id. (citing Edenfield v. Fane, 507 U.S. 761, 769 (1993)). It then observed that the interest was "clearly and

-21-

directly advanced" by a rule requiring the total price to be the most prominent price in a particular advertisement. Id. Finally, the Court of Appeals concluded that the rule was "reasonably tailored." Id. (noting that the rule focused primarily on the manner of disclosure and did not impose any burden on speech other than requiring disclosure of the final price).

Third, our Court of Appeals again examined the issue of which level of First Amendment scrutiny applies to restrictions on commercial speech in Reynolds. As noted above, tobacco companies challenged a Final Rule issued by the Food and Drug Administration that used its authority under the TCA to promulgate graphic warning labels depicting the negative health consequences of smoking to be placed on cigarette packages. Reynolds, 696 F.3d at 1209.

In Reynolds, the Court rejected application of the Zauderer test. It concluded that Zauderer review is limited to government restrictions targeted at "misleading or incomplete commercial messages." Id. at 1213 (citing Glickman v. Wileman Bros. v. Elliott, Inc., 521 U.S. 457, 491 (1997) (Souter, J., dissenting)). Because the FDA's "interest" was in discouraging consumers from buying cigarette products, not preventing consumer deception, the Court held that Zauderer did not apply. See id. at 1215-16.

Significantly, the Court of Appeals specifically distinguished Reynolds from this litigation. It noted that this case did involve "remedial measure[s] designed to counteract specific deceptive

claims made by the Companies." Id. at 1216 n.10 (observing that "[s]uch matters are the subject of a pending — and entirely separate — line of litigation against the Companies," citing this case).

The Court then discussed how, even if Zauderer applied, the warnings would fail that test because the graphic images were not "purely factual and uncontroversial." Id. at 1216 (citing Zauderer, 471 U.S. at 651); see also id. (describing the disclosures in Zauderer and Milavetz as "clear statements that were both indisputably accurate and not subject to misinterpretation by consumers").

The Court relied on two crucial concessions made by the FDA in determining that the images were not "purely factual." First, the FDA conceded that the graphic images were "not meant to be interpreted literally," which raised concerns that the images "could be misinterpreted by consumers." Id. Second, the FDA "tacitly admit[ted]" the images were intended to evoke an emotional response and/or shock the reader into retaining information. Id. at 1216. Because of these admissions, the Court concluded:

> These inflammatory images . . . cannot rationally be viewed as pure attempts to convey information to consumers. They are unabashed attempts to evoke emotion (and perhaps embarrassment) and browbeat consumers into quitting. . . . While none of these images are patently false, they certainly do not impart purely factual, accurate, or uncontroversial information to consumers.

-23-

> Consequently, the images fall outside the
> ambit of Zauderer.

Id. at 1216-17.

The Court of Appeals then found that the appropriate level of scrutiny to apply to the graphic images was the Central Hudson test. Id. at 1217 (citing its Affirmance Opinion, 566 F.3d at 1142-43). The Court reiterated its finding that the intended purpose of the FDA rule was "to encourage current smokers to quit and dissuade other consumers from ever buying cigarettes." Id. at 1218. Assuming without deciding that such a government interest was substantial, the Court concluded that the FDA had offered no evidence to show that the graphic warnings directly advanced that interest. Id. at 1218-21. For those reasons, the FDA rule did not survive Central Hudson scrutiny and was struck down.

These recent cases clarify two basic principles regarding First Amendment scrutiny of commercial speech. First, Zauderer only applies to government restrictions on commercial speech that require purely factual and noncontroversial disclosures in order to prevent and correct consumer deception. If a restriction qualifies for Zauderer review, it then need only be "reasonably related" to the state's interest, as long as it is not otherwise unjustified or unduly burdensome. Second, assuming Zauderer does not apply, the restriction is to be reviewed under Central Hudson and will survive First Amendment scrutiny if it directly advances a substantial

government interest, and the fit between the government's interest and the means chosen to advance that interest is reasonable.

### 2. **_Zauderer_ Is the Applicable Standard for Review of the Corrective Statements**

A government restriction on speech is reviewed under _Zauderer_ if: (1) the government restriction requires a disclosure rather than a ban on speech; (2) the required disclosures are purely factual and uncontroversial; and (3) the disclosures are aimed at false and misleading commercial speech and preventing such speech from deceiving consumers. Since no party is arguing that the Corrective Statements are bans on speech rather than "disclosures," the Court will turn to the remaining two requirements.

### a. **The Statements Are Purely Factual and Uncontroversial**

### i. **"Purely Factual"**

Every sentence of the Corrective Statements is based in specific Findings of Fact made by this Court in the Original Opinion. _See_ Appendix A. Moreover, each Statement is "clear" and "accurate." _Reynolds_, 696 F.3d at 1216 (describing the statements found factual in _Zauderer_ and _Milavetz_). Defendants disagree.

Defendants' first argument alleges that the preamble language that introduces the various Statements is not "purely factual." However, Defendants fail to raise any substantive argument against the _content_ of the preamble, which does nothing more than state that a federal court ruled that Defendant tobacco companies

deceived the public about the topic of the particular Statement and ordered them to issue an accurate Statement.

