## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil No. 99-CV-02496 (GK)** |
| **v.** | ) | |
| | ) | **Next scheduled court** |
| **PHILIP MORRIS USA INC.,** | ) | **appearance:  None** |
| **f/k/a PHILIP MORRIS INC., et al.,** | ) | |
| **Defendants.** | ) | |
| | ) | |

### UNITED STATES' OPENING SUPPLEMENTAL BRIEF
### ON RETAIL POINT OF SALE[a]

### Table of Contents

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL AND PROCEDURAL HISTORY ............................................................ 3

III.    DISCUSSION ..................................................................................................... 4

A.      Safety risks.................................................................................................... 4

B.      NACS's property, contractual-right, and takings arguments are misplaced................... 5

        1.  The Court should not reach out to determine whether judicial takings
claims are cognizable ................................................................................ 5

        2.  The injunction will not impair or impede any contractual or property rights
................................................................................................................. 5

        3.  The injunction will not be a physical or regulatory taking ........................ 8

C.      Participating Retailers should be compensated for potential lost profits on countertop
        sales, and the Court should refer to mediation how to do so ......................................... 12

D.      The injunction will not disturb retailers' First Amendment rights ................................ 13

E.      The retailers' remaining arguments are unavailing ....................................................... 15

IV.     CONCLUSION................................................................................................... 16

---

[a] This brief replaces an earlier version, which dropped part of a line at the end of footnote 13.

## I.   INTRODUCTION

The point-of-sale media channel is the most important of the five media channels prescribed in the Court's 2006 Final Order.  The Court of Appeals vacated the media channel and remanded with instructions for this Court either to abandon it or to "craft[] a new version reflecting the rights of third parties."  *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1142 (D.C. Cir. 2009) (*per curiam*) ("*Affirmance Opinion*"), *cert. denied*, 561 U.S. ___, 130 S. Ct. 3501 (2010).  The Defendants' current contracts authorize them to mandate displays in retailers' stores now; and even if they did not, Philip Morris and Lorillard's contracts authorize them to modify or terminate their contracts on notice, and RJR's on 10 days' notice.  For the reasons discussed below, the Court should restore this central provision of the injunction and enter the United States' proposed order to address certain financial and safety concerns and to refer other matters to mediation.

The point-of-sale venue remains the most important way for the Court to reach consumers.  Defendants report that 340,000 retail outlets sell their cigarettes, Defs.' 2011 Opening Br. at 4 (Dkt. No. 5906); 95% of them display in-store cigarette ads,[1] and about 65% of them, or 221,000, participate in Retail Programs with one or more Defendants.[2]  The large majority of college students' exposures to tobacco marketing and advertising occurs at the point

---

[1] Ryan G. Frick, Elizabeth G. Klein, Amy K. Ferketich, *et al.*, *Tobacco Advertising and Sales Practices in Licensed Retail Outlets After the Food and Drug Administration Regulations*, 37 J. Community Health 963, 965 (2012).

[2] Ellen C. Feighery, Kurt M. Ribisl, Nina C. Schleicher, *et al.*, *Retailer Participation in Cigarette Company Incentive Programs is Related to Increased Levels of Cigarette Advertising and Cheaper Cigarette Prices in Stores*, 38 Preventive Med. 876, 876 (2004).

of sale,[3] and Participating Retailers display significantly more cigarette marketing at point of sale

than other retailers.[4]  The 2012 Surgeon General's Report found that substantial evidence links

youth smoking behavior to tobacco marketing at the point of sale, especially inside convenience

stores.[5]  A Stanford University study found that compared to other stores in the same

community, stores popular among adolescents displayed more than three times as many cigarette

marketing materials outside, and contained inside almost three times more marketing materials

and twice as much shelf space for Marlboro, Camel, and Newport.[6]  Point-of-sale tobacco

marketing reduces the chance that smokers who try to quit will succeed.[7]  In its 2006 Final

Order, this Court correctly identified displays at retail point-of-sale as "one of Defendants'

central vehicles for communication."  *United States v. Philip Morris USA Inc.*, 449 F. Supp. 2d

1, 659, ¶ 3110 (D.D.C. 2006), *aff'd in relevant part*, 566 F.3d 1095 (D.C. Cir. 2009) (per

curiam), *cert. denied*, 561 U.S. ___, 130 S. Ct. 3501 (2010).[8]

---

[3] Martino SC, Scharf DM, Setodji CM, et al., *Measuring Exposure to Protobacco Marketing and Media: A Field Study Using Ecological Momentary Assessment*, 14 Nicotine & Tob. Res. 398 (2012).

