**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA

                Plaintiff

    v.

PHILIP MORRIS USA, INC., *et al.*,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Civil Action No: 99-2496 (GK)

Next scheduled court appearance:
NONE


**NATIONAL ASSOCATION OF CONVENIENCE STORES' SUPPLEMENTAL BRIEF**
**CONCERNING ORDER #1015'S POINT OF SALE DISPLAY REQUIREMENTS**

<br>

Scott A. Sinder
Douglas S. Kantor
Douglass V. Calidas
STEPTOE & JOHNSON
1330 Connecticut Ave. NW
Washington, DC 20036-1795
(202) 429-3000

**TABLE OF CONTENTS**

**INTRODUCTION** ................................................................................................................... 1

**ARGUMENT** ........................................................................................................................... 3

**I.    THE ORDER EXCEEDS THE DISTRICT COURT'S EQUITABLE POWERS AND VIOLATES THE DUE PROCESS RIGHTS OF NACS MEMBERS** ................................................................................................................ 3

    **A.    The D.C. Circuit's Mandate Requires That the Order Be Abandoned Unless It Can Be Rewritten to Respect the Rights of Retailers** ........................ 4

    **B.    The Government and Public Health Intervenors Misunderstand the Economic Harm Posed by the Point-of-Sale Requirements** ............................ 5

    **C.    The Order Violates the Due Process Rights of Retailers** ................................. 9

**II.   THE ORDER VIOLATES THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT** ............................................................................................................ 11

**III.  THE ORDER VIOLATES THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT BY COMPELLING RETAILERS TO SPEAK** .............................. 13

**IV.   GOVERNMENT AND PUBLIC HEALTH INTERVENORS MISCONSTRUE THE DC CIRCUIT'S DECISION** ................................................ 14

**CONCLUSION** ..................................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Elrod v. Burns*,
　427 U.S. 347 (1976) ................................................................................................................. 13

*Loretto v. Teleprompter Manhattan CATV Corp.*,
　458 U.S. 419 (1982) ........................................................................................................... 11, 12

*Mullane v. Cent. Hanover Bank & Trust Co.*,
　339 U.S. 306 (1950) ................................................................................................................. 10

*Penn Central Transp. Co. v. New York City*,
　438 U.S. 104 (1978) ................................................................................................................. 11

*Shelley v. Kraemer*,
　334 U.S. 1 (1948) ..................................................................................................................... 11

*U.S. Steel Corp. v. United Mine Workers of Am.*,
　519 F.2d 1236 (5th Cir. 1975) ................................................................................................. 10

*United States v. Philip Morris USA, Inc.*,
　449 F.Supp.2d 1 (D.D.C. 2006) ......................................................................................... passim

*United States v. Philip Morris USA Inc.*,
　566 F.3d 1095 (D.C. Cir. 2009) ......................................................................................... passim

**STATUTES**

18 U.S.C. §§ 1961-1968 ............................................................................................................. 3, 14

18 U.S.C. § 1964(a) .................................................................................................................. 14, 15

**CONSTITUTIONS**

U.S. CONST. amend. I ................................................................................................................ passim

U.S. CONST. amend. V ............................................................................................................... passim

**RULES**

Fed. R. Civ. P. 65 ...................................................................................................................... 3, 9, 10

**INTRODUCTION**

On August 17, 2006, this Court issued Order #1015 (the "Order"), in which the Court authorized a series of civil remedies intended "to prevent and restrain [Defendants'] violations of RICO in the future." *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 26-27 (D.D.C. 2006). The Order, along with other injunctive relief, mandated that Defendants "require retailers who participate in [a Retail Merchandising Program] to display" corrective statements "in a position of prominent visibility," specifically on a "Countertop Display and Header Display at retail point-of-sale." Order, Dkt. 5733, at 6 (Aug. 17, 2006) ; *see* National Association of Convenience Stores' Submission Concerning Order #1015's Point of Sale Display Requirements ("NACS Opening Br."), Dkt. 5934, at 2 (May 15, 2011). The Court's Order was appealed to the D.C. Circuit.

