# EXHIBIT A

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

-----------------------------------------------------------------x
UNITED STATES OF AMERICA,                            :
                                                     :
               Plaintiff,                    : Civil Action No. 99-2496 (GK)
                                                     :
TOBACCO-FREE KIDS ACTION FUND,                       :
AMERICAN CANCER SOCIETY, AMERICAN                    :
HEART ASSOCIATION, AMERICAN LUNG                     :
ASSOCIATION, AMERICANS FOR                           :
NONSMOKERS' RIGHTS, and NATIONAL                     :
AFRICAN AMERICAN TOBACCO                             :
PREVENTION NETWORK,                                  :
                                                     :
               Intervenors,                 :
                                                     :
PHILIP MORRIS USA, Inc.,                             :
(f/k/a Philip Morris, Inc.), *et al*                 :
                                                     :
               Defendants,                  :
-----------------------------------------------------------------x

## AFFIDAVIT OF LYLE BECKWITH

**LYLE BECKWITH**, being duly sworn, deposes and says:

1. I am the Senior Vice President for Government Relations of the National Association of Convenience Stores ("NACS").

2. NACS, founded in 1961, is organized as a not-for-profit trade association pursuant to Section 501(c)(6) of the United States Tax Code to represent the interests of the convenience story industry. The association operates throughout the United States to represent, advance, and protect the full interests of convenience stores through the political process and the courts, and is an integral part of the convenience store industry's success through its annual convention and trade show as well as education and standard-setting programs.

3. The U.S. convenience store industry, with 151,282 stores across the country, posted $695.5 billion in total sales for 2013, with $491.5 billion in motor fuels sales. In addition to cigarettes, in-store sales include items such as snacks, beverages, lottery tickets, ready-to-eat foods, and over-the-counter cold and flu products. Industry-wide, sales of cigarettes and other tobacco products account for 37 percent of in-store (non-motor fuel) sales. The United States convenience store industry sells 86.3% of all cigarettes sold in the United States, and 91.8% of all other tobacco products. We are the dominant channel of trade for tobacco products. There are approximately 20.6 million tobacco transactions per day in convenience stores.

4. The industry employs about 2.2 million workers across the nation. It is an industry of small businesses. 62.8 percent of convenience stores are owned by one-store operators.

5. The vast majority of NACS members have retail merchandising agreements with at least one cigarette manufacturer. Many NACS members have agreements with multiple cigarette manufactures.

6. NACS members that have retail merchandising agreements derive a significant portion of their store revenues from these agreements.

7. The Final Judgment and Remedial Order in this litigation (the Order) punishes NACS members even though they were not parties to the case and have not had the opportunity to participate in it. In particular, the requirement that retailers agree to have countertop and header displays in their stores communicating messages relating to this case at the risk of losing their retail merchandising agreements is coercive.

8. Retailers are treated very differently than newspapers and television networks under the Order without justification. The Order presents retailers with a lose-lose proposition: comply with the Order and compromise their business model and revenues; or fail to comply with the Order and forfeit revenues generated from merchandising agreements. Newspapers and television networks face only the prospect of increased business from the Order because the defendants will buy advertising space or time from them. They do not face the choice that NACS members will of either forfeiting a significant revenue stream or forfeiting sales. Manufacturers will have no reason to compensate retailers for including the Order's requirements into merchandising agreements because the Order will prohibit agreements that do not incorporate those requirements.

9. The countertop displays will interfere with standard industry retail business models. Countertop space is the single most important space within a convenience store. Retailers depend on this limited counter space for existing marketing and "impulse" sales.

10. The sales that NACS members would lose if they use counter space for the displays required by the Order are large. NACS estimates that the loss of one square foot of countertop space could cost the industry $201.4 million in sales per year. The point-of-sale display requirement would affect approximately 151,000 stores, which produces an industry-wide cost of $201.4 million per year per square foot of countertop space. Depending on the size and design of the countertop displays envisioned by the Order, the amount of space lost could be substantially more than one square foot and will likely make a full five to six feet of space unusable.

11. The value of countertop space has increased substantially since 2006. In the past 8 years, energy "shots," a high-margin item, have become increasingly popular and commonly purchased as impulse purchases at the point of sale. During the same time period, the sales of e-cigarettes have increased from virtually no sales in 2006 to sales of approximately $700 million in 2013. More categories of products now compete for counter space, and because the prices of commodities such as sugar, tobacco, wheat, and milk have and risen over the last three years, manufacturers have raised prices for finished products, including candy, snack bars, meat snacks, and others that contain these ingredients.

12. In an affidavit I prepared on behalf of NACS in 2006, I previously provided an industry-wide estimate of the value of one square foot of lost countertop space. It is my understanding that parties to this lawsuit have purported to use my estimate to produce per-store revenue and profit calculations. Those calculations are not accurate. In particular, these parties appeared to divide my industry-wide estimate by the total number of stores of any kind that sell tobacco in the United States. These stores include grocery stores, drug stores, tobacco shops and many others. However, I included only the total number of convenience stores in arriving at my estimate in my last affidavit and in this one. My estimate also considered the value of only one square foot of lost countertop space and it is clear that the large signs contemplated in this case would make a full 5-6 square feet of counter space unusable for product displays. And that is for just one sign. If multiple signs were required, for example at stores with more than one point of sale, the counter space and corresponding monetary losses would be higher.

13. The Order seeks to force retailers to convey the court's messages to customers under a threat of economic loss without regard to whether the retailers agree with those messages. Retailers, for example, may object to the messages because they carry an implication that the retailers engaged in some wrongdoing.

14. The Order's provisions for retailers are tantamount to sanctions: They sacrifice retailers' revenues either through lost sales or lost revenue from manufacturers.

6/3/14
Date

Lyle Beckwith

Sworn to before me this
3rd day of June 2014.

Notary Public

JEANETTE AGBEMBLE
Notary Public
Commonwealth of Virginia
7538907
My Commission Expires Mar 31, 2017