**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>**Plaintiff,**<br><br>**v.**<br><br>**PHILIP MORRIS USA INC.,**<br>**f/k/a PHILIP MORRIS INC., et al.,**<br>**Defendants.** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Civil No. 99-CV-02496 (GK)**<br><br>**Next scheduled court**<br>**appearance:  None** |

**UNITED STATES' RESPONSE SUPPLEMENTAL BRIEF**
**ON RETAIL POINT OF SALE**

I.      INTRODUCTION ........................................................................................................1

II.     DISCUSSION...............................................................................................................1

      A.      Cigarette retailers display nearly 30 tobacco marketing items apiece ...................1

      B.      A brief history of Defendants' control over displays in retailers' stores................2

      C.      A range of point-of-sale marketing materials are available to address all relevant
            store environments.................................................................................................5

      D.      The Court should not reduce the number of displays at retail outlets...................6

      E.      Defendants should bear the economic effects of reinstating the point-of-sale
            media channel.........................................................................................................7

      F.      The retailers' constitutional arguments are unavailing........................................8
           1.   The injunction will not disturb retailers' First Amendment rights.............8
           2.   The injunction will not be a taking or violate property or contract rights .10

III.    CONCLUSION.............................................................................................................10

## I.    INTRODUCTION

The 2014 opening point-of-sale briefs reveal at least three important areas of agreement:

- Corrective statements placed on top of counters should not be allowed to obstruct clerks' views of the interiors of their stores;

- If corrective statements are placed directly on top of counters, retailers are likely to lose some profits from lost sales (although the parties dispute the quantum); and

- The variety of retail store environments will require multiple specifications to place the corrective statements.

As demonstrated in the attachments, there are many ways to display substantive signs at the point of sale without blocking clerks' views of their stores.  Exs. 1-5.  Neither Defendants nor the retailer trade groups claim that the Court lacks authority to order Defendants to assume whatever financial burdens retailers incur; nor is there any claim that it would be difficult to determine those financial burdens.  Finally, Defendants have successfully partnered for many years with retailers of all sizes, and there is no claim that placement specifications cannot be devised to address the variety of retailers with which Defendants have contracts.  The Court should reinstate the point-of-sale remedy, and refer the parties to mediation with directions to apply best marketing practices and principles to prepare specifications to implement the remedy.

## II.    DISCUSSION

### A.    Cigarette retailers display nearly 30 tobacco marketing items apiece

New study findings confirm that the point-of-sale venue is an increasingly important way to reach consumers and potential consumers of tobacco products.  In a nationally-representative sample of 2,231 U.S. cigarette retailers, researchers found that 96% of retailers displayed at least

one tobacco marketing item, and that an average of 29.5 tobacco marketing items are displayed at cigarette retailers, 26 of them indoors.[1]

## B.  A brief history of Defendants' control over displays in retailers' stores

The United States' major cigarette manufacturers—all defendants in this lawsuit— "vigorously compete for in-store display space and advertising by offering promotional payments and discounts for advantageous promotional space in stores." *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 369 (M.D.N.C. 2002), *aff'd*, 67 Fed. App'x 810 (4th Cir. 2003) (per curiam).  As the court observed in the lawsuit brought by R.J. Reynolds, Lorillard, and Brown & Williamson against Philip Morris's new Retail Leaders program, the companies' retail programs reflect "[t]he critical importance of brand visibility and display space at the point of purchase." *Id.*  Product display is promotion.

Under the industry-leading Philip Morris "Retail Masters" program that ran through the late 1990s, countertop displays were *required*.[2]  The major innovation introduced by Philip Morris's current "Retail Leaders" program is to replace retail stores' historical "*package fixture*"[3] with "a remarkably flexible *industry* fixture which places all of the cigarette products in a store into one convenient location."[4]  A study commissioned by Philip Morris in the mid-1990s determined that "the best, most visible, point of sale spots were 'on the counter, behind the counter or cashier, and on and around the door.'" *United States v. Philip Morris USA Inc.*, 449 F. Supp. 2d 1, 660 at ¶ 3114 (D.D.C. 2006), *aff'd in part & vacated in part*, 566 F.3d 1095 (D.C.

