Issue Date: January 17, 2014

# PHILIP MORRIS USA INC.
## RETAIL LEADERS PROGRAM 2014 AGREEMENT
### Plan Groups I, H, and X

This Retail Leaders Program 2014 Agreement (the "Agreement"), by and between Philip Morris USA Inc., a Virginia corporation ("PM USA"), and the party identified below ("Retailer"), amends and restates as of April 1, 2014, the PM USA Retail Leaders 2012 Program and sets forth the terms and conditions of the PM USA Retail Leaders 2014 Program (the "Program").

| HQ M.A.#: | | Territory #: | | Retailer Name: | |
|---|---|---|---|---|---|
| Retail Control #: | | | | Street Address - Line 1: | |
| Mgmt. Acct. #: | | Indep: ☐ | | Street Address - Line 2: | |
| ☐ New Retailer | | Chain: ☐ | | City, State, Zip: | |
| | | | | Last 4 digits of Tax Id#: | Is Tax Id# correct?  Yes ☐  No ☐ |

| Effective Date of Agreement: |
|---|
| |

When executing this Agreement, Retailer must select the Plan and Category Merchandising Option in which its Stores will participate, as indicated in Columns 2 and 3 below.  In consideration of Retailer's participation in the Program and performance under this Agreement, PM USA will pay Retailer a Merchandising Payment per Store based on the rates set forth in Column 4.

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| Number of Stores | Plan | Category Merchandising Option | Rate per PM USA Carton |
| | I - | CMO 1 | 1¢ |
| | I | CMO 1 | 2¢ |
| | I- | CMO 2 | 1¢ |
| | I | CMO 2 | 2¢ |
| | H- | CMO 2 | 2¢ |
| | H | CMO 2 | 3¢ |
| | X- | CMO 3 | 2¢ |
| | X | CMO 3 | 3¢ |
| | X | CMO 4 | 5¢ |
| | X | CMO 5 | 10¢ |

This Agreement includes the following Exhibits, which are incorporated by reference and which PM USA may amend at any time.

| Exhibit | Description of Exhibit |
|---|---|
| Exhibit A | PM USA Portion Configurations |
| Exhibit B | Definitions |
| Exhibit C | CMO Requirements |
| Exhibit D | Merchandising Payments |
| Exhibit E | PM USA Remedies |
| Exhibit F | General Terms and Conditions |
| Exhibit G | PM USA Signage Zones |
| Exhibit H | General Terms and Conditions of PM USA Promotions |
| Exhibit I | STARS Calendar |

## Retailer Information

Enter Retailer information below.  If "Individual" is selected, provide Individual First Name and Individual Last Name. If "Entity" is selected, provide Entity Full Name.

□ Individual     □ Entity (e.g., corporation, partnership, or limited liability company)

Individual First Name: _____ *(only if "Individual" selected)*

Individual Last Name: _____ *(only if "Individual" selected)*

Entity Full Name: _____ *(only if "Entity" selected)*

Street Address: _____

City, State, Zip: _____

Telephone Number: _____

**Retailer's Officers, Directors, and Senior Managers.**  Please list each of Retailer's officers, directors, and senior managers.  If Entity is selected in Retailer Information above, list Retailer's chief executive officer first.

| First Name: | | Last Name: | | Title: | |
|---|---|---|---|---|---|
| First Name: | | Last Name: | | Title: | |
| First Name: | | Last Name: | | Title: | |
| First Name: | | Last Name: | | Title: | |
| First Name: | | Last Name: | | Title: | |

## Electronic Notice, Electronic Transactions, and the Website

**PM USA MAY, IN ITS SOLE DISCRETION, PROVIDE SOME OR ALL NOTICES AND OFFERS RELATED TO THE AGREEMENT AND TO PM USA PROMOTIONS ELECTRONICALLY THROUGH THE WEBSITE LOCATED AT WWW.INSIGHTSC3M.COM OR SUCH OTHER WEBSITE AS MAY BE SPECIFIED BY PM USA FROM TIME TO TIME (THE "WEBSITE").  RETAILER AGREES TO CONDUCT TRANSACTIONS, IF APPLICABLE, AND TO RECEIVE NOTICES AND OFFERS RELATED TO THE AGREEMENT OR TO PM USA PROMOTIONS ELECTRONICALLY THROUGH THE WEBSITE.**

### Marlboro Product Promotion Acceptance Election
(Retailer may change the following election at any time by executing a new agreement)

□ **Yes.**  Retailer agrees to participate in the Marlboro Product Promotion Acceptance Election, as set forth in Exhibit C, Section 3.E.

□ **No.**  Retailer does not agree to participate in the Marlboro Product Promotion Acceptance Election as set forth in Exhibit C, Section 3.E. and does not authorize PM USA to order <u>automatically</u> on each Store's behalf all quantities of each Marlboro Product Promotion offered to such Store.  Retailer understands that by checking "No," its Stores will not meet the requirement to purchase the applicable designated percentages of <u>automatically</u> ordered Marlboro Product Promotions in accordance with such Stores' Program participation levels and that Retailer will receive a payment reduction equal to one month of each such Store's Merchandising Payment for each quarter.

**Retail Leaders Program 2014 Form of Plan-O-Gram**

Retailer agrees to merchandise PM USA products and PM USA Cigarette Signs in accordance with the requirements of this Agreement.  With respect to a Store participating in the Fixture Plan, Retailer understands and agrees that certain requirements are illustrated in this Plan-O-Gram.  Retailer is solely responsible for full compliance with the terms and conditions of this Agreement.  In the event of a conflict between the Plan-O-Gram and the terms and conditions of the Agreement, the terms and conditions of the Agreement will control.  As of April 1, 2014, any Store Layout or Exterior Layout diagram included in a Plan-O-Gram is no longer in effect.

**Plan**          **CMO**          POG #:_____          Store #:_____

I   ☐          ☐ 1 ☐ 2
H  ☐          ☐ 3 ☐ 4
X  ☐          ☐ 5

Retailer: _____          AGDC Account Manager: _____

Retail Control #: _____          Territory #: _____

Mgmt. Acct #: _____

PM USA Share means the greater of:

☐   PM USA's share (expressed as a percentage) of the aggregate cigarette purchases (as reported in STARS) by the Store, or, for any Store that is part of a Chain, all Stores associated with such Store's AGDC management account number = ___%; **or**

☐   PM USA's share (expressed as a percentage) of the aggregate cigarette purchases (as reported in STARS) by all stores in the relevant Local Market = ___%.

☐   65% maximum PM USA Share applicable.

**PCMA Fixture Layout:**



**OCMA Fixture Layout:**

## Retailer Acknowledgement/Signature

By its signature below, Retailer:

1.   represents that it has taken all action necessary to, and is authorized to, enter into and sign this Agreement and that neither the execution of this Agreement nor the performance of Retailer's obligations under this Agreement will conflict with, or constitute a breach of, any law, contract, or other legal undertaking;

2.   acknowledges and agrees to the terms and conditions of this Agreement, including all Exhibits referenced in and attached to this Agreement;

3.   acknowledges that it has reviewed and agrees to the PM USA Trade Policies and the Website's Terms of Use;

4.   agrees that this Agreement will not become binding on PM USA unless and until this Agreement is approved by PM USA, as indicated by the signature of the duly authorized AGDC representative below;

5.   authorizes PM USA and its affiliates to obtain, and Retailer's suppliers to release, any information requested by PM USA or its affiliates regarding Retailer's purchases and sales of tobacco products;

6.   agrees at all times to comply with its training obligations under the Agreement with respect to the prevention of underage access to tobacco products;

7.   authorizes PM USA, its affiliates, and third parties contracted by PM USA or its affiliates, to take reasonable actions (including moving products and signs other than PM USA products and PM USA Cigarette Signs), within a reasonable period of time after Retailer's execution of this Agreement, to bring the Stores into initial compliance with the requirements of this Agreement; and

8.   authorizes PM USA, its affiliates, and third parties contracted by PM USA or its affiliates, to relocate any sign occupying, or product or other item obstructing, the Number One or, if applicable, the Number Two or Number Three Interior Cigarette Sign location, or the Number One Exterior Cigarette Sign location.

**This is an electronically executed agreement, which means that the electronically executed document is the original and legally binding agreement between PM USA and Retailer. Any paper version, even if signed, should be regarded only as a courtesy copy. In case of a conflict between the electronically executed document and any paper version, the electronically executed document controls.**

**Retailer (Must be signed by an authorized representative)**       **Philip Morris USA Inc.**

**By: Altria Group Distribution Company**

By: <u>DO NOT SIGN</u>                                             AGDC Account Manager: <u>DO NOT SIGN</u>

Printed Name: _____       Printed Name: _____

Title: _____       Title: _____

Date: _____       Date: _____

**Exhibit A**

**PM USA Portion Configurations**

The following depictions of the PM USA Portion are not drawn to scale and are for illustrative purposes only.  In the event of a conflict between any other term or condition of the Agreement and the following illustrations, the other terms and conditions of the Agreement will govern.

The requirements for the PM USA Portion are set forth in the Agreement.

CMO 1 Vertical Set



CMO 2 Vertical Set



CMO 3 Premium T (Optional)



CMO 2, 3, 4, and 5 Horizontal Set and OCMA (All Plan Groups)



**Exhibit B**

**Definitions**

The following terms have the following meanings when used in the Agreement:

**"Adulterated"** has the meaning set forth in the Family Smoking Prevention and Tobacco Control Act (Public Law 111-31, Section 902; *see also* 21 U.S.C. § 387(b)).

**"AGDC"** means Altria Group Distribution Company, a Virginia corporation and an affiliate of PM USA.

**"Agreement"** means the Retail Leaders Program 2014 Agreement (Plan Groups I, H, and X), between Retailer and PM USA, as it may be amended from time to time, including all Exhibits thereto, as they may be amended from time to time.

**"ALCS"** means Altria Client Services Inc., a Virginia corporation and an affiliate of PM USA.

**"Average PM-CCPM"** stands for Average PM USA Consumer Cartons Per Month, which means, with respect to a Store, the total number of cartons of PM USA Cigarettes purchased by such Store from STARS-reporting wholesalers during a STARS Quarter, less returns, divided by three, rounded to two decimal places.  All such purchases and returns are as reported in STARS.

**"Capped Store"** has the meaning set forth in Exhibit H, Section 4.B.(2).

**"Cap Threshold"** has the meaning set forth in Exhibit H, Section 4.B.

**"Category Space"** means the area in a Store, measured in terms of square footage (height x width), of all space in open view to adult tobacco consumers at any time that is dedicated to the merchandising of cigarettes within or attached to Fixtures, whether in the PCMA or any OCMA.  All space within or attached to a Fixture Body where cigarettes are merchandised, or with the capacity to merchandise cigarettes, in open view to adult tobacco consumers is included in Category Space, except as set forth in Exhibit C, Section 1.F.(3).

**"Chain"** means a retailer that shares a common legal ownership or business management relationship with three or more retail stores.

