UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|                                        |     |                               |
| -------------------------------------- | --- | ----------------------------- |
| UNITED STATES OF AMERICA,               | )   |                               |
|                                        | )   |                               |
| Plaintiff,                              | )   |                               |
|                                        | )   |                               |
| v.                                      | )   | Civil Action No. 99-2496 (PLF) |
|                                        | )   |                               |
| PHILIP MORRIS USA INC., et al.,         | )   |                               |
|                                        | )   |                               |
| Defendants.                             | )   |                               |
|                                        | )   |                               |

OPINION & ORDER #92 – REMAND

      Litigation in this case has persisted for over two decades. In 2006, Judge Gladys

Kessler, after conducting a nine-month bench trial, issued a thorough opinion in which she found

that the defendant manufacturers had conspired to violate and in fact did violate the substantive

provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

§ 1962. See United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1, 27 (D.D.C. 2006)

("J. Kessler Op."). Section 1964 of RICO gives the Court "jurisdiction to prevent and restrain

violations of section 1962 of this chapter by issuing appropriate orders . . . making due provision

for the rights of innocent persons." See 18 U.S.C. § 1964(a). Judge Kessler issued a remedial

order that set out specific remedies to prevent and restrain future RICO violations by the

defendant tobacco manufacturers, including an injunction requiring the defendants to issue

"corrective statements." See J. Kessler Op. at 27; 938-41. The D.C. Circuit "largely affirm[ed]

the remedial order . . . and remand[ed] to the district court regarding only four discrete issues."

See United States v. Philip Morris, 566 F.3d 1095, 1150 (D.C. Cir. 2009). One of those four

discrete issues is the implementation of one remedy: the corrective statements the defendants must include in their retail point-of-sale ("POS") displays. The D.C. Circuit "vacate[d] the remedial order as it regards point-of-sale displays and remand[ed] for the district court to make due provision for the rights of innocent third parties." Id. This is the single remaining issue on remand before this Court.[1]

## I. BACKGROUND

In her 2006 omnibus opinion, Judge Kessler determined that "an injunction ordering Defendants to issue corrective statements is appropriate and necessary to prevent and restrain them from making fraudulent public statements on smoking and health matters in the future." See J. Kessler Op. at 926. Judge Kessler ordered that the corrective statements be disseminated through newspapers, television, advertisements, onsets in cigarette packages, in retail displays, and on the manufacturers' corporate websites. See id. at 928. The corrective statements disseminated in retail displays (the POS remedy) would require retailers that participate in the defendants' Retail Merchandising Program – that is, those that contract to display the manufacturers' in-store advertising – to display signs containing corrective statements. See United States v. Philip Morris, 566 F.3d at 1141. The Remedial Order set out the specifications for the corrective statements; specifically, it dictated that the POS corrective statements be publicized in countertop displays and header displays. See J. Kessler Op. at 939-40.[2]

---

[1]     The D.C. Circuit also directed this Court to "clarify that the order, if reinstated in any form, does not require duplicative displays." United States v. Philip Morris, 566 F. 3d at 1142, 1150.

[2]     The exact wording of the corrective statements was to be proposed by the parties within sixty days of the issuance of the opinion (although the deadline was later modified), and then approved by the Court. See J. Kessler's Op. at 928, 938-39.

The D.C. Circuit vacated Judge Kessler's remedial order as it pertained to the POS displays only, finding that "the district court exceeded its authority by failing to consider the rights of retailers and crafting an injunction that works a potentially serious detriment to innocent persons not parties to or otherwise heard in the district court proceedings." See United States v. Philip Morris, 566 F.3d at 1141-42; see also 18 U.S.C. § 1964(a). The court reasoned that the "[r]etailers affected by this order – none of whom were involved in the litigation in any way – did not receive notice of this remedy or an opportunity to present evidence or arguments to the district court regarding the impact the injunction would have on their businesses. Nor does it appear that the district court independently considered the impact of this program on affected retailers," a part of the Court's obligations under Section 1964(a). See United States v. Philip Morris, 566 F.3d at 1141.

Upon vacating the remedial order as it pertained to the POS displays, the D.C. Circuit instructed this Court "to evaluate and 'mak[e] due provision for the rights of innocent persons,' either by abandoning this part of the remedial order or by crafting a new version reflecting the rights of third parties." See United States v. Philip Morris, 566 F.3d at 1142 (quoting 18 U.S.C. § 1964(a)). In other words, the Court may now order "some form of a point-of-sale display injunction" if it finds that it "is still appropriate after considering the rights of third parties and existing contracts." See id. After considering a joint status report [Dkt. No. 6261] from the parties, this Court decided that an evidentiary hearing would be necessary for the parties to adequately present their legal and factual arguments with respect to a "new version" of how the POS remedy would be implemented, and to allow third party retailers the opportunity to air their concerns. See May 21, 2019 Order [Dkt. No. 6283]. The Court's immediate task, therefore, is to determine the scope of that evidentiary hearing. A status

conference was held on June 24, 2019, during which the parties expressed disagreement about the meaning and import of the D.C. Circuit's instructions. The Court then ordered the parties to brief their interpretations of those instructions regarding the scope of the evidentiary hearing. It turns now to an evaluation of the arguments the parties presented at the status conference and in their filings.

