## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| TOBACCO-FREE KIDS | ) |
| ACTION FUND, *et al.* | ) |
| | ) |
| Plaintiff-Intervenors | ) |
| | ) |
| v. | ) |
| | ) |
| PHILIP MORRIS USA INC., *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| ITG BRANDS, LLC, *et al.*, | ) |
| | ) |
| Post-Judgment Parties Regarding | ) |
| Remedies. | ) |

Civil Action No. 99-CV-2496 (PLF)
Next scheduled court appearance:
NONE

_____

### PLAINTIFFS' MOTION FOR CLARIFICATION REGARDING THE APPLICATION OF ORDER #1015, AS AMENDED, TO HEATSTICKS CIGARETTES

Defendant Philip Morris USA ("PM USA") recently began test-marketing under the trademark "HeatSticks" several varieties of heated-tobacco cigarettes that are smoked using the IQOS Tobacco Heating System ("IQOS system"). To sidestep the application of the wide-ranging anti-fraud and other provisions of this Court's final injunction and remedial order, Order #1015, to HeatSticks cigarettes, PM USA has taken the position that they are not "cigarettes" within the meaning of Order #1015, because they do not use conventional combustible cigarette technologies; because PM USA contends they are less hazardous than conventional combustible cigarettes; and because FDA has authorized them to be marketed and is considering a further

1

application that would allow them to be marketed with "modified risk" claims. Plaintiffs ask the Court to clarify that HeatSticks cigarettes are "cigarettes" under Order #1015.[1]

To prevent and restrain defendants from continued fraud and deception with respect to "cigarettes," Order #1015 permanently enjoins defendants from engaging in fraud and racketeering, prohibits them from making health claims, obligates them to disclose documents and data, and requires them to make corrective statements—all in relation to "cigarettes." Although Order #1015 does not define the term "cigarette," the breadth of its meaning, and that it includes HeatSticks cigarettes, is clear from the way the parties and the Court used the term. Of particular relevance here, the Findings of Fact that accompanied Order #1015 discussed at great length PM USA's and other defendants' efforts to develop "less hazardous cigarettes." *United States v. Philip Morris USA Inc.*, 449 F. Supp. 1, 384-430 (D.D.C. 2006), *aff'd in part & rev'd in part*, 566 F.3d 1095 (D.C. Cir. 2009). The Court characterized every one of the roughly dozen or so unconventional products as "cigarettes." Like HeatSticks cigarettes, some of those purportedly less hazardous unconventional cigarettes heated rather than burned tobacco. Those heated-tobacco cigarettes included a PM USA product called the "Accord" system, a product substantially similar to PM USA's current IQOS system and HeatSticks cigarettes. Despite directly addressing in detail these "less hazardous cigarettes," nothing in Order #1015 confines its scope to "traditional," "conventional," or "combusted" cigarettes, or exempts any kind of potentially or actually "less hazardous cigarette"—regardless of who asserts the cigarette is less hazardous or on what basis.

---

[1] Counsel for plaintiffs met and conferred with counsel for PM USA in a good-faith attempt to resolve this dispute, but were unable to do so.

Nor is the scope of Order #1015 altered or otherwise demarcated by the subsequent

independent findings or actions of the FDA or any other government agency. Neither the fact

that FDA authorized the marketing of the IQOS system and HeatSticks cigarettes, nor whether

FDA grants the pending "modified risk" application and authorizes them to be marketed with a

reduced-risk and/or reduced exposure claim, have any bearing on whether HeatSticks cigarettes

are "cigarettes" within the scope of Order #1015. To the contrary, this Court, with the D.C.

Circuit's emphatic endorsement on appeal, has already rejected defendants' claims that FDA's

authority over cigarettes under the Family Smoking Prevention and Tobacco Control Act

(Tobacco Control Act), Pub. L. No. 111-31, 123 Stat. 1776 (2009) (codified at 21 U.S.C. §§ 387-

387s), ensured their future lawful conduct and required, or even justified, relieving them of their

obligations under Order #1015. *United States v. Philip Morris USA Inc.*, 787 F. Supp. 2d 68, 75-

77 (D.D.C. 2011), *aff'd*, 686 F.3d 832 (D.C. Cir. 2012).

