## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

       Plaintiff,

       and

TOBACCO-FREE KIDS
ACTION FUND, *et al.*,

       Plaintiff-Intervenors,

          v.                   Case No.:  1:99-cv-02496-PLF

PHILIP MORRIS USA INC., *et al.*,

       Defendants,

       and

ITG BRANDS, LLC, *et al.*,

       Post-Judgment Parties
       Regarding Remedies

## DEFENDANT'S MOTION TO MODIFY ORDER #1015

Under Federal Rule of Civil Procedure 60(b)(5) and 60(b)(6), Defendant Philip Morris USA ("PM USA") respectfully moves the Court to modify Order #1015 to make clear that PM USA's "HeatSticks" product is not subject to Order #1015.  In the alternative, PM USA moves the Court to (1) allow PM USA to market its "HeatSticks" product with any statements or information authorized by FDA under 21 U.S.C. § 387k; and (2) allow PM USA to market its "HeatSticks" product without making the "Corrective Statements" mandated by Order #1015 for traditional, combustible cigarettes.  Pursuant to Local Rule 7(f), PM USA respectfully requests that the Court hear oral argument on this motion at its earliest convenience.

Consistent with Local Rule 7(m), the parties have conferred over several months in a good-faith attempt to resolve this dispute.  Plaintiffs have indicated that that they would not in principle oppose modifying Order #1015 to allow PM USA to make statements authorized by FDA under 21 U.S.C. § 387k, but the parties have not agreed to any specific language of an Order allowing that result.  Plaintiffs otherwise oppose the relief sought in this Motion.


Dated:  August 10, 2020                                  Respectfully submitted,

                                             */s/ John M. McNichols*
                                             Lisa S. Blatt (D.C. Bar No. 429544)
                                             John M. McNichols (D.C. Bar No. 490479)
                                             WILLIAMS & CONNOLLY LLP
                                             725 Twelfth Street NW
                                             Washington, DC 20005
                                             Telephone: (202) 434-5000
                                             Fax: (202) 434-5029
                                             lblatt@wc.com
                                             jmcnichols@wc.com

                                             *Attorneys for Defendant Philip Morris USA Inc.*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this 10th day of August 2020, a copy of the foregoing

Motion to Modify was filed electronically with the Clerk of Court, using the CM/ECF system,

which sent notification of such filing to counsel of record in this case.


/s/ John McNichols
John McNichols

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

       Plaintiff,

    and

TOBACCO-FREE KIDS
ACTION FUND, *et al.*,

       Plaintiff-Intervenors,

          v.                     Case No.:  1:99-cv-02496-PLF

PHILIP MORRIS USA INC., *et al.*,

       Defendants,

    and

ITG BRANDS, LLC, *et al.*,

       Post-Judgment Parties
       Regarding Remedies

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLARIFICATION AND IN THE ALTERNATIVE
## <u>MOTION TO MODIFY ORDER #1015</u>

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ............................................................................................................1

BACKGROUND ...........................................................................................................4

    A.    FDA's Authorization of the Marketing of IQOS and HeatSticks as Modified-Risk Tobacco Products with a Reduced Exposure Claim ......................4

    B.    The RICO Injunction under Order #1015 .............................................12

    C.    This Dispute ...........................................................................14

ARGUMENT .................................................................................................15

I.    THE ORDER DOES NOT APPLY TO IQOS AND HEATSTICKS ...............................15

    A.    The Text, Circumstances, and Purposes of Order #1015 Do Not Apply to HeatSticks ...........................................................................................16

    B.    Applying Order #1015 to HeatSticks Would Not Prevent or Restrain Future RICO Violations Concerning the Health Hazards of Smoking.................18

        1.    Prohibiting Defendant from Making Truthful FDA-Authorized Statements About HeatSticks Will Not Prevent and Restrain RICO Violations ..............................................................................20

        2.    Mandating Corrective Statements About Combustible Cigarettes In IQOS System Marketing Will Not Prevent and Restrain RICO Violations ..............................................................................21

    C.    FDA's Continuing and Comprehensive Oversight over the Marketing of HeatSticks Further Makes this Court's RICO Jurisdiction Unwarranted.............25

II.    ALTERNATIVELY, THE COURT SHOULD MODIFY ORDER #1015 TO EXEMPT HEATSTICKS ..............................................................................27

    A.    Order #1015 Should Be Modified To Account for Factual and Legal Changes ...........................................................................................27

    B.    Applying Order #1015 To HeatSticks Would Violate the First Amendment........28

        1.    Applying Order #1015 Would Ban Truthful, Non-Misleading Speech ...........................................................................................29

        2.    Requiring the Corrective Statements Would Force Defendant to Make False, Misleading, and Confusing Statements ...............................30

CONCLUSION....................................................................................................32

# TABLE OF AUTHORITIES

## CASES

Page

*ALPO Petfoods v. Ralston Purina Co.*,
913 F.2d 958 (D.C. Cir. 1990) (Thomas, J.) ....................................................15, 28

*Barr v. Am. Ass'n of Political Consultants, Inc.*, -- S. Ct. --,
2020 WL 3633780 (July 6, 2020) ..............................................................29

*Better Bus. Bureau v. Med. Dirs.*, 681 F.2d 397 (5th Cir, 1982) ..................................28

*Carroll v. President & Comm'rs*, 393 U.S. 175 (1968) ................................................28

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980) .................29, 30

*Common Cause v. NRC*, 674 F.2d 921 (D.C. Cir. 1982) ............................................15

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192 (3rd Cir. 2014) ....................28

*Manitoba v. Zinke*, 849 F.3d 1111 (D.C. Cir. 2017) ..................................................27

*Matal v. Tam*, 137 S. Ct. 1744 (2017) ..............................................................29

*Nicopure Labs, LLC v. FDA*, 944 F.3d 267 (D.C. Cir. 2019) ............................................. *passim*

*Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367 (1992) ..........................................27

*Salazar by Salazar v. District of Columbia*, 896 F.3d 489 (D.C. Cir. 2018) ..............................26

*Sindi v. El-Moslimany*, 896 F.3d 1 (1st Cir. 2018) ..........................................15, 27, 28

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ...................................................29

*Tory v. Cochran*, 544 U.S. 734 (2005) ..............................................................28

*Toyota Motor Sales v. Tabari*, 610 F.3d 1171 (9th Cir. 2010) .......................................28

*United States ex rel. Yelverton v. Fed. Ins. Co.*, 831 F.3d 585 (D.C. Cir. 2016) ...........................15

*United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001) ...........................................18

*United States v. Philip Morris USA Inc.*, 436 F. Supp. 3d 1 (D.D.C. 2019) ...................19, 26, 31

*United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006), *aff'd in part,
vacated in part,* 566 F.3d 1095 (D.C. Cir. 2009), *and order clarified,* 778 F. Supp. 2d
8 (D.D.C. 2011) ..................................................................3, 16, 17, 19

Cases—continued:                                                                                      Page

*United States v. Philip Morris USA, Inc.*, 477 F. Supp. 2d 191 (D.D.C. 2007) ...........................15

*\*United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) ....................... *passim*

*United States v. Philip Morris USA Inc.*, 686 F.3d 832 (D.C. Cir. 2012) ........................19, 25, 26

*United States v. Philip Morris USA Inc.*, 787 F. Supp. 2d 68 (D.D.C. 2011), *aff'd*, 686
     F.3d 832 (D.C. Cir. 2012)..........................................................................................25

*United States v. Philip Morris USA Inc.*, 801 F.3d 250 (D.C. Cir. 2015) ....................................13

*\*United States v. Philip Morris USA Inc.*, 855 F.3d 321 (D.C. Cir. 2017) ........................ *passim*

*\*United States v. Philip Morris USA, Inc.*, 907 F. Supp. 2d 1 (D.D.C. 2012), *aff'd in part,
     rev'd in part*, 801 F.3d 250 (D.C. Cir 2015)..................................................................... *passim*

*United States v. Raymond*, 228 F.3d 804 (7th Cir 2000), *overruled on other grounds by
     Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).....................................................15

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985)................................30

## STATUTES AND RULES

Fed. R. Civ. P. 60 ........................................................................................................27

15 U.S.C. § 1332(1)(A)..................................................................................................9, 16

18 U.S.C. § 1964(a) .....................................................................................................18, 19

21 U.S.C. § 387 note .....................................................................................................26

21 U.S.C. § 387j(a)(2)...................................................................................................9

21 U.S.C. § 387j(c)(2)..................................................................................................5, 8

21 U.S.C. § 387k(b)(2)(A)..............................................................................................5

21 U.S.C. § 387k(g)(1)(B) ..............................................................................................5

21 U.S.C. § 387k(g)(2) ..................................................................................................9

21 U.S.C. § 387k(g)(2)(A)(i) .........................................................................................1, 4

