**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 99-CV-2496 (PLF)** |
| | ) | |
| **and** | ) | |
| | ) | |
| **TOBACCO-FREE KIDS** | ) | |
| **ACTION FUND,** *et al.* | ) | |
| | ) | |
| **Plaintiff-Intervenors** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PHILIP MORRIS USA INC.,** *et al.* | ) | |
| | ) | |
| **Defendants,** | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| **ITG BRANDS, LLC,** *et al.*, | ) | |
| **Post-Judgment Parties** | ) | |
| **Regarding Remedies.** | ) | |
| | ) | |

**EXPERT REPORT OF KEVIN M. MURPHY**
**January 11, 2021**

**TABLE OF CONTENTS**

**I.     INTRODUCTION**................................................................................- 3 -

   A. Assignment ........................................................................- 3 -

   B. Background and Qualifications.............................................- 4 -

   C. Summary of Opinions .........................................................- 6 -

**II.    BACKGROUND** ................................................................- 10 -

   A. The Defendants ..................................................................- 10 -

   B. The Proposed Remedy ........................................................- 10 -

   C. The Manufacturers' Merchandising Programs ....................- 14 -

   D. Cigarette Retailers..............................................................- 16 -

**III.   RETAILERS WOULD BEAR A SIGNIFICANT FRACTION OF THE
      REDUCTION IN PROFITS CAUSED BY THE PROPOSED REMEDY ...........- 16 -**

   A. Economics of the Incidence of Government Regulations.............................- 17 -

   B. The Proposed Remedy Would Reduce the Profits Created by the Manufacturers'
      Merchandising Programs with Retailers ....................................- 18 -

   C. Retailers Would Bear a Significant Share of the Reduction in Profits Created by the
      Proposed Remedy ......................................................................- 22 -

   D. Estimate of Retailers' Share of the Burden..................................- 24 -

**IV.   DR. CHALOUPKA'S ANALYSIS IS INADEQUATE TO SUPPORT HIS
      OPINION** ...............................................................................- 25 -

   A. Dr. Chaloupka's Claims about the Effect of the Proposed Remedy on the Merchandising
      Programs is Based on Flawed Economic Reasoning ...................- 26 -

   B. Dr. Chaloupka's Claims about the Effect of the Proposed Remedy on Participating
      Retailers' Competitive Advantage are Incorrect..........................- 28 -

   C. Dr. Chaloupka's Claim is Inconsistent with the Testimony of Retailers Themselves..- 29 -

   D. Dr. Chaloupka's Analysis of the Economic Literature Is Flawed and Does Not Support
      His Opinion...............................................................................- 33 -

      1. Studies of the Impact of Regulations That Affect Cigarette Sales but Do Not Affect
         How Cigarettes Are Sold at Retailers ..................................- 35 -

         a.   Smoke-Free Air Policies ..........................................- 35 -

         b.   Excise Taxes ............................................................- 38 -

      2. Studies of the Impact of Regulations That Do Not Directly Target Retail
         Establishments but Affect the Demand for Tobacco Products at Retailers ...........- 39 -

      3. Studies of the Impact of Retail Specific Tobacco Related Policies on Retail
         Establishments ....................................................................- 43 -

E.  Dr. Chaloupka's Analysis of the Trends in Convenience Store Business and Cigarette Sales Is Not Informative of the Claim That Tobacco Retailers Are Not Adversely Affected by Measures That Reduce Tobacco Product Demand ...................................- 45 -

# I.   INTRODUCTION

1.   My name is Kevin M. Murphy. I am the George J. Stigler Professor of Economics in the Booth School of Business and the Department of Economics at the University of Chicago, where I have taught since 1983. I have been retained by counsel for Altria, Philip Morris USA, Inc., R.J. Reynolds Tobacco Company, and ITG Brands, LLC, (the "Manufacturers") and the National Association of Convenience Stores ("NACS") and the National Association of Tobacco Outlets ("NATO") (collectively, the "Retailer Associations") to serve as an expert in economics in the above-captioned case.

## A.      Assignment

2.   Plaintiffs[1] in this case have proposed that the court impose a remedy on the Manufacturers for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act.[2] The proposed remedy at issue in this case regulates point-of-sale ("POS") advertisement and on-set display of the Manufacturers' products at each retail location where a Manufacturer has a merchandising contract with the retailer ("participating retailer").[3] The proposed remedy also regulates material that merchandises, advertises, markets or promotes the Manufacturers' covered brands[4] that is distributed to or displayed at retail locations that do not have merchandising contracts ("non-participating retailer"), to the extent that a Manufacturer has distributed, authorized, requested, or paid for such material.[5] In particular, at participating retailers, the proposed remedy would require, among other things, that 25 percent of the area of those POS advertisements and 25 percent of the on-set area used to display the Manufacturers'

---

[1]   Plaintiffs are the United States and Public Health Intervenors (Tobacco-Free Kids Action Fund, American Cancer Society, American Heart Association, American Lung Association, Americans for Nonsmokers' Rights, and National African American Tobacco Prevention Network). *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, (D.D.C. 2006), p. 937.

[2]   Docket 6308 – Opinion and Order 92: Remand ("Opinion and Order 92: Remand"), pp. 1-2; Docket 6276 – Plaintiffs' 2018 Supplemental Brief on Retail Point of Sale Remedy ("Point of Sale Remedy Briefing"), pp. 22-24.

[3]   Docket 6341-1 – Proposed Order Modifying and Reinstating the Corrective Statements Remedy for Retail Point of Sale ("Proposed Order for Retail Point of Sale"), pp. 4-5.

[4]   Covered brands are defined as any brand of cigarette marketed by a Defendant, and four brands acquired by ITG. Proposed Order for Retail Point of Sale, p.2.

[5]   Proposed Order for Retail Point of Sale, p. 5.

covered brands is covered by corrective statements regarding the health effects of smoking.[6] At non-participating retailers the proposed remedy would require that 25 percent of material that merchandises, advertises, markets or promotes the Manufacturers' covered brands that a Manufacturer distributed, authorized, requested, or paid for must be covered by corrective statements.

3.     The Manufacturers and Retailer Associations contend that the proposed remedy would impose costs on retailers, who were not guilty of any RICO Act violations.[7] The Plaintiffs dispute the Manufacturers' and Retailer Associations' contention regarding the effect of the proposed remedy on retailers and have retained an economist, Dr. Frank J. Chaloupka, to evaluate the effect of the proposed remedy on retailers. Dr. Chaloupka has submitted an expert report in which he opines that the proposed remedy is highly unlikely to cause significant economic harm to retailers.[8]

4.     Counsel for Manufacturers and Retailer Associations have asked me to evaluate, from an economic perspective, the likely effect of the proposed remedy on retailers. They have also asked me to assess whether Dr. Chaloupka's analysis is sufficient to support his opinion.

### B.        Background and Qualifications

5.     I received my bachelor's degree in economics from the University of California, Los Angeles, in 1981, and I received my doctorate in economics from the University of Chicago in 1986.

6.     At the University of Chicago, I am a member of the faculties of both the Booth School of Business and the Department of Economics. I teach graduate level courses in microeconomics, price theory, empirical labor economics, and the economics of public policy

---

[6]     I have been informed by counsel that the Manufacturers and Retailer Associations contend that Plaintiffs' proposal departs from earlier court rulings and agreements as to the previously-ordered corrective statements. For ease of reference, the remainder of this report uses the phrase "corrective statements," but such use does not suggest that Plaintiffs' proposed POS remedy adheres to the earlier rulings and agreements.

[7]     Docket 6278 – Defendants' Reply in Support of their Supplemental Brief Regarding Point-of-Sale Display Requirements, pp. 6-7. See also Docket 6279 – National Association of Convenience Stores' Supplemental Reply Brief Concerning Order #1015's Point-of-Sale Display Requirements, pp. 3-5.

[8]     Docket 6341 -9 – Report of Frank J. Chaloupka: Expert Report on Proposed Court-Ordered Corrective Statements at the Point-of-Sale, ("Chaloupka Report") at ¶ 11. Dr. Chaloupka defines harm to retailers to include loss of profit to retailers and retailers being forced out of business (Chaloupka Deposition at 125:2-126:9).

issues. In these courses, I cover a wide range of topics, including the incentives that motivate firms and individuals, the operation of markets, and the impacts of regulation and the legal system. Most of my teaching focuses on two things: how to use the tools of economics to understand the behavior of individuals, firms, and markets; and how to apply economic analysis to data. My focus in both research and teaching is on integrating economic principles with empirical analysis.

7.   I have authored or co-authored more than 75 articles in a variety of areas in economics. Those articles have been published in leading scholarly and professional journals, including the American Economic Review, Journal of Law and Economics, and Journal of Political Economy. Some of my research relates to the economic issues in this case including, for example, the economic effects of regulations, including regulations related to smoking, and the economics of advertising.[9]

8.   I am a Fellow of the Econometric Society and a member of the American Academy of Arts and Sciences. In 1997, I was awarded the John Bates Clark Medal, which, at the time, was awarded every two years[10] by the American Economic Association to an outstanding American economist under the age of forty. In 2005, I was named a MacArthur Fellow, an award that provides a five-year fellowship to individuals who show exceptional merit and promise for continued and enhanced creative work.

9.   In addition to my position at the University of Chicago, I am also a Senior Consultant at Charles River Associates ("CRA"). CRA is a consulting firm that specializes in the application of economics to law and regulatory matters. I have consulted on a variety of cases related to economic issues concerning the cigarette industry. My curriculum vitae is attached to this report as Appendix A. CRA is paid $1500/hour for my time spent on this matter, and I receive compensation from CRA based on its billings in this case. My compensation is not tied to the outcome of this case.

---

[9]   See, for example, Schneider, Lynne, Benjamin Klein and Kevin M. Murphy, "Government Regulation of Cigarette Health Information," *Journal of Law and Economics*, Vol. 24, No. 3, 1981, pp. 575-612 ("Schneider et al. 1981"); Becker, Gary S. and Kevin M. Murphy, "A Simple Theory of Advertising as a Good or Bad," *The Quarterly Journal of Economics*, Vol. 108, No. 4, 1993, pp. 941-964.

[10]   The award is currently awarded every year. *See* American Economic Association, "John Bates Clark Medal," available at http://www.aeaweb.org/honors_awards/clark_medal.php (accessed on November 19, 2020).

C.        **Summary of Opinions**

10. This report sets forth my opinions and describes the data and analyses that underlie my opinions. My opinions are based upon my analysis of data and documents produced in this matter, data and documents provided to me by the Manufacturers and Retailer Associations, court documents, witness statements, and interviews with manufacturers and with retailers that would be affected by the proposed remedy. My opinions are also based upon my general expertise in economics. My analysis has been supported by colleagues at CRA working under my direction. A list of the materials I have relied upon in forming those opinions is attached as Appendix B. My work is ongoing in this matter, and my opinions are based on the information available to me as of the date of this report. I will continue to examine information that may be relevant to the issues and opinions discussed in this report.

11. Retailers will be harmed by the proposed remedy even though it does not directly impose legal obligations on them. A significant share of the profits lost from the proposed remedy will be retailer losses. Although Dr. Chaloupka opines that the proposed remedy is "highly unlikely to cause significant economic harm to cigarette retailers"[11], his report does not provide adequate support for his opinion. Below I provide a brief description of the basis for my opinions.

**Opinion 1: Retailers would be harmed be the proposed remedy because they would likely bear a significant share of the costs of the proposed remedy.**

12. A fundamental principle of the economics of regulation is that the costs of a regulation need not be borne entirely, or even mostly, by the firm that is subject to the regulation. Instead, a significant fraction of those costs can be borne by the firm's suppliers or customers. Economics provides a framework for evaluating the share of those costs, referred to as the incidence, that are borne by the firm subject to the regulation relative to its suppliers or customers. Dr. Chaloupka's report ignores this framework for evaluating the likely effect of the proposed remedy on retailers.

13. Through their merchandising programs, the Manufacturers pay retailers to devote some of the POS space in their stores to merchandise, advertise, and promote the Manufacturers'

---

[11]    Chaloupka Report at ¶ 11.

products, thereby increasing the sales of the Manufacturers' products. These agreements create benefits for both Manufacturers and retailers by raising their profits. The proposed remedy regulates how retailers and Manufacturers can utilize the retailers' POS merchandising space and thereby lowers the value of the agreements between Manufacturers and retailers by acting like a tax on POS advertising and promotion. The proposed remedy would, therefore, reduce the value of the agreements because it would reduce the effectiveness of retailers' space for increasing cigarette sales, and the proposed remedy would impose direct costs on Manufacturers and retailers of complying with the proposed remedy.

14. Economic principles imply that the share of the costs that would be borne by retailers depends on the extent to which they have alternative uses for the merchandising and advertising space that would yield similar profits. The economic evidence suggests that many retailers are unlikely to have such alternatives, so dropping out of the merchandising programs would be unattractive to many retailers. This means that retailers are likely to bear a significant share of the lost profits.

15. The proposed remedy would also make it less beneficial for the retailers that remain in the merchandising programs. Because the remedy is implemented at retail locations, it would impose direct costs on retailers who continue to participate in the Manufacturers' merchandising programs, and thereby result in less profits for such retailers.

16. In addition, the proposed remedy would affect competition between retailers that participate in the Manufacturers' merchandising programs and non-participating retailers. The impact of the proposed remedy on the Manufacturers' merchandising programs and on participating retailers' direct costs could induce customers to switch from participating retailers to non-participating retailers for their purchases of cigarettes and other products. This substitution would reduce participating retailers' profits on the sales of cigarettes and other products. This means that the proposed remedy could effectively shift profits from participating retailers to non-participating retailers, including retailers that do not sell cigarettes.

17. The merchandising agreements generate benefits that manufacturers and retailers share. Economic theory suggests that the participating retailers' share of the lost profits from the proposed remedy is closely related to the share of the profits they earn from the merchandising programs, and this allows me to generate a rough estimate of the share of costs of the proposed

remedy that is borne by retailers. I estimate that participating retailers earn a significant share of the total profits generated by these agreements.

**Opinion 2: Dr. Chaloupka's analysis is inadequate to support his opinion.**

18. Dr. Chaloupka ignores the economic framework discussed above in his evaluation of the likely effect of the proposed remedy on retailers. Instead, Dr. Chaloupka basis his opinion on flawed economic reasoning, a review of some economic literature on the effect of anti-smoking regulations that differ from the proposed remedy, and an empirical analysis of the trends in cigarette sales and retailer profitability that does not support his opinions.

19. To support his opinion regarding the effect of the proposed remedy on retailers, Dr. Chaloupka contends that Manufacturers are unlikely to scale back their merchandising programs and that retailers are unlikely to opt out of these programs as a result of the proposed remedy. He also argues that the proposed remedy would not place participating retailers at a competitive disadvantage relative to non-participating retailers.

20. Dr. Chaloupka claims the effect of the proposed remedy on retailers would be limited because retailers would adapt to any reduction in sales of cigarettes caused by the proposed remedy. To support this claim, he surveys some of the economic literature that has examined the impact on retailers of various policies that reduce the demand for tobacco. He concludes that this research suggests that retailers have not been harmed by previous anti-smoking regulations, which he attributes to retailers' ability to adapt to these regulations. Dr. Chaloupka also analyzes the trends in cigarette smoking and retailer sales and profitability, and claims that this implies that retailers have been able to adapt to reductions in cigarette sales without reducing their profits.

21. For several reasons, Dr. Chaloupka's analysis is inadequate to support his opinion that the proposed remedy is highly unlikely to cause significant economic harm to retailers.

a) Dr. Chaloupka argues that Manufacturers would not discontinue or scale back their merchandising programs, despite the fact that the remedy reduces the effectiveness of the promotion, because Manufacturers would lose sales to other cigarette manufacturers if they did so. The flaw in Dr. Chaloupka's economic reasoning is that he effectively assumes that Manufacturers are choosing to maximize sales rather than

profits. If the effect of the proposed remedy is to reduce the effectiveness of a Manufacturer's merchandising programs, then it can be profit maximizing to reduce payments made through those programs, even if doing so reduces the Manufacturer's sales. Further, Dr. Chaloupka has not evaluated the effect of the proposed remedy on retailers' direct costs, so there is no basis for his claim that the retailers will not be harmed.

b) Dr. Chaloupka claims that the proposed remedy would not put participating retailers at a competitive disadvantage because it would have the same effect on participating and non-participating retailers. This is incorrect. Non-participating retailers are not affected by the proposed remedy in the same manner as participating retailers, as they are not required to display corrective statements unless they choose to obtain materials from Manufacturers, which very few retailers do, and they are not subject to the in-store audit procedure. Dr. Chaloupka does not address the impact of the audit requirements on retailers' costs. In addition, the proposed remedy could reduce the price differences between Manufacturer cigarettes sold at participating and non-participating retailers. For the reasons I explain in this report, this would reduce participating retailers' profits on sales of cigarettes and other products.

c) Dr. Chaloupka's claims are inconsistent with the testimony of the participating retailers. While Dr. Chaloupka claims it is highly unlikely that retailers will suffer significant harm, participating retailers have expressed a number of different concerns about the effects of the proposed remedy.

d) Neither the economic literature Dr. Chaloupka surveys nor his analysis of the trends in cigarette smoking and retailer profitability demonstrate that retailers would be able to adapt and completely offset any reductions in profits caused by the proposed remedy. Economic principles do not support his opinion that the ability to adapt will eliminate the harm on retailers. Further, the literature Dr. Chaloupka surveys is not informative because it does not examine the effect of policies that are sufficiently similar to the proposed remedy, and his analysis of the trends in retailer profitability and cigarette sales is uninformative because it ignores other factors affecting retailers' profitability.

## II.  BACKGROUND

### A.     The Defendants

22.   The original Defendants in the RICO litigation were R.J. Reynolds Tobacco Company ("RJR"), Lorillard Tobacco Company ("Lorillard"), Altria, and Philip Morris USA ("PM USA") (collectively, "Defendants").[12] After RJR and Lorillard merged in 2015, ITG Brands, LLC ("ITG") acquired Lorillard's Maverick cigarette brand and RJR's Winston, Salem, and Kool cigarette brands as part of required divestitures from the merger.[13] Following the merger, ITG became involved in litigation regarding the point-of-sale remedy as a Post-Judgment Remedies Party.[14]

23.   The proposed remedy is specified for a set of "covered brands", which are defined as any brand of cigarette marketed by a Defendant, and the four brands acquired by ITG.[15] In 2019, covered brands accounted for roughly 85 percent of cigarettes shipped to retailers.[16]

### B.     The Proposed Remedy

24.   Defendants were found to have conspired to violate the RICO Act and to have violated the RICO Act.[17] One part of the remedy imposed by the court for the RICO Act violations required that each Defendant that maintains a retail merchandising program for its cigarette products shall require "retailers that participate in [Defendants' merchandising programs] to display" "corrective statements […] in countertop displays and header displays" in their stores.[18] Counsel has instructed me that the D.C. Circuit vacated this order.[19] I further

---

[12]   Proposed Order for Retail Point of Sale, p. 2.

[13]   FTC, "FTC Requires Reynolds and Lorillard to Divest Four Cigarette Brands as a Condition of $27.4 Billion Merger," May 26, 2015 available at https://www.ftc.gov/news-events/press-releases/2015/05/ftc-requires-reynolds-lorillard-divest-four-cigarette-brands (accessed on December 22, 2020). These four brands are referred to as "Acquired Brands". See Point of Sale Remedy Briefing, pp. 4, 46-48.

[14]   Point of Sale Remedy Briefing pp. 1, 3-4.

[15]   Proposed Order for Retail Point of Sale, p. 2.

[16]   2019 MSA STARS Data. I understand this data provides the total cigarette volume shipped to retailers as reported by direct customers enrolled in PM USA's Wholesale Leaders Program.

[17]   Opinion and Order 92: Remand, p. 1.

[18]   Opinion and Order 92: Remand, p. 2. See also *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, p. 939 (D.D.C. 2006).

[19]   Counsel has instructed me that the D.C. Circuit vacated this order as it pertained to these POS displays because the District Court "exceeded its authority by failing to consider the rights of retailers and crafting an injunction that works a potentially serious detriment to innocent persons." Opinion and Order 92: Remand, p. 3.

understand from counsel that the D.C. Circuit instructed the court "to evaluate and 'mak[e] due provision for the rights of innocent persons,' either by abandoning this part of the remedial order or by crafting a new version reflecting the rights of third parties."[20] On October 7, 2020, Plaintiffs disclosed their proposal for a POS remedy that they contend makes due provision for the rights of retailers.

25.   Under the proposed remedy, Manufacturers have to communicate corrective statements at the retail point-of-sale. Because Manufacturers do not own the retailers' stores, the retailers would be required to maintain the signs in their stores. Specifically, the proposed remedy would require that 25 percent of the on-set merchandising space and off-set advertisements that participating retailers use to merchandize, advertise, and promote covered brands display the corrective statements.[21] The proposed remedy would also require that a corrective statement be displayed on 25 percent of any material that merchandises, advertises, markets or promotes the Manufacturers' covered brands that is distributed to or displayed at non-participating retail locations, to the extent that a Manufacturer has distributed, authorized, requested, or paid for such material.[22] Plaintiffs have proposed that the implementation of the POS remedy last a minimum of two years, with an extension period based on the level of non-compliance recorded during each audit.[23] Plaintiffs have proposed guidelines for the design and display of the corrective statements at POS that include details on the text, font, size, layout, and positioning of the corrective statement signs, also referred to as "corrective containers", that participating retailers must place throughout their merchandising areas.[24]

---

[20]   Opinion and Order 92: Remand, p. 3.

