# Exhibit 1

Excerpt from Transcript of Deposition of James E. Temme taken on February 23, 2021, in *United States v. Philip Morris USA Inc.*, 99-cv-2496 (PLF) (D.D.C.)

(excerpt consists of pages 1, 108-10, 136, 143-44, 148, 152, 184-85, 210-11, reporter's certificate, and witness's signed errata sheet)

**Note: This excerpt <u>does not</u> contain any passages that have been designated confidential or that are subject to any protective order.**

Page 1

1              UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF COLUMBIA

3

    UNITED STATES OF AMERICA,) Civil Action No.

4                            ) 99-CV-2496 (PLF)

        Plaintiff,           )

5                            )

        and                  )

6                            )

    TOBACCO-FREE KIDS         )

7    ACTION FUND, et al.     )

                             )

8        Plaintiff-           )

        Intervenors,         )

9                            )

        v.                   )

10                            )

    PHILIP MORRIS USA INC.,   )

11    et al.,                 )

                             )

12        Defendants.         )

    ------------------------)

13

14              TUESDAY, FEBRUARY 23, 2021

15                       - - -

16      **CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

17

18      Videotaped Remote deposition of JAMES TEMME,

19    beginning at 9:34 a.m., before Nancy J. Martin, a

20    Registered Merit Reporter, Certified Shorthand

21    Reporter.  All parties appeared remotely.

22    Job No. CS4464050

(pages 2-107 omitted)

James Temme                                              February 23, 2021

Page 108

1              THE WITNESS:  I guess the best way I could

2    answer would be there are consumer differences.  So

3    depending on how a specific consumer might react if

4    his or her brand was not available.  It was some

5    information provided that spoke of what they referred

6    to as "walk rates," meaning if their brand isn't

7    available, they could go to another brand or another

8    brand was acceptable to them, they would walk away

9    from their brand of choice.

10             There was other information that said if

11   their brand is not available, they might leave the

12   store and try to find it at another store.

13   BY MR. DIETERT:

14        Q.  And did you do any analysis of that

15   information?

16        A.  I reviewed it, but it was not part of my

17   analysis, no, sir.

18        Q.  Did you consider any of that information in

19   developing your opinions in this case?

20        A.  I considered a lot of the information that

21   was given, but I focused instead on what I found to be

22   more tangible information, again, that I could rely

James Temme                                        February 23, 2021

Page 109

1    on, which was the data relative to the sample stores

2    that was the subset of stores that were provided by

3    ITG where they were able to show the number of facings

4    and SKUs for the stores.

5         Q.  Was there any other data that you used as a

6    basis for any of your opinions in the case?

7         A.  Yes, there was a variety of other pieces of

8    information that were included that I reviewed, yes,

9    and some that were included in my report.

10        Q.  Information as to brand loyalty, is that

11   something that was actually the basis of any of your

12   opinions?  That's what I'm trying to clarify.

13        A.  Yes, I think I understand the question.  The

14   only reference I had relative to brand loyalty -- and

15   it was not a particularly strong reference -- it was

16   that if a brand is not available, a consumer may opt

17   to choose a different brand and what brands most

18   interacted for a couple of the ITG Brands.

19             I included that specific information in my

20   report.  I can't remember exactly where or exactly the

21   reference, but I know I pulled the information that

22   said if this brand is not available, what brands are

1   in that brand set for that particular consumer based

2   on the research that I was given from ITG.

3        Q.  Okay.  When you say, "it was not a

4   particularly strong reference," what do you mean by

5   that?

6        A.  I just highlighted it in a sentence.  I

7   didn't -- it wasn't one of the major cornerstones of

8   the work I completed.

9        Q.  Okay.  Do you mean that you weren't certain

10  as to how likely the outcome would be?

11          MS. MCCALLUM:  Objection to form.

12          THE WITNESS:  As I stated earlier, there was

13  conflicting information that I had seen relative to

14  brand loyalty.

15  BY MR. DIETERT:

16       Q.  And are you not sure what conflicting

17  information is more reliable or less reliable?

18       A.  The broader point, Mr. Dietert, was that it

19  really didn't impact my analysis.  My analysis was

20  more data driven relative to the number of facings and

21  SKUs that were available, how those facing and SKUs

22  are presented to the consumer.

(pages 111-35 omitted)

Page 136

1   I might have missed some of the names now because I'm

2   doing this from memory, but Jeff Eldridge, Kim Reed

3   were the primary sales folks that I spoke with

4   relative to these agreements.  There was another

5   meeting that had general counsel.  There was some data

6   analysts in another meeting.  Again, not all of those

7   discussions related to the RMAs.  There were other

8   topics discussed.

9       Q.  What were the -- what were the topics that

10  you were discussing with the data analysts?

