**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| TOBACCO-FREE KIDS ACTION FUND, ) | |
| *et al.*, ) | Civil Action No. 99-CV-2496 (PLF) |
| ) | |
| Plaintiff-Intervenors, ) | |
| ) | |
| v. ) | |
| ) | |
| PHILIP MORRIS USA, INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |

**PUBLIC HEALTH INTERVENORS' REPLY BRIEF IN SUPPORT**
**OF THEIR MOTION TO CLARIFY AND AMEND ORDER #1015**

When Judge Kessler issued Order #1015, she anticipated that PM and Altria, and the other defendants, would in the future find novel and inventive ways to fraudulently market addictive tobacco products to the public, with a keen eye toward the vulnerable but essential youth market, to provide a pipeline of future tobacco consumers. One set of tools she used in Order #1015 in an effort to prevent and restrain such future RICO violations were the document disclosure obligations imposed by Section III(C). They require each of the defendants, including PM and Altria, to post on an internet website all the documents they produce in cases "concerning smoking and health, marketing [or] addiction." The Juul MDL Litigation is such a case, but while PM and Altria have produced millions of pages in that case, they have not posted any to their document website. The Public Health Intervenors showed in their opening Brief in Support of Their Motion to Clarify or Amend Order #1015 (Dkt. No. 6446; filed Aug. 19, 2021)

("Intervenors' Br.) why this Court should clarify that Section III(C) covers the documents PM and Altria produce in the Juul MDL Litigation and amend Order #1015 so that the public has a reasonable opportunity to review these documents after they are posted.  PM and Altria have now filed their Opposition to Public Health Intervenors' Motion to Clarify and Amend Order #1015 (Dkt. No. 6450; filed Sept. 2, 2021) ("PM Br.").  Their Opposition ultimately rests on two arguments that this Court should swiftly reject, that (a) Section III(C) cannot possibly apply to the Juul MDL Litigation because e-cigarettes are different than traditional combustible cigarettes and did not exist when Order #1015 was issued, and (b) the Intervenors should have brought their motion sooner, although PM and Altria make no claim of prejudice.

Before turning to these arguments, the Intervenors want to address a preliminary point about how limited their ability is to see how thoroughly PM and Altria have complied with the transparency provisions of Order #1015.   In what appears to be an effort to convince the Court to trust them to comply on their own, PM and Altria tout that they have posted millions of pages of documents, produced in over 700 cases, to PM's document website.  PM Br. at 4. They boldly declare that the Intervenors "make no argument — and never have in the last fifteen years — that Defendants failed to comply with Order #1015's Internet Document Website requirement during that time.  Nor could they." PM Br. at 4.  Not so.  Ten years ago, in opposing the motion by PM and Altria (along with other defendants) to modify the requirements of Order #1015 so that the Minnesota Depository could be closed prematurely, the government and the Intervenors were able to make a remarkable showing that PM and Altria had failed to post as many as 60,000 documents on PM's website that should have been posted there.  *See* United States' Opening Brief on Defendants' Rule 60(b) Motion to Close the Minnesota Depository (Dkt. 5898; filed Mar. 24, 2011) at 14-15; Public Health Intervenors' Response to Defendants' Submission

Regarding the Minnesota Depository (Dkt. 5910; filed Apr. 5, 2011) at 4 (asking why these many documents had not been on the website until a third party raised the issue).

As the Public Health Intervenors observed then, there is no way for them to determine whether PM and Altria have wrongfully withheld other documents from the website.  *Id.*  This Court expressed the same concern in its seminal 2006 decision:

> The evidence is clear that on a significant number of occasions, Defendants did in fact suppress research and destroy documents to protect themselves and the industry.  . . . Moreover, in those instances where Defendants did successfully suppress, conceal, and destroy materials, it is most unlikely that there would be any evidence to reflect that since it would no longer exist.

