Exhibit 1

i

# Expert Report of Greg Brancaleone

## Contents

Expert Report of Greg Brancaleone ............................................................. i

I.    Assignment ............................................................................ 1

II.   Summary of Methodology ............................................................ 1

III.  Summary of Conclusions ............................................................ 2

IV.   Qualifications ........................................................................ 7

V.    Two Designs .......................................................................... 17

VI.   Methodology for Developing Style Guidelines ................................ 18

    A.    Style guides: Background and components ............................... 21

    B.    Overview of methodology for developing style guides ............ 24

VII.  Developing Design Specifications and Implementation Guidelines for the Corrective Statements ............................................................ 26

    A.    Listen and learn ...................................................................... 26

        i.    Generally .............................................................................. 27

        ii.   In this case ............................................................................ 27

    B.    Discovery and research ............................................................ 31

        i.    Background on POP ................................................................ 31

        ii.   Clip Strip research on POP ...................................................... 32

        iii.  Resulting insights .................................................................. 34

        iv.   How what was learned improved the design process ............ 47

    C.    Develop a creative brief ............................................................ 49

        i.    Minimizing burdens on retailers .............................................. 53

D.      Concept phase ...................................................................... 55

    i.     Inspiration Exploration ............................................ 57

    ii.    Mood Board Exploration ......................................... 65

    iii.   Creation and Evaluation of Concepts ..................... 68

E.      Design phase ........................................................................ 77

    i.     The framework – shape of the sign ........................ 78

    ii.    Designing for the category and attribution ............ 80

    iii.   Asterisk colors ........................................................ 83

    iv.   Remaining visual elements ..................................... 84

    v.     Typography and font style ...................................... 87

    vi.    Style guide rules and criteria ................................. 91

    vii.   Testing the style guide's performance and how the design is perceived in the environment ........................................... 100

F.      Execution and production phase ............................... 105

    i.     Sign shapes and dimensions ................................. 105

    ii.    Ink .......................................................................... 106

    iii.   Stock and signage cover considerations ............... 108

    iv.   Hardware and installation ...................................... 110

VIII.   Two designs compared ................................................ 111

IX.  Conclusions ................................................................... 113

  A.    The design problem ................................................... 114

  B.    Solving the design problem ....................................... 115

    i.     Communicating effectively to consumers about the manufacturers' products ................................................ 115

    ii.    Revealing previously hidden truths about the manufacturers' products ........................................................................ 116

    iii.   Avoiding off-limits design purposes ..................... 116

iii

iv.    Minimizing potential burdens on retailers ............................ 118

v.    Avoiding duplication ........................................................ 120

1

## I.   Assignment

1. I have been retained by the U.S. Department of Justice to develop a guideline with design specifications and implementation instructions for both the designs and the execution of designs into the displays, to be used (by court order) by three major cigarette manufacturers to communicate truthful information about their cigarettes to consumers at point-of-sale (POS). As discussed in further detail below, I was instructed to develop a design that would fulfill the Court's objectives of getting consumers' attention and communicating truthful information to them in an effective way.

2. I was also asked to prepare an expert report which would explain the process my team and I used to develop the design, and explain how the Court's objectives affected our design choices and shaped the ultimate design.

## II.   Summary of Methodology

3. I completed this assignment based on my knowledge and experience in the field of graphic design, using the following overall methodology:

  (1) Discern the assignment – *i.e.*, study and understand the problem that the design is intended to solve;

  (2) Conduct discovery and research to learn about the market and the environment in which the design will be placed;

  (3) Prepare a Creative Brief outlining the design's purpose, audience, essence, tone, and mandatory constraints;

2

(4)  Prepare concepts – ideas that offer solutions to the design problem – and select the best one;

(5)  Refine and finalize the design of the chosen concept, and prepare and test a Style Guide that sets out how the design must be executed; and

(6)  Ensure that the design can be executed and produced in its intended environment.

## III.   Summary of Conclusions

4.   The design that I recommend, an example of which is provided below, will help cigarette companies reveal previously hidden truths about their products by communicating truthful information about their products to consumers, both smokers and non-smokers, at retail.



5.   This color design cuts through the clutter of retail cigarette marketing, is visible and legible, and relates to cigarettes and the cigarette industry.

3

6.   My team and I also developed a black and white design, an example of which is provided below.  This design also accomplishes the objective of helping cigarette companies reveal previously hidden truths about their products by communicating truthful information about their products to consumers at retail.



A Federal Court has ordered Altria, R.J. Reynolds Tobacco, Lorillard, and Philip Morris USA to make this statement about designing cigarettes to enhance the delivery of nicotine.

**When you smoke, the nicotine actually changes the brain—that's why quitting is so hard.**

7.  This black and white design also cuts through the clutter of retail cigarette marketing, and is visible and legible.  However, it is a more general design that does not relate to cigarettes or the cigarette industry.

8.  Every aspect of both the color and the black and white designs, including the fonts and the layout of the different sections of the "containers," is crafted to work together to communicate the content of the corrective statements and their source effectively and in an informational fashion.

9.  Both the color and the black and white designs are constructed to get consumers' attention, so that consumers will notice and read the corrective statements, and communicate the corrective statements' content effectively, with a balanced delivery that simply communicates truthful information without advocacy, and

4

that avoids disruption of the POS venue and cigarette marketing at POS.

10. Throughout the design process, my team and I made choices for the black and white design, and even more so for the color design, that prevented the designs from having characteristics that the Court indicated they should not, such as the appearance of warnings or anti-smoking messages.

11. My colleagues and I prepared a "style guide" that provides clear instructions to implement the color design for the corrective statements on in-store marketing displays.

12. In response to court rulings providing that duplication of messages in a store during the same time period should be avoided, we built into the style guide a requirement to avoid such duplication. We also developed and are providing an algorithm to aid the cigarette manufacturers in doing so.

13. We have also provided hundreds of pre-made professional digital artwork files implementing the corrective statement design in dozens sizes (each of which can further be re-sized as needed). Each group of pre-made artwork files comes in a set of 18, with one print-ready piece of artwork ready for each of the 18 different factual statements.

5



The larger group of print-ready artwork files will be for posters and other marketing pieces that are usually displayed on their own. These artwork files apply the color corrective statement design to 25% of the total visible space, with the other 75% available for a cigarette manufacturer or retailer to insert its own messaging.

14. The remaining group of pre-made artwork files are for sizes the manufacturers often use for the signs they place on cigarette "set displays" at stores where they have contracts. (Set displays are the display cases that display cigarettes for sale. They are usually placed behind the checkout counter.)

15. Multiple aspects of both the design and its implementation according to the style guide minimize the burden on retailers, including:

(1) The rectangular shape of the design module, which resembles the general shape of the most common cigarette marketing materials at POS and is designed to fit within cigarette marketing, thereby avoiding disturbing the look of the store and any implementation problems caused by unusual shapes;

(2) The corrective statement design within this rectangle – including fonts, spacing, clearances, and (for the color design) the colors and icon – which was devised to be a good fit with the cigarette marketing ecosystem and to avoid disrupting retailers' stores;

(3) The color design's use of a standard four-color ink process, and the black and white design's use of standard black and white – as opposed to processes that would require pantones, fluorescents or other custom colors –makes it easier, simpler, and cheaper for retailers who participate in contracts with cigarette manufacturers to produce signs containing the corrective statements;

(4) The style guide's restriction that the corrective statements be placed solely on areas that already contain cigarette marketing, which does not require any additional space of the retailers or any freestanding displays;

(5) The design of on-set items that are meant to be used with attachment devices that retailers already have or can get easily and cheaply;

(6) The hundreds of print-ready digital artwork files provided with the style guide, which significantly reduce the burden on retailers with regard to any cigarette marketing materials that retailers who participate in contracts with cigarette manufacturers generate themselves; and

(7) The style guide's recommendation that the signs containing the corrective statements be printed on 20mm white polypropylene vinyl stock, which reduces the burden on retailers by using a standard, inexpensive, and durable printing material that makes plastic covers over the signage unnecessary, reducing both cost and any burdens with installation or removal.

# IV.   Qualifications

16. I am Account Director and a Creative Director at Clip Strip Corp., based in Hackensack, New Jersey. I have over twenty years of experience in branding, graphic design, and marketing at points of sale and in a variety of other physical and digital environments.

17. I graduated with a B.A. from Moravian College with a major in Arts and a focus in Graphic Design. Early in my career I was a designer and production artist for publication companies such as Newbridge Communications, where I created graphic designs and article layouts for *Weekly Reader*, *Highlights*, and *National Geographic* magazines. I spent twelve years working for DraftFCB (now called just "FCB") and its predecessors, a leading advertising agency in New York City and part of the IPG holding company, an award-winning global marketing firm. After DraftFCB I helped create an award-winning agency called Hero Media Group that started from a single client and added multiple Fortune 500 accounts and various types of work such as retail environments, digital, and print marketing. Because Hero Media was a smaller agency, I obtained hand-on experiences and expertise wearing many hats such as account director, designer, writer and overall operations.  As a freelance designer, I have worked with designers from advertising, marketing, and public relations firms Ogilvy, Wunderman, and McCann. This work included creating direct mail packages, print ads, brochures and catalogs.

18. As my career progressed, I continued to design, but I also began managing creative (throughout the marketing and design world, "creative" is frequently used as a noun, meaning "creative work"), production, and account teams and clients. As an Account Director and most recently as a Director of Accounts at Clip Strip Corp., I

have managed integrated campaigns leveraging digital and print channels, such as social media, content marketing, CRM (Customer Relationship Management), email marketing, video production and marketing, and direct mail marketing. Mostly in my role with Clip Strip Corp., I have worked with creative teams both internally and at clients to understand and implement brand and design guidelines for brands, products, and packaging for companies such as Walmart, Samsung, M&M Mars, and other large (and medium and small) clients. These guidelines include imagery, identity (such as logos, icons, colors, fonts and photos), and messaging (such as taglines and word descriptions for companies or products).

19. I also have a strong background in print and in-store marketing for a variety of other brands, including Samsung, Total Defense, and Invisible Glass. This experience includes developing displays using these clients' brand guidelines (some of which we created) and developing in-store implementation instructions for the designs. For some of these clients we determined the best use of store environments to develop what kind of displays we should create and how they should look and be placed as far as location in the stores.

20. In the creative design world, the account director is akin to a general contractor. The account director keeps track of the big-picture issues, schedules, and budgets, briefs the creative team, and oversees the entire project. The account director has sole direct contact with the client, and reviews and gives feedback on any creative work before it is presented to the client. The account director's core responsibility is to ensure that the creative team's work reflects what the client wants. Those on the creative side are

9

more like subcontractors who complete particular tasks that are part of the overall assignment. Although an account director need not be competent to do the work done by the creative team, I am often engaged in both creative and account work on a given project because I have worked on both the creative and account sides. As creative director, I lead the creative team in development of concepts, strategy and design. My role can dictate the concept for the team to implement and review designs from the team and give feedback and recommendations to ensure the design meets the project requirements.

21. I have substantial experience with retail-location point-of-purchase (POP) displays. I have designed for, created, executed, and coordinated manufacturing for retail POP displays, including Clip Strip® Brand Merchandisers customized for specific clients, clingers, peg-hook displays, wall signs, and packaging. I have also spent considerable time creating and designing training videos, brochures, and posters for retail sales representatives, to train them on how to educate customers about products and sell those products.

22. As discussed in detail beginning around Paragraph 28 below, a "style guide" or "brand guideline" provides the written instructions on how a design is to be developed, executed, and manufactured, across all anticipated applications and contexts. Over the course of my career so far, I have helped develop roughly 20 style guides, and my responsibilities have encompassed developing the structure, developing the hierarchy (what is the most important focus of the content, such as what do you want the reader to see first, second and so on), planning the overall style guide, and delivering the executables. I have directed teams of professionals

in developing brand guidelines from scratch for companies such as the plastic houseware maker Hutzler Manufacturing, the online electronic retailer Tiger Direct (now PCM), the security software firm Total Defense, Computer Associates, and approximately a half dozen smaller startup companies.

23. My work has also included implementing roughly 20 more style guides that other designers had already created for clients, including major brands such as AARP, American Express, Bank of America, Disney, Kraft, Verizon, and many others. My work on these accounts often required applying and working within an existing style guide to uphold the integrity of a client's brand and designs by ensuring that their brands, icons, logos, and designs are presented and appear properly in the market, in any use from indoor or outdoor signage to letterhead to promotional items such as branded coffee cups, mouse pads, or shirts. For one client, this even included determining and specifying how the company logo would appear on a private airplane.

24. In several of my past positions, as well as in my current work at Clip Strip Corp., me and my colleagues' graphic design work and recommendations have been informed by the results of consumer market research. Over my career I have been involved in many testing and market research studies to test designs, messaging, campaigns, environments and overall questionnaire type surveys. This has been conducted in person with focus groups, over the phone, and with online surveys/questionnaires. Recently I worked at an agency where we used testing utilizing neuro marketing methods for companies like Fresh Direct, Disney and professional sports teams. Neuro marketing employs aids such as eye tracking software to see where and how long the subject looks at imagery,

facial coding software to catalog the subject's expressions, and measurements of brainwave activity gauging the subject's excitement levels.  These tests have both confirmed that designs were successful and that some designs needed to be revised.  For one client, we realized the CTA (call to action), which is usually a phone number or webpage to visit, was not clear to the viewer and therefore was not effective.  In another case, we were informed by the results that the headline copy was not being interpreted the way we intended, and so we changed its design.

1. Much of my work has been on individual marketing campaigns. For several dozen of the campaigns I have worked on, however, the purpose was to generate awareness, rather than result in a sale. "Awareness" campaigns can include public service announcements, such as recent campaigns reminding people to wash their hands and wear masks to reduce the spread of COVID-19; campaigns to support charities; and Nike's "Just Do It" campaign, which does not direct consumers to a purchase or give them a "call to action," such as, "Go to Footlocker" or "Go to this website to buy our new sneaker," but rather is a rallying cry for people to get out and become more athletic.

2. I worked on a campaign for Computer Associates to bring awareness to cybercrime and the need for cybersecurity. Awareness campaigns resemble the corrective statements campaign in this case because the goal of the corrective statements is also to communicate statements and generate awareness of them, as opposed to resulting in a sale.

3. While I was working at Hero Media Group, my team and I received the New Jersey Advertising Club Award for excellence in brand design for our work for Total Defense, which included developing a

brand identity and an accompanying style guide. A brand identity consists of items like a logo mark or tagline or even messaging for the company. A brand identity dictates the brand's look and feel across multiple uses from marketing, to packaging, to colors and images on ads, and depending upon how broad the design is, can go as far as the look and feel of the company trucks.

4. I am being paid $120 per hour for my time on this project. Clip Strip Corp. is being paid $295 per hour for my time as an account director on this project, and $275 for my time as a creative director and expert witness on this project.

5. For this project, I supervised a team of Clip Strip Corp. professionals. Our company, Clip Strip Corp., has a wealth of expertise and experience in point-of-purchase (POP) merchandising and marketing and has been designing and manufacturing related products and services since 1980. "Creative Magazine" has recognized Clip Strip Corp. in its "Top 50 POP

 

Companies" list.

6. The company invented the Clip Strip® Brand Merchandiser decades ago, now seen in stores around the world.



7. Additional types of merchandising fixtures and hardware for POS use by retailers that Clip Strip Corp. manufactures and sells, beyond the Clip Strip® Brand Merchandiser itself, include:

- product merchandising items, such as retail display systems, shelving systems, shelf dividers, and display hook systems;
- sign holders, ranging from classic snap-frame sign holders to shelf-edge and countertop sign holders, and from wall and vertical mount sign holders to wire fixture sign and label holders, and wobblers;
- literature and brochure holders, ranging from freestanding to wall-mount to outdoor;
- ceiling and window sign holders and sign hanging equipment; and
- display construction items, such as power panel clips, displays, hooks, display poles and accessories, and corrugated display accessories.

8. A new service that Clip Strip began offering in 2016, our POP printing solution, has provided custom printing for retail POP signage, banners, labels, and custom displays to help retailers effectively capture customer attention, convey key messages, and drive sales. In addition, Clip Strip Corp. launched "POP Fuel: A Merchandiser's Blog" in 2015. This blog, located at http://clipstrip.com/pop-fuel, is for store owners and merchandisers. The blog helps merchandisers make in-store business decisions about how best to incorporate visual marketing principles in display, indoor environment POS systems, and store sign printing techniques.

