# Exhibit 2

Page 1

1              UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF COLUMBIA

2

3

4    UNITED STATES OF AMERICA,        )

                                      )

5                    Plaintiff,    )

                                      )

6           -vs-                  ) Civil Action No.

                                  )    99-CV-2496(PLF)

7    PHILIP MORRIS USA INC., et al.,)

                                      )

8                    Defendants.  )

9

10           Remotely held videotaped deposition of

11   GREG BRANCALEONE taken before CAROL CONNOLLY, CSR, CRR,

12   and Notary Public, pursuant to the Federal Rules of Civil

13   Procedure for the United States District Courts

14   pertaining to the taking of depositions, commencing at

15   10:03 a.m. Eastern Time on the 20th day of November,

16   A.D., 2020.

17

18

19

20

21

22

23

24

25

Page 2

```
 1            There were present at the taking of this
 2   deposition the following counsel:
 3            UNITED STATES DEPARTMENT OF JUSTICE by
             MR. JAMES NELSON (via Zoom)
 4            MR. ZACHARY DIETERT (via Zoom)
             MR. DANIEL K. CRANE-HIRSCH (via Zoom) and
 5            MR. ADAM LYONS
             P.O Box 386
 6            Washington, DC  20044-0386
             (202) 616-8242
 7            james.nelson2@usdoj.gov
             zachary.dietert@usdoj.gov
 8            daniel.crane-hirsch@usdoj.gov
             Adam.E.Lyons@usdoj.gov
 9
                  appeared on behalf of the Plaintiff;
10
11            ANDERSON & KREIGER, LLP by
             MR. SCOTT P. LEWIS (via Zoom)
12            50 Milk
             21st Floor
13            Boston, Massachusetts  02109
             (617) 621-6500
14            slewis@andersonkreiger.com
15                appeared on behalf of the Public Health
                 Plaintiff Intervenors;
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            JONES DAY by
              MR. MICHAEL A. CARVIN (via Zoom) and
 2            MR. JON G. HEINTZ (via Zoom)
              51 Louisiana Avenue, N.W.
 3            Washington, DC  20001
              (202) 879-3939
 4            macarvin@jonesday.com
              jheintz@jonesday.com
 5
                   appeared on behalf of Defendant
 6                 R.J. Reynolds Tobacco Company
                   (individually, as successor in
 7                 interest to Brown & Williamson
                   Tobacco Corporation, and as
 8                 successor to Lorillard Tobacco
                   Company)
 9
              WINSTON & STRAWN by
10            MS. KARALENA GUERRIERI (via Zoom)
              35 West Wacker Drive
11            Chicago, Illinois  60601
              (312) 558-5969
12            eguerrieri@winston.com
13                 appeared on behalf of Defendants
                   Altria Group, Inc. and Philip
14                 Morris USA, Inc.;
15            BAKER & HOSTETLER, LLP by
              MR. ROBERT J. BROOKHISER, JR. (via Zoom)
16            MS. ELIZABETH B. McCALLUM (via Zoom) and
              MS. CAREY BUSEN (via Zoom)
17            1050 Connecticut Avenue, N.W.
              Washington, DC  20036
18            (202) 861-1500
              rbrookhiser@bakerlaw.com
19            emccallum@bakerlaw.com
              cbusen@bakerlaw.com
20
                   appeared on behalf of Post-Judgment
21                 Parties Regarding Remedies ITG
                   Brands, LLC, Commonwealth Brands,
22                 Inc, and Commonwealth-Altadis, Inc.;
23
24
25
```

