UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) ) | |
| v. | ) | Civil Action No. 99-2496 (PLF) |
| PHILIP MORRIS USA INC., et al., | ) ) ) ) | |
| Defendants. | ) ) | |

OPINION

On October 29, 2021, defendant tobacco manufacturers ("manufacturers") and the national retailer groups ("retailers") filed two motions in limine to exclude certain testimony proffered by plaintiffs' expert witnesses.[1] The first motion alleges that two of plaintiffs' experts – Dr. Frank Chaloupka and Dr. James Spaeth – provided improper testimony in their rebuttal reports on topics not previously disclosed in their initial expert reports or at their depositions, and

---

[1] The Court has reviewed the following documents and their attachments in connection with the pending motion: Motion in Limine to Exclude Dr. Frank Chaloupka's and Dr. James Spaeth's Improper Rebuttal Evidence ("Mot. Exclude Rebuttal Evid.") [Dkt. No. 6461]; Manufacturers' and Retailers' Motion in Limine to Exclude the Opinion of Mr. Greg Brancaleone ("Mot. Exclude Brancaleone Op.") [Dkt. No. 6463]; Plaintiffs' Response in Opposition to Manufacturers' and Retailers' Motion in Limine to Exclude Portions of Dr. Frank Chaloupka's and Dr. James Spaeth's Rebuttal Evidence ("Pl. Opp. Rebuttal") [Dkt. No. 6467]; Plaintiffs' Response to Manufacturers' and Retailers' Motion in Limine to Exclude the Opinion of Mr. Greg Brancaleone ("Pl. Opp. Brancaleone") [Dkt. No. 6466]; Report of Frank J. Chaloupka Expert Report on Proposed Court-ordered statements at Point-of-Sale ("Chaloupka Initial Rep.") [Dkt. No. 6276-1]; Expert Report of Kevin M. Murphy ("Murphy Initial Rep.") [Dkt. No. 6366]; Rebuttal Expert Report of Frank J. Chaloupka on Proposed Court-Ordered Corrective Statements at the Point-of-Sale ("Chaloupka Rebuttal Rep.") [Dkt. No. 6401-9]; Expert Report of James Spaeth, Ph.D. ("Spaeth Initial Rep.") [Dkt. No. 6341-6]; Rebuttal Expert Report of James Spaeth, Ph.D. ("Spaeth Rebuttal Rep.") [Dkt. No. 6401-6]; Expert Report of Greg Brancaleone ("Brancaleone Initial Rep.") [Dkt. No. 6341-5]; and Deposition of Greg Brancaleone ("Brancaleone Deposition") [Dkt. No. 6463-3].

seeks to exclude from the record the portions of the testimony alleged to be improper. See Mot. Exclude Rebuttal Evid at 1. The second motion seeks to exclude the opinions set forth in the expert report of Mr. Greg Brancaleone, another of plaintiffs' experts, in full on the grounds that he presented no proper basis for his opinions concerning the design of the proposed point-of-sale ("POS") remedy. See Mot. Exclude Brancaleone Op. For the reasons discussed below, the Court will deny both motions in limine.

## I. BACKGROUND

Litigation in this case has persisted for over two decades. While the facts and procedural history of this case have been extensively laid out in previous opinions and orders, see, e.g., United States v. Philip Morris USA Inc., 566 F.3d 1095, 1105-10 (D.C. Cir. 2009) (per curiam), the Court will briefly set forth the pertinent details below.

### A. Scope of the Evidentiary Hearing

After a nine-month bench trial concluding in 2006, Judge Gladys Kessler issued a thorough opinion in which she found that the defendant manufacturers had conspired to and did in fact violate the substantive provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. See United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1, 27 (D.D.C. 2006). In accordance with that finding, Judge Kessler issued a remedial order that set forth remedies tailored to preventing and restraining future RICO violations by the defendant tobacco manufacturers, including an injunction that required the defendants to issue "corrective statements." United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 27, 938-41; see also 18 U.S.C. § 1964 (vesting the Court with "jurisdiction to prevent and restrain [RICO violations] by issuing appropriate orders . . . making due provision for the rights of innocent persons"). Judge

Kessler determined that such an injunction "[wa]s appropriate and necessary to prevent and restrain [defendants] from making fraudulent public statement on smoking matters and health matters in the future." United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 926.  One requirement, known as the "POS remedy," ordered retailers participating in the defendants' Retail Merchandising Program to display signs containing corrective statements at the retail point of sale of tobacco products.  See id. at 939-40; United States v. Philip Morris USA Inc., 566 F.3d at 1141.  Under the Retail Merchandising Program, participating retailers contract with the defendants to display the manufacturers' in-store advertising.  Id.

