**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>    and<br><br>TOBACCO-FREE KIDS<br>ACTION FUND, *et al.*<br>    Plaintiff-Intervenors,<br><br>    v.<br><br>PHILIP MORRIS USA INC., *et al.*,<br><br>    Defendants,<br><br>    *and*<br><br>ITG BRANDS, LLC, *et al.*<br>    Post-Judgment Parties Regarding<br>    Remedies. | Civil Action No. 99-CV-2496 (PLF)<br>Next scheduled court appearance:<br>    None |

**ORDER # 29 -Remand**

**FOURTH SUPERSEDING CONSENT ORDER IMPLEMENTING THE**
**CORRECTIVE-STATEMENTS REMEDY AT POINT OF SALE**

Upon consideration of the Joint Motion for Fourth Superseding Consent Order Implementing the Corrective-Statements Remedy at Point of Sale, the entire record herein, and following extensive negotiations among the parties to this action, including the United States of America as well as the non-party Retailer Groups, it is hereby ORDERED that:

The corrective-statements remedy under Order #1015 (Dkt. No. 5733; issued Aug. 17, 2006), published as *United States v. Philip Morris USA Inc.*, 449 F. Supp. 2d 1, 938-41 (D.D.C.

1

2006), *aff'd in part & vacated in part*, 566 F.3d 1095 (D.C. Cir. 2009) (*per curiam*), *cert. denied*, 561 U.S. 1025 (2010), is hereby MODIFIED as set forth below:

## REVISED IMPLEMENTATION SPECIFICATIONS FOR CORRECTIVE STATEMENTS AT POINT OF SALE

I.     **Definitions**.

A.     "Acquired Brands" means the Winston, Salem, Kool, and Maverick brands.

B.     "Adjudicator" means a third-party engaged to expeditiously hear appeals from (i) Working Group decisions on Noncompliance Appeals in the circumstances provided in Section V.7, below; and (ii) tie breaking decisions of the Mediator. The Adjudicator's costs and fees shall be paid for by Manufacturers.

C.     "Audit Period" means a nineteen-week period during which In-Person Audits take place.

D.     "Auditor" means one or more firms unaffiliated with and independent of any Manufacturer and acceptable to Plaintiffs that are retained by a Manufacturer or the Manufacturers to conduct In-Person Audits, review the Photo Database, administer the Tip Line, address and monitor audit results, and report on the same to the Working Group as required by this Order, either itself or through one or more subcontracts.

E.     "Corrective-Statement Signs" means signs to be displayed in Participating Retailer Locations as provided in this Order and designed in accordance with the Style Guide attached hereto as Exhibit A, with the image files used for printing signs provided by the Government.

F.     "Court-Ordered Corrective Statements" means the messages prescribed by Order #72-Remand.

2

G.      "Covered Brand" means any brand of cigarette marketed by a Defendant and any Acquired Brand.

H.      "Defendant" means each of the following: Altria Group, Inc., R.J. Reynolds Tobacco Company, Lorillard Tobacco Company, and Philip Morris USA Inc. To the extent any obligations under this Order pertaining to Lorillard Tobacco Company have been transferred to R.J. Reynolds Tobacco Company, as contemplated by the Notice of Transaction Involving Defendants R.J. Reynolds Tobacco Company and Lorillard Tobacco Company (Dkt. No. 6141; filed Apr. 7, 2015), such obligations shall apply to R.J. Reynolds Tobacco Company.

I.      "Effective Date" means the date on which this Order is entered.

J.      "Final Determination of Noncompliance" means a determination that a Participating Retailer Location is out of compliance with the Participating Retailer's contractual obligations to Manufacturers under this Order after (i) the timelines for contesting an In-Person Noncompliance Notice have expired without the filing of a timely Noncompliance Appeal, (ii) if a Noncompliance Appeal is timely filed, the Working Group has affirmed the Auditor's findings of noncompliance and no appeal is permitted, or the timelines for contesting that determination have expired, or (iii) the Adjudicator affirmed the Auditor's findings of noncompliance and no appeal is permitted, or the timelines for contesting that determination have expired.

K.      "Implementation Period" means the twenty-one month period beginning on the first day of the first month following the Posting Period.

L.      "In-person Audit" means a visit to a Participating Retailer Location by the Auditor during which the Auditor shall photograph (i) the main cigarette Merchandising Set, (ii) any displayed Corrective-Statement Signs, and (iii) an example of Off-Set Promotional Signage for

3

Covered Brands displayed by the Participating Retailer Location, if any, in as many images as are sufficient to show compliance with this Order or to adequately document noncompliance with this Order.

M.     "In-person Noncompliance Notice" means a letter issued by the Auditor notifying the Participating Retailer Location and the Working Group that the Auditor conducted an In-person Audit of the Participating Retailer Location and found the Participating Retailer Location not compliant with the terms of this Order, and specifically identifying the basis for the Auditor's finding of noncompliance, as well as whether the Auditor deemed the Participating Retailer Location to be in Major Noncompliance or Minor Noncompliance. The In-person Noncompliance Notice shall be sent to the Participating Retailer Location at the email address provided for notice in the Participating Retailer Contract, and shall also be sent to each member of the Working Group by email. If no email address is available and/or the sender receives a bounce-back or failed delivery message, the In-person Noncompliance Notice shall be sent via overnight delivery.

N.     "Kiosk Store" means (1) a Store that does not allow customers to enter and that has a selling window in front of one or more selling counters between the customer and Store personnel, or (2) a Store that is no more than 325 square feet in area, not including restrooms, regardless of whether customers are allowed to enter the Store.

O.     "Major Noncompliance" means a failure to post a required Corrective-Statement Sign, or an obstruction of a Corrective-Statement Sign in a manner that results in the Preamble, message, or icon not being visible from the customer's vantage point, including, but not limited to, the examples given in Exhibit B.

4

P.      "Major Noncompliance Notice" means an In-person Noncompliance Notice that identifies the noncompliance with the terms of this Order to be Major Noncompliance.

Q.      "Manufacturer" means a Defendant or ITG Brands, LLC.

R.      "Mediator" means a third-party engaged to assist in expeditiously resolving disputes of the Working Group and to cast a tie breaking vote in the event of a tie of the Working Group. The Mediator's costs and fees shall be paid for by Manufacturers.

S.      "Merchandising Set" means any rack, shelving, display, or fixture at a Store, including any canopy or header, used in whole or in part to merchandise one or more Covered Brands of cigarettes that are visible to customers.

T.      "Minor Noncompliance" means noncompliance with this Order's provisions for the Corrective-Statement Sign other than Major Noncompliance, and is defined to include, but is not limited to, the examples given in Exhibit B.

U.      "Minor Noncompliance Notice" means an In-person Noncompliance Notice that identifies the noncompliance with the terms of this Order to be Minor Noncompliance.

V.      "Noncompliance Appeal" means a written appeal by a Participating Retailer Location or Working Group member to the Working Group, submitted by email within 14 days after the In-Person Noncompliance Notice is sent by the Auditor, setting forth the basis for challenging the Auditor's finding. A Noncompliance Appeal may accept the finding of noncompliance, but challenge whether the noncompliance constitutes Major Noncompliance. A Noncompliance Appeal may include supporting evidence, which may include photos.

