UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————
                                                    )
UNITED STATES OF AMERICA,               )
                                                    )
                Plaintiff,                          )
                                                    )
        v.                                          )        Civil Action No. 99-2496 (PLF)
                                                    )
PHILIP MORRIS USA INC. et al.,          )
                                                    )
                Defendants.                         )
———————————————————)


OPINION

        On December 6, 2022, the Court granted the parties' Joint Motion to Enter Fourth

Superseding Consent Order Implementing the Corrective-Statements Remedy at Point of Sale

("Settlement Mot.") [Dkt. No. 6507] and entered the parties' proposed Fourth Superseding

Consent Order Implementing the Corrective-Statements Remedy at Point of Sale [Dkt.

No. 6520]. See Order #128-Remand [Dkt. No. 6521]; Order #129-Remand, Fourth Superseding

Consent Order Implementing the Corrective-Statements Remedy at Point of Sale ("POS Consent

Order") [Dkt. No. 6522].[1]  The Court's order stated that an opinion explaining the Court's

————————————————

        [1]        The parties are the United States and the Public Health Intervenors (collectively,
"plaintiffs"); Philip Morris USA Inc., Altria Group, Inc., and R.J. Reynolds Tobacco Company
(individually, as successor in interest to Brown & Williamson Tobacco Corporation, and as
successor to Lorillard Tobacco Company) (collectively, "defendants"); and ITG Brands, LLC,
Commonwealth Brands, Inc., and Commonwealth-Altadis, Inc. (collectively, the "remedies
parties").  Defendants and the remedies parties are collectively referred to as the
"manufacturers."  The nonparty national retailer groups – the National Association of
Convenience Stores ("NACS") and the National Association of Tobacco Outlets ("NATO") – are
collectively referred to as the "retailer groups."

reasons for concluding, after notice and hearing, that the POS Consent Order should be entered

would follow in due course.  See Order #128-Remand at 2.

   After careful consideration of the parties' proposed consent order, the views of

participating retailers both opposing and supporting the proposed consent order, and the basis for

the D.C. Circuit's limited remand to the district court "to make due provision for the rights of

innocent third parties," United States v. Philip Morris, 566 F.3d 1095, 1150 (D.C. Cir. 2009) (per

curiam) – and after conducting a POS Settlement Hearing on July 28, 2022 – the Court entered

the POS Consent Order for the following reasons.[2]


## I.   BACKGROUND

   Litigation in this matter has persisted for over two decades.  While the facts and

procedural history of the case have been extensively laid out in previous opinions and orders of

both this Court and the court of appeals, see, e.g., United States v. Philip Morris USA Inc., 566

F.3d at 1105-10, the Court will briefly set forth the most pertinent details below.


### A.   The Remedial Order

   After a nine-month bench trial concluding in 2006, Judge Gladys Kessler

determined that the defendant manufacturers had conspired to and did in fact violate the

substantive provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"),

18 U.S.C. § 1962.  See United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1, 27

---

[2]    A participating retailer is defined as "a retailer that is a party to a Participating
Retailer Contract."  POS Consent Order at ¶ Z.  A Participating Retailer Contract "means a
contract with a retailer that permits the Manufacturer (i) to choose the placement of Covered
Brands of cigarettes in or on a Merchandising Set related to Covered Brands or (ii) to approve,
place, remove, or require the placement or removal of advertising, marketing, promotional or
other informational material that advertises, markets, or promotes its Covered Brands in a Store."
Id. at ¶ AA.

(D.D.C. 2006).  In accordance with that finding, Judge Kessler issued a remedial order that set forth remedies tailored to prevent and restrain future RICO violations by the defendant tobacco manufacturers, including an injunction that required the defendants to issue "corrective statements."  United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 27; 938-41 (setting forth Order #1015 Final Judgment and Remedial Order [Dkt. No. 5733]); see also 18 U.S.C. § 1964 (vesting courts with "jurisdiction to prevent and restrain [RICO violations] by issuing appropriate orders . . . making due provision for the rights of innocent persons").