For example, the preamble in Corrective Statement B states, "A Federal Court has ruled that the Defendant tobacco companies deliberately deceived the American public about the addictiveness of smoking and nicotine, and has ordered those companies to make this statement." This Court made a number of explicit findings that the tobacco companies perpetuated fraud and deceived the public regarding the addictiveness of cigarettes and nicotine. See, e.g., Original Opinion, 449 F. Supp. 2d at 209 ("Defendants have publicly denied and distorted the truth as to the addictive nature of their products for several decades."); id. at 271 ("Defendants have publicly made false and misleading denials of the addictiveness of smoking[.]"); id. at 307 ("For approximately forty years, Defendants publicly, vehemently, and repeatedly denied the addictiveness of smoking and nicotine's central role in smoking."); id. at 856 ("Defendants have made and continue to make false and fraudulent statements about the addictiveness of nicotine and smoking."). These findings were upheld on appeal. Affirmance Opinion, 566 F.3d at 1127-28 (upholding the district court's conclusion that Defendants engaged in "a campaign of statements intended to mislead the public into believing that giving up smoking is not markedly more difficult than giving up everyday habits").

It is also factually true that the Court is ordering the Corrective Statements to be made on this topic so as to prevent further dissemination of untruthful information by Defendants. Original Opinion, 449 F. Supp. 2d at 928 (ordering Defendants to make corrective statement about addiction). Similar findings of fraud were made as to each of the other topics addressed, and the Court similarly ordered the Defendants to make statements on those topics. <u>See</u> Appendix A. Thus, there is simply no support for Defendants' argument that the language of the preamble text is not "factual."

Recognizing this flaw in their argument, Defendants' attack on the preamble language does not suggest that the actual content is inaccurate, but instead argues that the language evokes an "emotional response" and "embarrassment" and thus is not factual under <u>Reynolds</u>.[7] Defendants' attempts to analogize this case to <u>Reynolds</u> ignore the enormous and analytically significant differences between the two. The required disclosures in the two cases contain vastly different content, were issued under different statutes, and serve different government interests.

The warnings at issue in <u>Reynolds</u> contained graphic images such as a man smoking through a tracheotomy hole, a woman crying,

---

[7] In this context, as in the Supreme Court's many cases attempting to define obscenity, whether a Statement evokes an "emotional response" or "embarrassment" will often be in the eye of the beholder. <u>See, e.g.,</u> <u>Jacobellis v. Ohio</u>, 378 U.S. 184, 197 (1964) (Stewart, J., concurring) (noting difficulty of defining "hard-core pornography," but observing "I know it when I see it").

and a man wearing a shirt with the words "I QUIT" on it. Reynolds, 696 F.3d at 1216. The FDA conceded that these images were "not meant to be interpreted literally." Id. In contrast, the Corrective Statements contain no pictures and merely disclose facts. Thus, there is no danger that the Statements do "not convey any warning information" nor is there any fear that they are "not meant to be interpreted literally," as the Court of Appeals concluded about the graphic images. Id. at 1216-17 (emphasis in original). Thus, Defendants make no substantive argument for why the Statements should be found not to be factual under Reynolds.

Defendants then raise a number of challenges against the phrasing of particular facts in various Statements. First, Defendants argue that the assertion in Corrective Statement A regarding how many Americans die each day from smoking-related illnesses is not factual "because the calculation is based on a rough estimate of the number of Americans who die each year from smoking-related illnesses, not each day." Defs.' Resp. to the Gov't's Proposed Corrective Statements, 18 [Dkt. No. 5881]. The Original Opinion explicitly phrased the statistic in terms of days. Original Opinion at 854-55 ("Cigarette smoking and exposure to secondhand smoke kills . . . more than 1,200 [Americans] every single day."). To the extent the Defendants' argument is that the text of the statement does not properly indicate that the number is a "rough estimate," the final version of Corrective Statement A

reads, "Smoking kills, on average, 1,200 Americans. Every day." Thus, the text has been amended to address Defendants' concerns.

Second, Defendants argue that the portion of Corrective Statement D which asserts that Defendants "manipulated cigarettes to make them more addictive" is "misleading" because "it suggests that Defendants spike cigarettes with additional nicotine." Defs.' Resp. to the Gov't's Proposed Corrective Statements, 18 [Dkt. No. 5881]; see also Defs.' Reply to Pub. Health Intervenors' Resp. to U.S. Submission of Proposed Corrective Statements & Expert Report, 3-4 [Dkt. No. 5889]. It does no such thing.

The language does not state or imply that Defendants "spiked" or added nicotine to their cigarettes. Instead, the Statement summarizes the Factual Findings concluding that Defendants manipulated nicotine delivery in a number of ways. This Court found that:

> Defendants have used a variety of physical and chemical design parameters to manipulate the nicotine delivery of their commercial products. . . . Defendants' goal to ensure that their products deliver sufficient nicotine to create and sustain addiction influences their selection and combination of design parameters. No single design parameter is responsible, on its own, for the level of nicotine delivered by a particular cigarette. Rather, Defendants combine design parameters to ensure that any particular cigarette delivers a sufficient level of nicotine.

Original Opinion, 449 F. Supp. 2d at 337-38 (emphasis added); see also id. at 858-59 ("Defendants have studied extensively how every

-29-

characteristic of every component of cigarettes – including the
tobacco blend, the paper, the filter, additives, and the
manufacturing process – affects nicotine <u>delivery</u>. They have
utilized that understanding in designing their cigarettes.")
(emphasis added). Thus, the language asserting that Defendants
manipulated cigarettes is amply supported by the record and is
factually accurate.

Third, Defendants argue that Corrective Statement D errs when
it states that cigarette companies "add[] ammonia to make the
cigarette taste less harsh," because the assertion is "subject to
the misinterpretation that all of Defendants' cigarettes are
presently made with ammonia as an added ingredient, which is not
correct." Defs.' Supplemental Br. Regarding the Gov't's Proposed
Corrective Statements, 5 [Dkt. No. 5985]. However, the text clearly
specifies that adding ammonia is only one of "many ways" in which
cigarette companies control the impact and delivery of nicotine.
<u>See</u> Corrective Statement D ("Cigarette companies control the impact
and delivery of nicotine in many ways, including . . . adding
ammonia to make the cigarette taste less harsh . . . ."). The
language of Statement D in no way suggests that all Defendants add
ammonia to all of their cigarettes.