[4] Feighery, Ribisl, *et al.*, *Retailer Participation*, 38 Preventive Med. at 881-82 & fig.3.

[5] U.S. Dep't of Health & Human Services, *Preventing Tobacco Use Among Youth and Young Adults: A Report of the Surgeon General* 542-45 (2012); *see also* Henriksen L, Schleicher NC, Feighery EC, *et al.*, *A Longitudinal Study of Exposure to Retail Cigarette Advertising and Smoking Initiation*, 126 Pediatrics 232 (2010)

[6] Henriksen L, Feighery EC, Schleicher NC, *et al.*, *Reaching Youth at the Point of Sale: Cigarette Marketing Is More Prevalent in Stores Where Adolescents Shop Frequently*, 13 Tob. Control 315, 317 (2004).

[7] Germain D, McCarthy M, Wakefield M, *Smoker Sensitivity to Retail Tobacco Displays and Quitting: A Cohort Study*, 105 Addiction 159 (2010); *see also* Reitzel LR, Cromley EK, Li Y, *et al.*, *The Effect of Tobacco Outlet Density and Proximity on Smoking Cessation*, 101 Am. J. Pub. Health 315 (2011) (finding lower odds of continuous abstinence 6 months after a quit attempt among Houston smokers who live nearby tobacco retailers).

[8] *See also* R.J. Reynolds Tobacco Co., "Unit 6: RJRT Contracts," in *STORM: Sales Training Orientation Road Map: Sales Rep Training Manual* at 6-8 (2001) (Ex. 1 at 13) (Bates No. 527270233 at 0514) ("The contract provides a written document to position our products and

The convenience-store industry in particular has extraordinary reach among smokers and nonsmokers, young and old; it serves 160 million consumers per day, with an average of around 1,140 customers per day at convenience stores that sell gasoline.[9]  Due to the increasing importance of fuel sales, the industry's principal trade group, NACS, founded in 1961, changed its name for the first time in 2007, and again in 2011.[10]  Highlighting the importance of exterior messaging, pay-at-the-pump transactions accounted for between 19.0% and 24.1% of all convenience-store transactions in recent years; on average, 64% of customers purchasing fuel from convenience stores pay at the pump, and two-thirds of those who pay at the pump do not enter the store.[11]

## II.    FACTUAL AND PROCEDURAL HISTORY

The Court's 2006 Final Order called for Defendants to modify the terms of their retail programs, to require participating retailers to display the Court-ordered corrective statements as countertop and header displays.  449 F. Supp. 2d at 939-40, ¶ II(B)(6)(b).  On appeal, the D.C. Circuit held that the Court had erred "by failing to *consider* the rights of retailers" before issuing this part of the 2006 Final Order.  *Affirmance Opinion*, 566 F.3d at 1141 (emphasis added).  The

---

advertisements"); *id.* at 6-20 (Bates No. 527270233 at 0526) ("The display is not a 'pack rack'[,] it's a 'selling machine'.")

[9] NACS: The Association for Convenience & Fuel Retailing, *State of the Industry Report of 2012 Data* at 44 (2013).