On May 22, 2009, the D.C. Circuit vacated and remanded the Order as it pertains to point-of-sale displays. Specifically, the D.C. Circuit held that "the district court exceeded its authority by failing to consider the rights of retailers and crafting an injunction that works a potentially serious detriment to innocent persons not parties to or otherwise heard in the district court proceedings." *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1141-42 (D.C. Cir. 2009). The D.C. Circuit instructed this Court to "make due provision for the rights of innocent third parties," *id.* at 1150, and directed that this requirement could be satisfied "either by abandoning this part of the remedial order or by crafting a new version reflecting the rights of third parties," *id.* at 1142. In an Order dated May 2, 2014, this Court invited the Parties, NACS, and the National Association of Tobacco Outlets, Inc. ("NATO") to file "supplemental briefs . . . on point-of-sale displays." Order # 48-Remand, Dkt. 6085 (May 2, 2014).

NACS submitted its opening brief as a non-party "to provide the Court with an industry perspective on the issues and to help the Court understand how the Order will irreparably harm

1

NACS' members." NACS Opening Br. at 1.  In this Opening Brief, NACS emphasized a fact that may not have been obvious to the Court at the time that the Court drafted the challenged point-of-sale remedy contained in Order #1015—namely, that enforcement of the point-of-sale display requirement would occasion financial losses on the part of NACS' members that may be so detrimental as to "threaten the viability of many of these businesses." *Id.* at 13.

In the three years that have elapsed since NACS filed its Opening Brief, nothing has changed that would warrant a reappraisal of this assessment.  For NACS and its members, the point-of-sale display requirement was viewed as a serious problem at the moment it was announced and it will remain a threat unless and until this Court rules that the point-of-sale display requirement will not be reinstated.  A display such as the one mandated by the Order is unprecedented in merchandising contracts entered into between manufacturers of tobacco products and retailers, *see* Affidavit of Keith Broviak ("Broviak Aff."), Ex. B, at ¶ 13; Affidavit of Robert Richardson ("Richardson Aff."), Ex. C, at ¶¶ 11-13; Affidavit of Matthew Paduano ("Paduano Aff."), Ex. D, at ¶¶ 14-16, and enforcement of the point-of-sale display requirement would take the value of some of retailers' most valuable retail space and eviscerate the already-narrow store-wide profit margins[1] under which many retailers operate.  Because retailers are not now and never have been parties to this case, the imposition of such a penalty against retailers exceeds the Court's equitable powers and violates the due process and takings clauses of the Fifth Amendment.  By the same token, requiring retailers to promulgate messages with which they disagree constitutes compelled speech that violates the First Amendment.  Accordingly,

---

[1] It is critical to distinguish between the store-wide operating margins for retail stores, which are notoriously thin, and the profit margins yielded from incremental sales of particular items at the point-of-sale.  Margins from these incremental transactions are high and critical to maintaining overall profitability.  *See infra* Part I.B; Broviak Aff., Ex. B, at ¶¶ 16-17; Richardson Aff., Ex. C, at ¶ 14.

2

NACS reiterates its request that this Court abandon the point-of-sale requirements in Order #1015 and focus exclusively on the defendants rather than burdening third parties.

**ARGUMENT**

**I.     THE ORDER EXCEEDS THE DISTRICT COURT'S EQUITABLE POWERS AND VIOLATES THE DUE PROCESS RIGHTS OF NACS MEMBERS**

As explained in detail in NACS' Opening Brief, the fundamental problem with the point-of-sale display requirement is that it impermissibly burdens retailers, "innocent third parties" who are not and have never been parties to this litigation and whose conduct was not challenged during this litigation.  In short, retailers are being punished and deprived of their prerogative to make use of some of the most valuable space in their stores—not as a result of any wrongdoing on their part, but because the co-opting of retailers' property is viewed as an ostensibly necessary method of counteracting previous public statements disseminated by Defendants.

Insofar as the punishment of innocent third parties is repugnant to fundamental conceptions of fairness and justice, it is not surprising that this Order implicates the protections of several different sources of law, including the Fifth Amendment's due process clause, the Fifth Amendment's takings clause, limits on the permissible scope of injunctive relief under Federal Rule of Civil Procedure 65, requirements for the formulation of civil remedies under RICO, and the free speech clause of the First Amendment.  In their zeal to disseminate information regarding the adverse health consequences of tobacco products, the Government and the Public Health Intervenors have sought to minimize or brush over the very real legal problems presented by the point-of-sale display requirement.  Rather than revisit each of the arguments laid out in NACS' Opening Brief, NACS will use this supplemental submission to identify and correct some of the more glaring misrepresentations and distortions in the Government's and the Public Health Intervenors' previous submissions.