---

[1] Ctr. for Pub. Health Systems Science, Washington Univ. in St. Louis, *Point-of-Sale Report to the Nation: The Tobacco Retail and Policy Landscape* 7 & fig. 7 (2014).

[2] Ex. 6 ("Discussion Draft: Retail Leaders Article," 2071826035/6040 at 6039) (describing counter displays under Retail Masters as "mandatory").

[3] Ex. 7 (RJR, "Key Points About Retail Leaders," 519754859 at ¶ 9) (emphasis added).

[4] Ex. 6 ("Discussion Draft," 2071826035/6040 at 6035) (emphasis added).

Cir. 2009) (per curiam), *cert. denied*, 561 U.S. ___, 130 S. Ct. 3501 (2010).  In accord with these

study findings—and also to reduce visual clutter, create a single "category" department, and

adapt to state and local bans on self-service fixtures—Philip Morris located the new industry

fixture behind sales counters.  The cigarette industry fixture is a "back bar display," [5] "designed

to accommodate brand promotions and signage, while conforming to applicable display

regulations," [6] with Philip Morris signage dominant. [7]   One of the "Retail Leaders Principles" is

to "[d]isplay promotions in a highly visible location." [8]  Retail Leaders contracts require all Philip

Morris cigarettes to be "merchandised such that they are clearly visible and proximate to adult

tobacco consumers"; any merchandising displays "must be placed behind the Selling Counter in

[a non-self-service] location in open view to adult tobacco consumers."  Ex. 11 (PM Groups I, H

and X, at PDF pages 12, 15.) [9]

Against this background, it is puzzling that NACS tells the Court that a mandatory

signage requirement would be "unprecedented."  NACS 2014 Opening Br. at 2 (Dkt. No. 6101).

In August 2003, Philip Morris introduced, with immediate effect, a new Underage Cigarette

Sales Prevention Policy, a major component of which required mandatory posting of at least two

---

[5] *Id.* at 6039 (capitalization altered).

[6] *Id.* at 6035.

[7] Ex. 8 ("Top-to-Top March 1999: Retail Leaders Agenda," 2078285485/5499 at 5495).

[8] Ex. 9 (PM presentation, Travel Centers of America: Retail Leaders, 520657230/7247 at 7233).

[9] Retailers and Defendants share substantial economic incentives for such requirements. Retail pack displays themselves trigger smoking urges, prompt sales, and reduce the chance that smokers who try to quit will succeed.  M. Wakefield, D. Germain & L. Henriksen, *The Effect of Retail Cigarette Pack Displays on Impulse Purchase*, 103 Addiction 322 (2008); D. Germain, M. McCarthy & M. Wakefield, *Smoker Sensitivity to Retail Tobacco Displays and Quitting: A Cohort Study*, 105 Addiction 159 (2010).

"We Card" signs or an equivalent that satisfied state law.[10]   The "We Card" program, ostensibly

meant to reduce sales to minors,[11] does not promote specific cigarette brands, and would seem

unlikely to increase demand for cigarettes.   Nonetheless, Philip Morris imposed its new "We

Card" signage requirements, with immediate effect, on the approximately 250,000 retailers that

were called on by Philip Morris sales representatives:  "All stores that are called on by a PM

USA representative, referred to as workload stores, are *required* to display signs . . . (2) Number

– there *must* be at least two such signs."[12]   Philip Morris's CEO testified that when Philip Morris

instituted these changes in 2003, "far and away the vast majority of the retailers" complied.[13]

The very essence of Defendants' Participating Retailer programs is to give them

extensive control over the look and feel of retailers' stores—especially at the cash register and

behind the counter.  The success of these programs is easily seen in the stores of Defendants' and

the retailers' affiants, where the space on top of, above, behind, and in front of the counters is

---

[10] Ex. 13 (JDX3931785/1787 (U.S. 93329) (admitted)).

[11] This Court found it significant that Defendants have never attempted to evaluate
whether the "We Card" program actually does reduce sales to minors.  449 F. Supp. 2d at 669,
¶ 3165.  Internal industry documents, primarily from Philip Morris, reveal that the program was
not designed to reduce tobacco sales to minors, but "explicitly structured to improve the
industry's public image and to thwart regulation and law enforcement activity."  Dorie E.
Apollonio & Ruth E. Malone, *The "We Card" Program: Tobacco Industry "Youth Smoking
Prevention" as Industry Self-Preservation*, 100 Am. J. Pub. Health 1188, 1188 (2010).