**"Cigarette Sign"** means any item, other than Fixtures, Displays, and OPMs, that is in open view to adult tobacco consumers and that in any way features a cigarette brand name, trademark, logo, symbol, motto, or selling message or that advertises cigarettes in general without featuring a specific cigarette brand.

**"CMO"** stands for **"Category Merchandising Option,"** which means a level of participation under a Plan.

**"CMO 1 Vertical Set"** means the CMO 1 Vertical Set for Plan Group I, described in Exhibit C, Section 1.D.(1)(c)(i).

**"CMO 2 Horizontal Set"** means the CMO 2 Horizontal Set for Plan Group H, described in Exhibit C, Section 1.D.(1)(c)(ii).

**"CMO 2 Vertical Set"** means the CMO 2 Vertical Set for Plan Group I, described in Exhibit C, Section 1.D.(1)(c)(iii).

**CMO 3 Premium T Set"** means the CMO 3 Premium T Set for Plan Group X, described in Exhibit C, Section 1.D.(1)(c)(iv).

**"CMO 3, 4, and 5 Horizontal Set"** means the CMO 3, 4, and 5 Horizontal Set for Plan Group X, described in Exhibit C, Section 1.D.(1)(c)(v).

**"Designated Marlboro Packings"** means Marlboro Box, Marlboro Gold Pack Box, Marlboro Gold Pack 100's Box, Marlboro Menthol Box, Marlboro Menthol Gold Pack Box, and any one Marlboro Black Packing.

**"Display"** means a portable merchandising unit used to merchandise packs, cartons, or promotional product for retail sale to adult tobacco consumers, all as determined by PM USA.  Displays are not included in Category Space.

**"Effective Date"** means the date on which Retailer becomes eligible to earn Merchandising Payments pursuant to the Agreement.  Retailer will be eligible to earn Merchandising Payments beginning the first day of the STARS Week that includes the first day of the month during which Retailer executes the Agreement; provided, however, that if the date on which Retailer executes the Agreement occurs after the fifteenth day of a month, the Effective Date will be the first day of the STARS Week that includes the first day of the following month.

 **"EFT"** stands for Electronic Funds Transfer, which means the initiation of credit entries by PM USA, through its affiliates, to Retailer's identified bank account.

**"Exterior Cigarette Sign"** means any Cigarette Sign on a Store's premises that is either (i) outside the Store or (ii) posted on the inside surface of a Store window and facing outward.

**"Fixture"** means a stationary merchandising unit, except for Displays or OPMs, in which cigarettes are presented in open view to adult tobacco consumers.  A Fixture consists of a Fixture Header and a Fixture Body.  For purposes of the Agreement, the front portion and the back portion of a fixture commonly referred to as a slide-by fixture will each be considered a separate Fixture.

**"Fixture Body"** means the part of a Fixture with the capacity to merchandise cigarette packs, cartons, or promotional product for retail sale to adult tobacco consumers.

**"Fixture Header"** means either (i) the part of a Fixture that is attached to the top of the Fixture Body and which contains one or more signs, or (ii) one or more signs placed directly above a Fixture Body.

**"Fixture Security Doors"** means transparent locking doors that attach to a Fixture to prevent direct access by consumers to cigarettes merchandised on the Fixture.

**"Interior Cigarette Sign"** means any Cigarette Sign that is inside a Store and that is posted to be in open view to adult tobacco consumers inside the Store.

**"Introductory Period"** means, with respect to a new PM USA brand or brand packing, the period of six months (or such other duration as may be designated by PM USA) after the first retail delivery date for such new PM USA brand or brand packing.

**"Inventory Storage Cabinet"** means a closeable space that is affixed to the bottom of a Fixture or that is on the bottom of a Fixture, so that any item contained within such space is not in open view to consumers.

**"Line of Sight"** means within reasonable proximity, as determined by PM USA, of a Selling Counter, but not behind a Selling Counter, and in the full direct view and control, as determined by PM USA, of Store personnel at such Selling Counter.

**"Local Market"** means , (i) if Retailer is not a Chain, the AGDC sales district in which a Store is located or (ii) if Retailer is a Chain, the AGDC sales district in which the headquarters for the Stores is located (i.e., if Retailer executes the Agreement at a division level, the AGDC sales district in which the division headquarters is located; if Retailer executes the Agreement at Retailer's headquarters level, the AGDC sales district in which Retailer's headquarters is located).

**"Marlboro Black Packing"** means any Marlboro cigarette packing designated to be merchandised in the Marlboro Black brand zone, as determined by PM USA.

**"Marlboro Performance Options"** mean PM USA Promotions available to CMO 3, CMO 4, and CMO 5 Stores that meet the applicable eligibility requirements communicated in the applicable Promotion Notice.

**"Marlboro Product Promotion"** means a PM USA Product Promotion on a Marlboro cigarette brand packing.

**"Master Settlement Agreement"** or **"MSA"** means the agreement executed as of November 23, 1998, by certain tobacco product manufacturers and the settling states (as defined in the Master Settlement Agreement).   A link to the Master Settlement Agreement can be found on the Internet at www.philipmorrisusa.com.

**"Merchandising Payment"** means a payment made by PM USA to Retailer with respect to a Store, calculated in accordance with Exhibit D, and based upon performance by Retailer and such Store in accordance with the applicable requirements of the Agreement.  Merchandising Payments are earned monthly but paid quarterly.

**"Merchandising Payment Volume Cap"** means 10,400 cartons of PM USA Cigarettes per STARS Quarter.

**"New Offering"** means, with respect to a Store, a cigarette SKU that PM USA offers or allocates to that Store for the first time and which is designated by PM USA as a "New Offering".

**"No Access Store"** means a Store that does not allow customers to enter and that also has a selling window in front of one or more Selling Counters between the customers and the Store's cashier.

**"Non-Promoted Price"** means the price at which a Store would sell a PM USA promoted brand to adult tobacco consumers if no Promotional Allowances were available to reduce the price of such brand.

**"NSS"** stands for Non-Self-Service, which means a manner of merchandising and selling tobacco products in a store in which such products are stored under lock or are otherwise positioned to prevent direct access by consumers, and are sold in a face-to-face exchange with store personnel.

**"Number One," "Number Two," "Number Three," and "Number Five"** mean, with respect to a location, the position designated as such by PM USA.

**"OCMA"** stands for Other Cigarette Merchandising Area, which means an area in a Store, other than the PCMA, in which cigarettes are merchandised on one or more Fixtures.  There may be multiple OCMAs in a Store.

**"OPM"** stands for Overhead Pack Merchandiser, which means a stationary cigarette merchandising unit with cigarettes facing store personnel which is usually elevated above a Selling Counter or suspended from the ceiling over a Selling Counter.

**"PCMA"** stands for Primary Cigarette Merchandising Area, which means the area in a Store, located either entirely behind a Selling Counter or entirely within the Line of Sight of a Selling Counter within a Transaction Area designated by PM USA to be the main area in which cigarettes are merchandised on Fixtures.  To constitute the PCMA, an area, if located behind a Selling Counter, must consist of one Fixture or two or more Fixtures that are horizontally contiguous or in close proximity to each other and, if located within the Line of Sight of a Selling Counter, must consist of one Fixture or two or more horizontally contiguous Fixtures, all as determined by PM USA.  There may be only one PCMA in a Store.

**"Plan"** means an option under a Plan Group offered to retailers with respect to one or more stores.

**"Plan Group"** means a collection of Plans designed for stores that merchandise PM USA Cigarettes on Fixtures in specified configurations in accordance with the terms of the Agreement, including all applicable Exhibits.

**"Plan H"** means the Plan for Plan Group H for a store with respect to which a retailer selects the PMO.

**"Plan H −"** means the Plan for Plan Group H for a store with respect to which a retailer does not select the PMO.

**"Plan I"** means the Plan for Plan Group I for a store with respect to which a retailer selects the PMO.

**"Plan I −"** means the Plan for Plan Group I for a store with respect to which a retailer does not select the PMO.

**"Plan-O-Gram"** means the PM USA-approved diagram prepared in connection with, and attached to, the Agreement, or such other Plan-O-Gram as approved by PM USA.

**"Plan X"** means the Plan for Plan Group X for a store with respect to which a retailer (i) elects to participate at CMO 3 and selects the PMO or (ii) elects to participate at CMO 4 or CMO 5.

**"Plan X −"** means the Plan for Plan Group X for a store with respect to which a retailer elects to participate at CMO3 and does not select the PMO.

**"PMO"** means the Progressive Merchandising Option, which is the option for a Store with respect to which Retailer agrees not to merchandise cigarettes or place Cigarette Signs, or brand imagery associated with cigarettes, on, above, or attached to the front of certain Selling Counters, as described more particularly herein.

**"PM USA Carton Limit"** means 5 cartons of PM USA Cigarettes sold by a Store per day to a single adult tobacco consumer.

**"PM USA Cigarettes"** means cigarettes sold by PM USA and intended for resale in the United States domestic market.

**"PM USA Off-Invoice Promotion"** means a PM USA Promotion during which PM USA reduces by a specified PM USA Off-Invoice Promotional Allowance the price at which PM USA sells PM USA cigarette or other PM USA product brands or brand packings to its direct customers.

**"PM USA Off-Invoice Promotional Allowance"** means the monetary amount by which PM USA reduces the price at which PM USA sells PM USA cigarette or other PM USA product brands or brand packings to its direct customers in connection with the applicable PM USA Off-Invoice Promotion.

**"PM USA Portion"** means an uninterrupted portion within, and at the top of, one or more Fixture Bodies in either the PCMA or an OCMA that is used for merchandising PM USA products and displaying PM USA Cigarette Signs, and the area of which is equal to the PM USA Share of the Category Space in the PCMA or OCMA, subject to a maximum of 65% of such Category Space.

**"PM USA Price Promotions"** means both PM USA Off-Invoice Promotions and PM USA Retail Price Promotions.

**"PM USA Product Promotion"** means (i) a single specially packaged and marked revenue pack (or other individual product unit) or carton of any PM USA product offered by PM USA to its direct customers at a special list price or with a PM USA Off-Invoice Promotional Allowance, or (ii) multiple specially packaged and marked revenue packs (or other individual product units) or cartons of any PM USA product offered by PM USA to its direct customers at a special list price or with a PM USA Off-Invoice Promotional Allowance.

**"PM USA Promotion"** means any promotion or incentive offered by PM USA in connection with PM USA products.

**"PM USA Promotional Allowance"** means PM USA Off-Invoice Promotional Allowance, PM USA Retail Price Promotional Allowance, or any funds earned under a Marlboro Performance Option.

**"PM USA Retail Price Promotion"** means a PM USA Promotion during which a Store must reduce the Non-Promoted Price at which such Store sells specified PM USA brands or brand packings by no less than a specified amount in consideration of a Promotional Allowance paid to Retailer, with respect to such Store, directly by PM USA.

**"PM USA Retail Price Promotional Allowance"** means the monetary amount paid to Retailer, with respect to a Store, directly by PM USA in connection with a PM USA Retail Price Promotion.