## II. DISCUSSION

### A. The Parties' Arguments

The defendant manufacturers assert that the D.C. Circuit vacated the POS remedy in toto. Thus, they maintain that the Court's task is expansive: it must essentially begin at square one, allowing the parties to relitigate Judge Kessler's legal conclusions and factual findings. Specifically, defendants argue that the Court must evaluate its own statutory authority under Section 1964(a) and balance the equities before issuing an injunction. See Manufacturers' Opening Brief on the Scope of the Evidentiary Hearing ("Def. Op. Br.") [Dkt. No. 6293] at 2, 15-16.[3] According to the defendants, the Court also must determine the benefit that the proposed POS remedy would provide, so that any such benefit may be weighed against "the burdens the remedy would impose on innocent third parties." See id. at 2. Such a calculation is necessary, the defendants argue, for the Court to determine whether it should impose a new POS remedy or whether such remedy should be abandoned altogether. See id. at 5; Manufacturers' Reply Brief ("Def. Reply") [Dkt. No. 6303] at 4. In evaluating the propriety of the POS remedy, the defendants maintain that the Court must consider current information – updated from the point in time that Judge Kessler made her factual findings and announced her legal conclusions – to

---

[3]    Page number citations to the documents the parties have filed refer to those that the Court's electronic case filing system automatically assigns, not the numbers at the bottom of each page.

determine anew whether the POS remedy will prevent and restrain future RICO violations. See Def. Op. Br. at 5-10.

The plaintiffs urge a more limited approach.[4] In contrast to the defendants' argument, the plaintiffs contend that "[t]he D.C. Circuit's narrow remand does not authorize, much less require, this Court to consider or reconsider the many issues advanced by the manufacturers and retailers that are not specific to the retailers, such as whether the corrective statement remedy at retail points-of-sale is necessary and appropriate to prevent and restrain future violations of the RICO statute by the manufacturers." See Plaintiffs' Response Brief ("Pl. Response") [Dkt. No. 6300] at 7-8. They maintain that the question to be considered at the hearing instead is "whether Plaintiffs' proposed implementation of the corrective statement remedy at retail points-of-sale will affect retailers' rights, and if so, whether the order can be tailored to make 'due provision' for them." See id. at 7 (emphasis added).

The National Association of Convenience Stores ("NACS") has also submitted briefing on this topic.[5] The arguments of the NACS mirror those of the defendant manufacturers. Like the defendants, NACS contends that "making due provision for the rights of innocent persons" requires the Court to "consider the burdens to non-parties versus the need to restrain future RICO harms." See NACS Opening Brief ("NACS Op. Br.") [Dkt. No. 6294] at 8; see also id. at 11-12. NACS also argues that the statutory language permitting district courts to

---

[4]     The plaintiffs in this case are the United States of America and the Public Health Intervenors.

[5]     The NACS and the National Association of Tobacco Outlets, Inc. ("NATO") are the two national retail associations that plan to participate in the evidentiary hearing. See June 19, 2019 Joint Status Report [Dkt. No. 6286] at 1 n.2. NACS and NATO first joined the case on Judge Kessler's invitation to brief the "legal and practical impact of point-of-sale displays," see Order #19-Remand [Dkt. No. 5916] at 1, and the Court therefore now considers them as amici. NATO has not filed its own brief on the subject of the scope of the evidentiary hearing, but it concurs with NACS' positions set out in its opening brief and reply brief [Dkt. Nos. 6295, 6304].

order "reasonable restrictions" necessarily implicates a balancing analysis. See id. at 11. But the NACS goes further. Analogizing to the process provided to innocent third parties under Section 1963 of the same statute (related to forfeiture remedies), NACS argues that "[f]undamental principles of due process require notice and individual process for each and every retailer or other non-party that would be affected by the proposed injunction" -- which would total over 200,000 retailers, according to its calculations. See id. at 6 (emphasis in original). It therefore argues that "there simply is no practical way to 'make due provision' for third parties not before the Court," see id. at 6, and "[p]roviding NACS with the opportunity to brief issues and appear at the evidentiary hearing is insufficient." See id. at 14. Thus, the "concerns that led the D.C. Circuit to vacate the prior POS remedy will not be alleviated," and the POS remedy must be abandoned. See id. at 6. In addition, NACS contends that the Court has no jurisdiction to issue an injunction, binding the retailers, without such process. See id. at 13.

### B. Analysis

#### 1. The Court's Role is Limited

The Court concludes that its role is significantly narrower than the defendants and NACS suggest, but somewhat more expansive than the plaintiffs urge. Judge Kessler issued a detailed opinion that settles most of the legal questions involved in the Court's instant task. Specifically, she resolved the following matters: (1) Once it made a finding of liability under Section 1962, the Court had authority to enjoin future RICO violations pursuant to Section 1964(a), see J. Kessler Op. at 932; (2) pursuant to that authority, "an injunction ordering Defendants to issue corrective statements is appropriate and necessary to prevent and restrain them from making fraudulent public statements," see J. Kessler Op. at 926; (3) the defendants' First Amendment rights did not prohibit the corrective statement remedy, see id.; and (4) the

corrective statement injunction is "narrowly tailored to prevent Defendants from continuing to disseminate fraudulent public statements and marketing messages by requiring them to issue truthful corrective communications." See id. at 927.