## BACKGROUND ON HEATED-TOBACCO HEATSTICKS CIGARETTES

PM USA sells the IQOS system and HeatSticks cigarettes in the United States under

license from Philip Morris International (PMI).[2] FDA authorized their marketing pursuant to a

Premarket Tobacco Product Application ("PMTA") on April 30, 2019.[3] HeatSticks cigarettes

and conventional cigarettes are similar in structure, composition, and appearance. Like

conventional cigarettes, HeatSticks cigarettes contain tobacco—a HeatSticks cigarette includes a

plug of tobacco wrapped in paper. *See* Ex. 3, Philip Morris Products, S.A., Modified Risk

---

[2] *See* Ex. 1, Altria SEC Form 10-K Annual Report for 2019, at 2 (PDF p. 6), *available at* https://www.sec.gov/Archives/edgar/data/764180/000076418020000018/a2019form10-kq4.htm (last visited June 26, 2020).

[3] Ex. 2, FDA Marketing Order re: HeatSticks cigarettes and IQOS system (April 30, 2019), *available at* https://www.fda.gov/media/124248/download (last visited June 26, 2020).

Tobacco Product Application, Section 2.7 "Executive Summary," at 22 (PDF p. 23) ("MRTP

Executive Summary").[4] Apart from being shorter, as shown on the left in the image below,

HeatSticks cigarettes look like conventional cigarettes, including a mouth piece filter tip:



Ex. 4, IQOS, Meet IQOS, Marlboro HeatSticks, at PDF p. 7, *available at*

https://www.getIQOS.com/pages/home/meet-IQOS/meet-IQOS.html (last visited June 26, 2020).

HeatSticks cigarettes are also sold in packs of 20, like conventional cigarettes. *See id.*

      HeatSticks cigarettes are smoked using the IQOS system, which consists of a charger and

an electrically-powered, rechargeable holder. To use the system, a smoker removes the IQOS

holder from the charger, and inserts a HeatSticks cigarette. Ex. 5, IQOS, How to Guide, at PDF

p. 5, *available at* https://www.getiqos.com/pages/home/product-guides/how-to-guide.html (last

visited June 26, 2020). A heating blade within the IQOS holder then heats the tobacco in the

HeatSticks cigarette. Ex. 3, MRTP Executive Summary, at 23 (PDF p. 24). The heat generates an

inhalable aerosol containing nicotine and other chemicals. *Id.* The smoker puts the HeatSticks

cigarette filter to his or her mouth to inhale the aerosol. *See id.* at 22 (PDF p. 23) (diagram of a

---

[4] The Tobacco Control Act forbids the marketing of tobacco products with health claims
without an FDA marketing order granting a Modified Risk Tobacco Product ("MRTP")
application. 21 U.S.C. § 387k. PMI submitted such an application to FDA in November 2016
and it remains pending. As discussed in Section II of this brief, FDA's marketing determinations,
including its actions on PMTAs and MRTP applications, have no bearing on whether HeatSticks
cigarettes are "cigarettes" under Order #1015.

HeatSticks cigarette, including a "Mouth Piece Filter"). The following images depict a

HeatSticks cigarette when held in the IQOS holder:



Ex. 4, IQOS, Meet IQOS, Marlboro HeatSticks, at PDF p. 8.



Ex. 6, IQOS, IQOS Care, at PDF p. 3, *available at*

https://www.getIQOS.com/pages/home/support/support-center.html (last visited June 26, 2020).

PM USA marketing materials emphasize heated-tobacco HeatSticks cigarettes' similarity

to conventional combusted-tobacco cigarettes, explaining that HeatSticks cigarettes are meant

"to provide tobacco taste that replicates as much as possible what adult smokers expect," are

"designed for the same length of time and number of puffs as a traditional cigarette," and

"provide[] a similar experience to smoking traditional cigarettes." Ex. 7, IQOS, FAQs, "About

Heatsticks" and "Health Related," at PDF pp. 6, 7, 13, 19, *available at*

https://www.getIQOS.com/pages/home/support/faq.html (last visited June 26, 2020).