21 U.S.C. § 387k(g)(2)(B)(iv).........................................................................................1, 4, 5

21 U.S.C. § 387k(g)(2)(C)(ii)–(iii) .................................................................................25

21 U.S.C. § 387k(j) ..................................................................................................25

Family Smoking Prevention and Tobacco Control Act of 2009, Pub. L. No. 111-31, 123
    Stat. 1776 (2009) ..............................................................................................4

## FDA MATERIALS

*FDA, FDA PMTA Marketing Order (Apr. 30, 2019),
    https://www.fda.gov/media/124248/download ..............................................11, 25

*FDA, Modified Risk Granted Orders – Exposure Modification (July 7, 2020),
    https://www.fda.gov/media/139797/download ............................................ *passim*

FDA News Release, "FDA announces comprehensive regulatory plan to shift trajectory
    of tobacco-related disease, death" (July 27, 2017), https://www.fda.gov/news-
    events/press-announcements/fda-announces-comprehensive-regulatory-plan-shift-
    trajectory-tobacco-related-disease-death .............................................................6, 22

FDA News Release, "FDA Authorizes Marketing of IQOS Tobacco Heating System with
    'Reduced Exposure' Information (July 7, 2020), https://www.fda.gov/news-
    events/press-announcements/fda-authorizes-marketing-iqos-tobacco-heating-system-
    reduced-exposure-information ...............................................................................20

FDA, Summary Minutes for January 24–25 TPSAC Meeting, at 6 (Feb. 26, 2018),
    https://www.fda.gov/media/111455/download ........................................................7

PMP, Modified Risk Tobacco Product (MRTP) Application, Module 7 (Scientific Studies
    and Analysis), https://www.fda.gov/tobacco-products/advertising-and-
    promotion/philip-morris-products-sa-modified-risk-tobacco-product-mrtp-
    applications .................................................................................................. 7, 20-21

*Tech. Project Lead (TPL) Scientific Review of IQOS PMTA (April 29, 2019),
    https://www.fda.gov/media/124247/download ............................................ *passim*

*Tech. Project Lead (TPL) Scientific Review of IQOS PMTA (July 6, 2020),
    https://www.fda.gov/media/139796/download ............................................ *passim*

TPSAC Day 1 Tr. at 13 (Jan. 24, 2018), https://www.fda.gov/media/111444/download ..............8

## INTRODUCTION

For more than three years, FDA and Philip Morris International have worked extensively to allow Defendant Philip Morris USA Inc. ("Defendant" or "PM USA") to market a novel tobacco product that does not produce smoke:  the IQOS system.  The system consists of an electronic base unit and charger, and "HeatSticks."  IQOS is one of only two products that FDA has authorized as a "modified risk" product, meaning one that, when marketed with scientifically supported claims about reduced risk or reduced exposure, will be "appropriate to promote the public health," and is expected to "benefit the health of the population as a whole."  *See* 21 U.S.C. §§ 387k(g)(2)(A)(i), (g)(2)(B)(iv).   FDA has authorized the marketing of the IQOS system by PM USA with the following three statements that distinguish the product from combustible cigarettes:

> AVAILABLE EVIDENCE TO DATE:
>
> - The IQOS system heats tobacco but does not burn it.
> - This significantly reduces the production of harmful and potentially harmful chemicals.
> - Scientific studies have shown that switching completely from conventional cigarettes to the IQOS system significantly reduces your body's exposure to harmful or potentially harmful chemicals.

FDA, Modified Risk Granted Orders – Exposure Modification (July 7, 2020) ("FDA Exposure Modification Order") at 1.[1]

Since filing the instant Motion for Clarification that Order #1015 applies to HeatSticks, Plaintiffs have informed PM USA that they do *not* in principle oppose the Court's modifying Order #1015—which enjoins Defendant from making "any express health claim" when marketing "cigarettes"—to allow PM USA to make statements authorized by FDA under 21

---

[1] https://www.fda.gov/media/139797/download

U.S.C. § 387k.  Order #1015's injunctions, however, go well beyond prohibiting "express health claims," and in all such *other* respects, the parties disagree as to whether the Order applies at all. And if Order #1015 applies to HeatSticks, the parties disagree as to whether Order #1015 should be modified in light of the critical, FDA-acknowledged differences between HeatSticks and traditional, combustible cigarettes.

Plaintiffs filed their Motion for Clarification more than a year after FDA first authorized the marketing of IQOS in the United States.  They argue that HeatSticks—which do not produce smoke—are "cigarettes" subject to the Order's injunctions, including the requirement to market HeatSticks with "Corrective Statements" on the health hazards of *smoking* and risks of *second-hand smoke*.  *See* Pls.' Mot. 2 ("Mot.").  But the Order does not define "cigarettes" at all.  That is a critical omission because injunctions should be narrowly construed, and this Court based the injunction here solely on findings of misconduct with respect to traditional cigarettes.  Applying Order #1015 to a product that does not generate smoke, is not the subject of any misconduct, and was not even in existence at the time of the trial, would bear no relationship to the violations the Court found.  Tellingly, Plaintiffs do not even suggest that making HeatSticks subject to Order #1015 is necessary to "prevent and restrain" future RICO violations.  Nor would such a suggestion make sense.  The Corrective Statements do not apply to HeatSticks, and they are potentially misleading in the context of a non-combustible product that FDA found *reduces* consumers' exposure to hazardous substances for consumers who completely switch from smoking.

Plaintiffs rely on their introduction of evidence at the 2004 trial in this matter of other non-combustible products and infer that non-smoking products were within the Court's contemplation when it entered Order #1015.  *See* Mot. 2, 7–10.  But DOJ's claim was *not* that

2

Defendants had misrepresented the health hazards of such products, but rather that Defendants instead had failed to do *more* to develop them and make consumers aware of them as safer alternatives to cigarettes. The Court rejected this argument,[2] and non-combustible products played no part in any of the RICO violations found at trial.

In short, applying Order #1015 to HeatSticks would greatly exceed this Court's remedial authority under RICO, undermine FDA's determinations about how Defendant can appropriately market HeatSticks, and violate the First Amendment by banning truthful speech and compelling misleading speech. The Court accordingly should deny Plaintiffs' Motion for Clarification. In the alternative, the Court should grant Defendant's Cross-Motion to Modify Order #1015 to exclude HeatSticks. At a minimum, the Court should modify Order #1015 to permit PM USA (i) to make statements authorized by FDA under 21 U.S.C. § 387k—which relief, it bears repeating, Plaintiffs do not in principle oppose—and (ii) to sell the product without the Corrective Statements.

Defendant does not seek any relief from Order #1015 as it applies to combustible cigarettes or any other tobacco product besides HeatSticks. Nor does Defendant suggest that FDA's regulation of tobacco products makes this Court's remedial authority unwarranted to the extent the Court's factual findings support such authority. Defendant's Cross-Motion thus does not seek relief from the provisions of Order #1015 that enjoin (i) racketeering, (ii) controlling entities found to have engaged in racketeering, or (iii) making false, misleading, or deceptive statements. Defendant merely wants to make the Reduced Exposure claim that FDA has

---

[2] *See United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 399–430 (D.D.C. 2006), *aff'd in part, vacated in part,* 566 F.3d 1095 (D.C. Cir. 2009), *and order clarified,* 778 F. Supp. 2d 8 (D.D.C. 2011).

3

authorized and to be exempt from the requirement to make Corrective Statements pertaining to

combustible cigarettes when marketing a new, different, and non-combustible product.

## BACKGROUND

A.      **FDA's Authorization of the Marketing of IQOS and HeatSticks as Modified-Risk Tobacco Products with a Reduced Exposure Claim**

The IQOS system is a noncombustible alternative to smoking cigarettes.  It has three

main components:

- The HeatStick, which is a novel, patent-pending tobacco product containing uniquely processed tobacco made from tobacco powder. Consumers insert the HeatStick into the Holder where it is heated to produce a nicotine aerosol.

- The Holder, into which the HeatStick is inserted.  The Holder heats the tobacco material with an electronically controlled heat blade.

- The Charger, which recharges the holder after each use.

*See* Tech. Project Lead (TPL) Scientific Review of IQOS PMTA (April 29, 2019) ("2019 IQOS

TPL Review") at 15.[3]

Unlike previously available heated-tobacco products, the Holder's temperature controls

ensure that the HeatSticks are never ignited, and, hence, that neither smoke nor ash is generated.

Culminating an extensive three-year scientific review process, FDA authorized the IQOS system

both as a new tobacco product that is appropriate for the protection of public health and one

whose marketing with a Reduced Exposure claim is expected to "benefit the health of the

population as a whole."  *See* 21 U.S.C. §§ 387j(a)(1)(A), 387k(g)(2)(A)(i), 387k(g)(2)(B)(iv).