[21]   Proposed Order for Retail Point of Sale, pp. 4-5; Docket 6341-2 – Guidelines for Court-Ordered Corrective Statements at Retail Points of Sale 2020-10-07, pp. 23-26, 44, 55.

[22]   Proposed Order for Retail Point of Sale, pp. 5

[23]   Proposed Order for Retail Point of Sale, pp. 2-3, 9-10; Docket 6341-3 – Specifications for Audits of Manufacturer Compliance with Implementation of the Corrective Statement Remedy at Point-of-Sale ("Specifications for Audits"), pp. 16-17, 31-32. The proposal stipulates that the implementation of the remedy would be extended based on the non-compliance share of participating retailers. Specifically, for each quarter, after a non-compliance share is determined by the audit procedure, the implementation period is extended by a number of days equal to the non-compliance share multiplied by the total days in that quarter. Similarly, the proposed order would require the remedy to be extended to the extent manufacturers supply POS material to non-participating retailers based on a finding of non-compliance in monthly audits of the POS material, if any, distributed by Manufacturers to non-participating retailers.

[24]   Docket 6341-2 – Guidelines for Court-Ordered Corrective Statements at Retail Points of Sale 2020-10-07, pp. 6-98.

26.  Under the Proposed Guidelines, the corrective statements at retailers' stores must be included in the retailers' on-set areas, and in any off-set material displayed inside or outside the store that "merchandises, advertises, markets, or promotes its covered brands".[25] The requirement applies to all signage and fixtures at participating retailers regardless of whether they are provided by Manufacturers or owned and customized by the retailer. For retailers that do not participate in the Manufacturers merchandising programs (non-participating retailers), the corrective statements must be included in any materials that the manufacturer "distributed, authorized, requested or paid for" that the retailer chooses to display. A very limited number of non-participating retailers receive materials from Manufacturers and would be subject to this requirement.[26] I understand that non-participating retailers would not otherwise be required to place any corrective statements on their cigarette displays.[27]

27.  Figure 1, reproduced from Plaintiffs' Proposed Guidelines, shows a mock-up of a set display area that includes the proposed corrective statements. Figure 1 demonstrates how, under the proposed remedy, the corrective statements would cover 25 percent of the area of the cigarette displays at participating retailers.

---

[25]  Proposed Order for Retail Point of Sale, pp. 4-5.

[26]  Declaration of Michael Wilson (RAI Trade Marketing Services Company) ("Wilson Declaration") at ¶¶ 5, 14; Declaration of Frederick Scott Myers (Philip Morris USA Inc.) ("Myers Declaration") at ¶ 10.

[27]  Proposed Order for Retail Point of Sale, p. 5. The proposed order defines "POP Material" as "material distributed to or displayed at a Store that merchandises, advertises, markets, or promotes one or more Covered Brands" and requires that any POP material distributed, authorized, requested or paid for by a Manufacturer at a non-participating retailer location contain corrective statements. *Id.* at 4-5. It is unclear whether the proposed definition of "POP Material" includes display racks or fixtures at non-participating retailers to the extent they are provided or paid for by Manufacturers. I am not aware of any evidence that Manufacturers provide or pay for displays or fixtures at non-participating retailers.

Figure 1



28.   Plaintiffs have also proposed specifications for auditing Manufacturers' compliance with the POS remedy. Plaintiffs propose that the Manufacturers pay a third-party to audit a sample of participating retail locations[28] by taking photographs of all cigarette merchandising areas and any off-set marketing materials that are visible to consumers.[29] The auditor may return to a store location on multiple visits to examine different sections of a store, or even to re-take the same photographs on a later date, if there are issues with the original photographs.[30] Plaintiffs have also proposed a mechanism for sampling the stores to detect and record compliance.[31] Under the proposed methodology, the number of participating retail stores included in the audit sample would range from 271 to over 15,000 for different thresholds of statistical confidence level and sample precision, with the Plaintiffs' expert, Dr. Spaeth, recommending a sample of around 15,000 stores for each quarterly audit.[32]

---

[28]   Specifications for Audits, pp. 2, 4-10; Proposed Order for Retail Point of Sale, p. 8.

[29]   Specifications for Audits, p. 9.

[30]   Specifications for Audits, p. 10.

[31]   Specifications for Audits, pp. 4-8, 11-15, 28-30; Docket 6341-6 – Expert Report of James Spaeth, Ph.D. ("Spaeth Report"), ¶¶ 30-171.

[32]   Spaeth Report, ¶¶ 55, 59-61. See also Deposition of James Spaeth, Ph.D., taken November 25, 2020, at 84:18-85-15.

### C.        The Manufacturers' Merchandising Programs

29.   Manufacturers offer merchandising programs through which they offer payments to retailers in exchange for retailers' agreement to merchandise and promote the Manufacturers' products. Below, I describe the key features of these programs.

30.   The Manufacturers' merchandising programs typically include payments to retailers for a commitment to place advertising signs at the POS and for preferred placement of their products on on-set displays at the POS.[33] The agreements typically include payments, called merchandising payments, to retailers based on cigarettes sales that retailers do not have to pass on to customers.[34] Merchandising payments make up a small portion of cigarette manufacturers' overall expenditure under the merchandising programs.[35]

31.   In addition to merchandising payments, retailers that participate in one of the merchandising programs are generally eligible to receive price discounts and promotional payments that they are required to pass on to consumers, thus reducing the retail price of cigarettes by the amount of the discount.[36] This means that retailers benefit from the discounts by selling more cigarettes at a lower price, rather than earning higher margins on promoted

---

[33]   See, for example, 2015 Philip Morris USA Retail Leaders Agreement (Display Plan) (Amended March 29, 2020) (9561519821-9561519844) ("PM USA Display Plan"), Exhibits B, D; 2015 Philip Morris USA Retail Leaders Agreement (Fixture Plan) (Amended March 29, 2020) (9561519845-9561519874) ("PM USA Fixture Plan"), Exhibits C, E; RAI Trade Marketing Services Retail Partners Marketing Plan Contract Portfolio Pack Outlet Plan – Amended 07-01-2019 (RJRT_004729106) ("RJR Agreement"), pp. 2-4, 7-8;  ITG Brands Choice Growth Merchandising Plan Description 2020 Factory Made Cigarettes (FMC) (January 1, 2020) (ITGB-DOJ0000354) ("ITG Agreement")  , pp. 1-2.

[34]   See, for example, PM USA Display Plan Exhibit A p.1, Exhibit D; PM USA Fixture Plan Exhibit B p.1, Exhibit E; Myers Declaration at ¶ 35; RJR Agreement, pp. 3-4, 7-8; ITG Agreement, p.2.

[35]   According to data provided to the Federal Trade Commission, cigarette manufacturers spent $62 million on point of sale advertisements and $180 million on promotional allowances (merchandising payments) paid to retailers, and over $6 billion on price discounts to retailers in 2018. The total amount spent on advertising and promotional expenditures by cigarette manufacturers was about $8 billion in 2018. See Federal Trade Commission Cigarette Report for 2018, Issued 2019 ("FTC Report") at Table 2G and Appendix. Point of sale advertisements include any materials displayed or distributed at a retail location, and promotional allowances are paid to cigarette retailers in order to facilitate the sale or placement of cigarette products. FTC Report at p. 32. See also, for example, Myers Declaration at ¶ 35.

[36]   See, for example, Altria Group Distribution Company (AGDC) on behalf of Philip Morris USA (PM USA), "Marlboro Performance Options, Marlboro Menthol Margin Fairness Requirement and Business Enhancement Funds Notice – National excluding Massachusetts," October 29, 2018 (9560763272-9560763291) at pp. 12-14; RJR Agreement, pp. 4-6. See also Declaration of Michael Kurtz (Jacksons Food Stores) ("Kurtz Declaration") at ¶ 9; Roberts Declaration  at ¶ 14; Declaration of Francis J. Armstrong (Blue Ridge Tobacco Company) ("Armstrong Declaration") at ¶ 10; Declaration of Johnathan Polonsky (Plaid Pantry) ("Polonsky Declaration") at ¶ 10; Declaration of Rahim Budhwani (Encore Stores) at ¶ 13.

- 14 -

products. Selling more cigarettes can also generate profits on non-cigarette sales because customers who visit a retailer to purchase cigarettes may purchase other products.[37] In some cases, the cigarette discounts are temporary and coincide with a Manufacturer's promotion of individual brands,[38] while in other cases, the discounts allow retailers to offer lower prices on an everyday basis.[39] Eligibility for these promotional discounts can also depend in some cases on placement of specific signage at the POS.[40]

32. In 2019, about 197,900 retailers participated in a Philip Morris promotional program, out of about 312,000 retailers that sold Philip Morris cigarettes.[41] This corresponds to 63 percent of retailers, and accounts for 89 percent of the volume of cigarettes sold.[42] RJR has merchandising contracts with retailers at approximately 188,000 retail locations, with approximately 89 percent of its cigarettes sold through contracted retailers.[43] In addition, RJR reports there are many retailers that sell RJRT's covered brands and with whom RAI TMS does not have a merchandising contract.[44] ITG has merchandising contracts with approximately 176,000 retailers.[45] Non-participating retailers are often smaller stores that sell fewer cigarettes.[46]

---

[37]  See Declaration of Dr. Henry Armour (NACS) ("Armour Declaration") at ¶ 50. This is consistent with retail declarations. See Declaration of Johnathan Polonsky (Plaid Pantry) ("Polonsky Declaration") at ¶¶ 8, 17; Declaration of Michael Kurtz (Jacksons Food Stores) ("Kurtz Declaration") at ¶¶ 7, 12. According to the NACS Research Department, there are about $27 billion total ancillary sales associated with cigarette sales each year..

[38]  See, for example, Altria Group Distribution Company (AGDC) on behalf of Philip Morris USA (PM USA), "Marlboro Performance Options, Marlboro Menthol Margin Fairness Requirement and Business Enhancement Funds Notice – National excluding Massachusetts," October 29, 2018 (9560763272-9560763291) at pp. 2-3; Altria Group Distribution Company (AGDC) on behalf of Philip Morris USA (PM USA), "Revised Kentucky Chesterfield Base SPP Promotional Allowances beginning September 2019," September 5, 2019 (9560763373-9560763374); Altria Group Distribution Company (AGDC) on behalf of Philip Morris USA (PM USA), "Introduction of the Marlboro bold Ice SPP beginning February 2020," January 8, 2020 (9560763430).

[39]  See, for example, RJR Agreement, p. 7; ITG Agreement, p. 2.

[40]  For example, the MLP and MLP II options of the MPO require retailers to maintain their PM area of signage updated with promotional prices and discounts. The Marlboro Multi-Pack option also has signage requirements. See Altria Group Distribution Company (AGDC) on behalf of Philip Morris USA (PM USA), "Marlboro Performance Options, Marlboro Menthol Margin Fairness Requirement and Business Enhancement Funds Notice – National excluding Massachusetts," October 29, 2018 (9560763272-9560763291) at pp. 2-3, 12-16.

[41]  Myers Declaration at ¶ 10.

[42]  Myers Declaration at ¶ 12.

[43]  Wilson Declaration at ¶ 13. Wilson Declaration reports this figure corresponds to industry-wide statistics and it is "likely accurate" as it relates to RJR cigarettes.

[44]  Wilson Declaration at ¶ 13.

[45]  Declaration of Jeff Eldridge (ITG Brands, LLC) ("Eldridge Declaration") at ¶ 110.

[46]  Myers Declaration at ¶ 10; See also Declaration of Jared Scheeler (The Hub) ("Scheeler Declaration") at ¶¶ 21, 47 explaining that its seasonal store in Lake Sakakawea – which "does not generate significant revenue" – does

### D.      Cigarette Retailers

33.   Exhibit 1 shows shipments of cigarettes by retailer type in 2019. About two-thirds of cigarettes shipments are made to convenience stores. The next highest category is tobacco stores at eight percent of total sales.

34.   Cigarette sales constitute 27 percent of convenience stores' sales, but only 11 percent of convenience stores' gross profit.[47] Convenience stores earn lower margins on the sales of cigarettes than on other products within the top 10 sales categories.[48] The fact that cigarettes is the product category with the highest sales per store per month[49] is consistent with survey evidence indicating that purchasing cigarettes is one of the most important reasons for consumers' visits to convenience stores. According to NACS Convenience Tracking Program Survey data, cigarettes are one of the main products that bring consumers to convenience stores (See Exhibit 2.) As a result, focusing only on the margins that convenience stores earn on cigarettes sales understates the contribution of cigarette sales to convenience stores' profits because cigarette sales generate profits from purchases of other products.[50]

## III. RETAILERS WOULD BEAR A SIGNIFICANT FRACTION OF THE REDUCTION IN PROFITS CAUSED BY THE PROPOSED REMEDY

35.   To explain why Dr. Chaloupka's analysis is inadequate to support his opinion, it is important to first describe how economics implies one should evaluate the effect of a regulation. From an economic perspective, the proposed remedy acts like a tax on Manufacturers' merchandising programs. Manufacturers' merchandising agreements with retailers create value by raising profits for both manufacturers and participating retailers. The proposed remedy in this case would regulate the advertisement and display of covered brands at retail and would reduce

---

not participate in the merchandising programs since "[g]iven the store's seasonal nature and small size, it does not make sense for the store to contract with the tobacco Manufacturers."

[47]   NACS, "State of the Industry Part Two: *Understanding Categories and the need states that drive growth*", (9561439280_9561439303) ("NACS Presentation Part Two") at pp. 4-5. Tobacco sales are 34 percent of total sales and 17 percent of gross profits. I understand that the term "tobacco" in this slide refers to cigarettes and other tobacco products. Using the sales and gross profits figures for each category in page 5, I can calculate the share of cigarette on total sales and gross profits.

[48]   The top 10 sales categories account for 80 percent of inside sales dollars. See NACS Presentation Part Two at p.5.

[49]   See NACS Presentation Part Two at p.5.

[50]   Armour Declaration at ¶¶ 49,50. This is also consistent with testimony from the retailer declarations, which explain that cigarettes sales help drive the sales of non-cigarette items. Polonsky Declaration at ¶ 17; Kurtz Declaration at ¶¶ 7, 12.

the value created by the merchandising agreements. A relevant question is whether, and to what extent, participating retailers would bear the reduction in profits caused by the proposed remedy. Economics informs us that retailers would bear a share of the reduction in profits because many retailers likely have no alternative to their agreements with the Manufacturers that would yield similar profits. This is consistent with the evidence suggesting that retailers have enjoyed a significant share of the profits generated by the merchandising programs. Participating retailers would also be burdened by the remedy because the proposed remedy would not be applied equally to all retailers and could shift profits from participating to non-participating retailers.

A.        Economics of the Incidence of Government Regulations

36.   The proposed remedy in this case would require that the Manufacturers communicate corrective statements that cover 25 percent of the space devoted to merchandising and advertising their covered brands in retail locations, whether that be via off-set advertisements or the on-set displays for Manufacturers' products at retailers that participate in their promotional agreements.[51] That space is valuable to both the retailers and Manufacturers, and the proposed remedy acts like a tax on that space. For every three square feet of the space used to promote the Manufactures' covered brands, one square foot must be devoted to corrective statements. From an economic perspective this represents a tax rate of roughly 33 percent on the shelf and promotional space used for cigarettes. In addition, Manufacturers must pay a third party to audit Manufacturers' and retailers' compliance with the proposed remedy. However, the fact that the proposed remedy imposes the requirements on the Manufacturers does not mean that Manufacturers will bear the entire or even most of the economic burden of the proposed remedy. Instead, economics implies that participating retailers would bear some of that burden just as buyers and sellers of products each bear a portion of a monetary tax even when the requirement to pay that tax is explicitly allocated to one party.[52]

---

[51]   For participating retailers, corrective statements have to be communicated on all signage displayed in connection to covered brands, even if the signage is created by the retailers. See Proposed Order for Retail Point of Sale at ¶ 1. As mentioned above, non-participating retailers are only required to display corrective signage if they choose to display materials received from Manufacturers.

[52]   See, for example, Felix, R. Alison, "Do State Corporate Income Taxes Reduce Wages?" *Economic Review-Federal Reserve Bank of Kansas City*, Vol. 94, No. 2, 2009, pp.77-102 at pp.77-78; Hassett, Kevin A. and Aparna Mathur, "Taxes and Wages," *American Enterprise Institute Working Paper*, No. 128, 2006, pp. 1-46.

37.   In general, the incidence of a regulation or tax that affects upstream manufacturers' cost of distributing their products will be borne by both manufacturers and retailers, in the form of lower profits, and consumers, in the form of lower consumer surplus.[53] For the same reason that retailers share in the profits created by merchandising programs that are administered by Manufacturers, they will share the reductions in profits caused by a government regulation that reduces the profits created by those programs.

38.   An important insight from economics is that costs from a regulation affecting the profitability of the relationship between manufacturers and retailers can be borne by both parties even if the regulations are imposed primarily, or exclusively, on one party. If a regulation imposes new costs that are primarily legal obligations of Manufacturers, then retailers may share those costs in the form of less lucrative merchandising agreements, or lower participation levels. A regulation can also impose new costs on retailers, either in the form of direct costs or lost sales from complying with the regulation. If costs are primarily imposed on retailers, then Manufacturers would have to compensate retailers for part of the increase in their costs, so the burden would be shared between retailers and Manufacturers. In other words, retailers share in the new costs either by experiencing them directly, or as lower participation rates, or less lucrative merchandising agreements. Remaining on the merchandising programs will be less attractive under the proposed remedy than it is today.

**B.      The Proposed Remedy Would Reduce the Profits Created by the Manufacturers' Merchandising Programs with Retailers**

39.   In this case, the proposed remedy affects how the Manufacturers can promote their products at retail locations. To understand how the proposed remedy would affect profits of manufacturers and retailers, it is important to understand why the Manufacturers make promotional payments and merchandising payments to retailers.

40.   The POS space in retailers' stores is valuable to the Manufacturers for several reasons. First, the Manufacturers can use that space to advertise their products. Second, preferred placement of Manufacturers' products can increase their sales. Third, there is a complementarity between in-store advertising and preferred placement and Manufacturers' price promotion

---

[53]   See, for example, Milanez, Anna, "Legal tax liability, legal remittance responsibility and tax incidence: Three dimensions of business taxation," *OECD Taxation Working Papers*, No. 32, 2017, pp. 1-76.

programs. In-store advertising or promotional displays can be used to call attention to the fact that a retailer is offering a product at a promotional price.

41.   Thus, the agreements governing the Manufacturers' merchandising programs with retailers raises profits for both the Manufacturers and the retailers. Retailers' profits are higher because the payments increase their revenue and because the increased sales of cigarettes and other products purchased by cigarette buyers raise their profits. Dr. Chaloupka acknowledges that merchandising programs are valuable to retailers and not just to manufacturers.[54] Offering promotional programs increases Manufacturers' profits because the programs increase retail sales of their cigarettes.

42.   The proposed remedy will reduce the profits created by these agreements because it acts like a tax on using the retailers' space to advertise and promote the Manufacturers' covered brands. The tax has several elements. First, it taxes the use of space by forcing retailers to display corrective signs in proportion to the space used for cigarette promotion. For every three square feet of space retailers sell to Manufacturers for advertising and promotional displays, one square foot of space has to be devoted to corrective statements. Second, because the corrective statements are not desired by retailers or Manufacturers, the proposed remedy has the same effects on Manufacturers' demand for that space as a tax levied on the space at a rate of at least 33 percent. Third, it taxes promotion by imposing costs of compliance on both Manufacturers and retailers.

43.   For the same reasons that Manufacturers and participating retailers share the profits created by the merchandising programs, they will share in the reduction in profits caused by the proposed remedy. The proposed remedy will make the in-store advertising and promotional displays less effective at increasing sales. Because of the complementarity between in-store advertising and promotional displays and price promotion, the proposed remedy will also make Manufacturers' price promotions less effective. This will harm participating retailers by reducing their comparative advantage relative to non-participating retailers.

44.   The proposed remedy imposes several different forms of direct costs on retailers.

---

[54]   Chaloupka Report at ¶ 23.

a) At least some retailers would be responsible for incurring costs associated with placing and maintaining the new signs, and maintaining an even and random distribution of the corrective statements displayed on the signs.[55]

b) Retailers will experience increased compliance costs. Under the existing agreements, retailers may lose part of their merchandising payments if the merchandising at the location is out of compliance. Manufacturers report that retailers are at times unable to perfectly comply with merchandising contract requirements, so there is frequent non-compliance.[56] Manufacturers understand some of the difficulties of compliance, and typically work with retailers by issuing warnings, rather than financial penalties, on non-complying retailers.[57] Under the proposed remedy, retailers will not have this benefit. Because Manufacturers have no employees on site at retail locations and it is not feasible for a manufacturer representative to continually check on remedy compliance at every store,[58] Manufacturers must rely on retailers to ensure that the signage is compliant. And, as the compliance requirements of the proposed remedy are more extensive, the remedy will either create additional instances of noncompliance or induce retailers to incur additional costs to avoid those additional instances. Manufacturers may have an incentive to more strictly enforce penalties in order to discourage noncompliance with the remedy.[59] Either way, a share of the costs of complying with the audit program could be shifted to retailers.

---

[55] This is consistent with testimony from the retailer declarations. See Crozier Declaration at ¶ 25; Kurtz Declaration at ¶¶ 14-15.