11      A.  Specifically, the spreadsheet November

12  facings that outlines the 40,000 store universe that

13  ITG has collected that I use for a portion of my

14  analytic work.

15      Q.  And what other topics did you discuss with

16  Jeff Eldridge or "Ken" Reid?

17      A.  General topics about direction relative to

18  flip signs is one that comes to mind that we

19  discussed.  Their use of flip signs.  I asked them

20  about elements in the agreement to make sure I

21  understood what some of the terminology meant,

22  information like that.

(pages 137-42 omitted)

Page 143

1   versus ITG brands.

2        Q.  Is ITG Brand's location on the merchandising

3   set important to your opinion because it would be

4   disproportionately harmed?

5        A.  It's one of the factors, and there are

6   several other factors why it would be

7   disproportionately harmed, but certainly, shelf

8   location is important, as I identified, and again,

9   there's a lot of research that would reinforce that.

10  Again, I didn't necessarily cite it, information I

11  read that speaks about shelf positioning as being

12  important in terms of sales.

13        So the fact that ITG is generally in a poorer

14  shelf position puts them at an opportunity to be

15  disproportionately impacted as a result.

16        Q.  Did you ask how frequently or how many stores

17  ITG is displayed in a better position or equal

18  position to RJR?

19        A.  No, sir.  I relied on, again, the data in

20  that spreadsheet that I got from ITG that reflected

21  the overall number of facings that Reynolds and Philip

22  Morris had relative to the smaller number of facings,

James Temme                                           February 23, 2021

Page 144

1   average facings per SKU and average facings per store

2   were all decidedly smaller for ITG based on that --

3   the subset of information of the number of stores that

4   I got.

5       Q.  When you mentioned that RMAs specify a number

6   of facings, what does that word mean, "facings"?

7       A.  A placement of a pack of cigarettes on a

8   shelf would be considered a facing.  So they have

9   agreements that say they have 9 to 18 or 18 plus, are

10  their two primary distinctions relative to facings.

11      Q.  Okay.  Can signs be displayed on facings?

12      A.  Yes, I believe they have.  There are some

13  limitations in the agreement.  In other words, they

14  can't do a political ad or advertise another product,

15  but they do have the right to put a sign on -- as part

16  of their -- however many facings they've agreed to

17  with that particular retailer.

18      Q.  And does the contract say that ITG can't do a

19  political ad?

20      A.  I don't recall that specifically, the wording

21  of the political ad, but I do recall that there were

22  some limitations as to what they could or could not do

(pages 145-47 omitted)

Page 148

1    plans in terms of the number of facings that you would

2    provide.

3         Q.  Okay.  Actually, that next sentence may be

4    informative here.  It says, "Plan Descriptions issued

5    under this Agreement will be identified as either Gold

6    or Platinum"?

7         A.  What I said was correct, yes, sir.

8         Q.  Okay.  What is a gold plan, as you understand

9    it?

10        A.  My understanding was a gold plan required

11   them to have required the retailer to provide to ITG 9

12   to 18 facings.

13        Q.  And what would need to be displayed on each

14   of those facings?

15        A.  I think that would be at the discretion of

16   ITG working with the retailer, but obviously, it would

17   be ITG Brands for certain.  That's what they're trying

18   to get visible.

19        Q.  ITG Brands' products or signage?

20        A.  Yes, sir.

21        Q.  And is it your understanding that ITG Brands

22   could modify the agreement or the plan description at

(pages 149-51 omitted)

James Temme                                                February 23, 2021

Page 152

1      A.  Again, this is the overall plan description,

2  retail plan description.

3      Q.  Under "Base Requirements" here that's a

4  numbered list of items.  No. 4 says that "ITG Brands

5  share of merchandising space will be equal to or

6  greater than ITG Brands Share of national, state or

7  store(s) volume.  At no time can ITG Brands space be

8  less than 9 pack merchandising facings for Gold level

9  and no less than 18 packs merchandising facing for

10  Platinum level."  Did I read that correctly?

11      A.  Yes, sir.  I read it the same way.

12      Q.  Okay.  And is it your understanding that in

13  all of ITG's current RMAs that have the gold plan,

14  this is the rule or the guideline for what the space

15  will be for ITG, or are there any variations?

16      A.  If there are variations, I'm not aware of

17  them.  There might be, but I'm not aware of any.

18      Q.  Okay.

19          MS. MCCALLUM:  Zachary, I'm sorry.  I'm told

20  there's another exhibit showing up on the exhibit

21  display.  I haven't been following that long.

22          MR. DIETERT:  Yep.  That's correct.  Thank

(pages 153-83 omitted)

James Temme                                    February 23, 2021

Page 184

1    this paragraph -- are you with me?

2          A.  Yes, sir.

3          Q.  What does this -- what is this chart?  What

4    does this depict?