*United States v. Philip Morris USA Inc.*, 449 F. Supp. 2d 1, 801 (D.D.C. 2006).[1]  Now, in their latest effort to keep the public from learning about their alleged RICO violations, PM and Altria are urging the Court to accept an unsupportable interpretation of Order #1015 that would allow them to continue to conceal whatever evidence of unlawful conduct may emerge during discovery in the Juul MDL Litigation.

## Argument

### I.   THE DOCUMENTS PRODUCED BY PM AND ALTRIA IN THE JUUL MDL LITIGATION ARE COVERED BY THE TRANSPARENCY PROVISIONS OF ORDER #1015.

The focus of the Intervenors' Motion to Clarify is Order #1015, Section III(C).[2]  This provision describes the kinds of lawsuits that trigger PM and Altria' transparency obligations.

---

[1]     This Court earlier sanctioned PM and Altria and ordered them to pay $2,750,000 to the court as a result of the deliberate and repeated violations of court-ordered document preservation and production orders in this case by high-ranking company employees.  *See United States v. Philip Morris USA Inc.*, 327 F. Supp. 2d 21, 25-26 (D.D.C. 2004).

[2]     Both the "Applicability" and "Specific Remedial Orders" sections of Order #1015 are designated as "II" in their captions, but the internal citations within the Specific Remedial Orders sections confirm that it was intended to be designated as section "III".  The following section of Order #1015, "Miscellaneous Provisions," is properly captioned as Section "IV."  The

Section III(C)(¶10(a)) requires PM and Altria to add to their document website "all documents produced . . . in *any* court or administrative proceeding in the United States concerning smoking and health, marketing, addiction, low-tar or low-nicotine cigarettes, or less hazardous cigarette research" (emphasis added).   The Intervenors concede, as they must, that Order #1015 does not refer anywhere to "e-cigarettes" or "e-vapor products," but it is also the case that Section III(C)(¶10(a)) does not say that this transparency obligation only applies to cigarette cases.[3]   PM and Altria nevertheless ask the Court to interpret the command of Section III(C) *as if* the phrase "involving traditional combustible cigarettes and" had been inserted between "any case" and "concerning cigarettes and smoking and health, marketing [or] addiction" in ¶ 10(a) (PM Br. at 9; Harlowe Decl., ¶ 11).[4]   There is no such limiting clause in Section III(C), however, because this Court accurately anticipated that the defendants were likely to exploit new opportunities to defraud consumers of their tobacco products, as PM and Altria have with Juul e-cigarettes, and

---

Intervenors have referred to the transparency provisions of Order #1015 as "Section III(C)" throughout their motion papers.

[3]      When the Plaintiffs recently asked this Court to clarify that PM's "HeatSticks" are "cigarettes" within the meaning of Order #1015, they offered a highly-abbreviated summary of Order #1015 which characterized the injunction as being "all in relation to 'cigarettes.'"  Pls. Mot. For Clarification Regarding the Application of Order #1015 to HeatSticks Cigarettes (Dkt. No. 6325; filed June 26, 2020) ("HeatStick Motion") at 2.  PM and Altria suggest in their brief (PM Br. at 9, n.17) that this statement was an acknowledgement that the document disclosure obligations of Order #1015 only apply to cases involving cigarettes.  It was not.  The still-pending HeatStick motion has nothing to do with the scope of the document disclosure obligations imposed by Section III(C)(¶10(a)).

[4]      In a testament to the weakness of their position about the kinds of lawsuits that trigger Section III(C)'s transparency obligations, PM and Altria direct the Court to other provisions of Order #1015, such as the general injunctive relief provisions in Section II(A) (¶¶ 1-4); point to comments in Plaintiffs' briefs arguing that IQOS HeatSticks are covered by the court-ordered statement provisions of Section III(B) (¶¶ 5-9); note the definition of the term "Covered Websites" used in a consent order about how the court-ordered statements will be displayed on websites, again under Section III(B) (¶¶ 5-9); and, in general, speak about the scope of "the Order," without ever acknowledging that its separate sections have different scopes, language and purposes.  PM Br. at 8-10.