9. The chief Clip Strip Corp. individuals who supported my work on this project were John Spitaletta and Jaydee Jana.

10. John Spitaletta is a Partner, Chief Managing Officer, and an Account Director at Clip Strip Corp. Mr. Spitaletta has an

uncommon combination of experience in marketing and in-store merchandising. His education includes education in Business at Fordham University; Film at NYU; Art in Loyola University's "Art in Rome" program in Rome, Italy; and Publishing at Stanford. Mr. Spitaletta's career includes years as a film production manager, studio manager, magazine publisher, and ad agency executive. His work as an ad agency executive involved both creative work (branding, strategy, design, marketing communication) and media (planning and buying) for accounts such as the antivirus software firm CA.com (formerly Computer Associates International, later acquired by Broadcom), Panasonic, Ralph Lauren,

11. Continental Airlines, Coach USA/Gray Line Tours, Sharp Electronics, and Samsung. From 1993 to 2014, Mr. Spitaletta served as Executive Vice President for Marketing at Clip Strip Corp. while also serving as CEO of multiple advertising and marketing agencies, including The Adventure Group, Concrete Media, and Hero Media Group.

12. Mr. Spitaletta's experience with Clip Strip Corp. includes developing point of purchase hardware products such as retail display sign holders, marketing the company's hardware products for POP usage, and developing the company's graphic design division and store signage printing department, all while running all corporate marketing. In 2014, Mr. Spitaletta sold his most recent agency, Hero Media Group, when his father Edward D. Spitaletta, the inventor of the "Clip Strip® Brand Display Merchandiser," asked him to join Clip Strip full time as Chief Managing Officer. Since 2014, the younger Mr. Spitaletta has been running all marketing and has been intimately involved in business and new product development.

13. Mr. Spitaletta is currently developing a new division called "POP Fuel," an in-house branding and marketing agency of Clip Strip Corp. building off of the "POP Fuel" blog mentioned above. This agency will specialize in a broad array of marketing services, including branding and in-store marketing.

14. Jaydee Jana is a Creative Director at Clip Strip Corp. Mr. Jana graduated with honors from The School of Visual Arts in New York City, majoring in advertising and graphic design. He has expertise in the print category from creative to production, including developing print ads, direct mail and retail marketing as well as TV and radio, website development, video production, and social media.

15. Mr. Jana has worked on brands including IBM, AT&T Wireless, Virgin Atlantic Airways, JetBlue, AMEX, USA Networks and Mike's Hard Lemonade. Most recently, Mr. Jana spent 7 years as co-creative director on the Cablevision (Optimum) account. He has worked at several agencies, including Ogilvy, The Concept Farm, The AdStore and Hill Holliday. Mr. Jana works in every medium from print to broadcast to digital.

17

## V.   Two Designs

16. In this case, Clip Strip was instructed to prepare an early design
    swiftly, in case of an early deadline. The result was a black-and-
    white proposal, like so:



17. Even though its development was accelerated, I am confident that
    this design, with a style guide to accompany it, would fill the
    Court's needs. I explain why later in this report.

18. After developing the black and white design, we took a step back,
    revisited the process and decided to do a full exploratory and
    alternate concept that would have more of a Brand development
    process.  This would allow us to develop a design that
    communicated that it related to cigarettes, and, like the black and
    white design, was well-suited for the retail environment where the
    corrective statements would be viewed. This revisited process let to
    the development of the color design.

19. The color design is the design I ultimately recommend:



20. Where helpful, I compare and contrast the black-and-white and the color designs against one another.

## VI.   Methodology for Developing Style Guidelines

21. In this section, I describe the methodology I used to develop the color design and accompanying style guide; and compare and contrast that methodology against the more truncated process used to develop the black-and-white design.

22. The methodology is one I have learned, developed, applied, and refined over my two decades of hands-on experience with style guides, and is strengthened by my wealth of experience in the POS field. As a result of my past experience developing and applying style guides, I have good insight into the "whole picture" and the methodology to develop style guides holistically, as a process of evolution from inception to completion.

23. The methodology employs several best practices, which are proven processes and steps over time used as an industry standard. Our

19

process includes, whenever possible, a very hands-on approach to the listen and learn and the discovery and research phases so that we have a full understanding of the intended context for the design, which gives us a greater understanding of the environment and category in which the ultimate design will be placed. This early work helps guide and inform later creative decisions, enabling us to build a design that is tailor-made for its intended usage.

24. Another best practice is the way we refine our design. As opposed to just going with our guts alone and hoping a draft design works, we rip it apart internally, spending substantial time challenging the design with other designs that might work differently, pushing each other by questioning why aspects of the design are a certain way, improving and refining the design vigorously as a team, and testing it to make sure it works. The process often involves the creative designers and the production, account, media and research teams all sitting down at the table together to refine the design. This approach allows us to think and design on a larger scale, encouraging more collaboration and cohesive visions than in the more siloed environments typical at many design firms where the various teams do their work separately, each team limited to a specified area of input. These steps provide confidence that the design we put forward is not just a *good* way forward, but the *best* way forward we can devise.

25. As mentioned earlier, I have had a role in developing about twenty style guides, and have worked to implement about twenty more. This work has shown me the importance of developing a style guide that strikes a balance by being complete, but not overly complicated. I have worked with many excellent style guides, but

have found that others are unnecessarily repetitive or have important gaps in their instructions. I have built my methodology for developing style guides with the benefit of insights from these and many other experiences, and have applied it in dozens of brand developments for such brands as Bank of American, American Express, Computer Associates, Total Defense, and Samsung. My methodology is designed to develop a style guide that is clear and understandable, and spells out what needs to be done for its intended uses. To increase clarity, I prefer to include visual instructions and illustrations of correct implementations – as I have done in this case – which make the Style Guide easier to comprehend. The style guide was also produced with the assistance of my team, and benefited from their decades of experience as well.

26. While I may adapt some aspects of my methodology to fit the circumstances of a particular assignment, the methodology's core components stay consistent and include the discovery phase, concept phase, execution, and some form of testing. All four of these components were part of the development of the color design and the accompanying style guide I am ultimately recommending for the corrective statements in this case.

27. While it would be nice to be able to use the most fulsome version of this methodology with every client and for every assignment, it has two principal downsides: time, and money. It can take two months or more to develop a design. Any style guide that is to be created should be well underway as the design process nears its completion, but it is typical for style guide work to take an additional month or two (and frequently this work leads to insights that prompt further refinements to the design itself). The bills are

correspondingly large. As a result, graphic designers are often asked to propose designs that utilize our visual-communications expertise, but not the most robust version of every available step in the design process.

28. While we were able to use the full, unabbreviated four-component design process for the color design – from the listen and earn process through the design phase, with even the addition of the execution phase – the black and white design was produced under a more accelerated schedule, which required a less extensive approach.  However, the black and white design benefits significantly from having been the product of its own listen and learn and discovery and research phases.  These key phases of development, along with the additional components of the black and white design's creation, provide assurance that this design communicates effectively.  While it is not the design I am ultimately recommending, I am confident that black and white design communicates effectively in its intended environment.

## A.    Style guides: Background and components

29. A "style guide" or "brand guideline" is a fundamental document in the graphic design field. A style guide provides sufficient instruction for final, fully produced designs to be developed, executed, and manufactured. The style guide sets out principles, standards, rules, and specifications for a design's formatting and graphic elements, such as logo usage, fonts, colors, and sometimes page layouts.

30. The purpose of the style guide for a design is to ensure that the design is executed consistently and uniformly from one usage to the next—the essence of visual branding. Style guides are meant

to allow the design to be executed on (or as it is sometimes put, to be "translated to") a wide range of "deliverables" (which are sometimes also called "components"). The physical or digital "deliverables" where a design may be executed can range from letterhead to indoor and outdoor signage; from branded coffee cups and other promotional items to websites; and from business cards to (as I did for one client) a company jet.

31. Style guides are meant to be sufficiently explicit to provide clear instructions to designers who were not involved in drafting them, and who may work for wholly unrelated design teams or agencies. In addition, the work of ensuring that designs are properly executed and printed, conducted by production managers, is always based on the style guide.

32. The subject of a style guide could be as limited as the use and appearance of a single visual element—most likely a logo symbolizing an organization or product, or, in this case, a series of truthful statements.

33. A style guide can be as simple as a couple of pages of examples of logo usage, or as complicated as an entire binder to cover every possible application of the design such as print, online, TV/video applications, social media, promotional items, and out-of-home (formerly "outdoor") advertising.

34. At a minimum, a basic style guide for a color design needs to include a black-and-white version of its design, as well as color versions adapted for various print and digital contexts. Color specifications need to identify alternate options and breakdowns for colors; RGB (red, green, blue) codes for digital/screen displays; CMYK (cyan, magenta, yellow, black) codes for physical printing;

23

and any "fifth ink" or Pantone codes – these are standardized numeric codes that identify particular color breakdowns.

35. Even a basic style guide needs to identify the different display environments where the design is expected to appear, and for each one, it needs to specify the minimum and maximum recommended sizes for logos, and how much space must appear around them.

36. In addition, even basic style guides typically also include examples of how *not* to use logos. These examples usually both describe the prohibited usage in text (*e.g.*, "Never change the colors"), and show an example with a visual cue to convey that it is prohibited (*e.g.*, the logo with colors that the style guide did not specify, crossed by a conspicuous diagonal slash). For example, our style guide includes this as an example of *mis*-use of the required colors. All of the colors depicted are from the correct color palate, but the asterisk icon is black (not its required magenta and aqua blue colors); the factual statement container should be black (not aqua blue); the factual statement text should be in a white font (not black); and the Preamble container should be aqua blue (rather than magenta). Thus, the image is shown with a large slash to



show it illustrates *mis*-use, in this case, misuse of required colors, not correct use:

## B.   Overview of methodology for developing style guides

37. The basic steps I typically use to develop brand and display guidelines, based on the experience described above, are as follows; I explain them in much more detail later in this report:

38. **Listen and learn.** Understand the assignment and its challenges. Good design solves problems. The function of "listen and learn" is to discern the problem we need to solve.

39. **Discovery and research.** Learn about the marketplace, the physical environment where the design will be placed, and other executions and placements within that physical environment. For a design that will be placed in a physical environment, this phase often involves a physical tour or "audit" of some typical physical locations where the finished execution will be implemented.

40. **Creative brief.** By asking detailed questions to elicit additional information from the client, the creative and account teams further develop their understanding of the project's purpose and goal, audience, essence (sometimes known as the "value proposition" or "one true thing"), tone and manner, and mandatory constraints or "must haves."

41. **Concept phase.** Prepare a few ideas that offer different ways to solve the creative problem, within the context of the specific design environment and the goals of the project; identify which concept will be adopted as the final design.

42. **Design phase**. Refine the chosen concept to final design form and prepare it for execution. Prepare a "style guide" that sets out how

the design is to be applied across different applications, implementations, environments, and components. (The style guide will dictate design rules to ensure that the design and its elements appear appropriately and consistently in all of the design's intended ultimate uses.) Refine the design and the style guide by testing the design across the various uses and applications that are expected, and by testing the style guide's ability to guide users properly.

43. **Execution & production phase.** Ensure, through additional testing and other means that the design can be physically executed and produced in the various components, structures, fixtures and elements in and around stores, also known as the "store environment" or "setting."

44. It is a little artificial to show these phases as if they were completely separate and performed in strict sequence. In practice, adjacent steps often overlap to some extent, and a designer's work is often iterative, with insights at later stages prompting us to go back and revisit an earlier stage. For example, observations of the physical setting where the design will be placed, conducted during the "Discovery and research" phase, often bring out additional details that it is helpful to discuss with the client to learn more about the assignment and its constraints, even though those discussions could be considered part of the earlier "Listen and learn" phase rather than the "Discovery and research" phase. Another common example is that work done at the "Execution and production phase" often informs, and prompts us to go back and further refine, the style guide that is "officially" prepared during the "Design phase."

45. On this assignment, for our first, accelerated, design, we spent considerable time on the "Listen and learn" and "Discovery and research" steps; skipped the "Creative brief" step; touched briefly on some aspects of the "Concept phase"; and slowed down again in the "Design phase," where we developed our first, black-and-white design, and simultaneously began work on a style guide that would explain how the statements would be displayed at POS. At that point, we were able to put the early design to the side, and then went through the "Creative brief" and subsequent phases with care and attention. That work led to the color icon and design we propose; and built on our early style-guide work to develop the full style guide that we are recommending.

## VII. Developing Design Specifications and Implementation Guidelines for the Corrective Statements

46. In this section, I discuss how my team and I applied select steps of the methodology to develop our early black-and-white design and begin developing an accompanying style guide; and applied all steps of the methodology to develop the color design and the accompanying style guide that we are recommending for the court.

### A. Listen and learn

47. The purpose of the listen and learn phase is to understand the assignment and its challenges. Even for an accelerated project, it is essential for a designer to know the problems he or she is designing to solve.

### i.   Generally

48. The listen and learn phase allows us to learn directly from the client about the project—what it is intended for; its background; and insights from the client's history and the history of the relevant product or concept and any earlier marketing.

49. Our process involves listening to our customers' needs, goals, and challenges, and then asking lots of questions in different ways to formulate the best ways to approach the problem based on best practices. Doctors are experts in medicine/treatments, but if a doctor does not listen to his patient to understand the problem or all the symptoms, the doctor may not be able to diagnose the patient's illness or prescribe the right medicine or treatment.

### ii.   In this case

50. Clip Strip began this process with multiple phone calls with DOJ counsel, several lasting an hour or more. DOJ lawyers explained the Court's corrective-statement remedy and its purpose, and the need for a retail point-of-sale design that would fulfill the corrective-statements rationale.

51. During this time, the DOJ lawyers emailed us the precise text of the court-ordered statements; a declaration from a cigarette company executive with dozens of full-page color photographs of retail point-of-sale cigarette set displays; and various mockups that DOJ had filed in 2018 to illustrate a proposed "25% fixed percentage" approach to a retail point-of-sale corrective statements. I prepared and circulated to my colleagues a background document summarizing the project. "DOJ Project Background_Clipstrip9.17.docx", DOJ_POS_GB_000156. This document also copied and pasted from the email that forwarded the text for the messages, the cigarette-company executive's

declaration with the color photos, and the mockups that illustrated DOJ's 2018 proposal.

52. Over the course of our many phone calls back and forth with the DOJ lawyers, we learned that in 2009, the Court of Appeals affirmed the District Court's determination, made in 2006, that certain cigarette manufacturers were reasonably likely to commit future fraud and deception regarding their products unless the court prevented and restrained them from doing so. The 2006 District Court order required the cigarette manufacturers to issue statements about 5 specific topics, in 5 different media channels: newspapers, television, cigarette pack onserts, the cigarette manufacturers' websites for their own companies and for their cigarette brands, and finally, point-of-sale (POS). The Court of Appeals' 2009 decision found that requiring the manufacturers to reveal the previously hidden truth about their products to consumers would prevent and restrain them from future fraud and deception.

53. We learned that in 2017 and 2018, the District Court ordered the manufacturers to communicate the statements in the first 4 media channels: newspapers, television, cigarette pack onserts, and websites.

54. We learned that in 2009, the Court of Appeals "vacated" the requirement to issue statements in the POS media channel and told the District Court to consider the rights of retailers as innocent third parties (and to avoid duplicative signs). We learned that the District Court was going to have an "evidentiary hearing" to evaluate burdens on retailers, and that a central topic would be the design and execution requirements for the corrective statements at the POS.

55. We learned that the Court of Appeals had already approved particular text for the statements as "purely factual." There are a total of 18 factual statements, such as, "Cigarette companies intentionally designed cigarettes with enough nicotine to create and sustain addiction." The factual statements are grouped into 5 topics. Each topic has its own preamble, such as "A Federal Court has ordered Altria, R.J. Reynolds Tobacco, Lorillard, and Philip Morris USA to make this statement about designing cigarettes to enhance the delivery of nicotine."

56. We learned that many of our design decisions for this project would be driven by the requirements of the RICO law. We learned that the statements are meant to be used by the cigarette manufacturers, under court order:

- o   to reveal previously hidden truths about their products; and

- o   to communicate truthful information about their products to consumers.

57. We also learned that the purpose of the statements is ***not***:

- o   to be warnings;

- o   to be similar to the Surgeon General's warnings;

- o   to be anti-smoking messages;

- o   to be stop-smoking messages;

- o   to cure consumer misconceptions;

- o   to prevent consumer misinformation;

- o   to "inoculate" or "arm" consumers against future misinformation;

- o   to prevent future consumer deception;

- o   to safeguard consumers against future RICO violations;

- o   to make future RICO violations unprofitable for the cigarette manufacturers;

- o   to reduce the cigarette manufacturers' incentive to market their products; or

- o   to suggest past wrongdoing or to punish or sanction past misconduct.

58. We learned that in 2018, DOJ had proposed a "fixed percentage" approach to the court, under which a fixed percentage, such as 25%, of the space used to market the covered cigarette brands would be devoted to the corrective statements. As a result, the design we developed would be confined to POS space, both on-set and off-set, that was already used for cigarette marketing. The design would not appear independently; for example, it would not be displayed on stand-alone floor fixtures or stand-alone countertop displays.