Page 4

```
 1          STEPTOE & JOHNSON, LLP by
            MS. LAUREN GOLDSCHMIDT (via Zoom)
 2          1330 Connecticut Avenue, N.W.
            Washington, DC  20036
 3          (202) 429-3000
            Mbaratz@steptoe.com
 4          lgoldschmidt@steptoe.com
 5               appeared on behalf of National
                 Association of Convenience Stores;
 6
 7          MR. THOMAS A. BRIANT (via Zoom)
            17595 Kenwood Trail
 8          Minneapolis, Minnesota  55044
            (952) 683-9270
 9          info@natocentral.org
10               appeared on behalf of National
                 Association of Tobacco Outlets, Inc.
11
12   ALSO PRESENT:
13          Mr. Kevin Duncan, Videographer
14          Mr. Robert Brasch, Technical Concierge
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                      I N D E X
 2          REMOTELY HELD VIDEOTAPED DEPOSITION OF
 3                    GREG BRANCALEONE
 4                 TAKEN November 20, 2020
 5

 6   EXAMINATION BY                            PAGE
 7   Mr. Carvin                                 8
 8   Ms. Busen                                 198
 9                   - - - - - - - -
10

11                   EXHIBITS MARKED
12                                             PAGE
13   Exhibit 1         Report of Greg J.        10
                       Brancaleone
14
     Exhibit 2         Original POS guidelines  12
15
     Exhibit 3         Corrected POS guidelines 13
16

17

18

19

20

21

22

23

24

25
```

Page 66

1   else.

2           Is that right?

3       A   That's correct.

4       Q   Okay.  So you didn't care whether the design

5   side effects went beyond interest or engagement?

6       A   That was not the purpose of our assignment, no.

7       Q   Okay.  And specifically you were not concerned

8   with whether the consumers retain the information so it

9   would have the side effect of arming them or inoculating

10  them against future deceptions, right?

11      A   That's right.

12      Q   So you never examined the question of whether

13  the consumers reading the corrective statements retained

14  the information in a way that armed or inoculated them

15  against future deceptions by defendants, correct?

16      A   That's correct.

17      Q   Okay.  And so you didn't examine that question

18  in surveys or focus groups or any other context, correct?

19      A   No, we did not.

20      Q   Okay.  So if defendants sought in the -- seek

21  in the future to deceive or mislead consumers about the

22  topics addressed in the corrective statements, your

23  design is not designed to prevent or impair them from

24  deceiving those consumers, right?

25          MR. CRANE-HIRSCH:  Objection.

Page 67

1       THE WITNESS:  Repeat that again, please.

2       MR. CARVIN:  Q  If the defendants sought in the

3  future to deceive or mislead consumers about the topics

4  that are addressed in the corrective statements, your

5  design was not intended to prevent or impair them from

6  deceiving consumers on those topics, correct?

7       A    Yes.  Our design was not intended to do so,

8  again, I stated what our design was intended to do.

9       Q    Right.  The only purpose or goal of your design

10  was requiring the manufacturers of the covered brand to

11  communicate truthful information to consumers about

12  cigarettes to prevent and restrain the manufacturers from

13  making fraudulent claims, half truths, or omissions,

14  correct?

15       A    Again, you're making that sound like that was

16  the main goal.  No, that was not the main goal.  I

17  repeated myself many times what the main goal was.  It

18  was simply communicate truthful information.  That was

19  one of the other factors we considered and were aware of.

20       Q    All right.  Okay.  Please go to the second

21  sentence, if your paragraph 9 -- 97, okay.  It begins:

22  For example, the first two discussion prompts elicited

23  that the assignment aim was as before for cigarette

24  manufacturers covered in this case, covered brands, to

25  communicate truthful information to consumers about

Page 68

1    cigarettes to prevent and restrain the manufacturers from

2    making fraudulent claims, half truths, or omissions.

3    Right, that was the only aim of these things you

4    designed, correct?

5         A    Uh-huh.

6         Q    And A few sentences down you say:  After

7    discussing the best way to state the idea, the DOJ

8    lawyers agreed that the product or service positioning

9    statement was:  Quote, these statements prevent and

10   restrain future fraud and deception by communicating

11   truthful information about cigarettes to consumers.

12            Is that right?

13        A    That's right.

14        Q    Okay.  How does communicating truthful

15   information about cigarettes prevent and restrain the

16   manufacturers from making deceitful and fraudulent

17   statements?

18        MR. CRANE-HIRSCH:  Objection.

19        THE WITNESS:  Again, these are part of discussions.

20   This is information we took in.  We believe again that

21   the statements themselves are -- because they're truthful

22   information they are preventing and restraining based on

23   how they're approved by the court.  And, again, it was

24   part of our design process but not the ultimate goal.