On appeal, the D.C. Circuit largely affirmed Judge Kessler's decision but "vacate[d] the remedial order as it regard[ed] point-of-sale displays and remand[ed] for the district court to make due provision for the rights of innocent third parties."  United States v. Philip Morris USA Inc., 566 F.3d at 1150.  The court reasoned that the retailers affected by the POS remedy "did not receive notice of th[e] remedy or an opportunity to present evidence or arguments to the district court regarding the impact the injunction would have on their businesses," nor did the district court "independently consider[] the impact of th[e] [remedy] on affected retailers," as required by Section 1964(a).  Id. at 1141.

The impact that the POS remedy may have on third party retailers is the single remaining issue on remand before this Court.  To adequately resolve this issue, the Court decided that an evidentiary hearing would be necessary to allow the parties to present their legal and factual arguments concerning the implementation of the POS remedy and to allow third party retailers the opportunity to air their concerns.  See Order #86-Remand [Dkt. No. 6283].

In 2019, the Court clarified the scope of this evidentiary hearing.  See United States v. Philip Morris USA Inc., 436 F. Supp. 3d 1 (D.D.C. 2019).  The Court noted that Judge

Kessler's detailed opinion "settle[d] most of the legal questions" involved, namely that: (1) the Court had authority to enjoin future RICO violations pursuant to Section 1964(a); (2) "an injunction ordering Defendants to issue corrective statements is appropriate and necessary to prevent and restrain them from making fraudulent public statements"; (3) the defendants' First Amendment rights did not prohibit this remedy; and (4) the corrective statement injunction is "narrowly tailored to prevent Defendants from continuing to disseminate fraudulent public statements and marketing messages by requiring them to issue truthful corrective communications." See id. at 6. Consistent with the law of the case doctrine, the Court decided that it will "respect and apply Judge Kessler's prior legal conclusions to the POS remedy issue." Id. at 7. The Court was clear that "[t]he only question therefore is whether this Court can craft a new proposal to implement the POS remedy that makes due provision for retailers' rights." Id.

In order to sufficiently make "due provision" for retailers' rights, the Court further concluded that it will consider evidence presented during the hearing to determine

> (1) whether the plaintiffs' 2018 proposal for implementing the POS remedy will have an adverse impact on the retailers' rights; if so, (2) whether that proposal (or some modification thereof) is sufficiently tailored to minimize the impact on retailers; and (3) even if tailored to minimize the impact on the retailers' rights, whether it nevertheless interferes with those rights to such an extent as to make any implementation of the POS remedy improper.

United States v. Philip Morris USA Inc., 436 F. Supp. 3d at 9. Accordingly, the parties are constrained to presenting evidence consistent with this scope and these "due provision" considerations.

4

## B. The Parties' Pre-Hearing Disclosures

In anticipation of the evidentiary hearing scheduled for June and July 2022, the parties have proffered a number of expert witness reports, opinion witness declarations, and fact witness declarations. Plaintiffs' initial pre-hearing disclosures included their most recent POS remedy proposal, including the proposed Guidelines for Court-Ordered Corrective Statements at Retail Points of Sale [Dkt. No. 6341-2] and the Specifications for Audits of Manufacturer Compliance with Implementation of the Corrective Statement Remedy at Point-of-Sale [Dkt. No. 6341-3]. Each proposal includes plaintiffs' recommended specifications for the POS remedy, and each is accompanied by expert reports explaining the methodology leading to the development of the updated proposal. See, e.g., Brancaleone Initial Rep. (describing the methodology involved in designing the proposed POS corrective statement signage); Chaloupka Initial Rep. (considering the potential economic effects of the proposed remedy on retailers' businesses); Spaeth Initial Rep. (explaining the efficacy of the proposed audit mechanism).

At issue in the manufacturers and retailers' motions in limine are the opinions of three of plaintiffs' expert witnesses. Mr. Greg Brancaleone is a design professional who plaintiffs retained to develop a design with implementation specifications that would "communicate truthful information" about manufacturers' cigarettes at the point of sale. Brancaleone Initial Rep. ¶ 1. Dr. Frank Chaloupka, a research professor at the University of Illinois at Chicago and the Director of the UIC Health Policy Center, was retained by plaintiffs to provide testimony on the economic impact that the government's proposed POS statements would have on the retailers. See Chaloupka Initial Rep. ¶¶ 1, 12. Dr. James Spaeth, an expert in the market research industry, was retained by plaintiffs to "identify and recommend mechanisms for detecting and measuring cigarette manufacturers' non-compliance with the plaintiffs'

proposed court order," which became the "proposed audit mechanism," at points of sale. Spaeth Initial Rep. ¶¶ 1-2.