W.      "Non-Kiosk Store" means a Store other than a Kiosk Store.

X.     "Off-Set Corrective-Statement Sign" means a Corrective-Statement Sign required because of Off-Set Promotional Signage.

Y.     "Off-Set Promotional Signage" means Promotional Signage that is not placed within the four corners of the Merchandising Set, which for the avoidance of doubt, includes any canopy or header.

Z.     "Participating Retailer" means a retailer that is a party to a Participating Retailer Contract.

AA.     "Participating Retailer Contract" means a contract with a retailer that permits the Manufacturer (i) to choose the placement of Covered Brands of cigarettes in or on a Merchandising Set related to Covered Brands or (ii) to approve, place, remove, or require the placement or removal of advertising, marketing, promotional or other informational material that advertises, markets, or promotes its Covered Brands in a Store.

BB.     "Participating Retailer Location" means a Store with respect to which a Manufacturer has a Participating Retailer Contract.

CC.     "Plaintiffs" means the United States and the Public Health Intervenors.

DD.     "Photo Database" means the database maintained and reviewed by the Auditor to which Manufacturer representatives will and Participating Retailers can submit photos of Corrective-Statement Signs as posted in a Participating Retailer Location.

EE.     "Photo Noncompliance Notice" means a written letter issued by the Auditor notifying the Participating Retailer Location that the photo submitted of its Participating Retailer Location suggests noncompliance with the terms of this Order.

FF.    "POS Corrective Statements" means a modified version of the Court Ordered Corrective Statements using the POS Preamble and dividing the Court Ordered Corrective Statements among 17 distinct messages as reprinted in attached Exhibit A at p. 9.

GG.    "POS Preamble" means a modified version of the sourcing language from the Court-Ordered Corrective Statements. In approximately one-half of the Corrective-Statement Signs the shortened preamble text will read "A FEDERAL COURT HAS ORDERED R.J. REYNOLDS TOBACCO & PHILIP MORRIS USA TO STATE:" and in approximately one-half of the Corrective-Statement Signs the shortened preamble text will read "A FEDERAL COURT HAS ORDERED PHILIP MORRIS USA & R.J. REYNOLDS TOBACCO TO STATE:".

HH.    "Posting Period" means the three-month period beginning on the first day of the first month following the Ramp-Up Period.

II.    "Price Promotion" means any Manufacturer-provided discount on the price of cigarettes that the Participating Retailer must apply to reduce the retail price of cigarettes (*e.g.*, a Manufacturer pays a Participating Retailer an amount equal to $0.50 per pack of cigarettes to reduce the price of specific Covered Brands of cigarettes by $0.50 per pack of cigarettes).

JJ.    "Promotional Signage" means material displayed at a Participating Retailer Location that advertises, markets, or promotes one or more Covered Brands, but does not include the products themselves or signage that solely identifies brand and price (without using an advertising slogan, tagline, or imagery other than a brand logo or image of a branded cigarette package).

KK.     "Public Health Intervenors" means the Tobacco-Free Kids Action Fund, American Cancer Society, American Heart Association, American Lung Association, Americans for Nonsmokers' Rights, and the National African American Tobacco Prevention Network.

LL.     "Qualifying Census Tract" means a U.S. Census tract where (a) twenty percent (20%) or more of the total population of the U.S. Census tract is of Hispanic origin, and (b) twenty percent (20%) or more of the population of Hispanic origin in that U.S. Census tract speaks a language other than English at home and speaks English less than "very well." U.S. Census tracts shall be determined using the most recent available five-year estimates from the American Community Survey that have been released by the United States Census Bureau as of the Effective Date.

MM.    "Ramp-Up Period" means the six-month period beginning on the first day of the first month following the Effective Date.

NN.     "Remedies Party" means each of the following: ITG Brands, LLC, Commonwealth Brands, Inc., and Commonwealth-Altadis, Inc.

OO.     "Representative Sample" means a sample of Participating Retailer Locations selected using the following method:

1.      Sort a list of all Participating Retailer Locations according to the following strata:

a.      According to the Participating Retailer Location's presence in one of the four United States Census Regions or its presence in any United States Territory taken as a fifth group;

      b.      Then within each of those strata, by the volume of Covered Brands of cigarettes shipped to the Participating Retailer Location in the previous 12 months, from most to least.

      2.      Then draw a sample of 6,000 from the sorted list of Participating Retailer Locations in 19 distinct replicates, as follows:

      a.      Calculate a sampling interval (SI) using the formula SI = (19 × N') / 6,000 (rounding SI if necessary down to the next integer), where N' is the total number of Participating Retailer Locations in the sorted list;

      b.      Draw 19 unique random numbers from the interval inclusive of 1 to SI;

      c.      Create 19 sets of numbers (seeded sets) by using each of the 19 unique random numbers as a seed (S), as follows: { S, S + SI, S + 2×SI, S + 3×SI, … S + i×SI }, where i is 315 [[i.e., (6,000/19) - 1]]; and

      d.      Create 19 distinct replicates by using the 19 seeded sets to draw from the sorted list the Participating Retailer Locations at the positions corresponding to the numbers in the set.

PP.      "Representative Sample Noncompliance Rate" means the noncompliance rate of the Representative Sample calculated as follows:

$$\frac{\sum_{i=1}^{Total\ Sampled\ retailers} \text{Retailer\_NC}_i \times \text{Retailer\_sales}_i}{\sum_{i=1}^{Total\ Sampled\ retailers} \text{Retailer\_sales}_i}$$

This calculation uses the below definitions:

- "Sales" means volume of Covered Brands of cigarettes shipped to the Participating Retailer Location in last 12 months.

- "i" shall be used to denote 1 to the total number of sampled Participating Retailer Location.

- "Retailer_sales$_i$" equals sales for each sampled Participating Retailer Location "i"

- "Retailer_NC$i$" equals (i) 1 if the Participating Retailer Location is found to have one of more incidences of Major Noncompliance or (ii) 0 if Participating Retailer Location is found to have no incidences of Major Noncompliance.

QQ.  "Representative Sample Pool" means an audit pool that includes all Participating Retailer Locations nationwide, including those in the Suspected Noncompliance Pool.

RR.  "Retailer Groups" means the National Association of Convenience Stores ("NACS") and the National Association of Tobacco Outlets ("NATO").

SS.  "Rotation Period" means the three-month window comprising months 10, 11, and 12 of the 21-month Implementation Period, after the first two Audit Periods and before the final two Audit Periods.

TT.  "Semi-Permanent Display" means an advertising, marketing, or promotional display that requires specialized labor or more expense to install or remove than does a standard Promotional Signage.

UU.  "Set-Adjacent Corrective-Statement Sign" means a Corrective-Statement Sign posted because of the presence of a Merchandising Set at a Participating Retailer Location.

VV.    "Spanish Version" means the text of the Corrective-Statement Signs translated into Spanish, as set forth in the Style Guide attached to this Order as Exhibit A.

WW.    "Store" means a premises where cigarettes are offered for sale to consumers.

XX.    "Suspected Noncompliance Pool" means an audit pool consisting of Participating Retailer Locations (a) for which no photo showing compliance has been submitted (to be included in this pool in only the first Audit Period and third Audit Period), (b) that have been flagged as suspected of noncompliance by the Tip Line and not previously been audited based on the Tip Line communication that triggered its inclusion in the Suspected Noncompliance Pool, or (c) that were found in Major Noncompliance via In-Person Audit in the immediately prior Audit Period.