Judge Kessler determined that such an injunction "[wa]s appropriate and necessary to prevent and restrain [defendants] from making fraudulent public statements on smoking and health matters in the future."  United States v. Philip Morris USA, Inc., 449 F. Supp. 2d at 926.  One requirement, known as the "Point-of-Sale" or "POS remedy," ordered retailers participating in the defendants' Retail Merchandising Program to display signs with corrective statements at the retail point of sale of tobacco products.  See id. at 939-40; United States v. Philip Morris USA Inc., 566 F.3d at 1141.  Under the Retail Merchandising Program, participating retailers enter into contracts with the defendants to display the manufacturers' in-store advertising.  Id.

On appeal, the D.C. Circuit largely affirmed Judge Kessler's findings, conclusions, and injunctive order, but "vacate[d] the remedial order as it regard[ed] point-of-sale displays and remand[ed] for the district court to make due provision for the rights of innocent third parties."  United States v. Philip Morris USA Inc., 566 F.3d at 1150.  The court of appeals reasoned that the retailers affected by the POS remedy "did not receive notice of th[e] remedy or an opportunity to present evidence or arguments to the district court regarding the impact the

injunction would have on their businesses," nor did the district court "independently consider[] the impact of th[e] [remedy] on affected retailers," as required by Section 1964(a).  Id. at 1141.

To adequately resolve this issue on remand, this Court determined that an evidentiary hearing would be necessary to allow the parties to present their legal and factual arguments concerning the implementation of the POS remedy and to allow third party retailers the opportunity to air their concerns.  See Order #86-Remand [Dkt. No. 6283].  And on December 20, 2019, the Court clarified the scope of the evidentiary hearing.  See United States v. Philip Morris USA Inc., 436 F. Supp. 3d 1 (D.D.C. 2019) (Opinion and Order #92-Remand [Dkt. No. 6308]).  The Court concluded that the only remaining question for adjudication at the evidentiary hearing was "whether this Court can craft a new proposal to implement the POS remedy that makes due provision for retailers' rights."  Id. at 7.  In order to sufficiently make "due provision" for retailers' rights, the Court further concluded that it would consider evidence to determine

> (1) whether the plaintiffs' 2018 proposal for implementing the POS remedy will have an adverse impact on the retailers' rights; if so, (2) whether that proposal (or some modification thereof) is sufficiently tailored to minimize the impact on retailers; and (3) even if tailored to minimize the impact on the retailers' rights, whether it nevertheless interferes with those rights to such an extent as to make any implementation of the POS remedy improper.

United States v. Philip Morris USA Inc., 436 F. Supp. 3d at 9.

### B.  The Settlement and Consent Order

On May 3, 2022, the parties informed the Court that "[a]fter extensive, months-long discussions and negotiations, [they] ha[d] reached an agreement in principle to settle the point-of-sale messaging portion of the corrective-statements remedy."  Joint Motion for Status

Conference and Stay of Deadlines [Dkt. No. 6496] at 1.  In light of the parties' representations regarding an agreement in principle, the Court vacated the evidentiary hearing.  See Order #122-Remand [Dkt. No. 6497].  The Court instead scheduled a "POS Settlement Hearing" to "determine whether any proposed settlement is 'fair, adequate, and reasonable,' to consider the rights of retailers, and to hear any objections to the proposed settlement raised by any affected retailers, who will be notified of the parties' proposed settlement."  Order #123-Remand [Dkt. No. 6498] at 1 (citing United States v. Philip Morris USA Inc., 566 F.3d at 1141-42).

On June 28, 2022, the Court set forth the procedures for the POS Settlement Hearing.  See Order #125-Remand ("Procedures Order") [Dkt. No. 6503].  This order included procedures for (1) notice of the proposed settlement to all "participating retailers"; (2) written submissions from participating retailers for those who wished to express their views either opposing or supporting the proposed settlement; and (3) the consideration of oral objections from participating retailers during the hearing.  See id.; see also Minute Order (July 1, 2022) (regarding final approval of the notice to participating retailers).  On July 15, 2022, the parties filed a joint motion seeking the Court's approval of their proposed settlement agreement.  See Settlement Mot.  And that same day, the parties notified the Court that notice of the proposed settlement and procedures for the POS Settlement Hearing had been provided to all participating retailers.  See Notice of Distribution of Notice Regarding Corrective-Statements Remedy at Point of Sale [Dkt. No. 6508].