Fourth and finally, Defendants challenge the assertion in
Corrective Statements B and D that quitting is difficult because
nicotine actually changes the brain. They suggest that the language

inaccurately suggests that "smokers cannot quit smoking because of changes to the brain caused by smoking." Defs.' Resp. to the Gov't's Proposed Corrective Statements, 13 n.3 [Dkt. No. 5881]. Again, the Corrective Statement cannot reasonably be read in this way. The challenged language states, "When you smoke, the nicotine actually changes the brain – that's why quitting is so hard." The Factual Findings of this Court, affirmed by the Court of Appeals, support this assertion. <u>See</u> Original Opinion, 449 F. Supp. 2d at 210 ("[B]ecause the smoker's brain has adapted to the constant presence of nicotine, it becomes dependent on nicotine to function normally. When a smoker doesn't have nicotine, the brain functions abnormally and most people, approximately 80%, experience withdrawal symptoms."); <u>see also</u> <u>id.</u> ("Over time, the brain becomes tolerant to the effects of nicotine and needs even greater amounts of it to produce the same effects on hormones as it once did before the development of tolerance."). Identifying that quitting smoking is difficult, a fact Defendants do not dispute, is not the same as asserting that quitting smoking is impossible.

In conclusion, it is significant that Defendants do not point to any evidence that the assertions they challenge are not <u>true</u>. Rather, they argue that certain portions of the Statements will be misconstrued by consumers. As discussed above, their arguments are not based on reasonable readings of the language. Thus, since the Corrective Statements are grounded in the affirmed Findings of Fact

of this Court, convey accurate information, and do not attempt to "shock" the reader or elicit embarrassment, they are "factual" under Zauderer.

### ii.  "Uncontroversial"

The Corrective Statements also satisfy Zauderer's requirement that they be uncontroversial. "Controversy" is defined as "a cause, occasion or instance of disagreement or contention," or "a difference marked especially by the expression of opposing views." Webster's Third New International Dictionary 497 (1993). However, in the context of litigation, controversy must mean more than "the fact that some people may be highly agitated and be willing to go to court over the matter." Fund for Animals v. Frizzell, 530 F.2d 982, 988 (D.C. Cir. 1975). By the same token, it must also mean more than that Defendants simply disagree with a particular proposition that has been decided against them.

Our Court of Appeals discussed the contours of a "controversial" government restriction on commercial speech in Reynolds. The FDA, as noted earlier, conceded that the graphic images were intended to "symbolize the textual warning statements." Reynolds, 696 F.3d at 1216. The Court found this to be problematic because the images did not clearly convey the particular text, but rather were "subject to misinterpretation" and required "significant extrapolation on the part of consumers." Id.

The text of the Corrective Statements, in comparison, consists

of simple declarative sentences and basic, uncomplicated language. There are no images at issue and the language used does not raise similar concerns about misinterpretation. Nor is there any need for the consumer to "extrapolate" from the text. In short, the Statements are, as noted earlier, entirely distinguishable from the images in <u>Reynolds</u>.

Defendants raise two specific arguments to support their claim that the Statements are "controversial." First, Defendants again attack the preamble, reiterating their argument that it is controversial under <u>Reynolds</u> because it intends to evoke an emotional response. Defs.' Supplemental Br. Regarding the Gov't's Proposed Corrective Statements, 4 [Dkt. No. 5985] (citing <u>Reynolds</u>, 696 F.3d at 1217); <u>see also</u> Defs.' Reply to Pub. Health Intervenors' Resp. to U.S. Submission of Proposed Corrective Statements & Expert Report, 3 [Dkt. No. 5889] (calling the preamble "unprecedented, self-denigrating language which would compel Defendants to make public admissions of past wrongdoing").

Putting aside Defendants' hyperbole, their argument ignores the fact that the government regularly requires wrongdoers to make similar disclosures in a number of different contexts. The language of the preamble is hardly "unprecedented," and the variety of contexts in which such language has been approved undermines Defendants' position that the preamble is "controversial."

For example, the Federal Trade Commission ("FTC") has required

-33-

corporations to issue corrective messages for decades. Recently, the FTC ordered a seller of supposed "cancer remedies" to send a letter, on its own letterhead, signed by the seller itself, to individuals who had purchased its product. In re Daniel Chapter One, No. 9329, 2010 WL 387917, at *2 (F.T.C. Jan. 25, 2010). The letter included the statement, "the Federal Trade Commission ('FTC') has found our advertising claims for these products to be deceptive because they were not substantiated by competent and reliable scientific evidence, and the FTC has issued an Order prohibiting us from making these claims in the future." Id. at *4. The letter went on to specify that "[c]ompetent and reliable scientific evidence" did not support the company's claims that their products were "effective when used for prevention, treatment or cure of cancer." Id.

The company argued that requiring it to send the letter was compelled speech, barred by the First Amendment. See Br. of Pet'rs at *61, Daniel Chapter One v. F.T.C., 405 F. App'x 505 (D.C. Cir. 2010) (No. 10-1064), 2010 WL 5644693 (citations omitted). Our Court of Appeals firmly rejected this claim:

> Deceptive commercial speech is entitled to no protection under the First Amendment and, even if it were, that would not preclude the Commission's order, which is carefully tailored to protect DCO's clientele from deception.

Daniel Chapter One, 405 F. App'x at 506 (citations omitted), cert.