[10] NACS was founded in 1961 as "the National Association of Convenience Stores."  *Id.* at 2.  In 2007, it changed its name to the acronym plus a tagline, becoming "NACS: The Association for Convenience and Petroleum Retailing."  *Id.*  In 2011, "in acknowledgement that the future of our industry will include fuels," it changed its name again, to the current "NACS: The Association for Convenience and Fuel Retailing."  *Id.*

[11] *Id.* at 139; Samantha Oller, "Fueling Sales Inside and Out: An Exclusive Peek at Latest VideoMining Heat-Map Study Reveals Challenge of Pump-to-Store Conversion, Opportunity of Layout," *CSP Magazine* 62, 63 (July 2013), http://www.cspnet.com/sites/default/files/magazine-files/1307-F2_Heatmap.pdf (reporting that 64 of every 100 gasoline customers pay at the pump, of whom 43 (= 67.2%) pay only for gas and leave).

D.C. Circuit "remand[ed] for the district court to evaluate and 'mak[e] due provision for the rights of innocent persons,' either by abandoning this part of the remedial order or by crafting a new version reflecting the rights of third parties." *Id.* at 1142 (quoting 18 U.S.C. § 1964(a)). On remand, NACS and the National Association of Tobacco Outlets (NATO) filed briefs in 2011, Dkt. Nos. 5933, 5934, and are doing so again in the current 2014 supplemental briefing.

## III.    DISCUSSION

### A.    Safety risks

NACS's and NATO's 2011 briefs raised some safety concerns about the position and orientation of the counter displays. Specifically, they stated, it is important for store cashiers and clerks to have a clear view throughout their stores; and sightlines could be impeded in some stores if portrait-orientation signs were placed on top of checkout counters, as set out in the Court's 2006 Final Order. NACS 2011 Br. at 13-14 (Dkt. No. 5934); NATO 2011 Br. at 3 (Dkt. No. 5933). The point is well taken; reduced rates of robberies are associated with numerous factors that include clear sight-lines from the counter to the inside and to the outside of a store, as well as employee training, security systems, bullet-resistant shielding, presence of ATM machines, absence of gas pumps, good cash-handling policies, and evidence of weapons available for clerks' use.[12] The United States recommends converting "counter*top* displays" into "counter *area* displays," which may but need not be located on countertops; and allowing counter-area displays to use either portrait or landscape orientation. The United States

---

[12] Scott A. Hendricks, Douglas P. Landsittel, Harlan E. Amandus, *et al.*, *A Matched Case-Control Study of Convenience Store Robbery Risk Factors*, 41 J. Occup. Envtl. Med. 995, 1000-02 (1999).

4

recommends that the Court refer this and related topics to Judge Levie for mediation (and if need
be Reports and Recommendations).[13]

**B.      NACS's property, contractual-right, and takings arguments are misplaced**

**1.      The Court should not reach out to determine whether judicial takings claims
are cognizable**

The Supreme Court long rejected judicial takings claims as a categorical matter, *see, e.g.*,

*Brinkerhoff-Faris Trust & Sav. Co. v. Hill*, 281 U.S. 673, 680 (1930), and has yet to accept them,

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702 (2010) (splitting

4-4 on whether to recognize judicial takings claims, with Stevens, J., recused).[14]   In accord with

the doctrine of constitutional avoidance, this Court should hold, for the reasons discussed below,

that even assuming judicial takings claims are cognizable, the injunction here would not be one.

**2.      The injunction will not impair or impede any contractual or property rights**

In its 2009 decision, the D.C. Circuit stated that, "Of course, any such [point-of-sale]

remedy the district court imposes on remand can only affect contracts *entered after the injunctive

order issues*."   *Affirmance Opinion*, 566 F.3d at 1142 (emphasis added).   This statement appears

---

[13] The Court should state whether it will require point-of-sale displays to include exterior
displays to reach gasoline customers (and passengers in their vehicles) who do not enter
Participating Retailers' stores.  To address retailers' safety concerns and ensure that the Court
uses appropriate and professionally sound vehicles, the referral to Judge Levie should include the
precise locations of each type of corrective-statement display; whether ceiling-hung displays or
so-called "floor clings" should be options (see Ex. 5); and what site-specific factors, if any,
should be built into the requirements.  The Court should specify whether the guiding principle is
"effective" communication only; best marketing practices and principles; or some other standard.