3

### A. The D.C. Circuit's Mandate Requires That the Order Be Abandoned Unless It Can Be Rewritten to Respect the Rights of Retailers

Both the Government and the Public Health Intervenors have taken the position that the D.C. Circuit's opinion in this case did little more than request "this Court to simply 'consider the rights of retailers' in fashioning a remedy" upon remand. *See* Public Health Intervenors' Opening Brief Regarding Corrective Statements in Point-of-Sale Displays ("Intervenors' Opening Br."), Dkt. 5903, at 5 (April 1, 2011); United States' Response Brief on Retail Point of Sale ("U.S. Resp. Br."), Dkt. 5922, at 2 (April 15, 2011) ("The D.C. Circuit held only that the Court has erred 'by failing to *consider* the rights of retailers' before issuing its 2006 Final Order.").

Such a narrow reading of the D.C. Circuit's mandate is untenable and ignores critical language in the D.C. Circuit's opinion that specifically identifies the legal infirmities of the point-of-sale display requirements. Specifically, the D.C. Circuit held that "the district court *exceeded its authority* by failing to consider the rights of retailers and crafting an injunction that works a *potentially serious detriment to innocent persons not parties to or otherwise heard* in the district court proceedings." *Philip Morris*, 566 F.3d at 1141-42 (emphases added). Accordingly, the D.C. Circuit remanded the case for this Court to accommodate the rights of third party retailers "either by abandoning this part of the remedial order or by crafting a new version reflecting the rights of third parties." *Id.* at 1142 (citation omitted).

While the Government concedes that the D.C. Circuit directed this Court "to make due provision for the rights of innocent third parties," U.S. Resp. Br. at 3, the Government conspicuously ignores the D.C. Circuit's sharp criticism of the detrimental impact of the point-of-sale display requirements. The D.C Circuit's mandate is clear – the point-of-sale display requirements are to be abandoned in full unless this Court can craft a new remedy that

4

sufficiently respects the rights of innocent third-party retailers. While NACS believes that the point-of-sale display requirements are so clearly adverse to the economic and expressive interests of retailers that they must be abandoned, the Government and the Public Health Intervenors to date have not even attempted to suggest how the point-of-sale remedy may be redesigned in a way that might "respect the rights" of retailers in accordance with the D.C. Circuit's mandate.[2]

### B. The Government and Public Health Intervenors Misunderstand the Economic Harm Posed by the Point-of-Sale Requirements

As NACS discussed at length in its opening brief, forcing retailers to sacrifice countertop space at the point-of-sale that the D.C. Circuit recognized as "the most important space within a convenience store" to comply with Order #1015's point-of-sale display requirements would result in a substantial loss of revenue for retailers that could cripple many of the independent owners in this low-margin industry. *See Philip Morris*, 566 F.3d at 1141; Broviak Aff., Ex. B., at ¶¶ 13-17; Richardson Aff., Ex. C, at ¶ 14. Meanwhile, retailers who "choose not to carry the countertop displays" and accept suspension from Defendants' "retail merchandising programs for one year" could sacrifice "ten to fifteen percent" of their annual profits. *Philip Morris*, 566 F.3d at 1141 (quoting Hartman Aff. at 2). These costs present a grave threat to the very business model under which retailers operate. *See* Richardson Aff., Ex. C, at ¶¶ 7, 17.

Yet the Government and the Public Health Intervenors continue to downplay the economic pain that enforcement of the point-of-sale display remedy would visit upon retailers. *See* U.S. Resp. Br. at 1 (dismissing Defendants' description of retailers' anticipated losses as a

---

[2] The only revision to the original point-of-sale display remedy that the United States and the Public Health Intervenors have made is a recognition that the order should not "require duplicative displays." *See* Intervenors' Opening Br. at 2; *Philip Morris*, 566 F.3d at 1142. This prohibition of duplicative displays was a separate clarification of the D.C. Circuit's understanding of Order #1015 and does not come close to addressing the concerns expressed by the D.C. Circuit.