[12] *Id.* at 1787 (emphases added); Willard TT, 4/12/05, 18699:20-21 (number of retailers
called on by PM sales force); Szymanczyk TT, 4/11/05, 18337:13-21 (confirming that this policy
"is outside of Retail Leaders because it applies to any account whether they are [a] Retail
Leaders' account or not.").  For Lorillard, "the *requirement* in the Excel contract is they have the
signage available for We Card or any similar comparable state program."  Milstein TT, 1/10/05,
9470:24-9471:1 (emphasis added).

These contractual obligations remain in Defendants' contracts to this day.  Ex. 11 (PM
Groups I H and X at 16) ("Two We Card Signs or equivalent signs must be posted in the
following locations . . ."); *see also* U.S. 2014 Opening Br. Ex. 4 (Dkt. No. 6101-4) (2014
Lorillard contracts, requiring retailers to "maintain 'We Card' or equivalent signage"); Auger
Decl. at 31, 42, 53, 64, 76, 87, 93 (Dkt. No. 6097-2) (RJR contracts).

[13] Szymanczyk TT, 4/12/05, 18543:20-21.

overwhelmingly devoted to marketing cigarettes and other tobacco products and accessories.

Exs. 1-5 (Quality Mart and Wilco Hess stores in North Carolina; Ricker's Oil in Indiana; E-Z

Mart in Texas).  Defendants' authority and ability to control promotions and marketing at their

Participating Retailers is unquestioned.

C.     **A range of point-of-sale marketing materials are available to address all relevant store environments**

To demonstrate that a single set of placement specifications will be inadequate,

Defendants provide "before" and "after" photos of various store environments, such as a

cluttered convenience store and a multi-checkout supermarket.  Auger Decl. Ex. B at 7-20 (Dkt.

No. 6097-2).[14]  But Defendants are able to implement their contracts in numerous store

environments.  *See, e.g.*, Ex. 14 (Retail Leaders Market Walk 2001, 2080305263/5361 at 5266,

showing half a dozen categories of participation).  Defendants use a modest number of contract

types to implement their Retail Programs across the diversity of stores with which they

contract.[15]  Moreover, many point-of-sale display and placement options are available beyond

header and countertop displays.  Exs. 1-5.

---

[14] Notably, Defendants and the retailers' protestations about countertops appear to have rather little application.  During trial, Philip Morris CEO Michael Szymanczyk testified that only 2.5% of the company's retail sales were made at retailers so small that the only space available for display was on the counter.  Szymanczyk WD, 140:3-8.  Similarly, only 1.5% of the retailers in Lorillard's Excel program needed to use countertop displays.  Spell 2006 Decl. ¶ 3 (Dkt. No. 5746-3).

[15] Philip Morris offers four plans with up to 5 levels of participation, Exs. 10-12 (PM 2014 Group D plan; Groups I, H, and X plans; and Groups I H and M plans for Massachusetts); RJR offers seven plans, Auger Decl. Exs. B-H (Dkt. No. 6097-2); and Lorillard offers eight Excel and five non-Excel contracts (U.S. 2014 Opening Br. Ex. 4) (Dkt. No. 6101-4).

**D.     The Court should not reduce the number of displays at retail outlets**

Contrary to Defendants' claim, nothing in the D.C. Circuit's 2009 decision prohibits a

single store from having both counter-area and header displays, Defs.' 2014 Opening Br. at 8

n.5; the prohibition is to avoid "order[ing] each Defendant separately to require the same retail

store to display substantively identical, but separate, signs."  *United States v. Philip Morris USA,*

*Inc.*, 566 F.3d 1095, 1142 (D.C. Cir. 2009) (*per curiam*) ("*Affirmance Opinion*"), *cert. denied*,

561 U.S. ___, 130 S. Ct. 3501 (2010).

Defendants and the retailers urge the Court to vacate the point-of-sale requirement

entirely, on the specious grounds that the other media channels are "adequate."  *See, e.g.*, Defs.'