**"PM USA Share"** means a percentage equal to the greater of (i) PM USA's share of the aggregate cigarette purchases (as reported in STARS) by the Stores, and, for any Store that is part of a Chain, all stores associated with such Store's AGDC management account number, or (ii) PM USA's share of the aggregate cigarette purchases (as reported in STARS) by all stores in the relevant Local Market.

**"PM USA Signage Zone"** means:

(i)      for CMO 1 Vertical Set and CMO 2 Vertical Set, (a) if the PM USA Portion is located on one side of the PCMA, the area forming a 90° angle that extends out 48 inches from the bottom of the top 50% of the outer side of the outermost Fixture Body and 48 inches above the top of any Fixture Header located above the PM USA Portion; or (b) if the PM USA Portion is located between two Retailer's Choice Portions, the area that extends 48 inches above the top of any Fixture Header located above the PM USA Portion;

(ii)      for CMO 2 Horizontal Set, CMO 3 Premium T Set, and CMO 3, 4, and 5 Horizontal Set, the area forming a 90° angle that extends out 48 inches from the bottom of the outer side of the outermost Fixture Header on one side of any Fixture containing the PM USA Portion and 48 inches above the top of any Fixture Header on all of the Fixtures containing the PM USA Portion for the entire width of the PCMA;

(iii)      notwithstanding the foregoing paragraphs, the PM USA Signage Zone does not include any area that is occupied by, or is located directly above, a fixture in which non-cigarette tobacco products are merchandised; and

(iv)      for No Access Stores, the PM USA Signage Zone is the portion of the selling window extending from (a) the top edge to the bottom edge of the selling window and (b) from either the left or right edge of the selling window towards the center of the selling window until such portion is in an amount equal to the PM USA Share of the width of the selling window up to a maximum of 50% of the width of the selling window.

The PM USA Signage Zones are depicted in Exhibit G.

**"PM USA Trade Policies"** means policies promulgated by PM USA, including but not limited to, policies applicable to contraband PM USA cigarettes, remote cigarette sales (e.g., Internet, telephone, and mail order sales), and underage tobacco sales prevention, as such policies may be issued, modified, or supplemented from time to time by PM USA in its sole discretion.

**"Promotion Notice"** means a communication delivered through the Website, regular mail, electronically, or any other means from PM USA to Retailer containing the Promotional Allowance amounts, duration, eligibility, and other information regarding PM USA Promotions offered during a particular Promotion Period.

**"Promotion Period"** means a specified period of time established by PM USA during which PM USA offers a particular PM USA Promotion.

**"Retailer's Choice Portion"** means any portion of Category Space not occupied by the PM USA Portion.

**"Scan Data"** means electronic scan data that contains the following information for each sale of PM USA products:  (i) time, day, month, and year, (ii) sales volume for each PM USA brand packing by PM USA SKU, and (iii) transaction number.

**"Selling Counter"** means a horizontal surface in a Store, usually containing one or more cash registers and regularly staffed at all times that serves as a point of purchase of cigarettes by adult tobacco consumers.  Areas behind such surface, including other counters, that a consumer cannot access, are not part of a Selling Counter.

**"Signboard"** means an Exterior Cigarette Sign that (i) is outside a Store, (ii) is typically attached to a street sign or pole or attached to the side of the Store, or is a freestanding unit, and (iii) uses physically separate letters, numbers, and symbols to advertise cigarettes.

**"STARS"** means the Store Tracking Analytical Reporting System, which is the system used to capture information relating to weekly shipments of tobacco products to retailers by wholesalers.

**"STARS Calendar"** means the calendar used by STARS and attached to the Agreement as Exhibit I.

**"STARS Quarter"** means a calendar quarter according to the STARS Calendar.

**"STARS Week"** means a STARS Calendar week, consisting of a period commencing on Sunday and ending on Saturday.

**"Store"** means any premises in which Retailer engages in the retail sale of tobacco products and with respect to which Retailer participates in the Program under the Agreement.

**"Transaction Area"** means the area encompassing a Selling Counter, the area behind such Selling Counter, and any area within Retailer's store that is within the Line of Sight of store personnel at such Selling Counter.

**"Uncapped Store"** means a Store that has satisfied the requirements for an "Uncapped Store" set forth in Exhibit H, Section 4.B.(1).

**"Website"** has the meaning set forth on Page 2 of the Agreement.

**"We Card Items"** means the We Card Minimum Age Calendar, the We Card Age of Purchase Stickers, the We Card Fake ID Tip Sheet, and other materials, each produced by We Card Program, Inc. and designed to assist with age verification.  A We Card Item or any equivalent item is considered to be a Cigarette Sign for purposes of the Agreement if it includes any cigarette brand name, trademark, logo, symbol, motto, or selling message, or advertises cigarettes in general, without featuring a specific cigarette brand.

**"We Card Sign"** means a sign produced by We Card Program, Inc. that (i) informs consumers that a Store verifies the age of persons who seek to purchase tobacco products, (ii) informs consumers that the Store does not sell to anyone who is not old enough to purchase tobacco products legally where the Store is located, and (iii) does not contain any Cigarette Signs.  A We Card Sign or any equivalent sign will be considered to be a Cigarette Sign for purposes of the Agreement if it includes any cigarette brand name, trademark, logo, symbol, motto, or selling message, or advertises cigarettes in general, without featuring a specific cigarette brand.

**"We Card Training"** means training materials produced by We Card Program, Inc.

**Exhibit C**

**CMO Requirements**

By choosing for one or more Stores to participate in the Program under Plan Groups I, H, or X at a particular CMO, Retailer agrees that such Stores will comply with the merchandising, signage, and other requirements applicable to such Plan Groups at that CMO, as set forth below.

**1.      Merchandising Requirements.**

      **A.      NSS Merchandising.**  All cigarette and PM USA product merchandising and sales in a Store must be NSS.

      **B.      Visible Merchandising.**  All PM USA cigarettes in a Store must be merchandised such that they are clearly visible and proximate to adult tobacco consumers.

      **C.      Minimum Size Requirements for PCMA and OCMA.**  Any Fixtures comprising the PCMA or an OCMA must have a minimum height and width as indicated in Table A.

| Table A | | | | |
|---|---|---|---|---|
| | **PCMA** | | **OCMA** | |
| | Minimum Fixture Body Height | Minimum Fixture Body Width | Minimum Fixture Body Height | Minimum Fixture Body Width |
| CMO 1 and 2 | 38" | 2' | 30" | 2' |
| CMO 3, 4, and 5 | 38" | 3' | 30" | 2' |

      **D.      Merchandising on Fixtures Comprising the PCMA.**

      **(1)      PM USA Portion Requirements.**

      **(a)      Location.**  In the PCMA the PM USA Portion must be located within and at the top of one or more Fixture Bodies, subject to PM USA approval.  The PCMA, in its entirety, must be within 85 inches above the Store floor and must contain the PM USA Share of Category Space in the PCMA, up to a maximum of 65% of such Category Space.

      **(b)      PM USA Merchandising.**  PM USA Cigarettes, PM USA Cigarette Signs, other PM USA products, and other information must be merchandised in the PM USA Portion, as designated by PM USA from time to time.

      **(c)      Space Configuration.**

      **(i)      CMO 1 Vertical Set.**  The PM USA Portion is located on either side of the PCMA, as depicted in Exhibit A.  PM USA Cigarettes and PM USA Cigarette Signs, and other PM USA products in the PM USA Portion, as designated by PM USA, must be merchandised across the entire top shelves and contiguously on successive lower shelves thereafter until such PM USA-occupied space equals the PM USA Share of Category Space in the PCMA, subject to a maximum of 65% of such Category Space.

      **(ii)      CMO 2 Horizontal Set.**  The PM USA Portion spans the entire width of the PCMA, as depicted in Exhibit A.  PM USA Cigarettes, PM USA Cigarette Signs, and other PM USA products in the PM USA Portion, as designated by PM USA, must be merchandised across the entire top shelves and contiguously on successive lower shelves thereafter until such PM USA-occupied space equals the PM USA Share of Category Space in the PCMA, subject to a maximum of 65% of such Category Space.

Exhibit C
Page 1 of 8

(iii)    **CMO 2 Vertical Set.**  The PM USA Portion is located in the center of the PCMA, as depicted in Exhibit A, unless the width of the PCMA is four feet or less, in which case PM USA may elect to place the PM USA Portion on either side of the PCMA.  PM USA Cigarettes, PM USA Cigarette Signs, and other PM USA products in the PM USA Portion, as designated by PM USA, must be merchandised across the entire top shelves and contiguously on successive lower shelves thereafter until such PM USA-occupied space equals the PM USA Share of Category Space in the PCMA, subject to a maximum of 65% of such Category Space.

(iv)    **CMO 3 Premium T Set.**  At Retailer's option, the PM USA Portion may be in the Premium T configuration.  In such configuration the PM USA Portion spans the entire width of the PCMA and must consist of a center portion, a left portion, and a right portion.  The center portion is located in the center of the PCMA.  Left and right portions are adjacent to the center portion, as depicted in Exhibit A.  PM USA Cigarettes, PM USA Cigarette Signs, and other PM USA products must be merchandised across the entire top shelves and contiguously on successive lower shelves thereafter of each of the three portions comprising the PM USA Portion until such PM USA-occupied space equals the PM USA Share of Category Space in the PCMA, subject to a maximum of 65% of such Category Space.

(v)    **CMO 3, 4, and 5 Horizontal Set.**  The PM USA Portion spans the entire width of the PCMA, as depicted in Exhibit A.  PM USA Cigarettes, PM USA Cigarette Signs, and other PM USA products in the PM USA Portion, as designated by PM USA, must be merchandised across the entire top shelves and contiguously on successive lower shelves thereafter until such PM USA-occupied space equals the PM USA Share of Category Space in the PCMA, subject to a maximum of 65% of such Category Space.

(2)    **Retailer's Choice Portion.**   Other manufacturers' cigarettes may be merchandised in any manner Retailer chooses in the Retailer's Choice Portion.

E.    **Merchandising on Fixtures Comprising the OCMA.**  If cigarettes are merchandised in one or more Fixtures in an OCMA, such OCMA must be (1) located behind a Selling Counter or within the Line of Sight of a Selling Counter and (2) must be located a reasonable distance, as determined by PM USA, from the PCMA or be directly behind the front portion of a fixture commonly referred to as a slide-by fixture.

(1)    **PM USA Portion Requirements.**

(a)    **Location.**  In the OCMA the PM USA Portion must be located within and at the top of one or more Fixture Bodies, subject to PM USA approval.  The OCMA, in its entirety, must be within 85 inches above the Store floor and must contain the PM USA Share of Category Space in the OCMA, up to a maximum of 65% of such Category Space.

(b)    **PM USA Merchandising.**  PM USA Cigarettes, PM USA Cigarette Signs, other PM USA products, and other information must be merchandised in the PM USA Portion, as designated by PM USA from time to time.