None of these remain open questions to be litigated – or more accurately, relitigated. Contrary to the defendants' arguments, the D.C. Circuit did not upset these legal conclusions. In fact, the court of appeals generally affirmed the "corrective statements" fashioned by Judge Kessler's remedial order as appropriate RICO remedies, concluding that the "corrective statements will prevent and restrain [the defendants] from making fraudulent public statements on smoking and health matters in the future." See United States v. Philip Morris, 566 F.3d at 1140 (internal quotations omitted). There was no suggestion in the court of appeals' opinion that this conclusion did not apply also to corrective statements for POS displays, so long as this Court considered and gave due consideration to the rights of innocent persons.

The law of the case doctrine establishes that "a court involved in later phases of a lawsuit should not re-open questions decided (i.e. established as the law of the case) by that court or a higher one in earlier phases." See Crocker v. Piedmont Aviation, Inc., 49 F.3d 735, 739 (D.C. Cir. 1995). See also United States v. Philip Morris, 855 F.3d 321, 327-28 (D.C. Cir. 2017); United States v. Philip Morris, 801 F.3d 250, 257 (D.C. Cir. 2015); LaShawn v. Barry, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) (explaining that the law of the case doctrine dictates that "[t]he same issue presented a second time in the same case in the same court should lead to the same result" (emphasis in original)). It would be a waste of judicial resources – and it would contravene the law of the case doctrine – to permit relitigation of those legal conclusions. See, e.g., New York v. Microsoft Corp., 224 F. Supp. 2d 76, 88 (D.D.C. 2002) ("When issues have been resolved at a prior stage in the litigation, based upon principles of judicial economy, courts

generally decline to revisit resolved issues."). Because the D.C. Circuit affirmed the majority of Judge Kessler's Remedial Order and remanded only as to four discrete issues, Judge Kessler's legal conclusions – even if not explicitly affirmed by the D.C. Circuit – remain the law of the case. Consistent with the law of the case doctrine, this Court will respect and apply Judge Kessler's prior legal conclusions to the POS remedy issue.

Thus, contrary to the defendants' arguments, the Court's task is not to determine whether the POS remedy – one form of corrective statement – is an appropriate remedy under Section 1964(a), or whether to enter a permanent injunction after engaging anew in a balancing of the equities. See Def. Op. Br. at 2, 12-16; Def. Reply at 4-5. The prevent-and-restrain efficacy of a POS remedy, its constitutionality, and its propriety as injunctive relief have already been decided by Judge Kessler. The D.C. Circuit's decision to vacate and remand part of the Remedial Order did not disturb her conclusions; it merely set aside the specific plan to implement the POS remedy proposed by Judge Kessler and directed this Court to determine whether a new version of the POS remedy could be crafted. See United States v. Philip Morris, 566 F.3d at 1142. [6] Specifically, the D.C. Circuit "vacate[d] the order regarding point-of-sale displays and remand[ed] for the district court to evaluate and 'mak[e] due provision for the rights of innocent persons,' either by abandoning this part of the remedial order or by crafting a new version reflecting the rights of third parties." Id. The only question therefore is whether this Court can craft a new proposal to implement the POS remedy that makes due provision for

---

[6]     Judge Kessler's Remedial Order, as it related to the POS remedy, set out certain specifications about the type, duration, and size of the displays. See J. Kessler Op. at 939-40, 946. The fact that the plaintiffs have "significantly reformulated their proposal" does not change the Court's conclusion that it need not permit the parties to relitigate preserved legal conclusions. See Def. Op. Br. at 6. In her Opinion, Judge Kessler did not rely on the specifications of the proposal in reaching her legal conclusions and in deciding to order the injunctive relief; as stated, those details were set out separately in the Remedial Order.

retailers' rights. The Court will not revisit Judge Kessler's justifications for ordering corrective statements in the first place.

### 2. Due Provision for the Rights of Innocent Persons

The court of appeals vacated the POS remedy because in crafting it, Judge Kessler had not "consider[ed] the impact of th[e] program on affected retailers," United States v. Philip Morris, 566 F.3d at 1141; accordingly, the court of appeals directed this Court to "evaluate and make due provision for the rights of innocent persons" on remand. Id. at 1142 (internal quotations omitted). After the court of appeals' decision, Judge Kessler required the parties to identify third parties who should be invited to file briefs on the impact of POS displays; being so advised she invited eight retailer associations to participate in the litigation. See Order #19-Remand [Dkt. No. 5916]. Two prominent national retailers associations accepted her invitation, and will participate in the upcoming evidentiary hearing. NACS is the "preeminent representative" of convenience store operators. See NACS's Submission Concerning Order #1015's Point of Sale Display Requirements [Dkt. No. 5934] at 6. It is a non-profit organization founded almost 60 year ago that represents 2,100 retail members and 1,500 supply companies. Id. NATO is a national retail trade association that represents approximately 20,000 tobacco stores, convenience stores, grocery stores, and liquor stores that sell cigarettes and tobacco products. See NATO Brief Regarding Retailers Affected by the Retail Display Component of the Court's Corrective Statement Remedy [Dkt. No. 5933] at 1. Their participation will help this Court "consider[] the impact of [proposals to implement the POS remedy] on affected retailers." See United States v. Philip Morris, 566 F.3d at 1141.

In remanding to this Court, the court of appeals did not give much direction as to how this Court should go about "considering" the retailers' rights, in order to satisfy Section

1964's requirement that "due provision" be made for the rights of innocent persons. The statute itself does not give any express indication about what "due provision" means, and there is sparse case law addressing this question.