PMI's MRTP submission includes sample packaging for HeatSticks cigarettes that

describes them as "cigarettes":



Ex. 8, Philip Morris Products S.A. Modified Risk Tobacco Product (MRTP) Applications, Module 4: Labels, Labeling, and Advertising, "A4.2.6 HeatSticksPack R REC_Redacted.pdf" (submitted Nov. 18, 2016) (red oval added), *available at* https://www.fda.gov/tobacco-products/advertising-and-promotion/philip-morris-products-sa-modified-risk-tobacco-product-mrtp-applications#4 (last visited June 26, 2020).

## <u>ARGUMENT</u>

An injunction must be understood in light of the circumstances surrounding its entry, including the trial court's findings of fact, the evidence produced at the trial, the relief sought by the plaintiffs, and the mischief that the injunction seeks to prevent. *See United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009); *Common Cause v. Nuclear Regulatory Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982); *see also United States v. Philip Morris USA Inc.*, 778 F. Supp. 2d 8, 11 (D.D.C. 2011) (clarifying terms of Order #1015 by referring to findings of

fact and purpose of injunction), *appeal dismissed*, 686 F.3d 839 (D.C. Cir. 2012). As demonstrated below, the circumstances surrounding the Court's entry of Order #1015 make clear that HeatSticks cigarettes are within its scope.

**I.     The Circumstances of Order #1015's Entry Establish that the Term "Cigarette" as Used Therein Encompasses HeatSticks Cigarettes**

In nearly 50 published pages of Findings of Fact discussing defendants' efforts to use heated-tobacco and various other technologies to create potentially "less hazardous" cigarettes, the Court consistently referred to the resulting products as "cigarettes." *Philip Morris USA*, 449 F. Supp. 2d at 384-430. The Court was addressing the United States' claim that defendants improperly suppressed research, development, and marketing of such cigarettes. Although the Court ultimately determined that the claim had not been established, it made no effort to exclude heated-tobacco and other allegedly less hazardous unconventional cigarettes, or even genuinely less hazardous unconventional cigarettes, from the scope of Order #1015's prohibitions. To the contrary, the parties' and the Court's repeated characterization of such products as "cigarettes" and the Court's purpose to restrain defendants from continuing to engage in fraud and deceit with respect to their tobacco products, clearly demonstrate that heated-tobacco products such as HeatSticks cigarettes are within the scope of Order #1015.

**A.     Both the Parties and the Court Referred to Products Like HeatSticks Cigarettes as "Cigarettes."**

The potentially less hazardous cigarettes that the Court discussed for nearly 50 pages used a host of unconventional technologies not present in conventional cigarettes. Half a dozen of these products were combustible like conventional cigarettes, such as PM USA's virtually

nicotine-free cigarette, "Next." *Philip Morris USA*, 449 F. Supp. 2d at 400.[5] Others, like PM

USA's current HeatSticks cigarettes, were non-combustible and produced a nicotine-containing

aerosol by heating tobacco at a temperature below that which causes combustion. This latter

group included PM USA's own "Accord" system, *id.* at 399-400, as well as two heated-tobacco

cigarettes made by RJRT, *id.* at 403-15.

PM USA's and the Court's treatment of the Accord system cigarette are of particular

relevance here because, in all material respects, the Accord system is identical to the IQOS

system, including the use of heated tobacco cigarettes. Just as with the IQOS system, a smoker

used the Accord system by inserting a cigarette into an electrically-powered "lighter" that heated

the tobacco in the cigarette and produced a nicotine-containing aerosol. *Id.* at 399. Indeed,

despite the passage of approximately 20 years between the Accord system's introduction to the

U.S. market in 1998[6] and the IQOS system's entry last year, the two systems have the same basic

construction and means of consumption. They both:

- use specially-designed, shorter cigarettes that each contain a plug of processed tobacco wrapped in paper;

- use temperature-controlled heating blades to heat the tobacco in the cigarette;

- limit how many puffs a user can take per cigarette; and

- generate a nicotine-containing aerosol that purportedly reduces a user's exposure to harmful constituents.