1. Starting in 2016, Philip Morris Products, S.A. ("PMP"), whose parent, Philip Morris

International ("PMI") was a part of the same organization as PM USA until 2008, submitted

---

[3] https://www.fda.gov/media/124247/download

4

applications to FDA for the IQOS system in two regulatory pathways for novel tobacco products under the Tobacco Control Act, Pub. L. No. 111-31, 123 Stat. 1776 (2009).  The first pathway empowers FDA to authorize the marketing of "new" products, meaning those not marketed in the United States as of February 2007, if FDA finds that marketing them "would be appropriate for the protection of the public health."  21 U.S.C. §§ 387j(a)(1)(A), (c)(2).  Under this standard, FDA must find that the "product's public health harms do not exceed its benefits," *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 271 (D.C. Cir. 2019), taking into account "the population as a whole," *i.e.*, both persons who currently use tobacco and those who do not, 21 U.S.C. §§ 387j(c)(2)(A), (c)(4).[4]

The second pathway, which is "more stringent," *Nicopure*, 944 F.3d at 271, is for "modified-risk products," *i.e.*, products authorized to carry positive consumer messaging about exposure to harmful chemicals and/or risks of health effects.  To authorize a product in this category, FDA must find that the marketing of the product with the proposed messaging will, or is expected to, "benefit the health of the population as a whole taking into account both users of tobacco products and those who do not currently use tobacco products."  21 U.S.C. §§ 387k(g)(1)(B), (g)(2)(B)(iv) & (g)(4).  For tobacco products meeting this standard, FDA may authorize claims of "Risk Modification" or "Exposure Modification," depending on the scientific data.  *Id.*  FDA may authorize the latter type of claim when the data show that the product contains a reduced level—or none at all—of a harmful substance found in tobacco smoke.  *Id.* § 387k(b)(2)(A).  In this vein,

> [t]he substance identified as reduced or absent must actually be
> harmful, the reduction must be substantial and accurate as labeled,

---

[4]  *See Nicopure*, 944 F.3d at 281 ("Only tobacco products consistent with the population-effects standard fulfill the Act's requirement that each new tobacco product's risks not outweigh its benefits to the public health.").

> the product must not expose the consumer to increased levels of
> other harmful substances, and consumer perception testing must
> show that consumers will not misinterpret a specific claim as an
> assurance of relative overall safety.

*Nicopure*, 944 F.3d at 278.  Manufacturers must "substantiate such claims with evidence of their

overall public health effects in advance of marketing, and to show that the proposed product as

marketed will not mislead consumers as to its safety."  *Id.* at 284.

2.  In July 2017, FDA announced "a new comprehensive plan for tobacco and nicotine

regulation that will serve as a multi-year roadmap to . . . significantly reduce tobacco-related

disease and death."  FDA News Release, "FDA announces comprehensive regulatory plan to

shift trajectory of tobacco-related disease, death" (July 27, 2017) ("FDA Comprehensive

Tobacco Plan Announcement").[5]  The plan seeks to "strik[e] an appropriate balance between

regulation and encouraging development of innovative tobacco products that may be less

dangerous than cigarettes."  *Id.*  Consistent with this goal, FDA committed to making the

regulatory pathways for novel tobacco products "more efficient, predictable, and transparent for

manufacturers, while upholding the agency's public health mission."  *Id.*

3.  On November 18, 2016, PMI, through PMP, submitted its Modified-Risk Tobacco

Product Application ("MRTPA") for IQOS and HeatSticks, followed by its Premarket Tobacco

Application ("PMTA") on May 15, 2017.  PMI provided FDA with more than two million pages

of scientific evidence comparing HeatSticks with combustible cigarettes, including studies

showing:  (i) the reduced formation of harmful chemicals in the HeatSticks aerosol as compared

to cigarette smoke, (ii) reduced toxicity in laboratory models, (iii) reduced exposure in human

clinical studies, and (iv) reduced population harm based on the results of consumer assessments.

---

[5] https://www.fda.gov/news-events/press-announcements/fda-announces-comprehensive-regulatory-plan-shift-trajectory-tobacco-related-disease-death

*See* Tech. Project Lead (TPL) Scientific Review of IQOS PMTA (July 6, 2020) ("2020 IQOS TPL Review")[6] at 20–40; PMP, Modified Risk Tobacco Product (MRTP) Application ("IQOS MRTPA"), Module 7 (Scientific Studies and Analysis).[7]

The data was subject to review by, among other entities, the Tobacco Products Scientific Advisory Committee ("TPSAC"), which held a two-day hearing in January 2018 featuring 30 speakers and representatives from (i) the Centers for Disease Control, (ii) the National Institutes of Health, and (iii) the Substance Abuse and Mental Health Services Administration within the U.S. Department of Health and Human Services.  The hearing highlighted numerous comments from doctors, health care institutions, and health organizations concerning the public-health benefits of the IQOS system.  Following the hearing, the TPSAC voted overwhelmingly that the scientific evidence supported PMI's claim that "switching completely from cigarettes to the IQOS system significantly reduces your body's exposure to harmful or potentially harmful chemicals."  FDA, Summary Minutes for January 24–25 TPSAC Meeting, at 6 (Feb. 26, 2018).[8] Since then, public health groups have continued to support making the IQOS system available to smokers considering non-combustible alternatives to conventional cigarettes. [9]

---

[6] https://www.fda.gov/media/139796/download

[7] https://www.fda.gov/tobacco-products/advertising-and-promotion/philip-morris-products-sa-modified-risk-tobacco-product-mrtp-applications

[8] https://www.fda.gov/media/111455/download

[9] *See*, *e.g.*, Certain Tobacco Heating Articles and Components Thereof, Inv. No. 337-TA-3447, Comment of Dr. Nikan H. Khatibi ("IQOS is a non-combustible tobacco delivery system from which millions of Americans could benefit."); *id.*, Comment of Spark MD ("The IQOS allows for a gradual reduction in nicotine and an instant reduction in exposure to the harmful byproducts of traditional cigarette smoke- both for the smoker and the people around him or her."); *id.*, Comment of SARDAA ("We believe that in order to reduce the high incidence of traditional smoking in the community SARDAA serves, having a variety of cessation and harm reduction tools is vital. IQOS, which has been available in other countries for several years, should be one of the tools available to Americans."); *id.*, Comment of CASAA ("IQOS is not simply another

FDA's review of both the PMTA and MRTP application also included discussion of PMI's commercialization plans and the role of Defendant PM USA.  In FDA's detailed review of the PMTA, the agency noted that PMI had licensed IQOS to PM USA for exclusive sale and distribution in the United States.  2019 IQOS TPL Review at 10 (PMI "has entered into a distribution agreement . . . by which [Altria] and an ALCS affiliate, Philip Morris USA Inc. (PM USA), will be licensed to distribute and sell the IQOS system . . . .").  Altria and PM USA employees also discussed Defendant's licensing rights and plans for consumer education in presentations to TPSAC.  *See* TPSAC Day 1 Tr. at 13 (Jan. 24, 2018) (Defendant "will have exclusive rights to commercialize the IQOS system in the United States if authorized by FDA."); *id.* at 93 (discussing Defendant's plan to "educate smokers about IQOS, . . . encourage them to switch completely from cigarettes, and . . . limit our reach to unintended audiences.").[10]

4.  In April 2019, after two years of review by experts from thirteen disciplines, FDA found that the IQOS system met the statutory standard of "appropriate for the protection of public health," 21 U.S.C. § 387j(c)(2)(A), and thus authorized the marketing of IQOS and HeatSticks as a "new" tobacco product under 21 U.S.C. § 387j(a)(2).  *See* 2019 IQOS TPL Review.  In doing so, FDA observed that "the currently available evidence indicates [that] smokers who switch completely [from cigarettes] to IQOS will have reduced toxic exposures and this is likely to lead to less risk of tobacco-related diseases."  *Id.* at 11, 84.  FDA explained that the HeatSticks aerosol has very low or undetectable amounts of many harmful compounds found in cigarette smoke.  *See id.* at 91–92.  FDA also considered evidence of consumer behavior,

---

tobacco product. IQOS allows consumers to replace their smoking habit with [heat-not-burn] technology, thereby lowering their exposure and risk as compared to smoking.").

[10] https://www.fda.gov/media/111444/download

including studies showing a low likelihood of "youth and current nonsmokers" initiating tobacco use through HeatSticks, *id.* at 12, and the potential for existing smokers to "replace their use of [cigarettes] with Heatsticks long-term," *id.* at 97.