[56] Myers Declaration at ¶ 39; Wilson Declaration at ¶ 63 ("In my 19 years in this business, I have never seen a store that is consistently 100% perfect in fulfilling its display requirements.)"

[57] Myers Declaration at ¶¶ 40-41; Declaration of Francis J. Armstrong (Blue Ridge Tobacco Company) ("Armstrong Declaration") at ¶ 23; Declaration of James McElroy (QuickChek) ("McElroy Declaration") at ¶ 28; Declaration of Paul Crozier (Sheetz, Inc.) ("Crozier Declaration") at ¶ 29; Declaration of Mary Szarmach (Smoker Friendly International) ("Szarmach Declaration") at ¶ 19. In some cases, manufacturers are willing to rework certain display requirements. See, for example, Declaration of Lisa Dell' Alba (Square One) ("Dell' Alba Declaration") at ¶ 24 ("…we do not hang tobacco advertisements on the tobacco racks in the drive-through area, even though that area is subject to the same requirements under our Manufacturer contracts. We have been able to work with the sales representatives who audit our stores on behalf of the Manufacturers and convince them of the necessity of keeping those racks free of tobacco signage").

[58] Wilson Declaration at ¶¶ 62-63; Armstrong Declaration at ¶ 16.

[59] This is consistent with the expectations expressed by retailers in their declarations. See Polonsky Declaration at ¶¶ 22, 23; Armstrong Declaration at ¶ 25.

c) Retailers have also expressed concern over other forms of direct costs, including: additional training of employees,[60] costs of storage,[61] increased checkout times,[62] disruptions to the normal course of business operations brought on by the audit process,[63] interference with the display of product and pricing information, which may cause customers to leave the store,[64] and the investments made to the aesthetics of their stores.[65]

45.   Dr. Chaloupka ignores the majority of these direct costs on retailers. He states that retailers could "incur some limited, one-time costs for adding the corrective statements to these [display] materials" and "a reduction in the demand for cigarettes as a result of the factual information contained in the corrective statements."[66] However, he does not address the direct costs to retailers of complying with the audit program ,[67] the impact of the signs on store aesthetics and sales, or the costs retailers would incur maintaining and dealing with the signage.

46.   In conclusion, like other forms of regulation, the proposed remedy would reduce the value created by the Manufacturers' merchandising programs with retailers because it would make the programs less effective at increasing sales and impose direct costs on the Manufacturers and participating retailers.

---

[60]   Crozier Declaration at ¶ 24; Polonsky Declaration at ¶ 15; Armstrong Declaration at ¶ 19; Kurtz Declaration at ¶ 15; Declaration of Derek Gaskins (Yesway) ("Gaskins Declaration") at ¶ 16.

[61]   Polonsky Declaration at ¶ 19; see also Armstrong at ¶ 15.

[62]   Crozier Declaration at ¶ 28; Kurtz Declaration at ¶ 12; Gaskins Declaration at ¶ 14.

[63]   Crozier Declaration at ¶ 14; Armstrong Declaration at ¶ 20; Polonsky Declaration at ¶ 21; Szarmach Declaration at ¶ 17.

[64]   Crozier Declaration at ¶¶ 17-18; Kurtz Declaration at ¶ 12.

[65]   Retailers report spending resources creating a particular look and feel for their store that conveys a particular message about their business. See Polonsky Declaration at ¶ 5; McElroy Declaration at ¶ 7; Scheeler Declaration at ¶¶ 12, 36-38.

[66]   Chaloupka Report at ¶ 25.

[67]   Deposition of Frank J. Chaloupka, Ph.D., taken November 17, 2020 ("Chaloupka Deposition") at 89:4-20 ("Q [...] Are you aware that the DOJ proposed remedy includes an audit process? A No, I'm not. Q [...] you didn't look at anything related to the proposed audit process when you went through the materials relevant to your testimony here today? A I may have seen something about an audit process. I cannot remember anything about an audit process. Q [...] You haven't considered any costs to the retailers caused by the proposed DOJ audit process, is that correct? A That is correct.").

**C.      Retailers Would Bear a Significant Share of the Reduction in Profits Created by the Proposed Remedy**

47.   The proposed remedy would require that the in-store advertising and promotional displays of Manufacturers' covered brands at participating retailers be partially covered by corrective statements that would make in-store advertising and displays less effective at increasing sales. Because of the complementarity between in-store advertising and price promotion, it would also make price promotion less effective at increasing sales. The proposed remedy would also impose costs on retailers of complying with the requirements, and costs on the Manufacturers associated with the auditing of retailers' compliance with the program. All of these factors would reduce the profits created by the Manufacturers' merchandising programs. I now explain why a significant share of the reduction in profits would likely be borne by retailers.

48.   Economics suggests that one of the factors affecting participating retailers' share of lost profits is the extent to which those retailers have substitute uses for the POS space they are currently using for the Manufacturers' promotional programs. If participating retailers could earn similar profits shifting their POS space and promotional efforts to other Consumer Packaged Goods ("CPGs") companies, then the Manufacturers would bear a larger share of the reduction in profits caused by the proposed remedy.

49.   However, few retailers are likely to have such alternatives. Cigarette manufacturers' valuation of the POS space currently used for cigarettes likely significantly exceeds what retailers could recover by shifting the use of that space to other CPGs because, unlike other CPGs, cigarette manufacturers are significantly limited in their ability to use other forms of advertising and promotion, and limited in their ability to use other locations to display product within stores.[68] Further, most CPGs would likely prefer that their products be displayed on the retailers' shelve or in front of the POS counters, rather than behind the counter, where consumers can only purchase products sold by asking the cashier to select the product. As a result, it is

---

[68]   The 2009 Family Smoking Prevention and Tobacco Control Act banned self-service displays for cigarettes and smokeless products for stores open to underage consumers. "Family Smoking Prevention and Tobacco Control Act," Pub. L. No. 111-31, June 22, 2009, available at https://www.govinfo.gov/content/pkg/PLAW-111publ31/pdf/PLAW-111publ31.pdf (accessed on January 6, 2021); See also FDA, "Family Smoking Prevention and Tobacco Control Act - An Overview," available at https://www.fda.gov/tobacco-products/rules-regulations-and-guidance/family-smoking-prevention-and-tobacco-control-act-overview#youth (accessed on December 22, 2020).

unlikely that many retailers will find alternative uses for their space that will generate as much revenue as they currently get from participating in the Manufacturers' merchandising programs.

50.   This is consistent with the economic evidence. The majority of convenience stores sell cigarettes[69] and most of the volume of cigarettes are sold through stores that participate on merchandising programs with Manufacturers.[70] Further, retailers that participate in those programs have continued to do so for several years.[71] If there were equally profitable alternatives for use of that space, it is likely that more retailers would be using that space for those alternative uses and that retailers would be switching to those alternative uses more frequently.[72]

51.   Because many retailers likely do not have substitutes for the use of the space currently allocated to cigarette manufacturers that would yield similar profits, retailers would be unable to pass on to manufacturers the direct costs they incur as a result of the proposed remedy and would be unable to avoid sharing some of the reduction in profits associated with the proposed remedy.

52.   Another reason why retailers would bear a share of the reduction in profits caused by the proposed remedy is that the remedy could affect competition between participating and non-participating retailers. Participation in the merchandising programs allows retailers access to price discounts that enable them to sell cigarettes at lower prices, providing a competitive advantage to participating retailers. Because the merchandising programs would be less effective at increasing retailers' sales and would raise retailers' costs, they could have the effect of reducing the retail price difference of Manufacturers' cigarettes between participating and non-participating retailers. This could induce some consumers to substitute from participating to non-participating retailers for their cigarette purchases, which also reduces participating retailers' sales and profits on other products to the extent consumers also buy other products when purchasing cigarettes.

---

[69]   Armour Declaration at ¶ 49.

[70]   See Section III.C above.

[71]   For example, participation in PM USA merchandising programs is relatively constant. See Myers Declaration at ¶ 10; pp. 2-3. See also Crozier Declaration at ¶ 9; Szarmach Declaration at ¶ 8; Polonsky Declaration at ¶ 9; Declaration of Robert P. Roberts (Smoke em, Inc.) ("Roberts Declaration") at ¶ 13; McElroy Declaration at ¶ 11; Dell' Alba Declaration at ¶ 12; Scheeler Declaration at ¶ 20.

[72]   As James McElroy of QuickChek states, "There is no other product that QuickChek could put in the space currently occupied by cigarettes that would provide as much value to QuickChek's business." See McElroy Declaration ¶¶ 1, 10.

### D.        Estimate of Retailers' Share of the Burden

53.   The analysis above explains why economics suggests that participating retailers would likely bear a significant share of the reduction in profits caused by the proposed remedy. I now provide a rough estimate of that share based on the economic evidence.

54.   Participating retailers profits from the programs are proportional to the increase in cigarettes sales, where the proportionality factor is the retailer markup on cigarettes plus the retailer's markup on any non-cigarette sales that accompany the additional cigarette sales. Retailers also receive compensation from participating in the merchandising agreements that is proportional to their cigarette sales. Manufacturers' profits from their merchandising programs are proportional, or less than proportional,[73] to the increase in cigarette sales from the merchandising program, where the proportionality factor is the manufacturer's markup on promoted cigarettes.

55.   Retailer markups on cigarette sales are roughly 14 percent of retail price on average for convenience stores, and therefore at least 14 percent on sales involving pass-through promotions.[74] In 2020, convenience stores sold nearly $52 billion worth of cigarettes, with average ancillary sales associated with cigarettes of $27 billion.[75] Therefore, for every dollar of cigarette sales, convenience store retailers sold an additional 52 cents in non-cigarette products. Retailer markup on sales of non-cigarette products is, on average, 18.5 percent.[76] As a result, for each dollar of cigarettes sold, retailers made 24 cents in profits (14 cents in profit from $1 in cigarette sales plus 18.5 percent of 52 cents from ancillary sales).

56.   Manufacturer markups are calculated as the difference between the wholesale price paid to manufacturers and the costs that the manufacturers incur including taxes, MSA payments, costs associated with promotional programs, and production costs. An estimated upper bound on

---

[73]   Manufacturer's profits could be less than proportional since some of the increase in cigarette sales that result from the merchandising program could be offset by a reduction in sales from non-participating retailers.

[74]   NACS Presentation Part Two at p.5.

[75]   Armour Declaration at ¶¶ 49-50, citing the NACS Research Department.

[76]   NACS, "State of the Industry Part One: *Key Operational and Financial Lessons from 2019*" (9561439253_9561439279) ("NACS Presentation Part One") at pp. 9, 11. The margin on non-cigarette products is calculated as the total gross profit of all sales excluding cigarettes ($112,639 = $121,062 - $8,433) divided by the total sales excluding cigarettes ($610,101 = $669,037 - $58,936) which equals 18.5 percent (=$112,629/$610101). All of these estimates are per convenience store per month in 2019.

manufacturers' per pack profits is $3.43 per pack.[77] This profit estimate is an upper bound because it does not subtract all the Manufacturers' costs, such as those associated with the promotional programs and production costs. For a retail price of $7 per pack, the upper bound on the amount of profits that manufacturers made per dollar of cigarettes sold is 49 cents (=$3.43/$7).

57.   Therefore, convenience store retailers receive roughly one-third (=24 cents/(24 cents+49 cents)) of the profits from the Manufacturers' merchandising programs, or more. This means that retailers would bear a significant share of the lost profits from the proposed remedy.[78]

## IV.  DR. CHALOUPKA'S ANALYSIS IS INADEQUATE TO SUPPORT HIS OPINION

58.   Above, I described the appropriate economic framework for evaluating the likely effect of the proposed remedy on retailers. I also explained how using that framework implies that retailers would likely bear a significant share of the costs of the proposed remedy. I now explain why nothing in Dr. Chaloupka's report contradicts these conclusions.

59.   Dr. Chaloupka ignores the standard economic incidence analysis establishing that the costs of government regulation are not necessarily borne by the party legally obligated to follow it. He has not explained why, at the same time that (as he acknowledges) retailers benefit substantially from merchandising programs created and administered by Manufacturers, retailers would not share in any costs imposed on Manufacturers in their administration of that program. Dr. Chaloupka has not attempted any quantitative analysis of how the costs of the proposed remedy would be shared between retailers and Manufacturers.

---

[77]   The per-pack profit is calculated as the list price of Marlboro brand cigarettes ($5.32 per pack) minus Federal taxes ($1.01 per pack) and MSA payments (about $0.88 a pack). See Philip Morris USA, "Manufacturers of Highest Grade Cigarettes and Tobacco Products: Prices Effective November 1, 2020," p. 3. See Altria Group, Inc. Form 10-K for the Fiscal Year Ended December 31, 2019, available at https://sec.report/Document/0000764180-20-000018/ (accessed on January 11, 2021) at p 20 ("Altria's subsidiaries recorded approximately $4.5 billion,$4.5 billion and $4.7 billion of charges to cost of sales for each of the years ended December 31, 2019, 2018 and 2017, respectively") and p. 35. (Shipment volume in 2019 is reported as 101,799 million cigarettes), which is equivalent to 5.1 million packs. ($4.5billion/5.1million = $0.88).

[78]   Because convenience stores account for 67 percent of annual cigarette pack shipments (see Exhibit 1), even if non-convenience store retailers received zero profits from the agreements, participating retailers in the aggregate would still obtain a 22 percent (calculated as 67 percent of 33 percent) share of total profits.

60.   Instead, Dr. Chaloupka effectively makes two arguments to support his opinion that the proposed remedy is unlikely to have a significant negative economic effect on retailers. First, he reasons that it is highly unlikely the proposed remedy will cause Manufacturers to discontinue or scale back their merchandising programs,[79] and that the costs faced by retailers would be small, so any reduction in retailer's profits will mostly be the result of a reduction in cigarette sales. Second, he argues that participating retailers will not be placed at a competitive disadvantage with respect to non-participating retailers.[80]

61.   Dr. Chaloupka's analysis is entirely inadequate to support his opinion. His claim that Manufacturers would likely not discontinue or scale back their merchandising programs is based on flawed economic reasoning. In addition, his analysis does not establish that retailers will be able to adapt to the proposed remedy without experiencing significant reductions in profits. Dr. Chaloupka also ignores the impact of the audit procedure on retailers in his analysis.

A.      **Dr. Chaloupka's Claims about the Effect of the Proposed Remedy on the Merchandising Programs is Based on Flawed Economic Reasoning**

62.   Dr. Chaloupka argues that retailers are highly unlikely to be harmed by the proposed remedy. He argues that Manufacturers are highly unlikely to scale back or discontinue their merchandising programs and that retailers would not opt-out of Manufacturers' merchandising programs.[81]

63.   Dr. Chaloupka claims that the Manufacturers would not scale back their merchandising programs because if a manufacturer did so, it would lose sales to other manufacturers.[82] Dr. Chaloupka's claim is fundamentally at odds with economic principles because it implicitly assumes that Manufacturers are maximizing revenue rather than profits. Scaling back or discontinuing merchandising programs would likely reduce Manufacturers' sales. However, doing so would also reduce Manufacturers' costs. This means that the Manufacturers could have incentives to alter their merchandising programs in response to the proposed remedy if the cost savings from doing so would exceed the expected reduction in

---

[79]   Chaloupka Report at ¶ 28.
[80]   Chaloupka Report at ¶ 23.
[81]   Chaloupka Report at ¶¶ 23, 28.
[82]   Chaloupka Report at ¶ 28.

revenue.[83] To the extent that the proposed remedy reduces the effectiveness or increases the costs of price and non-price promotions, manufacturers may have an incentive to do less of these activities even if they do not discontinue the programs.

64.   With or without the proposed remedy Manufacturers face a tradeoff between the amount of payments they make to retailers, which comes out of their bottom line, and the additional sales that result from having retailers part of the program.[84] The proposed remedy reduces the value of the agreement to both Manufacturers and retailers, and alters that tradeoff by making merchandising less effective by increasing the display costs to retailers and by increasing the costs of having additional participating retailers. Each dollar paid to retailers still costs a dollar, but with the proposed remedy participation is worth less in terms of additional sales. Retailers require compensation for display costs and program implementation costs associated with participation, and participation in the program increases Manufacturers' costs of program compliance. This means the resulting agreement will either be less lucrative, have lower participation rates, and/or impose direct costs on retailers.

65.   Dr. Chaloupka also reasons that retailers are unlikely to opt out of the Manufacturers' merchandising programs because they would be unwilling to forego the revenue from those programs. The response of retailers to the reduction in value of the agreements depends on both the magnitude of the expected losses in terms of a less lucrative agreement and on retailers' alternative uses for that space. Any assessment of whether retailers are likely to opt out would require an analysis of the value of the less lucrative agreement and the value of either selling that space to other CPGs or not selling the space to reduce the clutter. Because Dr. Chaloupka has not considered these issues, he has no basis for claiming that retailers would not opt out of the Manufacturers' merchandising programs. Even if retailers would not opt out of these programs, they would still be harmed by the less lucrative agreement that reflects either an increase in direct costs borne by retailers or, potentially, reduced payments under the merchandising programs. Indeed, Dr. Chaloupka's claim that retailers would not reduce participation because the deals are lucrative for them implies exactly the opposite, that retailers likely would bear a significant share of the costs imposed on the agreements. As I outlined

---

[83]   See also Schneider et al. 1981 at pp. 601-602, where I find that Manufacturer demand for advertising is price elastic.

[84]   Most of these sales come from other manufacturers.

above, the share of costs borne by retailers will be higher the lower their ability or willingness to shift their promotional space and efforts to other products.

**B.      Dr. Chaloupka's Claims about the Effect of the Proposed Remedy on Participating Retailers' Competitive Advantage are Incorrect**

66.   Dr. Chaloupka claims that retailers participating in the Manufacturers' promotional programs would not be put at a competitive disadvantage relative to retailers that do not participate in those programs because non-participating retailers will be subject to the requirement that advertisements they receive from the Manufacturers contain the same corrective statements. Dr. Chaloupka's claim is incorrect.

67.   To earn promotional payments, participating retailers are required to place the Manufacturers' advertising signage in their stores in at least the on-set display area. The proposed remedy imposes the addition of corrective statements on signage and displays of participating retailers. Non-participating stores would not be required to place the Manufacturers' advertisements in their stores or add any corrective statements to their cigarette displays. To the extent non-participating stores desire to have advertisements provided by the Manufacturer displayed at their stores, those advertisements would have the corrective statements as verified by a third-party audit of the Manufacturer rather than the retail location.[85] As discussed above, a very small number of retailers receive such materials, and even these retailers could avoid displaying corrective statements entirely by choosing not to display Manufacturer-provided materials in their stores. This means that participating retailers would have significantly more of the corrective statements in their stores than non-participating retailers (which may not have to display any at all).

68.   Dr. Chaloupka's claims also ignore the potential effect of the proposed remedy on the price difference between participating and non-participating retailers. Participation in the merchandising programs provides competitive advantages to participating retailers relative to non-participating retailers because participation allows retailers access to price discounts that enable them to sell cigarettes at lower prices. Because the merchandising programs would be less effective at increasing retailers' sales and would raise retailers' costs, they could have the effect of reducing the retail price difference of Manufacturer's cigarettes between participating and

---

[85]    Proposed Order for Retail Point of Sale, pp. 2, 9.

non-participating retailers. This could induce some consumers to substitute from participating to non-participating retailers for their cigarette purchases. Similarly, to the extent that the signage reduces the effectiveness of POS promotions at participating retailers those retailers will lose sales to non-participating retailers. Since some consumers buy other products when they are purchasing cigarettes, as discussed before, this substitution would reduce participating retailers' sales and profits on other products.

### C.      Dr. Chaloupka's Claim is Inconsistent with the Testimony of Retailers Themselves

69.   Dr. Chaloupka's opinion that it is highly unlikely that the retailers would be adversely affected by the proposed remedy is inconsistent with the testimony provided in the retailer declarations.

70.   Several retailers have submitted declarations describing a variety of costs and burdens they anticipate from the proposed remedy. Retailers express concerns that they would incur costs related to maintaining the fixtures, updating signage, as well as training employees on the requirements and the protocol related to auditor visits. Retailers also express concerns related to customer perception of the corrective statements.

71.   In their declarations, retailers state that they would incur a variety of costs should the proposed remedy be issued. First, retailers explain that they would incur cost associated with maintaining the signs with the corrective statements that would cover the displays. According to the retailers, wear and breakage are common for signs placed on fixtures, and that this wear and breakage would be exacerbated by the larger signs provided in the DOJ's proposed guidelines.[86] Lisa Dell' Alba, President and CEO of Square One, "estimate[s] that the [current] signs break after a couple months of use. Larger and heavier signs tend to break more quickly. We do not currently have any signs as large as the 10-inch-by-30-inch signs contemplated by Plaintiffs' proposal, but I anticipate that signs of that size would break very quickly."[87] Retailers also state that in some cases, the breakage may take several days to repair, during which they could be

---

[86]    Crozier Declaration at ¶¶ 20-22; Armstrong Declaration at ¶ 16; Gaskins Declaration at ¶ 14.