5          A.  This is the information that I received from

6    ITG relative to a 40,000 store subset of information

7    they collected on stores that their salespeople

8    visited.

9          Q.  And did you request this information from

10   ITG?

11         A.  Yes, I did.

12         Q.  Why did you request it?

13         A.  When I -- if you recall earlier, we discussed

14   the need or my request for a planogram.  They

15   indicated they did not have planograms on their

16   accounts, and I continued to ask for information

17   relative to the number of SKUs and the number of

18   facings in the account, and that's when they supplied

19   this information.

20         Q.  Why is it that you were seeking information

21   on the number of facings per SKU?

22         A.  I thought that would be an important

James Temme                                February 23, 2021

Page 185

1    consideration for part of this, just to show the

2    relative importance that predominant brands have in

3    terms of their average facings per SKU and how that

4    compared to the ITG brands.

5         Q.   If we look at the chart, look at the first

6    column that's titled "Manufacturer."

7              The second column is "Brand Family."

8              And then the third column, called "Unique

9    SKUS," what does this column show?

10        A.   That would show for this 40,700 store subset,

11   all the unique SKUs that were shipped to those stores.

12   So if they shipped two SKUs -- I'm sorry.  A quantity

13   of two of the same SKU, it would count as one unique

14   SKU.

15        Q.   And what is a "unique SKU"?

16        A.   So in the case of Winston, Winston versus a

17   Winston Black would be a unique SKU.  A Kool 100

18   versus a Kool Blue, each of those would be unique

19   SKUs.  So when you asked earlier how many unique SKUs,

20   again, I'm doing it from memory, but I believe in this

21   data set Winston had 18 unique SKUs.  I believe Kool

22   had 7 unique SKUs.

(pages 186-209 omitted)

James Temme                                    February 23, 2021

Page 210

1   on the real world because in that instance, you are,

2   in effect, trying to model how a consumer is going to

3   react if a product isn't available.

4          To me, there's, again, a wide array of

5   choices that could come about.  As I indicated, if

6   it's not visible, the consumer can ask the retailer is

7   it there.  The consumer could decide not to wait in

8   line to ask the retailer and just leave.  The retailer

9   could say, "I don't see it.  We don't have it" if it's

10  a new -- so there's a variety of those kind of

11  responses that he could -- he or she could switch to a

12  different brand that is available.

13         So, again, there's a variety of different

14  ways they could -- that could play out.  You could

15  attempt to model it.  I don't know how accurate that

16  modeling would be if you would attempt to do that.

17  BY MR. DIETERT:

18     Q.  But you didn't attempt to model that?

19     A.  No, sir, I did not.

20     Q.  Is it possible that there's some stores that

21  display multiple SKUs of products that look the same,

22  the packaging looks the same?

Page 211

1        A.   Meaning that they have two of the same SKU?

2        Q.   Meaning that two different SKUs look the same

3   in terms of the package facing.

4        A.   I don't know if I'm familiar enough with all

5   the different package types to answer that question.

6        Q.   And did you ask or try to figure out whether

7   there are any SKUs that look the same in their

8   packaging?

9        A.   No, sir.  I think I answered that previously.

10  I'm not knowledgeable on all the different SKUs and

11  how the packaging of all those different SKUs for ITG

12  are displayed, or how they look, I should say, would

13  be a better word.

14       Q.   Okay.  So at a particular store, there could

15  be two or three different SKUs being sold and

16  packaging that visibly looks the same to a consumer?

17            MS. MCCALLUM:  Objection to form.  Misstates

18  his testimony.

19            THE WITNESS:  There could be.  Again, I don't

20  know how much detail ITG tries to make in their

21  packaging to make each SKU look different.  I don't

22  know the answer to that.

(pages 212-76 omitted)

Page 277

1            C E R T I F I C A T E

2        I do hereby certify that the aforesaid testimony

3    was taken before me, pursuant to notice, at the time

4    and place indicated; that said deponent was by me duly

5    sworn to tell the truth, the whole truth, and nothing

6    but the truth; that the testimony of said deponent was

7    correctly recorded in machine shorthand by me and

8    thereafter transcribed under my supervision with

9    computer-aided transcription; that the deposition is a

10   true and correct record of the testimony given by the

11   witness; and that I am neither of counsel nor kin to

12   any party in said action, nor interested in the

13   outcome thereof.