Case 1:99-cv-02496-PLF   Document 6452   Filed 09/09/21   Page 5 of 13

designed the provisions of Section III(C) in an effort to prevent and restrain such unlawful future conduct.

In a section of its decision accompanying Order #1015 titled, "There Is a Likelihood of Present and Future Violations of RICO," this Court emphasized that the cigarette manufacturers "are in the business of selling and marketing *tobacco products*," not just "cigarettes," and found that "as long as Defendants are in the business of selling and marketing tobacco products, they will have countless 'opportunities' and temptations to take similar unlawful actions in order to maximize their revenues, just as they have done for the past five decades." *Philip Morris*, 449 F. Supp. 2d at 909 (emphasis added).[5]  In denying Defendants' own motion for clarification about what they were and were not required to do under Order #1015, the Court explicitly refused to attempt "to catalog every conceivable means by which they might be violating or seeking to violate the injunction."  Mem. & Op. accompanying Order #1028 at 3 (Dkt. No. 5800; issued Mar. 16, 2007).  The fact that PM and Altria are arguing that Order #1015's transparency obligations could not possibly reach any lawsuit involving Juul, because e-cigarettes had not yet been devised, underscores the wisdom of Judge Kessler's finding that "Rule 65(d) does not require the District Court to predict exactly what the Defendants will think of next," and her observation that "it would be impossible to foresee what the ingenuity and creativity of Defendants' cadres of sophisticated lawyers could think of next."  *Id*. at 4 (citations omitted). PM and Altria should not be taken seriously when they contend that the transparency obligations of Order #1015 cannot possibly reach lawsuits targeting Juul simply because Juul and other e-cigarettes only came to market years after Order #1015 was issued.[6]  The document disclosure

---

[5]     There is no dispute that Juul e-cigarettes are "tobacco products."

[6]     PM and Altria urge that e-cigarette-related lawsuits "involving Defendants or the Remedies Parties" must not be subject to this case's transparency obligations, because otherwise

obligations of Section III(C) are not limited to cases involving tobacco products that Defendants already had on the market at that time.[7]

Presumably informed by what was learned from the documents produced and deposition testimony given by the defendants in the Juul case, including PM and Altria, the amended MDL Complaint lays out in remarkable detail three alleged schemes to mislead the American people about the impact of Juul's e-cigarettes on smoking and health, the addictiveness of the nicotine in Juul's products and their marketing efforts to entice kids to get hooked on nicotine and ensure a future pipeline of tobacco consumers. *See* Intervenors' Brief in Support of Their Motion to Clarify or Amend (Dkt. No. 6446; filed Aug. 19, 2021) at 9-16.[8] Even if this Court were to agree

---

the Public Health Intervenors would have invoked the transparency provisions of Order #1015 to force the posting of documents produced in previous e-cigarette cases. PM Br. at 11, n.18. But both of the cases they cite concluded with settlements and no sign of document production; and the second case did not even involve any of the "Defendants or the Remedies Parties." *See* Order of Dismissal upon Settlement of Case, *Whitney v. ITG Brands LLC*, No. 8:15-cv-02018 (C.D. Cal. Aug. 17, 2018) (Dkt. No. 38); Stipulation for Voluntary Dismissal with Prejudice, *Harris v. R.J. Reynolds Vapor Co.*, No. 15-cv-4075 (N.D. Cal. Sept. 20, 2017) (Dkt. No. 70) (the sole defendant was R.J. Reynolds Vapor Co., not a party to the present lawsuit).

[7]     PM and Altria assert that "the Court's ultimate findings of RICO violations all pertained to conventional cigarettes, not to e-vapor or other tobacco products" and argue on this basis that "Order #1015 cannot be interpreted broadly to extend to matters involving e-vapor products," citing *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1117 (D.C. Cir. 2009), and *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 929 (D.C. Cir. 1996) (PM Br. at 8-9). The Court of Appeals ruled, however, that Order #1015 was properly "tailored" to the wide-ranging RICO violations found by Judge Kessler, 566 F.3d at 1095, and the transparency provisions now before this Court were not themselves challenged on appeal. Given the Court's finding that future unlawful conduct with respect to tobacco products, not just cigarettes, could reasonably be anticipated on the basis of the defendants' past unlawful acts, it was well within the Court's power to impose broad document disclosure requirements, as Judge Kessler did in Section III(C), to prevent and restrain future RICO violations.