59. The purpose of the corrective statements is to communicate truthful information to consumers. For this communication to occur, consumers must notice the statements and read them. Thus, a key objective of the design for the corrective statements is to get consumers' attention and communicate these truthful statements effectively.

60. Designers who are developing a style guide frequently give future users a certain degree of discretion in many matters. But the corrective statements in this case are being made as a result of a court order. Therefore, we made our style guide for this project as specific as possible, with less discretion than typical, to ensure that

the manufacturers are capable of and accountable for complying with the Court's order.

## B.   Discovery and research

61. The next phase is discovery and research. It is important to research and understand the sector and retail environment for which guidelines are being designed because you need to fully understand all the parameters, aspects, challenges and curve balls that may arise.

62. We had to learn about the retail market, how the cigarette manufacturers use it, and what is currently being implemented in the store. To begin we needed to understand how they were treating "point of purchase" (POP).

### i.   Background on POP

63. POP refers to the area strategically chosen for product placement because it is an area that the customer must pass through, and merchandise displayed here is highly visible to customers.

64. A good example of a POP area is a cardboard retail cutout display placed at the end of a grocery store aisle, sometimes featuring product placements of seasonal items, and other times used to feature regularly displayed shelf goods to get customers to take notice. More designated POP areas where special items are often featured include the back wall, on pallets (in the POS context, these are free-standing aisle displays designed to be moved easily, often by forklift), behind a register, in an entry-way, or on a checkout counter to encourage impulse buys.

### ii.    Clip Strip research on POP

65. A common and valuable design practice is to begin by studying the relevant environment, considering where the design will physically appear and whatever other messages are already there. To develop a design that is relevant to an industry's existing presence, it is important to learn the way its existing materials look and feel. This gives the design process a framework and direction, and helps ensure that the design – including its shape, colors, and fonts – will be a good fit for its intended use.

66. As discussed earlier, my colleagues and I already had years of experience with retail store environments, both developing marketing materials for POP display, and also supplying physical POP sign-holder hardware, and of course, product merchandising systems such as the Clip Strip® Brand Merchandiser.

67. But each specific category within a marketplace – for this project, the "category" is the cigarette/tobacco industry – has its own characteristics. Despite my colleagues' and my substantial experience with the POP industry, it was important to look with fresh eyes as we considered the precise marketing ecosystem that our corrective-statement design would live in. My team and I accomplished this by evaluating the existing displays and placements of products and other signage for the cigarette/tobacco retail category. Our team reviewed various types of environments to understand the framework and structure of the displays and the marketing on them so we could further identify how to apply our proposed design formats. This allowed us to investigate and understand any existing limitations or opportunities to better fit our design structure into the retail environments.

68. In order to understand how the cigarettes manufacturers were using POP marketing and how their brands were represented in stores, we visited various retailers where cigarettes were sold to view and analyze the POP as well as placement, distances, customer experience and engagement.

69. For our audit, we visited approximately 40 stores in 5 states. We examined how cigarettes were marketed in each retailer and various types of challenges and/or unique cases. The in-store portion of our audit included examining the customer's physical journey into and through the store.

70. We were able to take photographs for later reference in about 75% of the stores we audited. At some stores, owners or managers asked us not to take pictures, especially behind the counter. Walking around the store and taking pictures of posters and signage in and especially outside of stores was less challenging.

71. We also conducted research online, including using Google to search for cigarette in-store marketing signage, tobacco displays, tobacco POP, set displays for cigarette companies in stores, and more. We looked at other various point of purchase (POP) manufacturers such as http://cigarettedisplay.com/ and production companies to gather information about tobacco POP marketing and to find other ideas/instances that we may have needed to consider in order to adapt the corrective statements for POP.

72. In our audits of and research into cigarette POP marketing, we reviewed the colors used, the sizes of the displays, and the marketing area. We also evaluated the types of devices the marketing and products were placed on. We also examined how flexible they were in terms of design and what their main function was (for example, holding cigarette packs). In addition, we

reviewed how other store signage was displayed, such as wrapped around poles, hung from ceilings, or placed on counters.

73. Our observations included how close consumers get to different POP materials, especially the set displays behind the counters.

74. Our review of set displays revealed a variety of set fixtures, shelving components, sign holders, methods of displaying cigarette packages, and marketing signage.

### iii.    Resulting insights

75.    We made many observations about the environments, both with respect to how the POP materials were implemented and with respect to how customers may engage with them.

76.    Cigarette POS marketing is general awareness marketing because it is marketed to the general public, does not exclusively target existing smokers, and is not focused on promoting sales. As a result, our design must communicate truthful information both to nonsmokers and smokers. And our design must be effective in the context of the consumer's journey through the shopping trip to help the cigarette companies communicate truthful information about their products to consumers.

77. The brand and brand presence are often designed to lead consumers to the product display in the store. The messaging can start in the parking lot when the customer sees off-set signs that are mounted in the lot, pole signs, and/or gas pump toppers.

35






36

78. As the consumer nears the store entrance, even before opening the
    door, they may encounter more signage, such as posters facing out
    from the store:



37



38

79. Within the store, the consumer may see yet more posters mounted or hanging from the ceilings:



80. All of these POP materials further solidify the brand presence and signal to the consumer that the store carries that particular brand of cigarette.

81. At the end of the shopping trip, the customer brings goods to the front counter for checkout. The register counter is thus a key

39

location where shoppers line up to process their purchases. This is the final stage of the buying journey where they pay for their items.

82. At this culmination of the shopper's trip through the store, the customer almost always encounters a vivid and enticing "power wall" that displays cigarettes and cigarette marketing that often goes as high up as the clerk can reach. This "power wall" is also called the on-set display. In addition, many stores feature cigarette marketing on mats placed directly on the checkout counter.



40



41



42



83. The customer's journey thus begins and ends with cigarette messaging and branding. The bottom line is that POS cigarette messaging is frequently visible and high-traffic. The fixture displays are generally well stocked, and always placed to face customers, making them both prominent and in close proximity to the customer.

84. POS cigarette marketing environments are visually busy. Inside retail stores, because of the number of packages and products fighting for shelf space, everything gets packed together. The setting for indoor and even external off-set cigarette marketing signs is likewise frequently visually cluttered. This gas station kiosk, for example, features Newport cigarette "clings": signs that



stick to windows, glass or other surfaces. In this case, the Newport clings are posted on each sash of a three-sash sliding window, so that every ad partially overlaps or is partially overlapped by at least one other. The setting is physically tidy, but visually noisy.

44

The offset marketing displays (posters, clings, and other signage)
contribute to the number of things in the store environment
competing for consumers' attention.

85. While viewing the set display behind the counter we could see a lot
of visual clutter. In addition to the cigarette packages and their
messaging, there is also content such as warnings and signage
relating to marketing, laws, pricing, and tax, for example. In this
set display photo, for example, the "clutter" I am referring to is not
the physical clutter (the trash can, boxes, and stepstool on the



floor), but the visual clutter of all the content on the set display.
The yellow price tags are distracting to the eye and make it harder
to view the other content. The hodgepodge of different colors and
all the items on and in the set display lead to a lack of focus and
legibility. In some cases we noticed that content was difficult to

read or comprehend. There is a lot of visual noise. In some ways, the clutter benefits cigarette brands that have established their brand identities over the years because those brands will tend to be noticed through the clutter more than less-established brands.

86. We also determined that individual cigarette marketing components at retail stores also have cluttered designs, often including pricing information; what marketing people call "legal info," usually meaning disclaimers and other information in small type; and Surgeon General's warnings. Cigarette marketing in retail stores is generally very traditional, clean and basic, containing lots of square and rectangle shapes. But when the individual marketing materials are assembled together, the total effect is often visually chaotic and cluttered.

46

87. We also got a sense of the colors used for the actual fixtures/displays as well as the marketing on and around them. Consistent with the traditional nature of the marketing, colors for the cigarette brands considered were traditional, very plain, and basic, such as primary reds, greens, and blues, with white backgrounds. Some of the newer brands had more vibrant colors, but were generally not a major part of the marketed area or



covered brands.

### iv.   How what was learned improved the design process

88. Our audit of POS retail sites thus demonstrated that the design for the court-ordered statements will need to make sure that the corrective statements do not to get lost in the clutter and, in fact, cut through the clutter to communicate court-ordered truthful information about cigarettes.

89. To help keep the corrective statements from getting lost in a visual sea of cigarette packs and advertisements, we needed to devise an appropriate color scheme for the corrective statements. As discussed below, our first, swift, design addressed this design issue by dividing the available space into two monochrome color blocks, one of them black, and the other white, surrounded by a heavy black border. In our second design, we took a different approach to address the same design issue, by using brighter, more modern colors that would contrast against the traditional cigarette marketing colors and "pop" amid the cigarette marketing ecosystem.

90. Regarding the shape of the design, we were mindful that under the "fixed percentage" approach, we had to make use of the available area, which was the off-set cigarette marketing space for covered cigarette brands, as well as the manufacturers' on-set fixture displays. We learned that the on-set displays have a distinct compartmented area for each manufacturer, which may be square, rectangular, or L-shaped. In this image, for example, the area with

48

the red border is Philip Morris territory; the blue-bordered area is
ITG Brands; and the area with the green border is R.J. Reynolds



Tobacco territory. Because of the way the manufacturers use the
space on set-display fixtures, we saw that it would reduce potential
problems if each manufacturer could implement the corrective-
statement design within its own territory, without needing to

coordinate with other manufacturers or getting accused of "invading" another manufacturer's territory. To solve this design problem, as discussed below, we used a modular approach, by designing scalable and flexible corrective statement modules that would fit well within these pre-existing set-display marketing compartments.

91. Our replications of the customer's journey through the retail store environment showed us that consumers will be at different distances from the corrective statements as they enter; as they move toward the checkout counter; and when they reach the checkout counter. Because of this variety of viewing relationships between consumers and the corrective statements, we wanted to develop a design that would enable the corrective statements to be noticed by customers, catch their attention, and be readable at the distances they will be from the customers. In other words, readability from various distances would be another of our goals. As discussed below, we addressed this design issue with clean, crisp, bold and legible fonts.

## C.   Develop a creative brief

92. The "brief" or "creative brief" aims to consolidate the design team's understanding of the assignment. The brief captures details such as the project's goals, target audiences, unique selling points, desired tone, manner, and visual voice; "mandatories" or "must haves," budget, and timing; and the physical materials on which (or the digital environment in which) the design will ultimately be executed (referred to as "deliverables").

93. In the marketing world, creative briefs are sometimes created by the client (for example, by an in-house marketing department),

and sometimes by the marketing agency based on discussions with the client. When a client does not yet have a creative brief for the assignment, as in this case, the design team works with the client to develop one, typically through multiple meetings and phone calls with the client's team during which the design team ask lots of questions—even more than during the earlier listen and learn phase.

94.    The process of creating the brief takes into account all of the discovery and research conducted as well as all of the information and direction from the client in the listen and learn phase in order to narrow down to a creative strategy that both design team and client agree on.

95. To go beyond the listen and learn information, my colleagues John Spitaletta and Jaydee Jana and I scheduled an extended working session with DOJ lawyers.  In advance, we sent the DOJ lawyers a proposed agenda,  "Clip Strip Agenda.docx", DOJ_POS_GB_000115, and a blank copy of our firm's template campaign brief. The DOJ lawyers reviewed the agenda and the Clip Strip template campaign brief before we arrived, and over the course of a day, we worked through and filled out much of the template brief. *See* "Clip Strip Brand Campaign Brief", DOJ_POS_GB_000118.

96. Our template brief provides numerous prompts for discussion with the client; the important thing of course is to understand the assignment, the client's goals, and so on, not to answer every question on the template just because it is there. The prompts in the template creative brief include a variety of questions: some that could be expected, such as asking for a "positioning statement" for the product or service, and asking, "What problem

51

do you solve for your customers (consumers)?"; and others that are a little whimsical but sometimes bring out important aspects of an assignment, e.g., "What actor/actress would be perfect to play your brand? Why?" and "What other brands would be [your brand's] friends?"

97. Many of the discussion prompts reiterated important constraints and themes from our listen and learn phase. For example, the first two discussion prompts elicited that the assignment's aim was, as before, for "cigarette manufacturers covered in this case (covered brands) to communicate truthful information to consumers about cigarettes to prevent and restrain the manufacturers from making fraudulent claims, half-truths or omissions." Similarly, the problem that the assignment or the brand needed to address was that "manufacturers are likely to engage in fraud and deception as long as they remain in the business of selling cigarettes." After discussing the best way to state the idea, the DOJ lawyers agreed that the product or service "positioning statement" was: "These statements prevent and restrain future fraud and deception by communicating truthful information about cigarettes to consumers." They defined a "competitor" to the brand as "anything that detracts from the cigarette manufacturers' successfully communicating truthful information." The answer to our standard question about how customers should feel when they interact with the product or service was "interest and engagement," followed immediately by, "Any other feelings or side effects after communication are not to our concern." The consistency and stability of these and other responses confirmed for us that the client's vision for the assignment remained precisely what they had been saying since our earliest phone calls: to develop a design

that implemented the permissible purpose from the Court of Appeals (to require the cigarette companies to communicate truthful information about their products to consumers), and nothing else.

98. Other discussion prompts in our creative brief template, though, did bring out additional aspects of the assignment. The idea that the design should evoke "interest and engagement" (mentioned just above) was echoed by requests for a design that would help communicate the corrective statements even "without the actual message/statement." There should be a "visual identity" with a "unified look" that would prompt consumers "to notice/read" the corrective statements. The design should make consumers "desire or allow the communication to happen," and should make them "interested to read other messages in the campaign."

99. A request for words to describe the "company or service" brought out:

- Informative
- Trustworthy
- Straightforward, objective
- Inclusive, in the sense that the information is meant to be for everyone to know
- Balanced, in the sense of not being advocacy for or against something, but simply communicating truthful information
- Important
- Believable

100. Some of our "whimsical" questions brought out that the brand should be "trustworthy," "truthful," and "reliable"; that its "friends" would be "Walter Cronkite, non-partisan, not trying to

sell anything, neutral, factual"; and that James Earl Jones would be perfect to play the brand, because his voice is "engaging, gravitas, believable, authoritative, confident, self-confident, even-tempered, professional, speaking with authority, respectful."

101.     Based on our earlier listen and learn work and our day-long creative brief meeting with the DOJ team, we developed a strategic approach. Our approach was to develop an informational campaign to provide truthful information about cigarettes to consumers at the POS in a way that was credible; that consumers would notice; and that would make consumers read the text of the corrective statements.

102.     In December 2019, after our all-day creative brief meeting, we learned that a new District Court decision explained that its upcoming hearing would focus on the DOJ's 2018 "fixed percentage" approach. In particular, we learned, DOJ needed to present a design proposal that implemented its 2018 "fixed percentage" approach, and was designed to minimize any impacts on retailers. The hearing would examine how the design proposal would impact retailers, and especially whether it would have an adverse effect on the rights of retailers as innocent third persons. Accordingly, we understood that minimizing burdens on retailers would be an essential element of our design work for the POS statements.

### i.   Minimizing burdens on retailers

103.     Consistent with the District Court's 2019 order, our creative brief also emphasized the need to minimize the burdens on retailers through both the design for the corrective statements and the style guide. Our goal was for neither the design nor its implementation to be burdensome.

104.     The design of the corrective statements minimizes potential burden on retailers in several ways, including:

(1) The use of a rectangular shape that resembles the general shape of the most common cigarette marketing materials at POP, as opposed to an unusual shape, which avoids a disturbance to the look of the store, as well as any problems getting an unusual shape to fit into the POP environment;

(2) The corrective statement design itself within the rectangle, which fits in with the general aesthetic of cigarette marketing, avoiding a contrast that would cause a disruption of the POP environment.

(3) The use of a four-color ink process, as opposed to a pantone or other custom color process, making retailer-produced signs containing the corrective statements more economical.

105.     The implementation of the design through the style guide minimizes potential burdens on retailers in several ways, including:

(1) Our development of the design to fit and to be placed exclusively within existing cigarette marketing, which does not require any additional space, such as a freestanding display, or any other messaging sticking out at customers, but instead uses only areas that already contain cigarette marketing materials;

(2) Our design of the replacement on-set items for use with attachment devices that retailers already have or can get easily and cheaply;

(3) Our design of print-ready artwork containing the corrective statements for on-set items and common sign shapes;

(4) Our inclusion in the style guide of examples and illustrations, with the corrective statement requirements satisfied, for irregularly-shaped designs such as circles, die-cut signs, and shelf wobblers (labeling that hangs over the shelf); and

(5) Our recommendation that the signs containing the corrective statements be printed on 20mm white polypropylene vinyl stock, which is a standard, inexpensive and durable printing material, the use of which makes it unnecessary to place plastic covers over the signs; this provides retailers with an easy, cheap and less burdensome path to compliance with the style guide.