25   These were conversations that you're reading.  This part

Page 69

```
 1   of the document is talking about discussions that we had.

 2        MR. CARVIN:  Q  Now I'm confused.  Your positioning

 3   statement is the ultimate goal of what you're trying to

 4   accomplish, right?

 5        A    Yes.

 6        Q    Okay.  And you opine that these statements

 7   prevent and restrain future fraud and deception by

 8   communicating truthful information about cigarettes to

 9   consumers, right?

10        A    Yes.

11        Q    That was your positioning statement, that was

12   your main goal in these designs, correct?

13        A    That was the positioning, yes.  The main goal

14   was simply to provide truthful information about

15   cigarettes to consumers, not always provide or preventing

16   the space.  That was part of these discussions and part

17   of the positioning statement that we were discussing in

18   these meetings.

19        Q    Well, the positioning statement was the

20   statements would prevent and restrain future fraud and

21   deception, right?

22        A    Right, that's what the statements do, not

23   the --

24        Q    Right.  That's what the statements do.  If you

25   want to draw that distinction.
```

1          How does communicating -- how does

2     communicating truthful information about cigarettes

3     prevent and restrain defendants from making deceptive and

4     fraudulent statements in the future?

5          MR. CRANE-HIRSCH:  Objection.

6          THE WITNESS:  The information these statements

7     provide is ultimately achieving these goals.

8          MR. CARVIN:  Q   Well, if they don't prevent future

9     -- if they don't arm and inoculate consumers against

10    future deception, why would it prevent the defendants

11    from making those statements in the future since they're

12    just as likely to succeed since the consumers have been

13    not armed or inoculated against their deception?

14         MR. CRANE-HIRSCH:  Objection.  Instruct the witness

15    not to answer based on discussions with DOJ about legal

16    strategy and the legal efficacy of the prevent restrain

17    purpose.

18         MR. CARVIN:  I assume you're doing that for comical

19    purposes.  He's written a 112-page report on what his

20    design accomplishes, and he says at least 15 times it

21    prevents and restrains, that's his opinion.  And I'm

22    asking him for the basis for that opinion.

23         MR. CRANE-HIRSCH:  Mr. Carver, would you direct me

24    in the report where he states that the design prevents

25    and restrains?

1      MR. CARVIN:  Really?  Okay.  I can read the sentence

2   I read you 2 minutes ago.  The position statement was,

3   these statements prevent and restrain future fraud and

4   deception.  I'm asking you how they can possibly prevent

5   future fraud and deception if they haven't armed or

6   inoculated consumers against those deceptions.

7      MR. CRANE-HIRSCH:  Yes.  The problem with the past

8   passage you just read is what it's describing is the

9   positioning statement that DOJ provided to Clip Strip.

10  That is not a statement they are expressing an opinion

11  about what the design did.  So you told me that the

12  expert report expresses an opinion about the efficacy of

13  the design as preventing and restraining future

14  misconduct, that surprises me.  But you said that it

15  occurred 15 times.  If you can direct me to one, please

16  do.

17      MR. CARVIN:  Again, if you're telling me that he has

18  no idea whether or not these corrective statements

19  prevent and restrain future fraud, that will be fine, but

20  you know that throughout his report he took his

21  directions on the positioning statement from you and

22  tried to accomplish it.  So it is absolutely part of his

23  expert opinion that he accomplished the goals of the

24  positioning statement.  I can take you back to his

25  conclusions where he said precisely that.

1      Q    So I'm going to ask him again whether or not

2  how communicating truthful information about cigarettes

3  prevents and restrains if consumers have not been armed

4  and inoculated against those future deceptions.

5      MR. CRANE-HIRSCH:  Object.  Instruct the witness not

6  to answer.

7      MR. CARVIN:  I am stunned.  You are telling me he

8  can't give an opinion on the basis for his expert opinion

9  that they prevent and restrain?

10     MR. CRANE-HIRSCH:  You haven't shown us any -- I'm

11 not sure --

12     MR. CARVIN:  I don't know what you mean I haven't

13 showed him that.  This is his positioning statement.

14 That is what he says he does, and this is what he tries

15 to accomplish, but I'm -- Are you really instructing the

16 witness not to answer whether or not his statements and

17 his design prevent and restrain future fraud?