After plaintiffs made their initial disclosures, including the initial expert reports of Mr. Brancaleone, Dr. Chaloupka, and Dr. Spaeth, the manufacturers and retailers filed their own initial pre-hearing disclosures, including their own experts' initial reports. See, e.g., Murphy Initial Rep. On March 24, 2021, plaintiffs filed a number of rebuttal reports, including one each from Dr. Chaloupka and Dr. Spaeth. See Chaloupka Rebuttal Rep. at 1; Spaeth Rebuttal Rep. at 1. On October 29, 2021, the manufacturers and retailers filed two motions in limine to exclude certain testimony proffered by three of plaintiffs' experts: Dr. Chaloupka, Dr. Spaeth, and Mr. Brancaleone.

In the first motion in limine, the manufacturers and retailers assert that Dr. Chaloupka and Dr. Spaeth offer previously undisclosed opinions and evidence in their rebuttal reports. Mot. Exclude Rebuttal Evid. at 1. First, they maintain that it was improper for Dr. Chaloupka, an economist, to opine in his rebuttal report about the economic effects of the government's proposed audit and about his own prior experience with retail audits, given the fact that he did not mention the audit mechanism in his initial expert report. Mot. Exclude Rebuttal Evid. at 1-2. Second, the manufacturers and retailers argue that Dr. Spaeth, who designed the audit of the POS remedy, improperly included in his rebuttal report details of discussions he held with two retail auditors about the intrusiveness of the proposed audit after submitting his initial expert report. Mot. Exclude Rebuttal Evid. at 2.

In the second motion, the manufacturers and retailers seek to exclude Mr. Brancaleone's initial expert report in full by effectively characterizing Mr. Brancaleone's opinion as a legal opinion that the government's proposed remedy would "prevent and restrain"

6

defendants from committing future RICO violations, which they assert is "not his own expert opinion, but instead one provided to him by counsel for the government." Mot. Exclude Brancaleone Op. at 1.

On December 6, 2021, plaintiffs filed their responses opposing these two motions, Pl. Opp. Rebuttal at 1; Pl. Opp. Brancaleone at 2, and both are now ripe for decision.

## II.  LEGAL STANDARD

The Court may consider motions in limine "pursuant to [its] inherent authority to manage the course of trials." Graves v. District of Columbia, 850 F. Supp. 2d 6, 10 (D.D.C. 2011) (quoting Luce v. United States, 469 U.S. 38, 41 n.4 (1984)). Motions in limine are permitted to "narrow the evidentiary issues at trial." Williams v. Johnson, 747 F. Supp. 2d 10, 14 (D.D.C. 2010).

Trial judges are generally afforded broad discretion in rendering evidentiary rulings "[i]n deference to their familiarity with the details of the case." Youssef v. Lynch, 144 F. Supp. 3d 70, 80 (D.D.C. 2015); Graves v. District of Columbia, 850 F. Supp. 2d at 11. Consistent with the Court's role as the "gatekeeper for expert testimony," Little v. Wash. Metro. Area Transit Auth., 249 F. Supp. 3d 394, 408 (D.D.C. 2017), the Court has "broad discretion in determining whether to admit or exclude expert testimony." Blake v. Securitas Sec. Servs., Inc., 292 F.R.D. 15, 17 (D.D.C. 2013) (quoting U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc., 608 F.3d 871, 895 (D.C. Cir. 2010)). When the Court is both gatekeeper and factfinder, it may "hear the evidence and make its reliability determination during, rather than in advance of, the [hearing]." F.T.C. v. Whole Foods Mkt., Inc., Civil Action No. 07-1021, 2007 WL 7632283, at *2 (D.D.C. July 27, 2007); Jacobsen v. Oliver, Civil Action No. 01-1810, 2007 WL 5527513, at *1 (D.D.C. Nov. 2, 2007); see also Ramirez v. ICE, Civil Action No. 18-0508, 2019 WL

6036121, at *2 (D.D.C. Nov. 14, 2019) ("[T]he law gives the judge a wide scope of discretion to read expert affidavits or hear expert testimony which will assist in reaching an informed decision.").

The Federal Rules of Civil Procedure govern a party's pre-trial disclosure obligations. The rules provide that, with respect to an expert, "a party must disclose to the other parties the identity of any witnesses it may use at trial to present evidence under Federal Rule of Evidence 702." FED. R. CIV. P. 26(a)(2)(A). These disclosures generally "must be accompanied by a written report – prepared and signed by the witness – if the witness is one retained or specially employed to provide expert testimony in the case." FED. R. CIV. P. 26(a)(2)(B). Subsequent to these initial disclosures, an opposing party has thirty days to submit evidence that is "intended solely to contradict or rebut evidence on the same subject matter identified by another party." FED. R. CIV. P. 26(a)(2)(D)(ii).