YY.    "Tip Line" means a system designed to accept telephonic and online submissions from members of the public concerning incidences of suspected noncompliance with this Order for review by the Auditor.

ZZ.    "Working Group" means a group consisting of ten individuals: three individuals appointed by the Department of Justice, two individuals appointed by the Public Health Intervenors, one individual appointed by each of (i) Altria Group, Inc., or Philip Morris USA Inc. (ii) R.J. Reynolds Tobacco Company and (iii) ITG Brands, LLC, and one individual appointed by each of the two Retailer Groups.

## II.    Display of Corrective-Statement Signs.

1.    At each Participating Retailer Location, the Manufacturers shall, during the Implementation Period, communicate the POS Corrective Statements to customers through Corrective-Statement Signs to be displayed in the sizes and locations and on the terms described in Section III, below.

2.      The Corrective-Statement Signs displayed in Participating Retailer Locations shall use the POS Preamble and follow the Style Guide attached to this Order as Exhibit A.

3.      The Manufacturers shall communicate a Spanish Version of the Corrective-Statements Sign following the Style Guide attached as Exhibit A in each Participating Retailer Location that (i) requires two or more Corrective-Statement Signs under the terms of Section III, below and (ii) is located in a Qualifying Census Tract that Plaintiffs have identified and disclosed to the Manufacturers, the Retailer Groups, and the Auditor within 60 days of the Effective Date. In such Participating Retailer Locations, the Set-Adjacent Corrective-Statement Sign shall be in English and any second Corrective-Statement Sign shall be in Spanish. If a Participating Retailer Location must display more than two signs, the additional sign(s) beyond the first two shall be in English and the Participating Retailer Location may choose which sign to display in Spanish. Where there are two signs in a Participating Retailer Location in Puerto Rico, the Set-Adjacent Corrective-Statement Sign shall be in Spanish and any second Corrective-Statement Sign shall be in English and, if a Participating Retailer Location in Puerto Rico must display more than two signs, the additional sign(s) shall be in Spanish and the Participating Retailer Location may choose which sign to display in English.

## III.    Set-Adjacent and Off-Set Corrective-Statement Signs.

1.      During the Ramp-Up Period, each Manufacturer shall amend or supplement its Participating Retailer Contracts to require, during the Implementation Period, display of a Set-Adjacent Corrective-Statement Sign for Non-Kiosk Stores from one of the Manufacturers as follows:

12

a.      A single 348 sq. in. Corrective-Statement Sign shall be displayed in one of the following locations:

i.      The sign shall be: (1) attached to and above, or hung above, the main cigarette Merchandising Set with a space of not more than 6" between the top of the main Merchandising Set and the bottom edge of the sign; and (2) in the same plane as the front of the Merchandising Set unless the configuration of the Merchandising Set and sign attachment or hanging hardware or ceiling attachment point does not allow the sign to be affixed in the same plane as the front of the Merchandising Set and, in such a case, the sign shall be affixed vertically but offset from the front plane of the Merchandising Set;

ii.      If (i) is not possible given the existing placement of the Merchandising Set within a Participating Retailer Location, then the sign shall be (1) attached and adjacent, or hung adjacent, to the main cigarette Merchandising Set with a space of not more than 6" between the side of the main Merchandising Set and the side edge of the sign; (2) in the same plane as the front of the Merchandising Set unless the configuration of the Merchandising Set and sign attachment hardware or ceiling attachment point does not allow the sign to be affixed in the same plane as the front of the Merchandising Set and, in such a case, the sign shall be affixed vertically but offset from the front plane of the Merchandising Set; and (3) at least 48" above the floor;

iii.      If (i) or (ii) are not possible given the existing placement of the Merchandising Set within a Participating Retailer Location, then in a highly visible

13

location either (a) within 48" of the main customer entrance, that can be seen by customers as they enter the store, and at least 48" above the floor, or (b) within 48" of the cash register, that can be seen by customers as they approach or are standing at the cash register/point of sale, and at least 48" above the floor, with the choice between (a) and (b) at the Participating Retailer Location's discretion;

      iv.      If (i), (ii), and (iii) are not possible, then (a) perpendicular to the main cigarette Merchandising Set, at least 48" above the floor, or (b) on a wall in front of a recessed main cigarette Merchandising Set but in a plane parallel to the front of the Merchandising Set, and at least 48" above the floor, with the choice between (a) and (b) at the Participating Retailer Location's discretion; and

      v.      If (i), (ii), (iii) and (iv) are not possible, then the retailer may request the Working Group for permission to use an alternative placement.

      b.      In addition, Non-Kiosk Stores with more than 9-horizontal linear feet of visible Merchandising Set space devoted to Covered Brands (which Manufacturers have represented as being approximately 10% of all Participating Retailer Locations), at any given time during the Implementation Period, shall post a second 348 sq. in. Set-Adjacent Corrective-Statement Sign, with placement following the hierarchy of Paragraph a, above, recognizing that it may not be possible to place a second Set-Adjacent Corrective Statement Sign in the same placement as the first Set-Adjacent Corrective Statement Sign.

      2.      During the Ramp-Up Period each Manufacturer shall amend or supplement its Participating Retailer Contracts to require Non-Kiosk Stores displaying Off-Set Promotional Signage to display during the Implementation Period, in addition to any required Set-Adjacent

14

Corrective-Statement Signs, a single 144 sq. in. Off-Set Corrective-Statement Sign from one of the Manufacturers placed in a highly visible location within 48" of the main customer entrance of the Store, that can be seen by customers as they enter the store, and at least 48" above the floor. Plaintiffs acknowledge Manufacturers' Participating Retailer Contracts do not require Participating Retailer Locations to place Off-Set Promotional Signage. A Participating Retailer Location is not subject to the contractual requirement to place an Off-Set Corrective-Statement Sign if it does not choose to display Off-Set Promotional Signage.

3.      The Manufacturers represent that some Participating Retailer Locations have expended costs for existing Semi-Permanent Displays that feature brand imagery. Any Participating Retailer Location that has such a semi-permanent display that would not otherwise be required to display an Off-Set Corrective Statement Sign may seek an exemption from the requirements of Section III.2 from the Working Group. The Working Group shall grant an exemption if it determines that (1) but for the semi-permanent display an Off-Set Corrective Statement Sign would not be required in the Participating Retailer Location, and (2) it would be unreasonable to expect the Participating Retailer Location to remove the semi-permanent display. The request may be accompanied by evidence in addition to any statement that demonstrates these points.

4.      During the Ramp-Up Period each Manufacturer shall amend or supplement its Participating Retailer Contracts to require Kiosk Stores to post during the Implementation Period a single 144 sq. in. Corrective-Statement Sign near the selling window, highly visible to the customer, and that can be seen by customers as they approach or are standing at the selling window. Placement of this Corrective-Statement Sign as a Set-Adjacent Corrective-Statement Sign will not

15

satisfy this requirement. If a Kiosk Store does not have a selling window, then the Corrective-Statement Sign shall be placed in a highly visible location, that can be seen by customers as they approach or are standing at the cash register/point of sale, or in a location approved by the Working Group prior to the start of the Implementation Period.