Before the POS Settlement Hearing, the Court received nine written submissions from participating retailers.  See Notice ("Retailer Notice") [Dkt. No. 6523] at Exs. A-I.  Four submissions supported the parties' proposed consent order, see id. at Exs. F-I, two submissions opposed the proposed consent order, see id. at Exs. B-C, and three submissions failed to

substantively respond to the terms and conditions of the proposed consent order, instead addressing unrelated matters, see id. at Exs. A, D, E.  After the POS Settlement Hearing, the Court received two additional submissions from one of the participating retailers.  See id. at Exs. J-K.

The retailer groups – which collectively represent over 100,000 of participating retailers – also filed submissions expressing their support of the parties' settlement.  See Response to the Parties' Consent Motion to Approve Consent Order on Retail Point of Sale Remedy by National Association of Tobacco Outlets ("NATO Resp.") [Dkt. No. 6509]; see also National Association of Convenience Stores' Response to the Parties' Joint Motion to Enter Fourth Superseding Consent Order Implementing the Corrective-Statements Remedy at Point of Sale ("NACS Resp.") [Dkt. No. 6510].  The retailer groups stated that they had participated substantially in the parties' negotiations and "[did] not object to the Court's acceptance of the parties' proposed Settlement Agreement and Consent Order."  NATO Resp. at 1-2; see also NACS Resp. at 1-2.

During the July 28, 2022 POS Settlement Hearing, the parties explained the terms of the settlement and implementation of the proposed consent order.  The Court asked numerous questions seeking to better understand how the proposed consent order made due provision for the rights of participating retailers.  In addition, the parties responded to the relevant written statements that had been submitted by participating retailers, and the Court heard from one participating retailer, John Galvan, who spoke in opposition to the proposed settlement.  No other participating retailers asked to speak at the POS Settlement Hearing.

## II.  DISCUSSION

The Court's task in approving the parties' settlement was to ensure that the POS Consent Order "makes due provision for retailers' rights" and adequately accounts for the issues raised by the D.C. Circuit in its decision vacating the POS remedy.  United States v. Philip Morris USA Inc., 436 F. Supp. 3d at 7; see also United States v. Philip Morris USA Inc., 566 F.3d at 1141 (noting that initially retailers "did not receive notice of th[e] remedy or an opportunity to present evidence or arguments to the district court regarding the impact the injunction would have on their businesses," nor did the district court "independently consider[] the impact of th[e] [remedy] on affected retailers," as required by Section 1964(a)).  As this Court has previously stated, if the POS remedy is found to have "an adverse impact on the retailers' rights," the Court must decide whether it is "sufficiently tailored to minimize the impact on the retailers; and [] even if tailored to minimize the impact on the retailers' rights, whether it nevertheless interferes with those rights to such an extent as to make any implementation of the POS remedy improper."  United States v. Philip Morris USA Inc., 436 F. Supp. 3d at 9.

The Court concludes that the POS Consent Order, entered by order of the Court on December 6, 2022, adequately addresses these concerns for four reasons.  First, two trade associations, or "retailer groups," representing over 100,000 retailers participated in negotiating the settlement.  Second, the Court assured that the parties and the retailer groups provided adequate notice of the proposed settlement to all participating retailers impacted by the settlement.  Third, the Court considered all written and oral statements by participating retailers in response to the proposed settlement.  And fourth, the parties revised the proposed consent order in response to questions raised by the Court following the POS Settlement Hearing.  These considerations are addressed in turn.

### A.  Retailer Groups

Two retailer groups – NATO and NACS – played an especially significant role in the success of the POS settlement negotiations through their collaboration with the parties on drafting and approving the terms of the POS Consent Order.  NATO is "a domestic retail trade association with some 65,000+ tobacco stores, convenience stores, gasoline stations, grocery stores, liquor stores and other retailers that sell cigarettes."  NATO Resp. at 1.  And NACS is "an international trade association representing the convenience industry . . . [representing] more than 148,000 convenience stores [in the United States]."  NACS Resp. at 1.

In 2011, after the court of appeals vacated the POS remedy, Judge Kessler required the parties to identify third parties that should be invited to file briefs on the impact of POS displays and invited eight retailer associations to participate in the litigation. See Order #19-Remand [Dkt. No. 5916].  NATO and NACS accepted Judge Kessler's invitation and submitted responsive briefs on this issue.  See NATO Brief Regarding Retailers Affected by the Retail Display Component of the Court's Corrective Statement Remedy [Dkt. No. 5933]; NACS's Submission Concerning Order #1015's Point of Sale Display Requirements [Dkt. No. 5934].