<u>denied</u>, 131 S. Ct. 2917 (2011).[8] The Corrective Statements are similarly "carefully tailored to protect" consumers from deception. They alert the consumer to the fact that they have been misinformed, and then provide the accurate information.

The National Labor Relations Board ("NLRB" or "Board") has also required companies that have violated federal labor law to post at their facilities a notice that it refers to as an "Appendix." <u>See, e.g.</u>, <u>Parkwood Dev. Ctr., Inc.</u>, 347 N.L.R.B. 974, 977-78 (2006), <u>pet. for rev. denied</u>, 521 F.3d 404 (D.C. Cir. 2008); <u>Guardsmark, LLC & Serv. Employees Int'l Union, Local 24/7</u>, 344 N.L.R.B. 809, 812, 814 (2005), <u>pet. for rev. denied in relevant part</u>, 475 F.3d 369, 380-81 (D.C. Cir. 2007). The Appendix begins:

> NOTICE TO EMPLOYEES
> POSTED BY ORDER OF THE NATIONAL LABOR
> RELATIONS BOARD
> An Agency of the United States Government
> The National Labor Relations Board has found
> that we violated Federal labor law and has
> ordered us to post and obey this notice.

<u>Parkwood</u>, 347 N.L.R.B. at 978; <u>Guardsmark</u>, 344 N.L.R.B. at 814. The Appendix then goes on to detail what rights the workers have and specifies what the company can and cannot do under federal law. <u>Parkwood</u>, 347 N.L.R.B. at 978; <u>Guardsmark</u>, 344 N.L.R.B. at 814. The Appendix is signed by the company itself. <u>Parkwood</u>, 347 N.L.R.B. at

---

[8] Similar FTC orders have been upheld. <u>See, e.g.</u>, <u>In re Brake Guard Prods., Inc.</u>, 125 F.T.C. 138 (1998) (requiring letter saying that FTC had determined that certain statements are "FALSE and MISLEADING"), <u>aff'd sub nom. Jones v. F.T.C.</u>, 194 F.3d 1317 (9th Cir. 1999) (unpublished table opinion).

978; Guardsmark, 344 N.L.R.B. at 814. Again, these cases demonstrate that there is nothing novel about requiring those who have violated the law to identify their wrongdoing and correct their conduct.

In addition, a number of other statutory and regulatory provisions establish that manufacturers can be compelled to disclose adverse determinations about themselves and their products. For example, under the National Traffic and Motor Vehicle Safety Act, the National Highway Transit Safety Administration ("NHTSA") can determine that there is a safety defect or noncompliance with an applicable safety standard and order the manufacturer to issue a notice alerting "owners, purchasers, and dealers" to that defect or noncompliance. 48 U.S.C. § 30118(b)(2)(A). If there is litigation and the government prevails, NHTSA can order the manufacturer to provide a notice alerting consumers that a defect exists, and that NHTSA's "decision has been upheld in a proceeding in the Federal Courts." 49 C.F.R. §§ 577.5, 577.6(c)(I). Thus, mandatory disclosures alerting the consumer to wrongdoing and giving accurate information about that wrongdoing have been upheld. They are neither unprecedented nor controversial.

Defendants' second argument is that the Factual Findings of this Court are inherently "controversial" because no other court has made similar findings. In fact, Defendants go so far as to

-36-

argue that other courts have actually made findings that directly contradict the Findings of this Court. <u>See</u> Defs.' Resp. to the Gov't's Proposed Corrective Statements, 10 [Dkt. No. 5881]; Defs.' Reply in Support of Resp. to the Gov't's Proposed Corrective Statements, 8-9 [Dkt. No. 5893].

The simplest response is that this Court's Findings are the law of this case – differing findings in another case do not create a legal "controversy." Regardless, none of the cases cited by Defendants support their argument. <u>See</u> U.S.' Surreply in Support of the U.S.' Submission of Proposed Corrective Statements & Expert Report, App'x 1 (addressing each case cited by Defendants and identifying why those cases do not contain findings that contradict the findings in this case); <u>see also</u> <u>Grisham v. Philip Morris, Inc.</u>, 670 F. Supp. 2d 1014, 1035 (C.D. Cal. 2009) ("[N]o previous case appears to include an ultimate finding of fact absolving tobacco companies of liability on the basis that they did not engage in fraudulent activities. Rather, the verdicts in favor of the tobacco companies are based on issues such as standing, absence of harm, or plaintiffs' non-reliance on the fraud."). Thus, the Defendants point to nothing that directly and substantively contradicts the Findings of this Court.

Because the Statements are grounded in Factual Findings that have been upheld on appeal and are not inflammatory or likely to be

misunderstood, they are both factual and uncontroversial under Zauderer and its progeny.

### b. The Government Interest Is to Correct and Prevent Consumer Deception

The next requirement for a government restriction on speech to receive First Amendment review under Zauderer is that the factual and uncontroversial disclosures must be aimed at correcting misleading speech and preventing deception of consumers. Milavetz, 130 S. Ct. at 1339-40. There can be no question that this is the purpose of the Corrective Statements. In the words of the Court of Appeals, the Statements intend to "reveal the previously hidden truth" about the products and "correct Defendants' campaign of deceptive marketing" in an attempt to prevent and restrain future RICO violations. Affirmance Opinion, 566 F.3d at 1140; see also Reynolds, 696 F.3d at 1216 & n.10 (observing that this case's remedial justification is "to correct any false or misleading claims made by cigarette manufacturers in the past").