[14] Even the logistic issues would raise their own constitutional problems.  "The Fifth
Amendment does not proscribe the taking of property; it proscribes taking without just
compensation."  *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194
(1985) (citing cases).  Recognizing "judicial takings" would let a disappointed litigant take an
appeal to the Court of Appeals—while also, presumably, filing a claim under the Tucker Act, 28
U.S.C. § 1491, presumably followed by suing the Article III District Court in the Article I U.S.
Court of Federal Claims.  *Cf. Stop the Beach*, 560 U.S. at 740 (Kennedy, J., concurring in part)
(querying what remedy could be afforded if "judicial takings" are recognized).

to rest on factual misapprehensions, so it will be helpful for this Court to clarify matters on the remand.

NACS makes no claim, nor could it, that Participating Retailers have any current contractual or property right *wholly* to prevent Defendants from placing corrective statements in their stores today.  (It is unclear from the contracts whether they might be able to exclude the statements from *some* parts of their stores.)  The essence of Defendants' Retail Programs is *precisely* to authorize Defendants to require retail point-of-sale displays as Defendants direct. Philip Morris's contracts require that within the Primary Cigarette Merchandising Area, specified products "and other information must be merchandised in the PM USA Portion, as designated by PM USA from time to time."  Ex. 2 at 12 (PM Retail Leader Plan, Groups I, H, and X, effective 4/1/2014).  RJR's contract provides, "Retailer will permit RJRT to choose the utilization of RJRT 'Featured Space' with regard to display type and advertising size and configuration," and that "[c]hanges in authorized location of displays and percentage of advertising, or effectiveness of location, will not be made without RJRT approval."  Ex. 3 at 1, 7 (RJR Retail Partners Marketing Plan (2012 Carton Outlet Plan – Effective 7-1-2013)).  Lorillard's Participating Retailers must "[a]llow the unrestricted placement of point-of-sale materials within Lorillard contracted merchandising displays."  Ex. 4 at 5-12, 19-20 (Lorillard 2014 contracts).[15]

---

[15] The declarations NACS submitted in 2011 further confirm that Defendants' Retailer Programs already give Defendants extensive control over the size, content, and location of the signs and displays in Participating Retailers' stores.  Broviak Decl. ¶ 9 (Dkt. No. 5934-2) ("Ricker's contracts with tobacco manufacturers also provide for signage in the stores.  Pursuant to these provisions, the companies provide us with signs promoting their brands and/or prices, and we place the signs in certain designated places in our stores."); Richardson Decl. ¶ 8 (Dkt. No. 5934- 3) ("E-Z Mart's contracts with tobacco companies also contain signage provisions, whereby the manufacturers provide us with signs promoting their brands and/or prices, and we place the signs in certain designated places in E-Z Mart stores.").  *See also* U.S. Opening 2011 Br. at 10-12 (Dkt. No. 5905).

Nonetheless, NACS contends that the injunction will impermissibly abrogate what it calls "current contracts," and urges that "to the extent the Order is applied at all, it should apply prospectively to future contracts and not alter, interfere with, or end existing agreements." NACS 2011 Br. at 18-20, 24-25.

The position is based on numerous mistakes of fact and law.  In the first instance, the injunction will not have retroactive effect; it will not apply to any conduct predating its issuance. Secondly, a contractual right can be impaired only to the extent that it exists.  As shown above, Defendants currently have the contractual right to install corrective statement displays within Participating Retailers' stores (although not necessarily in all locations within the stores).  But even if Participating Retailers' current contracts did give them a right *wholly* to exclude Defendant-required corrective-statement displays, they would have no right to indefinite perpetuation of such a hypothetical contractual right.  Just as in 2011, see U.S. 2011 Opening Br. at 15-16 (Dkt. No. 5905), Defendants can still modify or terminate Participating Retailers' contracts with minimal or no advance notice.  Philip Morris can amend its contract "at any time" and "in its sole discretion," Ex. 2 at 1, 26; RJR can amend or terminate its contracts "without cause upon ten days['] notice," Ex. 3 at 6, 10; and Lorillard can cancel its contracts "for any reason whatsoever, or no reason, at its sole discretion," Ex. 4 at 2, 14.  Distributor agreements cancelable by either party for any reason "are generally otherwise of indefinite duration, and it is therefore held that such agreements are in the nature of 'at-will' employment agreements."  19 Richard A. Lord, *Williston on Contracts* § 54:57, at 637-38 (4th ed. 2001).  Even if, hypothetically, Defendants' current contracts were not already sufficient for Defendants to require Participating Retailers to display corrective statements, Participating Retailers would not suffer a wrong or a breach of contract if Defendants used their reserved contractual powers to