5

"parade of horribles"); Intervenors' Response Br. at 4 (describing retailers' concerns as "minor economic interests"); *id.* at 7 (portraying retailers' lost revenue as a "extremely minor costs" and disaffirming the D.C. Circuit's assertion that the Order's cost to retailers may constitute a "serious detriment"). The losses that retailers would suffer as a result of Order #1015's point-of-sale display requirements are not conjectural. As explained at length in NACS' Opening Brief, enforcement of the point-of-sale requirements "would lead to significant losses for retailers" no matter how retailers choose to comply with the requirements. NACS Opening Br. at 5.

The Government and the Public Health Intervenors misunderstand the calculations used to arrive at some of the loss estimates presented by NACS in its Opening Brief. Specifically, the Government and the Public Health Intervenors have misinterpreted one particular estimate provided by Lyle Beckwith, NACS' Senior Vice President for Government Relations in 2006. *See* Beckwith Aff. (Ex. A to NACS Opening Br.). In paragraph 10 of his affidavit, Mr. Beckwith stated that "NACS conservatively estimates that the loss of *one square foot of countertop space* could cost the industry $82 million in sales per year." *Id.* ¶ 10 (emphases added). Without paying attention to the italicized terms, the Government and the Public Health Intervenors took this estimate out of context and used it to produce a series of ludicrous estimates regarding the expected harm to retailers that are entirely outside the realm of reasonable forecasting. *See* U.S. Resp. Br. at 12 ("[B]ased on the [Beckwith] affidavit, Intervenors calculated that the lost *revenue* would average less than $2.50 per day, per store, and the lost *profits* would average less than 5 cents per store.") (citing Intervenors' Opening Br. at 4, 12).

These calculations demonstrate a complete misapprehension of the terms and assumptions used by Mr. Beckwith in reaching his original calculation. The Government and the Public Health Intervenors produced their per-store revenue and profit calculations by dividing

6

Mr. Beckwith's industry-wide estimate by the *total number* of stores of any kind that sell tobacco in the United States. *See* Affidavit of Lyle Beckwith ("Beckwith Aff."), Ex. A, at ¶ 12. This includes grocery stores, drug stores, tobacco shops and many others. *Id.* However, Mr. Beckwith did not use the total number of stores that sell tobacco in the United States in preparing his industry-wide estimate; instead, he accounted *only* for the number of convenience stores. *See id.*; Beckwith Aff., Ex. A to NACS Opening Br., at ¶ 10. Moreover, Mr. Beckwith provided an estimate of the industry-wide cost of one square-foot of countertop space; the point-of-sale displays contemplated by Order #1015 would require significantly more than one square foot of space, resulting in a higher total loss estimate. *See* Beckwith Aff., Ex. A, at ¶ 12. In Mr. Beckwith's updated affidavit in support of this supplemental brief, he makes clear the methodology by which he arrived at his calculation. *See id.* at ¶ 10. Using the same methodology, Mr. Beckwith has provided an updated estimate placing the industry-wide value of the loss of one square foot of countertop space at $201.5 million.[3] *Id.* Again, this only accounts for convenience stores and only accounts for one square foot lost. Based on these figures, each store required to display the sign would lose at least $667 per square foot. And the signs would likely make at least 5-6 square feet of space unusable. *Id.* And that is for a single sign. As noted by Mr. Beckwith, if stores with multiple points of sale are required to have a sign at each point of sale (as the Order on its face may require), the square feet and revenues lost per store would increase accordingly. *Id.*

The confusion by the Government in assuming that a "free-standing display with a minimum height of 30 inches and a minimum width of 18 inches," *United States v. Philip Morris*

---

[3] Mr. Beckwith prepared his original affidavit in 2006. Since that time, "[t]he value of countertop space has increased substantially" for two separate reasons: the popularity of new high-margin items such as energy "shots" and significant increases in the prices of commodities used as ingredients in common snack items. Beckwith Aff., Ex. A, at ¶ 11.

7

*USA, Inc.*, 449 F. Supp. 2d 1, 946 (D.D.C. 2006), would only take up 1 square foot of counter space shines a spotlight on the lack of consideration given to this requirement. In fact, counter space at the point of sale in retail locations varies significantly in depth and configuration. Stores with multiple points of sale might lose many square feet of counter space to such signs. In fact, some stores will have counters that cannot accommodate signs of that size at all. The Order simply has not and cannot account for all the differing store formats in the industry without both harming these businesses and creating confusion about what is actually required.