2014 Opening Br. at 14.[16]  The United States' and Intervenors' prior briefs demonstrate that

point of sale is a crucial medium to reach consumers and potential consumers alike.  Defendants

internally acknowledge the importance of "reach[ing] consumers by linking point-of-sale brand

messages with messages appearing in other media."[17]  Consumers are estimated to be exposed to

some 5,000 marketing messages per day,[18] and cigarette retailers display, on average, nearly 30

---

[16] Defendants' contention that the other media channels are sufficient is particularly
unconvincing because they simultaneously reserve the right to challenge those other channels on
appeal, Order #51-Remand at 22 (Dkt. No. 6095), and (through an R.J. Reynolds' motion) are
currently seeking to reduce the number of TV spots (Dkt. No. 6103).  ***Error! Main Document
Only.****Cf.* **Error! Main Document Only.***United States v. Philip Morris USA, Inc.*, 787 F. Supp.
2d 68, 76 (D.D.C. 2011) (denying Defendants' motion for vacatur based on Tobacco Control Act
due in part to Defendants' "simultaneously and vigorously challenging" the Act in other
proceedings), *aff'd*, 686 F.3d 832, 837 (D.C. Cir. 2012) (delicately observing that scope of the
Act was unclear when district court ruled; and observing that in any event, this Court's
injunctions, "unlike the Act, are specifically designed to combat racketeering activity").

[17] Ex. 15 ("Retail Leaders 2000 Helps Retailers Manage the Cigarette Category in the
New Millennium: Discussion Draft," 2073977831/7835 at 7833-7834).

[18] Louise Story, *Anywhere the Eye Can See, It's Likely to See an Ad*, N.Y. Times, Jan. 15,
2007, www.nytimes.com/2007/01/15/business/media/15everywhere.html (citing study by market
research firm Yankelovich).

pieces of tobacco marketing.[19]   Defendants themselves have used every media channel that is

part of the corrective statement remedy.  449 F. Supp. 2d at 927-28.  In *Warner-Lambert*, the

D.C. Circuit affirmed a corrective-statement media buy of just 10% of one year's marketing

budget, where there was no bad faith; the Defendants here spend about $10 billion per year on

marketing, engaged in deliberate deception and fraud, and make no claim that they cannot afford

to reimburse retailers for any .  *Warner-Lambert Co. v. FTC*, 562 F.2d 749, 763-64 (D.C. Cir.

1977).

An important part of the point-of-sale media channel for the Court to consider requiring

in addition to interior signs are pump toppers and exterior signboards at Participating Retailers

with gas stations.  Ex. 5 at 9-10.  Forty-five percent of all retail sales of cigarettes are made at

gasoline stations with convenience stores, and another 2.3% are made at other gasoline

stations.[20]   As NACS reports, gasoline stations with convenience stores attract approximately

1,140 customers per day—large numbers of whom fill their tanks and pay at the pump without

entering the store.[21]

## E.   Defendants should bear the economic effects of reinstating the point-of-sale media channel

To demonstrate that reinstating the point-of-sale media channel will have economic

effects, Defendants and the retail trade groups discuss numerous financial figures, designed to

distract attention from two crucial points.  The first is that Defendants spend about 20 times more

---

[19] Ctr. for Pub. Health Systems Science, *Point-of-Sale Report to the Nation* at 7 & fig. 7. Convenience stores (with and without gas stations combined) display an average of 4.7 pieces of exterior tobacco marketing materials, and 33 pieces of interior marketing materials.  *Id.*

[20] Figures calculated from U.S. Bureau of the Census, 2007 Economic Census, ECO744SLLS1: Retail Trade: Subject Series – Product Lines.

[21] NACS: The Association for Convenience & Fuel Retailing, *State of the Industry Report of 2012 Data* at 44 (2013).

money on "buy-downs" to retailers as on incentive payments.  Buy-downs reimburse retailers for reducing the retail price of designated brands of cigarettes to the levels dictated by the Defendants; buy-down income is a "pass through discount" that precisely balances retailers' reduced revenue due to charging lower retail prices, and thus does not change retailers' net income.  By contrast, incentive payments are real money that goes into the pockets of retailers—but their amount is only 5% as large as buy-down sums.[22]  References to multi-digit "discounts" and "buy-downs" are misleading because that money is directly given to consumers, not kept by retailers.