(c)    **Space Configuration.**  For all Plan Groups, the PM USA Portion spans the entire width of the OCMA, as depicted in Exhibit A.  PM USA Cigarettes, PM USA Cigarette Signs, and other PM USA products must be merchandised in the PM USA Portion, as designated by PM USA, across the entire top shelves and contiguously on successive lower shelves thereafter until such PM USA-occupied space equals the PM USA Share of Category Space in the OCMA, subject to a maximum of 65% of such Category Space.

(2)    **Retailer's Choice Portion.**   Other manufacturers' cigarettes may be merchandised in any manner Retailer chooses in the Retailer's Choice Portion.

Exhibit C
Page 2 of 8

**F.      Other Merchandising Requirements.**

**(1)      Merchandising on Top of Fixtures.**   Nothing may be placed on top of any Fixture containing the PM USA Portion, except one or more PM USA Cigarette Signs in the PM USA Signage Zone.

**(2)      Merchandising Within or Attached to Fixtures.**   Non-tobacco merchandise and non-tobacco signs may not be merchandised within or attached to any Fixture containing the PM USA Portion.  Only tobacco products and tobacco product signs may be merchandised within any such Fixture.  Only tobacco products and tobacco product signs may be attached to any such fixture; provided, however, that such products and signs may not be attached adjacent to the PM USA Portion if they are non-PM USA products or non-PM USA signs, unless otherwise communicated by PM USA.  Any tobacco products within or attached to any Fixture containing the PM USA Portion and any tobacco product signs within any such Fixture will be included in Category Space for purposes of determining the PM USA Share of Category Space, subject to Section 1.F.(3).

**(3)      Exclusions from Category Space.**   Space on the bottom of a Fixture Body containing the PM USA Portion will be excluded from Category Space as long as (a) such space is no more than 24 inches in height; (b) 38 inches of vertical Category Space remain on each Fixture containing the PM USA Portion in the PCMA, or 30 inches of vertical Category Space remain on each Fixture containing the PM USA Portion in an OCMA; and (c) such space is occupied by either one of the following:

**(a)**      Inventory Storage Cabinets that display no Cigarette Signs, signs for non-cigarette merchandise, or signs containing the name of any manufacturer; or

**(b)**      Shelves containing non-cigarette tobacco merchandise or signs for non-cigarette tobacco merchandise, other than Cigarette Signs and non-cigarette tobacco merchandise that features a cigarette brand name, trademark, logo, symbol, motto, or selling message.

**G.      Sign, Display, and OPM Requirements.**

**(1)      Signs.**

**(a)      General Requirements.**   PM USA has the right to approve the position, number, location, and size of all signs for PM USA products that are displayed, including signs for PM USA products not supplied by PM USA, whether inside or outside a Store.

**(b)      Signs on Fixtures.**   Directly above any Fixture Bodies on which PM USA Cigarettes are merchandised, one or more Fixture Headers authorized by PM USA, and only Fixture Headers authorized by PM USA, must be maintained.  PM USA Cigarette Signs must be maintained, in or on the portion of each Fixture Body used to merchandise PM USA Cigarettes, as designated by PM USA.  Cigarette Signs for other manufacturers' cigarettes may be posted in or on the Retailer's Choice Portion in any manner Retailer chooses; provided, however, that such signs may not obstruct or otherwise interfere with the Fixture Headers or the PM USA Portion.

**(c)      Interior Cigarette Signs.**

**(i)      Signs Around Fixtures in the PCMA.**   PM USA has the right to place and maintain PM USA Cigarette Signs in the PM USA Signage Zone.  PM USA Cigarette Signs must be the only signs posted in the PM USA Signage Zone, and no tobacco products may be placed in the PM USA Signage Zone; provided, however, that a Store may place signage in the PM USA Signage Zone that features the name, logo or slogan of the Store alone or in conjunction with a non-tobacco product or service that either (i) is unbranded or (ii) bears a brand name that is owned by Retailer and only available in its Stores.  No part of such signage may be within six inches of the top of a Fixture, unless approved by PM USA.  Sufficient space must exist to place at least one PM USA Cigarette Sign with an area no smaller than 24 inches wide by 15 inches high in the Signage Zone that is highly visible.

Exhibit C
Page 3 of 8

All PM USA Interior Cigarette Signs that are not on a Fixture, Display, or OPM must be entirely within the PM USA Signage Zone, except that PM USA reserves the right to place a PM USA-supplied or Retailer-supplied PM USA Cigarette Sign in the Number One Interior Cigarette Sign location outside the PM USA Signage Zone, but entirely within 48 inches of the PCMA. All PM USA Cigarette Signs and PM USA products must be unobstructed.

    **(ii)**   **Signs Around Fixtures in an OCMA.** No Cigarette Signs, other signs, cigarettes, or non-cigarette tobacco merchandise may be placed within the space 48 inches above an OCMA. All PM USA Cigarette Signs and PM USA products must be unobstructed.

  **(d)**   **Exterior Cigarette Signs.**

    **(i)**   No more than three PM USA Exterior Cigarette Signs may be maintained at any Store, as more fully described in this Section, at any time. If at any time, other manufacturers' Exterior Cigarette Signs are maintained at a Store, PM USA has the right to require the Store to maintain in the Number One exterior sign location at such Store an equal number of PM USA Exterior Cigarette Signs, up to three such PM USA Exterior Cigarette Signs, as more fully described in this Section, unless prohibited by law. Any PM USA Cigarette Sign placed in the window of a Store must only be outward facing, except that a PM USA-supplied or Retailer-supplied PM USA Cigarette Sign may be inward facing provided it is within 48 inches of the PCMA.

    **(ii)**   For purposes of this Section:

      **a.**   All PM USA Cigarette Signs on any Fixture on which cigarettes are merchandised that are placed in the window of a Store facing outward, will be considered one PM USA Exterior Cigarette Sign, and all Cigarette Signs of other manufacturers placed on such Fixture that are placed in the window of a Store facing outward will be considered one other manufacturers' Exterior Cigarette Sign.

      **b.**   If a Store has a gasoline or fuel pump area that includes one or more gasoline or fuel pump islands, in each such gasoline or fuel pump island such Store may maintain no more than the following PM USA Exterior Cigarette Signs: either one PM USA Exterior Cigarette Sign on or attached to each gasoline or fuel pump, or no more than two PM USA Exterior Cigarette Signs, each no greater than 6.5 square feet, placed on or attached to the ends of the gasoline or fuel pump island. All PM USA Exterior Cigarette Signs, if any, in the gasoline or fuel pump area will be considered one PM USA Exterior Cigarette Sign.

  **(e)**   **No Access Stores.** Only PM USA Cigarette Signs may be attached to the front selling window of a No Access Store in the PM USA Signage Zone. If a No Access Store, at any time, maintains one or more other manufacturers' Exterior Cigarette Signs in the selling window, then such No Access Store must display one PM USA Exterior Cigarette Sign in the uppermost outside corner of the PM USA Signage Zone.

  **(2)**   **Displays.** PM USA does not require PM USA Cigarettes to be merchandised in Displays. If, however, a Store merchandises PM USA Cigarettes in Displays, such Store may maintain no more than three such Displays, and any such Display (a) may contain only PM USA Cigarettes and (b) must be placed behind the Selling Counter in an NSS location in open view to adult tobacco consumers. The location of any such Display is subject to PM USA approval.

  **(3)**   **OPMs.** If a Store maintains a PM USA-supplied OPM, such OPM must display only PM USA Cigarette Signs or other signs authorized by PM USA. If a Store maintains an OPM that is not supplied by PM USA, such OPM must display only PM USA Cigarette Signs, other signs authorized by PM USA, or signage that features the name, logo or slogan of the Store alone or in conjunction with a non-tobacco product or service that either (i) is unbranded or (ii) bears a brand name that is owned by Retailer and only available in its Stores. The OPM must not obstruct or otherwise interfere with any Fixture on which PM USA products are merchandised, as determined by PM USA.

Exhibit C
Page 4 of 8

**2.      PMO Requirements for Retailers.**  If, with respect to a Store, Retailer (A) participates in the Program at CMO 1, CMO 2, or CMO 3 and chooses to participate in the PMO or (B) participates in the Program at CMO 4 or CMO 5, Retailer agrees that such Store will not merchandise cigarettes or place or display Cigarette Signs, or brand imagery associated with cigarettes, on top of, attached to the top of, attached to the vertical surface below the front of, or above the surface of any Selling Counter in front of the PCMA or the Selling Counter closest to and within Line of Sight of the PCMA, all as determined by PM USA.  The Store may, however, maintain an OPM above the surface of a Selling Counter as long as the cigarettes in such OPM are not visible to consumers standing at such counter and there are no Cigarette Signs on such OPM.  Notwithstanding the foregoing, a No Access Store with respect to which Retailer selects the PMO may place Cigarette Signs attached to or in the front selling window, on top of, attached to the top of, or above a Selling Counter as set forth in Section 1.G.(1)(e).

**3.      General Requirements.**

**A.      We Card Signs, Underage Access Prevention Education, and Compliance.**

**(1)      We Card Signs or Equivalent Signs.**

**(a)**      Two We Card Signs or equivalent signs must be posted in the following locations at a Store:  (i) one sign outward facing at the primary point of entry into the Store or outward facing in a window next to the primary point of entry into the Store; <u>provided</u>, <u>however</u>, that if a Store cannot be entered by consumers or if the prescribed placement of We Card Signs or equivalent signs is prohibited by law, PM USA may designate an alternative location for placement of this sign; and (ii) one sign on top of, above, or behind the Selling Counter in front of the PCMA or the Selling Counter closest to and within the Line of Sight of the PCMA, as determined by PM USA.  Signs prescribed by a state or other governmental authority that perform a function similar to We Card Signs are considered equivalent signs for purposes of the Agreement.  However, We Card Signs should not be considered a replacement for state or other government-required signs performing a similar function.

**(b)**      One or more We Card Items or equivalent items, as determined by PM USA, must be maintained in a Store on top of, above, or behind the Selling Counter in front of the PCMA or the Selling Counter closest to and within the Line of Sight of the PCMA.

**(2)      Underage Retail Access Prevention Education.**

**(a)**      Retailer must ensure that (i) any current employee who sells tobacco products and has not completed We Card Training or equivalent training prior to the Effective Date of the Agreement will complete such training within 90 days following the Effective Date of the Agreement, (ii) any new employee who sells tobacco products will complete We Card Training or equivalent training within 90 days after beginning employment, and (iii) all employees who sell tobacco products complete We Card Training or equivalent training once every 12 months.

**(b)**      Printed materials supplied by PM USA or a third party designated by PM USA relating to preventing underage access to tobacco must be displayed in a prominent location in each Store.

**(3)      MSA Compliance.**  Retailer acknowledges that PM USA is required to comply with the terms of the Master Settlement Agreement.  Retailer agrees not to use or advertise any PM USA cigarette brand name, trademark, logo, symbol, motto, or selling message in any way that PM USA may not, including but not limited to, the posting of any billboard or any Exterior Cigarette Sign in excess of 14 square feet bearing a PM USA cigarette brand name, trademark, logo, symbol, motto, or selling message.  Notwithstanding the preceding sentence, a Store may maintain a Signboard that is greater than 14 square feet, provided the total space occupied by all cigarette advertising, as determined by PM USA, does not exceed 14 square feet and PM USA cigarette brands are in the Number One position on the Signboard.  The space occupied by cigarette advertising will include vacant portions of the Signboard surrounding cigarette advertising, but will not include portions of the Signboard dedicated to advertising services or products other than cigarettes.