The defendants and amici argue that when "making due provision" for the rights of innocent persons under Section 1964(a) the Court must undertake a "balancing" of competing interests – here, comparing the benefits of the POS remedy against the harms to or the burden on the retailers. See Def. Op. Br. at 13 (arguing the Court must "measur[e] the intrusions [on the retailers] against the remedy's ostensible benefit"). According to the defendants, the benefits to be considered are the need to prevent and restrain future RICO violations and the POS remedy's ability to do so within the current factual context. See id. at 11. In framing the Court's task as one of "balancing," the defendants place great emphasis on the D.C. Circuit's instructions that the POS remedy should be abandoned if the Court cannot craft a version that "reflect[s] the rights of third parties." See United States v. Philip Morris, 566 F.3d at 1142.

By contrast, the plaintiffs argue that the Court's task does not involve balancing at all; rather, it is to "tailor" an order imposing a new POS remedy, taking into account the rights of the retailers. See Pl. Response at 22, 25-26. The plaintiffs frame the Court's task as merely adjusting the design of the POS remedy to conform with Section 1964(a)'s requirements, emphasizing "the fitness of the order to protect the rights of innocent third parties." See id. at 29.[7]

After carefully reviewing the statute, its legislative history, the relevant case law, the D.C. Circuit's directions, and the parties' arguments, the Court concludes, for the reasons

---

[7]    In light of the D.C. Circuit's proviso that the Court might have to abandon the POS remedy entirely, United States v. Philip Morris, 566 F.3d at 1141-42, the plaintiffs do not go so far as to assume the remedy necessarily will be preserved in some form.

that follow, that in order to make "due provision" for the retailers' rights, the Court will have to

determine, after considering the evidence presented at the hearing, (1) whether the plaintiffs'

2018 proposal for implementing the POS remedy will have an adverse impact on the retailers'

rights; if so, (2) whether that proposal (or some modification thereof) is sufficiently tailored to

minimize the impact on the retailers; and (3) even if tailored to minimize the impact on the

retailers' rights, whether it nevertheless interferes with those rights to such an extent as to make

any implementation of the POS remedy improper. Throughout this process, the Court will keep

in mind that the purpose of any proposal to implement the POS remedy is to achieve the

legitimate government interest of preventing future RICO violations already recognized by Judge

Kessler and the court of appeals.

### a. Section 1964 allows for some impact on innocent persons' rights

Section 1964's requirement that the court make "due provision" for the rights of

innocent persons when imposing a remedy leaves room for the remedy to have some impact on

those innocent persons' rights. This is evident from the statute's language, legislative history,

and the relevant case law. First, the plain text of the statute acknowledges that a court-imposed

remedy may affect the rights of innocent persons.

Section 1964(a) provides in full:

> The district courts of the United States shall have jurisdiction to prevent
> and restrain violations of section 1962 of this chapter by issuing
> appropriate orders, including, but not limited to: ordering any person to
> divest himself of any interest, direct or indirect, in any enterprise;
> imposing reasonable restrictions on the future activities or investments of
> any person, including, but not limited to, prohibiting any person from
> engaging in the same type of endeavor as the enterprise engaged in, the
> activities of which affect interstate or foreign commerce; or ordering
> dissolution or reorganization of any enterprise, <u>making due provision for
> the rights of innocent persons</u>.

18 U.S.C. § 1964(a) (emphasis added). Section 1964(a) gives the district court broad equitable authority, setting out a non-exhaustive list of remedies that the Court may order to prevent and restrain future RICO violations. See United States v. Philip Morris, 396 F.3d 1190, 1200 (D.C. Cir. 2005).[8] The statute instructs courts to consider innocent persons' rights as a factor when implementing a remedy, not a jurisdictional bar. Section 1964(a) does not provide that a court may impose orders to prevent and restrain RICO violations only if those orders do not infringe whatsoever on the rights of innocent persons. As the plaintiffs correctly point out, "Congress did not provide for the rights of innocent persons to be invoked as a shield to protect the guilty from orders restraining them from violating RICO in the future." See Pl. Response at 25. The statute's language therefore contemplates that even after the Court makes "due provision" for them, a remedy may still affect innocent persons' rights. See 18 U.S.C. § 1964(a).

The legislative history supports this plain reading of the text that a remedy may ultimately have some impact on innocent persons' rights. The Senate Judiciary Committee Report on the legislation stated that the court's "equitable relief" should be "broad enough to do all that is necessary to free the channels of commerce from all illicit activity." S. Rep. No. 91-617, at 79 (1969). Such reference to freeing the channels of commerce from illicit activity suggests an understanding that in order to accomplish the purpose of Section 1964, the remedy ordered by the Court necessarily will affect more than just the defendants, and will have

---

[8]     As Judge Kessler explained: "[T]he full scope of a court's equitable jurisdiction must be recognized and applied except where . . . there is a clear and valid legislative command limiting jurisdiction." See J. Kessler Op. at 920. Section 1964(a) is such a legislative command: "[T]he plain language of § 1964(a) requires a showing of a reasonable likelihood of future RICO violations before [the Court may] enter[] any equitable remedies." See id. And here Judge Kessler found that "an injunction ordering Defendants to issue corrective statements is appropriate and necessary to prevent and restrain them from making fraudulent public statements on smoking and health matters in the future," establishing her jurisdictional authority to order the corrective statements. See J. Kessler Op. at 926.

an effect on the entire channel of commerce. The case law also supports this interpretation. See, e.g., United States v. Local 560, 974 F.2d 315, 347-48 (3d Cir. 1992) (holding that the injunction "makes appropriate provision for the rights of innocent third parties" even though it causes "detriment" to the innocent union members because that detriment is "relatively slight"); United States v. Local 30, 871 F.2d 401, 408 (3d Cir. 1989) (upholding the remedy as making "due provision" for the rights of innocent persons, even though the remedy interfered with the innocent union members' right to have the union govern itself).