---

[5] Other potentially less hazardous combustible cigarettes that the Court discussed in its Findings of Fact were R.J. Reynolds Tobacco's ("RJRT's") "multijet" filter, *id.* at 402, and "EW/Winston Select," the latter of which was a "tobacco burning" product, *id.* at 415; Brown & Williamson's "FACT" "low gas" cigarette, *id.* at 420, and "Advance," a "conventional potentially reduced-exposure product," *id.* at 423; and Liggett's "XA," which used "palladium as a catalyst to alter the chemical reactions occurring in a burning cigarette," *id.* at 426.

[6] *Philip Morris USA, Inc.*, 449 F. Supp. 2d at 399.

*Id*. at 399-400; Ex. 3, MRTP Executive Summary at 19-23 (PDF pp. 20-24). A side-by-side

comparison of the Accord system's cigarette and the IQOS system's HeatSticks cigarette further

illustrates their striking similarities:

 

Accord system packaging, pictured in Ex. 9, Michael E. Szymanczyk Revised Written Direct

Testimony at 168:2-4 (PDF p. 11) (Dkt. No 5117-1; filed 3/29/2005); Ex. 4, Meet IQOS,

Marlboro HeatSticks, Tobacco Made for IQOS, at PDF p. 8.

Although PM USA denies that its current HeatSticks cigarette is a "cigarette," at trial it

repeatedly characterized the materially-identical Accord product as exactly that. For example,

PM USA CEO Michael E. Szymanczyk described the company's efforts to "develop[] an

electrically heated *cigarette* that heats tobacco instead of burning it" and explained that the

Accord system used the company's "electrically heated *cigarette*" technology. Szymanczyk

Revised Written Direct Testimony at 166:18-21, 167:6-8 (PDF pp. 9-10) (emphases added); *see*

*also* PM USA technical consultant Jerry Whidby, Ph.D., Corrected Written Direct Testimony at

66:20-21 (PDF p. 9) (Dkt. 4769-1; filed 2/4/2005) (discussing "*cigarettes* that generate smoke by

heating rather than burning tobacco, *such as Accord*") (emphases added).

Evidence admitted at trial also showed that PM USA marketed the Accord system as

using a "cigarette" that was "smoked." Ex. 11, US Trial Ex. 25,908, at PDF pp. 2-5. Similarly,

PM USA conducted focus groups to evaluate the Accord system using marketing materials that, although not ultimately disseminated, described the consumable used with the Accord system as a "cigarette" that produced "smoke." Ex. 12, US Trial Ex. 21,855, at PDF pp. 2, 6.

Just as PM USA referred to its heated-tobacco Accord product as "cigarettes" that were "smoked," so too did the Court. In its Findings of Fact, the Court described the Accord system as:

> Philip Morris's electrically-heated *smoking* "system," [in which] the purchaser receives a kit—a starter set of shorter, *specially-designed cigarettes* and a dark rectangular heating device approximately the size of a large candy bar. To smoke Accord, the smoker inserts *a cigarette* into the end of the heating device. When a *smoker* inhales on *the inserted cigarette*, the inhalation triggers the device's electrical heating element, which heats *the cigarette* to a temperature below that necessary to create combustion and delivers *smoke* to the *smoker*.

*Philip Morris USA*, 449 F. Supp. 2d at 399 (emphases added).

The Court similarly described two other heated tobacco products—defendant RJRT's Premier and Eclipse—as cigarettes that were smoked. Addressing Premier, the Court stated, "R.J. Reynolds actively pursued a program to develop, and ultimately market, a *cigarette* that heated, rather than burned, tobacco." *Id*. at 403 (emphasis added). "The Premier *cigarette* had two major sections" and it "was lit and *smoked* similarly to *other cigarettes*, but it did not burn tobacco and burned very little paper." *Id*. (emphases added) (citations omitted). Addressing Eclipse, the Court said, "[i]n 1989, after withdrawing Premier from test marketing, RJR[T] shifted its focus to development of *another cigarette* that reduced the burning temperature to reduce the formation and delivery of harmful constituents." *Id.* at 410 (emphasis added). "Eclipse looks like and is *smoked* much the same way as *any other cigarette*. Because Eclipse primarily heats, rather than burns, tobacco, there are some important design differences that distinguish it from *other cigarettes*." *Id*. at 411 (emphasis added).