As part of its authorization, FDA noted that HeatSticks are subject to certain warnings under the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1332(1)(A), and required nicotine warnings as well. *Id.* at 12 ("This product contains nicotine.  Nicotine is an addictive chemical.").  But FDA exempted HeatSticks from the Surgeon General's carbon monoxide warning applicable to combustible cigarettes, finding that such a warning would be "misleading" because HeatSticks "do not produce carbon monoxide above environmental levels and do not increase CO-related health risks." *Id.* at 91–92, 95, 98.  Subject to the removal of the carbon monoxide warning and the addition of the nicotine warning, FDA found, "based on a fair evaluation of all material facts," that the HeatSticks labeling is not "false or misleading in any particular." *Id.* at 99.

5.  On July 7, 2020, after more than three years of review, FDA authorized the IQOS system as a modified-risk tobacco product, concluding that its marketing with a Reduced Exposure claim would "promote the public health," and was expected "to benefit the health of the population as a whole," including both smokers and nonsmokers.  2020 IQOS TPL Review at 9–10; 21 U.S.C. § 387k(g)(2).  In reaching this conclusion, FDA observed, among other things, that "a measurable and substantial reduction in morbidity or mortality among individual tobacco users is reasonably likely in subsequent studies."  2020 IQOS TPL Review at 72.

FDA's July 2020 Order granted in part and denied in part PMI's requests to market the IQOS system with claims concerning their health effects.  Based on the scientific data, PMI had sought authorization to make three such claims, two conveying "Reduced Risk" information and

9

one conveying "Reduced Exposure" information.  Although FDA found the available evidence insufficient to support the Reduced Risk claims, it authorized the Reduced Exposure claim, noting the "substantial reduction in [Harmful and Potentially Harmful Constituents] relative to combusted cigarette smoke," *id.*, and that completely switching from cigarettes to HeatSticks would "significantly reduce exposure" to such chemicals, *id.* at 77.  Again, based on these findings, FDA authorized the marketing of the IQOS system with the following claim:

> AVAILABLE EVIDENCE TO DATE:
>
> - The IQOS system heats tobacco but does not burn it.
>
> - This significantly reduces the production of harmful and potentially harmful chemicals.
>
> - Scientific studies have shown that switching completely from conventional cigarettes to the IQOS system significantly reduces your body's exposure to harmful or potentially harmful chemicals.

FDA Exposure Modification Order at 1.

FDA conditioned its modified-risk authorization on the same warnings required by FDA's 2019 marketing authorization, but FDA declined to require a disclaimer on the Reduced Exposure claim that would have emphasized that PM USA was not making claims about reduced risks.  *See Id.* at 2.  To address concerns that consumers might perceive HeatSticks to be "less addictive than combusted cigarettes," FDA noted that the 2019 marketing authorization already required nicotine warnings in all packaging and advertising.  2020 IQOS TPL Review at 13. FDA further concluded that "consumer understanding is in line with the relative health risks of the product," and that "testing of actual consumer perception shows that consumers will not be misled about the state of the evidence regarding [its] relative health risks."  *Id.* at 51.

6.  FDA's authorization of the IQOS system as a modified-risk product lasts only four years and is conditioned on all of the existing requirements from the 2019 marketing authorization, including the requirement that PM USA, through PMI, submit "all labeling, advertising, marketing, and/or promotional materials" for FDA review 30 days before publication.  FDA, FDA PMTA Marketing Order (Apr. 30, 2019) ("FDA Marketing Order") at 12[11]; FDA Exposure Modification Order at 1–2.  FDA further conditioned its authorization of the reduced-exposure claim on extensive "postmarket surveillance and studies," numerous data collection and reporting obligations concerning consumers' behavior in relation to the IQOS system, including as to younger populations.  FDA Exposure Modification Order at 1; *id.* App'x B.  These post-marketing requirements consist of:

- monitoring use of the IQOS system in terms of uptake, dual use with other tobacco products, and complete switching from combustible cigarettes;

- assessing the tobacco use status of consumers before they began using the IQOS system;

- monitoring whether IQOS consumers use the product exclusively, with other tobacco products, or transition to combustible cigarettes;

- assessing and monitoring youth awareness of the IQOS system and youth use of the IQOS system;

- assessing consumers' understanding of the modified exposure claim and perceptions of the IQOS system;

- tracking and reporting U.S. sales and distribution of IQOS and summarizing the growth rate post-MRTP authorization;

- conducting a toxicology assessment to characterize the potential impact of chemicals that were found to be higher in the IQOS

---

[11] https://www.fda.gov/media/124248/download

system aerosol than in combusted cigarette smoke in PMP's MRTPA studies;

- reporting of serious and unexpected adverse experiences related to the IQOS system; and

- surveilling of new research findings on consumer perception, behavior, and health.

*Id.* App'x B.

## B.    The RICO Injunction under Order #1015

In August 2006, following trial on RICO claims based on Defendants' misrepresentations in the marketing of combustible cigarettes, the Court entered Order #1015 imposing two categories of injunctive relief on Defendants: "General Injunctive Relief" and "Corrective Statements."  As to the former category, Order #1015 enjoins Defendants:

(1)    "from committing any act of racketeering . . . relating in any way to the manufacturing, marketing, promotion, health consequences or sale of cigarettes in the United States";

(2)    "from participating in any way, directly or indirectly, in the management and/or control of any of the affairs" of certain entities found to be engaged in racketeering;

(3)    "from making . . . any material false, misleading, or deceptive statement or representation . . . concerning cigarettes"; and

(4)    "from conveying any express or implied health message or health descriptor for any cigarette brand," such as "'low tar,' 'light,' 'ultra light,' 'mild,' 'natural,'" or other words "which reasonably could be expected to result in a consumer believing that smoking the cigarette brand using that descriptor may . . . be less hazardous to health than smoking other brands of cigarettes."

Order #1015 (D.E. 5733) at 2–3.

As to the Corrective Statements, Order #1015 required Defendants to make public statements on "five topics on which [Defendants] had historically made (and were currently making) false and misleading statements" in connection with their sale of combustible cigarettes, namely:

12

- "adverse health effects of smoking";

- "addictiveness of smoking and nicotine";

- "lack of significant health benefit from smoking 'low tar,' 'light,' 'ultra light,' 'mild,' and 'natural' cigarettes";

- "manipulation of cigarette design and composition to ensure optimum nicotine delivery"; and

- "adverse health effects of exposure to secondhand smoke."

*Id.* The Court left the specific text and content of the statements to be determined later, after receipt of the parties' proposals. An Appendix attaches the current text of the Corrective Statements as set forth in Order #72-Remand. There are currently 18 Corrective Statements, including:

- "'Low tar' and 'light' cigarette smokers inhale essentially the same amount of tar and nicotine as they would from regular cigarettes";

- "There is no safe level of exposure to secondhand smoke"; and

- "Smoking is highly addictive. Nicotine is the addictive drug in tobacco."

Order #72-Remand (D.E. 6227) at 2–4.

The D.C. Circuit upheld validity of the Corrective Statements under RICO on "exceedingly narrow grounds." *United States v. Philip Morris USA Inc.*, 801 F.3d 250, 257 (D.C. Cir. 2015). The court of appeals reasoned that requiring the Corrective Statements was within this Court's RICO jurisdiction not as a penalty for past misstatements or to correct consumer misunderstanding resulting from those misstatements, but solely because the Corrective Statements would make it more difficult for Defendants to make false statements about cigarettes in the future. As the court of appeals put it, "[r]equiring Defendants to reveal the previously hidden truth about their products will prevent and restrain them from

13

disseminating false and misleading statements, thereby violating RICO, in the future." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1140 (D.C. Cir. 2009).

### C.    This Dispute

In November 2019, seven months after FDA's initial authorization of HeatSticks as a new tobacco product, and two months after PM USA commercially launched the product in the United States, DOJ informed Defendant that, in its view, HeatSticks should be treated like combustible cigarettes under Order #1015 and thus subject to the same injunctions.  Defendant disagreed, explaining among other things that the critical differences between HeatSticks and combustible cigarettes would make the Corrective Statements misleading as applied to HeatSticks.  Six months later, in June 2020, Plaintiffs filed their pending Motion seeking "clarification" that Order #1015 applies to HeatSticks because they are "cigarettes," for purposes of the injunctions, notwithstanding that HeatSticks are not burned or smoked and did not even exist at the time the Court entered Order #1015.  The Motion twice invited PM USA to seek modification of Order #1015 if PM USA wanted to make health claims about the IQOS system. Mot. 14, 15.

On July 7, while Plaintiffs' Motion was pending, FDA issued its modified-risk marketing authorization, permitting the marketing of HeatSticks with the Reduced Exposure claim.  While maintaining that Order #1015 does not apply to HeatSticks in the first place, PM USA informed Plaintiffs that, in an abundance of caution—and on Plaintiffs' invitation—it nevertheless would seek modification of the Order to exempt HeatSticks or, at minimum, allow PM USA to make the health-related claim that FDA had expressly authorized it to make and to make clear that HeatSticks need not be marketed with the Corrective Statements.  The parties met and conferred thereafter, and Plaintiffs have indicated that they would not in principle oppose modifying Order #1015 to allow PM USA to make statements authorized by FDA under 21 U.S.C. § 387k, but the

14

parties have not agreed to any specific language of an Order allowing that result, and plaintiffs otherwise oppose PM USA's request.