[87]    Dell' Alba Declaration at ¶ 20.

deemed noncompliant with the proposed remedy.[88] As Sheetz's Category Manager for Cigarettes & Tobacco Paul Crozier states: "Sign breakage is a completely unintentional consequence of frequent use. That a broken sign can result in noncompliance finding does not seem fair or realistic."[89]

72.   Retailers also explain that the proposed requirements would cover the display of some of their products[90] and pricing information.[91] Retailers worry that if a customer does not see their preferred cigarette product on display, then they may assume that the store does not sell that product and not make a purchase or simply leave the store, resulting in lost sales to the retailer.[92] Michael Kurtz, Category Manager of Jacksons Food Stores, explains that "customers who do not see their preferred brand because it is covered by the government's proposed signs may leave without asking if their product is available" and that "[t]hese customers may have made other purchases, meaning Jacksons would lose not only cigarette sales, but also sales on other items in the customers' baskets."[93] Additionally, retailers state that they will incur costs from training their employees on the requirements of the proposed remedy.[94] Mr. Kurtz describes that there would have to be nearly "constant training" in order to maintain compliance given the high turnover among Jacksons' employees.[95] Retailers also explain that the proposed remedy may increase checkout times[96], affecting not only cigarette customers but all customers waiting in line.[97] For example, Mr. Crozier describes a numbering system that Sheetz has developed to help clerks efficiently identify the different tobacco products they offer at the store.[98] Mr. Crozier

---

[88]   Crozier Declaration at ¶¶ 22-23; Szarmach Declaration at ¶ 16; Polonsky Declaration at ¶ 14; Armstrong Declaration at ¶ 17.

[89]   Crozier Declaration at ¶¶ 1, 23.

[90]   Crozier Declaration at ¶ 17; Polonsky Declaration at ¶ 17; Szarmach Declaration at ¶ 12.

[91]   Kurtz Declaration at ¶ 13; Roberts Declaration at ¶ 16.

[92]   Crozier Declaration at ¶ 18; Kurtz Declaration at ¶ 12; McElroy Declaration at ¶ 21; Roberts Declaration at ¶¶ 10, 21; Declaration of Scott Woodward (Murphy USA) at ¶ 18.

[93]   Kurtz Declaration at ¶ 12.

[94]   Crozier Declaration at ¶ 24; Polonsky Declaration at ¶ 15; Armstrong Declaration at ¶ 19; Kurtz Declaration at ¶ 15.

[95]   Kurtz Declaration at ¶ 15. Other retailers share similar concerns. See McElroy Declaration at ¶ 23; Polonsky Declaration at ¶ 15.

[96]   Crozier Declaration at ¶ 17; Kurtz Declaration at ¶ 12; McElroy Declaration at ¶ 20.

[97]   Crozier Declaration at ¶ 17; McElroy Declaration at ¶ 20.

[98]   Crozier Declaration at ¶ 16.

explains that in the images of mock-ups of the proposed remedy, the corrective statements cover the display of the numbering system as well as the packs themselves, which will "decrease Sheetz's ability to provide fast and efficient customer service, which creates a burden on Sheetz's business."[99] Tom Brennan, Chief Merchandising Officer of Casey's General Stores, estimates that the increased time it takes to fulfill store-level cigarette activities (i.e., sales and counting inventory) due to the proposed remedy will result in an additional $8.3 million on employee labor costs per year.[100]

73.   Retailers also express concerns with costs and burdens associated with the audit procedure. The proposed remedy provides that auditors take photographs of the cigarette display area. Retailers typically prefer no photographs to be taken in their stores and often require pre-approval to do so.[101] Because of this, Sheetz's Crozier explains "we would have to train our employees to allow unfamiliar third parties to take pictures without advance notice and to verify that the auditors had the appropriate paperwork because allowing photographs is a departure from our current policy."[102] Additionally, the audit would disrupt the flow of normal business operations as it would require employees to move out of the way from the cigarette displays in order to allow for the required unobstructed photographs.[103] As Michael Kurtz of Jacksons Food Stores states: "Time that cashiers must spend away from the register or check out area is time that they cannot spend doing their jobs."[104] He also contends that the audit process would be particularly problematic for retailers that generally have one employee at the store per shift as this would require that one person "simultaneously confirm the auditor is authorized to take photographs, help the auditor do so by removing any obstructions from the cigarette display area, and provide customer service."[105] Jared Scheeler – CEO, Founder and Owner of The Hub Convenience Stores, Inc. – describes the burden that the audit process will place on retailers:

---

[99]   Crozier Declaration at ¶ 17.

[100]   Declaration of Tom Brennan (Casey's General Stores) at ¶ 19.

[101]   Crozier Declaration at ¶ 27; Polonsky Declaration at ¶ 20; Armstrong Declaration at ¶ 20; Kurtz Declaration at ¶ 17; Szarmach Declaration at ¶ 17; Scheeler Declaration at ¶ 50.

[102]   Crozier Declaration at ¶ 27.

[103]   Crozier Declaration at ¶ 27; Armstrong Declaration at ¶ 20; Polonsky at ¶¶ 20-21; Szarmach Declaration at ¶ 17.

[104]   Kurtz Declaration at ¶ 17.

[105]   Polonsky Declaration at ¶ 21.

"[B]ased on my experience as a NACS member and a NACS Board Member, this proposal would be challenging, if not impossible, for many NACS members to implement. It does not appear the realities of operating a convenience store were taken into account when the DOJ developed the court-ordered statement guidelines and the audit specifications."[106]

74.   Additionally, retailers express concerns on the impact the proposed remedy will have on their store environments. For example, Jonathan Polonsky, CEO of Plaid Pantry convenience stores, states that his company spends on average $1.5 million each year on capital expenditures towards "upgrading and improving the look and feel of its stores"[107] and works with a graphic designer every four to five years in order to "refresh [their] graphics package and overall store aesthetic."[108] Mary Szarmach, Vice President of Trade Marketing & Governmental Relations at the tobacco stores Smoker Friendly International, states that the proposed remedy is "inconsistent with the clean, de-cluttered look of Smoker Friendly stores."[109] Michael Kurtz of Jacksons Food Stores fears that the statements "do not lend themselves to the clean, friendly customer experience" of its stores and will put Jacksons at a competitive disadvantage to its fast-casual restaurant competitors.[110] Kurtz states that "It is important to Jacksons' business to have a clean, fresh environment that is inviting to customers who want to buy food and other products. If our stores were cluttered and unfriendly looking it would hurt our sales".[111] Jared Scheeler of The Hub states that the proposed remedy would create a "lose-lose situation" regarding the development of its LED signage[112] – something that his company takes "great pride" in and views as a "positive aspect of [their] brand."[113] Accordingly, Scheeler explains that his stores "can keep the signage and incur a new and significant burden and expense, or we discontinue our advertisements on LED signage and give up an aspect of our business that demonstrates The Hub's innovation and creativity."[114]

---

[106]   Declaration of Jared Scheeler (The Hub) ("Scheeler Declaration") at ¶¶ 3, 34-35.
[107]   Polonsky Declaration at ¶ 5.
[108]   Polonsky Declaration at ¶ 7.
[109]   Szarmach Declaration at ¶¶ 1, 11.
[110]   Kurtz Declaration at ¶ 11.
[111]   Kurtz Declaration at ¶ 4.
[112]   Scheeler Declaration at ¶ 44.
[113]   Scheeler Declaration at ¶ 43.
[114]   Scheeler Declaration at ¶ 44.

75.   Furthermore, retailers express concerns that the proposed remedy will negatively affect consumers' perceptions of their stores. For example, Lisa Dell' Alba of Square One Markets Inc. ("Square One") expresses concern that customers may be "offended and/or angered by the messaging in the proposed corrective statements" and are "likely to attribute the sentiments in the proposed corrective statements to Square One."[115] Douglas Galli of Reid Stores, Inc. worries customers will "view the signage as offensive or negative" and "may also assume Reid stores engaged in wrongdoing."[116] Mr. Galli states: "I am not comfortable posting signage that our customers could view as offensive or negative. This would not only be bad for business, but is contrary to our store's values and our hard work to create a positive store environment."[117] Paul Crozier of Sheetz, Inc. suggests that there can be an element of social pressure when a consumer is required to ask a clerk whether the store carries cigarettes and, if so, what brands.[118] He states that "smokers may not want to ask if their product is available, at the risk of finding out that it isn't, because of the public stigma associated with smoking."[119] POS displays today allow consumers to obtain such information without any assistance.

**D.      Dr. Chaloupka's Analysis of the Economic Literature Is Flawed and Does Not Support His Opinion**

76.   In Section V of his report, Dr. Chaloupka cites to a variety of economic literature to support his conclusion that tobacco companies' and business associations' assertions about the negative economic impact of the proposed remedy on cigarette retailers are "greatly overstated."[120] This economic literature addresses the impact of various tobacco control measures aimed at reducing cigarette consumption and can be characterized under three main types. The first type are policies that do not affect how cigarettes are sold at retailers, which include smoke-free air policies and changes in excise taxes. The second type includes policies that do not directly target retail establishments but affect how cigarettes are sold, such as Australia's tobacco plain packaging regulation. The third type are policies that directly target retail establishments, such as the bans on the retail displays of tobacco products in Ireland and

---

[115]   Dell' Alba Declaration at ¶¶ 2, 33.

[116]   Declaration of Douglas Galli (Reid Stores, Inc.) ("Galli Declaration") at ¶¶ 3, 28-29.

[117]   Galli Declaration at ¶ 28.

[118]   Crozier Declaration at ¶¶ 1, 18.

[119]   Crozier Declaration at ¶ 18.

[120]   Chaloupka Report at ¶¶ 29-38 and 47.

New Zealand. In this section, I address the economic literature that Dr. Chaloupka uses to support his conclusion. I explain that his analysis of the literature is not informative for understanding the impact of the proposed remedy on retailers because he ignores the significant differences between the impact of the types of regulation he cites and the proposed remedy, and because his analysis does not consider all the ways in which the proposed remedy would affect the profitability of retailers.

77.   The proposed remedy targets a specific cigarette industry input: retail merchandising displays and advertising in some, but not all, establishments that sell cigarettes. How other regulations, such as those studied in the literature cited by Dr. Chaloupka, inform the impact of the proposed remedy depends on how similar the regulations are in their impact on retailers. As I explain below, conclusions drawn from the empirical evidence of regulations that do not affect how cigarettes are sold at retail are not informative because these regulations do not affect the manner in which cigarettes are sold at retail like the proposed remedy does. Even if these regulations did affect the sale of cigarettes in the same way as the proposed remedy, the literature is uninformative because it examines regulations that impact all retailers uniformly whereas the proposed remedy does not.

78.   In addition, to understand the full impact of the proposed remedy on retailers, one needs to consider all the costs imposed on the retailer as a result of the regulation. As I explain below, the literature cited by Dr. Chaloupka often answers empirical relationships that are too narrow or too broad to be informative. For example, some of the literature he cites examines the impact of a regulation on broad economic outcomes, like unemployment, or the impact across all retailers, both of which are uninformative of whether *individual* retailers have been adversely impacted. At the other end of the spectrum, he also cites literature that is too narrow because it only examines one impact of a regulation, instead of the total impact of the regulation on retailers.

79.   Moreover, the proposed remedy subjects retailers to disproportionate costs in comparison to other measures such as, for example, excise taxes and smoking bans. It is a well-known result in economics that regulations targeting specific industry inputs create more

distortions than policies that target the industry's output.[121] In the case of the cigarette industry, "output" refers to the demand for cigarette packs and the "inputs" include manufacturing, marketing, various aspects of retail, and consumer time and effort. Because the proposed remedy targets retail displays, which is an input in the cigarette industry, the result suggests that the proposed remedy has significantly greater costs on the supplies of those inputs (retailers in this example) than policies that directly target the output, such as increasing the cigarette excise tax and imposing smoking bans.

80.   None of the studies discussed by Dr. Chaloupka attempted to determine whether specific retailers experienced disproportionate harm, even according to the limited available measures of harm. At most those studies measured market average outcomes or outcomes for a selected segment of the market.

### 1. Studies of the Impact of Regulations That Affect Cigarette Sales but Do Not Affect How Cigarettes Are Sold at Retailers

81.   The first category of economic literature cited in Dr. Chaloupka's report evaluates the impact of regulations that affect cigarette sales but do not affect how cigarettes are sold at retail. These policies include smoke-free air policies and changes in excise taxes.

#### a. Smoke-Free Air Policies

82.   Smoke-free air policies are regulations that aim to reduce cigarette consumption by preventing people from smoking in certain areas such as restaurants, bars, and workplaces. They affect smoking activity by limiting how and when cigarettes may be smoked. By limiting consumers' opportunities to smoke cigarettes, these policies can reduce total consumption of cigarettes and reduce smokers' expenditures at establishments that are made smoke-free by the policy.

83.   Dr. Chaloupka draws two conclusions from his review of the literature on the impact of smoke-free air policies. His first conclusion, which he cites from the review of the literature in

---

[121]   Diamond, Peter A., and James A. Mirrlees. "Optimal taxation and public production I: Production efficiency." *The American Economic Review*, Vol. 61, No. 1, 1971, pp. 8-27. Both authors went on to win Nobel Memorial Prize in Economic Sciences for this and related work. See "Nobel Award to Economists Mirrlees, Vickrey Mentions Work of MIT's Peter Diamond," MIT News, October 8, 1996, available at https://news.mit.edu/1996/peterdiamond (accessed on December 30, 2020); Dizikes, Peter, "MIT economist Peter Diamond wins Nobel Prize," MIT News, October 11, 2020, available at https://news.mit.edu/2010/nobel-diamond (accessed on December 30, 2020).

the IARC Handbook 13 on *Evaluating the Effectiveness of Smoke-Free Policies*,[122] is that "smoke-free air policies did not lead to a loss of business activity among restaurants or bars" and that "many studies found that there was a small positive impact on these businesses."[123] This conclusion is irrelevant for concluding that the proposed remedy would have no economic impact on retailers for two reasons.

84.    First, the establishments affected by smoke-free air policies are locations where smokers would *consume* cigarettes, like restaurants and bars, not *purchase* cigarettes, like convenience stores or other tobacco retailers. However, unlike the proposed remedy, non-smokers, which constitute a majority of the population, may increase expenditures at these establishments after the policy and mitigate or offset some of the losses from the reduction in expenditures from smokers. In addition, smokers can adjust their behavior and shift their cigarette consumption in response to smoke-free air policies, such as smoking before and/or after visiting retail establishments or stepping away from the establishment to smoke.

85.    Second, a finding that there was no loss of business activity, on average, for the sector, does not mean that there were no set of establishments that were harmed by this policy. Patrons in different areas and with different customer bases (those with a higher proportion of smoker clientele) may have been harmed, even if the sector as a whole was not.

86.    Dr. Chaloupka's second conclusion cites one of his own research papers with Jidong Huang that examines whether smoke-free air policies and excise taxes are correlated with the number of convenience stores.[124] He argues that if smoke-free air policies had a large enough impact on profits then, on net, there would be fewer convenience stores because more convenience stores would exit and fewer convenience stores would enter the market. Since he finds no correlation between a state's smoke-free air policies and the number of convenience stores, he concludes that smoke-free air policies "had no negative economic impact on

---

[122] International Agency for Research on Cancer and World Health Organization, "IARC Handbooks of Cancer Prevention – Tobacco Control, Volume 13: Evaluating the Effectiveness of Smoke-free Policies," International Agency for Research on Cancer, Lyon, France, 2009. Chapter 4 of the Handbook focused on the economic impact of smoke-free policies.

[123] Chaloupka Report at ¶¶ 31, 33.

[124] Huang, Jidong and Frank J. Chaloupka, "The economic impact of state cigarette taxes and smoke-free air policies on convenience stores," *Tobacco Control*, Vol. 22, No. 2, 2013, pp. 91-96, ("Huang and Chaloupka 2013").

convenience stores."[125] This conclusion is irrelevant for concluding that the proposed remedy would have no economic impact on retailers for three reasons.

87.   First, Dr. Chaloupka cites a research paper that he co-authored which violates the key methodologic characteristics that he lays out in his report as characteristics that "should be considered when evaluating the quality of the study."[126] He states that appropriate statistical methods should include "controls for…other factors that lead to fluctuations in business activity."[127] However, the regression analysis in Dr. Chaloupka's research that evaluates the impact of convenience store entry and exit does not control for important factors like the price of goods and services other than cigarettes, average wages of employees, or economic activity at similar retailers that do not sell cigarettes. Therefore, one cannot draw a causal inference from the simple regression correlation performed in his research.[128]

88.   Second, Dr. Chaloupka's study does not provide any analysis of the composition of convenience stores over time. A focus on the overall number of stores masks any changes that may have happened in terms of store size, location, profitability or composition of products sold across stores. Stores with high reliance on tobacco sales as part of their business strategy are likely to be affected differently by tobacco-related regulation than stores with little reliance on tobacco sales. In addition, the proposed remedy is not limited to convenience stores, but affects all retailers that sell cigarettes and participate in merchandising agreements. An appropriate analysis of the impact of the proposed remedy should account for heterogeneity of all retailers affected by the policy.

89.   Finally, there is no basis to draw the conclusion that convenience stores suffered no negative impact based on the lack of negative correlation between a state having a smoke-free air regulation and the number of convenience stores per capita. Convenience stores could be seriously harmed and face lower sales, revenues, and profits even if they do not to go out of business.

---

[125]   Huang and Chaloupka 2013 at p. 95. The authors study the combined impact of smoke-free air policies and taxation. While they provide a model that looks at the impact of tax only, the authors fail to provide an analysis that looks at the isolated impact of smoke-free air policies.

[126]   Chaloupka Report at ¶ 31.

[127]   Chaloupka Report at ¶ 31.

[128]   Chaloupka Deposition at 126:22-133:3 and Exhibit 2 to Chaloupka Deposition at p. 92.

b.  Excise Taxes

90.  Dr. Chaloupka also address the impact of excise taxes which is a tobacco control measure that reduces cigarette consumption by raising prices. An increase in excise taxes affects the demand for cigarettes by increasing the price consumers pay for each pack they purchase. The incidence of the tax may be distributed across various segments of the supply chain, including the manufacturers, wholesalers, retailers, and consumers.

91.  Dr. Chaloupka cites two conclusions from the literature on excise taxes. First, he cites the review in IARC Handbook 14 on the *Effectiveness of Tax and Price Policies for Tobacco Control* and the NCI/WHO Monograph 21 on *The Economics of Tobacco and Tobacco Control* of the empirical evidence on the impact of tobacco taxes on broad economic outcomes, like unemployment.[129] These reviews concluded "that there was strong evidence that increases in tobacco taxes did not lead to reductions in employment, with many studies, including those from the U.S., concluding that overall employment would increase in response to tax increases."[130]

92.  Second, as described above, he cites his own research paper with Jidong Huang which examines whether smoke-free air policies and excise taxes are correlated with the number of convenience stores.[131] They find that "[t]axes are positively correlated with the density of convenience stores…with a 10 percent increase in state cigarette taxes associated with a 0.19 percent ($p<0.05$) increase in the number of convenience stores per million people in a state."[132] From this finding, they conclude that "tobacco control policies did not harm convenience stores."[133]

---

[129]   International Agency for Research on Cancer and World Health Organization, "IARC Handbooks of Cancer Prevention – Tobacco Control, Volume 14: Effectiveness of Tax and Price Policies for Tobacco Control," International Agency for Research on Cancer, Lyon, France, 2011. Chapter 9 of the Handbook focused on the health and economic impact of tobacco taxation.  U.S. National Cancer Institute and World Health Organization. *The Economics of Tobacco and Tobacco Control.* National Cancer Institute Tobacco Control Monograph 21. NIH Publication No. 16-CA-8029A. Bethesda, MD: U.S. Department of Health and Human Services, National Institutes of Health, National Cancer Institute; and Geneva, CH: World Health Organization; 2016.

[130]   Chaloupka Report at ¶ 30.

[131]   Huang and Chaloupka 2013.

[132]   Huang and Chaloupka 2013 at p. 91. The study does not evaluate how this relationship changes with the magnitude of the tax. Huang and Chaloupka 2013 at p. 92.

[133]   Chaloupka Report at ¶ 35.

93.   Neither of these conclusions are relevant for concluding that the proposed remedy would not harm retailers for three reasons. First, a discussion of the aggregate economic effects of cigarette taxes is not informative with regards to how the proposed remedy will affect retailers. Any increases in overall employment or aggregate economic measures are not helpful for determining how specific retailers are affected by the proposed remedy.

94.   Second, as I previously discussed, there are several serious flaws in Dr. Chaloupka's study that are equally applicable to his conclusions about the impact of excise taxes. For example, his regression analysis does not control for important confounding factors like the price of goods and services other than cigarettes, average wages of employees, or economic activity at similar retailers that do not sell cigarettes. The study does not provide any analysis of the composition of convenience stores over time to understand how any changes in terms of size, location, profitability or composition of products sold across stores affected the sector or individual stores.

95.   Finally, a study of the overall number of convenience stores affected by a tax is not informative of the impact of the proposed remedy on retailers. Even if the impact of state excise taxes could be used as a proxy for the impact of the proposed remedy, a finding that cigarette state excise taxes and the total number of convenience stores is positively correlated does not mean that individual convenience stores benefit from an increase in state excise taxes. As such, this article is not relevant for the purposes of discussing the proposed remedy on individual retailers that sell tobacco products.

### 2.   Studies of the Impact of Regulations That Do Not Directly Target Retail Establishments but Affect the Demand for Tobacco Products at Retailers

96.   The second type of economic literature cited in Dr. Chaloupka's report evaluates the impact of regulations, like plain packaging regulation ("PPR"), that do not directly target retail establishments but affect the demand for tobacco products at retailers.