14

15            Nancy J. Martin, RMR, CSR

16

17   Dated:  March 4, 2021

18

19   (The foregoing certification of this transcript does

20   not apply to any reproduction of the same by any

21   means, unless under the direct control and/or

22   supervision of the certifying shorthand reporter.)

```
1                       E R R A T A   S H E E T
                  C A P I T A L   R E P O R T I N G   C O M P A N Y
2               1 2 5 0   E y e   S t r e e t ,   N W   -   S u i t e   3 5 0
                      W a s h i n g t o n ,   D C   2 0 0 0 5
3                          2 0 2 - 8 5 7 - D E P O
4      C A S E   N A M E :   Tobacco-free kids action fund, et al v. Philip Morris USA Inc. et al,
       D A T E   O F   D E P O S I T I O N :   February 23, 2021
5      W I T N E S S '   N A M E :   James E. Temme
6
       P A G E / L I N E ( S ) /        C H A N G E              R E A S O N
7        22  /  1 3      /  should read "lot of faith"   /  transcription error
              /          /                               /
8        27  /  8        /  should have period after "complete"/ transcription error
              /          /                               /
9        36  /  2        /  should read "that is scan data" /  transcription error
              /          /                               /
10       50  /  22       /  Daugherty                     /  spelling
              /          /                               /
11       51  /  9        /  should read "not directly at  /  transcription error
              /          /  a retailer"                   /
12       53  /  3        /  should read "handful of stores" /  misspoke
              /          /                               /
13       63  /  22       /  Daugherty                     /  spelling
              /          /                               /
14       76  /  20       /  should read "pipe baloney"    /  transcription error
              /          /                               /
15       90  /  4        /  Daugherty                     /  spelling
              /          /                               /
16      101  /  10       /  Daugherty                     /  spelling
              /          /                               /
17      118  /  21       /  Should read " demand would    /  misspoke
              /          /  go down one percent"          /
18      122  /  5        /  should read "they would be"   /  misspoke
              /          /                               /
19      135  /  8        /  should read "other contracts" /  misspoke
              /          /                               /
20                  __James E. Temme_____
                         Witness Signature
21     (Notary not required in California)
       SUBSCRIBED AND SWORN TO
22     BEFORE ME THIS  8th  DAY
       OF  April        ,  2021 .
23
       _____
24       NOTARY PUBLIC
25     MY COMMISSION EXPIRES  07/10/2022
```

DUYGU MCMILLION
Notary Public – Notary Seal
STATE OF MISSOURI
St. Louis County
Commission Number 18799292
My commission expires July 10, 2022

```
 1                         E R R A T A   S H E E T
                      C A P I T A L   R E P O R T I N G   C O M P A N Y
 2                   1 2 5 0   E y e   S t r e e t ,   N W   -   S u i t e   3 5 0
                             W a s h i n g t o n ,   D C   2 0 0 0 5
 3                               2 0 2 - 8 5 7 - D E P O
 4     C A S E   N A M E :    Tobacco-free kids action fund, et al v. Philip Morris USA Inc. et al,
       D A T E   O F   D E P O S I T I O N :   February 23, 2021
 5     W I T N E S S '   N A M E :    James E. Temme
 6
       P A G E / L I N E ( S ) /        C H A N G E                    R E A S O N
 7       136  /  1 6    /  should read "Kim Reed"          /  transcription error
         ____ / _____ / _____ / _____
 8       139  /  11     /  should read "promotion"         /  misspoke
         ____ / _____ / _____ / _____
 9       149  /  19     /  should read "FMC 85"            /  transcription error
         ____ / _____ / _____ / _____
10       174  /  22     /  should read "lose"              /  misspoke
         ____ / _____ / _____ / _____
11       75   /  2      /  repeated "repeatedly out of stock" /  misspoke
         ____ / _____ / _____ / _____
12       ____ / _____ / _____ / _____
         ____ / _____ / _____ / _____
13       ____ / _____ / _____ / _____
         ____ / _____ / _____ / _____
14       ____ / _____ / _____ / _____
         ____ / _____ / _____ / _____
15       ____ / _____ / _____ / _____
         ____ / _____ / _____ / _____
16       ____ / _____ / _____ / _____
         ____ / _____ / _____ / _____
17       ____ / _____ / _____ / _____
         ____ / _____ / _____ / _____
18       ____ / _____ / _____ / _____
         ____ / _____ / _____ / _____
19       ____ / _____ / _____ / _____
20                  ___James E. Temme_____
                         W i t n e s s   S i g n a t u r e
21     ( N o t a r y   n o t   r e q u i r e d   i n   C a l i f o r n i a )
       S U B S C R I B E D   A N D   S W O R N   T O
22     B E F O R E   M E   T H I S ___8th___ D A Y
       O F __April_____ ,   2 0 2 1 .
23     _____
24         N O T A R Y   P U B L I C
25     M Y   C O M M I S S I O N   E X P I R E S __07/10/2022_____
```

DUYGU MCMILLION
Notary Public – Notary Seal
STATE OF MISSOURI
St. Louis County
Commission Number 18799292
My commission expires July 10, 2022