[8]     PM and Altria have not questioned in any way how the Intervenors have characterized the MDL Complaint. PM and Altria do suggest, however, that the Intervenors cannot rely upon mere *allegations* of RICO violations which appear in the MDL Complaint. PM Br. at 13 (original emphasis). But the question of whether or not any given case "concerns" smoking and health or any other subject enumerated in Section III(C)(¶10(a)) must always be resolved with reference to the pleadings – and if the case is covered by ¶10(a), the Defendants' discovery

with PM and Altria that the document posting requirements of Section III(C)(10(a)) only apply to cases "involving" traditional combustible cigarettes, it should find that the Juul MDL Litigation is such a case because the MDL Complaint alleges that these companies are engaged in a fraudulent scheme to mislead the public, *especially cigarette smokers*, into believing that the use of e-cigarettes will help smokers quit and improve their health.  MDL Order at 14, citing MDL Complaint, ¶¶ 5, 59.[9]

The denial of PM and Altria's motion to dismiss the MDL Complaint ensures that (unless PM and Altria settle their enormous potential liabilities) these claims will be resolved on the merits after the completion of massive productions of documents and the depositions of many company witnesses.  The MDL Complaint alleges that PM and Altria have, in fact, done exactly what Judge Kessler feared they would — exploit a new opportunity with a tobacco product to engage in strikingly similar fraudulent activities to ensure that new generations of youth become addicted to nicotine and allow the companies to continue to maximize their profits, just as they had done "for the past five decades" when Judge Kessler entered Order #1015.

PM and Altria fancifully suggest that the Public Health Intervenors' reasoning would extend with similar force to litigation concerning the marketing of wines bottled by St. Michelle Winery.  PM Br. at 10.  This obvious red herring demonstrates the importance of determining the reach of Section III(C) in light of the overall purpose and intent of Order #1015: to limit the

---

documents must typically be posted on their internet website long before the case has been adjudicated.  PM and Altria PM and Altria surely do not mean to suggest that they waited for a ruling on the merits before posting their discovery documents in the 700+ cases they refer to in their opposition papers.  *See* PM Br. at 4; Harlowe Decl., ¶ 2.

[9]      In fact, just the opposite appears to be happening:  e-cigarette usage among youth is strongly associated with subsequent smoking initiation.  *See, e.g.*, *Association of Electronic Cigarette Use with Subsequent Initiation of Tobacco Cigarettes in US Youths*, JAMA Network Open (2019), https://jamanetwork.com/journals/jamanetworkopen/article-abstract/2723425.

cigarette companies' overall temptations and opportunities to engage in fraud relating to "the business of selling and marketing *tobacco products,*" 449 F. Supp. 2d at 909, and the specific purpose and intent of its transparency provisions in Section III(C): "to monitor what Defendants are doing . . . and act as a powerful restraint on Defendants' future fraudulent conduct." *Id.* at 928-29.   The clarification of Section III(C)(¶10(a)) the Intervenors seek – that the transparency obligations under Order #1015 extend to the documents and testimony PM and Altria produce in the Juul MDL Litigation – is consistent with the "intended result" of Order #1015, as PM and Altria assert it must be.  PM Br. at 11.  The Court should reject PM and Altria's argument and clarify (or amend Order #1015 to provide) that the Juul MDL Litigation is a case "concerning smoking and health, marketing [or] addiction" within the meaning of Order #1015.