## D.   Concept phase

106.      The concept phase is a critical stage in the development of a new design. During this phase, designers and other members of the development team brainstorm design ideas based on the creative brief and research into the audience. They first produce initial concepts in the form of sketches or "mood boards" that rough out how the design idea can be executed and implemented. They then use a mood board to guide their development of several concepts for the design. Following a review (and sometimes testing, as in the case of our color design), the most promising concepts progress to the next phase for detailed design and development.

107.      In our practice, we often develop or use icons or symbols, especially where space is limited. One particular challenge for this project was developing a design that could be implemented in smaller spaces and small set-display territories, where the statement text would be too long or illegible. Also an icon/symbol can bring an identity to a brand/design.  It becomes recognizable and associated with meanings.  Also in this case it helps bring

more context to the copy which is a lot of copy to read. This all confirmed the need for an icon or mark that would become representative of the statements without actually having any of the statements; a visual that would appear on its own but signal to the shopper that it relates to other imagery or text in the same environment.

108.     By creating an icon that is scalable to various sizes, we could ensure usage even in the smallest manufacturer area in a set display to make sure the brand/message is still communicated even without using the words. This scalable icon would represent the meanings of the statements. Using small set-display territories to display a symbol of significance is much more meaningful and will support the manufacturers' efforts to communicate truthful information to consumers better than displaying full textual statements (up to 45 words) that no one could read at the expected viewing distances.

109.     Once we understand the industry or category we are designing for (usually in the creative brief), part of the design strategy for the following phases is to make sure the design will be "relevant to" its industry category. This means that the design fits within the pre-existing visual and design environment for the category; for example, marketing materials for Nike and other athletic brands have a different look and feel than marketing for the soda drink category. The brand identity for a new product positioning itself as "athletic gear" should help consumers, even at a glance, and even without thinking about it, mentally "place" the product in the right industry category. Thus, Gatorade marketing does not show people relaxing or eating a meal while enjoying a Gatorade (as marketing for Pepsi or milk often does). Instead,

Gatorade marketing shows athletes in sports settings, drinking Gatorade for energy for intense, sweat-inducing athletic activity. Even though the consumer will probably not be aware of it, a design that is "relevant" to its category should prime them to anticipate the general topic of the marketing material, even before starting to mentally engage with the text, and even without any representational pictures or illustrations. This process, sometimes called "attribution" to an industry category, is essential for a "visual identity" to be most helpful.

110.     At the same time, of course, it also important for the design to distinguish itself from other, pre-existing elements of the industry category. An identity for a new line of bottled water should help convey that it is bottled water — but should not remind consumers of some other specific kind of bottled water that's already on the market. In other words, a design needs to express its own visual identity.

111.     During the concept phase we developed a number of different concepts that could potentially solve our challenges. We intended these concepts to have distinctive looks and feels and express their own visual language (or "have their own identities"), while still fitting into (or "being relevant to") the market, industry, and environment.

### i.   Inspiration Exploration

112.  We began the concept-development process by creating an "Icon Inspiration" deck comprised of images of signage, icons, and labels that are already in use in retail stores, in the context of cigarettes, or in other areas of society.  As is the norm, we assembled our "inspiration deck" from research online using Google to find warning and informational signs as well as famous logos. We searched

58

for warning type signs and informational signs, in order to compare
them. We found sites that showed the actual icons or examples of
signage. As we compiled the Icon Inspiration deck, we included both
signage, icons, and labels that are similar (for example, information
signs) and dissimilar (such as warning signs) to our design's purpose.
The designs and styles of these signs, icons, and labels provided useful
context during later phases of our design work in which we developed
a style and design. Identifying these already-existing signs, icons, and
labels also helped us determine what *not* to replicate or emulate.

1. *Warning and Anti-Smoking Signs Compared
to Informational Signs.*

113.     As our launching point, we reviewed some existing
warning signs. We began with the Surgeon General's Warning
concerning smoking, which appears on Page 4 in the Icon
Inspiration Deck, DOJ_POS_GB_000193.  (I have since observed
that one of the images on this page was actually a dust jacket for a
book relating to the Surgeon General's warning.) Here, we
observed the warning's strong bold font and bold lines. Its text
explicitly uses the word "warning" in the all-caps introductory
phrase, "SURGEON GENERAL'S WARNING," and the Surgeon
General is well known as a trusted and credible source of
information. We also observed that the warnings text uses word
capitalization (in which every word is capitalized). We also saw
that the white field against a colored background on POS signs,
both for offset pieces and when placed on a display set, combined
with the use of black type against that white field, was effective in
helping the Surgeon General's warning break away from the
clutter of the display set as much as possible given its small size.
Those elements also help the Surgeon General's warning stand out

in other store settings where POS signage is posted, both inside and outside the store environment. The white field helps the Surgeon General's warning separate from the multiple color schemes used in such cluttered environments.

114.      An important part of the context of any communication regarding cigarettes is anti-smoking campaigns, so we included designs and imagery from such campaigns on page 19 of the Icon Inspiration deck. Some of the campaigns use colors that can grab attention and provide the sense of a warning.

115.      We also observed warning and danger signs outside of those concerning cigarettes in order to identify commonalities across that signage category. As depicted on page 5 of the Icon Inspiration deck, these signs often communicated a "warning" message through the use of red coloring, bolded and capitalized text, and imagery overlaid with an "Ø" symbol. As shown on page 6 of the Icon Inspiration deck, other signs communicated a "warning" message through the use of yellow coloring, as well as icons, imagery, and even text in some cases, that provided direction or warned of something to look out for. Pages 7 and 8 of the Icon Inspiration deck provide additional examples of warning and danger signs that use yellow and red coloring to communicate a "warning" message.

116.      Preventative traffic signs, as shown at page 7 of the Icon Inspiration Deck, are another category of warning signs, although they also have some characteristics of informational signs. This kind of sign customarily uses a diamond or similar shape, with a yellow background, and conveys the traffic condition or hazard with black or sometimes red content and a large icon. We chose to avoid the look and feel of preventative traffic signs because the

purpose of the corrective statements is not to prevent consumers from doing anything, such as purchasing cigarettes, initiating smoking, or coming into retail stores that display the statements.

117.    In addition to warning and danger signs, we observed informational signs. Informational signs simply communicate information to the reader; they provide information, but do not warn or otherwise alert the reader to danger. Page 10 of the Icon Inspiration deck includes examples of informational signs that use icons to communicate information. Informational signs include signs that communicate handicap accessibility, as well as the presence of food, fuel, Wi-Fi, prescription medications, lodging, and hospitals. These signs often use a subdued blue color and bold icons to communicate information to readers without signaling a warning.

118.    Page 11 of the Icon Inspiration Deck depicts informational labels that provide nutritional and supplement facts that are placed on consumer goods packaging/food products. The execution

## Supplement Facts

Serving Size 1 Capsule

| Amount Per Capsule | % Daily Value |
|---|---|
| Calories  20 | |
| Calories from Fat  20 | |
| Total Fat  2 g | 3%• |
| Saturated Fat  0.5 g | 3%• |
| Polyunsaturated Fat  1 g | † |
| Monounsaturated Fat  0.5 g | † |
| Vitamin A  4250 IU | 85% |
| Vitamin D  425 IU | 106% |
| Omega-3 fatty acids  0.5 g | † |

• Percent Daily Values are based on a 2,000 calorie diet.
† Daily Value not established.

Ingredients: Cod liver oil, gelatin, water, and glycerin.

## Nutrition Facts

Serving Size 1 ounce    Servings in bag 4

| Amount Per Serving | | |
|---|---|---|
| Calories 155 | Calories from Fat 93 | |
| | | % Daily Value* |
| Total Fat  11g | | 16% |
| Saturated Fat  3g | | 15% |
| Trans Fat | | |
| Cholesterol  0mg | | 0% |
| Sodium  148mg | | 6% |
| Total Carbohydrate  14g | | 5% |
| Dietary Fiber  1g | | 5% |
| Sugars  1g | | |
| Protein  2g | | |
| Vitamin A  0% | • Vitamin C | 9% |
| Calcium  1% | • Iron | 3% |

* Percent Daily Values are based on a 2,000 calorie diet. Your daily values may be higher or lower depending on your calorie needs.

of these labels is simple, clean and clear, using black and white and readable fonts.

119.    Our audit identified several ways in which the design of warning signs differs from the design of informational signs and labels. In a warning sign, the design elements come together using big, bold fonts, often in all capital letters, and using a palette of bright red, yellow, and sometimes orange colors. By contrast, the design elements in informational signs and labels come together in a different way, namely, using neutral fonts that enhance readability, often with icons indicating the subject-matter of the information, employing an informational tone that is less urgent than a warning, and using a color palette that includes blue and white or (for food labels) black and white.

120.    Informational signs are akin to communications used in awareness marketing (marketing to generate awareness, as opposed to sales). Awareness campaigns employ a softer, less flashy informational tone, as opposed to a harder sales message. For example, the internet security company Symantec (by Norton) created an awareness campaign called "Every click matters" about cyber criminals and internet security. The awareness campaign's immediate purpose wasn't pushing sales of Norton's computer-security services and products but rather making consumers aware of internet security issues they needed to be aware of and protect themselves from. The campaign was created by Norton, and of course had their logo at the end, but unlike a marketing campaign, this was not a direct sale or call to action for one of their products or online services—in contrast to its digital marketing campaigns, which used banner ads to make offers of discounts and rebates for their products and services.

121.     Informational and awareness signs both have a softer tone than warning signs. The main difference between informational and awareness signs is that awareness signs usually encourage people to go to a website or other source where they can learn more, whereas an informational sign provides all of the information that is to be communicated on the sign itself, without referring people to an outside source. We took inspiration from these characteristics of both informational and awareness marketing.

*2.   Icons, Visuals and Emojis With Meaning.*

122.     After observing warning and informational signs, we wanted to review icons/visuals with meaning. An icon or visual with meaning can elicit an emotion, communicate an idea or concept, or both. Sometimes a visual may have a hidden meaning that needs further explanation through other signs or marketing areas.

123.     An example of a visual with meaning is the logo for Unilever, a consumer goods company, that appears on page 13 of the Icon Inspiration Deck. The Unilever logo itself is composed of 25 different icons, all of which have their own meanings but which, combined together in the shape of the letter "U," are intended to create one overarching meaning for the Unilever brand.

124.     In addition to the Unilever logo, we looked at emoji icons, shown on page 14 of the Icon Inspiration deck, each of which is intended to evoke a certain feeling. Each emoji's meaning is easily understood and directly relates to the emoji's content—that is, what it depicts visually. For example, a "grinning face" emoji is commonly understood to communicate some variation of general happiness, joy, or pleasure.

125.    We also considered icons that began as industry-specific and have become more broadly recognized over time, such as those icons depicted on page 15 of the Icon Inspiration deck. These icons all have specific meanings within the context of internet security. For example, although a bug is an insect, it is generally understood that, in the context of internet security, the bug icon refers to antivirus software. Similarly, although a fire image could be suggestive of a campground outside the context of internet security, within it the fire icon is generally understood to mean firewall. Although these icons have been used mostly in the internet security space, they have become more widely-known over time outside that space as some non-internet-security brands have used similar images for their products and marketing.

126.    We also reviewed the icons depicted on page 16 of the Icon Inspiration Deck, which are examples of well-recognized social media/internet icons. These icons are associated with more widely-known brands, such as Facebook, Twitter, Pinterest, and Internet Explorer. These visual icons can, by themselves, trigger brand recognition (similarly to, for example, the Nike swoosh symbol). Applying this concept to our current assignment, one of our thoughts was to create an image that is recognizable so, when people see it, they know we are referring to the truthful corrective statements.

127.    We also reviewed an image that appears on page 21 of the Icon Inspiration deck depicting iconic logos. (Logos are always symbolic, but they do not have to be abstract symbols; many famous logos are based on monograms, like IBM and UPS, or words, like FedEx, where the design hides an arrow between the last two letters—see paragraph 169 below.) Although it is perhaps

debatable as to whether these 10 logos are the "10 most iconic logos of all-time" as stated in the image, they nonetheless are well-recognized logos. These logos demonstrate that imagery can develop meaning and that meaning can be communicated via imagery such as logos or icons.

### 3. Straightforward Icons.

128. On page 17 of the Icon Inspiration deck, we explored different icon sets. The icons in these sets are more straightforward and basic; most of them are actually symbols depicting specific things such as check marks, time-clocks, hearts, magnifying glasses, and stars. These icons demonstrate that sometimes a simple design approach can convey the intended meaning directly and effectively.

### 4. Decision on Direction and Methods.

129. After reviewing the various signage, icons, logos, and labels we identified during the icon inspiration stage of our design concept phase, we determined which methods of approach and style we wanted to pursue and use as a direction for our assignment. We decided to base our design on informational signs focusing more on the messaging than the visual. The method would be to focus on the font style and color to find the solution to our design challenge, and to make sure our concepts would "relate" both to the corrective statement purposes and to the cigarette/tobacco product category. We also were looking to create an appealing but simple mark as we did not want anything too complicated due to the wide differences in the sizes in which the logo or mark would be displayed (within large and small corrective-statement signs). We also wanted to avoid a graphic that would be too complicated and hard to tell what it was against all the other visual clutter from multiple products and display signs.

### ii.   Mood Board Exploration

130.     Once we decided to base our design on informational signs, we transitioned into the "mood board" stage, in which we developed an overall stylistic approach to take as we developed our design concepts.

131.     A mood board is a tool that helps designers find the right direction for designs and create a solid foundation for the experience they want to create. It is a collection of textures and images related to design and used as a reference point.

132.     Our mood board exploration was intended to identify visuals that related not just to the corrective statements, but also to other brands, as well as visuals with a particular look we wanted to replicate in one way or another. We considered visuals based on their colors, font styles, or identity markers from logos or other signature design elements. We expected our ideas for the project's look and feel to evolve from and begin taking shape with our mood board work. The mood board would provide a jumping-off point for our design concepts.

133.     As part of our mood board exploration, we also explored fonts (or, more precisely, "font families"; for my purposes here, they can also be called "typefaces"; see page 4 of our mood board). Fonts convey a message even before an individual reads the words. They can be broken into two large groups, serif and non-serif. "Serif" typefaces have small decorative ornaments at the ends of some of the strokes that make up the letters. "Non-serif" fonts do not contain these decorative features. Bold, modern serif fonts have an authoritative, trustworthy character. Non-serif fonts have a clean, modern, and approachable character.

66

134.    Our mood board exploration also considered logo iconography (see page 5 of our mood board). Logo iconography adds a modern flair to a company name or product. More modern brands that have stayed relevant over time have leaned toward flat, two-dimensional icons as of late.

135.    With our discovery and research, creative brief, Icon Inspiration deck, and earlier portions of mood board deck in mind, we were prepared to begin design exploratory work. Like many graphic artists, we often begin with a few lines on the screen and begin moving them around: What if they are horizontal? Or vertical? What happens if they intersect each other? What if they are parallel? What if they are parallel, but instead of being lined up, they cascade from one to the next? What happens if all the lines are thick? What if they have different weights, some thick and others thin? What if we move the lines so they intersect each other again, but this time, at a different angle than before? (We are also good freehand artists, and sometimes it seems right to use representational images at the very start. The creative part of being a good graphic designer involves a lot more than just moving line segments around on a computer screen.)



136.     This work eventually brought us to a modern take on the asterisk. The overall concept of the asterisk appealed to us. An asterisk in the body text typically means that there is more information to be read or learned about, that there is something more to be informed of.

137.     Our mood board work also experimented with possible design treatments such as use of various colors in the asterisk. Originally we played with using different colors for the different statement topics, but we realized this would be too colorful, as there are more than enough usages of color on the current cigarette displays, and would also make the asterisk have five spokes, which seemed like too many. Our mood board work also led us to consider different angles and overall sizes for the icon in relation to the copy and the overall design size, some with a larger



icon like this:

68

And some with a smaller icon compared to the text, like this:



### iii.   Creation and Evaluation of Concepts

*1. Creating and evaluating further concepts for a visual identity and icon for a color design*

138.       After we completed all of our findings, research and groundwork, we began creating and evaluating further concepts. For this part of the work, we created three visual/iconic concepts that could communicate truthful information to consumers about the major cigarette manufacturers' products. For the third of these three concepts, we used the asterisk symbol from the mood board. But first we developed two new approaches to consider as concepts:

69

### a. Concept 1: The Information Symbol.

139.         Our "Concept 1" proposed modifying an existing symbol, the "i", which is known as the information symbol. Here, through this design, the three major cigarette manufacturers would communicate truthful "information" about their products. Taking the "i" information symbol and altering it to fit the cigarette category would give it more significant meaning in its intended context. We altered the "i" information symbol so that, while it still looked like the "i," it simultaneously also looked like a cigarette:



This altered version of the "i" information symbol would help viewers recognize that information was being communicated and that the information being communicated was related to the cigarette industry, prompting viewers to look at the text accompanying the symbol. Over time, the symbol could also develop meaning in itself, and a consumer to whom the symbol's meaning had been communicated would recognize it on signage at the point-of-sale and potentially look for nearby information about cigarettes.

b.   Concept 2: Statement Category
Icons.