18     MR. CRANE-HIRSCH:  We know this is a legal

19 question --

20     MR. CARVIN:  No, it's not -- it's -- no, no, no,

21 don't -- don't -- don't -- don't -- don't coach the

22 witness.  Don't coach the witness.  I'm trying to prevent

23 Mr. Crane-Hirsch from coaching the witness so I just want

24 to --

25     MR. CRANE-HIRSCH:  He's not going to answer your

Page 73

1    question.  The response to your question, Mr. Carvin,

2    about whether I am really instructing the witness not to

3    respond is that in 2009 the DC circuit held that in

4    telling the manufacturers to make truthful statements

5    about their product to consumers will prevent and

6    restrain the manufacturers from engaging in similar

7    misconduct.  This is a legal conclusion stated by the DC

8    Circuit Court of appeals.

9              This witness is not an attorney, this witness

10   has not expressed opinions on the workings of legal

11   causes and effect about such legal terms of art as

12   prevent and restrain under the racketeering statute.

13        MR. CARVIN:  All right.  I cannot believe you're

14   doing this.

15        Q    But let's go to paragraph 253 on page 114 of

16   your report.  You write, do you not, in paragraph 253:

17   As mentioned above, a great creative brief has one

18   primary purpose, to inspire the creative team to come up

19   with the most brilliant and effective solutions to design

20   problem.  In this case, the design problem was to prevent

21   and restrain future fraud and deception by the covered

22   cigarette manufacturers.  The core of this design problem

23   was to develop and implement a corrective statement

24   design through which cigarette manufacturers would reveal

25   previously hidden truths about their products and

1   communicate truthful information about their products to

2   consumers.

3          So, how does communicating truthful information

4   accomplish your brilliant and effective solution of

5   preventing and reframing future fraud and deception by

6   the manufacturers?

7       MR. CRANE-HIRSCH:  Objection.  Instruct the witness

8   not to answer concerning conversations with DOJ.

9       MR. CARVIN:  Q  Eliminate any conversations with DOJ

10  from your answer.

11      A    Do I answer?

12      Q    Yes.

13      MR. CRANE-HIRSCH:  If you know the answer.

14      THE WITNESS:  Again, the prevent and restrain is

15  based on the truthful statements themselves which we did

16  not develop.

17      MR. CARVIN:  Q   Right.  I'll ask you again.  How

18  did those truthful statements prevent and restrain future

19  fraud if they don't arm or inoculate consumers against

20  future fraud?

21      MR. CRANE-HIRSCH:  Objection.  Instruct the witness

22  not to answer.  This is a legal topic.  This is not an

23  attorney, Mr. Carvin.

24      MR. CARVIN:  He's offering an expert opinion.  Are

25  you telling me he can't answer his expert opinion on

Page 75

1  whether it accomplishes that?

2       MR. CRANE-HIRSCH:  I have instructed the witness not

3  to answer the most recent question.

4       MR. CARVIN:  I'm going to ask it again.

5       Q    You claim, do you not, you brilliantly and

6  effectively created a situation which was prevent and

7  restrain future fraud and deception, did you not?

8       MR. CRANE-HIRSCH:  Objection.

9       MR. CARVIN:  Q   Right?

10      A    Where do I say that exactly?

11      Q    253.

12      A    I didn't say -- Here it's not saying where

13  we're creating it.  Here is where the design problem was

14  we were trying to accomplish.

15      Q    And did you accomplish it?

16      A    Well, ultimately our goal --

17      MR. CRANE-HIRSCH:  Objection.

18      THE WITNESS:  Sorry.

19      MR. CARVIN:  Q  Did you accomplish it?

20      A    Ultimately our goal was accomplished because

21  our main goal purpose was to communicate truthful

22  information.

23      Q    Okay.  Well, the design problem was to prevent

24  and restrain future fraud and deception.  Did you

25  accomplish that design problem?

1        MR. CRANE-HIRSCH:  Objection.

2        THE WITNESS:  Again, yes, because that is -- that

3    design problem is also covered by the statements which we

4    did not come up with.

5        MR. CARVIN:  Q  Right.  And again, if the statements

6    themselves do not arm or inoculate consumers against

7    future deceptions, can you logically tell me wholly apart

8    from the law how in the world that would prevent and

9    restrain manufacturers from making such deceptions?

10       MR. CRANE-HIRSCH:  Objection.  Instruct the witness

11   not to answer.