Under the Federal Rules of Civil Procedure, if a party fails to comply with the disclosure requirements for a witness, "the party is not allowed to use that . . . witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1); see also In re Rail Freight Surcharge Antitrust Litig., Miscellaneous No. 07-0489, 2013 WL 12384733, at *2 (D.D.C. Nov. 12, 2013). The central Rule 37 requirement is that "any sanction must be just," and given the Court's "broad discretion" on the matter, it should be guided by the "concept of proportionality" between the offense and the sanction. Bonds v. District of Columbia, 93 F.3d 801, 808 (D.C. Cir. 1996); Burns v. Georgetown Univ. Med. Ctr., 106 F. Supp. 3d 238, 240 (D.D.C. 2015). In determining whether to exclude evidence as a sanction under Rule 37, "the district court may consider the resulting prejudice to the other party, any prejudice to the judicial system, and the need to deter similar

misconduct in the future." Bonds v. District of Columbia, 93 F. Supp. 3d at 808; see also Bristol Petroleum Corp. v. Harris, 901 F.2d 165, 167 (D.C. Cir. 1990) (considering all relevant circumstances to determine whether the plaintiff's alleged behavior prejudiced the defendant).

> Under the Federal Rules of Evidence;
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) [t]he expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) [t]he testimony is based on sufficient facts or data; (c) [t]he testimony is the product of reliable principles and methods; and (d) [t]he expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. "In general, Rule 702 has been interpreted to favor admissibility." Khairkhwa v. Obama, 793 F. Supp. 2d 1, 10 (D.D.C. 2011); see also FED. R. EVID. 702 advisory committee's note (2000) ("A review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule.").

## III.  DISCUSSION

### A.  Motion to Exclude Improper Rebuttal Evidence

The manufacturers and retailers seek to exclude specific paragraphs of Dr. Chaloupka's and Dr. Spaeth's rebuttal reports, and to preclude Dr. Chaloupka and Dr. Spaeth from testifying at the evidentiary hearing about certain topics. Mot. Exclude Rebuttal Evid. at 9. Because the Court finds that both Dr. Chaloupka and Dr. Spaeth responded to evidence proffered in the manufacturers and retailers' expert reports and fact witness declarations, consistent with the standard for rebuttal evidence under the Federal Rules of Civil Procedure, the motion will be denied.

Under the Federal Rules of Civil Procedure, "rebuttal expert testimony is permitted after the parties' initial disclosures only where it 'is intended solely to contradict or rebut evidence on the same subject matter identified by another party.'" Blake v. Securitas Sec. Servs., Inc., 292 F.R.D. at 17 (emphasis added) (quoting FED. R. CIV. P. 26(a)(2)(D)(ii)). Rebuttal testimony "cannot be used to advance new arguments or new evidence." Id. Such a rule "prevent[s] unfair surprise at trial" and "permit[s] the opposing party to prepare rebuttal reports, to depose the expert in advance of trial, and to prepare for depositions and cross-examination at trial." Minebea Co., Ltd. v. Papst, 231 F.R.D. 3, 5-6 (D.D.C. 2005).

Rebuttal testimony is proper if it "explain[s], repel[s], counteract[s], or disprove[s] evidence of the adverse party." Blake v. Securitas Sec. Servs., Inc., 292 F.R.D. at 17 (quoting United State v. Lamoreaux, 422 F.3d 750, 755 (8th Cir. 2005)). If a party attempts to designate the testimony of an expert witness as "rebuttal" but the testimony in fact introduces evidence beyond the scope of the opposing party's initial expert testimony, the rebuttal expert "may be viewed as an initial expert who was not timely designated and whose testimony may be struck by the Court for violating Rule 26(a)." Id. at 18. Thus, in evaluating the admissibility of rebuttal expert testimony, the Court looks to whether the rebuttal testimony goes "directly to refuting" a claim asserted by the opposing party's witness. United States v. Gatling, 96 F.3d 1511, 1523 (D.C. Cir. 1996).

1. Dr. Chaloupka's Rebuttal Testimony

The manufacturers and retailers contend that paragraphs 43, 48, and 49 of Dr. Chaloupka's rebuttal report should be stricken because Dr. Chaloupka raised the potential economic impact of the plaintiffs' proposed audit mechanism for "the first and only time" in his rebuttal report. See Mot. Exclude Rebuttal Evid. at 6 (suggesting "[t]here was nothing

10

preventing Dr. Chaloupka from offering these opinions in his initial report"). That, however, is not a valid basis for excluding rebuttal testimony. Rather, rebuttal testimony by an expert is proper if "it is intended solely to contradict or rebut evidence on the same subject matter identified by another party." FED. R. CIV. P. 26(a)(2)(D)(ii) (emphasis added). There simply is no per se rule against the introduction of new evidence in a rebuttal report, provided that it directly refutes a claim introduced by the opposing expert. See United States v. Gatling, 96 F.3d at 1523.