     5.     The Manufacturers represent that the forms of Participating Retailer Contracts most recently provided to the Plaintiffs on March 30, 2022 and June 17, 2022 remain in use and will not be amended or supplemented before the Implementation Period begins to diminish the Manufacturer's rights to (i) require Corrective-Statement Signs and noncompliance remedies in accordance with this Order or (ii) require any Participating Retailer Location to cooperate with In-Person Audits. During the Implementation Period, all Participating Retailer Contracts shall contain the provisions required by this Consent Order that (i) require Corrective-Statement Signs and noncompliance remedies in accordance with this Order, and (ii) require any Participating Retailer Location to cooperate with In-Person Audits, and the Manufacturers shall terminate any Participating Retailer Contract as to which a Participating Retailer refuses to accept such provisions.

     6.     Within 14 days of the Effective Date, each Manufacturer shall provide Plaintiffs with all of its then-current Participating Retailer Contract forms. Thereafter, until the end of the Implementation Period, any time a Manufacturer revises any Participating Retailer Contract form or establishes a new form, the Manufacturer shall provide Plaintiffs with a copy of that Participating Retailer Contract form no later than the first day such new or revised form takes effect.

IV.     **Implementation Timeline and Signage Rotation.**

1.      During the Ramp-Up Period, the Manufacturers shall print an equal number of each of the 17 distinct POS Corrective Statements and begin to distribute Corrective-Statement Signs to Participating Retailer Locations. The Manufacturers shall not distribute the Corrective-Statement Signs in a manner that results in the concentration of any particular POS Corrective Statement in any geographic region, chain of stores, or type of Participating Retailer Location. The Manufacturers shall ensure that each Participating Retailer Location is provided with each Corrective-Statement Sign(s) that it must display in order to comply with its contract and that no Participating Retailer Location receives duplicate Corrective-Statement Sign(s).

2.      Manufacturers shall provide appropriate training to their representatives who visit Participating Retailer Locations, covering the existence and provisions of this Order. Manufacturer representatives shall assist Participating Retailer Locations they visit in properly displaying required Corrective-Statement Signs.

3.      When a Corrective-Statement Sign is placed by a Manufacturer representative, the Manufacturer representative shall submit photos to the Photo Database of (i) the main cigarette Merchandising Set, (ii) any displayed Corrective-Statement Signs, and (iii) an example of Off-Set Promotional Signage for Covered Brands displayed by the Participating Retailer Location, if any, in as many images as are sufficient to show compliance with this Order.

4.      For those Participating Retailer Locations that a Manufacturer representative does not visit during the Posting Period, the Manufacturers shall mail or otherwise deliver required Corrective-Statement Signs to the Participating Retailer Location for posting. Upon posting the required Corrective-Statement Sign(s) during the Posting Period, a Participating Retailer Location

17

not visited by Manufacturer representatives may, but shall not be required to, submit a photo of the as-posted Corrective-Statement Sign(s) to the Photo Database.

5.      During the Rotation Period, each Corrective-Statement Sign required to be posted in a Participating Retailer Location shall be replaced with another Corrective-Statement Sign bearing a different POS Corrective Statement than any POS Corrective Statement previously displayed in that Participating Retailer Location. The Manufacturers shall not distribute the Corrective-Statement Signs in a manner that results in the concentration of any one POS Corrective Statement in any geographic region, chain of stores, or type of Participating Retailer Location. The Manufacturers shall ensure that each Participating Retailer Location is provided with each Corrective-Statement Sign(s) that it must display in order to comply with its contract.

a.      When a Corrective-Statement Sign is rotated by a Manufacturer representative, the Manufacturer representative shall submit photos to the Photo Database of (i) the main cigarette Merchandising Set, (ii) any displayed Corrective-Statement Signs, and (iii) an example of Off-Set Promotional Signage for Covered Brands displayed by the Participating Retailer Location, if any, in as many images as are sufficient to show compliance with this Order.

b.      For those Participating Retailer Locations that a Manufacturer representative does not visit during the Rotation Period, a Participating Retailer Location, upon posting the required replacement Corrective-Statement Sign(s), may, but shall not be required to, submit a photo of the new as-posted Corrective-Statement Sign(s) to the Photo Database.

6.      Any time that a Manufacturer representative visits a Participating Retailer Location and determines that the location is not in compliance with the terms of this Order, the representative shall counsel that Participating Retailer Location into compliance.

## V.      **Audits of Manufacturer Compliance.**

1.      The Manufacturers shall contract at their own expense with an Auditor to conduct audits of compliance with this Order in a manner consistent with the audit specifications set forth below.

2.      Prior to the start of the Implementation Period, each Manufacturer shall amend or supplement its Participating Retailer Contracts to notify Participating Retailers that: (a) audits will be conducted of compliance with this Order; (b) in connection with these audits, an Auditor may visit the Participating Retailer Location one or more times to conduct an In-Person Audit; and (c) the Participating Retailer Location has a contractual obligation to the Manufacturer to refrain from interfering with the In-Person Audit.

3.      During the Implementation Period, there shall be four Audit Periods. Two Audit Periods shall occur before the Rotation Period, and two Audit Periods shall occur after the Rotation Period. No In-Person Audits shall occur during the Rotation Period. At the beginning of each Audit Period, each Manufacturer shall provide a list of all Participating Retailer Locations to the Auditor and shall provide copies of its list to Plaintiffs. The list shall specify which Participating Retailer Locations are Kiosk Stores and, for all Participating Retailer Locations shall provide the name, address, number of signs provided, and a unique identifier. The list shall also specify which Participating Retailer Locations are Non-Kiosk Stores with more than 9-horizontal linear feet of visible Merchandising Set space devoted to Covered Brands.

4.      Photo Audits.

  a.      The Auditor shall review photos submitted to the Photo Database during the Posting Period and the Rotation Period on a rolling basis, and within 14 days of the submission of a photo that suggests noncompliance with this Order, issue a Photo Noncompliance Notice to the Participating Retailer Location and the Working Group detailing the basis for such suspected noncompliance, and whether such noncompliance, if confirmed through an In-Person Audit, would be Major Noncompliance or Minor Noncompliance.

  b.      For a period of 30 days following the issuance of a Photo Noncompliance Notice, the notified Participating Retailer Location may correct any compliance deficiency by submitting a new photo (subject to audit) to the Photo Database showing compliance or by otherwise demonstrating to the Auditor that its display of Corrective-Statement Sign(s) is compliant with this Order. If the Participating Retailer Location fails to demonstrate compliance during the 30-day period following the issuance of a Photo Noncompliance Notice, the Participating Retailer Location shall be added to the list for an In-Person Audit in the Suspected Noncompliance Pool (subject to the limits on the audit sample set forth in Section V.6.b, below).