Following vacatur of the evidentiary hearing, NATO and NACS represented that they had "participated in the parties' negotiations regarding the Settlement Agreement and the Consent Order" and had "no objection to the Court entering the proposed Consent Order." NATO Resp. at 1; NACS Resp. at 2.  They stated that "[i]n light of the unique facts and history of the manufacture and sale of cigarettes as well as the particular circumstances of this litigation, the Settlement Agreement and Consent Order fulfill the District Court's responsibilities as described in the D.C. Circuit's decision in United States v. Philip Morris USA Inc., 566

F.3d 1095, 1142 (D.C. Cir. 2009) (per curiam)."  NATO Resp. at 1; NACS Resp. at 2 (same).  At the POS Settlement Hearing, representatives from NATO and NACS reiterated their support for the proposed POS Consent Order and urged the Court to accept the settlement.  These two retailer groups "adequately represent the shared interests and rights of third party retailers for purposes of determining whether an injunction can be crafted under Section 1964(a) 'making due provision for the rights of innocent persons.'"  United States v. Philip Morris USA Inc., 436 F. Supp. 3d at 15 (quoting 18 U.S.C. § 1964(a)).  Their involvement therefore has provided assurance to the Court that the retailers belonging to these retailer groups – over 65,000 retailers for NATO and 148,000 for NACS – were represented at the negotiation table, and that the settlement made "due provision" for their interests.  Id.

### B.  Notice

        In addition to the input from NATO and NACS, the parties and the retailer groups provided notice and an opportunity to comment on the proposed settlement to all participating retailers.  On June 28, 2022, as part of the Court's Procedures Order, the Court ordered that "[t]he manufacturers shall prepare a proposed notice regarding the Proposed Point-of-Sale Consent Order (the 'Proposed Notice') that, when finalized, shall be sent, along with this [Procedures] Order, to all participating retailers . . . in accordance with any applicable provisions in participating retailer contracts and consistent with how the manufacturers regularly communicate with their participating retailers and participating retail locations."  Procedures Order at 2.  The Court further instructed that "[t]he Proposed Notice shall include instructions for how the participating retailers may submit written statements to the Court with their views opposing or supporting the Proposed Point-of-Sale Consent Order, as well as details about how to attend the Point-of-Sale Settlement Hearing."  Id.

On July 12, 2022, following input from the plaintiffs and the Court, the manufacturers filed the Proposed Notice on the public docket.  See Notice of Filing of Final Notice [Dkt. No. 6504]; see also "Final Notice" [Dkt. No. 6504-1].  And on July 15, 2022, the manufacturers confirmed that "on July 15, 2022 the Defendants and Remedies Parties provided copies of the Final Notice (Dkt. No. 6504-1), Order #125-Remand, and the Proposed Point-of-Sale Consent Order to all participating retailers consistent with how the Defendants and Remedies Parties regularly communicate with their participating retailers and participating retail locations."  Notice of Distribution of Notice Regarding Corrective-Statements Remedy at Point of Sale [Dkt. No. 6508] at 1-2.

The Final Notice provided a short summary of the history of the litigation, the POS remedy, and a copy of the POS Consent Order to all participating retailers.  See Final Notice at 1.  The Final Notice further explained that the proposed POS Consent Order would bring the following changes for participating retailers:

- The Manufacturers will be required to display corrective statement signs containing court ordered messages about cigarettes and smoking at the point of sale in all retail locations under contract with one or more of the Manufacturers for a period of 21 months following a posting period.

- The Manufacturers will amend or supplement their agreements to require the retailer to agree to placement of the signs and compliance audits as required by the court order. If a retailer does not want to accept such amendment or supplement for the duration of the display period, the retailer can terminate the agreement pursuant to its terms.

- The amended agreements will include a graduated scale of consequences for repeatedly not complying with the sign placement requirements, beginning with the placement of additional signs, then the loss of promotional funds, and ultimately suspension from the programs for a period of 17 weeks.

- The Manufacturers will not offer new cigarette retail program agreements without these terms for the duration of the display period.

Final Notice at 1.