Defendants suggest that the government's proposed statements were inappropriately motivated by a desire to motivate smokers to quit. Defs.' Reply in Support of Resp. to the Gov't's Proposed Corrective Statements, 13 [Dkt. No. 5893]. The Statements say nothing about the choices of individual smokers to quit or continue smoking. Unlike in Reynolds, where the FDA chose images with the express purpose of "encourag[ing] current smokers to quit and dissuad[ing] other consumers from ever buying cigarettes," 696 F.3d

-38-

at 1218, this Court has never suggested or indicated that its Corrective Statements seek to encourage smokers to quit. In fact, it has specifically acknowledged that such a goal would be inappropriate and not authorized by the RICO statute.[9]

Thus, the Defendants offer no substantive argument that the Statements are not "geared towards thwarting prospective efforts by Defendants to either directly mislead consumers or capitalize on their prior deceptions by continuing to advertise in a manner that builds on consumers' existing misperceptions," as directed by the Court of Appeals. Affirmance Opinion, 566 F.3d at 1144-45 (citation omitted).

In conclusion, the Corrective Statements should be reviewed under Zauderer because they are purely factual and uncontroversial disclosures aimed at preventing commercial speech from deceiving consumers.

**C.  The Corrective Statements Satisfy the Zauderer Requirements**

Once a court has concluded that the Zauderer standard of review is appropriate, the challenged disclosures survive constitutional scrutiny under Zauderer if they are (1) reasonably

---

[9] This Court rejected the government's request that a national smoking cessation program be included in the Remedial Order. Original Opinion, 449 F. Supp. 2d at 933. At that time, the Court observed that, while adoption of a cessation program would "unquestionably serve the public interest," it was not a permissible remedy under section 1964(a) because "it is not specifically aimed at preventing and restraining future RICO violations." Id.

related to the government interest in preventing consumer deception and (2) not otherwise unjust or unduly burdensome. The Court will address these issues separately.

### 1. The Statements Are Reasonably Related to Correcting and Preventing Consumer Deception

To satisfy Zauderer, the Statements must be "reasonably related" to the government's interest in correcting Defendants' false and misleading speech in order to prevent future consumer deception.[10]

As already discussed, the FTC regularly uses corrective statements as a tool to correct a public campaign of misinformation. In Warner-Lambert Company v. F.T.C., 562 F.2d 749 (D.C. Cir. 1977), the FTC ordered the manufacturer to inform consumers that, "[c]ontrary to prior advertising, Listerine will not help prevent colds or sore throats or lessen their severity." 562 F.2d at 763. Our Court of Appeals ruled that the First Amendment presented "no obstacle to government regulation of false or misleading advertising." Id. at 758 (discussing Virginia Bd. of Pharm., 425 U.S. at 772). After examining the specific wording and the details of publication, the Court approved the corrective statement as "well calculated to assure that the disclosure will

---

[10] This does not require a "least restrictive means" analysis. See Full Value Advisors, LLC v. S.E.C., 633 F.3d 1101, 1109 (D.C. Cir.) (noting that Zauderer rejected idea that disclosure requirements are subject to "least restrictive means" analysis), cert. denied, 131 S. Ct. 3003 (2011).

reach the public." <u>Warner-Lambert</u>, 562 F.2d at 763.

Though the Court of Appeals affirmed the corrective statement generally, it deleted the "contrary to prior advertising" language as unnecessary. <u>Id.</u> It observed that, although this case was not such an "egregious case of deliberate deception" as to justify the inclusion of such a preamble, it was possible that such a statement might be appropriate in another situation. <u>Id.</u>

While <u>Warner-Lambert</u> was decided well before the development of the commercial speech doctrine, our Court of Appeals reaffirmed its principal holding as to the value of corrective statements in <u>Novartis Corporation v. F.T.C.</u>, 223 F.3d 783 (D.C. Cir. 2000). In that case, the FTC found that Novartis's advertisements for Doan back pain remedies were "deceptive." 223 F.3d at 785. The administrative law judge who originally ruled on the complaint decided that corrective advertising was unjustified and too "drastic." <u>Id.</u> at 786. The Commission, however, concluded that it was warranted "because the Doan's advertisements had created or reinforced consumer misbelief in Doan's superior efficacy and the misbelief was likely to continue." <u>Id.</u> Therefore, it ordered Novartis to include a disclaimer stating, "Although Doan's is an

effective pain reliever, there is no evidence that Doan's is more effective than other pain relievers for back pain." Id.

The Court of Appeals affirmed the Commission's finding that the advertising was "deceptive," id. at 786-87, and held that the expert testimony proffered by the FTC provided "substantial evidence" in support of the Commission's decision. Id. at 788. Significantly, the Court of Appeals also concluded that there was "no First Amendment impediment to the remedy" under Central Hudson.[11] Id. at 788-89. The Court observed that the remedy chosen by the FTC advanced the government's interest in the "avoidance of misleading and deceptive advertising." Id. at 789. It then noted that, because the order was appropriate and justified under the Commission's regulatory standard, the remedy was no greater than necessary to serve the interest involved, and was thus not overly broad. Id. (citing Warner-Lambert, 562 F.2d at 758).

In addition to the fact that corrective statements have historically been used to target and redress consumer deception, our Court of Appeals has already ruled in this case that "the publication of corrective statements addressing Defendants' false assertions is adequately tailored to preventing Defendants from deceiving consumers." Affirmance Opinion, 566 F.3d at 1144. The Court of Appeals explained that "[r]equiring Defendants to reveal

---

[11] Interestingly, Novartis reviews the statements under Central Hudson, without any mention or discussion of Zauderer.

the previously hidden truth about their products will prevent and restrain them from disseminating false and misleading statements, thereby violating RICO, in the future." <u>Id.</u> at 1140; <u>see also</u> <u>id.</u> ("Defendants will be impaired in making false and misleading assurances about, for instance, smoking-related diseases or the addictiveness of nicotine . . . if they must at the same time communicate the opposite, truthful message about these matters to consumers.") Defendants offer no argument that challenges this conclusion.