7

amend or terminate the contracts to impose such requirements.  2 Joseph M. Perillo & Helen

Hadjiyannakis Bender, *Corbin on Contracts* § 6.16, at 323 (Joseph M. Perillo ed., rev. ed. 1995).

Moreover, there is no property interest in the indefinite continuation of an at-will

contract.  *Bishop v. Wood*, 426 U.S. 341, 347 (1976).  A commercial entity has no property

interest in a service contract that is terminable at will.  *Blackout Sealcoating, Inc. v. Peterson*,

733 F.3d 688, 689 (7th Cir. 2013).

A third problem with NACS's position is the mistaken notion that private contracts are

immune from disruption by government activity.  To the contrary, the government has

"'considerable leeway to fashion economic legislation, including the power to affect contractual

commitments between private parties.'"  *Nat'l Mining Ass'n v. Babbitt*, 172 F.3d 906, 917 (D.C.

Cir. 1999) (quoting *E. Enters. v. Apfel*, 524 U.S. 498, 528 (1998)).

### 3.   The injunction will not be a physical or regulatory taking

A party characterizing governmental action as an unconstitutional taking "bears a

substantial burden."  *E. Enters. v. Apfel*, 524 U.S. at 523.  NACS implausibly contends that the

injunction here would be *both* a permanent physical taking, under *Loretto v. Teleprompter*

*Manhattan CATV Corp.*, 458 U.S. 419 (1982), *and* a regulatory taking, under *Penn Central*

*Transportation Co. v. City of New York*, 438 U.S. 104 (1978).  NACS 2011 Br. at 26-28; *contra*,

*Yee v. City of Escondido*, 503 U.S. 519, 522-23 (1992) (identifying permanent takings under

*Loretto* and regulatory takings under *Penn Central* as "distinct classes").

In *Loretto*, the Supreme Court considered a requirement for landlords to let a cable

television company install cable facilities on their buildings; although the equipment occupied

only about 1½ cubic feet of space on the exterior of each building, and had only a *de minimis*

economic impact, a divided Court held that the regulation authorized a permanent physical

8

occupation of the property and thus constituted a taking.  *Loretto*, 458 U.S. at 435-38 & n.16.
The Court explained that a permanent physical occupation occurs when government action
permanently destroys a property owner's power to possess, to use, and to dispose.  *Id*. at 435-36
& n.12 (observing that "the permanent physical occupation of property forever denies the owner
any power to control the use of the property").

    The injunction here will not be a physical taking, for at least two reasons: First, retailers'
powers to possess and dispose of their property will remain undiminished, and their use of the
property will be affected, not permanently, but for two years.  *Cf. Loretto*, 458 U.S. at 436 ("the
permanent physical occupation of property forever denies the owner any power to control the use
of the property").  Second, the use of the retailers' space is not compelled.  The landlord in
*Loretto* could avoid a permanent intrusion on her property by a stranger only by ceasing to rent
to tenants.  *Id*. at 439 n.17.  By contrast, the Court held in *FCC v. Florida Power Corp.*, 480 U.S.
245 (1987), that there was no physical taking where federal regulations substantially reduced
how much rent an electric utility could charge for voluntarily leasing space on its utility poles to
cable companies.  The *Florida Power* Court explained that "it is the invitation, not the rent, that
makes the difference.  The line which separates these cases from *Loretto* is the unambiguous
distinction between a commercial lessee and an interloper with a government license."  *Florida
Power*, 480 U.S. at 252-53; *see also Yee*, 503 U.S. at 531-32.  So too here: The injunction will
affect only retailers that voluntarily participate in Defendants' Retail Programs; the tobacco
companies are hardly "interloper[s] with a government license."