Both the Government and the Public Health Intervenors have also conflated the distinct metrics used to calculate store-wide profit margins with the profit margin on incremental sales of high-margin items placed at the point-of-sale to reach an incorrect estimate of the economic impact of the point-of-sale displays. *See* U.S. Resp. Br. at 3; Intervenors' Opening Br. at 12 & n.6. Using an estimate provided by Chris Newton, President of the Texas Petroleum Marketers and Convenience Store Association, who estimated the razor-thin profit margins for convenience stores as being "under 2 percent," the Public Health Intervenors purported to multiply this figure by their previous miscalculation of lost revenue derived from Mr. Beckwith's affidavit. *See* Intervenors' Opening Br. at 12 ("Given that retailers generally earn no more than 2 percent profit on their sales, this translates into *a lost profit of about 5 cents per day*.").

This calculation is meaningless and demonstrates the Intervenors' lack of understanding of the business model under which retailers operate. As stated above, the "profit margin" identified by Mr. Newton is the profit margin for *convenience stores as a whole*, reached by comparing all costs – including the major fixed costs of land and property leases, labor, taxes, and utilities – with the total revenue generated by the store. By contrast, profit margins on the incremental sale of individual items recognize that the fixed costs are already expended when

8

retailers attempt to get customers to purchase something additional at the point of sale. These incremental sales are of items with very high margins that contribute significantly to store profitability. *See* Broviak Aff., Ex. B, at ¶¶ 16-17.

The Government and Public Health Intervenors also ignore other economic injuries to convenience stores caused by the order. The messages on the signs, for example, would result in losses of customers and losses of customer good will. *See* Paduano Aff., Ex. D, at ¶¶ 19-20. Alternatively, the loss of contracts with tobacco manufacturers would result, for example, in Nice N Easy Grocery Shoppes losing $1,000 to $1,500 per week per store before even calculating the lost sales that would result from being undercut on price by its competitors. *Id.* at ¶ 9; *see also* Broviak Aff., Ex. B, at ¶¶ 6, 26 (discussing lost sales due to loss of tobacco manufacturer contracts or customer goodwill).

The calculations provided by the Government and Public Health Intervenors make incorrect assumptions and use incorrect figures for stores in the industry. They are simply not reliable. The threat presented to retailers by the point-of-sale display requirements in Order #1015 is very real, and nothing has taken place in the past three years to change that conclusion.

### C. The Order Violates the Due Process Rights of Retailers

As discussed at length in NACS' Opening Brief, the Due Process Clause of the Fifth Amendment requires that persons "not be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V; *see* NACS Opening Br. at 20-21. Federal Rule of Civil Procedure 65(d)(2) provides that a valid injunction "binds only . . . the parties; the parties' officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participation with" the parties or their agents. Fed. R. Civ. P. 65(d).

Indeed, Federal Rule 65's limitations on the equitable powers of federal courts were not fashioned out of thin air. Rather, the scope of injunctive relief available under Rule 65

"embodies the elementary due process requirement of notice." *U.S. Steel Corp. v. United Mine Workers of Am.*, 519 F.2d 1236, 1246 (5th Cir. 1975) (citation omitted). Accordingly, the inquiry under Rule 65 and the due process issues in this case naturally converge into a single fundamental inquiry: were retailers provided with the baseline elements of process such that they could be deprived of valuable property as a result of this Court's order?

The answer to that inquiry must be "no." Notice and the opportunity for a hearing are the fundamental due process requirements that must be met before a person may be deprived of his property. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). As discussed in NACS' Opening Brief, NACS and its members are not parties to this case or any other relevant litigation and have never been afforded the opportunity for an evidentiary hearing. NACS Opening Br. at 20.