But the second crucial point is that the figures that matter are not Defendants' payments to retailers, but rather retailers' lost or foregone profits on high-profit items sold at countertop.  NACS's most recent brief provides some estimates of these figures.  After reinstating the point-of-sale media channel, the Court should direct the parties and retail trade groups to mediation to develop appropriate formulas for Defendants to bear the financial burdens retailers would otherwise incur.

**F.     The retailers' constitutional arguments are unavailing**

**1.   The injunction will not disturb retailers' First Amendment rights**

A retailer's "constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal." *Zauderer v. Office of Disciplinary Counsel of the Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985).  Half a dozen jurisdictions, including Indiana and Texas, require cigarette retailers to display tobacco or cigarette health warnings at the point

---

[22] FTC Cigarette Report 2011, tbl. 2E at 17 (showing the major cigarette manufacturers spent $6.996 billion on buy-downs and other payments to retailers to reduce the price of cigarettes to consumers, versus $357 million in promotional allowance payments to retailers).

of sale,[23] and at least twenty-three jurisdictions require alcohol retailers to post similar point of

sale warnings.[24]  For an illustration of Indiana's mandatory point-of-sale tobacco disclosure, see

Ex. 3 at 2-3 (Ricker's Oil).  (Texas's mandatory disclosure was not observed in visits to four

stores in that state run by E-Z Mart, one of NACS's affiants.  Ex. 18 (Dodgen Decl.).)

The retail trade groups' First Amendment arguments rest on amorphous declarations such

as, "I object and disagree with, and Ricker's objects and disagrees with, the messages that the

Order contemplates requiring on signs in our stores."[25]  The only specific objection is that

because the statements refer to *Defendants*' deliberately misleading the American people,

customers might wrongly think *retailers* misled them.  *See, e.g.*, Richardson 2014 Decl. ¶ 18.

No basis is provided to support such speculation; and in any event, it does not violate the First

Amendment to require merchants to warn consumers against the possibility of fraud in the

marketplace.[26]  Retailers can have no genuine First Amendment objection to statements that help

---

[23] D.C. Code § 7-1721.02(e)(1) (2012 & Supp. 2013); 410 Ill. Comp. Stat. Ann. 85/4 ("Display of Warning Signs") (West 2011); Ind. Code Ann. § 35-46-1-11 (LexisNexis 2009 & Supp. 2013) ("Retail sale of tobacco; warning notices to minors and pregnant women required; failure to post; offenses"); Nev. Rev. Stat. Ann. § 442.340 (LexisNexis Supp. 2013) ("Health warning about effects of smoking during pregnancy to be posted in certain retail establishments"); R.I. Gen. Laws § 11-9-13.8.1 (Supp. 2013) ("Signs concerning the health effects of tobacco"); Tex. Health & Safety Code Ann. § 161.084(b) (2010).

Shepard's Citations and West's KeyCite do not identify any reported decisions concerning these statutes, much less any reported First Amendment challenges.

[24] Fetal Alcohol Spectrum Disorders Ctr. for Excellence, U.S. Dep't of Health & Human Servs., "State Laws Related to Posting of Alcohol Warnings at Point of Sale," http://fasdcenter. samhsa.gov/publications/signageLaws.aspx (last visited June 16, 2014) (listing 20 jurisdictions); N.C. Gen. Stat. § 18B-808 (2013); Tex. Alco. Bev. § 11.042 (Supp. 2013); Utah Code Ann. § 32B-2-503 (LexisNexis 2011).

[25] Broviak 2014 Decl. ¶ 26 (Dkt. No. 6101-2), *cited in* NACS 2014 Opening Br. at 13; *see also* Richardson 2014 Decl. ¶ 19 (Dkt. No. 6101-3) ("I disagree with the messages . . . and object to displaying them.  This is both my personal position and the position of E-Z Mart.").

[26] *Cf.* P.R. Laws Ann. tit. 3, § 341r (2009) (requiring all Puerto Rico businesses to advise consumers, "It is illegal to publish false and deceitful advertisements," subject to a $10,000

prevent deception; for example, approximately half of "light" cigarette users buy them "because they [wrongly] perceive them to be a 'healthier' cigarette and a potential step toward quitting." 449 F. Supp. 2d at 860.