Exhibit C
Page 5 of 8

**(4)     Inventory Levels.**   At all times, a Store must keep in stock and merchandise at least one carton or 10 packs, excluding any PM USA Product Promotions, of undamaged product in accordance with the requirements of the Agreement for each of the Designated Marlboro Packings.

**(5)     New Offerings.**   If PM USA recommends that PM USA New Offerings be sold, each Store must accept such New Offerings for sale during the Introductory Period specified by PM USA and must merchandise such New Offerings in accordance with specifications provided by PM USA. Participation in any new PM USA non-cigarette product test market or launch is not a condition of Retailer's participation in the Program.

**B.     Illuminating the PM USA Shelf Signs and Fixture Headers.**   Retailer must ensure the availability of electricity to all Fixtures.  All PM USA Cigarette Signs and Fixture Headers containing PM USA Cigarette Signs must be illuminated, if directed by PM USA.  If any component within or attached to any Fixture, or any sign contained within any Fixture is illuminated or otherwise uses electricity, all PM USA Cigarette Signs and Fixture Headers containing PM USA Cigarette Signs must be illuminated.

**C.     Minimum Pack Size Requirement**.   All cigarettes must be sold in packs of at least 20 cigarettes.

**D.     Website Access Requirement.**   Retailer must log on to the Website at least once during each quarter during the term of the Agreement.  If Retailer does not yet have a valid user account for the Website, Retailer must go to the Website and create such an account, using a valid email address, before logging on.

**E.     Marlboro Product Promotion Acceptance Election.**

**(1)**     If Retailer participates in the Marlboro Product Promotion Acceptance Election, with respect to a Store:

**(a)**     Retailer authorizes PM USA to order <u>automatically</u> on such Store's behalf, from Retailer's designated STARS-reporting wholesaler, all quantities of each Marlboro Product Promotion offered by PM USA to such Store during each STARS Quarter.

**(b)**     Such Store must purchase at least the percentage designated for the CMO at which it participates in the Program of such <u>automatically</u> ordered quantities.  Only those quantities of <u>automatically</u> ordered Marlboro Product Promotions purchased within two STARS Weeks of the first retail delivery date (including the STARS Week during which the first retail delivery date occurs) for such Marlboro Product Promotions will be counted for purposes of determining whether a Store has satisfied this requirement.  A Store will be measured under this requirement for all <u>automatically</u> ordered Marlboro Product Promotions scheduled for delivery during each STARS Quarter.

**(2)**     Notwithstanding the requirement of Section 3.E.(1), a Store will not be required to purchase in any STARS Quarter Marlboro Product Promotions in quantities that, when combined, total more than 10% of the Store's prior year average quarterly Marlboro revenue cigarette purchase volume (or, for a Store that has no prior year average quarterly Marlboro revenue cigarette purchase volume, 10% of the prior year average quarterly Marlboro revenue cigarette purchase volume of stores in the same trade class in the Local Market), all as reflected in STARS.  Such information with respect to each Store will be available on the Website.

**4.     CMO 1 and 2 Requirements.**   For any Store with respect to which Retailer participates in Plan Group I at CMO 1 or CMO 2 or Plan Group H at CMO 2, Retailer must satisfy the applicable requirements set forth in Sections 1 through 3 and the following additional requirement:

**A.     Purchase of Marlboro Product Promotions.**   Subject to the limitation set forth in Section 3.E.(2), each Store with respect to which Retailer participates in the Marlboro Product Promotion Acceptance Election must purchase at least 60% of the quantities of Marlboro Product Promotions automatically ordered by PM USA on its behalf during each STARS Quarter.

Exhibit C
Page 6 of 8

5.      **CMO 3 Requirement.**  For any Store with respect to which Retailer participates in Plan Group X at CMO 3, Retailer must satisfy the applicable requirements set forth in Sections 1 through 3 and the following additional requirements:

A.      **PM USA Retail Price Promotion Participation Requirement.**  Each Store must participate in each PM USA Retail Price Promotion for which it is eligible and with respect to which participation is required, as designated by PM USA and announced on the Website.  In addition, a Store must at all times during any such required PM USA Retail Price Promotion maintain an inventory of at least one carton or 10 packs of undamaged product for at least one packing or brand subject to such PM USA Retail Price Promotion.

B.      **Purchase of Marlboro Product Promotions.**  Subject to the limitation set forth in Section 3.E.(2), each Store with respect to which Retailer participates in the Marlboro Product Promotion Acceptance Election must purchase at least 80% of the quantities of Marlboro Product Promotions automatically ordered by PM USA on its behalf during each STARS Quarter.

6.      **CMO 4 Requirements.**  For any Store with respect to which Retailer participates in Plan Group X at CMO 4, Retailer must satisfy the applicable requirements set forth in Sections 1 through 3 and the following additional requirements:

A.      **Consistent Ordering Requirement.**  Beginning with the first STARS Week of the STARS Quarter in which the Agreement becomes effective, each Store must purchase from a STARS-reporting wholesaler on a weekly basis during 12 out of 13 STARS Weeks in each STARS Quarter at least one carton of any Designated Marlboro Packing, excluding PM USA Product Promotions.  For purposes of determining compliance with this requirement Marlboro Black Box will be the only Marlboro Black Packing counted as a Designated Marlboro Packing.

B.      **PM USA Retail Price Promotion Participation Requirement.**  Each Store must participate in each PM USA Retail Price Promotion for which it is eligible and with respect to which participation is required, as designated by PM USA and announced on the Website.  In addition, a Store must at all times during any such required PM USA Retail Price Promotion maintain an inventory of at least one carton or 10 packs of undamaged product for at least one packing or brand subject to such PM USA Retail Price Promotion.

C.      **Purchase of Marlboro Product Promotions**.  Subject to the limitation set forth in Section 3.E.(2), each Store with respect to which Retailer participates in the Marlboro Product Promotion Acceptance Election must purchase at least 80% of the quantities of Marlboro Product Promotions automatically ordered by PM USA on its behalf during each STARS Quarter.

7.      **CMO 5 Requirements.**  For any Store with respect to which Retailer participates in Plan Group X at CMO 5, Retailer must satisfy the applicable requirements set forth above in Sections 1 through 3 and the following additional requirements:

A.      **PM USA Coupons.**  Unless prohibited by applicable law or regulation, each Store must accept all valid PM USA-issued coupons for PM USA Cigarettes (and other PM USA products sold by such Store) from adult tobacco consumers and must comply with the PM USA Coupon Redemption Policy, as such policy may be issued or modified from time to time by PM USA in its sole discretion.

B.      **Ordering Execution Requirement.**  Beginning with the first STARS Week of the STARS Quarter in which the Agreement is effective (or, for a Store to which an AGDC retail control number has been assigned during such STARS Quarter, beginning with the first STARS Week of the immediately following STARS Quarter), each Store must meet the following requirements for 12 out of 13 STARS Weeks in each STARS Quarter.  For purposes of determining compliance with this requirement Marlboro Black Box will be the only Marlboro Black Packing counted as a Designated Marlboro Packing.

(1)      The Store must purchase from a STARS-reporting wholesaler at least one carton of any Designated Marlboro Packing, excluding PM USA Product Promotions; and

Exhibit C
Page 7 of 8

**(2)**      The Store's weekly combined purchase volume of the Designated Marlboro Packings must be at least 50% of the Store's combined purchase of the Designated Marlboro Packings for the immediately preceding week; provided, however, that the Store's weekly combined purchase of the Designated Marlboro Packings may total no less than one carton.

**C.      PM USA Retail Price Promotion Participation Requirement.**   Each Store must participate in each PM USA Retail Price Promotion for which it is eligible and with respect to which participation is required, as designated by PM USA and announced on the Website.  In addition, a Store must at all times during any such required PM USA Retail Price Promotion maintain an inventory of at least one carton or 10 packs of undamaged product for at least one packing or brand subject to such PM USA Retail Price Promotion.

**D.      Purchase of Marlboro Product Promotions.**   Subject to the limitation set forth in Section 3.E.(2), each Store with respect to which Retailer participates in the Marlboro Product Promotion Acceptance Election must purchase at least 90% of the quantities of Marlboro Product Promotions automatically ordered by PM USA on its behalf during each STARS Quarter.

Exhibit C
Page 8 of 8

**Exhibit D**

**Merchandising Payments**

**1.      General Requirements.**  PM USA will pay Retailer a Merchandising Payment every quarter for each Store for each month during which the Store participates in the Program and during which Retailer and the Store at all times perform in accordance with all applicable requirements of the Agreement; provided, however, that if Retailer executes the Agreement on or before the fifteenth day of a month, subject to performance in accordance with all applicable requirements of the Agreement during the remainder of the month, Retailer will earn a full Merchandising Payment with respect to such month.

**2.      Specific Requirements Measured Quarterly.**  Notwithstanding the above, Retailer will not earn Merchandising Payments for failure to perform the specific requirements outlined below.

**A.**      If Retailer fails to satisfy the Marlboro Product Promotion Purchase Requirement set forth in Section 3.E. of Exhibit C with respect to a Store in any STARS Quarter, Retailer will not earn any Merchandising Payments with respect to such Store for one month of such quarter.

**B.**      If a Store with respect to which Retailer participates at CMO 4 fails to satisfy the Consistent Ordering Requirement set forth in Section 6.A. of Exhibit C in any STARS Quarter, Retailer will not earn any Merchandising Payment for such quarter with respect to such Store.

**C.**      If a Store with respect to which Retailer participates at CMO 5 fails to satisfy the Ordering Execution Requirement set forth in Section 7.B. of Exhibit C in any STARS Quarter, Retailer will not earn any Merchandising Payment for such quarter with respect to such Store.

**D.**      If Retailer fails to satisfy the Website Access Requirement set forth in Section 3.D. of Exhibit C in any quarter, Retailer will not earn any Merchandising Payment for such quarter with respect to its Stores.

**3.      Electronic Funds Transfer.**  Merchandising Payments will be paid only through EFT.   A Merchandising Payment will not be issued to any Store if Retailer has not registered for EFT prior to the end of the quarter for which the Merchandising Payment is being issued.

**4.      Amount of Merchandising Payments.**

**A.**      The amount of the Merchandising Payment earned by Retailer with respect to a Store for each month that the Store participates in the Program is determined by the Store's (1) applicable rate per PM USA Carton and (2) Average PM-CCPM for the current STARS Quarter.   Notwithstanding the preceding sentence, Merchandising Payments will not be paid on purchases of PM USA Cigarettes that exceed the Merchandising Payment Volume Cap.   If the Agreement is effective for only a portion of a STARS Quarter, the Merchandising Payment Volume Cap will be prorated over the period the Agreement is in effect, and the prorated amount will be the maximum on which Merchandising Payments can be earned during that month.