### b. The relevant case law

The parties point to the same three cases in an effort to help the Court understand Section 1964's provision that the court make "due provision" for the rights of innocent persons. In each of these cases, the court of appeals upheld the remedy imposed by the district court. See United States v. Sasso, 215 F.3d 283, 292 (2d Cir. 2000); United States v. Local 560, 974 F.2d 315, 347-48 (3d Cir. 1992); United States v. Local 30, 871 F.2d 401, 408 (3d Cir. 1989). To understand the standard for assessing Section 1964's "due provision" requirement, Local 30 is the most helpful of the three.

In Local 30, the Third Circuit found that the remedy imposed by the district court made due provision for the rights of innocent persons because the remedy was "tailored to minimize" the impact of the remedy on the affected innocent persons' rights. See United States v. Local 30, 871 F.2d at 408. After finding that thirteen union officials had violated RICO, the district court enjoined the officials from participating in union affairs and imposed a "decreeship" that gave the district court control (through an appointed enforcement officer) of many aspects of the union's administration, including control of all matters that required expenditure of any of the union's or its affiliated entities' funds. Id. at 404. The innocent union

members challenged the decree as depriving the union of the right to govern itself. Id. at 408. The court of appeals acknowledged that the decree impacted the union's right to govern itself, but it upheld the decision of the district court because it found that the remedy was "tailored to minimize the impact" on that right. Id. In reaching this conclusion, the court of appeals noted that the district court could have imposed a much more "drastic" remedy, such as dissolving the union entirely, or placing it in a trusteeship. Id. But by imposing the more moderate remedy of a decreeship, it "minimize[d]" the impact on the union's rights, and therefore was consistent with Section 1964(a)'s requirement to make due provision for the rights of innocent persons. Id.

In Local 560, the innocent persons – members of the union – argued that the district court's injunction was not valid under RICO because it did not make "appropriate provision" for their rights. See United States v. Local 560, 974 F.2d at 347. The Third Circuit rejected this argument. Id. at 347-48. In doing so, the court acknowledged that the injunction – prohibiting a former union president, alleged to have links to organized crime, from participating in the union's activities – affected innocent persons' rights. Id. at 348. It emphasized, however, that in the circumstances it was "a relatively slight limitation," and in fact "benefit[ted]" the union in other ways. Id. Thus, the Third Circuit held that the district court's injunction made "appropriate provision" for the innocent union members' rights. Id. at 347.[9]

Finally, in United States v. Sasso, the Second Circuit referred to Section 1964's "due provision" requirement as support for why the district court's remedy that imposed a

---

[9]     The parties' briefs also reference Local 560's First Amendment analysis. In Local 560, the innocent union members separately argued that the injunction violated their First Amendment associational rights. See United States v. Local 560, 974 F.2d at 342. While this part of the Local 560 opinion does not give insight into Section 1964's mandate to give "due provision" to innocent parties' rights generally, it may be relevant in the instant case, because one of the arguments presented is that the POS remedy affects the retailers' First Amendment rights. See infra at 23-25.

financial obligation on certain named union officials instead of on the union itself or on other innocent union members was appropriate. See United States v. Sasso, 215 F.3d at 291-92. There, the innocent parties – the union members – had not challenged the remedy as violating their rights. Rather, Robert Sasso, an officer of the union who had pled guilty to a RICO violation, was challenging the remedy imposed as being too broad, and thus inappropriate under Section 1964. Id. at 289. The Second Circuit invoked Section 1964's direction to make "due provision" for innocent persons' rights to explain why the district court's order that Mr. Sasso contribute to the monitorship – and not the union – was appropriate under Section 1964. Id. at 292.

### c. Possibility of abandoning the POS remedy

Even though Section 1964's "due provision" requirement allows for court-imposed remedies to have an adverse impact on innocent persons, the D.C. Circuit's opinion anticipates the possibility that this Court might have to "abandon[]" the POS remedy entirely if it finds that no form of injunction can be crafted after considering the rights of innocent persons. See United States v. Philip Morris, 566 F.3d at 1142. This limitation is grounded in case law that has developed around courts' equitable powers to impose injunctions generally. Id. (noting that "third parties may be so adversely affected by an injunction as to render it improper.") (citing Cook Inc. v. Boston Scientific Corp., 333 F.3d 737, 744 (7th Cir. 2003)). The case cited by the court of appeals was a breach of contract case, where the district court granted an injunction because damages could not be estimated with reasonable certainty; it was not a case interpreting Section 1964 of the RICO statute. In Cook, the Seventh Circuit modified an injunction that had been imposed by the district court because the original injunction did not give "due weight" to

the injunction's possible effect on innocent third parties and on existing contracts. <u>Cook Inc. v.</u> <u>Boston Scientific Corp.</u>, 333 F.3d at 744.