PM USA's and the Court's use of the term "cigarette" is also consistent with the various statutory definitions in effect at the time of trial (and now).[7] PM USA evidently considers HeatSticks cigarettes to meet at least the Internal Revenue Code definition of "cigarette" because, as illustrated in the image on page 6 *supra*, its packaging states that it contains "20 Class A Cigarettes"—the only generic term describing the contents.[8]

Even the unconventional technologies used in HeatSticks cigarettes that PMI cited in its MRTP application as distinguishing them from conventional cigarettes are among the same technologies that the Court found defendants had used in their efforts "to develop lower tar/nicotine cigarettes and other nonconventional less hazardous cigarettes." *Philip Morris USA*, 449 F. Supp. 2d at 386. PMI's application identified three particular aspects of HeatSticks cigarettes that it believed made them unconventional:

- HeatSticks cigarettes contain "tobacco [that] is ground and reconstituted into sheets (termed cast-leaf)";

- HeatSticks cigarettes contain "much smaller amounts of tobacco"; and

- HeatSticks cigarettes contain two filters.

Ex. 3, MRTP Executive Summary, at 23 (PDF p. 24). Each of these technologies was discussed by the Court in its 2006 Findings of Fact about non-conventional, potentially less hazardous

---

[7] *See* 26 U.S.C. § 5702(b)(1) (1954) (Internal Revenue Code of 1954) (defining "cigarette" to include "any roll of tobacco wrapped in paper or in any substance not containing tobacco); *see also* Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1332(1)(A) (defining "cigarette"—both now and at the time Order #1015 was entered—as including "any roll of tobacco wrapped in paper or in any substance not containing tobacco"); 18 U.S.C. § 2341(1)(A) (1978) (Trafficking in Contraband Cigarettes and Smokeless Tobacco Act) (same); *see also* 21 U.S.C. § 387 (Tobacco Control Act) (adopting the FCLAA's definition of "cigarette").

[8] "Class A" is the United States Treasury's designation for "small cigarettes"—cigarettes that weigh not more than 3 pounds per thousand. 27 C.F.R. §§ 40.11, 40.24; *see* 26 U.S.C. § 5701(b) (setting tax rates for small and large cigarettes).

cigarettes. As the Court summarized, "[s]uccessful general reduction techniques include the use of more efficient *filters*, the use of processed tobacco labeled *reconstituted tobacco*; the use of processed tobacco labeled expanded tobacco; reduction of the circumference of the cigarette which leads to burning *less tobacco*; the use of filter ventilation; the use of porous cigarette paper; and the use of faster burning papers." *Philip Morris USA*, 449 F. Supp. 2d at 389 (emphases added). Thus, reconstituted tobacco, reduction in total tobacco, and filter technology were all adaptations considered by the Court in 2006. None of them prevented either PM USA or the Court from considering these "potentially less hazardous non-conventional products" to be "cigarettes," and from referring to them consistently as such. *Id*. at 399 (header capitalization altered).

**B.   The Mischief the Injunction Sought to Prevent Includes Defendants' Conduct with Respect to All Cigarettes.**

Following a nine-month trial, the Court concluded that "as long as [d]efendants are in the business of selling and marketing tobacco products," they were likely to continue to engage in fraud and deception. *Philip Morris USA*, 449 F. Supp. 2d at 909. In other words, while the Court did not accept the United States' contention that defendants had fraudulently suppressed the development and marketing of potentially less hazardous cigarettes, it also did not find that they would refrain from making fraudulent claims about such products in the future. To the contrary, the Court reached the exact opposite conclusion; it found—without qualification as to the type or kind of cigarette—that defendants would continue to engage in fraud and deception concerning their tobacco products unless restrained. In light of its wide-ranging finding of likelihood of continued fraud and deception, the Court did not except heated-tobacco cigarettes or any other type of cigarette from the scope of Order #1015.