## ARGUMENT

The Court should deny Plaintiffs' Motion for Clarification because HeatSticks are not "cigarettes" within the meaning of Order #1015. But if the Court disagrees, it should modify the Order to exclude HeatSticks. At a minimum, the Court should modify the Order to allow Defendant to make statements authorized by FDA under 21 U.S.C. § 387k (relief Plaintiffs do not in principle oppose) and to exempt HeatSticks from the Corrective Statements. Without such relief, Order #1015 will bar Defendant from providing consumers with truthful information about IQOS and HeatSticks and require Defendant to market these products with information that may affirmatively mislead consumers, thereby exceeding this Court's remedial power to "prevent and restrain" RICO violations and violating the First Amendment.

## I.     THE ORDER DOES NOT APPLY TO IQOS AND HEATSTICKS

It is a bedrock requirement that "courts closely tailor injunctions to the harm that they address." *ALPO Petfoods v. Ralston Purina Co.*, 913 F.2d 958, 972 (D.C. Cir. 1990). Consistent with this, an injunction must be construed "in the light of the circumstances surrounding (the injunction's) entry: the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent." *United States v. Philip Morris USA, Inc.*, 477 F. Supp. 2d 191, 195 (D.D.C. 2007) (quoting *Common Cause v. NRC*, 674 F.2d 921, 927 (D.C. Cir. 1982)). In addition, courts always "resolve omissions or ambiguities in the order in favor of the enjoined party." *United States ex rel. Yelverton v. Fed. Ins. Co.*, 831 F.3d 585, 587 (D.C. Cir. 2016) (internal quotation marks omitted). Finally, where speech is concerned, an injunction should be "narrowly construed" "to prohibit only [speech] that can be restrained consistent with the First Amendment." *United States v. Raymond*, 228 F.3d 804, 816

15

(7th Cir. 2000), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013); *see also Sindi v. El-Moslimany*, 896 F.3d 1, 32, 34 (1st Cir. 2018) (injunctions against speech must be "narrowly tailored" and "precisely fitted to the circumstances of the case"). These principles compel the conclusion that Order #1015 does not cover HeatSticks.

### A.      The Text, Circumstances, and Purposes of Order #1015 Do Not Apply to HeatSticks

Order #1015 applies to "cigarettes," a term the Order does not define. To be sure, HeatSticks could be said to fall within the definition of "cigarette" from the 1966 Federal Cigarette Labeling and Advertising Act, which includes "any roll of tobacco wrapped in paper." 15 U.S.C. § 1332(1)(A). But the Court did not reference this distinct statutory definition, and there is no reason to suspect that it intended to embrace it. Quite to the contrary, given the evidence introduced at trial and the Court's ultimate findings, the term "cigarette" as used in Order #1015 is best read as limited to traditional, combustible cigarettes.

The Justice Department brought this case in 1999 based on claims of misrepresentation in the development and marketing of combustible cigarettes, and the Court's ultimate findings of RICO violations all pertained to combustible cigarettes only. *See Philip Morris*, 566 F.3d at 1106. The Court's remedial Orders thus refer repeatedly to products that are "smoked." Indeed, Order #1015 mentions "smoke" or "smoking" eleven times, while Appendix I to the Court's factual findings defines various key terms by reference to "smoking" or "smoking a cigarette." *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 445–49 (D.D.C. 2006), *aff'd in part, vacated in part,* 566 F.3d 1095 (D.C. Cir. 2009), *and order clarified,* 778 F. Supp. 2d 8 (D.D.C. 2011).

HeatSticks did not exist when the Court entered Order #1015, and they differ from combustible cigarettes in several fundamental ways. A HeatStick does not contain tobacco cut-

filler (*i.e.*, tobacco leaf cut in small pieces), but rather tobacco that has been ground and reconstituted into sheets (known as "cast-leaf").  2019 IQOS TPL Review at 16.  In addition, a HeatStick contains much less tobacco, only 320 mg as compared to 500–700 mg in a combustible cigarette.  *Id.*  And each HeatStick includes two unique and independent filters, which combustible cigarettes do not.  *Id.*

Critically, consumers do not "smoke" HeatSticks, and the product itself does not produce smoke, much less secondhand smoke, notwithstanding Plaintiffs' misstatements to the contrary. *See, e.g.*, Mot. 1, 4.  Instead, the heat blade in the IQOS Holder heats the tobacco to roughly 300°C, below the point of ignition and far below the 600°C temperature at which tobacco burns in combustible cigarettes.  2019 TPL Review at 16, 30.  The IQOS system is thus worlds apart from combustible cigarettes, which FDA has observed are at the "most harmful" end of the "continuum of risk" for tobacco products.  *See* FDA Comprehensive Tobacco Plan Announcement.  Indeed, because of its critical differences from combustible cigarettes, the IQOS system is exactly the sort of "innovation[] that ha[s] the potential to make a notable public health difference" that FDA sought to encourage through its 2017 comprehensive plan for regulating tobacco.  *See id.*; 2020 IQOS TPL Review at 74.

Plaintiffs' reliance on the trial evidence concerning alternative and lower-risk tobacco products—including PM USA's earlier heat-not-burn product, Accord, Mot. 7–10—is misplaced, as the trial record counsels *against* construing "cigarette" to cover such products.  If anything, the Court's knowledge of Accord and other antiquated heat-not-burn products suggests that the Court would have expressly defined a "cigarette" broadly to include products beyond traditional cigarettes had it intended that such products be covered by the injunctions.  The Court defined dozens of other terms in its other remand orders, *see, e.g.*, Order #72-Remand; Order

#81-Remand, thus suggesting the term "cigarette" most naturally referred to combustible cigarettes of the type that were the subject of the Court's findings of RICO violations.

Moreover, while DOJ presented evidence of such products, it did so not to argue that Defendants had misrepresented their health risks, but rather that Defendants should have engaged in "*more* effective marketing and advertising which focused on [their] health benefits," to help consumers overcome their resistance to switching.  *Philip Morris*, 449 F. Supp. 2d at 430 (emphasis added).  The Court rejected this claim, and far from suggesting that any defendant was likely to commit RICO violations with respect to reduced-exposure products, catalogued the "many years, enormous amounts of money," and "huge amounts of scientific and technical resources" devoted to developing the products DOJ had claimed were wrongly delayed.  *Id.* at 429–30.  Defendants' alternative products therefore played no part in the liability findings giving rise to the injunctions.  Construing the term "cigarette" to encompass such products would be perverse and inconsistent with the manner in which they featured at trial.

### B. Applying Order #1015 to HeatSticks Would Not Prevent or Restrain Future RICO Violations Concerning the Health Hazards of Smoking

RICO grants a court the power to impose injunctive relief only to "prevent and restrain" violations of its substantive prohibitions.  18 U.S.C. § 1964(a).  "[S]ection 1964 is no 'plenary grant of equitable jurisdiction,'" and thus a court's remedial authority under RICO must be read "narrowly."  *Philip Morris*, 801 F.3d at 256, 257.  RICO "authorizes only remedies that prevent and restrain future RICO violations, not all future effects of past RICO violations."  *Philip Morris*, 566 F.3d at 1140.  A court may not use a RICO injunction to punish past wrongdoing, or for mere deterrence purposes, *i.e.*, to "discourage [future violations] through any remedy that inflicts pain."  *Philip Morris*, 801 F.3d at 262; *see also United States v. Philip Morris USA Inc.*,

855 F.3d 321, 325 (D.C. Cir. 2017) (use of RICO injunction impermissible for deterrence or to remedy the effects of past misconduct).

Even when forward-looking, a RICO injunction cannot be used to restrain "all future unseemly business practices," *Philip Morris*, 566 F.3d at 1117 (quoting *United States v. Microsoft*, 253 F.3d 34, 104 (D.C. Cir. 2001)), or to "correct and prevent ongoing consumer misconception," *Philip Morris*, 801 F.3d at 257. Instead, any injunctive relief must always be "tailored to 'the violation found.'" *Philip Morris*, 566 F.3d at 1140. When imposing injunctive relief, therefore, this Court has looked for a "reasonable likelihood" of future RICO violations by defendants in "areas in which they have committed violations in the past." *United States v. Philip Morris USA Inc.*, 686 F.3d 832, 834 (D.C. Cir. 2012) (quoting *Philip Morris*, 449 F. Supp. 2d at 909–12).