97.   Australia enacted the Tobacco Plain Packaging Act in 2011 which required all tobacco products to be packaged in a certain color with the brand and variant name in a standard font, font size, font color, and position on the package.[134] It eliminated logos, brand images, and

---

[134]   Thomas, Dr. Matthew, "Tobacco Plain Packaging Bill 2011," Bills Digest No. 35, August 24, 2011, available at https://parlinfo.aph.gov.au/parlInfo/download/legislation/billsdgs/1022244/upload_binary/1022244.pdf;fileType

promotional texts from all cigarette packaging and required the addition of text and graphic health warnings.[135]

98.   To determine whether such PPR adversely affect retailers, Dr. Chaloupka examined three studies on one of the potential negative impacts that PPR can have on retailers: retail employees may have difficulty distinguishing between cigarette brands due to the homogenous packaging which could cause longer transaction times and potential loss of business. These studies measured the time it took convenience stores and other retail establishments to retrieve a specific pack of cigarettes. These studies find that there may be small, temporary increases in cigarette pack retrieval time following the implementation of PPR, but there are no increases in cigarette pack retrieval time within a few weeks of implementation.[136] Dr. Chaloupka concludes from this literature that the "[f]indings from these studies imply that the fears raised about the negative impact of plain packaging on retailers were unfounded."[137]

99.   Dr. Chaloupka's analysis of the literature is incomplete and not informative of either the impact of PPR on retailers or the impact of the proposed remedy on retailers. His analysis is incomplete because he only cites the impact of PPR on transaction times, which is only one potential impact of the regulation. The literature he cites finds other potential impacts of PPR on retailers including a much larger incidence of lack of product availability after implementation of plain packaging relative to pre-implementation.[138] In addition, he has not reviewed the literature that examines the impact of PPR on the composition of cigarettes sold. This literature, which features articles from some of the same authors that Dr. Chaloupka cites for the impact of PPR

---

=application/pdf#search=%222010s%202011%20thomas,%20matthew%22 (accessed on January 6, 2021) ("Tobacco Plain Packaging Bill 2011").

[135]   Tobacco Plain Packaging Bill 2011.

[136]   Wakefield, Melanie, Megan Bayly, and Michelle Scollo, "Product retrieval time in small tobacco retail outlets before and after the Australian plain packaging policy: real-world study," *Tobacco Control*, Vol. 23, No. 1, 2014, pp. 70-76 ("Wakefield et al. 2014"); Bayly, Megan, Michelle Scollo, and Melanie Wakefield, "No lasting effects of plain packaging on cigarette pack retrieval time in small Australian retail outlets," *Tobacco Control*, Vol. 24, No. e1, 2015, pp. e108-e109 ("Bayly et al. 2015"); Carter, Owen, Matthew Welch, Brennen Mills, Tina Phan, and Paul Chang, "Plain packaging for cigarettes improves retail transaction times," *BMJ*, Vol. 346, 2013, p.f1036.

[137]   Chaloupka Report at ¶ 36.

[138]   See Chaloupka Report at ¶ 36 citing to Wakefield et al. 2014 at pp. 72-74.

on transaction time,[139] finds that consumers shifted toward value cigarettes in the aftermath of PPR, which means that they shifted toward cigarettes that could yield lower profitability for retailers.

100. One article used survey results from nearly 9,000 current adult smokers to compare cigarette consumption patterns before and after PPR was implemented in Australia.[140] The authors find that the share of smokers choosing value cigarettes increased significantly[141] after the PPR and consumer's odds of purchasing multi-packs relative to single packs also increased significantly.[142] Overall, the authors conclude that they found "clear evidence of an increase in the proportion of current smokers using value brands following the introduction of [plain packaging]."[143]

101. A second article finds a similar shift in consumer purchasing patterns toward value cigarettes after the implementation of PPR.[144] The authors find that "baseline sales declined in premium and mainstream brands (particularly in the grocery channel) but *increased* toward value

---

[139] Michelle Scollo, Megan Bayly, and Melanie Wakefield are authors on multiple papers cited by Dr. Chaloupka. See Wakefield et al. 2014 and Bayly et al. 2015.

[140] Scollo, Michelle, Meghan Zacher, Kerri Coomber, Megan Bayly, and Melanie Wakefield, "Changes in use of types of tobacco products by pack sizes and price segments, prices paid and consumption following the introduction of plain packaging in Australia," *Tobacco Control*, Vol. 24, No. Suppl 2, 2015, pp. ii66-ii75 ("Scollo et al. 2015") at ii69.

[141] In the Pre-PP period, 21.1 percent (21.4 percent adjusted) of respondents smoked Value FM cigarettes, compared to 25.8 percent (25.5 percent adjusted) in the PP year 1 period and 27.4 percent (27.8 percent adjusted) in the PP post tax period. The odds ratio of smoking Value FM cigarettes in PP year 1 relative to Pre-PP period is 1.30 in the unadjusted model, and 1.27 in the adjusted model. The odds ratio of smoking Value FM cigarettes in PP post tax period relative to Pre-PP period is 1.41 in the unadjusted model, and 1.44 in the adjusted model. *See* Scollo et al. 2015 at ii68, Table 1. The Pre-PP period includes April-September 2012, the PP year 1 period includes December 2012 to November 2013, and the PP post-tax period includes December 2013 to March 2014. *See* Scollo et al. 2015 at ii69.

[142] In the Pre-PP period, 2.9 percent (2.9 percent adjusted) of respondents purchased multi-packs, compared to 6.2 percent (6.4 percent adjusted) in the PP year 1 period, and 9.1 percent (9.4 percent adjusted) in the PP post-tax period. The odds ratio of purchasing multi-packs in PP year 1 relative to the Pre-PP period is 2.20 in the unadjusted model, and 2.29 in the adjusted model. The odds ratio of purchasing multi-packs in PP post-tax period relative to the Pre-PP period is 3.33 in the unadjusted model, and 3.49 in the adjusted model. *See* Scollo et al. 2015 at ii70, Table 2. The Pre-PP period includes April-September 2012, the PP year 1 period includes December 2012 to November 2013, and the PP post-tax period includes December 2013 to March 2014. *See* Scollo et al. 2015 at ii69.

[143] Scollo et al. 2015 at ii73.

[144] Bonfrer, André, Pradeep K. Chintagunta, John H. Roberts, and David Corkindale, "Assessing the sales impact of plain packaging regulation for cigarettes: Evidence from Australia," *Marketing Science*, Vol. 39, No. 1, 2020, pp. 234-252 ("Bonfrer et. al. 2020").

brands. This suggests a shift in sales toward such value brands."[145] They also conclude their results are "consistent with the removal of the ability for consumers to distinguish between such classifications other than by price."[146] This study suggests that plain packaging may harm retailers by changing the composition of cigarette sales.

102. Dr. Chaloupka's analysis of whether PPR adversely affects retailers is also not informative of the impact of the proposed remedy on retailers because there are important differences between PPR and the proposed remedy. First, as previously discussed, PPR can dramatically change the composition of cigarette sales between the premium and discount segments. Even if transaction times were not negatively affected, retailers could be harmed by a decline in profits from this change in composition. Second, while PPR interferes with the marketing of cigarettes, it also tends to increase total packs sold because more of the sales are of the cheaper brands.[147] Third, PPR regulates packaging which is part of the manufacturing process.[148] As a result, the manufacturers incur the costs associated with changing the design of the packages. The proposed remedy targets retailer contributions to the industry instead. Fourth, PPR in Australia was implemented after point-of-sale tobacco displays had already been removed from retail establishments, which means that retailers were already forced to employ new storage and retrieval methods.[149] The ability of retailers to further adjust their stocking

---

[145] Bonfrer et al. 2020 at p. 247. Emphasis in original quote.

[146] Bonfrer et al. 2020 at p. 247.

[147] See Scollo et al. 2015; see also Bonfrer et al. 2020 at p. 247. To the extent that consumers are less interested in smoking because they find their regulated packaging to be less attractive, they may reduce their cigarette consumption. Even so, the net effect of PPR on total packs sold is a mostly weak negative effect, in contrast to other tobacco control policies such as excise taxes and smoking bans.

[148] Retailers may face costs associated with the initial implementation of the policy, such as updating their store design and functionality.

[149] In 2008, Australia passed amendments to the *Tobacco and Other Smoking Products Act 1927*, which banned point of sale tobacco displays; this legislation became effective by January 1, 2011 for all retailers. Under the legislation, one point of sale display is allowed per retail outlet as long as the display does not contain any trademarks, brands, manufacturer names, distributor names; the display specifies that only adults 18 years or older can purchase; the display is no larger than A5 paper size. See "Tobacco and Other Smoking Products Act 1927," ACT Government, October 2, 2018, available at https://www.legislation.act.gov.au/View/a/1927-14/current/PDF/1927-14.PDF (accessed on January 6, 2021) at Part 4, Section 23.4. See also Grace, C., "Tobacco in Australia: Facts & Issues, 11.4 State and territory legislation," Cancer Council Victoria, September 2018, available at https://www.tobaccoinaustralia.org.au/chapter-11-advertising/11-4-state-and-territory-legislation (accessed on January 4, 2021).

practices in response to plain packaging in order to minimize its impact on cigarette pack retrieval times is not informative on the impact of the proposed remedy in this matter.

### 3. Studies of the Impact of Retail Specific Tobacco Related Policies on Retail Establishments

103. The third category of studies cited by Dr. Chaloupka evaluates the impact of regulations directly targeted at retail establishments, such as bans on the retail displays of tobacco products in Ireland and New Zealand. While the regulations directly affect retailers in these two countries, as I discuss below, there are still significant differences between the changes that retailers in these studies face and the changes that retailers would face under the proposed remedy.

104. Ireland implemented a ban on the POS display of all tobacco products effective in July 2009 for all retailers.[150] In this type of regulation, retailers may bear the cost of having to change how they keep their products but differ from the proposed remedy because there are no display costs. To understand whether such a regulation adversely impacted retailers, Dr. Chaloupka examined one empirical study that analyzed the impact of the removal of point of sale tobacco promotional displays in Ireland on cigarette sales.[151] The study estimates whether weekly cigarettes sales in a subset of retail stores changed in Ireland following the regulation after controlling for trends in cigarette sales and seasonality.

105. The authors conclude that no statistically significant change in cigarette pack sales was observed following the implementation of the legislation for the three main categories of retailers where weekly data is available, and that visual data inspection also indicated no changes in cigarette pack sales following the legislation on other store types. Despite no short-term effect, the authors argue that the impact of such point of sale display removal is likely to have a long-term impact on sales as the effect of denormalization and reduced in initiation among youth take place.[152]

---

[150] "Best practices on implementation of the tobacco advertising and display ban at point of sale (Article 13 of the WHO FCTC), A four-country study: Ireland, Norway, Finland and the United Kingdom," WHO Framework Convention on Tobacco Control No. 5, available at https://www.who.int/fctc/publications/best_practices_art13_whofctc.pdf (accessed on January 6, 2021) at p. 6.

[151] Chaloupka Report at ¶ 37 citing to Quinn, Casey et al., "Economic evaluation of the removal of tobacco promotional displays in Ireland," *Tobacco Control*, Vol. 20, 2011, pp. 151-155 ("Quinn et al. 2011").

[152] Quinn et al. 2011.

106. There are several reasons the findings of this study are not informative for the impact of the proposed remedy. First, a finding that the number of packs sold were not statistically affected following a POS display ban does not properly measure the impact of the ban on retailers.[153] The analysis does not evaluate the impact of the ban on the revenue obtained by retailers or on the profits obtained by retailers, overall or in connection with their cigarette sales. The authors do not address any potential changes in the composition of cigarette sales in the underlying data. Consumers value the POS display advertisement and are willing to pay more for the advertised brand. Without such advertisement, consumers may switch to a lower margin cigarette.[154] As discussed above, studies of the impact of plain packaging in Australia show that there was a change in the composition of cigarette sales following the implementation of the policy towards lower priced, value brands. This shift is likely to negatively affect retailers' profits.

107. Second, the authors estimate a single parameter for the impact of the POS display removal across all stores, assuming away any differential impact of the policy across different outlets.

108. Dr. Chaloupka also cites to a second study which he states finds that "the removal of [tobacco product] displays was not costly, improved safety, reduced crime, and did not significantly reduce store revenues."[155] This study is based solely on interviews with retailers in New Zealand.[156] However, Dr. Chaloupka fails to mention in his report that the study is based on interviews with a very small sample of retailers, the sample of retailers is not representative of New Zealand retailers as a whole, and the study provides no quantitative analysis of these interviews. As a result, this study is not informative to understand the impact of removing tobacco displays or of the proposed remedy.

---

[153] This is aside from the shortcomings in the analysis acknowledged by the authors. See Quinn et al. 2011 at pp. 154-155.

[154] An analysis of the impact of changes in composition of sales on profits of retailers would need to account for the differential margins for various products and the composition of sales after the legislation was implemented.

[155] Chaloupka Report at ¶ 37.

[156] Hoek, Janet, Rhonwyn Vaudrey, Philip Gendall, Richard Edwards, and George Thomson, "Tobacco retail displays: a comparison of industry arguments and retailers' experiences," *Tobacco Control*, Vol. 21, 2012, pp. 497-501 ("Hoek et al. 2012") at pp. 497-498.

109. The authors conducted interviews with only 11 of the 26 identified retailers who removed their displays, which amounts to 0.1 percent of retailers in New Zealand that sell cigarettes.[157] In addition, these retailers had *voluntarily* removed their POS displays and received an award from the Asthma Foundation certifying their "out of sight" decision.[158] Retailers who voluntarily remove tobacco displays are likely to be differently situated from retailers that do not, and likely to expect a positive impact from removing such displays, especially when the decision is taken absent any connection with mandated regulation. It is not surprising that the small number of retailers who chose to eliminate displays and participate in this interview did not report negative outcomes following the display removal. For example, the frequent reference to safety provided by these specific retailers during their interviews may indicate that those stores were particularly vulnerable to break-ins associated with cigarette theft, and that removing cigarette displays would increase safety for those stores. That observation however does not provide any basis to conclude that removing cigarette displays would improve safety for all retailers.

110. The authors do not provide any quantitative analysis of the actual impact of the display removal on cigarette sales to support their conclusion that the removal did not significantly reduce store revenues. Their conclusion is based only on the limited number of interviews. The authors state that "most interviewees found removing tobacco from display had little effect on their sales[,]" and report select comments provided during the interview process, which include references to decline in sales such as "slight drop in sales[,]" "dropped say three percent," and "sales have just dropped […] over the years."[159] No formal analysis of the sales data for these retailers was conducted and therefore little weight can be assigned to that conclusion.

E.     **Dr. Chaloupka's Analysis of the Trends in Convenience Store Business and Cigarette Sales Is Not Informative of the Claim That Tobacco Retailers Are**

---

[157]   There are approximately 8,000 retailers that sell tobacco in New Zealand. Robertson, Lindsay, Louise Marsh, Richard Edwards, Janet Hoek, Frederieke S van der Deen, and Rob McGee, "Regulating tobacco retail in New Zealand: what can we learn from overseas?" *N Z Med J.*, Vol. 129, No. 1432, 2016, pp. 74-79 at p. 74. See also Hoek et al. 2012 at p. 498.

[158]   Hoek et al. 2012 at p. 498.

[159]   Hoek et al. 2012 at p. 500.

**Not Adversely Affected by Measures That Reduce Tobacco Product Demand**

111. In Section V of his report, Dr. Chaloupka performs a simple analysis of trends in convenience and tobacco store business and cigarette sales over time and concludes that the trends are consistent with the conclusion that "measures reducing the demand for tobacco products do not adversely affect tobacco retailers."[160]

112. In his Figures 1 through 8, Dr. Chaloupka compares the trend in total cigarette sales against various convenience store measures, including the total number of convenience stores, total store revenues, total inside store revenues and the pre-tax income per convenience store. Since there is no visually identifiable relationship between the number of cigarettes and these convenience store measures, he concludes that these trends are consistent with his conclusion that a decline in tobacco product demand does not adversely impact convenience stores. There are two main reasons why these figures are uninformative of the impact of the decline in cigarette sales on convenience stores.

113. First, as Dr. Chaloupka describes in his report, a key methodological characteristic of trying to understand the economic impact of measures affecting the demand for tobacco products is to "include controls for [...] other factors that lead to fluctuations in business activity."[161] There are many factors that affect convenience store revenues and profits outside of cigarette sales, including overall economic activity and the sales of non-tobacco goods. Without controlling for these other factors, these figures do not inform the impact of the decline in cigarette sales on convenience stores.

114. If the sales of non-tobacco goods increased during the 24 years included in Dr. Chaloupka's figures, then the impact of a decline in cigarette sales would be to flatten the growth in convenience store sales. For example, fuel sales at convenience stores (which are included Dr. Chaloupka's convenience store measures in Figures 1-4 and 7-8) have more than quadrupled from 1994 to 2019.[162] In this scenario, all Dr. Chaloupka's graphs would show was that the decline in cigarette sales was not enough to offset the increase in sales of all other goods.

---

[160]   Chaloupka Report at ¶ 38.

[161]   Chaloupka Report at ¶ 31.

[162]   "NACS Presentation Part One" at p. 3.

Without controlling for or understanding how overall economic activity and the sales of non-tobacco goods impacted convenience stores, these figures are uninformative of the impact of the decline in cigarette sales on convenience stores.

115. Second, Dr. Chaloupka mischaracterizes the relationships in the graphs. He argues that his measure of store profitability (inflation adjusted pre-tax income per store) is "generally trending up over time […] while overall cigarette sales are declining."[163] Dr. Chaloupka's Figure 8 shows that both cigarette sales and convenience store profitability trended downwards for most of the time period in the figure and it took over twenty years for convenience store profits to return to the level at the start of the graph.

116. Dr. Chaloupka also claims that the "trend data suggest that convenience stores successfully adapt to changes in market conditions, including the implementation of measures that affect the demand for tobacco products."[164] Whether or not convenience stores adapt to the decline in demand for tobacco product is not relevant for determining whether they were adversely impacted. These stores would be adversely impacted if their profits and revenues were lower than they would be absent the decline in cigarette demand. In addition, whether stores adapt in the aggregate does not address the question as to whether individual stores are harmed.

117. Dr. Chaloupka makes a similar claim for tobacco stores between 1997 and 2017 in his Figures 9 through 12. He claims that "tobacco stores are generally profitable"[165] since the number of these stores has increased over this period which suggest that "tobacco stores have not been adversely impacted by reductions in the demand for tobacco products."[166]

118. Dr. Chaloupka's trend analysis does not support his claim that tobacco stores have not been adversely impacted by reductions in the demand for tobacco products. His Figure 12 shows that sales per tobacco store have declined from nearly $1.5 million in 2002 to just over $900,000 in 2017 while cigarette demand has declined.[167] This decline in sales is not surprising

---

[163]  Chaloupka Report at ¶ 42.

[164]  Chaloupka Report at ¶ 43.

[165]  Chaloupka Report at ¶¶ 45-46.

[166]  Chaloupka Report at ¶ 44.

[167]  Chaloupka Report at ¶ 46 and Figure 12.

since Dr. Chaloupka's research has cited that tobacco stores get 87 percent of their sales from tobacco products.[168]

119. Additionally, Figures 9-12 suffer from the same issue as his Figures 1-8: Dr. Chaloupka does not control for any factors that affect tobacco store sales, including overall economic activity and the sales of e-cigarettes, and therefore provide little information on the relationship between cigarette sales and the status of the tobacco store industry. As Dr. Chaloupka's own research has shown, within five years of the introduction of e-cigarettes in 2007, over 73 percent of tobacco stores sold e-cigarettes and e-cigarette sales were increasing over this period.[169] The increase in e-cigarettes sales suggests that cigarette sales declined in tobacco stores even more than is suggested by his Figure 12.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 11, 2021.

Kevin M. Murphy

---

[168] Rose, Shyanika W., Dianne C. Barker, Heather D'Angelo, Tamkeen Khan, Jidong Huang, Frank J. Chaloupka, and Kurt M. Ribisl, "The availability of electronic cigarettes in US retail outlets, 2012: results of two national studies," *Tobacco Control*, Vol. 23, No. Suppl 3, 2014, pp. iii10-iii16 ("Rose et al. 2014") at p. iii10.

[169] Rose et al. 2014 at pp. iii10, iii13 ("… sales and marketing of e-cigarettes are growing and could reach $3 billion by 2015." "In both studies, odds of availability of e-cigarette sales in tobacco stores was substantially higher than in other store types; in study 1, 79% of tobacco stores sold e-cigarettes and 73% sold in study 2.").

# Exhibit 1

## Share of Annual Cigarette Pack Shipments by Trade Channel in 2019

| | |
|---|---|
| Convenience Stores | 67% |
| Drug | 2% |
| Mass Merchandisers | 1% |
| Supermarket | 6% |
| Tobacco | 8% |
| Wholesale Club | 0% |
| Other | 16% |
| Total Cigarette Pack Shipments (in Millions) | 10,657 |

Source: 2019 MSA STARS Data.