## II.   THE TIMING OF THE INTERVENORS' MOTION PROVIDES NO BASIS FOR DENYING THE RELIEF THEY SEEK.

PM and Altria's opposition to the Intervenors' Motion to Clarify does not say a word about the RICO allegations against PM and Altria in the MDL Complaint and their striking similarity to the RICO violations in this case.  Their entire discussion of the Juul MDL Litigation focuses, instead, on the publicity it has generated, in a feeble attempt to divert the Court's attention.  Their brief dwells on the timing of the Intervenors' Motion to Clarify (*see* PM Br. at 4-7) — even though PM and Altria make no claim that they have been prejudiced or that the orderly administration of justice has been impeded in any way by what they wrongly seek to characterize as unreasonable delay.

Altria acknowledges that it has produced "more than 875,000 documents and more than 6.5 million pages in the Juul MDL to date" (Harlowe Decl., ¶ 9).  None of them appear on PM's document website.  *See* Muggli Decl. (Dkt. No. 6445-4, filed Aug. 19, 2021), ¶¶ 4-5.  PM and Altria suggest that the Public Health Intervenors should have discovered this apparent

noncompliance with Order #1015 earlier — and that the Intervenors' delay in bringing the issue before the Court would somehow justify denying the Motion to Clarify.[10]  PM Br. at 1-2, 4-8, 13-14.  These claims are unjustified.

Even in ordinary cases, it is often difficult for outsiders to determine from publicly-available docket entries how much discovery has actually occurred.  Discovery requests are not typically filed with the court, and, other than certain preliminary disclosures under Fed. R. Civ. Proc. 26(a)(3)(A), responses to discovery requests do not appear on the docket.  Altria and PM nevertheless suggest that the Public Health Intervenors should have continuously reviewed the 1,000+ docket entries (and read the substantive filings behind those docket entries) in the Juul MDL lawsuit; and if only they had read page 3 of Dkt. No. 350, page 6 of Dkt. No. 375, page 11 of Dkt. No. 904, page 6 of Dkt. No. 975, and pages 5-6 of Exhibit D to Dkt. No. 1191 — all filed before the court in California denied the motions to dismiss the amended MDL Complaint — then they would have been on to what PM and Altria were doing in real time, rather than playing catch-up later, as the Intervenors did.  *See* PM Br. at 6-7, nn.9-12.  But the Juul MDL Litigation is no ordinary case.  PM and Altria have done all they could to keep their discovery documents secret.  They extracted a broadly-worded Stipulated Protective Order from plaintiffs' counsel, *In re Juul Labs, Inc*., No. 19-md-02913-WHO (ECF #308; filed Dec. 13, 2019), and then reached

---

[10]    PM and Altria go so far as to accuse the Intervenors of misleading the Court about when they discovered that the MDL Litigation involved RICO claims and that Altria had produced massive troves of documents there (PM Br. at 1).  The Intervenors readily admit that they have long been aware of that case.  It was not until sometime after April 13, 2021 – when the order denying PM and Altria's motion to dismiss was entered, however, that they determined that the RICO claims had been restated in a remarkably detailed second amended complaint which alleged fraudulent schemes that closely parallel the findings of RICO violations in this case.  The Intervenors then learned that document discovery was nearly complete; PM and Altria had produced hundreds of thousands of documents; and PM had not posted a single one of them on its document website.

agreement that all of their documents would be designated in bulk as "confidential," Harlowe

Decl., ¶ 8, to preclude documents of potentially grave consequence from being shared with the

public health community.[11]

PM and Altria nevertheless assert that the Public Health Intervenors could have raised

their concerns about PM's failure to add documents produced in the Juul MDL Litigation to its

internet website "long before this motion," and they claim on this basis that the Intervenors

"cannot now claim that developments in the Juul litigation constitute the sort of 'change' in

circumstances sufficient to modify Order #1015," citing a single unreported case, *Laffey v. Nw.