140.       Our "Concept 2" proposed the creation of an icon for each
of the five categories of corrective statements. In other words, we
explored the idea of creating imagery not just for the corrective
statements as whole, but for each of the five categories of
corrective statements individually. We developed icons that related
to the five categories of corrective statements as follows:



(1) Adverse Health Effects of Smoking: For this category of
corrective statements, we created the "heart icon with
heartbeat monitor" icon. Given the widespread usage of heart
and heartbeat symbols in interpersonal communication and
marketing, the heart and heartbeat monitor are very familiar
and in context of the cigarette category would be related to the
health effects of smoking.

(2) Addictiveness of Smoking and Nicotine: For this category of
corrective statements, we created a "fishing hook" icon that
represented getting "hooked" to the addictiveness of smoking
and nicotine.

(3) Lack of Significant Health Benefit from Smoking "Low Tar,"
"Light," "Ultra Light," "Mild," and "Natural" Cigarettes: For
this category of corrective statements, we created a "lungs" icon

to show cigarettes' negative effect on health and the location of a supposed reduction in harm that low tar cigarettes, promised, but never delivered. People think of smoking's negative effects on the lungs and how that affects breathing.

(4) Manipulation of Cigarette Design and Composition to Ensure Optimum Nicotine Delivery: For this category of corrective statements, we created the "frequency" icon, which simulates adjusting levels and, in this case, represents manipulation. We used the frequency slider to represent how cigarette manufacturers have manipulated the level of nicotine delivery in their cigarettes.

(5) Adverse Health Effects of Exposure to Secondhand Smoke: For this category of corrective statements, we created a simple icon that looks like an end of a cigarette with smoke coming out of it. The smoke coming out of the end of the cigarette represents both smoke inhaled by the smoker and secondhand smoke, and the use of two lines to depict that smoke reinforces that it includes secondhand smoke (that a second person (or more) is exposed to the smoke).

### c.   Concept 3: The Asterisk.

141.     As mentioned earlier, we used the asterisk concept from our mood board exploration as our "Concept 3." This concept was a modern take on the asterisk. The asterisk symbol is traditionally used as a reference mark, footnote symbol, or other indication that signals to a reader or viewer that there is more information to learn, usually nearby. For the corrective statements' execution to help cigarette manufacturers communicate truthful information about their products, we want viewers not only to notice the

statements, but to read them — and to learn more by reading the other corrective statements as well.



142.     The asterisk icon is also well suited to our specific case of having to deal with small areas where some or all of the statements' text would not fit. In those areas, the cigarette marketing materials would just display the icon of the asterisk, and not also the text of the corrective statements. Consumers seeing asterisk-only signs would look for and associate it with visually related material and information, thus reinforcing other POS signage of similar style design – which, in our case, will be the larger signs that have both the asterisk icon and adjacent statement text – so readers would link the asterisk to the corrective statements.

143.     In reviewing our mood board asterisk concept, we chose to keep a modern color schemes to help the asterisk concept stand out from the clutter in the POP environment. Modern colors are generally non-primary colors, and tend to be brighter than older colors, due to past printing difficulties that more recent technology

has overcome. Non-primary color hues are more modern, because print advertising traditionally tended toward primary colors. The modern colors are useful for our purposes because they tend to stand out against the background of the traditional color palette customarily used in cigarette marketing.

144. After developing these three concepts—the information symbol, the statement category icons, and the asterisk—we evaluated them, referring to our discovery and creative brief to make sure they solved the problem that was brought to us for this project. We also started to think about each concept and how it could evolve further to "relate to" the retail cigarette category and corrective-statement topic more closely. It was important that readers related our design to the cigarette category and that is what the factual statements relate to as well. It was an objective for consumers to be able to tell, even at a glance, that the statements are not just another sign in the store, but that they "relate to" cigarettes in the retail environment.

145. We also considered to the level of difficulty in implementing each concept through to the execution phase. While we believed all three concepts would work and could be executed, we needed to narrow them down and select one final concept to go forward to the design phase.

146. Concept 1 (Information Symbol) was a strong design concept, but we ultimately determined that our stylized version of the "i" information symbol looked so much like a cigarette that it no longer bore a close enough resemblance to the actual information symbol with the circle around it. While we could have altered the concept further, we also felt having it look too much like a cigarette would tend to make readers think it originated

from one of the cigarette companies on their own accord. We felt if consumers thought the statements came directly from a cigarette manufacturer acting on its own, it could undercut important values from the Creative Brief, such as being "informative," "trustworthy," "straightforward," and "objective."

147.     Concept 2 (statement category icons) would have been especially difficult to implement and execute, primarily because it would have required five different designs. While we also would have further refined each of the icons for each of the categories, we were not sure this quintupled amount of effort would have a corresponding payoff.

148.     Concept 3 (the asterisk) was our top design concept. It achieved all of the goals we wanted. It was a strong icon that had a meaning and purpose. It was able to be executed across the deliverables. In addition, the asterisk concept would seem more like an informational sign, and not like a warning. And we felt we could make improvements in the design phase to better relate it to the tobacco category and cigarettes in particular, and to make it work better as a standalone image.

149.     Concept 3, the asterisk, was the best concept to move forward to the design phase.

2.   *Creating and evaluating concepts for an accelerated black and white corrective-statement design*

150.     The work just described explains how we created and evaluated additional concepts for a visual identity and icon that would be used as part of our ultimate color design proposal. That process mirrored certain aspects of what we had done earlier in the accelerated work that led to the black and white corrective

statement design. While that earlier work was accelerated, it still provides a helpful comparison and contrast to the full design process that led to the color design and style guide we are recommending.

151.     First, after the listen and learn phase and the discovery and research phase, the earlier accelerated design process skipped the creative brief phase. Our creative-brief discussion and its resulting strategy approach, including the visual identity strategy, came only after we had completed the early design.

152.     Second (and in part because we had not had those creative brief discussions), the early accelerated design did not seek to develop an icon or mark. Instead, we moved promptly into developing a design for the corrective statement text.

153.     Third, the early design process included only limited concept work. We did not prepare inspiration decks or mood boards; and we prepared only two concepts. Based upon our POP store visits during our discovery and research phase, both concepts featured a bold black panel adjoining a larger white panel framed with a heavy black border. The stark black-and-white look would separate both these designs from all the other clusters of colors used on cigarette set displays.

The first of these positioned the Preamble on the left, using white type on a black background, and the factual statement on the right. For the

76

factual statement, we used Impact Regular, a heavy typeface with tightly compressed lettering:



154.    We believed this design would succeed in communicating the truthful information in the corrective statements. The design has a gripping look and feel, and its distinctive typeface would give the statements a personality. But it also appeared to us that this concept would visually "read" as a warning.

155.    Our other early concept design also laid the Preamble out in white type on a bold black field. We laid the factual statement out in black type on a white field below the Preamble field, and we set all text in one of the most commonly-used typefaces, Helvetica:

156.      Like the other monochrome design, this black-and-white design would also pierce through the riot of color on retail cigarette set displays.

### E.      Design phase

157.      In accord with widely-accepted and respected practices in graphic design, the design phase involves refining the final chosen concept and determining all final design parameters, including icon or logo design, colors, placement, and layout of visual elements within the overall design. Visual elements can include lines, shapes, shades of colors, and direction – such as horizontal or vertical or angles and rotated areas. For a design that includes text, designers must also decide upon such things as fonts (also called typefaces), font colors, font sizes, line heights, vertical spacing, justification, capitalization, alignment, and the use of effects such as bold, underline, italic, or outline.

158.      In the design phase, designers test and work within the environments dictated by the assignment to determine how the design will be perceived and perform. Designers determine whether the design works and makes sense based on the client's objectives. The design phase is when designers think through all the "what if's" and circumstances of where the design could live.

159.      It is customary for a design to go through several iterations during the design phase. During this phase, designers explore various uses and formats of the design in a software representation of the world, also called a "conceptual world," to confirm that the design will fit the various sizes and shapes of the signs, and that it should work in theory with the hardware. We will explore different iterations of the artwork such as tints of

colors, sizing, and spacing of elements, as well as overall uses of
the art, to be sure it is adaptable for the design's various types of
uses and needs. We want to see how changing the artwork size can
have negative or positive effects. We also want to see whether
differently colored versions of the same art have different effects
on viewers. Sometimes the smallest tweaks to an image can make
it go from good to great.

160.     This phase also includes examining how the design should
translate into the environment. This is important because, while
an image may look good on a blank page or computer screen, it
may not look as good when superimposed on top of a photo of its
intended environment, due to surrounding images, colors,
distractions or content.

161.     Following a common practice in graphic design, we
conducted testing at the end of the design phase, first using
sketches and 2D mocks of the design, and then printed out
physical components of the design for 3D testing. Graphic
designers commonly use these types of testing to determine
whether a design will convey what was intended, and to see how it
will appear in its intended context.

162.     As discussed below, we followed each of these steps in the
design phase of this project.

### i.   The framework – shape of the sign

163.     In the first part of the design phase, we focused on the
shape of the sign. Although many signs are rectangular, some are
not; for example, traffic signs that warn about road conditions and
hazards frequently use a diamond shape, and school crossing signs
are five-sided and resemble the outline of a simple school. Stop

signs use a distinctive eight-sided format. Yield signs use an upside-down triangle format.

164.     For on-set pieces, Clip Strip Corp. considered whether requiring unusual shapes would help grab consumers' attention or otherwise help the cigarette manufacturers convey truthful information about their products more effectively. Unusual shapes can provide some advantages in certain situations. And although we knew from our environmental audit that almost all marketing material mounted on cigarette set displays is rectangular, unusually-shaped signs would not reduce the storage space available for ready access by sales clerks. This is because hinged display mountings let set-display signs be lifted up, so that sales clerks can access product stored behind the signs. This functionality is used for many marketing signs that are mounted on set displays now, and would be just as true if the corrective-statement signs were shaped like a diamond or some other unusual shape.

165.     But we realized that if unusually-shaped signs were required on set fixtures, they would partially cover up the faces of the cigarette packages closest to the sign. A diamond-shaped sign, for example, would inevitably cover up some cigarette packages at a diagonal. Displays of cigarette packages and cartons are a powerful marketing tool; that is why cigarette manufacturers and retailers prominently display them in front of customers at checkout. We are aware that retailers are concerned that their sales could be hurt if they couldn't display as many cigarette packages and cartons to customers as they do now. To reduce this potential burden on retailers, we decided to recommend that the set signage use standard rectangle designs (both for the set signs

80

that carry the factual messages, and the smaller asterisk-only set signs).

166.    There are some other benefits to keeping our design framed in a contained box/rectangle shape. This will help conform the court-ordered signs into the existing POP areas, which are typically also rectangular. Figuring out calculations and how to implement a fixed-percentage display-sign rule into POP areas would have been a bit less easy if we had recommended circles or custom shapes.

167.    We also had to consider the amount of various text in each of the factual messages. Some of the messages are quite text-heavy. If all that text had to be worked into a circle, triangle, diamond or other unusual shape, it would be more difficult to fit all the information so that it was visually balanced and read properly, based on line breaks forced by the different borders of the shapes. An unusual shape also would have likely required center-aligned long text sentences, which are not as readable as justified ones.

### ii.    Designing for the category and attribution

168.    Once the asterisk mark was chosen as the final concept, we focused on the final design of the mark and how to best design it for our use. We also needed to make sure it was unique enough within our space and category (cigarettes/tobacco industry). We looked at other logo marks/icons using an asterisk and made sure ours was differentiated and relevant to our market.

169.    We then proceeded to refine the asterisk mark to fit the colors and fonts we selected in the concept phase at the same time we worked to ensure the design would feel relevant to the

cigarette/tobacco category and would work alongside the corrective statements.

170.      Our asterisk icon is custom made, with some subtle and abstract graphic design intentions, much like the arrow in the FedEx logo. First off, the FedEx logo is rather famous for the optical illusion hidden within it. Seeing it the first time requires looking closely, but the E and the X are carefully placed to create negative space that cleverly hides a small arrow. This arrow serves



to symbolize FedEx's speed and accuracy. There is also an important meaning in the colors used for the "Ex." FedEx uses



different colors for the "Ex" to differentiate among different parts of the company. As an example, an orange "Ex" stands for FedEx Express, while a red "Ex" stands for FedEx Freight. In this way FedEx is able to cleverly separate its individual businesses from within the whole of FedEx. So, as can be seen, FedEx has managed to pack quite a bit of information and symbolism into a clean and simple logo.

171.     We initially developed the asterisk with the purpose of getting noticed amid cigarette marketing. This goal led us to use vibrant colors to promote visibility among customary cigarette marketing. One of the considerations we thought of was how to better "attribute" or connect the icon to our category (cigarettes/tobacco industry). To make the asterisk more than a reference mark (as discussed in the Concept Phase section above), the Design Phase developed the asterisk to contain a graphic representation of two cigarettes. To develop this design, we started with a rectangle in the dimensions of a cigarette, and tried several designs until we settled upon a design using contrasting colors on two of the arms or "spokes" of the asterisk (at "ten o'clock" and



"two o'clock") to signify the filter and non-filter sections of two cigarettes.

### iii.   Asterisk colors

172.      We placed the asterisk on a black background to enhance its visibility and make the icon more easily recognizable. This revised design achieved our goal of relating the icon to the category of the corrective statement messaging: cigarettes and tobacco. Given the association between the icon and the cigarette category, it would be easier for people who saw the icon to latch onto it and understand it because the icon can create an association with cigarettes in the viewer's mind. By communicating to consumers that this is a message about cigarettes, the icon assists the cigarette companies in communicating truthful information about their products to consumers.

173.      In selecting colors, we aimed to communicate that the corrective statement information is true and to make the statements easily digestible.

174.      We decided to limit the number of colors to further reduce the risk of getting lost in the clutter of all of the cigarette brands' packaging and marketing. During the mood board and concept phase, our original asterisk concept utilized 4 different colors, not even counting whatever background design color the asterisk icon would be laid on top of. We made the design decision to limit the asterisk icon to 2 colors, aqua blue and magenta. The blue is a more modern blue color and is easier on the eye compared to the bold colors of reds, oranges, or yellows, which are commonly used in warnings. The modern blue is a departure from the primary blue and typical navy blue colors that were most commonly used in marketing for many decades (due to past limitations in ink

technology that can now be overcome with more recent printing and ink innovations). The brighter, vibrant color is what defines this blue as more modern. The subtle use of magenta allows for the cigarette element in the icon to pop and  attract a user's eye. Our use of bright colors and of similar tonality that complement each other likewise helps create an eye-catching look. In addition, using colors markedly different from those common in warnings also achieves our goal of reflecting an informational purpose, and not a warning.

### iv.    Remaining visual elements

175.    So far within the design phase, we had decided that the shape of the design should be rectangular (rather than circular or a customized shape), and we had further developed the asterisk icon (by designing two of the asterisk spokes to look like cigarettes, in order to design for the category; and by determining the asterisk colors, in part to reinforce the design for the category).

176.    The next step in our design methodology was to determine how to place the statement text and the icon within the rectangular design, the so-called "design container," and to determine what color background to lay the text on top of and what colors to use for the text itself. In doing so, we remained focused on fulfilling the Court's aim by helping the corrective statements get consumer attention and communicate effectively. For the text placement and font colors, we again prioritized the readability/legibility of the statements.

177.    The first consideration was whether the design should give equal primacy to the Preamble text and to the factual statement text. We felt that, ultimately, the most important part of the signs is the actual text of the corrective statement

information. In this respect, the corrective statements resemble awareness marketing, in that the substantive message is the focus. We determined that our design should therefore draw more attention to the factual statement text than to the Preamble text. The start of the Preamble ("A federal court has ordered ….") is the same for every statement, and if that was more of the focus, then readers would start to think the message was just repeating on every sign, and they would not continue to read other corrective statements in store environments.

178. The black and white choice for the statement text again was based on our earlier inspiration and the concept of "the message is there in black and white" – it's a true statement here to read.

179. We decided to also leverage our original thought process (from our original sprint concept of the black and white box) about the black and white theory, but reverse it by designing white type over black background. The black background would stand out from all the other clusters of colors used by the covered cigarette brands and the marketing display (onset or offset), and the white type would "pop" even more, to allow the messages to be even more visible to consumers, and allow the statements to communicate the truthful information they were intended to.  Plus, if we used a primary color that was close to one of the cigarettes brands' marketing colors, it could be perceived that the statements were part of or relative to that brand only. In contrast, the black box with white text will help the corrective statements effectively break through the clutter in their environment.