12       MR. CARVIN:  We're going to go to the court on this.

13   You're telling me that he claims he's prevented and

14   restrained manufacturers from fraud but he can't answer

15   how that is accomplished without inoculating them against

16   consumer deception, and the basis for you instructing him

17   not to answer is?

18       MR. CRANE-HIRSCH:  You are mischaracterizing what

19   the expert report states.  The expert report explains

20   that the design problem as set by the court, relayed by

21   DOJ to Clip Strips was ultimately to serve the legal

22   purpose of preventing and restraining.  So the

23   instructions did include that phrase, the instructions

24   also included the information that the DC circuit has

25   stated that forcing the companies to provide truthful

 1   information about their products to consumers will

 2   prevent and restrain, but that is the established law of

 3   the case.  That legal information has been relayed to

 4   Clip Strip.  That is an assumption, and the assumption

 5   was provided by DOJ.

 6          The mechanism that the -- through which this

 7   legal defect comes about is through communicating

 8   truthful information about cigarettes to consumers.  And

 9   so as the sentence states, the core of this design

10   problem was to develop and implement a corrective state

11   design to its cigarette manufacturers would reveal

12   previously hidden truths about their products and

13   communicate truthful information about their products to

14   consumers.  So the -- the link between prevent and

15   restrain and the results of a block of manufacturers to

16   communicate truthful information, that is an assumption

17   provided by DOJ, it is a legal statement, and it is not

18   the subject of Clip Strip's expertise about the ways in

19   which obliging the companies to communicate its

20   information will result in the legal effect of preventing

21   and restraining.

22   MR. CARVIN:  Thank you very much for that

23   clarification.  So you're telling me all of the expert

24   reports opinions about how this will prevent/restrain are

25   based on legal assumptions provided to him by DOJ and

Page 78

1  upon which he cannot comment.  That's fascinating.

2  That's precisely -- I'll ask you a question -- Let me

3  clarify.

4       Q    Do you have an independent view as to whether

5  or not your designs of the corrective statements will

6  prevent and restrain future fraud by the manufactures?

7  Wholly independent of what the Justice Department told

8  you to assume, do you have an opinion?

9       A    Yes, I can have an opinion.

10      Q    And what is it?

11      A    My opinion --

12      MR. CRANE-HIRSCH:  Objection.

13      THE WITNESS:  My opinion again is the messages that

14  have been approved in the factual statements and in court

15  proceedings before we got started on this project

16  accomplish this by some way or another.  Again, I'm not a

17  legal expert.  I don't know -- this is -- this is what

18  these statements are -- what our design was primarily to

19  provide truthful information to consumers about

20  cigarettes.  That's what our design was supposed to do.

21      MR. CARVIN:  Q  My question is, do you have a

22  opinion distinct from what you told the court has already

23  decided before you began this project.  Do you have an

24  independent basis for believing that your design of the

25  corrective statements will prevent and restrain

Page 79

1   manufacturers from committing future fraud or deception?

2          MR. CRANE-HIRSCH:  Objection.

3          THE WITNESS:  Sure.  My opinion is it could prevent,

4   yeah.

5          MR. CARVIN:  Q   How?

6       A    Sure.

7       Q    How?

8       A    I don't know.  I don't have the research.  I

9   don't have the research behind me to go through this.

10          (Off the written record)

11      Q    All right.  Let's go into detail on what your

12   assignment was on this case.  If you could turn to page 1

13   of your report.  The last sentence reads:  As discussed

14   in further detail below, I was instructed to develop a

15   design that would fulfill the court's objectives of

16   getting consumers' attention and communicating truthful

17   information to them in an effective way.

18          Is that what you wrote?

19      A    Yes.

20      Q    How did you know the court's objectives?

21      A    That was communicated to us by DOJ.

22      Q    Okay.  Did you read the opinion?

23      A    What opinion?

24      Q    The court's opinions.

25      A    No.

Page 80

1        Q     Okay.  Do you -- It's your understanding that

2   the court had the objective of getting consumers'

3   attention?

4        A     Yes, that's my understanding.

5        Q     To your knowledge did the court say anything

6   like that?

7        A     Again, no, I'm not a legal expert, or do I look

8   at the court's papers.  I didn't look at the court's

9   papers, I don't know.