Having reviewed the relevant expert reports, the Court easily concludes that Dr. Chaloupka's rebuttal report does just this: it "went directly to refuting" a claim introduced by the opposing expert, Dr. Kevin Murphy. United States v. Gatling, 96 F.3d at 1523. In the challenged portions of Dr. Chaloupka's rebuttal report, he observes that Dr. Murphy "relie[d] on the assertions in retailer declarations for his conclusion that the implementation of the proposed remedy will impose significant costs on retailers," including the cost of complying with "audit procedures." Chaloupka Rebuttal Rep. ¶ 43; see also Murphy Initial Rep. ¶ 73 (discussing the "costs and burdens associated with the audit procedure"). Dr. Chaloupka then goes on to directly challenge Dr. Murphy's conclusion as questionable because it was not based on any "effort to quantify [such] costs." Chaloupka Rebuttal Rep. ¶ 43. He continues:

> Dr. Murphy and various retailers assert that retailers will incur significant costs due to the audit procedures associated with the proposed remedy, but again provide no estimates of the magnitude of these costs. Cigarette retailers are or have been subject to various "audits" to ensure compliance with other measures affecting the sale of cigarettes, including minimum age laws that prohibit the sale of cigarettes to underage persons, minimum pricing policies, bans on the use of various price promotions, bans on the use of descriptors on cigarette packaging and advertising, requirements for onserts containing court-ordered corrective statements on cigarette packs, and many more. Moreover, many cigarette retailers are likely to be subject to audits related to the

11

>   sales of other products sold in their retailer outlets. Experiences
>   with these "audits" could have been used to provide some
>   indication of what the likely magnitude of the audit-related costs
>   would be.

Id. ¶ 48. In support of his opinion, Dr. Chaloupka relies on his twenty-five years of experience in implementing audits in retail outlets, during which he failed to recall any auditors being turned away, another possibility cited by retailers in their own declarations and expert reports. Id. ¶ 49.[2]

Thus, Dr. Chaloupka's assertions in his rebuttal report directly "explain, repel, counteract, or disprove evidence" proffered by manufacturers' expert witness, Dr. Murphy, that "audits would increase retailer costs." Blake v. Securitas Sec. Servs., Inc., 292 F.R.D. at 17; see Murphy Initial Rep. ¶ 73. For one, Dr. Chaloupka's responses specifically address the opinion of Dr. Murphy that retailers would incur significant costs because of the audit procedure. See Murphy Initial Rep. ¶ 73. Moreover, Dr. Chaloupka addresses Dr. Murphy's criticism that Dr. Chaloupka "ignore[d] the impact of the audit procedure on retailers in his [initial report's] analysis." See, e.g., id. ¶¶ 63, 73.

Although the manufacturers and retailers are correct that the proposed audit mechanism was available to Dr. Chaloupka when he drafted his initial expert report, see Mot. Exclude Rebuttal Evid. at 6, whether it was available or not is immaterial to the question of whether this rebuttal evidence should be excluded. Under the appropriate analysis, Dr. Chaloupka's responses squarely "contradict or rebut evidence" discussed by Dr. Murphy and

---

[2] Dr. Chaloupka is not precluded from relying on his twenty-five years of personal experience working with retail audits as a basis for his opinion. See FED. R. EVID. 702 advisory committee's note (2000) ("Nothing in [Rule 702] is intended to suggest that experience alone— or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.").

therefore qualify as proper rebuttal testimony. FED. R. CIV. P. 26(a)(2)(D)(ii). The Court therefore declines to strike the challenged portions of Dr. Chaloupka's rebuttal report.

### 2. Dr. Spaeth's Rebuttal Testimony

In a similar vein, the manufacturers and retailers seek to exclude paragraphs 13 and 14 of Dr. Spaeth's rebuttal report, which rely in part on certain discussions that Dr. Spaeth had with leading retail auditors <u>after</u> he prepared his initial report. Mot. Exclude Rebuttal Evid. at 2, 7.

To understand the nature of the manufacturers and retailers' objection, it is necessary to lay out the timing of the parties' disclosures. First, in his initial expert report, Dr. Spaeth proposed an audit mechanism "to detect and measure the extent of cigarette manufacturers' non-compliance" with the POS remedy. Spaeth Initial Report ¶ 20; <u>see also</u> <u>id</u>. ¶ 31 ("recommending "physical audits that involve site visits at Participating Retailer Locations"). In that report, Dr. Spaeth also disclosed that his proposal was informed by numerous interviews he had conducted with several retail audit firms to understand "current best practices in measurement at retail stores." <u>Id</u>. ¶¶ 26-27 (providing the list of professionals with whom Dr. Spaeth conducted interviews to inform the audit mechanism's design). As the manufacturers and retailers note, Dr. Spaeth also opined that the proposed audit mechanism "would not burden cigarette retailers, disrupt their business, or require them to affirmatively provide any information or data to auditors." <u>Id</u>. ¶ 34; <u>see also</u> <u>id</u>. ¶ 79.