5.      Tip Line.

  a.      The Manufacturers shall require the Auditor to create a Tip Line for the general public to report suspected noncompliance with this Order. The Auditor shall review tips received from the Tip Line, and, if the Auditor determines that a Participating Retailer Location may not be complying with this Order, the Auditor shall notify the Participating

Retailer Location and the Working Group of such suspected noncompliance and provide a monthly report to the Working Group of all tips received.

b.     Any Participating Retailer Location identified through the Tip Line as suspected of noncompliance with this Order shall be added to the Suspected Noncompliance Pool for the current Audit Period on a rolling basis (subject to the limits on the audit sample set forth in Section V.6.b, below). Once the limit of the audit sample set is reached or when there are less than 4 weeks remaining in the then current Audit Period, whichever occurs first, a Participating Retailer Location identified through the Tip Line shall be added to the list of Participating Retailer Locations eligible to be selected by Plaintiffs for an In-Person Audit from the Suspected Noncompliance Pool for the next Audit Period. Any Participating Retailer Location identified through the Tip Line and suspected of noncompliance during the Rotation Period, and selected by Plaintiffs for an In-Person Audit in the Suspected Noncompliance Pool, shall be added to the list for an In-Person Audit in the Suspected Noncompliance Pool for the third Audit Period (subject to the limits on the audit sample set forth in Section V.6.b, below).

c.     Any Participating Retailer Location identified through the Tip Line that does not later receive an In-Person Audit during the current Audit Period shall be sent a warning letter from the Auditor notifying the Participating Retailer Location that it was identified through the Tip Line as suspected of noncompliance and reminding the Participating Retailer of its obligations under its Participating Retailer Contract.

6.      In-Person Audits. During each Audit Period, the Auditor shall conduct In-Person Audits of Participating Retailer Locations drawn from two separate pools: the Representative Sample Pool and the Suspected Noncompliance Pool.

a.      Representative Sample Pool. The Auditor shall designate a Representative Sample of 6,000 Participating Retailer Locations for In-Person Audit during each Audit Period.

b.      Suspected Noncompliance Pool. During each Audit Period, the Auditor shall provide the Working Group notice of the Participating Retailer Locations included in the Suspected Noncompliance Pool. In each Audit Period, the Auditor shall conduct an In-Person Audit of up to 4,000 Participating Retailer Locations drawn from the Suspected Noncompliance Pool. If there are more than 4,000 Participating Retailer Locations in the Suspected Noncompliance Pool in any Audit Period, then prior to the beginning of each Audit Period, Plaintiffs shall select the Participating Retailer Locations from the Suspected Noncompliance Pool to be subject to In-Person Audit.

c.      If the Auditor determines that any Participating Retailer Location in the audit sample is no longer a Participating Retailer Location, that Participating Retailer Location shall be replaced in the audit sample with a Participating Retailer Location that is (i) in the same United States Census Region or United States Territory and (ii) was shipped a volume of Covered Brands of cigarettes in the last 12 months that is similar to the Participating Retailer Location being replaced.

d.      When conducting an In-Person Audit, the Auditor shall make all reasonable efforts not to interfere with the Participating Retailer Location's business activities and, in

22

any event, shall not interfere with the Participating Retailer Location's business activities any more than is necessary in order to take photos.

     e.     The Auditor shall evaluate those photos taken during an In-Person Audit to determine whether the Participating Retailer Location is displaying the Corrective-Statement Signs required for that Participating Retailer Location by its revised Participating Retailer Contract. The Auditor shall record any criteria that the Auditor determined in good faith were not satisfied and, in the event of noncompliance, issue an In-Person Noncompliance Notice to the Participating Retailer Location and Working Group by email within 21 days of the In-Person Audit.

     f.     Once a Participating Retailer Location is selected for an In-person Audit, either in the Representative Sample Pool or the Suspected Noncompliance Pool, the Auditor shall not disclose the identity of selected Participating Retailer Locations to anyone until after the completion of the In-person Audits, at which time the Auditor shall provide a report to the Working Group on the findings of the audit, including the evidence supporting such findings for each audited Participating Retailer Location.

7.    Noncompliance Appeals.

     a.     An In-Person Noncompliance Notice will become a Final Determination of Noncompliance 15 days after it is issued, unless there is a Noncompliance Appeal.

     b.     Within 14 days of issuance of an In-Person Noncompliance Notice, a Participating Retailer Location or member of the Working Group may submit a Noncompliance Appeal of the Auditor's decision by email to the Working Group.

c.      Within 7 days of receiving Noncompliance Appeal, the Working Group shall decide whether to affirm, vacate, or modify the In-Person Noncompliance Notice. If the Working Group decides by the vote of a majority of the members of the Working Group in attendance, including by proxy, to affirm, vacate, or modify the In-Person Noncompliance Notice, it shall immediately, by email, notify the Participating Retailer Location and the Auditor of its decision.

d.      A decision on a Noncompliance Appeal of Minor Noncompliance Notice made by the vote of a majority of the members of the Working Group in attendance, including by proxy, at a meeting of the Working Group is final and not subject to appeal.

e.      A Working Group decision adverse to the Participating Retailer Location on a Noncompliance Appeal of Major Noncompliance Notice by the vote of a majority of the members of the Working Group in attendance, including by proxy, at a meeting of the Working Group, may be appealed to the Adjudicator by the Participating Retailer Location or a member of the Working Group by email within 7 days following the decision of the Working Group.

f.      If there is a tie vote of the members of the Working Group in attendance, including by proxy, at a meeting of the Working Group regarding a Noncompliance Appeal following either a Major Noncompliance Notice or Minor Noncompliance Notice, such decision may be appealed by the Participating Retailer Location or a member of the Working Group by email within 7 days following issuance of the decision of the Working Group. A decision made by the Adjudicator following a tie at the Working Group of

Noncompliance Appeal of a Minor Noncompliance Notice shall be final and not subject to appeal.

g.      The Adjudicator's decision on a Noncompliance Appeal of a Major Noncompliance Notice is appealable to the Court by the Participating Retailer Location or a member of the Working Group. Any such appeal shall be submitted within 7 days of the Adjudicator's decision. If the Adjudicator's decision on a Noncompliance Appeal of a Major Noncompliance Notice is adverse and the result of the Major Noncompliance Notice is that the Participating Retailer Location must post an additional Corrective Statement Sign or be subject to other non-monetary consequences, such sign shall be posted or other non-monetary consequences shall occur during any appeal. No required financial payment resulting from a Major Noncompliance Notice shall be due while an appeal is pending.

h.      The Court's standard of review for a Noncompliance Appeal decision made by the Adjudicator shall be clear error, regardless of the basis for the appeal.

i.      Any Adjudicator decisions under this section must be issued within 14 days of the conclusion of briefing to the Adjudicator.

j.      If a Participating Retailer Location establishes that it did not receive Corrective-Statement Sign(s) from a Manufacturer at all, or in insufficient number to fulfill the requirements of Section III above, or that the Corrective-Statement Sign(s) received did not comply with this Consent Order, the Participating Retailer Location shall be deemed compliant with the Participating Retailer's contractual obligations to Manufacturers under this Order. The Manufacturers shall immediately correct the issue that caused the finding of noncompliance. If the noncompliance was discovered during an

25

In-Person Audit of the Representative Sample Pool, the Participating Retailer Location shall count as noncompliant for purposes of calculating the Representative Sample Noncompliance Rate. This paragraph does not preclude considering contempt against a Manufacturer.

VI.     **Result of Audit**.

1.     Minor Noncompliance.  With respect to any Participating Retailer Location:

a.     Upon the first Final Determination of an incidence of Minor Noncompliance, the noncompliant Participating Retailer Location shall be counseled into compliance by the Manufacturers.

b.     Upon the second Final Determination of an incidence of Minor Noncompliance upon, the noncompliant Participating Retailer Location shall be counseled into compliance by the Manufacturers and receive a warning letter from the Auditor that the third finding of Minor Noncompliance will result in the consequences described in Section VI.1.c, below, as shall be set forth in all Participating Retailer Contracts.

c.     Upon the third Final Determination of an incidence of Minor Noncompliance, the noncompliant Participating Retailer Location shall be counseled into compliance by the Manufacturers and shall be required to post an additional 144 sq. in. Corrective-Statement Sign for 120 days in one of the locations provided in Section III.1.a or III.2, above.