          The Final Notice also provided instructions on how participating retailers could submit comments both in writing and orally to the Court, either opposing or supporting the settlement.  See Final Notice at 1-2.  Pursuant to the Court's Procedures Order, participating retailers were instructed that "[w]ritten comments and requests to address the court during the hearing" should be submitted to a specific email address that was created exclusively to receive comments regarding the proposed POS Consent Order.  Id. at 2.  Participating retailers were given ten days to submit written comments.  See id.

### C. Submissions from Participating Retailers

          The Court received nine written submissions from participating retailers in advance of the POS Settlement Hearing.  See Retailer Notice at Exs. A-I.[3]  Of the nine submissions, four expressed support for the settlement.  See id. Exs. F-I.  These statements were submitted by the following entities:

- Sheetz, Inc., "a family-owned business which has more than 650 Sheetz store locations throughout Maryland, North Carolina, Ohio, Pennsylvania, Virginia, and West Virginia." Retailer Notice at Ex. F at 2;

---

[3]     Three of the written submissions failed to substantively respond to the terms and conditions of the proposed consent order.  See Retailer Notice at Exs. A, D, E.  The first email was completely blank with the subject line "Sing."  Id. at Ex. A.  The second email contained the subject line "flavored cigar ban," and stated:  "Won't do what it is suppose to do, they use them for marijuana.  And they just made that legal, does NOT discourage Tobacco smoking by any means, to me at least."  Id. at Ex. D.  The third email contained the subject line "New contract," and stated:  "This is eternal vape & tobacco. . . They took me off the contract and the said i was suppose to get a new contract on 7/4/2022 But no one contacted me."  Id. at Ex. E.

- United Pacific, which "operates more than 500 convenience stores in California, Colorado, Oregon, and Washington." Id. at Ex. G at 2;

- Cigaret Shopper Stores, "a 21-store chain of tobacco stores located in the State of Maine." Id. at Ex. H at 2; and

- Blue Ridge Tobacco Stores, which "operate[s] seven tobacco stores with some stores in Virginia and others located in North Carolina." Id. at Ex. I at 2.

These four retailers urged the Court to adopt the settlement and enter the proposed POS Consent Order. One retailer expressed the view that "the new settlement agreement terms are reasonable and [the participating retailer] can comply with the signage display requirements." Retailer Notice at Ex. I at 2. Another stated that it was in support of the settlement "[a]fter understanding where the signs would be hung in our stores and the length of time the signs would be displayed." Id. at Ex. H at 2. The Court considered these submissions in determining that the POS Consent Order made "due provision for retailers' rights." United States v. Philip Morris USA Inc., 436 F. Supp. 3d at 7.

The Court also received two submissions from participating retailers who opposed the settlement. See Retailer Notice at Exs. B-C. The first submission was from Scott A. Sadownikow, a "Managing Member" at Wisconsin Convenience Store Management, LLC. See id. at Ex. B. Mr. Sadownikow raised three points in opposition to the settlement. First, he stated that he did not receive timely communication of the settlement, and asserted that "[i]f [the manufacturers] were unable to follow the first steps of the settlement, who will be there to 'police' them for the remainder of the journey?" Id. Second, Mr. Sadownikow expressed his fear that "this court order will only expand the cigarette manufacturer's power over the retailers," explaining that "[s]ingle store/independent retailers currently have zero power when attempting to negotiate with the large tobacco manufacturers." Id. And third, he argued that the POS

remedy would exacerbate his frustration that the manufacturers use his shelf space for

advertising and marketing, stating that "[t]his is my shelf space that will be utilized."  Id.

The second objection was submitted by John Galvan, a "Category Manager" at

Hutchinson Oil Company / Hutch's C-Store.  See Retailer Notice at Ex. C.[4]  Mr. Galvan's

submission in advance of the hearing stated:

> I do have one issue with the order and that will be the placement of
> the sign. We strive to keep a "clean" look in our stores, no window
> signs, no hanging signs and no outdoor advertising. I would
> suggest that the Tobacco companies are forced to use their retail
> space to place the signs. Two of these manufacturers control the
> tobacco sets and freely place signs in their "contracted" space. I
> would suggest having the sign placed in either the "header"
> location or on one of the flip signs in the product area. Our stores
> should not have to clutter ourselves up to satisfy judgements
> against these companies.