Defendants' only concrete argument is that the preamble to the Corrective Statements is not "reasonably related" to the government's interest, because, under <u>Warner-Lambert</u> and <u>Novartis</u>, the Corrective Statements must be focused on facts regarding the product, not the speaker's past conduct. Defs.' Resp. to the Gov't's Proposed Corrective Statements, 7 [Dkt. No. 5881].

Defendants' argument is not persuasive for two reasons. First, as discussed above, while <u>Warner-Lambert</u> and <u>Novartis</u> did not see the need for a preamble focused on a speaker's past conduct, the FTC and our Court of Appeals have upheld determinations that alerting people to the deceptive nature of a business practice is warranted and tailored to "protect" consumers from further deception. <u>See, e.g.</u>, <u>Daniel Chapter One</u>, 405 F. App'x at 506; <u>see also</u> <u>supra</u> Sec. IV.B.2.a.ii (discussing compelled disclosures under other statutes).

-43-

Second, the deception at issue in <u>Warner-Lambert</u> and <u>Novartis</u> is very different from the deceptive campaign waged for close to fifty years by Defendants.[12] In those cases, companies presented one specific claim, namely, that their product provided a benefit that it did not, in fact, provide. To address that single untruth, the corrective statements merely had to state that the claim was not true. <u>Warner-Lambert</u>, 562 F.2d at 763 ("Listerine will not help prevent colds or sore throats or lessen their severity."); <u>Novartis</u>, 223 F.3d at 786 ("Although Doan's is an effective pain reliever, there is no evidence that Doan's is more effective than other pain relievers for back pain."). There was no finding of bad faith or intentional deception in either of those cases. <u>See</u> <u>Warner-Lambert</u>, 562 F.2d at 763 ("While we do not decide whether petitioner proffered its cold claims in good faith or bad, the record compiled could support a finding of good faith."); <u>Novartis</u>, 223 F.3d at 786 (noting that Novartis did not dispute that the implied claim was "likely to deceive," but not mentioning fraud, intentional deception, or bad faith).

The scope of the consumer fraud at issue here is much greater. The Defendants not only proffered scientific claims they knew were false, such as when they explicitly denied the adverse health

---

[12] As the Original Opinion discussed at length, even though a scientific consensus existed by 1964 that smoking caused disease, 449 F. Supp. 2d at 174-179, Defendants falsely denied and distorted that information for many years thereafter. <u>Id.</u> at 187-204.

effects of smoking and secondhand smoke, Original Opinion, 449 F. Supp. 2d at 187-204, 788-800, but also, for example, concealed and repressed research data showing that nicotine is addictive, id. at 289-307, marketed to young people to recruit "replacement smokers" in order to ensure their economic future, id. at 561-691, manipulated cigarette designs to ensure that cigarettes delivered doses of nicotine adequate to create and sustain addiction, id. at 338-74, conspired to undermine and discredit the scientific consensus that secondhand smoke causes disease, id. at 723-88, suppressed and concealed scientific research, id. at 801-14, and destroyed relevant documents to support their public and litigation positions, id. at 814-31. The length of time this went on and the scope of the manipulation of information that was given to consumers went far beyond a single advertising campaign making a single claim that a health benefit existed when it did not.

The Court of Appeals directed this Court to look to the entirety of the Defendants' deceptive scheme in crafting its remedy. See Affirmance Opinion, 566 F.3d at 1144-45 (citation omitted) (noting that the interest at issue is "thwarting prospective efforts by Defendants to either directly mislead consumers or capitalize on their prior deceptions by continuing to advertise in a manner that builds on consumers' existing misperceptions."); see also Warner-Lambert, 562 F.2d at 769 (determining that "advertising which fails to rebut the prior

claims . . . [would] inevitably build[] upon those claims; continued advertising continues the deception, albeit implicitly rather than explicitly"). Thus, in light of the record, this Court concludes that the massive scope of Defendants' campaign of deception and fraud differentiates this case from cases requiring simpler corrective statements such as <u>Warner-Lambert</u> and <u>Novartis</u>.

Given the lengthy record detailing Defendants' deceptions over the last several decades, and the finding, affirmed twice by the Court of Appeals, that Defendants are likely to commit future RICO violations, the preamble language provides important and necessary context for the consumer to understand the accurate information that follows.

Since the preamble is reasonably related to correcting and preventing future consumer deception, and the Defendants offer no substantive argument to suggest that the substance of the Statements is not also reasonably related to that interest, the Court concludes that the Statements in their entirety satisfy the "reasonably related" prong of <u>Zauderer</u> review.

### 2. The Corrective Statements Are Not Unjustified or Unduly Burdensome

The final step in the <u>Zauderer</u> analysis is determining whether the Corrective Statements are unjustified or unduly burdensome. Defendants argue that the Statements are "unduly burdensome" because they "impose far greater burdens on Defendants' speech than necessary to further the Government's anti-fraud interest." Defs.'

Supplemental Br. Regarding the Gov't's Proposed Corrective Statements, 9 n.3 (citing <u>Zauderer</u>, 471 U.S. at 651).

Defendants fail to point to any "burden" or "chill" that the Statements would actually have on their speech. There is no reason to believe that issuing these Corrective Statements would place any burden on Defendants' speech other than the desired one, namely preventing Defendants from denying the accuracy of them. <u>See</u> <u>Spirit Airlines</u>, 687 F.3d at 415 (considering, while conducting more stringent <u>Central Hudson</u> review, that DOT rule did not impose any burden on speech other than requiring disclosure of final price). Nor do Defendants acknowledge that the Court of Appeals has already concluded, presuming the Statements are "'purely factual and uncontroversial information' geared towards thwarting prospective efforts by Defendants to either directly mislead consumers or capitalize on their prior deceptions," that such Statements do not impermissibly chill Defendants' protected speech. Affirmance Opinion, 566 F.3d at 1144-45 (quoting <u>Zauderer</u>, 471 U.S. at 651). In sum, the Court finds no basis for deeming the Statements to be unduly burdensome.