    Analysis thus turns to *Penn Central*'s guidance for regulatory takings.  *Loretto*, 458 U.S.
at 440 ("So long as these regulations do not *require* the landlord to suffer the physical occupation
of a portion of his building by a third party, they will be analyzed under the multifactor inquiry

generally applicable to nonpossessory governmental activity.") (emphasis added).  A "regulatory taking" is one in which a government regulation is "so onerous that its effect is tantamount to a direct appropriation or ouster."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  The *Penn Central* inquiry considers three factors: (1) the "economic impact of the regulation on the claimant," (2) the extent to which the regulation interferes with "distinct investment-backed expectations," and finally (3) "the character of the governmental action."  *Penn Central*, 438 U.S. at 124.  This assessment is essentially an ad hoc and fact-intensive analysis to determine whether the challenged government action is simply "adjusting the benefits and burdens of economic life to promote the common good," or instead, "so frustrate[s] distinct investment-backed expectations as to amount to a 'taking.'"  *Id.* at 124, 127.

Even assuming "judicial takings" are cognizable, none of the *Penn Central* factors would favor the retailers here.  First, there is no dispute that any material economic consequences can and should be shifted to Defendants, *United States v. Sasso*, 215 F.3d 283, 292 (2d Cir. 2000) (affirming order for RICO defendant to pay portion of costs of court-ordered monitor to reduce financial burden borne by innocent union members); ordering the tobacco companies to mitigate retailers' lost profits will mitigate whatever financial burdens might otherwise arise.  As discussed below, the Court's referral for mediation (and for Reports and Recommendations if need be) should include devising appropriate formulas to compensate Participating Retailers for such potential lost profits—bearing in mind that some forms of display, such as displays suspended from the ceiling or mounted on the floor, *see* Ex. 5, would seem unlikely to have a material effect on sales of countertop merchandise.  Such mitigation of financial impacts must "be taken into account in considering the impact of regulation."  *Penn Central*, 438 U.S. at 137.

10

Second, becoming a Participating Retailer requires no capital or other investment.  There is no suggestion, for example, that store owners must make expensive alterations to their stores, purchase specialized equipment, or pay money to participate in Defendants' Retail Programs. Moreover, as discussed above, Defendants can amend or revoke their Retail Program contracts with, at most, 10 days' notice.  Consumers make larger "distinct investment-backed expectations" in their cable and cell-phone contracts than retailers do in their Participating Retailer contracts with Defendants.  Further, since at least 2007, when NACS submitted its appellate amicus brief to the D.C. Circuit,[16] it has been a salient fact of economic life for Participating Retailers that Defendants' Retail Programs might eventually require them to disseminate the corrective statements.  *Cf. Chang v. United States*, 859 F.2d 893, 897 (Fed. Cir. 1988) (holding that even though executive order led to termination of U.S. citizens' employment in Libya, they lacked distinct investment-backed expectations, in part on grounds that "those who enter into employment contracts overseas do so in light of one salient fact of economic life: that their ability to perform and compel performance is contingent upon the continuation of friendly relations between nations") (internal quotation marks and citation omitted).

Third, the character of the governmental action is "to 'reveal the previously hidden truth' about the products and 'correct Defendants' campaign of deceptive marketing' in an attempt to prevent and restrain future RICO violations."  *United States v. Philip Morris USA, Inc.*, 907 F. Supp. 2d 1, 20 (D.D.C. 2012) ("*Corrective Stmt. Opinion*") (quoting *Affirmance Opinion*, 566 F.3d at 1140), *appeal docketed*, No. 13-5028 (D.C. Cir. Jan. 30, 2013).  The retail point-of-sale environment is "one of Defendants' central vehicles for communication."  449 F. Supp. 2d at

---

[16] NACS 2007 Amicus Br., 2008 WL 2682542, *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) (*per curiam*) (No. 06-5267).