By forcing retailers to choose between sacrificing valuable counter space to carry public health messaging or forgo anticipated advertising and promotional revenue long collected from the tobacco industry, "[t]he Order's provisions for retailers are tantamount to sanctions: They sacrifice retailers' revenues either through lost sales or lost revenue from manufacturers." Beckwith Aff., Ex. A, at ¶ 13. A review of the structure and text of the Order supports Mr. Beckwith's understanding of the Order and reveals that it unquestionably targets retailers with coercion:

> Each Defendant that utilizes a Retail Merchandising Program *shall require retailers* who participate in such program to display each Countertop Display in a position of prominent visibility for the entire four month period . . . . Each Defendant that utilizes a Retail Merchandising Program *shall require retailers* who participate in such program to display each Header Display in an equivalent position with any other brand advertising header for the entire period on the same schedule . . . . Each Defendant *shall suspend* from its Retail Merchandising Program for a period of one year *any retailer that fails to comply* with this provision.

10

Order at 5-6 (emphases added).

While the Order is nominally directed at Defendants, the italicized terms make it clear that the point-of-sale display requirements specifically burden retailers, whose "failure to comply" will trigger sanctions imposed by Defendants, who are effectively made to serve as the Court's chosen agents in enforcing this remedy. This type of coercion is exactly what the D.C. Circuit had in mind when it stated that "[e]ven though not explicitly bound by the terms of an injunction on pain of contempt, third parties may be so adversely affected by an injunction as to render it improper." *Philip Morris*, 566 F.3d at 1142.

## II.   THE ORDER VIOLATES THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT

The Fifth Amendment's takings clause is closely related to the due process clause. While the due process clause prevents the government from depriving a person of his property without due process of law, the takings clause prevents the government from simply commandeering the property outright. "It is well-established that 'state action' can occur through judicial decrees," NACS Opening Br. at 25 (citing *Shelley v. Kraemer*, 334 U.S. 1, 14 (1948)), and "[t]he Order's requirement that large signs cover the point of sale counter space in retail locations is a regulatory taking as defined by *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978)." *Id.* at 27.

In fact, the Government's commandeering of retailers' most valuable space (countertop space) for the purpose of disseminating corrective messages can be recognized as a "physical invasion" that constitutes a *per se* taking under the Fifth Amendment. The Supreme Court recognized the seriousness of physical occupations in the landmark case of *Loretto v. Teleprompter Manhattan CATV Corporation*:

11

> Property rights in a physical thing have been described as the rights "to possess, use and dispose of it." To the extent that the government permanently occupies physical property, it effectively destroys each of these rights. First, the owner has no right to possess the occupied space himself, and also has no power to exclude the occupier from possession and use of the space. The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights. Second, the permanent physical occupation of property forever denies the owner any power to control the use of the property; he not only cannot exclude others, but can make no nonpossessory use of the property.

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) (citations omitted). While the *Loretto* case featured a permanent physical occupation of private property as opposed to the finite multi-year term required under Order #1015 for point-of-sale displays, the Supreme Court's description of harm to property rights occasioned by a small-scale physical occupation is directly on point. "Such an appropriation is perhaps the most serious form of invasion of an owner's property interests. To borrow a metaphor, the government does not simply take a single 'strand' from the 'bundle' of property rights; it chops through the bundle, taking a slice of every strand." *Loretto*, 458 U.S. at 435.

The loss of countertop space would have a "profound and adverse effect on NACS member companies." NACS Opening Br. at 3. As explained at length in NACS' Opening Brief, compliance with the point-of-sale display requirements would interfere with retailers' careful design of the physical layout of their stores, markedly increase security risks, and interfere with retailers' use of countertop space, "the single most important marketing space within a convenience store." Beckwith Aff., Ex. A, at ¶ 9; *see* Broviak Aff., Ex. B, at ¶¶ 18, 20; Richardson Aff., Ex. C, at ¶¶ 20-22. Forcing retailers to accept imposition of the point-of-sale displays within their physical locations constitutes a taking under the Fifth Amendment, and is unconstitutional absent the payment of just compensation.

### III. THE ORDER VIOLATES THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT BY COMPELLING RETAILERS TO SPEAK

Both the Government and the Public Health Intervenors fail to recognize the First Amendment burden that Order #1015 places upon retailers' speech. Neither the Government nor the Public Health Intervenors in their earlier briefs confronted the fact that *retailers* are being compelled to promulgate statements with which they may not agree and which may damage their reputation with customers.