### 2.  The injunction will not be a taking or violate property or contract rights

The United States' opening 2014 brief demonstrated that, even assuming "judicial takings" are cognizable, a physical taking arises when "an interloper with a government license" arrives, not "a commercial lessee" with an "invitation" from the landowner. *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252-53 (1987).  Presuming that the Court does require Defendants to assume the financial burdens retailers might otherwise incur, retailers can establish none of the elements for a regulatory taking.  *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 137 (1978).  Nor can they establish a violation of any contractual or property right.  As discussed in the United States' 2014 opening brief, Defendants' current contracts would authorize them to require corrective statements now if they wished.  The key terms of their contracts are the same now as in 2003, when Philip Morris unilaterally directed all Retail Leader program members (plus another 50,000 stores that its representatives called on) to display additional "We Card" signage with immediate effect.  Reinstating the corrective-statement media channel will not interfere with any property or contractual rights.

### III.    CONCLUSION

For the reasons addressed above and in our earlier briefs, the United States respectfully urges the Court to reinstate the point-of-sale remedy, and refer the parties to mediation with

---

penalty, and explain how to file complaints); P.R. Regs. DACO Reg. 7923, Rule 28 (Oct. 15, 2010) (requiring such signs to be displayed conspicuously at each checkout, within 5 feet of the checkout).

directions to apply best marketing practices and principles to prepare specifications for

implementing the remedy.

Dated: June 18, 2014                        Respectfully submitted,
          Washington, D.C.
                                            STUART F. DELERY
                                            Assistant Attorney General

                                            MICHAEL BLUME, Director
                                            ANDREW CLARK, Assistant Director
                                            Consumer Protection Branch


                                               /s/ Daniel K. Crane-Hirsch
                                            DANIEL K. CRANE-HIRSCH
                                            JOHN W. BURKE
                                            LINDA M. McMAHON
                                            Trial Attorneys
                                            Civil Division
                                            United States Department of Justice
                                            P.O. Box 386
                                            Washington, D.C. 20044-0386
                                            Telephone:    (202) 616-8242 (Crane-Hirsch)
                                                          (202) 353-2001 (Burke)
                                                          (202) 307-0448 (McMahon)
                                            Fax: (202) 514-8742
                                            *Attorneys for Plaintiff United States of America*

11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>PHILIP MORRIS USA INC.,<br>f/k/a PHILIP MORRIS INC., et al.,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil No. 99-CV-02496 (GK)

Next scheduled court
appearance:  None

EXHIBITS IN SUPPORT OF
UNITED STATES' RESPONSE SUPPLEMENTAL BRIEF
ON RETAIL POINT OF SALE

| Exhibit | Description |
|---|---|
| 1 | Quality Mart, 3398 Robinhood Road, Winston-Salem, NC |
| 2 | Wilco Hess, 3396 Robinhood Road, Winston-Salem, NC |
| 3 | 71st Street Ricker's BP, 6050 West 71st St., Indianapolis, IN |
| 4 | E-Z Mart #490, 4601 S. Collins St., Arlington, TX |
| 5 | Additional potential placements |
| 6 | Discussion Draft: Retail Leaders Article," 2071826035/6040 |
| 7 | RJR, "Key Points About Retail Leaders," 519754859 |
| 8 | Top-to-Top March 1999: Retail Leaders Agenda, 2078285485/5499 |
| 9 | PM presentation, Travel Centers of America: Retail Leaders, 520657230/7247 |
| 10 | PM 2014 Group D plan |
| 11 | PM Groups I, H, and X plans |
| 12 | PM Groups I H and M plans for Massachusetts |

1

| 13 | JDX3931785/1787 (U.S. 93329) (admitted) |
|----|------------------------------------------|
| 14 | Retail Leaders Market Walk 2001, 2080305263/5361 |
| 15 | Retail Leaders 2000 Helps Retailers Manage the Cigarette Category in the New Millennium: Discussion Draft, 2073977831/7835 |
| 16 | Paul M. Ribisl Declaration |
| 17 | Miranda Spitznagle Declaration |
| 18 | Leilani Dodgen Declaration |
|    |  |