**B.**      PM USA will exclude from a Store's Average PM-CCPM all sales of PM USA Cigarettes that are sold to other retail, wholesale, or trade accounts, as determined by PM USA.   If Retailer disagrees with PM USA's determination that a portion of its purchases are for sales to other retail, wholesale, or trade accounts, Retailer must demonstrate to PM USA's satisfaction that such purchases were not for such sales.

**Exhibit E**

**PM USA Remedies**

**1.      Termination of the Agreement.**

      **A.**      PM USA may terminate the Agreement in its entirety or with respect to one or more Stores immediately if PM USA determines that (1) Retailer has failed to fulfill any term or condition of the Agreement, any term or condition of any PM USA Promotion or any other merchandising or promotional agreement with PM USA, or (2) Retailer has violated any policy promulgated by PM USA and made available to Retailer.

      **B.**      Either Retailer or PM USA may terminate the Agreement in its entirety or with respect to one or more Stores effective 30 days after the delivery of a termination notice to the other pursuant to Exhibit F, Section 24.

      **C.**      Retailer agrees that any termination under this Section will give PM USA the right to terminate any other agreement by and between PM USA and Retailer as of the date that the Agreement is terminated.

**2.      Other PM USA Remedies.**  In addition to the termination rights contained in Section 1, PM USA may exercise the following remedies:

      **A.**      If Retailer violates any of the terms or conditions applicable to any PM USA Promotion, any PM USA Trade Policy or any policy promulgated by PM USA and made available to Retailer from time to time:

      **(1)**      PM USA may suspend or terminate Retailer's participation in current PM USA Promotions;

      **(2)**      Retailer may become ineligible to receive future PM USA Promotions;

      **(3)**      PM USA may suspend Merchandising Payments; and

      **(4)**      PM USA may withhold payment of allowances offered in connection with PM USA Promotions and may offset any overpayments or payments to which Retailer was not entitled against such allowances, Merchandising Payments, or other payments or credits that may otherwise be due to Retailer.

**Exhibit F**

**General Terms and Conditions**

**1.      Plan-O-Grams.**

      **A.**      Each Store must have a Plan-O-Gram provided by PM USA depicting the Fixtures containing the PCMA and any OCMAs.  Such Plan-O-Gram must be attached to the Agreement.  While PM USA will not designate the placement of cigarettes or Cigarette Signs of other cigarette manufacturers, the Plan-O-Gram may reflect the Retailer's Choice Portion.  If designated by PM USA, one Plan-O-Gram may cover more than one Store.  In the event of a conflict between the Plan-O-Gram and the terms and conditions of the Agreement, the terms and conditions of the Agreement will control.  As of April 1, 2014, any Store Layout or Exterior Layout diagram included in a Plan-O-Gram is no longer in effect.

      **B.**      Retailer hereby authorizes PM USA, its affiliates, and third parties contracted by PM USA or its affiliates to move (1) any non-PM USA items, including but not limited to, point of sale materials, signs, light boxes, products, and any or all parts of a fixture (a) from the space that is allocated on the Plan-O-Gram to the merchandising of PM USA products or the placing of PM USA Cigarette Signs, (b) from the space that is determined by PM USA to be in a PM USA Exterior Cigarette Sign location or in the PM USA Interior Cigarette Sign Number One location, or (c) that obstructs PM USA Cigarettes or any PM USA Cigarette Signs; (2) any Cigarette Signs, non-Cigarette Signs or tobacco products from the PM USA Signage Zone or the space 48 inches above the PM USA Portion in an OCMA; or (3) any non-cigarette merchandise that is above the PM USA Portion in either the PCMA or an OCMA.

**2.      PM USA Pack Sales**.  Each Store must at all times advertise and offer for sale packs of PM USA Cigarettes, both premium and discount brands, in a variety and quantity adequate to satisfy local market demand, as determined by PM USA.

**3.      Inventory.**  Each Store must at all times maintain distribution and an inventory of PM USA Cigarettes, both premium and discount brands, in a variety and quantity adequate to satisfy local market demand, as determined by PM USA.

**4.      Product Freshness and Storage.**  Each Store must rotate PM USA Cigarettes on a "first in, first out" basis and remove damaged PM USA Cigarettes from Retailer's sales inventory.  Notwithstanding the preceding sentence, each Store must permit PM USA or its designee to inspect and rotate PM USA Cigarettes and other PM USA products.  Each Store must store all PM USA products (A) away from excessive heat and sunlight, (B) away from excessive odors, (C) above floor level, and (D) in accordance with more detailed specifications that PM USA may provide from time to time.

**5.      Product Quality.**  Retailer may not directly or indirectly permit PM USA products to become Adulterated.

**6.      Prohibited Sale of PM USA Products.**  The sale of damaged or Adulterated PM USA products is prohibited.

**7.      PM USA Carton Limit.**  Each Store may sell no more than 5 cartons (or the equivalent quantity in single packs) of PM USA Cigarettes per day to a single adult tobacco consumer in a single transaction or multiple transactions.  Each Store must place and maintain at least one PM USA-supplied or approved sign communicating the PM USA Carton Limit in a prominent location clearly visible to adult tobacco consumers behind the front Selling Counter.

**8.      PM USA-Supplied Fixtures, Displays and OPMs; Ownership.**  The size and number of all Fixtures, Displays, and OPMs, if any, supplied by PM USA or its affiliates pursuant to the Agreement will be at the sole discretion of PM USA or its affiliates.  Retailer acknowledges the ownership by PM USA or its affiliates of all Fixtures, Displays, and OPMs provided by PM USA or its affiliates and that PM USA may remove such Fixtures, Displays, and OPMs at any time in its sole discretion, unless ownership of such Fixtures, Displays or OPMs has been transferred to Retailer in writing.  Neither Retailer nor any

Store may modify or alter, or allow others to modify or alter, Fixtures, Displays, or OPMs owned by PM USA or its affiliates without the advance written approval of PM USA.

**9.      Entire Store.**   Retailer must satisfy the requirements of the Agreement for each Store in its entirety.   If Retailer divides any Store, literally, or in effect, into separate parts and does not fulfill the requirements of the Agreement for the entire undivided Store, the entire Store will be deemed to have failed to satisfy the requirements of the Agreement.

**10.      No Financial Harm to PM USA.**   Retailer will not be party to, or otherwise participate in, a commercial transaction that may result, directly or indirectly, in a financial loss to PM USA including, but not limited to, any transaction that may result in artificially inflating Retailer's STARS-reported purchase volume of PM USA products.

**11.      Performance Measurement**.   PM USA or its designee may inspect any Store, including, without limitation, conducting a physical inventory of all PM USA Cigarettes and other PM USA products purchased by Retailer, to measure Retailer's performance under the Agreement or in connection with any PM USA Promotion.

**12.      Taxpayer Identification Number.**   PM USA will make Merchandising Payments associated with the Agreement only if Retailer has provided its taxpayer identification number to PM USA or an affiliate of PM USA.

**13.      Change in Taxpayer Identification Number or Retailer Information.**   Retailer will notify AGDC of any change in Retailer's taxpayer identification number or in any of the Retailer Information set forth on page 2 of the Agreement.   Retailer will provide such notification as soon as Retailer becomes aware of, but no later than seven days prior to, any change in the previously submitted information. Notwithstanding the preceding sentence, if disclosure no later than seven days in advance is prohibited by law or impracticable under the circumstances, the disclosure will be made as soon as the disclosure is no longer prohibited by law or as soon as is practicable.

**14.      PM USA Designated Agents.**   PM USA has designated AGDC as its agent to represent PM USA for purposes of all sales-related activities at wholesale and retail, including, but not limited to, the offering and execution of the Program.   PM USA has designated ALCS as its agent to represent PM USA for purposes of financial matters.

**15.      PM USA Brand Indicia.**   Retailer recognizes and acknowledges that the PM USA brand names and the designs, emblems, slogans, and insignia of the PM USA brands, and the goodwill associated therewith ("PM USA Brand Indicia"), have great value and are the sole property of PM USA, and Retailer agrees that it has and will claim no right, title, or interest in or to any PM USA Brand Indicia or the right to use any PM USA Brand Indicia except in accordance with the terms and conditions of the Agreement. Retailer also agrees that it will not use any PM USA Brand Indicia in its corporate or trade name and will not use any PM USA Brand Indicia in marketing its business except to promote the sale of PM USA products to adult tobacco product consumers.

**16.      Confidentiality.**   Retailer and its employees and agents will hold strictly confidential all information and materials provided by PM USA or any affiliate of PM USA to Retailer that are designated by PM USA as confidential.   Retailer will not use or disclose to any third party any such information or materials, without the prior written consent of PM USA.   If Retailer is requested or required to disclose such information or materials to a third party in connection with any ongoing civil or criminal investigation or any judicial or administrative proceeding, Retailer will promptly notify PM USA so that PM USA may, if it chooses, seek an appropriate protective order.   Retailer's obligation to maintain such confidentiality will survive the termination of the Agreement.

**17.      Document Retention.**   Retailer will, and will cause each Store to, maintain complete and accurate books and records and retain all documentation with respect to its performance under the Agreement for a minimum of three calendar years after the date the documentation was created or for such longer period as required by law.   Such documentation will include, without limitation, (A) information regarding PM USA product sales as reported from the Store's register system, (B) monthly cigarette revenue and cigarette sales tax information, including sales tax returns, (C) copies of wholesaler invoices

for PM USA product purchases, (D) documentation sufficient to evidence full and timely payment of all applicable state and local excise taxes, including state and local excise or use tax returns, (E) documents evidencing that Retailer has all required licenses to operate as a seller of tobacco products in the states in which it sells PM USA products, (F) information regarding returns of PM USA products, and (G) any other information or documentation reasonably requested by PM USA in connection with its exercise of its audit and inspection rights under Section 18.

18.     **Reasonable Audits and Inspections; Verification of Purchases and Sales.**  Upon PM USA's request, Retailer will permit PM USA or its designee to audit and inspect, with or without notice, its books, records, documentation, including but not limited to, all licenses, permits, consents, and other authorizations necessary for the conduct of its business, cigarette inventory, Store premises, and all on and off-site cigarette storage locations to evaluate Retailer's satisfaction of its obligations under the Agreement or Retailer's rights to receive any benefits under the Agreement.  If PM USA requests, Retailer will submit full and complete copies of documentation to PM USA or its designee in lieu of, or in addition to, PM USA or its designee conducting an on-site audit or inspection.  Audits and inspections may include, or consist only of, physical inventories or physical inspections conducted by or on behalf of PM USA of all cigarettes in Retailer's possession or under its control, and Retailer will cause cigarettes to be conveniently available for such purposes.  In addition, Retailer agrees to provide any and all information and documentation requested by PM USA, in a form satisfactory to PM USA, sufficient to verify Stores' cigarette purchases and sales by brand and SKU.  Such information and documentation may include, the information and documentation set forth in Section 17.

19.     **Taxes.**  Any tax liabilities, including but not limited to income, sales, transfer, use, or excise taxes payable in connection with the Merchandising Payments and other transactions contemplated by the Agreement, if any, are the sole responsibility of and will be paid by Retailer.