This limitation on a court's equitable power to order an injunction is not a matter of comparison, but of degree. Because Section 1964 contemplates that remedial orders may affect innocent parties, when an injunction is issued under Section 1964 it can have more of an impact on innocent parties than injunctions in other contexts – because Congress expressly recognized that it might. In other words, Congress contemplated some adverse impact on innocent persons from remedial orders entered under Section 1964; but at some point too much of an impact may render the remedy "improper." <u>See</u> <u>United States v. Philip Morris</u>, 566 F.3d at 1142. The same evidence is necessary for the Court to determine both whether the remedy's implementation makes "due provision" for the retailers, <u>see</u> <u>supra</u> at 10-11, and whether it so negatively impacts retailers as to render it "improper." To answer both questions, the Court necessarily will have to entertain and evaluate evidence concerning the impact of the government's new proposal to implement the POS remedy on tobacco retailers.

### d. Tailoring, not balancing

The parties seem to think that defining the scope of the evidentiary hearing turns on the difference between tailoring and balancing. Plaintiffs argue that all the cases cited by the parties speak of "tailoring," not "balancing." <u>See</u> Pl. Response at 9, 22, 26. Conversely, defendants argue that the Court must "balance" the benefits of the POS remedy against the burdens on the retailers. Def. Op. Br. at 14-15. In their view, such balancing would require the Court to consider evidence of the current needs for and efficacy of the POS remedy and the ability of the remedy ordered to prevent and restrain future RICO violations. Def. Op. Br. at 13.

They maintain that the Court must balance the benefits of the POS remedy against the burdens on retailers. Def. Op. Br. at 2.

Under defendants' proposed balancing approach, the Court is asked to consider "new evidence" (1) that an undisputed 13-year absence of enforcement efforts before this Court negates any necessity for further remedial efforts whatsoever; (2) that because the defendants have "inundated" current and potential tobacco consumers with court-ordered corrective statements over the years, there is no basis for the Court to conclude that the POS remedy would have any further prevent and restrain efficacy; and (3) that plaintiffs' current POS proposal – the 2018 proposal – is so different from what they originally proposed to Judge Kessler more than a decade ago that Judge Kessler's conclusions should be revisited. See Def. Op. Br. at 6-10. But none of these matters is relevant to the task before the Court. [10]

First, the Court need not consider or revisit the Court's statutory authority under Section 1964(a), or balance the equities as a prerequisite to the issuance of an injunction. These assessments already have been made by Judge Kessler. She concluded that the corrective statement injunctive relief was narrowly tailored to prevent and restrain future RICO violations. See J. Kessler Op. at 927; see also United States v. Philip Morris, 566 F.3d at 1144 (discussing "whether the remedy is sufficiently narrowly tailored to achieve a substantial government interest – in this case, preventing Defendants from committing future RICO violations"). She

---

[10]     Judge Kessler's Remedial Order required signage with corrective statements on retail counter and header displays. See J. Kessler Op. at 939-40, 946, 947. In response to the court of appeals' opinion vacating that version of the POS remedy and in attempt to accommodate many of the defendants' criticisms, see United States' Op. Supp. Br. on Retail Point of Sale [Dkt. No. 6100] at 4-6, the plaintiffs have since issued a new proposal that would instead require a fixed percentage of all defendants' signage displayed in their Retail Merchandising Programs be devoted to corrective statements. See Plaintiffs' 2018 Supp. Br. on Retail POS Remedy [Dkt. No. 6276] at 23-30.

made those threshold determinations without specific reference to the specifications of how the POS remedy would be implemented.

Second, the Court will not consider evidence of the manufacturers' conduct since Judge Kessler's 2006 decision in order to determine whether the POS remedy will prevent and restrain future RICO violations. See Def. Op. Br. at 5, 7, 11. The defendants' compliance with other parts of Judge Kessler's Remedial Order does not change the fact that Judge Kessler concluded that a POS remedy was appropriate as a part of the parcel of remedies needed to prevent and restrain future RICO violations. She intentionally ordered the POS remedy, in addition to other corrective statements. The fact that those other remedies may have been fully and faithfully implemented does not alter her original judgment. Furthermore, the fact that potential consumers may have seen advertisements on television, in newspapers, on websites or possibly even on cigarette package onsets over the past thirteen years is not relevant to the current inquiry. Contrary to the defendants' argument, the universe of potential consumers today is not "the very same population that has been (and continues to be) repeatedly directly exposed to these messages." See Def. Op. Br. at 9. For instance, the universe of potential consumers in 2019 includes those who were children or teenagers at the time other corrective statements were promulgated, and they had no reason to have seen them or to have paid much attention even if they did.

The Court agrees with the plaintiffs that there is no requirement for a balancing of interests when considering the rights of innocent persons under Section 1964. Of course, courts must always undertake a balancing of equities in deciding whether to grant injunctive relief. See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (explaining that "a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such

relief," including a "balance of hardships between the plaintiff and defendant"); see also League of Women Voters v. Newby, 838 F.3d 1, 6-7 (D.C. Cir. 2016) (requiring a "balance of the equities"). Beyond that, however, the statutory requirement that the Court "mak[e] due provision for the rights of innocent persons" in Section 1964(a) does not require any additional balancing. Section 1964(a) requires only that any injunctive relief ordered to prevent and restrain future RICO violations be "tailored" to take account of the rights of the innocent persons who may be affected. See United States v. Local 30, 871 F.2d at 408. Here, the Court's task is to see whether it is possible to craft a plan to implement the POS that is sufficiently tailored as to minimize the impact on the retailers. See also supra at 10-11, 16.