The Court began its lengthy discussion of potentially less hazardous cigarettes by distinguishing "between cigarettes which actually reduce the smoker's consumption of harmful constituents and those which, despite their marketing, do not (e.g., light/low tar cigarettes)." *Philip Morris USA*, 449 F. Supp. 2d at 385 n.18. The Court's decision not to include a similar distinction in its final injunction and remedial order is entirely consistent with the purpose of Order #1015. The Court's broad injunction, among other things, enjoined defendants from engaging in racketeering and fraud, prohibited defendants from using any health descriptors, obligated defendants to make public certain documents, required defendants to disclose disaggregated marketing data, and ordered defendants to make corrective statements. Had the Court intended to exclude a class or category of cigarette from Order #1015's scope, it would have carefully designated the characterizing features of that class or designated some mechanism or authority by which they could be identified. It did neither of those things. The Court would certainly not have left it up to defendants themselves to designate which of their products were "less hazardous" and thereby not "cigarettes" within the scope of the Order. Such a result would have flown in the face of the Court's conclusions, supported by hundreds of pages of findings. It would also have made a dead letter of Order #1015's prohibition against "any express or implied health message or health descriptor for any cigarette brand," since any defendant making such a claim would have thereby instantaneously made its product "not a cigarette."

Given the Court's extensive findings of fact about defendants' decades-long fraud and deceit, including defendants' false representation of light and low tar cigarettes as less harmful, it is inconceivable that the Court tacitly intended to entrust them with the power to exclude particular products from the scope of Order #1015 simply by making health claims about them. To the contrary, the Court's Findings of Fact and Conclusions of Law demonstrate that it meant

the final injunction to apply to all cigarettes made by defendants, regardless of whether they are

conventional or novel, and regardless of whether they are allegedly, potentially, or genuinely less

hazardous. Based upon defendants' proclivity for fraud, which the Court found likely to continue

"as long as [d]efendants are in the business of selling and marketing tobacco products," *Philip*

*Morris USA*, 449 F. Supp. 2d at 909, the proper mechanism for a cigarette manufacturer subject

to the RICO injunction to be permitted to make health claims about a cigarette is to seek

modification of the RICO injunction.

II.   **FDA's Findings and Actions Have No Bearing on the Scope of Order #1015**

The scope of Order #1015 is not affected by any finding or action FDA has taken or may

take regarding HeatSticks cigarettes. Indeed, nothing in this Court's final injunction and remedial

order and accompanying Findings of Fact, or any subsequent decision, suggests that whether a

tobacco product constitutes a "cigarette" under Order #1015 turns on the determinations of any

government agency. Thus, the simple fact that FDA granted PMTA marketing orders for the

IQOS system and HeatSticks cigarettes has no bearing on whether HeatSticks cigarettes are

"cigarettes" subject to Order #1015. Nor would it matter if FDA subsequently were to grant

marketing orders that authorized HeatSticks cigarettes to be marketed with one or more reduced-

risk or reduced-exposure claims.[9] That was true in 2006 and it remained true even with the

passage of the Tobacco Control Act in 2009, as this Court made clear when it rejected

"[d]efendants' claim that, due to the passage of the Tobacco Control Act, and subsequent

regulation of the tobacco industry by FDA, there is no longer a reasonable likelihood of future

---

[9] PMI's pending MRTP application seeks marketing orders that would authorize two reduced-risk claims and one reduced-exposure claim: (1) "switching completely from cigarettes to the IQOS system can reduce the risks of tobacco-related diseases"; (2) "switching completely to IQOS presents less risk of harm than continuing to smoke cigarettes"; and (3) "switching completely from cigarettes to the IQOS system significantly reduces your body's exposure to harmful and potentially harmful chemicals." Ex. 3, MRTP Executive Summary at 9 (PDF p. 10).

RICO violations" as "simply unconvincing" and "particularly untenable." *United States v. Philip Morris USA Inc.*, 787 F. Supp. 2d 68, 75-77 (D.D.C. 2011), *aff'd*, 686 F.3d 832 (D.C. Cir. 2012).

## CONCLUSION

The Court's Findings of Fact and Conclusions of Law demonstrate that the Court considered heated-tobacco products such as the Accord system and the current HeatSticks cigarettes used with the IQOS system to be "cigarettes," and intended Order #1015's anti-fraud and other provisions to reach such cigarettes, regardless of whether they were potentially or actually less hazardous. This Court should therefore clarify that PM USA's HeatSticks cigarettes are "cigarettes" subject to Order #1015, as amended. PM USA should not be allowed to decide for itself that HeatSticks cigarettes are not "cigarettes"; if it believes that HeatSticks cigarettes should be excepted from one or more provisions of Order #1015, its remedy is to move the Court for a modification of those provisions, not to engage in self-help by ignoring this Court's final injunction and remedial order.