These principles foreclose applying Order #1015 to the marketing of HeatSticks. The IQOS system was not the subject of any violation found at trial—again, the product did not even exist at the time. And applying to HeatSticks the same restraints that were crafted based on the trial evidence regarding traditional combustible cigarettes will do nothing to "prevent and restrain" future racketeering activity, 18 U.S.C. § 1964(a), or to "prevent consumers from being confused or misled," *United States v. Philip Morris USA Inc.*, 436 F. Supp. 3d 1, 15–16 (D.D.C. 2019).

Order #1015's ban on health-related messages is based on trial evidence about traditional cigarettes, and such a ban becomes nonsensical when applied to foreclose the dissemination of truthful statements specifically authorized by FDA after a years-long scientific review. This Court's Corrective Statements remedy is likewise targeted at traditional cigarettes and based on the evidence at trial. The Corrective Statements are grossly inaccurate, incoherent, and

misleading when applied to HeatSticks.  Finally, RICO oversight of HeatSticks is not necessary to ensure adequate federal controls over how PM USA markets the product because FDA has already determined that the commercial messaging for IQOS and HeatSticks will not mislead consumers, and FDA will continue to oversee that messaging.

> **1.      Prohibiting Defendant from Making Truthful FDA-Authorized Statements About HeatSticks Will Not Prevent and Restrain RICO Violations**

After exhaustive review, FDA determined that public health is expected to benefit if tobacco users are armed with the knowledge that completely switching to HeatSticks from ordinary cigarettes would reduce their exposure to harmful chemicals present in cigarette smoke. *See* FDA Exposure Modification Order at 1.  As a result, FDA authorized the marketing of IQOS and HeatSticks with a claim that switching completely may significantly reduce their exposure to harmful and potentially harmful chemicals.  *Id*.  The process FDA followed to come to this decision, as FDA emphasized in its public statement about the MRTP Order, was robust.

> By law, the FDA must also ensure that the advertising and labeling of modified risk products enables the public to understand the modified risk or modified exposure information and to understand the significance that information has in the context of total health and in relation to all tobacco-related diseases and health conditions.

FDA News Release, "FDA Authorizes Marketing of IQOS Tobacco Heating System with 'Reduced Exposure' Information" (July 7, 2020).[12]  And, as the D.C. Circuit has held, the FDA process "directly advances the government's interest in accuracy and public health."  *Nicopure Labs*, 944 F.3d at 285.

Prohibiting Defendant from conveying the FDA-authorized claim in marketing and selling the product would keep accurate information from smokers who might otherwise benefit

---

[12] https://www.fda.gov/news-events/press-announcements/fda-authorizes-marketing-iqos-tobacco-heating-system-reduced-exposure-information

from it.  And reducing the amount of truthful, science-based information that consumers have about HeatSticks would decrease the likelihood that smokers might switch to an alternative that would expose them to fewer harmful substances, thus perversely undermining the government's public-health objectives.

FDA's determination, moreover, was the result of a herculean scientific and technical review, making it all the more important that the public have the benefit of the FDA-authorized statements.  PMI presented FDA with more than two million pages of scientific evidence, including chemical tests, toxicological studies, consumer-behavior studies, and clinical studies. *See* IQOS MRTPA, Module 7 (Scientific Studies and Analyses).  These studies showed, among other things, that the IQOS system results in the reduced formation of harmful chemicals, reduced toxicity in laboratory models, reduced exposure in human clinical studies, and reduced population harm.  *See* 2020 IQOS TPL Review at 20–40.  Armed with this documentation, FDA conducted a multi-year review, drawing from experts from 13 disciplines, and including in a two-day public hearing at which 30 individuals spoke and representatives from various federal agencies participated, including the Centers for Disease Control, the National Institutes of Health, and the Substance Abuse and Mental Health Services Administration within the U.S. Department of Health and Human Services.  Using RICO to bar Defendant from uttering the very words that were the culmination of this process would be contrary to public health and *a fortiori* is not necessary to prevent and restrain future RICO activities.

> ### 2.   Mandating Corrective Statements About Combustible Cigarettes In IQOS System Marketing Will Not Prevent and Restrain RICO Violations

The Corrective Statements are manifestly unnecessary to prevent and restrain future RICO activities with respect to HeatSticks.  The statements correct previous misstatements about an entirely differently product and by definition, do not "prevent and restrain Defendants from

disseminating false and misleading statements, thereby violating RICO, in the future." *Philip Morris*, 566 F.3d at 1140. Indeed, the D.C. Circuit previously rejected portions of the Corrective Statements that only "disclose defendants' prior deceptive *conduct*" and "reveal nothing" about the product itself. *Philip Morris*, 801 F.3d at 261; *see also Philip Morris*, 855 F.3d at 326. There is no "previously hidden truth" about HeatSticks, and thus there is nothing to correct.

The court based "[e]very sentence of the Corrective Statement" on "specific" factual findings, based on the evidence at trial, falling into five topics. *United States v. Philip Morris USA, Inc.*, 907 F. Supp. 2d 1, 15 (D.D.C. 2012), *aff'd in part, rev'd in part*, 801 F.3d 250 (D.C. Cir 2015). None of those factual findings and thus none of the Corrective Statements apply to HeatSticks:

Low Tar and Light Cigarettes. This Court based three statements on findings that Defendants "marketed and promoted 'low tar brands' as less harmful than conventional cigarettes." *Id.* at 6. And the D.C. Circuit explained that Defendant must continue to make the "low tar" Corrective Statements on brands that were formerly marketed as such because those brands are the exact same product. *See Philip Morris*, 801 F.3d at 260. That justification plainly does not apply to HeatSticks. PM USA obviously has never marketed HeatSticks as "low tar" or "light." Take just one example, which highlights the problem: "Many smokers switch to low tar and light cigarettes rather than quitting because they think low tar and light cigarettes are less harmful. They are **not**." But here, FDA determined that smokers who switch completely to the IQOS system would reduce users' exposure to harmful and potentially harmful chemicals. Mandating the Corrective Statements on HeatSticks marketing would undermine the statements FDA has found to be supported by the science.

Manipulation of Cigarette Design.  This Court based three Corrective Statements on findings that Defendants designed cigarettes to "provide doses of nicotine sufficient to create and sustain addiction" by "using reconstituted tobacco material, additives, burn accelerants, ash conditioners, and buffering substances." *Philip Morris*, 907 F. Supp. 2d at 5.  HeatSticks do not use burn accelerants or ash conditioners because the tobacco is never ignited.  And nicotine "is most harmful when delivered through smoke particles in combustible cigarettes."  FDA Comprehensive Tobacco Plan Announcement.  Moreover, the government does not attack the design of HeatSticks.  To the contrary, the product delivers nicotine while reducing users' exposure to harmful and potentially harmful compounds; indeed DOJ emphatically argued to this Court that PM USA should have been making products like HeatSticks that consumers would find acceptable.  What's more, FDA authorized the marketing of HeatSticks with full knowledge of how the product was designed.  *See* 2019 IQOS TPL Review at 14–30.  FDA recognized, for instance, that the paper wraps in HeatSticks "only serve as structural components and do not have any functionality as they would in a [combustible cigarette]," and that the HeatSticks "filters do not control nicotine delivery."  *Id.* at 16, 29.  Statements about how Defendant designed *other* products are manifestly irrelevant.

Secondhand Smoke.  This Court based the four statements about secondhand smoke on findings that Defendants undermined and distorted evidence about secondhand smoke being a health hazard.  *Philip Morris*, 907 F. Supp. 2d at 6.  The Corrective Statements thus state that "There is no safe level of exposure to secondhand smoke" and "Secondhand smoke causes lung cancer and coronary heart disease in adults who do **not** smoke."  These statements cannot possibly prevent or restrain future RICO violations for a product that *does not produce any smoke*—secondhand or otherwise.  What's worse, the statements could seriously mislead

23

consumers into thinking that HeatSticks produce secondhand smoke and that such smoke is the same between HeatSticks and combustible cigarettes.

Adverse Health Effects of Smoking.  This Court based these four statements on findings that Defendants falsely denied the existence of any adverse health effects of smoking.  *Id.* at 5. Not surprisingly, the statements in this category warn of the risks of *smoking*.  For example, one statement reads: "More people die every year from smoking than from murder, AIDS, suicide, drugs, car crashes, and alcohol, **combined**."  Requiring these statements could seriously mislead consumers to conclude that the health risks of smoking combustible cigarettes and using HeatSticks are the exact same, even though HeatSticks are not smoked.  In any event, Defendant has not made health claims about HeatSticks in any of its labeling or promotional materials and cannot do so without prior FDA authorization.  And even as to the reduced-exposure claims, FDA has authorized the precise wording of those claims, and FDA must have 30 days to review any marketing materials displaying such claims before they reach consumers.  Not only has FDA found that Defendant successfully developed a product that reduces users' exposure to harmful and potentially harmful chemicals, FDA has also found that the product is "reasonably likely" to show "measurable and substantial reduction in morbidity or mortality among individual tobacco users . . . in subsequent studies." 2020 IQOS TPL Review at 72.