# Exhibit 2

## NACS Survey: Main Product or Service that Brought You Here Today

| 2018 Survey Responses | |
|---|---|
| Cigarettes | 913 |
| Stores Services (ATM, restrooms, carwash, lottery, etc.) | 843 |
| Bottled/canned drinks (coke, dr pepper, sport, water, tea, etc.) | 743 |
| Cold/Dispensed Fountain | 723 |
| Hot Beverage | 517 |
| Food prepared in the store | 340 |
| Beer | 306 |
| Salty Snacks | 242 |
| Frozen/Dispensed Fountain | 215 |
| Other Tobacco Products | 172 |
| Pre-packaged sandwiches/wraps/meals/salads/burritos/pizza/sides | 164 |
| Candy | 160 |
| General Merchandise/ Non-edible Grocery/ Health and Beauty Care | 157 |
| Dairy Products (milk, ice cream, etc.) | 142 |
| Alternative Snacks | 89 |
| Sweet Snacks | 68 |
| Publications (magazines, newspapers, maps, etc) | 64 |
| Wine | 11 |
| Liquor | 5 |

| 2019 Survey Responses | |
|---|---|
| Cold dispensed fountain | 599 |
| Cigarettes | 533 |
| Stores Services (ATM, restrooms, carwash, lottery, etc.) | 520 |
| Bottled/canned drinks (coke, dr pepper, sport, water, tea, etc.) | 438 |
| Food prepared in the store | 289 |
| Hot beverages | 273 |
| Beer | 189 |
| Frozen dispensed fountain | 143 |
| Pre-packaged sandwiches/wraps/meals/salads/burritos/pizza/sides | 115 |
| General Merchandise/ Non-edible Grocery/ Health and Beauty Care | 96 |
| Dairy Products (milk, ice cream, etc.) | 90 |
| Other Tobacco Products | 89 |
| Publications (magazines, newspapers, maps, etc) | 74 |
| Salty snacks | 68 |
| Candy | 63 |
| Alternative Snacks | 49 |
| Sweet Snacks | 29 |
| Wine | 5 |
| Liquor | 3 |

Note: The 2018 version of the survey asked consumers "What is the main product or service (ONE) that brought you here today? You may buy other items, but what item drove your decision to stop in." The 2019 version of the survey asked consumers "What was the main product or service that brought you here today?"

Source: NACS Convenience Tracking Program (CTP) All Surveys 2019, Batch C; All Surveys 2018, Batch D.

Appendix A

# *Curriculum Vitae*

# **Kevin M. Murphy**

December 2020

*Business Address:*

*Home Address:*

The University of Chicago
Booth School of Business
5807 South Woodlawn Avenue
Chicago, Illinois  60637
email: kevin.murphy@chicagobooth.edu

1810 Pennington Court
New Lenox, Illinois 60451
Phone: (815)463-4756
Fax: (815)463-4758

**Current Positions**

July 2005-Present: George J. Stigler Distinguished Service Professor of Economics, Department of Economics and Booth School of Business, The University of Chicago

Faculty Research Associate, National Bureau of Economic Research

Co-Director, Health and Human Capital Program, Health Economics Initiative, Becker Friedman Institute

**Education**

University of California, Los Angeles, A.B., Economics, 1981

The University of Chicago, Ph.D., 1986

Thesis Topic: *Specialization and Human Capital*

**Previous Research and Academic Positions**

2002-2005: George J. Stigler Professor of Economics, Department of Economics and Booth School of Business, The University of Chicago

1993 – 2002: George Pratt Shultz Professor of Business Economics and Industrial Relations, The University of Chicago

1989 – 1993: Professor of Business Economics and Industrial Relations, The University of Chicago

1988 – 1989: Associate Professor of Business Economics and Industrial Relations, The University of Chicago

1986 – 1988: Assistant Professor of Business Economics and Industrial Relations, The University of Chicago

1983 – 1986: Lecturer, Booth School of Business, The University of Chicago

1982 – 1983: Teaching Associate, Department of Economics, The University of Chicago

1979 – 1981: Research Assistant, Unicon Research Corporation, Santa Monica, California

**Honors and Awards**

2008: John von Neumann Lecture Award, Rajk College, Corvinus University, Budapest

2007: Kenneth J. Arrow Award (with Robert H. Topel)

October 2005: Garfield Research Prize (with Robert H. Topel)

September 2005: MacArthur Foundation Fellow

1998: Elected to the American Academy of Arts & Sciences

1997: John Bates Clark Medalist

1993: Fellow of The Econometric Society

1989 – 1991: Sloan Foundation Fellowship, The University of Chicago

1983 – 1984: Earhart Foundation Fellowship, The University of Chicago

1981 – 1983: Fellowship, Friedman Fund, The University of Chicago

1980 – 1981: Phi Beta Kappa, University of California, Los Angeles

1980 – 1981: Earhart Foundation Fellowship, University of California, Los Angeles

1979 – 1981: Department Scholar, Department of Economics, University of California, Los Angeles

**Publications**

**Books**

Social Economics: Market Behavior in a Social Environment with Gary S. Becker, Cambridge, MA: Harvard University Press (2000).

<u>Measuring the Gains from Medical Research: An Economic Approach,</u> edited volume with Robert H. Topel, Chicago: The University of Chicago Press (2003).

<u>Chicago Price Theory,</u> by Sonia Jaffe, Robert Minton, Casey B. Mulligan, and Kevin M. Murphy, Princeton University Press (2019).

## Chapters in Books

"Income and Wealth in America," with Emmanuel Saez, in <u>Inequality and Economic Policy</u>, ed. Tom Church, Christopher Miller, John B. Taylor, Stanford, CA: Hoover Press (2015)

## Articles

"Government Regulation of Cigarette Health Information," with Benjamin Klein and Lynne Schneider, 24 *Journal of Law and Economics* 575 (1981).

"Estimation and Inference in Two-Step Econometric Models," with Robert H. Topel, 3 *Journal of Business and Economic Statistics* 370 (1985).

"Unemployment, Risk, and Earnings: Testing for Equalizing Wage Differences in the Labor Market," with Robert H. Topel, in <u>Unemployment and the Structure of Labor Markets</u>, pp. 103-139, ed. Kevin Lang and Jonathan S. Leonard. London: Basil Blackwell (1987).

"The Evolution of Unemployment in the United States: 1968-1985," with Robert H. Topel, in <u>NBER Macroeconomics Annual,</u> pp. 11-58, ed. Stanley Fischer. Cambridge, MA: MIT Press (1987).

"Cohort Size and Earnings in the United States," with Mark Plant and Finis Welch, in <u>Economics of Changing Age Distributions in Developed Countries</u>, pp. 39-58, ed. Ronald D. Lee, W. Brian Arthur, and Gerry Rodgers. Oxford: Clarendon Press (1988).

"The Family and the State," with Gary S. Becker, 31 *Journal of Law and Economics* 1 (1988).

"A Theory of Rational Addiction," with Gary S. Becker, 96 *Journal of Political Economy* 675 (1988).

"Vertical Restraints and Contract Enforcement," with Benjamin Klein, 31 *Journal of Law and Economics* 265 (1988).

"Income Distribution, Market Size, and Industrialization," with Andrei Shleifer and Robert W. Vishny, 104 *Quarterly Journal of Economics* 537 (1989).

"Wage Premiums for College Graduates: Recent Growth and Possible Explanations," with Finis Welch, 18 *Educational Researcher* 17 (1989).

"Industrialization and the Big Push," with Andrei Shleifer and Robert W. Vishny, 97 *Journal of Political Economy* 1003 (1989).

"Building Blocks of Market Clearing Business Cycle Models," with Andrei Shleifer and Robert W. Vishny, in <u>NBER Macroeconomic Annual,</u> pp. 247-87, ed. Olivier Jean Blanchard and Stanley Fischer. Cambridge, MA: MIT Press (1989).

"Efficiency Wages Reconsidered: Theory and Evidence," with Robert H. Topel, in <u>Advances in the Theory and Measurement of Unemployment</u>, pp. 204-240. ed. Yoram Weiss and Gideon Fishelson. London: Macmillan (1990).

"Empirical Age-Earnings Profiles," with Finis Welch, 8 *Journal of Labor Economics* 202 (1990).

"Human Capital, Fertility, and Economic Growth," with Gary S. Becker and Robert F. Tamura, 98 *Journal of Political Economy*, S12 (1990).

"Accounting for the Slowdown in Black-White Wage Convergence," with Chinhui Juhn and Brooks Pierce, in <u>Workers and Their Wages: Changing Patterns in the United States</u>, pp. 107-143, ed. Marvin Kosters. Washington, D.C.: American Enterprise Institute (1991).

"The Role of International Trade in Wage Differentials," with Finis Welch, in <u>Workers and Their Wages: Changing Patterns in the United States,</u> pp. 39- 69, ed. Marvin Kosters. Washington, D.C.: American Enterprise Institute (1991).

"Why Has the Natural Rate of Unemployment Increased over Time?" with Robert H. Topel and Chinhui Juhn, 2 *Brookings Papers on Economic Activity* 75 (1991).

"The Allocation of Talent: Implications for Growth," with Andrei Shleifer and Robert W. Vishny, 106 *Quarterly Journal of Economics* 503 (1991).

"Rational Addiction and the Effect of Price on Consumption," with Gary S. Becker and Michael Grossman, 81 *American Economic Review* 237 (1991).

"Wages of College Graduates," in <u>The Economics of American Higher Education</u>, pp. 121-40, ed. William E. Becker and Darrell R. Lewis. Boston: Kluwer Academic Publishers (1992).

"Changes in Relative Wages, 1963-1987: Supply and Demand Factors," with Lawrence F. Katz, 107 *Quarterly Journal of Economics* 35 (1992).

"The Structure of Wages," with Finis Welch, 107 *Quarterly Journal of Economics* 285 (1992).

"The Transition to a Market Economy: Pitfalls of Partial Planning Reform," with Andrei Shleifer and Robert W. Vishny, 107 *Quarterly Journal of Economics* 889 (1992).

"The Division of Labor, Coordination Costs, and Knowledge," with Gary S. Becker, 107 *Quarterly Journal of Economics* 1137 (1992).

"Industrial Change and the Rising Importance of Skill" with Finis Welch, in Uneven Tides: Rising Inequality in America, pp. 101-132, ed. Peter Gottschalk and Sheldon Danziger. New York: Russell Sage Foundation Publications (1993).

"Wage Inequality and the Rise in Returns to Skill," with Chinhui Juhn and Brooks Pierce, 101 *Journal of Political Economy* 410 (1993).

"Occupational Change and the Demand for Skill, 1940-1990," with Finis Welch, 83 *American Economic Review* 122 (1993).

"Inequality and Relative Wages," with Finis Welch, 83 *American Economic Review* 104 (1993).

"Why Is Rent-Seeking So Costly to Growth?" with Andrei Shleifer and Robert W. Vishny, 83 *American Economic Review* 409 (1993).

"A Simple Theory of Advertising as a Good or Bad," with Gary S. Becker, 108 *Quarterly Journal of Economics* 941 (1993).

"Relative Wages and Skill Demand, 1940-1990," with Chinhui Juhn, in Labor Markets, Employment Policy, and Job Creation, pp. 343-60, ed. Lewis C. Solmon and Alec R. Levenson. The Milken Institute Series in Economics and Education. Boulder, CO: Westview Press (1994).

"Cattle Cycles," with Sherwin Rosen and Jose A. Scheinkman, 102 *Journal of Political Economy* 468 (1994).

"An Empirical Analysis of Cigarette Addiction," with Gary S. Becker and Michael Grossman, 84 *American Economic Review* 396 (1994).

"Inequality in Labor Market Outcomes: Contrasting the 1980s and Earlier Decades," with Chinhui Juhn, 1 *Economic Policy Review* 26 (1995).

"Employment and the 1990-91 Minimum Wage Hike," with Donald R. Deere and Finis Welch, 85 *American Economic Review* 232 (1995).

"Examining the Evidence on Minimum Wages and Employment," with Donald R. Deere and Finis Welch, in The Effects of the Minimum Wage on Employment, pp. 26-54, ed. Marvin H. Kosters. Washington, D.C.: The AEI Press (1996).

"Social Status, Education, and Growth," with Chaim Fershtman and Yoram Weiss, 104 *Journal of Political Economy* 108 (1996).

"Wage Inequality and Family Labor Supply," with Chinhui Juhn, 15 *Journal of Labor Economics* 72 (1997).

"Quality and Trade," with Andrei Shleifer, 53 *Journal of Development Economics* 1 (1997).

"Vertical Integration as a Self-Enforcing Contractual Arrangement," with Benjamin Klein, 87 *American Economic Review* 415 (1997).

"Unemployment and Nonemployment," with Robert H. Topel, 87 *American Economic Review* 295 (1997).

"Wages, Skills, and Technology in the United States and Canada," with W. Craig Riddell and Paul M. Romen, in General Purpose Technologies and Economic Growth, pp. 283-309, ed. Elhanan Helpman.  Cambridge, MA: M.I.T. Press (1998).

"Perspectives on the Social Security Crisis and Proposed Solutions," with Finis Welch, 88 *American Economic Review* 142 (1998).

"Population and Economic Growth," with Gary S. Becker and Edward Glaeser, 89 *American Economic Review* 145 (1999).

"A Competitive Perspective on Internet Explorer," with Steven J. Davis, 90 *American Economic Review* 184 (2000).

"Industrial Change and the Demand for Skill," with Finis Welch, in The Causes and Consequences of Increasing Inequality, pp. 263-84, ed. Finis Welch.  Volume II in the Bush School Series in the Economics of Public Policy.  Chicago: The University of Chicago Press (2001).

"Wage Differentials in the 1990s: Is the Glass Half Full or Half Empty?" with Finis Welch, in The Causes and Consequences of Increasing Inequality, pp. 341-64, ed. Finis Welch.  Volume II in the Bush School Series in the Economics of Public Policy. Chicago: The University of Chicago Press (2001).

"Economic Perspectives on Software Design: PC Operating Systems and Platforms," with Steven J. Davis and Jack MacCrisken, in Microsoft, Antitrust, and the New Economy: Selected Essays, pp. 361-420, ed. Davis S. Evans. Boston, MA: Kluwer (2001).

"Current Unemployment, Historically Contemplated," with Robert H. Topel and Chinhui Juhn, 1 *Brookings Papers on Economic Activity* 79 (2002).

"The Economics of Copyright 'Fair Use' in A Networked World," with Andres Lerner and Benjamin Klein, 92 *American Economic Review* 205 (2002).

"The Economic Value of Medical Research," with Robert H. Topel, in Measuring the Gains from Medical Research: An Economic Approach, pp. 41-73, ed. Robert H. Topel and Kevin M. Murphy. Chicago: The University of Chicago Press (2003).

"School Performance and the Youth Labor Market," with Sam Peltzman, 22 *Journal of Labor Economics* 299 (2003).

"Entrepreneurial ability and market selection in an infant industry: evidence from the Japanese cotton spinning industry," with Atsushi Ohyama and Serguey Braguinsky, 7 *Review of Economic Dynamics* 354 (2004).

"Entry, Pricing, and Product Design in an Initially Monopolized Market," with Steven J. Davis and Robert H. Topel, 112 *Journal of Political Economy* S188 (2004).

"Diminishing Returns: The Costs and Benefits of Increased Longevity," with Robert H. Topel, 46 *Perspectives in Biology and Medicine* S108 (2004).

"Persuasion in Politics," with Andrei Shleifer, 94 *American Economic Review* 435 (May 2004).

"Black-White Differences in the Economic Value of Improving Health," with Robert H. Topel, 48 *Perspectives in Biology and Medicine* S176 (2005).

"The Equilibrium Distribution of Income and the Market for Status," with Gary S. Becker and Iván Werning, 113 *Journal of Political Economy* 282 (2005).

"The Market for Illegal Goods: The Case of Drugs," with Gary S. Becker and Michael Grossman, 114 *Journal of Political Economy* 38 (2006).

"Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees," with Benjamin Klein, Andres V. Lerner, and Lacey Plache, 73 *Antitrust Law Journal* 571 (2006).

"The Value of Health and Longevity," with Robert H. Topel, 114 *Journal of Political Economy* 871 (2006).

"Social Value and the Speed of Innovation," with Robert H. Topel, 97 *American Economic Review* 433 (2007).

"Education and Consumption: The Effects of Education in the Household Compared to the Marketplace," with Gary S. Becker, 1 *The Journal of Human Capital* 9 (Winter 2007).

"Why Does Human Capital Need a Journal?" with Isaac Ehrlich, 1 The Journal of Human Capital 1 (Winter 2007).

"Critical Loss Analysis in the Whole Foods Case," with Robert H. Topel, 3 (2) GCP Magazine (March 2008).

"Exclusive Dealing Intensifies Competition for Distribution," with Benjamin Klein, 75 Antitrust Law Journal (October 2008).

"Fertility Decline, the Baby Boom and Economic Growth," with Curtis Simon and Robert Tamura, 2 The Journal of Human Capital 3 (Fall 2008).

"The Market for College Graduates and the Worldwide Boom in Higher Education of Women," with Gary S. Becker and William H. J. Hubbard, 100 American Economic Review: Papers & Proceedings 229 (May 2010).

"Explaining the Worldwide Boom in Higher Education of Women," with Gary S. Becker and William H. J. Hubbard," 4 Journal of Human Capital No. 3 (2010).

"How Exclusivity is Used to Intensify Competition for Distribution-Reply to Zenger," with Benjamin Klein, 77 Antitrust Law Journal No. 2 (2011).

"Achieving Maximum Long-Run Growth," *Federal Reserve Bank of Kansas City Proceedings of the Annual Jackson Hole Conference 2011.*

"On the Economics of Climate Policy," with Gary. S. Becker and Robert. H. Topel, 10 *B.E. Journal of Economic Analysis and Policy* No. 2 (2011).

"Measuring Crack Cocaine and its Impact," with Roland G. Fryer, Jr., Paul S. Heaton, and Steven D. Levitt, 51 *Economic Inquiry* No. 3 (July 2013).

"Some Basic Economics of National Security," with Robert H. Topel, 103 *American Economic Review* No. 3 (2013).

"Activating *Actavis*: A More Complete Story," with Barry C. Harris, Robert D. Willig, and Matthew B. Wright, 28 *Antitrust* No. 2 (Spring 2014).

"Competitive Discounts and Antitrust Policy," with Edward A. Snyder and Robert H. Topel, Chapter 5 of *The Oxford Handbook of International Antitrust Economics*, Volume 2 (2014).

"Gary Becker as Teacher," 105 *American Economic Review* No. 5 (2015).

"Black and White Fertility, Differential Baby Booms: The Value of Equal Education Opportunity," with Robert Tamura and Curtis Simon, 82 *Journal of Demographic Economics*, Issue 1 (2016).

"Human Capital Investment, Inequality, and Economic Growth," with Robert H. Topel, 34 *Journal of Labor Economics,* No. S2/Part 2 (2016).

"A Theory of Intergenerational Mobility," with Gary S. Becker, Scott Duke Kominers, and Jörg L. Spenkuch, *Journal of Political Economy 126*, no. S1 (October 2018): S7-S25.

"Gary Becker Remembered," with James J. Heckman and Edward P. Lazear, J*ournal of Political Economy 126*, no. S1 (October 2018): S1-S6.

Sample of "The Power of the Economic Approach: Unpublished Manuscripts of Gary S. Becker," Edited by Julio J. Elías, Casey B. Mulligan, and Kevin M. Murphy, University of Chicago Press (Forthcoming). Journal of Human Capital 2019 13:2, 140-141.

**Selected Working Papers**

"Gauging the Economic Impact of September 11th," with Gary S. Becker, Unpublished Working Paper (October 2001).

"War In Iraq Versus Containment: Weighing the Costs," with Steven J. Davis and Robert H. Topel, NBER Working Paper No.12092 (March 2006).

"The Interaction of Growth in Population and Income," with Gary S. Becker, Unpublished Working Paper (2006).

"Persuasion and Indoctrination," with Gary Becker (2007).

"The Value of Life Near Its End and Terminal Care," with Gary S. Becker and Tomas Philipson (2007).

"On the Economics of Climate Policy," with Gary S. Becker and Robert H. Topel, Working Paper No. 234 (January 2010, Revised September 2010).

"The Manipulation of Children's Preferences, Old Age Support, and Investment in Children's Human Capital," with Gary S. Becker and Jörg L. Spenkuch, Unpublished Working Paper (February 2012).

"The Collective Licensing of Music Performance Rights: Market Power, Competition and Direct Licensing" (March 2013).

"Activating *Actavis* with A More Complete Model," with Michael G. Baumann, John P. Bigelow, Barry C. Harris, Janusz A. Ordover, Robert D. Willig, and Matthew B. Wright, (January 2014).

"A Theory of Bundling Advertisements in Media Markets," with Ignacio Palacios-Huerta, NBER Working Paper No. 229994 (December 2016).

**Selected Comments**

Comment on "Causes of Changing Earnings Equality" by Robert Z. Lawrence. Federal Reserve Bank of Kansas City (1998).

"Comment: Asking the Right Questions in the Medicare Reform Debate," Medicare Reform: Issues and Answers, pp. 175-81, ed. Andrew J. Rettenmaier and Thomas R. Saving. Chicago: The University of Chicago Press (2000).

Comment on "Social Security and Demographic Uncertainty" by Henning Bohn, in Risk Aspects of Investment-Based Social Security Reform, ed. John Y. Campbell and Martin Feldstein. Chicago: The University of Chicago Press (2001).

Comment on "High Technology Industries and Market Structure" by Hal R. Varian. Federal Reserve Bank of Kansas City (2001).

## Popular Press Articles

"The Education Gap Rap," *The American Enterprise* (March-April 1990), pp. 62.

"Rethinking Antitrust," with Gary S. Becker, *Wall Street Journal* (February 26, 2001), A22.

"Prosperity Will Rise Out of the Ashes," with Gary S. Becker, *Wall Street Journal* (October 29, 2001), A22.

"The Economics of NFL Team Ownership," with Robert H. Topel, report prepared at the request of the National Football League Players' Association (January 2009).