Airlines, Inc.*, No. 2111-70, 1978 WL 44, at *3 (D.D.C. Apr. 19, 1978) (PM Br. at 14).  The

Intervenors rely on five unanticipated circumstances:  this case is still pending, 15 years after

Order #1015 was entered; the "corrective statement" remedy at retail points-of-sale has yet to be

implemented; "e-cigarettes" have come into the market and now fuel an epidemic of youth

tobacco use; detailed allegations that PM and Altria have violated RICO in ways strikingly

similar to Judge Kessler's findings in this case will now be heard on the merits in the Juul MDL

Litigation; and PM and Altria have produced millions of pages of documents in that case, but not

posted a single one to PMN's internet website.  *See* Motion to Clarify, ¶ 14.  PM and Altria have

not explained how the current timing has somehow stripped the Intervenors of the ability to

claim that these changes in circumstance warrant the relief they seek.  *Laffey* was a very different

case.  There, the defendant sought to amend an injunction, after appeal, based upon its own

change in corporate policy, and the district court refused to do so, finding that the proposed

---

[11]     This presumably explains the vast number of redactions that appear in the public copy of
the MDL Complaint.

amendment was contrary to the intent of the injunction and would violate Title VII and the Equal Pay Act.  1978 WL 44, at *3.

Notably, PM and Altria make no argument that the timing of the Intervenors' Motion to Clarify has prejudiced them in any way.  Altria claims it would take seven months and cost as much as $2.8 million "to complete a confidentiality review" and the required metadata coding before its Juul MDL production could be uploaded to PM's website (Harlowe Decl., ¶ 10).  For a company the size of Altria, that is not a lot of money to comply with court-ordered transparency obligations.[12]  In the usual course, Altria would have already conducted such a costly "pre-production review," which they acknowledge is "typical in civil litigation," but they were able to avoid doing so by convincing the plaintiffs in the Juul MDL Litigation to allow Altria "to apply bulk confidentiality designations to these documents" (Harlowe Decl., ¶¶ 7-8).  There is no assertion anywhere in Altria's papers that any of these costs could have been avoided if the Intervenors' Motion to Clarify had been filed sooner.[13]

---

[12]    Altria's net revenues in 2020 were approximately $26 billion.   Altria Press Release, "Altria Reports 2020 Fourth-Quarter and Full-Year Results; Provides 2021 Full-Year Earnings Guidance; Announces New $2 Billion Share Repurchase Program" (Jan. 28, 2021), https://s25.q4cdn.com/409251670/files/doc_news/2021/01/28/Press-Release.pdf.

[13]    There is also no claim that the continued maintenance of PM's internet website would itself impose any significant burden on PM or Altria.

**Conclusion**

For these reasons and the reasons offered in the Intervenors' opening brief, the Court

should grant the Public Health Intervenors' Motion to Clarify and Amend Order #1015; clarify

that the Juul MDL Litigation is a case "concerning smoking and health, marketing [or]

addiction" within the meaning of Section III(C)(¶10(a)) of Order #1015; and amend Order #1015

to require PM and Altria to post on PM's document website all the documents produced and

deposition testimony given in the Juul MDL Litigation for no fewer than 12 months.[14]


September 9, 2021                           Respectfully submitted,



                                            */s/ Christina S. Marshall*
                                            Scott P. Lewis (admitted pro hac vice)
                                            slewis@andersonkreiger.com
                                            Melissa C. Allison (admitted pro hac vice)
                                            mallison@andersonkreiger.com
                                            Christina S. Marshall (Bar # MA0022)
                                            cmarshall@andersonkreiger.com
                                            ANDERSON & KREIGER LLP
                                            50 Milk Street, 21st Floor
                                            Boston, MA 02109
                                            T:  617-621-6500
                                            F:  617-621-6660

                                            *Attorneys for the Public Health Plaintiff-*
                                            *Intervenors*

---

[14]     PM and Altria make no argument that it would be unreasonable to extend the life of PM's
internet website in this way if the Court finds that the documents produced in the Juul MDL
Litigation must be added to PM's internet website.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of this document was filed through the Electronic Case Filing system, and will be served upon the attorney of record for each party registered to receive electronic service on this 9th day of September, 2021.

*/s/ Christina S. Marshall*
Christina S. Marshall