180. One of our other observations was that, most of the set displays/power walls were comprised of black shelving and walls,

although some had lighter materials that provided a cleaner vibrant look. The black background would work well for both options, allowing the statements to be seen and not blend in to the rest of the set display. Furthermore, the white type stands out from the black background, making it easier to read.

181.     This way when customers view the icon, whether it is with the statement or not, they will relate the image to being part of truthful statements about the cigarette/tobacco industry and also now the asterisk means there is more information to be consumed.

182.     Given that one of our primary design goals is conveying that the corrective statements provide truthful information to consumers, we thought of the common adage, "It is right there in black and white." So, what better color choice than black and white? Another primary reason supporting this color choice was our design goal of having the corrective statements break through the clutter. When looking at the POS marketing and cigarette products, there are various uses of colors and graphics. Thus, using color for the corrective statements would ultimately look cluttered and would blend into the surrounding display, rendering the statements not readable or clear enough. Plus, if we used a primary color that was close to one of the cigarettes brands' marketing colors, it could be perceived that the statements were part of or relative to that brand only. In contrast, the black box with white text would help the corrective statements effectively break through the clutter in their environment.

### v.    Typography and font style

#### 1.  Fonts and weights

183.    As mentioned in the "Mood Board" discussion above, the fonts that are used for any text in a design are highly important; they help convey a message even before the statement is read. There are two statements within the statement area: The Preamble and the factual statement.

184.    Bold and modern serif fonts convey authority and a trustworthy character. For the factual statements, we chose Tisa Pro as a more contemporary serif font that is very legible at all sizes and iterations (bold, regular, semi-bold, italic). It resembles other popular serif fonts such as Garamond and Bodoni. Tisa Pro was one of only seven font families recognized in the 2007 TDC (Type Directors Club) Typeface Design Competition. As Linotype's "Font News" explains, Tisa Pro offers "a more dynamic, softer" take on nineteenth-century wood-cut slab serif fonts, and provides "a warm and gentle appearance" that is particularly effective for corporate communications. https://www.linotype.com/8145/ff-tisa.html.

185.    We chose a different font for the Preamble for the same reason we set the two text elements on different colored backgrounds: to reinforce that the text elements convey different kinds of information. We selected Helvetica, a standardized non-serif font, across all applications. This is an easy to read font even at smaller sizes. https://www.vistaprint.com/hub/design-decoded-top-12-easy-read-fonts.

186.  We chose bold fonts for both the factual statements and the preambles. To help their message be visible and clear, we chose more weighted (bolder) fonts. We also chose a bolder font for the

factual statements because white type on black background can
sometimes bleed into the background during printing, thus making
the text seem less thick.

### 2. *Size and spacing*

187.        With regard to the size and spacing of text, both generally
and in this case, viewing distance is important. The sizing of the
fonts used had to be flexible due to various sizes of POS materials
and the distances from which they will be viewed.

188.        To ensure legibility and eliminate the possibility that the
statements will be small and unreadable, we developed a system
for how the relationships of the font sizes work with the various
sizes and viewing distances. We used published information on
viewing distances and conducted our own tests in-house to test
legibility of fonts at various viewing distances. We built a life size
mock up with printouts of the containers. We then measured off
the distances from the display and tested with several people who
had different levels of eyesight to see if the distances and font size
we determined was accurate and realistic.

189.        The vertical spacing between lines of type is called
"leading" (pronounced "ledding"). For both the factual statements
and the preambles, we are specifying that the leading should be
between 1.25 and 1.5 times greater than the font size. (Because
the Preamble font size is always smaller than the factual
statement font size, its leading will always be less in absolute
terms.) These leading specifications are based on best practices. If
the leading is too tight (less space), then the font will look
cluttered, big, and clunky, and as a result, become less readable as
words would seem to butt up against each other. On the other
hand, if there is too much leading, the sentence, blurb, or phrase

would not appear as one message or flow well as a grouping. However, we allow here for some adjustment in setting the leading between 1.25 and 1.5 times font size, to help fit and proportion the factual statements and the preambles. Here is a link providing an example of guidelines around leading: https://99designs.com/blog/tips/6-tips-line-spacing-typography/.

### 3. Capitalization

190.    Graphic designers have three main options for capitalization. The option that is used most often for body text is "sentence capitalization," which capitalizes just proper nouns and the first word of each sentence. The second major option, "word capitalization," capitalizes every word, no matter whether it is a proper noun, and no matter whether it is at the start of a sentence. The third major option is all capitals. Many warnings are set in all capitals. The Surgeon General's health warnings begin with all capitals for the phrase, "SURGEON GENERAL'S WARNING," and then use



Word Capitalization for the rest of their text.

191.    We chose sentence capitalization for the factual statements for several reasons. First, they use a larger font size than the Preamble, in order to give them the most emphasis

among the corrective container elements. Given the factual statements' size, using more capitalization would have made them a bit harder to read. In addition, we wanted to avoid using word capitalization or all capitals for the factual statements to further distinguish them from warnings, and to instead give them an informational tone.

192.         We chose to use all capitals for the Preamble text for several reasons. First, we wanted to make sure that, even though the Preamble uses a smaller font size than the factual statement, it can still be read at the various sizes and viewing distances. Other capitalization options would be harder to read because the Preamble is fairly long. Second, we chose all capitals to communicate the importance of the Preamble's message that the factual statement is required by a federal court. We felt that using sentence capitalization or even word capitalization would make it lose some of its emphasis. Lastly, because our design choice for the Preamble uses black text set on the aqua-blue background color, we felt the Preamble would benefit from larger letter sizes to increase legibility against the colored background.

*4.   Text justification*

193.         For this project, we decided to use flush-left justification with a ragged right for the factual statement, and center justification for Preamble. We did this because the factual statement copy varies in length a great deal from one statement to another, and centering lines in factual statements with 3, 4, or even more lines of text is cumbersome, difficult, and problematic. The lines would break at different lengths, and because they would be centered under each other, every line would be ragged on both the left and the right, which would make the text much harder to

read. Left justification for the factual statements also ensures that there is consistent symmetry between the icon and the statement copy.

194.    By contrast, the length of the Preambles does not vary as much as the factual statements, and we didn't want the factual statement copy and the Preamble to look like one big block of text, since that would make the overall corrective statement harder to read. Because the Preambles lay out at two lines of text, they can be centered without the problems that occur when 3, 4, or more lines of text are centered above one another. We also chose to use center justification for the Preamble to help the visual separation between the two blocks of text and put different emphases on them.

### vi.    Style guide rules and criteria

195.    Having settled on a design for the corrective statements and icon, we needed to create all of the rules and criteria for the style guide that would provide instructions on how to implement the design. Drafting the style guide required developing clear and understandable steps to create a design and also to implement it into various uses.  The guide provides rules and criteria for how colors, fonts, spacing and scaling should be implemented.  The guide's ultimate objective is to provide rules, descriptions, examples and requirements to ensure the consistency of the design and its implementation.

196.    The style guide is meant to ensure that the implementation of the design satisfies several important goals. These include: consistency of presentations no matter their size or location in the retail environment; consistency of presentations on

each of the marketing components (set displays, posters, etc.); and legibility of the statements' text.

197.      One of the main functions of a style guide is to show how to use, and also how *not to use*, the design. This gives the designers using the guide (who are typically visual people) both descriptions and illustrations showing what the proper uses should be.  There are many improper uses that can negatively affect the integrity of the design, and we use style guides to show how to avoid these uses to ensure that the design is used correctly and consistently.

198.      The guide starts by outlining the content that is being used, the elements that make up the design, and the locations where the design will be used. This is where the corrective container is introduced and illustrated to show what the overall design looks like.  Then the design is broken down into its components to clarify how it is constructed and define each element. For example, we define the factual statement, the preamble, and the icon with illustrations.  This breakdown shows how the icon is created, placed and sized.  We chose the icon's size to ensure that it would be comprehensible at the expected viewing distances and large enough to have presence, but not so large that it would overpower the corrective statements themselves.  We placed the icon to the left of the text, because viewers are accustomed to seeing explanatory text to the right of an asterisk, as in a footnote.  Next, the text of the various factual statements is provided with instructions and illustrations detailing how the different statements are organized in sets of topics and statements. These are displayed in English, and then Spanish.

199.      The guide instructs users how to determine a manufacturer's territory on a set display, and provides instructions

on how to implement the design in the marketing areas and fixtures. The style guide provides many examples showing designs integrated into both set and offset displays, clarifying common uses for these areas.

200.     We worked to provide consistent instructions for the design's usage and prevent any manipulation that would affect the overall message or legibility of the statements. The designs are also scalable, and so they are able to accommodate the infinite amount of sizes needed in the retail market place.  Using the guidelines and existing sizes, a designer can easily customize a standard container size and adjust its proportions to better fit the intended layout.  With the range of sizes provided and the rules and criteria in the guide, designers can develop containers suitable for their uses.

201.     Our team used the research conducted through store visits to determine what kinds of fixtures and signage were being used. Looking at standard sizes of signage and fixtures allowed us to tailor portions of the style guide to include instructions specific to these staples of cigarette marketing at POP.  There are always some exceptions to the rules, but we worked to make sure they weren't overlooked or misused.  By calling out these items, such as the irregular shaped displays that may not allow for our standard proportions, we allow for exceptions to the design for these instances. Also, pricing on its own was not part of the manufacturers' marketing areas and therefore we provided specific rules for those, with examples to illustrate them.

202.     Having provided a breakdown of the elements in the design and content used, we provide instructions showing how the corrective container is constructed from a design perspective,

explaining and illustrating the rules for how it is built and comes together. We include calculations and spacing rules to improper treatments that would be detrimental to the integrity, look, or feel of the design.

203.        Then we provide instructions on the fonts chosen for the text, as well as capitalization.  Because of the various sizes of statements, from 1 line of copy to 5 lines of copy per statement in a container of the same size, we made a decision to allow different font sizes while keeping the overall proportions in check. This avoids having statements that would not fit appropriately at the same size across the board.  If we had used the same size font for all statements, then the largest statement of 5 lines would dictate a small font size, in order to fit all 5 lines of content into the container. However, using that same font size would have made the 1 line statement appear to be very small relative to the rest of the design's content. Therefore we developed special values to keep the text proportionate with other design elements in the box, and ensure consistent spacing at various statement lengths.

204.        In addition to size of statements in the container, we needed to make sure the statements were legible in various uses of sizes and distances, because not all displays are viewed at the same distance by a customer.  The farther the customer is from the display, the larger the font needs to be to be legible. To achieve proper font size to ensure legibility, we integrated a viewing distance chart for the containers that shows what the minimum font size for each component at various viewing distances is.  For instances where smaller font sizes would occur, the style guide defaults to instructions to just use an icon on its own. (In a very small subset of cases, the size of the display or distance viewed at

will not allow for a large enough font, so the style guide provides that the icon on its own will represent the corrective statement content.)

205.    As with fonts, it is important that the style guide clearly specify the colors to be used, to make sure that implementations of the design are consistent in all uses in various media. In the guide, we specify what colors must be used for the various elements of the design.

206.    We also added specifications governing the "clearance space" and "clearance area" of the design. A clearance space is the amount of space between a design and nearby visual elements that can distract a viewer or make the design feel incomplete or out of place.  Specifying a clearance space is important because it creates necessary visual space to preserve legibility and separation, so two designs do not blend together and become lost and indecipherable. A clearance area ensures that a design is not placed too close to the edges, which would create a risk that the design would be cut off during printing, or appear too close to other types of graphics that would detract from the design.

207.    We determined that the clearance amounts should be set at 0.25 inches for corrective statements embedded within most signs, but 1 inch for signs over 1,000 square inches.

208.    We settled upon this rule after working through a number of alternatives. We began with one fairly common rule: Whatever is the font size for the body text of a statement, the capital X of that size would determine how close to the edge, graphic elements, text, or branding the corrective container could be placed.

96



**Design with clearance space specified as "1 X-height"**

209.     This is a common rule because it scales to different sizes automatically; larger implementations of a given design will have larger fonts and thus larger X heights, and thus, proportionately larger clearance spaces. In this case, though, our testing work (described at the end of the design phase) swiftly brought out that the varying lengths of the factual statements caused drastically different X heights—making it impossible to use as a consistent guide.  The corrective statements with the five word factual statements would have an extremely large X height, while the longer 20 and 45 word statements would have much smaller X heights, which would give the different corrective statements differing appearances.



**Design with clearance space specified as " 0.25″ "**

210.     We were also aware that any retailers that created their own offset POS signs for the covered brands would need to adhere to the style guide rules. Providing a uniform, single clearance rule that applies to all 18 statements for a given dimension would help further reduce any burdens on retailers. For this reason, we adopted a second option: A highly simplified "set" of pre-defined clearance spaces, with 0.25" for most sizes, but 1 full inch for the larger corrective containers.

211.     All else being equal, having gradations between 0.25″ and 1 full inch would be better from a visual standpoint. But simplifying according to the clear and simple clearance rule above is easier to implement, and our overall judgment is that the effect is acceptable for the payoff of reducing potential burdens on retailers.

212.     One of the biggest subjects to explain in the style guide is how all this comes together for the manufacturers on their marketing areas. We break down how the 25% rule is calculated, and then its application with regard to spacing, sizing, and various

uses.  With these instructions, we provide many examples of how the 25% rules is executed with the design into commonly used displays and marketing POS for both set and offset displays. We have added content to these examples showing how the examples were calculated, which rules applied, and why.

213.        Accompanying the style guide, we are providing a demonstrative called the "Set Display Territory Algorithm." It shows one way that manufacturers can determine how to satisfy their 25% requirement on a set display. The algorithm begins by asking for the store and manufacturer to be identified; has the user specify the overall dimensions of the set display fixture; add various rectangles to provide the contours of their manufacturer's territory on the set display; and then provides a choice of sign dimensions that will add up to 25% while minimizing the number of signs. The user may if they wish drag and drop the signs onto a schematic representing the set display. Finally, the algorithm recommends which specific factual statements to display. The user repeats the exercise for each set display fixture at the store where their manufacturer has territory; and likewise for each offset POS piece in the store that advertises one of their manufacturer's covered cigarette brands.

214.        The algorithm is distinctive in that, during the next use, it keeps track of the specific factual statements recommended to User 1. The factual statements it recommends that User 2, representing Manufacturer 2, display at the same store, are programmed to avoid duplication with the statements displayed by Manufacturer 1 at the same store.

215.        The style guide also requires each manufacturer to display the factual statements equally and randomly at each store,

and prohibits each manufacturer from duplicating factual statements at a single store (unless it displays more than 18 signs at that store). The "Set Display Territory Algorithm" provides one way manufacturers can keep track of this if they wish; and shows how they can, if they wish, coordinate across manufacturers to ensure that one manufacturer does not duplicate a factual statement posted by another manufacturer. By prohibiting each manufacturer from duplicating factual statements, any duplication that occurs will be the result of the manufacturers' choosing not to coordinate with one another through the "Set Display Territory Algorithm" or any other mechanism; and the result of a second manufacturer's choosing to duplicate the same factual statement that another manufacturer has already posted at the same store. In such instances, duplication will be the result of the two manufacturers' decision not to coordinate to avoid duplication, and of the second manufacturer's deciding to duplicate the display of a factual message that is already being displayed at the same store. Any such duplication will be the result of the manufacturers' decisions, not the result of being compelled by the style guide.

216.     In order to add an extra layer of ease and reliability, we have provided hundreds of easy to use artwork files for many display sizes that are commonly used to display cigarette marketing at POS, with prefabricated, compliant final artwork with each of the corrective statements added to 25% of the area. While there are infinite possible sizes, we are providing a range of sizes that are most commonly used, and that will be easily scaled to fit any of the various types of sizes needed. Working from finalized art files eliminates work for the design team creating the cigarette marketing materials, and allows them to be more

efficient in placement and proper use for their needs and design challenges, saving them time and effort. (It's like getting prepared meals delivered, instead of having to figure out the ingredients and put it all together yourself.)  The print-ready artwork enables designers to just drag and drop the art into the format or design they need. With all of the standard sizes provided, they can simply choose a size and be done, or they can easily scale a provided size to fit specific calculated areas or layout constraints. This eliminates any effort that might otherwise be needed to determine spacing, sizing and which fonts are needed, as it is all there in the art files. The style guide explains how these various sizes and uses can be implemented, and provides rules to make sure that, if you do need to alter the artwork, it complies with the provided guidelines.