10        Q     And under your understanding as relayed to you

11   by the DOJ, there was two court's objectives, one was

12   getting consumers' attention, other one communicating

13   truthful information to them in an effective way, right?

14        A     That was our --

15        MR. CRANE-HIRSCH:  Objection.

16        MR. CARVIN:  Q   I thought communicating truthful

17   information alone was enough to prevent restrain.

18        MR. CRANE-HIRSCH:  Objection.

19        MR. CARVIN:  Q   Is that your understanding?

20        A     I don't have a really elaborate understanding

21   of prevent and restrain.  It's more of a legal term.

22   Again, the statement I believe that were approved --

23        Q     Right.  But -- Do you -- That's a fair point.

24   Do you think communicating truthful information in and of

25   itself prevents and restrains?  Is that your

Page 98

```
 1       A    That's correct, we didn't put it on the bottom
 2    in the black and white, right.
 3       Q    Okay.  And you avoided giving prominence to the
 4    preamble, correct?
 5       A    Yes, that's what it says here, yes.  We avoided
 6    giving prominence to give the impression of a warning.
 7       Q    Right.  Okay.  So you made a conscious decision
 8    to give greater prominence to what you called the factual
 9    statements and less prominence to the preamble, correct?
10       A    Yes.
11       Q    Let's talk about the size of the preamble as
12    opposed to its location.  And the section of the
13    container housing the preamble is much smaller than the
14    portion of the container housing the factual statements,
15    right?
16       A    Correct.
17       Q    The preamble section is 22.5 percent the size
18    of the container, right?
19       A    Yes.
20       Q    Okay.  And the preamble's text is with one or
21    two exceptions out of 18 always longer than the text of
22    the substantive factual statements, right?
23       A    I believe that's true typically, yes.
24       Q    In some cases it's much, much longer, maybe two
25    to three times as long in terms of word count, right?
```

Page 143

1   what we're trying to accomplish here, is it not, is to

2   get the consumer to read the actual text.  The asterisk

3   itself is of virtually no value.  The thing that's going

4   to prevent and restrain is the text of the corrective

5   statements, right?

6        MR. CRANE-HIRSCH:  Objection, and instruct the

7   witness not to answer.

8        MR. CARVIN:  Q   You don't have an opinion on this?

9   You told me the icon helps to communicate the corrective

10  statements text effectively, but you can't answer why

11  that is so?

12       MR. CRANE-HIRSCH:  I'm sorry.  Who is that addressed

13  to, Mr. Carvin?

14       MR. CARVIN:  I'm asking him and I'm assuming you're

15  going to withdraw your objection because it's so facially

16  frivolous.

17       MR. CRANE-HIRSCH:  Sorry.  Could you walk me through

18  again -- So we are talking about something that is

19  established law of this case that communicating truthful

20  information about cigarettes to consumers will as a

21  matter of law in this case prevent and restrain

22  misconduct.  So that is all a matter of law, it is

23  established as a matter of law.  This expert witness is

24  not an attorney, this expert witness has told you he does

25  not know about prevent and restrain and how it works

1   according to lawyers.  So this is outside the ambit of

2   his expertise, it is calling -- to whatever extent he has

3   views on it, they would be views he has received from his

4   communications with DOJ, views that are subject to work

5   product protection under Federal Rule of Civil

6   Procedure 26(B).

7         MR. CARVIN:  Done?

8         Q    Assume with me as a matter of law, as your

9   counsel has just instructed you, that the corrective

10  statements prevent and restrain, therefore, it would be

11  bad, would it not, if we distracted the consumers'

12  attention away from the text of the corrective

13  statements?

14        A    Again, we believe that the icon brings

15  attention to the statements, so --

16        Q    Okay.  But, again, we -- if we are trying today

17  like unlike in the Ghostbusters example, some text as

18  opposed to the icon speak for itself, icons are not

19  typically used, are they?  For example, if you're

20  provided a consumer basic information about ingredients

21  or nutrition labels or those sorts of things, they are

22  usually not accompanied, are they, by icons?

23        MR. CRANE-HIRSCH:  Object.

24        THE WITNESS:  In those cases again there's -- this

25  is not the same case, but -- go ahead.