In response to Dr. Spaeth's report, the manufacturers and retailers filed fact witness declarations that contended that the audit mechanism would adversely impact retailers' business. <u>See</u>, <u>e.g.</u>, Declaration of Paul Crozier [Dkt. No. 6365-5] ¶ 28 (noting that "the need for an auditor to take photographs of the cigarette display area will disrupt normal operations");

13

Declaration of Francis J. Armstrong [Dkt. No. 6365-3] ¶ 20 (noting the manner in which the audit mechanism might "distract employees" or "interfere with [their] other duties"); Declaration of Michael Kurtz [Dkt. No. 6363-7] ¶ 17; Declaration of Jonathan Polongsky [Dkt. No. 6363-10] ¶ 20.  And the manufacturers and retailers also filed an expert witness report summarizing these concerns and opining that the proposed audit mechanism would "impose costs on retailers." Murphy Initial Rep. ¶ 47; see also id. ¶ 73 (noting that "[r]etailers also express concerns with costs and burdens associated with the audit procedure").

    Dr. Spaeth then submitted a rebuttal report to, among other things, undermine the notion that the proposed audit mechanism would burden retailers and adversely impact their business.  See Spaeth Rebuttal Report ¶¶ 8, 12.  In addition to relying on the materials gathered to inform his initial expert report, Dr. Spaeth interviewed "two retail audit firms to ask about their responses to [the retailers'] concerns."  Pl. Opp. Rebuttal at 2-3, 9; see also Spaeth Rebuttal Report ¶¶ 13-14 (noting that Dr. Spaeth "spoke with a number of leading retail auditors about the degree of intrusiveness or potential disruption of retailer operations due to an audit").  Dr. Spaeth observed that those audit firms "confirmed that audits of this nature are familiar to retailers," that "they are conducted without disruption to retailer operations," and that they "are a standard retail practice."  Spaeth Rebuttal Report ¶ 13.  He also noted that the representatives of those audit firms "spoke with pride about the professionalism of their staff and the quality of their training" and "do not want to disrupt retailer operations in any way."  Id.  Particularly objectionable to the manufacturers and retailers, Dr. Spaeth went on to directly quote from his two recent interviews with audit firms.  See id. ¶ 14 (discussing interviews with Michelle Bostater of Intelli-shop and Ray Walsh of Market Force).

The manufacturers and retailers contend that these details should be excluded from the rebuttal report because Dr. Spaeth could have discussed – and did in fact discuss – the "potential disruptions to retailers" in his initial expert report.  See Mot. Exclude Rebuttal Evid. at 8.  They object to Dr. Spaeth's "late" interviews with audit firms because those interviews "d[id] not address something new presented by Manufacturers and Retailers during the course of discovery."  Id.; see also id. at 9 ("There was nothing preventing Dr. Spaeth from asking these questions of the retail auditors when drafting his initial expert report.").

The manufacturers and retailers' characterization of Dr. Spaeth's supplemental interviews with audit firms does not properly account for the "same subject matter" standard under which the Court assesses the admissibility of rebuttal evidence.  FED. R. CIV. P. 26(a)(2)(D)(ii).  Whether rebuttal testimony is proper does not turn on whether the proffering party could have anticipated the relevance or importance of its subject matter beforehand.  Rather, "rebuttal expert testimony is permitted . . . where it 'is intended to contradict or rebut evidence on the same subject matter identified by another party.'"  Blake v. Securitas Sec. Servs., Inc., 292 F.R.D. at 17 (quoting FED. R. CIV. P. 26(a)(2)(D)(ii)).  Indeed, even entirely new expert testimony is permitted so long as it "explain[s], repel[s], counteract[s], or disprove[s] evidence of the adverse party."  Id. (quoting United States v. Lamoreaux, 422 F.3d at 755); see also United States v. Gatling, 96 F.3d at 1523 (rejecting the argument that "new expert testimony is per se inappropriate rebuttal evidence"); cf. Little v. Wash. Metro. Area Transit Auth., 249 F. Supp. 3d at 416 ("District courts routinely permit new experts for rebuttal purposes and permit rebuttal experts to use new methodologies to rebut the opinions of the opposing expert").