2.     Major Noncompliance.  With respect to any individual Participating Retailer Location:

a.      Upon   the   first   Final   Determination   of   an   incidence   of   Major Noncompliance,  the noncompliant  Participating  Retailer Location  shall be (i) counseled into compliance  by the Manufacturers and (ii) required to post an additional  144 sq. in. Corrective-Statement Sign in one of the locations  provided in Sections III.1.a or III.2, above, with such additional  sign to be posted for the remainder of the Implementation Period.  Notwithstanding   the  foregoing,  for  Participating   Retailer  Locations   that Manufacturer representatives do not regularly visit and have not visited  since the beginning of the Posting Period, upon the first finding  at such a Participating  Retailer  Location  of Major Noncompliance  after an In-Person Audit, the noncompliant  Participating  Retailer Location shall (i) be counseled into compliance  by the Manufacturers and (ii) receive a warning  letter from the Auditor that subsequent  findings  of Major Noncompliance  will result in required payments.

b.      Upon   the  second  Final   Determination   of  an   incidence   of  Major Noncompliance,  the noncompliant  Participating  Retailer Location shall (i) be counseled into compliance  by the Manufacturers and (ii) owe to each Manufacturer with which it is contracted a payment equal to any Price Promotion  for Covered Brands owed to the Participating  Retailer Location by each contracted Manufacturer for a period of 4 weeks. The Participating  Retailer Location will  have 4 weeks to either (i) make the payment to each contracted Manufacturer or (ii) elect to have future payment under its Participating Retailer Contract withheld until the amount of the payment is fully  satisfied. In choosing between paying the payment and having future payments withheld, a Participating  Retailer Location need not make the same choice with regard to each contracted Manufacturer.  If

27

the Participating Retailer Location does not make the payment by the end of this four-week period or elect to have payments withheld, the unpaid Manufacturers shall withhold future payments owed to the Participating Retailer Location under the Participating Retailer Contract(s) until the payment is satisfied. Once the payment is fully offset, the Manufacturer(s) shall resume payments to the Participating Retailer Location, including the remaining balance of any payment partially offset by the payment. The Participating Retailer Location may pay the outstanding balance at any time even if Manufacturers have started to withhold future payments.

      c.      Upon the third Final Determination of an incidence of Major Noncompliance, the noncompliant Participating Retailer Location shall (i) be counseled into compliance by the Manufacturers and (ii) owe to each Manufacturer with which it is contracted a payment equal to any Price Promotion for Covered Brands owed to the Participating Retailer Location by each contracted Manufacturer for a period of 13 weeks. The Participating Retailer Location will have 4 weeks to either (i) make the payment to each contracted Manufacturer, or (ii) elect to have future payment under its Participating Retailer Contract withheld until the amount of the payment is fully satisfied. In choosing between paying the payment and having future payments withheld, a Participating Retailer Location need not make the same choice with regard to each contracted Manufacturer. If the Participating Retailer Location does not make the payment by the end of this four-week period or elect to have payments withheld, the unpaid Manufacturers shall withhold future payments owed to the Participating Retailer Location under the Participating Retailer Contract(s) until the payment is satisfied. Once the payment is fully offset, the

Manufacturer(s) shall resume payments to the Participating Retailer Location, including the remaining balance of any payment partially offset by the payment. The Participating Retailer Location may pay the outstanding balance at any time, even if Manufacturers have started to withhold future payments.

  d.  Upon the fourth Final Determination of an incidence of Major Noncompliance, the noncompliant Participating Retailer Location shall (i) be counseled into compliance by the Manufacturers and (ii) be suspended for 17 weeks from the Participating Retailer Contracts of each Manufacturer with which it is contracted. This suspension period will begin 45 days after the Final Determination of such noncompliance.

  3.  The Manufacturers shall provide proof of satisfaction of additional signage required by Section VI.1.c and Section VI.2.a, the monetary payments required by Section VI.2.b and VI.2.c, and the suspension from the Participating Retailer Contracts required by Section VI.2.d to the Auditor and the Working Group within 30 days after such actions were required to be completed.

  4.  Monetary Penalty. If the Auditor finds a Representative Sample Noncompliance Rate greater than fifteen percent (15%) in any of the first, second, or third Audit Periods, and such finding is not subsequently revised below that threshold by challenges to the audit results, then the Manufacturers shall pay a civil penalty to the U.S. Treasury of Three Million Five Hundred Thousand Dollars ($3,500,000) to be apportioned among the Manufacturers as determined by the Manufacturers. If the Auditor finds a Representative Sample Noncompliance Rate greater than fifteen percent (15%) in the fourth Audit Period, and such finding is not subsequently revised below that threshold by challenges to the audit results, then the Manufacturers shall pay a civil

penalty to the U.S. Treasury of Seven Million Five Hundred Thousand Dollars ($7,500,000) to be apportioned among the Manufacturers as determined by the Manufacturers. The results of the In-Person Audits of the Suspected Noncompliance Pool shall not be considered in determining whether this monetary penalty provision has been triggered. Any payments under this Section shall be made within 30 days of the penalty accruing.

## VII.   <u>Working Group.</u>

1.     Plaintiffs and Manufacturers shall establish a Working Group to address implementation and compliance questions and any individual circumstances that do not meet this Order's terms. The Working Group may begin fielding implementation questions upon the Effective Date, shall continue providing assistance through the end of the remedy, and is authorized to resolve Noncompliance Appeals as described herein.

2.     Attendance of six members of the Working Group, with at least one member representing, including by proxy, each of the Department of Justice, the Public Health Intervenors, the Manufacturers, and the Retailer Groups, and attendance of the Mediator constitutes a quorum for the transaction of business. By unanimous consent of the members of the Working Group otherwise constituting a quorum, the absence of the Mediator may be excused. At any point during any meeting, if less than a quorum is present, the meeting shall adjourn without further notice. A member of the Working Group may participate in a meeting by conference telephone or other remote communications equipment by means of which all persons participating in the meeting can communicate with one another. Participation in a meeting in this manner constitutes presence in person at the meeting. A member of the Working Group may appoint a proxy, including another member of the Working Group, to attend, participate, vote, or otherwise act for the member.

3.      At any meeting of the Working Group at which a quorum is present, the vote of a majority of the members of the Working Group in attendance, including by proxy, shall be the act of the Working Group. A written record shall be kept of all acts of the Working Group.