Retailer Notice at Ex. C.  Mr. Galvan reiterated these concerns orally at the POS Settlement

Hearing, during which he focused his presentation on the requirement that signs must be placed

in the areas surrounding the cigarette Merchandising Set (the "tobacco set").[5]  He argued that the

requirement that the signs be hung outside the tobacco set – as opposed to within the tobacco set

where manufacturers place their advertisements – would impede the views of consumers and

employees in the store.  He advocated for the signs being placed in the "headers" of the tobacco

---

[4]      At the POS Settlement Hearing, Mr. Galvan explained that Hutchinson Oil
Company is a medium-size chain with twenty-one stores in western Oklahoma.

[5]      The POS Consent Order defines a "Merchandising Set" as "any rack, shelving,
display, or fixture at a Store, including any canopy or header, used in whole or in part to
merchandise one or more Covered Brands of cigarettes that are visible to customers."  POS
Consent Order at ¶ S.  The consent order requires participating retailers (other than Kiosk Stores)
"to post a 348-square-inch POS Corrective-Statement Sign that is attached to and above, or hung
above, the main cigarette Merchandising Set in the store. . . If that placement is not possible
given the existing placement of the cigarette Merchandising Set in a particular store, the sign
may be placed in one of several alternative, highly visible locations."  Settlement Mot. at 3.

sets or on a "flip sign" in the product area.  Counsel for the manufacturers and for the government responded to these concerns and this suggestion at the POS Settlement Hearing.

After the POS Settlement Hearing, the Court received two additional emails from Mr. Galvan.  See Retailer Notice at Exs. J-K.  The first email thanked the Court for allowing him to speak at the POS Settlement Hearing and stated that "everything the Tobacco Companies said about the cigarette sets, headers and flip signs is not factual."  Id. at Ex. J.  The second email reiterated Mr. Galvan's position that the POS signs should be placed in headers or flip signs in the tobacco sets, not on top of the tobacco sets.  See id. at Ex. K.  Mr. Galvan also enclosed a photograph of the "Plan O Gram" in his store to illustrate sections of the tobacco set display mentioned in his objection.  See id.

The Court has carefully considered the objections raised by Mr. Sadownikow and Mr. Galvan and concludes that none of their arguments merit modification or rejection of the POS Consent Order.  To start, the Court does not believe that these two objectors sufficiently demonstrate that the POS remedy will have "an adverse impact on the retailers' rights."  United States v. Philip Morris USA Inc., 436 F. Supp. 3d at 9.  To the contrary, the vast majority of participating retailers provided no comment, and the submissions the Court did receive from participating retailers weigh in favor of entering the POS Consent Order.  Counsel for the manufacturers represented at the POS Settlement Hearing that the manufacturers provided notice of the settlement and a copy of the proposed POS Consent Order to hundreds of thousands of retailer locations.  NATO and NACS also separately sent notice to their entire membership lists. Out of the hundreds of thousands of retailers that were notified, only two objected to the settlement, a miniscule number.

Furthermore, the POS Consent Order is "sufficiently tailored" and does not "interfere[] with [retailers'] rights to such an extent as to make any implementation of the POS remedy improper."  United States v. Philip Morris USA Inc., 436 F. Supp. 3d at 9.  First, with regard to Mr. Sadownikow, the Court believes that Mr. Sadownikow's comments essentially amount to a rejection of the POS remedy at large, not an objection to the terms of the settlement. As this Court has already noted, "the Court's task is not to determine whether the POS remedy . . . is an appropriate remedy under Section 1964(a). . . The only question [] is whether this Court can craft a new proposal to implement the POS remedy that makes due provision for retailers' rights."  United States v. Philip Morris USA Inc., 436 F. Supp. 3d at 7.  Mr. Sadownikow's comments therefore are inapposite.

Second, with regard to Mr. Galvan, the Court does not believe that requiring retailers to position the POS signs above the tobacco sets "interferes with [retailers'] rights to such an extent as to make any implementation of the POS remedy improper."  United States v. Philip Morris USA Inc., 436 F. Supp. 3d at 9.  Moreover, Mr. Galvan fails to provide a workable alternative to the terms laid out in the POS Consent Order.  In fact, both counsel for the government and the manufacturers explained at the POS Settlement Hearing the reasons why flip signs and headers were considered and rejected as a part of the POS remedy.  Counsel for the government stated that the parties intentionally steered away from flip signs because several retailers expressed opposition to them, citing safety concerns and potential issues with flip signs breaking and/or needing maintenance.  Although the Court understands Mr. Galvan's frustration that retail "stores should not have to clutter [themselves] up to satisfy judgements against these companies," the parties persuasively articulated why the terms in the POS Consent Order are the most workable solution for implementing the POS remedy.  Retailer Notice at Ex. C.  Neither

Mr. Galvan's nor Mr. Sadownikow's objections persuaded the Court to reject the POS

Consent Order.