Based on the foregoing review, the Court concludes that the Corrective Statements satisfy the <u>Zauderer</u> requirements.

**D.   Even if the <u>Zauderer</u> Requirements Are Not Satisfied, the Corrective Statements Satisfy the Requirements of <u>Central Hudson</u>**

Even if the Corrective Statements do not satisfy <u>Zauderer</u>,

-47-

they meet the Central Hudson requirements and thus survive First Amendment scrutiny. Our Court of Appeals has indicated that it is correct to evaluate a government restriction on commercial speech under Central Hudson if it does not survive Zauderer review. See Reynolds, 696 F.3d at 1217 (holding that when FDA rule did not "fall within the narrow enclave carved out by Zauderer," Central Hudson review was appropriate); see also Spirit Airlines, 687 F.3d at 415 (determining that Zauderer applied and was satisfied, but also ruling that the DOT rule survived Central Hudson scrutiny).

Three questions must be answered under Central Hudson: (1) whether the asserted government interest is substantial; (2) whether the regulation directly advances the government interest asserted; and (3) whether the fit between the government's interest and the means chosen is "not necessarily perfect, but reasonable." Id. (citation omitted).

The answer to the first question is easy. Defendants do not deny that the government's interest in preventing and restraining future consumer deception is substantial.

As to the second question regarding whether the Statements directly advance the governmental interest asserted, the burden is on the government to show that "the harms it recites are real and that its restriction will in fact alleviate them to a material degree." Florida Bar v. Went for It, Inc., 515 U.S. 618, 626 (1995) (citing Rubin v. Coors Brewing Co., 514 U.S. 476, 487 (1995)).

There has been some discussion as to what quantum of evidence is necessary to support the government's assertion that corrective statements are necessary and will be effective. <u>Florida Bar</u>, 515 U.S. at 626. However, in 2001 the Supreme Court clarified that:

> We do not . . . require that empirical data come . . . accompanied by a surfeit of background information. . . . [W]e have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense.

<u>Lorillard Tobacco Co. v. Reilly</u>, 533 U.S. 525, 555 (2001) (citations and internal quotation marks omitted).

In this case, "simple common sense," as well as deference to the guidance proffered by the Court of Appeals, supports this Court's conclusion that "reveal[ing] the previously hidden truth" about the products and "correct[ing] Defendants' campaign of deceptive marketing" will prevent and restrain future RICO violations. Affirmance Opinion, 566 F.3d at 1140.

As to the third question, Defendants argue that the statements they originally proposed advance the same government interest with less encroachment on their First Amendment rights. Defendants appear to be arguing that the "fit" between the government's interest and the Statements is not "reasonable." <u>Spirit Airlines</u>, 687 F.3d at 415 (citation omitted).

-49-

This argument fails for several reasons. First, there is no "least restrictive means" test under Central Hudson. Fox, 492 U.S. at 477 ("Whatever the conflicting tenor of our prior dicta may be, we now focus upon this specific issue for the first time, and conclude that the reason of the matter requires something short of a least-restrictive-means standard."). Rather, the test is whether there is "a reasonable fit between the [government]'s ends and the means chosen to accomplish those ends, . . . a means narrowly tailored to achieve the desired objective." Lorillard Tobacco, 533 U.S. at 556 (citing Florida Bar, 515 U.S. at 632 (citations and internal quotation marks omitted)).

Our Court of Appeals has already concluded that the Corrective Statements meet this standard, observing that the remedy is narrowly tailored to achieve the substantial government interest in "preventing Defendants from committing future RICO violations." Id. at 1144; see also Novartis, 223 F.3d at 789 (citing Warner-Lambert, 562 F.2d at 758) (holding that corrective statements were no greater than necessary to serve the interest involved). In its Affirmance Opinion, the Court made clear that "[a]lthough the standard for assessing burdens on commercial speech has varied . . ., the Supreme Court's bottom line is clear: the government must affirmatively demonstrate its means are 'narrowly tailored' to achieve a substantial government goal." Affirmance Opinion, 566 F.3d at 1143 (citations omitted).

Moreover, there are significant differences between Defendants' proposed submissions and the Statements fashioned by the Court. These differences are material for predicting how effective the Statements will be at preventing and restraining Defendants from violating RICO in the future. For example, the Original Opinion found that an "overwhelming accumulation of data demonstrates that [secondhand smoke] causes disease," 449 F. Supp. 2d at 703, and that such a consensus has existed since at least 1986. Id. at 800. The Opinion also found that Defendants recognized these dangers as early as 1961, based on studies done by public health officials and their own internal research. Id. at 708-09. Despite publicly promising to fund independent research on the issue, Defendants "took steps to undermine independent research, to fund research designed and controlled to generate industry-favorable results, and to suppress adverse research results." Id. at 722-23; see also id. at 724-88 (describing various consultants and organizations created and funded by Defendants and publicized as "independent" that in reality controlled and manipulated scientific information about secondhand smoke).

Based on these Findings of Fact, this Court and the Court of Appeals concluded that there was a reasonable likelihood that Defendants would continue to engage in false and deceptive advertising practices in the future. Original Opinion, 449 F. Supp. 2d at 910; Affirmance Opinion, 566 F. 3d at 1131-34.