659, ¶ 3110.  Requiring Defendants to use their Participating Retailer programs to disseminate the corrective statements at point-of-sale does not "merely involve a balancing of . . . private economic interests," but is instead manifestly a public purpose.  *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485 (1987).  Even assuming if "judicial takings" can be recognized, and even if the injunction here did impose "public burdens which, in all fairness and justice, should be borne by the public as a whole," *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994), the retailers' remedy would be just compensation, not invalidation of the injunction. *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 236 (2003); *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 734 (1997).

### C.      Participating Retailers should be compensated for potential lost profits on countertop sales, and the Court should refer to mediation how to do so

Although it will not disturb Participating Retailers' property or contractual rights, it is plausible that retailers may lose some profits due to reduced sales of goods from their countertops to the extent that counter-area displays occupy or obstruct such countertops.  An NACS official states without explanation that the loss of one square foot of countertop space across the convenience-store industry could cost the industry $82 million in lost sales per year. Beckwith Aff. ¶ 10 (Dkt. No. 5394-1).  NACS asserts that "high profit" items are sold at countertop, but gives no information about what that "high profit" rate actually is.  Even assuming a profit margin as high as 30% on countertop merchandise, and that each affected store would lose all sales from 4 square feet of countertop space, the total lost profits would be slightly under $100 million—an average of about $250 per tobacco retail outlet per year.[17]  The United

---

[17] 30% sales profit * $82 million lost countertop sales per square foot of counter per year * 4 square feet of counter = $98.4 million in lost profits per year; $98.4 million / 390,000 retail tobacco outlets = $252.30 in lost profits per retail tobacco outlet per year.  Defendants would pay

States recommend that the Court include in its referral to Judge Levie the question of how much retailers should be compensated for lost profits on foregone sales of countertop merchandise. (Displays that are hung from ceilings or mounted on floors, *see* Ex. 5, if appropriate, would presumably substantially reduce such potential lost profits.)

> **D.** **The injunction will not disturb retailers' First Amendment rights**

The D.C. Circuit's 2009 Affirmance Opinion held that the corrective statements in this case will be a form of compelled commercial disclosure; that their purpose is to prevent and restrain fraud and deception; and that this Court was to develop statements that would satisfy the requirements of *Zauderer v. Office of Disciplinary Counsel of the Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985). *See Affirmance Opinion*, 566 F.3d at 1142-45. Over protests from Defendants, this Court ordered specific text for the corrective statements in this case, finding that they are purely factual and uncontroversial under *Zauderer*, are reasonably related to correcting and preventing consumer deception, and are not unjustified or unduly burdensome. *Corrective Stmt. Opinion*, 907 F. Supp. 2d at 15-24. Notably, neither Defendants nor the retailers make any claim that the injunction would chill protected commercial speech, which *Zauderer* acknowledged "might offend the First Amendment." 472 U.S. at 651.

Nearly all of this Court's First Amendment analysis in its 2012 *Corrective Statement Opinion* applies equally to the Participating Retailers' First Amendment objections. NACS's only First Amendment arguments specific to retailers are that many Participating Retailers might disagree with the corrective statements; and that consumers might wrongly conclude that Participating Retailers were implicated in some wrongdoing. NACS 2011 Br. at 14, 15, 22.

---

out only 65% of this amount, totaling less than $65 million, because only 65% of tobacco retail outlets are Participating Retailers.

Neither argument succeeds.  First, the Court has since issued specific corrective statements that it determined are purely factual and uncontroversial.  *Corrective Stmt. Opinion*, 907 F. Supp. 2d at 15-21.  A retailer's "constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal."  *Zauderer*, 471 U.S. at 651 (emphasis in original).  Second, NACS provides no plausible basis to believe that the corrective statements would prompt any genuine consumer confusion.  The corrective-statement preambles have two clauses.  The first clause explicitly says that a Federal Court has ruled that the American public was deliberately deceived by the Defendants; retail outlets are not mentioned.  The second clause explicitly says that it is the Defendants (not retail outlets) that the Court ordered to make the statements.  Three of the eighteen "Here is the Truth" bullets reference wrongdoing; all three are in Statements B (addiction) and D (manipulation), and all three explicitly attribute the wrongdoing to Defendants or to "cigarette companies."