Instead, the Government pretended that because the Order is nominally directed at Defendants, its compulsive effect upon retailers' speech is merely incidental. *See* U.S. Resp. Br. at 17 ("[T]here is no government compulsion. Retailers who find the content of the required displays and signs offered under Defendants' current retail programs disagreeable are free not to enroll; retailers who find the content of the required displays and signs offered under the programs as modified by the Court order will be equally free not to enroll."). The Public Health Intervenors can do no better. *See* Intervenors' Resp. Br. at 9 ("[T]he remedy does not require retailers to do or say anything – it simply requires that, if they want to participate in Defendants retail merchandising programs, they must make the point-of-sale venue available for corrective communications imposed on the Defendants designed to prevent and restrain further fraud.").

This distinction does not remove the First Amendment problem. The order compels speech by retailers on sanction of lost revenue. That is no choice at all. Rather, "[t]he loss of First Amendment freedoms, even for minimum periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The Government did not even consider the fact that retailers may well disagree with the content of the corrective statements. *See* Broviak Aff., Ex. B, at ¶ 26; Richardson Aff., Ex. C, at ¶¶ 16, 18-19; Paduano Aff., Ex. D, at ¶ 19. When retailers agree to serve as conduits for tobacco

product advertising, the retailers have negotiated with the tobacco companies and determined what particular advertisements they will carry. Here, no such negotiation has taken place or could take place—retailers are required to carry such corrective statements *or else* the retailers must forfeit their contracts with tobacco companies and the associated revenue from those agreements. *See Philip Morris*, 449 F. Supp. 2d at 940. This heavy-handed attempt to use retailers as messengers for the promulgation of information regarding the adverse health consequences of smoking is exactly the type of "harm to innocent third parties" that the D.C. Circuit sought to prevent, and such "forced speech" violates retailers' First Amendment rights. *See* NACS Opening Br. at 21.

### IV. THE GOVERNMENT AND PUBLIC HEALTH INTERVENORS MISCONSTRUE THE DC CIRCUIT'S DECISION

As the D.C. Circuit recognized, RICO "explicitly cautions that in crafting an injunctive remedy the court must 'mak[e] due provision for the rights of innocent persons.'" *Philip Morris*, 566 F.3d at 1141 (quoting 18 U.S.C. § 1964(a)). The D.C. Circuit specifically identified retailers as being the "innocent persons" whose rights the district court must consider under § 1964(a) in fashioning an equitable remedy:

> Retailers affected by this order—none of whom were involved in the litigation in any way—did not receive notice of this remedy or an opportunity to present evidence or arguments to the district court regarding the impact the injunction would have on their businesses. Nor does it appear that the district court independently considered the impact of this program on affected retailers.

*Philip Morris*, 566 F.3d at 1141.

Rather than follow the D.C. Circuit's mandate and suggest a revised remedy that properly considers the rights of retailers, both the Government and the Public Health Intervenors have attempted to minimize the impact of the D.C. Circuit's holding by setting up a false parallel between innocent third party retailers and consumers in general. *See* U.S. Resp. Br. at 2, 21

14

("The consumers whom Defendants seek to keep from receiving effective point-of-sale communications must be considered in addition to the retailers . . . . These consumers are surely as much 'innocent persons' as retailers"); Intervenors' Response Br. at 3 ("[I]n considering the 'rights of innocent persons' here, the Public Health Intervenors urge the Court to bear in mind the rights of the millions of innocent *consumers* . . . . ").

The Government and the Public Health Intervenors do violence to the text and structure of § 1964(a) to identify American consumers as "innocent persons not parties to or otherwise heard in the district court proceedings" whose rights require particularized attention in fashioning a civil remedy for Defendants' violations. *See Philip Morris*, 566 F.3d at 1141-42. Nor may American consumers be considered "third parties who may be so adversely affected by an injunction as to render it improper." *See id*. at 1142. The DC Circuit's opinion on point of sale messages was not directed at consumers' rights.

## CONCLUSION

For the foregoing reasons, NACS respectfully urges this Court to abandon the point of sale message requirements of Order #1015.

Dated: June 4, 2014

                                          Respectfully submitted,

                                          Scott A. Sinder
                                          Douglas S. Kantor
                                          Douglass V. Calidas
                                          STEPTOE & JOHNSON LLP
                                          1330 Connecticut Avenue, N.W.
                                          Washington, DC 20036-1795
                                          (202) 429-3000