20.     **Deductions or Setoff.**  Retailer agrees that it will not make any deduction from any amount due to PM USA at any time, whether under the Agreement or any other agreement between PM USA and Retailer, and whether under a claim of offset, recoupment, dispute, or otherwise.  Retailer agrees, however, that PM USA, may, but is in no way obligated to, recoup, offset, or otherwise reduce or withhold any Merchandising Payment or payment under any other agreement between PM USA and Retailer from or by any outstanding amount due to PM USA from Retailer hereunder or thereunder (including amounts paid in error by PM USA to Retailer).

21.     **Compliance with Laws.**  Retailer must comply with all applicable laws, regulations, and ordinances relating to the Agreement, Retailer's performance under the Agreement, and the sale or use of PM USA Cigarettes.  Retailer represents and warrants that it has obtained all licenses, permits, consents, and other authorizations necessary for the conduct of its business and that it will maintain all such licenses, permits, consents, and other authorizations in full force and effect throughout the term of the Agreement.  Retailer will comply with all federal, state, local, or other laws, regulations, and ordinances applicable to the sale of tobacco products, including the Federal Cigarette Labeling and Advertising Act (15 U.S.C. § 1331 *et seq.*) and the Family Smoking Prevention and Tobacco Control Act (Public Law 111-31; *see also* 21 U.S.C. § 301 *et seq.*).  Retailer will promptly disclose to PM USA any conviction of Retailer, its officers, owners, or principals, whether by trial or by plea agreement, for a criminal offense related to the sale or distribution of tobacco products.  Retailer must promptly notify PM USA in the event that any of Retailer's obligations under law, contract, or other legal undertaking is or may be inconsistent with any of the terms or conditions of the Agreement.

22.     **Indemnification.**  Retailer agrees to indemnify and hold harmless PM USA, its affiliates, and each of their respective officers, employees, directors, and agents from all claims, liabilities, costs, and expenses, including reasonable attorneys' fees, that arise from or may be attributable to any error, omission, misrepresentation, or fault of Retailer, including, but not limited to, Retailer's failure to pay or cause to be paid any applicable state or local excise taxes due on PM USA products purchased or sold by Retailer.  Retailer's obligation to indemnify and hold harmless will survive the termination of the Agreement.  PM USA will have primary control of the defense or settlement of any such claim; <u>provided, however</u>, that Retailer will have the right to participate at its own expense in the defense or settlement of any such claim that is asserted against Retailer.

**23.    Attorneys' Fees.**  In the event that PM USA is required to engage the services of any attorneys for the purpose of enforcing the Agreement, or any provision thereof, PM USA will be entitled to recover its reasonable expenses and costs in enforcing the Agreement or provision, including attorneys' fees.

**24.    Independent Status.**  The Agreement is not to be construed to create an association, partnership, joint venture, relation of principal and agent, or employer and employee between PM USA and Retailer or Retailer's employees, agents, or subcontractors, within the meaning of any federal, state, or local law.  Retailer is not authorized to and will not enter into any agreement, oral or written, on behalf of PM USA or otherwise obligate PM USA without PM USA's advance, written approval.

**25.    Notices.**  If at any time PM USA wishes to give any notice or other communication in connection with the Agreement, including notices of alterations, amendments, or modifications of the Agreement or the termination of the Program, PM USA may deliver such notice or other communication in writing by posting such notices on the Website, or by using e-mail, mail, fax, or such other means as PM USA determines.   All notices and other communications hereunder will be deemed to have been made: (A) when delivered: if in person, by confirmed facsimile transmission, or by certified or registered mail return receipt requested; (B) if sent by recognized overnight delivery service, the date after it is sent; (C) when sent:  if sent through e-mail or by postage prepaid first class mail; or (D) if posted on the Website, when posted.  In each case notice will be provided as follows:

To Retailer:  On the Website or at the (1) e-mail address or facsimile number provided by Retailer through the Website or (2) address listed on the Agreement or

To PM USA:  By delivery of such notice in writing to Retailer's AGDC representative.

**26.    Waiver With Respect to the Website.**  Retailer acknowledges that Retailer's failure to provide and update as necessary a valid email address or to access the Website regularly may result in Retailer's inability to be apprised of updates to the Website and to otherwise receive important information and notices in connection with the Agreement.  Retailer waives any and all claims at law or in equity it may have against PM USA that arise out of or relate to Retailer's failure to provide and update as necessary a valid e-mail address or to access the Website regularly, to receive information or notices via e-mail or through the Website, or to otherwise conduct transactions through the Website.

**27.    NO REPRESENTATION OR WARRANTY.  NEITHER PM USA NOR ANY PM USA AFFILIATE WARRANTS, AND EACH SPECIFICALLY DISCLAIMS ANY REPRESENTATION THAT THE INTERNET, ITS EMAIL SYSTEM OR ANY OTHER ELECTRONIC MEANS WILL BE UNINTERRUPTED OR ERROR-FREE.  PM USA SHALL HAVE NO LIABILITY FOR THE FAILURES OF ITS SERVICE PROVIDERS AND SHALL NOT BE RESPONSIBLE FOR ANY UNDELIVERED, MIS-DELIVERED, OR INACCURATE ELECTRONIC MESSAGES.**

**28.    Review of Agreement.**  Retailer represents that Retailer has read carefully and fully understands the terms of the Agreement.  Retailer acknowledges that Retailer is executing the Agreement voluntarily and knowingly, and that Retailer has not relied on any representations, promises, or agreements of any kind made to Retailer in connection with Retailer's decision to accept the terms of the Agreement, other than those set forth in the Agreement.

**29.    Construction.**  The parties to the Agreement have had the opportunity to consult legal counsel regarding the terms hereof, and, therefore, the Agreement will not be construed for or against either party hereto.

**30.    No Conflict.**  Retailer represents that neither the execution and delivery by Retailer of the Agreement, nor the performance by Retailer of its obligations hereunder will conflict with, result in a breach of, or create in any party the right to terminate, modify, or cancel, any contract or instrument to which Retailer is a party.

**31.    Disclosure of Participation Level.**  PM USA may disclose Retailer's level of participation in the Program, a PM USA Promotion, or any other PM USA promotional offering to any of Retailer's suppliers that has delivered PM USA Cigarettes to Retailer within 13 weeks prior to such disclosure.

**32.** **Governing Law.**  The Agreement will be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to any conflict of law provisions thereof that would cause the application of the laws of any jurisdiction other than the Commonwealth of Virginia.

**33.** **Submission to Jurisdiction.**  Each of the parties hereto hereby agrees that all actions, suits, or other proceedings arising out of or relating in any way to the Agreement will be brought only in (A) the General District Court and Circuit Court of the Commonwealth of Virginia, Henrico County or (B) the United States District Court for the Eastern District of Virginia, Richmond Division.  Each of the parties hereto hereby knowingly, voluntarily, intelligently, absolutely, and irrevocably waives and agrees not to assert any objection he, she, or it may now or hereafter have to the laying of venue of all actions, suits, or proceedings arising out of or relating in any way to the Agreement in such courts and irrevocably consents to the jurisdiction of such courts for such purposes.  Each of the parties hereto hereby knowingly, voluntarily, intelligently, absolutely, and irrevocably waives and agrees not to assert in any such action, suit, or proceeding that he, she, or it is not subject to the personal jurisdiction of such courts or that the action, suit, or proceeding should be transferred to a different venue under *forum non conveniens* principles or statutes embodying such principles.  Each party to the Agreement covenants and agrees not to bring any action or proceeding arising out of or relating to the Agreement in any forum not specifically provided for in the Agreement.  If either party breaches this covenant, such party must pay the reasonable attorneys' fees and expenses incurred by the other party in connection with such proceedings.  The parties agree that this Section 33 will apply even where there are third parties to or involved in an action, suit, or other proceeding covered by this Section 33.

**34.** **Waiver of Jury Trial.**  RETAILER AND PM USA HEREBY WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, ARISING OUT OF, OR RELATING TO, THE AGREEMENT.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR PM USA TO ENTER INTO THE AGREEMENT.

**35.** **Sovereign Immunity.**  If Retailer is a corporation or other business entity duly chartered and validly existing pursuant to the laws of a sovereign Indian nation, tribe, band, or other Indian community recognized as such by the federal government, then Retailer hereby waives whatever sovereign immunity it may possess in connection with the enforcement by PM USA of its rights under the Agreement.

**36.** **Changes to the Retail Leaders 2014 Agreement.**  PM USA may amend the Agreement, in whole or in part, including any Exhibit, from time to time in its sole discretion by providing notice to Retailer in accordance with the terms of the Agreement.

**37.** **Alteration of Terms.**  No member of the AGDC field sales force has the authority to modify, amend, or otherwise alter any terms or conditions of the Agreement.

**38.** **Exercise of Rights; Non-Waiver.**  Neither failure nor delay on the part of either party hereto to exercise any right, power, or privilege hereunder will operate as a waiver or relinquishment thereof, nor will any single or partial exercise of any other right, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

**39.** **No Assignment.**  The Agreement may not be assigned by Retailer in whole or in part, either directly or by operation of law.

**40.** **Severability.**  If any provision of the Agreement is held invalid or unenforceable, the remaining provisions will remain in effect.

**41.** **Entire Agreement.**  The Agreement constitutes the entire agreement between the parties hereto and supersedes all prior and contemporaneous proposals, discussions, understandings, and agreements, whether oral or written, between the parties on this subject matter.

**42.** **Titles and Headings.**  The titles, headings, and captions used in the Agreement are used for convenience only and are not to be considered in construing or interpreting the Agreement.  All references in the Agreement to parts, sections, paragraphs, subparagraphs, and exhibits, if any, will, unless otherwise provided, refer to parts, sections, paragraphs, and subparagraphs of the Agreement and the exhibits incorporated therein by reference.

**43.     Retailer Signature.**   The Agreement must be signed and accepted by an authorized representative of Retailer.

**44.     Counterparts; Execution.**   To facilitate execution, the Agreement may be executed in as many counterparts as may be required, and each such counterpart will be deemed to be an original instrument, but all such counterparts together will constitute but a single agreement.

## Exhibit G

## PM USA Signage Zones

### *CMO 1 and CMO 2 Vertical Sets*

*(PM USA Portion not in center)*

***OR***

*(PM USA Portion in center)*

### *CMO3 Premium T Set (Optional); CMO 2,CMO 3, CMO 4, and CMO 5 Horizontal Set*

***OR***



 **PM USA Signage Zone**

*No Access Retailers (Plan Groups I, H, and X)*

 **PM USA Signage Zone**

**Selling window in No Access Retail Store**



**PM USA Share of selling window not to exceed 50%**

**Exhibit H**

**General Terms and Conditions of
PM USA Promotions**

**1.      PM USA Promotions.**

        **A.       General.**  A Store may participate in PM USA Promotions for which it is eligible.  Retailer must comply with all requirements communicated by PM USA via the Website or other Promotion Notice for such promotions.  Prior to the start of each Promotion Period, PM USA will notify Retailer of the PM USA Promotions available to each Store during a Promotion Period.  A Store will be eligible only for those PM USA Promotions (a) that are available to such Store during a particular Promotion Period and (b) for which such Store satisfies the eligibility criteria communicated.