### 3. Process not Required for Innocent Persons

The Court turns now to a consideration of whether Section 1964 requires the Court to provide particular process for innocent persons when making due provision for their rights. For a number of reasons, the Court disagrees with NACS that each retailer must be given individual notice and an opportunity to be heard pursuant to the Federal Rules of Civil Procedure and due process. First, the court of appeals did not in any way suggest that "due provision" required the district court to provide each retailer with individual notice or representation. Rule 65(d)(2) requires that certain persons receive "actual notice" in order to be bound by an injunctive order: "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." See FED. R. CIV. P. 65(d)(2). In addition, the D.C. Circuit has recognized that "Rule 65(d)(2) incorporates the common-law principle that an injunction 'not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control.'" See Washington Metropolitan Area

Transit Com'n v. Reliable Limousine Service, LLC., 776 F.3d 1, 9 (D.C. Cir. 2015) (quoting

Golden State Bottling Co. v. NLRB, 414 U.S. 168, 179 (1973)). Neither party argues that the

retailers fall within any of the three categories explicitly set forth in Rule 65, or as agents at

common law; nor do they suggest that they are in privity with the manufacturers. The Court

therefore does not see any reason to require "actual notice" to each individual retailer.

      In addition, under fundamental principles of constitutional due process, "[i]t is

elementary that one is not bound by a judgment in personam resulting from litigation in which he

is not designated as a party or to which he has not been made a party by service of process." See

Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V., 188 F. Supp. 3d 22,

120 (D.D.C. 2016) (quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 110

(1969)); see also Taylor v. Sturgell, 553 U.S. 880, 884 (2008). And the D.C. Circuit itself has

recognized that the retailers would not be "explicitly bound by the terms of an injunction on pain

of contempt." See United States v. Philip Morris, 566 F.3d at 1142; see also 11A CHARLES

ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE

§ 2956 (3d ed. 2019).

      As the Court understands it, any version of a plan to implement the POS remedy

will not have an impact on all retailers – only on those who voluntarily opt into the

manufacturers' Retail Merchandising Program in future contracts. See United States v. Philip

Morris, 566 F.3d at 1141-42. Certainly, the potential economic harm to the retailers or any

infringement on their First Amendment rights, see infra at 23-25, that could result from their

voluntary participation in the merchandising program are negative effects of the POS remedy

that the Court may consider when evaluating the "rights of innocent persons." But any order

issued by the Court would be directed to the manufacturers (the defendants in this case) directing them to make particular changes in their contracts with retailers, who are not parties to the case.

NACS relies on Section 1963, a separate section of the RICO statute, to argue that because third parties are provided notice and process in the context of criminal forfeitures under Section 1963, the same should apply in proceedings under Section 1964. See NACS Reply Brief [Dkt. No. 6302] at 6 ("principles of statutory construction provide that the same phrase must be construed consistently throughout a statute"). The Court agrees that "[w]here Congress uses the same term in the same way in two statutes with closely related goals, basic canons of statutory construction suggest a presumption that Congress intended the term to have the same meaning in both contexts." New Hampshire v. Ramsey, 366 F.3d 1, 26 (1st Cir. 2004) (citing Sullivan v. Stroop, 496 U.S. 478, 484 (1990)). But the Court is not persuaded that it should be guided by Section 1963 case law in interpreting Section 1964 because Section 1963 deals with an entirely different situation -- the potential rights of third parties in property that has already been ordered seized and forfeited. In contrast, here the Court must take the rights of third parties into account before entering an injunction. This is a fundamentally different calculation. See New Hampshire v. Ramsey, 366 F.3d at 26 ("Th[e] presumption [that Congress intended the term to have the same meaning in both contexts] can be rebutted when there is some indication that the term is intended to serve different purposes in each statute."). The Court therefore rejects NACS's argument that the statutory phrase "making due provision for the rights of innocent persons" has an identical meaning in Sections 1963 and 1964.

Section 1963 provides: "Following the seizure of property ordered forfeited under this section, the Attorney General shall direct the disposition of the property by sale or any other commercially feasible means, making due provision for the rights of any innocent

persons." 18 U.S.C. § 1963(f) (emphasis added). Section 1963 deals with criminal forfeiture and governs a situation where the property has already been seized. And unlike Section 1964, it makes explicit provision in a separate subsection of the statute for notice to and process for third parties asserting a legal interest in the property that already has been ordered forfeited and seized pursuant to an order of forfeiture. See 18 U.S.C. § 1963(l). The provision for notice to and process for third parties in Section 1963(l) and the related rule, see General Rules for Civil Forfeiture Proceedings, Supp. R. G(4)(b), is unremarkable: it parallels similar provisions in other forfeiture statutes and rules requiring notice to third parties who have an interest in – and thus may be potential claimants to – funds that have already been seized. See, e.g., 21 U.S.C. § 853(n); Fed. R. Crim. P. 32.2(b)(6), (c); see also Sunrise Academy v. United States, 791 F. Supp. 2d 200, 202-05 (D.D.C. 2011). Contrary to NACS's contention, the fact that Section 1963 expressly provides for notice to and process for third parties shows that these requirements are not implicitly included in Section 1963's language that directs the Attorney General to make "due provision" for the rights of any innocent persons. See 18 U.S.C. § 1963. Instead, Section 1963 shows that Congress knows how to require notice to third parties when it wants to, and has chosen not to do so in Section 1964. The Court therefore rejects the argument that notice requirements are incorporated into the "due provision" language of Sections 1963 and 1964.