Dated:  June 26, 2020                    Respectfully submitted,

GUSTAV W. EYLER, Director
ANDREW CLARK, Assistant Director
Consumer Protection Branch

 */s/ Daniel K. Crane-Hirsch*
DANIEL K. CRANE-HIRSCH
JAMES NELSON
MEREDITH B. HEALY
Trial Attorneys
Civil Division
United States Department of Justice
PO Box 386
Washington, DC  20044-0386
Telephone: 202-616-8242 (Crane-Hirsch)

Facsimile:  202-514-8742
daniel.crane-hirsch@usdoj.gov

*Attorneys for Plaintiff United States of America*


   */s/ Scott P. Lewis*
Scott P. Lewis (admitted pro hac vice)
slewis@andersonkreiger.com
Christina S. Marshall
cmarshall@andersonkreiger.com
ANDERSON & KREIGER LLP
50 Milk, 21st Floor
Boston, MA 02109
Telephone:  617-621-6500
Fax:  617-621-6660

*Attorneys for the Public Health Plaintiff-*
*Intervenors*

16

**EXHIBIT LIST**

| Exhibit Number | Description |
|---|---|
| 1 | Altria SEC Form 10-K Annual Report for 2019, at 2 (Feb. 25, 2020), available at https://www.sec.gov/Archives/edgar/data/764180/000076418020000018/a2019form10-kq4.htm (last visited June 26, 2020) (excerpt includes cover, contents, pages 1-2 & 118) |
| 2 | FDA Marketing Order re: HeatSticks cigarettes and IQOS system (April 30, 2019), *available at* https://www.fda.gov/media/124248/download (last visited June 26, 2020) |
| 3 | Philip Morris Products, S.A., Modified Risk Tobacco Product Application, Section 2.7 "Executive Summary" (Nov. 18, 2016), *available at* https://www.fda.gov/tobacco-products/advertising-and-promotion/philip-morris-products-sa-modified-risk-tobacco-product-mrtp-applications#E (last visited June 26, 2020) (excerpt includes pages 1-23) |
| 4 | IQOS, Meet IQOS, Marlboro HeatSticks, *available at* https://www.getIQOS.com/pages/home/meet-IQOS/meet-IQOS.html (last visited June 26, 2020) |
| 5 | IQOS, How to Guide, *available at* https://www.getiqos.com/pages/home/product-guides/how-to-guide.html (last visited June 26, 2020) |
| 6 | IQOS, IQOS Care, *available at* https://www.getIQOS.com/pages/home/support/support-center.html (last visited June 26, 2020) |
| 7 | IQOS, FAQs, "About Heatsticks" and "Health Related," *available at* https://www.getIQOS.com/pages/home/support/faq.html (last visited June 26, 2020) |
| 8 | Philip Morris Products S.A. Modified Risk Tobacco Product (MRTP) Applications, Module 4: Labels, Labeling, and Advertising, "A4.2.6 HeatSticksPack R REC_Redacted.pdf" (submitted Nov. 18, 2016), *available at* https://www.fda.gov/tobacco-products/advertising-and-promotion/philip-morris-products-sa-modified-risk-tobacco-product-mrtp-applications#4 (last visited June 26, 2020) |
| 9 | PM USA CEO Michael E. Szymanczyk Revised Written Direct Testimony (Dkt. No 5117-1; filed 3/29/2005) (excerpt includes cover, page i-ii, 1, 164-71) |
| 10 | PM USA technical consultant Jerry Whidby, Ph.D., Corrected Written Direct Testimony at 66:20-21 (Dkt. 4769-1; filed 2/4/2005) (excerpt includes pages 1-6, 66-67) |
| 11 | US Trial Ex. 25,908, Four print ads for Accord Cigarettes |
| 12 | US Trial Ex. 21,855, Draft package insert for Accord system |