Addictiveness of Smoking and Nicotine.  This Court based these four statements on findings that Defendants "publicly made false and misleading denials of the addictiveness of smoking, as well as nicotine's role in causing that addiction." *Philip Morris*, 907 F. Supp. 2d at 5.  Defendant has made no such claims about the use of HeatSticks, and FDA mandates that HeatSticks carry a nicotine warning anyway.  Moreover, consumers could be misled into thinking that Defendant designed HeatSticks to have *more* nicotine than combustible cigarettes,

when in fact the HeatSticks aerosol contains 26–42% less nicotine than combustible cigarette smoke.  2020 IQOS TPL Review at 22–23.  FDA, however, reviewed the specific nicotine content of HeatSticks and reasoned that "[n]icotine exposures" from HeatSticks "appear sufficient to provide user satisfaction, which may facilitate switching from combusted cigarettes to IQOS."  *Id.* at 54–55.  Imposing additional nicotine warnings, above and beyond those that FDA specifically crafted for HeatSticks, could discourage consumers from switching to HeatSticks, which would thwart FDA's objective to move consumers to products lower on the continuum of risk.

       **C.**      **FDA's Continuing and Comprehensive Oversight over the Marketing of HeatSticks Further Makes this Court's RICO Jurisdiction Unwarranted**

Applying the injunction to HeatSticks is not needed to ensure federal oversight of HeatSticks' marketing.  FDA's 2019 marketing authorization order requires Defendant, through PMI, to submit "all labeling, advertising, marketing, and/or promotional materials" for FDA review 30 days before publication.  FDA Marketing Order at 12.  Moreover, under FDA's July 7, 2020 Exposure Modification Order, PMI must conduct extensive "postmarket surveillance and studies" detailing how the FDA-authorized statements affect consumer perception, behavior, and health.  FDA Exposure Modification Order at 1; *id.* App'x B; *see* 21 U.S.C. § 387k(g)(2)(C)(ii)–(iii).  Among other things, PMI must generate new toxicology studies about the nicotine aerosol, report any "serious or unexpected adverse experiences" related to IQOS and HeatSticks, assess and monitor youth awareness of the IQOS system and youth use, and develop models evaluating the effect of the IQOS system on the health of the population.  FDA Exposure Modification Order App'x B; *see also supra*, pp. 12–13.  This post-market surveillance enables FDA to ensure (i) that the authorized statements continue to be accurate, based in science, and understood by consumers, and (ii) that the marketing of IQOS and HeatSticks continues to be "appropriate to

promote the public health." *Id.* And FDA may withdraw its marketing authorization if Defendant and PMI fail to comply with any of FDA's marketing requirements, 21 U.S.C. § 387k(j), or based on FDA's own continued "monitor[ing] of the marketing of [IQOS and HeatSticks] and their impact on the population." FDA Exposure Modification Order at 2.

In asking the Court to take account of FDA's findings and authorization, Defendant does not seek to revisit prior decisions declining to hold the injunctions moot in light of the passage of the Tobacco Control Act and the oversight role of the FDA. *See Philip Morris*, 686 F.3d at 835–37. As this Court has recognized, "regulation under the [] Act and any injunctions issued by this Court target different conduct." *United States v. Philip Morris*, 787 F. Supp. 2d 68, 75 (D.D.C. 2011); *see also Philip Morris*, 686 F.3d at 838 (concluding based on the Tobacco Control Act's savings clause, 21 U.S.C. § 387 note, that "Congress was not concerned about the district court's injunction interfering with the proper functioning of the Act."). In so holding, however, the Court observed that while fears of inconsistency between its injunctions and the Tobacco Control Act were at that time "both premature and speculative," they might not always be, and invited Defendant to return should circumstances warrant. *See Philip Morris*, 787 F. Supp. 2d at 81. Those circumstances are now at hand. Defendant's intended commercial messaging for HeatSticks is not merely *regulated* by FDA, but has actually been *authorized* by FDA as appropriate for public health, of potential benefit to the population as whole, and not misleading. Expanding Order #1015 to cover a product that was not at issue at trial, and not the subject of any liability findings, does nothing to further the injunctions' purpose of "prevent[ing] consumers from being confused or misled," and, indeed, only conceals from them accurate health-related information. *Philip Morris*, 436 F. Supp. 3d at 15.

## II.    ALTERNATIVELY, THE COURT SHOULD MODIFY ORDER #1015 TO EXEMPT HEATSTICKS

If the Court concludes that HeatSticks are subject to Order #1015, it should modify the Order to exclude them.  At a minimum, the Court should modify the Order to allow Defendant to make statements authorized by FDA under 21 U.S.C. § 387k—a modification Plaintiffs do not in principle oppose—and exempt HeatSticks from the Corrective Statements.  Such a modification is appropriate in light of (i) changed factual and legal circumstances that warrant relief under Federal Rule of Civil Procedure 60(b), and (ii) the First Amendment implications of applying Order #1015 to a brand new product with no associated findings of wrongdoing and thereby banning truthful speech about the product and simultaneously compelling misleading speech about it.

### A.    Order #1015 Should Be Modified To Account for Factual and Legal Changes

Under Federal Rule of Civil Procedure 60(b), a court may modify an injunction when "applying it prospectively is no longer equitable" or for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(5), (6).  District courts should be "flexible" in this regard, *Manitoba v. Zinke*, 849 F.3d 1111, 1118 (D.C. Cir. 2017), modifying injunctions when there has been a "significant change" in the factual or legal circumstances of a case, *see Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992).  Factual changes are "significant" when, among other things, they "make[] compliance with the decree . . . 'detrimental to the public interest.'"  *Salazar by Salazar v. Dist. of Columbia*, 896 F.3d 489, 492 (D.C. Cir. 2018) (quoting *Rufo*, 502 U.S. at 388).  Legal changes, meanwhile, warrant modification when they "'make legal what the decree was designed to prevent,' or otherwise effect a material change in the governing legal regime." *Id.* (quoting *Rufo*, 502 U.S. at 384).

The criteria for modification under Rule 60(b) are readily met here.  Since the Court issued Order #1015 in August 2006, FDA has authorized the marketing of HeatSticks as a modified-risk product, finding (i) that offering them commercially with Reduced-Exposure claims is expected to benefit the public health through smokers' switching completely from higher-risk combustible cigarettes, and (ii) that their accompanying marketing and labeling materials are not misleading.  Under these circumstances, applying Order #1015 to HeatSticks does not support the injunctions' original purpose of preventing and restraining Defendant from engaging in future racketeering activity.

### B.        Applying Order #1015 To HeatSticks Would Violate the First Amendment

It is black-letter law that "[a]n order issued in the area of First Amendment rights" must "be tailored as precisely as possible to the exact needs of the case."  *Carroll v. President & Comm'rs,* 393 U.S. 175, 183–84 (1968).  Even where speech is purely commercial in nature, an injunction against allegedly misleading speech "must be narrowly tailored to cover only the speech most likely to deceive consumers."  *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 206 (3d Cir. 2014).  In addition, injunctions must be "closely tailor[ed] to the harm that they address," preventing the specific violations of law found by the court, not deception in general.  *ALPO Petfoods*, 913 F.2d at 972.

The narrow tailoring of an injunction against speech is not a static concept.  A court has an "ongoing duty to review the efficacy and consequences of an injunction," *Sindi*, 896 F.3d at 29, and to curtail or withdraw it when circumstances require, *see Tory v. Cochran*, 544 U.S. 734, 738 (2005) (Constitution forbids enjoining speech when "grounds for the injunction" "diminished" or "disappeared altogether").  Courts of appeals therefore have ordered injunctions modified when they "frustrate[d] honest communication between the [the defendants] and their customers."  *Toyota Motor Sales v. Tabari*, 610 F.3d 1171, 1176–77 (9th Cir. 2010); *accord*

*Better Bus. Bureau v. Med. Dirs.*, 681 F.2d 397, 404 (5th Cir, 1982) (modifying injunction to permit "accurate, factual information"). Thus, even if an injunction is constitutional at the time it is imposed, it cannot forever prevent "the utterance of particular words and phrases" regardless of context. *Sindi*, 869 F.3d at 33. An injunction that "fails to make allowance for contextual variation" suffers a "cardinal vice." *Id.*

These considerations prevent applying Order #1015 to HeatSticks. Although previous decisions have rejected First Amendment challenges to the injunction—including as to the Corrective Statements, *e.g.*, *Philip Morris*, 855 F.3d at 328; *Philip Morris*, 566 F.3d at 1144–45; *Philip Morris*, 907 F. Supp. 2d at 26—the First Amendment objection here has never been addressed by any Court, nor could PM USA ever have raised such a claim because HeatSticks did not exist at the time of the injunction.