## Articles About Murphy

"Higher Learning Clearly Means Higher Earning," by Carol Kleiman. *Chicago Tribune*, March 12, 1989, Jobs Section pp. 1.  Long article about "The Structure of Wages" with picture of Murphy.

"Why the Middle Class Is Anxious," by Louis S. Richman. *Fortune*, May 21, 1990, pp. 106. Extensive reference to Murphy's work on returns to education.

"Unequal Pay Widespread in U.S.," by Louis Uchitelle, *New York Times,* August 14, 1990, Business Day section pp. 1. Long piece on income inequality.

"One Study's Rags to Riches Is Another's Rut of Poverty," by Sylvia Nasar, *New York Times*, June 17, 1992, Business Section pp. 1. Long piece on the income inequality research.

"Nobels Pile Up for Chicago, but Is the Glory Gone?" by Sylvia Nasar, *New York Times* November 4, 1993, Business Section pp. 1. Long piece on Chicago School of economics. Featured a photo of five of the "brightest stars on the economics faculty" (including Murphy) and a paragraph about Murphy's research.

"This Sin Tax is Win-Win," by Christopher Farrell. *Business Week*, April 11, 1994, pp. 30. Commentary section refers to Murphy, Becker, and Grossman's work on rational addiction.

"Growing inequality and the economics of fragmentation," by David Warsh, *Boston Sunday Globe*, August 21, 1994, pp. A1. Two-page article with picture and biographical details about Murphy and his research; part of a series about "how the new generation replaced the old in economics."

"A Pay Raise's Impact," by Louis Uchitelle. *New York Times*, January 12, 1995, Business Section pp. 1. Article about consequences of proposed increase in the minimum wage. Articles featuring Murphy's comments on the minimum wage appeared in numerous

other publications, including the *Chicago Tribune*; in addition, Murphy was interviewed on CNN (January 26, 1995).

"The Undereducated American," *Wall Street Journal*, August 19, 1996, A12. Changes in the rate of returns to education.

"In Honor of Kevin M. Murphy: Winner of the John Bates Clark Medal," by Finis Welch, 14 *Journal of Economic Perspectives* 193 (2000).

**Testimony, Reports, and Depositions (Last 4 Years)**

Deposition of Kevin M. Murphy, January 5, 2016, in the Matter of ABS Global, Inc. v. Inguran, LLC d/b/a Sexing Technologies and XY, LLC v Genus PLC, The United States District Court for the Western District of Wisconsin.  Case No. 14-cv-503.

Supplemental Expert Report of Kevin M. Murphy, January 13, 2016, in the Matter of The Dial Corporation, Henkel Consumer Goods, Inc., H.J. Heinz Company, H.J. Heinz Company, L.P., Foster Poultry Farms, Smithfield Foods, Inc., HP Hood LLC, BEF Foods, Inc. and Spectrum Brands, Inc. v. News Corporation, News America Inc., News America Marketing FSI L.L.C., News America Marketing In-Store Services L.L.C., The United States District Court for the Southern District of New York. Case No. 13-cv-06802 (WHP).

Declaration of Kevin M. Murphy, January 26, 2016, in the Matter of ABS Global, Inc. v. Inguran, LLC d/b/a Sexing Technologies and XY, LLC v Genus PLC, The United States District Court for the Western District of Wisconsin.  Case No. 14-cv-503.

Expert Report of Kevin M. Murphy, February 5, 2016, in the Matter of Moldex Metric, Inc. v. 3M Company and 3M Innovative Properties Company, The United States District Court for the District of Minnesota.  Case No. 2014-cv-01821 (JNE/FLN).

Confidential Submission on Fractional Licensing to the U.S. Department of Justice in Connection with Modification of the ASCAP Consent Decree, February 12, 2016.

Deposition of Kevin M. Murphy, February 16, 2016, in the Matter of Moldex Metric, Inc. v. 3M Company and 3M Innovative Properties Company, The United States District Court for the District of Minnesota.  Case No. 2014-cv-01821 (JNE/FLN).

Verified Statement of Kevin M. Murphy, March 7, 2016, Exhibit II-B-2 to CSXT Reply Evidence, In Re: STB Docket No. NOR 42142.

Expert Report of Kevin M. Murphy, March 8, 2016, in the Matter of ABS Global, Inc. v. Inguran, LLC d/b/a Sexing Technologies and XY, LLC v Genus PLC, The United States District Court for the Western District of Wisconsin.  Case No. 14-cv-503.

Expert Report of Kevin M. Murphy, March 9, 2016, in the Matter of Lisa Watson, Wayne Miner, and James Easley, Individually and on Behalf of All Others Similarly Situated v. Philip Morris Companies, Inc. a corporation, and Philip Morris Incorporated, a corporation, in the Circuit Court of Pulaski County, Arkansas. Case No. CV03-4661.

Trial Testimony of Kevin M. Murphy, April 4, 2016, in the Matter of Dayna Craft (Withdrawn), Deborah Larsen, individually and on behalf of all others similarly situated v. Philip Morris USA Inc., a corporation, Missouri Circuit Court for the Twenty-Second Judicial District (City of St. Louis). Case No. 002-00406-02.

Reply Expert Report of Kevin M. Murphy, April 11, 2016, in the Matter of Kleen Products LLC, et al. v. International Paper, et al., The United States District Court for the Northern District of Illinois Eastern Division. Case No. 1:10-cv-05711.

Responsive Damages Report of Kevin M. Murphy, April 12, 2016, in the Matter of ABS Global, Inc. v. Inguran, LLC d/b/a Sexing Technologies and XY, LLC v. Genus PLC, The United States District Court for the Western District of Wisconsin. Case No. 14-cv-503.

Deposition of Kevin M. Murphy, May 2, 2016, in the Matter of ABS Global, Inc. v. Inguran, LLC d/b/a Sexing Technologies and XY, LLC v. Genus PLC, The United States District Court for the Western District of Wisconsin. Case No. 14-cv-503.

Verified Statement of Kevin M. Murphy, July 26, 2016, In Re: STB Docket No. 704 (Sub-No. 1), Review of Commodity, Boxcar, and TOFC/COFC Exemptions.

Expert Report of Kevin M. Murphy, July 29, 2016, In Re Biogen '755 Patent Litigation, The United States District Court for the District of New Jersey. Civil Action No. 10-2734 (CCC/JAD).

Trial Testimony of Kevin M. Murphy, August 3, 2016 and August 12, 2016, in the Matter of ABS Global, Inc. v. Inguran, LLC d/b/a Sexing Technologies and XY, LLC v. Genus PLC, The United States District Court for the Western District of Wisconsin. Case No. 14-cv-503.

Expert Report of Kevin M. Murphy, September 23, 2016, in the Matter of First Impressions Salon, Inc., Roy Mattson, Belle Foods Trust, Bankruptcy Estate of Yarnell's Ice Cream Company, Inc., Piggly Wiggly Midwest LLC and KPH Healthcare Services, Inc., aka Kinney Drugs, Inc. et.al. v. National Milk Producers Federation, Cooperatives Working Together, Dairy Farmers of America, Inc., Land O'Lakes, Inc., Dairylea Cooperative Inc., Agri-Mark, Inc. d/b/a Cabot Creamery Cooperative, Inc., The United States District Court for the Southern District of Illinois. Case No. 3:13-cv-00454-NJR-SCW.

Verified Statement of Kevin M. Murphy, October 26, 2016, In Re: STB Docket EP 711 (Sub-No. 1), Reciprocal Switching.

Expert Report of Kevin M. Murphy, November 21, 2016, in the Matter of Valassis Communications, Inc. v. News America Inc., a/k/a News America Marketing Group, News America Marketing FSI, Inc., a/k/a News America Marketing FSI LLC, and News America Marketing In-Store Services, Inc. a/k/a News America Marketing In-Store Services, LLC, The United States District Court for the Eastern District of Michigan, Southern Division.  Case No. 2-06-cv-10240-AJT-MJH.

Deposition of Kevin M. Murphy, December 2, 2016 and December 3, 2016, In Re Biogen '755 Patent Litigation, The United States District Court for the District of New Jersey. Civil Action No. 10-2734 (CCC/JAD).

Trial Testimony of Kevin M. Murphy, December 7, 2016 and December 8, 2016, in the Matter of US Airways, Inc. v. Sabre Holdings Corp., Sabre, Inc., and Sabre Travel International Ltd., The United States District Court for the Southern District of New York. Case No. 1:11-cv-02725-MGC.

Expert Report of Kevin M. Murphy, February 23, 2017, in the Matter of 1-800 Contacts, Inc., Before the Federal Trade Commission, Office of Administrative Law Judges, United States of America. Docket No. 9372.

Expert Report of Kevin M. Murphy, March 1, 2017, in the Matter of Gene R. Romero, et al. v. Allstate Insurance, et al., The United States District Court for the Eastern District of Pennsylvania. Case No. 01-3894 (consolidated with other matters) (E.D. Pa.).

Deposition of Kevin M. Murphy, March 16, 2017, in the Matter of 1-800 Contacts, Inc., Before the Federal Trade Commission, Office of Administrative Law Judges, United States of America. Docket No. 9372.

Deposition of Kevin M. Murphy, March 27, 2017, in the Matter of Gene R. Romero, et al. v. Allstate Insurance, et al., The United States District Court for the Eastern District of Pennsylvania. Case No. 01-3894 (consolidated with other matters) (E.D. Pa.).

Supplemental Expert Report of Kevin M. Murphy, April 3, 2017, in the Matter of Parallel Networks Licensing, LLC v. Microsoft Corporation, The United States District Court for the District of Delaware. Case No. 13-2073-SLR.

Expert Report of Kevin M. Murphy, April 3, 2017, in the Matter of Optical Disc Drive Products Litigation (Acer America Corp., et al. v. Lite-On Corporation, et al.), The United States District Court for the Northern District of California, San Francisco Division. No. 3:10-md-2143, RS 5:13-cv-04991.

Expert Report of Kevin M. Murphy, April 3, 2017, in the Matter of Optical Disc Drive Products Litigation (Dell Inc. and Dell Products L.P., v. Hitachi, Ltd., et al.), The United States District Court for the Northern District of California, San Francisco Division. No. 3:10-md-2143 RS.

Expert Report of Kevin M. Murphy, April 3, 2017, in the Matter of Optical Disc Drive Products Litigation (Hewlett-Packard Company v. Toshiba Corporation, et al.), The United States District Court for the Northern District of California, San Francisco Division. MDL No. 2143, No. 3:13-cv-05370 RS.

Expert Report of Kevin M. Murphy, April 3, 2017, in the Matter of Optical Disc Drive Products Litigation (Ingram Micro Inc., et al. v. LG Electronics, Inc., et al.), The United States District Court for the Northern District of California, San Francisco Division. No. 3:10-md-2143 RS.

Expert Report of Kevin M. Murphy, April 3, 2017, in the Matter of Optical Disc Drive Products Litigation (All Indirect Purchaser Actions), The United States District Court for the Northern District of California, San Francisco Division. No. 3:10-md-2143 RS.

Expert Report of Kevin M. Murphy, April 3, 2017, in the Matter of Optical Disc Drive Products Litigation (Alfred H. Siegel v. Sony Corporation, et al. and Peter Kravitz v. Sony Corporation, et al.), The United States District Court for the Northern District of California, San Francisco Division. No. 3:10-md-2143 RS.

Deposition of Kevin M. Murphy, April 30, 2017 and May 1, 2017, in the Matter of Optical Disc Drive Products Litigation, The United States District Court for the Northern District of California, San Francisco Division. No. 3:10-md-2143 RS.

Trial Testimony of Kevin M. Murphy, May 10, 2017 and May 11, 2017, in the Matter of 1-800 Contacts, Inc., Before the Federal Trade Commission, Office of Administrative Law Judges, United States of America. Docket No. 9372.

Expert Report of Kevin M. Murphy, July 3, 2017, in the Matter of Blue Cross Blue Shield Antitrust Litigation (MDL No.: 2406), The United States District Court for the Northern District of Alabama Southern Division. Master File No. 2:13-CV-20000-RDP.

Deposition of Kevin M. Murphy, July 22, 2017, in the Matter of Blue Cross Blue Shield Antitrust Litigation (MDL No.: 2406), The United States District Court for the Northern District of Alabama Southern Division. Master File No. 2:13-CV-20000-RDP.

Expert Report of Kevin M. Murphy, August 25, 2017, in the Matter of Gene R. Romero, et al. v. Allstate Insurance, et al., The United States District Court for the Eastern District of Pennsylvania. Case No. 01-3894 (consolidated with other matters) (E.D. Pa.).

Expert Rebuttal Report of Kevin M. Murphy, September 18, 2017, in the Matter of Gene R. Romero, et al. v. Allstate Insurance, et al., The United States District Court for the Eastern District of Pennsylvania. Case No. 01-3894 (consolidated with other matters) (E.D. Pa.).

Expert Report of Kevin M. Murphy, November 3, 2017, in the Matter of Valassis Communications, Inc. v. News Corporation, News America Marketing, a/k/a News America Incorporated, a/k/a News America Marketing Group, a/k/a News America Marketing FSI L.L.C., a/k/a News America Marketing FSI, Inc.; and News America

Marketing In-Store Services L.L.C., a/k/a News America Marketing In-Store Services, Inc., The United States District Court for the Southern District of New York. Case No. 1:17-cv-07378-PKC.

Deposition of Kevin M. Murphy, January 17, 2018, in the Matter of Valassis Communications, Inc. v. News Corporation, News America Marketing, a/k/a News America Incorporated, a/k/a News America Marketing Group, a/k/a News America Marketing FSI L.L.C., a/k/a News America Marketing FSI, Inc.; and News America Marketing In-Store Services L.L.C., a/k/a News America Marketing In-Store Services, Inc., The United States District Court for the Southern District of New York. Case No. 1:17-cv-07378-PKC.

Verified Statement of Kevin M. Murphy, January 19, 2018, In Re Biogen '755 Patent Litigation, The United States District Court for the District of New Jersey. Civil Action No. 10-2734 (CCC/JAD).

Trial Testimony of Kevin M. Murphy, February 1, 2018, In Re Biogen '755 Patent Litigation, The United States District Court for the District of New Jersey. Civil Action No. 10-cv-2734 (CCC/JBC).

Expert Report and Testimony of Kevin M. Murphy, February 28, 2018 in the Matter of Washington Metropolitan Area Transit Authority and Amalgamated Transit Union Local 689, Interest Arbitration Under Sections 66(C) Of the WMATA Compact, The United States District Court for the District of Columbia.

Expert Report of Kevin M. Murphy, June 29, 2018, in the Matter of Gene R. Romero, et al. v. Allstate Insurance, et al., The United States District Court for the Eastern District of Pennsylvania. Case No. 01-3894 (consolidated with other matters) (E.D. Pa.).

Expert Report of Kevin M. Murphy, July 30, 2018, in the Matter of Daniel Gordon, et al. v. Amadeus IT Group, S.A. et al.  The United States District Court for the Southern District of New York. Civ. A. No. 1:15-cv-05457-KPF.

Declaration of Kevin M. Murphy, August 16, 2018, in the Matter of Genentech, Inc., Biogen, Inc., Hoffmann-La Roche Inc., and City of Hope v. Celltrion, Inc., Celltrion Healthcare Co., Ltd., Teva Pharmaceuticals USA, Inc., and Teva Pharmaceuticals International GmbH, The United States District Court for the District of New Jersey. Civ. A. No. 18-cv-00574 (RMB) (KMW).

Expert Report of Kevin M. Murphy, September 21, 2018, in the Matter of Certain Memory Modules and Components Thereof, International Trade Commission, Washington, DC 20436.  No. 337-TA-1089.

Reply Declaration of Kevin M. Murphy, September 26, 2018, in the Matter of Genentech, Inc., Biogen, Inc., Hoffmann-La Roche Inc., and City of Hope v. Celltrion, Inc., Celltrion Healthcare Co., Ltd., Teva Pharmaceuticals USA, Inc., and Teva Pharmaceuticals International GmbH, The United States District Court for the District of New Jersey.  Civ. A. No. 18-cv-00574 (RMB) (KMW).

Expert Rebuttal Report of Kevin M. Murphy, October 9, 2018, in the Matter of Certain Memory Modules and Components Thereof, International Trade Commission, Washington, DC 20436.  No. 337-TA-1089.

Deposition of Kevin M. Murphy, October 29, 2018, in the Matter of Certain Memory Modules and Components Thereof, International Trade Commission, Washington, DC 20436.  No. 337-TA-1089.

Confidential Submission to the U.S. Department of Justice, Economic Considerations for Modification and Termination of the ASCAP Consent Decree, October 30, 2018.

Expert Report of Kevin M. Murphy, March 1, 2019, in the Matter of First Impressions Salon, Inc., Roy Mattson, KPH Healthcare Services, Inc., d/b/a Kinney Drugs, Inc. and Piggly Wiggly Midwest, LLC. v. National Milk Producers Federation, Cooperatives Working Together, Dairy Farmers of America, Inc., Land O'Lakes, Inc., Dairylea Cooperative Inc., Agri-Mark, Inc. d/b/a Cabot Creamery Cooperative, Inc., The United States District Court for the Southern District of Illinois. Case No. 3:13-cv-00454-SCW.

Expert Report of Kevin M. Murphy, March 15, 2019, in the Matter of Robert Binz V, Michael Binz, Leslie Clemenson, William Clynes, Andrew Margolick, Gregory Melita, and Nili Sinai-Nathan v. Amadeus IT Group, S.A., Amadeus North America, Inc., Amadeus Americas, Inc., Sabre Corporation f/k/a Holdings Corporation, Sabre Holdings Corporation, Sabre GLBL Inc., Sabre Travel International Limited, Travelport Worldwide Limited, and Travelport LP d/b/a Travelport, The United States District Court for the Southern District of New York.  Civ A. No. 1:15-cv-05457-KPF.

Verified Statement of Kevin M. Murphy, April 25, 2019, On Behalf of Union Pacific Railroad Company in NAFCA vs. Union Pacific Railroad Company, Before the Surface Transportation Board. STB Docket No. NOR 42144.

Deposition of Kevin M. Murphy, May 9, 2019, in the Matter of Robert Binz V, Michael Binz, Leslie Clemenson, William Clynes, Andrew Margolick, Gregory Melita, and Nili Sinai-Nathan v. Amadeus IT Group, S.A., Amadeus North America, Inc., Amadeus Americas, Inc., Sabre Corporation f/k/a Holdings Corporation, Sabre Holdings Corporation, Sabre GLBL Inc., Sabre Travel International Limited, Travelport Worldwide Limited, and Travelport LP d/b/a Travelport, The United States District Court for the Southern District of New York.  Civ A. No. 1:15-cv-05457-KPF.

Expert Report of Kevin M. Murphy, May 10, 2019, in the Matter of National Prescription Opiate Litigation (MDL No. 2804), The United States District Court for the Northern District of Ohio Eastern Division. Case No. 17-op-5004 and Case No. 18-op-45090. (Corrected and Restated Expert Report filed June 21, 2019).

Expert Report of Kevin M. Murphy, May 10, 2019, In Re Packaged Seafood Products Antitrust Litigation (Associated Wholesale Grocers, Inc. v. Bumble Bee Foods, LLC et al.), In the United States District Court of the Southern District of California. No. 15-md-2670.

Expert Report of Kevin M. Murphy, May 10, 2019, In Re Packaged Seafood Products Antitrust Litigation (W. Lee Flowers & Co., Inc. v. Bumble Bee Foods LLC, et al.), In the United States District Court of the Southern District of California. No. 15-md-2670.

Expert Report of Kevin M. Murphy, May 10, 2019, In Re Packaged Seafood Products Antitrust Litigation (Winn-Dixie Stores, Inc. and Bi-Lo Holding, LLC. v. Bumble Bee Foods, LLC et al.), In the United States District Court of the Southern District of California. No. 15-md-2670.

Expert Addendum Report of Kevin M. Murphy, May 24, 2019, In Re Packaged Seafood Products Antitrust Litigation (Affiliated Foods Midwest Cooperative, Inc. v. Bumble Bee Foods LLC, et al.), In the United States District Court of the Southern District of California. No. 15-md-2670.

Deposition of Kevin M. Murphy, June 6, 2019, in the Matter of National Prescription Opiate Litigation (MDL No. 2804), The United States District Court for the Northern District of Ohio Eastern Division. Case No. 17-op-5004 and Case No. 18-op-45090.

Expert Report of Kevin M. Murphy, June 10, 2019, In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, In the United States District Court for the Eastern District of New York. No. 05-md-1720 (MKB) (JO).

Deposition of Kevin M. Murphy, June 25, 2019, In Re Packaged Seafood Products Antitrust Litigation, In the United States District Court of the Southern District of California. No. 15-md-2670.

Expert Report of Kevin M. Murphy, July 15, 2019, in the Matter of Blue Cross Blue Shield Antitrust Litigation (MDL No.: 2406), The United States District Court for the Northern District of Alabama Southern Division. Master File No. 2:13-CV-20000-RDP.

Submission to the U.S. Department of Justice, Economic Considerations for Modification and Termination of the ASCAP Consent Decree, August 9, 2019.

Expert Report of Kevin M. Murphy, November 15, 2019, In Re Dealer Management Systems Antitrust Litigation, MDL 2817, The United States District Court for the Northern District of Illinois Eastern Division. No. 1:18-CV-00864. (Corrected and Restated Expert Report filed January 15, 2020).

Expert Report of Kevin M. Murphy, December 6, 2019, in the Matter of North American Soccer League, LLC v. United States Soccer Federation, Inc., and Major League Soccer, LLC, In the United States District Court for The Eastern District of New York.  No. 1:17-cv-05495-MKB-ST.