### vii.   Testing the style guide's performance and how the design is perceived in the environment

217.     I described earlier the 2D software representation or "conceptual world" testing we performed. (As discussed below, during the Execution phase, several conceptual designs from this Design phase were checked to see how they worked in the 3D environment of real life.) Several times during the development process, toward the end of the design phase, and continuing until and after the style guide was near completion, we ran a series of "test and use cases" to be sure the design and style guide were communicating what we wanted.  Graphic designers commonly use these types of testing to determine whether a design will convey what was intended, and to see how it will appear in its intended context. Our testing accomplished these objectives, let us observe

the design at various viewing distances and assess its legibility, and led to additional insights and improvements.

218.     We began the testing to finalize the design by making digital renderings/mockups of the corrective statements so we can get a visual on our computers (not at life size) to see how this could look overall with sizing and proportions and balance. These mockups of the corrective containers retouched into pictures of set and offset displays gave us a visual reference of how a finished produced piece would look in the retail environment. From here we could refine spacing and colors, further examine legibility, and assess how well the design stands out in the midst of other cigarette POS marketing. This led to changes in how the borders and clearance areas work, particularly the clearance of the corrective container area, and resulted in improvements that prevent the design from blending in with, and getting lost in, cigarette marketing. This testing also confirmed that our theories about font legibility in the design's intended environment held water.

219.     Later, we printed out life-sized mockups. These tests focused on viewing distance and font legibility, as well as how the design would live in the POS ecosystem, and whether it did what it was intended: cut through the clutter, and communicate the corrective statements in a readable way. Our team printed out mock printouts of the statements to scale (representing various sizes) to see how they would replicate and look at the various viewing distances. We set up a wall and a mock printed display with standard statement sizes and measured off on the floor the various distances to see if various test subjects with different levels of eye sight could in fact read the statements. These tests

included corrective statements with long, five-line statements, and those with shorter statements, because the design had to accommodate both. We had younger and older test subjects in our office and employees who wear glasses and others who don't. All were in fact able to clearly read the statement copy at distances corresponding to those at which customers would encounter the signs in stores.

220.     After the design was finalized, we used in-house employees who had no knowledge of the project to conduct repeated tests. We wanted to see if operators could create the statement container with the necessary artwork and text laid out correctly on their own. During these tests we also met as a team to ask questions to see if the operator's understanding of the style guide was what we intended. Based on the operator's responses, we either edited or deleted rules as appropriate to help make the style guide clearer and more efficient.

221.     For one of our tests with employees who were not part of the project and had no familiarity with the assignment, we used a production artist because production artists are some of the cigarette-manufacturer workers who will likely be assigned to work with the style guide. Rather than create style guides or digital artwork files from scratch, production artists generally receive design artwork files that other designers have created, and then get them finalized and formatted for production. This often requires edits, final touches, and execution work. We had the production artist read through the style guide to see if he understood its contents and their purpose. The production artist was then given dimensions of a full set display and the measurements of one specific manufacturer's area on the set

display that would be his responsibility (such as the R.J. Reynolds Tobacco area or the Philip Morris USA area). We then left him on his own to figure out what size corrective statements he needed and to see if he could create the statement and then implement it on the set display by following the rules of the style guide. At this point, we did not yet have standard size artwork files with pre-fabricated artwork that we now make available, so the production artist had to create everything from scratch. As a result of this testing, we added a definition for total visible area, and tightened up several style guide rules, including adding a set of rules regarding how to build the corrective statement containers and place them in set and off-set displays.

222.     It was during one of our preliminary run-throughs of the guide that we determined it would be more efficient and less difficult if we created standard sizes for the set displays to choose from and calculate with.

223.     In another test of the off-set displays, we had a production artist create an off-set poster of 24x36 size and place a statement box on it following the rules. Based on the results from this testing, we improved rules regarding required clearance space for the corrective containers.

224.     In a later test use case, we utilized one of our traffic managers, whose job is to arrange and organize a project. Our traffic manager knew about retail environments generally, but had no particular familiarity with the cigarette industry or this project. We had the traffic manager act as a cigarette company field representative who puts up retail POS marketing materials on behalf of one of the cigarette manufacturers. Our reasoning was that, if the traffic managers could figure out and successfully use

the style guide, we were confident that cigarette field representatives, who knew how set designs worked, would be able to understand and follow the style guide. This test was also to make sure the style guide was clear from a non-designer perspective about the rules of sizing. The task we assigned our traffic manager was actually *more* difficult than a cigarette company field representative's task will be because we required him to create containers from scratch and put them on set displays, whereas we are providing print-ready artwork files with pre-built corrective containers. The traffic manager was able to successfully understand how to use the style guide, and it was due to this testing and quality control process that we learned we needed to tighten up the criteria around the rotation, spacing, and justification rules.

225.    Throughout the development and iterations of the style guide, we would regularly check back with our internal team to see if our rules made sense and if the guide in fact translated to the final desired outcomes. This testing process allowed us to keep consistency and accuracy in our style guide and ensure quality control across all of the determinations. In addition, this testing led to multiple refinements to the style guide, including improvements in describing how to lay out the factual statements within the containers; specifying how the corrective containers fit into set displays; clearance rules for offset displays to prevent the corrective statements from bleeding to the edges; instructions for the size and placement of the icon within the corrective container; rules on leading; and instructions for the distance between lines of the corrective statements, particularly for factual statements with three lines of text and those with five lines.

## F.      Execution and production phase

226.        The final phase of the design process is to prepare executions ready to go to print production. For POS designs, the key considerations are generally requirements from stores and from sign fabricators.

227.        Store considerations may include the size of the store and displays, layout of the displays, existing marketplace hardware to hang signage on set displays and power walls, and the ease of installation onto new and existing POS displays. A particularly important consideration in a style guide would be ensuring the use of appropriate stock so that the signage fits into the relevant sign frames and holders, and is thick enough to sustain its physical integrity and be visible.

228.        Manufacturer considerations include how the manufacturers will actually produce the physical pieces of signage. This includes ensuring that the specifications are in line with cost-efficient offset and digital printing capabilities. Manufacturer considerations also include production efficiencies, such as utilizing processes that are standard in the printing and production of signage in pertinent set and offset displays.

### i.    Sign shapes and dimensions

229.        Having researched the on-set and off-set sign dimensions most commonly used by cigarette manufacturers at POS, we created and are providing print-ready artwork files for these dimensions. The style guide also provides detailed instructions for generating compliant signage for any other dimensions that a cigarette manufacturer wishes.

230.     We took particular care to minimize any potential burden to retailers that might otherwise be caused by a non-standard on-set sign. To do so, we realized that the sign holder for these non-standard signs should include a hinge to provide retailers with easy access to cigarette packaging stored behind the signs on set displays. These components are small, plastic, and are stock products readily available. Their cost ranges from 2 cents to 10 cents each. When utilizing these sign holders, the cigarette manufacturers will normally need just one in order to hang any given sign. A really wide sign may need to use a second sign holder. A short (4 second) video file shows the product in action holding the sign and hinging it. *See* DOJ_POS_GB_004661.

231.     The style guide also ensures that the specifications use cost-efficient industry offset and digital printing capabilities. Signs with unusual shapes force printers to use a custom-made die, resulting in a "die cut" that forms the physical sign to the required shape. Specialized and customized shapes are often used in POS marketing for consumer packaged goods. However, for the reasons discussed in the "framework" section of the design phase above, the design here deliberately uses a rectangular corrective container, meaning that we have avoided the need (and associated expense) for specialized die cuts.

### ii.     Ink

232.     With respect to color, we decided on utilizing four color process, and not Pantones, to give cigarette manufacturers a simple standard in which to print the corrective statements. Four color process is a minimum standard when printing imagery, so it will not increase costs of manufacturing.

233.     Some style guides dictate using a distinctive ink color for in-store signage (and other marketing as well). We have avoided imposing this expense as well. Additional ink colors are often used to constitute, convey, and reflect a brand's identity. Style guides for in-store signage sometimes require using reflective ink coatings and specific Pantone colors for this purpose.

234.     A four-color process can be used to replicate every color to a close degree of approximation. But a fifth color gives brands a more distinct image that will stand out in their marketing environment. For example, Panasonic uses "Reflex Blue" as its unique color and requires its use on most of its marketing avenues. A combination of CMYK: 100, 72, 0, 0 makes a four color process near-equivalent of Reflex Blue—but this version will not be exact. Because the Reflex Blue color is central to and establishes Panasonic's brand identity, the Panasonic style guide requires using a specially made Reflex Blue ink, and thus requires a fifth ink in addition to four-color process.

235.     We considered a fifth color in the design. Having a fifth color would make the design further stand out and thus would assist the cigarette companies in communicating truthful information about their products. But, to reduce the cost and burden of printing, we decided to adhere to four color process, and the style guide's color palette specifies the relevant colors (Aqua Blue, Magenta, and Rich Black) with CMYK (cyan, magenta, yellow, black) levels, but not a fifth color.

236.     Reflective ink is printed on a piece after color inks are printed. It is used only on paper signs and is not necessary on plastic signs. It makes the surface shiny and mirror-like. If reflective ink is printed over the entire sign, it is called a flood

coat. Reflective ink may also be used only in certain spots on a piece, called a spot coat, targeting specific graphics (which, for this purpose, includes copy, type, images, artwork, etc.). Reflective inks have several advantages. Because they are bright and shiny, they draw attention to specific graphics. In addition, they also protect whatever they cover from action and environment. For example, they protect the sign from smudging and too much sunlight. Without this protection, color inks may fade much faster.

237.　　　All else being equal, we would have strongly recommended using a reflective ink on the entire sign as a flood coat; however, to be less burdensome, the style guide does not call for paper, stock, width, or reflective ink coatings. Instead, the style guide simply recommends the use of vinyl stock, which does not lend itself to smudging and fading nearly as easily as paper. In addition, we observe that the use of vinyl stock, in lieu of paper plus a fifth ink, will be even less expensive for the cigarette manufacturers.

### iii.　Stock and signage cover considerations

238.　　　"Stock" refers to the physical printed medium, normally either paper or a plastic substrate, such as vinyl. ("Paper" in this context includes all weights, from onion skin to office paper to cardboard.) A signage cover protects the printed sign beneath it from wear and tear and smudging. It is important for a style guide to dictate what type of stock is used, and what signage covers (if any) are to be used, in order for signs to be able to last the time frame intended and not degrade through what, in the marketing business, are known as "action" and "environment."

239.　　　"Action" includes the store operator grabbing the signage and moving the sign on its hinge in order to retrieve cigarette

packaging from behind the sign. Doing that thousands of times will have an effect on the signage. Thin stock can wear out or degrade, which diminishes the physical quality of the printed piece. Signage covers, such as clear acetate, work in conjunction with the stock quality to protect signs from wear and tear and smudging from such action.

240.      "Environment" refers to the risk that stock will warp. Paper tends to warp, especially when not inserted into a sign frame.

241.      The Style Guide recommends (although does not require) the use of plastic for on-set signs for several reasons. Using plastic avoids the need to use sign covers, which can be difficult to fit into some sign holders. Even when sign covers fit appropriately into sign frames, using a clear acetate cover is proportionately more expensive than simply printing the sign on plastic. (Cigarette manufacturers often do use clear acetate covers with paper signs because they leave the covers in place and rotate different signs periodically.) Using plastic also makes it unnecessary to use a reflective coating because plastic itself already protects the sign from smudging.

242.      By contrast, for off-set signage, it was apparent that no style guide specifications were needed for the stock thickness or substrate. This is because the 25% mandate is strictly for the signage displayed independently of the set display fixtures. The cigarette manufacturers will put the 25% Corrective Statement section onto the same substrate as the rest of the off-set sign.

110

### iv.    Hardware and installation

243.       To ease the burden of installation, a style guide should
consider utilizing existing store fixture equipment to accomplish
the goal. In such circumstances, if a style guide includes any stock
and sign coverage specifications, they must be chosen carefully to
work in concert with the relevant hardware. Where signage will be
displayed on existing sets or fixtures, it is best to use existing
hardware to attach the new signs. When existing hardware will
not work or is not appropriate, a style guide needs to identify
suitable hardware options to attach the new signs to the existing
display sets.

244.       Displays are built to store, merchandise, and market
cigarettes. Besides displaying and storing cigarette packaging,
display fixtures are designed to support hardware that holds signs
which can be hung from the very top of the display to the bottom.
Specialized hardware exists in the marketplace to hold sign types
such as header signs, flipper signs, channel/rail signs, and pricer
signs. While the print-ready artwork files we are providing focuses
on common off-set POS sign dimensions, it also includes artwork
for many of these standard set-display sign dimensions.

245.       As noted above, most style guides for consumer package
goods do not address hanging hardware at all, although style
guides prepared by chain stores for marketing pieces to be hung in
their own stores often will consider any specialized hanging
requirements for the set fixtures used in their own stores. To
reduce any potential burdens, our style guide specifically identifies
appropriate hanging hardware used in the current marketplace.

## VIII.   Two designs compared

246.  I am confident that both the black-and-white design my team created early and the color design that we created with the benefit of the full design process will help the cigarette manufacturers communicate truthful information to consumers about their products.

247.  The black and white design effectively and clearly communicates the statements with a clean simple look and feel and very easily digestible typography. Its bold clean design stands out from the clutter of color.  While it was subject to an abbreviated design process, that process benefited substantially from the listen and learn and discovery and research phases. It performed well in Seth Noar's single-session online survey, with results that reinforce that the design communicates effectively.  It even performed slightly better than the color design in this survey.  In light of all of this, I am confident that the black and white design communicates effectively.

A Federal Court has ordered Altria, R.J. Reynolds Tobacco, Lorillard, and Philip Morris USA to make this statement about designing cigarettes to enhance the delivery of nicotine.

### When you smoke, the nicotine actually changes the brain—that's why quitting is so hard.

248.  However, the black and white design can be construed as generic and not specific to anything; it can easily strike consumers as just more text on an already busy backdrop of store POS.

249.  The color design provides a much stronger visual identity, including a graphic icon that will create recognition over time, both reinforcing the design in its own context and also as a standalone. The subtle inclusion of cigarettes in the asterisk "spokes" helps relate the icon and the design to the retail cigarette category and complements the asterisk look which stands for learning more information. These characteristics give the icon meaning of its own before even reading the statements.  In addition, the icon alone can be used in smaller use cases that do not allow for large enough type to be used or legible therefore still allowing representation of the corrective statement with just the visual. The visual will be related to others in the same retail environment that have the corrective statements, which will indicate to consumers that the icon relates to the corrective statements. The color palette used is fresh and modern and still cuts through the clutter of the traditional colors of the tobacco brands. It has its own colors that establish its own identity amongst the brands. Also the color design does still incorporate the original concept of the black and white as the black acts as the primary color with the knock out copy popping off the background for clearly readable text.  On another note, we realized that many white backgrounds tend to get dirty and stained in stores over time, resulting in them looking dingy and less legible. The black background will show less of this and tend to look cleaner.

250.  The color design was also the product of an extensive methodology.  Its methodology was more extensive than the one used to develop the black and white design, and included all the steps described in this report, from listen and learn, to the creative brief – which was not used for the black and white design – through the design phase, as well as the addition of an execution phase.  The use of

all the elements of this methodology to craft the color design also provides additional assurance that the design communicates effectively.

251.   In addition, Seth Noar's online survey results indicate that the color design, like the black and white design, will effectively communicate to consumers.  While the black and white design results were slightly better than the color design, I do not view that slight difference as dispositive.  In my opinion, the icon and the cigarette-specific, informational nature of the color design enhance the color design's visual identity and will become increasingly important the longer consumers are exposed to the color design.  As a result, I would expect the color design to perform better with repeated viewings over time.  Seth Noar's single-session survey, which is helpful to confirm both designs' effectiveness at communicating, would not be expected to capture these types of long-term effects.

## IX.   Conclusions

252.     The style guide my design team and I prepared provides clear instructions to implement the corrective statements and corrective containers, and to use them in in-store marketing displays. The underlying design accomplishes a clean look and feel for transmitting the corrective statements' informational content, and is specifically crafted to fit in the cigarette marketing ecosystem where the statements are expected to be placed. While the design is created to attract a viewer's attention, we exercised great care throughout the design process to avoid anything that would be disruptive to the POS venue or to cigarette marketing. For example, while it would have been easier to attract attention to the corrective statements by incorporating starburst, circular, or

114

three-dimensional shapes, flashing lights, and in-your-face, pop-up or obtrusive signage, we created the corrective statement design to attract attention in a subtler way that is not disruptive to cigarette marketing or the retail environment, but rather tailored to transmit the informational content.

## A.     The design problem

253.     As mentioned above, a great creative brief has one primary purpose: to inspire the creative team to come up with the most brilliant and effective solution to the design problem. In this case, the design problem was to prevent and restrain future fraud and deception by the covered cigarette manufacturers. The core of this design problem was to develop and implement a corrective statement design through which cigarette manufacturers would reveal previously hidden truths about their products and communicate truthful information about their products to consumers. To do this effectively, the design would have to get consumers' attention, get them to notice and read the corrective statements, and communicate their content effectively. Another key aspect of the design problem was to minimize the burden of the corrective statement remedy on retailers.