The challenged paragraphs describing Dr. Spaeth's supplemental interviews with the two audit firms satisfy this requirement; they directly "contradict or rebut" assertions made in

15

the manufacturers and retailers' fact witness declarations that audits would adversely impact retailers' business. FED. R. CIV. P. 26(a)(2)(D)(ii); see also Crowley v. Chait, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) ("All that is required [on rebuttal] is for the information to repel other expert testimony."). Even if Dr. Spaeth could have anticipated the contents of those declarations when he prepared his initial expert report, it was not improper for him to conduct additional interviews to test the veracity of those declarations and to "counteract . . . evidence" contained in the fact witness declarations and discussed in Dr. Murphy's report. Blake v. Securitas Sec. Servs., Inc., 292 F.R.D. at 17.

        Dr. Spaeth's inclusion of additional interviews and observations in his rebuttal report therefore were not improper under Rule 26(a)(2)(D)(ii) of the Federal Rules of Civil Procedure, and the Court declines to strike reference to these interviews from Dr. Spaeth's testimony. The Court concludes that the evidence proffered by Dr. Spaeth was proper rebuttal evidence that was timely disclosed.[3]

---

[3] In light of this conclusion, a prejudice analysis under Rule 37 of the Federal Rules of Civil Procedure is not strictly necessary to determine the admissibility of the disputed testimony. Nevertheless, even assuming the contested testimony is improper rebuttal testimony, the Court concludes that the requirements for prejudice are not met in this case. Courts routinely permit parties to supplement their filings in advance of trial to mitigate prejudice. See United States v. Gatling, 96 F. Supp. 3d at 1524; see also Colorado v. Warner Chilcott Holdings Co., Civil Action No. 05-2182, 2007 WL 6215857, at *1-2 (D.D.C. Mar. 24, 2007) (granting leave for the party to file "very limited sur-rebuttal reports" in response to the material deemed "not purely rebuttal."). Here, the Court's scheduling order allowed for supplemental filings on expert reports and imposed a deadline that was more than four months after plaintiffs filed Dr. Chaloupka's and Dr. Spaeth's rebuttal reports, allowing ample time for manufacturers and retailers to respond to the points raised in their rebuttals. See Order #109-Remand [Dkt. No. 6434]. The manufacturers did not file any supplemental expert report in response to these disclosures, despite having done so for other experts. See, e.g., Supplemental Expert Report of James E. Temme [Dkt. No. 6441]; Supplemental Expert Report of David Reibstein [Dkt. No. 6433].

B. *Motion to Exclude Opinion of Greg Brancaleone*

The manufacturers and retailers seek to exclude the initial expert report of Mr. Brancaleone in its entirety, effectively arguing that he offered a legal opinion – namely, that the POS remedy's design would effectively "prevent and restrain future fraud and deception by covered cigarette manufacturers." Mot. Exclude Brancaleone Op. at 2, 4-5. In support of their argument, the manufacturers and retailers point to instances in Mr. Brancaleone's deposition where he appears to suggest that the purpose of the design is to "prevent and restrain" future fraud, such as when he states that "because [the corrective statements contain] truthful information[,] they are preventing and restraining based on how they're approved by the court." Brancaleone Deposition at 68:14-69:1. They also cite to three paragraphs from his 271-paragraph initial report where the phrase "prevent and restrain" is used. See Brancaleone Initial Rep. ¶¶ 52, 97, 253.

"Expert testimony consisting of legal conclusions is impermissible because such testimony merely states what result should be reached, thereby improperly influencing the decisions of the trier of fact and impinging upon the responsibilities of the court." Halcomb v. Wash. Metro. Area Transit Auth., 526 F. Supp. 2d 24, 27 (D.D.C. 2007); accord Convertino v. U.S. Dep't of Just., 772 F. Supp. 2d 10, 12 (D.D.C. 2010). Thus, an expert's opinion is inadmissible when it is merely a "conduit for the attorney's opinion," In re Tri State Outdoor Media Grp., Inc., 283 B.R. 358, 365 (Bankr. M.D. Ga. 2002), or if it "rests solely on subjective belief or unsupported speculation," Groobert v. President & Dirs. of Geo. Coll., 219 F. Supp. 2d 1, 6 (D.D.C. 2002).