4.      The Mediator shall serve and the Adjudicator shall issue decisions, as follows:

a.      The Mediator shall attempt to facilitate informal resolution of Working Group disputes. If there is a tie vote of the members of the Working Group in attendance, including by proxy, at a meeting of the Working Group, the Mediator shall vote on the issue to break the tie.

b.      The Adjudicator may be asked to hear Noncompliance Appeals on the terms provided in Section V.7 above and to hear appeals from tie-breaking decisions of the Mediator. The Participating Retailer Location, or the member of the Working Group seeking the Adjudicator's appellate review, may submit a brief at the same time as the notice of appeal provided for in Section V.7.e-f above. Any other member of the Working Group or the Participating Retailer Location (if it is not the appellant) may submit a brief in support of the appellant's position within 3 business days of the appellant's notice of appeal. Any other member of the Working Group may submit a brief in opposition to the appellant's position within 7 business days of the appellant's notice of appeal. Briefs submitted to the Adjudicator pursuant to this paragraph may be no more than 5 pages. Any Adjudicator decisions under this section must be issued within 14 days of the conclusion of briefing to the Adjudicator.

c.      Linda Singer, Esq. shall serve as the initial Mediator. The Honorable Richard A. Levie (ret.) shall serve as the initial Adjudicator. Should the Mediator or

Adjudicator resign by notice to the Court and members of the Working Group or otherwise become unavailable to serve, the Mediator or Adjudicator may be replaced by unanimous agreement of the members of the Working Group to nominate a new Meditator or Adjudicator, or, if the Working Group cannot so agree, by a replacement appointed by the Court.

d.      In the event that one of the Mediator or Adjudicator is temporarily unable to serve, the other shall fill in for the unavailable individual on that issue; in such a circumstance where the Adjudicator fills in for the Mediator on a specific issue, the Mediator shall fill the Adjudicator's role, if any, with respect to that specific issue. For the avoidance of doubt, the Mediator shall not fill the Adjudicator's role with respect to a specific issue in which the Mediator issued a tie breaking vote at the Working Group level.

e.      Manufacturers shall pay all fees and costs of the Mediator and Adjudicator, allocated amongst Manufacturers as they see fit.

5.      The Retailer Groups' participation in the Working Group will be voluntary, and their status as non-parties invited by the Court to provide input will not change by virtue of this Order or their participation in the Working Group. In the event either or both Retailer Groups opt out of the Working Group, the Manufacturers shall fill the remaining spots on the Working Group by appointing additional individuals to bring the total membership to 10.

## VIII.   Additional Provisions.

1.      This Fourth Superseding Consent Order Implementing the Corrective-Statements Remedy at Point of Sale modifies certain provisions of Order #1015. Where the terms of this Fourth Superseding Consent Order differ from Order #1015, this Fourth Superseding Consent Order will govern.

2.      The Corrective-Statement Sign formats specified above and illustrated in Exhibit A are intended to be comprehensive. No Manufacturer shall alter, modify, or add to the specified elements of these formats, and no additional text, images, or other elements may be included, absent approval of a majority of the Working Group or further Order of this Court.

3.      The parties agree that, if the parties' (Proposed) Fourth Superseding Consent Order Implementing the Corrective-Statements Remedy at Point of Sale is approved by this Court without modification, then the parties will not challenge on appeal this Fourth Superseding Consent Order, and the specific implementation executions will commence on the schedule specified herein, unless this Court orders otherwise. However, should the Court modify any term or requirement in the parties' (Proposed) Fourth Superseding Consent Order Implementing the Corrective-Statements Remedy, no party waives or abandons any appeal or appellate rights or argument, and the parties reserve the right to seek different requirements than those stated herein.

4.      The parties agree to refrain from soliciting or supporting in any way any opposition to this Order from any other person or entity, except by voluntarily providing requested relevant information to another person or entity.

5.      Defendants and the Remedies Parties' agreement to these terms and to these executions of the POS Corrective Statements prescribed by Order #72-Remand shall not be deemed or construed as an admission of Defendants or the Remedies Parties, collectively or individually.

6.      Nothing in this Order shall be construed as precluding any other relief provided by law, including a finding of contempt.

7.     Should there be any stay of the implementation of this Order, any party may petition the Court to vacate this Order and nullify the settlement. Should the Court do so, it will then set this matter for the evidentiary hearing that was previously scheduled to begin on June 13, 2022, at the soonest opportunity.

8.     This Fourth Superseding Consent Order is the complete agreement of the parties as to the point of sale remedy and supersedes any prior negotiations, agreements, or understandings of the parties as to the parties' agreement. The terms of this Order cannot be modified or amended without written consent by all parties.

**SO ORDERED.**

DATED: _December 6_, 2022

_____
PAUL L. FRIEDMAN
U.S. District Judge

We consent to entry of the above superseding consent order:

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
LISA K. HSIAO, Assistant Director
Consumer Protection Branch

/s/
_____
ADAM E. LYONS
Assistant Director
DANIEL K. CRANE-HIRSCH
JAMES T. NELSON
Senior Trial Attorneys
ZACHARY A. DIETERT
MEREDITH B. HEALY

34

Trial Attorneys
Civil Division
United States Department of Justice
PO Box 386
Washington, DC 20044-0386
Telephone: 202-532-4406 (Lyons)
adam.e.lyons@usdoj.gov

*Attorneys for Plaintiff United States of
America*

/s/

Scott P. Lewis (pro hac vice)
slewis@andersonkreiger.com
Melissa C. Allison (pro hac vice)
mallison@andersonkreiger.com
Christina S. Marshall (D.C. Bar # MA0022)
cmarshall@andersonkreiger.com
ANDERSON & KREIGER LLP
50 Milk, 21st Floor
Boston, MA 02109
Telephone: 617-621-6500
Fax: 617-621-6660
*Attorneys for the Public Health Plaintiff-
Intervenors*

/s/

Miguel A. Estrada (D.C. Bar No. 456289)
Amir C. Tayrani (D.C. Bar No. 490994)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone: (202) 955-8257
Fax: (202) 530-9016
mestrada@gibsondunn.com
atayrani@gibsondunn.com

George C. Lombardi
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601

35

Telephone: (312) 558-5969
Fax: (312) 558-5700
glombard@winston.com

*Attorneys for Defendants Altria Group, Inc.
and Philip Morris USA Inc.*


/s/

John M. Gore (D.C. Bar No. 502057)
Jon G. Heintz (pro hac vice)
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Fax: (202) 626-1700
jmgore@jonesday.com
jheintz@jonesday.com

Jeffrey A. Mandell (D.C. Bar No. 999791)
Stafford Rosenbaum LLP
222 West Washington Avenue, Suite 900
Madison, Wisconsin 53703
Telephone: (608) 256-0226
Fax: (608) 259-2600
jmandell@staffordlaw.com

*Attorneys for Defendant R.J. Reynolds
Tobacco Company (individually, as
successor in interest to Brown & Williamson
Tobacco Corporation, and as successor to
Lorillard Tobacco Company)*


/s/

Elizabeth B. McCallum (D.C. Bar No.
451361)
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304
Telephone: (202) 861-1500
Fax: (202) 861-1783

*Attorneys for Post-Judgment Parties
Regarding Remedies ITG Brands, LLC,*

36

*Commonwealth Brands, Inc. and*
*Commonwealth-Altadis, Inc.*

**Exhibits**

Exhibit A—Revised Style Guide for Corrective-Statement Signs (including Spanish language)

Exhibit B—Examples of Major/Minor Noncompliance

# Exhibit A



# GUIDELINES FOR COURT-ORDERED CORRECTIVE-STATEMENTS SIGNS AT RETAIL POINTS OF SALE

July 2022

**TABLE OF CONTENTS**

3   Overview

4   POS Corrective-Statements Signs Architecture

7   POS Corrective-Statements Signs Elements / English

10   POS Corrective-Statements Signs Elements / Spanish

13   POS Corrective-Statements Signs Size Variations

15   General Rules

**OVERVIEW**

A Federal Court Order requires "POS Corrective-Statements Signs" to be displayed with certain cigarette merchandising sets and off-set cigarette marketing material at retail points of sale.