### D.  Questions Raised by the Court

The Court's final consideration relates to revisions made to the POS Consent

Order in response to questions raised by the Court at and after the POS Settlement Hearing.  On

August 18, 2022, after carefully reviewing certain provisions of the proposed consent order and

having interviewed Judge Richard Levie and Ms. Linda Singer as proposed candidates for

appointment as Adjudicator of the Working Group, the Court raised several questions with the

parties via email.  See Notice [Dkt. No. 6515].  These questions pertained specifically to the

roles of various individuals in and working with the Working Group.[6]  The parties responded to

---

[6]    The POS Consent Order includes the following relevant definitions:

- "Working Group" means a group consisting of ten individuals: three individuals appointed by the Department of Justice, two individuals appointed by the Public Health Intervenors, one individual appointed by each of (i) Altria Group, Inc., or Philip Morris USA Inc.  (ii) R.J. Reynolds Tobacco Company and (iii) ITG Brands, LLC, and one individual appointed by each of the two Retailer Groups.

- "Adjudicator" means a third-party engaged to expeditiously hear appeals from (i) Working Group decisions on Noncompliance Appeals in the circumstances provided in Section V. 7, below; and (ii) tie breaking decisions of the Mediator. The Adjudicator's costs and fees shall be paid for by Manufacturers.

- "Mediator" – a role added at the urging of the Court after the POS Settlement Hearing – means a third-party engaged to assist in expeditiously resolving disputes of the Working Group and to cast a tie breaking vote in the event of a tie of the Working Group.  The Mediator's costs and fees shall be paid for by Manufacturers.

POS Consent Order at ¶¶ ZZ, B, R.

the Court's questions on September 12, 2022.  See Joint Response to August 31, 2022 Notice

(D.N. 6515) [Dkt. No. 6516].

        Following receipt of the parties' responses, the Court had further discussions with

Judge Levie and Ms. Singer, resulting in additional email correspondence with the parties and a

status conference "to discuss the status of the [Settlement Motion] and potential amendments to

the pending motion."  Minute Order (Nov. 22, 2022).  At the November 30, 2022 status

conference, the Court summarized the status of the pending Settlement Motion and read into the

record an email sent by the Court to counsel on October 28, 2022.  The email stated that

> [the undersigned] has concluded that he will appoint Judge Levie
> as the Adjudicator and Ms. Singer as the Mediator/Facilitator for
> the Working Group, with the understanding that they may, when
> circumstances necessitate, fill in for one another at a given
> time.  As the Mediator, Ms. Singer will attend Working Group
> meetings to facilitate discussion and, when necessary, to break tie
> votes.  It is agreed that it is important to have the Mediator at
> Working Group sessions to facilitate informal resolution of issues
> when possible.  Like all decisions of the Working Group, any
> tiebreaks decided by Ms. Singer will be appealable to Judge Levie
> as the Adjudicator.  And to the extent a law clerk or some other
> individual is needed to aid with Noncompliance Appeals, Ms.
> Singer and Judge Levie have agreed to hire just one individual.

Email from the Court's Chambers to Counsel (Oct. 28, 2022).  The parties represented that they

were in the process of finalizing a revised consent order to account for the Court's appointment

of both Judge Levie as Adjudicator and Ms. Singer as Mediator.

        On December 2, 2022, the parties filed a revised consent order.  See Proposed

Fourth Superseding Consent Order Implementing the Corrective-Statements Remedy at Point of

Sale [Dkt. No. 6520].  The revised version accounted for the issues raised by the Court in its

questions to counsel and alleviated any concerns the Court may have had about the function of

the Adjudicator, the need for a Mediator, and the role of the Working Group.  The Court entered

the POS Consent Order on December 6, 2022, resolving decades of litigation and the last

remaining piece of Judge Kessler's historic remedial order.

                    SO ORDERED.


_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  January 19, 2023