The corrective statements submitted by the Defendants would be less effective at preventing and restraining such future violations because they would allow Defendants, once the two-year publication period expires,[13] to falsely deny that secondhand smoke causes disease. Defendants' proposed statements depict this well-established fact as if it were a mere opinion held by public health officials, rather than representing a consensus held by the scientific community at large.[14]

By ensuring that consumers know that Defendants have misled the public in the past on the issue of secondhand smoke in addition to putting forth the _fact_ that a scientific consensus on this subject exists, Defendants will be less likely to attempt to argue in the future that such a consensus does not exist. Thus, Defendants' proposed statements do not advance the interest in

---

[13] The corrective statements are to be published in various forms, but the longest-running public statements will be the cigarette onserts and the point-of-sale displays, which will continue for two years. 449 F. Supp. 2d at 939-40. The statements will be placed on Defendants' websites "for the duration of this Final Judgment and Remedial Order," however, which may be longer. Id. at 939.

[14] All of the statements on secondhand smoke submitted by the Defendants phrased the fact as merely a "conclusion" held by either the Surgeon General or "public health officials." See Philip Morris USA's Proposed Corrective Statements As Compelled by the Final J. & Remedial Order, 5 [Dkt. No. 5776] ("Public health officials have concluded that secondhand smoke from cigarettes causes disease . . . ."); Certain Joint Defs.' Submission of Proposed Corrective Statements Pursuant to Order #1015, 6-7 [Dkt. No. 5780] ("The Surgeon General has concluded: Exposure to environmental tobacco smoke has been proven to cause . . . ."); Lorillard Tobacco Company's Proposed Corrective Statements Required by Order #1015, 4 [Dkt. No. 5781] ("The Surgeon General has concluded: The evidence is sufficient to infer a causal relationship between exposure to secondhand smoke and [various diseases].").

preventing future consumer deception to the same extent as the final Corrective Statements. Beyond that, Defendants offer no concrete reasons to support their argument that the "fit" between the chosen Corrective Statements and the government's interest is not "reasonable."[15]

Thus, since the Corrective Statements satisfy the requirements of both <u>Central Hudson</u> and <u>Zauderer</u>, they do not violate the First Amendment.

## V.   Due Process

One last argument needs to be briefly addressed. Defendants argue that the preamble is "confessional" and has "an exclusively punitive purpose." It then argues that such a punitive measure cannot be imposed in the absence of the procedural protections available to defendants in criminal cases. Defs.' Resp. to the Gov't's Proposed Corrective Statements, 25-26 [Dkt. No. 5881].

First, the Court does not construe the preamble as confessional. Its purpose is not punitive, but corrective. Second, court have, in various cases and under various statutes, upheld decisions ordering defendants to admit wrongdoing and publish

---

[15] Defendants' only other support for the proposition that its statements would be effective is the government's expert report. <u>See</u> Defs.' Supplemental Br. Regarding the Gov't's Proposed Corrective Statements, 8-9 [Dkt. No. 5985]; Defs.' Supplemental Reply Br. Regarding the Gov't's Proposed Corrective Statements, 7 [Dkt. No. 5989]. Although the Court has not relied on the report, it can't help but note that the Defendants' reliance on the report contradicts its vigorous attempts to convince the Court that it is "fundamentally flawed" and "unreliable." Defs.' Resp. to the Gov't's Proposed Corrective Statements, 3 [Dkt. No. 5881].

corrections, though those defendants were not provided with the procedural protections of the criminal justice system. See supra IV.B.2.a.ii. Third, this argument attempts to relitigate an issue raised by Defendants at an earlier stage that was resolved against them. See United States v. Philip Morris, Inc., 273 F. Supp. 2d 3 (D.D.C. 2002) (rejecting Defendants' arguments for a jury trial).

## VI. Conclusion

This Court's authority to order corrective statements as a remedy for past deception was affirmed by the Court of Appeals. This Court has heeded its mandate to fashion Corrective Statements that are purely factual and uncontroversial and are directed at preventing and restraining the Defendants from deceiving the American public in the future.

Now that the text for the Corrective Statements has been finalized, the Court intends to address the details of implementation. Originally, Defendants were ordered to publish the Statements on their corporate websites, publish them as full-page advertisements in major newspapers, run them on major television networks, and attach onserts containing the Statements to their cigarette packaging. Original Opinion, 449 F. Supp. 2d at 939-41.[16]

---

[16] Defendants were also ordered to include the statements on Countertop Displays and Header Displays provided as part of their Retail Merchandising Programs. Id. at 939-40. This part of the remedial order was vacated and remanded "for the district court to evaluate and 'make due provisions for the rights of innocent persons,' either by abandoning this part of the remedial order or by crafting a new version reflecting the rights of third parties." Affirmance Opinion, 566 F.3d at 1142
(continued...)

These media were chosen in order to "structure a remedy which uses the same vehicles which Defendants have themselves historically used to promulgate false smoking and health messages." Id. at 928. Over six years have passed since the Court issued that ruling. During that interval, the types of media in which Defendants convey commercial messages of this nature have changed dramatically. See Appendix B (listing various implementation considerations).

Because of the complexity of these issues, the Court has concluded that the most efficient way to address them is to have the parties meet and confer with the Special Master to see if agreement can be reached. If not, the Court will order a Report and Recommendation from the Special Master.

Even though the holiday season is upon us, the Court wants discussions to begin in December and expects them to conclude by March 1, 2013, unless the Special Master believes that additional time would prove useful.


                                    /s/
November 27, 2012                   Gladys Kessler
                                    United States District Judge


**Copies via ECF to all counsel of record**

---

[16](...continued)
(citing 18 U.S.C. § 1964(a)). This issue has been fully briefed, and will be resolved in the near future.