As discussed above, Defendants' Retailer Programs already give Defendants extensive control over the size, content, and location of the signs and displays in Participating Retailers' stores.  NACS's only response is to suggest that the counter area is somehow different, because many retailers do not display tobacco advertising there.  NACS 2011 Br. at 10 (citing declarations).  But NACS overlooks that many the check-out counters at many retail outlets do in fact advertise tobacco products (such as e-cigarettes, smokeless tobacco, and cigars), just not *cigarettes*; and NACS ignores the reason, which is that 97% of Philip Morris's 190,000 Participating Retailers (some 5/6 of all participants in all Defendants' programs) accept higher Philip Morris payments in exchange for *not* displaying *cigarette* marketing on their

countertops.[18]  As shown above, Participating Retailers have no current property or contractual right to prevent Defendants from placing corrective statements in their stores today, and they identify nothing that makes First Amendment analysis of counter-area displays conceptually different from any other space in their stores.

**E.  The retailers' remaining arguments are unavailing**

Several portions of NACS's 2011 brief imply that RICO injunctions are prohibited from adversely affecting non-parties.  To the contrary, the RICO statute simply commands the Court to "mak[e] due provision for the rights of innocent persons," 18 U.S.C. § 1964(a), not to avoid all adverse impacts on non-parties.  The D.C. Circuit remanded because "third parties *may* be *so* adversely affected by an injunction *as to* render it improper."  *Affirmance Opinion*, 566 F.3d at 1142 (emphases added).

NACS's 2011 brief also contends that retailers were deprived of due process because they were not heard before the Court issued its 2006 Final Order.  NACS 2011 Br. at 21; *see also Kessler v. Surface Transp. Bd.*, 637 F.3d 369, 372 (D.C. Cir. 2011) (holding court lacked jurisdiction to unwind sale of locomotive because new owner was "an absent third party").  But the D.C. Circuit vacated the relevant portion of the 2006 Final Order and remanded to this Court precisely to ensure that the rights of innocent persons are evaluated and duly provided for. *Affirmance Opinion*, 566 F.3d at 1142.  Due process requires notice and the opportunity to be heard, *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950), and the Court has provided ample process.

---

[18] Martin Decl. ¶ 9 (Dkt. No. 5906-1).  The relevant "PMO" or "Progressive Merchandising Option" requirements are set out in the 2014 Philip Morris contract. Ex. 2 at 9, 16.  The United States previously hypothesized that as the market leader, Philip Morris may find it worthwhile to preclude countertop cigarette advertising by its competitors.  U.S. 2011 Resp. Br. at 14 -15 & n.3 (Dkt. No. 5922).

15

## IV.      CONCLUSION

For the reasons addressed above and in our 2011 briefs, the United States respectfully urges the Court to (1) set out any findings it considers it appropriate about whether Participating Retailers could currently entirely exclude corrective statement displays if Defendants were to require them today; and about the terms on which Defendants may terminate or amend the contracts; (2) hold that, even assuming that "judicial takings" are cognizable, the injunction here will be neither a physical judicial taking nor a regulatory judicial taking; (3) reinstate the retail-display component of the corrective-statement remedy; and (4) refer designated topics to Judge Levie for mediation and, if need be, for preparation of Reports and Recommendations.

Dated: June 4, 2014
      Washington, D.C.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

MICHAEL BLUME, Director
ANDREW CLARK, Assistant Director
Consumer Protection Branch

   /s/ Daniel K. Crane-Hirsch
DANIEL K. CRANE-HIRSCH
JOHN W. BURKE
LINDA M. McMAHON
Trial Attorneys
Civil Division
United States Department of Justice
P.O. Box 386
Washington, D.C. 20044-0386
Telephone:      (202) 616-8242 (Crane-Hirsch)
             (202) 353-2001 (Burke)
             (202) 307-0448 (McMahon)
Fax: (202) 514-8742
*Attorneys for Plaintiff United States of America*

16