        **B.       Disclosure of Competitive Promotional Activity**.  PM USA may, at times, offer PM USA Promotions in response to promotions offered by PM USA's competitors.  To assist PM USA in responding to such promotional activity in the marketplace, PM USA may require that Retailer provide to AGDC accurate information regarding manufacturer-funded promotional allowances or price reductions on non-PM USA Cigarettes, including informing AGDC of any changes to such promotional allowances or price reductions.

        **C.       Modification or Cancellation of PM USA Promotions.**  PM USA may modify or cancel any PM USA Promotion at any time.

**2.      PM USA Product Promotions.**

        **A.**       A Store must sell each PM USA Product Promotion only as originally packaged and marketed to adult tobacco consumers and must not break up or reconfigure any PM USA Product Promotions in any manner.

        **B.**       A Store must not sell or give away any PM USA Product Promotion: (i) to other retail, wholesale, or commercial purchasers; (ii) in any transaction that is not face-to-face to adult tobacco consumers; or (iii) otherwise in violation of any of the policies promulgated by PM USA and distributed or otherwise made available to Retailer.

        **C.**       Retailer acknowledges and agrees that each Store's eligibility for certain PM USA Product Promotions may be conditioned on such Stores' compliance with additional terms and conditions, as communicated by PM USA via the Website or other Promotion Notice.  To the extent a Store purchases such PM USA Product Promotions from its wholesaler, such Store must comply with all such additional terms and conditions applicable to such PM USA Product Promotions.

**3.      PM USA Off-Invoice Promotions.**  Retailer understands that its Stores may receive from one or more wholesalers PM USA Cigarettes or other PM USA products at prices reduced by PM USA Off-Invoice Promotional Allowances.  If and when a Store receives from any wholesaler PM USA Cigarettes or other PM USA products at prices reduced by PM USA Off-Invoice Promotional Allowances, Retailer agrees that such Store will reduce the selling price for each PM USA promoted brand or brand packing by subtracting from the Non-Promoted Price an amount not less than the amount of the applicable PM USA Off-Invoice Promotional Allowance and comply with all other requirements communicated by PM USA for such promotions.

**4.      PM USA Retail Price Promotions and Marlboro Performance Options.**

        **A.**       To the extent a Store participates in and complies fully with the terms of a PM USA Retail Price Promotion or Marlboro Performance Option, PM USA will pay to Retailer any applicable PM USA Promotional Allowance offered in connection with such PM USA Promotion based on such Store's purchases of the promoted PM USA products reported in STARS, except as otherwise provided herein or as otherwise communicated by PM USA.  Upon request, Retailer must provide to PM USA information

and documentation (e.g., Scan Data, register tapes), in a form satisfactory to PM USA, sufficient to verify a Store's pricing and sales of promoted PM USA products during a designated Promotion Period.

       **B.**      In support of the PM USA Carton Limit, certain PM USA Promotions may specify a volume limit above which Promotional Allowances will not be paid with respect to cigarette volume for Capped Stores during any Promotion Period (the "Cap Threshold"). For such PM USA Promotions, only Uncapped Stores will be eligible for Promotional Allowances on volume in excess of the Cap Threshold. For all such PM USA Promotions and Stores, the following requirements apply:

       **(1)**      For a Store to be an "Uncapped Store," such Store must pass an initial review by PM USA or an affiliate of such Store's Scan Data to determine if the Store is in compliance with the PM USA Carton Limit. "Uncapped" status will be granted beginning with the STARS Quarter immediately following a successful passing of such initial review. Thereafter, the Store must continue to maintain Scan Data demonstrating continued compliance with the PM USA Carton Limit. Upon the request of PM USA or an affiliate, the Store must submit to PM USA such Scan Data, and pass each subsequent review of such Scan Data by PM USA or an affiliate, which reviews may be conducted at any time in the sole discretion of PM USA. "Uncapped" status will continue until the Store fails to pass a review by PM USA or an affiliate.

       **(a)**      To participate in an initial review of Scan Data, a Store must (i) participate in the Agreement at CMO 3, 4, or 5, (ii) have had Marlboro and L&M volume, as determined by PM USA, exceeding an average of 650 cartons per week in any Promotion Period during the preceding 13 Weeks, and (iii) notify PM USA that such Store has Scan Data covering at least the five-week period immediately preceding such notification.

       **(b)**      All Scan Data requested by PM USA or an affiliate must be submitted at the times and in the format specified by PM USA or an affiliate.

       **(2)**      In the event that a Store fails to maintain, and upon request submit to PM USA or an affiliate, the required Scan Data in the specified format and in the required time period for any review or submits Scan Data demonstrating non-compliance with the PM USA Carton Limit, in addition to any other remedies available to PM USA, such Store will fail the review and be deemed a "Capped Store." Such Store will not be eligible for Promotional Allowances in excess of the Cap Threshold beginning with the next STARS Quarter. Such Store will become an Uncapped Store only after it passes a review by PM USA or an affiliate. The Store's status as an Uncapped Store will be effective as of the beginning of the STARS Quarter immediately following the successful passing of such review.

       **C.**      Payment of PM USA Promotional Allowances will be made only for PM USA products sold in accordance with all applicable provisions of the Agreement and the terms and conditions of the PM USA Promotion. Without limiting the foregoing, PM USA Promotional Allowances are not payable on (1) purchases of promoted PM USA products that exceed sales of such products to adult tobacco consumers during a designated Promotion Period, as determined by PM USA or (2) any sale that:

       **(a)**      is not conducted on a face-to-face basis (e.g., mail order, Internet);

       **(b)**      is a PM USA Product Promotion, unless otherwise communicated by PM USA;

       **(c)**      is made in violation of a PM USA Trade Policy or other policy promulgated by PM USA;

       **(d)**      exceeds the PM USA Carton Limit; or

       **(e)**      is made to other retail, wholesale, or trade accounts.

       **D.**      If a Store meets the criteria established by PM USA for participation in a PM USA Retail Price Promotion, including participation in the Program or participation in the Program at a certain CMO, such Store will be eligible to participate in such PM USA Retail Price Promotion beginning on the Effective Date; provided, however, that if the date on which Retailer executes the Agreement is after the fifteenth day of the month, its Stores will become eligible to participate in such PM USA Retail Price Promotion beginning on the first day of the next Promotion Period unless otherwise communicated by PM USA.

**E.**     With respect to all PM USA Retail Price Promotions and Marlboro Performance Options, Retailer must place and maintain interior point-of-sale signage that advertises the promoted price of each promoted product in a location visible to adult tobacco consumers.

**F.**     In the event of the initiation of a PM USA Retail Price Promotion, an increase in a Promotional Allowance, or any change in a Store's eligibility or election to participate in any PM USA Retail Price Promotion, PM USA may require that such Store maintain its Non-Promoted Price for the applicable PM USA promoted product at a level not higher than the average Non-Promoted Price for such product during the previous Promotion Period for no less than one full Promotion Period, or the announced duration of the PM USA Retail Price Promotion up to three full Promotion Periods, after the date of a Store's participation in the relevant PM USA Retail Price Promotion, unless such Store incurs an increase in the cost of such product (e.g., state excise tax increase or wholesale list price increase by a non-affiliated distributor).

**G.**     Retailer agrees that artificially inflating its Non-Promoted Prices so as to impede the objective of actual price reductions to adult tobacco consumers in amounts at least equal to the Promotional Allowances offered by PM USA constitutes non-compliance with the Agreement.

**Exhibit I**

**STARS Calendar (2014)**

| STARS Week Ending Date | STARS Week | STARS Month | STARS Quarter | MSA Week # |
|---|---|---|---|---|
| Year 2014 | | | | |
| 01/04/14 | 1 | 1 | Q1 2014 | 1029 |
| 01/11/14 | 2 | 1 | | 1030 |
| 01/18/14 | 3 | 1 | | 1031 |
| 01/25/14 | 4 | 1 | | 1032 |
| 02/01/14 | 5 | 2 | | 1033 |
| 02/08/14 | 6 | 2 | | 1034 |
| 02/15/14 | 7 | 2 | | 1035 |
| 02/22/14 | 8 | 2 | | 1036 |
| 03/01/14 | 9 | 3 | | 1037 |
| 03/08/14 | 10 | 3 | | 1038 |
| 03/15/14 | 11 | 3 | | 1039 |
| 03/22/14 | 12 | 3 | | 1040 |
| 03/29/14 | 13 | 3 | | 1041 |
| 04/05/14 | 14 | 1 | Q2 2014 | 1042 |
| 04/12/14 | 15 | 1 | | 1043 |
| 04/19/14 | 16 | 1 | | 1044 |
| 04/26/14 | 17 | 1 | | 1045 |
| 05/03/14 | 18 | 2 | | 1046 |
| 05/10/14 | 19 | 2 | | 1047 |
| 05/17/14 | 20 | 2 | | 1048 |
| 05/24/14 | 21 | 2 | | 1049 |
| 05/31/14 | 22 | 3 | | 1050 |
| 06/07/14 | 23 | 3 | | 1051 |
| 06/14/14 | 24 | 3 | | 1052 |
| 06/21/14 | 25 | 3 | | 1053 |
| 06/28/14 | 26 | 3 | | 1054 |
| 07/05/14 | 27 | 1 | Q3 2014 | 1055 |
| 07/12/14 | 28 | 1 | | 1056 |
| 07/19/14 | 29 | 1 | | 1057 |
| 07/26/14 | 30 | 1 | | 1058 |
| 08/02/14 | 31 | 2 | | 1059 |
| 08/09/14 | 32 | 2 | | 1060 |
| 08/16/14 | 33 | 2 | | 1061 |
| 08/23/14 | 34 | 2 | | 1062 |
| 08/30/14 | 35 | 3 | | 1063 |
| 09/06/14 | 36 | 3 | | 1064 |
| 09/13/14 | 37 | 3 | | 1065 |
| 09/20/14 | 38 | 3 | | 1066 |
| 09/27/14 | 39 | 3 | | 1067 |
| 10/04/14 | 40 | 1 | Q4 2014 | 1068 |
| 10/11/14 | 41 | 1 | | 1069 |
| 10/18/14 | 42 | 1 | | 1070 |
| 10/25/14 | 43 | 1 | | 1071 |
| 11/01/14 | 44 | 2 | | 1072 |
| 11/08/14 | 45 | 2 | | 1073 |
| 11/15/14 | 46 | 2 | | 1074 |
| 11/22/14 | 47 | 2 | | 1075 |
| 11/29/14 | 48 | 2 | | 1076 |
| 12/06/14 | 49 | 3 | | 1077 |
| 12/13/14 | 50 | 3 | | 1078 |
| 12/20/14 | 51 | 3 | | 1079 |
| 12/27/14 | 52 | 3 | | 1080 |

Exhibit I
Page 1 of 1