For these reasons, the Court is not persuaded that the retailers have any right to individual notice in advance of or individual representation during the evidentiary hearing. The Court concludes that the two trade associations who will participate in the evidentiary hearing as amici – NACS and NATO – are able to adequately represent the shared interests and rights of third party retailers for purposes of determining whether an injunction can be crafted under

Section 1964(a) "making due provision for the rights of innocent persons." See 18 U.S.C.
§ 1964(a).

### 4. Retailers' First Amendment Rights

Last, the Court turns to the retailers' rights under the First Amendment to the
United States Constitution. See Def. Op. Br. at 2.[11] Judge Kessler determined that the First
Amendment "does not preclude corrective statements where necessary to prevent consumers
from being confused or misled," J. Kessler Op. at 926, and the court of appeals concluded that
the corrective statements are a permissible restraint on the defendants' commercial speech,
reasoning that "the publication of corrective statements addressing Defendants' false assertions
is adequately tailored to preventing Defendants from deceiving consumers." See United States
v. Philip Morris, 566 F.3d at 1144.[12] It did not – as the plaintiffs emphasize – pass any judgment
on the First Amendment rights of the retailers.

The parties previewed their arguments as to the proper legal standard to apply to
the retailers' First Amendment rights in their briefs and at the status conference and should be
prepared to expand on those arguments at the evidentiary hearing. As the parties seem to agree,
the retailers' First Amendment rights will be considered under the Zauderer standard or the more
exacting Central Hudson test. See United States v. Philip Morris, 855 F.3d at 327; United States

---

[11]     Contrary to the plaintiffs' assertions, the Court does not interpret the defendants
arguments as advocating for the relitigation of the defendants' First Amendment rights. See Pl.
Response at 6-7, 16-17. And indeed, Judge Kessler's opinion precludes this Court's
consideration of those issues now. See J. Kessler Op. at 926.

[12]     At the time of the D.C. Circuit's opinion, Judge Kessler had not yet determined
the content of the corrective statements. See United States v. Philip Morris, 566 F.3d at 1144-45.
The D.C. Circuit made clear that its decision to permit the corrective statements depended on
their content because the corrective statements' constitutionality hinged on "the commercial
nature of the speech it burdens." See id. at 1144.

v. Philip Morris, 566 F.3d at 1142-45 (citing Zauderer v. Officer of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626, 637-38 (1985); Central Hudson Gas & Elec. Corp. v. Public Service Comm'sn of New York, 447 U.S. 557, 562-66 (1980)). The D.C. Circuit has already established – within the context of the corrective statements – that the burden is on the government to "affirmatively demonstrate its means are 'narrowly tailored' to achieve a substantial government goal." See United States v. Philip Morris, 566 F.3d at 1143; see id. at 1144 ("whether the remedy is sufficiently narrowly tailored to achieve a substantial governmental interest – in this case, preventing Defendants from committing future RICO violations."). See also United States v. Philip Morris, 855 F.3d at 327 (whether remedy "directly advances the governmental interest asserted").

The parties agree that to the extent the retailers are making First Amendment arguments, there is "no need for the Court to engage in a 'weighing' or 'balancing' of interests," see Pl. Response at 30, but only to consider whether the POS proposal is "narrowly tailored" to achieve a substantial governmental interest. See Def. Op. Br. at 2-5, 10-12. But the defendants go on to contend that the Court must consider evidence as to the new POS remedy's efficacy in preventing and restraining future RICO violations.

The Court believes that the directives of the D.C. Circuit with respect to the retailers' First Amendment rights are as follows: The Court must ensure that the specific POS remedy proposed by the government puts no impermissible chill on protected speech, see United States v. Philip Morris, 566 F.3d at 1144, that the remedy proposed is "reasonably related to the [government's] interest in preventing deception of consumers," United States v. Philip Morris, 855 F.3d at 328,[13] and that it is narrowly tailored to achieve the substantial governmental interest

---

[13]     Since the content of the warnings will not change, this matter may already have been fully resolved.

24

of preventing the defendants from committing future RICO violations. <u>United States v. Philip</u> <u>Morris</u>, 566 F.3d at 1144.

## III. CONCLUSION

At the evidentiary hearing, the parties shall address: (1) the 2018 proposal for the POS remedy, and (2) the impact of that remedy on retailers, including (a) the various rights the proposal may affect, and (b) the ways in which the 2018 proposal accommodates – or fails to accommodate – for the retailers' rights. The Court will <u>not</u> hear arguments or evidence during the evidentiary hearing about: the need for a POS remedy, the language of the corrective statements, or "balancing" of any sort. These are issues that have already been decided and will distract from the purpose of the evidentiary hearing, which is to give the Court an opportunity to determine the impact the government's current proposal to implement the POS remedy may have on affected retailers' rights. In the end, the Court will have to determine (1) whether the plaintiffs' 2018 proposal for implementing the POS remedy will have an adverse impact on the retailers' rights; if so, (2) whether that proposal (or some modification thereof) is sufficiently tailored to minimize the impact on the retailers; and (3) even if tailored to minimize the impact on the retailers' rights, whether it nevertheless interferes with those rights to such an extent as to make any implementation of the POS remedy improper. The parties' legal and factual arguments presented at the forthcoming evidentiary hearing are constrained by these parameters. They must present evidence and arguments that conform to the guidelines provided in this opinion.

The Court will issue an order today requesting a further joint status report to supplement the parties' views in light of this opinion.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 12/20/19