### 1.    Applying Order #1015 Would Ban Truthful, Non-Misleading Speech

Previous First Amendment challenges in this case involved challenges to compelled disclosures, but the issue here—Order #1015's application to HeatSticks—involves an outright *ban* on PM USA uttering the three FDA-authorized statements that would inform consumers that available evidence shows that switching completely from conventional cigarettes (which produce smoke) to the IQOS system (which does not produce smoke) reduces the consumer's exposure to hazardous substances. For good reason, Plaintiffs do not in principle oppose modifying the Order #1015 to allow truthful speech that FDA has authorized PM USA to communicate.

Any content-, speaker- or viewpoint-based bans on speech, even commercial speech, are either presumptively unconstitutional, *see, e.g.*, *Barr v. Am. Ass'n of Political Consultants, Inc.*, __ S. Ct. __, 2020 WL 3633780 (July 6, 2020); *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563–64 (2011), or subject to intermediate scrutiny under *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 564–

66 (1980).  Under *Central Hudson*, where commercial speech is "neither misleading nor related to unlawful activity," any restriction on speech must (1) be supported by a substantial governmental interest; (2) directly advance that state interest; and (3) be no more extensive than is necessary to serve that interest.  *Nicopure Labs*, 944 F.3d at 284.

Here, FDA has already concluded that "consumers will *not* be misled" by HeatSticks' proposed labeling and marketing messages.  2020 IQOS TPL Review at 74 (emphasis added). Plaintiffs—including the Department of Justice—lack any legitimate interest in suppressing the public-health messages already authorized by the federal government as benefitting the public health.  *See Cent. Hudson*, 447 U.S. at 561–62.

### 2. Requiring the Corrective Statements Would Force Defendant to Make False, Misleading, and Confusing Statements

Applying Order #1015 to HeatSticks would also violate the First Amendment through unwarranted compelled disclosures in the form of the Corrective Statements.  When analyzing the Corrective Statements against previous First Amendment challenges, the D.C. Circuit has held that "as long as a disclosure requirement is not 'unjustified or unduly burdensome,' a company's rights 'are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers.'"  *Philip Morris*, 855 F.3d at 327 (quoting *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985)).  While that standard is appropriate when the compelled disclosure "is purely factual and uncontroversial," that description does not apply to the Corrective Statements in the context of the IQOS system.

The Court designed the Corrective Statements to require Defendants "to reveal the previously hidden truth about their products"—*i.e.*, combustible cigarettes—in order to "prevent and restrain [Defendants] from disseminating false and misleading statements . . . in the future." *Philip Morris*, 566 F.3d at 1140.  The D.C. Circuit upheld the Corrective Statements on that

basis alone, because they were "geared towards thwarting prospective efforts by defendants to either directly mislead consumers or capitalize on their prior deceptions by continuing to advertise in a manner that builds on consumers' existing misperceptions."  *Id.* at 1144–45.  But no one has suggested PM USA has made any misleading statement about IQOS or HeatSticks, nor—more importantly—is there any basis for the Court to expect PM USA to make misleading statements about these products in the future.   To the contrary, any "corrective" statements, are by definition, nonsensical with respect to a product that a company has never misled the public about, and misleading to the extent the findings underpinning the statements conflict with FDA's determination about the IQOS system.

Moreover, FDA has found that switching completely to HeatSticks from combustible cigarettes would "significantly reduce exposure to harmful or potentially harmful chemicals," and thus its marketing with Reduced-Exposure claims is expected to "*benefit* the health of the population as a whole."  2020 IQOS TPL Review at 74 (emphasis added).  It would be contrary to that government's interest to require PM USA to convey to consumers statements that correct previous misleading statements about an entirely different product.  Indeed, requiring 18 detailed corrective statements about combustible cigarettes perversely risks misleading consumers into thinking that HeatSticks expose consumers to the *same* amount of harmful chemicals as combustible cigarettes.

Extending the Corrective Statements to HeatSticks would not convey the kind of "purely factual and uncontroversial information about *attributes of the product or service being offered*," *Philip Morris*, 855 F.3d at 328 (emphasis added), that the D.C. Circuit found to be appropriate for the remedy in this case.  Just the opposite:  it would undermine the government interest on which the Corrective Statements were previously upheld against First Amendment scrutiny—

"prevent[ing] consumers from being confused or misled."  *Philip Morris*, 436 F. Supp. 3d at 15–16; *see also, e.g.*, *Philip Morris*, 566 F.3d at 1140 (upholding corrective statements to prevent "efforts . . . to either directly mislead consumers or capitalize on . . . prior deceptions by continuing to advertise in a manner that builds on consumers' existing misperceptions"). Because the government has no legitimate interest in compelling Defendant to make the Corrective Statements in connection with HeatSticks marketing and advertising, applying Order #1015 to HeatSticks would fail First Amendment scrutiny under any standard of review.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Government's Motion for Clarification, and in the alternative, grant Defendant's Cross-Motion to Modify Order #1015.


Dated:  August 10, 2020                      Respectfully submitted,

                                             */s/ John M. McNichols*
                                             Lisa S. Blatt (D.C. Bar No. 429544)
                                             John M. McNichols (D.C. Bar No. 490479)
                                             WILLIAMS & CONNOLLY LLP
                                             725 Twelfth Street NW
                                             Washington, DC 20005
                                             Telephone: (202) 434-5000
                                             Fax: (202) 434-5029
                                             lblatt@wc.com
                                             jmcnichols@wc.com

                                             *Attorneys for Defendant Philip Morris USA Inc.*

<u>APPENDIX</u>
**CORRECTIVE STATEMENTS FROM ORDER #72-REMAND**

**A.**     **Adverse Health Effects of Smoking**

A Federal Court has ordered Altria, R.J. Reynolds Tobacco, Lorillard, and Philip Morris USA to make this statement about the health effects of smoking.

- Smoking kills, on average, 1,200 Americans.  Every day.
- More people die every year from smoking than from murder, AIDS, suicide, drugs, car crashes, and alcohol, **combined**.
- Smoking causes heart disease, emphysema, acute myeloid leukemia, and cancer of the mouth, esophagus, larynx, lung, stomach, kidney, bladder, and pancreas.
- Smoking also causes reduced fertility, low birth weight in newborns, and cancer of the cervix.

**B.**     **Addictiveness of Smoking and Nicotine**

A Federal Court has ordered Altria, R.J. Reynolds Tobacco, Lorillard, and Philip Morris USA to make this statement about the addictiveness of smoking and nicotine.

- Smoking is highly addictive. Nicotine is the addictive drug in tobacco.
- Cigarette companies intentionally designed cigarettes with enough nicotine to create and sustain addiction.
- It's not easy to quit.
- When you smoke, the nicotine actually changes the brain – that's why quitting is so hard.

**C.**     **Lack of Significant Health Benefit from Smoking "Low Tar," "Light," "Ultra Light," "Mild," and "Natural" Cigarettes**

A Federal Court has ordered Altria, R.J. Reynolds Tobacco, Lorillard, and Philip Morris USA to make this statement about low tar and light cigarettes being as harmful as regular cigarettes.

- Many smokers switch to low tar and light cigarettes rather than quitting because they think low tar and light cigarettes are less harmful. They are **not**.
- "Low tar" and "light" cigarette smokers inhale essentially the same amount of tar and nicotine as they would from regular cigarettes.
- **All** cigarettes cause cancer, lung disease, heart attacks, and premature death – lights, low tar, ultra lights, and naturals.  There is no safe cigarette.

**D.** **Manipulation of Cigarette Design and Composition** to **Ensure Optimum Nicotine Delivery**

A Federal Court has ordered Altria, R.J. Reynolds Tobacco, Lorillard, and Philip Morris USA to make this statement about designing cigarettes to enhance the delivery of nicotine.

- Altria, R.J. Reynolds Tobacco, Lorillard, and Philip Morris USA intentionally designed cigarettes to make them more addictive.
- Cigarette companies control the impact and delivery of nicotine in many ways, including designing filters and selecting cigarette paper to maximize the ingestion of nicotine, adding ammonia to make the cigarette taste less harsh, and controlling the physical and chemical make-up of the tobacco blend.
- When you smoke, the nicotine actually changes the brain – that's why quitting is so hard.

**E.** **Adverse Health Effects of Exposure to Secondhand Smoke**

A Federal Court has ordered Altria, R.J. Reynolds Tobacco, Lorillard, and Philip Morris USA to make this statement about the health effects of secondhand smoke.

- Secondhand smoke kills over 38,000 Americans each year.
- Secondhand smoke causes lung cancer and coronary heart disease in adults who do **not** smoke.
- Children exposed to secondhand smoke are at an increased risk for sudden infant death syndrome (SIDS), acute respiratory infections, ear problems, severe asthma, and reduced lung function.
- There is no safe level of exposure to secondhand smoke.