Expert Report of Kevin M. Murphy, December 20, 2019, in the Matter of The United States of America v. Sabre Corporation, Sabre GLBL Inc., Farelogix, Inc., and Sandler Capital Partners V, L.P., In the United States District Court for The District of Delaware. No: 1:19-cv-01548-LPS.

Expert Rebuttal Report of Kevin M. Murphy, January 3, 2020, in the Matter of The United States of America v. Sabre Corporation, Sabre GLBL Inc., Farelogix, Inc., and Sandler Capital Partners V, L.P., In the United States District Court for The District of Delaware. No: 1:19-cv-01548-LPS.

Expert Rebuttal Report of Kevin M. Murphy, January 10, 2020, in the Matter of The United States of America v. Novelis Inc. and Aleris Corporation, In the United States District Court for the Northern District of Ohio. No.: 1:19-cv-02033-CAB.

Expert Reply Report of Kevin M. Murphy, January 15, 2020, in the Matter of The United States of America v. Sabre Corporation, Sabre GLBL Inc., Farelogix, Inc., and Sandler Capital Partners V, L.P., In the United States District Court for The District of Delaware. No: 1:19-cv-01548-LPS.

Deposition of Kevin M. Murphy, January 18, 2020, in the Matter of The United States of America v. Sabre Corporation, Sabre GLBL Inc., Farelogix, Inc., and Sandler Capital Partners V, L.P., In the United States District Court for The District of Delaware. No: 1:19-cv-01548-LPS.

Deposition of Kevin M. Murphy, January 21, 2020, and January 22, 2020, In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, In the United States District Court for the Eastern District of New York. No. 05-md-1720 (MKB) (JO).

Deposition of Kevin M. Murphy, January 24, 2020, In Re Dealer Management Systems Antitrust Litigation, MDL 2817, The United States District Court for the Northern District of Illinois Eastern Division. No. 1:18-CV-00864.

Deposition of Kevin M. Murphy, January 27, 2020, in the Matter of The United States of America v. Novelis Inc. and Aleris Corporation, In the United States District Court for the Northern District of Ohio. No.: 1:19-cv-02033-CAB.

Expert Report of Kevin M. Murphy, February 3, 2020, In Re Opioid Litigation, In the Supreme Court of the State of New York County of Suffolk.  Index No.:400001/2017, Index No.: 400008/2017, and Index No.: 400016/2018.

Trial Testimony of Kevin M. Murphy, February 3, 2020, in the Matter of The United States of America v. Sabre Corporation, Sabre GLBL Inc., Farelogix, Inc., and Sandler Capital Partners V, L.P., In the United States District Court for The District of Delaware. No: 1:19-cv-01548-LPS.

Deposition of Kevin M. Murphy, February 13, 2020, in the Matter of North American Soccer League, LLC v. United States Soccer Federation, Inc., and Major League Soccer, LLC, In the United States District Court for The Eastern District of New York.  No. 1:17-cv-05495-MKB-ST.

Deposition of Kevin M. Murphy, February 19, 2020, In Re Opioid Litigation, In the Supreme Court of the State of New York County of Suffolk.  Index No.:400001/2017, Index No.: 400008/2017, and Index No.: 400016/2018.

Arbitration Testimony of Kevin M. Murphy, February 25, 2020, in the Matter of The United States of America v. Novelis Inc. and Aleris Corporation, In the United States District Court for the Northern District of Ohio. No.: 1:19-cv-02033-CAB.

Expert Report of Kevin M. Murphy, May 30, 2020, in the Matter of an Independent Review Process, Afilias Domains No. 3 Limited v. Internet Corporation for Assigned Names and Numbers, before The International Centre for Dispute Resolution.

Expert Report of Kevin M. Murphy, July 24, 2020, in the Matter of The State of Ohio v. McKesson Corporation, Cardinal Health, Inc., AmerisourceBergen Drug Corporation, and Miami-Luken, Inc., In the Court of Common Pleas for Madison County, Ohio. Case No. CVH20180055.

Expert Report of Kevin M. Murphy, August 27, 2020, in the Matters of The City of Huntington v. AmerisourceBergen Drug Corporation, et al., and Cabell County Commission v. AmerisourceBergen Drug Corporation, et al., In the United States District Court for the Southern District of West Virginia.  Civil Action Nos. 3:17-01362 and 3:17-01665.

Verified Statement of Professor Kevin M. Murphy and Professor Mark E. Zmijewski, September 1, 2020, Joint Petition for Rulemaking to Modernize Annual Revenue Adequacy Determinations on Behalf of Canadian National Railway, Norfolk Southern Railway and Union Pacific Railroad Company, Before the Surface Transportation Board. STB Ex Parte 766.

Deposition of Kevin M. Murphy, September 15, 2020, in the Matters of The City of Huntington v. AmerisourceBergen Drug Corporation, et al., and Cabell County Commission v. AmerisourceBergen Drug Corporation, et al., In the United States District Court for the Southern District of West Virginia.  Civil Action Nos. 3:17-01362 and 3:17-01665.

Expert Report of Kevin M. Murphy, September 18, 2020, in the Matter of Axon Enterprises, Inc., a corporation, In the United States of America Before the Federal Trade Commission Office of Administrative Law Judges.  Docket No. 9389.

Deposition of Kevin M. Murphy, October 2, 2020, in the Matter of Axon Enterprises, Inc., a corporation, In the United States of America Before the Federal Trade Commission Office of Administrative Law Judges.  Docket No. 9389.

Expert Report of Kevin M. Murphy, October 5, 2020, In Re Peanut Farmers Antitrust Litigation, In the United States District Court for the Eastern District of Virginia Norfolk Division, No. 2:19-cv-00463-RAJ-LRL.

Supplemental Verified Statement of Professor Kevin M. Murphy and Professor Mark E. Zmijewski, October 13, 2020, Joint Petition for Rulemaking to Modernize Annual Revenue Adequacy Determinations on Behalf of Canadian National Railway, Norfolk Southern Railway and Union Pacific Railroad Company, Before the Surface Transportation Board. STB Ex Parte 766.

Deposition of Kevin M. Murphy, October 16, 2020, In Re Peanut Farmers Antitrust Litigation, In the United States District Court for the Eastern District of Virginia Norfolk Division, No. 2:19-cv-00463-RAJ-LRL.

Verified Statement of Professor Kevin M. Murphy and Professor Mark E. Zmijewski, October 21, 2020, Joint Petition for Rulemaking to Modernize Annual Revenue Adequacy Determinations on Behalf of Canadian National Railway, Norfolk Southern Railway and Union Pacific Railroad Company, Before the Surface Transportation Board. STB Ex Parte 766.

Deposition of Kevin M. Murphy, November 9, 2020, in the Matter of Blue Cross Blue Shield Antitrust Litigation (MDL No.: 2406), The United States District Court for the Northern District of Alabama Southern Division. Master File No. 2:13-CV-20000-RDP.

Expert Report of Kevin M. Murphy, December 7, 2020, In Re Keurig Green Mountain Single Serve Coffee Antitrust Litigation, In the United States District Court for the Southern District of New York, Case No. 1:14-md-02542.

Appendix B

# Materials Relied Upon

## Academic Sources

Bayly, Megan, Michelle Scollo, and Melanie Wakefield, "No lasting effects of plain packaging on cigarette pack retrieval time in small Australian retail outlets," *Tobacco Control* Vol. 24, No. e1, 2015, pp. e108-e109

Becker, Gary S. and Kevin M. Murphy, "A Simple Theory of Advertising as a Good or Bad," *The Quarterly Journal of Economics,* Vol. 108, No. 4, 1993, pp. 941-964

Bonfrer, André, Pradeep K. Chintagunta, John H. Roberts, and David Corkindale, "Assessing the sales impact of plain packaging regulation for cigarettes: Evidence from Australia," *Marketing Science*, Vol. 39, No. 1, 2020, pp. 234-252

Carter, Owen, Matthew Welch, Brennen Mills, Tina Phan, and Paul Chang, "Plain packaging for cigarettes improves retail transaction times," *BMJ*, Vol. 346, 2013, p.f1036

Diamond, Peter A., and James A. Mirrlees, "Optimal taxation and public production I: Production efficiency," *The American Economic Review*, Vol. 61, No. 1, 1971, pp. 8-27

Felix, R. Alison, "Do State Corporate Income Taxes Reduce Wages?" *Economic Review-Federal Reserve Bank of Kansas City*, Vol. 94, No. 2, 2009, pp. 77-102

Hassett, Kevin A. and Aparna Mathur, "Taxes and Wages," *American Enterprise Institute Working Paper*, No. 128, 2006, pp. 1-46

Hoek, Janet, Rhonwyn Vaudrey, Philip Gendall, Richard Edwards, and George Thomson, "Tobacco retail displays: a comparison of industry arguments and retailers' experiences," *Tobacco Control*, Vol. 21, 2012, pp. 497-501

Huang, Jidong and Frank J. Chaloupka, "The economic impact of state cigarette taxes and smoke-free air policies on convenience stores," *Tobacco Control*, Vol. 22, No. 2, 2013, pp. 91-96

International Agency for Research on Cancer and World Health Organization, "IARC Handbooks of Cancer Prevention – Tobacco Control, Volume 13: Evaluating the Effectiveness of Smoke-free Policies," International Agency for Research on Cancer, Lyon, France, 2009

International Agency for Research on Cancer and World Health Organization, "IARC Handbooks of Cancer Prevention – Tobacco Control, Volume 14: Effectiveness of Tax and Price Policies for Tobacco Control," International Agency for Research on Cancer, Lyon, France, 2011

Milanez, Anna, "Legal tax liability, legal remittance responsibility and tax incidence: Three dimensions of business taxation" *OECD Taxation Working Papers*, No. 32, 2017, pp. 1-76

Quinn, Casey, Sarah Lewis, Richard Edwards, and Ann McNeill, "Economic evaluation of the removal of tobacco promotional displays in Ireland," *Tobacco Control*, Vol. 20, 2011, pp. 151-155

Robertson, Lindsay, Louise Marsh, Richard Edwards, Janet Hoek, Frederieke S van der Deen, and Rob McGee, "Regulating tobacco retail in New Zealand: what can we learn from overseas?" *N Z Med J.*, Vol. 129, No. 1432, 2016, pp. 74-79

Rose, Shyanika W., Dianne C. Barker, Heather D'Angelo, Tamkeen Khan, Jidong Huang, Frank J. Chaloupka, and Kurt M. Ribisl, "The availability of electronic cigarettes in US retail outlets, 2012: results of two national studies," *Tobacco Control*, Vol. 23, No. Suppl 3, 2014, pp. iii10-iii16

Scollo, Michelle, Meghan Zacher, Kerri Coomber, Megan Bayly, and Melanie Wakefield, "Changes in use of types of tobacco products by pack sizes and price segments, prices paid and consumption following the introduction of plain packaging in Australia," *Tobacco Control*, Vol. 24, No. Suppl 2, 2015, pp. ii66-ii75

Schneider, Lynne, Benjamin Klein and Kevin M. Murphy, "Governmental Regulation of cigarette health Information," *Journal of Law and Economics*, Vol. 24, No. 3, 1981, pp. 575-612

U.S. National Cancer Institute and World Health Organization. *The Economics of Tobacco and Tobacco Control.* National Cancer Institute Tobacco Control Monograph 21. NIH Publication No. 16-CA-8029A. Bethesda, MD: U.S. Department of Health and Human Services, National Institutes of Health, National Cancer Institute; and Geneva, CH: World Health Organization; 2016

Wakefield, Melanie, Megan Bayly, and Michelle Scollo, "Product retrieval time in small tobacco retail outlets before and after the Australian plain packaging policy: real-world study," *Tobacco Control*, Vol. 23, No. 1, 2014, pp. 70-76

## Produced by Manufacturers

Altria Group Distribution Company, "PM USA Merchandising & Promotional Programs – Marlboro Performance Options and Business Enhancement Funds – Reference Guide Revised 3/25/2020" (9561439442_9561439475)

Altria Group Distribution Company (AGDC) on behalf of Philip Morris USA (PM USA), "Introduction of the Marlboro bold Ice SPP beginning February 2020," January 8, 2020 (9560763430)

Altria Group Distribution Company (AGDC) on behalf of Philip Morris USA (PM USA), "Marlboro Performance Options, Marlboro Menthol Margin Fairness Requirement and Business Enhancement Funds Notice – National excluding Massachusetts," October 29, 2018 (9560763272-9560763291)

Altria Group Distribution Company (AGDC) on behalf of Philip Morris USA (PM USA), "Revised Kentucky Chesterfield Base SPP Promotional Allowances beginning September 2019," September 5, 2019 (9560763373-9560763374)

ITG Brands Choice Growth Merchandising Plan Description 2020 Factory Made Cigarettes (FMC) (January 1, 2020) (ITGB-DOJ0000354)

ITG Brands Choice Growth Merchandising Plan Description 2020 Machine Made Cigars (MMC) (January 1, 2020) (ITGB-DOJ0000358)

ITG Brands Choice Growth Retail Merchandising Agreement (signature form) (January 1, 2020) (ITGB-DOJ0000345)

ITG Brands Choice Growth Scan Data Reporting Plan Description (January 1, 2020) (ITGB-DOJ0000347)

ITG Brands eCigs Choice Growth Merchandising Plan Description 2020 (January 1, 2020) (ITGB-DOJ0000350)

Philip Morris USA 2015 Retail Leaders Program Agreement (Display Plan) (Amended March 29, 2020) (9561519821-9561519844)

Philip Morris USA 2015 Retail Leaders Program Agreement (Display Plan) (Amended October 29, 2018)

Philip Morris USA 2015 Retail Leaders Program Agreement (Fixture Plan) (Amended March 29, 2020) (9561519845-9561519874)

Philip Morris USA 2015 Retail Leaders Program Agreement (Fixture Plan) (Amended October 29, 2018)

Philip Morris USA, "Manufacturers of Highest Grade Cigarettes and Tobacco Products: Prices Effective November 1, 2020"

NACS, "State of the Industry Part One: *Key Operational and Financial Lessons from 2019"* (9561439253_9561439279)

NACS, "State of the Industry Part Two: *Understanding the Categories and the Need States that Drive Growth*" (9561439280_9561439303)

RAI Trade Marketing Services Retail Partners Marketing Plan Contract 2017 Dollar Store Meeting Competition Plan - Effective 07-03-2017 (RJRT_001811977)

RAI Trade Marketing Services Retail Partners Marketing Plan Contract 2017 Dollar Store Scan Data Reporting Program Addendum - Effective 07-03-2017 (RJRT_001811995)

RAI Trade Marketing Services Retail Partners Marketing Plan Contract 2017 Metro Pack Outlet Plan - Effective 07-03-2017 (RJRT_001811988)

RAI Trade Marketing Services Retail Partners Marketing Plan Contract 2017 Portfolio Carton Outlet Plan - Amended 07-01-2019 (RJRT_004729093)

RAI Trade Marketing Services Retail Partners Marketing Plan Contract 2017 Portfolio Cigarette Tobacco Outlet Plan - Amended 07-01-2019 (RJRT_004729119)

RAI Trade Marketing Services Retail Partners Marketing Plan Contract 2017 Portfolio Pack Outlet Plan - Amended 07-01-2019 (RJRT_004729106)

RAI Trade Marketing Services Retail Partners Marketing Plan Contract 2017 Scan Data Reporting Program Addendum - Amended 04-02-2018 (RJRT_002644357)

RAI Trade Marketing Services Retail Partners Marketing Plan Contract 2019 Menthol Outlet Plan - Effective 07-01-2019 (RJRT_004729132)


**Expert Reports**

Docket 6341-6 – Expert Report of James Spaeth

Docket 6341-9 – Report of Frank J. Chaloupka: Expert Report on Proposed Court-Ordered Corrective Statements at the Point-of-Sale


**Depositions**

Deposition of Frank J. Chaloupka, Ph.D., taken November 17, 2020


**Declarations**

Declaration of Derek Gaskins (Yesway)

Declaration of Douglas Galli (Reid Stores, Inc.)

Declaration of Dr. Henry Armour (NACS)

Declaration of Francis J. Armstrong (Blue Ridge Tobacco Company)

Declaration of Frederick Scott Myers (Philip Morris USA Inc.)

Declaration of James McElroy (QuickChek)

Declaration of Jared Scheeler (The Hub)

Declaration of Johnathan Polonsky (Plaid Pantry)

Declaration of Jeff Eldridge (ITG Brands, LLC)

Declaration of Lisa Dell' Alba (Square One)

Declaration of Mary Szarmach (Smoker Friendly International)

Declaration of Michael Kurtz (Jacksons Food Stores)

Declaration of Michael Wilson (RAI Trade Marketing Services Company)

Declaration of Paul Crozier (Sheetz, Inc.)

Declaration of Rahim Budhwani (Encore Stores)

Declaration of Robert P. Roberts (Smoke em, Inc.)

Declaration of Scott Woodward (Murphy USA)

Declaration of Tom Brennan (Casey's General Stores)


**Other Court Documents**

Docket 6276 – Plaintiffs' 2018 Supplemental Brief on Retail Point of Sale Remedy

Docket 6278 – Defendants' Reply in Support of their Supplemental Brief Regarding Point-of-Sale Display Requirements

Docket 6279 – National Association of Convenience Stores' Supplemental Reply Brief Concerning Order #1015's Point-of-Sale Display Requirements

Docket 6308 – Opinion and Order 92: Remand

Docket 6341-1 – Proposed Order Modifying and Reinstating the Corrective Statements Remedy for Retail Point of Sale

Docket 6341-2 – Guidelines for Court-Ordered Corrective Statements at Retail Points of Sale 2020-10-07

Docket 6341-3 – Specifications for Audits of Manufacturer Compliance with Implementation of the Corrective Statement Remedy at Point-of-Sale

United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1 (D.D.C. 2006)


**Interviews**

December 10 – Interview with Michael Wilson (RAI Trade Marketing Services Company)

December 15 – Interview with Kim Reed and Jeff Eldridge (ITG Brands, LLC)

December 18 – Interview with Frederick Scott Myers (Philip Morris USA Inc.)

January 6 – Interview with Robert Roberts (Smoke em, Inc.)

January 6 – Interview with Mary Szarmach (Smoker Friendly International)

January 6 – Interview with Paul Crozier (Sheetz, Inc.)

January 7 – Interview with Lisa Dell' Alba (Square One)

January 8 - Interview with Jared Scheeler (The Hub)

## Data

NACS Convenience Tracking Program (CTP), All Surveys 2019 Batch C

NACS Convenience Tracking Program (CTP), All Surveys 2018 Batch D

2019 MSA STARS Data

## Other Public Documents

Altria Group, Inc. Form 10-K for the Fiscal Year Ended December 31, 2019, available at https://sec.report/Document/0000764180-20-000018/ (accessed on January 11, 2021).

American Economic Association, "John Bates Clark Medal," available at http://www.aeaweb.org/honors_awards/clark_medal.php (accessed on November 19, 2020)

"Best practices on implementation of the tobacco advertising and display ban at point of sale (Article 13 of the WHO FCTC), A four-country study: Ireland, Norway, Finland and the United Kingdom," WHO Framework Convention on Tobacco Control No. 5, available at https://www.who.int/fctc/publications/best_practices_art13_whofctc.pdf (accessed on January 6, 2021)

Dizikes, Peter, "MIT economist Peter Diamond wins Nobel Prize," MIT News, October 11, 2020, available at https://news.mit.edu/2010/nobel-diamond (accessed on December 30, 2020)

"Family Smoking Prevention and Tobacco Control Act," Pub. L. No. 111-31, June 22, 2009, available at https://www.govinfo.gov/content/pkg/PLAW-111publ31/pdf/PLAW-111publ31.pdf (accessed on January 6, 2021)

FDA, "Family Smoking Prevention and Tobacco Control Act - An Overview," available at https://www.fda.gov/tobacco-products/rules-regulations-and-guidance/family-smoking-prevention-and-tobacco-control-act-overview#youth (accessed on December 22, 2020)

Federal Trade Commission Cigarette Report for 2018, Issued 2019

"FTC Requires Reynolds and Lorillard to Divest Four Cigarette Brands as a Condition of $27.4 Billion Merger," FTC, May 26, 2015, available at https://www.ftc.gov/news-events/press-releases/2015/05/ftc-requires-reynolds-lorillard-divest-four-cigarette-brands (accessed on December 22, 2020)

Grace, C., "Tobacco in Australia: Facts and Issues, 11.4 State and territory legislation," Cancer Council Victoria, September 2018, available at https://www.tobaccoinaustralia.org.au/chapter-11-advertising/11-4-state-and-territory-legislation (accessed on January 4, 2021)

"Nobel Award to Economists Mirrlees, Vickrey Mentions Work of MIT's Peter Diamond," MIT News, October 8, 1996, available at https://news.mit.edu/1996/peterdiamond (accessed on December 30, 2020)

Thomas, Dr. Matthew, "Tobacco Plain Packaging Bill 2011," Bills Digest No. 35, August 24, 2011, available at https://parlinfo.aph.gov.au/parlInfo/download/legislation/billsdgs/1022244/upload_binary/1022244.pdf;fileType=application/pdf#search=%222010s%202011%20thomas,%20matthew%22 (accessed on January 6, 2021)

"Tobacco and Other Smoking Products Act 1927," ACT Government, October 2, 2018, available at https://www.legislation.act.gov.au/View/a/1927-14/current/PDF/1927-14.PDF (accessed on January 6, 2021)