254.     The design problem also included several things that the design was *not* intended to do, including: to be warnings; to be similar to the Surgeon General's warnings; to be anti-smoking messages; to be stop-smoking messages; to cure consumer misconceptions; to prevent consumer misinformation; to "inoculate" or "arm" consumers against future misinformation; to prevent future consumer deception; to safeguard consumers against future RICO violations; to make future RICO violations

unprofitable for the cigarette manufacturers; to reduce the cigarette manufacturers' incentive to market their products; or to suggest past wrongdoing or to punish or sanction past misconduct. Accordingly, it was part of our design work to consciously avoid these qualities and objectives that the court warned against.

255.     In addition, based on discussions with Department of Justice counsel, we determined that the design problem included designing the corrective statement design to be: informative; trustworthy; straightforward; objective; inclusive, in the sense that the information is meant to be for everyone to know; and balanced, in the sense of not being advocacy for or against something, but simply communicating truthful information.

## B.     Solving the design problem

256.     To create, refine, and finalize a design that solves this design problem, I used methods that are widely accepted in the graphic design industry—methods I have developed and refined during my 20 years of graphic design experience.

257.     Based upon my extensive experience and expertise in graphic design, my professional judgment is that the recommended style guide provides effective solutions to the design problem.

### i.     Communicating effectively to consumers about the manufacturers' products

253.     Every aspect of the design, including the colors, fonts, the different sections of the container, and the icon are crafted to work together to communicate, effectively and in a suitable informational manner, the content of the corrective statements, where they come from, and that they relate to the tobacco industry and cigarettes. The aqua blue, magenta, and

rich black colors provide a clean and modern look that will
help draw consumers' notice because of the color contrast
against the primary colors of the cigarette brands and the
visually cluttered retail display areas. The design succeeds in
being informative, straightforward, objective, inclusive and
balanced, and displays the information in a clean, legible font.
In the perception of the corrective statements' trustworthiness
is enhanced by the careful crafting of the design to avoid being
obtrusive or disruptive and the Preamble's explanation that
making the statement has been ordered by a Federal Court.

### ii. Revealing previously hidden truths about the manufacturers' products

258.    The design helps reveal previously hidden truth about
cigarettes by providing the language of the corrective statements
in a message that, by design, cuts through the clutter, is visible,
legible, and relates to the cigarette industry. This association is
emphasized by the fact that the message will always be displayed
on the actual cigarette displays and marketing.

### iii. Avoiding off-limits design purposes

259.    Beginning with our initial briefing onward and carrying
on all the way through the design process, we consciously avoided
wherever possible design choices that could result in the corrective
statements having characteristics that the Court indicated they
should not (while still fulfilling the purposes of communicating
clearly to consumers about the manufacturer's products and
revealing the previously hidden truths about the manufacturer's
products).

260.    At numerous points, we made specific design choices to avoid as much as possible having the design look like a warning. We made the factual messages—the previously hidden truths—the most prominent part of the design by making them larger and placing them above the Preamble. This makes people more likely to focus on the factual messages because the eye tends to go to the most prominent text, regardless of which order it is in the presentation. Because of the Preamble's wording, beginning with, "A Federal Court has ordered," we avoided giving prominence to the Preamble in order to avoid giving the impression of a warning. We also stayed away from the bright red and the orange colors that are often used to signify warnings, and the yellow colors that are used for preventative traffic signs, in favor of a very different palette using bright magenta and aqua blue. We also used sentence capitalization on the factual messages, and chose fonts and font sizes with the goal of legibility, as opposed to using all capitals or word capitalization, and to avoid using very bold, in-your-face fonts and font sizes that are often used in and are characteristic of warnings. These choices result in a design with an informational, unobtrusive, and transparent tone with softer, non-warning colors and visuals.

261.    Through similar design choices, we steered clear of designing the corrective statements as anti-smoking or stop-smoking messages.

262.    Likewise, throughout the design process, we avoided as much as possible design choices that we would have considered if one of the off-limits purposes had been assigned to us, including: curing consumer misconceptions; preventing consumer misinformation; arming or inoculating consumers against future

misinformation; preventing future consumer deception; safeguarding consumers against future RICO violations; and making future RICO violations unprofitable for the cigarette manufacturers.

263.     If we had been assigned such purposes, we would have considered many of the features commonly seen in warnings mentioned a few paragraphs above. In addition, we deliberately avoided disruptive design choices as overly intrusive, including: container shapes that would cut outside the typical rectangle area of cigarette set displays, such as starbursts, circles, or three-dimensional popup displays; standalone marketing executions; and in-your-face visuals that could resemble warning, stop-smoking, or anti-smoking messages.

### iv.   Minimizing potential burdens on retailers

264.     Multiple aspects of both the design and the implementation of the corrective statements serve to minimize the burden on retailers.

#### 1.   *Using design to minimize potential burdens.*

265.     The shape of the corrective statements module was developed as a rectangle that resembles the general shape of the most common cigarette marketing materials at POP, and is tailor-made to fit within them. While we could have designed the corrective statements for placement within an unusual shape that might more easily attract attention, we made the choice to use the rectangular presentation, which is a good fit for the generally square or rectangle-based cigarette marketing areas, both in the set and off-set areas. As a result, the design avoids both disturbing the look of the store and any problems caused by getting an unusual shape to fit into the POP environment.

266.     Likewise, we created the corrective statement design within this rectangle – including its colors, fonts, spacing, and clearances – to be a good fit with the aesthetic ecosystem of cigarette marketing, and to avoid disrupting the retailers' stores.

267.     In addition, our decision to use a standard four-color ink process, as opposed to a process requiring pantones, fluorescents, or other custom colors, reduces the burden on retailers because it makes it easier, simpler, and cheaper for retailers to produce signs containing the corrective statements.

### 2. Developing placement and implementation rules to reduce potential burdens on retailers

268.     The style guide calls for placing the corrective statements solely in areas of the retail environment that already contain cigarette marketing, either on the set display or else on off-set items that advertise, market, or promote one of the covered cigarette brands. Thus, the remedy we recommend does not require any additional space of the retailers or any freestanding display or other messaging sticking out at customers. In addition, we designed the on-set items to reduce the burden on retailers by devising them to be used with attachment devices that retailers already have or can get easily and cheaply.

269.     We also designed hundreds of print-ready digital artwork files containing the corrective statements for on-set items and common sign shapes, which will significantly reduce the burden on retailers with regard to any cigarette marketing materials that retailers generate themselves. In addition to providing this print-ready artwork for common sign shapes used by manufacturers and retailers, we supplied in the style guide examples and illustrations for unusual and irregularly-shaped signs, showing how the

120

corrective statement requirements can be satisfied with regard to them. These examples and illustrations include circles, die-cut signs, and shelf wobblers, also described as shelf talkers.

270.     In addition, we recommended that the signs containing the corrective statements be printed on 20mm white polypropylene vinyl stock in order to reduce the burden on retailers. This vinyl stock is a standard, inexpensive, and durable printing material, and its use makes placing plastic covers over the signs unnecessary, which reduces the cost to retailers, as well as any burdens relating to the signs' installation and removal. This recommendation provides retailers with an easy, cheap, and less burdensome path to compliance with the style guide.

### v.   Avoiding duplication

271.     The style guide goes further, though, also providing an algorithm to aid the cigarette manufacturers in avoiding duplication, and the algorithm also shows that it is quite feasible to avoid duplication and meet all of the other requirements of the style guide.

121

Signed under penalties of perjury this _7th_ day of October, 2020

Greg Brancaleone

# Greg Brancaleone

(201) 563.2988 • greg.brancaleone@gmail.com • Kinnelon, NJ 07405

## Account & Creative Director

*~ Account and Creative Director that provides strategic and creative solutions to managing accounts ~*

Resourceful and innovative leader in Agency and Client Services role with a Creative mind. High-level experience and background for creation and execution of integrated brand strategies, marketing and merchandising programs within multi-disciplinary verticals and channels for global brands. Maintains strong client relations for continued growth in accounts and revenue. Develops creative and manages design teams to ensure creative projects are on brand and message. Passionate about leveraging latest industry best practices and cutting-edge resources to maintain competitive edge within demanding markets.

### BACKGROUND/EXPERIENCES

**Clip Strip Corp.**                                                    **January 2014 – Present**
**Account Director/Art Director**

Develop and manage in-store marketing materials for various retailers and brands. Includes development from strategy, concepts, design, production and implementation. Create new and innovative designs for point of purchase materials.

- Develop inbound and outbound in-store marketing strategies from inception to execution.
- Assist brands and retailers in maximizing their consumer communications and merchandising strategies inside retail environments; making sure their brand, category and/or product is recognized and communicates the brand's messaging.
- Develop creative for new instore retail installations and translate brand guidelines from retailers to execute and manufacture creative on to new displays and product placements in stores.
- *Distinguished Clients:* Blistex, Reckitt Benckiser, Walmart, Kellogs, General Mills.

**Rhee Agency**                                                    **January 2018 – November 2019**
**Director of Accounts**

Lead agency accounts, present capabilities, and creative solutions to clients while allocating and managing the appropriate staff before and during the project. Drive global business strategy to ensure successful client engagements that deliver on corporate objectives.

- Oversee internal and external resources throughout the creative process and create pitches, proposals, and briefs for various new business and projects.
- Created multichannel marketing program for ADP global sales teams to market their offerings to.
- Developed packaging for Nest products based on using their style guides to create holiday packaging for their products to launch in retail stores for the holiday season
- Successfully executed creative and production on retail packaging and in store POP for national client throughout several retail locations and engineered product videos for global internet security products.
- Managing UX and UA design on various high-level web development projects.
- *Distinguished Clients:* Vera Wang, ADP, Nest, Total Defense, Ricoh Business Services, Alpha Wire, Olayan Group.

**Ballantine – Fairfield, NJ**                                        **January 2017 – October 2017**
**VP, Director of Client Services**

Customized unique brand strategies for current print / direct mail accounts of Ballantine and deployed innovative brand and brand messaging campaigns for startups, Plymouth Rock, ADP, and Meyer & Associates. Spearheaded a new brand and identity along with positioning and offerings for the organization.

- Directed new business development and key decisions for Agency along with day to day operations. Created new brand and messaging for Ballantine company consolidating print and digital services.
- Enhanced margins and profitability for Agency's existing clients by evaluating workflow, staffing, and implementing new process and workflow tools.
- Deployed new marketing automation program for National Insurance Company with 40% margins.
- Charged with presenting agency proficiencies, led pitches, and developed MSA's and scope for new account opportunities.
- Oversaw process to ensure financial goals were met, built revenue, delivered profits, controlled spend, and met / exceeded new business targets.
- Negotiated contracts and was tasked with integrating contract requirements with business operations.
- **Distinguished Clients:** Fresh Direct, ADP, BMW, Royal Caribbean, Plymouth Rock Insurance, Meyer & Associates Insurance, Monsanto, and Christopher Reeves Foundation.

# Greg A. Brancaleone

(201) 563.2988 • greg.brancaleone@gmail.com  • Kinnelon, NJ 07405 • Page 2 of 2

**RICG – New York, NY (Now Blue Kite Agency)**                    **November 2013 – January 2017**

***EVP, Director of Client Services***

Served as a key contributor for the acquisition / merger of previous Agency (Hero Media Group); transitioned high value clients and staff from NJ location to new NYC offices. Implemented new brand along with positioning and sales enablement materials for agency to increase revenue.

♦ Created new brand and identity for Tiger Direct business model after it was sold to PCM (PC Mall). Created in-store marketing materials for various clients of Tiger Direct to maximize store shelf reach, merchandising and marketing areas.

♦ Restructured / Rebranded Total Defense brand, packaging, and POP to be launched in major national retail chains.

♦ Directed new business efforts that generated $2 million / yr. in incremental revenue; growth included several tech-based companies acquired from relationships and lead gen programs.

♦ Oversaw and managed account, creative, and production teams to ensure SLA's were met by each department.

♦ Deployed and managed social media program for Invisible Glass (#1 auto glass retailer).

♦ **Distinguished Clients:** CA Technologies, ADP, Disney, Nickelodeon, FJC Securities, Prudential, Total Defense, Inc, Tiger Direct, Samsung Electronics, Invisible Glass, Hutzler, Untangle, and PC Pitstop.

**Hero Media Group – River Edge, NJ**                    **November 2010 – November 2013**

***EVP, Director of Client Services***

Built agency from eight staff members to 35; team included creative, account, print production, video / film, retail display, and digital marketing resources. Developed 10 new business accounts with cumulative revenue of $25M. Played a key role in creating award winning work across various tactics and channels including branding, social, point of purchase and digital.

♦ Developed branding, strategy and retail execution for various clients such as Total Defense, 16 Handles, GreenROKS, Invisible Glass, Lush Décor, Clip Strip Corp, Lola Products and Hutzler product launches. Inlcudes development and execution of brand guidelines and style guides.

♦ Engineered and managed new offerings in agency such as social media, Drupal platforms, SEO, and email marketing; collaborated with new agency partners to offer best solutions for client demands.

♦ Launched new mattress brand into Kohls stores, including in-store point of sale materials and displays. Developed the brand guidelines for how to market and message around mattress product.

♦ Awarded yearly scope for social media for Sharp USA, along with several other incremental digital marketing revenue opportunities to launch products and support sales and service.

♦ Successfully created exclusively owned office in Manila for global clientele, including graphic and digital marketing areas.

♦ **Distinguished Clients:** CA Technologies, Becton Dickinson, Total Defense, Inc, Sharp Electronics, Samsung Electronics, Hunter Douglas, Hackensack UMC, Clip Strip Corp, Lola Brand and 16 Handles.

**DraftFCB – New York, NY**                    **August 2001 – November 2010**

***VP Executive Business Manager***

Charged with managing top fortune 500 accounts, integrating marketing programs and leading agency in progressive direction with new offerings and processes. Served as the first person to launch new agency offering "direct to client"; expanded abilities from print to digital mediums.

♦ Increased email marketing open rates from 5% to 20% for B2B lead gen program and played a key role in new business pitches and developments for CA, Gevalia, HP, and Roche.

♦ Managed accounts profitability margins between 25-35% and developed workflows and rate cards for agency and clients.

♦ Cultivated offering from five to 45 people with resources ranging from creative, studio, production, and management.

♦ Designed and executed digital banner strategy for Actemra and Micardis; included scrolling feature for lengthy prescribing information.

♦ Developed new branding and messaging with partner agency for Computer Associates brand. Implemented brand for campaigns and in product interfaces. Created multichannel marketing programs supporting the brand message.

♦ Created flash product selector and logic for Roche brand to be used at tradeshow kiosk.

♦ Developed product packaging and in-store displays and POP for HP, CA, Kraft products and Canon consumer products.

♦ **Distinguished Clients:** Merck, Actemra, Roche, Micardis, CA (Computer Associates), Bank of America, AARP, Kraft, Citi, Hampton Inn, HP (*Hewlett-Packard), Mark.* (Division of Avon), Verizon, American Express, and AVIS.

# Greg A. Brancaleone

(201) 563.2988 • greg.brancaleone@gmail.com • Kinnelon, NJ 07405 • Page 2 of 2

---

## EDUCATION | AWARDS

**BACHELOR OF ARTS, GRAPHIC DESIGN, MORAVIAN COLLEGE**

**DMA ECHO AWARD** "USPS GOLDEN MAILBOX AWARD" FOR NON-PROFIT INTEGRATED MAIL CAMPAIGN
**NJ ADVERTISING CLUB AWARDS** "BEST OF BRANDING DEVELOPMENT" FOR TOTAL DEFENSE INC. | "BEST OF POINT OF SALE" FOR LUSH DÉCOR |
"BEST OF SOCIAL MEDIA CAMPAIGN" FOR SHARP ELECTRONICS ACHIEVERS | "BEST OF STATIONARY DESIGN" FOR LUSH DÉCOR "BEST OF UNSOLD
WORK, FOR ABSOLUT VODKA | "BEST OF WEBSITE DESIGN B2B" FOR SHARP ELECTRONICS AMBASSADOR PROGRAM
"BEST OF SHOW" FOR SOCIAL MEDIA CATEGORY OVERALL FOR SHARP ELECTRONICS

## CORE COMPETENCIES / AREAS OF EXPERTISE

**Branding • Digital Marketing • Point of Purchase • Merchandising • Website Development • Email Marketing • In-Store Marketing • Social
Media • Direct Mail • Neuromarketing • Video, TV & Radio • Marketing Automation • Content Marketing • Packaging • SEO • Act On •
Sitecore • Salesforce • Photoshop • InDesign • Quark • Magento • Illustrator • HTML • WordPress • Drupal • Global Accounts**

References Upon Request.