The manufacturers and retailers exaggerate the significance of Mr. Brancaleone's use of the phrase "prevent and restrain," which he references only four times in his initial report,

17

to argue that Mr. Brancaleone gave a legal opinion. Read in context, Mr. Brancaleone used that term only to situate his proposed design for the POS remedy within the Court's prior rulings. See Brancaleone Initial Rep. ¶¶ 52, 97, 253; see also United States v. Philip Morris USA Inc., 436 F. Supp. 3d at 7 (noting that Judge Kessler already decided "[t]he prevent-and-restrain efficacy of a POS remedy," which was undisturbed by the D.C. Circuit's remand).[4] Contrary to the manufacturers and retailers' characterization of Mr. Brancaleone's expert opinion, the vast majority of his report opines on the effectiveness of various elements of the design – such as its color schemes, id. ¶¶ 172-74, typography and font style, id. ¶¶ 183-87, and text justification, id. ¶¶ 193-194 – to "provide truthful information to consumers about cigarettes." Brancaleone Deposition at 78:18-20. Thus, it is clear that Mr. Brancaleone has provided a proper expert opinion that is in no way a "conduit for the attorney's opinion." See In re Tri State Outdoor Media Grp., Inc., 283 B.R. at 365.

In drafting his expert report, Mr. Brancaleone was entitled to rely on assumptions provided to him by government counsel, see FED. R. EVID. 703, 704(a), including the assumption that "corrective statements" are appropriate remedies to "prevent and restrain future RICO violations." United States v. Philip Morris USA Inc., 436 F. Supp. 3d at 3; see United States v. Philip Morris USA Inc., 566 F.3d at 1140 (observing that "corrective statements will prevent and restrain [defendants] from making fraudulent public statements on smoking and health matters in

---

[4] The manufacturers and retailers mischaracterize the scope of the evidentiary hearing by suggesting that Mr. Brancaleone's design opinions cannot exist without also considering whether they effectively prevent and restrain future RICO violations. See Mot. Exclude Brancaleone Opp. at 12. This argument fails in light of previous decisions issued by this Court clarifying the scope of the evidentiary hearing. The Court has been extremely clear: the evidentiary hearing is limited to "whether this Court can craft a new proposal to implement the POS remedy that makes due provision for retailers' rights." United States v. Philip Morris USA Inc., 436 F. Supp. 3d at 7.

the future"). "[A]n expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d 1207, 1212-13 (D.C. Cir. 1997); accord Minebea v. Pabst, 231 F.R.D. 1, 2 (D.D.C. 2005) (allowing an expert to rely on a legal definition provided by counsel as a basis for his calculations, as "the Court ultimately may or may not agree with that definition").[5]

Even assuming that Mr. Brancaleone's expert report contained impermissible legal opinions – which it did not – the wholesale exclusion of Mr. Brancaleone's opinion would be unwarranted because the Court is capable of "screening factual statements from legal conclusions." Moses v. Halstead, 477 F. Supp. 2d 1119, 1124 (D. Kan. 2007). Where, as here, such evidentiary issues arise in the course of a non-jury proceeding, "the Court's gatekeeper role is 'significantly diminished' . . . because 'there is no risk of tainting the [hearing] by exposing a jury to unreliable evidence.'" Window Specialists, Inc. v. Forney Enters., Inc., 47 F. Supp. 3d 53, 60 (D.D.C. 2014) (quoting United States v. H & R Block, Inc., 831 F. Supp. 2d 27, 30 (D.D.C. 2011)); see F.T.C. v. Whole Foods Mkt., Inc., Civil Action No. 07-1021, 2007 WL 7632283, at *2 (denying motion in limine to permit the court to "hear the evidence and make its reliability determination during, rather than in advance of, the trial" (quoting In re Salem, 465 F.3d 767, 776-77 (7th Cir. 2006))).

---

[5] Moreover, the Court concludes that Mr. Brancaleone's expert opinion is both relevant and reliable. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993); see also FED. R. EVID. 702. His opinion that the POS remedy's design effectively "get[s] consumer's attention and communicat[es] truthful information to them in an effective way," Brancaleone Initial Rep. ¶ 1, will help the Court determine "whether [the POS remedy] proposal (or some modification thereof) is sufficiently tailored to minimize the impact on the retailers." United States v. Philip Morris USA Inc., 436 F. Supp. 3d at 17; see also FED. R. EVID. 702(a) (noting that an "expert's scientific, technical, or other specialized knowledge [must] help the trier of fact to understand the evidence or to determine a fact in issue").

Because the manufacturers and retailers offer no convincing arguments as to why Mr. Brancaleone's expert report does not meet the requirements of Rule 702 of the Federal Rules of Evidence, the Court denies the motion to exclude his initial expert report in its entirety.

## IV.  CONCLUSION

For the foregoing reasons, the Court will deny Manufacturers' and Retailers' Motion in Limine to Exclude Dr. Frank Chaloupka's and Dr. James Spaeth's Improper Rebuttal Evidence [Dkt. No. 6461] and Manufacturers' and Retailers' Motion in Limine to Exclude the Opinion of Mr. Greg Brancaleone [Dkt. No. 6463].  An Order consistent with this Opinion will issue this same day.

SO ORDERED.

_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  April 13, 2022