These guidelines explain the POS Corrective-Statements Signs' design and display.

All POS Corrective-Statements Signs must comply with these guidelines.



**POS CORRECTIVE-STATEMENTS SIGNS ARCHITECTURE**

This is the basic architecture of the POS Corrective-Statement Sign. Although the substantive statements vary in length, the containers in which they are presented should all follow these instructions. The asterisk icon is always on the left side of the POS Corrective Statement, and the preamble is always in an aqua blue box that is designed at 25% of the entire container. There are two versions of the preamble. The POS Corrective-Statements Signs come in two sizes – 348 and 144 square inches – in both a rectangular and square orientation.



**POS Corrective-Statement Sign**

## POS CORRECTIVE-STATEMENTS SIGNS DESIGN / TYPOGRAPHY / COLOR PALETTE



A FEDERAL COURT HAS ORDERED R.J. REYNOLDS TOBACCO & PHILIP MORRIS USA TO STATE:

More people die every year from smoking than from murder, AIDS, suicide, drugs, car crashes, and alcohol, **combined.**

**Helvetica Bold** used for the preamble.

ABCDEFGHIJKLMNOPQRSTUVWXYZ

**Tisa Pro Bold** used for the factual statements.

ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz 0123456789!@#%&*(,.:"?)

**Tisa Pro Black** used for the words of a factual statement that show in heavy type.

ABCDEFGHIJKLMNOPQRSTUVWXYZ
abcdefghijklmnopqrstuvwxyz 0123456789!@#%&*(,.:"?)

**Color Palette**
POS Corrective-Statements Signs use this color palette.



Aqua Blue
C: 50
M: 0
Y: 17
K: 0

R: 119
G: 205
B: 214



Magenta
C: 15
M: 94
Y: 26
K: 0

R: 209
G: 50
B: 119



Rich Black 4c
C: 30
M: 30
Y: 30
K: 100

R: 0
G: 0
B: 0





POS CORRECTIVE-STATEMENTS SIGNS ELEMENTS / ENGLISH

## PREAMBLE VARIATIONS / ENGLISH

There are two versions of the preamble in English.

Preamble One / English

> **A FEDERAL COURT HAS ORDERED
> R.J. REYNOLDS TOBACCO & PHILIP MORRIS USA TO STATE:**

Preamble Two / English

> **A FEDERAL COURT HAS ORDERED
> PHILIP MORRIS USA & R.J. REYNOLDS TOBACCO TO STATE:**

## 17 POS CORRECTIVE-STATEMENTS SIGNS / ENGLISH

There are 17 versions of the POS Corrective-Statements Signs in English.



















POS CORRECTIVE-STATEMENTS SIGNS ELEMENTS / SPANISH

## PREAMBLE VARIATIONS / SPANISH

There are two versions of the preamble in Spanish.

Preamble One / Spanish

**UNA CORTE FEDERAL HA ORDENADO A R.J. REYNOLDS TOBACCO
Y PHILIP MORRIS USA A REALIZAR LA SIGUIENTE DECLARACIÓN:**

Preamble Two / Spanish

**UNA CORTE FEDERAL HA ORDENADO A PHILIP MORRIS USA
Y R.J. REYNOLDS TOBACCO A REALIZAR LA SIGUIENTE DECLARACIÓN:**

## 17 POS CORRECTIVE-STATEMENTS SIGNS / SPANISH

There are 17 versions of the POS Corrective-Statements Signs in Spanish.









## POS CORRECTIVE-STATEMENTS SIGNS / SIZE VARIATIONS

The images below are representations, that show some distortion, and are not actual size. Final outputs should be printed at 100% for in-store placement. The preamble box is designed at 25% of the container's total area.

### 348 SQ INCH



Note: All preamble boxes have been sized at 25% of the container's total area.

18.655" X 18.655"



32" X 10.875"

### 144 SQ INCH



12" X 12"



20" X 7.2"

14    Guidelines for Court-Ordered POS Corrective-Statements Signs

# GENERAL RULES



## POS CORRECTIVE-STATEMENTS SIGNS / INCORRECT USAGE

POS Corrective-Statements Signs must be printed
on (i) 18pt - 20pt card stock or material with similar
durability and stiffness or (ii) vinyl or material with
similar durability and stiffness.

**Incorrect Usage**

1  Never change the colors

2 Never rotate the corrective container

3 Never distort the proportion

4 Never add a drop shadow

5 Never add type elements

6 Never change the opacity

7 Never change the artwork to include a graphic frame.
   A physical frame is permitted for support as long as no
   graphics are obscured

8 Never change the proportions

9 Never change the position of elements



16   Guidelines for Court-Ordered POS Corrective-Statements Signs

## POS CORRECTIVE-STATEMENTS SIGNS / CLEARANCE & PLACEMENT

The Consent Order sets forth the precise
requirements for placement of the POS
Corrective-Statement Signs. These images
show only some examples of potential
POS Corrective-Statement Sign placement.





At Least 48"

# Exhibit B

## Examples Of Major And Minor Noncompliance

I.     **Examples Of Major Noncompliance**

A retail location comes into major noncompliance by:

1. Failing to post any sign that it is required to post

2. Posting a sign in a location that results in the message (Preamble or corrective statement) not being visible from the customer's vantage point

3. Obstructing any portion of the message (Preamble or corrective statement) or icon on any sign that it is required to post

4. Defacing or damaging a sign in any way that renders unreadable from the customer's vantage point any portion of the message (Preamble or corrective statement) on any sign that the location is required to post

5. Taking down a sign that it is required to post before expiration of the Full Implementation Period

6. Placing an on-set sign in a position in the hierarchy that is lower than possible, where the location has previously been found noncompliant on this basis via in-person audit. *E.g.*:
   - Placing a sign in position #3 when position #1 or #2 is possible, after the location was found noncompliant via in-person audit for placing a sign in position #3 when #1 or #2 is possible.

7. Failing to rotate its sign as required, as determined in an in-person audit, unless the retail location has uploaded a photo showing compliance with the rotation requirement within 30 days of the finding of noncompliance.

8. Posting a sign in English where it is required to post a sign in Spanish, where the location has previously been found noncompliant on this basis via in-person audit

II.    **Examples Of Minor Noncompliance**

A retail location comes into minor noncompliance by:

1. Obstructing any portion of a sign other than the message (Preamble or corrective statement) or icon

2. Placing an on-set sign in a position in the hierarchy that is lower than possible, unless the location has previously been found noncompliant on this basis via in-person audit. *E.g.*:
   - A retail location placing a sign in position #3 when position #1 or #2 is possible.

1

3.  Posting a sign whose message is visible to customers but not in the precise location required. *E.g.*:

    - An on-set sign that is up to 12" lower than 48" (*i.e.*, between 36" and 48") but whose message is still visible from the customer's vantage point;
    - An on-set sign that is not exactly in the same plane as the fixture but whose message is still visible from the customer's vantage point;
    - An off-set sign that is up to 12" farther from the main entrance than 48" (*i.e.*, between 48" and 60" from the main entrance)

4.  Posting a sign in English where it is required to post a sign in Spanish, unless the location has previously been found noncompliant on this basis via in-person audit